IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ANGELA MCCULLOUGH, MARQUITA JOHNSON, KENNY JONES, ALGI EDWARDS, LEVON AGEE, ADRIAN EDDIE FLOYD, HASSAN CALDWELL, DEVRON JAMES, ASHELY DAWN SCOTT, AND CHRISTOPHER MOONEY, ON BEHALF OF THEMSELVES, INDIVIDUALLY, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED, | RECEIVED<br><br>JUL - 1 2015<br><br>CLERK<br>U.S. DISTRICT COURT<br>MIDDLE DIST. OF ALA. |
| **Plaintiffs,** | |
| **VS.** | CASE NO. 2:15-CV-463 |
| THE CITY OF MONTGOMERY, ALABAMA; ERNEST N. FINLEY, JR., CHIEF OF POLICE OF THE CITY OF MONTGOMERY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES;   KEVIN MURPHY, FORMER CHIEF OF POLICE OF THE CITY OF MONTGOMERY, IN HIS INDIVIDUAL CAPACITY; LES HAYES, III, PRESIDING JUDGE OFTHE MUNICIPAL COURT OF THE CITY OF MONTGOMERY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; And JUDICIAL CORRECTIONS SERVICES, INC. (JCS) | |
| **Defendants.** | **JURY TRIAL DEMANDED**<br>**CLASS ACTION COMPLAINT** |

**COMPLAINT**

### INTRODUCTION

1. "Punishing a person for his poverty"[1] by arresting and incarcerating individuals such as Plaintiffs because of their inability to pay any court-ordered monies, including fines, fees, costs, restitution, surcharges or bonds, violates long-established federal constitutional principles of equal protection and due process as well as other state[2] and federal laws.

2. Plaintiffs are indigent individuals who have been subjected to a modern day "debtors' prison"[3] scheme designed to increase municipal budgets through policies and practices, including but not limited to, the targeted stops and arrest of, the extortionate imposition and collection of fines, fees, costs, restitution and surcharges and bail or bond charges on, and the use of coerced labor from, poor and predominately minority residents. This scheme composed of policies, practices and customs has been operated by the Defendants City of Montgomery, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, Presiding Municipal Court Judge Les Hayes, III, and Judicial Corrections Services, Inc. (JCS). Plaintiffs allege that all Defendants have acted under color of state law and as state actors in pursuing a pervasive intentional and deliberate scheme of acts and omissions

---

[1] Bearden v. Georgia, 461 U.S. 660, 671 (1983).
[2] Rule 26.11(i)(2) of the Alabama Rules of Criminal Procedure provides:
   2) In no case shall an indigent defendant be incarcerated for inability to pay a fine or court costs or restitution.
[3] Judge Hub Harrington of the Shelby County Circuit Court found that a similar scheme operated by the City of Harpersville, Alabama and JCS could reasonably be characterized as the operation of a "debtors' prison," though these had generally fallen into disfavor by the early 1800's. He lamented that "a judicially sanctioned extortion racket" might be a more apt description of the practices. Burdette v. Town of Harpersville, Civil Action No.: CV 2010-900183 (Order of July 11, 2012).

2

through systemic and related policies, practices and customs that separately and taken together, violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the Fourth, Sixth, and Thirteenth Amendments (and related anti-peonage laws), Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act (RICO), as well as constitute false imprisonment, abuse of process, and support a claim for money had and received under Alabama law.

3. Plaintiffs bring this case individually and as representatives of a proposed class and subclasses of similarly situated individuals who have been or will be similarly injured. They seek compensatory, punitive and treble damages, as available, as well as declaratory and injunctive relief, as appropriate, to redress the personal injuries (including humiliation, anxiety, stress, emotional distress, and other injuries) they have suffered, or face a real and imminent threat of suffering, as the direct and proximate result of the Defendants' challenged policies, practices and customs.

4. The City of Montgomery and Presiding Judge Les Hayes, III have entered into settlement agreements with the parties in three prior related cases in this Court challenging some, but not all, aspects of the scheme that Plaintiffs challenge in this case. (Case Nos. 2:13-cv-732-MHT, 2:13-cv-733-MHT, Consolidated, and Case No. 2:14-cv-186-MHT.) On May 1, 2014, a preliminary injunction was entered in Case No. 2:14-cv-186 based on a finding that plaintiffs there were likely to succeed on the merits.

5. On November 17, 2014, the parties' joint motion for entry of an agreed settlement order in consolidated Case Nos. 2:13-cv-732 and 2:13-cv-733 was granted and an opinion and judgment entered that included the following declaration:

> The court declares that, under the current status of the law, the constitutional principles set out in Bearden v. Georgia, 461 U.S. 660 (1983), regarding incarceration for non-payment, and Turner v. Rogers, ___ U.S. ___, 131 S.Ct. 2507 (2011), regarding notice, apply in municipal-court proceedings and that, to the extent applicable[4] in a particular case, the judges of the Montgomery Municipal Court are legally required to follow them.[5]

6. In Case No. 2:14-cv-186, the City of Montgomery and Presiding Judge Hayes were parties to a settlement agreement in which they denied any liability but whereby Judges of the Municipal Court of the City of Montgomery agreed to certain changes in court policies and practices (for periods ranging from 180 days to three years). For example, the Judges agreed "not to hire, contract with, or otherwise use any private probation company (or any other company profiting from offering payment

---

[4] The Court added a footnote to its opinion clarifying that, "[t]his court reads the "extent applicable" phrase to mean only that municipal judges are bound by these Supreme Court cases whenever an issue before the municipal court implicates them rather than implying exceptions for municipal judges in certain cases."

[5] The judgment also included the following two declarations:

> The court declares that the "Judicial Procedures of the Municipal Court of the City of Montgomery for Indigent Defendants and Nonpayment," submitted as Exhibit A to the joint motion for entry of agreed settlement order (ex. A to doc. no. 56), facially comply with the constitutional principles set out in *Bearden,* regarding incarceration for non-payment, and *Turner,* regarding notice.

> The court declares that these "Judicial Procedures of the Municipal Court of the City of Montgomery for Indigent Defendants and Nonpayment" facially comply with the requirements of the Fourteenth and Sixth Amendments to the U.S. Constitution, Article I, §§ 1, 6, and 22 of the Alabama Constitution, and Rule 26.11 of the Alabama Rules of Criminal Procedure.

plans relating to unpaid court fines, costs, and restitution) for a period of not less than three years following the execution of this Agreement," (Par. 8.)[6] and " [t]o comply with the provisions set out in the Judicial Procedures, attached hereto as Appendix 1, for a period of not less than three years following the execution of this Agreement." (Para. 9).[7]

7.  As part of the settlement in Case No. 2:14-cv-186, the parties stipulated to the dismissal of all class action aspects of that case. On information and belief, the individual plaintiffs in these prior cases have reached agreements with the defendants therein on any personal damage claims.

8.  None of the Plaintiffs in this lawsuit or the members of the class and subclasses they seek to represent have received any compensation from any of the Defendants' for the injuries they and their families have suffered as a direct and proximate result of the challenged policies, practices or customs of the Defendants. Some had been led to believe that their injuries would be redressed through the class action claims

---

[6] Defendants City of Montgomery and Presiding Judge Hayes no longer contract with JCS; the contract for probation services terminated or was not renewed in the summer of 2014. Several other cities have also terminated their contracts with JCS. On June 16, 20015, The City of Clanton entered a settlement to claims that its probation contract with JCS violated state law requiring public bids for contracts and JCS's fees were unauthorized by state law by ending its JCS contract, and thereafter, on June 17, 2015,  the Southern Poverty Law Center sent letters to nearly 100 other cities advising them of the illegality of these contracts with JCS under state and federal law.

[7] On April 2, 2015, Plaintiffs in Case No. 2:14-cv-186 filed a Notice of Willful Violation of Court Order calling the Court's attention to allegations that  one Municipal Judge's assessing summary fines of $50 against numerous individual for arriving late and jailing at least two who could not immediately pay the $50. On April 7, 2015, the Court entered an order that it would not take any further action regarding these allegations, based on the defendants' representations on the record that they had taken corrective action.

in Case No. 2:14-cv-186 and have been surprised to learn that all class action claims were dismissed as part of the settlement agreement of that case. [8]

9.  Plaintiffs have no desire to unnecessarily add to the caseload of this court. But, given the magnitude of the wrongs that Defendants have committed against the indigent Plaintiffs and others similarly situated, the court-entered agreements in these three prior cases are insufficient to redress their injuries or afford justice to them. Class action treatment is the only way to bring justice for all those injured by the policies, practices and customs challenged in this lawsuit. Without the notice and other procedural protections a class action affords most of the indigent class members may never even learn of their rights to seek redress for their injuries.

10. As indigent individuals, Plaintiffs certainly are no less deserving of such treatment than consumers or patients injured by illegal practices or devices, who are routinely allowed to pursue their claims as class actions. There must not be a different system of justice for the poor.

## Jurisdiction

11. This lawsuit includes civil rights claims under 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq.*; 18 U.S.C. §§ 1581 (peonage), 1589 (forced labor under threat of physical restraint or abuse of process), 1593A (benefitting from peonage) and 1595 (civil remedy); 18 U.S.C. §1964 (RICO); the Fourth, Sixth, Thirteenth, and Fourteenth Amendments to the United States

---

[8] To the extent relevant for purposes of determining statutes of limitations or for any other relevant purposes, the named Plaintiffs give notice that in filing this lawsuit they seek to bring their personal damage claims as individual claims as well as seeking to pursue this case as a proposed class action.

Constitution; 28 U.S.C. §§ 2201 and 2202; and state law claims of false imprisonment under Ala. Code § 6-5-170, abuse of process, and for money had and received.

12. This Court has jurisdiction over the federal law claims raised in this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343 and 18 U.S.C §1964. The Court has supplemental jurisdiction over the state law causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

## Venue

13. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 and 18 U.S. C. §1965.

## Parties

### A. Plaintiffs

14. Plaintiff Angela McCullough is a 40 year-old African American woman who is a resident of Montgomery, Alabama.

15. Plaintiff Marquita Johnson is a 31 year-old African American woman who is a resident of Montgomery, Alabama.

16. Plaintiff Kenny Jones is a 39 year-old African American man who is a resident of Montgomery, Alabama.

17. Plaintiff Algi Edwards is a 28 year-old African American man who is a resident of Montgomery, Alabama.

18. Plaintiff Levon Agee is a 33 year-old African American man who is a resident of Montgomery, Alabama.

19. Plaintiff Adrian Eddie Floyd is a 46 year-old African American man who is a resident of Montgomery, Alabama.

20. Plaintiff Hassan Caldwell is a 20 year-old African American man who is a resident of Montgomery, Alabama.

21. Plaintiff Devron James is a 36 year-old African American man who is a homeless resident of Montgomery, Alabama.

22. Plaintiff Ashley Dawn Scott is a 26 year-old indigent Caucasian female who is a resident of Montgomery Alabama.

23. Plaintiff Christopher Mooney is a 37 year-old African American man who is a resident of Montgomery, Alabama.

**B. Defendants**

24. Defendant City of Montgomery, Alabama is a municipal corporation that operates the Montgomery Police Department and the Municipal Jail, and that is extensively engaged in many aspects of the operation, including contracting for services, of the Municipal Court of the City of Montgomery.

25. Defendant Ernest N. Finley, Jr. is Chief of Police of the City of Montgomery, Alabama and a final policymaker for the City and the Police Department concerning policies, practices and customs challenged in this lawsuit. He is sued in his individual and official capacities.

26. Defendant Kevin Murphy, is the former Chief of Police of the City of Montgomery and was a final policymaker for the City and the Police Department concerning policies, practices and customs challenged in this lawsuit. He is sued in his

8

individual capacity for his official acts and omissions during his service as Chief of Police.

27. Defendant Les Hayes, III, is the Presiding Judge of the Municipal Court of the City of Montgomery and a final policymaker for the City of Montgomery and the Municipal Court of the City of Montgomery concerning policies, practices and customs challenged in this lawsuit. His administrative and executive responsibilities have included responsibility for the day-to-day execution of the City of Montgomery's contract with JCS, as well as establishing and executing policies and practices on, and training, directing, and supervising Municipal Court judges on, among other things, the system of collection of fines, fees, costs and surcharges and the protection of probationers' rights, including policies, practices and customs of failure to advise them of their rights. Presiding Judge Hayes is sued in his official capacity and also is sued individually for his actions and omissions taken in his executive and administrative capacity.

28. Defendant Judicial Correction Services, Incorporated, is a Delaware corporation that provided "probation" collection services under contract with the City of Montgomery on behalf of the Municipal Court, from at least as early as July 1, 2010 until the summer of 2014. JCS maintained an office in the Municipal Court and a collection center in another location in the City, and was a person acting under the color of state law and a state actor for purposes of liability under 42 U.S.C. § 1983.

29. Each Defendant acted as a state actor and under color of state law in undertaking the acts or omissions set forth herein as violations of 42 U.S.C. § 1983 and these acts or omissions can fairly be attributed to the City of Montgomery (as well as to

Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, Presiding Judge Hayes and JCS) entitling Plaintiffs to compensatory damages against the City of Montgomery under 42 U.S.C. § 1983. Each Defendant constitutes a "policymaker" with respect to the policies, practices, and customs challenged in this lawsuit. In adopting and in executing the policies, practices, and customs challenged in this lawsuit, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, Presiding Judge Hayes, and JCS acted with actual malice and reckless indifference to Plaintiffs' clearly established rights entitling Plaintiffs to compensatory damages and punitive damages under 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

### A. GENERAL ALLEGATIONS

30. For many years, the City of Montgomery and its Police Department through the acts and omissions of its Chiefs of Police have adopted and pursued customs, policies or practices of establishing roadblocks or other checkpoints or of making other stops in or near areas with high percentages of low-income African American or minority residents, including near predominately African American churches on Sundays, as means of arresting the targeted residents of these areas for traffic tickets or other minor offenses, or simply to provide an opportunity for running warrant checks for past due charges stemming from prior similar charges. Multiple charges are "stacked" to result in high fines, fees, court costs and surcharges, sometimes amounting to thousands of dollars that indigent individuals are unable to pay. Under the Municipal Court's currently posted fines schedule,[9] uniform court costs of $155

---

[9]< http://www.montgomeryal.gov/home/showdocument?id=290>.

are added to all fines, even those for as little as $10 (e.g., failure to dim lights or improper muffler) or $20 (e.g., expired license or expired tag). For delinquent fines of these amounts with an alias warrant issued the total amounts due rise to $207 and $295, respectively.

31. Individuals stopped and arrested have not been informed either on arrest or at the City Jail of their rights to avoid incarceration for their debts to the City or of their their rights to indigency hearings, counsel, or waivers or reductions of fixed pre-trial release bonds or appellate bonds.

32. The City of Montgomery uses monies collected from municipal fines, court costs, and fees to help finance the City's budget. The City of Montgomery 2013 year end budget reflects $15.9 million as the gross income from fines and forfeitures. The 2013 Municipal Court Survey for the City o Montgomery Municipal Court lists 86,161 filed cases in the category of Non-DUI traffic cases ("Other Traffic"), along with 87,596 such cases disposed of, and only 37 appeals. By comparison, in its 2013 Municipal Court Annual Survey, the City of Huntsville lists 27,889 Non-DUI traffic cases file, 7251 disposed of, and 1249 appealed. In 2013, the City of Montgomery (2013 estimated Census population of 201,846) raised more than three times as much money as Huntsville (2013 estimated Census population of 186,309) from fines and more than 15 times as much money from local court costs.

33. The City of Montgomery is systemically and pervasively involved in and responsible for the operation of the City police department, jail and the Municipal Court. The City is not required to have a Municipal Court but has chosen to do so and cannot escape responsibility for its acts and omissions in the operation and

administration of the court (as opposed to any involvement in or responsibility for judges' decisions about how to resolve disputed issues in individual cases). Indeed the City issues regulations that govern the operation of the Municipal Court. One entire chapter of the Code of Ordinances of the City of Montgomery, Alabama is devoted to the operation of the Municipal Court.[10] In addition to adopting these written policies, the City is responsible for the unwritten custom, policies, and customs challenged in this case.

34. The City of Montgomery and Presiding Judge Hayes have developed and pursued related policies, practices or customs of denying release on bail of indigent individuals who are unable to pay pre-fixed bail or bonds, and of ordering those unable to pay in full debts owed to the City from fines, fees, costs, restitution or surcharges for traffic tickets and other minor offenses (including fines for being late for court appearances) to be incarcerated until they "sit out" or paid off their debts to the City at a rate of $50 per day. The docket entries "Fines or Days" and/or "commuted" were often used to indicate the stark "choice" afforded the indigent debtors.

---

[10] Chapter 17 of the Code of Ordinances of Montgomery, Alabama covers: Sec. 17-1. - Jurisdiction; Sec. 17-2. - Municipal judge generally; Sec. 17-3. - Selection of judges; Sec. 17-4. - Compensation of municipal judge; Sec. 17-5. - Appointment and duties of clerk; Sec. 17-6. - Appointment and duties of prosecuting attorney; Sec. 17-7. - Time and place of holding court; Sec. 17-8. - Execution of warrants and processes for service; Sec. 17-9. - Cases to be tried without jury; Sec. 17-10. - Judicial notice of ordinances; Sec. 17-11. - When and how prosecutions commenced; Sec. 17-12. - Officers empowered to administer oaths and issue warrants; Sec. 17-13. - When warrant to be issued; Sec. 17-14. - Authority of municipal judge; Sec. 17-15. - Acceptance of defendant's bond; Sec. 17-16. - Suspension of sentence; probation; Sec. 17-17. - Warrants; Sec. 17-18. - Court costs; Sec. 17-19. - Fine schedules. modified; Sec. 17-20. - Powers of mayor; Sec. 17-21. - Prosecutions of corporations; Sec. 17-22. - Appeals.

35. Indigent debtors were further faced with a coercive promised reduction of their debts by an additional $25 per day if they performed onerous and sometimes dangerous janitorial and other work within the jail, the Montgomery Municipal Court, or other city buildings. Record-keeping for time worked was poor and inmates did not even receive full credit due them for the jobs they performed.

36. While incarcerated, Plaintiffs were allowed only extremely limited visitation time with their families; frequently were subjected to the loss of jobs, homes or other property, and the pursuit of education; they and their families were forced to borrow or otherwise come up with money they needed for vital necessities to pay bonds or debts to avoid imprisonment; they incurred additional debts to family or friends who came to their aid; and they otherwise suffered humiliation, emotional and mental distress, and other injuries.

37. During much of the time relevant to the claims in this case, the City of Montgomery, Presiding Judge Hayes and Judicial Correction Services, Incorporated ("JCS"), a for-profit "probation" company that the City of Montgomery contracted with on behalf of the Municipal Court, developed, adopted and administered a policy of collecting payments of fines and fees through placing individuals under "probation" supervision by JCS for the purpose of collecting fines, fees, costs, restitution and surcharges. Individuals placed on probation with JCS were required to pay monthly installments (plus a $10 set-up fee and $40 monthly probation fees to JCS). Those unable to pay monthly installments and fees in full were continuously threatened with and/or subjected to probation revocation and incarceration for their debts where they would be forced to "sit out" and/or "work

13

off" their debts. JCS failed to notify indigent individuals of their rights to file affidavits of hardship or to seek waivers of JCS fees and failed to advise them that failure to pay because of indigency could be raised in any probation revocation hearing as a grounds that would prevent their incarceration for debts. In many instances, indigent individuals were placed on probation with JCS more than once and more than once, JCS threatened to and/or did participate in bringing probation revocation hearings for individuals knowing they would be ordered to again serve time in the Montgomery City Jail sitting out their debts at the rate of $50 per day, with a further $25 per day reduction for performing jail labor. Individuals sometimes were released from incarceration with some of their debt remaining after reduction for "sitting" in jail and/or "jail labor" and again placed on a payment plan under the supervision of JCS, only to again be threatened with or subjected to probation revocation and reincarceration under these conditions.

38. More specifically, at least since July 1, 2010,[11] the City of Montgomery, the City's Municipal Court and JCS entered into a one-year contract that was automatically renewed annually until summer 2014, for JCS to provide probation services to the City and the City Court. In this contract the City agrees that it is authorized to enter the contract for probation supervision and related services "for the benefit of the City and the Court." Under the terms of the agreement the parties agreed that JCS would supervise indigent cases and they further agreed that, "[t]hese cases will not be charged the standard probation fee, but will be offered all JCS services." The

---

[11] One redacted copy of a probationer's General Conditions of Probation agreement with JCS and the Municipal Court is dated May 27, 2010, suggesting an earlier agreement as well.

agreement also stated that "JCS" shall comply with all provisions of state and federal law."

39. JCS agreed not to invoice the City or the Court for its services and in consideration of the probation services provided by JCS, the Court agreed that:

"[E]ach Court Order shall provide for the following:

1. Probation fee of 40 per month flat fee (Basic or intensive supervision)

2. One time probationer set-up fee of $10.00. . . .

40. Individuals placed on probation under the supervision of JCS were required to sign a form bearing what appears to be an official governmental seal containing the words Judicial Correctional Services, Inc. underneath which appear the following headings "Judicial Correctional Services, Inc. Municipal Court of Montgomery, AL General Conditions of Probation." In this form probationers, were required to recognize having been "granted the privilege" of serving on probation, and were further required to agree to pay the $10 set-up fee, the $40 monthly probation fee and a minimum monthly payment of $140 per month. They also had to agree that they "understand that there are NO excuses for missing my scheduled appointment." The form also required "probationers" to sign acknowledgments stating:: "I understand that if I fail to meet my monthly obligation as I have agreed to above, I may have to meet with my probation officer more than once a month. I further understand that if I fail to abide by these conditions of probation that I may be returned before the court for a hearing or a warrant may be issued or my arrest." At no place on this form are probationers told of any of their rights under state or federal law to indigency/ability to pay hearings or of their right to counsel at such

15

hearings, and they are not informed that JCS is prohibited from charging its probation fees to indigent probationers.

41. JCS "Probation Officers" routinely signed Municipal Court "Notice to Show Cause" forms that instruct probationers to appear in court for failure to pay and notify them that a warrant will be issued for their arrest if they fail to appear. The JCS-issued Notice to Show Cause also informs the probationer that they have failed to report and that in order to dismiss the court date they not only must report to their next scheduled appointment but also an amount they must pay to JCS (e.g., $1417) to rescind the scheduled hearing. The Certificate of Service on the Notice to Show Cause From indicates that the forms were sent to the probationer by regular U.S. mail.

42. The City of Montgomery's conduct of entering into the above-described contract with JCS on behalf of the City and the Court was a moving force behind the probation payments and conditions, probation revocations, and incarcerations in Plaintiffs' cases and the acts by employees of JCS and the Municipal Court can be fairly attributed to the City.

43. Defendants City of Montgomery, Presiding Judge Hayes and JCS systemically and repeatedly failed to advise Plaintiffs of any of their constitutional, federal or state law, or contractual rights, including rights to seek waivers or reductions of bail, bonds or fees, not to be imprisoned for inability to pay bail, bonds or debt, to receive meaningful pre-privation hearings, and to be afforded representation by counsel.

44. The City of Montgomery has admitted elsewhere that hundreds of Montgomery residents have been jailed for non-payment of fees. Indeed the figure likely reaches

into the thousands. The Defendants' policies, practices, and customs challenged here have created a climate of fear among Montgomery's indigent population and in its predominately minority neighborhoods.

45. Defendants City of Montgomery, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, Presiding Judge Hayes and JCS have been deliberately indifferent to the obvious need to train police, jail employees, judges and other court employees with respect to the constitutional and statutory rights of those subject to police stops, and those unable to pay fines, fees, costs, surcharges or bonds and previously have failed to adopt policies requiring such training and failed to provide such training. These policies of failure to train have caused the deprivation of Plaintiffs' rights under 42 U.S.C. §1983.

## B. INDIVIDUAL PLAINTIFF EXPERIENCES

### Plaintiff Angela McCullough

46. Plaintiff Angela McCullough is a 40 year-old indigent African American woman who is the mother of four children: an 8 year old son, a 13 year-old girl, a 24 year-old son, and a 26 year-old son who is Psycho Schizophrenic.

47. On or about July 3, 2013, Plaintiff McCullough was arrested and jailed by the City of Montgomery for 19 days for unpaid tickets, fine, and related costs. At the time she was a student at Faulkner University with a 3.87 GPA. Plaintiff McCullough was forced to quit college and to use the student refund she received to pay the tickets. She has not been able to go back to college.

48. On or about November 27, 2009, Plaintiff McCulloch was arrested because she could not make the required payments and probation fees to Judicial Correction

Services for debts owed the City of Montgomery from traffic tickets. JCS told Plaintiff McCullough that she had to either pay the tickets or go to jail. Plaintiff McCullough could not pay and was locked up for 66 days. She was released on or about February 2, 2010.

49. While in jail, Plaintiff McCullough performed labor to help work off her unpaid tickets. While incarcerated she was made to watch a white female inmate who was known to have Hepatitis C. Plaintiff McCullough was sent to the "drunk tank" where the white female with Hepatitis C had slit her wrist with what appeared to be a rose crack pipe. Plaintiff McCullough was made to watch the white female inmate on "suicide watch" for about 2 hours in which the inmate again slit her other wrist. Plaintiff McCullough was then made to clean up the blood after the guards threw Clorox or bleach on the floor. She has also been made to clean feces in cells during her incarceration..

50. Plaintiff McCullough lost her job because of her incarceration. Her mentally disabled son was very agitated while institutionalized during her incarceration because he could not speak to her nor see her as he regularly did.

51. During all the events described above, at no time was Plaintiff Angela McCullough ever informed by the City, any city official or employee or JCS or any employee of JCS of any of her rights under the 4th, 6th, 13th, and 14th Amendments, including her rights not to be jailed for inability to pay debts and rights to counsel and pre-deprivation hearings.

52. Plaintiff McCullough has continued to be stopped by Montgomery Police and she believes that she is being targeted and profiled because of her race and poverty.

**Plaintiff Marquita Johnson**

53. Plaintiff Marquita Shauron Johnson is a 31 year-old indigent homeless African American woman and a mother of four children: an 11 year-old girl, a 5 year-old girl, a 4 year-old girl, and a 1 year-old boy. One of her children has a speech impediment and another has been diagnosed with ADHD.

54. On or about April 24, 2012 Plaintiff Johnson was arrested for a Probation Revocation hearing. She had been on probation under the supervision of JCS and her probation revocation was for failure to pay JCS weekly payments and probation fees on tickets owed to the City of Montgomery. Plaintiff Johnson had lost her job which caused her to be unable to pay JCS.

55. At the probation revocation hearing Judge Hayes did not make any inquiry into Plaintiff Johnson's ability to pay or into any alternatives to imprisonment and did not appoint an attorney to represent her at the hearing. Judge Hayes ordered Plaintiff Johnson to serve 494 in jail or pay $12,410.00, and she was taken back to jail to begin serving her time.

56. Prior to her jailing by Judge Hayes, Judge Knight had thrown out all of her No Insurance tickets because she brought proof of insurance. Judge Hayes placed the No Insurance charges back on the Plaintiff Johnson's record.

57. Judge Hayes said Plaintiff Johnson could be released on making a $5000 cash payment and this notation was entered on her docket records. Plaintiff Johnson's family hired an attorney and brought the money within a week's time to Judge Hayes in court. Judge Hayes refused to accept the $5000 payment and he told the family that he did not want to see them or Plaintiff Marquita Johnson.

58. Plaintiff Johnson remained in the Montgomery Municipal Jail for approximately 9 months. She was released from jail on or about January 28, 2013.

59. Plaintiff Johnson was informed of alternative ways to perform jail labor to "work off" her debt. Plaintiff performed the following "jobs" to "work off" debt while incarnated:

   a. Washed police cars;

   b. Worked in Jail Laundry;

   c. Cooked in the kitchen;

   d. Swept jailed;

   e. Washed lockers; and

   f. Cleaned courtrooms

60. Plaintiff Johnson's work was not recorded daily by the jailer which extended her time in jail.

61. Plaintiff Johnson was diagnosed as being "Depressed" while in the City Jail and given the medication Paxil but no other treatment. She had never suffered from Depression prior to her lengthy incarceration.

62. Prior to her jailing, Plaintiff Johnson had a car and home. Since her release she has been homeless and not been able to find a job. Plaintiff Johnson has had a fourth child, a son, since her January 28, 2013 release. She receives Supplemental Nutrition Assistance Program (SNAP) benefits.

63. On or about November 4, 2013, Plaintiff Johnson was arrested on other charges and was about to post bail when she was told that she had unpaid tickets. Plaintiff Johnson noticed that the tickets were the same tickets in which she had earlier

served time and should have been cleared. She showed her release order for the time served but she was jailed for four days for failure to pay.

64. During all of the events described above, at no time was Plaintiff Marquita Shauron Johnson ever informed by the City, any city official or employee or JCS or any employee of JCS of any of her rights under the 4th, 6th, 13th, 14th Amendments, including rights not to be jailed for inability to pay debts and rights to counsel and pre-deprivation hearings.

**Plaintiff Kenny Jones**

65. Plaintiff Kenny Jones is a 30 year old an illiterate indigent African American male who is a resident of Montgomery, Alabama.

66. On or about May 6, 2013, Plaintiff Kenny Jones was arrested by Officer Blake Brauer for not having auto insurance and failure to display vehicle registration. An alias warrant was issued for plaintiff on May 3, 2013. Plaintiff was released from jail on or about May 10, 2013. During the time of this arrest and incarceration plaintiff was receiving a disability check.

67. On or about February 11, 2011, Plaintiff Jones was arrested for unpaid traffic tickets after he ran a stop sign on 5th Street in Montgomery, Alabama. He was released from jail on or about June 19, 2011. Plaintiff jones was held in jail for over 4 months. At the time his fines for unpaid traffic tickets was $700.

68. During the time of this arrest and incarceration, Plaintiff Jones was receiving a disability check. Plaintiff Jones was never asked about his indigency or ability to pay.

69. Plaintiff Jones was told he would be jailed or placed on fine and fees only probation if did he did not immediately pay in full.

70. Plaintiff Jones was placed on "probation" payment plan under the supervision of JCS. His probation was revoked because he was unable to make scheduled payments and fees. His sentence was "commuted" and he was incarcerated to "sit out" his debt at a rate of $50 per day.

71. During his incarceration Plaintiff Jones was forced to performed menial labor that consisted of road squad clean-up in order to further reduce his debt by $25 per day. While in jail he worked for the road squad by picking up trash on the side of the road from 8 in the morning until 1:00 in the afternoon, five days a week.

72. Plaintiff Jones was never informed of any right to have the costs associated with pursuing an appeal waived based on indigency. During all the events described above, at no time was Plaintiff Jones was ever informed by the City, any city official or employee or JCS or any employee of JCS of any of his rights under the 4th, 6th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to counsel and pre-deprivation hearings.

**Plaintiff Algi Edwards**

73. Plaintiff Algi Edwards, Jr. is an indigent 28 years-old African American male who is a resident of Montgomery, Alabama. He is the father of two children ages 6 and 7. He has completed 3 years of college.

74. On or about November 20, 2012, Plaintiff Edwards was arrested for an expired tag and driving while his license was suspended by Officer A.S Wright in Montgomery, Alabama. An alias warrant was executed on plaintiff for running a stop sign.

75. Plaintiff Edwards' fine for traffic tickets was $3500 and his bond was $1000.

76. Plaintiff Edwards was not asked about indigency or ability to pay. While jailed he performed labor in jail for 75 days in order to reduce his debt and thus time in jail by an additional $25 per day. He performed the following forced labor duties:

- Cleaned the jail cells; and

- Picked up trash

77. During the time plaintiff was incarcerated he lost his job and fell behind on child support.

78. Plaintiff Edwards, was never informed of any right to have the costs associated with pursuing an appeal waived based on indigency.

79. On or about April 30, 2013, Plaintiff Edwards was ordered to pay $150 a month starting on June 1. On or about July 22, 2014, Plaintiff Edwards was ordered to pay $175 and $175 by the 18th of each month. He made a payment of $118 that day and a payment of $262 on or about September 4, 2014, when his case was closed.

80. Plaintiff Edwards has continued to be stopped by Montgomery Police and he believes that he is being targeted and profiled because of his race and poverty.

81. Plaintiff Edwards was arrested on or about March 19, 2015 by B.J. Truss for failure to register vehicle. His trial date for this offense is July 16, 2015.

82. During all the events described above, at no time was Plaintiff Algi Edwards ever informed by the City, any city official or employee or JCS or any employee of JCS of any of his rights under the 4th, 6th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to counsel and pre-deprivation hearings.

**Plaintiff Levon Agee**

83. Plaintiff Levon Agee is an indigent 33 year-old African American male who is a resident of Montgomery, Alabama. He has two children that are ages 7 and 12. The 11th grade is the highest level of education he has completed. Plaintiff Agee is currently unemployed.

84. A warrant was executed on or about June 13, 2013 for Levon Agee on numerous unpaid traffic tickets for offenses including obstructed windshield, no driver license, and failure to wear a seat belt. He was ordered to serve time in jail to "sit out" his debt on or aboutJune 14, 2013. A docket entry for that date states: "Fines or Days"

85. He was in jail for 28 days with no bond and released on or about July 12, 2013. While in jail Plaintiff Agee was ordered to clean the bathrooms in the jail in order to reduce his debt and thus time served by $25 per day.

86. Plaintiff Agee has continued to be stopped by Montgomery Police and he believes that he is being targeted and profiled because of his race and poverty.

87. On or about July 7, 2014, Plaintiff Levon Agee was jailed for an expired tag and for not having a driver's license.

88. Plaintiff Agee was never asked about indigency or ability to pay. At the time of the arrest the plaintiff received no government assistance. Plaintiff was told he would be jailed if did not immediately pay in full and was placed on probation payment plan.

89. Plaintiff, Levon Agee, was never even informed of any right to have the costs associated with pursuing an appeal waived based on indigency.

24

90. During all the events described above, at no time was Plaintiff, Levon Agee ever informed by the City, any city official or employee or JCS or any employee of JCS of any of his rights under the 4th, 6th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to counsel and pre-deprivation hearings.

**Plaintiff Adrian Eddie Floyd**

91. Plaintiff Adrian Floyd is a 46 year-old indigent African American male and father of three children: a 22 year-old male, 16 year-old male, and a 12 year-old male. He is a resident of Montgomery, Alabama and has resided at the same address for 21 years. He resides with his elderly mother as her primary caregiver. His children do not reside at this address. Plaintiff Floyd was unemployed at the time of his arrest.

92. On or about July 3, 2013, Plaintiff Floyd was arrested because he had numerous outstanding warrants based on debts that he owed the City from traffic tickets issued in years 2006, 2007, 2008, and 2009.

93. Plaintiff Floyd was arrested by Montgomery Police Officer Anderson (a white male) after coming out of the Wells Fargo Bank located at 210 Waters Street in downtown Montgomery, Alabama. Plaintiff Floyd was walking to his car when the police officer drove by and told him to "come here".

94. Officer Anderson said that Plaintiff Floyd fit the description of someone who had attempted to rob the Wells Fargo Bank on Madison Ave, Montgomery, Alabama less than a mile away.

95. Plaintiff Floyd asked to show the officer his bank receipt but the officer said he did not want to see it.

96. The officer proceeded to go through Plaintiff Floyd's pockets without asking permission, conducting an illegal search and seizure.

97. Plaintiff Floyd stayed in handcuffs approximately 45 minutes and then was told that 17-18 warrants for his arrest were out.

98. The officers took Plaintiff Floyd to jail where he stayed 10-12 hours in a holding cell.

99. Plaintiff Floyd was not asked about his indigency or ability to pay the fixed schedule bond. Plaintiff Floyd was told if he didn't get bailed out that he would be there until he saw a judge.

100.     Plaintiff Floyd was bailed out in the amount of $2067 on Professional Bond and fees that were in the estimated total amount of between $3100-$3200.

101.     Plaintiff Floyd was released on or about July 4, 2013 with a court date of July 26, 2013.

102.     Plaintiff Floyd went to the City of Montgomery Police Departments Internal Affairs a few weeks before his court date. Plaintiff Floyd felt that he needed to report the arresting officer for illegal search and seizure of his personal effects, but the Internal Affairs officer would not look at the bank receipt to check date and time that he was there to make clear he was not the alleged "look alike" attempted bank robber.

103.     Plaintiff Floyd also wanted Internal Affairs to know he was humiliated, disrespected, embarrassed, and wanted to be exonerated.

104.     Corporal Dailey of Internal Affairs took report and told Plaintiff Floyd that
he would get back to him in 3 days. Plaintiff Floyd never heard from Corp. Dailey
again. Plaintiff Floyd went back to Internal Affairs twice to no avail.

105.     Plaintiff Floyd went to court on or about July 26, 2013 and was released
because his tickets were paid through the bond he had been required to post, without
inquiry into his indigency/ability to pay.

106.     During all the events described above, at no time was Plaintiff Floyd ever
informed by the City, any Municipal Court official or employee of any of his rights
under the 4th, 6th, 13th, and 14th Amendments, including rights not to be jailed for
inability to pay bonds or debts and rights to counsel and pre-deprivation hearings.

107.     In 2006, Plaintiff Floyd was arrested and jailed for 2-3 days for unpaid
traffic tickets. He was arrested on a stop for outstanding warrants on unpaid traffic
tickets. Plaintiff Floyd was sent straight to lock up after arrest.

108.     Plaintiff Floyd saw Judge Troy Massey 2 ½ days later, and he did not enter
a guilty plea.

109.     Plaintiff Floyd was not offered or provided with a Court Appointed
Attorney.

110.     Plaintiff Floyd was not offered community service.

111.     The Judge told Plaintiff Floyd, "The only way you leave here today is you
pay."

112.     Plaintiff Floyd's sister paid for his unpaid traffic tickets with a debit card.
She asked for a copy of the receipts from City employees and was told they were
not going to look for them.

**Plaintiff Hassan Caldwell**

113.    Plaintiff Hassan Caldwell is an indigent 20 year-old African American male who is a resident of Montgomery, Alabama. The highest level of education that he has completed is the 12th grade. At the time of his arrests Plaintiff Caldwell was unemployed.

114.    On or about February 3, 2014, Plaintiff Caldwell was arrested by Officer Sherman Randall Smith for unpaid traffic tickets after he ran a stop sign on 5th Street in Montgomery, Alabama.

115.    Plaintiff's fine for this offense was $373.00 and he bonded out of jail on a fixed schedule bond, without inquiry into his indigency/ability to pay.

116.    On or about September 28, 2014, Plaintiff was arrested for driving while license was suspended and for having improper lights. Plaintiff's fine for improper lights was $230.00. Plaintiff was arrested on Ann Street. An alias warrant was issued on September 28, 2014.

117.    Plaintiff was in jail for 2 days and the plaintiff's fine for unpaid tickets was $2,287.00.

118.    Plaintiff Caldwell's bond was $1500 and he posted this fixed schedule bond to get out of jail. He was not asked about his indigency or ability to pay the bond. He was told that his fine for unpaid tickets was $2,287.00. At the time of the arrest he had no income.

119.    Plaintiff Caldwell told the judge of his indigent financial circumstances. Plaintiff Caldwell was not told of his right not to be incarcerated for inability to pay his debt; instead he was told if he paid half of the $2,287.00 the case would be

thrown out. When he managed to pay half of the $2,287.00, he was told to pay the other half.

120.   Plaintiff Caldwell was not asked about indigency or ability to pay but was placed on "probation" payment plan under the supervision of JCS.

121.   Plaintiff Hassan Caldwell was never informed of any right to have the costs associated with pursuing an appeal waived based on indigency. During all the events described above, at no time was Plaintiff Caldwell ever informed by the City, any city official or employee or JCS or any employee of JCS of any of his rights under the 4th, 6th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to counsel and pre-deprivation hearings.

122.   Plaintiff Caldwell has continued to be stopped by Montgomery Police and he believes that he is being targeted and profiled because of his race and poverty.

123.   On or about February 21, 2015, Plaintiff Caldwell was arrested by Officer Robert Joseph for driving without a license on Fairground Road in Montgomery. He was fined $230 for this offense.

**Plaintiff Devron James**

124.   Plaintiff Devron James is a 36 year-old African American man who is a homeless resident of Montgomery, Alabama. He is the father of three children ages 7, 10 and 16. He is now unemployed after being laid off his prior job several months ago.

125.   On or about March 10, 2013, Plaintiff Jones was pulled over by Montgomery City Police in the Ridgecrest area of Montgomery, a predominately African American area for failure to wear a seatbelt. The officer then ran his name to check

for warrants and arrested him on warrants based on June 2009 traffic tickets. He was taken to jail and held overnight before being taken before Judge Hayes the following day. Plaintiff James told the arresting officer and Judge Hayes that he had a receipt showing that he had paid his June 2009 fines. He was told that his payment was not listed in the computer. The computerized docket for Plaintiff James does contain a notation that at least some 2009 tickets had been paid in full.

126.   On or about March 11, 2013, Plaintiff James was sentenced to jail with a docket entry of "Fines or Days." At the time he was homeless and living on the streets. He was released on or about March 27, 2013. He lost his job because of this incarceration.

127.   Plaintiff James was not provided any meaningful inquiry into his indigency/ability to pay, he was not offered or advised of any alternatives to paying in full or going to jail, and he was not advised of his right not to be incarcerated for debt or his right to waiver of appellate bond.

**Plaintiff Ashley Dawn Scott**

128.   Plaintiff Ashley Dawn Scott is a 26 year-old indigent Caucasian woman who is a resident of Montgomery Alabama. She is the mother of a 3 year-old girl. At the time of her arrest Ashley Dawn Scott was unemployed.

129.   On or about June 19, 2015, around 3:00 in the afternoon Plaintiff Ashley Dawn Scott was arrested outside of her residence. Plaintiff Scott heard an argument outside her residence and she proceeded to walk outside. Once Plaintiff Scott walked outside, an officer on the scene asked to see her license without probable cause.

130.   When the officer ran her license it was brought to the officer's attention that Plaintiff Scot had an outstanding warrant from 2012. On or about January 31, 2012, Plaintiff Scott was pulled over by Officer Shelia Ruth Shaffer for a cracked tail light. The officer discovered that Plaintiff Scott's driver license had been suspended. She was then charged with driving while her license was suspended. Plaintiff Scott's fine for the January 31, 2012 offense was $373. Plaintiff Scott was given a court date for the January 31, 2012 offense, but missed the court date because she went into labor the same day she was scheduled to be in court. The City of Montgomery then issued a warrant for her arrest.

131.   Plaintiff was arrested for the 2012 offense on June 19, 2015 for having an outstanding warrant for failure to pay. Her bond was set at $1000 pursuant to a fixed-schedule and she had to spend 1 night in jail until she was able to come up with money to post the bond which was set without inquiry into her indigency/ability to pay.

132.   During all the events described above, at no time was Plaintiff Ashley Dawn Scott ever informed by the City, any city official or employee of any of her rights under the 4th, 6th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to counsel and pre-deprivation hearings or her right to consideration of her indigency in setting her bond.

**Plaintiff Christopher Mooney**

133.   Plaintiff Christopher Mooney is an indigent African American male and a father of a 6 year-old daughter, a 17 year-old son, a 19 year-old son, and a 20 year-old son. All of his children live with him except the 19 year-old son.

134.     On or about May 8, 2013 Plaintiff was arrested for unpaid tickets. Plaintiff was
a self-employed plumber at the time of his arrest.

135.     Plaintiff was not asked about his indigency or ability to pay. Plaintiff was told
by Judge Hayes to either do time or pay all of the fines.

136.     Plaintiff offered Judge Hayes approximately $700 and was told he still would
have to do time.  Plaintiff sent money home with his fiancé to pay bills and take care
of his children while he was in jail.

137.     Plaintiff Christopher Mooney was held in jail for inability to pay for about 2
months.

138.     Plaintiff performed jail work in exchange for time.  Plaintiff washed MPD cars,
cut grass, and pruned bushes around the Montgomery Police Department.

139.     Plaintiff was released for "early release-jail work list" on or about June 7, 2013.

140.     Plaintiff lost clients and potential clients while being jailed for unpaid tickets.

141.     Plaintiff witnessed an inmate found dead in a cell and witnessed other
deplorable conditions which still affect him.

142.     During all the events described above, at no time was Plaintiff Christopher
Mooney ever informed by the City, any city official or employee of any of his rights
under the 4th, 6th, 13th and 14th Amendments, including rights not to be jailed for
inability to pay debts and rights to counsel and pre-deprivation hearings.

## C. RICO-SPECIFIC ALLEGATIONS

143.     Culpable Person. Defendant JCS is a "person" subject to civil liability under
RICO. Defendant JCS is a corporate entity that is "capable of holding a legal or
beneficial interest in property."

144.     Enterprise. Defendant JCS together with the City of Montgomery and Presiding Judge Hayes constituted a RICO association-in-fact "enterprise."Among other purposes, this enterprise had the common purpose of maximizing the collection of court fines, costs and fees, surcharges and "probation" fees paid to JCS without meaningful consideration of the individuals' ability to pay by threatening revocation of probation, illegal incarceration for debt with earlier release conditioned on performing janitorial labor, without advising indigent individuals of their constitutional rights not to be jailed for their debts, to be provided with pre-deprivation hearings, and to be represented by counsel.

145.     Interstate or Foreign Commerce. The activities of the enterprise and the predicate acts of racketeering affect interstate commerce. Defendant JCS, a corporate entity based outside Alabama that operated, conducted and managed the alleged extortionate activities in Montgomery, Alabama. Defendant JCS travelled in interstate commerce and used the mail and other facilities of interstate commerce in pursuit of its pattern of racketeering, and the proceeds obtained from the enterprise were used in interstate commence.

146.     Pattern of Racketeering. Defendant JCS engaged in a pattern of racketeering under Section 1961(5)'s definition of "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity." For several years prior to the summer 2014 termination or non-renewal of its contract with the City of Montgomery, Defendant JCS engaged on a daily basis in a closed-ended related and continuous "pattern of racketeering" by conducting and participating in the enterprise. These related acts had the same

or similar purposes, results, participants, victims, and methods of commission and were not isolated events.

147.     Racketeering Activity. Defendant JCS has committed multiple related predicate acts of extortion using illegal means of threats of imprisonment and forced labor, and for the illegal purpose of collection of fees to which it had no lawful claim because of Plaintiffs' inability to pay, pursuant to and in furtherance of this pattern of racketeering, including the following:

    a.  Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (relating to interference with commerce, robbery or extortion);

    b.  Extortion in violation of § 18 U.S.C. § 1952 ( relating to racketeering; interstate and foreign travel or transportation in aid of racketeering enterprises;

    c.  Violations of 18 U.S.C. § 1581 (peonage)

    d.  Violations of 18 U.S.C. § 1589(b) (forced labor under threat of physical restraint or abuse of process); and

    e.  Extortion in violation of Ala.Code §13A-8-13.

148.     Injury. The Plaintiffs are (1) persons (2) who have sustained injury (3) to their property(4) "by reason of" defendant's violation of § 1962(c) and (d). The economic harm to Plaintiffs and their families that Plaintiffs have suffered by reason of Defendant JCS's violations of § 1962(c) and (d) are redressable by damages under RICO.

## CLASS ACTION ALLEGATIONS

149. Plaintiffs bring this class action for damages pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of a Class and two Subclasses of all individuals who have been or will be similarly situated.

150. The proposed Damages Class is defined as all individuals who, during the time periods applicable to the various claims in this lawsuit, have been or will be injured by the Defendants' challenged actions, including but not limited to those indigent individuals who were jailed or threatened with jail by the Defendants for non-payment of bonds or debts from fines, fees, costs, and surcharges arising from cases in the Municipal Court of Montgomery.

151. The Damages Class contains two Subclasses: the Jail Labor Subclass and the "Probation" Subclass. The Jail Labor Subclass is defined as: Those indigent individuals who were jailed for non-payment of debts and who were subjected to the Defendants' policy of releasing people from the city jail more quickly if they "worked off" their debts, including by laboring for the City to clean the offices of the city court employees, municipal court bathrooms, the city jail, and other city property. The "Probation" Subclass is defined as: Those people who were placed on "probation" and forced to comply with restrictions on their liberty in the form of probation conditions based solely on their inability to pay debts.

152. The members of this class are so numerous that their joinder is impractical. On information and belief, there are hundreds, and likely thousands, of indigent individuals who have been subjected to Defendants' challenged policies, practices, and customs. According to news reports, records of the Montgomery City Jail and

35

Municipal Court and the admission of the City of Montgomery, hundreds have been jailed for nonpayment of debts during each of the past several years.

153.    The policies and practices challenged in this action have been applied with equal force to named Plaintiffs and members of the class and subclasses. The relief sought is common to all members of the Classes, and common questions of law and fact exist as to all class or subclass members, The Plaintiffs and all class and subclass members seek monetary relief for injuries caused by the Defendants' policies, practices, and procedures that have violated their rights, as well as declaratory and injunctive relief where appropriate.

154.    Questions of law or fact common to the Class and Subclasses as a whole concern the constitutionality and lawfulness of each of Defendants' challenged policies and practices. The important common questions of law and fact include but are not limited to the constitutionality and lawfulness of: the use of racially targeted roadblocks or stops; the use of pre-fixed cash bail bond schedules; the incarceration of indigent individuals for inability to pay fines, costs, surcharges, probation fees, bail bonds or appeal bonds; the failure to provide counsel or meaningful pre-deprivation hearings for indigent individuals incarcerated for failure to pay debts; the incarceration of indigent individuals to "pay off" debts at the rate of $50 per day; the provision of additional $25 per day reductions of debts for performing janitorial or other labor for the City; the use of extortion and threats of imprisonment and/or forced labor as collection methods for  indigent individuals placed on "probation" for debt; the failure to advised Plaintiffs of their federal and

36

state law rights alleged in this complaint; and the failure to train employees and officers with respect to the rights alleged in this complaint.

155.    These common legal and factual questions arise from a central scheme and set of policies and practices: the Defendants' enormously profitable debt collection system. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the Class are entitled to the constitutional and other relief that they seek.

156.    The named Plaintiffs' claims are typical of the claims of the members of the Classes and Subclasses respectively, and they have the same interest in this case as other members of the Classes that they represent. Each of them suffered injuries from the failure of the Defendants to comply with the basic constitutional and other provisions detailed below. The Court's determinations of the legality of Defendants' scheme of policies and practices will determine the claims of the named Plaintiffs and every other Class member.

157.    If the named Plaintiffs succeed in their claims that the Defendants' policies and practices concerning debt collection for fines, fees, costs, and surcharges have violated the law in ways alleged in each claim of this Complaint, then that ruling will likewise benefit every other member of the Damages Classes, as well as the Damages Subclasses.

158.    The named Plaintiffs will fairly represent and adequately protect the interests of the Class and Subclasses as a whole. They possess the requisite personal interest

in the subject matter of the lawsuit and are are representative of the Class and Subclasses. They possess no interests adverse to other class members.

159. Plaintiffs are represented by counsel with extensive experience handling civil rights class action litigation. Plaintiffs' counsel have the requisite expertise and experience to effectively pursue this litigation.

160. The interests of the members of the Class and Sub-classes will be fairly and adequately protected by the Plaintiffs and their attorneys.

161. Class action status is appropriate under Rule 23(b)(2) because the City, through the policies, practices, and procedures that make up its traffic debt-collection scheme, has acted and/or refused to act on grounds generally applicable to Declaratory and Injunctive relief Class.

162. Class treatment under Rule 23(b)(3) is appropriate for the Damages Class and Subclasses because the common questions of law and fact overwhelmingly predominate in this case. This case turns for every Plaintiff on what the Defendants' policies and practices have been and on whether those policies are lawful.

163. The common questions of law are dispositive questions in the case of every of the Damages Classes and Subclasses. The question of liability can therefore be determined on a class-wide basis. Class- wide treatment of liability is a far superior method of determining the content and legality of the Defendants' policies and practices than individual suits by hundreds or thousands of City residents. The question of damages will also be driven by class-wide determinations, such as the policies, practices, and conditions at the City jail. To the extent that individual damages will vary, they will vary depending in large part on the amount of time

members were jailed and can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration. If need be, individual hearings in Class-member specific damages based on special circumstances can be held after Class-wide liability is determined- a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

164.    Finally, the expense and burden of individual litigation make it extraordinarily difficult for indigent class members to redress—or even learn of--the wrongs done to them without the procedures applicable to class action litigation.

## Demand for Jury Trial

165.    Plaintiffs seek the following relief and hereby demand a jury in this case for all matters so appropriate.

## Claims for Relief

### Count I
### Violations of the Fourteenth Amendment Equal Protection and Due Process Clauses, Fourth Amendment and 42 U.S.C. § 1983 By Unconstitutional Stops and Arrests Against the City of Montgomery, Chief of Police Ernest N. Finley, Jr., and Former Chief of Police Kevin Murphy

166.    The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

167.    As part of its purposeful use of law enforcement activities to generate revenue, Defendants City of Montgomery, Chief of Police Ernest N. Finley, Jr., and Former

Chief of Police Kevin Murphy have adopted and pursue a policy, practice or custom of using the Montgomery Police Department to stop and arrest individuals without reasonable suspicion or any objective, articulable suspicion of wrongdoing but instead to harass them anf run checks for debts owed to the City from prior arrests, in violation of the Fourth Amendment. These practices constitute false arrest and violate the Fourth and Fourteenth Amendments.

168.    Plaintiffs are African American individuals who have been stopped by police officers pursuant to the Defendants' intentional policy, practice or custom of establishing traffic roadblocks, checkpoints, or conducting pedestrian stops, in or near predominately African American neighborhoods.

169.    Defendants have systemically engaged, and continues to engage, in intentional racial profiling and discriminatory treatment of Plaintiffs and other African American individuals based on their race, color and/or ethnicity.

170.    Defendants have a policy, practice or custom of pretextually and impermissibly using race as a factor in stopping and arresting Plaintiffs or other African American individuals referred to above.

171.    Through their policy of purposefully stopping and arresting Plaintiffs and subjecting them to different, burdensome and injurious treatment because of their race, color and/or ethnicity, Defendants have deprived Plaintiffs and members of the plaintiff class of the equal protection and due process of the law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

172.    Defendants have devised and implemented a policy, custom and practice of
illegally stopping and arresting African American individuals because of their race,
color and/or ethnicity.

173.    Defendants also have a policy, practice or custom of failing to adequately train
officers and employees with regard to protecting against violations of the rights
alleged in this count.

174.    The above policies or customs of the Defendants violate Plaintiffs' and class
members' Fourteenth and Fourth Amendment rights under color of state law in
violation of 42 U.S.C. § 1983.

175.    As a direct and proximate result of these Defendants' wrongful policies,
Plaintiffs and class members have suffered and will continue to suffer significant
and substantial personal injuries that can be redressed by damages and other
requested relief. Without appropriate injunctive relief these violations will continue
to occur.

**Count II**
**Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq.***
**Against the City of Montgomery, Chief of Police Ernest N. Finley, Jr., and**
**Former Chief of Police Kevin Murphy**

176.    The allegations of Paragraphs 1 through 165 are incorporated herein by
reference.

177.    The law enforcement activities described in this Complaint have been funded,
in part, with federal funds. Discrimination based on race in the law enforcement
activities and conduct described in this Complaint are prohibited by Title VI of the
Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq.* The acts and conduct

complained of herein were motivated by racial animus, and were intended to discriminate on the basis of race and/or had a racially disparate impact on minorities, particularly African Americans.

178.   As a direct and proximate result of the above mentioned facts, Plaintiffs have suffered injuries and damages and have been deprived of their rights under Title VII. Without appropriate injunctive relief these violations will continue to occur.

### Count III
**Violation of Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 By Policy and Practice of Issuing and Serving Warrants Based Solely on Nonpayment of Monetary Debts Against Against the City of Montgomery, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, and Presiding Judge Hayes**

179.   The allegations of Paragraphs 1 through 165  are incorporated herein by reference.

180.   The Defendants have a policy and practice of issuing and serving warrants at the homes of those who have not paid their traffic debts. These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when the Defendants have advance knowledge that the person is impoverished and unable to pay the debts. These warrants are sought, issued and served without any finding of probable cause that the person has committed any offense. The Defendants choose to pursue warrants instead of issuing summons even when their employees have spoken to people on the phone or in person and have had the opportunity to notify them to appear in court. The Defendants' policy and practice is to deprive people of their liberty without any prior notice and hearing or any basic inquiry into whether the debt is still owed or valid. Without appropriate injunctive relief these violations will continue to occur.

181.   Defendants have also pursued a policy, practice or custom of failing to adequately train officers and employees with regard to protecting against violations of the rights alleged in this count.

182.   The above policies or customs of the Defendants violate Plaintiffs' and class members' Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983.

183.   As a direct and proximate result of Defendants' above policies or customs, Plaintiffs and class members have suffered and will continue to suffer significant and substantial personal injuries that can be redressed by damages and other requested relief.

### Count IV
### Violations of the Fourteenth Amendment Equal Protection and Due Process Clauses and 42 U.S.C. § 1983 By Use of Fixed-sum Bail System Against the City of Montgomery, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, and Presiding Judge Hayes

184.   The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

185.   Defendants have devised and implemented a policy, custom and practice of applying a fixed-sum bail system that mandates the payment of pre-fixed amounts based solely on the offenses charged in order to gain pre-trial release, without regard to the individual defendant's ability to pay (or dangerousness or risk of flight). This policy or practice has been used as a substitute for, or way of circumventing prohibitions on, imprisonment for fines, court costs, fees or restitution, providing another means of "punishing" indigent individuals for their poverty.

186.   Defendants have systemically engaged, and continues to engage, in a policy, practice or custom of applying a fixed schedule for setting bail that has resulted in pre-trial detention and incarceration of Plaintiffs and other indigent individuals based solely on their inability to pay bail in violation of the equal protection and due process clauses of the Fourteenth Amendment.

187.   Defendants have also pursued a policy, practice or custom of failing to adequately train officers and employees with regard to protecting against violations of the rights alleged in this count.

188.   The above  bail policies or customs of the Defendants violate Plaintiffs' and class members' Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983.

189.   As a direct and proximate result of Defendants' wrongful bail policies, Plaintiffs and class members have suffered and will continue to suffer significant and substantial personal injuries that can be redressed by damages and other  requested relief. Without appropriate injunctive relief these violations will continue.

**Count V**
**Violations of the Fourteenth Amendment Due Process and Equal Protection
Clauses and 42 U.S.C. § 1983 By Imprisonment For Non-Payment of Debt
Without Meaningful Inquiry Into Inability To Pay Defendants City of
Montgomery, Presiding Judge Hayes, and JCS**

190.   The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

191.   The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person for the failure to pay money owed to the

government if that person is unable to pay and to fail to provide meaningful hearings to make the indigency determination.

192. Defendants City of Montgomery, Presiding Judge Hayes, and JCS, all acing under color of state law, have violated Plaintiffs' rights through their policy practice or custom of jailing them, and by harassing and threatening to jail them, without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment as required by the United States Constitution. The Defendants similarly did not provide the required notice to the Plaintiffs concerning the relevant issues at any hearing contemplating their imprisonment, provide a meaningful opportunity for Plaintiffs to present evidence related to their imprisonment, provide a meaningful opportunity for Plaintiffs to present evidence of their ability to pay, or make findings concerning their ability to pay.

193. Defendants' policies and practices of imprisoning people when they cannot afford to pay their debts and of automatically converting monetary fines into days in jail at a rate of $50 per day and reducing the debts by another $25 per day conditioned on the performance of labor for the City constitute false imprisonment by unlawful restraint and detention of their personal liberty as well as otherwise violate the due process and equal protection provisions of the Fourteenth Amendment of the United States Constitution.

194. Defendants also have pursued a policy, practice or custom of failing to adequately train officers and employees with regard to protecting against violations of the rights alleged in this count.

195.   The above policies or customs of the Defendant City of Montgomery, Presiding Judge Hayes, and JCS violate Plaintiffs' and class members' Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983.

196.   As a direct and proximate result of Defendants' wrongful policies, Plaintiffs and class members have suffered and will continue to suffer significant and substantial personal injuries that can be redressed by damages and other requested relief.

**Count VI**
**Violations of Six and Fourteenth Amendments and 42 U.S.C. § 1983 By Imprisonments For Inability To Pay Debts Without Appointing Adequate Counsel Against the City of Montgomery and Presiding Judge Hayes**

197.   The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

198.   Defendant City of Montgomery and Presiding Judge Hayes have violated Plaintiffs' right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution by their policy of imprisoning indigent debtors in proceedings litigated by the City prosecutors at which they do not have the benefit of adequate counsel and do not knowingly, intelligently, and voluntarily waive counsel.

199.   The Defendants' policy of not providing adequate counsel at hearings for indigent individuals ordered to be imprisoned in the City jail for unpaid debts, which are, in turn, based on convictions for traffic tickets or violations or other minor violations at which the person was also unrepresented, violates the Sixth and Fourteenth Amendments to the United States Constitution.

200.    Defendants City of Montgomery and Presiding Judge Hayes also have a policy, practice or custom of failing to adequately train officers and employees with regard to protecting against violations of the rights alleged in this count.

201.    The above policies or customs of the Defendant City of Montgomery and Presiding Judge Hayes violate Plaintiffs' Sixth and Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983.

202.    As a direct and proximate result of Defendants' wrongful policies, Plaintiffs and class members have suffered and will continue to suffer significant and substantial personal injuries that can be redressed by damages and other requested relief.

**Count VII**
**Violations of Fourteenth Amendment Due Process Clause and 42 U.S.C.§ 1983**
**By Delegation of Probation Functions to JCS, An Entity With A Personal**
**Financial Stake in the Outcome of Judicial Proceedings and Case Decisions**
**Against The City of Montgomery, Presiding Judge Hayes, and JCS**

203.    The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

204.    The Due Process Clause of Fourteenth Amendment requires neutrality in all aspects of cases prosecuted and decided by governmental actors. The Defendants City of Montgomery and Chief Judge Hayes contracted with JCS, a private, for-profit corporation that acted under color of state law and as a state actor in performing traditional governmental functions and, further, made the resolution of Plaintiffs' cases contingent, at least in part, on the advice, recommendations, discretionary decisions, enforcement actions, and representations of this private entity.

47

205.   Because the non-neutral actor JCS profited significantly from the decisions about whether to place people on probation, what payment and fee schedule and conditions to require, and how vigorously to enforce those conditions, there is a possibility, indeed a likelihood that those financial interests affected its judgment when it made or participated in those decisions. Because JCS had a significant personal financial interest in how these cases were resolved, unlike a traditional neutral governmental actor, the delegation of these functions to JCS in the Defendants' scheme of policies and practices violates the longstanding due process restrictions against self-interested arrangements in American courts of justice.

206.   The above policies or customs of the Defendants City of Montgomery, Presiding Judge Hayes and JCS violate Plaintiffs' and class members' Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983.

191. As a direct and proximate result of Defendants' wrongful policies, Plaintiffs and class members have suffered and will continue to suffer significant and substantial personal injuries that can be redressed by damages and other requested relief.

### Count VIII
### Violations of the Thirteenth Amendment and 42 U.S.C. § 1983 and Federal Anti-Peonage Laws (18 §§ U.S.C. 1581, 1589(a) and (b), 1593A, and 1595) Against All Defendants

207.   The allegations of Paragraphs 1through 165 are incorporated herein by reference.

208.   Defendants' scheme of unlawfully imprisoning Plaintiffs for monetary debts owed to the City violates the Thirteenth Amendment and federal laws enacted pursuant to it that prohibit peonage and forced labor. Plaintiffs were, pursuant to

48

Defendants' policies and customs, coerced with threats of even longer unlawful jail terms by City officials if they did not "volunteer" to labor in the City jail under onerous conditions for an extra of $25 per day reduction of their debts. This amounts to peonage and forced labor, whereby a person is coerced by threat of legal sanction-i.e., imprisonment –to work off a debt to a "master." It is also an abuse of the legal process that exploited Defendants' unlawful incarceration of Plaintiffs to force them to accept, in their desperation to end their unlawful incarceration more quickly, the conditions of forced labor, performing janitorial tasks that City employees did not want to perform, such as cleaning up blood and feces in an overcrowded jail environment.

209. Plaintiffs allegedly owed the City a monetary debt for traffic tickets and associated fees, costs, and surcharges. Because Plaintiffs were not imprisoned or sentenced to involuntary servitude as punishment for any crime, the Thirteenth Amendment bars the coerced use of their labor to work off their purely monetary debt.

210. The conduct of the Defendants also violates federal anti-peonage and forced labor statutes, including:

211. Violation of 18 U.S.C. § 1581(a): Defendants have held or returned Plaintiffs to a condition of peonage, or arrested them with the intent of placing them in or returning them to a condition of peonage.

212. Violation of 1589(a): Defendants have knowingly provided or obtained the labor or services of Plaintiffs by any one of, or by any combination of, the following means—

    a. by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    b. by means of serious harm or threats of serious harm to that person or another person;

    c. by means of the abuse or threatened abuse of law or legal process; or

    d. by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

213. Violation of 1589(b): Defendants have knowingly benefited, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

214. § 1593A (benefiting from peonage): Defendants have knowingly benefited, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of sections 1581(a) and 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation.

215. Violation of § 1595 (providing a civil remedy and ten year statute of limitations): As individuals who are victims of a violation of this chapter, Plaintiffs bring this civil action against the Defendants as perpetrators (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in

violation of this chapter) in this appropriate district court of the United States to recover damages and reasonable attorneys fees.

216. Defendants also have pursued a policy, practice or custom of failing to adequately train officers and employees with regard to protecting against violations of the rights alleged in this count.

217. The above policies or customs of the Defendants violate Plaintiffs' Thirteenth Amendment rights in violation of 42 U.S.C. § 1983.

218. As a direct and proximate result of Defendants' wrongful policies, Plaintiffs and class members have suffered and will continue to suffer significant and substantial personal injuries that can be redressed by damages and other requested relief.

**Count IX**
**Violations of the Fourteenth Amendment Due Process and Equal Protection Clauses and 42 U.S.C. § 1983 By Use of Probation and Threat of Probation Revocation Solely to Collect Fines and Fees from Indigent Individuals Against Defendants City of Montgomery, Presiding judge Hayes and JCS**

219. The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

220. The Defendants' policy and practice has been to ask whether a person can pay the entirety of any fees, fines, costs, and surcharges immediately. If the person can pay, the person pays and the case is closed. If the person is too poor to pay, the Defendants have pursued a practice of placing the person on "probation," under supervision delegated to Defendant JCS, acting under color of state law, including forcing the person to aide by conditions that restrict the person's liberty and that purport to subject the person to punishment if those conditions (including payment of extra fees) are violated. This policy and practice of altering punishment and

51

deprivation of fundamental liberties based solely on wealth status violates fundamental principles of Due Process and Equal Protection.

221.   Defendants also have a policy, practice or custom of failing to adequately train officers and employees with regard to protecting against violations of the rights alleged in this count.

222.   The above policies or customs of the Defendants violate Plaintiffs' and class members' Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983.

223.   As a direct and proximate result of Defendants' wrongful policies, Plaintiffs and class members have suffered and will continue to suffer significant and substantial personal injuries that can be redressed by damages and other requested relief.

## Count X
## Violations of Fourteenth Amendment Due Process and Equal Protection Clauses and 42 U.S.C. § 1983 In Requirements of Appeal Bond Against the City of Montgomery and Presiding Judge Hayes

224.   The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

225.   When Plaintiffs have attempted, to file emergency appeals of orders of imprisonment for owing the City a monetary debt, the Defendants City of Montgomery and Presiding Judge Hayes have followed their policy of attempting to bar inmate appeals unless the Plaintiffs pay costly appeals bonds without any meaningful inquiry into their ability to pay.

226.   Pursuant to this policy and practice, Plaintiffs were never even informed of any right to have the costs associated with pursuing an appeal waived if they are indigent.

227.   This policy of charging appeal bonds to those who cannot afford them, as well as the practice of not informing inmate debtors of their rights concerning appeal, including the right to have such costs waived, violates due process and equal protection rights secured to Plaintiffs by the Fourteenth Amendment.

228.   Defendants City of Montgomery and Presiding Judge Hayes also have pursued a policy, practice or custom of failing to adequately train officers and employees with regard to protecting against violations of the rights alleged in this count.

229.   The above policies or customs of the Defendants City of Montgomery and Presiding Judge Hayes violate Plaintiffs' and class members' Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983.

230.   As a direct and proximate result of Defendants' wrongful policies, Plaintiffs and class members have suffered and will continue to suffer significant and substantial personal injuries that can be redressed by damages and other requested relief.

### Count XI
### Violations of RICO § 1962(c) Against Defendant JCS

231.   The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

232.   This Count is against Defendant JCS.

233.   Defendant JCS together with the City of Montgomery and Presiding Judge Hayes was an association-in-fact and thus a RICO enterprise that engaged in and

whose activities affected interstate commerce. Defendant JCS was employed by or associated with the association- in- fact or enterprise.

234.　　　Defendant JCS agreed to and willfully or knowingly participated in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting monetary fees from Plaintiffs. Specifically, Defendant JCS repeatedly, routinely and continually engaged in a close-ended pattern of obtaining from Plaintiffs by threat a set-up fee and additional $49 probation fees each month with the intent to deprive them of this money. Defendant JCS repeatedly harassed and threatened Plaintiffs, telling them that if they did not pay these fees, they would have their probation revoked and be jailed for non-payment, without revealing any information to Plaintiffs about their rights as indigent persons to wavier of JCS fees or the rights of indigent persons to pre-deprivation hearings and their rights not to be jailed for failure to pay fines.

235.　　　Pursuant to and in furtherance of the above scheme, Defendant JCS committed multiple related acts of extortion using illegal means of threats of imprisonment, and for the illegal purpose of collection of fees to which it had no lawful claim because of Plaintiffs' inability to pay and entitlement to waiver of fees, including:

236.　　　Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (relating to interference with commerce, robbery or extortion);

237.　　　Defendant JCS, individually and in conspiracy with the City of Montgomery, obtained money from Plaintiffs with consent that was induced by the wrongful use of fear, in violation of 18 U.S.C. § 1951.

238.     The proceeds of this extortionate activity was used in commerce and thereby and in other ways affected interstate commerce under § 18 U.S.C. 1951(a).

239.     Extortion in violation of § 18 U.S.C. § 1952 ( relating to racketeering; interstate and foreign travel or transportation in aid of racketeering enterprises;

240.     Defendant JCS, individually and in conspiracy with the City of Montgomery, obtained money from Plaintiffs by threat with the intent to deprive them of this money   in violation of in violation of 18 U.S.C. § 1952.

241.     Defendant JCS, a corporate entity based outside Alabama that operated, conducted and managed the alleged extortionate activities in Montgomery, Alabama; Defendant JCS travelled in interstate commerce and used the mail and other facilities of interstate commerce in pursuit of its pattern of racketeering; and the proceeds obtained from the enterprise were used in interstate commence in violation of 18 U.S.C. §§ 1952(a)(1) and 1952(a)(2).

242.     Violations of 18 U.S.C. §1581(peonage);

243.     JCS, individually and in conspiracy with the City of Montgomery, knowingly returned Plaintiffs to a condition of peonage.

244.     Violations of 18 U.S.C. §1589(b) (forced labor under threat of physical restraint or abuse of process);

245.     Defendant JCS, individually and in conspiracy with the City of Montgomery and Presiding Judge Hayes, knowingly benefited, financially or by receiving anything of value, from participation in a venture (the RICO enterprise) knowing or in reckless disregard of the fact that the venture engaged in the

providing or obtaining of labor or services by the following means described in subsection (a):

    a.   --by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    b.   --by means of serious harm or threats of serious harm to that person or another person;

    c.   --by means of the abuse or threatened abuse of law or legal process; or

    d.   --by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

    e.   Extortion in violation of Ala. Code §13A-8-13.

246.     Defendant JCS, individually and in conspiracy with the City of Montgomery and Presiding Judge Hayes, obtained money from Plaintiffs by threat with the intent to deprive them of this money in violation of Ala.Code §13A-8-13.

247.     The repeated acts of threats and extortion set forth above were part of the enterprise's regular way of doing business and constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

248.     Defendant JCS directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

249.     As a direct and proximate result of Defendant JCS's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered personal concrete injuries to their property. As a direct and proximate result of Defendant JSC's

racketeering activities Plaintiffs were subjected to set-up fees and monthly probation fees charged by Defendant JCS and were forced to continue paying these monthly fees under threat of imprisonment even though they were indigent and entitled to waivers of such fees, resulting in economic harm to them and their families. These injuries to property Plaintiffs have suffered are redressable by monetary damages.

Wherefore, Plaintiffs requests that this Court enter judgment against Defendant JCS as follows:

      a.   Actual damages;

      b.   Treble damages; and

      c.   Attorney's fees.

RICO Claim Jury Trial Demanded

**Count XII**
**Violations of RICO § 1962(d) Against Defendant JCS**

250.      The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

251.      This count is against Defendant JCS.

252.      As set forth above, Defendant JCS agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically Defendant JCS intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

253.      Defendants JCS  intentionally conspired and agreed with the City of Montgomery, Presiding Judge Hayes,  and other officials and employees of the City

to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendant JCS knew that its predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962 (c), in violation of 18 U.S.C. § 1962(d).

As direct and proximate result of Defendant JCS's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their property in that: Plaintiffs were subjected to set-up fees and monthly probation fees charged by Defendant JCS and were forced to continue paying these monthly fees under threat of imprisonment even though they were indigent and entitled to waivers of such fees, resulting in economic harm to them and their families. These injuries to property that Plaintiffs have suffered are redressable by monetary damages.

Wherefore, Plaintiffs request that this Court enter judgment against Defendant JCS as follows:

    a.  Actual damages;

    b.  Treble damages; and

    c.  Attorney's fees.

RICO Claim Jury Trial Demanded

**Count XIII**
**False Imprisonment Against Presiding Judge Hayes and JCS**

254.    The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

255.    The Defendant Presiding Judge Hayes, in his individual capacity, by and

58

through his administrative and executive functions of executing the City of Montgomery's contract with JCS and adopting and administering unconstitutional policies by which indigent individuals were imprisoned for fines, fees, and other debts, did intentionally and unlawfully detain and/or cause the detention of the persons of Plaintiffs for varying lengths of time whereby they were directly restrained and deprived of their personal liberty and subjected to false imprisonment in violation of Ala. Code § 6-5-170.

2.  Defendant JCS unlawfully induced and procured, and aided and abetted in the policies of incarceration of indigent Plaintiffs for fines, fees, and other debts pursuant to which Plaintiffs were intentionally and unlawfully detained for varying lengths of time during which they were restrained and deprived of their personal liberty and thus subjected to false imprisonment in violation of Ala. Code § 6-5-170.

Wherefore, Plaintiffs request that this Court enter judgment against Defendants as follows:

    a.  An award of damages in an amount to be determined at trial;

    b.  Punitive damages in an amount to be determine at trial.

## Count XIV
### Abuse of Process Against JCS

256.  The allegations of Paragraphs 1 through 165 are incorporated herein by reference.

257.     JCS abused the process of probation in the City of Montgomery Municipal

Court by using the probation orders granting them authority to supervise probation

to coerce and extort money from Plaintiffs for their its own profit.

258.     JCS intentionally and maliciously used the probation orders in this way, by

harassing and threatening Plaintiffs, failing to give Plaintiffs full information about

their contractual, due process and other rights, and failing to provide them notice

of or access to a process for evaluating or presenting indigency as a basis of waiver

of fees or in a hearing before the court when Plaintiffs were unable to pay.

Wherefore, Plaintiffs request that this Court enter judgment against JCS as follows:

   a.   An award of damages in an amount to be determined at trial;

   b.   Punitive damages in an amount to be determine at trial.


## Count XV
## State Law Claim Against JCS for Money Had and Received


259.     The allegations of Paragraphs 1 through 165 are incorporated herein by

reference.

260.     JCS is liable to Plaintiffs under Alabama state law for Money Had and

Received.

261.     JCS obtained and held money in the form of set-up and monthly probation

fees, that it was not entitled to under Alabama laws governing public contracts or

authorized municipal fees, and which in equity and good conscience belongs to the

Plaintiffs; or

262.     JCS obtained and held money in the form of set-up and monthly probation

fees that it was not entitled to and which was improperly paid to the defendant

because of mistake or other wrongful reasons.

Wherefore, Plaintiffs request that this Court enter judgment against JCS as follows:

    a.   An award of damages in an amount to be determined at trial.

    b.   An award of punitive damages in an amount to be determined at trial.

## Request for Relief

WHEREFORE, Plaintiffs request that this Court enter a judgment including the

following relief:

    a.   Declaratory relief;

    b.   Injunctive relief;

    c.   Compensatory damages;

    d.   Punitive damages;

    e.   Treble damages for RICO violations;

    f.   Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, 18

U.S.C § 1595(a) and 18 U.S.C. 1964(c); and

    g.   Any other relief this Court deems just and proper, including any

injunctive and declarative relief as may be required in the interests of

justice.

Dated: July1, 2015

Respectfully submitted,

_____
FAYA ROSE TOURE

_____
HENRY SANDERS

**OF COUNSEL:**
Chestnut, Sanders & Sanders, LLC
One Union Street
P.O. Box 1290
Selma, Alabama 36702