IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANGELA MCCULLOUGH, MARQUITA )
JOHNSON, KENNY JONES, ALGI )
EDWARDS, LEVON AGEE, ADRIAN )
EDDIE FLOYD, HASSAN CALDWELL, )
DEVRON JAMES, ASHLEY DAWN SCOTT, )
and CHRISTOPHER MOONEY, on behalf of )
themselves, individually, and on behalf of a class )
of all others similarly situated, )
)
        Plaintiffs, )
) CASE NO. 2:15-cv-463-WKW-WC
)    CLASS ACTION COMPLAINT
)    JURY TRIAL DEMANDED
    V. )
)
THE CITY OF MONTGOMERY, ALABAMA; )
ERNEST N. FINLEY, JR., CHIEF OF )
POLICE OF THE CITY OF MONTGOMERY, )
in his individual capacity; )
KEVIN MURPHY, FORMER )
CHIEF OF POLICE OF THE CITY OF )
MONTGOMERY, in his individual capacity; )
LES HAYES, III, PRESIDING JUDGE OF THE )
MUNICIPAL COURT OF THE CITY OF )
MONTGOMERY, in his individual and official )
capacities; JUDICIAL CORRECTION )
SERVICES, INC., a corporation; )
and TODD STRANGE, MAYOR OF THE CITY )
OF MONTGOMERY, in his individual capacity, )
)
        Defendants. )

## PLAINTIFFS' FIRST AMENDED COMPLAINT

**Come Now** Plaintiffs, individually and on behalf of those similarly situated, upon

personal knowledge as to their own acts, and upon information and belief as to all other

matters, by and through their undersigned counsel, and file this First Amended

Complaint, as a matter of course, as follows:

## **INTRODUCTION**

1.        "Punishing a person for his poverty" [1] by arresting and incarcerating

individuals such as Plaintiffs because of their inability to pay court-ordered monies,

including fines, fees, costs, restitution, surcharges or bonds, violates long-established

federal constitutional principles of equal protection and due process as well as other state[2]

and federal laws.

2.        Plaintiffs are individuals who have been subjected to a "judicial [and law

enforcement] extortion racket," including a modern day "debtors' prison,"[3] as part of a

scheme designed to increase municipal budgets by using the City of Montgomery's law

enforcement and courts to generate and collect revenue rather than to protect public safety

and to administer justice.[4] This scheme has been implemented through illegal policies,

---

[1] *Bearden v. Georgia*, 461 U.S. 660, 671 (1983).

[2]  Const. of Ala., Art. I, Sec. 20: "That no person shall be imprisoned for debt."
*See also* Ala. Code § 15-18-62 (fines and costs can be converted into jail time only if a defendant is found to have *willfully* failed to pay the fines or costs) (emphasis added); Rule 26.11(i)(2) of the Alabama Rules of Criminal Procedure ("[i]n no case shall an indigent defendant be incarcerated for inability to pay a fine or court costs or restitution.")

[3] Judge Hub Harrington of the Shelby County Circuit Court found that a similar scheme, operated by the City of Harpersville, Alabama and JCS, could reasonably be characterized as the operation of a "debtors' prison," though these had generally fallen into disfavor by the early 1800's. He lamented that "a judicially sanctioned extortion racket" might be a more apt description of the practices. *Burdette v. Town of Harpersville,* Civil Action No.: CV 2010-900183 (Order of July 11, 2012).

[4] The policies, practices and customs challenged in this case are remarkably similar to those described in the U.S. Department of Justice's recent report on policing and court policies in Ferguson, Missouri.

practices or customs, including but not limited to, unlawful stops, ticketing and arrests;

racial profiling and targeted stops, ticketing and arrests of African Americans;[5]

extortionate imposition and collection of fines, fees, costs, restitution, surcharges and bail

or bond and related charges, including through imprisonment for nonpayment; the use of

threatened and actual probation revocation as a means of collection of these debts; and the

use of coerced jail labor. Through the adoption and implementation of these policies,

practices or customs, Defendants have trapped Plaintiffs in a cycle of debt by preying

upon the City's largely voiceless poor and minority residents to pay the City's bills and

replenish its public coffers.

3.      The extortionate scheme composed of these illegal policies, practices and

customs has been operated by the Defendants City of Montgomery, Mayor Todd Strange,

Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, Presiding

---

Ferguson's law enforcement practices are shaped by the City's focus on revenue rather than by public safety needs. This emphasis on revenue has compromised the institutional character of Ferguson's police department, contributing to a pattern of unconstitutional policing, and has also shaped its municipal court, leading to procedures that raise due process concerns and inflict unnecessary harm on members of the Ferguson community. Further, Ferguson's police and municipal court practices both reflect and exacerbate existing racial bias, including racial stereotypes. Ferguson's own data establish clear racial disparities that adversely impact African Americans. The evidence shows that discriminatory intent is part of the reason for these disparities. Over time, Ferguson's police and municipal court practices have sown deep mistrust between parts of the community and the police department, undermining law enforcement legitimacy among African Americans in particular.

Investigation of the Ferguson Police Department, U.S. Dept. of Justice, Civil Rights Division. March 4, 2015 at 2.

[5] Many of these stops have been made based on allegations of extremely minor infractions, or for specious or fabricated reasons. Following the recent traffic stop shooting death of Samuel DuBose in Cincinnati, the local prosecutor and a top law enforcement official themselves referred to similar stops as "chicken crap" stops or "fishing" stops, respectively.

Municipal Court Judge Les Hayes, III, and Judicial Correction Services, Inc. (hereinafter referred to as "JCS"). Plaintiffs allege that all Defendants have acted under color of state law and as state actors in pursuing a pervasive intentional and deliberate scheme of acts and omissions through systemic and related policies, practices and customs that separately, and taken together, caused injuries to Plaintiffs that violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the Fourth, Sixth, Eighth and Thirteenth Amendments (and related anti-peonage laws), 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq.*, the Racketeer Influenced and Corrupt Organizations Act (RICO), as well as constitute state law violations of false imprisonment (including false arrest), abuse of process, and support a claim for money had and received under Alabama law.

4.      The named Plaintiffs bring this case individually, and as representatives of proposed classes of similarly situated individuals who have been or will be similarly injured by Defendants' policies, practices or customs. Plaintiffs seek compensatory, punitive and treble damages, as well as declaratory and injunctive relief, to redress their personal injuries (including humiliation, anxiety, stress, emotional distress, and other injuries) and the injuries to their real or personal property that they have suffered, or face a real and imminent threat of suffering, as the direct and proximate result of the Defendants' challenged policies, practices or customs.

5.      The City of Montgomery and Presiding Judge Les Hayes, III have entered into settlement agreements with the parties in three prior related cases in this Court challenging some, but not all, aspects of the scheme that Plaintiffs challenge in this case. (Case Nos. 2:13-cv-732-MHT, 2:13-cv-733-MHT, Consolidated, and Case No.  2:14-cv-186-MHT.)

On May 1, 2014, a preliminary injunction was entered in Case No. 2:14-cv-186 based on a finding that plaintiffs there were likely to succeed on the merits.

6.      On November 17, 2014, the parties' joint motion for entry of an agreed settlement order in Consolidated Case Nos. 2:13-cv-732 and 2:13-cv-733 was granted and an opinion and judgment entered that included the following declaration:

> The court declares that, under the current status of the law, the constitutional principles set out in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983), regarding incarceration for non-payment, and <u>Turner v. Rogers</u>, ___ U.S. ___, 131 S.Ct. 2507 (2011), regarding notice, apply in municipal-court proceedings and that, to the extent applicable [6] in a particular case, the judges of the Montgomery Municipal Court are legally required to follow them.[7]

7.      In Case No. 2:14-cv-186, the Defendants City of Montgomery and Presiding Judge Les Hayes, III were parties to a settlement agreement in which they denied any liability but whereby the Judges of the Municipal Court of the City of Montgomery agreed to certain changes in court policies and practices (for periods ranging from 180 days to

---

[6] The Court added a footnote to its opinion clarifying that, "[t]his court reads the "extent applicable" phrase to mean only that municipal judges are bound by these Supreme Court cases whenever an issue before the municipal court implicates them rather than implying exceptions for municipal judges in certain cases."

[7] The judgment also included the following two declarations:

> The court declares that the "Judicial Procedures of the Municipal Court of the City of Montgomery for Indigent Defendants and Nonpayment," submitted as Exhibit A to the joint motion for entry of agreed settlement order (ex. A to doc. no. 56), facially comply with the constitutional principles set out in <u>Bearden,</u> regarding incarceration for non-payment, and <u>Turner,</u> regarding notice.

> The court declares that these "Judicial Procedures of the Municipal Court of the City of Montgomery for Indigent Defendants and Nonpayment" facially comply with the requirements of the Fourteenth and Sixth Amendments to the U.S. Constitution, Article I, §§ 1, 6, and 22 of the Alabama Constitution, and Rule 26.11 of the Alabama Rules of Criminal Procedure.

three years).[8] For example, the Judges agreed "not to hire, contract with, or otherwise use any private probation company (or any other company profiting from offering payment plans relating to unpaid court fines, costs, and restitution) for a period of not less than three years following the execution of this Agreement," (Par. 8.)[9] and " [t]o comply with the provisions set out in the Judicial Procedures ["Judicial Procedures of the Municipal Court of the City of Montgomery for Indigent Defendants and Nonpayment"], attached hereto as Appendix 1, for a period of not less than three years following the execution of this Agreement." (Para. 9).[10]

8.      As part of the settlement in Case No. 2:14-cv-186, the parties stipulated to the dismissal of all class action aspects of that case. The individual plaintiffs in all three of these prior cases have reached agreements with the defendants therein on any personal damage claims.

---

[8] Plaintiffs do not seek injunctive relief, at this time, on their claims that are against policies or practices which the City of Montgomery and Presiding Judge Les Hayes, III agreed to pursuant to settlement agreements in these prior cases.

[9] Defendant City of Montgomery no longer contract with JCS; the contract for probation services terminated or was not renewed in the summer of 2014. Several other cities have also terminated their contracts with JCS. On June 16, 20015, The City of Clanton entered into a settlement agreement on claims that its probation contract with JCS violated state law requiring public bids for contracts and that JCS's fees were unauthorized by state law by ending its JCS contract. Thereafter, on June 17, 2015, the Southern Poverty Law Center sent letters to nearly 100 other cities advising them of the illegality of these contracts with JCS under state and federal law. More than half of these cities have ended their contracts with JCS.

[10] On April 2, 2015, Plaintiffs in Case No. 2:14-cv-186 filed a Notice of Willful Violation of Court Order calling the Court's attention to allegations that one Municipal Judge had assessed summary fines of $50 against numerous individual for arriving late and had jailed at least two who could not immediately pay the $50. On April 7, 2015, the Court entered an order stating that it would not take any further action regarding these allegations, based on the defendants' representations on the record that they had taken corrective action.

9.      None of the Plaintiffs in this lawsuit, or the members of the proposed classes they seek to represent have received any compensation from any of the Defendants' for the injuries they and their families have suffered as a direct and proximate result of the challenged policies, practices or customs of the Defendants. Some had been led to believe that their injuries would be redressed through the class action claims in Case No. 2:14-cv-186 and have been surprised to learn that all class action claims were dismissed as part of the settlement agreement of that case. [11]

10.      Plaintiffs have no desire to add unnecessarily to the number or complexity of the caseload of this Court. But, given the magnitude of the wrongs that Defendants have committed against Plaintiffs, and others similarly situated, the court-entered agreements in these three prior cases, that addressed, without resolving, only a portion of the claims raised in this lawsuit, are insufficient to redress their injuries or afford justice to them. And given the multiple interrelated parts of the scheme Plaintiffs challenge, it is appropriate to include all Defendants and all claims in one lawsuit, not only because the claims arise from the same nucleus of operative facts, but also to enable a jury to see and understand the full picture of the existence and operation of the challenged policies, practices, or customs.

11.      It is important to note that Plaintiffs do not seek to challenge or enjoin any ongoing state court proceedings. They do not ask this Court to usurp any judicial authority of municipal judges to decide individual cases. Similarly, none of the injunctive relief or

---

[11] To the extent relevant for purposes of determining statutes of limitations or for any other relevant purposes, all the named Plaintiffs give notice that in filing this lawsuit they bring their personal claims as individual claims, as well as seek to pursue this case as a class action.

other relief sought would constitute any major continuing intrusion by federal courts into the daily conduct of the municipal police or courts, as demonstrated by recent cases in this and other Courts in which agreements including injunctive relief have been entered with respect to many of the general issues raised in this case, including fixed schedule bail bonds and debtors' prison schemes.

12.      Class action treatment is the only way to bring justice for all those injured by the policies, practices or customs challenged in this lawsuit. Class action certification is intended to "vindicat[e] . . . the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."[12] Without the notice and other procedural protections a class action affords, most of the proposed class members may never even learn of their rights to seek redress for their injuries. Alone, they truly are "without effective strength to bring Defendants into court at all."

13.      Plaintiffs certainly are no less deserving of such treatment than consumers or patients injured by illegal practices or devices, who routinely are allowed to pursue their claims as class actions. There must not be a different system of justice for minority, poor and voiceless individuals.

## Jurisdiction

14.      This lawsuit includes civil rights claims brought under 42 U.S.C. § 1983 for violations of the Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq*.; 18 U.S.C. §§ 1581 (peonage), 1589 (forced labor under threat

---

[12] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 2246 (1997) (citations omitted).

of physical restraint or abuse of process), 1593A (benefitting from peonage) and 1595 (civil remedy); 18 U.S.C. §1964 (RICO); 28 U.S.C. §§ 2201 and 2202; and state law claims of false imprisonment (including false arrest) under Ala. Code § 6-5-170; abuse of process; and for money had and received. They also bring claims for reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, 18 U.S.C § 1595(a) and 18 U.S.C. 1964(c).

15.    This Court has jurisdiction over the federal law claims raised in this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343 and 18 U.S.C §1964. The Court also has supplemental jurisdiction over the state law causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

## Venue

16.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 and 18 U.S. C. §1965.

## Parties

**A. Plaintiffs**

17.    Plaintiff Angela McCullough is a 40 year-old African American woman who is a resident of Montgomery, Alabama.

18.    Plaintiff Marquita Johnson is a 31 year-old African American woman who is a resident of Montgomery, Alabama.

19.    Plaintiff Kenny Jones is a 39 year-old African American man who is a resident of Montgomery, Alabama.

20.    Plaintiff Algi Edwards is a 28 year-old African American man who is a resident of Montgomery, Alabama.

21.      Plaintiff Levon Agee is a 33 year-old African American man who is a resident of Montgomery, Alabama.

22.      Plaintiff Adrian Eddie Floyd is a 46 year-old African American man who is a resident of Montgomery, Alabama.

23.      Plaintiff Hassan Caldwell is a 20 year-old African American man who is a resident of Montgomery, Alabama.

24.      Plaintiff Devron James is a 36 year-old African American man who is a resident of Montgomery, Alabama.

25.      Plaintiff Ashley Dawn Scott is a 26 year-old Caucasian woman who is a resident of Montgomery Alabama.

26.      Plaintiff Christopher Mooney is a 37 year-old African American man who is a resident of Montgomery, Alabama.

### B. Defendants

27.      Defendant The City of Montgomery, Alabama is a municipal corporation that operates the Montgomery Police Department and the Montgomery Municipal Jail.

28.      The City of Montgomery exercises administrative control over many aspects of the operation of the Municipal Court of the City of Montgomery. The City issues extensive regulations that govern the operation and administration of the Municipal Court.[13] In the exercise of its control over administrative operations of the Municipal Court, the City entered into contracts with JCS on behalf of the court.

---

[13] An entire chapter of the Code of Ordinances of the City of Montgomery, Alabama is devoted to the operation of the Municipal Court. Chapter 17 of the Code of Ordinances of Montgomery, Alabama covers:
Sec. 17-1. - Jurisdiction; Sec. 17-2. - Municipal judge generally; Sec. 17-3. - Selection of

29.     The City is responsible for the administrative policies, practices or customs related to the operation of the Municipal Court that are challenged in this case, whether made by Defendant Hayes or any other final policymaker for a particular aspect of the operation of the Municipal Court.

30.     Defendant Todd Strange is Mayor of the City of Montgomery, Alabama and has served as head of the administrative branch of City government since March 10, 2009. He is a final policymaker for the City regarding policies, practices or customs challenged in this lawsuit.  Mayor Todd Strange's executive duties include executing all contracts with the city and he has a duty to "see that all contracts with the city or town are faithfully kept or performed." Ala. Code § 11-43-83. Other of his duties as Mayor include: enforcing all laws and ordinances; appointing and removing all officers and employees of the City; exercising administrative supervision and control over all departments; keeping the Council fully advised of the financial conditions and needs of the City; preparing and submitting annual budgets to the Council; recommending actions to the Council; and

---

judges; Sec. 17-4. - Compensation of municipal judge; Sec. 17-5. - Appointment and duties of clerk; Sec. 17-6. - Appointment and duties of prosecuting attorney; Sec. 17-7. - Time and place of holding court; Sec. 17-8. - Execution of warrants and processes for service; Sec. 17-9. - Cases to be tried without jury; Sec. 17-10. - Judicial notice of ordinances; Sec. 17-11. - When and how prosecutions commenced; Sec. 17-12. - Officers empowered to administer oaths and issue warrants; Sec. 17-13. - When warrant to be issued; Sec. 17-14. - Authority of municipal judge; Sec. 17-15. - Acceptance of defendant's bond; Sec. 17-16. - Suspension of sentence; probation; Sec. 17-17. - Warrants; Sec. 17-18. - Court costs; Sec. 17-19. - Fine schedules. modified; Sec. 17-20. - Powers of mayor; Sec. 17-21. - Prosecutions of corporations; Sec. 17-22. - Appeals.

setting salaries and/or compensations of appointed officers and employees of the City. Mayor Todd Strange is sued in his individual capacity.[14]

31.     Defendant Ernest N. Finley, Jr. is Chief of Police of the City of Montgomery, Alabama, He was appointed by the City and is a final policymaker of the City for the Montgomery Police Department and the Montgomery Municipal Jail concerning policies, practices or customs challenged in this lawsuit. He is sued in his individual capacity.

32.     Defendant Kevin Murphy, is the former Chief of Police of the City of Montgomery and was a final policymaker of the City for the Montgomery Police Department and the Montgomery Municipal Jail concerning policies, practices or customs challenged in this lawsuit. He is sued in his individual capacity for his official acts and omissions during his service as Chief of Police.

33.     Defendant Les Hayes, III is the Presiding Judge of the Municipal Court of the City of Montgomery. Defendant Hayes' judicial functions as a municipal judge are not at issue in this case. As presiding judge, he a final policymaker of the City of Montgomery for the Municipal Court of the City of Montgomery concerning administrative policies, practices or customs challenged in this lawsuit.

34.     Defendant Hayes was designated Presiding Judge by the City Mayor and the City of Montgomery pays his supplemental salary for his administrative duties for the City as Presiding Judge.[15]

---

[14] For purposes of 42 U.S.C. §1983 claims, official capacity claims against the individual municipal defendants as policymakers for the City are claims against the City itself, and redundant. Thus, Plaintiffs' claims against Defendants Strange, Finley, and Murphy, individually, are against them in their individual capacities. However, Plaintiffs do sue Presiding Judge Les Hayes, III in both his individual and official capacities to preserve all claims against him, given Defendant The City of Montgomery's denial of any responsibility for, or control over, his challenged actions.

35.      As Presiding Judge, Defendant Hayes' administrative and executive functions included responsibility for establishing written and unwritten policies and practices for the day-to-day administration of the City of Montgomery's contract with JCS, which was made on behalf of the Municipal Court. In the exercise of these administrative powers and duties for the City, Presiding Judge Hayes adopted a standing order setting certain policies for the Municipal Court for implementation of the City's contracts with JCS. See, "In re: Extension/JCS Placement, General Order No. 2013-0001."

36.      As Presiding Judge of the Montgomery Municipal Court, Judge Hayes also is liable individually for compensatory and punitive damages for his acts or omissions in the performance of his official administrative functions, regardless of whether he is acting as the final policymaker for the City, or acting for some other state governmental entity, at the time of his acts or omissions. Accordingly, Presiding Judge Les Hayes, III is sued in both his individual and official capacities.

37.      Defendant Judicial Correction Services, Inc. is a Delaware for-profit corporation that provided so-called "probation" debt collection services under contract with the City of Montgomery on behalf of the Municipal Court, from at least as early as March 19, 2009 until the summer of 2014. JCS maintained an office in the Municipal Court building and a collection center in another location in the City, and was a person acting under the color of state law and a state actor for purposes of liability under 42 U.S.C. § 1983. Defendant JCS was a final policymaker for the City of Montgomery with

---

[15] Defendant Les Hayes, III demonstrated some of the influence Mayor Todd Strange has over his administrative decisions by responding to and carrying out the Mayor's politically-motivated plans to hold publicized, but ineffective or counterproductive, "Amnesty Days" on the first two Saturdays of June 2013.

regard to the adoption and implementation of its contractual administrative policies, practices, or customs challenged in this lawsuit.

38.     Each above-listed individual Defendant and JCS acted as state actors and under color of state law in undertaking the acts or omissions set forth herein as violations of 42 U.S.C. § 1983 and each was a final policymaker for the City in adopting and implementing their policies, practices or customs, which are fairly attributable to the City of Montgomery, and thus entitle Plaintiffs to compensatory damages against the City of Montgomery under 42 U.S.C. § 1983. Each of these Defendants was a final policymaker for the City with respect to the policies, practices, and customs challenged in this lawsuit, which they adopted or ratified.

39.     Each individual Defendant is also individually liable for their acts or omissions challenged in this case. In their individual capacities, Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, Presiding Judge Les Hayes, III, and JCS have acted with actual malice, or with reckless or deliberate indifference to Plaintiffs' clearly established federal rights in performing their challenged administrative functions, and are not entitled to qualified immunity. Thus, they all are liable, in their individual capacities, for compensatory and punitive damages under 42 U.S.C. § 1983. Each of these Defendants, in their individual capacities, also acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law, in performing discretionary functions, and thus is not entitled to state agent immunity for the state law claims raised in this case.

## FACTUAL BACKGROUND

### A.  GENERAL ALLEGATIONS: POLICIES, PRACTICES OR CUSTOMS

40.     The City of Montgomery and Mayor Todd Strange use monies collected from municipal fines, court costs, and other fees to help finance the City's budget. The City of Montgomery's 2013 year-end budget reflects $15.9 million as the gross income from fines and forfeitures. The 2013 Municipal Court Survey for the City of Montgomery Municipal Court lists 86,161 cases filed under the category of Non-DUI traffic cases ("Other Traffic"), 87,596 such cases disposed of, and only 37 appeals. By comparison, in its 2013 Municipal Court Annual Survey, the City of Huntsville lists 27,889 Non-DUI traffic cases filed, 7251 disposed of, and 1249 appealed. In 2013, the City of Montgomery (2013 estimated Census population of 201,846) raised more than three times as much money as Huntsville (2013 estimated Census population of 186,309) from fines and more than 15 times as much money from local court costs.

41.     Defendants City of Montgomery, Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr., and Former Chief of Police Kevin Murphy, have adopted or ratified and have implemented customs, policies or practices of police stops, ticketing or arrests without reasonable suspicion of any wrongdoing. They have also adopted or ratified and pursued policies, practices, or customs of establishing roadblocks or other checkpoints or of making other stops and arrests in or near areas with high percentages of low-income African American or minority residents, including near predominately African American churches on Sundays, and of otherwise stopping, ticketing or arresting minorities because of their race or ethnicity. Both white and minority police officers have implemented Defendants' racial profiling policy, practice or custom against Plaintiffs. These unlawful and racially motivated stops have been used as a means of ticketing or arresting individuals on traffic tickets or for other minor offenses, or on specious or fabricated

charges, when the real purpose of these stops are made is simply to provide an opportunity for running warrant checks for past due charges stemming from prior similar tickets.

42.     African American Plaintiffs have been racially profiled or targeted because of their race, for stops on charges of minor traffic violations such as, for example, obstructed windshield, failure to wear a seatbelt, improper lights and/or cracked taillight where the real purpose of the stop was to enable police officers to run checks for outstanding warrants or debts. Even when stopped for charges such as running a stop sign, African Americans have been targeted and stopped in instances that would have been overlooked or excused if they were white citizens.

43.     An investigative reporter who, on February 9, 2015, reported on his recent visit to Montgomery Municipal Court, observed that nine out of ten of the approximately 100 defendants in the courtroom awaiting hearings that morning were African American. According to the 2010 U.S. Census, African Americans comprised only 56.6% of the population of the City of Montgomery. David J. Krajicek, "Special Report, Paying the Piper: Montgomery, Alabama's City Court is a Debt-Collecting Machine, The Crime Report," Feb. 9, 2015, www.thecrimereport.org/news/inside-criminal-justice/2015-02-paying-the-piper (visited Aug. 20, 2015).

44.     When individuals are ticketed for more than one traffic violation at the same time, according to policy, practice, or custom adopted by Presiding Judge Les Hayes for the Montgomery Municipal Court, and ratified by Mayor Strange, each ticket is treated as a separate case, with court costs and other fees assessed on each ticket, even though all tickets are handled in a single court proceeding. This policy, practice or custom results in high cumulative debts for fines, fees, court costs and surcharges, sometimes amounting to

thousands of dollars, that indigent individuals are unable to pay. Under the Municipal Court's currently posted fines schedule, uniform court costs of $155 are added to all fines, even those for as little as $10 (e.g., failure to dim lights or improper muffler) or $20 (e.g., expired license or expired tag). For delinquent fines of these amounts, when an alias warrant is issued, the total amounts due rise to $207 and $295 per ticket, respectively.

45.     Failures to appear and/or pay traffic tickets, fines or surcharges result in suspension of driver's licenses in Alabama. Thus individuals often are subjected to repeated ticketing for driving with a suspended license, simply because of their inability to pay prior traffic tickets, or because the Municipal Court fails to send prompt notices to the Alabama Department of Motor Vehicles when these individuals have made an appearance and/or their debts have been paid or satisfied.

46.     Defendants City of Montgomery, Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, and Presiding Judge Les Hayes, III have adopted, ratified and pursued customs, policies or practices of refusing to release those arrested for traffic offenses or misdemeanors who are unable to pay bail under a fixed bail schedule, without making any inquiry into their indigency or ability to pay.

47.      Individuals stopped and arrested have not been informed, either on arrest or at the City Jail or Municipal Court, of their rights to avoid incarceration for their debts to the City or of their rights to indigency hearings, access to counsel, or waivers or reductions of fixed scheduled pre-trial release bonds or appellate bonds.

48.     The City of Montgomery, Mayor Todd Strange, Presiding Judge Les Hayes, III, and Chiefs of Police Ensley and Murphy, as a means of coercing the payment of fines, costs and other debts owed to the City, adopted, ratified and administered policies,

practices or customs of, without meaningful hearings on indigency or adequate consideration of alternatives to imprisonment, and without adequate access to counsel, ordering persons unable to pay in full their debts owed to the City from fines, fees, costs, restitution or surcharges for traffic tickets and other minor offenses (including fines for being late for court appearances) to be incarcerated until they, day-by-day, "sat out" or "paid off" some or all of their debts to the City by earning a $50 credit each day that is applied to their debts. Each separate day in jail was credited as a $50 payment on an individual's debt. The docket entries "Fines or Days" and/or "commuted" were often used to indicate the stark "choice" afforded the indigent debtors.

49.     Pursuant to these policies, practices or customs, the "hearings" held before commuting fines to jail time lasted only a few minutes. Individuals were not even told that indigency was a ground that they could raise in order to try to avoid incarceration. Alternatives to incarceration, such as community service were not considered for these individuals. No reasons were given for commuting their sentences. The only access to counsel provided was a chance, along with numerous others awaiting hearings, to speak briefly with a single Public Defender immediately before the hearings. The Public Defender was not even have been present in the courtroom during some individuals' hearings; instead he was in the nearby jail speaking with numerous other individuals awaiting hearings.

50.     Once jailed, indigent debtors were further faced with a coercive promised reduction of their debts by an additional $25 per day on the condition that they performed onerous and sometimes dangerous janitorial and other work within the jail, the Montgomery Municipal Court, or other city buildings. Record keeping for the time they

worked was poor and inmates did not even receive full credit due them for the jobs they were forced to perform in order to shorten their period of incarceration.

51.      While incarcerated, Plaintiffs were allowed extremely limited visitation time with their families. The Montgomery Municipal Jail allows inmates only one visitor per week and each visit is limited to 15 minutes. Visitation is allowed only on weekends and only during limited time periods; for women, visits are allowed only during a single two-hour period of 3:00-5:00 p.m. on Sundays. Frequently Plaintiffs and others similarly situated were subjected to the loss of jobs, homes or other property, business or customer losses, and/or the pursuit of education. At times, they and their families were forced to borrow or otherwise use money that they needed for vital necessities to pay bonds or debts to avoid detention or imprisonment; they incurred additional debts to family or friends who came to their aid; and they otherwise suffered humiliation, emotional and mental distress, and other injuries.

52.      On March 19, 2009, and again on July 1, 2010, the City of Montgomery, on behalf of the City's Municipal Court, and JCS (a so-called "probation" service company, which actually served as a collection agency for the City) entered into contracts, that were in effect until August 2014, providing that JCS would provide probation services to the City and the Municipal Court. In these JCS-supplied standard form contracts, the City affirms that it is authorized to enter the contract for probation supervision and related services "for the benefit of the City and the Court." Mayor Todd Strange signed the July 1, 2010 contract for the City. The City's prior mayor signed the earlier contract for the City.

53.      In implementing these contracts, the Defendants City of Montgomery, Mayor Todd Strange, Presiding Judge Les Hayes, III and JCS developed, adopted, ratified and administered policies, practices or customs of collecting payments of fines, court costs and other fees through placing individuals under "probation" supervision by JCS for the sole purpose of collecting fines, fees, costs, restitution and surcharges. Individuals placed on "probation" with JCS were required to pay JCS monthly installments on their debts to the City, along with a $10 set-up fee and $40 monthly "probation fees" to JCS. Those unable to pay monthly installments and fees in full were continuously threatened with and/or subjected to probation revocation and incarceration for their debts, where they would be forced to "sit out" and/or "work off" their debts.

54.      JCS failed to notify indigent individuals of their rights to file affidavits of hardship or to seek waivers of JCS fees and failed to advise them that failure to pay because of indigency could be raised in any probation revocation hearing as a grounds to prevent their incarceration for debts. In many instances, individuals were placed on probation with JCS more than once and thus, more than once, JCS threatened to and/or did participate in bringing probation revocation hearings for these individuals knowing they would be ordered to again serve time in the Montgomery City Jail sitting out their debts at the rate of $50 per day, with a further $25 per day reduction for performing jail labor. Sometimes individuals were released from incarceration with some of their debt remaining after the daily reductions for "sitting out" their debts in jail and/or for performing "jail labor." Some individuals were again placed on a payment plan under the supervision of JCS, only to again be threatened with or subjected to probation revocation and reincarceration under these conditions.

55.      Under the terms of the City's contracts with JCS, the parties agreed that JCS would supervise indigent cases and they further agreed that, "[t]hese cases will not be charged the standard probation fee, but will be offered all JCS services."

56.      The agreements also required that JCS "shall comply with all provisions of state and federal law." Both the March 19, 2009 contract and the July 1, 2010 contract are illegal under Alabama law governing public bidding for exclusive public contracts (Ala. Const., Art. I, Sec. 22; Ala. Code § 41-16-50) and illegal because they require monthly probation fees not authorized by Alabama law.

57.      Under these contracts, JCS agreed not to invoice the City or the Municipal Court for its services and, in consideration of the probation services provided by JCS, the Municipal Court agreed that:

  [E]ach Court Order shall provide for the following:

  1.  Probation fee of $40.00  per month flat fee.(Basic or intensive supervision)

  2.  One time probationer set-up fee of $10.00. . . .

58.      The "Order of Probation" forms used to place individuals on JCS probation were signed by municipal judges but left to be filled in by JCS employees.

59.      Individuals placed on probation under the supervision of JCS were required to sign a form bearing what had the appearance of an official governmental seal containing the words Judicial Correction Services, Inc., underneath which appeared the following headings, respectively: "Judicial Correction Services, Inc.; Municipal Court of Montgomery, AL; General Conditions of Probation." In signing this form, probationers were required to recognize having been "granted the privilege" of serving on probation, and were further required to agree to pay the $10 set-up fee, the $40 monthly probation

fee and a minimum total monthly payment of $140 per month. They also had to agree that they "understand that there are NO excuses for missing my scheduled appointment." The form also required "probationers" to sign acknowledgments stating: "I understand that if I fail to meet my monthly obligation as I have agreed to above, I may have to meet with my probation officer more than once a month. I further understand that if I fail to abide by these conditions of probation that I may be returned before the court for a hearing or a warrant may be issued for my arrest." At no place on this form were probationers told of any of their rights under state or federal law to indigency hearings or of their right to counsel at such hearings, and they were not informed that JCS was prohibited by contract from charging its probation fees to indigent probationers.

60.    JCS employees were referred to as "Probation Officers" by both JCS and Municipal Court personnel and they wore badges similar to those worn by governmental officials. They routinely signed Municipal Court "Notice to Show Cause" forms that instruct probationers to appear in court for failure to pay and notify them that a warrant will be issued for their arrest if they fail to appear. The JCS-issued Notice to Show Cause also informs probationers that they have failed to report and that in order to dismiss the court date they not only must report to their next scheduled appointment, but also must pay a certain amount to JCS (e.g., $1417 in one instance) to rescind the scheduled hearing. The Certificate of Service on the Notice to Show Cause Form indicates that the forms were sent to the probationers by regular U.S. mail.

61.    The actions of the City of Montgomery, Mayor Todd Strange, Presiding Judge Le Hayes, III and JCS were inextricable interwoven; they were joint participants in the adoption, ratification and administration of the JCS contracts; and the City delegated to

JCS the important public functions of municipal debt collection and of initiating court proceedings leading to imprisonment for debts as part of this collection process.

62.     The conduct of City Mayors, including Mayor Todd Strange, as the City's final policymaker in entering into the above-described contracts, was a moving force behind the illegal probation payments and conditions, probation revocations, and/or incarcerations in Plaintiffs' cases. The acts of Presiding Judge Les Hayes, III as the final decision maker in adopting and administering the policies of the contract as policies of the Municipal Court can be fairly attributed to the City.

63.     Defendants City of Montgomery, Mayor Todd Strange, Presiding Judge Les Hayes, III and JCS adopted, ratified, administered and implemented policies, practices, or customs of systemically and repeatedly failing to advise Plaintiffs of any of their constitutional, federal or state law, or contractual rights, including their rights not to be charged the monthly pobation fee to JCS, to file affidavits of hardship, to seek waivers or reductions of bail, bonds or fees, not to be imprisoned for inability to pay bail, bonds or debt, to receive meaningful pre-privation indigency hearings, and to be afforded representation by counsel.

64.     The City of Montgomery has admitted elsewhere that hundreds of Montgomery residents have been jailed for non-payment of fees. Indeed the figure likely reaches into the thousands. The Defendants' policies, practices, and customs challenged here have created a climate of fear and distrust of law enforcement and courts among Montgomery's indigent population and among residents of its predominately minority neighborhoods.

65.     Defendants City of Montgomery, Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, Presiding Judge Les Hayes, III and JCS have been deliberately indifferent to the obvious need to supervise or train police, jail employees, judges and other court employees and JCS employees with respect to individuals' constitutional and statutory rights, including the rights of those subject to police stops, ticketing or arrests and of those unable to pay probation fees, fines, fees, costs, surcharges, restitution, bail or bonds. They failed to adopt policies to protect Plaintiffs' rights or to adopt policies requiring adequate supervision or training, and they failed to provide such training. These policies of failure to supervise or train, which are fairly attributable to the City of Montgomery, caused deprivations of Plaintiffs' rights by police, jail employees, judges and other court employees and JCS employees under 42 U.S.C. §1983.

66.     The training manual that JCS gives to its employees contains sample copies of Montgomery Municipal Court Orders, but includes no training on the federal or state law relating to the rights of the individuals assigned to them.

67.     The training policies, practices or customs of the Montgomery Municipal Court do not include specific courses or other trainings on the federal or state law rights of indigent debtors.

**68.**     The Defendants City of Montgomery and Presiding Judge Les Hayes, III, without admitting any liability, entered into a court-approved settlement agreement in Case No. 2:14-cv-186-MHT, in which they agreed to temporary changes in certain of the above challenged policies, practices, or customs, and these new policies have been declared facially constitutional. But even if these temporary policy changes are fully

implemented, they will have no effect on Plaintiffs' claims for declaratory relief as to some other of the challenged policies, practices, or customs, and no effect on any of their claims for damages on all claims.

### INDIVIDUAL PLAINTIFF EXPERIENCES

### Plaintiff Angela McCullough

69.     Plaintiff Angela McCullough is a 40 year-old indigent African American woman who is the mother of four children: an 8 year-old son, a 13 year-old daughter, a 24 year-old son, and a 26 year-old son who is Psycho Schizophrenic.

70.     On or about July 3, 2013, Plaintiff McCullough was stopped by Officer Joseph A. Ioimo on charges of failure to have turned on her car headlights lights and/or having a cracked taillight, as she was leaving her class at Faulkner University before dark. She was ticketed and arrested on warrants for unpaid fines and taken to the Montgomery City Jail where she was held because she could not pay the bail schedule amount of approximately $2,500 for her release. When she appeared before Presiding Judge Les Hayes, III, she was initially told she would have to spend more than 100 days in jail to pay off the fines and costs that the city claimed she owed; the number of days that subsequently appeared on her papers was less, but still was approximately 85 days. She served approximately 19 days before being released. She was released after she used money intended for her education to pay her remaining debt of approximately $1350.

71.     At the time of her arrest, Plaintiff McCullough was a student at Faulkner University with a 3.87 GPA and had a part-time job at Home Inn & Suites. Because of her arrest and imprisonment, she lost her job and was forced to quit college. She has not been able to go back to college.

72.	While in jail, Plaintiff McCullough was forced to perform jail labor in order to help work off her unpaid tickets fines and court costs sooner. While incarcerated she was made to stand watch over a white female inmate who was known to have Hepatitis C. Plaintiff McCullough was sent to the "drunk tank" where the white female with Hepatitis C had slit her wrist with what appeared to be a rose crack pipe.  Plaintiff McCullough was made to watch the white female inmate on "suicide watch" for about 2 hours, in which the inmate again slit her other wrist. Plaintiff McCullough was then made to clean up the blood after the guards threw Clorox or bleach on the floor. She has also been made to clean feces in cells as part of the jail labor performed during her incarceration.

73.	Plaintiff McCullough's mentally disabled son was very agitated while he was institutionalized during her incarceration because he could not speak to her nor see her as he regularly did.

74.	 On or about November 27, 2009, Plaintiff McCulloch was arrested because she could not make the required payments and probation fees to Judicial Correction Services for debts the City of Montgomery claimed she owed from traffic ticket fines and costs. JCS told Plaintiff McCullough that she had to either pay the tickets or go to jail. Plaintiff McCullough could not pay and was locked up for 66 days. She was forced to perform jail work in order to be released sooner. The jail labor included working in the laundry during her incarceration. She was released on or about February 2, 2010, after paying around $2,200 to eliminate her remaining debt.

75.	During all the events described above, at no time was Plaintiff Angela McCullough ever informed by the City, any city official or employee or JCS or any employee of JCS of any of her rights under the 4th, 6th, 8th 13th, and 14th Amendments,

including her rights not to be jailed for inability to pay debts and rights to meaningful access to counsel and meaningful pre-deprivation hearings. At no time during the events described above was Plaintiff McCullough advised about her appeal rights or that appellate bond could be lowered or waived based on inability to pay.

76.     After her release, Plaintiff McCullough had to personally contact the Department of Public Safety to tell them that her tickets had been paid. The Municipal Court's failure to do so, or do so in a timely manner, means that paid tickets remain on the records and people like her cannot get their driver's licenses reinstated and thus can be arrested again on the same tickets, even when they show receipts for payment.

77.     Plaintiff McCullough has continued to be stopped by Montgomery Police. Within the past nine months, she has been stopped three times, by a different officer each time, on charges that her tag had expired. On or about February 17, 2015, she was stopped by Montgomery City Police Officer J.R. Jones on expired tag charges. These recent repeated stops demonstrate the real and imminent threat and substantial risk of future injury to Plaintiff McCullough caused by the Defendants City of Montgomery, Mayor Todd Strange, former Police Chiefs Murphy and Police Chief Finley's policies, practices or customs of racial profiling and racially targeted stops. They also demonstrate that the injuries caused her by these policies, practices or customs are capable of repetition yet may evade review if not addressed in this lawsuit.

**Plaintiff Marquita Johnson**

78.     Plaintiff Marquita Shauron Johnson is a 31 year-old indigent, homeless African American woman and a mother of four children: an 11 year-old girl, a 5 year-old

girl, a 4 year-old girl, and a 1 year-old boy. One of her children has a speech impediment and another has been diagnosed with ADHD.

**79.**     On or about April 24, 2012, Plaintiff Johnson was arrested for a Probation Revocation hearing. She had been on probation under the supervision of JCS and her probation revocation was for failure to pay JCS weekly payments and probation fees on ticket fines and costs the City of Montgomery claimed she owed. Plaintiff Johnson had lost her job, which caused her to be unable to pay JCS.

**80.**     At the probation revocation hearing Judge Les Hayes, III did not make any inquiry into Plaintiff Johnson's indigency or ability to pay or into any alternatives to imprisonment and did not appoint an attorney to represent or assist her at the hearing. Judge Hayes ordered Plaintiff Johnson to serve 494 in jail or pay $12,410, and she was taken back to jail to begin serving her time.

**81.**     Prior to her jailing by Judge Les Hayes, III, Judge Knight had thrown out all of Plaintiff's No Insurance tickets because she had brought proof of insurance. Judge Hayes placed the No Insurance charges back on Plaintiff Johnson's record.

**82.**     Judge Les Hayes, III said Plaintiff Johnson could be released on making a $5000 cash payment and this notation was entered on her docket records. Plaintiff Johnson's family hired an attorney and brought the money within a week's time to Judge Hayes in court. Judge Hayes refused to accept the $5000 payment and he told the family that he did not want to see them or Plaintiff Marquita Johnson.

**83.**     Plaintiff Johnson remained in the Montgomery Municipal Jail for approximately 9 months. She was released from jail on or about January 28, 2013.

**84.** Plaintiff Johnson was informed of and forced to accept alternative ways to perform jail labor in order to "work off" her debt sooner. Plaintiff performed the following "jobs" to "work off" debt while incarnated: washed police cars; worked in jail laundry; cooked in the kitchen; swept jail; washed lockers; and cleaned courtrooms. Plaintiff Johnson's work was not recorded daily by the jailer, which extended her time in jail.

**85.** Plaintiff Johnson was diagnosed as being "Depressed" while in the City Jail and given the medication Paxil but no other treatment. She had never suffered from Depression prior to her lengthy incarceration.

**86.** Prior to her jailing, Plaintiff Johnson had a car and a home, which she lost because of her imprisonment.  Since her release she has been homeless and has not been able to find a job. Plaintiff Johnson has had a fourth child, a son, since her January 28, 2013 release. She receives Supplemental Nutrition Assistance Program (SNAP) benefits.

**87.** On or about November 4, 2013, Plaintiff Johnson was arrested on other charges and was about to try to post bail under a fixed-sum bail schedule when she was told that she had warrants for prior unpaid ticket fines and costs. Plaintiff Johnson noticed that the tickets were the same tickets on which she had earlier served time and should have been cleared. She showed her release order for the time served but she was jailed for four days for failure to pay.

**88.** During all of the events described above, at no time was Plaintiff Marquita Shauron Johnson ever informed by the City, any city official or employee or JCS or any employee of JCS of any of her rights under the 4th, 6th, 8th, 13th, 14th Amendments, including rights not to be jailed for inability to pay debts and rights to meaningful access to counsel and meaningful pre-deprivation hearings.

**Plaintiff Kenny Jones**

89.      Plaintiff Kenny Jones is a 30 year-old indigent African American male who is a resident of Montgomery, Alabama. He has reading difficulties.

90.      On or about May 6, 2013, Plaintiff Kenny Jones was stopped by Officer Blake Brauer and ticketed on charges of not having auto insurance and failure to display vehicle registration. An alias warrant was issued for Plaintiff on or about May 3, 2013. Plaintiff arrested and was released from jail on or about May 10, 2013.   During the time of this arrest and incarceration Plaintiff was receiving a disability check.

91.      On or about February 11, 2011, Plaintiff Jones was arrested on a warrant for unpaid traffic ticket fines and costs after he was stopped on a charge of running a stop sign on 5th Street in Montgomery, Alabama.  He was released from jail on or about June 19, 2011. Plaintiff Jones was held in jail for over 4 months. At the time the amount the City claimed he owed for unpaid traffic ticket fines and costs was approximately $700.

92.       During the time of this arrest and incarceration, Plaintiff Jones was receiving a disability check. Plaintiff Jones was never asked about his indigency or ability to pay. Plaintiff Jones was told he would be jailed or placed on fine and fees only probation if did he did not immediately pay in full.

93.      Plaintiff Jones was placed on a "probation" payment plan under the supervision of JCS. His probation was revoked because he was unable to make scheduled payments and fees. His sentence was "commuted" and he was incarcerated to "sit out" his debt at a rate of $50 per day.

94.       During his incarceration Plaintiff Jones was forced to performed menial labor that consisted of road squad cleanup in order to further reduce his debt by $25 per day.

While in jail he worked for the road squad picking up trash on the side of the road from 8 in the morning until 1:00 in the afternoon, five days a week.

95.     Plaintiff Jones was never informed of any right to have the costs associated with pursuing an appeal waived or reduced based on indigency. During all the events described above, at no time was Plaintiff Jones was ever informed by the City, any city official or employee or JCS or any employee of JCS of any of his rights under the 4th, 6th, 8th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to meaningful access to counsel and meaningful pre-deprivation hearings.

**Plaintiff Algi Edwards**

96.     Plaintiff Algi Edwards, Jr. is an indigent 28 years-old African American male who is a resident of Montgomery, Alabama. He is the father of two children ages 6 and 7. He has completed 3 years of college.

97.     On or about November 20, 2012, Plaintiff Edwards was stopped by Officer A.S Wright in Montgomery, Alabama on charges of having an expired tag and was ticketed on this charge and on charges of driving while his license was suspended. An alias warrant was executed on Plaintiff Edwards at his home related to earlier charges of running a stop sign.

98.     The total amount the City claimed that Plaintiff Edwards owed for traffic ticket fines and costs was $3500 and his fixed schedule bond was $1000.

99.     Plaintiff Edwards was jailed without being asked about his indigency or ability to pay. While jailed, he was forced to performed labor in jail for 75 days in order to reduce his debt and thus time in jail by an additional  $25 per day. He performed the following jail labor duties: cleaned the jail cells and picked up trash.

100.    During the time Plaintiff was incarcerated he lost his job and fell behind on child support payments.

101.    Plaintiff Edwards, was never informed of any right to have the costs associated with pursuing an appeal waived or reduced based on indigency.

102.    On or about April 30, 2013, Plaintiff Edwards was ordered to pay $150 a month starting on June 1. On or about July 22, 2014, Plaintiff Edwards was ordered to pay $175 and another $175 by the 18th of each month. He made a payment of $118 that day and a payment of $262 on or about September 4, 2014, when his case was closed.

103.    Plaintiff Edwards has continued to be stopped by Montgomery Police. He was stopped on or about March 19, 2015, by Montgomery Police Officer B. J. Truss and ticketed on charges of failure to register vehicle. He pled not guilty and this case was dismissed by Judge Les Hayes, III on July 16, 2015. His recent stop and ticketing demonstrate the real and imminent threat and substantial risk of future injury to Plaintiff Edwards caused by the Defendants City of Montgomery, Mayor Todd Strange, former Police Chief Murphy and Police Chief Finley's policies, practices or customs of racial profiling and racially targeted stops. They also demonstrate that the injuries caused him by these policies, practices or customs are capable of repetition yet may evade review if not addressed in this lawsuit.

104.    During all the events described above, at no time was Plaintiff Algi Edwards ever informed by the City, any city official or employee or JCS or any employee of JCS of any of his rights under the 4th, 6th, 8th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to meaningful access to counsel and meaningful pre-deprivation hearings.

**Plaintiff Levon Agee**

105.     Plaintiff Levon Agee is an indigent 33 year-old African American male who is a resident of Montgomery, Alabama. He has two children that are ages 7 and 12. The 11th grade is the highest level of education he has completed.   Plaintiff Agee is currently unemployed.

106.     A warrant was served on or about June 13, 2013, for Levon Agee on debts the City claimed he owed on numerous unpaid traffic ticket fines and costs on charges including obstructed windshield, no driver license, and failure to wear a seat belt. He was ordered to serve time in jail to "sit out" this debt on or about June 14, 2013. A docket entry for that date states: "Fines or Days"

107.     He was in jail for approximately 28 days with no bond and released on or about July 12, 2013. While in jail Plaintiff Agee was ordered to clean the bathrooms in the jail in order to reduce his debt and thus time served by $25 per day.

108.     Plaintiff Agee has continued to be stopped by Montgomery Police. On or about July 7, 2014, Plaintiff Levon Agee was arrested by Montgomery Police Officer N. M. Faggert on charges of having an expired tag and then ticketed and jailed on this charge and charges of not having a driver's license. His recent stop, ticketing and arrest demonstrate the real and imminent threat and substantial risk of future injury to Plaintiff Agee caused by the Defendants City of Montgomery, Mayor Todd Strange, former Police Chief Murphy and Police Chief Finley's policies, practices or customs of racial profiling and racially targeted stops. They also demonstrate that the injuries caused him by these policies, practices or customs are capable of repetition yet may evade review if not addressed in this lawsuit.

109.     Plaintiff Agee was never asked about indigency or ability to pay. Plaintiff was told he would be jailed if did not immediately pay in full and was placed on probation payment plan.

110.     During all the events described above, at no time was Plaintiff, Levon Agee ever informed by the City, any city official or employee or JCS or any employee of JCS of any of his rights under the 4th, 6th, 8th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to meaningful access to counsel and meaningful pre-deprivation hearings. Plaintiff, Levon Agee, was never informed of any right to have the costs associated with pursuing an appeal waived or reduced based on indigency.

**Plaintiff Adrian Eddie Floyd**

111.   Plaintiff Adrian Floyd is a 46 year-old indigent African American male and father of three children: a 22 year-old male, 16 year-old male, and a 12 year-old male.  He is a resident of Montgomery, Alabama and has resided at the same address for 21 years. He resides with his elderly mother and serves as her primary caregiver.  His children do not reside at this address. Plaintiff Floyd was unemployed at the time of his arrest.

112.     On or about July 3, 2013, Plaintiff Floyd was stopped and arrested by Montgomery Police Officer Anderson, a white male, after coming out of the Wells Fargo Bank located at 210 Waters Street in downtown Montgomery, Alabama.   Plaintiff Floyd was walking to his car when the police officer drove by and told him to "come here".

113.     Officer Anderson said that Plaintiff Floyd fit the description of someone who allegedly had attempted to rob the Wells Fargo Bank on Madison Ave, Montgomery,

Alabama less than a mile away. Plaintiff Floyd never heard anything further about such a robbery having taken place.

114.    Plaintiff Floyd asked to show the officer his bank receipt but the officer said he did not want to see it.

115.    The officer proceeded to go through Plaintiff Floyd's pockets without asking permission or obtaining consent.

116.    Plaintiff Floyd stayed in handcuffs approximately 45 minutes and then was told that 17-18 warrants for his arrest were out.

117.    Plaintiff Floyd was arrested on numerous outstanding warrants based on debts the City claimed he owed from traffic ticket fines and costs issued in years 2006, 2007, 2008, and 2009. This was his second arrest for these tickets.

118.    The officers took Plaintiff Floyd to jail where he stayed 10-12 hours in a holding cell.

119.    Plaintiff Floyd was not asked about his indigency or ability to pay the fixed schedule bond.  Plaintiff Floyd was told that if he didn't get bailed out that he would be there until he saw a judge.

120.    Plaintiff Floyd was bailed out on a fixed bail schedule amount of $2067 on a professional bond and fees that were in the approximate total amount of between $3100-$3200.

121.    Plaintiff Floyd was released on or about July 4, 2013, with a court date of July 26, 2013.

122.     Plaintiff Floyd went to the City of Montgomery Police Department's Internal Affairs Office a few weeks before his court date.  Plaintiff Floyd felt that he needed to

report the arresting officer for illegal search and seizure of his personal effects, but the Internal Affairs officer would not look at the bank receipt to check date and time that he was there to make clear he was not the alleged "look alike" attempted bank robber.

123.   Plaintiff Floyd also wanted Internal Affairs to know he was humiliated, disrespected, embarrassed, and wanted to be exonerated.

124.   Corporal Dailey of Internal Affairs took report and told Plaintiff Floyd that he would get back to him in 3 days.  Plaintiff Floyd never heard from Corp. Dailey again. Plaintiff Floyd went back to Internal Affairs twice to no avail.

125.   Plaintiff Floyd went to court on or about July 26, 2013, and was released because his ticket fines and costs were ordered to be paid from the bond he had been required to post, all without inquiry into his indigency or ability to pay.

126.   During all the events described above, at no time was Plaintiff Floyd ever informed by the City, any Municipal Court official or employee of any of his rights under the 4th, 6th, 8th, 13th, and 14th Amendments, including rights not to be jailed for inability to pay bonds or debts and rights to meaningful access to counsel and meaningful pre-deprivation hearings.

**Plaintiff Hassan Caldwell**

127.   Plaintiff Hassan Caldwell is an indigent 20 year-old African American male who is a resident of Montgomery, Alabama. The highest level of education that he has completed is the 12th grade. At the time of his arrests Plaintiff Caldwell was unemployed.

128.   On or about February 3, 2014, Plaintiff Caldwell was stopped by Officer Sherman Randall Smith on charges of running a stop sign on 5th Street in Montgomery,

Alabama, and he was arrested on this charge, as well as  on a warrant for prior unpaid traffic ticket fines and costs.

129.       Plaintiff's fine for this offense was $373.00 and he bonded out of jail on a fixed schedule bond, without inquiry into his indigency or ability to pay. Plaintiff Caldwell was not asked about indigency or ability to pay but was placed on "probation" payment plan under the supervision of JCS.

130.       On or about September 28, 2014, Plaintiff was stopped by Montgomery Police Officer G. J. Marshall on Anne Street on charges of having improper lights, and then he was also ticketed on charges of driving while his license was suspended and arrested. Plaintiff's total fine and costs on the improper lights charge was $230.00. An alias warrant was issued on him on September 28, 2014.

131.       Plaintiff was in jail for 2 days and the total amount that the City claimed he owed on fines and costs for unpaid tickets was $2,287.00.

132.       Plaintiff Caldwell's bond was $1500 and he posted this fixed schedule bond to get out of jail. He was not asked about his indigency or ability to pay the bond. He was told that his total debt for fines and costs for unpaid tickets was $2,287.00.  At the time of the arrest he had no income.

133.       Plaintiff Caldwell told the judge of his indigent financial circumstances. Plaintiff Caldwell was not told of his right not to be incarcerated for inability to pay his debt; instead he was told if he paid half of the $2,287.00 the case would be thrown out. When he managed to pay half of the $2,287.00, he then was told to pay the other half.

134.        Plaintiff Caldwell was never informed of any right to have the costs associated with pursuing an appeal waived based on indigency. During all the events

described above, at no time was Plaintiff Caldwell ever informed by the City, any city official or employee or JCS or any employee of JCS of any of his rights under the 4th, 6th, 8th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to counsel and pre-deprivation hearings.

135.     Plaintiff Caldwell has continued to be stopped by Montgomery Police. On or about February 21, 2015, Plaintiff Caldwell was stopped and ticketed by Montgomery Police Officer Robert Joseph on charges of driving without a license on Fairground Road in Montgomery. He was fined $230 for this offense. His recent stop and ticketing demonstrate the real and imminent threat and substantial risk of future injury to Plaintiff Caldwell caused by the Defendants City of Montgomery, Mayor Todd Strange, former Police Chief Murphy and Police Chief Finley's policies, practices or customs of racial profiling and racially targeted stops. They also demonstrate that the injuries caused him by these policies, practices or customs are capable of repetition yet may evade review if not addressed in this lawsuit.

**Plaintiff Devron James**

136.      Plaintiff Devron James is a 36 year-old African American man who is a homeless citizen of Montgomery, Alabama.  He is the father of three children ages 7, 10 and 16. He is now unemployed after being laid off his prior job several months ago.

137.     On or about March 10, 2013, Plaintiff Jones was pulled over by Montgomery City Police in the Ridgecrest area of Montgomery, a predominately African American area, on charges of failure to wear a seatbelt. The officer then ran his name to check for warrants and arrested him on warrants based on June 2009 traffic tickets. He was taken to jail and held overnight because he could not pay for release under the fixed bail schedule.

He was taken before Judge Les Hayes, III the following day. Plaintiff James told the arresting officer and Judge Hayes that he had a receipt showing that he had paid his June 2009 fines and costs. He was told that his payment was not listed in the computer.

138.     On or about March 11, 2013, Plaintiff James was sentenced to jail with a docket entry of "Fines or Days." At the time he was homeless and living on the streets. He was released on or about March 27, 2013. He lost his job because of this incarceration.

139.     Plaintiff James was not provided any meaningful inquiry into his indigency or ability to pay, he was not offered or advised of any alternatives to paying in full or going to jail, and he was not advised of his right not to be incarcerated for inability to pay debts or of his rights to meaningful access to counsel, meaningful pre-deprivation hearings or to waiver or reduction of appellate bond.

**Plaintiff Ashley Dawn Scott**

140.     Plaintiff Ashley Dawn Scott is a 26 year-old indigent Caucasian woman who is a resident of Montgomery Alabama. She is the mother of a 3 year-old girl. At the time of her arrest Ashley Dawn Scott was unemployed.

141.     On or about June 19, 2015, around 3:00 in the afternoon, Plaintiff Ashley Dawn Scott was arrested outside of her residence. Plaintiff Scott had heard an argument outside her residence and she had proceeded to walk outside. Once Plaintiff Scott walked outside, an officer on the scene asked to see her license, without any probable cause or reasonable suspicion.

142.     The officer ran her license and it was brought to the officer's attention that Plaintiff Scott had an outstanding warrant from 2012. On or about January 31, 2012, Plaintiff Scott was pulled over by Officer Shelia Ruth Shaffer on charges of having a

cracked taillight. The officer discovered that Plaintiff Scott's driver license had been suspended. She was then charged with driving while her license was suspended. Plaintiff Scott's fine for the January 31, 2012 offense was $373.  Plaintiff Scott was given a court date for the January 31, 2012 offense, but missed the court date because she went into labor the same day she was scheduled to be in court. The City of Montgomery then issued a warrant for her arrest.

143.     Plaintiff was arrested on the 2012 charges on June 19, 2015, on an outstanding warrant for failure to pay. Her bond was set at $1000 pursuant to a fixed-schedule and she had to spend one night in jail until she was able to come up with money to post the bond, which was set without inquiry into her indigency or ability to pay.

144.     During all the events described above, at no time was Plaintiff Ashley Dawn Scott ever told by the City, any city official or employee of any of her federal constitutional rights, including rights not to be jailed for inability to pay for release under a fixed bail schedule or rights to consideration of her indigency in setting her bond.

**Plaintiff Christopher Mooney**

145.     Plaintiff Christopher Mooney is an indigent African American male and a father of a 6 year-old daughter, a 17 year-old son, a 19 year-old son, and a 20 year-old son.  All of his children live with him except the 19 year-old son.

146.     On or about May 8, 2013, Plaintiff Mooney was stopped and ticketed by Montgomery Police Officer Devin R. Drummond and then was arrested on a warrant for unpaid ticket fines and costs. Plaintiff was a self-employed plumber at the time of his arrest.

147.     Plaintiff was not asked about his indigency or ability to pay. Plaintiff was told by Judge Les Hayes, III to either do time or pay in full all of the fines and costs.

148.     Plaintiff offered Judge Les Hayes approximately $700 and was told he still would have to do time.  Plaintiff sent money home with his fiancé to pay bills and take care of his children while he was in jail.

149.     Plaintiff Christopher Mooney was held in jail for inability to pay for about 2 months.

150.     Plaintiff was forced to perform jail work in order to exchange it for time so that he could be released earlier. Plaintiff washed MPD cars, cut grass, and pruned bushes around the Montgomery Police Department as part of his jail labor.

151.     Plaintiff was released with the notation "early release-jail work list" on or about June 7, 2013.

152.     Plaintiff suffered injuries to his business and lost clients and potential clients while being jailed for the unpaid ticket fines and costs the City claimed he owed.

153.     Plaintiff witnessed an inmate found dead in a cell and witnessed other deplorable conditions which still affect him.

154.     During all the events described above, at no time was Plaintiff Christopher Mooney ever informed by the City, any city official or employee of any of his rights under the 4th, 6th, 8th, 13th and 14th Amendments, including rights not to be jailed for inability to pay debts and rights to meaningful access to counsel and meaningful pre-deprivation hearings.

**Joint Allegation**

155.     Based on their own personal experiences, including numerous traffic stops in earlier years, and on the above factual allegations of the other Plaintiffs, the nine African American Plaintiffs (Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Floyd, Caldwell, James, and Mooney) believe that but for their race they would not have been subjected to stops, ticketings, arrests, and warrants on prior debts as described above.

## C. RICO-SPECIFIC ALLEGATIONS

156.     <u>Culpable Person.</u> Defendant JCS is a "person" subject to civil liability under RICO. Defendant JCS is a corporate entity that is "capable of holding a legal or beneficial interest in property."

157.     <u>Enterprise.</u>  Defendant JCS, together with the City of Montgomery, Mayor Todd Strange and Presiding Judge Les Hayes, III, constituted a RICO association-in-fact "enterprise." Among other purposes, this enterprise had the common purpose of maximizing the collection of court fines, costs and fees, surcharges and the collection of "probation" fees paid to JCS, without meaningful consideration of the individuals' ability to pay by threatening or initiating revocation of probation and illegal incarceration for debt with earlier release conditioned on performing janitorial labor, without advising indigent individuals of their constitutional, statutory and contractual rights not to be jailed for their debts, to be provided with pre-deprivation hearings, and to be represented by counsel at probation revocation hearings.

158.     <u>Interstate or Foreign Commerce.</u> The activities of the enterprise and the predicate acts of racketeering affect interstate commerce. Defendant JCS, is a corporate entity based outside Alabama that operated, conducted and managed the alleged extortionate activities in Montgomery, Alabama. Defendant JCS travelled in interstate commerce and used the

mail and other facilities of interstate commerce in pursuit of its pattern of racketeering, and the proceeds obtained from the enterprise were used in interstate commerce.

159.   Pattern of Racketeering. Defendant JCS, individually and in conspiracy with the City of Montgomery, Mayor Strange and Presiding Judge Hayes, engaged in a pattern of racketeering under Section 1961(5)'s definition of "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity." For several years prior to the City of Montgomery's summer 2014 termination or non-renewal of its contract, Defendant JCS engaged on a daily basis in a closed-ended related and continuous "pattern of racketeering" by conducting and participating in the enterprise. These related acts had the same or similar purposes, results, participants, victims, and methods of commission and were not isolated events.

160.   Racketeering Activity. Defendant JCS committed multiple related predicate acts of extortion, using illegal means of threats of imprisonment and forced labor, and for the illegal purpose of collection of fees to which it had no lawful claim because of Plaintiffs' indigency or inability to pay and their contractual entitlement to waiver of fees, or because its contracts were unlawful under Alabama law, or inherently wrongful, pursuant to and in furtherance of this pattern of racketeering, including the following:

    a.   Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (relating to interference with commerce, robbery or extortion);

    b.   Extortion in violation of 18 U.S.C. § 1952 (relating to racketeering; interstate and foreign travel or transportation in aid of racketeering enterprises;

    c.   Violations of 18 U.S.C. § 1581 (peonage)

43

d.  Violations of 18 U.S.C. § 1589(b) (forced labor under threat of physical restraint or abuse of process); and

e.  Extortion in violation of Ala. Code §13A-8-13.

161.  <u>Injury.</u> The Plaintiffs are  (1) persons (2) who have sustained injury (3) to their real or personal property (4) "by reason of" defendant's violation of § 1962(c) and (d). The economic harm to their real or personal property, including loss of employment or employment opportunities, loss of business or clients, loss of educational investments or opportunities, or loss of cars, homes, or other real or personal property, that Plaintiffs have suffered by reason of, or as a direct and proximate result of, Defendant JCS's violations of § 1962(c) and (d) are redressable by treble damages under RICO.

## CLASS ACTION ALLEGATIONS

Plaintiffs seek certification of this case as a class action under Rule 23(b)(2) (with respect to declarative or injunctive relief)[16] and under Rule 23(b)(3) (with respect to damages claims).[17] The proposed classes that named Plaintiffs seek to represent are initially defined as follows:[18]

**Unlawful Stops Class**

All persons who have been, or in the future will be, subjected to the Montgomery Police Department's policies and/or widespread customs or practices of stopping,

---

[16] Plaintiffs seek injunctive relief only on those claims where there is a real and immediate substantial risk of threat of future injury to Plaintiffs, or alternatively, the injuries are capable of repetition yet evading review and so not moot. They do not seek injunctive relief, at this time, on claims against policies or practices which the Defendants City of Montgomery and Presiding Judge Les Hayes, III agreed to change pursuant to settlement agreements in prior cases.

[17] Plaintiffs seek compensatory, punitive and/or treble damages.

[18] The applicable starting dates and time periods for the classes are not stated in the class definitions because they will vary according to the different statutes of limitations, including tolling periods, applicable to the claims.

or stopping and ticketing, or arresting persons because of their race, or in the absence of a reasonable, articulable suspicion that criminal activity has taken, is taking, or is about to take place.

**Probation Class**

All individuals who were placed on "probation" with JCS pursuant to the City of Montgomery's contracts with JCS and were required to make payments to JCS that included monthly fees to JCS, including those whom JCS subjected to threatened or actual probation revocation and incarceration.

**Jail Class**

All individuals who, despite their indigency, have been, or who will be, detained or incarcerated in the Montgomery Municipal Jail because of their nonpayment of fixed-sum bail or bonds, fines, court costs, restitution, surcharges or other fees arising from traffic tickets or other minor offenses, including a **Jail Labor Subclass** of those who have performed or jail labor in order to reduce the time unlawfully incarcerated for nonpayment of debts to the City of Montgomery.

162.     Each of the above classes in this matter is adequately defined and clearly ascertainable. The members of each of the classes are defined by objective criteria, including, respectively, whether an individual has been subjected to an illegal stop or arrest; placed on JCS probation; held in jail for inability to pay fixed-sum bail or bond amounts or jailed for inability to pay debts from fines, court costs, restitution, surcharges or other fees; or has performed jail labor. Ascertainment is administratively feasible because all members of the classes may be identified through records held by the Defendants and/or by self-identification. These records include but are not limited to stop, ticketing and arrest records, JCS probation records, bail and bond records, Municipal Court records on "fines or jail" and "commuted" sentences; and jail work lists.

163.     Certification of the proposed classes is appropriate in this case under Rule 23(c)(4) providing that [w]hen appropriate an action may be brought or maintained as a class action with respect to particular issues," and Rule 23(c)(5) providing that "[w]hen

appropriate, a class may be divided into subclasses that are each treated as a class under this rule,"[19] as well as under Rule 23(d) granting courts broad authority to issue orders to promote the fair and efficient management of Rule 23 actions. The classes proposed in this case are proposed for case management purposes; there are no conflicts of interests between or among members of the different classes that would necessitate separate classes.

164.    While exact numbers are not available at this time, numerosity for each of the classes is apparent based on records such as the Municipal Court Annual Survey (listing 86,161 non-DUI traffic cases filed in 2013) and 2010 Census data for the City of Montgomery showing the percentage of Black or African American persons as 56.6%; JCS and court records expected to reveal that over 1000 individuals were placed on JCS probation at any given time; and an admission of the City of Montgomery that hundreds have been jailed for nonpayment of debts. The numerosity as well as the impoverished circumstances of most class members make joinder impracticable, as does their lack of knowledge about how to pursue their claims absent the notice class certification provides. Joinder is also impracticable because not all class members are identifiable at this stage, including future members.

165.    The policies and practices challenged in this action have been applied with equal force to named Plaintiffs and members of the classes they seek to represent. The relief sought is common to all members of each of the classes, and common questions of law and fact exist as to all members of each class. The named Plaintiff representatives and

---

[19] The term "class" will be used to include the jail labor subclass as well; under Rule 23(c)(5) subclasses are to be treated as classes. Fed. R. Civ. P. Rule 23(c)(5).

all members of each class will seek relief for the same injuries caused by the Defendants' policies, practices, and procedures that have violated their rights.Common issues of fact and law for each class include ,but are not limited to, whether the following policies, practices or customs exist or have existed (questions of fact) and whether of not they violate federal constitutional or statutory law, and/or state law (questions of law):

Unlawful Stops Class: Stops, ticketing and/or arresting individuals without reasonable suspicion; racially targeted roadblocks or stops; racially motivated stops, ticketing or arrests of African Americans; failure to advise arrested individuals of their federal and state law rights concerning racial profiling; and failure to adequately supervise or train employees and officers about the constitutional and other rights of these individuals.

Probation Class: Use of extortion or threats of imprisonment and/or forced labor as collection methods for indigent individuals placed on "probation" for payment of fines, court costs, fees, and restitution; failure to advise indigent individuals placed on JCS probation of their federal, state and contractual rights; and failure to adequately supervise or train employees and officers about the constitutional and other rights of individuals placed on JCS probation.

Jail Class: Use of pre-fixed bail and bond schedules; refusal to release indigent individuals who are unable to pay fixed bail or bonds; failure to advise indigent individuals of their federal and state law rights concerning the use of fixed bail and bond schedules and detention or imprisonment for inability to pay scheduled bail or bonds; failure to adequately supervise or train employees and officers about the constitutional and other rights of these individuals; incarceration of indigent individuals for inability to

pay fines, costs, surcharges, restitution or probation fees; failure to provide meaningful

access to legal counsel or meaningful pre-deprivation hearings for indigent individuals

incarcerated for failure to pay debts; incarceration of indigent individuals to "pay off"

debts at the rate of $50 per day; failure to advise indigent individuals of their federal and

state law rights concerning detention or imprisonment for inability to pay fines, costs,

surcharges, restitution or fees; and failure to adequately supervise or train employees and

officers about the constitutional and other rights of these individuals.

For the Jail Labor Subclass, additionally: Coercion to perform janitorial or

other labor in order to obtain additional $25 per day reductions of debts for nonpayment

of fines, court costs, and fees; failure to advise those jailed of federal rights not to be

subjected to forced labor; and failure to adequately supervise or train employees and

officers about the law on forced labor.

166.     These common legal and factual questions arise from a central scheme and set

of policies and practices: the Defendants' enormously profitable revenue generating and

debt collection system.  The material components of the scheme do not vary from class

member to class member, and the resolution of these legal and factual issues will be

determinative of whether the members of each class are entitled to the relief that they

seek.

167.     The named Plaintiffs who will represent each class have claims and injuries

that are typical of the claims of the members of the classes and they have the same interest

in this case as other members of the classes that they will represent. Each personally

suffered injuries from the failure of the Defendants' policies, practices or customs to

comply with constitutional and other federal and state law provisions. The Court's

determinations of the legality of particular policies, practices or customs of the Defendants will determine the claims of the named Plaintiffs and the other members of each class.

168.     If the named Plaintiffs succeed in establishing that some or all of the Defendants' particular policies, practices or customs have violated the law in the way(s) alleged in any of the claims in this Complaint, the ruling(s) will likewise benefit the other members of each affected class.

169.     The named Plaintiffs representing each class will fairly represent and adequately protect the interests of the members of each of the classes as a whole.  While not every named Plaintiff has been injured by every challenged policy, practice or custom, some or all of them have been injured by each of the challenged policies, practices or customs, and thus possess the requisite concrete personal interest in the subject matter. They are representative of the classes they will seek to represent and possess no interests adverse to other members of these classes.

170.     Counsel for the named Plaintiffs have extensive experience handling class actions and civil rights cases and are prepared to adequately prosecute this action on behalf of both named Plaintiffs and the members of the classes they seek to represent. They have sufficient resources to effectively pursue this lawsuit. They have adequately investigated the potential claims in this action and are knowledgeable about the applicable law.

171.     The interests of the members of the classes will be fairly and adequately protected by the named Plaintiffs and their attorneys. Named Plaintiffs request that these attorneys be appointed as class counsel in this class action litigation.

172.     Class action status for claims for declaratory or injunctive relief  is appropriate under Rule 23(b)(2) because the Defendants, through the general policies, practices, or customs that make up the challenged revenue generating and debt-collection scheme, have acted and/or refused to act on grounds generally applicable to each class so as to make class-wide declaratory or injunctive relief appropriate.

173.     Class treatment of damages claims under Rule 23(b)(3) is appropriate for each of the classes because the common questions of law or fact overwhelmingly predominate in this case. This case turns, for every Plaintiff and class member, on what the Defendants' challenged policies, practices or customs are or have been and on whether those policies, practices or customs violate the federal constitutional and statutory, or state law as Plaintiffs claim.

174.     Numerous common questions of law or fact are dispositive questions in the case of every member of each of the classes. Questions of liability can therefore be determined on class-wide bases. Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendants' policies, practices or customs than individual suits by hundreds or thousands of individuals.

175.     Questions of damages will also be driven by class-wide determinations. Damages for each class are capable of measurement on a class-wide basis through the use of relatively simple methodologies or models. To the extent that individual damages will vary, they will vary depending largely on the number of times an individual plaintiff or class member was unlawfully stopped, ticketed or arrested; the number of months spent on JCS probation; the number of days jailed for inability to pay scheduled bail or bonds; the number of days jailed for nonpayment of fines and costs; and the number of days of

jail labor. These determinations typically can be handled in a ministerial fashion based on Defendants' own easily verifiable records. If needed, individual hearings on member-specific damages based on special circumstances could be held after class-wide liability `is determined, a method far more efficient than the wholesale litigation of hundreds of individual lawsuits.

176.    Finally, the expense and burden of individual litigation of the numerous and somewhat interwoven issues raised in this case make it extraordinarily difficult for class members to redress--or even learn of--the legal wrongs done to them without the notice procedures applicable to class action litigation. And certification of the case as a class action also will prevent settlement, compromise or dismissal without proper notice to these individuals.

## **Demand for Jury Trial**

177.    Plaintiffs seek the following relief and hereby demand a jury in this case for all matters so appropriate.

## **Claims for Relief**

### **Count I**
**Violations of the Fourteenth Amendment Equal Protection and Due Process Clauses, Fourth Amendment, 42 U.S.C. § 1981 and 42 U.S.C. § 1983, By Stops, Ticketing or Arrests – Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Floyd, Caldwell, James, Scott, Mooney, and others similarly situated, Against The City of Montgomery, Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr., and Former Chief of Police Kevin Murphy**

178.    The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

179.     As part of the purposeful use of law enforcement activities to generate municipal revenue, Defendant Mayor Todd Strange, acting under color of state law, and as a final policymaker as Mayor for the City of Montgomery, has instigated, adopted, ratified, and administered policies, practices or customs, that also have been adopted, administered and implemented for the Montgomery Police Department by Chief of Police Ernest N. Finley, Jr. and Former Chief of Police Kevin Murphy, acting under color of state law, and as final policymakers for the City for the Montgomery Police Department, which policies, practices or customs are so widespread and persistent that they have the force of law, including the use the police officers of the Montgomery Police Department to stop, ticket and/or arrest individuals (1) without reasonable suspicion or any objective, articulable suspicion of wrongdoing and/or (2) because of their race or ethnicity, for minor traffic violations or other infractions, with the purpose of harassing them, running checks for debts owed to the City from prior arrests, and arresting them on these warrants. These policies, practices or customs (1) constitute false arrests and unreasonable seizures and violate the Fourth Amendment and/or (2) violate the equal protection and due process clauses of the Fourteenth Amendment and 42 U.S.C. § 1981.

180.     As described in the individual Plaintiff allegations above, Plaintiffs have been stopped for specious, fabricated or untrue reasons, such as resemblance to a claimed robbery suspect (Plaintiff Floyd), or for failure to have on headlights when it was not yet dark (Plaintiff McCullough) where the real purpose of the stop was to enable police officers to run checks for outstanding warrants or debts. Plaintiff Floyd filed a complaint about his arrest with Corporal Dailey of Internal Affairs and went back to that office twice to no avail.

181.     Plaintiffs have also been racially profiled or targeted because of their race, for stops on charges of minor traffic violations such as, for example, obstructed windshield (Plaintiff Agee) failure to wear a seatbelt (Plaintiffs Agee, James); improper lights and/or cracked taillight (Plaintiff Caldwell) where the real purpose of the stop was to enable police officers to run checks for outstanding warrants or debts. Even when stopped on charges such as running a stop sign, African Americans are targeted and stopped in instances that would have been overlooked or excused but for their race.

182.     An investigative reporter who, on February 9, 2015, reported on his recent visit to Montgomery Municipal Court, observed that nine out of ten of the approximately 100 Defendants in the courtroom awaiting hearings that morning were African Americans. According to the 2010 U.S. Census, African Americans comprised 56.6% of the population of the City of Montgomery. See, David J. Krajicek, "Special Report, Paying the Piper: Montgomery, Alabama's City Court is a Debt-Collecting Machine," The Crime Report, Feb. 9, 2015, www.thecrimereport.org/news/inside-criminal-justice/2015-02-paying-the-piper (visited Aug. 20, 2015).

183.     African Americans Plaintiffs, and others similarly situated, have been  stopped by Montgomery City police officers pursuant to the Defendants' widespread and persistent intentional policies, practices or customs having the force of law of establishing traffic roadblocks, checkpoints, or conducting pedestrian stops, in or near predominately African American neighborhoods and have been racially targeted or profiled in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Defendants Strange, Finley and Murphy, all acting under color of state law, also have systemically engaged in, and continue to engage, in instigating and ratifying (Defendant

Strange), or adopting and implementing (Defendants Finley and Murphy) intentional widespread and persistent policies, practices or customs having the force of law of racial targeting and profiling in other stops, ticketing and/or arrests and/or of discriminatory treatment of African American Plaintiffs or other minority individuals because of their race, color and/or ethnicity. These race-based policies or practices violate the equal protection and due process clauses of the 14th Amendment because they are based on race and infringe fundamental rights to personal freedom and are not justified by a compelling government interest. They also violate 42 U.S.C. § 1981's explicit guarantee of the same right "to the full and equal benefit of all laws for the security of person and property as is enjoyed by white citizens" and it's requirement that all persons "shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other," and subject African Americans to the kind of second-class citizenship this post-Civil War legislation was intended to abolish.

184.    As indicative from the continuous pattern of obvious, persistent and repeated violations of these rights of Plaintiffs and others, by numerous different police officers, both black and white, Defendants have adopted, administered and implemented a widespread and persistent policy, practice or custom of failing to adequately train and/or supervise officers and employees with regard to protecting against violations of the rights alleged in this count. Defendants have acted with deliberate indifference to the foreseeable or highly predicable and heightened risk of violations created by the lack of adequate training and/or supervision.

185.    The above acts, policies, practices or customs of the Defendants violate Plaintiffs' Fourth and Fourteenth Amendment rights, as well as their rights under 42

U.S.C. § 1981, under color of state law in violation of 42 U.S.C. § 1983. These federal rights were clearly established at the times of their violations. Defendants acted willfully and maliciously and with reckless or callous indifference to Plaintiffs' federally protected rights.

186.     The above acts, policies, practices or customs of the Defendants, acting under color of state law, were the driving force behind the violations of Plaintiffs' Fourteenth and Fourth Amendment rights and their rights under 42 U.S.C. § 1981, in violation of 42 U.S.C. § 1983.

187.     As a direct and proximate result of these Defendants' wrongful acts, policies, practices or customs, Plaintiffs, and others similarly situated, have suffered and will continue to suffer significant and substantial personal injuries, such as are described in the factual allegations of the individual Plaintiffs, that are redressable by damages and other requested relief. As demonstrated by the recent arrests of Plaintiffs McCullough, Edwards, Caldwell, and Scott, without appropriate injunctive relief against the City of Montgomery, these violations will continue to occur and cause real and imminent threats, and substantial risks, of future injury to Plaintiffs and others similarly situated, entitling Plaintiffs to equitable injunctive relief. Alternatively, the injuries caused Plaintiffs by these policies, practices or customs are capable of repetition yet may evade review and are not moot. Plaintiffs also are entitled to declaratory relief and compensatory damages from the City of Montgomery, as well as to compensatory and punitive damages against the Defendants Strange, Finley and Murphy, in their individual capacities.

**Count II**
**Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq.***
**– Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Floyd, Caldwell,**

**James, Scott and Mooney, and others similarly situated, Against The City of Montgomery**

188.     The allegations of the previous paragraphs are incorporated herein by reference and certain more specific reference to these factual allegations are set out below.

189.     The law enforcement activities described in this Complaint have been funded, in part, with federal funds or grants given to the City of Montgomery. Discrimination based on race in the law enforcement activities and conduct described in this Complaint are prohibited by Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq.,* The acts and conduct of racial discrimination pursuant to Defendant's policies, patterns or practices of racial targeting and profiling, as further described in Count I, were motivated by racial animus, and were intended to and did discriminate, on the basis of race in violation of Title VI.

190.     As a direct and proximate result of these acts, policies, practices or customs of the City of Montgomery, Plaintiffs have suffered personal injuries, as described in the individual Plaintiffs' factual allegations and have been deprived of their rights under Title VI. They are entitled to compensatory damages, as well as injunctive relief against the City of Montgomery. These violations of Title VI continue to occur and cause real and imminent threats, and substantial risks, of future injury to Plaintiffs and others similarly situated. Alternatively, the injuries caused Plaintiffs by these policies, practices or customs are capable of repetition to them yet may evade review, and thus are not moot.

**Count III**
**Violation of Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 By Policies and Practices of Issuing and Serving Warrants Based Solely on Nonpayment of Monetary Debts – Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Floyd, Caldwell, James, Scott, Mooney, and others similarly situated, Against The City of Montgomery, Mayor Todd Strange, Chief of Police**

### Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, and Presiding Judge Les Hayes, III and JCS

191.     The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

192.     JCS, Defendant Strange, as final policymaker as Mayor for the City of Montgomery, Defendants Finley and Murphy, as final policymakers for the City of Montgomery for the Montgomery Police Department and the Municipal Jail, and Defendant Hayes, as final policymaker for the City of Montgomery for the Montgomery Municipal Court, all acing under color of state law, have adopted, ratified, administered and implemented policies, practices or customs of issuing and serving warrants, including at homes, on those who have not paid their traffic debts or made their monthly payments to JCS. These warrants are sought, issued, and served without any inquiry into the person's ability to pay, even when the Defendants have advance knowledge that the person is impoverished and unable to pay the debts. These warrants are sought, issued and served without any finding of probable cause that the person has committed any offense. The Defendants have chosen to pursue the practice of issuing warrants instead of issuing summons even when their employees have spoken to people on the phone or in person and have had the opportunity to notify them to appear in court. The Defendants' policy, practice or custom is to unlawfully sieze and to deprive people of their liberty without any prior notice and hearing or any basic inquiry into whether the debt is still owed or valid in violation of the Fourth and Fourteenth Amendments.

193.     As indicative from the repeated violations of Plaintiffs' and others' rights by numerous different police officers, Defendants have adopted, administered and

implemented a widespread and persistent policy, practice or custom of failing to adequately train and/or supervise officers and employees with regard to protecting against violations of the Fourth and Fourteenth Amendment rights alleged in this count. Defendants have acted with deliberate indifference to the foreseeable or highly predicable and heightened risk of unconstitutional conduct created by the lack of adequate training and/or supervision.

194.    The above acts, policies or customs of the Defendants violate Plaintiffs' Fourth and Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983 as was clearly established at the times of their acts. Defendants acted willfully and maliciously or with reckless or callous indifference to Plaintiffs' federally protected rights.

195.    The above acts, policies, practices or customs of the Defendants, acting under color of state law, were the driving force behind these violations of Plaintiffs' Fourteenth and Fourth Amendment rights in violation of 42 U.S.C. § 1983.

196.    As a direct and proximate result of Defendants' above acts, policies, practices or customs, Plaintiffs and others similarly situated have suffered and will continue to suffer significant and substantial personal injuries, as described in the individual Plaintiffs' factual allegations, that can be redressed by damages and other requested relief. Without appropriate injunctive relief, these violations will continue to occur and cause real and imminent threats, and a substantial risk, of future injury to Plaintiffs, entitling them to equitable injunctive relief. Plaintiffs also are entitled to declaratory relief and compensatory damages from the City of Montgomery, as well as compensatory and

punitive damages against Defendants Strange, Finley, Murphy and Hayes, in their individual capacities, and against JCS.

**Count IV**
**Violations of the Fourteenth Amendment Equal Protection and Due Process Clauses, the Fourth and Eighth Amendments and 42 U.S.C. § 1983 By Use of Fixed-sum Bail System – Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Floyd, Caldwell, James, Scott, Mooney, and others similarly situated, Against The City of Montgomery, Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr. and Former Chief of Police Kevin Murphy, and Presiding Judge Les Hayes, III**

197.    The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

198.    Defendant Strange, as final policymaker as Mayor for the City of Montgomery, Defendants Finley and Murphy, as final policymakers for the City of Montgomery for the Montgomery Police Department and Municipal Jail; and Defendant Hayes, as final policymaker for the City of Montgomery for the Montgomery Municipal Court, all acing under color of state law, have adopted, ratified, administered and implemented policies, practices or customs for the Montgomery Municipal Jail and the Montgomery Municipal Court of applying a fixed-sum bail schedule that mandates the payment of pre-fixed amounts based solely on the offenses charged in order to gain pre-trial release, without regard to the individual defendant's indigency or ability to pay (or dangerousness or risk of flight). This policy or practice has been used as another means of "punishing" indigent individuals for their poverty.

199.    Defendants have systemically engaged, and continue to engage, in adopting, administering, and implementing a policy, practice or custom of applying a fixed schedule for setting bail for traffic tickets or misdemeanors that has resulted in pre-trial detention

and incarceration of Plaintiffs and other indigent individuals based solely on their inability to pay for their release, which infringes on their fundamental liberty interest based on their wealth status in violation of the equal protection and due process clauses of the Fourteenth Amendment and constitutes an unlawful seizure of their persons in violation of the Fourth Amendment. The generic bail schedule also indiscriminately sets excessive bail in an arbitrary way that violates both substantive due process under the 14th Amendment and the Eighth Amendment. As described in the factual allegations for individual Plaintiffs, Plaintiffs, and others similarly situated, have had their release denied or delayed because of the use of the generic fixed-sum bail schedule.

200.    As indicative from the repeated violations of Plaintiffs' and others' rights by regular use of this bail schedule, Defendants have adopted, administered and implemented a widespread and persistent policy, practice or custom of failing to adequately train and/ or supervise officers and employees with regard to protecting against violations of the rights alleged in this count. Defendants have acted with deliberate indifference to the foreseeable or highly predicable and heightened risk of unconstitutional conduct created by the lack of adequate training and/or supervision.

201.    The above acts, policies, practices or customs of the Defendants violate Plaintiffs' Fourth, Eighth and Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983, as was clearly established at the times of their acts. Defendants acted willfully and maliciously and with reckless or callous indifference to Plaintiffs' federally protected rights.

202.    The above acts, policies, practices or customs of the Defendants, acting under color of state law, were the driving force behind the violations of Plaintiffs' Fourteenth, Fourth and Eighth Amendment rights in violation of 42 U.S.C. § 1983.

203.    As a direct and proximate result of these Defendants' wrongful acts, policies, practices or customs, Plaintiffs and others similarly situated have suffered and will continue to suffer significant and substantial personal injuries, as described in the factual allegations for individual Plaintiffs, that are redressable by damages and other requested relief. Without appropriate injunctive relief, these violations will continue to occur and cause real and imminent threats, and substantial risks, of future injury to Plaintiffs. Alternatively, the injuries caused Plaintiffs by these policies, practices or customs are capable of repetition yet may evade review and are not moot. Plaintiffs are entitled to injunctive relief against the City of Montgomery. Plaintiffs also are entitled to declaratory relief and compensatory damages against the City of Montgomery, as well as to compensatory and punitive damages against Defendants Strange, Finley, Murphy and Hayes, in their individual capacities.

**Count V**
**Violations of the Fourteenth Amendment Due Process and Equal Protection Clauses, the Fourth Amendment and 42 U.S.C. § 1983 By Imprisonment For Non-Payment of Debt Without Meaningful Inquiry Into Inability to Pay – Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Caldwell, James, Mooney, and others similarly situated, Against Defendants The City of Montgomery, Mayor Todd Strange, Presiding Judge Les Hayes, Ernest N. Finley, Jr., Kevin Murphy, and JCS**

204.    The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

205.    The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person for the failure to pay money owed to the government if that person is indigent or unable to pay and to fail to provide meaningful hearings to determine ability to pay and to consider alternatives to imprisonment.

206.    Defendant Mayor Todd Strange, as final policymaker as Mayor for the City of Montgomery; Defendants Finley and Murphy, as final policymakers for the City of Montgomery for the Montgomery Municipal Jail; and Defendant Hayes, as final policymaker for the City of Montgomery for the Montgomery Municipal Court, and JCS, all acing under color of state law, violated Plaintiffs' rights through their adoption, ratification, administration and implementation of policies practices or customs of commuting fines and costs and jailing them as a means of punishing them or coercing the payment of fines, costs and other debts owed to the City, and of harassing and threatening to jail them, all without conducting meaningful inquiries into their indigency or ability to pay and without conducting inquiries into alternatives to imprisonment as required by the due process and equal protection clauses of the United States Constitution. The Defendants' policies, practices, or customs similarly did not provide the required notice to the Plaintiffs concerning the relevant issues at any hearing contemplating their imprisonment, provide a meaningful opportunity for Plaintiffs to present evidence related to their imprisonment, provide a meaningful opportunity for Plaintiffs to present evidence of their inability to pay, or make findings concerning their ability to pay.

207.    Defendant Mayor Todd Strange, as final policymaker as Mayor for the City of Montgomery; Defendants Finley and Murphy, as final policymakers for the City of Montgomery for the Montgomery Municipal Jail; Defendant Hayes, as final policymaker

for the City of Montgomery for the Montgomery Municipal Court, and JCS, all acing under color of state law, adopted, ratified, administered and implemented policies, practices or customs of imprisoning indigent people when they cannot afford to pay their debts and of automatically converting monetary fines and court costs into days in jail at a rate of $50 per day and reducing the debts by another $25 per day conditioned on the performance of "jail labor" for the City, which constitute false imprisonment by unlawful restraint and detention of Plaintiffs' personal liberty and violate the due process and equal protection provisions of the Fourteenth Amendment  of the United States Constitution. They also constitute unreasonable seizures of Plaintiffs persons in violation of the Fourth Amendment.

208.     Defendant Mayor Todd Strange, as final policymaker as Mayor for the City of Montgomery and Defendant Les Hayes, III, as final policymaker for the City of Montgomery for the Montgomery Municipal Court, have adopted, ratified, administered and implemented a policy, practice, or custom for the Montgomery Municipal Court under which, when individuals are ticketed for more than one traffic violation at the same time, each ticket is treated as a separate case, with court costs and other fees are assessed on each ticket, though all are handled in a single court proceeding. This results in high fines, fees, court costs and surcharges, sometimes amounting to thousands of dollars, that indigent individuals are unable to pay. These high fines and court costs resulted in substantially longer commuted sentences and thus more days served in jail and performing jail labor. Under the Municipal Court's currently posted fines schedule, uniform court costs of $155 are added to all fines, even those for as little as $10 (e.g., failure to dim lights or improper muffler) or $20 (e.g., expired license or expired tag). For delinquent

fines of these amounts, with an alias warrant issued, the total amounts due rise to $207 and $295, respectively. Each of these days in jail and performing jail labor constituted further false imprisonment by unlawful restraint and detention of their personal liberty and violated the due process and equal protection provisions of the Fourteenth Amendment of the United States Constitution. They also constituted further unreasonable seizures of Plaintiffs' persons in violation of the Fourth Amendment.

209. As indicative from the repeated violations of Plaintiffs' and others' rights by the regular use of this policy of commuting fines and court costs to jail time, whereby Plaintiffs were jailed for various periods, as long as 9 months, Defendants adopted, ratified. administered, and implemented a widespread and persistent policy, practice or custom of failing to adequately train and/or supervise officers and employees with regard to protecting against violations of the rights alleged in this count. Defendants acted with deliberate indifference to the foreseeable or highly predicable and heightened risk of unconstitutional conduct created by the lack of adequate training and/or supervision.

210. The training manual that JCS gives its employees contains sample copies of Montgomery Municipal Court Orders but includes no training on the federal or state law relating to the rights of the individuals assigned to them.

211. The training policies, practices or customs of the Montgomery Municipal Court do not include specific courses or other trainings on the federal or state law rights of indigent debtors.

212. The above acts, policies or customs of the Defendant City of Montgomery, Mayor Todd Strange, Police Chief Ernest N. Finley, Jr., Former Police Chief Kevin Murphy, Presiding Judge Les Hayes, III, and JCS violated Plaintiffs' Fourth and

Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983, as was clearly established at the times of their acts. Defendants acted willfully and maliciously or with reckless or callous indifference to Plaintiffs' federally protected rights.

213.     The above acts, policies, practices or customs of the Defendants, acting under color of state law, were the driving force behind the violations of Plaintiffs' Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

214.     As a direct and proximate result of Defendants' wrongful acts, policies, practices or customs Plaintiffs and others similarly situated have suffered significant and substantial personal injuries, as described in the factual allegations of individual Plaintiffs, that can be redressed by damages and other requested relief. Plaintiffs are entitled to compensatory damages against the City of Montgomery. And they are entitled to compensatory and punitive damages against Defendants Strange, Finley, Murphy and Hayes, in their personal capacities, and against JCS.

**Count VI**
**Violations of Six and Fourteenth Amendments and 42 U.S.C. § 1983 By Imprisonments For Inability To Pay Debts Without Adequate Counsel – Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Mooney, and others similarly situated, Against The City of Montgomery and Presiding Judge Les Hayes, III**

215.     The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

216.     As final policymaker for the Montgomery Municipal Court for the City of Montgomery, Presiding Judge Less Hayes, III violated Plaintiffs' right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States

Constitution by adopting, administering and implementing a policy, practice or custom for the City of Montgomery Municipal Court, of imprisoning indigent debtors in proceedings, including probation revocation hearings, litigated by the City prosecutors at which they were not afforded appointed counsel or they did not have the benefit of adequate counsel and did not knowingly, intelligently, and voluntarily waive counsel. The one Public Defender that was on duty at any time was often speaking briefly with defendants awaiting hearings in the nearby jail and not even present in the courtroom during hearings.

217.     The Defendants' policy, practice or custom of not providing adequate counsel at hearings for indigent individuals ordered to be imprisoned in the City jail for unpaid debts, which were, in turn, based on convictions for traffic tickets or violations or other minor violations at which the person was also unrepresented, violates the Sixth and Fourteenth Amendments to the United States Constitution.

218.     As indicative from the repeated violations of Plaintiffs' and others' rights by the routine and regular failure to appoint counsel or provide meaningful access to counsel, Defendants adopted, administered and implemented a widespread and persistent policy, practice or custom of failing to adequately train and/or supervise officers and employees with regard to protecting against violations of the rights alleged in this count. Defendants acted with deliberate indifference to the foreseeable or highly predicable and heightened risk of unconstitutional conduct created by the lack of adequate training and/or supervision.

219.     The above acts, policies or customs violate Plaintiffs' Sixth and Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983, as was

clearly established at the times of their acts. Defendants acted willfully and maliciously and with reckless or callous indifference to Plaintiffs' federally protected rights.

220.     The above acts, policies, practices or customs of the Defendants, acting under color of state law, were the driving force behind the violations of Plaintiffs' Sixth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

221.     As a direct and proximate result of Defendants' wrongful acts, policies, practices or customs, Plaintiffs and others similarly situated have suffered significant and substantial personal injuries, as described in the factual allegations for individual Plaintiffs, that can be redressed by damages and other requested relief. Plaintiffs are entitled to compensatory damages against the City of Montgomery. They also are entitled to compensatory and punitive damages against Defendant Hayes, in his individual capacity.

**Count VII**
**Violations of the Thirteenth Amendment and 42 U.S.C. § 1983 and Federal Anti-Peonage Laws (18 §§ U.S.C. 1581, 1589(a) and (b), 1593A, and 1595) – Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Mooney, and others similarly situated, Against The City of Montgomery, Mayor Todd Strange, Presiding Judge Les Hayes, III, Ernest N. Finley, Jr., Kevin Murphy, and JCS**

222.     The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

223.     Unlawfully imprisoning indigent individuals for monetary debts owed to the City and subjecting these unlawfully imprisoned individual to "jail labor" violate the Thirteenth Amendment and federal laws enacted pursuant to it that prohibit peonage and forced labor. Pursuant to policies, practices or customs adopted, ratified, administered and implemented by Defendant Todd Strange, as final policymaker as Mayor for the City of

Montgomery, Defendants Finley and Murphy, as final policymakers for the City of Montgomery for the Montgomery Municipal Jail, Defendant Hayes, as final policymaker for the City of Montgomery for the Montgomery Municipal Court, and JCS, Plaintiffs were coerced with threats of more prolonged unlawful jail terms by City officials if they did not "volunteer" to labor in the City jail under onerous conditions for an extra of $25 per day reduction of their debts. This amounts to peonage and forced labor, whereby a person is coerced by threat of legal sanction - i.e., imprisonment – to work off a debt to a "master." It is also an abuse of the legal process that exploited Defendants' unlawful incarceration of Plaintiffs to force them to accept, in their desperation to end their unlawful incarceration more quickly, the conditions of forced labor, performing janitorial tasks that City employees did not want to perform, such as cleaning up blood and feces in an overcrowded jail environment, as described in the factual allegations for individual Plaintiffs.

224.    Plaintiffs allegedly owed the City monetary debts for traffic tickets and associated fees, court costs, and surcharges. Because Plaintiffs were not imprisoned or sentenced to involuntary servitude as punishment for any crime, the Thirteenth Amendment bars the coerced use of their labor to work off their purely monetary debts.

225.    The conduct of the Defendants also violates federal anti-peonage and forced labor statutes, including:

226.    Violation of 18 U.S.C. § 1581(a): Defendants have held or returned Plaintiffs to a condition of peonage, or arrested them with the intent of placing them in or returning them to a condition of peonage.

227.    Violation of 1589(a): Defendants have knowingly provided or obtained the labor

or services of Plaintiffs by any one of, or by any combination of, the following means—

    a.  by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    b.  by means of serious harm or threats of serious harm to that person or another person;

    c.  by means of the abuse or threatened abuse of law or legal process; or

    d.  by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

228.    Violation of 1589(b): Defendants have knowingly benefited, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowingly or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

229.    § 1593A (benefiting from peonage): Defendants have knowingly benefited, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of sections 1581(a) and 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation.

230.    Violation of § 1595 (providing a civil remedy and ten year statute of limitations): As individuals who are victims of a violation of this chapter, Plaintiffs bring this civil action against the Defendants as perpetrators (or persons who knowingly benefit, financially or by receiving anything of value from participation in a venture which that persons knew or should have known has engaged in an act in violation of this chapter) in

this appropriate district court of the United States to recover damages and reasonable attorneys fees.

231.     As indicative from the repeated violations of Plaintiffs' and others' 13th Amendment and federal statutory rights, in the manners described above, Defendants have adopted, ratified, administered and implemented a widespread and persistent policy, practice or custom of failing to adequately train and/or supervise officers and employees with regard to protecting against violations of the rights alleged in this count. Defendants have acted with deliberate indifference to the foreseeable or highly predicable and heightened risk of unconstitutional conduct created by the lack of adequate training and/or supervision.

232.     The above acts, policies or customs of the Defendants violate Plaintiffs' Thirteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983 and violate the statutory provisions stated in this count, as was clearly established at the times of their acts. Defendants acted willfully and maliciously or with reckless or callous indifference to Plaintiffs' federally protected rights.

233.     The above acts, policies, practices or customs of the Defendants, acting under color of state law, were the driving force behind the violations of Plaintiffs' Thirteenth Amendment rights in violation of 42 U.S.C. § 1983 and of their statutory rights stated in this count.

234.      As a direct and proximate result of Defendants' wrongful acts, policies, practices or customs, Plaintiffs, and others similarly situated, have suffered significant and substantial personal injuries that can be redressed by damages and other requested relief. Plaintiffs are entitled to compensatory damages against the City of Montgomery, and to

compensatory and punitive damages against Defendants Finley, Murphy and Hayes, in their individual capacities, and against JCS under 42 U.S.C. § 1983. They also are entitled to compensatory and punitive damages against the City of Montgomery, as well as against Defendants Todd, Finley, Murphy and Hayes, in their individual capacites, and against JCS under 8 U.S.C. § 1595.

### Count VIII
**Violations of the Fourteenth Amendment Due Process and Equal Protection Clauses, the Fourth Amendment and 42 U.S.C. § 1983 By Use of Probation and Threat of or Actual Probation Revocation Solely to Collect Fines and Fees from Indigent Individuals – Plaintiffs McCullough, Johnson, Jones, Agee, Caldwell, and others similarly situated, Against Defendants The City of Montgomery, Mayor Todd Strange, Presiding Judge Les Hayes, III and JCS**

235.     The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

236.     The policy, practice or custom adopted, ratified, administered and implemented by Presiding Judge Hayes, acting under color of state law and as a final policymaker for the Montgomery Municipal Court for the City of Montgomery was that persons owing debts to the City should be asked whether they could pay the entirety of any fees, fines, costs, and surcharges immediately. If the person could pay in full, the person was to be allowed to pay and their case was to be closed. If a person was unable to pay in full, the policy practice or custom as agreed to in the JCS contracts by the City and City Mayors, including Mayor Strange, acting as final policymakers for the City and under color of state law, and as adopted, ratified, administered and implemented for the Municipal Court by Presiding Judge Hayes, was to place persons on "probation," under the supervision of Defendant JCS, acting under color of state law, which included forcing

the person to aide by conditions that restricted the person's liberty and purporting to subject the person to punishment if those conditions (including payment of extra fees) were violated. These policies, practices, or customs of altering punishment and deprivation of fundamental liberties of personal freedom based solely on wealth status violate fundamental principles of the 14th Amendment due process and equal protection clauses. JCS-initiated probation revocation processes and JCS initiation of charges of "failure to obey court order," pursuant to the agreed-to policy in the JCS contracts signed by City Mayors, including Mayor Todd Strange, result in unlawful imprisonment for nonpayment of debt and constitute unreasonable seizures of Plaintiffs by JCS and other Defendants in violation of the Fourth Amendment.

237.    As indicative from the five years that the JCS contracts were in force and adopted, ratified, administered and implemented in violation of Plaintiff's federal constitutional rights, Defendants adopted, administered and implemented a widespread and persistent policy, practice or custom of failing to adequately train and/or supervise officers and employees with regard to protecting against violations of the rights alleged in this count. Defendants acted with deliberate indifference to the foreseeable or highly predicable and heightened risk of unconstitutional conduct created by the lack of adequate training and/or supervision.

238.    The training manual that JCS gives its employees contains sample copies of Montgomery Municipal Court Orders but includes no training on the federal or state law relating to the rights of the individuals assigned to them.

239.     The training policies, practices or customs of the Montgomery Municipal Court do not include specific courses or other training on the federal or state law rights of indigent debtors.

240.     The above acts, policies or customs of the Defendants violate Plaintiffs' Fourth and Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983, as was clearly established at the times of their acts. Defendants acted willfully and maliciously or with reckless or callous indifference to Plaintiffs' federally protected rights.

241.     The above acts, policies, practices or customs of the Defendants, acting under color of state law, were the driving force behind the violations of Plaintiffs' Fourth Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

242.      As a direct and proximate result of Defendants' wrongful acts, policies, practices or customs, Plaintiffs and others similarly situated have suffered substantial personal injuries that can be redressed by damages and other requested relief. Plaintiffs are entitled to compensatory damages against the City of Montgomery. They are also entitled to compensatory and punitive damages against Mayor Strange and Presiding Judge Hayes, in their individual capacities, and against JCS.

**Count IX**
**Violations of Fourteenth Amendment Due Process and Equal Protection Clauses and 42 U.S.C. § 1983 In Requirements of Appeal Bonds – Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Floyd, Caldwell, James, Mooney, and others similarly situated, Against The City of Montgomery, Mayor Todd Strange and Presiding Judge Les Hayes, III**

243.     The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

244.     Mayor Todd Strange, as final Policymaker as Mayor of the City of Montgomery, and Presiding Judge Les Hayes, III, as a final policymaker for Montgomery Municipal Court for the City of Montgomery, acting under color of state law, adopted, ratified, administered and implemented for the Montgomery Municipal Court a policy, practice of attempting to bar inmate appeals by requiring them to pay costly fixed sum or schedule set appeals bonds without meaningful inquiry into their indigency or ability to pay. Pursuant to this policy, practice or custom, Plaintiffs were never even informed of any right to have the costs associated with pursuing an appeal waived if they are indigent.

245.     The 2013 Municipal Court Survey for the City of Montgomery Municipal Court, lists only 37 appeals out of 87,596 Non-DUI traffic cases disposed of that year; the City of Huntsville's 2013 Report lists 1,249 appeals out of 27,889 Non-DUI traffic cases disposed of that year.

246.     These policies, practices or customs of requiring costly appeal bonds for those who cannot afford them and not informing incarcerated debtors of their rights concerning appeal, including the right to have such costs reduced or waived, violate due process and equal protection rights of the Fourteenth Amendment, as Plaintiffs are deprived of their fundamental liberties of personal freedom and their access to the appellate processes of the courts on the basis of their indigency.

247.     The above factual allegations are indicative, Defendants adopted, administered and implemented a widespread and persistent policy, practice or custom of failing to adequately train and/or supervise officers and employees with regard to protecting against violations of the rights alleged in this count. Defendant Hayes acted with deliberate

indifference to the foreseeable or highly predicable and heightened risk of unconstitutional conduct created by the lack of adequate training and/or supervision.

248.    The above acts, policies or customs of the Defendants violate Plaintiffs' Fourteenth Amendment rights under color of state law in violation of 42 U.S.C. § 1983, as was clearly established at the times of their acts. Defendants acted willfully and maliciously and with reckless or callous indifference to Plaintiffs' federally protected rights.

249.    The above acts, policies, practices or customs of the Defendants, acting under color of state law, were the driving force behind the violations of Plaintiffs'' Fourteenth, Amendment rights in violation of 42 U.S.C. § 1983.

250.    As a direct and proximate result of these Defendants' wrongful acts, policies, practices or customs, Plaintiffs and others similarly situated have suffered significant and substantial personal injuries, as described in the factual allegations of individual Plaintiffs, that are redressable by damages and other requested relief. Plaintiffs are entitled to compensatory damages against the City of Montgomery. They are also entitled to compensatory and punitive damages against Mayor Strange and Presiding Judge Hayes, in their individual capacities, and against JCS.

**Count X**
**Violations of RICO § 1962(c) – Plaintiffs McCullough, Johnson, Jones, Agee, Caldwell, and others similarly situated, Against Defendant JCS**

251.    The allegations of the previous paragraphs, and in particular the RICO-Specific factual allegations, are incorporated herein by reference and certain more specific references to other factual allegations are set out below.

252.    This Count is against Defendant JCS.

253.     Defendant JCS together with The City of Montgomery, Mayor Todd Strange and Presiding Judge Les Hayes, III constituted an association-in-fact and thus a RICO enterprise that engaged in and whose activities affected interstate commerce, including by regular use of the U.S. Postal Service to mail notices and otherwise facilitate court and JCS activities. Defendant JCS was employed by or associated with the association- in-fact or enterprise through its contracts with the City of Montgomery to provide probation services, signed by City Mayors including Todd Strange, for the benefit of the Montgomery Municipal Court, which contracts were adopted as policy for the Municipal Court by, and orders for their performance were issued by, Presiding Judge Les Hayes, III.

254.     Defendant JCS agreed to and willfully or knowingly participated in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting monetary fees from Plaintiffs. Specifically, Defendant JCS repeatedly, routinely and continually engaged in a close-ended pattern of obtaining from Plaintiffs, by threat a $10 set-up fee and additional $49 probation fees each month, with the intent to deprive them of this money. Defendant JCS repeatedly harassed and threatened Plaintiffs and others, by telling them that if they did not pay these fees, they would have their probation revoked and be jailed for non-payment, without revealing any information to Plaintiffs about their contractual rights as indigent persons to wavier of JCS fees or the constitutional rights of indigent persons to pre-deprivation hearings and not to be jailed for failure to pay fines.

255.     Pursuant to and in furtherance of the above scheme, Defendant JCS committed multiple related acts of extortion using illegal means of threats of imprisonment, and for the illegal purpose of collection of $40 monthly probation fees to which it had no lawful

claim because of Plaintiffs' and others' indigency and their contractual entitlement not to be charged the $40 monthly probation fees, and/or because the JCS contracts with the city of Montgomery were illegal because they provided for probation fees unauthorized by Alabama law,  and/or violated state laws on competitive bidding, and/or  were inherently wrongful, including:

a. Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (relating to interference with commerce, robbery or extortion):

Defendant JCS, individually and in conspiracy with The City of Montgomery, Mayor Todd Strange and Presiding Judge Les Hayes, III, obtained money, in the form of $10 set-up fees and $40 monthly probation fees, from Plaintiffs with consent that was induced by the wrongful use of fear (e.g., use of fear that JCS would set probation revocation proceedings leading to commutation of fines and court costs to jail time to be sat out at a rate of $50 a day) in violation of 18 U.S.C. § 1951.

The proceeds of this extortionate activity were used in commerce and thereby and in other ways affected interstate commerce under § 18 U.S.C. 1951(a).

b. Extortion in violation of § 18 U.S.C. § 1952 (relating to racketeering; interstate and foreign travel or transportation in aid of racketeering enterprises):

Defendant JCS, individually and in conspiracy with The City of Montgomery, Mayor Todd Strange, and Presiding Judge Les Hayes, III, obtained money in the form of $10 set-up fees and $40 monthly probation fees from Plaintiffs and others by threats (e.g., of setting probation revocation hearings leading to the commutation of fines and court costs to jail time to be sat out at a rate of $50 a day) with the intent to deprive them of this money in violation of in violation of 18 U.S.C. § 1952.

Defendant JCS is a corporate entity based outside Alabama that operated, conducted and managed the alleged extortionate activities in Montgomery, Alabama. Defendant JCS travelled in interstate commerce (e.g., by using interstate highways to travel between its office in the Municipal Court and its payment center) and used the mail (e.g., for sending Notices to Show Cause or notices setting hearing on probation revocation) and other facilities of interstate commerce in pursuit of its pattern of racketeering; and the proceeds obtained from the enterprise were used in interstate commence (e.g., as profits as part of a corporate entity located in another state) in violation of 18 U.S.C. §§ 1952(a)(1) and 1952(a)(2).

c.   Violations of 18 U.S.C. §1581(peonage):

JCS, individually and in conspiracy with The City of Montgomery, Mayor Todd Strange, and Presiding Judge Les Hayes, III, knowingly returned Plaintiffs to a condition of peonage by subjecting Plaintiffs and others to performance of jail work in order to reduce by $25 a day the time required to "sit out" unpaid fines and court costs.

d.   Violations of 18 U.S.C. §1589(b) (forced labor under threat of physical restraint or abuse of process):

Defendant JCS, individually and in conspiracy with The City of Montgomery, Mayor Todd Strange and Presiding Judge Les Hayes, III knowingly benefited, financially or by receiving anything of value, from participation in a venture (the RICO enterprise) knowingly or in reckless disregard of the fact that the venture engaged in the providing or obtaining of forced labor or services, in the form of Plaintiffs' and others' coerced performance of jail work in order to reduce the time required to "sit out" unpaid fines and court costs by $25 a day, by the following means described in subsection (a):

e.   --by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

f.   --by means of serious harm or threats of serious harm to that person or another person;

g.   --by means of the abuse or threatened abuse of law or legal process; or

h.   --by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

e.   Extortion in violation of Ala. Code §13A-8-13:

Defendant JCS, individually and in conspiracy with The City of Montgomery, Mayor Todd Strange and Presiding Judge Les Hayes, III obtained money from Plaintiffs by threat with the intent to deprive them of this money in violation of Ala. Code §13A-8-13.

256.   The repeated acts of threats and extortion set forth above were part of the enterprise's regular way of doing business and constituted a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

257.   Defendant JCS directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

258.   As a direct and proximate result of Defendant JCS's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered concrete injuries to their real or personal property. As a direct and proximate result of Defendant JCS's racketeering activities Plaintiffs were subjected to set-up fees and monthly probation fees charged by Defendant JCS and were forced to continue paying these monthly fees under threat of

imprisonment even though they were indigent and entitled to waivers of such fees, resulting in economic harm to their real or personal property. Plaintiffs have also suffered other injuries to their real or personal property, including loss of employment or employment opportunities, loss of business or clients, loss of educational investments or opportunities, or loss of cars, homes, or other property. Plaintiffs have suffered all these above-mentioned injuries by reason of Defendant JCS's violations of § 1962(c) and (d) are the injuries are redressable by treble damages under RICO.

Wherefore, Plaintiffs are entitled to judgment against Defendant JCS as follows: Actual damages; Treble damages; and Attorney's fees.

RICO Claim Jury Trial Demanded

**Count XI**<br>**Violations of RICO § 1962(d) – Plaintiffs McCullough, Johnson, Jones, Agee, Caldwell, and others similarly situated, Against Defendant JCS**

259.    The allegations of the previous paragraphs, and in particular the RICO-Specific factual allegations, are incorporated herein by reference and certain more specific references to other factual allegations are set out below.

260.    This Count is against Defendant JCS.

261.    As set forth above, Defendant JCS agreed and conspired with the City of Montgomery, Mayor Todd Strange and Presiding Judge Les Hayes, III, to violate 18 U.S.C. § 1962(c). Specifically, Defendant JCS intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as described in the previous count and in the RICO-Specific factual allegations.

262.    Defendants JCS intentionally conspired and agreed with The City of Montgomery, Mayor Todd Strange, Presiding Judge Les Hayes, III and/or other officials and employees of the City to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendant JCS knew that its predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962 (c), in violation of 18 U.S.C. § 1962(d).

263.    As direct and proximate result of Defendant JCS's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered concrete injuries to their real or personal property. As a direct and proximate result of Defendant JCS's racketeering activities, Plaintiffs were subjected to set-up fees and monthly probation fees charged by Defendant JCS and were forced to continue paying these monthly fees under threat of imprisonment even though they were indigent and entitled to waivers of such fees, resulting in economic harm to their real or personal property. Plaintiffs have also suffered other injuries to their real or personal property, including loss of employment or employment opportunities, loss of business or clients, loss of educational investments or opportunities, or loss of cars, homes, or other property.  Plaintiffs have suffered all these above-mentioned injuries by reason of Defendant JCS's violations of § 1962(c) and (d) are the injuries are redressable by treble damages under RICO.

264.    Wherefore, Plaintiffs are entitled to judgment against Defendant JCS as follows: Actual damages; Treble damages; and Attorney's fees.

RICO Claim Jury Trial Demanded

**Count XII**

**False Imprisonment – Plaintiffs McCullough, Johnson, Jones, Edwards, Agee, Floyd, Caldwell, James, Scott, Mooney, and others similarly situated, Against Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, and Presiding Judge Les Hayes, III and JCS**

265.   The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

266.   Defendants Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr., and Former Chief of Police Kevin Murphy, in performance of discretionary functions, by their personal acts and by and through their instigation and participation in (by Mayor Todd Strange), adoption and administering (by former Police Chief Kevin Murphy and Police Chief Ernest Finley, Jr.) of policies or customs pursuant to which the Montgomery Police Officers (in the stops, ticketing, and arrests, including on warrants, described in the factual allegations for the individual Plaintiffs) stopped, ticketed or arrested individuals without reasonable suspicion of any wrongdoing, in violation of the Fourth Amendment, and racially profiled and targeted African Americans and minorities for stops, ticketing or arrest, in violation of the federal due process and equal protection clauses, 42 U.S.C. § 1981. and Title VI, did intentionally and unlawfully instigate, participate in, cause and/or induce, or aid and abet, the unlawful detention of the persons of Plaintiffs for varying lengths of time. Through their acts, policies, practices, or customs these Defendants are liable, in their individual capacities, for violating their personal duties to Plaintiffs and others similarly situated arising under Ala. Code § 6-5-170, by restraining and depriving Plaintiffs of their personal liberty and subjecting them to false imprisonment (including false arrest as a type of false imprisonment) in violation of Ala. Code § 6-5-170.

267.   The Defendant Mayor Todd Strange and Presiding Judge Les Hayes, III, in

performance of discretionary functions, instigated, participated in and/or caused the unlawful detentions of Plaintiffs, through warrants, arrests, placements on probation with JCS, probation revocations, and detentions or imprisonments of Plaintiffs, and others similarly situated, as detailed in the factual allegations for individual Plaintiffs, (despite their lack of willfulness in failing to pay, and despite their indigency or inability to pay), for failure to pay fixed sum bail or bonds, fines, court costs, fees, and other debts. Thereby, Mayor Todd Strange and Presiding Judge Les Hayes, III, in their individual capacities, and in violation of their personal duties to Plaintiffs, and others similarly situated, arising under Ala. Code § 6-5-170, did intentionally and unlawfully instigate, participate in, cause and/or induce, or aid and abet, the detention of the persons of Plaintiffs for varying lengths of time, as long as nine months, whereby they were directly restrained and deprived of their personal liberty and subjected to false imprisonment (including false arrest) in violation of Ala. Code § 6-5-170.

268.    Defendant JCS and its employees unlawfully induced and procured, instigated or participated in, and/or aided and abetted in the detentions through warrants, arrests, probation revocation, detention and incarceration of indigent Plaintiffs for failure to pay bonds, fines, court costs, fees, and other debts pursuant to which Plaintiffs were intentionally and unlawfully detained for varying lengths of time, as long as nine months, during which they were restrained and deprived of their personal liberty and thus subjected to false imprisonment (including false arrest) in violation of Ala. Code § 6-5-170.

269.    Defendant JCS is liable for the acts of all of its employees who arrested or otherwise instigated or participated in the detentions of Plaintiffs or who aided or abetted

this false imprisonment (including false arrest).

270.    Defendants Todd, Finley, Murphy, and Hayes, in their individual capacities, have each acted (1) beyond his or her authority (e.g., contrary to and in violation of their personal duties to Plaintiffs and others similarly situated arising under Ala. Code § 6-5-170; under clear federal prohibitions on racial discrimination; and/or under detailed state rules on imprisonment for debts that are so clear as to remove Defendants' judgment, including Const. of Ala., Art. I, Sec. 20: "That no person shall be imprisoned for debt.", Ala. Code § 15-18-62 (fines and costs can be converted into jail time only if a defendant is found to have willfully failed to pay the fines or costs), and Rule 26.11(i)(2) of the Alabama Rules of Criminal Procedure ("In no case shall an indigent defendant be incarcerated for inability to pay a fine or court costs or restitution."); (2) recklessly, wantonly, willfully, maliciously, fraudulently, or in bad faith (e.g., by willfully acting beyond detailed scope of Defendants' authorities, and by willfully misinterpreting clear and unambiguous laws, all for the purpose of generating and collecting revenue, with malicious disregard for the plight of minority or indigent individuals such as Plaintiffs who are subjected to profiling or subjected to the cruel punishment of spending time in jail); and (3) under a mistaken interpretation of the law (e.g., mistaken interpretations of Ala. Code § 6-5-170, the federal constitutional and statutory law with regards to the legality of profiling, state law with regard to legality of JCS contracts, and/or state law provisions cited above on imprisonment for debts), coupled with willfulness, maliciousness or bad faith.

271.    Without appropriate injunctive relief, the false imprisonments (including false arrest) relating to unlawful stops, ticketing, and arrests and those related to setting fixed

schedule bonds for indigents will continue, and poor and minority individuals including Plaintiffs face a real and immediate, and substantial risk of future injury of being deprived or their personal liberty or of their state and federal rights mentioned above.

272.    Wherefore, Plaintiffs are entitled to judgment against Defendant JCS, Defendants Mayor Todd Strange, Chief of Police Ernest N. Finley, Jr., Former Chief of Police Kevin Murphy, and Presiding Judge Les Hayes, III, in their individual capacities, for violations of their personal duties, arising under Ala. Code § 6-5-170, to Plaintiffs and others similarly situated, including: Injunctive relief; An award of damages in an amount to be determined at trial; and Punitive damages in an amount to be determine at trial.

### Count XIII
### Abuse of Process – Plaintiffs McCullough, Johnson, Jones, Agee, Caldwell, and others similarly situated, Against JCS

273.    The allegations of the previous paragraphs are incorporated herein by reference and certain more specific references to these factual allegations are set out below.

274.    JCS and its employees abused the process of probation in the City of Montgomery Municipal Court by wrongfully using the probation orders approved of in its contracts with The City of Montgomery, which granted it authority to supervise probation and charge $40 monthly probation fees to non-indigent probationers, for the ulterior motive of coercing and extorting money from Plaintiffs who were indigent or unable to pay, for its own profit. JCS and its employees issued such probation orders for this ulterior motive and then withdrew them if it was successful in its extortion of probation fees.

275.    JCS and its employees intentionally and maliciously used the probation orders in this way, and by harassing and threatening Plaintiffs, failing to give Plaintiffs full information about their contractual, due process, equal protection or other rights, and

failing to provide them notice of, or access to, a process for evaluating or presenting indigency or inability to pay as a basis of waiver of fees, or in a hearing before the court on commuting fines and court costs to jail time when Plaintiffs were unable to pay.

276.    Defendant JCS is liable for the acts of all of its employees who abused process or who were involved as instigators or participants in, or aided and abetted the abuse of process.

Wherefore, Plaintiffs are entitled to judgment against JCS as follows: An award of damages in an amount to be determined at trial; and punitive damages in an amount to be determine at trial.

## Count XIV
### State Law Claim for Money Had and Received – Plaintiffs McCullough, Johnson, Jones, Agee, Caldwell, and others similarly situated Against JCS

277.    The allegations of the previous paragraphs are incorporated herein by reference and certain more specific reference to these factual allegations are set out below.

278.    JCS is liable to Plaintiffs under Alabama state law for Money Had and Received.

279.    JCS and its employees obtained and held Plaintiffs' money in the form of set-up fees and $40 monthly probation fees, that it was not entitled because its contracts with the City of Montgomery were illegal under Alabama laws governing public bidding for exclusive public contracts (Ala. Const., Art. I, Sec. 22; Ala. Code § 41-16-50), and/or that it was not entitled to because requiring the monthly probation fees were not authorized by law, and/or in equity and good conscience belongs to the Plaintiffs; or

280.    JCS and its employees obtained and held Plaintiffs' money in the form of set-up and $40 monthly probation fees that it was not entitled to and which was improperly paid to the defendant because of mistake or other wrongful reasons, including because charging

indigent individuals its regular monthly probation fees was prohibited by express language in its contracts with The City of Montgomery.

281.    Defendant JCS is liable for the acts of all of its employees who were involved as instigators or participants in or aided and abetted in the unlawful obtaining and holding of Plaintiffs' money.

Wherefore, Plaintiffs are entitled to judgment against JCS as follows: An award of damages in an amount to be determined at trial; and an award of punitive damages in an amount to be determined at trial.

### Request for Relief

WHEREFORE, Plaintiffs request the following relief:

a. Declaratory relief;

b. Injunctive relief;

c. Compensatory damages;

d. Punitive damages;

e. Treble damages for RICO violations;

f. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, 18 U.S.C § 1595(a) and 18 U.S.C. 1964(c); and

g. Any other relief this Court deems just and proper, and as may be required in the interests of justice.

Dated: August 20, 2015

Respectfully submitted,

    s/ Martha I. Morgan
MARTHA I. MORGAN (ASB-3038-A46M)

8800 Lodge Lane
Cottondale, Alabama 35453
Telephone: 205-799-2692
E-mail: mimorgan@yahoo.com
**Attorneys for Plaintiff**

FAYA ROSE TOURE (ASB-5931-R78R)
HENRY SANDERS (ASB-6179-A34H)
CHESTNUT, SANDERS &
 SANDERS, LLC
One Union Street
P.O. Box 1290
Selma, Alabama 36702
Telephone: 334-526-4531
Fax: 334-526-4535
E-mail: fayarose@gmail.com
         gpompey@csspca.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, on this 20 day of August, 2015.

And that I served copies of the same via U.S. Mail CMRRR and addressed to:

Mayor Todd Strange
City Hall, Room 206
103 North Perry Street
Montgomery, Alabama 36104

Judicial Correction Services, Inc.
Corporate Creations Network, Inc.
6 Office Park Circle #100
Mountain Brook, AL 35223

s/ Martha I. Morgan
Martha I. Morgan
 **Of Counsel**