### IN THE UNITED STATES DISTRICT COURT FOR THE
### MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

---

**ANGELA McCULLOUGH, MARQUITA JOHNSON, KENNY JONES, ALGI EDWARDS, LEVON AGEE, ADRIAN EDDIE FLOYD, HASSAN CALDWELL, DEVRON JAMES, ASHLEY DAWN SCOTT, and CHRISTOPHER MOONEY,** on behalf of themselves, individually, and on behalf of a class of all others similarly situated,

        **Plaintiffs,**

**V.**

**THE CITY OF MONTGOMERY, ALABAMA; ERNEST N. FINLEY, JR., CHIEF OF POLICE OF THE CITY OF MONTGOMERY,** in his individual capacity; **KEVIN MURPHY, FORMER CHIEF OF POLICE OF THE CITY OF MONTGOMERY,** in his individual capacity; **LES HAYES, III, PRESIDING JUDGE OF THE MUNICIPAL COURT OF THE CITY OF MONTGOMERY,** in his individual and official capacities; **JUDICIAL CORRECTION SERVICES, INC.,** a corporation; and **TODD STRANGE, MAYOR OF THE CITY OF MONTGOMERY,** in his individual capacity,

        **Defendants.**

**Case No. 2:15-cv-00463-WKW-WC**
**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED**

---

### PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................................1

     *Frazier v. Jordan,* 457 F. 2d 726, 729 (5th Cir. 1972).........................................1

**GENERAL DISCUSSION OF KEY ISSUES**.......................................................................4

  **1)**  **The City of Montgomery is Liable for the Challenged Administrative Policies
      and Customs of Presiding Judge Because, For Purposes of the Claims in this
      Case, Presiding Judge Hayes is a Municipal, not State, Officer…**......................4

     **a. The Status of Presiding Judge Hayes as a Municipal Officer**...................4

     Advisory Opinion No. 14-926, Alabama Judicial Inquiry Commission
     (2014)................................................................................................................4
     *Mt. Healthy City School Dist. Bd. of Ed.*, 429 U.S. 274 (1977)..............................5
     *Lincoln County v. Luning*, 133 U.S. 529 (1890)......................................................5
     *Owen v.  City of Independence*, 445 U.S. 622 (1980).............................................5
     *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).....................5
     *Grech v. Clayton Cnty,* 335 F. 3d 1326, 1329-30 (11th Cir. 2003).......................5
     *Ex parte Tulley,* Case No. 1140049, at 24-25 (Ala. Sept. 4, 2015).....................6
     Municipal Code, City of Montgomery, Chapter 17 Municipal Court.................6
     *McMillian v. Monroe County,* 520 U.S. 781, 785 (1997).......................................7
     1901 Alabama Constitution, Art. VI .................................................................9
     *State ex rel. Wilkerson v. Lane*, 181 Ala. 646 (1913)............................................9
     1901 Constitution of Alabama, Art. VI, as amended by Amendment 328
     (1973)..............................................................................................................10
     One Idea for a New State Constitution: The 1973 Proposed Constitution
     (1973)..............................................................................................................10
     James D. Thomas & William H. Stewart, Alabama Government & Politics, 103
     (1988)..............................................................................................................11
     1901 Constitution of Alabama, Art. VI, § 6.01(a)............................................11
     1901 Constitution of Alabama, Art. VI, § 6.065..............................................11
     1901 Constitution of Alabama, Art. VI, § 6.06................................................11
     1901 Constitution of Alabama, Art. VI, § 6.11................................................12
     1901 Constitution of Alabama, Art. VI, § 6.17................................................12
     1901 Constitution of Alabama, Art. VI, § 6.18................................................12
     Alabama Code § 12-14-1………………………………………………..…12
     *Wilkins v. Dan Haggerty Assocs.*, 682 So. 2d 507, 509-10 (Ala. 1995).............12
     Advisory Opinion No. 14-926, Alabama Judicial Inquiry Commission
     (2014)..............................................................................................................13
     Advisory Opinion No. 90-410, Alabama Judicial Inquiry Commission
     (1990)..............................................................................................................14

**b. The City is Liable Regardless of the Status of Presiding Judge Hayes**……………………………………………………………………**15**

*Wilkins v. Dan Haggerty Assocs.*, 682 So. 2d 507, 509-10 (Ala. 1995)…………15
*Dickinson v. Lowery,* 302 F.3d 857, 867 (8th Cir. 2002)……………………….....15
*Ray v. Judicial Corrections Services,* No. 2:12-cv-02819, p. 13-14 (N.D. Alabama Sept. 26, 2013)……………………………………………………………….....16
Ala. Code §12-14-30(a)……………………………………………………………17
Ala. Code § 12-14-19……………………………………………………………....18
Ala. Code § 12-14-2(b)………………………………………………………….....18
Ala. Code § 12-14-16……………………………………………………..………...18

2) **Absolute Judicial Immunity is Not Available to Presiding Judge Hayes in His Individual Capacity Because the Acts and Omissions He Is Sued for Are Administrative Functions as Presiding Judge, Not Judicial Functions…..…19**

*Forester v. White,* 484 U.S. 219, 227-29 (1988)……………………………………20
*Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 436 (1993)………………………20
*Morrison v. Lipscomb,* 877 F. 2d 463, 466 (6th Cir. 1989)…………………………20
*Ratte v. Corrigan,* 989 F. Supp. 2d 550 (E.D. Mich. 2013)………………………21

3) **Qualified Immunity is Not Available to Any of the Defendants Sued in their Individual Capacities Because Their Personal Acts or Omissions Violated Clearly Established Rights………………………………………………..…22**

*Hill v. Madison County School Board, et al.*, No. 14-12481 (11th Cir. Aug. 12, 2015)…………………………………………………………………………….….22
*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)………..23
*Frazier v. Jordan,* 457 F. 2d 726 (5th Cir. 1972)…………………………………23
*Tucker v. City of Montgomery Board of Commissioners,* 410 F. Supp. 494 (M.D. Ala. 1976)……………………………………………………………………………23
*Tate v. Short,* 401 U.S. 395 (1971)…………………………………………………24
*Argersinger v. Hamlin,* 407 U.S. 25 (1972)………………………………………24
*Burns v. Ohio,* 360 U.S. 252 (1959)………………………………………………24
*Smith v. Bennett,* 365 U.S. 708 (1961)……………………………………………24
*Griffin v. Illinois,* 351 U.S. 12 (1956)……………………………………………24

**COUNT-BY-COUNT RESPONSES**………………………………………………**25**

**Standard of Review**…………………………………………………………………**25**

**Plaintiffs' First Amended Complaint Meets the Pleading Requirements of Rule 8(a)(2), as Interpreted in *Twombly/Iqbal* and Subsequent Cases**……………………**25**

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)………………………………25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................25
*Randall v. Scott*, 610 F. 3d 701, 710 (11th Cir. 2010).........................................25
*Smiley v. Ala. Dep't of Transp.,* 788 F. Supp. 1283, 1299 (M.D. Ala. 2011).......25
*Quality Foods De Centro Am., S.A. Agribusiness,* 711 F. 2d 989 (11th Cir. 1983)....................................................................................................................26
*St. George v. Pinella County,* 285 F.3d 1334, 1337 (11th Cir. 2002)..................26
*Skinner v, Switzer,* 131 S. Ct. 1289, 1296 (2010)................................................26
*Tolan v. Cotton,* 134 S. Ct. 1861 (2014)..............................................................26
Fed. R. Civ. P. Rule 12(e)......................................................................................27
*McGuire v. City of Montgomery,* Case No. 2:11-cv-1027-WKW (WO), at 14, (M.D. Ala. March 29, 2013)...................................................................................27

**I. COUNT I: PLAINTIFFS ARE ENTITLED TO PROCEED WITH THEIR CLAIMS OF RACIAL PROFILING OR TARGETING AND UNLAWFUL ARRESTS…………………………………………………………..………28**

   **A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes…………………………………………………..…………28**

   **1) Plaintiffs' Count I Claims Meet the Pleading Requirement of Rule 8(a)(2) as interpreted in the *Twombley/Iqbal* Line of Cases……………..……………28**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................28
*Washington v. Davis*, 426 U.S. 229 (1976)…………………………………….29
*Arlington Heights v. Metropolitan Housing*, 429 U.S. 252 (1977)……………...29
*Bradley v. U.S.,* 299 F.3d 197 (3rd Cir. 2002)…………………………………...32
*Pembaur v. City of Cincinnati*, 475 U.S. 469, 585 (1986)…………….…………32
*Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir. 2003).....................................33
*Whren v. U.S.,* 517 U.S. 806 (1996)……………………………………………..34
*Jett v. Dallas Independent School District*, 491 U. S. 701 (1989)………………35
*Mc Donnell Douglas Corp., v. Green,* 411 U.S. 792 (1973)……………..………35
*Von Zuckerstein v. Argonne National Laboratory*, 984 F.2d 1467, 1472 (7th Cir. 1993)……………………………………………………………………………....35
*Palmer v. Board of Education,* 46 F.3d 682, 686-688 (7th Cir. 1995)…………..35
42 U. S. C. § 1988 (c)……………………………………………………………..36

**2) Defendants Strange, Finley, and Murphy Are Not Protected by Qualified Immunity on the Individual Capacity Claims Against Them…………………………36**

*Whren v. U.S.*, 517 U.S. 806, 813 (1996).............................................................36

**3) Plaintiffs Have Standing to Claim Injunctive Relief……………………………..…36**

*Sonsa v. Iowa,* 419 U.S. 393 (1975)……………………………………………..37
*Lyons v. City of Los Angeles*, 461 U.S. 95 (1983)……………………………....37
*Honig v. Doe,* 484 U.S. 305 (1988)……………………………………………...37

*Olmstead v. L.C.,* 527 U.S. 581, 594 n.6 (1999)…………………………………37

**II. COUNT II: PLAINTIFFS ARE ENTITLED TO PROCEED ON TITLE VI CLAIMS AGAINST THE CITY OF MONTGOMERY**…………..……………....37

**A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes**…………………………………………………………………37

1) **Count II Meets the Pleading Requirement of Rule 8(a)(2) as interpreted in the *Twombley/Iqbal* Line of Cases**……………………………………………38

*Liese v. Indian River Co. Hosp. Dist.,* 701 F. 3d 334, 345 (11th Cir. 2012)……..38
42 U.S.C § 2000(d)

2) **Plaintiffs Have Standing to Seek Injunctive Relief**……………….…………38

**III. COUNT III: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS OF UNLAWFUL USES OF WARRANTS**……………………………………………38

A. **Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes**…………………………………………………………………39

1) **Plaintiffs' Allegations are Sufficient to Plead The City of Montgomery's Liability for the Policies or Customs Causing the Deprivation of Plaintiffs' Fourth and Fourteenth Amendment Rights**……………………………………39

2) **Presiding Judge Hayes, in his Individual Capacity, Is Not Entitled to Dismissal Because Plaintiffs State Claims for Relief Against Administrative Functions Not Covered By Absolute Judicial Immunity**…………………………………………………………………………39

*Forrester v. White,* 484 U.S. 219, 227-229 (1988)……………………….……..40

3) **Individual City Defendants Are Not Entitled to Qualified Immunity**……....40

*Bearden v. Georgia*, 461 U.S. 660 (1983)…………………………………………41
*Tate v. Short,* 401 U. S. 395 (1971)……………………………………………....41
*Turner v. Rogers,* 131 S. Ct. 2507 (2011)……………………………………….41
*Barrett v. Hopper*, 548 F. 2d 550, 554 (5th Cir. 1997)………………………….41

4) **Plaintiffs Have Standing to Seek Injunctive Relief**…………..……………42

*Mitchell v. City of Montgomery* (Case 2:14-CV-00186-MHT-CSC, Docs. 51 and 51.1)…………………………………………………………………….………..42

B. **Responses to Ground for Dismissal Raised by JCS**………………………43

**Plaintiffs Have Sufficiently Pleaded Claims for Relief Against JCS for Its Involvement in the Unlawful Conduct Claimed in Count III**……………………..43

**IV. COUNT IV: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS AGAINST THE USE OF FIXED-SUM BAIL SCHEDULES**………………………44

**A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes**................................................................................................44

**1) Plaintiffs' Allegations are Sufficient to State Claims Against The City of Montgomery Based on the Bail Policies or Customs That Caused the Deprivation of Plaintiffs' Rights**……………………………………………44

Ala Code § 12-14-30……………………………………………...……44
General Order No. 2015-0002, In re: Bail *Procedures* (Doc.# 53, Ex. 1)……….44
*Cooper v. City of Dothan*, No. 1:15-cv-00425-WKW-TFM (M. D. Ala. June 18, 2015)(Doc. #7)............................................................................45
*Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978)................................45
*State v. Blake*, 642 So, 2d 959, 968 (Ala. 1994)................................................45
*Co. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)…………………….45
Ala. R. Crim. P.  Rule 4.3……………………………………………46
*Stack v. Boyle*, 342 U.S. 1, 5 (1951)……………………………………46
*U.S. v. Salerno*, 481 U. S. 739 (1987)……………………………………46

**2) The Count IV Claims Against Presiding Judge Hayes in his Individual Capacity Are Based on His Performance of Administrative Functions and Not Protected by Absolute Judicial Immunity**……………………………………………………46

General Order No. 2015-0002, In re: Bail Procedures………………………...47

**3) Plaintiffs' Allegations Are Sufficient to State Claims for Which Police Chief Ernest Finley And Former Chief Of Police Kevin Murphy Are Not Entitled to Qualified Immunity**...……………………………………………………47

*Cooper v. City of Dothan*, No. 1:15-cv-00425-WKW-TFM (M. D. Ala.  June 18, 2015) (Doc. # 7)............................................................................48
*Jones v. City of Clanton*, Case No. 2:15-cv-34-MHT (2015) (Doc.# 76)……….48
*Baker v. Wingo*, 407 U.S. 514, 532 (1972)............................................................48

**4) Plaintiffs Have Standing to Seek Injunctive And Declaratory Relief on the Claims in Count IV**………………………………………………………49
*Lyons v. City of Los Angeles*, 461 U.S. 95 (1983)…...……………………....50
*United States v. W.T. Grant Company*, 345 U. S. 629, 632 (1953)……………..50
*Knox v. Service Employees International Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012)..........................................................................................................50

*Harrell v. The Fla. Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010)………………....50
*Rich v Fla. Dept. Corr.*, 716 F. 3d 525, 531 (11th Cir. 2013)……………….…...50
General Order No. 2015-0002, In re: Bail Procedures…………………….......…..51
*Jones v. City of Clanton,* Case No. 2:15-cv-34-MHT (2015) (Doc.# 76)……..…52
*Cooper v. City of Dothan,* Case No. 1: 15-cv-425-WKW (2015) (Doc. # 25)…..52
*Co. of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991)……………………...…53
*Pierce v. Velda City,* Case No. 4:15-cv-570-HEA (June 3, 2015)………..…...53

**V. COUNT V: PLAINTIFFS ARE ENTITLED TO PROCEED ON THEIR CLAIMS AGAINST THE JAILING OF INDIGENT DEBTORS………….………55**

**A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes………………………………………………………………….………55**

**1) The Plaintiffs Have Sufficiently Pleaded Claims That Jailing Indigent Debtors Was A Policy Or Custom Of The City Of Montgomery……………………………55**

**2) Count V Is Not Due To Be Dismissed As To Presiding Judge Hayes On Grounds Of Absolute Judicial Immunity…………………………………………………….56**

**3) Count V Is Not Due To Be Dismissed on Qualified Immunity Grounds As To Finley, Murphy And Strange………………………………………………………57**

*Bearden v. Georgia,* 461 U.S. 666 (1983)………………………………57
*Tate v. Short,* 401 U.S. 395 (1971)……………………………………....57
*Turner v. Rogers,* 131 S. Ct. 2507 (2011)...…………………...………...57
*Frazier v. Jordan,* 457 F. 2d 726, 728 (5th Cir. 1972)…………………….57
*Barnett v. Hopper,* 548 F. 2d 550, 554 (5th Cir. 1997)……………….…...57
*Burton v. Goodlett*, 480 F.2d 983 (5th Cir. 1973)……………………….…58

**B. Response to Grounds for Dismissal of Count V Raised by JCS…….…………58**

**Count V Should Not Be Dismissed as to JCS Because JCS Initiated and Participated in the Practice of Jailing Indigent Debtors……………………………..………58**

Ala. R. Crim. P. Rule 26.11……………………………………………………59

**VI. COUNT VI: PLAINTIFFS ARE ENTITLED TO PROCEED WITH CLAIMS OF FAILURE TO PROVIDE MEANINGFUL ACCESS TO COUNSEL……,….59**

**A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes...................................................................................................................60**

**1) Plaintiffs Have Sufficient Pleaded That The Failure To Appoint Counsel Was A Policy Or Practice Of The City Of Montgomery…………………….……60**

2) **Plaintiffs' Claims Against Presiding Judge Hayes in his Individual Capacity Are for Administrative Functions for which He Is Not Entitled to the Protection of Absolute Judicial Immunity**......................................61

**VII. COUNT VII: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS OF DEPRIVATION OF RIGHTS UNER THE THIRTEENTH AMENDMENT AND 18 U.S.C. § 1581;18 U.S.C. § 1589(a) AND (b);AND 18 U.S.C. § 1593A**..............................61

**A. Responses to Grounds for Dismissal Raised by City Defendants and Presiding Judge Hayes**.....................................................................................**64**

**1) Presiding Judge Hayes is Not Entitled to Dismissal on Grounds of Absolute Judicial Immunity Because He Was Performing Administrative Functions**..........**61**

**2) Defendants Sued in their Individual Capacities Are Not Entitled to Dismissal on Grounds of Qualified Immunity**..............................................................................**61**

*Bailey v. Alabama*, 219 U.S 291 (1911)...........................................63
*Menocal, et al. v. The GEO Group, Inc.*, No. 14-cv-02887-JLK (D. Col. July 6, 2015)..............................................................................................................64
*Nunag-Tanedo v. East Baton Rouge Parish School Bd.*, 790 F. Supp. 2d 1134 (C.D. Cal. 2011)......................................................................................64
*U.S. v. Kaufman*, 546 F. 3d 1242, 1263 (10th Cir. 2008)......................................64

**B. Responses to Grounds for Dismissal Raised by JCS**.........................................**64**

**Plaintiffs Sufficiently Plead Claims Against JCS in Count VII Because JCS Was an Active Participant in the Scheme or Venture Leading to Plaintiffs' Imprisonment and Forced Labor**..........................................................................................**64**

**VIII. COUNT VIII: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS OF THREATENING OR INITIATING PROBATION REVOCATION AND SUBSEQUENT IMPRISONMENT AND JAIL LABOR**.....................................................................**65**

**A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes**............................................................................................**65**

1) **Defendants Miscalculate the Applicable Statute of Limitations and Accrual**.............................................................................................**65**

*Wallace v. Kato*, 459 U.S. 384 (2007)..............................................66
*Mitchell v, City of Montgomery*, Case No. 2:14-cv-186-MHT (2014)............66
*Ray v. Judicial Corrections Services*, No. 2:12-cv-02819 (Dec. 20, 2012) (Doc. # 29).................................................................................................66
*Kellat v. Douglas County*, 2011 U.S. App. LEXIS 26442 (11th Cir. 2011)..........67

vii

**2) Plaintiffs' Claims Against Judge Hayes in His Individual Capacity Are for Administrative Functions for Which He Is Not Entitled to the Protection of Absolute Judicial Immunity………………………………………………………………67**

*Ala. Code § 12-14-13*………………………………………………………………68

**3) Plaintiffs Have Properly Pleaded Claims As To Defendant Strange And The City of Montgomery………………………………………………………………...…68**

**B. Response to Grounds for Dismissal raised by JCS............................................68**

**Plaintiffs Sufficiently Plead Claims Against JCS in Count VIII……………………68**

*Bearden v. Georgia*, 461 U.S. 660 (1983)…………………………………………70
*Tate v. Short,* 401 U. S. 395 (1971)………………………………………………...70
*Turner v. Rogers,* 131 S. Ct. 2507 (2011)…………………………………………70

**IX. COUNT IX: PLAINTIFFS ARE ENTITLED TO PROCEED WITH CLAIMS RELATED TO APPELLATE BONDS………………………………………………..70**

**A. Responses to Grounds for Dismissal of Count IX Claims Raised by City Defendants and Defendant Hayes.............................................................................70**

**1) Plaintiffs Properly State Claims Against Presiding Judge Hayes for Administrative Functions That Are Not Protected By Absolute Judicial Immunity.................................................................................................................71**

**2) Plaintiffs Properly State Claims of Municipal Liability in Count IX...............71**

2013 Municipal Court Survey City of Montgomery Municipal Court…………..72
2013 Municipal Court Survey City of Huntsville's Municipal Court……………72

**3) Plaintiffs Properly Plead Count IX Claims Against Defendant Strange.........72**

**X. PLAINTIFFS' CLAIMS OF INADEQUATE TRAINING AND SUPERVISION PROPERLY STATE CLAIMS FOR RELIEF………..……………………………72**

*City of Canton v. Harris,* 489 U.S. 378 (1989).…………………………………72
*City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988)………………………73

**XI. COUNTS X AND XI: PLAINTIFFS ARE ENTITLED TO PROCEED ON RICO CLAIMS AGAINST JCS.........................................................................................74**

**A. Responses to Grounds for Dismissal Raised by JCS.........................................74**

**1) Plaintiffs Sufficiently Plead that JCS' Actions Were Not Authorized by the Terms**

**of Its Contracts with the City of Montgomery**……………………………………....**74**

**2) Plaintiffs Properly Plead Predicate Acts That Support These RICO Claims**…..**75**

Hobbs Act, 18 U.S.C. § 1951……………………………………………………….................75
Travel Act, 18 U.S.C § 1951……………………………………………………....................75
Alabama Code § 13A-8-13……………………………………………………....................75
*United States v. Pendergraft,* 297 F.3d 1198, 1206 (11th Cir. 2002)…………75
Ala. R. Crim. P. 26.11(g)……………………………………………………………75
Ala. R. Crim. P. 27.2……………………………………………………………….75
*Wilkie v. Robbins,* 551 U.S. 537, 564-65 (2007)…………………………………78
*U.S. v Sturm,* 807 F.2d 769, 774 (1st Cir, 1989)……………………………………76
18 U.S.C. § 1589……………………………………………………………………77
*Chevron Corp. v. Donziger,* 974 F. Supp.2d 362, 579 (S.D.N.Y. 2014)……...…77
*United States v. Sturm,* 870 F.2d 769, 774 n.6 (1st Cir. 1989)……………....…77

**XII. COUNT XII: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS
OF FALSE IMPRISONMENT UNDER ALABAMA CODE § 6-6-170**……....…….**78**

**A. Response to Grounds for Dismissal Raise by City Defendants and Defendant
Hayes**..................................................................................................................**78**

**1)   Plaintiffs Sufficiently State Claims for False Imprisonment**……...………**78**

*Crown Cent. Petroleum Corp. v. Williams,* 679 So. 2d 651, 653 (Ala. 1996)…..78

**2)   The Individual City Defendants Are Not Entitled to State-Agent
      Immunity**……………………………………………………………...…**79**

*Hill v. Madison County School Board,* No. 14-12481 (11th Cir. Aug. 12,
2015)..........................................................................................................79
*Ex parte Cranman,* 792 So. 2d 392, 402 n.13 (Ala. 2000)...............................79
*Ex parte Butts,* 775 So.2d 173 (Ala. 2000).....................................................79
Const. of Ala., Art. I, Sec. 20.......................................................................80
Ala. Code § 15-18-62..................................................................................81
Ala. R. Crim. P. Rule 26.11(i)(2)....................................................................81
*Crown Cent. Petroleum Corp. v. Williams,* 679 So. 2d 651, 653 (Ala. 1996).....81

**3)   Presiding Judge Hayes Is Not Entitled to Dismissal On Grounds Of Absolute
      Judicial Immunity**……………………………………………………………**81**

*Ex parte City of Greensboro,* 948 So. 2d 540, 542-43 (Ala. 2006)…………….....82
*City of Bayou La Batre v. Robinson,*785 So.2d 1128, 1132 (Ala. 2000)…....…..82
*Ryan v. Hayes,* 831 So.2d 21, 27-28 (Ala. 2002)…………………………………82

**B. Response to Ground for Dismissal Raised by JCS**………………………….**83**

**Plaintiffs State a Claim for False Imprisonment Against JCS**..........................**83**

*Crown Cent. Petroleum Corp. v. Williams,* 679 So. 2d 651, 653 (Ala. 1996).....83

**XIII. COUNT XIII: THE FIRST AMENDED COMPLAINT SUFFICIENTLY STATES A CLAIM AGAINST JCS FOR ABUSE OF PROCESS**....................**83**

*Dempsey v. Denman,* 442 So.2d 63, 65 (Ala. 1983)...........................................84
*Shoney's Inc. v. Barnett,* 773 So.2d 1015, 1025 (Ala. Civ. App. 1999)...............84

**XIV. COUNT XIV: PLAINTIFFS STATE AN EQUITABLE CLAIM FOR MONEY HAD AND RECEIVED AGAINST JCS**......................................**84**

*Foshee v. General Telephone Co. of Southeast,* 322 So.2d 715, 716 (Ala. 1975)..............................................................................................................84

**XV. PLAINTIFFS' FIRST AMENDED COMPLAINT IS NOT DUE TO BE DISMISSED FOR USE OF "SHOTGUN PLEADINGS."**.............................**85**

**XVI. QUASI-JUDICIAL IMMUNITY NOT APPLY TO JCS**.......................**85**

*Owen v. City of Independence,* 445 U.S. 622 (1980)..........................................86
*Richardson v. McKnight,* 521 U.S. 399 (1997)..................................................86
*Filarsky v. Delia,* 132 S. Ct. 1657 (2012)........................................................86
*Roland v. Phillips,* 19 F. 3d 552, 555 (11th Cir. 1994)......................................87
*Scott v. Dixon,* 720 F. 2d 1542, 1546 (11th Cir. 1983)......................................87
*Galvan v. Garmon,* 710 F. 2d 214, 215-16 (5th Cir. 1983)................................88
*A.M. v. Grant,* 889 F. Supp. 1495, 1503-04 (M.D. Ala.) *aff'd sub nom. A.M. v. Grant,* 68 F.3d 486 (11th Cir. 1995).......................................................88
*Hughes v. Chesser,* 731 F.2d 1489, 1490 (11th Cir. 1984)................................89
*Spaulding v. Nielsen,* 599 F. 2d 728, 729 (5th Cir. 1979)...................................89
*Paris v. Quattlebaun,* 2009 Westlaw 734146 (M.D. Ala)...................................89

**XVII. PLAINTIFFS CLAIMS ARE NOT BARRED BY THE ROOKER-FELDMAN DOCTRINE AND ARE NOT COLLATERAL ATTACKS**...............................................**89**

**A. The *Rooker-Feldman* Doctrine Does Not Apply to Plaintiffs' Claims**..............**89**

28 U.S.C. § 1331.............................................................................................89
28 U.S.C. § 1257.............................................................................................89
*Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923)............................................89
*District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983)...........89
*Exxon Mobil Corporation v. Saudi Basic Industries Corporation,* 554 U.S. 280 (2005)............................................................................................................90
*Nicholson v. Schafe,* 558 F.3d 1226 (11th Cir. 2009)........................................90

*Skinner v. Switzer,* 131 S. C. 1289, 1297 (2011)................................................90
*Ray, et al. v. Judicial Corrections Services, et al.*, Case No. 2:12-cv-02819-RDP,
Northern District of Alabama, Sept. 13, 2013 at 14-16………………..…………90
*Siegel v. LePore,* 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc)………………91
*Powers v. Hamilton County Public Defender Commission,* 501 F. 3d 592, 597 (6th
Cir. 2007) *cert. denied,* 555 U.S. 813 (2008)…………………………………91

**B. Plaintiffs' Claims Are Not Collateral Attacks on Criminal Convictions..........91**

*Sprint Commc'ns, Inc. v. Jacobs,* 134 S. Ct. 584, 591 (2013)............................
*Powers v. Hamilton County Public Defender Commission,* 501 F. 3d 592, 597 (6th
Cir. 2007) *cert. denied,* 555 U.S. 813
(2008)……………………………………………………………………………92

**XVIII. THE STATE LAW CLAIMS IN THIS CASE ARE NOT DUE TO BE
DISMISSED UNDER 28 U.S. C. § 1367....................................................................93**

28 U.S. C. § 1367 ..................................................................................................93

# INTRODUCTION

Plaintiffs hereby file this Combined Response to the Defendants' three Motions to Dismiss Plaintiffs' First Amended Complaint (Docs. # 47, 48, 54 [Corrected]) and the corrected supporting brief  (Doc. # 53) filed by the City of Montgomery, Chief of Police Ernest N. Finley, former Chief of Police Kevin Murphy, and Mayor Todd Strange (hereinafter collectively the "City Defendants") and Presiding Judge Les Hayes.

Defendants' Motions to Dismiss are without merit and are due to be denied. More than four decades ago, Judge Wisdom's opinion for the Fifth Circuit Court of Appeals in *Frazier v. Jordan,* 457 F. 2d 726, 729 (5th Cir. 1972),[1] refused to accept the "house of cards" the defendants there built in an attempt to justify a "pay or stay" policy used to imprison debtors.[2] Defendants in the present case also construct many "houses of cards" in their motions to dismiss Plaintiffs' First Amended Complaint. The grounds raised in all three of the motions to dismiss are foundationless. Plaintiffs have sufficiently pleaded plausible claims for relief under Rule 8(a)(2) of the Federal Rules of Civil Procedure.

---

[1]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[2] The issue posed in *Frazier* was: "May a municipal court constitutionally impose a sentence requiring an indigent defendant to pay a [$17] fine forthwith or serve a specified number of days [13] in jail?" *Id.* Judge Wisdom's opinion for the Court held that the sentence discriminated against defendants unable to pay their fines because of their indigency.

The *Frazier* opinion concluded by noting that: "Our holding should not be read, though, to discharge or relieve the appellees from the responsibility for satisfying the fines levied against them in such fashion as the authorities may deem appropriate in light of [t]his opinion." *Id.,* at 730.  Nor do Plaintiffs in this case seek to be relieved of liability for fines imposed upon them or to challenge their convictions for traffic or misdemeanor offenses.

Fed. R. Civ. P. Rule 8(a)(2). Their claims are not due to be dismissed on any of the other grounds raised by the Defendants.

Paragraph two of Plaintiffs' First Amended Complaint describes the general nature of Plaintiffs' claims:

> 2. Plaintiffs are individuals who have been subjected to a "judicial [and law enforcement] extortion racket," including a modern day "debtors' prison," as part of a scheme designed to increase municipal budgets by using the City of Montgomery's law enforcement and courts to generate and collect revenue rather than to protect public safety and to administer justice. This scheme has been implemented through illegal policies, practices or customs, including but not limited to, unlawful stops, ticketing and arrests; racial profiling and targeted stops, ticketing and arrests of African Americans; extortionate imposition and collection of fines, fees, costs, restitution, surcharges and bail or bond and related charges, including through imprisonment for nonpayment; the use of threatened and actual probation revocation as a means of collection of these debts; and the use of coerced jail labor. Through the adoption and implementation of these policies, practices or customs, Defendants have trapped Plaintiffs in a cycle of debt by preying upon the City's largely voiceless poor and minority residents to pay the City's bills and replenish its public coffers. (Doc.# 32. ¶ 2).

Plaintiffs' claims for relief include civil rights claims under 42 U.S.C. § 1983 for violations of the Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1981. They also allege violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), et seq.; 18 U.S.C. §§ 1581 (peonage), 1589 (forced labor under threat of physical restraint or abuse of process), 1593A (benefitting from peonage) and 1595 (civil remedy); and 18 U.S.C. §1964 (RICO). Lastly, they bring state law claims of false imprisonment under Ala. Code § 6-5-170 and abuse of process, as well as equitable claims for money had and received.

Plaintiffs seek equitable relief (declaratory and injunctive), and damages. (Doc. # 32, p. 87-Request for Relief) to redress injuries caused them by the Defendants' actions or omissions. Sufficient factual allegations to state plausible claims for relief are

included in the First Amended Complaint's descriptions of the Defendants' authority and responsibilities (Doc. # 32, ¶¶27-39) and the factual allegations in the Background on Policies, Practices or Customs, (Doc. # 32, ¶¶40-68). Further factual allegations supporting the existence and operations of Defendants' challenged patterns or customs are also contained in the Plaintiffs' factual allegations concerning their own experiences. (Doc. # 32, ¶¶ 69-155). Relevant factual allegations for each claim will be referred to in the count-by-count discussion below.

Plaintiffs likewise have supplied factual allegations supporting the many concrete, palpable injuries they have suffered because of the Defendants' alleged deprivations of their rights. Lives have been shattered by these injuries, which include, but are not limited to: loss of jobs (Doc. # 32, ¶¶ 70-McCullough; 100-Edwards; 138-James); business (Doc. # 32, ¶ 152-Mooney); homes (Doc. # 32, ¶ 86-Johnson); cars (Doc. # 32, ¶ 86-Johnson); inability to pay child support (Doc. # 32, ¶ 100-Edwards) being forced to quit college (Doc. # 32, ¶ 70-McCullough); being made homeless, along with family, including children with disabilities (Doc. # 32, ¶ 86-Johnson); extreme emotional distress, including but not limited to, the onset of depression while incarcerated for more nine months (Doc. # 32, ¶ 85-Johnson ); being allowed only one 15 minute visit, with only one person per week, and only during very limited time periods (between 3 p.m. to 5 p.m. on Sundays for women); (Doc. # 32, ¶ 51); being separated from family, including a child with disabilities who was institutionalized and whose conditions worsened because of lack of contact with his mother (Doc. # 32, ¶ 73-McCullough); being forced to perform dangerous jail labor and exposure to distressing conditions. (Doc. # 32, ¶¶ 72-McCullough; 153-Caldwell).

## GENERAL DISCUSSION OF KEY ISSUES

In order to limit repetition in the count-by-count responses, Plaintiffs begin by addressing the following three reoccurring issues regarding the claims brought under 42 U.S.C. § 1983 (Count I, and Counts III through IX): (1) The City of Montgomery's Liability for the Policies and Customs of Presiding Judge Hayes, as a Municipal Officer; (2) The Functional Nature of Absolute Judicial Immunity; and (3) The Existence of Clearly Established Law Defeating Individual Defendants' Assertions of Qualified Immunity.

1) **The City of Montgomery is Liable for the Challenged Administrative Policies and Customs of Presiding Judge Because, For Purposes of the Claims in this Case, Presiding Judge Hayes is a Municipal, not State, Officer.**

   **a. The Status of Presiding Judge Hayes as a Municipal Officer**

   *"Alabama law is clear: a municipal judge is the chief judicial officer of the municipality . . . ."* Alabama Judicial Inquiry Commission Advisory Opinion No. 14-926 at 7 (2014). (emphasis added).

   Paragraph 33 of Plaintiffs' First Amended Complaint states:

   33.  Defendant Les Hayes, III is the Presiding Judge of the Municipal Court of the City of Montgomery. Defendant Hayes' judicial functions as a municipal judge are not at issue in this case. As presiding judge, he [is] a final policymaker of the City of Montgomery for the Municipal Court of the City of Montgomery concerning administrative policies, practices or customs challenged in this lawsuit." (Doc. # 32, ¶ 33).

   The City of Montgomery and Presiding Judge Hayes repeatedly argue for dismissal of claims against them on the ground that Presiding Judge Hayes acts as a state judicial officer of Alabama's Unified Judicial System ("UJS").  They do so because the state or state agencies can claim 11th Amendment immunity in § 1983 suits while municipalities cannot. Municipalities can be held liable not only for

declaratory and injunctive relief, but also for compensatory damages. The U. S. Supreme Court has long held that the 11th Amendment does not apply to suits against municipalities or political subdivisions of a state. *See, e.g., Mt. Healthy City School Dist. Bd. of Ed.*, 429 U.S. 274 (1977); *Lincoln County v. Luning*, 133 U.S. 529 (1890). In addition, municipalities sued under § 1983 are not entitled to claim any of the absolute or qualified immunities that may be available to their officers when they are sued in their individual capacities. *Owen v.  City of Independence*, 445 U.S. 622 (1980).  Thus, municipalities are strictly liable for their deprivations of federal rights, with out regard to whether a right was clearly established at the time of the unlawful actions. The only immunity available to municipalities  under § 1983 is immunity from punitive damages. *City of Newport v. Fact Concerts,* 453 U.S. 247 (1981).

Municipalities are liable under § 1983 whenever (1) a municipal employee's allegedly unconstitutional actions are undertaken *"in execution of a government's policy or custom*, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," and (2) the policy or custom is the *"moving force"* behind the constitutional or federal law violations claimed. *See Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).

Plaintiffs may establish the existence of a "policy" by showing municipal authority and responsibility for either "(1) an officially promulgated [municipal] policy or (2) an official custom or practice of the [municipality] shown through the repeated acts of a final policymaker." *Grech v. Clayton Cnty*, 335 F. 3d 1326, 1329-30 (11th Cir. 2003). The City of Montgomery is liable for the  actions of any of its

employees or agents that are taken in the execution of unconstitutional policies or customs made by any final policymaker for the City. (Doc. #32 ¶ 29).

When acting in his capacity as presiding judge, Defendant Hayes is an officer of the City of Montgomery and is the City's final policymaker with respect to his *administrative* policies, practices, and customs that are challenged by Plaintiffs. The City of Montgomery is subject to liability under § 1983 for deprivations of Plaintiffs' rights *caused by the execution* of these policies or customs.

The City and Presiding Judge Hayes take a categorical "all or nothing" approach to the determination of his municipal vs. state status. They misunderstand the significance of some of the state law provisions cited as support,[3] and seek to downplay the relevance of Chapter 17 of the Municipal Code of the City of Montgomery.[4] (Doc. # 32, ¶ 28 n.13). Defendants ask the wrong question and thus

---

[3] *All* municipal power must be delegated by state law. The mere fact that state law confers power or authority on municipal judges cannot be determinative of whether the authority is granted to them as officials of municipal or state government. The Alabama Supreme Court recently emphasized the true nature of municipal corporations in *Ex parte Tulley,* Case No. 1140049, at 24-25 (Ala. Sept. 4, 2015).

> [We] are guided by the following overarching principles: "A municipal corporation is but a creature of the State, existing under and by virtue of authority and power granted by the State." *Hurvich v. City of Birmingham,* 35 Ala. App. 341, 343, 46 So. 2d 577, 579 (1950). "Municipal corporations may exercise only such powers as are expressly granted to them by the Legislature or necessarily implied in or incident to the powers expressly conferred, and those indispensably necessary to the accomplishment of the objects of the municipality." *Phenix City v. Putnam*, 268 Ala. 661, 664, 109 So. 2d 836, 838 (1959). "Although municipalities exercise 'such power ... as is conferred upon [them] by law,' a municipality need not predicate its every action upon some specific express grant of power. Alabama's cities possess certain implied powers that derive from the nature of the powers expressly granted to them by the legislature." *Wilkins v. Dan Haggerty & Assocs., Inc.,* 672 So. 2d 507, 509 (Ala. 1995). . . .

[4] City Defendants attempt to downplay and minimize the significance of City of Montgomery's devoting an entire chapter of its municipal code to its municipal court and

fall far short of following the U.S. Supreme Court's requirements for determining whether a policymaker acts for a local government or for the state in performing particular functions.

The two guiding principles that govern the determination of whether a government official acts as a final policymaker for a local government or for the state in performing particular duties, were set out by the U. S. Supreme Court in *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997). They are as follows:

> In deciding this dispute, our inquiry is guided by two principles. First, the question is not whether Sheriff Tate acts for Alabama or Monroe County in some categorical, "all or nothing" manner. Our cases on the liability of local governments under §1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue. . . .Thus, we are not seeking to make a characterization of Alabama sheriffs that will hold true for every type of official action they engage in. We simply ask whether Sheriff Tate represents the State or the county when he acts in a law enforcement capacity. . . .
>
> Second, our inquiry is dependent on an analysis of state law. Cf. *Jett, supra,* at 737 (" `[W]hether a particular official has "final policymaking authority" is a question of *state law*' " (quoting, with original emphasis, *Praprotnik, supra,* at 123 (plurality opinion))); *Pembaur* v. *Cincinnati,* 475 U.S. 469, 483 (1986) (plurality opinion) (same). This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy.

---

its judges. They argue that, "the ordinances merely track the language of state statutory provisions governing the municipal court". However, the City through its City Council has not merely tracked the language of certain state statutes in its municipal code, it has expressly ratified and adopted these provisions as City policy. As such, they are evidence of the broad authority and control the City has assumed with respect to its Municipal Court. The Alabama Supreme Court's September 04, 2015 decision in *Ex parte Tulley,* explains the relationship between municipal ordinances that incorporate state law, and the state law itself:

> [T]he Constitution and the statutes of this state prevent municipal corporations from enacting laws inconsistent with the state laws, and also authorize state and municipal laws condemning the same act and making a given act an offense both against the state and against the municipality . . . . (quoting *Ex parte Davis*, 200 Ala. 436, 76 So. 368 (1917)).

Application of *McMillan's* two guiding principles in this case demonstrates that, under Alabama law,[5] Presiding Judge Hayes acts for the City of Montgomery, not for the UJS, when performing his challenged administrative functions as presiding judge of the Montgomery Municipal Court.[6] It is not necessary in this case for the Court to decide whether the same is true for any of his other functions. (Doc. #32, ¶ 33).

In *McMillan*, the Court's analysis of whose policymaker an Alabama Sheriff is when performing law enforcement functions, examined the relevant provisions of the 1901 Alabama Constitution, their historical development, and the interpretation given them by the Alabama Supreme Court, and looked as well to state legislation and practices. Justice Rehnquist's opinion for the Court in *McMillan* emphasized that titles are not conclusive, and that plaintiffs are allowed "to prove that 'a widespread

---

[5] The City Defendants' citations to cases finding that municipal judges acted as state policymakers with respect to certain functions in *other states* are not relevant to the state law question in this case. And it they were, other caselaw can be cited that recognizes a municipal judge as final administrative policymaker for the local government entity under relevant state law. *See Williams v. Butler,* 863 F.2d 1398 (8th Cir. 1988) (finding that the municipal judge had final policymaking authority for the city over hiring and firing court employees, and further stating, "It begs the question to say that because it did not expressly authorize Williams' termination the City cannot be held liable. Because he was given final policymaking authority,[Judge] Butler was, in effect, the City.").

[6] In *Ray v. Judicial Corrections Services,* No. 2:12-cv-02819, p. 13-14 (N.D. Alabama Sept. 26, 2013), Judge Proctor's broad summary conclusion that the Alabama Supreme Court rather than the City of Childersburg had authority over the Childersburg Municipal Court also appears to have been made in a "categorical 'all or nothing' manner" and to have been reached based upon a single state law rather than careful analysis of various sources as directed in *McMillian.* The entire discussion of the status of the municipal court in the *Ray* opinion was as follows: " Under Alabama Code § 12-1-2, '[t]he judicial power of the state is vested exclusively in a unified judicial system which shall consist of . . . such municipal courts as may be provided by law.' As such, the Alabama Supreme Court, not Childersburg, has authority over the Childersburg Municipal Court." *Id.*

practice' has been established by 'custom or usage' with the force of law." *McMillan* at
785.

In this case, analysis of Alabama law begins with the 1901 Alabama
Constitution. The original judicial article of the 1901 Alabama Constitution did not
mention municipal judges or municipal courts.  *See* 1901 Alabama Constitution, Art.
VI. The Alabama Supreme Court's opinion in *State ex rel. Wilkerson v. Lane*, 181 Ala.
646 (1913), discusses at length the status of municipal judges and courts under
Alabama law as it existed at that time. In *Lane,* Judge DeGraffenried's opinion
examines the traditional status of municipal courts and their judges, both under the
common law of England and Alabama law. The opinion explains that, given the
traditional two-fold character of municipal corporations as both public and private,
"[a]t common law the citizens of towns and cities were subjects of the crown, but
their officers were not crown officers."  *Id.* at 651-52.  He further traced the history
of the status of municipal judicial officers:

> [T]he town people acquired the right to regulate, by their own town laws,
> their internal affairs and by officers selected by themselves, to collect the
> town's taxes and to administer justices [sic] under their own valid town
> ordinances, an early distinction was drawn between a town officer and an
> officer of the crown, and between mere town affairs and the affairs of the
> crown or general government. . . . In truth, we do not see how, unless the
> historical development of municipal law is entirely discarded, it can be held
> upon sound reasoning that, in a state with a constitutional and statutory
> history like our own, a mere municipal officer can be held to be, within the
> meaning of our Constitution, an officer of the state. *Id.*   at 652-53.
>
> We can conceive of no town or city, even in the most primitive condition of
> society, which must not, ex necessitate, possess a need for town or city laws,
> and, as a necessary corollary, judicial officers to interpret and administer
> justice under those laws. . . . *Id.* at 659-60.

The people of Alabama undoubtedly had the power to depart from the "municipal law our ancestors brought with them from the parent country as a part of the English common law" *Lane,* at 655, when, in 1973, they ratified Amendment 328 which replaced the judicial article of the 1901 Constitution. *See* 1901 Constitution of Alabama, Amendment 328 (1973). But had they chosen to so, a clear intent to depart from such a longstanding understanding would be expected. There is no indication of such an intent in the history of the adoption and ratification of Amendment 328's new Article VI. Rather, this history demonstrates that Amendment 328 was intended and understood to preserve rather than disturb the prior law on municipal courts and judges.

The history of the campaign to adopt Amendment 328, under the leadership of then Chief Justice Howell Heflin, sheds important light on the proper interpretation of today's Article VI.[7] The original version of the proposal for a new Article VI came from Governor Albert Brewer's Constitutional Commission's 1973 Proposed Constitution and did not mention municipal courts as part of its' new unified judicial system. *See* One Idea for a New State Constitution: The 1973 Proposed Constitution, 23 (1973).

The Alabama League of Municipalities opposed this original version of a new Article VI because as they read it, municipal courts were to be eliminated and their jurisdiction over cases arising under municipal ordinances transferred to state control as part of the jurisdiction of the new state district courts. Municipal officials'

---

[7] None of the Defendants refer to this history of Amendment 328. The supporting brief filed by the City Defendants and Presiding Judge Hayes (Doc. # 53) quotes from the original version of Art. VI of the 1901 Alabama Constitution, as if it were still the law today.

opposition to this proposal led to an amendment to the proposed judicial article, later ratified as Amendment 328, which expressly allowed municipalities the *option* of keeping their municipal courts or having their limited jurisdiction fall to the newly created district courts as state trial courts of general jurisdiction.

As pointed out by Professors James Thomas and William Stewart, "[t]heir success in getting the judicial article amended so that city courts could be retained if desired demonstrates the municipal officials' considerable political clout." James D. Thomas & William H. Stewart, Alabama Government & Politics, 103 (1988).

As this history shows, the very reason municipal courts with their limited jurisdiction were mentioned in Article VI, § 6.01(a) was to ensure their optional right to exist as municipal courts rather than be subsumed into the state-controlled district courts. The new judicial article vested the judicial power of the state in a "*unified* judicial system" to which the traditional limited jurisdiction of municipal courts was added. It did not, however, create an entirely "*unitary* judicial system" in which municipal courts and their judges were transformed into *state* courts and judges.

The limited, but now constitutionally protected, original jurisdiction of municipal courts was explicitly confined to the municipal jurisdiction they have traditionally exercised in this state: "All municipal courts shall have uniform original jurisdiction limited to cases arising under municipal ordinances as prescribed by law." Art. VI, § 6.065. The authority and option to establish, abolish or reestablish municipal courts, and to appoint (and pay) municipal judges was left to the governing body of the municipalities.  Art.VI, § 6.06.  Municipal courts and judges

11

were expressly exempted from many of Article VI's other provisions. *See* Art. VI, §

6.065,

Although Article VI subjects municipal judges to certain statewide rules and

regulations, it does not change the longstanding character of municipal courts and

judges. Article VI gives the Alabama Supreme Court rule-making authority, subject

to Legislative revision, over "all courts." Art.VI, § 6.11. Municipal judges also are

subject to the ethical standards and complaint procedures of the new Judicial

Inquiry Commission created by Art. VI, § 6.17, and the Court of the Judiciary created

by Art.VI, § 6.18.   But as shown by subsequent legislation, opinions of the Alabama

Supreme Court and advisory opinions of the Judicial Inquiry Commission, municipal

courts and judges remain officers of the municipalities that chose to retain them.

The Alabama Legislature demonstrated its understanding of the intent of Art.

VI, § 6.01 when adopting Alabama Code § 12-14-1, which grants municipal courts

concurrent jurisdiction with the district court of  "all acts constituting *violations of state

law* committed within the police jurisdiction of the municipality *which may be prosecuted

as breaches of municipal ordinances*. (emphasis added). This authorization to prosecute

violations of state law only if the state law is incorporated by municipal ordinances

demonstrates the legislature's intent and understanding that municipal courts were given

constitutional recognition as part of the unified judicial system, but remained municipal

courts whose jurisdiction is limited to prosecuting violations of municipal not state law.

Judge Houston's 1995 opinion for the Alabama Supreme Court in *Wilkins v.

Dan Haggerty Assocs.*, 682 So. 2d 507, 509-10 (Ala. 1995), issued decades after the

1973 ratification of Amendment 328, shows the Alabama Supreme Court's

12

understanding that municipal courts, where they exist, are still courts within the

control and responsibility of their municipalities.  In *Wilkins,* Judge Houston

observed that, "Section 12-14-2(a), Ala. Code 1975, mandates that "municipalit[ies]

shall provide appropriate facilities and necessary supportive personnel for [their]

municipal court[s]."

The Alabama Judicial Inquiry Commission has issued at least two opinions

that provide additional insight regarding the current status of municipal judges.

Advisory Opinion 14-926, issued on March 4, 2014, speaks to the ethical constraints

on municipal judges with respect to many of the very policies and practices

challenged in this case.[8] As quoted earlier, the Commission's opinion unequivocally

---

[8] The Commission described the following areas of concern to which a municipal judge
must be attentive:

A. COURT RECORDS
That orders of the court are duly signed by the judge in a timely manner; that
blank orders are never signed by the judge to be filled in by staff; that
execution of orders not be delegated to staff by use of signature stamps; that all plea
agreements, waivers of counsel, and other forms be properly executed and
maintained; that counsel be appointed for indigent defendants where appropriate;
that all orders and records of the court be retained by the court clerk as required
by law; that the amount of fines imposed and court costs and fees assessed be
limited to those allowed by law; that proper corrective action be taken upon
discovery that the amount of such fines, costs, or fees was excessive and that
traffic tickets be timely forwarded to the Department of Public Safety as required
by law.
B. PROBATION That probation be used only when a suspended sentence is
imposed following conviction of an offense; that probation be imposed only after
a properly executed order of conviction has been entered; that all probation orders
be executed by the judge at the time the defendant is placed on probation and
advised of the conditions of probation; that periods of probation be neither
imposed nor extended beyond the time authorized by law; that petitions for
revocation of probation be processed in accordance with due process
requirements, including proper notice to the defendant; and written findings of the
grounds for revocation of probation be recorded.
C. COUNSEL, INCARCERATION, AND PRE-TRIAL DIVERSION
That incarcerated defendants be provided timely initial appearance hearings as

states: *"Alabama law is clear:* a municipal judge is the chief judicial officer of the municipality . . . ."* Advisory Opinion 14-926 at 7. (emphasis added).[9] In 1990, Alabama Judicial Ethics Opinion 90-410, the Judicial Inquiry Commission found that, under the Alabama Canons of Judicial Ethics, a conflict exists if a part-time municipal judge's law firm enters into a contract with the *city for which the judge sits.* (emphasis added).

---

provide by law; that defendants be informed of their right to counsel; that defendants be given a reasonable time to secure an attorney prior to arraignment or a decision on pre-trial diversion; that any bond set should be reasonable, with consideration of the defendant's ability to make bond; that defendants not remain incarcerated beyond a court date due simply to administrative failures in the court; that defendants not be incarcerated for nonpayment of fines, costs, and restitution without the judge first conducting an inquiry as to the reasons for nonpayment; that defendants not be incarcerated for failure to pay fines, costs, and restitution beyond the maximum time allowed by law for such incarceration; that incarcerated defendants be properly credited on fines and costs with time served; that defendants not be incarcerated for nonpayment of fines, costs, and restitution, where the defendant has failed to pay because of indigency; and that any finding of contempt for nonpayment of fine, costs, and restitution be based on a petition for contempt and a hearing after notice.

D. PRIVATE PROBATION That private probation or other services used by the court be reviewed on a consistent basis to ensure there is no usurpation of the authority of the court, and to prevent such agencies from creating the perception that they have the authority to make the final determination of conditions of probation or to incarcerate offenders for noncompliance with court orders; that such agencies not be delegated the authority to make indigency determinations or other determinations relative to incarceration for noncompliance; and that all actions regarding probation be subject to review by the judge to ensure that such actions do not violate an offender's rights of due process or equal protection of the law.

E. JUDICIAL ENGAGEMENT
 That sufficient time is committed by the judge to the court to insure that the judge and the other officials of the court protect the due process rights of all individuals appearing before the court."

Advisory Opinion 14-926 at 2-4.

[9] If the Court were to find that there is substantial ambiguity with regard to the resolution of this state law question, the proper course of action would be to certify the question to the Alabama Supreme Court, rather than to dismiss any of Plaintiffs' claims.

In summary, Presiding Judge Hayes is a municipal official when performing the administrative functions of presiding judge challenged here.

### b. The City is Liable Regardless of the Status of Presiding Judge Hayes

Finally, Plaintiffs emphasize that the City and Presiding Judge Hayes exaggerate the significance of his status a municipal versus state officer for purposes of either municipal liability or Defendant Hayes' individual liability. None of Plaintiffs' §1983 claims against the City of Montgomery, (nor any of their individual capacity claims against Presiding Judge Hayes),[10] stand or fall based on a determination that Presiding Judge Hayes is a final policymaker for the City. (Doc. 32, ¶ 29). Each claim in the First Amended Complaint alleges that the City is liable under § 1983 because it adopted or ratified[11] the challenged policies and customs that were part of the scheme.

Judge Houston's opinion in *Wilkins, supra,* demonstrates the Alabama Supreme Court's understanding of the City of Montgomery's authority and duties with respect to its municipal court and the exacting and collecting of fines. Judge Houston observed:

Section 12-14-2(a), Ala. Code 1975, mandates that "municipalit[ies] shall provide

---

[10] The question of which governmental entity Presiding Judge Hayes acts for in performing the particular actions or omissions challenged in this case is of no importance with respect to Plaintiffs' *individual capacity* claims against him. The standards for official immunities of government officials under § 1983 are the same for state or local officials who are sued in their individual capacities. *See McMillian v. Monroe County,* 520 U.S. 781 n. 1 (1997) ("The claims against the defendants [including Sheriff Tate] in their individual capacities have proceeded independently in the lower courts, with some of petitioner's claims [including some against Sheriff Tate] surviving motions for summary judgment.").

[11] *See Dickinson v. Lowery,* 302 F.3d 857, 867 (8th Cir. 2002) (finding genuine issue of fact whether the municipality was liable for ratification by the city and police chief of police officers' misconduct).

appropriate facilities and necessary supportive personnel for *[their]* municipal court[s]." Cities fulfill this mandate to support *their* municipal courts in part through exacting and collecting fines for misdemeanor and traffic offenses. *Wilkins,* at 509-510. (emphasis added).

Plaintiffs do not contest the City's authority to collect fines for misdemeanors and traffic offenses, but rather the unlawful means they have pursued in doing so. The numbers of cases filed and disposed of ( 86,161 cases filed and 87,596 disposed of in 2013, as compared to 27,889 filed and 7251 disposed of the same year in the City of Huntsville, Alabama) and the amount of revenues obtained ($15. 9 million from fines and forfeitures in 2013, and more than 15 times as much revenue from local court costs as the City of Huntsville, Alabama) (Doc. # 32, ¶ 40), support a reasonable inference that the City  of Montgomery is misusing and abusing its authority to collect fines to help fulfill its mandate to support their municipal courts. Based on Plaintiffs factual allegations, it is more than reasonable to infer that the City has turned its municipal court into a primarily money-making enterprise with policies and customs of handling cases in an assembly line fashion, and imprisoning individuals for debts arising from fines and court costs without meaningful hearings, indigeny inquiries, or access to counsel, and without giving reasons for decisions or affording access to appeals. (Doc. # 32, e.g., ¶¶ 40, 44, 45, 47,48, 49).

In *Ray v. Judicial Corrections Services,* No. 2:12-cv-02819, p. 13-14 (N.D. Alabama Sept. 26, 2013), a case involving similar claims to some of those in this case, Judge Proctor ruled that the plaintiffs sufficiently stated § 1983 claims against the Town of Childersburg based on the town's own responsibility to furnish "appropriate facilities and necessary supportive personnel" to municipal courts under Ala. Code § 12-14-2, and the necessarily implied "power to contract with a private firm to aid in the collection of

delinquent municipal court fines . . . *Wilkins v. Dan Haggerty & Associates, Inc.,* 672 So.2d 507, 510 (Ala. 1995)." *Id.*

Judge Proctor pointed out that "[i]n failing to address head on its own authority to appoint a probationary services provider such as JCS, the Town misses the theoretical crux of Plaintiffs' case." *Id.* His opinion concluded that, "Plaintiffs plausibly allege that the policy (contracting out probation services) of a state actor (Childersburg) was the 'moving force' behind their deprivations. The court concludes that these allegations are sufficient to satisfy the pleading requirements for claims under § 1983." *Id.*

As in *Ray v. JCS,* support for Plaintiffs' contention that the City of Montgomery is subject to liability on the claims brought against it in this case includes Alabama municipalities' express authority and duty to furnish facilities and personnel (including judges and presiding judges) for their municipal courts and their necessarily implied powers, including but not limited to entering into contracts with JCS for collection of delinquent fees.

Other relevant powers and responsibilities (and those which can be necessarily implied thereby) imposed upon Alabama municipalities include, but are not limited to: the power to appoint municipal judges, as authorized by Ala. Code 12-14-30(a) (and the implied authority and responsibility to provide a sufficient number of municipal judges to meet constitutional standards for providing meaningful pre-deprivation hearings, etc.); the power of the mayor to designate a presiding judge whose additional duties and responsibilities, and additional pay are determined by the city, as authorized by Ala. Code 12-14-30(a); the responsibility of providing indigent defense services, as required by Ala.

17

Code § 12-14-19[12] (including both express and implied responsibility to provide sufficient indigent defense services to meet constitutional standards); the duty of furnishing prosecutorial services, as required by Ala. Code § 12-14-2(b); and the duty of reporting on the proceedings of their municipal courts, as required by Ala. Code § 12-14-16 (and the corresponding duty to be aware of the number of cases being processed, the number of persons imprisoned for debt, and the numbers of appeals and the consequent responsibility for providing sufficient judges, public defenders, and other personnel to operate in compliance with constitutional standards). (Doc. # 32, ¶¶ 40). The City has admitted knowledge that hundreds have been jailed for nonpayment of fees. (Doc. # 32, ¶ 64).

Plaintiffs have sufficiently pleaded claims against the City of Montgomery for injuries caused them by the execution of the challenged policies and customs made by *any* of its final policymakers.  (Doc. # 32, ¶ 29). This includes policies or customs of JCS, acting under color of state law, and as a joint participant whose actions were intertwined with those of the City and to whom the City delegated the functions of debt collection and initiating court proceedings, so as to create liability for both the City and JCS). (Doc. # 32, ¶¶ 37, 61). The required causal link between the City's policies, practices and customs and the deprivations of Plaintiffs' rights is shown by Plaintiffs' individual factual allegations providing details on how they were stopped, arrested, had warrants served on them, were jailed for debts, were placed on probation with JCS and then threatened or subjected to probation revocation and

---

[12] Section 12-14-9 of the Ala. Code provides:
> A municipality which retains *its court* shall provide indigent defense services *as otherwise provided by law*. (emphasis added).

18

incarceration for debts, the descriptions of the jail labor they performed, or not informed of their rights. The names of the individual Plaintiffs who were subjected to deprivations of particular rights by the execution of each of the challenged policies or practices are identified for each count.

**2) Absolute Judicial Immunity is Not Available to Presiding Judge Hayes in His Individual Capacity Because the Acts and Omissions He Is Sued for Are Administrative Functions as Presiding Judge, Not Judicial Functions.**

Presiding Judge Hayes argues that, in his individual capacity, he is entitled to the absolute protection of judicial immunity in this case. Whose policymaker Presiding Judge Hayes is for purposes of municipal liability, and whether he is a final policymaker at all, have no bearing on his entitlement to absolute judicial immunity for his challenged acts or omissions, in his individual capacity. (Doc. # 32, ¶36).

Plaintiffs do not dispute that Presiding Judge Hayes is a judicial officer. However, judicial officials routinely perform both administrative and judicial functions. It is the administrative or executive, as opposed to, judicial nature of the *function* being performed, not the fact the defendant is a judicial officer, that determines the officer's entitlement to absolute judicial immunity. See *Forester v. White,* 484 U.S. 219, 227-29 (1988) (applying a "functional" approach to judicial immunity).

Defendant Hayes repeatedly invokes *Stump v. Sparkman,* 435 U.S. 349 (1978), in support of his arguments for dismissal of claims based on judicial immunity. But here, the first prong of *Stump's* two-part test for absolute judicial immunity is not met because Presiding Judge Hayes' acts and omissions challenged here were *not* made while dealing with Plaintiffs as part of his judicial functions. The second prong of the test asking

whether a judge acted "in the clear absence of authority" in performing judicial functions is reached only if the first prong has been satisfied. It does not apply to Presiding Judge Hayes' administrative functions challenged in this case.

Plaintiffs' individual capacity claims against Defendant Hayes all are for acts or omissions he has taken while performing executive or administrative functions. In *Forreste*r, Justice O'Connor's opinion for the Court identified the "paradigmatic" judicial acts as "acts involved in resolving disputes between parties who may have invoked the jurisdiction of a court." *Id.   See also Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 436 (1993) (the touchstone of the absolute judicial immunity concept is "the function of resolving disputes between parties, or of authoritatively adjudicating private rights"). According the *Forrester* opinion:

> Administrative decisions, *even though they may be essential to the very functioning of the courts*, have not similarly been regarded as judicial acts. In *Ex parte Virginia*, 100 U.S. 339 (1880), for example, this Court declined to extend judicial immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts. The Court reasoned:
> "Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. . . ." Id. at 348.

Plaintiffs' claims against Presiding Judge Hayes are not to any of his judicial decisions in particular cases, but rather to his administrative acts or omissions that caused the deprivations of their rights. (Doc. # 32, ¶¶33, 35). As the Sixth Circuit explained in *Morrison v. Lipscomb,* 877 F. 2d 463, 466 (6th Cir. 1989), "simply because rule making and administrative authority has been delegated to the judiciary does not mean that acts pursuant to that authority are judicial." In *Morrison*, the Sixth Circuit concluded that a state judge's issuance of a general order

declaring a moratorium on the issuance of writs of restitution was an administrative, not a judicial act and held that absolute judicial immunity did not apply. *Id.*

Additionally, in a case involving factual allegations strikingly similar to some of Plaintiffs' allegations here, the District Court for the Eastern District of Michigan rejected the claim of judicial immunity by the presiding judge of a family court. In *Ratte v. Corrigan,* 989 F. Supp. 2d 550 (E.D. Mich. 2013), the Court held that the presiding judge's actions in putting in place a process and procedure policy of allowing judicial pre-signing of blanks orders, granting any relief requested by the police, to be filled in by a probation officer, was an administrative act, not judicial one, for purposes of immunity. *Id.*

In this case, Presiding Judge Hayes, himself has conceded the administrative nature of his challenged actions or omissions by issuing at least two general administrative orders related to issues raised in this litigation. First, in 2013, he issued general Order No. 2013-0001, In Re: Extention/JCS Placement ( Doc. # 32, ¶ 35).  And second, in an attempt to moot claims for injunctive and declaratory relief in Count IV, City Defendants and Presiding Judge Hayes have attached a recent general order on bail procedures, signed by him as Presiding Judge, as an exhibit to their brief in support of their motions to dismiss. (Doc. # 53, Exhibit 1). This recent general order will be discussed further under the responses to Count IV.

Presiding Judge Hayes has specifically asserted qualified immunity as an alternative ground for dismissal only with respect to the claims in Count IV. ("Judge Hayes also seeks to be dismissed on Qualified Immunity grounds but is entitled to

absolute judicial immunity as well. This footnote exists to avoid waiving his right to qualified immunity on the ground that it is not clearly established that the use of a bail schedule violates the Eight or Fourteenth Amendments."). (Doc. # 53, n. 5). The discussion on qualified immunity that follows is applicable Defendant Hayes with respect to these Count IV claims.

Apart from this footnote to the discussion of Count IV, Defendant Hayes includes no affirmative defense of qualified immunity. Accordingly, has waived qualified immunity as an affirmative defense to any claims, other than those contained in Count IV. In any event he would not be entitled to qualified immunity on any counts because he violated rights that were clearly established at the time of his actions.

**3) Qualified Immunity is Not Available to Any of the Defendants Sued in their Individual Capacities Because Their Personal Acts or Omissions Violated Clearly Established Rights.**

The Eleventh Circuit Court of Appeals recently addressed the rules governing qualified immunity in *Hill v. Madison County School Board, et al.*, No. 14-12481 (11th Cir. Aug. 12, 2015). In *Hill,* the principal of a middle school asserted qualified immunity as a defense to an equal protection claim against him for his adoption and single application of a policy or custom of "doing nothing" after an eighth grade student was raped when another school employee intentionally used the student as "rape-bait." The Court reversed the District Court for the Northern District of Alabama's grant of summary judgment to the principal on grounds of qualified immunity. *Id.*

The *Hill* opinion explains that officials performing discretionary functions are entitled to qualified immunity "insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)".) *Hill* at 56. A defendant bears the initial burden of showing that he or she was engaged in a discretionary function. Then the burden shifts to plaintiff to show that the defendant is not entitled to qualified immunity. A plaintiff bears the burden of showing the violation of a federal right that was clearly established at the time of the alleged violation. *Id.* at 57.

In *Hill*, the Court discussed the three ways a right may be clearly established for purposes of qualified immunity determinations:

> A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted). Doe has confined her argument to the second of these methods. Under this method, "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." See, e.g., *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11thCir. 2002); see also *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002) (the "salient question" is whether the state of the law gave "fair warning" the conduct was unconstitutional). *Hill* at 58.

The Eleventh Circuit concluded that the unnamed plaintiff had shown that the principal violated a clearly established principle by the second of these ways.

Plaintiffs' allegations in their First Amended Complaint properly state claims of deprivations of federal rights that not only were clearly established at the time they acted, but had been so for decades. Many of the claims against the Defendants sound like "déjà vu all over again."[13] Judge Wisdom's 1972 opinion in *Frazier, supra,* held that pay or stay sentences violated the equal protection clause. And nearlyearly

---

[13] Yogi Berra (1925-2015).

four decades ago, in *Tucker v. City of Montgomery Board of Commissioners,* 410 F.

Supp. 494 (M.D. Ala. 1976) (three-judge-court including Circuit Judge Godbold,

District Judge Varner and then District Judge Johnson), the Court considered and

unanimously upheld challenges to some of the same policies and customs which

Plaintiffs challenge today. Circuit Judge Godbold's unanimous opinion in *Tucker*[14]

found violations of several federal constitutional rights by policies including: (1)

incarcerating indigents for nonpayment of fines, in contravention of the Supreme

Court's opinion in *Tate v. Short,* 401 U.S. 395 (1971);  (2) failure to furnish counsel

to indigents in contravention of *Argersinger v. Hamlin,* 407 U.S. 25 (1972); and (3)

requiring a bond from indigents wishing to appeal municipal court convictions, in

contravention of *Burns v. Ohio,* 360 U.S. 252 (1959); *Smith v. Bennett,* 365 U.S. 708

(1961); see *Griffin v. Illinois,* 351 U.S. 12 (1956). [15]

At the time Defendants acted, each of the other federal rights allegedly

deprived in this case also was clearly established[16] under the second way described

in *Hill:* by "broad statements of principle within the Constitution, statute, or case

law." Indeed, even if the no such statements of principle existed, the deprivations of

---

[14] In *Tucker* the Court recognized both a plaintiff class and a statewide defendant class. The Court directed that its order granting declaratory relief be sent to all municipal courts in the State.

[15] *Tucker* was decided under pre-*Monell*, pre-*Harlow,* and pre- *Forrester* § 1983 law and so the resolution of immunity issues would differ under current law. However none of these differences affect the continuing validity of its rulings on the merits of these constitutional issues. As parties or successors in office to parties in *Tucker,* Defendants unquestionably should be aware of the holdings in that case and the Supreme Court opinions it cited.

[16] The Eleventh Circuit Court of Appeals has held that law may become "clearly established " for purposes qualified immunity analysis under § 1983, only by caselaw from the United States Supreme Court, the applicable United States Court of Appeals, and the highest court in the state where the case arose. *Hamilton v. Cannon*, 80 F. 3d 1526, 1531 n. 7 (11th Cir. 1996).

rights here also involve "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." For example, revoking probation and jailing Plaintiff Johnson, an indigent mother of children with disabilities, without inquiry into her ability to pay, and then, despite attempts of family members to partially pay her delinquent fines and costs, holding her in jail for *nine months*, which caused her to suffer the onset of mental illness and caused her and her children to become and remain homeless is such egregious conduct that a constitutional right was clearly established. (Doc. # 32, ¶¶ 78-88). Here the answer to the  "salient question" of whether the state of the law gave "fair warning" the challenged conduct was unconstitutional, *Hope v. Pelzer* at 2516, is unquestionably yes, with respect to rights invoked by Plaintiffs.

**COUNT-BY-COUNT RESPONSES**

**Standard of Review**

**Plaintiffs' First Amended Complaint Meets the Pleading Requirements of Rule 8(a)(2), as Interpreted in *Twombly/Iqbal* and Subsequent Cases**

Plaintiffs have met or exceeded the pleading requirements of Rule 8 (a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), as this rule has been interpreted by the U.S. Supreme Court in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), are met.

 "After *Iqbal*  it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints." *Randall v. Scott,* 610 F. 3d 701, 710 (11th Cir. 2010); *see also Smiley v. Ala. Dep't of Transp.,* 788 F. Supp. 1283,1299 (M.D. Ala. 2011). A court must accept the facts pleaded as

true and construe those facts in a light favorable to the nonmoving party. *Quality Foods De Centro Am., S.A. Agribusiness,* 711 F. 2d 989 (11th Cir. 1983).  All reasonable inferences must be drawn in favor of the nonmovant.[17] *St. George v. Pinella County,* 285 F.3d 1334, 1337 (11th Cir. 2002).

While detailed factual allegations are not necessary to survive a Rule 12(b)(6) motion, *Iqbal* "demands more than an unadorned, the defendant unlawfully-harmed me accusation." *Iqbal.* Plaintiffs are required to plead facts that "permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 678. "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than legal conclusions," *Id*. at 678-79. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  at 678.

The Supreme Court explained in its post-*Iqbal* opinion in *Skinner v, Switzer,* 131 S. Ct. 1289, 1296 (2010), that "the pertinent question is 'not whether [plaintiff] will ultimately prevail' on his claim  . . . 'but whether his complaint was sufficient to cross the federal court's threshold.'" The Court found:

---

[17] The U.S. Supreme Court's recent opinion in *Tolan v. Cotton,* 134 S. Ct. 1861 (2014) (per curiam), addressed the application of the analogous axiom that a court must view the evidence "in the light most favorable to the opposing party" in making summary judgment determinations. The Court found that the Fifth Circuit had not properly credited the plaintiff's evidence or drawn reasonable factual inferences in his favor and thus vacated and remanded. The Court stated that, under both prongs of the qualified immunity analysis, courts must not resolve genuine disputes of fact in favor of the party seeking summary judgment. Thus, in drawing its own inferences and failing to credit contradictory evidence, the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of the case when it ruled that the law was not clearly established as to his Fourth Amendment excessive force claim.

Skinner's complaint is not a model of the careful drafter's art, but under the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the Federal rules of Civil Procedure generally requires only a plausible "short and plain" statement of the plaintiff's claim, not an exposition of his legal arguments." *Id.*

In no way can Plaintiffs' First Amended Complaint be characterized as containing only "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.  Instead it contains factual allegations providing ample support for the conclusion that Plaintiffs' claims challenging the debtors' prison scheme, or "extortion racket" operated by the City of Montgomery, its city council, mayor, police, court officials, and JCS are "plausible."

Rule 12(e) specifically allows any party to move for a more definite statement of a pleading "which is so vague or ambiguous that the party cannot reasonably prepare a response," pointing out the defects complained of and the details desired. None of the Defendants in this case availed themselves of this option prior to filing their motions to dismiss.

As this Court stated in *McGuire v. City of Montgomery,* Case No. 2:11-cv-1027-WKW (WO), at 14, (M.D. Ala. March 29, 2013), "[a]t this stage, the parties have had no opportunity to develop proof-clear or otherwise." Discovery will be required to establish further details about both the overt and covert operations of this scheme and fuller information about the roles that each of the named Defendants and others played in these operations, so as to allow the Court to make a better informed judicial review on summary judgment or trial. *See id.* at 20. But Plaintiffs have crossed the federal threshold and are entitled to the opportunity to develop further proof on their claims.

Finally, if Plaintiffs' First Amended Complaint were found to be insufficient to state claims for relief under Rule 8(a)(2) in any regard, Plaintiffs respectfully request that the Court grant them leave to file a second amended complaint to address these, or any other, curable deficiencies in the First Amended Complaint. Granting leave to file a second amended complaint is particularly appropriate in this case because, despite objections, City Defendants and Defendant Hayes initially filed only a standalone motion to dismiss the original complaint. Plaintiffs did not have the benefit of reviewing the brief in support of this motion to dismiss the original complaint, (Doc. # 16), within the 21 days for filing an amended complaint as a matter of course under Rule 15 (a)(1) of the Federal Rules of Civil Procedure. *See* (Docs. # 17, 18).

## I. COUNT I: PLAINTIFFS ARE ENTITLED TO PROCEED WITH THEIR CLAIMS OF RACIAL PROFILING OR TARGETING AND UNLAWFUL ARRESTS

### A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes

### 1) Plaintiffs' Count I Claims Meet the Pleading Requirement of Rule 8(a)(2) as interpreted in the *Twombley/Iqbal* Line of Cases

City Defendants' Rule 12(b)(6) challenges to the sufficiency of Plaintiffs' factual allegations to state claims for relief under Rule 8(a)(2) on their Count I claims is due to be dismissed. Defendants contend that the factual allegations in this case are analogous to those the Supreme Court found deficient in *Iqbal*. However, the only claims before the Supreme Court in *Iqbal* were those against the highest of the many federal officials sued, Attorney General John Ashcroft and FBI Director Robert Mueller, whereas Plaintiffs here sue only defendants who had personal involvement in the deprivations of their rights.

28

In *Iqbal,* Justice Kennedy's opinion for the Court, twice underscored the limited reach of its holding, pointing out that the Court was not addressing the claims against the any of the lower federal officials also sued in that case. "Respondent's account of his prison ordeal, could, if proved, demonstrate unconstitutional conduct by some governmental actors. But the allegations and pleadings with respect to these actors are not before us here." *Id.* Later, the Court again emphasized that, "[i]t is important to note, however, that we express no opinion concerning the sufficiency of respondent's complaint against the defendants who are not before us. Respondent's account of his prison ordeal raises serious official misconduct that we need not address here. Our decision is limited to the determination that respondent's complaint does not entitle him to relief from petitioners." *Id.*

*Fourteenth Amendment Equal Protection Claims.* The City Defendants devote the longest portion of their brief to arguments that Plaintiffs' have not adequately pleaded their claims of racial profiling or targeting because they have not sufficiently pleaded intentional racial discrimination. Plaintiffs agree that intentional racial discrimination is required to state their fourteenth amendment equal protection claim, and acknowledge that it is difficult to establish racial intent by direct evidence. But City Defendants fail to recognize that, for this very reason, shortly after holding that proof of a racially disproportionate impact was insufficient to establish an equal protection violation in *Washington v. Davis,* 426 U.S. 229 (1976), the U.S. Supreme Court established standards for proving that race was a motivating factor by circumstantial evidence as well. *See Arlington Heights v. Metropolitan Housing,* 429 U.S. 252 (1977). In *Arlington Heights,* the Court explained:

Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action -- whether it "bears more heavily on one race than another," *Washington v. Davis*, *supra* at 242 -- may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.  *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339(1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo,* impact alone is not determinative, and the Court must look to other evidence.

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.  *See Lane v. Wilson*, supra; *Griffin v. School Board*, 377 U.S. 218 (1964); *Davis v. Schnell*, 81 F.Supp. 872 (SD Ala.), aff'd per curiam, 336 U.S. 933 (1949); cf. *Keyes v. School Dist. No. 1, Denver Colo., supra* at 207. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.  *Reitman v. Mulkey,* 387 U.S. 369, 373-376 (1967); *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936). For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plan to erect integrated housing we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached. *Arlington Heights* at 267-68. (footnotes omitted).

Plaintiffs may not yet have alleged sufficient factual allegations to *prove* racial intent under this framework. But sources of relevant evidence identified by the Court in *Arlington Heights* are evident in the factual allegations in the amended complaint. For example, factual allegations of the racially disproportionate number of African-Americans in the courtroom or among the plaintiffs in this case do not present a pattern "as stark as that in *Gomillion* or *Yick Wo*" and thus impact alone would not be determinative under these allegations. But Plaintiffs' allegations of the historical background of City's practice of establishing roadblocks near African-American churches on Sundays shows a substantive and perhaps procedural departure from normal

decisionmaking. "Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights* at 267-68. Factors that usually would be considered important but were disregarded by Defendants include respect for the peace and quite of neighborhood and respect for religious observances.

Moreover, the joint factual allegation of African-American Plaintiffs, (Doc. # 32, ¶ 155), is not just an allegation of their "purely subjective feelings." It explicitly states the bases for their beliefs that, but for their race they would not have been subjected to the challenged practices, including their *personal histories* of such stops and their *knowledge about the allegations of other Plaintiffs.* And while Defendants' brief purports to list all of the arguable fact-specific allegations of racial discrimination, the list fails to include other factual allegations concerning the racial discrimination in continuing stops and arrests. *See* (Doc. # 32, ¶¶ 77, 103, 105). Taking all the factual allegations as true, reading them in a light favorable to Plaintiffs, and drawing all reasonable inferences in their favor, Plaintiffs sufficiently state plausible claims for relief under the equal protection clause. That is all that is required of them at this stage of this litigation.

Plaintiffs have had no opportunity to further develop the necessary elements of proof for their equal protection claims and much of the evidence necessary to do so is in Defendants' hands. But at this stage the required causal connection is also sufficiently pleaded in Plaintiffs' factual allegations of the personal injuries (e.g., losses of employment, customers, home, car, pursuit of education, mental health, etc.) caused to them by individual police officers' execution of the City's racially discriminatory policies and practices.

City Defendants are wrong in their insistence that to prove racial profiling Plaintiffs must identify similarly situated white individuals who have been treated differently. *Bradley v. U.S.,* 299 F.3d 197 (3rd. Cir. 2002) is cited by Defendants but it does not support this position. The *Bradley* Court did require that the plaintiff to show that she was a member of a protected class and was treated differently from similarly situated individuals in an unprotected class, *id.* at 206. However, the Court explained that this may be proven in ways other than naming similarly individuals, including "in some cases by submitting statistical evidence of bias." *Id.* As to the relevance of Plaintiff Scott's claims, Plaintiffs do not allege that every person stopped or arrested is African American, nor need they.

Plaintiffs also have sufficiently alleged the existence and operation of policies attributable to the City that were the moving force behind their injuries. Defendants acknowledge that "the plaintiffs' claims are "that the City Defendants themselves (three officials and the City itself) violated their rights." (Doc. # 53, p. 11). Plaintiffs have alleged facts supporting both the existence and operation of policies adopted by final policymakers for the City. Policies do not have to be written. In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 585 (1986), a single utterance of a five word oral command ("go in and get [him]") by a city prosecutor with final policymaking authority was sufficient to establish municipal liability for action taken "pursuant to official policy of some nature . . .." *Monell v. New York City Dept. Social Services,* 436 U.S. 658, 691 (1978), that violated fourth amendment rights. Widespread and persistent acts or omissions by final policy makers for the City, such as alleged in the First Amended Complaint, can also establish City policy or custom. The huge number of traffic cases

per year, as shown in the City's own reports, should have put all the City Defendants on notice of the existence of widespread and persistent unlawful acts and omissions.

Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior*. In *Iqbal, supra,* the Supreme Court explained that "supervisory liability" is a misnomer because defendants sued in their individual capacities can only be liable based on their own unconstitutional conduct that proximately causes a deprivation of a plaintiff's rights. Supervisory officials are liable under § 1983 when the supervisor "personally participates in the alleged unconstitutional conduct." *Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir. 2003). None of the allegations against the City or the individual Defendants are based on the tort principle of *respondeat superior,* nor on do they seek to impose so-called supervisory liability. The liability claimed in this case is for Defendants' own unlawful actions or omissions.

The claims against the individual Defendants in their personal capacity allege the direct participation of the individual Defendants in a scheme of using fines and fees, from traffic offenses and other minor violations of Municipal Ordinances, to generate immense revenue for the City through illegal means. Individual Defendants participated in that scheme, at least in part, by the adoption or ratification of the customs or practices of targeting African-Americans and of violating fourth amendment rights as alleged in Count I. The execution of these policies or customs by police or other city employees caused the deprivation of Plaintiffs rights.

The factual allegations in this case are sufficient to state a claim against the individual Defendants based alternatively on (1) a widespread history of abuse which  put the

Defendants on notice of the abuse and they did nothing to stop it; (2) the Defendants'
policies or customs which resulted in deliberate indifference to Plaintiffs' constitutional
rights; or (3) facts supporting  a reasonable inference that Defendants directed their
subordinates to act unlawfully or knew that the subordinate would act unlawfully and
failed to stop them. *Cottone*, 326 F. 3d at 1360-61.

*Due Process Claims.* Plaintiffs' due process claims in Count I are based on the
deprivations of their fundamental liberty interest in bodily freedom from detention
(1) without adequate procedural guarantees of fairness and (2) without
substantively sufficient compelling governmental interests. The elements for these
violations overlap those for violations of the Fourth Amendment and equal
protection claims.

*Fourth Amendment Claims.* City Defendants are wrong in stating that none of the
Plaintiffs, except "perhaps" Plaintiffs Floyd and Scott, who were stopped on a city
street and outside her home, respectively), have alleged that he or she was pulled
over without having violated some traffic rule or another. But all other Plaintiffs
allege that they were pulled over on *charges* of traffic violations, some deny that
they had committed the violation, (Doc. # 32, ¶ 70-Plaintiff McCullough, ¶ 103-
Plaintiff Edwards) and in at least one instance, one pled not guilty and charges were
dismissed. (Doc. # 32, ¶103-Plaintiff Edwards).

In *Whren v. U.S.,* 517 U.S. 806 (1996), the Court found that a law officer's
subjective reason or ulterior motive for a traffic stop is not controlling and upheld a
decision to stop a vehicle as reasonable under the fourth amendment if the officer
had objective probable cause to believe a traffic violation had occurred.  *Whren*

applies only to the situation where individual police officers are found to have had objective probable cause to arrest for traffic violations, but alleged to have had other subjective motives or purposes for making the arrest.

In this case, Plaintiffs' challenges are to the acts or omissions of the higher level officials whose policies or customs, when executed by police officers, caused the deprivations of their rights. For the general reasons discussed above with respect to their equal protection claims, Plaintiffs have stated sufficient factual allegations of unlawful City policies or customs and the personal participation and liability of the individual Defendants.

*Section 1981 Equal Benefits Clause Claims.* City Defendants fail to appreciate the difference between typical § 1981 "contracts clause" claims of racial discrimination and claims under its "equal benefits" clause. All § 1981 claims can be brought against governmental entities only under § 1983. *See Jett v. Dallas Independent School District,* 491 U. S. 701 (1989). But the language of the equal benefits clause implies a more affirmative governmental duty than the negative prohibitions in the initial clause of § 1981 contract clause.  While evidence of intent is required under § 1981's contract clause, plaintiffs may satisfy this burden through either direct proof or the burden shifting approach of *Mc Donnell Douglas Corp., v. Green,* 411 U.S. 792 (1973). *Von Zuckerstein v. Argonne National Laboratory,* 984 F.2d 1467, 1472 (7th Cir. 1993). Moreover, in *Palmer v. Board of Education,* 46 F.3d 682, 686-688 (7th Cir. 1995), the court found that the "full and equal benefit" clause was intended to forbid disparate treatment. Because Plaintiffs' have pleaded "plausible claims" under the higher standard of purposeful intent required for equal protection claims, they have pleaded claims for relief under either of

these less stringent standards for proving racial discrimination under § 1981.

Plaintiffs § 1981 claims also differ from their equal protection claims because, if they prevail on their § 1981 claims, they will be entitled to claim fees for the expert(s) as part of the attorney's fee, pursuant to the 1991 amendment adding subsection (c) to 42 U. S. C. § 1988.

## 2) Defendants Strange, Finley, and Murphy Are Not Protected by Qualified Immunity on the Individual Capacity Claims Against Them

Plaintiffs' factual allegations support their claims of deprivations of clearly established federal constitutional and statutory rights and are sufficient to strip these Defendants of any entitlement to qualified immunity. City Defendants concede that the law governing Plaintiffs equal protection and Fourth Amendment claims was "arguably" clearly established at the time Defendants acted. (Doc. # 53, p. 16) ("it is arguably clearly established that stopping a defendant based on his or her race, or without probable cause, is unconstitutional").  Indeed, in *Whren v. U.S.*, 517 U.S. 806, 813 (1996), Justice Scalia's opinion for a unanimous Court stated:

> We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of the laws is the Equal Protection Clause, not the Fourth Amendment. . . .

## 3) Plaintiffs Have Standing to Claim Injunctive Relief

First, Plaintiffs' factual allegations as to the continuing police stops are sufficient to show "a sufficient likelihood" or "immediate threat" of the reoccurrence of the City Defendants' unlawful conduct to establish the injury required for standing. Plaintiff McCullough alleges that she has been stopped three additional times within a recent nine-month period. (Doc. # 32, ¶ 77). Plaintiffs Agee and Caldwell also allege continuing

stops. (Doc. #32, ¶¶ 108,135). Moreover, though not yet certified as a class action, under the principles of *Sonsa v. Iowa,* 419 U.S. 393 (1975), the standing analysis in this case should take into account the threat of injury to similarly situated members of the purported class(es).

Additionally, as alleged in the First Amended Complaint, the claims in Count I fall within the well-established *exception* to general mootness doctrine for injuries that are "capable of repetition yet evading review." Defendants cite the case of *Lyons v. City of Los Angeles*, 461 U.S. 95 (1983) but do not address this mootness exception. Nor do they mention the subsequent case of *Honig v. Doe,* 484 U.S. 305 (1988), which lightens the burden for establishing this exception. In *Lyons,* the Court stated that it was "unwilling to assume the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury [in *Lyons,* being subjected to deadly chokehold by the Los Angles police]." In *Honig*, however, the Court held that a "reasonable expectation" of reoccurrence was sufficient to overcome mootness. "In numerous cases  . . . we have found controversies capable of repetition based on expectations that, while reasonable, were hardly demonstrably probable." *Honig* at 319 n. 6.  And in *Olmstead v. L.C.,* 527 U.S. 581, 594 n.6 (1999)*,* the Court found the prior history of plaintiffs' interactions with defendants could demonstrate such a reasonable expectation. Plaintiffs' factual allegations are clearly sufficient to place this case within the "capable of repetition yet evading review" exception to mootness as interpreted in this line of cases.

## II. COUNT II: PLAINTIFFS ARE ENTITLED TO PROCEED ON TITLE VI CLAIMS AGAINST THE CITY OF MONTGOMERY

## A. Responses to Grounds for Dismissal Raised by the City of Montgomery

### 1) Count II Meets the Pleading Requirement of Rule 8(a)(2) as interpreted in the *Twombley/Iqbal* Line of Cases

City Defendants reference and rely primarily on the same arguments they made regarding the equal protection claims in Count I. Plaintiffs likewise reference and rely on their arguments in Count I. However, as Defendants note, under *Liese v. Indian River Co. Hosp. Dist.,* 701 F. 3d 334, 345 (11th Cir. 2012),  "deliberate indifference" alone is sufficient to establish intentional discrimination under Title VI of The Civil Rights Act Of 1964, 42 U.S.C § 2000(d), et seq. Deliberate indifference requires: (1) knowledge a federal right is substantially likely to be violated, and (2) failure to act. Plaintiffs have satisfied the pleading burden for deliberate indifference with their factual allegations of the longstanding continuation of the widespread and persistent policy or custom of racial profiling/targeting, despite the City's knowledge of policies such as the establishment of roadblocks in African American communities and near African American churches, and of the numbers of traffic cases being processed along with the racially disproportionate number of African-Americans appearing in Municipal Court. Their knowledge that federal rights were substantially likely to be violated and failure to act to stop the violations are sufficient to show "deliberate indifference."

### 2) Plaintiffs Have Standing to Seek Injunctive Relief

The City of Montgomery merely states that "[f]or the reasons argued relative to Count I, Plaintiffs lack standing to seek injunctive relief in connection with the allegations made in Count II. Accordingly, for the reasons they argued relative to Count I, Plaintiffs do have standing to seek injunctive relief as to Count II.

## III. COUNT III: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS OF UNLAWFUL USES OF WARRANTS

### A.  Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes

### 1)  Plaintiffs' Allegations are Sufficient to Establish The City of Montgomery's Liability for the Policies or Customs Causing the Deprivation of Plaintiffs' Fourth and Fourteenth Amendment Rights

The City argues here that it cannot be held liable here because under state law, it has no authority or control over municipal court judges, and that to exercise any such control would violate principles of separation of powers. Defendants broadly argue that Presiding Judge Hayes is not an officer of the City but of the UJS.  Plaintiffs have shown in their general discussion of key issues that Presiding Judge Hayes is the City of Montgomery's chief judicial officer and acts for the City when performing the administrative functions of that job which are challenged here.

The Defendants' argument that separation of powers principles make it unlawful for the executive branch of the City to assert control over the Municipal Court and Presiding Judge Hayes is also unavailing. To the extent Defendants argue that the City is not liable because it has no control over Presiding Judge Hayes' judicial functions, they misunderstand the nature of Plaintiffs' allegations. Plaintiffs do not challenge any individual judicial rulings of Presiding Judge Hayes, or any of Montgomery's other municipal judges. (Doc. # 32, ¶ 33). This explains why other judges are not named as defendants. The challenges in this case are to the unlawful policies and customs established by Defendant Hayes in the performance of his administrative functions as Presiding Judge.

### 2) Presiding Judge Hayes, in his Individual Capacity, Is Not Entitled to Dismissal Because Plaintiffs Sufficiently State Claims Against Administrative Functions Not Covered By Absolute Judicial Immunity.

Presiding Judge Hayes is not entitled to dismissal of the Count III claims against him in his individual capacity because he was performing administrative rather than judicial functions with respect to the acts or omissions challenged here. As the U.S. Supreme Court explained in *Forrester v. White,* 484 U.S. 219, 227-229 (1988), a judge is not absolutely immune for acts committed in an administrative capacity.Plaintiffs have not sued all the Montgomery Municipal Judges for their actions in issuing warrants in particular cases. Plaintiffs have sued *only* Presiding Judge Hayes and *only* for his executive or administrative functions in setting policies and customs with respect to the issuance of warrants, which they claim violate their federal rights.[18]

Only qualified immunity applies to administrative functions. Defendant Hayes has waived qualified immunity as a defense to the Count III claims against him by not asserting it as a ground for dismissal of these claims.  Additionally, for the reasons discussed below with respect to the qualified immunity claims of other individuals sued in their individual capacities, he would not be entitled to dismissal of the Count III claims because his actions violated clearly established law.

### 3) Individual City Defendants Are Not Entitled to Qualified Immunity

Plaintiffs do not allege that the individual Defendants are subject to supervisory liability on the basis of *respondeat superior*; the allegations are that Defendants are individually liable for their own unlawful policies, practices or customs, the execution of which, caused injury to Plaintiffs when executed.

The correct question for purposes of qualified immunity analysis then is whether,

---

[18] *Woodard v. Town of Oakman,* 885 F. 2d 1216 (N. D. Ala. 2012) is inopposite here because Plaintiffs do not challenge the *issuance* of the warrants in their individual cases but the unconstitutional policies, practices or customs that led to the issuance of the warrants.

accepting Plaintiffs' allegations as true and drawing reasonable inferences in Plaintiffs' favor, the law was clearly established so that officials in their positions should have had notice that their own acts and omissions were unconstitutional. The answer to this question is yes.

The practice of issuing and executing "pay-or-serve" arrest warrants for failure to pay fines and court costs creates a two-tiered system of justice where those who can pay are free to go on with their lives and those unable to pay end up imprisoned. It has been clearly established since at least 1983 that punishing criminal defendants just because they are poor violates the equal protection clause. *See Bearden v. Georgia*, 461 U.S. 660 (1983); *Tate v. Short*, 401 U. S. 395 (1971); *see also Turner v. Rogers*, 131 S. Ct. 2507 (2011). Under both the Fourth and Fourteenth Amendments the unreasonableness of a policy or practice of seizing and holding indigent persons for such an unconstitutional purpose has been clearly established since *Bearden and Tate*.

As expressly pointed out by the Court in *Barrett v. Hopper*, 548 F. 2d 550, 554 (5th Cir. 1997):[19]

> This court has not interpreted the *Williams-Morris-Tate* line of cases to be limited to their precise facts. When a defendant is imprisoned for financial inability to pay a fine immediately, he is treated more severely than a person capable of paying a fine immediately.

As in *Hill, supra,* Plaintiffs have shown violations of clearly established law by the second way that rights can become clearly established, i.e., a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right.

---

[19] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### 4)  Plaintiffs Have Standing to Seek Injunctive Relief

Defendants reference their arguments on standing in Counts I and II here. Plaintiffs do the same for their opposing arguments on standing. However, Defendants do raise one additional argument against Plaintiffs' standing to seek injunctive relief in Count III. They argue that the Court-approved settlement order and attached Judicial Procedures in *Mitchell v. City of Montgomery* (Case 2:14-CV-00186-MHT-CSC, Docs. 51 and 51.1) moot any issues related to arrests made in connection with court defendants who still owe fines and costs.

As plaintiffs in *Mitchell*, the City and Presiding Judge Hayes denied any liability, insisting that "nothing in the agreement should be construed to constitute an admission by the Plaintiffs that the City of Montgomery is liable for the constitutional violations alleged in this case or capable of remedying those violations and providing the relief sought." Without information concerning the interpretation and implementation of the settlement agreement and attached procedures, it is impossible to know whether or not these documents would moot Plaintiffs' claims in Count III. Defendants have put into question the meaning and current application of these documents, as well as whether an to what extent they are being complied with by Defendants. The documents could moot Plaintiffs' claims for injunctive or declaratory relief only if they apply to the claims here and are being fully complied with and implemented.

Furthermore, the provisions of the settlement agreement and new judicial procedures are applicable for a maximum of 3 years. Some provisions are applicable for even less time. The requirement that municipal judges notify the plaintiffs' counsel within 12 hours of any Municipal Court defendant's being placed in jail for nonpayment of fines, costs,

fees or restitution was applicable for only 180 days after Nov. 17, 2014 court approval of the settlement agreement in *Mitchell* (Doc. 51 ¶ 3), and is no longer in force.

### B. Responses to Ground for Dismissal Raised by JCS

**Plaintiffs Have Sufficiently Pleaded Claims for Relief Against JCS for Its Involvement in the Unlawful Conduct Claimed in Count III**

JCS argues that the claims against it in Count III should be dismissed because there is no allegation that it issued or served warrants or committed any unlawful seizures, and that it had no authority to do so. However, Plaintiffs' allegations are not that JCS or its employees issued or served warrants. Rather they allege that, because of JCS's entwinement and joint participation with the other Defendants, JCS was a state actor and acted under color of state law in supplying the terms for the standard contracts with the City, and as well as in threatening and initiating proceedings leading to the service of warrants against persons "who have not paid their traffic debts *or made their monthly payments to JCS."* (Doc. # 32, ¶ 192). Plaintiffs allege that JCS used threats of issuance of the unlawful warrants to intimidate indigent people and try to extort money it had no right to receive. *See* (Doc. # 32, ¶¶59, 60) (¶ 59: warnings to "probationers" that nonpayment could result in a warrant being issued for their arrest; ¶ 60: even more direct statements that unless they pay up, "a warrant will be issued for your arrest" on JCS-issued Notices to Show Cause.). Plaintiffs further allege: "These warrants are sought*, issued and served without any inquiry into the person's ability to pay, even when the Defendants have advance knowledge that the person is impoverished and unable to pay the debts." (Doc. # 32, ¶ 192).

Taking Plaintiffs' factual allegations as true and drawing reasonable inferences in their favor, JCS's motion to dismiss the claims against it in Count III should be denied.

**IV. COUNT IV: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS AGAINST THE USE OF FIXED-SUM BAIL SCHEDULES**

**A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes**

**1) Plaintiffs' Allegations are Sufficient to State Claims Against The City of Montgomery Based on the Bail Policies or Customs That Caused the Deprivation of Plaintiffs' Rights**

As shown in the initial general discussion of key issues of this combined response, Presiding Judge Hayes is the chief judicial officer of the City of Montgomery. The mayor designates the presiding judge and the City Council has control over the duties, powers, and pay of the presiding judge. *See* Ala Code § 12-14-30. Plaintiffs allege that as presiding judge, Defendant Hayes is the final policymaker responsible for setting the policies, practices and customs on bail for the Municipal Court and the City. Plaintiffs' allegations do not address Judge Hayes' rulings on bail in individual cases. Their allegations are that the policies and procedures he adopted and implemented of applying a fixed-sum bail schedule, without any inquiry into indigent defendants' ability to pay is unconstitutional.

Defendants themselves have demonstrated that as presiding judge, Defendant Hayes has final policymaking authority with respect to bail policies, practices and customs by attaching Exhibit 1 to their brief. Exhibit 1 is an August 11, 2015 General Order No. 2015-0002*, In re: Bail Procedures.*" (Doc.# 53, Ex. 1). Exhibit 1 is a new general order on bail procedures, issued and signed by Defendant Hayes as part of his administrative functions as Presiding Judge. By implying that the new general order somehow "fixes" the previous fixed-sum bail schedule procedures, Defendants also demonstrate the existence and use of the procedures challenged here.

*Equal Protection and Due Process Claims.* This Court recently acknowledged the long established law of this Circuit recognizing the unconstitutionality of applying fixed sum or master bond schedules to indigent detainees under the equal protection and due process clauses of the Fourteenth Amendment. *See Cooper v. City of Dothan*, No. 1:15-cv-00425-WKW-TFM (M. D. Ala.  June 18, 2015) at 3-4 (order granting temporary restraining order (Doc. # 7) (dissolved pursuant of order of June 26, 2015):

> Mr. Cooper also has demonstrated the four elements required for temporary injunctive relief. First, *he has highlighted long standing case law from the Fifth Circuit Court of Appeals, as well as from the Supreme Court of Alabama, that establishes the unconstitutionality of a pretrial detention scheme whereby indigent detainees are confined for periods of time solely due to their inability to tender monetary amounts in accordance with a master bond schedule, while those able to afford the preset bond may quickly purchase their release. See Pugh v. Rainwater,* 572 F.2d 1053, 1057 (5th Cir. 1978) ("Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty meeting its requirements. The incarceration of those who cannot, without meaningful consideration of other possible alternatives, *infringes on both due process and equal protection requirements.*")[fn 1: In *Bonner v. City of Prichard,* the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. See 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).] ; *State v. Blake*, 642 So, 2d 959, 968 (Ala. 1994) (recognizing the unconstitutionality and irrationality of a bail schedule scheme that allows "a defendant with financial means who is charged with a noncapital violent felony, and who may potentially pose a great threat to community safety, to "obtain immediate release simply by posting bail," while forcing an "indigent defendant charged with a relatively minor misdemeanor" to "remain incarcerated for a minimum of three days, and perhaps longer, before being able to obtain judicial public bail".

*Fourth Amendment Claims.*  Defendants cite *Co. of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991) holding that the Fourth Amendment requires a hearing within 48 hours for persons arrested without a warrant based on probable cause. But in *McLaughlin* the Court also recognizes that at times, it may be unreasonable to wait even 48 hours and that for any detention longer than 48 hours, the burden of proof shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstances,

45

which cannot include intervening weekends. *Id.,* at 9-12. Rule 4.3 of Alabama Rules of Criminal Procedure also requires that criminal defendants be released from custody if no probable cause hearing is held within 48 hours.

 *Eighth Amendment Claims.* In *Stack v. Boyle,* 342 U.S. 1, 5 (1951), the United Supreme Court ruled that bail set at a figure higher than an amount reasonably calculated to ensure a defendant's presence is excessive under the Eighth Amendment. The Court also held that the fixing of bail before trial for any individual defendant must be based upon standards relevant to this purpose. *Id.* In *U.S. v. Salerno,* 481 U. S. 739 (1987), the Court recognized the fundamental nature of the right to pretrial liberty. observed that Eighth Amendment bail rights are not absolute, but government must establish a compelling interest, such as protection of public safety, to deny release on bail. Risk of flight may also be such an interest, but risk of flight should be evaluated on an individual basis and not by use of a bail schedule such as Defendants attach as part of Exhibit 1 and continue to rely on for those who have been charged with failure to appear within the last two years.

**2) The Count IV Claims Against Presiding Judge Hayes in his Individual Capacity Are Based on His Performance of Administrative Functions and Not Protected by Absolute Judicial Immunity**

Presiding Judge Hayes' argument that he is entitled to absolute judicial immunity is wrong for the same reasons pointed out in other discussions of his judicial immunity arguments. Plaintiffs' allegations are not based on his setting of bail in any particular case. Rather, Plaintiffs allege claims against Presiding Judge Hayes for his administrative functions in adopting unconstitutional policies regarding bail. Defendant Hayes' exercise of his role as the presiding judge to set the challenged policies, practices or customs was

not a judicial function, but an administrative function. Indeed, City defendants and Presiding Judge Hayes have admitted and further demonstrated the administrative nature of Judge Hayes' role as presiding judge by attaching Exhibit 1 to their brief. Exhibit 1 is an August 11, 2015 General Order No. 2015-0002, In re: Bail *Procedures* that directs changes to bail procedures challenged in this lawsuit. This general order was signed and issued by Defendant Hayes as part of his administrative and executive duties as Presiding Judge of the City of Montgomery's Municipal Court.

Defendants' exhibit itself demonstrates the administrative nature of Presiding Judge Hayes' adoption and implementation of City policy on bail procedures. At most, only qualified immunity would apply to such functions. A footnote to the discussion of Count IV in the joint brief, (Doc. # 53, p. 26 n. 5), states: "Judge Hayes also seeks to be dismissed on Qualified Immunity grounds but is entitled to absolute judicial immunity as well. This footnote exists to avoid waiving his right to qualified immunity on the ground that it is not clearly established that the use of a bail schedule violates the Eighth or Fourteenth Amendments." For the reasons discussed below with respect to the qualified immunity claims of other individual Defendants sued in their individual capacities, Defendant Hayes is not entitled to dismissal of the Count IV claims on the ground of qualified immunity because his actions violated clearly established law.

### 3) Police Chief Ernest Finley And Former Chief Of Police Kevin Murphy Are Not Entitled to Qualified Immunity

Plaintiffs' claims against these Defendants are that they individually participated in the deprivations of Plaintiffs' rights-not through the fixing of bail for any individual defendant-but by ratifying and/or implementing the unlawful general policies. As well, Plaintiffs state claims that these Defendants are liable in their individual capacities for

deprivations of Plaintiffs rights caused by their own failure to train and supervise.

While it may not be clearly established that the mere existence and use of a bond schedule is unconstitutional, it was clearly established at the time defendants acted that a policy of application the use of a fixed-sum bail schedule to set bail for indigents without any inquiry into their ability to pay was. As mentioned above, this Court recently recognized the long standing law of this Circuit establishing the unconstitutionality under equal protection and due process clauses of the Fourteenth Amendment of the use of fixed sum or master bond schedules to detain indigent individuals where others would go free. *See Cooper v. City of Dothan*, No. 1:15-cv-00425-WKW-TFM (M. D. Ala.  June 18, 2015) at 3-4 (granting temporary restraining order) (Doc. # 7) (dissolved by order of June 26, 2015). *See also, Jones v. City of Clanton, supra*, (Doc. # 76) and cases cited therein, including *Baker v. Wingo,* 407 U.S. 514, 532 (1972)(recognizing that pretrial detention "often means loss of a job; it disrupts family life; and it enforces idleness").

Defendants rely on the opinion in *Colburn v. Huddleston,* No. 6:14-cv-01942-LSC (N.D. Ala. March 30, 2015) (Doc. 26), to argue that the Defendants sued in their individual capacities are entitled to qualified immunity. However, the allegations in that case differ significantly from Plaintiffs' claims in Count IV. The plaintiffs in *Colburn* challenged only the duration of their detentions prior to being given a probable cause hearing. They did not raise any equal protection, due process or 8th Amendment challenges to the use of a bail schedule to detain indigents, which are the crux of Plaintiffs' Count IV claims. Also, Defendants Finley and Murphy are not sued for their actions with respect to any individual court order. Their actions challenged here are significantly different from simply following a judicial official's

order in a particular case. Officials in their position should know, or at least inquire

and learn about, the long standing unconstitutionality of the *bail procedures*

challenged in this case, as well as train the employees in their department

concerning the constitutional law governing such practices.

As chief executive official for the City, Defendant Strange is responsible for

enforcing all laws and ordinances, and for exercising administrative supervision and

control over all departments. (Doc.# 32, ¶30).  He should be aware of the long

established rights with respect to the bail practices challenged in Count IV and

should see that city employees are properly trained to respect these constitutional

rights of individuals with whom they frequently come into contact. Defendant

Strange as well as Defendants Finley, Murphy and Hayes were deliberately

indifferent in failing to provide this training and supervision. Plaintiffs have

specifically alleged that, "[t]he training policies, practices or customs of the

Montgomery Municipal Court do not include specific courses or other trainings on

the federal or state law rights of indigent debtors." (Doc. # 32, ¶67).

Plaintiff in this case have also sufficiently alleged that the individual

Defendants' acts or omissions in detaining them through the policy or practice of

using a fixed sum bail schedule for indigents caused the deprivations of their

constitutional rights and injuries.

**4) Plaintiffs Have Standing to Seek Injunctive And Declaratory Relief on the Claims in Count IV**

Presiding Judge Hayes' recent issuance of a new general order on bail

practices, attached as Exhibit I to the supporting brief, (Doc.# 53, Exhibit 1), does

not moot Plaintiffs claims for injunctive and declaratory relief with regards to the

49

use of a fixed bail schedule as applied to indigent persons such as plaintiffs and class members.  Rather, it is a well-established part of mootness doctrine that a defendant may not moot a claim for injunctive relief simply by voluntary cessation of unlawful conduct. *See, Lyons v. City of Los Angeles, supra (*declaring a temporary moratorium on the use of chokeholds by police did not moot plaintiff's claims for injunctive relief).

In *United States v. W.T. Grant Company*, 345 U. S. 629, 632 (1953), the U. S. Supreme Court held that the voluntary cessation of illegal conduct would moot a case only if the defendant meets the "heavy burden" of establishing that "there is no reasonable expectation that the wrong will be repeated."  Moreover, a defendant who discontinues the challenged conduct while proclaiming its legality is not entitled to succeed in mooting a case because the defendant is free to return to his old ways. *See Knox v. Service Employees International Union, Local 1000,* 132 S. Ct. 2277, 2287 (2012); *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010).

In *Rich v Fla. Dept. Corr.*, 716 F. 3d 525, 531 (11th Cir. 2013), the Court recognized that government actors carry a lesser burden than others when they have unambiguously terminated the challenged policy. Nevertheless, the Court rejected Defendants' arguments in that case that a prisoner's claim was moot "because Florida now has a plan to provide kosher meals to qualified inmates." The Court explained:

> Our consideration of voluntary cessation by government actors, calls for us to look at several factors. "First, we consider whether the termination of the offending conduct was unambiguous." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011) (quotation marks omitted). "[T]he timing and content of the decision are . . . relevant in assessing whether the defendant's 'termination' of the challenged conduct is sufficiently 'unambiguous' to warrant application of the . . . presumption in favor of governmental entities." *Harrell,* 608 F.3d at 1266. "Second, we look to whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction." *Nat'l Ass'n of Bds. of Pharmacy, 633 F.3d at*

50

*1310.* "Third, we ask whether the government has 'consistently applied' a new policy or adhered to a new course of conduct." *Id.*

Applying theses three factors in this case shows that Plaintiffs' claims for injunctive and declaratory relief in Count IV are not moot. First, the timing of Defendants' policy change creates even more ambiguity than the change of meal plans in *Rich.* The policy change in bail procedures was not made until after this litigation had begun-even later than the meal plan changes made prior to the filing of the complaint in *Rich.* Second, the appearance that the change is an attempt to manipulate jurisdiction is also stronger here. Defendants have not conceded that the voluntarily ceased conduct is unconstitutional and they have never promised not to resume the prior practice. The change in government policy or conduct appears to have been hastily drafted and not the result of substantial deliberation. While discovery would be needed to know for sure, it appears General Order No. 2015-0002 was drafted quickly and without careful consideration and first made public when filed as an exhibit in this case. The deficiencies in the order identified below and its differences from bail orders in other recent cases in this Court further support this appearance. Third, it is unclear whether the government has 'consistently applied' the new policy or adhered to a new course of conduct. Thus, Defendants fail to carry their burden of establishing mootness through voluntary cessation.

Exhibit 1 is an August 11, 2015 General Order No. 2015-0002*, In re: Bail Procedures"* that directs certain changes to the prior bail procedures which are challenged in this lawsuit. It is noticeable, given the City's constant insistence that they have no control or authority over Defendant Hayes and that he is not a final policymaker for the City, that the City now submits an *administrative* order that was signed and issued by him as part of his administrative functions as Presiding Judge of the City of Montgomery's

Municipal Court.  In addition, the general orders of their municipal courts that were issued as part of settlements in two recent cases challenging the bail procedure of the municipalities of Clanton, *Jones v. City of Clanton,* Case No. 2:15-cv-34-MHT, and Dothan, *Cooper v. City of Dothan,* Case No. 1: 15-cv-425-WKW, where the only defendants were the cities, further support plaintiffs contentions that Alabama municipalities do have and exercise administrative authority and control over their municipal courts and judges with respect to general bail practices, whether by express policies or by unwritten traditional customs.

Turning to Exhibit 1, itself, the City's interpretation of Presiding Judge Hayes' new bail order apparently differs from and goes beyond the wording of the order. The general order contains no mention of release within two hours. Yet, the Defendants' brief states that, "[b]ecause arrestees are all being released on unsecured bonds issued within two hours of his or her arrest, any claim that Plaintiffs in this case have with respect to the use of a fixed bail schedule have been mooted." (Doc. # 53, p. 30). The bald assertion that all arrestees are being released within two hours is insufficient to moot Plaintiffs claims for injunctive or declarative relief, particularly in the face of Defendants continued denial of any liability for the constitutional violations alleged in Count IV.

Moreover, there is no mention of, and certainly no agreement as to, the duration of Presiding Judge Hayes' new general order submitted as Exhibit 1. Defendants do not even assert that the new general order on bail procedures meets all constitutional standards. Plaintiffs certainly do not concede that it does. For example, the new order calls for continued use of the same fixed sum Bond Schedule for all arrestees with any outstanding warrants within the last two years. It also allows for detainees who are unable

to meet the amounts specified in the Bail Schedule to be held for 72 hours including intervening weekends. This 72 hours provision is included in the new bail procedures order, despite the Defendants' own earlier cites to *Co. of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991) which holds that the Fourth Amendment requires a hearing within 48 hours and expressly recognizes that at times, it may be unreasonable to wait even 48 hours. The Court also holds that for any detention longer than 48 hours, the burden of proof shifts to the government to demonstrate the existence of a *bona fide emergency or other extraordinary circumstances, which cannot include intervening weekends*. *Id.,* at 9-12. (emphasis added). Defendants have also acknowledged that Rule 4.3 of Alabama Rules of Criminal Procedure requires that criminal defendants be released from custody if no probable cause hearing is held within 48 hours. Yet, no explanation is given for paragraph five of Exhibit 1which, (unlike the bail orders in the recent Dothan and Clanton Cases) allows arrestees to be held for up to 72 hours in case of weekends. (Doc. # 53, Exhibit 1, ¶ 5, lines 1-3).

Defendants contend that Exhibit 1 is for all material purposes the same as the bail order recently approved by the Court in *Jones v. City of Clanton,* Case No. 2:15-cv-34-MHT (Doc. #76). Even if that were true, and it is not, the Bail and Indigency Determination standing order issued in *Jones* was not held to moot that case but rather was adopted of as part of a court-approved settlement agreement. And under the standing order in *Jones*, the maximum time an arrestee can be held before a hearing is 48 hours.

More recently, this Court's June 26, 2015 order in *Cooper v. City of Dothan,* Case No. 1: 15-cv-425-WKW, (Doc. # 25) did not dismiss the case as moot based on the a new bail procedure order similar to the one adopted in the Clanton case. Rather, the parties in

the case agreed to a settlement agreement including this new order. Similarly, the June 3, 2015 order of the District Court for the Eastern District of Missouri, *Pierce v. Velda City,* Case No. 4:15-cv-570-HEA, a case involving challenge to the defendant City's bail procedures, was adopted pursuant to a court-approved settlement agreement granting declaratory and injunctive relief, rather than relied upon to dismiss the case based on mootness.

Defendants have not met their burden of establishing that the voluntary cessation exception to the mootness doctrine does not apply to the claims in Count IV based solely upon the unsupported statement that Count IV is "moot due to the recent changes implemented by the municipal court judges." (Doc. # 53, p. 30). Other than attaching Presiding Judge Hayes's recent administrative order on bail procedures, they do nothing to address whether, for how long, or to what extent the order has been or will be implemented or whether it is constitutionally sufficient to cure the constitutional deficencies Plaintiffs raise in Count IV.

The Defendants' submission of Exhibit 1 to support their argument that the Court lacks jurisdiction over Plaintiffs' claims for injunctive and declaratory relief does not require that the Court treat this part of their motion as a motion for summary judgment, as would such a submission under 12(b)(6). If the Court were to do so, Plaintiffs should be permitted discovery on issues including, but not limited to, the timing and reason(s) for the issuance of this general order, and the extent of compliance with and implementation of the order.

Not only is the City's reliance on Exhibit 1 futile as an attempt to deny Plaintiffs' standing to seek injunctive and declaratory relief as to the claims in Count IV, it also

appears to be an attempt by the Defendants to avoid paying attorney's fees to Plaintiffs should they prevail on the Count IV claims. Defendants' brief makes the incredibly self-serving and entirely unsupported argument that Presiding Judge Hayes issued this recent general order "wholly independent of the filing of this lawsuit." (Doc. # 53, p. 30). Yet the *Jones* order they cite two sentences later was issued on May 15, 2015, six weeks before Plaintiffs filed the original complaint in this case on July 1, 2015, and Presiding Judge Hayes' bail order was not signed until August 11, 2015, nearly three months after the *Jones* bail order (Doc. # 71) was submitted to the Court.

Finally, Defendants incorporate their arguments that Plaintiffs lack standing to seek injunctive relief from Counts I, II, and III. Plaintiffs do likewise with respect to their demonstration of why they do possess standing to seek such relief.

## V. COUNT V: PLAINTIFFS ARE ENTITLED TO PROCEED ON THEIR CLAIMS AGAINST THE JAILING OF INDIGENT DEBTORS

### A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes

### 1) Plaintiffs Have Sufficiently Pleaded Claims that Jailing Indigent Debtors Was A Policy Or Custom Of The City Of Montgomery

Plaintiffs do not allege that the City's liability is based on any municipal judge's conduct in resolving an individual case and do not question that the City has no control over such judicial decisions. Presiding Judge Hayes is the only municipal judge sued and he is sued as presiding judge. Defendant Hayes is the chief judicial officer of the City of Montgomery and his final policymaking in his administrative functions as presiding judge related to the challenged debtors' prison scheme are  attributable to the City itself for purposes of liability under § 1983.

The City itself has admitted that hundreds of Montgomery residents have been

jailed for nonpayment of fees. (Doc. # 32, ¶ 64). With regard to the City's contracts with JCS, which formed part of and furthered this scheme, Plaintiffs have alleged that Defendant Todd Strange and the former Mayor of the City signed the contracts, (Doc.# 32, ¶ 52), and that Presiding Judge Hayes issued General Order No. 2013, setting procedures for JCS placement. (Doc.# 32, ¶ 35). The City cannot be allowed to disclaim the actions of its final policymakers in its debtors prison scheme.

**2) Count V Is Not Due To Be Dismissed As To Presiding Judge Hayes On Grounds Of Absolute Judicial Immunity**

Once again, Plaintiffs allegations do not challenge the actions of Presiding Judge Hayes in handling particular cases, but rather his actions or omissions as presiding judge. For this reason, the argument that claims of Plaintiffs who did not appear before Judge Hayes should be dismissed also misses the point.

With regard to the City's contracts with JCS, for example, Plaintiffs have alleged that Presiding Judge Hayes issued General Order No. 2013, setting procedures for JCS placement. (Doc.# 32, ¶ 35). Issuing general orders of this nature are administrative functions, not judicial functions.

Defendant Hayes has not raised and thus waived qualified immunity as an affirmative defense to the claims in Count V. For the reasons discussed below with respect to Defendants Finley, Murphy, and Strange,  Presiding Judge Hayes would not be entitled to qualified immunity on Count V claims, in any event because he violated clearly established law of which a reasonable presiding judge certainly should have been aware. Indeed, Presiding Judge Hayes continued to implement his policy on incarcerating indigent debtors for months after first being sued over it. (Doc. # 32, ¶ 5) (prior related

debtors' prison cases against Presiding Judge Hayes filed in 2013). Nevertheless, Plaintiff Caldwell alleges he was jailed as late as September 28, 2014. (Doc. #32, ¶ ¶130-131). By that time, Presiding Judge Hayes had been preliminarily enjoined, on May 1, 2014, based on a finding that Plaintiffs were likely succeed on the merits. (Doc. #32, ¶5). It is beyond dispute that he should have consulted the clearly established law on so-called debtors' prisons by then. His failure to do so, and to bring it to the attention of other municipal judges or personnel by provide training on it (Doc.# 32, ¶¶ 67, 211) demonstrates willful, malicious and deliberate indifference to Plaintiffs' clearly established rights. *See* (Doc. # 32, ¶¶ 39, 212).

**3) Count V Is Not Due To Be Dismissed on Qualified Immunity Grounds As To Defendants Finley, Murphy And Strange**

Defendants refer to their previous arguments for qualified immunity; Plaintiffs do the same for their arguments against qualified immunity. The law with respect to imprisonment for debt was clearly established when these defendants acted by the U.S. Supreme Court's landmark opinions in *Bearden v. Georgia,* 461 U.S. 666 (1983)*, Tate v. Short,* 401 U.S. 395 (1971)*, and Turner v. Rogers,* 131 S. Ct. 2507 (2011)*.*

More than 40 years ago, Judge Wisdom spoke clearly on this issue for the Fifth Circuit Court of Appeals in *Frazier v. Jordan,* 457 F. 2d 726, 728 (5th Cir. 1972).[20] The single issue posed in *Frazier* was: "May a municipal court constitutionally impose a sentence requiring an indigent defendant to pay a [$17] fine forthwith or serve a specified number of days [13] in jail?" *Id.* Judge Wisdom's opinion for the Court rejected the "house of cards" defendants built to try to justify their actions and held that the sentence

_____

[20]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

discriminated against defendants unable to pay their fines because of their indigency.

Additionally, the Fifth Circuit's 1997 opinion in *Barnett v. Hopper,* 548 F. 2d

550, 554 (5th Cir. 1997) stated as follows:

> This court has not interpreted the *Williams-Morris-Tate* line of cases to be limited to their precise facts. When a defendant is imprisoned for financial inability to pay a fine immediately, he is treated more severely than a person capable of paying a fine immediately. . . . To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws. See also *Burton v. Goodlett*, 480 F.2d 983 (5th Cir. 1973).

Finally, Plaintiffs do not allege supervisory liability against these Defendants, but

rather individual liability for their personal participation in the challenged policies or

widespread and persistent practice of jailing indigent individuals for nonpayment of debts

without meaningful inquiry into their ability to pay.

## B. Response to Grounds for Dismissal of Count V Raised by JCS

### Count V Should Not Be Dismissed as to JCS Because JCS Initiated and Participated in the Practice of Jailing Indigent Debtors

Plaintiffs' factual allegations are more than sufficient to state the Count V claims

against JCS. True, Plaintiffs have not alleged that JCS employees personally placed

anyone in jail. JCS, however, is alleged to be a joint participant with other Defendants in

causing indigent defendants to be jailed for nonpayment of debts. (Doc. # 32, ¶ 33).

Plaintiffs also allege that "the City delegated to JCS the important public functions of

municipal debt collection and of initiating court proceedings leading to imprisonment for

debts as part of that collection process," (Doc.# 32, ¶ 61), and that, JCS employees

routinely signed Municipal Court 'Notice to Show Cause" forms that initiated

proceedings that lead to its probationers' imprisonment for debt. (Doc.# 32, ¶ 60).

Additionally, Plaintiffs allege that in JCS's contracts with the City of Montgomery, the

company agreed not to charge its $40 per month fee for its probation, or debt collection, services. (Doc. # 32, ¶¶ 55, 61). To comply with this contractual obligation, JCS had the duty to inquire into individuals' ability to pay and inform indigent individuals of this contractual provision or of their right to seek an indigency determination. How else was JCS to know whether it had the authority to charge for its services? Plaintiffs allege that JCS neither inquired about their ability to pay, informed them that they could request a waiver of fees based on indigency, nor informed them of the existence of its forms to request indigency status. (Doc.# 32, ¶ 63). Given that only those who could not immediately pay their fines, costs, and fees were assigned to JCS, and having knowledge that many of those assigned to them were not able to make the monthly payments which were themselves set by JCS in filing out the court's probation orders, JCS either knew or certainly should have known that many of their clients would likely be entitled to a waiver of JCS fees if aware of their right to request one. JCS cannot now try to wash its hands of any responsibility by arguing that only the court bore any responsibility with respect to the indigency determinations called for in its contracts with the City. Even Rule 26.11 of the Alabama Rule of Criminal Procedure, which JCS cites to support its argument that the court had the sole legal duty to inquire into indigency, recognizes that this responsibility or parts of it may be assigned to others. ("If a defendant fails to pay a fine or restitution as directed, the court may inquire *and cause an investigation to be made* into the defendant's financial, employment, and family standing, and the reasons for nonpayment of the fine and/or restitution, including whether nonpayment of the fine and/or restitution was contumacious or due to indigency."). This rule expressly contemplates that a court may use others in making these indigency inquiries.

## VI. COUNT VI: PLAINTIFFS ARE ENTITLED TO PROCEED WITH CLAIMS OF FAILURE TO PROVIDE MEANINGFUL ACCESS TO COUNSEL

### A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes

#### 1) Plaintiffs Have Sufficiently Pleaded That The Failure To Provide Counsel Was A Policy Or Practice Of The City Of Montgomery

The City insists that it is not liable for its municipal court judges' actions in appointing counsel. However, as repeatedly argued, Plaintiffs have not sued Presiding Judge Hayes for his actions in particular cases. The claims in this case are against the policies, practices, or customs adopted by Defendant Hayes, as presiding judge, while acting as a final policymaker for the City.

The City admits there was a duty to inform Plaintiffs of their constitutional rights but insists it is not liable for the breaches of this duty. "Clearly the municipal court, not the City, had the duty to do so." (Doc. # 53, p. 34).

Plaintiffs also have alleged facts sufficient to establish municipal liability based on the City's own failure to provide constitutionally sufficient public defense services. Plaintiffs have alleged that the one public defender on duty spoke only briefly to defendants at the jail and may not have even be in the courtroom when cases were being decided. (Doc.# 32, ¶ 216). Individual Plaintiffs allege that they were not told about their rights or provided counsel. (e.g., Doc. 32, ¶ 75). The City concedes that it has the responsibility for *funding* required to provide counsel for indigent defendants under Ala. Code § 12-14-9, but fails to acknowledge the nature of its express and implied authority and responsibility under this code provision.  The code provision states: "A municipality which retains *its court,* shall provide indigent defense services *as otherwise provided by law."* (emphasis added).  The City's duty is to provide indigent defense services "as

otherwise provided by law," including federal constitutional law with respect to meaningful assistance of counsel.

### 2) Plaintiffs' Claims Against PresidingJudge Hayes in his Individual Capacity Are for Administrative Functions for which He Is Not Entitled to the Protection of Absolute Judicial Immunity

Plaintiffs' allegations in this case do not challenge the judicial functions of Presiding Judge Hayes in handling particular cases, but rather his administrative actions or omissions as presiding judge in setting the above mentioned policies and practices of failure to provide meaningful assistance of counsel for the City of Montgomery's Municipal Court.

## VII. COUNT VII: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS OF DEPRIVATION OF RIGHTS UNER THE THIRTEENTH AMENDMENT AND 18 U.S.C. § 1581;18 U.S.C. § 1589(a) AND (b);AND 18 U.S.C. § 1593A

### A. Responses to Grounds for Dismissal Raised by City Defendants and Presiding Judge Hayes

### 1) Presiding Judge Hayes is Not Entitled to Dismissal on Grounds of Absolute Judicial Immunity Because He Was Performing Administrative Functions

The City Defendants have not moved to dismiss the Count VII claims against the municipality. However, Presiding Judge Hayes and the other Defendants sued in their individual capacities (Strange, Finley and Murphy) have raised absolute and qualified immunity respectively, as ground for dismissal of these claims.

Presiding Judge Hayes' argument that he is entitled to absolute judicial immunity on these claims fails for the same reasons his absolute immunity arguments on prior counts fail. He is not being sued for his actions in any judicial proceedings but for the policies, practices, and customs he established in the performance of his administrative functions as presiding judge. (Doc. #32, ¶¶ 53, 61).

**2) Defendants Sued in their Individual Capacities Are Not Entitled to Dismissal on Grounds of Qualified Immunity**

The individual Defendants make two arguments for why Count VII should be dismissed on grounds of qualified immunity. First, they again mistake Plaintiffs' claims as supervisory liability claims. Rather the claims against them are for their own unlawful acts and omissions that caused the deprivations of Plaintiffs' rights by other city employees, regardless of whether these employees were under their direct supervision.

Defendants' second argument is that they are entitled to dismissal on grounds of qualified immunity because Plaintiffs have not alleged the violation of a clearly established right. Plaintiffs allege they were forced to do jail labor. (Doc. 32# ¶¶74, 84, 94, 99, 107, 150). Defendants' statement that Plaintiffs' allegations are that they volunteered to do jail labor is based on a complete mischaracterization of their factual allegations, including the language in paragraph 223. (Doc. #32, ¶ 223). The word "volunteer" is carefully placed in parentheses in this paragraph, which states as follows:

> Plaintiffs were *coerced* with threats of more prolonged unlawful jail terms if they did not "volunteer" to labor in the City jail under onerous conditions for an extra $25 per day reduction of their debts. This amounts to peonage and forced labor, whereby a person is coerced by threat of legal sanction--i.e., imprisonment—to work off a debt to the "master." It is also an abuse of the legal process that exploited Defendants' unlawful incarceration of Plaintiffs to *force them to accept*, in their desperation to end their unlawful incarceration more quickly, the *conditions of forced labor*, performing janitorial tasks that City employees did not want to perform, such as cleaning up blood and feces in an overcrowded jail environment, as described in the factual allegations for individual Plaintiffs. (emphasis added).

> In paragraph 224, Plaintiffs further allege:

> Plaintiffs allegedly owed the City monetary debts for traffic tickets and associated fees, court costs and surcharges. Because Plaintiffs were not imprisoned or sentenced to involuntary servitude as punishment for any crime, the Thirteenth Amendment bars the *coerced use of their labor* to work off their purely monetary debts. (emphasis added).

*Bailey v. Alabama,* 219 U.S 291 (1911), is the landmark case clearly establishing the law here. In *Bailey*, the Supreme Court struck down a statute where, "the effect of the statute is to enforce involuntary servitude by compelling personal service in liquidation of a debt." *Id.* The Court held that the challenged Alabama statue violated the Thirteenth Amendment and anti-peonage laws authorized by Sec. 2 of the Amendment.

The Thirteenth Amendment cases Defendants cite do not deal with the situation Plaintiffs allege they faced. First, Plaintiffs here were not convicted of a crime carrying a sentence of incarceration for. Plaintiffs' forced jail labor was not performed to earn a few dollars or get outside for a few hours while serving of a duly imposed term of incarceration. Plaintiffs received no pay whatsoever for their jail work; it reduced the amount of debts to the City by $25 a day. The work was coerced because it was the only way to shorten the duration of their unlawful confinement. Making earlier release from unlawful confinement contingent on performing sometimes dangerous janitorial work is far different from "the community service programs which require labor of their participants as punishment for a crime" that Defendants argue is an apt comparison. Under the alleged circumstances in this case, the forced work Plaintiffs performed cannot be considered to be the result of voluntary choices.

With respect to Plaintiffs' claims under federal anti-peonage statutes, Defendants' citations to U.S. v. *Kozminski*, 487 U.S. 931 (1988), which held that the then existing anti-peonage laws were to be construed in a way consistent with the Thirteenth Amendment, does not support their call for dismissal for two reasons. First, Plaintiffs allegations *are* sufficient to state a violation of the Thirteenth Amendment itself. Second,

lower courts have found *Kozminski* inapplicable to claims under 18 U.S.C. § 1859. *See, e.g., Menocal, et al. v. The GEO Group, Inc.,* No. 14-cv-02887-JLK, Memorandum Opinion and Order (D. Col. July 6, 2015).

In *Menocal*, the Court denied defendant's motion to dismiss plaintiffs' claims that forcing detainees to clean their living areas, or "pods" under threat of solitary confinement violated § 1859's prohibition on forced labor.  The court rejected defendants' argument that §1859 of the Trafficking Victims Protection Act ("TVPA"), which applies to anyone who "knowingly provides or obtains the labor or services of a person by . . .means of force, threats or force, physical restraint, or threats of physical restraint," was exclusively intended to apply to trafficking persons for labor and/or sex. The opinion stated:

> Plaintiffs respond that the plain text of the TVPA reaches any type of forced labor, citing *Nunag-Tanedo v. East Baton Rouge Parish School Bd.*, 790 F. Supp. 2d 1134 (C.D. Cal. 2011), which held that teaching high school math and science could qualify as forced labor under § 1859(a). *See id.* at 1144-46; *U.S. v. Kaufman,* 5466 F. 3d 1242, 1263 (10th Cir. 2008) (finding that the "involuntary servitude and forced labor statutes apply to coerced acts other than 'work in an economic sense'"). … Congress enacted § 1859 in order to broaden the narrow definition of coercion adopted by the Supreme Court in *Kozminski. See Kaufman,* 546 F.3d at 1261 ("the legislative history reveals that, in enacting § 1589, Congress sought to expand *Kozminski's* limited definition of coercion . . . , stating that '[s]ection 1859 will provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski.")*. *Menocal*  at  8-10. (footnote omitted).

## B. Responses to Grounds for Dismissal Raised by JCS

**Plaintiffs Sufficiently Plead Claims Against JCS in Count VII Because JCS Was an Active Participant in the Scheme or Venture Leading to Plaintiffs' Imprisonment and Forced Labor**

JCS argues that Count VII claims against it should be dismissed because the Plaintiffs do not allege that JCS forced Plaintiffs to perform labor. JCS fails to

acknowledge the full language and scope of the Thirteenth Amendment and federal anti-peonage statutes Plaintiffs allege have been violated. None of these provisions require the person sued to have been the one who personally jailed or forced a person to perform forced labor. (Doc. # 32, ¶¶ 226, 227, 228, 229). The last three of the provisions expressly cover to injury caused by schemes or ventures.

The broad language of the 13th Amendment is applicable to both private parties and governmental actors and provides that: 'Neither slavery or involuntary servitude, *except as a punishment for a crime, whereof the party shall have been duly convicted,* shall exist within the United States, or any place subject to their jurisdiction." (emphasis added). Plaintiffs' imprisonment was not for their conviction for traffic offenses or misdemeanors, but for failure to pay debts arising from the fines, fees and costs imposed as the sole punishment for their convictions.

Plaintiffs allege that JCS was part of the scheme or venture that resulted in Plaintiffs' imprisonment for debt and forced labor. (Doc. 32, ¶ 61). Plaintiffs allege that JCS used threats of imprisonment and jail labor to coerce payments and, when unsuccessful, initiated probation revocation proceedings leading to such imprisonment and forced labor. (Doc. 32, ¶¶ 53, 54).

## VIII. COUNT VIII: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS OF THREATENING OR INITIATING PROBATION REVOCATION AND SUBSEQUENT IMPRISONMENT AND JAIL LABOR

### A. Responses to Grounds for Dismissal Raised by City Defendants and Defendant Hayes

#### 1) Defendants Miscalculate the Applicable Statute of Limitations and Accrual

The statute of limitations for § 1983 claims is determined by looking to state law, and Plaintiffs agree that Alabama's two-year statute of limitations for personal injury

torts is applicable to all such claims in this case. On the other hand, the issue of when a §1983 claim accrues is a question of federal law. In *Wallace v. Kato*, 459 U.S. 384 (2007), the Supreme Court addressed the issue of when §1983 claims of false arrest and false imprisonment under the Fourth Amendment accrue.  The Court looked to false imprisonment as the common law cause of action providing the "closest analogy to the claims of the type considered here." The Court referred to false arrest and false imprisonment together as "false imprisonment because "they overlap; the former is a species of the later."  The Court explained that "[e]very confinement of a person is an imprisonment," and held that "the statute of limitations begins to run when the alleged false imprisonment *ends,* see e.g., 4 Restatement (Second) of Torts §899, Comment c . . . ." *Id.* at 389 (emphasis added). The *Wallace* accrual rule applies to all of the Plaintiffs' §1983 challenges to their arrests, detentions and imprisonments for debt. This accrual rule should be applied to their other § 1983 claims as well because false imprisonment provides the "closest analogy to the claims of the type considered here."

Plaintiffs disagree with Presiding Judge Hayes' and City Defendants' computation of the statute of limitations applicable to this claim. First, the tolling of the statute of limitations during the pendency of the class action allegations in *Mitchell v. City of Montgomery,* Case No. 2:14-cv-186, extends beyond the date of the parties' joint stipulation of dismissal filed on October 31, 2014. (*Mitchell* Doc.# 45). The correct date is Nov. 14, 2014, when the Court approved the dismissal of the class action aspects of the case. (*Mitchell* Doc. # 50).

Defendants fail to mention the tolling period for Count VIII claims against JCS began on December 20, 2012, when an Amended and Restated Complaint in *Ray*, *supra,*

66

(*Ray* Doc. # 29) was filed. This Amended and Restated Complaint in *Ray* which was filed

on behalf of a class including all persons who have been or will be on probation or

incarcerated by all Alabama municipal courts employing JCS. The tolling created by *Ray*

extends the statute of limitations to December 20, 2010 and thus Plaintiff Jones' claims

related to his 2011 incarceration are not barred by the statute of limitations.

Moreover, the Eleventh Circuit has adopted the continuing violation doctrine.

This doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional

violations occur within the statutory period. *See Kellat v. Douglas County,* 2011 U.S.

App. LEXIS 26442 (11th Cir. 2011).

In any event, all of the Plaintiffs' factual allegations remain relevant for showing

the existence and operation of the policies or customs challenged here.

Finally, Plaintiff Agee does make allegations relative to JCS and probation, (Doc.

# 32, ¶¶ 109, 110) and his Count claims in this count are not due to be dismissed.

**2) Plaintiffs' Claims Against Judge Hayes in His Individual Capacity Are for Administrative Functions for Which He Is Not Entitled to the Protection of Absolute Judicial Immunity**

Presiding Judge Hayes' argument that he is entitled to dismissal based on absolute

judicial immunity on these claims fails for the same reasons his absolute immunity

arguments on prior counts failed. He is not being sued for his judicial actions in any

individual judicial proceedings, but rather, for the policies, practices, and procedures he

established in the performance of his administrative functions as presiding judge.

Plaintiffs allege that their injuries were caused by his policies, practices, and customs as

presiding judge, including policies and customs regarding the implementation of the

City's contracts with JCS; the policy or custom of placement with JCS when individuals

were unable to pay their debts in full; the policy or custom of providing blank pre-signed probation orders to JCS to complete, the policy or custom of allowing JCS to sign and issue Notices to Show Cause, schedule court dates, and initiate probation revocation proceedings; the policy or custom of using threats of, or actual, imprisonment for debt and jail labor. Doc. # 32, ¶ 53) And, though Alabama Code § 12-14-13 authorizes municipal courts to place defendants on probation, it is not applicable to this case because it applies only to probation imposed as part of the suspension of execution of sentences of imprisonment.

### 3) Plaintiffs Have Properly Pleaded Claims As To Defendant Strange And The City of Montgomery

The one sentence argument of City Defendants is that the City is not liable for Presiding Judge Hayes's rulings or decisions in particular probation proceedings. As previously argued with respect to other Counts, this may be so but it is not the nature of Plaintiffs' Count VIII claims. (Doc. # 32, ¶¶ 33, 236).

As Mayor, Defendant Strange is authorized to sign all contracts for the City and the duty to see that all contracts with the City are faithfully executed. *See* Alabama Code § 11-43-83. The City is liable for its mayors' acts in signing the contracts with JCS and for the contracts themselves. Mayor Todd is also liable individually for his role in signing and overseeing the execution of the City's contracts with JCS. (Doc. # 32, ¶ 30).

### B. Response to Grounds for Dismissal raised by JCS

### Plaintiffs Sufficiently Plead Claims Against JCS in Count VIII

JCS contends that the amended complaint does not allege facts establishing it violated Plaintiffs' rights by the use of probation or threat of or actual probation to collect fines and fees from indigent persons. Plaintiffs' allegations are that JCS'

challenged acts and omissions, including the use threats of or actual probation revocation resulted in the claimed deprivations of Plaintiffs' rights. (Doc. # 32, ¶ 236). There is no allegation that JCS itself seized Plaintiffs or put them in jail for failure to pay their debts.

Plaintiffs allege that JCS was a joint participant in the scheme that resulted in Plaintiffs' imprisonment for debt and forced labor. (Doc. 32, ¶ 61). Plaintiffs allege that JCS failed to comply with its contractual obligation not to charge its $40 monthly fees to indigent individuals placed with JCS and failed to inform clients of their rights seek indigency determinations or waivers of this fee. (Doc. #32, ¶¶ 54, 59). Plaintiffs also allege that JCS used threats of imprisonment and jail labor to coerce payments and, when unsuccessful, initiated probation revocation proceedings leading to imprisonment and jail labor. (Doc. 32, ¶¶ 53, 54). Further, Plaintiffs' factual allegations against JCS include that it filled in the pre-signed probation orders; that it set $140 per month payments which included $40 monthly payments to JCS, without inquiring about indigency and without granting waivers of the $40 fees to indigent individuals as required under the contracts with the City (Doc. # 32, ¶¶ 54, 59); that it used threats of, and/or participating in bringing probation revocation hearings, sometimes more than once for the same obviously indigent individual (Doc.# 32, ¶ 54); that it filled in and signed Municipal Court Notice to Show Cause orders and scheduled parole revocation hearing dates, which it would then cancel only if payments of amounts such as $1417 were made. (Doc. # 32, ¶60).

Finally, Plaintiff McCullough's factual allegations state that: "JCS told Plaintiff McCullough that she had to either pay the tickets or go to jail." (Doc. #32, ¶ 74). This

allegation cannot be characterized, as JCS would have it, as "simply threatening to report noncompliance with the probation order and referring the issue to the court for a hearing." (Doc. # 54, p. 12).

JCS also argues that only rational basis scrutiny applies to Plaintiffs' equal protection clause claims and that all probationers were treated alike. However, Plaintiffs' challenges are to JCS' actions or omissions with respect to indigent individuals that resulted in their imprisonment for inability to pay fines, costs, and fees, without providing constitutionally sufficient procedural protections. The equal protection and due process rulings in *Bearden, Tate and Turner,* not rational basis scrutiny, provide the applicable legal standards here. Plaintiffs state sufficient claims for relief under the principle of these cases, namely that indigent individuals may not be subjected to imprisonment for their inability to pay debts, without meaningful inquiry into their ability to pay and other procedural protections.

JCS does not separately address or argue for dismissal of Plaintiffs' claims against it for inadequate training, and has thereby waived raising grounds for dismissal of these claims. JCS does refer to Plaintiffs' factual allegations, (Doc. #32, ¶¶ 237, 238), that the JCS training manual fails to include any training on the federal or state law relating to the rights of the individuals assigned to them, but this claim of inadequate training materials is referred to by JCS only to argue that these do not constitute searches or seizures prohibited by the Fourteenth Amendment. (Doc. # 54, p. 10).

Additionally, unlike City Defendants and Presiding Judge Hayes, JCS has not specifically raised statute of limitations as a ground for dismissal of any of the Count VIII claims, and thus has waived this statute of limitation defense.

## IX. COUNT IX: PLAINTIFFS ARE ENTITLED TO PROCEED WITH CLAIMS RELATED TO APPELLATE BONDS

### A. Responses to Grounds for Dismissal of Count IX Claims Raised by City Defendants and Defendant Hayes

### 1) Plaintiffs Properly State Claims Against Presiding Judge Hayes for Administrative Functions that Are Not Protected By Absolute Judicial Immunity

Presiding Judge Hayes again argues that he is entitled to Absolute Judicial Immunity when he sets an individual's appeal bond. He may be, but Plaintiffs expressly disclaim any claims against him for his judicial acts or omissions in performing his judicial functions of making decisions in individual cases.

Presiding Judge Hayes does not assert and thus has waived any Qualifieed immunity defense to the claims in Count IX. In any event, he would not the entitled to qualified immunity for the reasons discussed below with respect to the other individual Defendants.

### 2) Plaintiffs Properly State Claims of Municipal Liability in Count IX

The City of Montgomery contends that it is not liable because it has no ability or authority to set an appeal bond, and because separation of powers prevents it from directing a municipal judge's actions.  But, be that as it may, Plaintiffs expressly disclaim any claims against the City for Defendant Hayes' judicial acts or omissions in his role as a municipal judge making decisions in individual cases.

Plaintiffs state sufficient factual allegations to satisfy Rule 8(a)(2) pleading requirements. Plaintiffs allege a municipal court policy or practice of attempting to bar appeals by requiring indigent individuals to pay costly fixed sum or schedule appeals bonds without meaningful inquiry into their ability to pay. (Doc. # 32,

¶243): "Pursuant to this policy, practice or custom, Plaintiffs were never even informed of any right to have the costs associated with pursing an appeal waived if they are indigent." *Id.* Plaintiffs' individual factual allegations regarding their particular cases support this claim. (Doc.  32, ¶¶ 69-155).

In addition, Plaintiffs' factual allegations are that, of *87,596* Non-DUI traffic cases disposed of, as reported in the 2013 Municipal Court Survey for the City of Montgomery Municipal Court, *only 37 appeals* are listed. (Doc. #32, ¶¶ 40, 245) (emphasis added). The comparative numbers in the 2013 report for the City of Huntsville's Municipal Court lists 1, 249 appeals out of 27, 889 Non-DUI traffic cases. *Id.*  The dramatically low number of appeals reported for the Montgomery Municipal Court supports a reasonable inference that the policy of attempting to bar indigent appeals exists and that it has been implemented so as to cause the alleged deprivations of Plaintiffs rights under the equal protection and due process clauses.

### 3) Plaintiffs Properly Plead Count IX Claims Against Defendant Strange

City Defendants refer to their prior discussion in Counts IV through VIII and merely state that, "Mayor Todd Strange cannot be held liable under § 1983 for the judicial act of the municipal court judges over whom he has no control." (Doc. # 53, p. 41 ). Plaintiffs do not allege or contend that he may and do not base the claims against him on supervisory liability. Rather, Plaintiffs allege that, as mayor, Defendant Strange himself ratified the unconstitutional administrative policies and practices with respect to appeal bonds reflected in the shocking report numbers. (Doc. # 32, ¶ 244).

### X. PLAINTIFFS' CLAIMS OF INADEQUATE TRAINING AND SUPERVISION PROPERLY STATE CLAIMS FOR RELIEF

According to *City of Canton v. Harris,* 489 U.S. 378 (1989), for purposes of municipal liability under § 1983, a challenged municipal policy, such as failure to train, itself need not be unconstitutional, if the policy is a "moving force" in a deprivation of protected rights. With respect to claims based on a policy of failure to train, the Court recognized that "deliberate indifference"[21] to the rights of persons with whom police come into contact can establish such a policy. There are two ways of demonstrating a policy of failure to train: (1) a pattern of unconstitutional violations of which policymaking officials can be charged with knowledge; and (2) training is obviously necessary to avoid constitutional violations. In *Canton*, the Court observed:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury. *Canton,* at 390 (footnotes omitted).

As Defendants recognize, the requirements for establishing a policy of failure to supervise claim are closely akin to a failure to train policy. Plaintiffs must show that a municipality knew of a need to supervise and deliberately chose not to do so. Finally, as Defendants also acknowledge, a city may be liable on a "ratification theory, "[i]f the authorized policy makers approve a subordinate's decision and the basis for it." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988).

---

[21] Deliberate indifference for purposes of establishing a policy of failure to train differs from deliberate indifference as required to establish a violation of eighth amendment rights. *See Farmer v. Brennan,* 511 U.S. 825 (1994). The former is an "objective obviousness," *Collins v. City of Harker Heights,* 503 U.S. 115, 124 (1992), whereas the latter is a subjective awareness of the risk of serious harm.

Defendants are wrong in saying that Plaintiffs have failed to plead factual allegations to support their claims for failure to train or supervise. Plaintiffs' factual allegations and reasonable inference drawn from them are sufficient. Plaintiffs identify the specific constitutional and statutory rights concerning which more training and supervision are needed. And they identify specific inadequacies in training materials or practices of the Municipal Court and JCS. (Doc. # 32, ¶¶ 66, 67, 238, 239).

## XI. COUNTS X AND XI: PLAINTIFFS ARE ENTITLED TO PROCEED ON RICO CLAIMS AGAINST JCS

### 1) Plaintiffs Sufficiently Plead that JCS' Actions Were Not Authorized by the Terms of Its Contracts with the City of Montgomery

JCS' does not claim its contracts with the City of Montgomery, or the probation orders signed by municipal judges but left to be filled in later by JCS, (Doc. 32, ¶ 58), authorized JCS to use threats of incarceration as a means of collection or to set and maintain uniform $140 payments (including $40 monthly fees to JCS) without any consideration of the individual probationer's ability to pay. (Doc. # 32, ¶¶ 53-54). Instead, the contracts expressly prohibited JCS from collecting its $40 monthly fee from indigent individuals (Doc.# 32, ¶¶ 55, 255). Plaintiffs' RICO claims against JCS are based on actions that were *not authorized* by the contracts with the City, as is precisely stated and amply supported by their factual allegations. Plaintiffs allege that "JCS committed multiple related acts of extortion using *illegal means of threats of imprisonment*, and for the *illegal purpose of collection of $40 monthly probation fees to which it had no lawful claim because of Plaintiffs' and others' indigency*." (Doc. #32, ¶ 255) (emphasis added).

Plaintiffs allege that JCS used threats of imprisonment and jail labor to coerce

payments and, when unsuccessful, initiated probation revocation proceedings leading to imprisonment and jail labor. (Doc. 32, ¶¶ 53, 54. 254). JCS nowhere claims that these actions were authorized by their contracts with the City and points to no contract language purporting to do so. Plaintiff McCullough's factual allegations include an allegation that: "JCS told Plaintiff McCullough that she had to either pay the tickets or go to jail." (Doc. #32, ¶ 74).

### 2) Plaintiffs Properly Plead Predicate Acts That Support These RICO Claims

The predicate acts alleged by Plaintiffs are (1) *extortion* in violation of the Hobbs Act, 18 U.S.C. § 1951, the Travel Act, 18 U.S.C § 1951, and the Alabama Code § 13A-8-13 and (2) violations of federal *anti-peonage or forced labor statutes*.

*Extortion.* JCS relies on position of the Eleventh Circuit, as stated in *United States v. Pendergraft,* 297 F.3d 1198, 1206 (11th Cir. 2002), that a threat that is not inherently wrongful is insufficient to establish extortion under RICO unless there is also a wrongful objective, i.e., no lawful claim to the money sought. Regardless of whether JCS' threats are inherently wrongful, Plaintiffs do allege the threats were made for the wrongful objective of obtaining money that JCS was prohibited from charging under its contract with the City. Plaintiffs' factual allegations include language from the contract between JCS and the City of Montgomery prohibiting JCS from charging its $40 monthly fee to indigent persons. (Doc. # 32, ¶ 55).

JCS also argues that it had no duty to inquire into the indigency of Plaintiffs and that it was the duty of the municipal court to do so. JCS cites Ala. R. Crim. P. 26.11(g), providing that, "[i]f a defendant fails to pay a fine or restitution as directed, the court may inquire and cause an investigation to be made" into whether the nonpayment was due to

indigency.  However, Ala. R. Crim. P. 27.2 authorizes probation officers to request modifications or clarifications of probation orders at any time. JCS itself filled in the probation orders and set the uniform condition of $140 per month for all probationers, without consideration of the probationers' ability to pay and without informing them of the right to seek an indigency determination or providing them the forms to do so. (Doc. # 32, ¶ 53-54).

JCS' agreement not to charge indigents its monthly fee imposed a duty on JCS to at least to advise the court that such an inquiry was needed, or to inform individuals who told JCS they could not pay that they could ask for an indigency determination and to tell them about the forms available for asking for an indigency determination and that they had the right to have a determination of indigency at court hearings on probation revocation. Instead JCS threatened imprisonment if their payments were not made. (Doc. # 32, ¶¶ 53-54).

JCS also argues that it cannot be guilty of extortion because it acted as a "quasi-governmental body" collecting money owed to the municipality. However, *Wilkie v. Robbins*, 551 U.S. 537, 564-65 (2007), relied upon by JCS here, dealt with "extortion undertaken for the *sole* benefit of the Government." *Id.* . JCS concedes that the money obtained in this case was not for the sole benefit of the City of Montgomery. JCS merely states that *"much* of the money collected was for the benefit of a governmental entity." (Doc. # 54, p. 16) (emphasis added). In this case it is only the $40 monthly fee that goes directly to JCS ( i.e., 28.57% of the required $140 monthly payments) that Plaintiffs allege JCS was not entitled to collect from indigent individuals and was thus extorted with a wrongful purpose. (Doc. # 32, ¶ 255).

JCS argues that under *U.S. v Sturm,* 807 F.2d 769, 774 (1st Cir, 1989)*,* Plaintiffs must show intent or that JCS knew it was not legally entitled to the money it received. Plaintiffs have done so by alleging that JCS agreed in the contract with the City of Montgomery that indigents would not be charged the $40 fee. Thus JCS clearly knew that it was not entitled to fees it collected from those unable to pay. (Doc. # 32, ¶ 55, 254).

*Violation of Federal Anti-peonage Statutes.* JCS refers to and makes essentially the same argument here as it made with respect to Count VI's claims of violations of the federal ant-peonage laws. Plaintiffs do the same with respect to their arguments that they have stated a claim for violation of the anti-peonage statutes, and in particular 18 U.S.C. § 1589.  Thus Plaintiffs have sufficiently pleaded violations that constitute predicate acts for their RICO claims.

JCS repeats its argument that Count VII claims against it should be dismissed because the Plaintiffs do not allege that JCS itself forced Plaintiffs to perform labor. JCS fails to acknowledge the full scope of the language of federal anti-peonage statutory provisions Plaintiffs alleged have been violated. None of these provisions require the person sued have been the one to have personally jailed or forced any person to perform forced labor. (Doc. # 32, ¶¶ 226, 227, 228, 229). The last three of the anti-peonage statues provisions expressly cover to injury caused by schemes or ventures. Plaintiffs allege that JCS was part of the scheme or venture that resulted in Plaintiffs' imprisonment for debt and forced labor. (Doc. 32, ¶ 61). Plaintiffs allege that JCS used threats of imprisonment and jail labor to coerce payments and, when unsuccessful, initiated probation revocation proceedings leading to such imprisonment and labor. (Doc. 32, ¶¶ 53, 54).

Finally, the existence of the wrongfulness of a defendant's actions is usually a question

of fact for the fact finder. *Chevron Corp. v. Donziger,* 974 F. Supp.2d 362, 579 (S.D.N.Y. 2014); *see also United States v. Sturm,* 870 F.2d 769, 774 n.6 (1st Cir. 1989) ("We realize that many defendants will claim that they thought they were legally entitled to the property allegedly extorted. The factfinder is not obligated, however to believe these claims.").

## XII. COUNT XII: PLAINTIFFS ARE ENTITLED TO PROCEED ON CLAIMS OF FALSE IMPRISONMENT UNDER ALABAMA CODE § 6-6-170

## A. Response to Grounds for Dismissal Raised by City Defendants and Defendant Hayes

### 1) Plaintiffs Sufficiently State Claims For False Imprisonment

Alabama's law on false imprisonment, including false arrest,[22] provides: "False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code §6-6-170. Plaintiffs' claims against the individual City Defendants and Defendant Hayes include (1) Claims against Defendants Strange, Finley, and Murphy for false imprisonment of Plaintiffs by stopping, ticketing and arresting, including on warrants, without reasonable cause, or based on racial profiling or targeting, (Doc. 32, ¶ 266); (2) Claims against Defendants Strange and Hayes for false imprisonment by warrants, arrests, probation revocations, detention for inability to pay bonds, and incarceration for inability to pay fines and court costs, without meaningful inquiry into their ability to pay. (Doc. 32, ¶ 267).

Under Alabama law, people who do not actually effect an arrest, provided they are "involved with or related to the [arrest] . . . as instigators or participants," can be liable for false arrest. *Crown Cent. Petroleum Corp. v. Williams,* 679 So. 2d 651, 653

---

[22] An unlawful arrest amounts to a type false imprisonment, not a standalone tort under Alabama law.. *See Crown Cent. Petrol. v. Williams,* 679 So.2d 651, 654 (Ala. 1996).

(Ala. 1996). Plaintiffs have alleged that Defendants instigated, caused or induced or aided and abetted the false imprisonment challenged in Count XII. (Doc. # 32, ¶¶ 266, 267).

**2) The Individual City Defendants Are Not Entitled to State-Agent Immunity**

Individual City Defendants assert that their acts were discretionary and covered by state-agency immunity.  However, the Defendants' actions fall within established exceptions to state-agent immunity.

In its recent opinion in *Hill v. Madison County School Board,* No. 14-12481 (11th Cir. Aug. 12, 2015), the Eleventh Circuit also addressed Alabama law governing discretionary, state-agent immunity from tort liability, as well as the exceptions to this immunity. The Court stated:

> Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles,* 852 So. 2d 117, 122 (Ala. 2002). The Alabama Supreme Court has established a burden-shifting framework for application of the state-agent immunity test. *Ex parte Estate of Reynolds,* 946 So. 2d 450, 452, 454– 55 (Ala. 2006). A state agent initially bears the burden of demonstrating that she was acting in a discretionary function that would entitle her to immunity. Id. If the state agent makes such a showing, the burden shifts to the plaintiff to show the state agent "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte Cranman,* 792 So. 2d 392, 402 n.13 (Ala. 2000). *Id.* at 62.

*Ex parte Cranman* was only a plurality opinion*,* but its holding was adopted by the full court in *Ex parte Butts,* 775 So.2d 173 (Ala. 2000). *Cranman,* outlined the exceptions to discretionary state-agency immunity as follows:

> Notwithstanding anything to the contrary in the foregoing statement of the rule, a state agent shall not be immune from civil liability in his or her individual capacity
> 
> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted

or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the state agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. *Id.* at 405.

In *Hill,* the Eleventh Circuit looked to the Alabama law on each of these exceptions: First it noted that, "As the Alabama Supreme Court has explained, a state agent acts beyond his authority when he "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000). . . . [U]nder Alabama law, a state official acts beyond her authority when she fails to comply with a policy that has "remove[d] a State-agent's judgment in the performance of required acts." *Ex parte Spivey,* 846 So.2d at 333.  Next it pointed out that, "Bad faith "is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty . . . through some motive of self-interest or ill will." Gulf Atl. Life Ins. Co. v. Barnes, 405 So. 2d 916, 924 (Ala. 1981)." Finally, it explained that, "Not every innocent misinterpretation of the law revokes an official's state- agent immunity under Alabama law. If nothing more were required than an innocent misinterpretation of the law, "that exception would 'swallow' the whole of the general rule of immunity itself" because "any misstep by any state employee or other state agent that wrongs another can be said to be beyond his or her authority and/or committed under a mistaken interpretation of the law." Segrest v. Lewis, 907 So. 2d 452, 456 (Ala. Civ. App. 2005). For that reason, the misinterpretation of the law must be coupled with willfulness, maliciousness, or bad faith to "pull the agent out from under the umbrella of state-agent immunity." Id. *Hill,* at 63-66.

80

Following the Eleventh Circuit's approach in *Hill,* in Count XII of the First

Amended Complaint, Plaintiffs carefully describe the reasons why Defendants are

not entitled to state-agent immunity, demonstrating that Defendants' actions fall

within each of these well-recognized exceptions to such immunity. Paragraph 270

states:

*1. Acting beyond authority:*"[C]ontrary to and in violation of their personal duties to
Plaintiffs and others similarly situated arising under Ala. Code § 6-5-170; under
clear federal prohibitions on racial discrimination; and/or under detailed state rules
on imprisonment for debts that are so clear as to remove Defendants' judgment,
including Const. of Ala., Art. I, Sec. 20: "That no person shall be imprisoned for debt.",
Ala. Code § 15-18-62 (fines and costs can be converted into jail time only if a
defendant is found to have willfully failed to pay the fines or costs), and Rule
26.11(i)(2) of the Alabama Rules of Criminal Procedure ("In no case shall an
indigent defendant be incarcerated for inability to pay a fine or court costs or
restitution.");

*2. Bad Faith:* "[R]ecklessly , wantonly, willfully, maliciously, fraudulently or in bad
faith (e.g., by willfully acting beyond the scope of Defendants authorities, and by
willfully misinterpreting clear and unambiguous laws, all for the purpose of
generating and collecting revenue, with malicious disregard for the plight of
minority or indigent individuals such as Plaintiffs who are subjected to racial
profiling or subjected to the cruel punishment of spending time in jail); and

*3. Mistaken Interpretation of Law:* ([E].g., mistaken interpretations of Ala.  Code § 6-
5-170, the federal constitutional and statutory law with regards to the legality of
racial profiling, state law as regard to the legality of JCS contracts, and/or state law
provisions cited above on imprisonment for debts), coupled with willfulness,
maliciousness or bad faith. *See* (Doc. # 32, ¶ 270).

Plaintiffs do not base their state false imprisonment claims against the

individual City defendants on *respondeat superior* liability. While employers are

subject to liability for an employee who commits false imprisonment, *Crown Cent.*

*Petroleum Corp. v. Williams,* 679 So. 2d 651, 653 (Ala. 1996), Plaintiffs do not claim

that any of the City's employees or agents who participated in the false

imprisonment were employees of the individual Defendants.

**3) Presiding Judge Hayes Is Not Entitled to Dismissal On Grounds Of Absolute Judicial Immunity**

Presiding Judge Hayes' arguments for absolute judicial immunity from Count XIII's false imprisonment claims is due to be denied. He begins by repeating arguments of why *Stump,* a case dealing with immunities under § 1983, not Alabama tort law, supports his claim for absolute judicial immunity. Plaintiffs have repeatedly shown why he is not entitled to judicial immunity for his administrative functions under § 1983 law, but this is not the governing law for the state claims in this case.

The only Alabama caselaw on state immunity that Defendant Hayes refers to fails to support his argument. In *Ex parte City of Greensboro,* 948 So.2d 540, 542-43 (Ala. 2006) the Court held that the Alabama law on judicial immunity also takes a functional approach that focuses on the function being performed. The Court explained:

> Judges *acting in an official judicial capacity* are entitled to absolute judicial immunity.
> Broad policy interests support allowing immunity for judges acting within their judicial capacity:
> Since the English common law doctrine of absolute judicial immunity was recognized in the United States, courts have held its application necessary to preserve the system established for the administration of justice and the law. Judicial immunity arose because it was in the public interest to have judges who were at *liberty to exercise their independent and impartial judgment about the merits of a case* without apprehension of the personal consequences of exposure to potential damages liability from vexatious and frivolous actions prosecuted by disgruntled litigants. *City of Bayou La Batre v. Robinson,* 785 So.2d 1128, 1132 (Ala. 2000). *Id.*

Plaintiffs' state false imprisonment claims against Presiding Judge Hayes are not for his judicial functions in individual cases, but rather for his administrative functions as Presiding Judge. Thus, he is not entitled to absolute judicial immunity under Alabama law. Defendant Hayes has not asserted and thus waived any defense based on state-agency immunity. *See Hall,* at 68 n. 13: "Simpson has not asserted a state-agent defense.

*See Ryan v. Hayes,* 831 So.2d 21, 27-28 (Ala. 2002) (stating state-agent immunity

doctrine applies to "*asserted* state-agent immunity defense") (emphasis added)."

(emphasis orginal).

**B. Response to Ground for Dismissal Raised by JCS**

**Plaintiffs State a Claim for False Imprisonment Against JCS**

JCS argues that it cannot be liable because there are not allegations that JCS

directly restrained Plaintiffs. However as discussed above with respect to the

arguments of the individual City Defendants, those who do not actually effect an

arrest, provided they are "involved with or related to the [arrest] . . . as instigators

or participants" are liable under Ala. Code §6-6-170. *Crown Cent. Petroleum Corp. v.*

*Williams,* 679 So. 2d 651, 653 (Ala. 1996).  Plaintiffs have alleged that JCS was a joint

participant and its actions were inextricable intertwined with those of other

Defendants. They have pleaded numerous factual details of JCS' participation in the

scheme which resulted in Plaintiffs' false imprisonment, as demonstrated above.

Lastly, as an employer, JCS is also liable for acts of their employees who commit false

imprisonment. *Id.* Plaintiffs specifically allege that JCS is liable both for its own

actions and those of its employees. (Doc. # 32, ¶¶ 268, 269).

**XIII. COUNT XIII: THE FIRST AMENDED COMPLAINT SUFFICIENTLY
STATES A CLAIM AGAINST JCS FOR ABUSE OF PROCESS**

JCS ignores many of Plaintiffs factual allegations when it argues Plaintiffs fail to

state a claim for abuse of process. Plaintiffs do not dispute that the elements of the

tort of abuse of process under Alabama law are (1) an ulterior purpose, (2) a

wrongful use of process, and (3) malice.  Plaintiffs' factual allegations are more than

sufficient to state a plausible claim with respect to each of these elements.

Plaintiffs' factual allegations as to each element are summarized and included in the following paragraphs of Count XIII:

274. JCS and its employees abused the process of probation in the City of Montgomery Municipal Court by *wrongfully using the probation orders* approved in its contracts with The City of Montgomery, which granted it authority to supervise probation and charge $40 monthly probation fees to non-indigent probationers, *for the ulterior motive of* coercing and extorting money from Plaintiffs who were indigent and unable to pay, for its own profit. . . .

275. JCS and its employees *intentionally and maliciously used the probation orders* in this way, and by harassing and threatening Plaintiffs, failing to give Plaintiffs full information about their contractual, due process, equal protection, or other rights, and failing to provide them of notice of, or access to, a process for evaluating or presenting indigency or inability to pay as a basis of waiver of fees, or in a hearing before the court on commuting fines and costs to jail time when plaintiffs were unable to pay. (Doc. # 32, ¶¶ 274, 275) (emphasis added).

JCS points out that, according to *Dempsey v. Denman,* 442 So.2d 63, 65 (Ala. 1983), "[T]he [ulterior motive] must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect." This is exactly what Plaintiffs have pleaded JCS did with respect to the probation orders and Notices to Show Cause.

While Plaintiffs must show that JCS acted intentionally, s*ee Clikos v. Long,* 231 Ala. 424, 428 (1936), the element of "malice" required involves not ill will or meanness, but the goal of achieving some result not properly achieved by the process undertaken. *Shoney's Inc. v. Barnett,* 773 So.2d 1015, 1025 (Ala. Civ. App. 1999).

## XIV. COUNT XIV: PLAINTIFFS STATE AN EQUITABLE CLAIM FOR MONEY HAD AND RECEIVED AGAINST JCS

JCS again ignores Plaintiffs' factual allegations. Plaintiffs agree that pursuant to *Foshee v. General Telephone Co. of Southeast,* 322 So.2d 715, 716 (Ala. 1975), plaintiffs

bringing an action for money had and received must plead that the defendant has received money that rightfully belongs to the plaintiff through mistake or fraud. JCS asserts that Plaintiffs have not pleaded what the mistake was and cannot do so because the money was taken pursuant to a valid court order and JCS did not participate in any wrongful conduct in the collection of the money. However, in Count XIV Plaintiffs plead that, "JCS and its employees obtained and held Plaintiffs' money in the form of set-up and $40 monthly probation fees, that it was not entitled to and was improperly paid to the defendant because of mistake or other wrongful reasons, including because charging indigent individuals its regular monthly probation fees was prohibited by express language in its contracts with The City of Montgomery." (Doc. #32, ¶ 280).

## XV. PLAINTIFFS' FIRST AMENDED COMPLAINT IS NOT DUE TO BE DISMISSED FOR USE OF "SHOTGUN PLEADINGS."

JCS is wrong in contending that Plaintiffs' have used "shotgun pleadings." As shown in this Combined Response, Plaintiffs instead plead targeted factual allegations supporting each claim which satisfy Rule 8(a)(2) pleading requirements as interpreted in the *Twombly/Iqbal* line of cases.

Nevertheless, if any of Plaintiffs' pleadings are found to constitute "shotgun pleadings" or to lack sufficient factual allegations to put Defendants on notice of the claims against them, Plaintiffs respectfully request that the Court grant them leave to file a still more factually detailed second amended complaint.

## XVI. QUASI-JUDICIAL IMMUNITY NOT APPLY TO JCS

Quasi-Judicial Immunity does not apply to the claims against JCS in this case for two reasons. First, as a private for-profit entity JCS is not entitled to claim the individual immunities afforded to governmental officials under § 1983. Second, JCS would not be

entitled to quasi-judicial immunity in any event because neither of the two requirements for this immunity are met: (1) that the acts be quasi-judicial and (2) that the acts be within the scope of its authority.

It would be "uniquely amiss" for JCS, a private for-profit corporation, to escape liability in this case. The considerations that led the U.S. Supreme Court to reject pleas to extend § 1983's individual officer immunities to municipal entities apply with even greater force to private entities. In *Owen, supra,* the Supreme Court recognized that it would be "uniquely amiss" to allow a municipality to escape liability for injuries it caused plaintiffs where the responsible officer may be entitled to absolute or qualified immunity. The Court determined that the policies supporting immunities for officers sued in their individual capacity do not justify extending these immunities to municipal entities.  The Court found that the risk of municipal liability was unlikely to chill officers performing their discretionary duties and that municipal decision-making already takes financial matters into consideration. *Id.* at 651-56.

In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court rejected claims of §1983 immunity for an employee of a private company operating a state prison.  Because a profit-motivated private entity responds to market-created pressures that provide strong incentives to avoid timid, fearful, or insufficiently vigorous performance, it can offset risks to employees with higher pay or increased benefits. *Id.* at 410.  As a for-profit private entity, JCS is subject to market-pressure as the private prison in *Richardson* was and is not entitled to claim immunity here.

JCS's situation here is in no way comparable to that of the private individual working as a short-term independent contractor for the government in *Filarsky v. Delia*, 132 S. Ct. 1657 (2012) (a private lawyer hired by a municipality on a short-term contract to conduct an internal affairs investigation was allowed to assert the same qualified immunity that a full-time employee performing the same function would be)(*Richardson* distinguished but not overruled.) Had any of JCS' employees been sued in this case they would not be entitled to claim any immunity for their actions. Their positions as private probation officers are not comparable to the position of the attorney in *Filarsky,* and they do not have the same duties or perform the same functions as public probation officers. In particular, their duties do not include preparation of pre-sentence reports as is done by public probation officers. Actions other than preparing pre-sentence reports are not shielded by absolute immunity even when performed by public probation officers.

Second, JCS is not entitled to quasi-judicial immunity in any event because it (1) was not "acting within the scope of [it's judicial] authority," *Roland v. Phillips*, 19 F. 3d 552, 555 (11th Cir. 1994) and (2) was not exercising "discretionary power similar to that exercised by a judge." *Id.* Judicial immunity has been extended to "those officials with discretionary power similar to that exercised by a judge." *Scott v. Dixon,* 720 F. 2d 1542, 1546 (11th Cir. 1983) (citing McCray v. Maryland, 456 F. 2d 1, 3 (4th Cir. 1972).

JCS acted outside of any authority under its' contracts with the City or the probation orders by using threats of probation revocation, jail time, and jail labor as means of collecting fines, court costs, and monthly fees due JCS. (Doc. # 32, ¶ 53, 54).

Also, under these contracts, JCS explicitly agreed not to collect its monthly fees from indigent probationers, (Doc. 32 ¶ 55), but did so without informing probationers of this provision or of their rights to file affidavits of hardship and to ask for indigency determinations. Instead JCS continued to insist on payment of fines and monthly fees through threats of imprisonment. (Doc. # 32, ¶¶53, 54).

Further, Plaintiffs do not challenge their individual court-imposed sentences of fines and costs. (Doc. # 32, ¶ 11). Nor do Plaintiffs challenge the orders assigning them to probation or any of JCS's actions *in accord* with the terms of these probation orders (which were signed by the court but actually filled in later by JCS). (Doc. # 32, ¶ 58). Although some of JCS' employees were called "probation officers," JCS essentially provided debt collection services to the city. (Doc. 32 ¶ 52). The activities of JCS employees were mostly administrative and ministerial and in no way resemble the kinds of discretionary decision-making that judges or prosecutors exercise in performing their judicial or prosecutorial functions, or that probation officers exercise in preparing and submitting presentence reports.  JCS's employees' activities of collecting from debtors and threatening and/or initiating revocation proceedings for failure to make payments are far "less intimately associated with the judiciary" and therefore not protected by judicial immunity. *Galvan v. Garmon,* 710 F. 2d 214, 215-16 (5th Cir. 1983).

Judge Albritton's opinion for this Court in *A.M. v. Grant,* 889 F. Supp. 1495, 1503-04 (M.D. Ala.) *aff'd sub nom. A.M. v. Grant,* 68 F.3d 486 (11th Cir. 1995), held that a juvenile probation officer was not entitled to absolute judicial immunity for her actions in authorizing the detention of a juvenile. The Court's opinion

emphasizes that the scope of any absolute judicial immunity for probation officers is

limited, stating as follows:

> Smith argues that she is entitled to the protection of absolute judicial immunity for her actions. She bases this argument on cases which hold that a probation officer is entitled to absolute immunity when preparing and submitting a presentence report in a criminal case. *See Hughes v. Chesser,* 731 F.2d 1489, 1490 (11th Cir. 1984) (state probation officers enjoy immunity to the same extent as would a federal probation officer); *Spaulding v. Nielsen,* 599 F. 2d 728, 729 (5th Cir. 1979) (federal probation officers enjoy absolute judicial immunity from damage suits for preparing and submitting a presentence report in a criminal case).
>
> The cases on which Smith rests her claim to judicial immunity do not authorize this court to immunize Smith for actions that she took which caused AM to be detained. The problem with Smith's argument is that this case does not involve the preparation and submission of a presentence report. The aforementioned cases are expressly limited to that narrow factual setting. . . . *A.M. v. Grant* at 1503. *See also Paris v. Quattlebaun,* 2009 Westlaw 734146 (M.D. Ala).

## XVII. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE ROOKER-FELDMAN DOCTRINE AND ARE NOT COLLATERAL ATTACKS.

### A. The *Rooker-Feldman* Doctrine Does Not Apply to Plaintiffs' Claims

The *Rooker-Feldman* doctrine derives from 28 U.S.C. § 1331's grant of federal

district court jurisdiction and 28 U.S.C. § 1257, which sets forth the exclusive means

by which state court judgments are reviewable in federal court, with the U.S.

Supreme Court alone having federal appellate jurisdiction over state court

judgments. In *Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923)*,* the Court held that a

federal bill in equity to have a judgment of the an Indiana circuit court, which had

been affirmed by the Indiana Supreme Court, declared null and void was plainly not

within the district court's jurisdiction as defined by Congress. Years later, in *District*

*of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), the Court drew a

distinction between general challenges to the constitutionality of the District of

Colombia bar rule requiring graduation from an accredited law school and challenges to particular judicial decisions denying individual petitions based on this rule. The Court held that the federal district court had jurisdiction to consider the former but not the latter. *Feldman* at 486-87.

In *Exxon Mobil Corporation v. Saudi Basic Industries Corporation,* 554 U.S. 280 (2005), the Court held that, given the "narrow ground" the *Rooker-Feldman* doctrine occupies, it "is confined to those cases of the kind from which the doctrine acquired its name: cases brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284. *See Nicholson v. Schafe,* 558 F.3d 1226 (11th Cir. 2009) (discussing how narrowly the *Rooker-Feldman* doctrine has been applied after *Exxon*).

Even more recently, in *Skinner v. Switzer,* 131 S. C. 1289, 1297 (2011), the Supreme Court observed that it had invoked the *Rooker –Feldman* doctrine only twice, "in the two cases from which the doctrine takes its name, i.e., in *Rooker* and *Feldman.*" In *Skinner,* the Court upheld the lower courts' holding that the doctrine did not bar a federal § 1983 challenge that was not to the adverse state court decisions in Skinner's case, but to the Texas statute allowing prisoners to gain postconviction DNA testing in limited circumstances. *Id.* 8-10

Additionally, in the ongoing *Ray* lawsuit against JCS and the City of Childersburg, Judge Proctor held that the *Rooker-Feldman* doctrine does not preclude subject matter jurisdiction in this type case because Plaintiffs do not seek to overturn their convictions. See *Ray, et al. v. Judicial Corrections Services, et al.*, Case No. 2:12-cv-

02819-RDP, Northern District of Alabama, Memorandum Opinion of Sept. 13, 2013 at

14-16. Judge Proctor reasoned:

> The *Rooker-Feldman* doctrine stands for the proposition that "federal courts, other than the Supreme Court [of the United States], have no authority to review the final judgments of state courts." *Siegel v. LePore,* 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc). . . . To be sure, such attempts to invoke the jurisdiction of the federal courts are clearly misguided. But this case is not one of them. . . .

Judge Proctor concluded instead that the *Ray* case closely resembled *Powers v.*

*Hamilton County Public Defender Commission,* 501 F. 3d 592, 597 (6th Cir. 2007) *cert.*

*denied,* 555 U.S. 813 (2008). In *Powers,* a former prisoner challenged the Public

Defender's policy of not pursuing indigency hearings for defendants placed in jail for

unpaid fines. The Court rejected the defendant's argument that the suit called into

question the plaintiff's prior conviction, declaring instead that "[a] conclusion that

procedures, or rather the lack of procedures, that culminated in Powers' incarceration

violated his constitutional rights has nothing to do with the propriety of his underlying

conviction." *Id.* at 604.

As these cases demonstrate, the *Rooker-Feldman* doctrine does not apply in this

case in which Plaintiffs do not challenge the propriety of their prior convictions, but

rather the unconstitutional or otherwise unlawful policies or customs that culminated in

the deprivations of their rights.

## B. Plaintiffs' Claims Are Not Collateral Attacks on Criminal Convictions

The U.S. Supreme Court has described federal courts' obligation to adjudicate

federal claims properly within their jurisdiction as "virtually unflagging." *See Sprint*

*Commc'ns, Inc. v. Jacobs,* 134 S. Ct. 584, 591 (2013). Nonetheless, JCS argues that

that this case is an improper civil proceeding collaterally attacking judgments in

state criminal cases.  To the contrary, none of Plaintiffs' claims in this case seek to attack their individual convictions for traffic violations or other minor offenses or the fines and costs imposed for these violations.  Rather, they challenge the unlawful policies, practices and customs which caused their stops and arrests, arrest warrants, bail bonds, placement on "probation, revocation of probation, incarceration for inability to pay fines and costs and forced jail labor.

As argued above, this case is very similar to *Powers v. Hamilton County Public Defender Commission*, 501 F. 3d 592, 597 (6th Cir. 2007) *cert. denied*, 555 U.S. 813 (2008) in which a former prisoner challenged the Public Defender's policy of not pursuing indigency hearings for defendants placed in jail for unpaid fines. The Sixth circuit rejected the defendant's argument that the suit called into question the plaintiff's prior conviction, declaring instead that "[a] conclusion that procedures, or rather the lack of procedures, that culminated in Powers' incarceration violated his constitutional rights has nothing to do with the propriety of his underlying conviction." *Id.* at 604.

The forms of relief Plaintiffs seek are damages for the injuries caused them by these unlawful policies, declarations of their illegality, and injunctions against their continuing application. They do not ask this Court for reversal of their convictions or invalidation of any municipal court orders in their cases. Defendants are not attacking the fines and fees assessed in their individual cases but are challenging the policy of imprisoning indigent persons for failure to pay in full the assessed fines and costs without meaningful consideration of their indigency.

The only case JCS cites as support for its' collateral attack argument is the Alabama Supreme Court's opinion in *Citizenship Trust v. Keddie-Hill*, 68 So. 3d  99, 105

(Ala. 2011). In *Kidde-Hall,* the plaintiffs challenged the constitutionality of a $12 fee for

a DNA database which was imposed as part of the court costs in their cases. The

Alabama Supreme Court found that the state court civil case should be dismissed because

it fell within the scope of Rule 32 of the Alabama Rules of Criminal Procedure's

application to a postconviction challenge to a portion of a court cost. Because this case

dealt with the state rules governing postconviciton relief for fines imposed in individual

cases it is inopposite here.

## XVIII. THE STATE LAW CLAIMS IN THIS CASE ARE NOT DUE TO BE DISMISSED UNDER 28 U.S. C. § 1367

JCS concludes by arguing that, even if the RICO and other federal claims

remain, this Court should not exercise jurisdiction over the state-law claims, but

instead should *abstain* from addressing the purely state-law claims. (Doc. # 54, p.

34-35).  JCS cites cases where federal courts have abstained from exercising

jurisdiction over federal claims, or stayed resolution of federal claims pending

resolution by state courts of an issue of state law. (i.e., *Colorado River Water*

*Conservation Dist. v. United States v. United States,* 424 U.S. 800, 814 (1976),

*Quackenbush v. Allstate Insurance Company,* 517 U.S. 706, 728 (1966) and *Buford v.*

*Sun Oil*, 319 U.S. 315 U.S. 315, 334 (1943)).

None of these cases deal with federal courts' exercise of supplementary

jurisdiction over purely state law claims, a topic which is governed instead by 28

U.S. C. § 1367. Section 1367(c) addresses when district courts have the discretionary

authority to decline to exercise supplemental jurisdiction over a claim. None of the

four reasons listed in this subsection are applicable here. First, the state law claims

in this case do not raise any novel or complex issue of State law and only call upon

the court to apply settled state law. Second, the three state law claims do not substantially predominate over the claims in the other ten counts raising numerous federal claims. Third, the district has not dismissed all claims over which it has original jurisdiction. Nor are these federal claims due to be dismissed, as demonstrated in Plaintiffs count-by-count responses. Finally, JCS has pointed to no other compelling reason or exceptional circumstances, for dismissal of the state law claims in this case.

Although JCS contends that Plaintiffs' state law claims are seeking the interpretation of state laws and statutes, Plaintiffs' state law claims only ask the Court to apply well-established state law and grant relief for the injuries caused them by the claimed violations of state law.

CONCLUSION

Based on the foregoing, all of the Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint are due to be denied.

Respectfully submitted,

_____
FAYA ROSE TOURE (ASB-5931-R78R)
HENRY SANDERS (ASB-6179-A34H)
CHESTNUT, SANDERS & SANDERS, LLC
One Union Street
P.O. Box 1290
Selma, Alabama 36702
Telephone: 334-526-4531
Fax: 334-526-4535
E-mail: fayarose@gmail.com
          Gpompey@csspca.com


s/ Martha I. Morgan_____
MARTHA I. MORGAN (ASB-3038-A46M)

94

8800 Lodge Lane
Cottondale, Alabama  35453
Telephone: 205-799-2692
E-mail: mimorgan@yahoo.com

**Attorneys for Plaintiffs**


## CERTIFICATE OF SERVICE


I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, on this 12th day of November, 2015.

s/ Martha I. Morgan
   Of Counsel