**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

—————————————————————————

| | |
|---|---|
| **ANGELA MCCULLOUGH,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )      **Case No. 2:15-cv-463 (RCL)** |
| | ) |
| **THE CITY OF MONTGOMERY,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

—————————————————————————

<u>**MEMORANDUM OPINION**</u>

Before this Court are a series of motions to dismiss or, in the alternative, for summary judgment. Plaintiffs have also voluntarily dismissed certain claims, rendering some of the motions, or portions of the motions, moot. The complaint in this case regards the City of Montgomery, Alabama's alleged creation of debtor's prisons. Plaintiffs maintain that indigent individuals were were made to sit in jail and "sit out" fines they could not afford to pay without ever being informed of their rights. This was done without any determination as to whether the plaintiffs could afford to pay the fines. Plaintiffs in this case are individuals who were subject to stops and arrests tied to the alleged policies and practices surrounding the debtor's prisons. Plaintiffs filed suit against the City and several named persons they claim were involved in creating or perpetuating this practice, including the mayor, chief of police, and the part-time municipal judge, Judge Les Hayes, III. Plaintiffs also filed suit against Judicial Corrections Services, Inc. (JCS), a private company that was contracted to run the City's probation program. Plaintiffs allege JCS was also involved in the City's policy and, among other things, served as a collection agency for the City. Upon review of the motions, oppositions, and replies thereto in addition to the record

of this case and applicable law, defendants' motions to dismiss are GRANTED in part and DENIED in part.

## I.     Background

### 1.  Factual Background

This case concerns practices and policies of the City of Montgomery, Alabama.  Plaintiffs file suit on behalf of themselves and those similarly situated.  They claim that Montgomery had a series of interwoven policies designed to increase municipal budgets at the expense of members of the community, particularly minorities.

One aspect of this is that police would make a large number of stops, particularly in minority communities.  These stops occurred in predominately minority residential areas or at times when predominately minority church services concluded.  In addition to the fees associated with any violation for which an individual was stopped, such stops allowed officers to determine if the individual had prior unpaid fines.

Individuals who violated various offenses, typically traffic offenses, were levied substantial fees.  Those who could not afford to pay were incarcerated for their failure. Incarcerated individuals "sat out" their debts to the City at a rate of $50 per day.  Those individuals who did work for the City, such as cleaning blood and feces in the local jail cells, had their debts reduced by another $25 per day of labor.

Individuals with fines levied against them could be placed on "probation" with JCS, a private company that was contracted to run the City's probation program.  Individuals paid a fee to JCS to be on probation in addition to the money owed to the City.  Those who could not pay were subject to arrest and were then incarcerated to sit out their debts as described above. Plaintiffs

2

maintain this was all done without providing them sufficient notice of their rights or due process. They further argue that JCS failed to fulfill its contractual obligation to determine if individuals were indigent and not collect fees from such persons.   They contend these practices constitute creation of debtor's prisons in violation of several federal and state laws.

Plaintiffs make fourteen claims, but all relate generally to the policies described above. For example, plaintiffs' claims include that the City intentionally and unlawfully structured its bail system in a manner that magnified these issues.   Some of these claims have been subject to prior litigation.   For example, in *Mitchell v. City of Montgomery*, the City and municipal judge Hayes were sued many of the same underlying policies.   No. 2:14-cv-186-MHT, 2014 WL 11099432 (M.D. Ala. Nov. 17, 2014).   There, without admitting liability, defendants entered into a settlement and agreed to make changes to some of the City's policies.   As part of that settlement, the parties stipulated to the dismissal of class claims.   This action seeks injunctive and compensatory relief on behalf of those individuals who did not settle their claims in related cases.

### 2.   Procedural Background

As of the time of this writing, the docket for this case contains over 120 entries and the case has not proceeded past these motions to dismiss.  This case was filed July 1, 2015.  Defendants filed motions to dismiss, but on August 20, 2015, plaintiffs filed an amended complaint.  Judge Capel denied the motions to dismiss the first complaint as moot and defendants refiled motions to dismiss plaintiffs' amended complaint.

Plaintiffs filed a motion to consolidate this case with another, *Mitchell*, which addressed some of the same issues. No. 2:14-cv-186-MHT, 2014 WL 11099432 (M.D. Ala. Nov. 17, 2014). That motion was denied December 1, 2015.  Plaintiffs also filed for class certification.  In January

2016, plaintiffs filed a notice of supplemental authority [78], to which defendants responded.  That authority and series of briefs concerns litigation surrounding similar policies to those challenged here in the City of Calhoun, Georgia.  In March 2016, the City filed a notice of supplemental authority regarding a case with similar issues arising in Texas [86].

By May 2016, there were motions for class certification, scheduling orders, stays, and motions to dismiss before the Court.  Additionally, the Court noted the possibility of class overlap between plaintiffs in this case and those in *Carter v. City of Montgomery*, 2:15-cv-555.  Accordingly, the Court granted a stay and denied the motion for class certification without prejudice to refile after the stay is lifted [95].

The case was transferred to the undersigned in June 2016, and in August this Court held a motions hearing on the pending motions to dismiss in both this case and similar cases against both Montgomery and other Alabama cities.

Immediately thereafter, plaintiffs filed notice dismissing claims brought against defendants in their individual capacity under 42 U.S.C. § 1983 [103, 104].  The following approximately twenty docket entries concern the parties' disagreement about what plaintiffs voluntarily dismissed.  Defendants also filed a supplemental motion to dismiss at this time.  Finally, plaintiffs filed a motion to partially lift the stay of discovery.

## II.    <u>Legal Standards</u>

### 1.  Motions to Dismiss and Summary Judgment

A motion to dismiss is appropriate when the complaint fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Such a failure occurs when the complaint is so factually deficient that the plaintiff's claim for relief is not plausible on its face.  *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Though facts in a complaint need not be detailed, Rule 8 "demands more than an unadorned, the-defendant-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept all factual statements as true when deciding a Rule 12(b)(6) motion to dismiss.  *Id.* at 678.  However, conclusory legal allegations devoid of any factual support do not enjoy the same presumption of truth. *Id.* at 679. "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  This is not a high bar however, as plaintiffs need only plead facts sufficient to "nudge[] their claims across the line from conceivable to plausible."  *Id.* at 547.

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is a fact that might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In making a summary judgment determination, the court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.  However, "the mere existence of a scintilla of evidence in support of the non-moving party" is insufficient to create a genuine dispute of material fact.  *Id.* at 252.  Instead, evidence must exist on which the jury could reasonably find for the non-moving party.  *Id.*

Given that discovery has been stayed, to the degree these motions are for summary judgment, the Court declines to reach summary judgment at this time.  The parties have not yet had the opportunity to conduct depositions, ask interrogatories, or request the production of documents.  Once discovery is complete, parties will be able to file motions for summary judgment and argue that there are no material facts in dispute.

### 2.   Indigency and Jailing for Failure to Pay Fines

There is a body of caselaw articulating that the state may not jail people based solely on their inability to pay fines or fees without first considering the alternatives.  In *Williams v. Illinois* an individual was unable to pay a court ordered fine and was made to sit out the fine at a rate of $5/day after the conclusion of his normal jail term.  399 U.S. 235 (1970).  The Court held that this practice was impermissible as it amounted to "impermissible discrimination that rests on ability to pay," *id.* at 241.  *Williams* was extended in *Tate v. Short*, 401 U.S. 395 (1971), "which held that a State cannot convert a fine imposed under a fine-only statute into a jail term solely because the defendant is indigent and cannot immediately pay the fine in full."  *Bearden v. Georgia*, 461 U.S. 660, 664 (1983).

*Williams* and *Tate* thus stand for the proposition that "the State cannot 'impos[e] a fine as a sentence and then automatically conver[t] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.'"  *Id.* at 667 (citations omitted).  After reviewing these cases, *Bearden* articulates the law as it applies to jailing people for indigence:

> [I]n revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority. If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment.

*Id.* at 672–73.  The Court further explained that courts also may not imprison people for failing to follow court orders to pay fines, as imprisonment for failing to follow court orders of that nature is "no more than imprisoning a person solely because he lacks funds to pay the fine."  *Id.* at 674.

The 11th Circuit has thus interpreted *Bearden* to require sentencing courts to determine "(1) whether the defendant made a bona fide effort to pay and (2) if the defendant made such an effort and still cannot comply, whether alternative measures of punishment are available."  *United States v. Mitchell*, 317 F. App'x 963, 965 (11th Cir. 2009) (citing *United States v. Satterfield*, 743 F.2d 827, 842 (11th Cir.1984)).

### III.    Plaintiffs' Claims

Plaintiffs have a number of claims both against the City of Montgomery and various officials, including municipal Judge Hayes.  Plaintiffs also have a number of claims against JCS, which they argue functioned as a state actor.  In the course of this litigation, the parties have disputed not only whether plaintiffs have articulated a claim under the Federal Rules of Civil Procedure, but also the acceptable scope of any remedies for such a claim.  For the purpose of readability, this section addresses the legal validity of plaintiffs' claims count by count.  The following section, IV, addresses the question of injunctive relief.

However, the Court will not include a complete analysis of all arguments made by defendants.  This is because a number of arguments advanced by defendants have already been made and rejected in very similar cases.  *Higginbotham v. Judicial Corrections Servs., Inc.*, No. CV-13-BE-740-S, 2014 WL 507448, at *1 (N.D. Ala. Feb. 6, 2014) (noting that the City and JCS advanced arguments that had already been rejected in a similar case, including the City's authority, quasi-judicial immunity, and the *Rooker Feldman* doctrine).

7

1.  **Count One: Violations of the Fourteenth Amendment Equal Protection and Due Process Clauses, Fourth Amendment, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 By Stops, Ticketing, or Arrests.**

As it currently stands this claim is only against the City of Montgomery.  Originally, this claim included 42 U.S.C. § 1983 claims against Mayor Todd Strange, Chief of Police Ernest Finley, Jr., and former Chief of Police Kevin Murphy.  Those claims were voluntarily dismissed by plaintiffs, leaving only the claims against the City.

   a.  **Fourteenth Amendment Challenge**

The first basis of Count One is that traffic stops and fines were levied against plaintiffs because of their race or ethnicity.  Plaintiffs claim that stated reasons for stopping them, such as cracked taillights or failure to wear a seatbelt, were pretextual, and the actual reason for the stops was to allow officers to check for outstanding debts to the City.  Am. Comp. ¶ 181.  In support of this, plaintiffs cite to an investigative reporter who noted that one a trip to Montgomery Municipal Court approximately 90% of the defendants were African American.  *Id.* at 182.  Additionally, plaintiffs allege practices of roadblocks, checkpoints, and stops in or near African American neighborhoods. *Id.* at 183.

In determining whether plaintiffs have stated a claim under the Fourteenth Amendment in a case such as this one, the Court makes an "inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  There are relatively easy cases, such as when "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.*  Often it is much more difficult to determine if there is an invidious discriminatory purpose, and the Courts look to what evidence is available, including the historical background of decisions, if there was a substantive departure from normal

procedures, or specific pieces of legislative or administrative history. *Id.* at 267-268. The Court must bear in mind however, the "heterogeneity of the Nation's population." *Jefferson v. Hackney*, 406 U.S. 535, 548 (1972).

Here, plaintiffs note that they have not articulated as stark a pattern as in other cases, and thus racial impact alone is insufficient. *See* Pls.' Resp. Opp'n Mot. Dismiss 30, ECF No. 57. However, they argue that checkpoints in predominately African American areas is a substantial departure from normal decision-making. *Id.* Plaintiffs do not show that it is in fact a substantial departure however. Even accepting as true that roadblocks and checkpoints were set up in predominately African American residential areas or by African American churches for the purpose of collecting fees, plaintiffs make no allegation regarding similar actions in other neighborhoods or by other churches. That is, there may well have been checkpoints in *every* residential area, including predominately African American ones.

Plaintiffs also cite to an instance where an investigative journalist was in the county court and witnessed a very high percentage of minority defendants—far higher than the percentage of the population. This lone statistic is insufficient. What happened on a single day may not be telling. Additionally, there are a number of reasons why the demographic makeup of those waiting in the courthouse may be unrelated to the number of people who were stopped. For example, lower income individuals may be more likely to contest tickets. Who appears in court may also be linked to work schedules or any number of other possibilities. In brief, a limited look at the demographic profile of individuals waiting in municipal court says very little about the demographic profile of who the police stopped.

Moreover, plaintiffs' case as a whole seems to provide a non-racial basis for defendants' alleged actions: a "scheme designed to increase municipal budgets by using the City of

Montgomery's law enforcement and courts to generate and collect revenue." Am. Comp. ¶ 2. Through the "extortionate imposition and collection of fines, fees, [and] costs . . . Defendants [trap] plaintiffs in a cycle of debt . . . to pay the City's bills and replenish its public coffers." *Id.* While plaintiffs admittedly argue that the city engages in racial profiling throughout the complaint, the general scheme they articulate, a debtor's prison and its corollary coercive impacts, appears largely devoid of racial considerations and far more focused on class considerations. Indeed, all plaintiffs appear to be indigent and one named plaintiff, Ashley Dawn Scott, is Caucasian and was allegedly arrested without any probable cause. As noted above, this is not to say a policy with a stark racial impact, though facially for some other reason, is lawful. However, this is admittedly not such a case, and the alleged basis for the City's actions, while perhaps invidious, does not appear to be racially so. As such, plaintiffs do not state a claim under the Equal Protection clause for this count.[1]

### b.  Due Process Challenge

Though the parties spend very little time briefing due process, it appears the plaintiffs' contention in this count is that by engaging in racial targeting, minority plaintiffs were deprived of their liberty interest without adequate procedural protections or a compelling governmental interest. *See* Pls.' Resp. Opp'n Mot. Dismiss 34. Plaintiffs argue that this overlaps with the Fourth Amendment and Equal Protection aspects of this this count. *Id.* The Court will, like the parties, address due process in the context of the Fourth Amendment and Equal Protection.

---

[1] The Court notes that *Bearden* looks to the Fourteenth Amendment and explicitly states "[d]ue process and equal protection principles converge in the Court's analysis." 461 U.S. 660, 665. As the Court understands plaintiffs' argument in this case, the Fourteenth Amendment claim here relates to the alleged targeting of racial minorities. This Court's analysis regarding indigency is contained under the due process claims, though the Court recognizes that prior Supreme Court precedent has spoken in the language of both due process and equal protection.

To the degree this is linked to the Equal Protection aspects of this Count, the Due Process claim must fail for the same reasons the Equal Protection claims fail.  To the degree it is linked to the Fourth Amendment claims, it fails for the reasons they fail, articulated below.

### c.   Fourth Amendment Challenge

With regard to the Fourth Amendment, plaintiffs argue the stops made were unreasonable because the stated reasons, such as failure to wear a seatbelt or being stopped due to resembling a robbery suspect, were pretext for furthering the City's debt collection efforts.  As the plaintiffs' argument revolves around the distinction between stated reasons for a stop and true reasons for a stop, *Whren* guides our analysis in this case.  *Whren v. United States*, 517 U.S. 806 (1996).

Under *Whren*, the Court asks if there is probable cause to justify a stop, not the subjective intent of the officer.  *Id.*  Here, the plaintiffs largely do not dispute the actions underlying the stops, i.e. that a tail light was indeed broken or that the plaintiff in question was not in fact wearing a seatbelt.   While they argue that they were pulled over on "charges" of these violations and "some deny they had committed the violation," Pls.' Resp. Opp'n Mot. Dismiss 34, plaintiffs' amended complaint and brief are bereft of specific facts and argument sufficient to state a claim that there was no probable cause for the stops in question.  For example, while plaintiffs note that in one instance an individual was found not guilty of an offense for which they were stopped, they do not argue that the officer had no probable cause for the stop.

Plaintiffs argue that *Whren* is inapplicable in this case because they are challenging the actions not of the specific officers who made the stops, but of their superiors and city officials who created policies.  *Id.* at 35.  The Court agrees that this is a distinct question, however, it is not clear how that distinct question is different from the analysis under the Fourteenth Amendment.  That

is, say the plaintiffs are *not* arguing that stops were unlawful as to the actions of the officers but rather that the policy of ordering, for example, increased traffic stops was unlawful.   In this particular count, it is not clear under what basis the policy of conducting widespread traffic stops is being challenged other than the equal protection challenge.   Indeed, plaintiffs appear to concede this by stating, in response to defendant's arguments regarding *Whren*, "[f]or the general reasons discussed above with respect to their equal protection claims, Plaintiffs have stated sufficient factual allegations."  *Id.*

Accordingly, plaintiffs do not state a claim for the Fourth Amendment portion of this count.

### d.  42 U.S.C. § 1981, § 1983 Challenge

Section 1981 reads, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  Plaintiffs must use the remedial provisions of § 1983 when bringing a claim against state actors under § 1981.  *Butts v. Cty. of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000). When a claim is brought under § 1981, the analytical framework and requirements of proof are the same as those for violations of Title VII.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

"A plaintiff bringing suit under section 1981 or Title VII can meet his burden of proof for establishing intentional discrimination either through direct proof of discriminatory intent or through the indirect, burden-shifting method of proof first elaborated in *McDonnell Douglas*." *Von Zuckerstein v. Argonne Nat. Lab.*, 78 F.3d 587 (7th Cir. 1996) (internal citations omitted).

Neither party has made arguments about the burden shifting framework of *McDonnel Douglas*. Indeed, plaintiffs appear to argue that the equal benefits clause, under which they argue, is distinct from the contracts clause.

Regardless of the clause, § 1981 concerns racial discrimination and the arguments regarding discrimination discussed in the section on equal protection are equally applicable here. In brief, while plaintiffs claim that defendants' actions were discriminatory, they do not sufficiently plead facts to survive a motion to dismiss.  For example, while they point to checkpoints in predominately African American areas, they do not say there were not checkpoints in other areas predominately made up of other racial or ethnic backgrounds.  Moreover, plaintiffs cast the City's policies as being widespread stops for the purpose of revenue generation.  This runs counter to the argument that African Americans were being stopped due to their race.

Accordingly, plaintiffs do not state a claim for the § 1981 section of this count.

### 2.  Count Two: Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), *et seq.*

This count against the City of Montgomery, like count one, focuses on the racial impact of the City's actions.  The Court's analysis regarding equal protection is sufficient for this point and will not be repeated.  *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1406 n. 11 (11th Cir. 1993) ("[W]e will not engage in a separate discussion of the Title VI statutory claims, as such an inquiry would duplicate exactly our equal protection analysis.").  This is also true to the extent plaintiffs are arguing for liability under a disparate impact scheme, *id.* at 1407, as plaintiffs do not allege the practices in question, e.g. roadblocks, occurred *only* or *disproportionally* in predominately African American residential areas.  Given the alternative suggested by the

complaint itself—that the city engaged in a widespread pattern of stops for the purpose of raising funds—the plaintiffs do not state a claim under Title VI.

### 3. Count Three: Violation of Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 By Policies and Practices of Issuing and Serving Warrants Based Solely on Nonpayment of Monetary Debts

Like count one, portions of this count have been voluntarily dismissed by plaintiffs. At this time, count three is against the City of Montgomery, Judge Les Hayes, III in his official capacity, and JCS.

Underlying this count are questions about the nature of Alabama's Court system and several court documents. Plaintiffs claim the City of Montgomery is responsible for the policies of their municipal court. Defendants argue that the City cannot be responsible as the municipal court is part of the unified judicial system of Alabama and is thus part of a distinct branch of government.

Under the Alabama constitution, judicial power is vested in a "unified" judicial system that includes municipal courts. ALA. CONST. art. VI, amend. 328. However, plaintiffs' claims contain an important nuance: they "do not challenge any individual judicial rulings of Presiding Judge Hayes, or any of Montgomery's other municipal judges." Pls.' Resp. Opp'n Mot. Dismiss 39. Rather, plaintiffs' argument is that the municipal judge serves as a City official with administrative powers in such a role. Am. Comp. n. 14, ¶¶ 30-35. As the City denies they are responsible for policies Hayes put in place, plaintiffs also sue Hayes in his official capacity while simultaneously maintaining that the City is in fact liable for his actions. *Id.*

Additionally, after the August 2016 motions hearing, defendants submitted documents that purport to be plaintiffs' arrest warrants [105]. They contend these show that plaintiffs were not arrested for failure to pay fines but for failure to appear. Plaintiffs take issue with these documents,

pointing to inconsistencies or raising questions about the documents.  They also moved for a protective order, which the Court previously granted.

### a.   Inclusion of Arrest Warrants for the Motion to Dismiss

In determining if the Court can consider extrinsic documents in a motion to dismiss for failure to state a claim the Court must determine if (1) the documents are central to the claims and (2) the authenticity of the documents is not challenged.  *Speaker v. U.S. Dep't of Health & Human Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).  *Speaker* provides insight for what it means for the authenticity of documents to be challenged.  There, the Center for Disease Control and Prevention (CDC) provided press conference transcripts.  *Id.* at n. 8.  Speaker contested the authenticity of these documents by alleging irregularities and omissions. *Id.*  CDC supplemented the record with videos of the press conferences in question and Speaker did not contest the authenticity of those videos on appeal.  *Id.*; *see also Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002) (holding that transcripts were disputed when a party argued, among other things, they were incomplete).

Plaintiffs' "initial response" is admittedly confusing and contains arguments tangential to the point at issue.  However, as the Court understands it, plaintiffs contest both the centrality of the documents as well as their authenticity.  While they do not contest the existence of those warrants, they do question the documents' accuracy as well as their centrality.  Pls.' Initial Resp. 2-3, ECF No. 106.  Their arguments in some sense merge.  For example, plaintiffs reject that the documents are central by arguing that "whatever their nomenclature, the warrants [plaintiffs] challenge might more candidly be described as warrants for failure to appear to be jailed (or jailed again) for inability to pay fines and fees."  *Id.* at 5.  That is, they appear to dispute the importance of the document and also that the text of the warrant document is not an accurate representation of

the warrant itself.  Plaintiffs also point to inconsistencies with timelines in these warrants, actions being taken at odd hours or years after something is closed, to argue they should not be taken at face value.  *Id.* at 3-4.

The Court finds that these challenges are sufficient to prevent consideration of these documents at the motion to dismiss stage.  Given that discovery has been stayed pending resolution of these motions to dismiss, the Court declines to consider these documents in the context of a motion for summary judgment at this time.

### b.  Judicial Immunity

*Mireles v. Waco*, 502 U.S. 9 (1991), explains that "judicial immunity is an immunity from suit, not just from ultimate assessment of damages."  *Id.* at 11.  However, it also makes clear that immunity is overcome in two sets of circumstances, for non-judicial actions and for judicial actions taken in the complete absence of jurisdiction.  *Id.* at 11-12.  In determining if an act is judicial "we look to the particular act's relation to a general function normally performed by a judge."  *Id.* at 13 (discussing *Stump v. Sparkman*, 435 U.S. 349 (1978)).

In this case, plaintiffs allege that the City and Judge Hayes created a series of policies to increase municipal revenue through stops, ticketing, and arrests.  Am. Comp. ¶¶ 2-3.  These are "systemic and related policies, practices and customs."  *Id.*  They note these policies resulted in millions of dollars in fines and forfeitures and note that Montgomery raised more than three times as much in fines and more than fifteen times as much in local court costs as did Huntsville, which has a similar population.  *Id.* at ¶ 40. As previously noted, plaintiffs explicitly do not take issue with any judicial actions taken by Hayes or any other municipal judge.

Given that municipal revenue generation is not a function normally performed by a judge, these allegations are thus for non-judicial actions. Rather, they concern the creation of policy for the City or for the municipal courts on behalf of the City. Accordingly, Judge Hayes cannot rely on the doctrine of judicial immunity. That is, because the allegations concern actions outside the scope of the judicial role, there is no immunity and the question shifts to the role of Judge Hayes.

### c. Judge Hayes' Role is Currently Undetermined

Plaintiffs' allegations of a series of interwoven policies designed to increase municipal revenue raise factual questions that cannot be resolved at this time. It is possible to understand Judge Hayes' role as creating policy for the municipal court independent of the City, but it is also possible to understand the allegations as Judge Hayes operating as a *de facto* City official working with the police and others to craft a series of policies to increase municipal cashflow. Plaintiffs have sufficiently alleged that these policies were created, but it is not clear at this point the precise nature of Judge Hayes' role.

Accordingly, plaintiffs have stated a claim either that Judge Hayes is liable in his official capacity or that the City is liable because he was acting as a City official in creating those policies. Which of these two allegation is correct cannot currently be determined, but plaintiffs have nonetheless stated a claim for this Count.

However, the Court notes that the City is not liable for executing valid warrants absent knowledge of an unlawful policy, and Judge Hayes is not liable for his judicial actions as he is protected by the doctrine of judicial immunity for any such actions.

### d.  Judicial Corrections Services

With respect to count three, JCS argues that it should be dismissed because plaintiffs do not allege JCS served any warrants or committed any unlawful seizure.  JCS Mot. Dismiss 1-2, ECF No. 54.  Plaintiffs allege that JCS participated jointly with other defendants and was a state actor with respect to this count.  Moreover, the complaint alleges not only that arrests were carried out for failure to pay municipal debt, but for failure to pay fines owed to JCS.  Pls.' Resp. Opp'n Mot. Dismiss 43.

While it is true that the complaint does not allege JCS themselves conducted arrests, plaintiffs do allege JCS was responsible for threatening and initiating such proceedings.  Indeed, plaintiffs' claims regarding JCS involvement are substantially similar to the claims in *Ray v. Judicial Corrections Services*, No. 2:12-CV-02819-RDP, 2013 WL 5428395 (N.D. Ala. Sept. 26, 2013).  This Court sees no reason to depart from the holding in *Ray*, where the court held that plaintiffs had a claim against JCS under the Fourth, Sixth, Eighth, and Fourteenth Amendments. *Id.* at *17.[2]

### 4.  Count Four: Violations of the Fourteenth Amendment Equal Protection and Due Process Clauses, the Fourth and Eighth Amendments and 42 U.S.C. § 1983 By Use of Fixed-sum Bail System

As in other counts, this count is now against the City and Judge Hayes in his official capacity.

The basis articulated in defendants' motion to dismiss are largely the same as those offered with regard to count three.  The Court will not repeat its analysis, and finds that there is not judicial

---

[2] The Court is aware of the recent memorandum opinion in *Ray* granting summary judgment to defendants.  The fact specific opinion granting summary judgment is not wholly applicable to this case, where there has been no discovery and the motions before the Court are for dismissal under rule 12(b)(6).

immunity and that plaintiffs have stated a claim against either the City or Judge Hayes in his official capacity. Which is a question that cannot be answered at this time.

Defendants make a brief paragraph argument about the validity of bail schedules in the midst of their argument on qualified immunity. *See* Defs. Mot. Dismiss 28, ECF No. 53. There, they cite to *Pugh* for the proposition that bail schedules are permissive. *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978). Specifically, they quote *Pugh* for the proposition that bail schedules are constitutional, quoting "Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meetings its requirements." *Id.* at 1057. As defendants may or may not have realized, the following sentence reads "The incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Id.* That is, bail schedules that do not take into account alternatives for indigent defendants are unconstitutional.

Additionally, this Court sees no reason to depart from Judge Watkins reasoning in *Cooper v. City of Dothan*, which addressed a very similar issue in the context of a temporary restraining order. *Cooper v. City of Dothan*, No. 1:15-CV-425-WKW, 2015 WL 10013003 (M.D. Ala. June 18, 2015). The court there granted in part a requested restraining order related to Dothan's bail schedule and specifically noted that bail schemes that punish indigence are unconstitutional.

Here, plaintiffs specifically allege a fixed bail schedule that does not take into account an individual's ability to pay. Am. Comp. ¶ 46. That is, plaintiffs are saying that individuals are incarcerated for failure to pay bail without any consideration of the difficulty they may have paying it. This closely resembles the very thing *Pugh* warns of. Plaintiffs have stated a claim under count four.

**5. Counts Five, Six, and Nine: Violations of the Fourteenth Amendment Due Process and Equal Protection Clauses, the Fourth Amendment and 42 U.S.C. § 1983 By Imprisonment For Non-Payment of Debt Without Meaningful Inquiry Into Inability to Pay; Violations of Six and Fourteenth Amendments and 42 U.S.C. § 1983 By Imprisonments For Inability To Pay Debts Without Adequate Counsel; Violations of Fourteenth Amendment Due Process and Equal Protection Clauses and 42 U.S.C. § 1983 In Requirements of Appeal Bonds**

Counts five, six, and nine are against the City of Montgomery and Judge Hayes in his official capacity.  The Court's analysis regarding liability for the City and Judge Hayes in count three is applicable here.

As defendants offer no distinct basis for dismissal for any of these counts, only recycling judicial immunity and the argument that the City is not responsible for Judge Hayes' policies, plaintiffs state a claim for counts five, six, and nine.

### a.   Count Five as to Judicial Corrections Services

Count five is also directed to Judicial Corrections Services.  Plaintiffs allege JCS knew or should have known that indigent defendants were entitled to a waiver of fees.  They further allege that JCS personnel routinely signed "show cause" notices, and was contractually obliged not to charge monthly fees to indigent defendants.  Plaintiffs allege JCS did not make any effort to identify indigent individuals or notify people of their rights.

JCS maintains that under Alabama law the court may inquire into a defendant's financial situation if they fail to pay a fine.  *See* Ala. R. Crim. P. 26.11(g) ("If a defendant fails to pay a fine or restitution as directed, the court may inquire and cause an investigation to be made into the defendant's financial, employment, and family standing, and the reasons for nonpayment of the fine and/or restitution, including whether nonpayment of the fine and/or restitution was contumacious or due to indigency.").  JCS maintains that the municipal court's ability to do

something obviates any requirement they do the same as a matter of law.  JCS Mot. Dismiss 3-4.

This does not follow.  That the municipal court may inquire does not mean JCS had no contractual

duty, as plaintiffs allege they had.  This is easily understood in other contexts.  For example, if a

municipality let teachers drive school buses in certain conditions, it would not mean school bus

drivers were not contractually obliged to do the same.  Similarly, parties *may* seek to involve the

Court in facilitating settlement in most civil cases, Fed. R. Civ. P. 16(a)(5), but *must* do so when

there is a certified class, Fed. R. Civ. P. 23(e).  That party 1 *may* bears no relation on if party 2

*must*.  Accordingly, plaintiffs state a claim against JCS in count five.

### 6.  Count Seven: Violations of the Thirteenth Amendment and 42 U.S.C. § 1983 and Federal Anti-Peonage Laws (18 §§ U.S.C. 1581, 1589(a) and (b), 1593A, and 1595)

This count is unlike the others as plaintiffs assert that in addition to the City and Judge

Hayes being liable in his official capacity, several defendants are individually liable under anti-

peonage laws.  Accordingly, count seven is against the City of Montgomery, Mayor Todd Strange,

Judge Hayes, Earnest Finley, and Kevin Murphy as well as JCS.  To the extent defendants make

arguments that have already been addressed, the Court's prior analysis stands.

Plaintiffs also contend that the City did not move to dismiss this count.  Pls.' Resp. Opp'n

Mot. Dismiss 61.  It is true that the defendants' motion to dismiss count seven does not articulate

a basis to dismiss the City in their section on count seven.  Defs.' Mot. Dismiss § IX.  However,

defendants maintain that they intended to move for dismissal and did so in their motion, if not their

brief.  Defs.' Reply 38, ECF No. 69 ("The City's motion to dismiss and its initial brief clearly state

that the City seeks dismissal of all counts as to all Parties, the City included.").

The Court elects to construe defendants' motion and brief as moving for this count to be

dismissed as to the City along with the other defendants.  Furthermore, defendants filed a

supplemental motion to dismiss on December 28, 2016.   The motions, both original and supplemented, are denied for the same reasons those of other defendants are denied.

### a.   Voluntary versus coerced labor

The central dispute with regard to this count is whether the labor undertaken by plaintiffs and others similarly situated was voluntary or coerced.   In making that determination, the Court notes that "when the employee has a choice, even though it is a painful one, there is no involuntary servitude."   *Watson v. Graves*, 909 F.2d 1549, 1552 (5th Cir. 1990).   However, statutes that "compel[] personal service in liquidation of a debt" are unlawful.   *Bailey v. Alabama*, 219 U.S. 219, 227 (1911).

In this case, taking the allegation as true, plaintiffs were not paid.   Plaintiffs could work to liquidate their debt, as each day of work would diminish the number of days plaintiffs remained in jail.   That is, plaintiffs "sat out" their debts at a rate of $50/day.   By working, they would earn an additional $25/day.   Accordingly, every two days of work removed a day of time plaintiffs were incarcerated.   Defendants maintain that this choice may have been a painful one.   The law maintains that it was no choice at all.   Indeed over 100 years ago the Supreme Court wrote:

> Peonage is a term descriptive of a condition . . . . The essence of the thing is compulsory service in payment of a debt.  A peon is one who is compelled to work for his creditor until his debt is paid . . . . Congress was not concerned with mere names or manner of description, or with a particular place or section of the country. It was concerned with a fact, wherever it might exist; with a condition, however named and wherever it might be established, maintained, or enforced.

*Bailey*, 219 U.S. at 242.   What plaintiffs allege in this complaint is a manifestation of this same condition, somehow yet to be eradicated.   While defendants compare plaintiffs' work to community service, it more closely resembles *United States v. Reynolds*, where an individual worked to pay off a debt under threat of arrest if he did not comply.   235 U.S. 133 (1914).   The

difference here is that the entity to which debt, and thus labor, is owed is the City of Montgomery. In *Reynolds*, those working knew they would be incarcerated if they did not continue to do so. Here, it is true plaintiffs were incarcerated already, but it was certain the duration of their incarceration was tied to their work. This is not a meaningful distinction.

The Court sees the condition of peonage in the context of this complaint. Here, plaintiffs allege a modern day debtor's prison. Individuals sat out their debt at a preset rate that could be modified by working for the City. This is wholly distinct from sentences involving community service where individuals can continue to go about their daily lives and keep their jobs. Under defendants' understanding wherein the choice between work and continued incarceration is voluntary, it is not clear what would be involuntary.

In their supplemental motion for dismiss, individual defendants also argue this claim should be dismissed due to qualified immunity. Very little time is spend arguing this point, and the brief largely references the prior arguments surrounding qualified immunity. Defendants are correct that there must be a violation of a statutory or constitutional provision and it must be clearly established that the action in question constitutes such a violation. As noted above, coerced labor does violate statutory provisions. Additionally, the previously cited cases are over 100 years old, so it has long been established that the threat of jail to coerce labor is unlawful. *See also United States v. Kozminski*, 487 U.S. 931 (1988); *Pierce v. United States*, 146 F.2d 84, 86 (5th Cir. 1944) ("Peonage is a status or condition of compulsory service or involuntary servitude based upon a real or alleged indebtedness."). Defendants do not provide grounds for dismissal other than those already addressed here or in other sections. Accordingly, plaintiffs state a claim for count seven.

### b.  Application of anti-peonage laws to Judicial Corrections Services

JCS maintains that its position is unlike other defendants with respect to this count. Specifically, they argue that not only did JCS not arrest people, but once a defendant was in jail, JCS had no role in what transpired.  JCS Mot. Dismiss 7-8.  JCS argues that due to the nature of their role, they cannot be part of a "venture" as contemplated in the statutes.

As JCS notes, 18 U.S.C. § 1589 requires the defendant to take "knowing" action.  Here, JCS is correct that plaintiffs do not articulate that JCS knew about the coerced labor.  While plaintiffs do allege and articulate how JCS was involved in other parts of the interwoven policies, JCS argues convincingly that plaintiffs fail to articulate how JCS knew of—and thus was part of a scheme or plan under the statute—plaintiffs' coerced labor.  It appears from the complaint that plaintiffs' allegations against JCS in this count all rely on JCS knowing about the coerced labor. However, JCS is correct that plaintiffs do not allege this.  Indeed, the only references to JCS in the text of this count are in a list of defendants in paragraph 223 and plaintiffs' theories of legal remedies articulated in paragraph 234.  Accordingly, plaintiffs do not state a claim against JCS in count seven.

### 7.  Count Eight: Violations of the Fourteenth Amendment Due Process and Equal Protection Clauses, the Fourth Amendment and 42 U.S.C. § 1983 By Use of Probation and Threat of or Actual Probation Revocation Solely to Collect Fines and Fees from Indigent Individuals

#### a.  Statute of Limitations

In count eight, the parties dispute the application of the statute of limitations.  Both parties agree that under Alabama law the pertinent statute of limitations is two years.  They disagree on whether time was tolled due to various related litigation.

The Court cannot comprehend this portion of the motion to dismiss, the response, or the reply. Case cites are inaccurate, for example plaintiffs cite to *Wallace v. Kato*, 459 U.S. 384 [sic] (2007). *Wallace* is at <u>549</u> U.S. 384, not 459. Defendants do not even bother to find one of the cases cited by plaintiffs, noting in their reply brief that plaintiffs use a Lexis cite defendants cannot find on Westlaw. The Court notes the document appears to be readily available on PACER. Neither party articulates the time tolled for each defendant under their respective theories though they spend a good deal of time disagreeing about two week window between October 31, 2014 and November 14, 2014. Why those two weeks matter is never articulated.

Additionally, defendants' brief supporting the motion to dismiss contains a one sentence reference to the Mayor and City not having control over judicial policy. The reply brief appears to contain pages of argument on City's role, or lack thereof, in various policies. The relationship between this argument and the statute of limitations argument is unclear at best.

Count eight will not be dismissed. Defendants may request leave to file a supplemental memorandum on this count, not to exceed 10 pages.

### b. Additional Arguments Raised by Judicial Corrections Services

As in other counts, JCS maintains that they did not place people on probation or effectuate arrests. However, as noted previously, JCS is alleged to have signed "show cause" orders and participated in a common scheme with the City and others. As did the plaintiffs in *Ray*, plaintiffs here state a claim against JCS. However, plaintiffs do not state a claim with respect to equal protection. As noted previously, plaintiffs allege a joint scheme that includes seizures and the deprivation of process but fail to sufficiently allege this scheme was tied to plaintiffs' race.

### 8.  Counts Ten and Eleven: RICO § 1962(c) and (d)

Plaintiffs allege JCS activities amount to violations of the Racketeer Influenced and Corrupt Organization (RICO) Act sections 1962(c) and (d).

While the parties dispute whether JCS committed underlying predicate acts, the Court believes the logic articulated in *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), is dispositive.

JCS entered into a contract with the City to provide parole services funded by persons on parole in the form of setup and monthly fees.  While plaintiffs have alleged that there were a series of interwoven policies that deprived individuals of their rights, the mere existence of such a contract does not inherently amount to a violation and is not necessarily wrongful.

Plaintiffs allege, among other things, that JCS failed to fulfill their contractual duty to investigate the indigence of those who were put on parole.  JCS then sought to collect fees from those indigents though they were obliged not to do so.  In this count, plaintiffs maintain that JCS's pursuit of the fees amounts to extortion and thus a RICO violation.

In *Pendergraft* the Court held that threatening to sue, even when supported by false affidavits, does not constitute wrongful extortion.  *Id.* at 1205.  While the holding was admittedly distinct, focusing on threatened litigation, the Court's analysis demanded there be a "wrongful objective" and a "wrongful means" to find extortion.  *Id.* at 1205-06.  Here, JCS was permitted to collect money and those who did not make required payments could indeed be arrested.  *See* Ala. Code 12-14-13(d)(7), 12-14-113(i) (allowing a judge to order payments of costs and fines and allowing defendants to be arrested for failing to meet conditions of parole).

Ultimately, what is at issue in this case appears to be a great number of issues surrounding an otherwise legal regime.  That is, plaintiffs' allegations that they were not informed of their rights, that JCS had a duty to investigate, that plaintiffs were ultimately jailed solely for their inability to pay and sat out their debt at specified rates, and that this series of policies had a disparate impact on minority communities.  JCS's alleged failure to fulfill their contract, or even their coordination with City officials as part of a broader scheme to increase municipal revenue, does not amount to extortion however, as neither the objective nor means were inherently wrongful—collecting fees and costs from defendants on parole and notifying such defendants a warrant may be issued if they do not comply is both commonplace and does not appear to be challenged.

The Court has already addressed anti-peonage statutes above and plaintiffs fail to articulate any grounds to analytically distinguish the Travel Act—which plaintiffs improperly cite in their opposition and never again mention—or Ala. Code § 13A-8-13 which is never discussed in plaintiffs' brief.  *See* Pls.' Opp'n Mot. Dismiss.  Accordingly, plaintiffs fail to state a RICO claim against JCS in counts ten and eleven.

### 9.  Count Twelve: False Imprisonment

Count twelve is for false imprisonment.  Like count seven, it is against the City of Montgomery, Mayor Todd Strange, Judge Hayes, Earnest Finley, and Kevin Murphy as well as JCS.

Under Alabama law, false imprisonment "consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty."  Ala. Code §6-5-

170.[3]  Defendants argue that plaintiffs fail to state a claim because arresting officers had probable cause and also because of state agent immunity.  Their argument about judicial immunity has already been addressed.

Plaintiffs claim that liability arises because the individuals in question were instigators of the arrests.  Pls.' Resp. Opp'n Mot. Dismiss 79 ("Defendants instigated, caused or induced or aided and abetted the false imprisonment challenged in Count XII.").  Plaintiffs further argue that defendants' actions place them within exceptions to traditional state agent immunity.

Under Alabama law, individuals do not receive state agent immunity if they (1) acted beyond their authority, (2) acted in bad faith, or (3) had a mistaken interpretation of the law.  *Hill v. Cundiff*, 797 F.3d 948, 981 (11th Cir. 2015).

As noted, this count is for false imprisonment.  Plaintiffs do not sufficiently allege a grounds for false arrest.  Indeed, they largely do not contest the underlying actions for which they were stopped, such as failing to wear a seatbelt or having expired tags.  Accordingly, while they may argue the stops were unconstitutional or illegal for a number of other reasons, there is nothing in the complaint to suggest the stop itself constituted false arrest or imprisonment.

Complicating this is the fact that the complaint addresses both stops and imprisonment for failure to pay fines.  *See* Am. Comp. ¶¶ 266-267.  While the stops do not constitute false imprisonment as a matter of law, as they were not unlawful given the existence of probable cause, imprisonment due to the inability to pay fines is in fact unlawful.  Plaintiffs here allege that defendants acted beyond their authority, in bad faith, and under mistaken interpretations of the law

---

[3] This is another one of many instances where plaintiffs' citation is incorrect.  Plaintiffs cite to Ala. Code §6-6-170, a section of the code that does not appear to exist.  Plaintiffs are encouraged to check their citations before submitting documents to the Court.

in the course of incarcerating them due to their inability to pay fines.  Thus, with respect to a policy of incarcerating individuals on the basis of their indigency as part of a larger scheme to increase municipal budgets, plaintiffs state a claim.

It is certainly the case that "[n]ot every innocent misinterpretation of the law revokes an official's state-agent immunity under Alabama law," that exercising poor judgment is insufficient to strip away immunity, and that to act beyond one's authority there must be clear rules that remove the official's judgment.  *Hill v. Cundiff*, 797 F.3d at 981.  That the Court should ensure the exception does not swallow the rule, *see id.* at 982, does not mean immunity covers the actions and policies alleged in this case.  Here, the allegations are very much tied to bad faith and violations of clear Alabama constitutional provisions.

Thus, the motion to dismiss this count is granted in part and denied in part.  It is GRANTED with respect to any claims associated with stops and arrests for which the officer had probable cause.  It is DENIED with respect to creation of municipal policy or activities that incarcerated plaintiffs due to their inability to pay fines.

While JCS makes arguments similar to those made previously, namely that they were not the ones doing actual arrests, plaintiffs' allegations remain sufficient.  As noted previously, these include JCS signing show cause orders, failing to inquire into ability to pay, and being part of the larger scheme to use fines, fees, and the JCS collection service to increase revenue.  Accordingly, plaintiffs state a claim for this count to the same extent they state a claim against the City.

### 10.   Count Thirteen: Abuse of Process by Judicial Corrections Services

The parties do not dispute that to have abuse of process there must be (1) ulterior motive, (2) wrongful use of process, and (3) malice.  *C.C. & J., Inc. v. Hagood*, 711 So. 2d 947 (Ala. 1998).

Defendants claim this is not met because JCS was simply seeking to collect money pursuant to their contract with the state.

Plaintiffs' allegations are very different.  They include that JCS used its position "for the ulterior motive of coercing and extorting money from Plaintiffs[,] who were indigent and unable to pay, for its own profit."  Am. Comp. ¶ 274.  Moreover, plaintiffs allege JCS intentionally and maliciously used probation orders to harass and threaten plaintiffs and failed to give plaintiffs full information about their rights.  *Id.* at ¶ 275.  For example, JCS would issue probation orders demanding fees from indigent individuals and, if they paid, would withdraw the orders.

This series of allegations is sufficient to state a claim for abuse of process.  The allegations may, like all others, turn out to be false, but for the purposes of a 12(b)(6) motion, the Court accepts them as true.

### 11.   Count Fourteen: Money Had and Received

The final count, also against JCS, is for money had and received.  The parties spend very little time briefing this point.  JCS appears to argue that the count should be dismissed because JCS did not participate in any wrongful conduct.  JCS Mot. Dismiss 26.  JCS clarifies this position in their reply brief, arguing that the municipal court had the duty to make indigency determinations, so the fact that JCS collected money from indigent defendants when their contract with the City prohibited such collection is the fault of the court, not JCS.  JCS Mot. Dismiss Reply Brief 23, ECF No. 66.

This is the same argument JCS advanced previously and succumbs to the same flaws: that the municipal court had a power does not mean JCS did not have an obligation to inquire.  Plaintiffs point to JCS's contract with the City and their role in the municipal court process and argue that

30

JCS had precisely such a duty.  JCS's arguments that their collection of money was not wrongful thus must fail.  If JCS was collecting money from indigent defendants when they had an obligation not to do so—and an obligation to inquire into indigency—JCS collected money that rightfully belongs to plaintiffs.  This is what is alleged and such allegations sufficiently state a claim for money had and received.

### IV.    Plaintiffs' Request for Injunctive Relief

Throughout the complaint plaintiffs request injunctive relief.  Defendants argue that plaintiffs are not entitled to such relief due to lack of standing.  With respect to counts one and two, the Court granted defendants' motion to dismiss.  Accordingly, it is not necessary to reach the question of injunctive relief as to those claims.  However, plaintiffs also request injunctive relief for counts three, four, and twelve.

When seeking an injunction, plaintiffs "must show a sufficient likelihood that [they] will be affected by the allegedly unlawful conduct in the future."  *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1265 (11th Cir. 2001).  Moreover, prior exposure to unlawful conduct is insufficient to create standing for injunctive relief.  *Wahl v. McIver*, 773 F.2d 1169 (11th Cir. 1985).

However, plaintiffs may seek injunctive relief when cases or controversies are capable of repetition yet evading review.  This exception applies only in exceptional circumstances when a plaintiff can make a "reasonable showing" he or she will be subjected to the alleged illegality again.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).  Plaintiffs claim that there is a reasonable risk of their facing illegality again, and point to the fact that some plaintiffs have been

stopped multiple times.  Defendants, pointing to *Lyons*, argue that the speculative possibility of rearrest is insufficient for the capable-of-repetition exception.

This case is distinct however, in that plaintiffs challenge more than police conduct. Plaintiffs challenge a series of polices relating primarily to indigence.  While the possibility an individual will be forcefully arrested again in the future may be speculative, the continued indigence of these plaintiffs is much less so.  As in *Hoing v. Doe*, the issue in this case is not the plaintiffs' misconduct, which the Court is unwilling to assume a party will repeat, but the plaintiffs' indigent status which is reasonably likely to continue.  *See* 484 U.S. 305 (1988).  While admittedly this case is close to the line as the probable cause for the arrests underlying plaintiffs' claims are largely unchallenged, the wrongs that plaintiffs challenge are associated with their indigency, not the fact of their arrest.

Defendants further claim that the agreement entered in *Mitchell v. City of Montgomery* moots plaintiffs' claims, as it changes some of the City's policies.  No. 2:14-cv-186-MHT, 2014 WL 11099432 (M.D. Ala. Nov. 17, 2014).  Not only are the changes made through that agreement for a specified period of time, but the City claims it is not responsible for a large number of the practices identified by plaintiffs—indeed it did not accept liability in the *Mitchell* settlement.  In this case plaintiffs seek to enjoin the City, an entity that, it seems, does not think itself enjoined at the moment.

Accordingly, plaintiffs may seek injunctive relief as the issues they present are capable of repetition.

V.      **Conclusion**

1.  **Overview of Motions to Dismiss**

Plaintiffs' fourteen claims revolve around a series of policies and practices they allege were taken by the City and others.  These policies were designed to increase municipal revenue and such increases came at the expense of plaintiffs' rights.  Given the nature of plaintiffs' allegations, which included there being intentionally interwoven policies designed to maximize profits, and the standards applicable to motions to dismiss, wherein the Court accepts all alleged facts as true, plaintiffs sufficiently state a large number of claims.

However, there are two primary areas where plaintiffs' claims are insufficient.  The first regards equal protection, specifically the idea that defendants' actions targeted or disparately impacted minorities.  While the Court does not doubt that many minorities were adversely impacted by the policies that plaintiffs identify, plaintiffs fail to state these claims because they do not properly articulate differences on racial lines.  For example, they argue that generically that there were checkpoints by predominately black churches, but leave open the possibility that there were checkpoints by *all* churches.  Thus, not only are plaintiffs' claims in this regard lacking sufficient factual detail, but plaintiffs fail to argue in a non-conclusory manner the core of their claim: that treatment was unequal.

The second area where plaintiffs' claims are insufficient relate to alleged RICO violations by JCS.  While plaintiffs stated a claim against JCS for their involvement, along with the City and others, in other instances, the alleged wrongdoing does not rise to the level of a RICO violation. That is, while plaintiffs do state a claim that JCS should be liable for their actions or inactions, they do not show that JCS's actions or inactions amounted to extortion.

Thus, the defendants' motions to dismiss are GRANTED and DENIED as follows:

- With respect to count one, Violations of the Fourteenth Amendment Equal Protection and Due Process Clauses, Fourth Amendment, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 By Stops, Ticketing, or Arrests, the motions to dismiss are GRANTED.

- With respect to count two, Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), et seq., the motions to dismiss are GRANTED.

- The motions to dismiss are DENIED with respects to counts three, four, five, and six.

- With respect to count seven, Violations of the Thirteenth Amendment and 42 U.S.C. § 1983 and Federal Anti-Peonage Laws (18 §§ U.S.C. 1581, 1589(a) and (b), 1593A, and 1595), the motions from the City, Judge Hayes, and all City defendants is DENIED. JCS's motion is GRANTED with respect to this count.

- The motions to dismiss count eight are DENIED with opportunity for supplemental briefing as identified above.

- The motions to dismiss are DENIED with respect to count nine.

- With respect to counts ten and eleven, Violations of RICO § 1962(c) and (d), JCS's motion to dismiss is GRANTED.

- The motions to dismiss count eight, False Imprisonment, are GRANTED in part and DENIED in part.

- The motions to dismiss are DENIED with respect to counts thirteen, and fourteen.

## 2. Miscellaneous Docket Entries

### a. Notice of voluntary dismissal

On Friday August 19, 2016, plaintiffs filed a notice of voluntarily dismissing certain claims or, in the alternative, a motion to dismiss certain claims. On Monday, August 22, 2016, plaintiffs filed a corrected document. Where the first document dismissed all claims against defendants in their individual capacity, the corrected document dismissed all § 1983 claims against defendants

in their individual capacity.  There was no response or opposition to this notice/motion, and on December 1, 2016, the Court noted on the docket that it accepted the voluntary dismissal, citing to the corrected docket entry, 104.  However, in doing so, it noted the dismissal was for dismissal of any and all claims brought against defendants in their individual capacities.  Shortly thereafter, plaintiffs moved for clarification, noting that docket entry 104 dismissed any and all claims brought against defendants in their individual capacities under 42 U.S.C. § 1983.

The Court then granted the motion to clarify and noted that the notice of voluntary dismissal was for claims under § 1983.  The court further noted that Court action was not necessary and that plaintiffs were to submit a document detailing precisely what claims they were voluntarily dismissing.  Plaintiffs did this and defendants moved for reconsideration.  It appears that defendants are now arguing that the notice plaintiffs filed on August 19 dismissed all individual capacity claims though that filing was corrected the very next business day to note that it was confined to 1983 claims.  This is a voluntary dismissal by plaintiffs.  Given that plaintiffs are voluntarily dismissing their own claims and they immediately corrected the filing in error, defendants' motion for reconsideration is DENIED.  It would be a waste of judicial resources to determine that the original notice of voluntary dismissal—immediately corrected and no longer even available on dockets—dismissed the non-1983 individual capacity claims.  Not only is there no prejudice to defendants given the brief period of time between the original and corrected filings, but the voluntary dismissal is without prejudice.  If the Court were to find the additional claims dismissed, plaintiffs could simply file again.  This would add yet another layer of complication to an already complicated docket.

### b. Motion to Partially Lift Stay of Discovery

In light of this memorandum opinion and order, the motion to partially stay is DENIED as MOOT. It is unnecessary to grant a partial stay when the stay as a whole is lifted in light of this opinion and order.

A separate order will issue on this date.

Royce C. Lamberth
United States District Judge

DATE: 3/10/17