**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| ANGELA MCCULLOUGH, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO: 2:15-CV-463-RCL** |
| | ) | |
| **VS.** | ) | |
| | ) | |
| **THE CITY OF MONTGOMERY, ALABAMA,** | ) | |
| et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT CITY OF MONTGOMERY'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON PLEADINGS

However often Plaintiffs repeat in a conclusory way that there was a City scheme to use the municipal courts to raise revenue, or that there was a City policy to do so, they have not adequately pled this theory. Initially this Court denied the City's Motion to Dismiss because the wrongs, as pled, though acts of the judge, were alleged to be not judicial because he was claimed to have committed them for the purpose of increasing municipal revenue. This Court had reasoned that these allegations made the judge's actions administrative rather than judicial and made him a municipal administrator/policy-maker whose actions could then serve as a basis for City liability. (*See* Doc. 131 at 17). It was this alleged City-policy-maker role that served as the connecting link to hold the City in as a Defendant. The Eleventh Circuit has severed that link by ruling that the judge's actions were judicial and has further precluded the possibility that any allegation in the Complaint otherwise supports the scheme alleged by Plaintiffs. Accordingly, judicial efficiency and the law of the case doctrine both require dismissal of the claims pled in the Amended Complaint against the City of Montgomery. The City addresses herein each argument raised in

Plaintiffs' Response in Opposition to Defendant City of Montgomery's Motion for Judgment on the Pleadings (Doc. 181) ("Pls.' Resp.").

I.      **The Eleventh Circuit's dismissal of the City's appeal does not foreclose the City's motion for judgment on the pleadings.**

Plaintiffs argue that the Eleventh Circuit's order of August 17, 2017, (Doc. 166), declining to take jurisdiction over the City's appeal, precludes the City from relying on the Eleventh Circuit's October 29, 2018 ruling (referred to herein as *McCullough v. Finley*) to support its Motion for Judgment on the Pleadings. This is a convenient but incorrect argument.

The City's appeal was based on pendent-party appellate jurisdiction. The Eleventh Circuit may exercise such discretionary jurisdiction over otherwise non-appealable claims only when they are "'inextricably intertwined' with the appealable decision or when 'review of the former decision is necessary to ensure meaningful review of the latter.' " *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)) (alterations omitted). The narrow issue before the Circuit in its August 17, 2017 ruling was whether the City's appeal fell within one of these "rare circumstances." *Id.*

The City argued that the denial of its Motion to Dismiss was appealable on the ground that it was "inextricably intertwined" with Judge Hayes' immunity claim. The Eleventh Circuit, in dismissing the City's appeal, identified two potential questions relative to the City's liability that were independent of those the Court necessarily had to resolve to determine whether Judge Hayes was entitled to judicial immunity. These two issues were: (1) "whether the plaintiffs have stated claims for denial of due process, [etc.]"; and (2) whether "the judge and the City were independently responsible for creating the policies at issue." Doc. 166 at 3. The Court determined that it need not reach either issue to resolve Judge Hayes' immunity. *Id.*

The City's Motion for Judgment on the Pleadings goes to exactly the second question identified by the Court. The City now asks this Court to determine whether, given the Eleventh Circuit's ruling as to what actions were judicial and what allegations were plausible, there exists any plausible allegation in the Complaint that the City was "*independently responsible for creating the policies at issue*." In August 2017, the Eleventh Circuit did not address (nor was it in a position to foretell) whether its future ruling on the individual defendants' appeal would provide guidance in answering this question. But its subsequent rulings as to both Hayes' *and* the Police Chief's immunities, as well as its application of *Twombly* and *Iqbal* to those issues, are now the law of the case, *see Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1288 (11th Cir. 2000), and they clearly do impact the question of whether the Plaintiffs have made plausible allegations under *Twombly/Iqbal* to support the City's liability.

II.   **The Eleventh Circuit's ruling in *Walker v. City of Calhoun* is not applicable here, and, even if it were, it would only relate to the bail issue.**

In *Walker v. City of Calhoun*, the Eleventh Circuit held that, under Georgia's particular statutory scheme, a Georgia municipality was potentially liable under *Monell* "for acquiescing in an unconstitutional [bail] policy and practice by its Municipal Court." 901 F.3d 1245, 1256 (11th Cir. 2018), *cert* denied, No. 18-814, 2019 WL 1428955 (U.S. Apr. 1, 2019). Plaintiffs' attempt to apply that holding to this case – and not just to bail, which was the only issue in *Walker*, but to every allegedly unconstitutional act of the municipal judges – falls flat.

Plaintiffs argue that the Georgia municipal court system is comparable to the Alabama municipal court system as it relates to bail. But the only thread on which to hang this theory is the Plaintiffs' citation to Montgomery Municipal Ordinance § 27-123. This is found in the chapter of the Montgomery Municipal Code relating to traffic and vehicles. The ordinance does not even relate to the non-traffic cases and misdemeanors that the Municipal Court handles. Moreover, the

ordinance does *not* provide that the City can create a fixed-sum bail schedule – the wrong alleged in this case.   The ordinance merely restates what is provided in the Alabama Uniform Traffic Ticket and Complaint form (UTTC) required by state law to be used in all courts. *See* Ala. R. Jud. Adm. 19(A). The UTTC provides for release on personal recognizance upon written promise to appear[1]; the Municipal Code simply provides for the same: "for a violation of any of the traffic laws" an "officer, upon receiving the written promise [i.e., the signed UTTC] of the alleged violator to answer as specified in the notice, may release such person from custody." Montgomery Municipal Ordinance § 27-123.   Thus, the language in Montgomery's ordinance reflects the dictates of state law rather than independent municipal authority to dictate bail.

Moreover, the City of Calhoun, Georgia ordinance was not sufficient in and of itself to establish that municipalities in Georgia could establish their own bail schedules. There are at least two crucial differences between the Georgia municipal court system on which the *Walker* Court based its decision and Alabama's system.

First, the *Walker* Court concluded that the city there had "concurrent" authority to establish a bail schedule.  901 F.3d at 1256.  The Court based this decision not just on the municipal ordinance Plaintiffs cite, but also on the fact that at least five Georgia cities had, in fact, explicitly provided by ordinance that their executive branches had authority to establish bail schedules.[2]

---

[1] *See* Ala. R. Jud. Adm. 19, attach. 1, first unnumbered pg.

[2] *See Walker*, 901 F.3d at 1256 n.2 (citing ordinances). Albany, Georgia Ordinance's ordinance, for example, exists under an entire article of the City's code titled "Bail, Bond and Fines" and provides: "The amounts set for bail, bonds and fines shall be as established by the city board of commissioners, from time to time, and made available for public examination in the municipal court clerk's office and the city treasurer's office." Albany Mun. Code § 22-164. Doraville, Georgia's Ordinance similarly provides: "Bond amounts for offenses shall be in such amounts as shall be established from time to time by the Mayor and Council…" Doraville Mun. Code § 11-1.

Second, these Georgia cities' executive branches established bail schedules because Georgia law explicitly gave them the authority to do so. As the *Walker* Court wrote: "Georgia's Uniform Municipal Court Rules, as promulgated by the Supreme Court of Georgia, recognize that '[b]ail in misdemeanor cases shall be set as provided in [State statutes], *and as provided by applicable municipal charter or ordinance*.' " 901 F.3d at 1256 (quoting Ga. Unif. Mun. Ct. R. 18.1) (alterations and italics in original; additional emphasis supplied).  In other words, the Georgia Supreme Court rule gave the authority to set bail to the municipalities.

The authority as to who may establish bail schedules or set bail at all in Alabama's Municipal Courts is Alabama Code section 15-13-103, which provides in pertinent part that "Admission to bail <u>is the order of a judicial officer of any court</u> of the State of Alabama" and that "The amounts <u>of bail may be set by a judicial officer in</u> a standard bail schedule as prescribed by the judge or pursuant to the bail schedule promulgated by Supreme Court rule." (emphasis supplied).  Alabama Code section 12-14-5 further regulates municipal court judges' authority to set bail, placing a cap on bail at $1000 per offense. Thus, unlike the Plaintiff in *Walker*, the Plaintiff here has provided no authority for the City to establish a bail schedule or otherwise set bail.

Finally, even if *Walker* did apply (it does not), it would be relevant only as to the bail issue (Count IV of the Amended Complaint), and that is only one of many issues raised here. The remaining counts against the City involve the following allegedly wrongful acts (all judicial): issuance of warrants (Count Three); imprisonment for non-payment of debt without meaningful inquiry into inability to pay (Count Five); imprisonment without adequate counsel (Count Six); the wrongful reduction of sentences in connection with the jail work program (Count Seven); use of probation and threat of or actual probation revocation to collect fines and fees (Count Eight); and failure to waive appeal bonds for indigents (Count Nine).  There is no plausible allegation that

the City has concurrent authority over these judicial functions, nor any citation to statutory authority giving the City such concurrent authority, nor any factual allegation of City actions exercising such authority.

### III. Ordinances regarding court costs do not show the City controlled the Municipal Court.

Next, Plaintiffs argue that the City's ordinances (explicitly permitted by state law[3]) providing that the Municipal Court's court costs track those of the local Montgomery County District Court or that it charge a $10.00 fee (also authorized by state law) somehow shows that the municipality was the "moving force" behind the wrongs alleged here.[4]  None of the allegedly wrongful acts in this case arose from the City's court-cost ordinances.  Plaintiffs do not allege that the court costs, in and of themselves, are illegal.  Rather, it is the judges' various alleged actions in connection with collecting fines, fees and court costs on which Plaintiffs base their Complaint.  Indeed, this odd theory of liability would make the state legislature liable here on the theory that it authorized the court costs and itself enacted the majority of the court costs charged[5] by the Municipal Court.

### IV. The stacking of court costs is not a municipal policy nor is it the constitutional wrong alleged here.

---

[3] Ala. Code § 12-14-14 (authorizing maximum of $10.00); *id.* § 11-47-7.1 (permitting municipal court to levy additional court costs not to exceed those levied by county district court on similar cases)

[4] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (to support *Monell* claim, municipality's official policy must be "moving force behind the constitutional violation") (quoting *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978) (alteration omitted).

[5] *See* Doc. 181 (Plaintiffs' Resp.) (noting that $56.00 of the Court costs charged by the municipal court are those passed by the municipal governing body but that the standard court costs are $155.00 total; thus $99.00 are provided strictly by state law).

Next, Plaintiffs argue that the City is somehow behind what they call the "stacking" of court costs. But they reference no City ordinance on this point or other actual City policy. Nor does any allegation in the Complaint tie the City to the allegedly wrongful stacking of court costs. Rather, court costs are assessed by the Municipal Court and not the City. To the extent that the City's lawyers here have argued in the course of these proceedings that there is a lawful basis for the Municipal Court's charging a court cost on each ticket, that argument does not make the act a City policy.[6] Moreover, to the extent that there is flexibility as to when and how to charge court costs, state law makes the judiciary responsible for determining when multiple court costs will be charged.[7] In short, the Amended Complaint does not plausibly allege that the City has authority to make these decisions or that it exercised some unlawful authority over the judges here in connection with the charging of court costs. Nor do the constitutional wrongs that Plaintiffs allege flow from the stacking of court costs; rather, they flow from the judiciary's allegedly wrongful collection methods related thereto.

## V.   The fact that the Attorney General has not appeared for the judges here has no bearing on whether the judges are municipal policy-makers.

Next, Plaintiffs argue that the Judges here must be municipal policymakers because the Attorney General did not appear as the Judges' representative in this litigation. But the identity of a government actor's legal counsel is truly irrelevant. To cite just one example, the United States Supreme Court has held that Alabama's sheriffs are state (and not local government) actors in connection with their law enforcement duties, *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 783

---

[6] That argument is that state law both creates the UTTC form requiring that only one traffic offense be charged per ticket and gives each ticket a separate case number. *See* Ala. R. Jud. Adm. 19, attach. 1, ninth unnumbered pg. ( (instructing officers to "Use a separate UTTC for each violation").

[7] *See* Ala. Code Sec. 12-19-150(c) ("[T]he judge, in his or her discretion, may assess costs for each conviction.").

(1997), yet, as Alabama's reported cases involving sheriffs in their law-enforcement capacity show, the Attorney General's office virtually never represents these state officers.[8]

Indeed, even in *McMillian* at the Eleventh Circuit, it was the private Alabama law firm Webb and Eley and local attorneys in Monroeville who represented the Monroe County Sheriff[9]; the Alabama Attorney General's office is not listed as representing the Sheriff even before the Supreme Court.[10] The absence of the Attorney General's office as counsel for Alabama's sheriffs and their deputies claiming immunity as state officers in Alabama even after *McMillian* shows that the identity of a government official's legal representative simply has no bearing on whether that official is a local or state actor as a legal matter.

## VI.    Plaintiffs' historical argument.

Plaintiffs spend several pages of their brief recounting a long history of Alabama municipal courts. This history is unnecessary and irrelevant. Whether it is accurate or not[11], it ends in the constitutional amendment making the municipal courts part of the Alabama Unified Judicial System, subjecting them to the dictates of the Alabama Supreme Court, the Alabama Court of

---

[8] A review of cases involving state-actor sovereign immunity defenses raised on behalf of sheriffs and their deputies, shows that private law firms are regularly representing these state actors. *See, e.g.*, *Young v. Myhrer*, 651 F. App'x 878, 879 (11th Cir. 2016) (listing private counsel for defendants); *Bowden v. Cook*, No. 2:15-CV-620-KOB, 2015 WL 9311965 (N.D. Ala. Dec. 23, 2015) (same).

[9] *See McMillian v. Johnson*, 88 F.3d 1573, 1575 (11th Cir. 1996) (counsel listing), *aff'd sub nom. McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781 (1997).

[10] *See* 520 U.S. at 782 (counsel listing).

[11] Plaintiffs' reliance on the 1913 case *State ex rel. Wilkerson* v. Lane, 181 Ala. 646 (1913), is utterly unhelpful to their case. For present purposes, the case serves only to underscore why the municipal courts, as part of the State Unified Judicial System (*see* 1901 Const. of Ala., Amendment 328 (1973)), are protected by the separation of powers doctrine and certainly from control by a mere city official or the city council. The case articulates the role separation of powers plays in our constitutional system. Under the separation of powers principle, state judicial officers' powers may not be usurped by the state legislature or executive branches. *See* 181 Ala. at 658. If the state legislature and executive branches cannot control the judicial acts of a municipal court judge because he is part of the state judicial system, it is beyond question that the mayor and city council cannot do so.

Judiciary, and the Judicial Inquiry Commission.[12]  This, coupled with the passing of the Alabama Code sections which, along with the aforementioned constitutional amendment, control all aspects of the municipal court system, place the Court and its judges squarely in the control and under the supervision of the State of Alabama for all judicial actions.

Plaintiffs do not even bother to acknowledge <u>the holding of the three Alabama federal courts</u> that have directly considered the issue and found that cities <u>do not</u> and cannot control the judicial actions of Alabama's municipal courts or judges (and that, therefore, the cities cannot be liable for judicial actions of the municipal courts or their judges or clerks).  *See Ray v. Judicial Corr. Servs., Inc.*, No. 2:12-CV-2819-RDP, 2017 WL 660842, at *11 (N.D. Ala. Feb. 17, 2017); *Woodard v. Town of Oakman*, 885 F. Supp. 2d 1216, 1232 (N.D. Ala. 2012); *Smedley v. City of Ozark*, No. 1:11-CV-954-MHT, 2012 WL 512586, *2–3 (M.D. Ala., Feb. 1, 2012).  Nor do Plaintiffs attempt to address the multitude of other federal cases in which various courts have repeatedly ruled that cities are not liable for the actions of their municipal courts.[13]  In fact, the

---

[12] *See* Def. City of Montgomery's Mot. for J. on the Pleadings (Doc. 180) at 6 n.4 (referencing earlier arguments and full legal citations on these points). Plaintiffs' response does not contest any of the points referenced in Document 180 footnote 4, including: that separation of powers is dictated by Alabama law; that a state constitutional amendment makes municipal courts part of Alabama's Unified Judicial System, where the judicial power of the state is vested; that the Alabama Constitution and Code govern municipal court operations and jurisdiction; and that Alabama's rules of court govern municipal court operations). Nor do Plaintiffs contest that the State Constitution places municipal court judges under the supervision of the Administrative Office of Courts, state appellate courts, the Court of Judiciary, and the Judicial Inquiry Commission. *See* Ala. Const. art. VI, §§156–157.

[13] *See Davis v. Tarrant Cnty., Tex.,* 565 F.3d 214, 227 (5th Cir. 2009) (finding local judges' actions in denying a local attorney's application to serve as appointed counsel were attributable to state and not to county); *Granda v. City of St. Louis,* 472 F.3d 565, 569 (8th Cir. 2007) (finding that municipal judge's actions in illegally jailing plaintiff for her daughter's truancy were not attributable to city and noting that the plaintiff "fail[ed] to cite a single case where a municipality has been held liable" for a municipal court's judicial decision); *Ledbetter v. City of Topeka, Kan.,* 318 F.3d 1183, 1189–90 (10th Cir. 2003) (finding municipality not liable for conduct of municipal judge in violation of state law relative to signing and issuance of arrest warrants where judge had state-law duty relative to issuance of warrants); *Eggar v. City of Livingston,* 40 F.3d 312, 314–15 (9th Cir. 1994) (finding municipality not liable for judge's action in imprisoning indigents without appointed counsel because the challenged action "arises from his membership in the state judiciary" and rejecting ratification as a theory of municipal liability for judicial

Eleventh Circuit in *Pompey v. Broward County*, 95 F.3d 1543 (11th Cir. 1996), made it clear that a local government cannot be held liable even where it showed a "tolerance" of the allegedly unconstitutional practices of its local court. *Id*. at 1552. There the county and its officials were sued in connection with large-scale contempt proceedings before the local court. The Eleventh Circuit concluded that neither the county officials nor the county itself had control over the local court's handling of the proceedings and thus could not be deemed liable for them. *Id.* at 1552–53.

Nonetheless Plaintiffs argue that there is still a blurry line regarding the City's authority over the Municipal Court judges' judicial actions because the jurisdiction of the Court includes all state laws that have been adopted as municipal ordinances, because municipal courts may be abolished by the cities that have opted to have them, and because mayors have the traditional clemency power of the executive branch.  Doc. 181 (Pls.' Resp.) at 17-21.  This is akin to saying that the state executive or legislative branch officials could be held liable for judicial actions because these branches are involved in creating judgeships and courts and can abolish and reorganize the judicial system, and because the Governor has clemency powers. These powers do not give state executives power over district or circuit-court judicial actions (Alabama's trial level courts) any more than a mayor's or city council's authorities give them power over a municipal court judge's actions.

---

acts); *Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir. 1992) ("We have repeatedly held … that a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker."); *Woods v. City of Mich. City, Ind.,* 940 F.2d 275, 279 (7th Cir. 1991) (holding, in case challenging an illegal bond schedule, that judges who were by state law "units of the judicial branch of the state's constitutional system" were not local county officials for purposes of Section 1983 liability); *Carbalan v. Vaughn,* 760 F.2d 662, 665 (5th Cir. 1985) (rejecting municipal liability based on a judge's actions in illegally denying bail and holding: "If Judge Bagley erred in [exercise of judicial duties], the city is not liable simply because Judge Bagley held the office of municipal judge…."); *Edwards v. Hare,* 682 F. Supp. 1528, 1533–34 (D. Utah 1988) (finding that municipality was not liable for city judge's actions in setting bail and appointing counsel, which were not city responsibilities).

**VII.    The assertion that the Eleventh Circuit only considered acts of the municipal court judges performed in plaintiff's individual cases is not accurate.**

The dichotomy that the Plaintiffs insist upon whereby judicial acts are administrative if not rendered in a single individual case is not an accurate reflection of the law (as shown in the margin)[14] nor is it an accurate characterization of the holding in *McCullough v. Finley,* 907 F.3d 1324, 1335 (11th Cir. 2018).

The Eleventh Circuit ruled that the only plausible allegations in the Complaint that supported the Plaintiffs' claims were all judicial "misconduct" with the sole additional plausible allegation being the assertion that Montgomery's Municipal Court collected more in fines and fees than Huntsville's Municipal Court.[15]   The Court went on explicitly to recognize a broad array of the wrongful acts as judicial in nature.   These included not just individual judicial rulings

---

[14] *See* Doc. 70 at 1–9, esp. 6–9. Judge Haikala's opinion for the Northern District of Alabama in *Hester v. Gentry*, No. 5:17-CV-270-MHH (N.D. Ala. November 8, 2018), is inconsistent with the extensive federal precedent holding that an act is fully judicial if it relates to a traditional judicial function notwithstanding the fact that it might spring from a general order or policy not applied in an individual case. *See, e.g., Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 226 (5th Cir. 2009), ("[T]he act of selecting applicants for inclusion on a rotating list of attorneys eligible for court appointments is inextricably linked to and cannot be separated from the act of appointing counsel in a particular case, which is clearly a judicial act, and therefore … the judges' acts at issue in this suit must be considered to be protected by judicial immunity."); *Roth v. King*, 449 F.3d 1272, 1277-78; 1286-87 (D.C. Cir. 2006) (holding that creation of family-court attorney panel system and selection of attorneys for inclusion on such a panel were judicial, not administrative, acts, notwithstanding fact that chief judge had issued administrative order establishing panel system); *Dunn v. Kennedy*, No. 07-50548, 2008 WL 162855, at *1 (5th Cir. Jan. 17, 2008) (holding that, because only judge or his designee could appoint counsel for indigent defendants, removal of attorney from court appointment list was judicial act); *Jefferson v. City of Hazlehurst*, 936 F. Supp. 382, 390 (S.D. Miss. 1995) (holding that municipal court judge's action in terminating bail bondsman's ability to write bail was judicial act based on reasoning that, because judge had power to admit bail, judge was "empowered to inquire into the capacity and readiness of the surety to stand by her bond"); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 348–49 (2009) (holding prosecutor immune where allegation was that prosecutor's office lacked a *system* for providing certain exculpatory information, despite plaintiff's argument that creation of such a system was "administrative task").

[15] *McCullough v. Finley*, 907 F.3d at 1335 (referencing the lone factual allegation relating to Montgomery's Court collecting greater revenue than Huntsville's and holding: "The jailees' complaint contains factual allegations about misconduct in the municipal court, but as we explained, that misconduct concerns judicial acts.").

applicable only to individual cases. Indeed, Plaintiffs quote the following sentence from the Eleventh Circuit: "The precise acts that the jailees allege that the judges performed—*their probation procedure*, indigency hearings, *provision of counsel*, sentences, and *work program*— are all judicial acts." *McCullough*, 907 F.3d at 1335. This single list itself includes "probation procedure," "provision of counsel," and the "work program," which are all clearly descriptions of judicial policies or practices that necessarily apply beyond one single individual case. Thus the use of the words "procedure" and "program." While Plaintiffs contend that the Eleventh Circuit erroneously ignored the standing probation order (Doc. 181 at 25-26), a reference to that order and procedure comprises a full paragraph in the Amended Complaint.[16] Clearly the reference to "probation procedures" encompasses this general order. In fact, the allegations in the Amended Complaint itself clearly refer to judicial practices or policies related to appointment of counsel and indigency hearings (and indeed all other matters) that Plaintiffs contend applied beyond just an individual case. However, the Eleventh Circuit clearly held that the alleged application of the unlawful practices to more than one case did not render the practices non-judicial or administrative. Because these broader orders and practices were judicial, as the Eleventh Circuit has ruled[17], the City could and did have no authority over them and cannot be held liable for them.[18]

---

[16] See Doc. 32 (Amended Complaint) at Par. 35: "As Presiding Judge, Defendant Hayes' administrative and executive functions included responsibility for establishing written and unwritten policies and practices for the day-to-day administration of the City of Montgomery's contract with JCS, which was made on behalf of the Municipal Court. In the exercise of these administrative powers and duties for the City, Presiding Judge Hayes adopted a standing order setting certain policies for the Municipal Court for implementation of the City's contracts with JCS. See, "In re: Extension/JCS Placement, General Order No. 2013-0001."

[17] "Not a single act that the jailees allege that the judges performed falls outside ordinary judicial functions." *McCullough*, 907 F.3d at 1331.

[18] *See Pompey v. Broward Co.,* 95 F.3d 1543, 1552-53 (11th Cir. 1996) (dismissing the plaintiff's claim against County where "County had neither the duty nor the authority to appoint counsel for the plaintiffs; that duty and authority was the courts' alone.")

Plaintiffs seem to be trying to carve out Count IV, the fixed-sum bond schedule count, in an effort to force at least its survival in the wake of *McCullough v. Finley*.  Notwithstanding Plaintiffs' argument to the contrary, the Eleventh Circuit's ruling as to both Judge Hayes and the Police Chiefs on Count XII required the Court to consider the setting of bond schedules (the issue in Count IV).  As noted in the City's previous brief, this is because Count XII included within it the following alleged wrongs as to all defendants in Paragraph 271: "the false imprisonments (including false arrest) relating to unlawful stops, ticketing, and arrests and those related to <u>setting fixed schedule bonds</u> for indigents." It then listed those alleged acts that related to Judge Hayes and the Mayor in Paragraph 267: "caused the unlawful detentions …<u>for failure to pay fixed sum bail or bonds</u>, fines, court costs, fees, and other debts." *See* Doc. 32, Pars. 267 & 271 (emphasis supplied).  And the overarching reference to the inadequacy of "indigency hearings" also pled in Count XII relates directly to the implementation by the Court of the fixed sum bail schedule as the facts are pled.[19]

Finally, it is important to note here that the constitutional issue with respect to bond schedules is not their existence but whether and when the <u>*court*</u> which sets such a bond schedule holds a hearing to determine whether the criminal defendant can afford bail, and, if not, what alternatives to provide[20] – which is an "indigency hearing." The Eleventh Circuit clearly and explicitly held that indigency hearings were judicial acts.

---

[19]"During all the events described above, at no time was Plaintiff Ashley Dawn Scott ever told by the City, any city official or employee of any of her federal constitutional rights, including rights not to be jailed for inability to pay for release under a fixed bail schedule or rights to consideration of her indigency in setting her bond." Doc. 32 Par. 144.  See also, e.g., Par. 137 (Jones "could not pay for release under the fixed bail schedule"); Par. 70 (McCullough "could not pay the bail schedule amount").

[20] *Pugh v. Rainwater*, 572 F.2d 1053, 1057-1058 (5th Cir. 1978) (Holding that "[u]tilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meetings its requirements" and further holding that courts must *also* provide alternatives to money bail for those who cannot afford it but presuming that Florida's courts will comply with that constitutional dictate).

Even if one were to accept Plaintiffs' assertion that any action not taken in a specific individual case is "administrative" rather than judicial such that the City could potentially be liable for such act (something the City absolutely contests), the wrongs alleged count by count here are based on judicial acts taken, or judicial policies applied, in individual cases. Counts Three through Nine are the counts remaining in this case as to the City. Count Three is for issuing warrants based solely on nonpayment of monetary debts.  Issuance of warrants is a judicial function.[21]  Count Four is for use of a fixed-sum bail system.  As noted above, the setting of bail and the fixed-sum bond schedule are purely judicial functions in Alabama.  Count Five is for imprisonment for non-payment and it was explicitly held in *McCullough v. Finley* to be a judicial function. Count Six is for imprisonment for inability to pay debts without adequate counsel.  Again, the Eleventh Circuit made clear in *McCullough v. Finley* that appointment of counsel was a judicial function. The alleged wrongful act in Count Seven is wrongful reduction of sentences in connection with the jail work program.  The Eleventh Circuit also made clear in *McCullough v. Finley* that the jail work program and sentencing (the only wrong alleged in connection with the program)[22] were judicial functions. Count Eight is for use of probation and threat of or actual probation revocation solely to collect fines and fees from Indigent Individuals. The Eleventh Circuit made clear in *McCullough v. Finley* that probation procedures were a judicial function. Count Nine relates to the judges'

---

[21] This Court has already ruled that "the City is not liable for executing valid warrants absent knowledge of an unlawful policy" Doc. 131 at 17. Nor is there liability even if a warrant was invalid if it was issued by a judicial officer. *Roland v. Phillips*, 19 F.3d 552 (11th Cir. 1994).  Thus, the City's role in serving warrants is no longer an issue in this case.

[22] Even requiring work in jail without compensation is not unlawful. *See Vanskike v. Peters,* 974 F.2d 806, 809 (7th Cir.1992) (citing *Draper v. Rhay,* 315 F.2d 193, 197 (9th Cir. 1963), *cert. denied*, 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 153; *Sigler v. Lowrie,* 404 F.2d 659 (8th Cir.1968), *cert. denied*, 395 U.S. 940, 89 S.Ct. 2010, 23 L.Ed.2d 456 (1969)).

failure to waive appeal bonds for indigents.  And there can be no valid argument that setting appeal bonds is anything but a judicial function.

For purposes of the *Monell* liability analysis, the Plaintiffs have alleged no non-conclusory allegation that the City policy (as opposed to what the Eleventh Circuit called judicial "misconduct")[23] was the moving force behind the wrongful acts alleged above.

## VIII.   Plaintiffs' contention that the Eleventh Circuit erred in failing to take into account allegations in the Complaint is contrary to the plain language and holding in *Mccullough v. Finley*.

The Plaintiffs contend that the Eleventh Circuit somehow just forgot to consider Plaintiffs' allegations regarding the Mayor's role in signing the JCS contracts and appointing the presiding judge; the allegedly large number of non-DUI traffic tickets; or the few municipal court appeals filed.[24] The Court's language refutes this argument. The Eleventh Circuit clearly considered the entire Amended Complaint. The Court wrote: "No factual allegations in the complaint plausibly connect the mayor or chiefs to the [allegedly unconstitutional] judicial acts." *McCullough v. Finley*, 907 F.3d at 1335.  Even more to the point here, the court spoke of the Amended Complaint as a whole in dismissing Plaintiffs' allegations that a scheme existed: "The jailees argue that their complaint contains 'great factual detail,' but we disagree. After discarding their conclusory allegations, we struggle to find factual allegations left in the complaint, and the few factual allegations that remain do not state a plausible claim." *Id*.

---

[23] The Eleventh Circuit wrote: "The jailees' complaint contains factual allegations about misconduct in the municipal court, but as we explained, that misconduct concerns judicial acts. And any connection between the judicial acts and the mayor and chiefs is 'too chimerical to be maintained.' *Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937."

[24] Doc. 181 at 27-29.

Clearly, the Court went through the Amended Complaint and found the factual allegations recited above, which Plaintiffs assert are so compelling, to be either too conclusory, utterly irrelevant to the alleged scheme, or just lacking any facial plausibility.  The only factual allegation outside the alleged "misconduct in the municipal court" that passed muster as nonconclusory (and presumably at least somewhat potentially relevant) was, as noted elsewhere, the allegation that the City "collected more fines and costs than the City of Huntsville."[25] The Circuit Court not only dismissed this factual allegation as merely consistent with the Plaintiff's theory, but said "[t]his lone factual allegation does not support a plausible inference of a scheme by the mayor and chiefs." *Id.*

The above-referenced "factual allegations" about the Mayor's signing the JCS contracts, the mayor's appointing the chief judge, the number of tickets, and the number of appeals were not relevant or nonconclusory so as to "support a plausible inference of a scheme by the mayor and chiefs." And there is no valid reason to conclude that the above-referenced allegations are relevant or non-conclusory enough to support a plausible inference of a scheme between the City and the municipal court judges. The Court obviously cast its net wide in looking for *any* evidence of such a scheme, going so far as to identify the funds collected by the Court as potentially plausible evidence, a fact that directly implicates no particular city official.

Plaintiffs also err in asserting that the Eleventh Circuit ignored allegations that would support a scheme relating to the judges' reduction of sentences for work done in the jail.  The Plaintiffs' contention that the anti-peonage claim was dismissed as to the Mayor and Chiefs only because of Plaintiffs' failure to allege their dates of service and the like is simply wrong.  (Doc.

---

[25] *McCullough*, 907 F.3d at 1335 (noting a breadth of acts that were judicial in nature and ultimately concluding: "The jailees' complaint contains factual allegations about misconduct in the municipal court, but as we explained, that misconduct concerns judicial acts.").

181 (Pls.' Resp.) at 29.)   This discussion in the Circuit Court's opinion went to the general conclusory nature of the allegations in the Complaint and the Court's rejection of *all* such conclusory allegations because they lacked detail.   *McCullough* at 1334–35 ("The absence of allegations about any individual acts of the mayor or chiefs *reinforces* the conclusory nature of the jailees' complaint.") (emphasis supplied).

In the end, however, as noted elsewhere, the Court did consider allegations that were totally removed from any individual acts of the Mayor or Chiefs, as evidenced by the Court's reference to the collection of funds by the Montgomery Court as opposed to that of the Huntsville Court. Thus, it is worth repeating here that facts that were not specific to the Mayor or Chiefs were taken into account by the Eleventh Circuit in their search for some evidence of a scheme and all such allegations were found wanting as support for a scheme between the City officials and the Municipal Court judges.

Finally, Plaintiffs argue that the City's counsel admitted the jail work program was an initiative of the City.   Thankfully, Plaintiffs provide the actual quote from the transcript in a footnote in which it was clear that what was said was merely that the jailer did permit people to work.  (Doc. 181 (Pls.' Resp.) at 32 n. 28.)   There has never been an allegation, legal argument, or authority provided to the effect that people who are incarcerated cannot be permitted to do work. Thus, the Circuit Court was correct in saying that the jail work program was a judicial act because the underlying alleged wrong was the reduction of the sentence in connection with the jail labor inmates did.   The wrong alleged, therefore, was purely a judicial act.   There is no plausible allegation that the reduction in the sentences was a City policy versus purely a judicial one.

**IX**.    **The Plaintiffs' remaining attempts to assert that there are plausible factual allegations supporting their claims also fail.**

In the final pages of Plaintiffs' brief, they make further attempts at restating factual allegations that Plaintiffs believe the Circuit Court somehow missed.  They re-reiterate a litany of their allegations here:  the repeated traffic stops, arrest warrants, application of bail-bond policies (presumably the schedule), commuted sentences, jail-labor program.  Plaintiffs go so far as to point out that the City in its answer admits things like, for instance, that the Plaintiffs were ticketed on multiple occasions or, in some cases, they were jailed.  Why that is relevant is utterly unclear.  The mere fact that the City admits to some of the individual allegations as to judicial conduct does not support any conclusion that there was a scheme between the City and the Municipal Court or that the City (rather than judicial) policies was the "moving force" behind the wrongs alleged.

Plaintiffs then revisit their allegations regarding the City and JCS as joint participants in the alleged scheme.  But, as with all of the allegations pled, the Eleventh Circuit clearly was aware of all of the JCS-as-joint-participants allegations.  Indeed, the Mayor is necessarily front and center as to those allegations because it is pled that he signed the JCS contract.  The Court has already concluded that this allegation was either irrelevant or conclusory.

Even Plaintiffs' specific allegations about JCS show that the wrongs alleged are judicial acts.  Plaintiffs' quote Paragraph 60 from their Amended Complaint which alleges that "*Municipal Court* personnel" referred to JCS employees as probation officers. (Doc. 181(Pls.' Resp.) at 34 (emphasis supplied).) This has no relevance to the City, but is an allegation of judicial conduct.  Next, the paragraph alleges that JCS's employees signed "Municipal Court 'Notice to Show Cause' forms."  (Doc. 181 at 34). This act is also not tied in any plausible way to the City – the Complaint acknowledges that the forms were Municipal Court forms.  (Doc. 181 (Pls.' Resp.) at 34.).

Then, Plaintiffs next re-assert their extremely vague "failure to train" allegations, without pointing to any specific training, much less any training that related to a non-judicial function, the City had a duty to provide.  (Doc. 181 (Pls.' Resp.) at 34-35.)  Again, these are allegations that the Eleventh Circuit necessarily must have considered in ruling whether any plausible scheme had been alleged.

In conclusion, Plaintiffs have simply failed to satisfy the dual requirements of *Monell* and *Twombly/Iqbal*.  They have failed to allege nonconclusory, relevant, plausible factual allegations that would support their claim that a policy of the City was the moving force behind any of the acts alleged as the bases for their Complaint.

## X.    The City cannot be liable for violation of the anti-peonage claims because it cannot form the requisite intent.

Plaintiffs take issue with the City making an argument here not directly related to the Eleventh Circuit appeal, presumably because this argument was not raised in the motion to dismiss. There is no such rule limiting what may be raised in a motion for judgment on the pleadings.

The City's initial brief cited case law holding that municipalities cannot be liable for violation of criminal statutes because cities cannot form the necessary criminal intent.  Instead of citing any case law that would suggest that a City can be liable for violation of a criminal statute, Plaintiffs instead argue that the holdings in the RICO cases upon which the City relies are not applicable here. They contend that they are not applicable because RICO includes a treble (punitive) damages requirement.  While it is true that cities also cannot be liable for punitive damages, the cases the City cited do not speak just to the principle that municipalities cannot be liable for punitive damages, but also to the *mens rea* issue, i.e., that cities cannot be held liable under criminal statutes because they cannot form the requisite *mens rea*.  (*See* Doc. 180 at 11 n.10.)

Plaintiffs' second argument on this issue is that at least one of the three anti-peonage statutes they plead in Count VII does not explicitly require criminal intent. Thus, they seem to reason, a City could be held liable under at least that provision. Plaintiffs concede that two of the three statutes have an explicit intent requirement (18 U.S.C. §§ 1589 and 1593A). And only one part of 18 U.S.C. § 1581 supposedly lacks an intent requirement – the portion that reads, "[w]hoever holds or returns a person to a condition of peonage." Thus, all of the statutory provisions which clearly mention the word "intent" are due to be dismissed as to the City on the ground that the City cannot form the requisite *mens rea*.

But even the language in section 1581 –"[w]hoever holds or returns a person to a condition of peonage" – contains an implicit intent requirement. The United States Supreme Court, in construing a federal criminal statute which, much like section 1581, included the word "intent" in some portions, but not in others, found that the requirement of intent nevertheless applied implicitly to each portion. *Elonis v. United States*, 135 S. Ct. 2001, 2009–12, 192 L. Ed. 2d 1 (2015) ("We… generally 'interpret criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them.' ") (quoting *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 70 (1994)) (alterations omitted). Thus, Section 1581 must be read to have an intent requirement and, given that a municipality cannot form the requisite intent, the City is due to be dismissed as to the criminal statutory provisions at issue in Count Seven on that independent ground.

**CONCLUSION**

For the foregoing reasons and those set out in the City's initial brief, the Complaint against

the City is due to be dismissed in full.

Respectfully submitted this 25th day of April, 2019.

/Shannon L. Holliday
Shannon L. Holliday [ASB-5440-Y77S]
Robert D. Segall [ASB-7354-E68R]
Richard H. Gill [ASB-7945-G70R]
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347
holliday@copelandfranco.com
segall@copelandfranco.com
gill@copelandfranco.com
**Attorneys for Defendant City of Montgomery**

## CERTIFICATE OF SERVICE

I hereby certify that on the 25TH day of April, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Martha I. Morgan
8800 Lodge Lane
Cottondale, Alabama  35453

Faya Rose Toure
Henry Sanders
Chestnut, Sanders & Sanders, LLC
One Union Street
P.O. Box 1290
Selma, AL  36702

Michael L. Jackson
Larry S. Logsdon
Wesley K. Winborn
Wallace, Jordan, Ratliff & Brandt, L.L.C.
P.O. Box 530910
Birmingham, AL  35253

E. Ham Wilson
Miland F. Simpler, III
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, AL  36109-5413

and served via email:

R. Bernard Harwood, Jr.
Rosen Harwood, P.A.
2200 Jack Warner Parkway
Suite 200
Tuscaloosa, AL  35401

s/Shannon L. Holliday
Of Counsel