# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

<table>
<tr><td>ANGELA MCCULLOUGH, <em>et al.</em>,</td><td>)<br>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Case No: 2:15-cv-463 (RCL)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>THE CITY OF MONTGOMERY,</td><td>)</td><td></td></tr>
<tr><td>ALABAMA, <em>et al.</em>,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

In *McCullough v. Finley*, the Eleventh Circuit reversed this Court's denial of judicial immunity to the presiding judge of the municipal court for the City of Montgomery (the "City") and of qualified and state-agent immunity for the City's mayor and two police chiefs. 907 F.3d 1324, 1335 (11th Cir. 2018). In doing so, the Circuit held that all of the judge's alleged actions were judicial acts for which he was entitled to absolute immunity. *Id.* at 1332. And for the mayor and police chiefs, the Circuit found that the plaintiffs failed to plausibly state a claim sufficient to overcome qualified and state-agent immunities. *Id.* at 1335. Although the City was not a party to that interlocutory appeal in *Finley*, it now argues that the Circuit's holdings necessitate dismissal of all claims against it. For the reasons stated herein, this Court agrees with some of the City's arguments while disagreeing with others. The City's Motion for Judgment on the Pleadings [ECF No. 180] will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

The Court need not go in depth on the background of this case, as the facts have been summarized in both this Court's prior opinion, *McCullough v. City of Montgomery*, No. 2:15-cv-

463, 2017 WL 956362, at *1–2 (M.D. Ala. March 10, 2017), and in the Circuit's opinion in *Finley*. 907 F.3d at 1328–30. Briefly, plaintiffs in this case filed their complaint on behalf of a proposed class of indigent jailees, alleging the City subjected them to an extortionate scheme designed to increase municipal revenues. According to the complaint, the City instituted aggressive policies to collect fines and court costs owed by individuals for various offenses, often minor traffic tickets.

One of these policies was the placement of plaintiffs onto "probation" with Judicial Corrections Services, Inc. ("JCS"). The City contracted with JCS to run its probation program. Individuals placed on JCS probation were required to pay JCS monthly installments on their debts to the City, along with a $10 set-up fee and $40 monthly probation fees to JCS. Probationers unable to pay their monthly installment in full were threatened with or subjected to probation revocation and incarceration for their debts.

Another key part of the alleged scheme was the City's operation of a modern day debtors' prison. Indigent offenders or probationers were forced to "sit out" their fines at a rate of $50 per day. Additionally, the plaintiffs claim the City coerced them to participate in a work program, which allowed them to reduce their time in jail by working for an additional credit of $25 a day.

Plaintiffs' amended complaint included fourteen claims related to the policies described above against the City, JCS, the presiding judge of the City's municipal court in his official capacity, as well as against the presiding judge, the City's mayor, and two of its police chiefs in their individual capacities. Am. Compl. ¶¶ 178–281, ECF No. 32. The plaintiffs allege various constitutional torts and state law torts, as well as violations of federal statutes by either some or all of the defendants, depending on the claim. *Id.*

Most of plaintiffs' causes of action made it past the motion to dismiss stage, including claims against certain defendants in their individual capacities. *See* Order, ECF No. 132.

Specifically, the Court held that neither the presiding judge nor the former presiding judge could rely on judicial immunity, *McCullough*, 2017 WL 956362, at *9, and that the chief of police, the former chief of police, and the mayor could not rely on qualified immunity. *Id.* at *12.

On interlocutory appeal, the Eleventh Circuit reversed that holding. *Finley*, 907 F.3d at 1135. For the judge, the Circuit found he was entitled to judicial immunity because all the alleged acts were judicial in nature and his motivation was irrelevant to the immunity analysis. *Id.* at 1330–33. For the mayor and chiefs, the Circuit found there were no non-conclusory allegations connecting them to the alleged constitutional violations. *Id.* at 1332–35. Accordingly, the panel concluded the mayor and police chiefs were entitled to qualified and state-agent immunity. *Id.* at 1335.

The City attempted to participate in the appeal in *Finley*, but its appeal was dismissed. *See Finley*, Order (Aug. 17, 2017) at 3, No. 17-11554. The City claimed a right to appeal because the claims against it were "both inextricably intertwined with and solely dependent upon the actions" of the municipal court judge. *Finley*, Appellants' Joint Suppl. Mem. Jurisdiction, No. 17-11554. The Circuit rejected this argument, stating that it was this Court's denial of immunity that entitled the appellants to interlocutory appeal and that the City could not "piggyback" on the other defendants' proper appeal. *See Finley*, Order (Aug. 17, 2017) at 2, No. 17-11554. Specifically, the Circuit held: (1) that this Court "left open the possibility the judge and the City were independently responsible for creating the policies at issue;" (2) that "the City's liability does not necessarily match the judge's;" and (3) that "the City's appeal is not inextricably intertwined with the judge's entitlement to immunity." *Id.* at 3.

Although the City was unable to participate in the appeal, it argues that the Court is bound by the Circuit's findings in *Finely*—findings that necessitate its dismissal from the case entirely. Accordingly, it has moved for judgment on the pleadings. City's Mot. J. Pleadings, ECF No. 180.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." "A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Rule 12(b)(6)." *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018). Accordingly, to survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint states a plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. And the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556.

## III.    DISCUSSION

After this Court's opinion on the motion to dismiss, seven counts from plaintiffs' amended complaint remain against the City. Order, ECF No. 132. These are largely Section 1983 claims alleging constitutional violations. Count III claims the City violated the Fourth and Fourteenth Amendments through its alleged policy and practice of issuing warrants on those individuals who have not paid traffic debts or monthly payments to JCS. Am. Compl. ¶¶ 191–96, ECF No. 32. Count IV alleges various constitutional violations for the City's use of a fixed-sum bail schedule,

which requires payment of pre-fixed amounts to gain pre-trial release without regard to indigency or ability to pay. *Id.* ¶¶ 197–03. Count V claims the City violated the Constitution by imprisoning people for failure to pay fines without conducting meaningful inquiries into their indigency or ability to pay. *Id.* ¶¶ 204–14. Count VI faults the City for failing to provide adequate counsel. *Id.* ¶¶ 215–21. Count VII alleges that the jail work program violated the Thirteenth Amendment, as well as federal statutes outlawing peonage and forced labor. *Id.* ¶¶ 222–34. Count VIII claims constitutional violations through the use of probation and threats of probation revocation to collect fines and fees. *Id.* ¶¶ 235–242. And Count IX alleges the City violated the Constitution through requiring appeal bonds without inquiry into indigency or ability to pay. *Id.* ¶¶ 243–50. The City argues that each of these causes of action are due to be dismissed on the pleadings.

### A. The Eleventh Circuit's opinion in *Finley* requires the Court to reevaluate whether plaintiffs state a plausible claim against the City.

To determine what effect, if any, the Circuit's opinion in *Finley* has on the plaintiffs' claims against the City, the Court must examine what the Circuit actually did and said.

The Circuit did not have jurisdiction to hear an appeal over this Court's entire opinion, but rather only the Court's denial of immunity to the defendants sued in their individual capacities. *Finley*, 907 F.3d at 1330. This included the denial of judicial immunity to Judge Hayes, presiding judge of the City's municipal court, and denials of qualified and state-agent immunities to Mayor Todd Strange and police chiefs Ernest Finley and Kevin Murphy. *Id.* Because plaintiffs voluntarily dismissed most individual capacity claims and because this Court granted the City's motion to dismiss on some others, the only individual capacity claims before the Circuit were: (1) Count VII's statutory anti-peonage and forced labor claims against all four individual defendants, and (2) Count XII's false imprisonment claims against the Mayor and Judge Hayes. *Id.* at 1329–30.

The opinion in *Finley* first addressed whether Judge Hayes was entitled to judicial immunity. *Id.* at 1330–32. "A judge enjoys absolute immunity from suit for judicial acts performed within the jurisdiction of his court." *Id.* at 1330 (citing *Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978)). So, in deciding whether judicial immunity applies, courts must "look at the nature and function of his act, not the propriety of the act itself, and consider whether the nature and function of the particular act is judicial." *Id.* at 1330–31.

In the prior motion to dismiss opinion, this Court found that the allegations in the complaint were for non-judicial actions "[g]iven that municipal revenue generation is not a function normally performed by a judge." *McCullough*, 2017 WL 956362, at *9. But the Circuit disagreed. *Finley*, 907 F.3d at 1331. The Circuit held that the judge's alleged desire to generate revenue went to his motivation, rather than the character of his action. *Id.* "A judge's motivation is irrelevant to determining whether his act was judicial." *Id.* And even if Judge Hayes was motivated to generate municipal revenue, his act "does not become less judicial by virtue of an allegation of malice or corruption of motive." *Forrester v. White*, 484 U.S. 219, 227 (1988).

The Circuit instructed that the Court should have instead evaluated whether the acts alleged in the amended complaint were judicial based on four factors:

> (1) the precise act complained of is a normal judicial function; (2) the events involved occurred in the judge's chambers; (3) the controversy centered around a case then pending before the judge; and (4) the confrontation arose directly and immediately out of a visit to the judge in his official capacity.

*Finley*, 907 F.3d at 1331 (citation omitted). The Circuit easily dispensed with the first factor, stating that the "precise acts that the [plaintiffs] allege that the judges performed—their probation procedure, indigency hearings, provision of counsel, sentences, and work program—are all judicial acts." *Id.* Stronger still, the Circuit found that "[n]ot a single act that the jailees allege that the

judges performed falls out outside ordinary judicial functions." *Id.* The panel agreed that a judge is not entitled to judicial immunity for administrative acts but held that none of the acts alleged were in fact administrative. *Id.* at 1332. Because the Circuit held the other three factors also favored immunity, the Circuit barred all claims against the judges. *Id.*

> ### 2. The Circuit found the amended complaint deficient to overcome the mayor and police chiefs.

After addressing judicial immunity, the Circuit turned to the mayor and police chiefs' claims to qualified and state-agent immunity. *Id.* at 1332. "Qualified immunity shields government officials acting within their discretionary authority from liability unless the officials 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). And state-agent immunity "shields government officials acting within their discretionary authority from liability unless the officials 'acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'" *Finley*, 907 F.3d at 1333 (quoting *Hill v. Cundiff*, 797 F.3d 948, 980–81 (11th Cir. 2015)). Because it was undisputed that the mayor and chiefs acted within the scope of their discretionary authority, the Circuit looked to the allegations to determine whether the plaintiffs overcame these immunities. *Id.* at 1333–35.

The Circuit was not impressed with the amended complaint (or with this Court's evaluation of it). *Id.* It evaluated plaintiffs' allegations under the two-step *Iqbal/Twombly* framework: first, identifying and discarding allegations that are no more than conclusions, and then, assuming the truth of any remaining factual allegations, determining whether those factual allegations plausibly give rise to an entitlement to relief. *Id.* at 1333–35.

The panel deemed nearly all allegations from the complaint relating to the mayor and chiefs conclusory. It stated that "[t]he allegations that the mayor 'adopted' and the chiefs 'administered' an unlawful scheme to increase municipal revenue, without more, are 'not entitled to be assumed true.'" *Id.* at 1334 (quoting *Iqbal*, 556 U.S. at 681). And furthermore, the Circuit found "the allegations that the mayor and chiefs intended to subject the [plaintiffs] to the scheme [to be] conclusory." *Id.*

After discarding these and other conclusory allegations, the Circuit "struggle[d] to find factual allegations left in the complaint." *Id.* at 1335. The panel acknowledged the plaintiffs' allegation that the City collected more fines and court costs than the City of Huntsville, which has a similar population. *See* Am. Compl. ¶ 40. But according to the Circuit, "[t]his lone allegation does not support a plausible inference of a scheme by the mayor and chiefs." *Finley*, 907 F.3d at 1335. Moreover, although the Circuit recognized that the "complaint contains factual allegations about misconduct in the municipal court, . . . that misconduct concerns judicial acts." *Id.* And the Circuit found "any connection between the judicial acts and the mayor and chiefs [] 'too chimerical to be maintained.'" *Id.* (quoting *Iqbal*, 556 U.S. at 681). Accordingly, the Circuit held that the plaintiffs failed to plausibly state sufficient facts to overcome the mayor's and police chiefs' claims to qualified and state-agent immunities.

> 3.    *The Circuit's holdings in* Finley *require dismissal of most claims against the City.*

The Circuit's opinion in *Finley* causes problems for the plaintiffs' claims against the City. "[F]indings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *Westbrook v. Zant*, 743 F.2d 764, 768 (11th Cir. 1984). And despite the City's absence from the appeal, the Circuit's

characterization of certain allegations as judicial acts and its evaluation of the complaint under *Iqbal/Twombly* impacts whether plaintiffs plausibly state a claim against the City.

Each of the counts remaining against the City contains a claim under Section 1983.[1] Section 1983 allows persons to sue municipalities acting under the color of state law for violations of the Constitution or other federal law. *Hill*, 797 F.3d at 976. But under Section 1983, "municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). "A municipality therefore may be held liable 'only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law.'" *Hill*, 797 F.3d at 977 (quoting *Denno v. Sch. Bd. of Volusia Cty.*, 218 F.3d 1267, 1276 (11th Cir. 2000)). The municipality must be shown to have "authority and responsibility over the governmental function in issue[,]" and the plaintiff "must identify those officials who speak with final policymaking authority for [the municipality] concerning the act alleged to have caused the particular constitutional violation in issue." *Grech v. Clayton Cty.*, 335 F.3d 1326, 1330 (11th Cir. 2006). Furthermore, the policy or custom must be the "moving force" behind the alleged constitutional torts. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

In its prior opinion, this Court found that the plaintiffs had alleged administrative policies made at the municipal court for the benefit of the City, which led to the constitutional violations. *McCullough*, 2017 WL 956362, at *7. The Court gave alternative possibilities for Judge Hayes' role in creating these policies based on its reading of the amended complaint:

> It is possible to understand Judge Hayes' role as creating policy for the municipal court independent of the City, but it is also possible to understand the allegations

---

[1] Count VII also includes a statutory claim under 18 U.S.C. § 1595.

as Judge Hayes operating as a *de facto* City official working with the police and others to craft a series of policies to increase municipal cashflow.

*Id.* at *9. But in *Finley*, the Circuit rejected this understanding of the plaintiffs' complaint. It held that Judge Hayes' alleged actions were not administrative, but rather judicial. *Finley*, 907 F.3d at 1331–32 ("Not a single act that the [plaintiffs] allege that the judges performed falls outside ordinary judicial functions.").

This harms plaintiffs' claims because City does not have authority or control over the strictly *judicial* actions of its municipal court. Municipal courts in Alabama are a part of Alabama's unified judicial system. *See* Ala. Const. of 1901, Art. VI, § 139(a) (stating that "the judicial power of the state shall be vested exclusively in a unified judicial system which shall consist of . . . such municipal courts as may be provided by law."); Ala. Code §12-1-2 (Same). And while state law grants cities some administrative responsibility for their municipal courts, *see, e.g.*, Ala. Code §12-14-12, the Court has not been presented, nor has it found, any authority granting cities any influence or control over a municipal court judge's judicial actions. Under Section 1983, "a local government 'must have power in an area in order to be held liable for an official's acts in that area.'" *Turquitt v. Jefferson Cty., Ala.*, 137 F.3d 1285, 1292 (11th Cir. 1998) (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996)).

As the Circuit pointed out, the Court "left open the possibility that the judge and the City were independently responsible for creating the policies at issue." *Finley*, Order (Aug. 17, 2017) at 3, No. 17-11554. But that is where the second part of *Finley* becomes troublesome for plaintiffs' claims against the City. Through its judicial immunity ruling, the Circuit foreclosed the possibility that the municipal judge acted as a *de facto* city official. This begs the question: if not the municipal judge, then who? Who with final policymaking authority for the city allegedly caused the alleged constitutional violations? Who connects the City to the alleged scheme?

The obvious answer would be the mayor or the police chiefs. But the panel in *Finley* found the amended complaint almost entirely devoid of non-conclusory allegations related to those city officials and specifically stated that "any connection between the judicial acts and the mayor and chiefs is 'too chimerical to be maintained.'" *Finley*, 907 F.3d at 1335 (quoting *Iqbal*, 556 U.S. at 681).

It is true that the Circuit's opinion was limited to the plaintiffs' statutory anti-peonage/forced labor claim and their false imprisonment claim. And it is also true that a Section 1983 complaint asserting municipal liability need not "always specifically identify the municipality's final policymaker by name." *Hoefling v. City of Miami*, 811 F.3d 1271, 1281 (11th Cir. 2016). But the panel often discussed the complaint more generally, and few allegations name the City without also including either the mayor or chiefs. Moreover, the plaintiffs still must plead factual content that allows the Court to draw the reasonable inference that such a final policymaker exists. *See Iqbal*, 556 U.S. at 678.

With the guidance that the municipal court judge is not a city official and in light of the Circuit's reading of the complaint—by which the Court is bound— the Court must take a second-look at the amended complaint to determine whether the claims against the City may properly move forward. For some counts, the answer is clearly no, while others may proceed in spite of *Finley*'s holdings.

        a)      Counts III, V, and VI concern strictly judicial actions over which the City has no control.

Count III relates primarily to the issuance of warrants—clearly a judicial act over which the City lacks control. And once the judge is eliminated as a possible final policymaker, there are no allegations allowing the Court to draw an inference that there is some other city official who speaks with final policymaking authority for the issuance of warrants. *See Grech*, 335 F.3d at

1330. In other words, the plaintiffs fail to plausibly allege that the City is actually responsible for the alleged illegal issuance of warrants.

The same is true of the plaintiffs' claims in Count V for imprisonment of indigent persons for non-payment of fines and in Count VI concerning the failure to appoint adequate counsel before imprisonment for inability to pay debts. The Circuit explicitly stated that indigency hearings and "[t]he appointment of counsel, or failure to do so" are judicial acts. *Finley*, 907 F.3d at 1331. Further, although Counts V and VI also contain allegations of a failure to train or adequately supervise on the part of the City, Am. Compl. ¶¶ 209, 218, these allegations amount to little more than conclusory recitations of the elements of a failure to train and lack factual support in the rest of the complaint. On the face of the complaint, it is even unclear who the City allegedly failed to train. Is it the municipal court judge? These counts, as well as Count III, must be dismissed.

     b)  The Circuit's reasoning in *Finley* necessitates dismissal of plaintiffs' fixed-sum bail and appellate bond claims.

*Finley* similarly dooms plaintiffs' claims regarding fixed-sum bail and bond schedules—Counts IV and IX. The existence of a fixed-sum bail or bond schedule is not *per se* unconstitutional. *Walker v. City of Calhoun,* 901 F.3d 1245, 1269 (11th Cir. 2018). Instead, the constitutional issue with respect to bond schedules is whether and when a court holds an indigency hearing to determine whether the criminal defendant can afford bail, and, if not, what alternatives it provides. *See id.* at 1257–69; *see also* Am. Compl. ¶¶ 198, 244 (alleging that the defendants required payment under a fixed schedule "without regard to the individual defendant's indigency or ability to pay"). Thus, these claims focus on "indigency hearings" and "a judge's duty to advise indigent defendants of their rights"—two activities explicitly held to be judicial acts under *Finley*. 907 F.3d at 1331.

Citing *Walker v. City of Calhoun, GA*, plaintiffs argue that the Eleventh Circuit has held that cities can make bail policy independent of the municipal court. Pls.' Opp. Mot. J. Pleadings 8–13, ECF No. 181. But plaintiffs interpret *Walker* far too broadly. That case turned on a municipality's relationship with its municipal court under Georgia law. In evaluating a challenge to a bail policy that permitted a municipal court to wait 48 hours before holding an indigency hearing, the Eleventh Circuit held that the district court judge did not clearly error in permitting the city to be held responsible for the policy. *Walker*, 901 F.3d at 1256. Specifically, the panel—reviewing the grant of a preliminary injunction—found that Georgia law allows cities to directly regulate bail if they wish. *Id.* And so it was not clear error to find that the City of Calhoun could be held responsible for acquiescing to the policy. *Id.*

However, unlike *Walker*, this case is not under Georgia law. So, Georgia's treatment of municipalities *vis-à-vis* the regulation of bail is of no moment. The *Walker* court noted that "Georgia 'grants a city the legislative power to adopt ordinances relating to its property, affairs, and local government for which no provision has been made by general law and which are not inconsistent with the Georgia Constitution.'" 901 F.3d at 1255 (quoting *City of Atlanta v. McKinney*, 454 S.E.2d 517, 520 (Ga. 1995)) (internal quotation omitted). It noted that this "broad grant of authority enables [cities] to regulate bail" and highlighted Georgia's Uniform Municipal Court Rules, which recognize that "'[b]ail in misdemeanor cases shall be set as provided in [State statutes], and *as provided by applicable municipal charter or ordinance*.'" *Id.* (quoting Ga. Unif. Mun. Ct. R. 18.1) (emphasis in original).

But the Court has not been presented, nor has it found, similar provisions in Alabama law allowing cities to directly regulate bail. In Alabama, "[m]unicipal corporations may exercise only such powers as are expressly granted to them by the Legislature or necessarily implied in or

incident to the powers expressly conferred, and those indispensably necessary to the accomplishment of the objects of the municipality." *Phenix City v. Putnam*, 109 So. 2d 836, 838 (Ala. 1959). And Alabama law clearly states that "[a]dmission to bail is the order of a judicial officer of any court of the State of Alabama" and that "the amounts of bail may be set by a judicial officer in a standard bail schedule as prescribed by the judge or pursuant to the bail schedule promulgated by Supreme Court rule." Ala. Code § 15-13-103. Further, Alabama Code further acknowledges municipal court judges' authority to set bail for violations of municipal ordinances. *Id.* § 12-14-5 ("Municipal judges shall admit to bail any person charged with violation of any municipal ordinance . . . ."). Thus, the Court sees no basis under Alabama law to find that the City—in addition to the judges—could be independently responsible for setting bail policy.

Moreover, the policy in *Walker* was detailed and explicit. From the face of the complaint, it appears the policy in this case is not. Even if the City could regulate bail, the amended complaint lacks factual support concerning the specific practices regarding bail or bonds and indigent defendants and City officials' knowledge thereof to reasonably infer that the City acquiesced to the policy or custom. Accordingly, the Court dismisses Count IV and Count IX against the City.[2]

> c) Both the 1983 claim and the other statutory claims in Count VII may proceed against the City.

In Count VII, plaintiffs claim the City's jail work program violates the Thirteenth Amendment and federal anti-peonage and forced labor statutes. *See* Am. Compl. ¶¶ 222–34, ECF No. 32. It is unique not only because it includes other statutory claims in addition to a Section 1983 claim, but also because the *Finley* court looked at this count directly. 907 F.3d at 1329–30.

---

[2] The failure to train allegations in these counts fail for the same reasons articulated with respect to Counts V and VI. Am. Compl. ¶¶ 200, 247, ECF No. 32.

However, the Circuit evaluated only the non-Section 1983 statutory claims against the judge, the mayor, and the police chiefs in their individual capacities. *Id.*

The panel classified both the "work program" and "giving an opportunity to reduce a sentence" as judicial acts. *Finley*, 907 F.3d at 1331. That holding eliminates the possibility that the municipal judge acted as a *de facto* city official in reducing sentences based on work completed in jail. *See supra* pp. 9–11. Accordingly, the path forward for the plaintiffs on the Count VII Section 1983 claim depends on whether the amended complaint plausibly alleges the City was independently responsible for creating the policies at issue in Count VII. The Court believes that it does.

The City argues that because the Circuit found the amended complaint deficient as to the mayor and police chiefs, the complaint must be deficient as to the City as well. City's Mot. J. Pleadings 7–11, ECF No. 180. After all, the mayor and police chiefs are clearly final policymakers for the City. And "[a]fter discarding [the] conclusory allegations, [the panel] struggle[d] to find factual allegations left in the complaint" with the few that remained insufficient to state a claim. *Finley*, 907 F.3d at 1335.

But for Count VII, the determination that the peonage and forced labor claims could not go forward against the mayor and chiefs in their individual capacity does not foreclose claims moving forward against the City. The amended complaint contains detailed allegations of plaintiffs being forced or coerced to work while in jail. Plaintiff Angela McCullough was allegedly forced to stand "suicide watch" over an inmate infected with Hepatitis C and clean feces in cells to work off her unpaid tickets. Am. Compl. ¶ 72, ECF No. 32. "[F]orced to accept alternative ways to perform jail labor in order to 'work off' her debt sooner," plaintiff Marquita Johnson performed tasks such as washing police cars and clean courtrooms. *Id.* ¶ 84. Kenny Jones was forced to do road side clean up, *id.* ¶ 94, Algi Edwards cleaned jail cells and picked up trash, *id.* ¶ 99, Levon Agee was

forced to clean bathrooms, *id.* ¶ 107, and Christopher Mooney was forced to wash police cars, cut grass, and prune bushes. *Id.* ¶ 150.

There are no factual allegations that the mayor or police chiefs even knew about the alleged forced labor or that they were ever present in a municipal jail when plaintiffs were forced to work. *See Finley*, 907 F.3d at 1334–35. And the Circuit found that without some factual allegations connecting the mayor and chiefs to these acts, they could not be held liable. *Id.* at 1335.

But the City's exposure is different. All the alleged actions took place at the municipal jail under the City's watch. These instances took place independent of the municipal court; whether the judge reduced the plaintiffs' sentences—clearly a judicial act—is separate from the actual forced labor. While plaintiffs do not identify a final policymaker sanctioning these actions, they need not do so at the pleading stage. *See Hoefling*, 811 F.3d at 1280. The facts give rise to a plausible inference that some final policymaker exists that either set the policy or "acquiesced in a longstanding practice that constitutes the entity's standard operating procedure." *Id.* at 1279. Plaintiffs' 1983 claim in Count VII may move forward.

Plaintiffs' statutory claims require a different analysis but lead to the same result. The statutory claims arise not under Section 1983, but rather under the civil remedy provided in the criminal code for violations of federal anti-peonage laws. 18 U.S.C. § 1595. The code provides that an individual who is a victim of a criminal violation of the anti-peonage laws may bring a civil action in a district court to recover damages and reasonable attorneys' fees. *Id.* The statute empowers victims to sue perpetrators or "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of certain anti-peonage laws. *Id.*

Specifically, the plaintiffs claim to be victims of 18 U.S.C. §§ 1581, 1589 (a) and (b), and 1593A. Am. Compl. ¶¶ 225–30, ECF No. 32. Section 1581 assesses criminal liability on "[w]hoever holds or returns any person to a condition of peonage." Section 1589(a) punishes offenders "who[] knowingly provide[] or obtain[] the labor or services of a person" through a list of impermissible means, including "threats of physical restraint to that person." Section 1598(b) assigns criminal liability to "whoever knowingly benefits, financially or by receiving anything of value" from violations of Section 1589(a). And Section 1593A punishes "[w]hoever knowingly benefits from participation in a venture which has engaged in any act" violating the anti-peonage laws.

Although the Court found in its prior opinion that plaintiffs plausibly stated a claim for damages against under Section 1595, the City now advances a new argument for dismissal. The City claims plaintiffs fail to state a claim because each of the cited criminal statutes "has a specific intent requirement, and it is well-established that government entities cannot form the *mens rea* required to establish liability for criminal acts." City's Mot. J. Pleadings 11, ECF No. 182. If the City could not commit the underlying acts, the argument goes the plaintiffs may not recover damages as victims through the civil remedy.

But this is wrong on two accounts. First, the City does not have to be the perpetrator of the underlying criminal act for the plaintiffs to recover. The civil remedy permits victims to recover from anyone who knowingly benefits from the violations of the criminal laws. But even so, the Court is not convinced of the City's claim that "government entities cannot form the *mens rea* required to establish liability for criminal acts." Every case the City cites on this point arises in a specific context—civil actions under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See Gil Ramirez Group, L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400 (5th Cir.

2015); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991); *Pedrina v. Chun*, 97 F.3d 1296, 1300 (9th Cir. 1996); *Pine Ridge Recycling, Inc. v. Butts Cnty.*, 855 F. Supp. 1264 (M.D. Ga. 1994); *In re Citisource, Inc. Sec. Litig.*, 694 F. Supp. 1069 (S.D.N.Y. 1988); *Massey v. City of Oklahoma City*, 463 F. Supp. 81 (W.D. Okla. 1986).

These cases hold that government entities cannot form the requisite malicious intent to commit the predicate acts under RICO. *See, e.g.*, *Lancaster*, 940 F.2d at 404. But they do so because RICO requires mandatory treble damages, which the courts consider punitive. *See, e.g.*, *Gil Ramirez*, 786 F.3d at 412; *Pine Ridge*, 855 F. Supp. at 1273.

Historically, municipalities were immune from punitive damages. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 264 (1981) (holding that punitive damages are not recoverable against a municipality in a Section 1983 suit). By definition, punitive damages exist not to compensate an injured party, but rather to punish the tortfeasor. *Id.* at 266–67. The rationale for the immunity is that "punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill." *Id.* at 267. "Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." *Id.* Therefore, the Supreme Court held that Congress must express its intention clearly to overcome municipal immunity from punitive damages. *Id.* at 263.

"No such clear intent to overcome governmental immunity appears in the RICO provision for treble damages." *Gil Ramirez*, 786 F.3d at 412. It stands to reason then that courts that interpret the treble damages as punitive have found that municipalities may not form the requisite malicious intent required under RICO.

But Section 1595's civil remedy provision is not RICO. It makes no mention of treble or punitive damages. And the Court will not stretch a specialized rule from RICO actions to preclude municipalities from all criminal liability. Without more relevant authority, the Court rejects the City's argument.

Plaintiffs' specific allegations support a reasonable inference that they were held in a condition of peonage. The work they were allegedly forced to complete—standing suicide watch, washing police cars, cleaning city buildings—benefited the City. And the allegations support a plausible inference that, at the very least, the City "knowingly benefited from participation in a venture which [the City] knew or should have known has engaged in" violations of the anti-peonage laws. 18 U.S.C. § 1595. So the Court denies the City's motion as to the non-Section 1983 statutory claims in Count VII.

> d) Plaintiffs plausibly allege that the City was the moving force behind the constitutional violations alleged in Count VIII.

Count VIII alleges constitutional violations through the use of JCS probation and the threat of probation revocation by JCS to collect fines owed to the City. Am. Compl. ¶¶ 235–42. If a municipal court defendant could not pay a fine in full, she was placed on "probation" with JCS. *Id.* ¶ 236. The amended complaint alleges that JCS was no more than the City's collection agency, charging additional fees and threatening probationers with probation revocation and jail time if they could not make their monthly payments. *Id.* ¶ 53. Like most of the other claims, plaintiffs bring this cause of action through Section 1983, and like all the other claims, the City maintains that *Finley* requires its dismissal on the pleadings. *See* City's Reply 14, ECF No. 182.

The panel described the "probation procedure" of municipal court judges as a judicial— not administrative—act. *Finley*, 907 F.3d at 1331. And so plaintiffs claim again depends on

whether the City could be independently responsible for the alleged constitutional violations from JCS's probation program.

In *Carter v. City of Montgomery*—a case before the Court also challenging the City's collection of municipal debts—the Court answered that question in the affirmative. 2019 WL 1440284, at *1–4 (M.D. Ala. Mar. 29, 2019). The Eleventh Circuit has yet to evaluate the pleadings in *Carter*. But nonetheless, in response to a motion for judgment on the pleadings based on *Finley*, the Court held that Alabama law grants municipalities some administrative authority over their municipal courts. *Id.* at *3. For example, municipalities are responsible for "provid[ing] appropriate facilities and necessary supportive personnel for the municipal court and may provide probation services." Ala. Code §12-14-12. They also have the "power to contract with a private firm to aid in the collection of delinquent municipal court fines." *Wilkins v. Dan Haggerty & Assocs., Inc.*, 672 So. 2d 507, 510 (Ala. 1995). Because the plaintiff in *Carter* alleges that the "City exercised its administrative authority under Alabama law to contract with JCS as part of a scheme to increase revenue at the expense of its residents' constitutional rights," the Court held he had "plausibly alleged that the City's decision to contract with JCS and make it the exclusive operator of probation services within the municipality was the moving force behind the constitutional deprivations alleged." *Carter*, 2019 WL 1440284, at *3–4.

So too here. While the *Carter* complaint relates more directly to the administrative act of contracting with JCS than the plaintiffs' amended complaint, plaintiffs do allege that it was the City, not the municipal court, who contracted with JCS for probation services. Am. Compl. ¶ 52. The contract was signed by Mayor Todd Strange, a final policymaker for the City. *Id.* The plaintiffs allege "the City delegated to JCS" its municipal debt collection function. *Id.* ¶ 61. These are factual rather than conclusory allegations. And they support a plausible inference that the

City's delegation of municipal functions through its contract with JCS was the "moving force" behind the constitutional violations alleged in Count VIII. *See Monell*, 436 U.S. at 694.

The City, for its part, argues that the allegations relating to the JCS contract include Mayor Strange and were therefore considered and rejected in the Circuit's evaluation of the complaint. City's Reply 15–16. But the Circuit evaluated the amended complaint only in connection with plaintiffs' anti-peonage/forced labor and false imprisonment claims. These claims have more to do with what happened once the plaintiffs were incarcerated than with the JCS probation program. Thus, to these claims, the City's contract with JCS is far less relevant. But Count VIII deals directly with JCS and its probation practices. It alleges constitutional torts stemming directly from the plaintiffs' placement on probation and their interactions with JCS probation officers. The Court finds the fact that the City hired JCS highly relevant and dispositive to the question of whether plaintiffs plausibly state a Section 1983 claim against the City. The Court denies the City's motion for judgment on the pleadings as to Count VIII.

## IV.     CONCLUSION

The Eleventh Circuit's decision in *Finley* required this Court to take a second look at the amended complaint in light of the panel's reasoning. Having done so and for the reasons stated herein, the City's Motion for Judgment on the Pleadings [ECF No. 180] will be **GRANTED IN PART** and **DENIED IN PART**. The Court will dismiss Counts III, IV, V, VI, and IX against the City. A separate order will issue.

Date: 5/14/19

Royce C. Lamberth
United States District Court

21