IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANGELA MCCULLOUGH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO: 2:15-CV-463-RCL |
| | ) | |
| VS. | ) | |
| | ) | |
| THE CITY OF MONTGOMERY, | ) | |
| ALABAMA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CITY OF MONTGOMERY'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

1.      The City of Montgomery employs 2,500 people and has a population of 205,000. (Ex. 16 (Strange Dep.) at 50:1-3.)  Montgomery's budget is in the range of $260,000,000 annually. (*See* Ex. 16 (Strange Dep.) at 57:22-23.)

2.      The City, like numerous municipalities throughout Alabama, has a Municipal Court, in which traffic and misdemeanor offenses are prosecuted and adjudicated. Ala. Code §§ 12-12-32, 12-12-51, 12-14-1; Ala. Const. art. VI, § 145. The Municipal Court is a part of the Alabama Unified Judicial System and, thus, is subject to the oversight of both the Alabama Administrative Office of Courts ("AOC"), an agency of the Supreme Court, and the Alabama Court of the Judiciary. Ala. Const. art. VI, §§ 139(a), 156(b), 157(a)(1); Ala. Code § 12-1-2, 12-14-54; Ala. Jud. Ethics Op. 87-305, 1997 WL 1446594 (June 29, 1987); *Ray v. Judicial Corr. Servs., Inc.*, No. 2:12-cv-02819-RDP, 2017 WL 660842, at *11 (N.D. Ala. Feb. 17, 2012).

3.      Within the Administrative Office of Courts is the Department of Court Management which exists to assist the Chief Judge of the Alabama Supreme Court in administration of "all the trial courts of the state."  See Ala. Code § 12-5-3.  The Administrative

1

Director of Courts, head of the AOC, is charged with assisting the Chief Judge in the administration

of the Alabama Unified Judicial System and with collecting data from the courts of the "Alabama

Unified Judicial System," including preparing an annual report on the Alabama Unified Judicial

System. See Ala. Code § 12-5-10. The AOC also provides training to the Municipal, including a

certification program for the State's municipal court magistrates. (Ex. 8 (Nixon 2014 Dep.) 15:18-

17:20.) Ken Nixon, the Municipal Court Administrator, testified that the Administrative Office of

Courts, a state agency, dictates what records must be retained at the Municipal Court. (Ex. 14

(Nixon *McCullough* Dep.) at 12:1-11.) The retention schedule for the judicial branch is completely

separate from what is required of the City. (Ex. 14 (Nixon *McCullough* Dep.) at 74:1-4.) AOC

also requires Municipal Courts to complete annual surveys. (Ex. 14 (Nixon *McCullough* Dep.) at

141:2-16.)

4.      Nixon testified that the State also requires municipal courts to report revenue in a

state-provided format. (Ex. 14 (Nixon *McCullough* Dep.) at 54:19-55:2; 57:13-60:6.)

5.      The City's role in connection with the Court is to pay employees to staff it, and to

provide facilities.[1] (*See* Ex. 16 (Strange Dep.) at 52-53; Ex. 31 (Strange Decl. at ¶ 2; & Ala. Code

§ 12-14-2 (municipality shall provide appropriate facilities).) The City Council, in connection

with those duties, appoints the judges, and the Mayor appoints the presiding judge. Ala. Code §

12-14-30.

6.      The Mayor testified that "the court sentencing and procedures were under the

jurisdiction of the presiding judge and the judges, not the mayor's office or the City," and "the

mayor's office had no jurisdiction over the operations of the municipal court." (Ex. 16 (Strange

---

[1] One example of the separation and distinction between the City and the Court, by way of example, was the fact that
the City IT Department, while it housed the Court's electronic record-keeping system on its servers, did not have
anything to do with programming or running reports from that data. (Ex. 20 (Ialacci Dep.) at 10:9-11:14.)

Dep.) at 24:17-20; *see also* Ex. 16 (Strange Dep.) at 48:2-7.)  He further testified that the operations of the Court would have been something that was under the auspices of the Administrative Office of Courts.  (Ex. 16 (Strange Dep.) at 28:6-11.)

7.     Police Chief Art Baylor, who was Chief of Police from 2004 to 2010, and then Chief U.S. Marshall (Ex. 17 (Baylor Dep.) at 8, 10-11), made it clear that the Municipal Court was a separate branch of government and that the police could not tell the Court what to do, just as the Court could not control how he ran the Police Department.  (Ex. 17 (Baylor Dep.) at 15:19-16:11 ("I mean, they were a separate branch of government.  So, I mean, I couldn't go over there and tell the court what to do…." 16:4-6).)

8.     Chief Baylor likewise testified that the police and police chief were <u>not</u> responsible for determining <u>why</u> people were placed in jail.  Only the judges of the Municipal Court put people in jail.  (Ex. 17 (Baylor Dep.) at 23:12-17.)  He noted that after officers arrest an individual on a warrant, it is up to the judicial system "to handle it after that." (Ex. 17 (Baylor Dep.) at 24:4-25:5.)

9.     Chief Kevin Murphy, who was Police Chief from 2010 to 2014, testified that the only interaction he had with Judge Hayes, the then-Presiding Judge at the Municipal Court was when Judge Hayes mentioned to Chief Murphy "a few times" that he was concerned that police officers were missing court dates at which they were due to testify.  (Ex. 18 (Murphy Dep.) at 43:1-7.)

10.    The Municipal Court judges are responsible for directing the actions of the Municipal Court clerks:

Q. … The clerks are people who work for you, right?

A. They work for the court, yes.

(Ex. 14 (Nixon *McCullough* Dep.) at 90:18-20.)  Mr. Nixon also testified that "the chief judge or presiding judge is ultimately responsible for those actions of the court personnel." (Ex. 14 (Nixon *McCullough* Dep.) at 91:1-4; *see also* Ex. 14 (Nixon *McCullough* Dep.) at 93:2-3 ("Clerks should follow the direction and orders of a judge.").)

11.     Kenneth Nixon, the Montgomery Municipal Court Administrator, reported to two bosses, for different purposes – the Mayor and the Presiding Judge. (Ex. 14 (Nixon *McCullough* Dep.) at 51:8-15.)[2]  With respect to anything judicial in nature, Mr. Nixon reported to the Presiding Judge of the Municipal Court.  (*See* Ex. 8 (Nixon 2014 Dep.) 35:10-22 (pursuant to separation of powers he answers to presiding judge for "any judicial matter" and mayor regarding funding and administrative matters).)  With respect to needs relative to funding and facilities and other purely administrative matters, Mr. Nixon reported to the Mayor.  (Ex. 8 (Nixon 2014 Dep.) 35:10-22.)

12.     While Mr. Nixon was in the Mayor's cabinet, and Plaintiffs will attempt to make much of that fact, the purpose of the cabinet, as he testified, was merely for the Mayor to disseminate information which he thought important to give to "all personnel," and then each department head would be asked "if they had anything that needed to be presented to the other personnel."  (Ex. 14 (Nixon *McCullough* Dep.) at 52:9-17.)  The Mayor testified that at cabinet meetings, discussion is "about administrative and general citywide matters that cross all the lines." (Ex. 16 (Strange Dep.) at 54:8-9.)  The Mayor made it clear that the Court administrator did not speak to him at cabinet meetings about matters having to do with "the administration of the court." (Ex. 16 (Strange Dep.) at 56:4-9.)

---

[2] Mr. Nixon was not the only person who reported to the Mayor but also answered to another superior.  Mr. Ialacci, the City's head of IT, worked for both the City of Montgomery and Montgomery County.  (Ex. 20 (Ialacci Dep. at 7:11-8:20) (Ialacci is a county employee who works for the City pursuant to a memorandum of understanding).)

13.     Mr. Nixon did not recall the amount of money the Municipal Court generated *ever* being discussed at a cabinet meeting.  (Ex. 14 (Nixon *McCullough* Dep.) at 53:14-18.)

14.     While the City, by state law, has a financial obligation to fund the Court, there is no evidence that it did anything to control judicial functions or usurp judicial authority.  Nor is there any evidence that any effort was taken by the City to increase or control the revenue generated by the Court.  While a budget had to be prepared each year which reflected anticipated Court revenue, the Court Administrator testified that the people who prepared the budgets would merely ask him if he had "any idea of what collection might be."  His answer: "I would normally just look at trends, prior years, just look at how it was tracking and trending and extrapolate it up or down based on that."  (Ex. 14 (Nixon *McCullough* Dep.) at 53:23-54:13.)  This would include looking "at month-to-month gross revenues and then sometimes maybe cumulative for the fiscal year."  (Ex. 14 (Nixon *McCullough* Dep.) at 54:14-18.)  The City had an obligation to budget for the costs of the court personnel and facilities, which was not tied to the revenue from fines and costs, and existed regardless of what amount of revenue came from the court.  (*See* Ex. 16 (Strange Dep.) at 87:10-18 (Mayor was not even aware whether revenue generated from Court covered Court's expenses: "[W]hether that revenue stream covers it or doesn't cover it, I don't have that particular detail.") & Ala. Code § 12-14-2 (providing that a municipality shall provide "appropriate facilities," "necessary supportive personnel" and "prosecutorial services" and making no contingency tying such provision to revenue generated by the municipal court).)

15.     In addition, the Mayor asked to meet with Mr. Nixon "occasionally."  (Ex. 14 (Nixon *McCullough* Dep.) at 180:23-181:1.)  The Mayor asked Mr. Nixon to prepare something in writing.  (Ex. 14 (Nixon *McCullough* Dep.) at 181:1-3.)  While Mr. Nixon created a document to provide to the Mayor, the Mayor did not direct Mr. Nixon as to the information he reported.

(*See* Ex. 14 (Nixon *McCullough* Dep.) at 181:1-5.)  Mr. Nixon included the number of tickets issued and revenue numbers in the requested report because "it seemed easy to create, and it was something measurable, and then, I would sent it to him once a month."  (Ex. 14 (Nixon *McCullough* Dep.) at 181:3-5.)  Any projections that Mr. Nixon provided in his report to the Mayor were "extrapolations" based on prior numbers.  (Ex. 14 (Nixon *McCullough* Dep.) at 183:6-10.)  They were not revenue targets or goals nor is there any evidence to that effect.

16.     There is no evidence that the Mayor used these numbers in any way other than as a source of knowledge regarding the number of tickets written and possibly regarding revenue for budgeting purposes. (*See* Ex. 16 (Strange Dep.) at 58:5-59:23 (describing how he used information).)  *See* Discussion in ¶ 60, *infra* (Murphy not aware of income from tickets nor did he help prepare budgets based on income related to tickets); ¶¶ 65-70, *infra* (testimony from Murphy and Baylor showing no requests were made of them to raise revenue through increasing number of tickets and that no such thing was discussed).  Mr. Nixon testified that he never had any discussion with any of the City's police chiefs about the number of tickets they needed to write to reach budgeted revenues.  (Ex. 14 (Nixon *McCullough* Dep.) at 187:21-188:8.)  No one set targets for the number of tickets.  (*See* Ex. 14 (Nixon *McCullough* Dep.) at 187:9-20, 188:4-8; Ex. 18 (Murphy Dep.) at 41:5-14; Ex. 32 (Decl. of Jett).)

17.     Chief Baylor, who was Chief of Police when JCS began working in the Municipal Court in 2009, testified that JCS was under the Court system, and that it had nothing to do with the Police Department or its traffic enforcement practices.  (Ex. 17 (Baylor Dep.) at 29:21-30:14.)  Chief Murphy, who was Chief of Police from 2010 to 2014, testified that he did not even know what JCS did and didn't "recall ever talking to anybody about JCS."  (Ex. 18 (Murphy Dep.) at 36:16-37:23.)   While one or two of the Plaintiffs reported seeing who they thought were

Montgomery Police Officers at JCS locations, Chief Murphy said that he did not assign police officers to JCS facilities.  (Ex. 18 (Murphy Dep.) at 37:7-9.)  Off-duty police officers were permitted to earn extra income by serving in the role of private security guards at the JCS office, but had no function at all relating to collection or probation.  (*See* Ex. 18 (Murphy Dep.) at 37:10-13; Ex. 13 (Ennis *McCullough* Dep.) at 184:13-186-16.)

18.    Barry Crabb, the Finance Director for the City from 2013 to 2019, testified that he was aware that there was an entity called JCS that was contracted to provide services to the Municipal Court, but that he "didn't know a lot of particulars about it."  (Ex. 21 (Crabb Dep.) at 52:11-21.)

19.    Janice Hopkins, who worked in the jail from 1984 to 2011, and left as assistant warden, testified that she had no interaction with JCS, though she was aware that their representatives would come to the jail from time to time to talk to inmates.  (Ex. 22 (Hopkins Dep.) at 38:22-39:6.)

20.    There is a single email in which Ken Nixon, the Court Administrator, very early in Mayor Strange's tenure and early in JCS's tenure working with the Municipal Court, wrote a brief email to the Mayor about how JCS was working in the Court.  Nixon indicated that JCS and Court staff were working well together and that one positive was that "numerous citizens are electing to pay their tickets as opposed to going on a payment plan with JCS."  (Ex. 14 (Nixon *McCullough* Dep.) at 205:19-207:3 and Ex.15 (Ex. 14 to Nixon *McCullough* Dep.).)

21.    While Nixon told the Mayor in the email that he would keep the Mayor updated as to the progress with JCS, there is no evidence that Nixon and the Mayor discussed JCS at any point thereafter. The Mayor did not respond to Mr. Nixon's email by indicating that he had any interest in JCS or its progress.  All he said in response was: "Thanks. When are we going to talk about

space options?"  (Ex. 15 (Ex. 14 to Nixon *McCullough* Dep.) at 1.)  Both Mr. Nixon and the Mayor testified that this was a reference to the fact that the courthouse needed more space, rather than any reference to JCS.  (Ex. 14 (Nixon *McCullough* Dep.) at 209:4-6 ("Well, the mayor had asked me from the time he came on what my biggest concern was. It was space. We were busting at the seems [sic] there."); *see also* Ex. 16 (Strange Dep.) at 104:19-105:12.)  As noted above, under the statutory scheme requiring funding of the State's municipal courts, cities are responsible for providing court facilities.

22.     Mayor Strange testified that he signed the renewal of the JCS contract in 2010 as a matter of routine after he became Mayor because it was presented to him by the Court as simply a third party offering probationary services that the Court did not offer. (Ex. (Strange Dep.) at 95:23-96:9.)  Interim Mayor Jinright signed the first JCS contract in 2009.  (Ex. 31 (Strange Decl.) at ¶ 1.)  The Judges of the Court made the decision to stop using JCS.  (*See* Strange Dep. at 97-99 (Mayor learned from Court Administrator that JCS's services were being terminated).)  When asked if he had any opinion about the termination of the JCS contract, the Mayor answered: "I didn't have an opinion one way or another, but if they [the Court personnel] were recommending the termination, then, yes, it would have been fine."  (Ex. 16 (Strange Dep.) at 99:20-23.)

23.     JCS did create a document from time to time called a "Report Card."  (Ex. 13 (Ennis *McCullough* Dep.) at 73:3-74:10.)  The Mayor further testified that he never saw a document known as the JCS Report Card.  (Ex. 16 (Strange Dep.) at 102:20-103:5.)  In discussing the JCS Report Card in his deposition, Wes Ennis, JCS's Regional Manager for Montgomery, testified that his "communication was with the Court" and not the City.  (Ex. 13 (Ennis *McCullough* Dep.) at 77:11-78:1; 92:9.)

24. Wes Ennis testified at length that it was exclusively the Court that set the policies and procedures the Court wanted JCS to follow in Montgomery. (Ex. 13 (Ennis *McCullough* Dep.) at 23:8-25; *see also* Ex. 13 (Ennis *McCullough* Dep.) at 30:18-23 & 34:1-6 (Court made ultimate decision).) In fact, each judge would determine how the judge wanted JCS to handle things for his or her cases. (Ex. 13 (Ennis *McCullough* Dep.) at 25:6-17.) The judges met with JCS from time to time to instruct them on how the Court wanted things done. (Ex. 13 (Ennis *McCullough* Dep.) at 48:11-17.) When issues arose, JCS personnel went to the Court to determine how to handle them. (Ex. 13 (Ennis *McCullough* Dep.) at 65-66; 68:6-13.)

25. Mr. Ennis understood that the Presiding Judge of the Court approved JCS's letters and forms and that the judges did review the probation orders. (Ex. 13 (Ennis *McCullough* Dep.) at 151:20-152:5 & 171:14-172:11.)

26. Mr. Ennis, testifying as JCS's Rule 30(b)(6) representative, was clear that the City had no involvement in JCS's activities in Montgomery:

> Q. Do you see Category 2 says -- they ask about interaction with the City of Montgomery Police as part of the process of collection of fines and fees. I'll ask you whether or not there was any interaction with the City police as part of JCS's process of collecting fines and fees?

> A. Absolutely not.

> Q. Number 6 asks for reports and related accounting to the City of Montgomery by JCS with respect to the collection of JCS fees and collection of court-ordered fees and fines. I'll ask you whether or not JCS reported to the City itself as opposed to the municipal court?

> A. No, sir. Reported directly to the court.

> Q. All right. Then Category 7 asks for interactions that JCS had with the City of Montgomery -- And again, it's distinct from the court -- as part of the compliance with the contract between the City and JCS. Did you have any interaction with the City or was your interaction with the court?

> A. My interaction was with the court, court of Montgomery.

Q. In your experience with JCS in Montgomery, did the mayor of Montgomery or the City council or the City officially override the Court's determination as to whether or not to assign people to JCS?

**A. I can't recall a single time the City of Montgomery, outside of the Court, having any involvement with anything that went on with JCS.**

(Ex. 13 (Ennis *McCullough* Dep.) at 192:3-193:14 (emphasis added).)

27.     As mentioned above, JCS did, from time to time, hire off-duty police officers to provide security at its facilities, just as an individual hosting a party might hire an off-duty Police Officer for security purposes.  (Ex. 13 (Ennis *McCullough* Dep.) at 183:19-186:1; 189:6-19; *see also* Ex. 18 (Murphy Dep.) at 39:7-13.)

28.     Under Alabama law, specifically (Ala. Code § 15-18-62 and Rule 26.11, Ala. R. Crim. P.), a Court is authorized to jail an individual who fails to pay court-ordered fines and costs, if the failure to pay was willful or he failed to make a good-faith effort to pay.  Willfulness or lack of good-faith effort include not attempting to find work or earn extra funds and not attempting to borrow funds to pay the fines and costs.  *Bearden v. Georgia*, 461 U.S. 660, 660 (1983) ("If the probationer has willfully refused to pay the fine or restitution when he has the resources to pay or has failed to make sufficient bona fide efforts to seek employment or borrow money to pay, the State is justified in using imprisonment as a sanction to enforce collection.") (summarizing holding); *see also id.* at 668.

29.     The Montgomery Municipal Court called this practice "commuting."  The word "commute" is defined in versions of Black's Law Dictionary as "To substitute one punishment in the place of another." https://dictionary.thelaw.com/commute.  A more current edition defines the term commutation generally as "exchange or replacement."  Black's Law Dictionary 11th Ed. That's the sense in which the Municipal Court uses the term.

30.     As Mr. Nixon testified, "I believe consistent with Rule 26.11, upon a judge's inquiry as to one's ability to pay and they determine willful noncompliance, that those unpaid fines can be commuted to a jail sentence for time." (Ex. 14 (Nixon *McCullough* Dep.) at 87:1-9.)  Mr. Nixon testified that there would be an inquiry as to why the fine and costs were not paid before individuals were commuted.  (Ex. 14 (Nixon *McCullough* Dep.) at 100:1-11.)  While Plaintiffs take issue with the adequacy of the Judges' hearings, there is no dispute that there was a hearing held before anyone was commuted.

31.     The standard credit toward fines, fees and costs permitted for each day in jail was increased from $25.00 a day to $50.00 a day on July 13, 2012. (Ex. 14 (Nixon *McCullough* Dep.) at 48:3-17.)  Such credit had no relation to any work but was the means of satisfying the fines and costs simply by sitting in jail.  (Ex. 14 (Nixon *McCullough* Dep.) at 47:23-48:17.)

32.     JCS had absolutely no involvement in any decisions regarding commuting a sentence. (Ex. 3 (Hamby Decl.) at ¶ 26; Ex. 7 (Hayes Dep.) at 18.)  As a matter of general practice, as noted above, judicial hearings were provided to Municipal Court defendants prior to their having unpaid fines and costs converted to jail time.  (Ex. 2 (Nixon Aff.) at ¶ 24.)  Municipal Court defendants could be commuted whether they had been assigned to JCS or not.  (Ex. 2 (Nixon Aff.) at ¶¶ 2-3.)  Individuals assigned to JCS who had no suspended sentences were not jailed when their probation was revoked; if they were jailed, it would have been because they were commuted. (*See* Ex. 2 (Nixon Aff.) at ¶¶ 2-3 and ¶ 86.)

33.     Ken Nixon, the Court Administrator, testified about the separate policy of the Municipal Court to give people sentenced to jail credit against their time in jail for electing to perform work in jail.  (Ex. 14 (Nixon *McCullough* Dep.) at 35; 47.)  An inmate who volunteered to perform certain commonplace tasks was then credited with an additional $25 per day against

the fines and costs. (*See* Ex. 14 (Nixon *McCullough* Dep.) at 47; 48:18-49:6.)  Mr. Nixon started

working at the Court around 2007 (twelve years before).  (*See* Ex. 14 (Nixon *McCullough* Dep.)

at 10.)  This credit was not in place when he started work, and he believed that it began in 2010 or

2011.  (Ex. 14 (Nixon *McCullough* Dep.) at 35:1-14.)  Mr. Nixon explained that the Presiding

Judge initiated the credit for jail work program, and that the jail was to communicate to the Court

the days an inmate worked.  (Ex. 14 (Nixon *McCullough* Dep.) at 43:3-11.)

34.     Janice Hopkins, who was employed at the jail from 1984 through August 2011

(with the exception of a one-year gap around 2007-2008, when she left, then returned).  She ended

her tenure at the jail as assistant warden.  (Ex. 22 (Hopkins Dep.) at 7:18-8:6.)  She testified about

some of the different kinds of work detainees did while in jail, including cleaning the holding cell,

washing clothes, and working in the kitchen or on litter detail.  (Ex. 22 (Hopkins Dep.) at 10:14-

20; 11:2-12; 36:23-37:5.)  Brenda Gooden Lewis, also a former corrections officer, testified that

prisoners worked in the kitchen and laundry and cleaned their toilets.  (Ex. 23 (Lewis Dep.) at 67.)

35.     The work detainees could do outside the jail included washing cars, picking up trash

around the building, a sanitation detail at the municipal ball field, and a sanitation detail on the

road crew picking up roadside trash. (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 51:2-6;

*see also* Ex. 22 (Hopkins Dep.) at 32:4-7.)

36.     Janice Hopkins testified that detainees who worked were volunteers.  (Ex. 22

(Hopkins Dep.) at 11:18-12:1 (detainees who were "eligible to go out"[3] were given opportunity to

volunteer); Ex. 22 (Hopkins Dep.) at 16-18 (officers asked for volunteers).)  Ms. Hopkins further

---

[3] Certain detainees – those with a history of violence or domestic abuse, for example – were not eligible to work off
the jail premises.  Such persons, as well as any without medical clearance, were not eligible to work in the kitchen.
(Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 75-76; 102.)

testified that when individuals sought people for outside work details, they would ask for volunteers and sign them out and back in.  (Ex. 22 (Hopkins Dep.) at 31:19-32:3.)

37.     Brenda Lewis testified that the jail merely permitted eligible inmates to work "[i]f they volunteered."  (Ex. 23 (Lewis Dep.) at 27:15-19.)  Lt. Smith, a corrections officer from 2003 to the present, testified that detainees were expected to keep their own cells sanitary (which had no connection to the $25 work credit, but applied to all inmates) but that other work such as sweeping the halls, cutting grass, etc. was entirely voluntary and was never forced. (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 12; 37:17-39:12; 41; 47-48; 50-54.)

38.     Ms. Lewis was consistent in her testimony that the work was voluntary.  Ms. Lewis was asked:  "But they also had to clean the toilets in the holding areas; right?" She answered: "They didn't <u>have</u> to do it. It was volunteered."  (Ex. 23 (Lewis Dep.) at 66:12-17.)

39.     Notwithstanding her unequivocal testimony that the jail work was voluntary, Plaintiffs' counsel attempted to press her on the point of jail work and whether it was voluntary, and Ms. Lewis testified:

> A. They cleaned their cells. And if they wanted to get credit so they can get out and work early they came, and if they wanted to mop the floors, they was allowed to do that. If they wanted to work in the kitchen and volunteered to do that, as well as doing the laundry, they were allowed so they could get credit.

(Ex. 23 (Lewis Dep.) at 67:8-15.; *see also* Ex. 23 (Lewis Dep.) at 78:23-79:13 (work detail list did not have separate column detailing which work was voluntary because all work was voluntary).)

40.     Lt. Smith, a corrections officer, testified in his Rule 30(b)(6) deposition, that prisoners would generally be responsible for cleaning their own areas in the jail, but "[t]hey would volunteer to clean other parts of the jail."  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 37:17-19.)  These included the kitchen, main hallway, and the Court holding area.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 37:17-23 & 38:6-9 (all cleaning in these areas was done by

volunteers "as long as there's a volunteer").)  Lt. Smith was very clear that at no point in time were individuals required to do such work.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 40:20-42:1 (discussing holding cell as example).)  He also testified that no one was ever ordered to do work, and no one was ever threatened if they did not volunteer.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 66:16-21.)

41.     Lt. Smith testified that "[t]here is a constant flow of people asking for work.  It's really not necessary to recruit."  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 73:21-23.)

42.     Lt. Smith, a long-serving jail corrections officer, testified that prisoners had been sweeping the jail floors and assisting with cooking and cleaning in the kitchen at the jail since 2003, when he was hired.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 12; 35:19-38:9.)  He further testified that even though a list of inmates who work is no longer kept at the jail,[4] inmates continue to volunteer to clean at the jail and volunteer for work outside the jail.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 40:12-41:1 (cleaning holding cell as example) & 54:9-13 (washing cars as example) & 59:12-22 (picking up trash outside building as example).)  The jail stopped keeping a list around 2015 because the Court did not ask for it anymore.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 48:20-49:3.)

43.     Ms. Hopkins testified that if there were no inmates willing to do the work, the correctional officers would perform the job.  (Ex. 22 (Hopkins Dep.) at 51:23-52:10.)  Ms. Hopkins further testified that officers would clean when inmates did not want to do the work or where there was a security risk or combative inmate. (Ex. 22 (Hopkins Dep.) at 18:4-22 (stating "Sometimes [officers] would have to" clean and "[i]f you had a combative inmate in an area, we wouldn't ask the inmates to do it, or security risk").)  Ms. Lewis testified that detainees were not made to clean

---

[4] The $25 credit program has been discontinued.

cells that housed inmates with mental conditions who may have soiled their cells.  Only officers cleaned those cells.  (Ex. 23 (Lewis Dep.) at 66-67.)

44.    Along the same lines, Lt. Smith, in his Rule 30(b)(6) deposition, testified that if there is not a volunteer to clean a particular area "the officer assigned to that area will clean it." (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 38:18-19; *see also* Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 41:21-42:1; 98:16-99:4.)  When asked about who would clean the security cells for inmates who are drunk and the like, Lt. Smith said that, if there were no volunteers, a corrections officer would do it, noting that he had cleaned those cells in the past himself.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 88:3-90:20.)

45.    Chief Murphy testified that it was ultimately the correction officers' responsibilities to clean up the general area and the toilets in the jail.  (Ex. 18 (Murphy Dep.) at 18:19-23.)

46.    Chief Baylor testified that he was aware that prisoners worked but not aware of whether they were compensated and that he was not aware of what kind (if any) credit people were being given by the court for jail work in 2010.  (Ex. 17 (Baylor Dep.) at 11:19-12:3; Ex. 17 (Baylor Dep.) at 21:4-6.)

47.    Chief Murphy, Police Chief from 2010 to 2014, testified that he understood that detainees cleaned and worked in the kitchen on a voluntary basis but that he was not "aware of what the arrangement was" regarding credit for jail work.  (Ex. 18 (Murphy Dep.) at 13:5-14:15; *see also* Ex. 18 (Murphy Dep.) at 20:12-21:2 (he did not know "specifically," and there were "no discussions" when he was chief about any rate people were receiving for jail work).)

48.    Lt. Smith was also not aware of the type of credit that individuals who volunteered to work were receiving from the Court.  In response to being asked to explain what "value" was

given for the work done in jail, he responded, "That would be a Court issue.  I can't answer that question."  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 83:3-17.)

49.     The Mayor testified that he did not know whether he was ever informed that detainees were getting credit for jail work.  (Ex. 16 (Strange Dep.) at 24:4-10.)  In fact, the Mayor testified that he did not know if he was informed that inmates worked at all.  (Ex. 16 (Strange Dep.) at 23.)

50.     All that the jail did was permit individuals to volunteer to work, keep a list of those who did, and forward that information to the bailiff of the Court. Brenda Gooden Lewis testified that the jail kept a list of inmates who performed work.  (Ex. 23 (Lewis Dep.) at 21:17-22:4 ("As far as credit is concerned, all that was handled through the court. The only thing I can testify is that we had a list.").)  Lt. Smith testified that the jail was asked to provide detainee work records to the Court.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 63:10-18.)  For a consolidated excerpt of the testimony from the Plaintiffs regarding work in jail, please refer to Section II. B. (ii) of the City's Brief in Support of the Motion for Summary Judgment.

51.     Janice Hopkins testified that the jail would only release an inmate on the Municipal Court's instructions.  (Ex. 22 (Hopkins Dep.) at 24:5-21.)  Brenda Lewis, who was warden of the jail from approximately 2012 to 2014 (Ex. 23 (Lewis Dep.) 40:12-15), also testified that a release order was "what would be generated from the court to let us [the jail] know whose [sic] getting ready to be released."  (Ex. 23 (Lewis Dep.) at 56:23-57:15.)

52.     Brenda Lewis, testified that if any credit was given for inmate work, that was handled by the Municipal Court , not through the jail, and that she had nothing to do with any such credit being given.  (Ex. 23 (Lewis Dep.) at 21:12-16.)  While Ms. Lewis testified that it was important for the jail to record the days worked because it affected when a detainee could get out

of jail, she reiterated that she did not know the way the Municipal Court figured the credit for jail work.  (Ex. 23 (Lewis Dep.) at 46:20-47:7.)  Ms. Lewis testified that to the extent there was any document related to releasing inmates, she explained "all that would have been done by the courts." (Ex. 23 (Lewis Dep.) at 76:16-77:14.)

53.     Lt. Steven Smith also testified that it was the Municipal Court that provided the jail release dates for detainees. (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 26:7-18; *see* Ex. 14 (Nixon *McCullough* Dep.) at 47-49.)  No one is released without an order from the Court.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 27:9-11 ("You cannot release until you get an order of release from the Court.").)

54.     Janice Hopkins testified that though she had heard the word "commuted," she did not know what it meant.  (Ex. 22 (Hopkins Dep.) 38:15-21 ("I have no idea what it means.").)  She also testified that she was not familiar with the concept of "sitting out a fine;" she relied on the orders that came from the Court regarding releasing and detaining inmates.  (Ex. 22 (Hopkins Dep.) at 42:2-11.)

55.     Brenda Lewis testified that she was not familiar with the "idea that a sentence has been commuted."  (Ex. 23 (Lewis Dep.) at 54:18-55:1.)  Nor was she aware of what the phrase "sitting out days" meant.  (Ex. 23 (Lewis Dep.) at 78:1-3.)  Lt. Smith was also not aware of what "commute" meant.  (Ex. 37 (Smith *Carter* Dep.) at 28:11-19.)

56.     Often, Plaintiffs' counsel used discovery as a means of exploring unpled claims or claims this Court had already dismissed.  One instance of Plaintiffs' attempts to pursue information that is not relevant to the claims remaining was Plaintiffs' question to Chief Art Baylor, Montgomery's former African-American Chief of Police, as to whether he ever did an analysis of who was receiving tickets by race.  (Ex. 17 (Baylor Dep.) at 15:15-18.)

57.     Another example of such efforts on the Plaintiffs' part was a series of questions to the City's head of IT, Lou Ialacci about whether his department could analyze the race of individuals who received traffic tickets, followed by a series of questions about whether the City is able to create reports about economic development in certain neighborhoods.  (Ex. 20 (Ialacci Dep.) at 13:16-16:6.)

58.     Plaintiffs will, as they have throughout, try to argue that because the Municipal Court collected substantial amounts in fines, costs and fees, there must therefore have been some control exercised by the City over the Court system.  There is no such evidence.  As to fines and costs, Barry Crabb, the City's Finance Director from 2013 to 2019 (*see* Ex. 21 (Crabb Dep.) at 8), testified that about thirty to forty percent of gross fines and forfeitures (the line on the City's budget and financial statements representing Court revenue) that are collected by the Municipal Court are obligated to be paid out to various outside agencies.  (Ex. 21 (Crabb Dep.) at 10:13-17.)  He likewise testified that the budgets of the City of Montgomery reported fines and forfeitures as a gross number.  (Ex. 21 (Crabb Dep.) at 10:18-21; 13:5-6.)  The distributions from the gross amounts of fines and forfeitures were then contained in a separate section of the budget so that the net number could be determined by subtraction.  (Ex. 21 (Crabb Dep.) at 13:20-14:3.)  This reporting changed in 2015 to reflect the projected net number in the budget.  (Ex. 21 (Crabb Dep.) at 14:9-15:2.)

59.     With respect to the thirty or forty percent of the collections that are payable to other entities, it is the Court Administrator who "direct[s]" the City "to cut a check payable to the state treasury" for those various entities or accounts.  (Ex. 14 (Nixon *McCullough* Dep.) at 136:9-12.)

60.     Chief Murphy testified that he was not aware of how much income the City budgeted from fines.  (Ex. 18 (Murphy Dep.) at 22:12-15.)  Chief Murphy did not prepare the

revenue or budget documents that estimated the number of tickets expected to be written in a given year.  (Ex. 18 (Murphy Dep.) at 38:18-39:1.)

61.     While Plaintiffs make an issue out of what they call "stacking tickets," Chief Murphy was not aware that an individual would be charged three sets of court costs by the court if he or she received three traffic tickets.  (Ex. 18 (Murphy Dep.) at 45:17-23.)  The police had no role in applying court costs.

62.     The Municipal Court takes the fines, costs and fees it collects and deposits them into the City's General Fund bank account.  (Ex. 21 (Crabb Dep.) at 25-26.)

63.     The evidence shows that, even when Municipal Court revenue fluctuated, no action was taken by the City other than to adjust the budget.  Barry Crabb (the City Finance Director) testified that even though revenue from the Court dropped from 2011 to 2014, he took no action and performed no analysis in connection with that fluctuation in revenue.  (Ex. 21 (Crabb Dep.) at 44:17-45:18.)

64.     Ken Nixon took part in the negotiations of the Settlement Agreement in the *Mitchell v. City of Montgomery*, Civil Action No. 2:14cv186-MHT, but he did not recall ever being consulted about the effect on revenue that the plan, which was implemented in connection with the Settlement Agreement, would have.  (Ex. 14 (Nixon *McCullough* Dep.) at 105:10-106:1.)  By way of further explanation of that settlement, the Judges of the Municipal Court voluntarily intervened in the *Mitchell* case for the purpose of providing the equitable relief that served as the basis for settlement of the plaintiffs' equitable claims in that case.  (*See* Ex. 2 (Nixon Aff.) at 22-42 (*Mitchell* "Agreement to Settle Injunctive and Declaratory Relief Claims") (showing judges agreeing to terms of Settlement Agreement and extensive terms agreed to); Ex. 2 (Nixon Aff.) at 45-49 ("Unopposed Motion for Joinder of Parties") (noting, in ¶ 5, that Municipal Court Judges of

City of Montgomery voluntarily "agreed to joinder in their official capacities" and, in ¶ 6, that judges subjected themselves to jurisdiction of federal court).)  Judge Hayes played a significant role in negotiating the terms of that Settlement Agreement and in the development of the judicial policies adopted in 2014 (policies that served as the basis for that above-referenced settlement), and those policies have been provided to other courts as best municipal court practices.  (*See* Ex. 33 (Agreement and Stipulation of the Parties) at 11 ¶¶ 4(a)-(c) (Hayes' stipulations).)  Central to the agreement and judicial policies is that any indigent defendant appearing before the Court is afforded a $25.00 a month payment plan or community service.  (Ex. 2 (Nixon Aff.) at 32 ("Basic Premises," ¶ 9).) (In practice, the option is generally afforded to anyone who chooses not to pay in full immediately without requiring them to prove indigence.)

65.     There is no evidence that anyone encouraged the Police Department to increase the number of tickets written at any point in time.  The evidence is to the contrary.  There were no discussions between the Mayor and the Police Department regarding the number of tickets written or the fines and costs associated with them.  Chief Baylor testified that he did not recall ever providing any information to the mayor regarding the number of tickets written or the fines and costs associated with them.  (Ex. 17 (Baylor Dep.) at 18:18-19:11.)

66.     Chief of Police Art Baylor testified that there was an increase in total tickets written between 2002 and 2010, which was due to an increased emphasis on public safety through enforcement of the traffic laws.  (Ex. 17 (Baylor Dep.) at 9; 27.)  Major Terry Jett, who took over as Commander for the Montgomery Police Department Traffic Division in 2005 and the Patrol Division (along with the Traffic Division) in 2007, instituted some new practices of his own choosing, including sobriety check points, which resulted in an increase in the number of tickets written.  (Ex. 32 (Jett Decl.).)  Maj. Jett did not institute the new practices in connection with any

direction from superiors that he increase the number of tickets written.  (Ex. 32 (Jett Decl.).)  Jett

left those positions in 2010, and some of the practices he had initiated were discontinued thereafter.

(Ex. 32 (Jett Decl.).)

67.     Chief Baylor testified that, at points during his tenure (from 2004 to 2010), the

Police Department conducted "sobriety checkpoints," but the Department did not use other kinds

of checkpoints or "other kinds of situations that would require people to go through some kind of

police search."  (Ex. 17 (Baylor Dep.) at 12:17-20; 13:11-14:7.)  There is no evidence that such

sobriety checkpoints were part of some scheme within the City to increase the number of traffic

tickets or Court revenue.  The evidence is to the contrary.  (*See* Ex. 32 (Jett Decl.).)

68.     Chief Murphy testified that he was never told "how much revenue they expected

[his] department to produce."  (Ex. 18 (Murphy Dep.) at 23:5-8.)  While Chief Murphy was aware

of the number of tickets written, he did not attach any significance to it.  There were no quotas for

officers.  (Ex. 18 (Murphy Dep.) at 41:5-14.)  His focus was on crime.  (Ex. 18 (Murphy Dep.) at

23:20-24:21.)  Chief Murphy further testified:

> "Q. … But from the time you became police chief until the time you were relieved,
> you recall no conversations with the mayor that it was the responsibility of the
> police to generate a certain amount of revenue, right?
>
> **A: Never discussed it.**

(Ex. 18 (Murphy Dep.) at 38:11-17 (emphasis added).)

69.     Chief Murphy was never asked by the City administration "how many tickets" he

thought the police were "going to issue" in any given year, and Chief Murphy had no idea where

the City got its estimated number of tickets shown in Exhibit 10 to his deposition, which are

revenue projections for FY 2013.  (Ex. 18 (Murphy Dep.) at 39:2-9; *see* Ex. 18 (Murphy Dep.) at

38:18-20 for reference to Ex. 10.)  (This was a document created by the Municipal Court, not the

Police.)  He testified that no one asked the Police Department about projected revenue figures. (Ex. 18 (Murphy Dep.) at 39:10-16.)

70.     Chief Murphy further testified that his officers were never told "that they were expected to produce so many traffic stops", by which he meant some set number of stops.  (Ex. 18 (Murphy Dep.) at 41:5-10.)  Nor were the officers' performance reviews tied to "how many traffic stops they had actually achieved."  (Ex. 18 (Murphy Dep.) at 41:11-14.)

71.     When the Mayor was asked why the number of tickets had dropped at some point, he said that the number of officers is declining, and the police force has put more focus on the "patrol side of the equation rather than the traffic side."[5]  (Ex. 16 (Strange Dep.) at 61:7-9; 61:23-62:2.)  In other words, various kinds of changes at the Police Department can and do result in fluctuation in the numbers of tickets written.  (*See, e.g.*, Ex. 32 (Jett Decl.).)

72.     There is also no evidence that there was a decision by the City to use the jail to extract fines and costs from poor people.  Chief Baylor testified that there was never any discussion about using the jail as "part of a system to extract fines from poor people."  (Ex. 17 (Baylor Dep.) at 19:22-20:3.)

73.     Plaintiffs, based on their approach to discovery, may claim that the City is somehow responsible for the Municipal Court's actions because there was a nationwide financial crisis beginning in 2008, and that the crisis roughly corresponded with an increase in tickets written. This partial coincidence is that and nothing more.  Chief Baylor, who was police chief at that time, testified that there was never any discussion between himself and the Mayor about the financial situation in the City of Montgomery, and that there was never any discussion in the Police

---

[5] The Patrol Division is distinct from the Traffic Division, and is generally not involved in issuing traffic citations. (*See generally* Ex. 16 (Strange Dep.) at 61:21-62:4.)

Department about the financial situation in the City.  (Ex. 17 (Baylor Dep.) at 26:9-27:23; *see also* Ex. 32 (Jett Decl.) (indicating no discussion about increasing income from tickets).)

74.    When the Mayor was asked about the increase in tickets written that partially coincided with the financial crisis (Ex. 16 (Strange Dep.) at 14-17), he said the increase in tickets "would have been driven by … enforcement policies by the police department."  (Ex. 16 (Strange Dep.) at 17:20-22.)

75.    The City produced to Plaintiffs numerous emails in the court of discovery.  In one, Chief Kevin Murphy, who worked at the Montgomery Police Department from 1986 until 2014, where he finished his career as police chief (Ex. 18 (Murphy Dep.) at 7:15-17), sent an email to the Mayor in late December 2013 (Ex. 19 (Ex. 31 to Murphy Dep.)) with an attached article from Fox News.  The article discussed litigation related to municipal court practices in various places around the country.  Chief Murphy had no memory of even sending the article.  (Ex. 18 (Murphy Dep.) at 9:21-10:10; *see also* Ex. 16 (Strange Dep.) at 32:21-33:23).  Murphy testified merely that he did send things to the Mayor from time to time that he thought were interesting.  (Ex. 18 (Murphy Dep.) at 48:8-17.)  Chief Murphy surmised that he must have sent the article to the Mayor because there was a reference to Alabama in the article.  (Ex. 18 (Murphy Dep.) at 49:13-22.)  Mayor Strange testified that he had no recollection of receiving the email at all.  (Ex. 16 (Strange Dep.) at 33:10-34:1.)

76.    Plaintiffs may contend that City officials had knowledge of a Shelby County Circuit Court ruling from 2012 involving JCS's activities in Harpersville, Alabama.  Chief Murphy had never seen the Shelby County Circuit Court Order from 2012 involving the Harpersville Municipal Court.  (Ex. 18 (Murphy Dep.) at 40:1-15.)  The Mayor likewise testified that he had never seen the order.  (Ex. 16 (Strange Dep.) at 25:6-15.)  While an email showed that Ken Nixon, the Court

Administrator, had been emailed the order in 2012 involving the Harpersville Municipal Court, he testified that he did not recall discussions comparing the Montgomery system to the Harpersville system or what he may have done with that Order.  (Ex. 15 (Nixon *McCullough* Dep.) at 77:1-80:1.)  Nixon was not concerned that the Montgomery Municipal Court was a "debtors' court" because "we did not run a debtors court."  (Ex. 14 (Nixon *McCullough* Dep.) at 80:2-12.)  Nixon felt "that we followed all constitutional guidelines and the state law."  (Ex. 14 (Nixon *McCullough* Dep.) at 80:14-16.)

77.     The *Harpersville* ruling referenced above (Ex. 43 (Ex. 6 to Nixon *McCullough* Dep.)) reflects a different system than the one in Montgomery.  In Harpersville, according to the 2012 Order, individuals were placed on probation "without an adjudication" at all; were placed on probation when they were unable to pay fines and costs in full on the day of trial; and were incarcerated for probation violations.  (Ex. 43 (Ex. 6 to Nixon *McCullough* Dep.) at 3 ¶¶ 1-3.)  These were not consistent with the practices in Montgomery as reflected elsewhere herein.

78.     In addition, according to the 2012 order regarding Harpersville, a failure to pay or appear would result in new and separate criminal charges subject to incarceration and additional fines for contempt of court, without any valid court order or adjudication and Defendants were not afforded an Ala. R. Crim. P. Rule 26.11 hearing at all.  (Ex. 43 (Ex. 6 to Nixon *McCullough* Dep.) at 3 ¶¶ 5-6.)  These were not consistent with the practices in Montgomery as reflected elsewhere herein.

79.     Judge Armstead Lester Hayes, the former presiding judge of the Municipal Court, was sanctioned by the Alabama Court of Judiciary in November 2016 and agreed to a suspension from the bench in connection there with for a period of eleven months.  (*See* Ex. 33 (Agreement

and Stipulation of the Parties).)  Plaintiffs will argue that the City is liable for the Court's actions because the City offered Judge Hayes a contract position during his suspension.

80.    During the period of Judge Hayes' suspension, the Municipal Court was in the process of moving to a new facility.  (*See* Ex. 16 (Strange Dep.) at 41-42.)

81.    Mayor Strange testified about the City's contract with Judge Hayes. Judge Hayes was offered a temporary contract to allow him to assist in relocating and starting the operation of the court in a new building; he was not employed as a judge during his suspension:

> I guess when we knew that he was not going to be able to work as a judge. And he had so much expertise in the movement of the courts, my thought was that we ought to use that expertise in a fashion that would benefit the City.  And that's the reason we offered him that contract. And my intentions were that he would be in a position to help with -- some of our city investigation activities, but I don't know that that ever happened.

(Ex. 16 (Strange Dep.) at 41:5-15; *see also* Ex. 16 (Strange Dep.) at 40:11-12 ("[H]e wasn't working as a judge or an attorney.")  The Mayor further testified:

> It was my idea for the issue of helping in the movement of the court because that was a major project, a lot of logistics and that we – we had some – some hurdles to – to overcome with the construction – and the – movement.  The city council, almost to a person, indicated to me that they felt that we ought to be supportive of Judge Hayes to the extent we could. And it was against that background that I chose to engage him as we did.

(Ex. 16 (Strange Dep.) at 42:3-13.)

82.    The Mayor could not speak to why individual council members wanted to be supportive of Judge Hayes.  However, it is important to note that, in 2014, Judge Hayes and the other Municipal Court judges voluntarily negotiated with Plaintiffs' counsel in *Mitchell v. City of Montgomery,* Civil Action No. 2:14cv186-MHT, a new set of judicial procedures for handling traffic violations and voluntarily intervened in *Mitchell* in order to implement that new set of negotiated judicial policies and procedures.  Judge Hayes did so for the purpose of helping to resolve the *Mitchell* case in connection with which he had not been named as a defendant.  (*See*

Ex. 2 (Nixon Aff.) at 22- 42 (*Mitchell* "Agreement to Settle Injunctive and Declaratory Relief

Claims") (showing judges agreeing to terms of Settlement Agreement and extensive terms agreed

to); Ex. 2 (Nixon Aff.) at 45-49 ("Unopposed Motion for Joinder of Parties") (noting, in ¶ 5, that

Municipal Court Judges of City of Montgomery voluntarily "agreed to joinder in their official

capacities" and, in ¶ 6, that judges subjected themselves to jurisdiction of federal court).)  This had

all occurred over two years prior to the actions of the Court of Judiciary Stipulation by Judge

Hayes.  The judicial practices implemented by the Judges in connection with the *Mitchell*

settlement have served as a model for courts elsewhere.  (*See* Ex. 33 (Agreement and Stipulation

of the Parties) at ¶ 2(b) (Hayes representing that Montgomery Municipal Court policies

implemented in settlement "have been provided to other courts as examples of best municipal court

practices and other courts have used those procedures in revising their own procedures in

connection with cases involving fines and costs").)

83.     The actual judgment of the Court of the Judiciary (which was publicly released)

found against Judge Hayes on three general issues: (1) that the recordkeeping at the court under

his presiding judgeship was lacking (Ex. 33 (Agreement and Stipulation of the Parties) (various

paragraphs); (2) that the Court had permitted JCS to send or provide notice revocation hearings

and had used JCS probation to collect fines where there were no suspended sentences, (Ex. 33

(Agreement and Stipulation of the Parties) at ¶¶ 1(k)-1(n)); and (3) that, in some instances, Judge

Hayes had failed to conduct adequate *Bearden* hearings on ability to pay, (Ex. 33 (Agreement and

Stipulation of the Parties) at ¶¶ 1(f)-1(g) & 3(a)).[6]  These were deemed by the Court of the

Judiciary as violations of the Canons of Judicial Ethics.  The penalty to which Judge Hayes

---

[6] (Ex. 16 (Strange Dep.) at 52:1-4 ("[A]s I understand it, [Judge Hayes] agreed with doing something inconsistent with what the [JIC] felt was good practices at the municipal court.").)

stipulated was not a removal from office but was only a suspension, which Judge Hayes served. Given that, and the lack of any evidence there was ever any attempt by the City to control anything that Judge Hayes or any Judge in the Municipal Court did, the fact that the Mayor offered Judge Hayes a contract around the time that he was suspended from office to help with the relocation from the old courthouse to the new location is simply not evidence that the Mayor or anyone at the City had control over Judge Hayes' or any of the judges' alleged actions that are at issue in this litigation.

84.     One of the recordkeeping issues stipulated to in connection with Judge Hayes' plea was that the jail transcript (the Court's instruction to the jail about how to handle a detainee after he had appeared in Court) was often not signed by a judge.  (*See* Ex. 33 (Agreement and Stipulation of the Parties) at ¶ 1(o).)   As Mr. Nixon explained, a jail transcript would deal with "matters handled before the judge related to someone who had been in jail."  (Ex. 14 (Nixon *McCullough* Dep.) at 29:10-17.)   The jail transcript reflected, among other judicial decisions, the judge's decision whether to commute someone.  (Ex. 14 (Nixon *McCullough* Dep.) at 89.)

85.     Both the Court and the Jail recognized the jail transcript document to be a Court order, whether it was traditionally signed or not.  (*See* Ex. 14 (Nixon Dep.) at 88:19-23 (judge's order of commutation would be reflected in system or on jail transcript); Ex. 12 (Smith *Carter* Dep.) at 27:2-20 (jail transcript tells jailer whether, after detainee attends court, that detainee would stay or be released).)   There was nothing nefarious about the fact that the judges did not regularly sign the documents, given that it was considered a court order.   At most, this was an allegation that the Court should have had better practices.   Jail transcripts were prepared for all detainees sent from jail to Court or to jail from Court by a judge of the Municipal Court, not just Judge Hayes, and the frequent lack of a signature was applicable to all of the judges, although only Judge Hayes

was charged.  Among the seven named Plaintiffs here, orders were entered at various times by different judges.  (*See, e.g.*, Ex. 24 (Edwards Dep.) at 350-57 (testifying that he was commuted by Judge Westry, not Judge Hayes).)  (Other Plaintiffs' testimony and Municipal Court records mention Judge Knight, Judge James, and Judge Hendley.)

86.    All defendants with tickets[7] were granted access to a Public Defender, and misdemeanor defendants were required to speak with a PD before the judge would even address that case.  (Ex. 6 (Westry Dep.) at 85:18–86:22; *see also* Ex. 7 (Hayes Dep.) at 92; Ex. 8 (Nixon 2014 Dep.) at 69; 76–77 ("The public defenders speak to one hundred percent of the people jailed.").)

87.    Montgomery's judges exclusively made ability-to-pay or indigency determinations. (Ex. 6 (Westry Dep.) at 22:11–23:19 ("[W]e as judges, have to make a determination whether this person has a total inability to pay …."); *see also* Ex. 7 (Hayes Dep.) at 58:7-12 ("Q. Do you believe that judges have an obligation to make an independent inquiry into indigency before they commute fines and costs? A. Yes, sir."); Ex. 1 (Ennis 2014 Dep.) at 47; 50.)  Again, while the adequacy of those hearing may be contested, that hearings were held in each of Plaintiffs' cases is not.  *See* portion of the Statement of Facts relating to each individual Plaintiff.

88.    Individual defendants could be brought before Montgomery's Municipal Court in multiple ways.  Many simply received traffic tickets; others were charged with non-traffic misdemeanors, including drug possession, possession of a gun without a permit, DUI, etc.  (Ex. 2 (Nixon Aff.) at ¶ 72.)

---

[7] Constitutionally, except when incarceration is a potential part of a sentence upon an initial finding of guilt, counsel are not required, but were nonetheless provided.

89.     People who received tickets were not arrested when ticketed, but were released on their own recognizance with a written promise to appear on the date set out on the face of the ticket, known as a Uniform Traffic Ticket and Complaint ("UTTC").  (Ex. 2 (Nixon Aff.) at ¶ 72.)

90.     Offenders with offenses for which the scheduled fine was not paid prior to the Court date were required by law to appear in Municipal Court on the date set out in the UTTC.  (Ex. 2 (Nixon Aff.) at ¶ 75.)

91.     For those who pleaded guilty, the judges had discretion with respect to the sentence to be imposed, including the amount of the fines assessed.  (Ex. 2 (Nixon Aff.) at ¶ 75.)

92.     If a defendant did not appear for the hearing set on his UTTCs, the judges would issue arrest warrants for the defendant's failure to appear.  (Ex. 2 (Nixon Aff.) at ¶ 79; *see* Ex. 7 (Hayes Dep.) at 13:19-14:1.)

93.     For people who did not pay their fines and costs immediately upon pleading guilty or adjudication, the Municipal Court would afford additional time to pay. (*See* Ex. 7 (Hayes Dep.) at 100:15-20 (explaining that when person is adjudicated and says they cannot pay, judge would either give them time to pay or place them with JCS (which, of course, resulted in more time to pay)).)

94.     After affording defendants additional time to pay**,** Montgomery Municipal Court Judges at times "commuted" a fine, which meant aggregating a defendant's fines and court costs and having the defendant go to jail, crediting the defendant with $50 for each day served in jail. (Ex. 7 (Hayes Dep.) at 9:16–10:3.)  This could occur after a municipal court defendant had been given time to pay fines and costs, but did not do so, after he or she had appeared for a hearing before a Municipal Court judge.  The court bailiff tracked the credits which defendants earned on a commuted sentence and the release date.  (Ex. 8 (Nixon 2014 Dep.) at 290-91.)  If a sentence

29

were commuted to jail time, the Municipal Court Judge generally removed several incidental fees, which lowered the total due.  (Ex. 2 (Nixon Aff.) at ¶¶ 105-08.)  The judge (based on the lowered figure) also provided an amount upon which the individual could be released (sometimes the entire amount and sometimes 50% of what was owed) and a time period over which the defendant could pay any remaining amounts due.  (Ex. 6 (Westry Dep.) at 21; 42; Ex. 7 (Hayes Dep.) at 9–10; Ex. 8 (Nixon 2014 Dep.) at 312.)

95.     As noted above, one way to give defendants more time to pay and an alternative to requiring that fines and costs be paid at one time that was available to judges in Montgomery was the use of JCS probation.  The purpose of having JCS probation available in Montgomery was to provide a citizen a choice as to how they wanted to pay court-imposed fines and costs.  (Ex. 7 (Hayes Dep.) at 117:12-20.)  It was within the judge's discretion whether or not to use JCS.  (Ex. 3 (Hamby Decl.) at ¶ 14.)

96.     JCS began providing private probation services to the Montgomery Municipal Court in March 2009.  (Ex. 9 (March 2009 Contract).)  Under the terms of the Contract between JCS and the City, JCS was contractually obligated to abide by all state and federal laws in processing probations assigned to it by the Court.  (Ex. 10 (July 2010 Contract) at Ex. A, ¶ 8.)  The contract required JCS to provide its service without charge to any indigent defendant; indigency was a determination for the court, not JCS.  *See ¶* 3, *infra*.  (*See* Ex. 3 (Hamby Decl.) at ¶ 17; Ex. 13 (Ennis *McCullough* Dep.) at 37:11-22.)

97.     JCS and the City entered into a renewal written contract effective July 1, 2010.  (Ex. 10 (July 2010 Contract).)  That Contract remained operative until the contract was terminated effective June 2014.  (Ex. 1 (Ennis 2014 Dep.) at 128:1–8; Ex. 4 (Hill Decl.) at ¶ 2.)

98.     For those probationers assigned to JCS, JCS would provide its services and charge
its fees, except for probationers "determined by the Court" to be indigent (such persons would "not
be charged the standard probation fee, but [would] still be offered all JCS services"). (Ex. 9 (March
2009 Contract) at Ex. A, ¶ 5; *see also* Ex. 10 (2010 Montgomery Contract) at Ex. A, ¶ 5.)

99.     Montgomery's judges were never required to use JCS or to order probation. (*See,
e.g.*, Ex. 3 (Hamby Decl.) at ¶ 14.)  The Montgomery municipal judges offered some defendants
court-supervised probation which was not with JCS, or sometimes ordered a defendant to pay the
court directly over time rather than put them on probation with JCS.  (Ex. 8 (Nixon 2014 Dep.) at
233; Ex. 3 (Hamby Decl.) at ¶ 16; Ex. 4 (Hill Decl.) at ¶ 20; Ex. 7 (Hayes Dep.) at 60; 77; Ex. 6
(Westry Dep.) at 25-26; 110.)  There is no evidence that the City of Montgomery had any role
whatsoever in the decision to assign a defendant to JCS probation, in the handling of such
probation, nor the decision by the Court to revoke or not revoke probation.

100.     For those assigned to a JCS-supervised probation, however, probationers might be
treated differently by a judge based upon perception of the probationer's compliance efforts.
Judges usually treated probationers more favorably if they showed up for court dates, even if they
had failed to pay what the court had ordered them to pay.  (Ex. 3 (Hamby Decl.) at ¶ 18; *see also*
Ex. 2 (Nixon Aff.) at ¶ 78.)

101.     The judges did not ask JCS personnel for any information or input into the Court's
indigency determinations.  (Ex. 3 (Hamby Decl.) at ¶ 17.)  JCS employees knew and understood
that determining a defendant's indigency was solely up to the judge.  (Ex. 3 (Hamby Decl.) at ¶
17.); Ex. 13 (Ennis *McCullough* Dep.) at 37:11-22; *see* Ex. 14 (Nixon *McCullough* Dep.) at
215:16-26.)

31

102.    JCS had no power to reduce the amount which a judge had ordered a probationer to pay.  (Ex. 5 (Gray Decl.) at ¶ 20.)

103.    Defendants in Montgomery's Municipal Court very commonly requested that the court assign them to JCS probation to pay fines and costs so as to allow extended installment payments.  In Judge Westry's experience, "nine times out of ten they request[ed] it."  (Ex. 6 (Westry Dep.) at 107:23–08:6.)

104.    A JCS probation officer would sometimes sit in the courtroom when judges were hearing cases, and other times would be in a room adjacent to the courtroom.  (Ex. 3 (Hamby Decl.) at ¶ 10.)  This would vary depending on the judge's instructions and the circumstances. (Ex. 3 (Hamby Decl.) at ¶ 10.)

105.    JCS did not participate in the defendants' initial hearings nor make any recommendations to the court during those hearings; a JCS representative was simply there to intake defendants whom the judge determined to sentence to probation with JCS.  (Ex. 3 (Hamby Decl.) at ¶ 10.)

106.    Individuals were placed on JCS probation only after being found guilty by the Municipal Court either on a hearing or a plea.  (*See* Ex. 7 (Hayes Dep.) at 105.)  The Court entered a Probation Order.  Individuals could also be placed on JCS by the Court at the window in the Municipal Court pursuant to standing orders by the Court's presiding judge.  While some individuals were placed on JCS at the Municipal Court clerk's window, that procedure was accomplished pursuant to the Presiding Judge's directive and later a written order.  (Ex. 38 (Nixon *Carter* Dep.) at 129 ("done pursuant to the presiding judge's directive at the window") & 131 ("as it relates to the [presiding judge's] – general order to put someone on JCS")).)  The fact that the window procedure was undertaken by the clerks pursuant to the Presiding Judge's order is

explained by Mr. Nixon in his deposition. (Ex. 38 (Nixon *Carter* Dep.) at 134:5-138:12 (referencing memorandum in June of 2009 instructing clerks how people could be assigned to JCS at window and subsequent written order referencing that memorandum: "'Pursuant to my directive implemented in June of 2009 to reduce arrests….'"); Ex. 44 (Exs. 5-6 to Nixon *Carter* Dep.) (memorandum reflecting judge's directive and General Order referencing same).)

107.   Upon assignment to JCS, JCS's personnel would meet with the defendant. JCS staff would discuss the terms and conditions of payment in detail with probationers and their obligations to report, etc. (Ex. 5 (Gray Decl.) at ¶ 8 & Ex. 1; *see* Ex. 13 (Ennis *McCullough* Dep.) at 187.) JCS personnel presented probationers a document entitled "General Conditions of Probation" and would initial ten areas of the document, acknowledging that they understood such conditions. (Ex. 5 (Gray Decl.) at ¶ 8 & Ex. 1.) This included items such as the amount to be paid, the time and frequency of payments owed, the appointment schedule by which the probationer was to meet with the JCS employee assigned to the probationer's case, and the need to keep JCS notified of the probationer's current contact information (both telephone and address). (Ex. 5 (Gray Decl.) at ¶ 8 & Ex. 1.)

108.   The JCS probation officer would ask the probationer if he or she had any questions about any of the conditions on the form. (Ex. 5 (Gray Decl.) at ¶ 8 & Ex. 1.) If the probationer indicated he or she understood all the conditions, the probationer and the probation officer would sign the form. (Ex. 5 (Gray Decl.) at ¶ 8 & Ex. 1.)

109.   Keeping JCS appointments was one condition of probation. Appointments varied in frequency from probationer to probationer, and they were set according to an individual probationer's situation (such as work schedule). (Ex. 4 (Hill Decl.) at ¶ 7.)

110.    When a probationer asked for an appointment to be rescheduled, JCS almost always tried to work with him to find a convenient time.  (Ex. 4 (Hill Decl.) at ¶ 7.)

111.    A JCS-supervised probationer who was not paying on time or was not meeting JCS appointment obligations would first be sent multiple reminders and inquiries from JCS.  (*See* Ex. 4 (Hill Decl.) at ¶ 21.)  This was by mail to the address furnished by the probationer, or by telephone or text.

112.    If compliance was not obtained, a JCS probation officer would then file one of two different pleadings with the Municipal Court—either an application for an Order to Show Cause or a Petition for Revocation.  (Ex. 6 (Westry Dep.) at 115; *see also* Ex. 4 (Hill Decl.) at ¶ 21.)

113.    At the beginning of JCS's work in Montgomery, the municipal court directed JCS to serve the Notice to Show Cause or the Petition for Revocation.  (*See* Ex. 1 (Ennis 2014 Dep.) at 63; 68; 70.)  Service would be made on the probationer at the probationer's address on file with JCS.  (*See* Ex. 4 (Hill Decl.) at ¶ 21.)  A record of that transmission would generally be recorded in Probation Tracker.  (*See, e.g.*, Ex. 11 (Probation Tracker showing entries of 12/6/12) at 4.)

114.    Sometimes, if the probationer had provided JCS with a wrong address or failed to update his address with JCS after moving, these notices would be returned to JCS.  (Ex. 3 (Hamby Decl.) at ¶¶ 2, 41.)  In such cases, JCS would try to locate a new address through an online database like Accurint.  (Ex. 3 (Hamby Decl.) at ¶ 41.)  The JCS Montgomery office followed this policy.  (Ex. 3 (Hamby Decl.) at ¶ 41.)

115.    If a petition for revocation was filed, a revocation hearing time and date was set forth in the petition, as well as in any related correspondence sent to the probationer.  (*See, e.g.*, Ex. 39 (COURT 008879) (Johnson revocation petition with hearing date); Ex. 92 (Ex. 19 to Johnson Dep.) (letter notifying Johnson of February 9, 2012 revocation hearing).)

116.     When a petition for revocation was filed, JCS would send copies of both the petition and an explanatory cover letter to the probationer at his or her last known address.  (Ex. 1 (Ennis 2014 Dep.) at 67:19-68:5; 74:13-77:23; Ex. 3 (Hamby Decl.) at ¶¶ 26-27; Ex. 4 (Hill Decl.) at ¶ 21; Ex. 5 (Gray Decl.) at ¶ 14.)

117.     When a probationer failed to appear for his or her revocation hearing, judges would sometimes, but not always, issue warrants for their arrest, for failure to appear.  (Ex. 3 (Hamby Decl.) at ¶ 32; Ex. 4 (Hill Decl.) at ¶ 21; *see also* Ex. 5 (Gray Decl.) at ¶ 16.)

118.     In no event did JCS ever issue arrest warrants or provide the warrant forms the court used.  (Ex. 3 (Hamby Decl.) at ¶ 42.)  Whether to issue a warrant was entirely the decision of the court.  (Ex. 3 (Hamby Decl.) at ¶ 42; Ex. 13 (Ennis *McCullough* Dep.) at 143:13-14; 144:9-22.) Warrants issued by the Court were for failure to appear.

119.     At the point a warrant was issued, JCS ceased any active involvement with that probationer.  (Ex. 3 (Hamby Decl.) at ¶ 43.)  The court directed what happened after a warrant was issued, and JCS would not be informed that the probationer was arrested or was placed in jail.  (Ex. 3 (Hamby Decl.) at ¶ 43; Ex. 2 (Nixon Aff.) at ¶¶ 110-11.)

120.     After a probationer failed to attend a probation-revocation hearing, JCS discontinued its monthly probation fee, and stopped all activity in connection with the probationer except in limited circumstances (notice of a new hearing date from the Court, for instance).  (Ex. 3 (Hamby Decl.) at ¶ 44.)

121.     In addition, outstanding unpaid JCS fees were not collected by the Court.  (Ex. 2 (Nixon Aff.) at ¶ 22.)

122.     Though a warrant for a probationer's arrest could be outstanding after his failure to appear for a revocation hearing, it would oftentimes go unexecuted for many months.  (Ex. 3 (Hamby Decl.) at ¶ 39.)

123.     If a post-revocation warrant was executed, it would generally be done as a by-product of a different detention by some officer, where the former probationer was stopped again for another violation, at which time outstanding warrants were discovered.  (Ex. 2 (Nixon Aff.) at ¶ 88.)  In Carter's case, the warrants for his arrest were for both failures to appear at a revocation hearing and for failures to appear in court on three other charges completely unrelated to his probation with JCS.  (Ex. 2 (Nixon Aff.) ¶ 14.)

124.     If a defendant was arrested after failing to appear at a revocation hearing, the defendant would be brought back before the court pursuant to a failure to appear warrant.  (Ex. 2 (Nixon Aff.) at ¶ 99.)   The judge could then consider reinstating probation (whether JCS-supervised or not), giving more time to pay fines and costs, placing the defendant on a court-supervised payment plan, or commuting a sentence.  (Ex. 2 (Nixon Aff.) at ¶ 99.)  The latter appears to have happened to Mr. Carter (as set out *infra*).  (*See* Ex. 2 (Nixon Aff.) at ¶ 30.)

125.     If a probationer was jailed by the court, JCS had nothing to do with that decision or with setting bond amounts or any other conditions relating to his or her release from jail.  (Ex. 3 (Hamby Decl.) at ¶ 45.)

126.   JCS also had no involvement in the Judges' decisions to jail any Municipal Court defendant.  (*See, e.g.*, Ex. 13 (Ennis *McCullough* Dep). at 193:15-22.)

## ANGELA MCCULLOUGH

127.    In addition to receiving tickets in Montgomery and failing to appear on those, it appears Ms. McCullough was arrested in connection with traffic tickets in Elmore County, Alabama.  (Ex. 25 (McCullough Dep.) at 158-61.)

128.    The Montgomery Country District Court also issued an arrest warrant for Ms. McCullough in 2016 in connection with her failure to appear on traffic tickets.  (Ex. 72 (Ex. 46 to McCullough Dep.) at 4.)  She was arrested and jailed by the District Court in connection with that offense.  (Ex. 72 (Ex. 46 to McCullough Dep.) at 4 (noting that she had been arrested and jailed in connection with executed warrant); Ex. 25 (McCullough Dep.) at 214 (acknowledging being arrested in October 2016 on tickets she got which were before Montgomery County District Court in July or August of 2016).)

129.    Plaintiff McCullough testified that she never in her entire life had a driver's license.  (Ex. 25 (McCullough Dep.) at 294-95.)  Yet, she was clearly willfully driving constantly during her entire adult life.  (*See, e.g*., Exs. 57-59, 61, 63, 65-66 (selected exhibits to McCullough Dep.) (documenting traffic tickets between 1999 and 2010).)  She testified that she cannot now get a license because she still owes money from an at-fault accident (Ex. 25 (McCullough Dep.) at 373-74—i.e., not because the Montgomery Municipal Court notified the State (the Alabama Law Enforcement Agency) that she failed to appear.

130.    Ms. McCullough also acknowledged driving without insurance.  (*See* Ex. 25 (McCullough Dep.) at 203-05.)

131.    Plaintiff McCullough acknowledged in her deposition that she had dozens of tickets and had missed many court appearances associated with them.  (Ex. 25 (McCullough Dep.) at

268:10-18.)[8]  She further admitted that she had pled guilty to all seventeen tickets that were the subject of the arrest warrants for the arrest at issue in this case.  (Ex. 25 (McCullough Dep.) at 272:21-273:6.)  Ms. McCullough acknowledges that she was guilty on most charges brought against her by the Montgomery Police Department.  (Ex. 25 (McCullough Dep.) at 280:15-17.)

132.    Ms. McCullough testified to having been given the opportunity to pay her tickets off through a payment plan with a prior service (General Probation Services, not JCS) used by the Municipal Court.  (*See* Ex. 25 (McCullough Dep.) at 118-19.)

133.    On December 7, 2010, the Municipal Court judge placed Ms. McCullough on probation with JCS.  (Ex. 25 (McCullough Dep.) at 170; Exs. 66, 67 (Exs. 34, 36 to McCullough Dep.).)  While McCullough, throughout her deposition, reported that every interaction she had with the Court involved Judge Hayes (*see, e.g.*, Ex. 25 (McCullough Dep.) at 170; 377:7), her JCS Probation Order appears to have been signed by Judge Karen Knight.  (Ex. 67 (Ex. 36 to McCullough Dep.).)  Ms. McCullough recognized her own signature and handwriting on the Probation Order dated December 7, 2010.  (Ex. 25 (McCullough Dep.) at 184:10-186:7; Ex. 67 (Ex. 36 to McCullough Dep.).)  She testified that she was in Court in December 2010 after having been transferred to Montgomery from Elmore County subsequent to an arrest there.  (*See* Ex. 25 (McCullough Dep.) at 188-89.)  She said she talked to someone at JCS to complete the paperwork after being ordered to JCS by the Judge.  (Ex. 25 (McCullough Dep.) at 189:15-190:1.)  She further

---

[8] She made the same acknowledgements with respect to various individual tickets.  (*See, e.g.*, Ex. 25 (McCullough Dep.) at 110-12 (did not recall if she appeared for driving-without-a-license ticket in March 2001; did not pay ticket until around 2012); Ex. 25 (McCullough Dep.) at 124 (did not recall whether she appeared in court on 2002 ticket); Ex. 25 (McCullough Dep.) at 129-32 (acknowledging that she was arrested for and was in fact guilty of giving a false name to police in 2005, but see Ex. 60, showing arrest actually occurred in 2004); Ex. 25 (McCullough Dep.) at 144:15-145:13; 147 (acknowledging driving without insurance when ticketed for the same in 2006; did not recall whether she appeared in court as ordered on ticket); Ex. 25 (McCullough Dep.) at 121:16-122:13 (did not recall if she appeared in court with respect to 2011 ticket for driving without a license; acknowledged that she was guilty of offense).)

testified that she did not tell the Municipal Court that she would not be able to make the payments. (Ex. 25 (McCullough Dep.) at 299:4-10.)

134.    Ms. McCullough testified that she decided from the outset that she would not comply with the terms of her assignment to JCS.  (*See* Ex. 25 (McCullough Dep.) at 192 (stating that she never attended any appointments or made any payments and that her decision that "I'm not going to do that" was made "from the get-go").)[9]  In other words, she acknowledged that her refusal to pay was deliberate and willful, and that she did not meet with JCS or pay it any money. (Ex. 25 (McCullough Dep.) at 192; 268-69.)  She did not even appear at her initial appointment with JCS.  (*See* Ex. 25 (McCullough Dep.) at 189; 191-92 (she met with JCS to complete initial paperwork and never met with them again).)  Although she did not pay JCS, she did not take this up with the Municipal Court or anybody else.  (Ex. 25 (McCullough Dep.) at 285:11-286:9.)  Nor did she appeal her assignment to JCS.  (Ex. 25 (McCullough Dep.) at 269.)

135.    JCS's records indicate that they sent Ms. McCullough a letter and Petition for Revocation from JCS on January 13, 2011.  (Ex. 68 (Ex. 39 to McCullough Dep.) (Petition followed by letter).)  This correspondence instructed Ms. McCullough to appear in Court on February 23, 2011.  (Ex. 68 (Ex. 39 to McCullough Dep.).)  Ms. McCullough did not deny getting this correspondence.  (Ex. 25 (McCullough Dep.) at 196-97.)  There is no indication that she appeared on that date for the revocation hearing.  (*See* Ex. 67 (Ex. 36 to McCullough Dep.) at 1, 2.)

136.    Not only did Ms. McCullough testify that she failed to appear on various tickets, but the Municipal Court issued warrants for her failure to appear in November 2008, which resulted

---

[9] She later attempted to backtrack on this testimony.  (*See* Ex. 25 (McCullough Dep.) at 289; 299-300.)

in her arrest on November 30, 2008.  (*See* Ex. 25 (McCullough Dep.) at 162-64; 350-51; Ex. 64 (Ex. 32 to McCullough Dep.) (setting out clearly dates Ms. McCullough failed to appear).)

137.    The Court then issued warrants for her arrest on July 2, 2013 for additional failures to appear; Ms. McCullough acknowledged that she had failed to appear.  (Ex. 25 (McCullough Dep.) at 198-200 (incorrectly identifying arrest date as July 3, 2019, but see Ex. 69); Ex. 69 (Ex. 41 to McCullough Dep.) (alias warrant).)

138.    Ms. McCullough was arrested on several tickets on July 2, 2013 that had not been assigned to JCS.  A comparison of the cases listed in her July 3, 2013, jail transcript reflecting the cases on which she appeared in Court that day (Ex. 70 (Ex. 42 to McCullough Dep.)) and a collection of the arrest warrants from her Municipal Court files dated July 2, 2013 (*see* Ex. 36 (sample of McCullough warrants)) to her 2010 Probation Order (Ex. 67 (Ex. 36 to McCullough Dep.)) shows that the following cases in connection with which she was arrested were not ever assigned to JCS: 2011TRT007985, 2011TRT056458, 2011TRT007987, 2011TRT007986.

139.    Thus, Ms. McCullough was subject to arrest separate and apart from her failure to appear for her revocation hearing.  In fact, she received seven of the seventeen tickets on which she was arrested well after having been assigned to JCS, as evidenced by the ticket numbers that indicate that they were issued in 2011 and 2013.  (*See* Ex. 70 (Ex. 42 to McCullough Dep.) (jail transcript), as compared with Ex. 67 (Ex. 36 to McCullough Dep.) (probation order).)

140.    Ms. McCullough recalls being commuted on tickets twice by the Montgomery Municipal Court.  She initially testified that the first time she was arrested and commuted on tickets was in November 2009.  (Ex. 25 (McCullough Dep.) at 153-54.)  She later acknowledged that the arrest was actually in November 2008, and that her release was in February 2009.  (Ex. 25 (McCullough Dep.) at 318; 350.)   In connection with her November 2008 arrest (initially

incorrectly identified as November 2009 by her), she testified that she spoke with the judge and asked him if there was any alternative.  The judge afterwards sentenced her to 152 days.  (Ex. 25 (McCullough Dep.) at 177:17-178:11.)

141.   Her second arrest and subsequent commutation was, she testified, July 3, 2013; she served twenty-one days at that time.  (Ex. 25 (McCullough Dep.) at 158.)  Ms. McCullough acknowledged that, before that arrest, she had been put on probation with JCS.  (*See* Ex. 25 (McCullough Dep.) at 188; 192; 268; 288-89.)

142.   Although Ms. McCullough said she was "forced" to work in jail, she acknowledged that the corrections officers never threatened to put her in solitary or the drunk tank if she did not work.  (Ex. 25 (McCullough Dep.) at 308-11.)  She said that the jail withheld food from her at some point, but, when questioned further, it became clear that this reference was merely to jail personnel putting her on a liquid soup diet for three or four days after she had been sick and had an upset stomach, and that it was not in relation to jail work.  (Ex. 25 (McCullough Dep.) at 311-13.)

143.   Ms. McCullough testified that, during her second incarceration, which was in the period when detainees were getting the $25.00 a day work credit at issue in this litigation, detainees would get in line to seek work assignments.  (Ex. 25 (McCullough Dep.) at 314; 325-29.)  She added that she could have chosen to stay in her jail cell instead of working during that period.  (Ex. 25 (McCullough Dep.) at 314.)  The work she chose to do during that period was cleaning out garbage cans, collecting trays after meals, cleaning and mopping floors and cleaning the showers.  (Ex. 25 (McCullough Dep.) at 316.)  This was the same kind of work she had been doing at her regular job at a motel.  (Ex. 25 (McCullough Dep.) at 316-17.)

144.     Ms. McCullough makes no claim that, during her 2008-2009 incarceration, any credit was being given for work done in the jail.  She said that she did not work for credit during that first incarceration, and she was unaware that there was any such program at that time.  (Ex. 25 (McCullough Dep.) at 328-29.)  It was during this first incarceration that she contends she had to clean up after a woman who cut herself.  (Ex. 25 (McCullough Dep.) at 321-22; 324.)  She testified that she was told to watch the other inmate, and, when that person cut herself, Ms. McCullough summoned the corrections officer.  (Ex. 25 (McCullough Dep.) at 319-22.)  Ms. McCullough agreed that she had never heard of another inmate having a similar experience with respect to jail work.  (Ex. 25 (McCullough Dep.) at 324.)  Despite there being no program of credit for jail work during her first incarceration, she says she worked in the laundry.  (Ex. 25 (McCullough Dep.) at 328-29.)  There is no substantive testimony that such work was forced or was connected to paying off the delinquent ticket debt.

145.     Ms. McCullough was release from jail in 2009, after her first commutation, with a remaining balance of $2,067.00.  (Ex. 25 (McCullough Dep.) at 301-02; Ex. 73 (Ex. 47 to McCullough Dep.).)  She acknowledges that, despite being given time to pay this balance, she did not pay on the tickets associated with that balance between 2009 and 2012.  (Ex. 25 (McCullough Dep.) at 301-02.)

146.     The Municipal Court issued an order for Ms. McCullough's release from jail in connection with her second commutation on July 22, 2013.  (Ex. 25 (McCullough Dep.) at 206-07; Ex. 71 (Ex. 44 to McCullough Dep.).)  Ms. McCullough was able to pay some funds to be released early, and she got credit for jail work.  (*See* Ex. 25 (McCullough Dep.) at 206-07.)

147.     Ms. McCullough acknowledged that she was sentenced by a judge of the Municipal Court.  (Ex. 25 (McCullough Dep.) at 140; 161 (Judge Hayes sentenced her).)  She acknowledged

that the police did not set fines but, rather, that the judges did.  (Ex. 25 (McCullough Dep.) at 277-78.)

148.   Plaintiff McCullough listed her claims in this case as follows: (a) she believed that the Municipal Court incarcerated her twice for fines she had already paid; (b) she objected to the conditions of the jail; (c) she was offended that the Municipal Court judge told her that she was not a good parent because she had not set a good example by failing to pay her fines and costs; (d) she asserted a grievance in connection with what she called police "roadblocks."  (*See* Ex. 25 (McCullough Dep.) at 245-47.)  She then went on to vaguely reference her belief, not supported by any facts, that the City undertook a scheme to excessively fine and ticket people over ten or fifteen years to make money.  (*See* Ex. 25 (McCullough Dep.) at 257-65.)  She was unable to articulate any evidence to support her claim that Mayor Strange caused this to happen.  (Ex. 25 (McCullough Dep.) at 264-65.)  Later, she testified that the fact that officers were dispatched to poorer neighborhoods and wrote tickets there somehow supports a connection between Mayor Strange and the sentences and fines that were imposed on her by the judges because the Mayor is "their boss."  (Ex. 25 (McCullough Dep.) at 273-75.)

149.   At some later point, Ms. McCullough complained that she did not have access to a public defender, but acknowledges that there was a public defender present, and that she did talk to him.  (Ex. 25 (McCullough Dep.) at 278-79.)

150.   Ms. McCullough could not articulate any evidence to suggest that Mayor Strange had anything to do with how JCS conducted business, nor that the City did.  (Ex. 25 McCullough Dep.) at 304-07.)

## MARQUITA JOHNSON

151.    Marquita Johnson had a long history of traffic offenses, failures to appear in court, and failure to comply with the payment terms contained in the probation order.  (*See, e.g.*, Ex. 30 (Johnson Dep.) at 98; 108; 316; 371; Ex. 88-92 (Exs. 12 & 16-19 to Johnson Dep.).)  When her fines and costs were commuted to jail time, she had accumulated 37 unpaid tickets, and a delinquent balance of $12,410.  (Ex. 30 (Johnson Dep.) at 98:12-99:15.)

152.    Johnson was assigned to JCS probation by Judge Karen Knight on May 24, 2011, (Ex. 30 (Johnson Dep.) at 115-17; Ex. 87 (Ex. 5 to Johnson Dep.)), which Ms. Johnson viewed as a mechanism by which she could pay over time by installments (Ex. 30 (Johnson Dep.) 109:17-110:3.  She made some payments to JCS, and has receipts for three such payments (Ex. 30 (Johnson Dep.) 91-95); these match the JCS record of payments, although she believes, without supporting evidence, that she made as many as 20 payments (Ex. 30 (Johnson Dep.) 111:2-4; 118:17-23).  She sometimes went to make payments at JCS, but left in exasperation because there as a line, and she "wouldn't have time" to wait.  (Ex. 30 (Johnson Dep.) at 124-25; *see also* Ex. 30 (Johnson Dep.) at 303.)

153.    Ms. Johnson stopped making any payments to JCS after she lost her job (for habitual tardiness).  (Ex. 30 (Johnson Dep.) at 113:23-114:2; 119:19-21; 151-53.)

154.    A revocation hearing was set for February 9, 2012.  (*See* Ex. 39 (COURT 008879) (revocation petition with hearing date); Ex. 92 (Ex. 19 to Johnson Dep.) (letter notifying Johnson of Feb. 9, 2012, revocation hearing).)  When she was later arrested on the failure to appear at the revocation hearing, she then appeared before the Municipal Court and the Court commuted her remaining fines to jail time.  (*See* Ex. 40 (COURT 008882) (listing cases in connection with which warrants were served, most of which were cases she was assigned to JCS on); Ex. 30 (Johnson

44

Dep.) at 97:16-21 (acknowledging that she was commuted on fines and expenses for thirty-two tickets).)

155.    Johnson did not tell the Municipal Court that she had failed to get notice of the revocation hearing, nor that she had a belief that she had not been given credit by JCS for all the payments she had made, nor that she believed Judge Knight had dismissed 12 of the tickets.  (Ex. 30 (Johnson Dep.) at 122-27; 164:2-11.)

156.    Johnson signed the probation order which was entered by Judge Knight.  (Ex. 30 (Johnson Dep.) at 115-17.)

157.    Johnson never paid all of her fines and costs.  (Ex. 30 (Johnson Dep.) at 108.)

158.    Johnson complains about how Judge Hayes handled the commutation hearing, and about the number of days of commuted time.  (Ex. 30 (Johnson Dep.) at 125-29; 187; 203.)  She further complains that Judge Hayes did not tell her she had a right to a lawyer and did not ask questions about her ability to pay.  (Ex. 30 (Johnson Dep.) at 187; 201-02.)

159.    Johnson also complains that JCS did not credit her for all her payments, although she has no evidence of any payments other than those shown on JCS' records and the receipts she has produced.  (Ex. 30 (Johnson Dep.) at 91; 231-32; 300; 423-24.)

160.    Johnson did not appeal any of her convictions (Ex. 30 (Johnson Dep.) at 165); she admits failing to appear for court hearings (Ex. 30 (Johnson Dep.) at 316-18.)

161.    Johnson has, at various times, been arrested and/or jailed for theft of property and public intoxication (Ex. 30 (Johnson Dep.) 353-54), and jailed in Elmore County, Montgomery County, and Wetumpka City in connection with traffic offenses and failures to appear (Ex. 30 (Johnson Dep.) 157:14-160:12.)

162.    While incarcerated, Johnson volunteered to work because she learned about the plan which provided a credit of $25 a day for work.  (Ex. 30 (Johnson Dep.) at 74:4-6; 172:18-21.) She would ask one of the Correction Officers to allow her to work, and her work days were written down in a notebook by the officers.  (Ex. 30 (Johnson Dep.) at 173.)  Some inmates elected to work to get the $25 credit, while some volunteered just to get out of their cells, whether or not they owed any money balance on tickets.  (Ex. 30 (Johnson Dep.) at 173:21-174:9.)  Johnson's work included working in the kitchen, mopping, washing dishes and passing out food trays to female inmates.  (Ex. 30 (Johnson Dep.) at 177:14-178:1.)  Sometimes she washed police cars or washed federal inmates' laundry.  (Ex. 30 (Johnson Dep.) at 178:7-179:2.)  Johnson testified that the amount credited toward fines and costs unrelated to work (the daily amount credited for merely sitting out fines and costs) changed while she was there from $25.00 a day to $50.00 a day.  (Ex. 30 (Johnson Dep.) at 74-76.)

163.    Johnson understood that she did not have to perform any work, but she wanted to work so as to get out earlier.  (Ex. 30 (Johnson Dep.) at 179:3-7.)  No one forced her to volunteer to work; no one threatened her; she was not deprived of food or threatened with a longer sentence if she did not work.  (Ex. 30 (Johnson Dep.) at 181:1-182:10.)  The First Amended Complaint contains recitals that she was forced to perform jail labor (Doc. 32 at ¶ 84), but, in her testimony, she agrees that, in fact, no one forced her to work.  (Ex. 30 (Johnson Dep.) at 181:1-4; 186:11-21.) She has no claim to have been injured by any of the work.  (Ex. 30 (Johnson Dep.) at 185:10-12.)

164.    As to the City, as opposed to the Court, Johnson acknowledges:

(a)    She had no interaction with anyone outside of the court, in the context of her tickets, arrests and jail.  (Ex. 30 (Johnson Dep.) at 205:10-14.)

(b)      She has no evidence that anyone from the City knew about Judge Hayes reinstating tickets which Judge Knight had thrown out.  (*See* Ex. 30 (Johnson Dep.) at 213-214.)  One of her complaints in this lawsuit is that Judge Hayes reinstated such tickets (Ex. 30 (Johnson Dep.) at 212), a judicial action.

165.      Johnson's claims asserted in her lawsuit are:

(a)      That Judge Hayes reinstated the tickets Judge Knight threw out.  (Ex. 30 (Johnson Dep.) at 70-71).

(b)      She believes, but has no proof that credits for days spent in jail or for work performed in jail were not recorded or applied correctly to reduce her sentence.  (*See* Ex. 30 (Johnson Dep.) at 73-79; 175-76).

(c)      That the commuted sentence imposed by Judge Hayes was too long.  (Ex. 30 (Johnson Dep.) at 85-88.)

(d)      That JCS did not credit all of her payments.  (Ex. 30 (Johnson Dep.) at 71-73.)

(e)      That Judge Hayes did not give her a sufficient hearing before commuting her fines to jail time.  (*See* Ex. 30 (Johnson Dep.) at 187-88.)

She could not identify any other grievances related by her to her lawyers.  (Ex. 30 (Johnson Dep.) at 88.)

166.      Ms. Johnson was released from jail on January 28, 2013, after her sentence was commuted and having been given credit for jail work by the Court.  (*See* Ex. 41 (COURT 008890) (Release Order with "early release—jail work list" noted).)

### KENNY FRED JONES

167.    Plaintiff Jones testified in his deposition that he has three issues which he is raising in this case: (a) he is complaining about the number of traffic tickets he received; (b) he is complaining about being sentenced to four months[10] in jail in 2011; and (c) he is separately complaining about an incident of being shot by a "bounty hunter."[11]  (Ex. 28 (Jones Dep.) at 89:22-90:12; 201:4-8.)  Later, he says that another claim he has in this case is that, while driving he was encountering what he called "road blocks."  (Ex. 28 (Jones Dep.) at 131:20-132:8.)[12]

168.    Mr. Jones testified that he had no recollection of being placed on probation with JCS.  (Ex. 28 (Jones Dep.) at 100:1-101:6.)  Jones was simply not familiar with JCS.  (Ex. 28 (Jones Dep.) at 103:6-12.)  Nor did he recall being ordered by the Court to pay $140.00 a month (the standard JCS payment).  (Ex. 28 (Jones Dep.) at 103:13-17.)  Even in answer to his own lawyer's questions, Mr. Jones maintained that he had never heard of JCS and indicated that his knowledge of any entity collecting fines and costs was second-hand, at most.  (Ex. 28 (Jones Dep.) at 314:10-318:15.)

169.    Mr. Jones admitted that he had received numerous tickets when he first moved back to Montgomery from 2008 to 2010.  (Ex. 28 (Jones Dep.) at 138:12-139:8.)

170.    Mr. Jones cannot read.  (Ex. 28 (Jones Dep.) at 35).  He testified that he gave those tickets to his mother, that his mother can barely read, and that he never had anyone read the tickets to him (including the provision requiring him to appear in court).  (Ex. 28 (Jones Dep.) at 138:20-

---

[10] After originally testifying that he spent six months in jail, Mr. Jones later acknowledged that the time period was actually four months.  (Ex. 28 (Jones Dep.) at 199:15-200:15.)

[11] Mr. Jones described the bounty hunter episode at some length in his deposition.  It had nothing to do with any of the traffic tickets or claims raised in this case.  It just happened to occur before he went to jail, according to him, and thus he saw a jail nurse for the continuing ache he had from the rubber bullet.  (Ex. 28 (Jones Dep.) at 212:13-218:23.)

[12] At this point in his testimony, he is referencing 2010 tickets.  (Ex. 28 (Jones Dep.) at 130:11, 132:9.)

139:4; 145:1-146:19.)  For the entire time that Mr. Jones has been receiving traffic tickets, he has relied on his mother to pay them.  (Ex. 28 (Jones Dep.) at 107:12-108:1; 146:20-147:2.)

171.    Mr. Jones stated that he was both unable to recall receiving many of the tickets Municipal Court records show were issued to him,[13] and he did not recall whether he appeared in Municipal Court on such tickets.  (*See, e.g.,* Ex. 28 (Jones Dep.) at 113:8-117:5; 118:7-12; Ex. 28 (Jones Dep.) at 152:2-5 (admitting at this point in his deposition that he does not recall if he ever appeared in Court for any of these tickets); Ex. 28 (Jones Dep.) at 163:3-12 (Jones later says that he does remember that he sometimes appeared in court with his mother).)

172.    Some tickets that Mr. Jones recalled receiving were for his failure to have and use child restraints.  (Ex. 28 (Jones Dep.) at 147:3-148:14.)  He did recall that he was "just riding" on that day with three children in the car without child restraints.  (*See* Ex. 28 (Jones Dep.) at 147:5-8; 149:9-12.)  He admitted that he might have received a ticket for failure to possess car insurance in 2010.  (Ex. 28 (Jones Dep.) at 151:11-21.)  In connection with a ticket received in 2011, he did remember that he was pulled over on his way back from a trip to the store to buy tobacco.  (Ex. 28 (Jones Dep.) at 154:12-155:11; Ex. 78 (Ex. 151 to Jones Dep.).)

173.    Mr. Jones has never been employed except to cut a few people's grass or help occasionally on a brake job at his brother's car repair business.  (Ex. 28 (Jones Dep.) at 38; 52-53; 239.)  He testified that he has been on Social Security Disability since he was a seven-year-old child (Ex. 28 (Jones Dep.) at 35-36) and that the disability office will not permit him to work (Ex. 28 (Jones Dep.) at 43:11-17).  Jones testified that he was not working in 2009 or 2010 when he

---

[13] At some point, Mr. Jones, after some coaching from his lawyers, testified that he had no recollection of receiving any of the tickets that had been described to him in the exhibits put into his deposition up to page 124 of the testimony (he cannot read).  (Ex. 28 (Jones Dep.) at 124.)  This was so even though, in connection with at least one case, his mother's insurance declaration page had been scanned into Mr. Jones' Municipal Court file.  (Ex. 28 (Jones Dep.) at 126.)  Yet, he did have a specific recollection of receiving various tickets.  (*See, e.g.*, Ex. 28 (Jones Dep.) at 129:11-15; 148:11-14.)  And, in answer to his own lawyer's questions, Mr. Jones established that although he did not recall when or where he got tickets, he had received tickets.  (Ex. 28 (Jones Dep.) at 314:10-318:15.)

received many of his tickets, and thus he would not have been driving to work.  (Ex. 28 (Jones Dep.) at 152:14-18.)  He simply did not know where he was going.  (Ex. 28 (Jones Dep.) at 152:8-13.)  Mr. Jones lives with his mother, who is also on Social Security Disability.  (*See* Ex. 28 (Jones Dep.) at 18.)

174.     Mr. Jones testified that he had no idea how many tickets he had received from the City of Montgomery.  (Ex. 28 (Jones Dep.) at 171:10-14.)  And he continued to testify that he did not recall getting certain tickets, or, at the very least, driving certain of the cars noted in the tickets as having been driven by him.  (*See* Ex. 28 (Jones Dep.) at 174-75.)

175.     Mr. Jones said that, with respect to his traffic tickets, he did not know at the time he received them that he had to pay them or appear in court on the charges to avoid being arrested.  (Ex. 28 (Jones Dep.) at 186:6-23.)

176.     While Mr. Jones testified that he sometimes did have extra money that could have been paid on his tickets (Ex. 28 (Jones Dep.) at 238:10-23), there is no indication that he, himself, made any attempt to ensure that the tickets were paid.  Rather, as stated above, he relied on his mother to take care of them.  (Ex. 28 (Jones Dep.) at 107:12-108:1; 146:20-147:2.)

177.     Mr. Jones testified that nobody had ever told him that his license had been suspended, notwithstanding his receipt of several driving-while-suspended tickets.  (Ex. 28 (Jones Dep.) at 132:9-18; Ex. 77 (Ex. 146 to Jones Dep.) (driving while suspended ticket issued to Jones in 2010).)

178.     Mr. Jones testified that he was only arrested twice – once in connection with the four-month term he spent in jail in 2011 and once when he was arrested after being accused of pointing a gun at someone.  (Ex. 28 (Jones Dep.) at 204:3-19.)  He acknowledged that one of those arrests was approximately February 2011.  (Ex. 28 (Jones Dep.) at 189:18-23.)  He only spent one

night in jail in connection with the arrest associated with his pointing a gun at someone.  (Ex. 28 (Jones Dep.) at 177:14-178:2.)

179.    Mr. Jones testified that it is the 2011 jailing (in connection with which he was held for four months (Ex. 28 (Jones Dep.) at 199:15-200:15)) that he is complaining about in this lawsuit.  (Ex. 28 (Jones Dep.) at 201:4-8.)  Mr. Jones appeared before the Municipal Court judge in connection with that arrest for a hearing.  (*See* Ex. 28 (Jones Dep.) at 188-89.)  (Mr. Jones understood that it was the Municipal Court judge who put him in jail.  (Ex. 28 (Jones Dep.) at 188:8-13; 187:22-189:4.))  Mr. Jones did not understand that he could be released early by paying money towards the fines and costs owed.  (Ex. 28 (Jones Dep.) at 193:14-18.)

180.    Mr. Jones testified that every time he went to Municipal Court, the Judge appointed him a lawyer:

> Q. (BY MS. HOLLIDAY) And when you said he appointed you a lawyer, you mean one of the judges at the municipal court appointed you a lawyer?
>
> A. Yes, ma'am.
>
> Q. Okay. And that was every time you went to -- was that common practice that when you showed up in municipal court that the judge would appoint you a lawyer?
>
> A. Yes, ma'am.

(Ex. 28 (Jones Dep.) at 75:2-11.)  Mr. Jones said that he talked to those appointed lawyers about his tickets.  (Ex. 28 (Jones Dep.) at 75:12-16.)

181.    He was also appointed a lawyer in connection with the misdemeanor charge. Mr. Jones testified that a court-appointed lawyer represented him when he was charged with pointing a gun at someone.  The appointed lawyer questioned the complainant, and the charge was dismissed by the Court.  (Ex. 28 (Jones Dep.) at 177-80.)

182.    Mr. Jones testified ultimately that, although he worked while he was in jail, he did

not know if he would have gotten the $25.00 credit toward his fines and costs whether he worked

or did not work:

> Q. Okay. And, as far as you know, when you were in jail for those months in 2011, whether
> you worked or not, you got the twenty-five dollars a day credit?
>
> A. I think so. I don't even know.

(Ex. 28 (Jones Dep.) at 206:6-10.)   The undisputed facts are that when the Court commuted

individuals in 2011, the credit they received for each day they were in jail was $25.00 a day; it was

not changed to $50.00 a day until 2012.  (Ex. 14 (Nixon *McCullough* Dep.) at 48:3-17.)  The jail

work credit (also $25 a day) was, it is believed, initiated in late 2011.  (Ex. 14 (Nixon *McCullough*

Dep.) at 35:10-40:11 ("I think that's when it began was in 2011." 40:6-7); Ex. 14 (Nixon

*McCullough* Dep.) at 43:3-11 (presiding judge initiated program in November 2011 time frame).)

183.    The work Mr. Jones testified that he did in jail was picking up trash and washing

police cars.  (Ex. 28 (Jones Dep.) at 207:22-208:17.)  His complaint as to the work is largely that

there was too much walking involved, and that he could not talk to anybody while working.  (Ex.

28 (Jones Dep.) at 209.)

184.    No one ever threatened Mr. Jones in connection with jail work or told Mr. Jones

that he would get additional punishment if he did not work while in jail.  (Ex. 28 (Jones Dep.) at

209:23-212:8.)

185.    The court records show that Mr. Jones was released in connection with the

incarceration about which he complained in his deposition on or about June 4, 2011.  (Ex. 79 (Ex.

156 to Jones Dep.) at 1 (jail transcript from 2011 setting "commuted time release date" as June 19,

2011); Ex. 79 (Ex. 156 to Jones Dep.) at 2 ("payout calculator" showing a payment made and, as

of June 2, 2011, only two days remaining to be served).)

## ALGIA EDWARDS

186.     Plaintiff Edwards was ticketed and failed to appear in Greenville (Butler County), Alabama in 2004 where he lived when he was in high school.  (Ex. 24 (Edwards Dep.) at 158-62; Ex. 45 (Ex. 53 to Edwards Dep.).)  He received a ticket for driving while his driver's license was suspended as early as 2007, also in Greenville, Alabama.  (Ex. 24 (Edwards Dep.) at 163-65; Ex. 46 (Ex. 54. to Edwards Dep.).)  He failed to appear on the 2007 ticket, and an arrest warrant was issued.  (Ex. 24 (Edwards Dep.) 185-90; Exs. 55, 56 (Exs. 47, 48 to Edwards Dep.).)  He received an additional ticket in Butler County, Alabama in 2009; he cannot recall if he appeared on the 2009 ticket.  (Ex. 24 (Edwards Dep.) at 208-214.)

187.     Edwards testified that he knowingly drove with a suspended license from 2007 to 2014.  (Ex. 24 (Edwards Dep.) at 423-24.)[14]

188.     Edwards, over time, accumulated many tickets in the City of Montgomery.  For example, he was ticketed in Montgomery in August 2008 for driving while his license was suspended.  (Ex. 49 (Ex. 58 to Edwards Dep.).)  He cannot recall if he showed up for Court for that ticket.  (Ex. 24 (Edwards Dep.) at 192-195; 198:23-99:4.)  In 2009, he was ticketed by the Montgomery Police Department for running a red light, and for driving on a suspended license (after being stopped for speeding).  (Edwards Dep. at 199-200; Ex. 50 (Ex. 59 to Edwards Dep.); Ex. 24 (Edwards Dep.) at 214-16; Ex. 51 (Ex. 61 to Edwards Dep.).)  With respect to every Montgomery ticket he was asked about, Mr. Edwards could not recall if he showed up in Municipal Court on the court appearance date.  (*See, e.g.,* Edwards at 199; 200; 205; 211-12; 265.)

---

[14] During this period, he was married, but he testified that his wife did not have a driver's license and did not drive because she did not have the "will" to drive.  Edwards Dep. at 114 & 422-23 & 211-12 (noting his wife in 2009 was home with a newborn).

189.    Edwards was ordered to JCS by Judge Darron Hendley of the Montgomery Municipal Court on six of his Municipal Court cases after Edwards appeared before the Municipal Court on June 1, 2009.  (*See* Ex. 52 (Ex. 62 to Edwards Dep.) at 10-11 (two-page signed Order of Probation listing three driving while suspended cases, two speeding cases and one red light case).)  On March 8, 2010, Judge Hendley signed a Probation Order assigning other cases Edwards had before the Court to JCS.  (*See* Ex. 53 (Ex. 70 to Edwards Dep.) at 3-4.)

190.    Edwards testified that he could not remember meeting at any time with JCS after May 2, 2011.  (Ex. 24 (Edwards Dep.) at 299.)  The JCS files reflect a May 23, 2011, letter in which JCS instructed Edwards that he had violated the terms and conditions of his probation and, further, instructed him to appear in the Municipal Court on June 30, 2011; Edwards did not recall appearing in Municipal Court on that date.  (Ex. 24 (Edwards Dep.) at 395; Ex. 54 (Ex. 72 to Edwards Dep.).)

191.    On September 18, 2012, Edwards was stopped for traffic violations by the Montgomery Police Department.  (Ex. 24 (Edwards Dep.) at 282; 286-87; Ex. 55 (Ex. 73 to Edwards Dep.) (tickets issued Sept. 18, 2012).)  He was then arrested at that stop pursuant to Failure to Appear (FTA) warrants which had been issued by the Municipal Court in connection with previously issued tickets.  (*See, e.g.*, Ex. 56 (Ex. 76 to Edwards Dep.) at 1 (FTA warrant dated Sept. 18, 2012).)

192.    Edwards testified that, the morning after this arrest, he saw an African-American judge in the Municipal Court and was told that his sentence would be commuted at the rate of $50 a day.  (Ex. 24 (Edwards Dep.) at 287-93.)  He recalled that the judge (Judge Westry) also ruled that he could be released on payment of a portion of the total.  (Ex. 24 (Edwards Dep.) at 350-57.)

193.    Edwards testified that he waived his right to a public defender at that September 2012 hearing.  (Ex. 24 (Edwards Dep.) at 295.)  He testified that he did not speak to the Public Defender because "they were working together," by which he meant he thought that the public defender and prosecutor were working together.  (Ex. 24 (Edwards Dep.) at 347-48.)  Edwards explained that he based this on the fact that the public defender and prosecutor were being "buddy up in there" so he chose not to speak to the public defender.  (Ex. 24 (Edwards Dep.) at 348.)

194.    Edwards testified that he was, in fact, not offered the opportunity to work while in jail in September 2012.  (Ex. 24 (Edwards Dep.) at 296 ("I wasn't able to do any of that kind of work.").)  Edwards contends that he was not provided the opportunity to work while in jail because of "favoritism" by the corrections officer; in other words, he believes that the corrections officer showed favoritism by providing work opportunities to others.  (Ex. 24 (Edwards Dep.) at 296; 398.)

195.    Edwards was, in fact, released from the jail based on a release order issued by the Municipal Court on September 20, 2012; the Municipal Court records indicate that he made a $1900 payment on that date, and Edwards acknowledged making that payment.  (Ex. 24 (Edwards Dep.) at 356-57; Ex. 56 (Ex. 76 to Edwards Dep.).)  Edwards was in the jail from September 18, 2012, until September 20, 2012.  (*See* Ex. 24 (Edwards Dep.) at 350:15-357:19.)

196.    Edwards acknowledged that the Judge was the person who placed him on probation and ordered him to pay JCS probation fees.  (Ex. 24 (Edwards Dep.) at 396-97.)  Edwards also acknowledges that the Municipal Court Judge was responsible for commuting his fines to jail time. (Ex. 24 (Edwards Dep.) at 396-97.)

197.    Edwards was asked to list all the claims he is bringing in this case.  They are as follows: (a) that the $40 he paid to JCS should have gone towards his fines and not to JCS (Ex. 24

(Edwards Dep.) at 330-31); (b) the jail sleeping quarters were too crowded (Ex. 24 (Edwards Dep.) at 331-32); (c) he was once shackled by a police officer in a nonviolent arrest, and he said that was inhumane (Ex. 24 (Edwards Dep.) at 333); (d) he believes he was racially profiled based on the color of his skin and the fact that he was driving a nice Cadillac (Ex. 24 (Edwards Dep.) at 333-36); and (e) "them locking us up for not being able to pay a ticket … unconstitutional" (Ex. 24 (Edwards Dep.) at 325); in other words that "Judge Westry commuted [his] fines and costs to jail time" (Ex. 24 (Edwards Dep.) at 330).

198.    When asked what evidence he had that the City was responsible for JCS's actions, he said that he had heard on the radio and through the press that the City made money off JCS fees.  (Ex. 24 (Edwards Dep.) at 337-40.)  Edwards also said that he believed the City "hired" JCS to do probation for them and that he believed the Judge and the City of Montgomery were the same.  (Ex. 24 (Edwards Dep.) at 342-43.)  Edwards also takes the position that the Judge is the "ambassador of the City."  (Ex. 24 (Edwards Dep.) at 397.)

## LEVON AGEE

199.    Levon Agee has been ticketed numerous times over the years, for various offenses, including driving without a license, no insurance, failure to stop at a stop sign, and other traffic violations.  (*See, e.g.*, Ex. 29 (Agee Dep.) at 246-47; 252; 260-61; 288; 303.)

200.    In fact, Mr. Agee did not have a driver's license nor insurance.  (Ex. 29 (Agee Dep.) at 263; 291; 303-04.)  Despite years of driving, he never got a driver's license.  (Ex. 29 (Agee Dep.) at 263.)

201.    On multiple occasions, Mr. Agee failed to appear in court for hearings on tickets or warrants.  (Ex. 29 (Agee Dep.) at 265; 284; 290; 302; 306.)

202.    On several occasions, Mr. Agee was given an option of paying his fines and costs on a payment plan (Ex. 29 (Agee Dep.) at 258; 309-11; 317), and various charges were dropped in order to facilitate payment (*see* Ex. 29 (Agee Dep.) at 311).

203.    On at least several occasions, warrants were issued for Mr. Agee for Failure to Appear in Municipal Court.  (Ex. 29 (Agee Dep.) at 281-82; Ex. 80 (Ex. 108 to Agee Dep.); Ex. 29 (Agee Dep.) at 296-97; Ex. 81 (Ex. 111 to Agee Dep.); Ex. 29 (Agee Dep.) at 305-06; Ex. 82 (Ex. 113 to Agee Dep.).)

204.    Agee was placed on JCS probation in August 2010 (Ex. 29 (Agee Dep.), at 307-09), and an order of probation was entered on August 31, 2010, which Agree read, signed and acknowledged (Ex. 29 (Agee Dep.) at 322-25; Ex. 83 (Ex. 116 to Agee Dep.)).  He understood that this was a judge's order, and that he was acknowledging an obligation to pay off his fines and costs at the rate of $140 per month (Ex. 29 (Agee Dep.) at 323; 325); he understood he had to keep his scheduled appointments with JCS (Ex. 29 (Agee Dep.) at 326-27).

205.    The JCS records show many missed appointments and non-payments.  (Ex. 29 (Agee Dep.) at 330-33; Ex. 84 (Ex. 117 to Agee Dep.).)  Although not willing to admit the correctness of those records, Agee testified that he could not remember well enough to dispute them or to testify as to which dates he did or did not show up for appointments or make payments. (*See* Ex. 29 (Agee Dep.) at 330-34.)  He has no evidence showing payments any greater than the JCS records reflect.  (Ex. 29 (Agee Dep.) at 337-38; 348.)

206.    On January 16, 2011, after repeated missed appointments and very little payment, JCS sent a letter to Mr. Agee informing him of his hearing on March 2, 2011, before the Montgomery Municipal Court in connection with JCS's Petition for Revocation.  (*See* Ex. 85 (Ex. 120 to Agee Dep.).)

207.    Mr. Agee did not appear for the Revocation Hearing held on March 2, 2011, and the judge terminated the JCS probation and directed that a warrant be issued for such failure to appear, and Agee had no contact with JCS after JCS sent him the January 16, 2011, letter.  (*See* Ex. 29 (Agee Dep.) at 352 (acknowledging that he could not recall having shown up at Mar. 2, 2011, hearing); Ex. 84 (Ex. 117 to Agee Dep.) at 2; Ex. 29 (Agee Dep.) at 388:21-23; 389:1-3; *see also* Ex. 34 (COURT 015909, 015911, 015913, 015915) (case action summary for sampling of Mr. Agee's cases assigned to JCS showing Mar. 15, 2011, case status change from "P" meaning probation to "CAP" meaning "capias warrant" and showing next action as June 13, 2013, service of alias warrants); Ex. 38 (Nixon *Carter* Dep.) at 210:5-14 ("P" in the old system meant pending); Ex. 38 (Nixon *Carter* Dep.) at 212:3-9 (testifying that the abbreviation "CAP" in the old system meant capias).)

208.    Notice of the Revocation Petition and Hearing was sent to Mr. Agee at the address he had given to JCS; he had not advised JCS of any change of address and acknowledges that it was appropriate to use such address.  (Ex. 29 (Agee Dep.) at 342-44.)  However, he does not remember getting letters from JCS or text messages giving him notice.  (Ex. 29 (Agee Dep.) at 347.)  The notice sent to Agee advised that the hearing date was March 2, 2011, and he does not remember appearing.  (Ex. 29 (Agee Dep.) at 352.)

209.    On June 13, 2013, Agee was arrested in connection with a traffic stop, which led to the officer checking for outstanding warrants and his subsequent arrest.  (Ex. 29 (Agee Dep.) at 352:18-353:6; Ex. 86 (Ex. 121 to Agee Dep.) (jail transcript).)

210.    At a hearing in the Municipal Court on the Monday following his arrest over the weekend, Agee's remaining fines and costs were commuted to jail time after he talked one on one with a public defender.  (Ex. 29 (Agee Dep.) at 367:21-368:11; 370:9-23.)

211.    Agee was released on July 12, 2013.  (*See* Ex. 34 (COURT 015909, 015911, 015913, 015915) (case action summary for sampling of Agee's cases showing release on July 12, 2013).)

212.    Agee was arrested again on July 4, 2014, for a domestic disturbance, and posted a bond and was released on July 5.  That arrest revealed that there was an outstanding warrant for Agee for failure to appear on traffic charges.  (Ex. 29 (Agee Dep.) at 381-87.)

213.    Agee appeared before Judge Westry on October 1, 2014, and was placed on a non-JCS payment plan.  (Ex. 29 (Agee Dep.) at 387-89.)

214.    Agee was arrested again on a charge arising from a family brawl on December 25, 2017, (Ex. 29 (Agee Dep.) at 390-91) and again in Cottondale, Georgia, after Thanksgiving 2015 (Ex. 29 (Agee Dep.) at 392-93.)

215.    In deposition, Agee described the claims he is asserting in this case; he asserts that he has claims for various things not involved in the claims remaining in this case, *i.e.*:  (a) In June 2014, he claimed that he was held for three days before seeing a judge (Ex. 29 (Agee Dep.) at 415-17), but, factually, he saw the judge the next day after his nighttime arrest (*see* Ex. 86 (Ex. 121 to Agee Dep.); he offers no basis for why it might have taken three days (Ex. 29 (Agee Dep.) at 418-19); (b) that the public defender (unidentified) lied to him to get him to plead guilty (*see* Ex. 29 (Agee Dep.) at 409-10), which, in deposition, he acknowledges is a "complaint with respect to the public defender," and "not anybody else" (Ex. 29 (Agee Dep.) at 417:22-418:14);[15] (c) he complains that, on the day his sentence was commuted, the judge did not adequately listen to his side of why he got arrested (Ex. 29 (Agee Dep.) at 426 ("[T]he judge, he never asked me, all right, what's the reason for this guy to pull you over or anything, or the situation or what was the cause

---

[15] The complaint, however, does not sue any public defender.

of the police officer even come up to you guys.  I never got questioned. They never heard my side

of the story.")).  But neither lack of probable cause for the arrest nor judicial indifference in Agee's

case are issues now before this Court in claims against the City.

216.    While incarcerated, Agee put his name on a list to be able to get the opportunity to

do jail work.  (Ex. 29 (Agee Dep.) at 421:22-422:1.)  He did so to get the extra $25 credit in order

to speed up the process of getting out of jail.  (Ex. 29 (Agee Dep.) at 421-22.)  He understood that

he was not required to work:

> Q:      Well, could you have told the folks in the jail, the employees in the jail, no, I'm not
> going to work today?
>
> A:      Right.
>
> Q:      … And if you had told them you're not going to work today, you wouldn't have
> gotten that twenty-five dollars extra credit, right?
>
> A:      Right.

(Ex. 29 (Agee Dep.) at 430.)

217.    Agee was in jail for a week before he learned about the $25 credit program, and

then began volunteering.  (Ex. 29 (Agee Dep.) at 434.)  An officer would come around and ask,

"hey, do you want to work in the lunchroom, or, hey, do you want to pass out the meals or, hey,

do you want to mop the hallway for the night."  (Ex. 29 (Agee Dep.) at 434.)  He believes he recalls

a single incident, before he started on the credit program, in which a female corrections officer

handed him a rag and directed him to clean something up.  (Ex. 29 (Agee Dep.) at 432; 435.)  That

was the only such occasion where he even arguably had not volunteered.  (Ex. 29 (Agee Dep.) at

435.)  It had nothing to do with paying his debt to the City.

218.    Agee performed various tasks as a volunteer, such as mopping the hallways, cutting

grass outside around the jail, picking up papers, and washing cars.  (Ex. 29 (Agee Dep.) at 435.)

Again, he testified: "Q: But you could have chosen not to work, correct?  A:  Sure."  (Ex. 29 (Agee Dep.) at 436.)

219.    Agee thought that one or more of the JCS personnel to whom he reported were police officers because of the way they were dressed, and that they accepted his payments.  (Ex. 29 (Agee Dep.) at 402.)  He saw no JCS logo on the uniforms.  (Ex. 29 (Agee Dep.) at 402.)  He testifies to no other acts suggesting that the City had control over JCS or its interactions with him. (Ex. 29 (Agee Dep.) at 406.)  Agee heard a radio ad or program suggesting claims for people arrested or jailed for traffic offenses, and he saw a lawyer in 2013.  (Ex. 29 (Agee Dep.) at 406-07.)  Suit was not filed until August 2015.

## CHRISTOPHER MOONEY

220.    Plaintiff Mooney trained as a plumber and had obtained his journeyman's rating since 2001.  (Ex. 26 (Mooney Dep.) at 59-60.)  He was employed as a plumber from 2001 to 2017. (Ex. 26 (Mooney Dep.) at 62-63 (acknowledging that he worked off-and-on for Edwards Plumbing from 2001 to about 2017); Ex. 26 (Mooney Dep.) at 69 (work for Edwards Plumbing was always full time); Ex. 26 (Mooney Dep.) at 72-73 (worked for North Georgia Plumbing when he was laid off from Edwards).)  He testified that his highest income for any year between 2011 and 2017 was $32,000.  (Ex. 26 (Mooney Dep.) at 107-09.)  He has also done freelance plumbing, for which he was compensated.  (Ex. 26 (Mooney Dep.) at 68.)

221.    Mr. Mooney admitted to having been assessed fines by Montgomery Municipal Court judges.  (Ex. 26 (Mooney Dep.) at 115:1-3.)  Mooney failed to appear on tickets issued to him in Montgomery.  (*See* Ex. 35 (selected Mooney FTA warrants).)

222.    Mr. Mooney acknowledged having been guilty of an improper license plate (tag) charge in the City of Homewood, Alabama.  (Ex. 26 (Mooney Dep.) at 99:20-100:2.)  He also admitted to failing to appear on that ticket in Homewood.  (Ex. 26 (Mooney Dep.) at 105:12-19.)

223.    Mr. Mooney acknowledged that he was without a driver's license throughout 2011 and 2012.  (Ex. 26 (Mooney Dep.) at 64:12-14.)  He was ticketed numerous times during this period and in 2009 and 2010 for driving without a license.  (*See* Ex. 76 (Ex. 87 to Mooney Dep.) (listing seven charges for driving with revoked license).)

224.    Mooney was placed on a payment plan by the Montgomery Municipal Court in October 2011.  (Ex. 26 (Mooney Dep.) at 115:16-116:11; 121-27; Ex. 74 (Ex. 80 to Mooney Dep.).)  The Order lists ten Montgomery Municipal Court cases as being assigned to JCS.  (Ex. 74 (Ex. 80 to Mooney Dep.).)

225.    Mr. Mooney had also been placed on a payment plan by the Court in connection with his Municipal Court cases prior to the JCS payment plan.  (Ex. 26 (Mooney Dep.) at 230:9-11.)

226.    Mooney does not recall whether he kept even his first appointment with JCS.  (Ex. 26 (Mooney Dep.) at 158:1-10.)  And he agreed that he made very few payments and showed up for only a few appointments overall – possibly two or three.  (Ex. 26 (Mooney Dep.) at 158:13-159:11; 160:19-20; 161:5-6.)  His mother told him that he was getting mail from JCS once or twice.  (Ex. 26 (Mooney Dep.) at 162:15-19.)  Mr. Mooney did not go back to court when his mother told him he was supposed to go back based on the notices coming to her house.  (Ex. 26 (Mooney Dep.) at 165:8-12.)  He understood from what his mother told him that he could be arrested if his probation was revoked or if he failed to appear for his court date.  (Ex. 26 (Mooney Dep.) at 165:13-166:10.)  Mr. Mooney acknowledged that, while he believed he had completed

one or two other payment programs that the Municipal Court had placed him on, he did not complete JCS.  (Ex. 26 (Mooney Dep.) at 230:9-11.)

227.    JCS records show that Mr. Mooney was served with a Petition for Revocation of Probation.  (Ex. 75 (Ex. 86 to Mooney Dep.).)  Mooney does not recall whether he went to court on the date listed on the Petition, July 27, 2012.  (Ex. 26 (Mooney Dep.) at 167:7-168:13.)

228.    Mr. Mooney testified that he not only missed many JCS appointments and payments, but that he had missed Municipal Court hearings, too.  (Ex. 26 (Mooney Dep.) at 257:9-258:4.)  Mr. Mooney was arrested on multiple warrants for some of these failures to appear on May 8, 2013.  (*See* Ex. 35 (selected May 8, 2013, warrants).)

229.    Mr. Mooney testified that it was only the last time that he was arrested by the Montgomery Police Department (on May 8, 2013) that he actually spent time in jail.  (Ex. 26 (Mooney Dep.) at 173:22-174:3; 248:2-20; Ex. 76 (Ex. 87 to Mooney Dep.) (showing May 8, 2013, booking date and time).)  He testified that he had been arrested once in connection with Montgomery County charges (issued by the Sheriff's Department) and twice before his May 2013 arrest in connection with City charges.  (Ex. 26 (Mooney Dep.) at 178:2-7.)

230.    At least six of the Municipal Court cases in connection with which Mr. Mooney was arrested on May 8, 2013, had never been assigned to JCS.  (*Compare* Ex. 76 (Ex. 87 to Mooney Dep.) (jail transcript), *with* Ex. 74 (Ex. 80 to Mooney Dep.) (Mooney's Probation Order).)[16]

---

[16] This comparison reveals the following:

Tickets (case numbers and offenses) listed on Mooney's October 11, 2011, Probation Order (Ex. 74 (Ex. 80 to Mooney Dep.)):

| | |
|---|---|
| 10TRT088735 | Speeding |
| 10TRT042210 | DWR [Driving While Revoked] |
| 10TRT088736 | DWR |
| 10TRT088737 | [not legible] |
| 11TRT028157 | [not legible] |
| 11TRT028158 | No seat belt |

Exhibit 35 (selected Mooney warrants) of the City's evidentiary submissions is a copy of the warrants issued on May 8, 2013, for cases not associated with JCS.

231.    The only arrest and jailing which is at issue in this litigation is that which commenced by warrants on May 8, 2013.  (*See* Doc. 32 at ¶¶ 146-51.)

232.    On May 9, 2013, Mr. Mooney appeared before a judge, who told him that he was going to be sentenced to jail.  (Ex. 26 (Mooney Dep.) at 179:18-181:1; 248:2-14; Ex. 76 (Ex. 87 to Mooney Dep.) (showing May 9, 2013, disposition of his cases).)  The Court, on May 9, 2013, sentenced Mr. Mooney to one day in jail on tickets for driving with a revoked license and running a stop sign (Ex. 76 (Ex. 87 to Mooney Dep.) at cases 1 and 5 on list); gave him time to pay the fines on four cases (Ex. 76 (Ex. 87 to Mooney Dep.) at cases 2-4 and 6 on list); and commuted Mr. Mooney's fines on the remainder of his fifteen then-pending cases (Ex. 76 (Ex. 87 to Mooney Dep.)).  As noted elsewhere, at this time the Municipal Court was requiring people to serve one day for each $50.00 owed.  (*See* Ex. 14 (Nixon *McCullough* Dep.) at 48:3-17.)  Mr. Mooney recalled that his total time was originally computed at something like fifty days.  (Ex. 26 (Mooney Dep.) at 181:2-6.)

| 10TRT088734 | No seat belt |
| 10TRT031116 | DWR |
| 09TRT101900 | NPI [No Proof of Insurance] |
| 09TRT101899 | DWR |

Tickets (case numbers and offenses) listed on Mooney's May 9, 2013, Jail Transcript (Ex. 76 (Ex. 87 to Mooney Dep.)) which were not listed in Mooney's Probation Order:

| 2011TRT060243 | DWR |
| 2013TRT064333 | DWR |
| 2012TRT050481 | Seat belt violation |
| 2012TRT064334 | No proof of insurance |
| 2012TRT072154 | Running stop sign |
| 2012TRT072155 | No proof of insurance |

Only one ticket appears to have been paid in full between the 2011 assignment to JCS and Mr. Mooney's arrest in May 2013:  2011TRT028158 (no seat belt).

233.     Mr. Mooney testified that he understood when he was jailed in 2013 that, if he worked, his time in jail would be reduced.  (Ex. 26 (Mooney Dep.) at 194:1-195:19.)  He testified that, "[i]f I was told that was my time where my fine was going to be reduced, then, yes, I wanted a shot at that, yes, sir."  (Ex. 26 (Mooney Dep.) at 196:6-8.)  He testified that, as part of that work during his 2013 detention, he washed cars, picked up paper around the jail, painted, cut grass, and did weed eating.  (Ex. 26 (Mooney Dep.) at 196:13-19.)  Later in his deposition he explained, that he was offered work during that 2013 detention to expedite his getting out of jail and he took it.  (Ex. 26 (Mooney Dep.) at 209.)  He testified that he never knew the amounts the Court was going to credit him, but that he merely understood that there would be a credit given to reduce his time in jail.  (Ex. 26 (Mooney Dep.) at 194:15-195:2.)

234.     Initially, Mooney did not recall exactly how much time he spent in jail, but he believes he served around one month.  (*See* Ex. 26 (Mooney Dep.) at 181:7-182:17; 186:6-14.)  Later he agreed that when he was released on June 6, 2013, that he still had four tickets which the Court gave him until September 2013 to pay.  (Ex. 26 (Mooney Dep.) at 251:16-252:7.)

235.     When asked what his claims are in this lawsuit, he testified that he believed he was "targeted" in that he kept getting tickets and could not pay them off.  (*See, e.g.*, Ex. 26 (Mooney Dep.) at 228:21-232 (listing principally his alleged damages when asked about claims).)  The only other claims that he arguably identified were that the public defender did not "do right" by him (Ex. 26 (Mooney Dep.) at 238); that the judge did not ask if he had an ability to pay the tickets (Ex. 26 (Mooney Dep.) at 255-56); and he thought the Judge treated him unfairly (Ex. 26 (Mooney Dep.) at 272).

### HASSAM UMAR CALDWELL

236.   Hassam Caldwell ("Caldwell") presents an odd story.   He stated under oath, repeatedly, that he first brought his claims or grievances to Plaintiffs' counsel in January or February 2019, and authorized this federal lawsuit at that time. (*See, e.g.*, Ex. 27 (Caldwell Dep.) at 48-50; 57; 60-62.)  His testimony is:

> Q:  Had you ever met with them [his lawyers, Ms. Toure and Ms. Morgan] and signed up with them before that meeting in January or February of this year? [The deposition is dated October 3, 2019.]
>
> A:  No.  No, sir.

(Ex. 27 (Caldwell Dep.) at 50.)  And:

> Q:  And when did you first engage or hire those lawyers and enter into that contract?
>
> A:  I don't know the quite date [sic], but I think it was – or was it in the six months? I don't know the quite date it was.  It was a little while back.
>
> Q:  Well, a year ago, six months ago?
>
> A:  … Probably longer than six months, I think.
>
> . . .
>
> A:  … So, I'll probably say around the top of the year or something.
>
> . . .
>
> Q:  . . . like January or February?
>
> A:  Yeah, something like that.

(Ex. 27 (Caldwell Dep.) at 48-49.)  He confirms, at page 57, that the initial meeting with the lawyers was "in the winter of this year."  (Ex. 27 (Caldwell Dep.) at 57.)

237.   When asked what he was complaining about, Mr. Caldwell listed two complaints:

(a)      He claims that Municipal Judge Loria James, on one appearance, told him that if he paid half of his tickets, she would dismiss the other half (Ex. 27 (Caldwell Dep.) at 57), but that she did not actually do so (Ex. 27 (Caldwell Dep.) at 58).  His mother lodged a complaint with the Judicial Inquiry Commission against Judge James over this asserted incident.  (Ex. 27 (Caldwell Dep.) at 58.)[17]

(b)      He felt like police officers were "targeting" him when they stopped and ticketed him:

> Q:  … And was there anything else other than that [the incident with Judge James]?  . . . anything else that caused you to feel like you hadn't been treated right and you wanted to go see a lawyer?
>
> A:  Yeah, it was - - like, I felt like some stops, like, it'll be the police if they're, like, in the area and they know you.  So, I felt like they - - if they - - if they're in the area, they're patrolling that area and they specifically know your car, they're straight.  Like, they targeting you.
>
> Q:  Okay.  Let me get straight.  Some of the tickets, you say, were because you felt like that the police knew you and were targeting you?
>
> A:  Yes, sir.
>
> Q:  Okay.  And I've got the one about Judge James.  And anything else?  Those two - - I've got those down, and we'll come back to the details.
>
> A:  That's basically it.
>
> . . .
>
> Q:  And so, did you furnish the information about your complaints to the lawyers?
>
> A:  Oh, yes.  Yes, sir.
>
> . . .
>
> Q:  And did you authorize the filing of a Federal lawsuit in your name?

---

[17] Caldwell believes Judge James is deceased (Caldwell Dep. at 58), but is likely confusing her with Judge Karen Knight.  Judge James, while she is now an assistant district attorney, is very much alive.  She has not been sued.

A:  Yes, sir.

(Ex. 27 (Caldwell Dep.) at 59-61.)  Caldwell belatedly, at the very end of his deposition, says he believes JCS misapplied some of his payments, and that is what this lawsuit is about.  (Ex. 27 (Caldwell Dep.) at 354-55.)

238.    Caldwell has no claim that he worked or was "forced to work" in the city jail.

239.    Caldwell produced no records or documents pursuant to the deposition notice, but claimed to have records or contacts with JCS, the Municipal Court, and JCS and receipts for payment, etc.  (Ex. 27 (Caldwell Dep.) at 112-18; 143-45.)  To date, none have been produced. (He testified he has "a lot" of such documents.  (Ex. 27 (Caldwell Dep.) at 117.))

240.    Caldwell has been arrested several times for failure to appear (Ex. 27 (Caldwell Dep.) at 122:21-123:7; 125:9-126:10), and, separately, by Montgomery County on a robbery charge, and in Elmore County on unlawful possession of a pistol (for which he was fined $500) (Ex. 27 (Caldwell Dep.) at 130-35).  His driver's license is suspended because of an open ticket conviction in Bay County, Florida.  (Ex. 27 (Caldwell Dep.) at 95:19-99:12.)

241.    Caldwell was twice assigned by a Montgomery Municipal Court judge to JCS.  (*See* Ex. 27 (Caldwell Dep.) at 140:8.)  Once, he completed the payments.  (Ex. 27 (Caldwell Dep.) at 140:8-9; 156:16-157:6.)

242.    Caldwell was arrested on September 28, 2014, arising from a traffic stop.  At that time, he was driving a friend's car, because the friend was "really …drunk."  (Ex. 27 (Caldwell Dep.) at 162:3-4.)  He did not have a valid driver's license, and the warrant check disclosed that there were outstanding warrants for failure to appear.  Those warrants arose from previous tickets which he had not paid, and on which he had not appeared in Municipal Court.  (Ex. 27 (Caldwell Dep.) at 158-65.)

243.    The September 28 arrest occurred at 4:28 a.m. on Sunday morning, and he saw a judge and was released at 12:29 p.m. on Monday.  (Ex. 27 (Caldwell Dep.) at 200:1-11.)  The unpaid tickets totaled $2287, and he was given an installment payment plan.  (Ex. 27 (Caldwell Dep.) at 200:12-16; 203:2-14.)  JCS was, at that time (September 2014), no longer providing services to the Court.

244.    Caldwell never paid off the previous JCS assigned ticket amounts.  (Ex. 27 (Caldwell Dep.) at 190:7-12; 203:17-207.)

245.    Caldwell, although given a list of documents by the Municipal Court to take to Court if he wanted to support indigency or an inability to pay, did not do so.  He knew and was informed that failure to appear would lead to a warrant. (Ex. 27 (Caldwell Dep.) at 182:3-183:10.)

246.    Caldwell admits he was guilty of each of the offenses with which he was charged. (Ex. 27 (Caldwell Dep.) at 214:12-19.)  He did not appeal any ticket convictions, nor did he ask for a lawyer.  (Ex. 27 (Caldwell Dep.) at 211.)

247.    Caldwell appears to have committed tax fraud, and his lawyers advised him to decline to answer questions concerning those facts.  (Ex. 27 (Caldwell Dep.) at 225; 228:2-11; 229:17-21; 235:16--239:9.)

248.    Caldwell has no knowledge of any involvement in his convictions, fines and probation by anyone other than a municipal judge (variously, Judge James, Judge Westry and Judge Hendley), the court bailiff, and the court clerk.  (Ex. 27 (Caldwell Dep.) at 251-259:1.)  He has no facts concerning Chief Finley, Chief Baylor or Chief Murphy (but whom he sued).  (Ex. 27 (Caldwell Dep.) at 259-61.)

249.    Caldwell reiterated in his deposition that he is complaining in this lawsuit about racial profiling and targeting.  (Ex. 27 (Caldwell Dep.) at 265:4-6.)

250.    Caldwell claims that he got "points" at his Dow Corning job for missing work while in jail, and that the points contributed to him losing the job.  Also, he says he lost about $200 in wages for the days he missed.  (Ex. 27 (Caldwell Dep.) at 265-269; 265:21; 267:14.)

251.    However, Caldwell claims no money damages.  (Ex. 27 (Caldwell Dep.) at 270:2-8.)

252.    Caldwell's tickets and fines were never commuted to jail time.  (Ex. 27 (Caldwell Dep.) at 323:5-20.)

Respectfully submitted this 21st day of January, 2020.

s/Shannon L. Holliday
Shannon L. Holliday [ASB-5440-Y77S]
Richard H. Gill [ASB-7945-G70R]
Robert D. Segall [ASB-7354-E68R]
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347
holliday@copelandfranco.com
gill@copelandfranco.com
segall@copelandfranco.com
**Attorneys for Defendant City of Montgomery**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 21st day of January, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

| | |
|---|---|
| Martha I. Morgan<br>8800 Lodge Lane<br>Cottondale, Alabama  35453<br>mimorgan@yahoo.com<br><br>Harold C. Hirshman<br>Jennifer A. Barrett<br>Dentons US LLP<br>233 South Wacker Drive<br>Suite 5900<br>Chicago, IL  60606<br>harold.hirshman@dentons.com<br>jennifer.barrett@dentons.com<br><br>Stephen J. O'Brien<br>Dentons US LLP<br>One Metropolitan Square, Suite 3000<br>St. Louis, MO  63102<br>stephen.obrien@dentons.com<br><br>Greg Bass<br>Britney Wilson<br>National Center for Law and Economic Justice<br>275 Seventh Avenue, Suite 1506<br>New York, NY  10001<br>bass@nclej.org<br>wilson@nclej.org | Faya Rose Toure<br>Henry Sanders<br>Chestnut, Sanders & Sanders, LLC<br>P.O. Box 1290<br>Selma, AL  36702<br>fayarose@gmail.com<br>gpompey@csspca.com<br><br>Michael L. Jackson<br>Larry S. Logsdon<br>Wesley K. Winborn<br>Wallace, Jordan, Ratliff & Brandt, L.L.C.<br>P.O. Box 530910<br>Birmingham, AL  35253<br>mjackson@wallacjordan.com<br>llogsdon@wallacejordan.com<br>wwinborn@wallacejordan.com<br><br>E. Ham Wilson<br>Miland F. Simpler, III<br>Ball, Ball, Matthews & Novak, P.A.<br>P. O. Box 2148<br>Montgomery, AL  36109-5413<br>hwilson@ball-ball.com<br>msimpler@ball-ball.com<br><br>R. Bernard Harwood, Jr.<br>Rosen Harwood, P.A.<br>2200 Jack Warner Parkway<br>Suite 200<br>Tuscaloosa, AL  35401<br>bharwood@rosenharwood.com |

s/Shannon L. Holliday
Of Counsel