**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANGELA MCCULLOUGH, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No.:  2:15-cv-00463-RCL-SMD** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE CITY OF MONTGOMERY, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THE CITY OF MONTGOMERY'S BRIEF**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES .................................................................................. iv

I.      INTRODUCTION............................................................................................1

II.     Plaintiffs have not presented substantial evidence that the City violated the
        Thirteenth Amendment or any of the related federal statutes pled in
        Count VII......................................................................................................3

        A.      What remains of Count VII..............................................................3

        B.      The undisputed facts regarding jail work.........................................5

                1.      Jail work credit generally........................................................5

                2.      Plaintiff Marquita Johnson......................................................9

                3.      Plaintiff Angela McCullough.................................................10

                4.      Plaintiff Christopher Mooney ...............................................11

                5.      Plaintiff Levon Agee.............................................................11

                6.      Plaintiff Kenny Jones.............................................................12

                7.      Correctional officers' testimony ...........................................12

        C.      The existence of the undisputedly voluntary work program in the
                Montgomery City jail does not violate the laws pled in Count VII......................13

                1.      A general overview of Count VII ..........................................13

                2.      Requiring inmates to work does not constitute "involuntary servitude,"
                        "peonage," or "forced labor." ................................................15

                3.      Clearly voluntary work programs do not violate the prohibitions
                        against "forced labor," "peonage" or involuntary servitude cited in
                        Count VII ...............................................................................16

                4.      Because corrections officers did not harm or threaten to harm
                        the detainees if they chose not to work, the officers' actions fall
                        squarely outside those proscribed by the Thirteenth Amendment

|   |   | and the federal statutes pled in Count VII | 18 |
|   | a. | *United States v. Reynolds*, 235 U.S. 133 (1914) | 18 |
|   | b. | *Bailey v. Alabama*, 219 U.S. 219 (1911) | 19 |
|   | c. | *United States v. Kozminski*, 487 U.S. 931 (1988) | 19 |
|   | d. | *Pierce v. United States*, 146 F.2d 84 (5th Cir. 1944) | 20 |
|   | e. | *Menocal v. Geo Group, Inc.*, 113 F. Supp. 3d 1125 (D. Colo. 2015) | 21 |
|   | f. | United States v. Peterson, 627 F. Supp. 2d 1359 (M.D. Ga. 2008) | 22 |
|   | g. | Application of the law to these facts | 22 |
| D. | | No substantial evidence suggests that the City "knowingly benefit[ed] from participation in a venture" that obtained labor in violation of either 18 U.S.C. §§ 1581 or 1589(a) | 24 |
| E. | | The claims based on the criminal statutes pled in Count VII are due to be dismissed because a municipality lacks the requisite *mens* rea | 26 |
| F. | | Count VII is to be dismissed as to all Plaintiffs | 26 |
| **III.** | | **As to Count VIII, Plaintiffs cannot present substantial evidence that the City had any substantive involvement with JCS apart from the signing of the Contract, nor can they present substantial evidence that either the Contract or JCS was the cause of any of the wrongs alleged** | **27** |
| A. | | Introduction | 27 |
| B. | | The only link between the City and JCS was the Contract | 30 |
| C. | | The terms of the Contract did not result in either of the wrongs alleged | 31 |
|   | 1. | Municipal Court Judges were not bound by the Contract Terms. | 31 |
|   | 2. | The Contract's terms unequivocally gave the Municipal Court judges Discretion as to whether to use JCS to collect fines and costs. | 32 |
|   | 3. | The Contract provided for use of JCS's services in probated cases, not every case in which fines and costs were pending. | 32 |

4.      The Contract did not even arguably mandate JCS supervision of indigent cases merely because fines and costs were due or that JCS's fees be charged in such cases. ..................................................................33

5.      Nothing in the Contract was the moving force behind any of the wrongs alleged in Count II. ..................................................................34

D.      It was judicial acts, not those of JCS, that resulted in the alleged wrongs ...........35

E.      Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine .............................37

F.      Plaintiffs' supervision claim ..............................................................................38

G.      Further reasons for dismissing individual Plaintiffs' claims .................................38

1.      The claims pled by Plaintiffs Mooney and McCullough are due to be dismissed as to their arrests because they would have been arrested even absent their failures to appear on JCS-related cases ...................................................................38

2.      Count VIII is due to be dismissed as to Plaintiff Edwards on statute of limitations grounds....................................................39

3.      Count VIII is due to be dismissed as to Plaintiff Caldwell because, though he was arrested for failure to appear, his fines and costs were not commuted to jail time..................................40

4.      Count VIII is due to be dismissed as to Plaintiff Johnson because her claims are also barred by the statute of limitations.............................40

5.      Count VIII should be dismissed as to Plaintiff Jones ...............................41

6.      Count VIII is due to be dismissed as to Plaintiff McCullough .................42

7.      Count VIII is due to be dismissed as to Mr. Agee ....................................42

**CONCLUSION** ...........................................................................................................43

**CERTIFICATE OF SERVICE** .......................................................................................44

**TABLE OF AUTHORITIES**

*Ali v. Johnson*,
    259 F.3d 317, 318 (5th Cir. 2001) ...................................................................15

*Bailey v. Alabama*,
    219 U.S. 219 (1911)...............................................................................19,23

*Bass v. County of San Deigo*,
    2009 WL 10671992 *5 (S.D. Cal. August 25, 2009) ......................................16

*Bistline v. Parker*,
    918 F.3d 849 (10th Cir. 2019) ........................................................................25

*City of Canton v. Harris*,
    489 U.S. 378, 389 (1989)...........................................................................4,30

*City of L.A. v. Heller*,
    475 U.S. 796, 799 (1986).................................................................................5

*D.C. Court of Appeals v. Feldman*,
    460 U.S. 462 (1983).........................................................................................37

*Draper v. Rhay*,
    315 F.2d 193, 197 (9th Cir. 1963) ..................................................................16

*Fochtman v. Darp, Inc.*,
    No. 5:18-CV-5047, 2018 WL 3148113, at *4 (W.D. Ark. 2018).............................16-17

*Grech v. Clayton Cnty., Ga.*,
    335 F. 3d 1326 (11th Cir. 2003) .....................................................................10

*Holt v. Givens*,
    757 Fed. App'x 915, 922 (11th Cir. 2018) ......................................................15

*Immediato v. Rye Neck Sch. Dist.*,
    73 F.3d 454, 486 (2d Cir. 2015).......................................................................17

*McCullough v. Finley*,
    907 F.3d 1324 (11th Cir. 2018) ......................................................................28

*Menocal v. Geo Group, Inc.*,
    113 F. Supp. 3d 1125 (D. Colo. 2015)........................................................21,23

*Miranda-Martinez v. Fed. Corr. Inst. #2,*
    No. 2:19-CV-7742, 2019 WL 5791454, at *4 (C.D. Cal. Sept. 25, 2019)
    *report and recommendation adopted*, 2019 WL 5784738 (C.D. Cal. Nov. 4, 2019)........16

*Mikeska v. Collins,*
    900 F.2d 833, 837 (5th Cir. 1990) .................................................................................15

*Miranda-Martinez v. Fed. Corr. Inst. #2,*
    No. 2:19-CV-7742, 2019 WL 5791454, at *4 (C.D. Cal. Sept. 25, 2019) .......................16

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658, 691 (1978)..............................................................................................4,5

*Murray v. Miss. Dep't of Corr.*,
    911 F.2d 1167 (5th Cir. 1990) .......................................................................................15

*Omasta v. Wainwright,*
    696 F.2d 1304 (11th Cir. 1983) ................................................................................15,18

*Pierce v. United States*,
    146 F.2d 84 (5th Cir. 1944) .......................................................................................20,23

*Ray v. Judicial Corr. Servs., Inc.*,
    No. 2:12-CV-2819-RDP, 2017 WL 660842 (N.D. Ala. Feb. 17, 2017).......................4,31

*Rooker v. Fid. Trust Co.*,
    263 U.S. 413 (1923)........................................................................................................37

*Shakouri v. Davis*,
    923 F.3d 407, 411 (5th Cir. 2019) .................................................................................17

*Sigler v. Lowrie,*
    404 F.2d 659 (8th Cir. 1968) .........................................................................................15

*Steiner v. Bethlehem Area School District,*
    987 F.2d 989, 1000 (3d Cir. 1993)..................................................................................17

*Taylor v. Georgia,*
    315 U.S. 25, 29 (1942)............................................................................................... 13-14

*Thurman v. Judicial Corr. Servs., Inc.*,
    760 F. App'x 736, 737 (11th Cir.), *cert denied*
    139 S. Ct. 2646 (2019).....................................................................................................37

*Tracker Marine Retail, LLC v. Oakley Land Co., L.L.C.*,

190 So. 3d 512 522 (Ala. Civ. App. 2015) .......................................................................33

*Troster v. Penn. Dep't of Corr.,*
    65 F.3d 1086 (3d Cir. 1995)...........................................................................................17

*United States v. Kozminski,*
    487 U.S. 931 (1988)...........................................................................................13,17,19,20

*United States v. Peterson,*
    627 F. Supp. 2d 1359 (M.D. Ga. 2008) ....................................................................22,23

*United States v. Reynolds,*
    235 U.S. 133 (1914)......................................................................................................18,19,23

*United States v. Shackney,*
    333 F.2d 475, 486 (2d Cir. 1964).................................................................................17

*Vanskike v. Peters,*
    974 F.2d 806, 809 (7th Cir. 1992) ...............................................................................15

*Watson v. Graves,*
    909 F.2d 1549, 1552 (5th Cir. 1990) ...........................................................................17

*Wendt v. Lynaugh,*
    841 F.2d 619, 620 (5th Cir. 1988) ...............................................................................17

## **RULES AND STATUTES**

Ala. Code § 12-1-3.............................................................................................................4

Ala. Code § 12-1-2...........................................................................................................31

Ala. Code § 12-1-12...........................................................................................................4

Ala. Code § 12-2-7(4) .......................................................................................................4

Ala. Code § 12-2-19(a) ......................................................................................................4

Ala. Code § 12-14-13........................................................................................................32

Ala. Code § 15-18-62 ...................................................................................................6,18,36

Ala. Const. of 1901, Art. VI, § 129(a) ..............................................................................4

Ala. Const. of 1901, Art. VI, § 145...................................................................................4

vi

Ala. Const. of 1901, Art. VI, § 156(b) ...........................................................................4

Ala. Const. of 1901, Art. VI, § 157(a)(1). .....................................................................4

Ala. R. Crim. P. 26.11........................................................................................6,18,36

Fed. R. Civ. P. Rule 56 ...................................................................................43

18 U.S.C. § 1581 .............................................................................................*Passim*

18 U.S.C. § 1584 .......................................................................................13

18 U.S.C. § 1589.............................................................................................*Passim*

18 U.S.C. § 1589(a) .............................................................................3,13,14,23,24

18 U.S.C. § 1589(b) .............................................................................13,14,24

18 U.S.C. § 1593A ........................................................................1,3,13,14,24

18 U.S.C. § 1595.............................................................................1,3,13,14

18 U.S.C. § 3624(b) .....................................................................................23

42 U.S.C. § 1983.....................................................................................4

## ADDITIONAL AUTHORITIES

H.R. Conf. Rep. No. 106–939, at 101, *as reprinted* in 2000 U.S.C.C.A.N. 1380, 1393 ...............13

U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement P5884.03 (3/31/06) at 2........23

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANGELA MCCULLOUGH, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No.:  2:15-cv-00463-RCL-SMD** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE CITY OF MONTGOMERY, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THE CITY OF MONTGOMERY'S BRIEF**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I.    Introduction

The City of Montgomery files herewith its Motion for Summary Judgment, Statement of Undisputed Facts, and Evidentiary Submission in Support of Motion for Summary Judgment.

Despite the vast and wandering complaint, and the equally wandering and unfocused testimony of the seven remaining Plaintiffs, all the claims left for decision are encapsulated in two issues:

(1)    Did the Judicial Correction Services ("JCS") probation service commit some Constitutional tort – actionable under § 1983 – for which the City of Montgomery was the moving force (through some identified policy or practice or action by a City final policymaker)?

(2)    Were any of the Plaintiffs subjected to involuntary servitude in violation of the Thirteenth Amendment or the several implementing statutes contained in 18 U.S.C. §§ 1581, 1589, 1593A and 1595?

This complaint – 281 paragraphs in length – began with a huge body of diverse allegations, many of which were not actually tied to a specific legal claim, nor predicated on facts arising in

1

Montgomery.  Plaintiffs made allegations by reference to an investigation of Ferguson, Missouri, which had no connecting link to Montgomery; there were claims of false arrests, false imprisonment, racial profiling and targeting; nefarious plots and schemes by Montgomery's police chiefs (two of whom are African-Americans) back through three administrations; evil plans and policies by several mayors; claims against immune judicial officers.  The testimony has contained claims that JCS failed to account for all the payments some Plaintiffs made, or that JCS absconded with funds that should have been paid to the court.  No Plaintiff has any evidence of such things, no receipts for unaccounted funds, no basis for such claims at all, but these and many other extraneous, unsupported assertions pepper the various Plaintiffs' testimony.  Three of the original Plaintiffs turned out to have no claims at all, and they have been dismissed; only five of the remaining seven performed <u>any</u> jail work, much less involuntary labor.

All of this cloud of claims makes it difficult for the City – and the Court – to focus on and address what actually is in the case, which is only the two claims stated above.  The City has no knowledge of or burden to address things like the accounting claims against JCS (which, if there were any factual predicate, might present some sort of common law tort, but not a due process claim).

At the end of the discovery phase, it is clear that the Plaintiffs may feel aggrieved that they received traffic tickets,[1] that they were ordered by the Municipal Court to an installment payment plan run by JCS, that they had to report and make payments, and that they were arrested after repeated failures to show up for court; they may feel that the judges did not listen to them or have

---

[1] A Plaintiff like Ms. McCullough, for example, feels wronged because she received multiple tickets for driving without a valid license, but, it turns out that, in her lifetime, she has <u>never</u> bothered to get a license.  (McCullough Dep. at 294-295.)  Yet, she continues to flout the law and is persuaded that she should somehow be immune from fines or paying fines.  (*See* McCullough Dep. 373-374 (she still has no license due to an accident she was involved in).)  Similarly, despite years of driving, Plaintiff Agee never bothered to get either a license or insurance.  (*See* Agee Dep. at 263, 291, 303-304.)

enough patience with them.  But all those things occurred within the court system, and there is no basis for unsupported, reckless charges against the City itself, the Mayor or the Chief of Police. This Court and the Eleventh Circuit have pared down much of the clutter, and what is left is now due to be dismissed as well.

The City disposes here with the customary recital of the summary judgment standard with which this Court is certainly more than familiar.  Suffice it to say that summary judgment is the intended vehicle to bring a needed and proper end to a case which turns out to have much sound and fury, but no factual or legal basis to proceed against the City.  As shown below, there is no genuine dispute of material fact against the City regarding the two remaining claims and, thus, summary judgment is due to be granted.

## II.   Plaintiffs have not presented substantial evidence that the City violated the Thirteenth Amendment or any of the related federal statutes pled in Count VII.

### A.   What remains of Count VII

Plaintiffs, in the First Amended Complaint ("Complaint" or "FAC"), assert that they were "forced" or "coerced" to perform labor while in the municipal jail, in violation of the Thirteenth Amendment and several related statutes (*i.e.*, 18 U.S.C. §§ 1581, 1589(a) and (b), 1593A, and 1595).  (Doc. 32, Count VII, ¶¶ 222-34.)  Like much of the Complaint, these allegations were essentially conclusory and contained no details as to how (or even which) Plaintiffs were so forced.

In its May 2019 order on the City's Motion for Judgment on the Pleadings, this Court permitted Count VII to survive notwithstanding this Court's dismissal of all remaining counts but one.  The Court recognized that the dismissed counts alleged only judicial actions as their bases for liability, and it dismissed those counts on the ground that the City does not have the authority

to control the Municipal Court or its judges, and thus cannot be held liable for their actions under 42 U.S.C. § 1983.  (*See* Doc. 183 at 1-14.)[2]

The Court considered Count VII as different from the dismissed counts because: (a) the allegations contained the word "forced" in connection with the work some Plaintiffs allegedly did in jail, presumably suggesting that correctional officers themselves forced the Plaintiffs to do the work; and (b) some of the allegations that Plaintiffs were "forced" to work could have been "independent of the municipal court" and "separate" from "whether the judge reduced the plaintiffs' sentences."  (Doc. 183 at 15-16.)

In this treatment of Count VII, this Court signaled that, to survive summary judgment, each Plaintiff would have to produce substantial evidence that some jail official used means in violation of the law set out in Count VII to obtain the Plaintiff's work independent of the Court's reduction of the Plaintiffs' sentences.  Plaintiffs would further have to show the jail official did so pursuant to some policy of the City.  This is consistent with *Monell v. Department of Social Services*,[3] which requires that the moving force behind the alleged violations be the municipality's policy.  Plaintiffs would have to show that the correctional officers' actions were unlawful and amounted to an actual City policy or custom.  *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (to support *Monell*

---

[2] As this Court has recognized, under Alabama law, the "judicial power of the state [is] vested exclusively in a unified judicial system" that includes "such municipal courts as may be provided by law."  (Doc. 183 at 10 (quoting Ala. Const. of 1901, Art. VI, § 129(a)).)  *See also* Ala. Code § 12-1-12; *Ray v. Judicial Corr. Servs., Inc.*, No. 2:12-CV-2819-RDP, 2017 WL 660842, at *11 (N.D. Ala. Feb. 17, 2017) (quoting same sources).  This judicial power includes jurisdiction over criminal cases.  Ala. Code § 12-1-3.  The Alabama Supreme Court has been authorized to create procedural and administrative rules for municipal courts.  *Id.* § 12-2-19(a); *see also id.* § 12-2-7(4).  The Alabama Constitution requires municipal judges to possess law licenses and allows the state legislature to set other qualifications for municipal judges.  Ala. Const. of 1901, Art. VI, § 145.  In addition, Alabama's Judicial Inquiry Commission and Court of the Judiciary have jurisdiction over municipal court judges.  *See id.*; Art. VI, § 156(b) (allowing the Commission to investigate "any judge of a court of the judicial system of this state" et seq.); Art. VI, § 157(a)(1).  (*See also* Statement of Undisputed Facts filed contemporaneously herewith at ¶¶ 2-4 (setting out role played by Alabama Administrative Office of Courts over municipal court system and State-mandated reporting requirements); ¶¶ 2-10 (establishing that all judicial functions are handled by judicial personnel and not City) & generally (setting out the general facts which illustrate the distinction between the City and the Municipal Court).)

[3] 436 U.S. 658 (1978).

claim, official policy must be "moving force behind the constitutional violation"); *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (*Monell* claim is derivative of—and thus requires—an underlying constitutional violation).

To be clear, the City does *not* concede that the Judges' practice of releasing detainees early if they chose to work would constitute the force or coercion necessary to violate the laws as pled in Count VII. Nevertheless, even if, under some far-fetched argument, it were sufficient, that is irrelevant here as this Court has framed the issue. The issue now is whether, during the time the Municipal Court offered the $25.00 credit (the period alleged in the complaint (Doc. 32 ¶ 223))[4], any corrections officer forced or coerced Plaintiffs to do any work in violation of the law independent of the Municipal Court's reduction of that sentence.

### B.    The undisputed facts regarding jail work

#### 1.    Jail work credit generally

A quick recap is in order: of the ten Plaintiffs – each of whom is separately subject to the grant of summary judgment – only five even claim to have performed work of any kind.[5] Three Plaintiffs have been entirely dismissed. (Doc. 231.) And, as set out *infra*, out of the five who do assert that they worked, not a single Plaintiff claims to have been forced or coerced to do that work. All five of them have now testified that they chose to work, that they volunteered, and that no adverse action was taken or threatened for not working.

---

[4] Plaintiffs' clearly identified the wrong at issue as encompassing the period in which the $25.00 credit was being given in other paragraphs in the fact section of their Complaint as well. (*See, e.g.,* Doc. 32 ¶ 50 ("indigent debtors were further faced with a coercive promised reduction of their debts by an additional $25 per day on the condition that they performed some onerous and sometimes dangerous janitorial and other work"); ¶ 72 (McCullough "forced to perform jail labor in order to help work off her unpaid tickets and fines and costs sooner"); ¶ 84 (Johnson forced to work "in order to 'work off' her debt sooner"); ¶ 150 (Mooney, same).)

[5] Plaintiffs McCullough, Johnson, Agee, Mooney, and Jones. The complaint, in Count VII, names McCullough, Johnson, Jones, Agee, Edwards and Mooney, but Edwards' deposition does not support such claims. He testified that he was never offered an opportunity to work. (Ex. 24 (Edwards Dep.) at 296.) Mr. Caldwell did not work.

Second, the Complaint (which is all the Court had before it when it entered the May 14, 2019, order (Doc. 183)) did not make clear to the Court what was actually entailed in the jail work program.  The vast majority of the Plaintiffs were sent to the municipal jail by a Municipal Court judge after a hearing, on what were known as commuted sentences,[6] after extensive histories of convictions, of non-payment of fines and costs, noncompliance with probation orders and payment plans, and failures to appear for court-ordered hearings.  (*See generally* Statement of Undisputed Facts at ¶¶ 127-252 (facts related to Plaintiffs); *see also* JCS's evidentiary submission and factual statement regarding Plaintiffs, filed contemporaneously with this brief.)  Such commutation, purely a judicial act, was authorized under Alabama state law and was not a City of Montgomery policy or rule.  *See* Ala. Code § 15-18-62 & Ala. R. Crim. P. 26.11.[7]  There is no evidence that either the jail personnel, the police, or JCS played any role in the Court's decision to commute a person's fines and costs to jail time.[8]

A commuted sentence meant that a convicted defendant who had been fined and assessed costs but who failed to pay (after being given time to pay) could have the unpaid balances commuted into days in jail at a fixed sum per day.[9]  Thus, if a defendant owed $300 in a particular case, that was commuted to six days in jail at $50 per day.  Those days were not tied in any way

---

[6] Caldwell was never commuted.

[7] While each of these provisions has a willfulness element, the judges of the Municipal Court were alone charged with making that determination.

[8] Rather, there is affirmative evidence to the contrary.  (*See generally* City's Statement of Undisputed Facts, for instance at ¶¶ 2-11 (separation between Court and City) and ¶¶ 54-55 (former jail warden and assistant warden did not know what commute meant); Ex. 37 (Smith *Carter* Dep.) at 28:11-19 (same); Ex. 31 (Strange Decl.) at ¶ 2 (City exercised no control over Court).)  In addition, there is no evidence that during these hearings, either police or jail personnel were even in the courtroom, and the evidence is also clear that JCS played no role.  (*See* Ex. 13 (Ennis *McCullough* Dep.) at 193:15-22 (JCS played no role in judge's decisions to jail people); Ex. 3 (Hamby Decl.) at ¶ 26; Ex. 7 (Hayes Dep.) at 5 (Dep. p. 18).)

[9] Prior to July 2012, that amount had been $25 per day, but was raised to $50 by court order.  (Ex. 14 (Nixon *McCullough* Dep.) at 48.)  That older standard of $25 per day is not the same as or part of the jail work credit program, which _also_ was $25 per day.

to any jail work; the detainee simply had to sit out the required number of days.[10]  Except for being required to keep their own cells sanitary, a detainee could watch television, read or simply sleep and sit.[11]

At some point, which the evidence indicates was in 2011,[12] the Municipal Court instituted a program by which detainees could be given a $25 credit against their unpaid fines and costs if they elected to work in jail.[13]  This meant that (after July 2012, see n.9) such a volunteer would therefore be credited with a total of $75 for each day in which work was performed, but $50 per day if no work was done.  (Ex. 14 (Nixon *McCullough* Dep.) at 48-49.)

The Complaint (Doc. 32 (First Amended Complaint)) in this case necessarily relates only to the above-described credit-for-work program, since no work was required or associated with the standard $50 daily credit, which applied regardless of whether any work was done.  Some detainees chose to work and some did not.  Even before the inauguration of the jail work credit program and after it was discontinued, detainees often volunteered to work to have something to do.

The types of work were not onerous or dangerous, generally consisting of things like sweeping the hallways, cutting grass around the courthouse, washing police cars, putting clothes through the laundry, distributing food trays, assisting in the kitchen, and picking up roadside trash.

---

[10] Plaintiffs take issue with whether the Municipal Court's four judges made adequate inquiries into the willfulness of their nonpayment, but the manner in which the Judge handled the hearing was purely a judicial act.

[11] Detainees did clean their own cells but Plaintiff here has raised that as a basis for liability.  (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 37:17-19 ("they would clean their own cells").)

[12] (Ex. 14 (Nixon *McCullough* Dep.) at 35:10-40:11 ("I think that's when it began was in 2011"); Ex. 14 (Nixon *McCullough* Dep.) at 43:3-11 (presiding judge initiated the program in November 2011 time frame).  While the Plaintiffs may take issue with precisely when the program began, that is not material here for summary judgment purposes.

[13] (*See* Ex. 14 (Nixon *McCullough* Dep.) at 35:10-42:8 ("Q. And it's your understanding, based on your refreshed recollection, that this was an initiative that came from the judge, right?/A. From the presiding judge, yes, sir.").)

(*See* Statement of Undisputed Facts at ¶ 143 (McCullough - cleaning out garbage cans, collecting trays after meals, cleaning and mopping floors and cleaning showers); ¶ 162 (Johnson - working in kitchen, mopping, washing dishes and passing out food trays to female inmates); ¶ 183 (Jones - picking up trash and washing police cars); ¶ 217 (Agee – acknowledging that officers asked people if they wanted to work in lunchroom, pass out meals, or mop hallway);  ¶ 233 (Mooney - washed cars, picked up paper around jail, painted, cut grass, and did weed eating).)

A corrections officer was directed by the Court to keep a weekly list of detainees who volunteered to work each day and turned it in to the bailiff of the Municipal Court.  (*See* Ex. 14 (Nixon *McCullough* Dep.) at 43:3-18 (list of people who worked would be delivered by jail weekly to bailiff).)  The list was requested by the Court.  (*See* Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 54:6-8 (someone kept list during period Municipal Court asked for it).)

It was the bailiff, who was a Municipal Court staff member, and not anyone involved with the jail, who calculated and applied the work credit and determined the detainee's adjusted release date.[14]  Using the above example of a $300 unpaid fine at $50 per day for sitting, if a detainee also volunteered to work on two of those days, there would be a reduction of $75 in total on those two days ($50 plus $25), so that, instead of being released in six days, the Municipal Court would order his release in five days ($300 minus 2 x $25, plus $50/day = 5 days).

As noted above, the Municipal Court determined what credit would be given, and calculated the release dates.  The jail personnel merely provided a list of workers.  The jail

---

[14] (*See* Ex. 14 (Nixon *McCullough* Dep.) at 36-37 (court administrator testifying that work list was sent from jail to "my chief bailiff" who was part of Municipal Court staff); Ex. 14 (Nixon *McCullough* Dep.) at 46:17-47:9 (bailiff or other court staff would see that detainees got credit for work based on jail work list); Statement of Undisputed Facts at ¶¶ 48-53 (jail relied fully on Court to determine release dates, including determining jail credit) & ¶¶ 46-50 (summarizing testimony of Murphy, Smith, Lewis, and Hopkins that they did not know what credit was given; and testimony of Strange and Baylor who did not know that there was any credit given).)

personnel released no one without an order of release from the Court.  The jail relied entirely on the Court to instruct them to release detainees.  (*See* Statement of Undisputed Facts at ¶¶ 48-53 (jail relied fully on Court to determine release dates, including determining jail credit).)

The undisputed facts show that there is no evidence whatsoever of force or coercion in connection with jail work; no one was physically forced; no one was threatened with physical harm or deprivation of anything; no one was put in solitary.  Independently of the law (cited *infra*) and the question of voluntariness, the Count VII claims of Plaintiffs Caldwell and Edwards must be dismissed, since neither of them even claims to have done <u>any</u> jail work to receive the $25 credit. Below the City addresses the testimony of the five Plaintiffs who did work in jail.

> ### 2.    Plaintiff Marquita Johnson

Ms. Johnson stated unequivocally, under oath that: (1) no one forced her to work; (2) no one threatened her; (3) no one deprived her of food; (4) no one threatened her with a longer sentence if she did not work.

> Q:    Did you understand that you didn't have to do that work, you wanted to do it to get out earlier; isn't that right?
> A:    Yes.
> …
> Q:    Ms. Johnson, did anybody force you to volunteer to do that work?
> A:    No.
> …
> Q:    You would go up to an officer every day and say, can I get some work?
> A:    Not <u>every</u> day.
>  . . .
> Q:    No one threatened you?
> A:    No.
> Q:    Nobody - -
> MR. BASS [Plaintiff's counsel]:  Objection. Threatened as to what?
> Q:    (BY MR. GILL) <u>As to anything would happen if you didn't do the work</u>?
> A:    No.
> Q:    And you were not deprived of any food because you didn't do work?
> A:    No.
> …

Q:      You were not threatened with adding to your sentence if you didn't work, were you?
A:      No.

(Ex. 30 (Johnson Dep.) at 179-82 (emphasis added).)

### 3.      Plaintiff Angela McCullough

Ms. McCullough testified that she was given credit for days worked in jail during her second incarceration in 2013 (Ex. 25 (McCullough Dep.) at 158-61),[15] and she testified generally about that jail work:

Q:      You understood that if you did work, you could get an extra twenty-five dollars credit against your time; is that right?
A:      Yes.
Q:      And you would go up to an officer and get in line and get work assignments so you could get that twenty-five dollars, right?
A:      Correct.
Q:      And if you chose not to go up there and get in line and get that assignment, you could stay in your cell and not get the twenty-five dollars; is that right?
…
A:      That's correct.
Q:      And you, being a reasonable person, wanted to get out soon if you could … right?
A:      That's how it worked.
Q:      And you wanted to get out … right?
A:      Right.
Q:      And so, you were willing to work in order to get the twenty-five dollars; is that right?
…
A:      Correct.[16]

(Ex. 25 (McCullough Dep.) at 314-15 (emphasis added).)[17]

---

[15] The following pages lay out the dates of her two commutations:  Ex. 25 (McCullough Dep.) at 152-157 & 176 (first arrest/jailing in November 2008); Ex. 25 (McCullough Dep.) at 158-161 (second arrest/jailing).

[16] Ms. McCullough pleads a single incident in which she says that she was directed by a corrections officer to watch another detainee who was a suicide risk; when the detainee cut her wrist, Ms. McCullough summoned an officer. That one-off event, if it occurred (it is disputed) was outside the statute of limitations and is certainly not the sort of repeated occurrence which could give rise to an inference of a pattern or policy of the City. *See Grech v. Clayton Cnty., Ga.,* 335 F. 3d 1326 (11th Cir. 2003).

[17] Ms. McCullough described the single incident in which she claims to have been assigned to a "suicide watch" over a disturbed inmate.  That incident, if her testimony were to be credited (it is, in fact, contradicted by jail officials), was a unique one-off occurrence, clearly not part of some City-directed policy.  She agrees that no one else has any similar experience.  (Ex. 25 (McCullough Dep.) at 324.)  She also testified that it occurred during her first incarceration in 2008-2009 at which point in time she was offered no credit for her work in jail.  (Ex. 25 (McCullough Dep.) at 317-

### 4.     Plaintiff Christopher Mooney

Mr. Mooney testified that he worked twenty-two days for the extra credit, that he wanted

to be outside, and that <u>he would not have worked but for the extra credit offered</u>:

Q:     So you said you were a person - - you didn't like sitting in the cell.  You
wanted to be outside, right?
A:     That's correct.
Q:     <u>Would you have worked whether or not you got money</u> credit - -
A      <u>No, sir.</u>
Q:     <u> - - for it?</u>
A:     <u>No.</u>
Q:     … <u>You would have just stayed in the cell and served the [entire] fifty-two
days</u>?
A:     If there was no way to speed, expedite me getting out, yes, sir, <u>I would have
sat there</u>.
Q:     Okay.
A:     It's a well-deserved rest.
Q:     But you preferred to work and shorten the time?
…
A:     I preferred not to be there.
…
Q:     But you preferred to work because you wanted to get out - -
A:     No, I was offered - - <u>I was offered an arrangement that would expedite me
getting out</u>.
…
Q:     <u>Well, and you took that offer</u>?
A:     <u>I took that</u>.

(Ex. 26 (Mooney Dep.) at 208-09 (emphasis added).)

### 5.     Plaintiff Levon Agee

Mr. Agee testified that he saw the opportunity to work as "the only way I could speed the

process up of me getting out of jail."  (Ex. 29 (Agee Dep.) at 421.)  He further testified:

Q:     Well, <u>could you have told the folks in the jail, the employees in the jail, no,
I'm not going to work today</u>?
A:     <u>Right</u>.

---

318 (suicide watch incident occurred during her first incarceration); Ex. 25 (McCullough Dep.) at 325-329 (no work
program during her first incarceration).)

> Q:    … And if you had told them you're not going to work today, you wouldn't have gotten that twenty-five dollars extra credit, right?
> A:    Right.

(Ex. 29 (Agee Dep.) at 430 (emphasis added).)

### 6.    Plaintiff Kenny Jones

Mr. Jones recalled that he worked in jail in 2011.  (*See, e.g.*, Ex. 28 (Jones Dep.) at 206:6-10 (acknowledging that he worked in 2011).)  Mr. Jones' grievance about the work was that there was too much walking involved.  (Ex. 28 (Jones Dep.) at 209.)  He admits that no one threatened him in connection with jail work or told him that he would receive any punishment if he chose not to work in jail.

> Q:    Did anyone tell you you'd get additional punishment if you didn't work while you were in jail?
> A:    No.
> …
> Q:    Okay. Anybody threaten - - any officers in the jail, workers in the jail threaten to hurt you or physically do anything to you if you didn't work?
> A:    No, ma'am.
> Q:    … And I take it, you wanted to get the twenty-five dollars a day credit so you could get out?
> A:    Yes.

(Ex. 28 (Jones Dep.) at 209-10; 212 (emphasis added).)

### 7.    Correctional officers' testimony

In addition to the Plaintiffs' own testimony, each of the corrections officers Plaintiffs deposed – all of whom had management responsibility – have testified unequivocally that no one was forced to work, but that jail work was absolutely voluntary.  Lt. Steven Smith, who began work in the jail in 2003, repeatedly made it clear that inmate work was voluntary and never forced. (Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 37-48.)  Maj. Brenda Gooden Lewis, a deputy warden, testified that all inmate workers were volunteers.  (Ex. 23 (Lewis Dep.) at 27-29; 40; 48; 66; 81.)  Janet Hopkins was a shift supervisor at the City Jail, and then the assistant warden, and

described the process of a corrections officer asking for volunteers among those eligible for work. (Ex. 22 (Hopkins Dep.) at 11-13; 16-19; 31-32.)  The inmates were free to simply sit (Ex. 22 (Hopkins Dep.) at 35), and it was only volunteers who performed work (Ex. 22 (Hopkins Dep.) at 52).

### C.   The existence of the undisputedly voluntary work program in the Montgomery City jail does not violate the laws pled in Count VII.

#### 1.   A general overview of Count VII

In Count VII, Plaintiffs are proceeding on the Thirteenth Amendment and several federal implementing statutes:  18 U.S.C. §§ 1581, 1589(a) and (b), 1593A, and 1595.  As for the Thirteenth Amendment claim, as the Supreme Court ruled in *United States v. Kozminski*, 487 U.S. 931 (1988), the Thirteenth Amendment prohibition against involuntary servitude only bars labor forced through "physical or legal coercion."  *Id.* at 953; *see also id.* at 943 (explaining that Court has "found a condition of involuntary servitude" only where "victim had no available choice but to work or be subject to legal sanction").  The federal statutory scheme has broadened the general concept of forced labor to include other forms of coercion through threats that something harmful will happen to an individual who refuses to work.[18]

Only two of the four federal statutory provisions listed in Count VII relate to the substantive claims here.  These two are §§ 1581 and 1589(a).  Section 1581 proscribes returning individuals to, or holding individuals in, a "condition of peonage."  "Peonage" is defined by the courts as a species of involuntary servitude, prohibited by the Thirteenth Amendment.  *Taylor v. Georgia*,

---

[18] The legislative history reveals that, in enacting § 1589, Congress sought to expand *Kozminski*'s limited definition of coercion under § 1584's prohibition against involuntary servitude, stating that "[s]ection 1589 will provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*."  *See* H.R. Conf. Rep. No. 106–939, at 101, *as reprinted* in 2000 U.S.C.C.A.N. 1380, 1393.

315 U.S. 25, 29 (1942).  Thus, it is synonymous for the Court's purposes here with involuntary servitude prohibited under the Thirteenth Amendment.

Section 1589(a) arguably broadens punishable conduct beyond that which might be punishable under the Thirteenth Amendment.  *See* n. 18, supra.  It requires that the labor or services be "provide[d] or obtain[ed]" "<u>by means of</u> force, threats of force, physical restraint, or threats of physical restraint" or "<u>by means of</u> serious harm or threats of serious harm" or "<u>by means of</u> the abuse or threatened abuse of law or legal process" or "<u>by means of</u> any scheme… intended to cause the person to believe that, if that person did not perform such labor or services, that person … would suffer serious harm or physical restraint."  18 U.S.C. § 1589(a) (emphasis added).

Section 1593A, much like 18 USC § 1589(b), criminalizes knowingly benefitting from "participation in a venture" "engaged in" a violation of the Peonage, Slavery and Trafficking in Persons chapter of the criminal code.  Because, as explained below, there was no statutory violation of § 1581 or § 1589(a) (which provisions are within the Peonage, Slavery and Trafficking in Persons chapter of the penal code), there is no reason to address what constitutes "participation" in a venture or a knowing "benefit" (though Plaintiffs will likely muddy the waters by skipping to arguments about who may have benefited from the work without providing substantial evidence of any underlying criminal act).[19]

As explained below, the Supreme Court, various Courts of Appeal, and District Courts across the country have made it clear that the lynchpin for any kind of "involuntary servitude," "peonage" or "forced labor" claim is that unlawful forms of coercion must be present.  The analysis starts with the case law holding that, in the prison context, even <u>requiring</u> an inmate to work does not violate the laws raised in Count VII.  In the detention context, the cases also hold that when

---

[19] Section 1595 merely authorizes a civil remedy for violations of the other statutory sections cited in the Complaint.

the plaintiff or alleged victim has a choice or option <u>not</u> to work without the threat of the imposition

of additional sanctions or harm, or actual physical force, there is no claim.

### 2.   Requiring inmates to work does not constitute "involuntary servitude," "peonage," or "forced labor."

One thing is very clear:  requiring prisoners to work – even without pay or any benefit at

all[20] – is <u>not</u> involuntary servitude.  "[F]orcing inmates to work without pay, and compelling them

to work on private property without pay, do not violate the Thirteenth Amendment."  *Ali v.*

*Johnson*, 259 F.3d 317, 318 (5th Cir. 2001); *see also Mikeska v. Collins*, 900 F.2d 833, 837 (5th

Cir. 1990) rev'd on jurisdictional grounds as to same, but not all, plaintiffs, 928 F. 3d 126; *Murray*

*v. Miss. Dep't of Corr.*, 911 F.2d 1167 (5th Cir. 1990); *Holt v. Givens*, 757 Fed. App'x 915, 922

(11th Cir. 2018).  The law is clear that prisoners may be required to work, and that any

compensation for their labor exists by grace of the state.  *See Vanskike v. Peters,* 974 F.2d 806,

809 (7th Cir. 1992) (citing *Sigler v. Lowrie,* 404 F.2d 659 (8th Cir. 1968)).

Based on the above premise, the Eleventh Circuit recognized in *Omasta v. Wainwright,*

696 F.2d 1304 (11th Cir. 1983) (per curiam), that requiring work in prison is not involuntary

servitude merely because an inmate's sentence is subject to reversal and <u>even if</u> the inmate's

sentence is ultimately reversed.  *Id*. at 1305.  Indeed, the Court need go no further to conclude that

the **<u>voluntary</u>** work program in the Montgomery City jail did not violate any constitutional or

statutory right.  If the Plaintiffs' claims are that their work was somehow involuntary because their

sentences were subject to reversal or were entered in error, the Eleventh Circuit has made it clear

in *Omasta* that possibility does not convert the work done while in jail into involuntary servitude.

*See id.* (prohibition against involuntary servitude "not implicated" where plaintiff required to work

---

[20] The credit given here was not "pay" in the traditional sense, but it is admittedly some kind of compensation.  The existence of a benefit to the prisoner makes the issue even less favorable to Plaintiffs' claims, not more.

while "incarcerated pursuant to a presumptively valid judgment and commitment order issued by a court of competent jurisdiction"). Here, of course, none of these Plaintiffs' sentences have ever been reversed or set aside.

In keeping with the well-established case law on prison work, requiring prisoners to work also does not violate the forced-labor statute, 18 U.S.C. § 1589. *See, e.g., Miranda-Martinez v. Fed. Corr. Inst. #2*, No. 2:19-CV-7742, 2019 WL 5791454, at *4 (C.D. Cal. Sept. 25, 2019) (because prisoners may be required to work without violating Thirteenth Amendment, § 1589 "cannot be read to proscribe requiring prisoners to work"), *report and recommendation adopted*, 2019 WL 5784738 (C.D. Cal. Nov. 4, 2019); s*ee also, e.g., Bass v. Cnty. of San Diego*, 2009 WL 10671992, at *5 (S.D. Cal. Aug. 25, 2009) (allegation that one was required to work while he was serving his prison sentence cannot state claim under § 1589) (citing *Draper v. Rhay,* 315 F.2d 193, 197 (9th Cir. 1963)).

Thus, it follows that the corrections officers did not violate any law cited in Count VII by merely offering detainees the choice to work. The Court need look no further to dismiss this claim against the City as to all five of those claiming to have worked.

3.   **Clearly voluntary work programs do not violate the prohibitions against "forced labor," "peonage" or involuntary servitude cited in Count VII.**

In this case, every Plaintiff who worked admits that he or she had a choice in the matter. This is also evidenced by the fact that two did not work, and the rest testified that they could have chosen not to work, and, had they chosen not to, corrections officers would neither have taken nor threatened any harmful actions against them. *See* discussion, *supra*. Choice precludes any finding of involuntary servitude under established precedent. "Critical to a claim of involuntary servitude is an absence of choice." *Fochtman v. Darp, Inc.*, No. 5:18-CV-5047, 2018 WL 3148113, at *4

(W.D. Ark. 2018) (citing *Kozminksi*, 487 U.S. at 953 ("[C]ompulsion . . . is a necessary incident of a condition of involuntary servitude.")).  As the Court in *Fochtman*, quoting the Second Circuit, put it:  "The Thirteenth Amendment does not prohibit 'labor that an individual may, in at least some sense, choose not to perform, even where the consequences of that choice are exceedingly bad.'"  *Id.* (quoting *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 486 (2d Cir. 2015)).

There is no constitutional right not to participate in a prison work program.  *Shakouri v. Davis*, 923 F.3d 407, 411 (5th Cir. 2019) (per curiam).  In *Steiner v. Bethlehem Area School District*, the Third Circuit, describing the case law on prison work, noted that no compulsion existed where "a prisoner can choose to stay in jail rather than enter the work-release program.  The fact that th[is] choice[] may not be appealing does not make the required labor involuntary servitude."  987 F.2d 989, 1000 (3d Cir. 1993), *abrogated on other grounds as recognized in Troster v. Penn. Dep't of Corr.*, 65 F.3d 1086 (3d Cir. 1995).  Indeed, the character of the situations covered by the Thirteenth Amendment are best "confin[ed] … to those situations that are truly 'akin to African slavery.'"  *Id.* (quoting *Kozminski*, 487 U.S. at 942).  It is not involuntary servitude where there is a choice, even if the choice "may entail consequences that are exceedingly bad."  *United States v. Shackney*, 333 F.2d 475, 486 (2d Cir. 1964) (Friendly, J.); *accord Immediato*, 73 F.3d at 459 (citing *Shackney*).

All of the above-cited cases are obviously in keeping with *Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990), a seminal case on this issue, which held that a voluntary work program, even if it presents a painful choice between staying in prison or leaving the premises, is still a choice and therefore does not violate the anti-peonage laws or the Thirteenth Amendment.  *Watson*, 909 F.2d at 1552 (citing *Wendt v. Lynaugh*, 841 F.2d 619, 620 (5th Cir. 1988), which held that compulsory work program did not constitute involuntary servitude).

  **4.** **Because corrections officers did not harm or threaten to harm the detainees if they chose not to work, the officers' actions fall squarely outside those proscribed by the Thirteenth Amendment and the federal statutes pled in Count VII.**

  <u>Plaintiffs' sentences were not entered as a result of their failure to do work in the jail.</u>[21] This fact is critical.  A voluntary good-time credit/community service program such as the one afforded here merely provided a method by which one could <u>reduce</u> a sentence imposed under state law.  "Forced labor," "involuntary servitude" or "peonage" could only have resulted here had Plaintiffs been sentenced or threatened **<u>with additional punishment</u>** by correctional officers for <u>not performing the jail work</u>.  This is evident from a review of some of the fundamental case law upon which Plaintiffs have relied throughout these proceedings, and leading cases construing 18 U.S.C. § 1589.

  **a.** *United States v. Reynolds*, 235 U.S. 133 (1914).

  <u>Reynolds</u> was a criminal case. The federal defendant charged with the crime of peonage had appeared as a surety and paid the fines and costs for a state-court criminal defendant.  The surety agreement provided that the state-court defendant would have to work for Reynolds until he paid the debt off or be arrested.  The state-court defendant <u>was then arrested for failing to complete his work</u> for Reynolds, and charged further fines and costs, whereupon he entered into

---

[21] As explained elsewhere, Plaintiffs' sentences were imposed under state law by judges operating as state judicial officers and as part of the Alabama Unified Judicial System.  Plaintiffs themselves recognize that Rule 26.11, Ala. R. Crim. P., and Ala. Code § 15-18-62 provide that unpaid fines and costs may be converted to jail time.  (*See, e.g.,* Doc. 32 ¶ 270.)  They contend only that the Municipal Court erred in its application of the statute and rule providing for such conversion. (Doc. 32 ¶ 270.)  Plaintiffs' sentences, even if imposed in error by the judicial branch, were imposed as a matter of state law as a result of Plaintiffs' admitted failure to pay a fine or costs imposed after valid criminal convictions.  (*See, e.g.,* Doc. 32 ¶ 70 (acknowledging unpaid fines/costs and hearing before conversion of fines/costs into jail time; not assailing prior convictions).)  Erroneous sentences do not convert jail work into involuntary servitude.  *See Omasta,* 696 F.2d at 1305, cited *supra.*

the same sort of service/surety contract with a second person <u>under threat of arrest and imprisonment if he failed to complete that work</u>.  235 U.S. at 139-43.

The threat of arrest/imprisonment in *Reynolds*, therefore, <u>resulted solely from failure to complete work contracted for with the surety</u>.  He was, in short, punished under a state statute for failing to do the work at issue.  Here, there is no allegation of any threat of arrest, imprisonment or punishment following from failure to participate in the work program.

**b.**    ***Bailey v. Alabama*, 219 U.S. 219 (1911).**

*Bailey* involved a challenge to a statute, the application of which resulted in a virtually automatic criminal conviction for anyone <u>who failed to complete a prepaid service contract</u>.  *See* 219 U.S. at 228-29, 237-38.  The Court held that the purpose of the act "was to compel, under the sanction of the criminal law, the enforcement of a contract for personal service."  *Id.* at 237-38. The Court further concluded that federal law prohibits "all legislation which seeks to compel the service or labor <u>by making it a crime to refuse or fail to perform it</u>."  *Id.* at 243 (emphasis added).

Clearly, here there is no allegation that failing to perform the jail labor at issue was made a crime or resulted in criminal sanctions.  The criminal sanctions here flowed from the violation of state law to which these Plaintiffs all pled guilty or were found guilty, and their subsequent failure to pay fines and costs, <u>not from failure to perform work</u>.  They do not allege (nor could they) that criminal (or any other) sanctions would have resulted from their failure to take part in the jail's voluntary work program.  They merely would have preserved the status quo had they chosen not to work.

**c.**    ***United States v. Kozminski*, 487 U.S. 931 (1988).**

In *Kozminski*, there were two mentally retarded men had been used as farm labor on the Kozminski farm without pay for many years before criminal charges were filed against the

19

Kozminskis.  The Supreme Court cleared up a circuit split regarding what sort of coercion could result in a conviction under laws preventing "involuntary servitude."  *See* 487 U.S. at 939.

Just as the City Defendants have done in this brief, now that the factual record has disclosed the true events, the *Kozminski* Court looked beyond "broad statements" in their previous cases to their "actual holdings" to determine what constituted the coercion required to support a finding of involuntary servitude.  It found "in every case in which [the U.S. Supreme] Court has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction."  487 U.S. at 942-43 (emphasis added).  The Court held that such threat, or the threat of physical coercion, "is a necessary incident of a condition of involuntary servitude."  *Id.* at 953.  (The District Court in that case had allowed the jury to consider evidence beyond the threat of physical coercion or legal sanctions (psychological sanctions), and so the convictions were reversed.  *Id.*)  As explained throughout, Plaintiffs in this case faced no legal, physical or psychological sanctions for refusing to take part in the voluntary work program.

In addition, *Kozminski* is helpful in that it reiterates the well-established requirement that Courts construe criminal statutes narrowly.  487 U.S. at 962 n.8 (Brennan, J., concurring in the judgment).  This applies equally to §§ 1589 and 1581, both of which are criminal statutes.  The narrow-construction requirement further militates against any possibility that the voluntary jail work program at issue here was in violation of these provisions.

> d.      *Pierce v. United States*, 146 F.2d 84 (5th Cir. 1944).

In *Pierce*, the defendant required young girls to work in what amounted to a brothel.  146 F.2d at 84-87.  He told them they owed him a debt, forced them to work to pay it off, and kept them working through threats of physical violence.  *Id.* at 85-86.  Without much discussion or analysis of the criminal statute at issue there (not the later-passed §1589), the Court upheld the

criminal peonage convictions.  *See id.*  That case is, like the others, clearly distinguishable from the facts here.  Corrections officers in Montgomery made no threat of physical violence to obtain the labor.  The *Pierce* Court said that the victim must be, at the very least, "made to work."  *Id.*  There is no evidence that anyone was, in fact, "made" to work or "forced … to work against their wills," *id.*, in the jail.  As discussed earlier, the program was purely voluntary, and each of the Plaintiffs had a choice whether to work or not to work.  Two of the seven did not work, while five chose to work.

> **e.**     ***Menocal v. Geo Group, Inc.*, 113 F. Supp. 3d 1125 (D. Colo. 2015).**

In *Menocal*, a § 1589 case, immigration detainees alleged they were required to clean certain areas of the detention facility "<u>under threat of solitary confinement</u>."  113 F. Supp. 3d at 1128 (emphasis added).  They claimed this violated § 1589's prohibition against "'knowingly provid[ing] or obtain[ing] the labor or services of a person by … means of force, threats of force, physical restraint, or threats of physical restraint'."  113 F. Supp. 3d at 1131-32 (quoting 18 U.S.C. 1589(a)).

The *Menocal* facts are easily distinguished.  The § 1589 issue in *Menocal* was not that the detainees in the private facility were given an opportunity to work to shorten judicially ordered periods of detention.  *See* 113 F. Supp. 3d at 1128.  Rather, the issue was that their refusal to do a given job was enforced by threat of physical punishment, i.e., by a threat that the detention facility would worsen their confinement conditions by placing them in solitary.  The undisputed facts in the instant case are that neither solitary confinement nor any other punishment of any kind was threatened or resulted from failure to take part in the voluntary work program.  Detainees here were merely left with the status quo if they chose not to work.

**f.**       ***United States v. Peterson*, 627 F. Supp. 2d 1359 (M.D. Ga. 2008).**

In *Peterson*, the defendant was a prisoner who had been permitted release to work at a private business, even though the sheriff who permitted the release lacked the legal authority to do so.  627 F. Supp. 2d at 1370-71.  Although *Peterson* was a criminal case, like the case here, liability was sought under § 1589 for actions that provided the prisoner a benefit.

The Court concluded:  "[I]t would be absurd to say that the statute prohibits someone from threatening to misuse the legal process for the laborer's benefit."  *Id. at* 1372 (emphasis added).  It therefore dismissed the charge based on the defendant sheriff having offered an inmate "the choice to work on [a] blueberry farm."  *Id.* at 1373.  The same reasoning applies equally to this case: it would be absurd to say that § 1589 precludes a voluntary work program that is for the laborer's benefit.  The *Peterson* Court correctly concluded that § 1589 "prohibits using *harmful measures* to induce another to provide labor."  *Id*. at 1372 (emphasis added).  A voluntary work program that reduces a detainee's jail sentence is not a "harmful measure."

*Peterson*'s analysis is both in keeping with the spirit and the letter of § 1589.  Where there is no harm threatened in connection with obtaining the work, § 1589 simply does not apply.  Here, to the extent the corrections officers did anything, it was to turn the jail work list in to the Court as they were directed to do, which act benefited the Plaintiffs by shortening their judicially-imposed sentences.

**g.       Application of the law to these facts**

If this Court were to rule with Plaintiffs, every good-time credit program in the country that involves work would be subject to attack, whether in federal prison, state prison, county jail,

or municipal jail.  Shortened sentences are often the result of prison work programs, and prison or jail work is unquestionably a condition for early release in many systems.[22]

This Court is confronted with a set of facts in which no Plaintiff testifies to actually being forced to work to pay a debt.  Each of those who worked admits that the work he or she did was, at its core, voluntary.  They had an option <u>not</u> to work and to simply sit out their entire commuted sentences.  The choice may have been unpleasant, but that is not the test under the case law construing the Thirteenth Amendment and statutory claims pled here.

These cases show that the service or labor must be obtained by means of threats of imprisonment or criminal sanction <u>for failing to do the work</u> (*Bailey* and *Reynolds*); threats of additional punishment (*e.g.*, solitary confinement in *Menocal*) <u>for</u> failing to do the work; threats or actual physical abuse (*Pierce*) <u>for</u> the failing to do the work; and the threats must be threats of harm (*Peterson*).

The language of § 1589(a) is consistent with this construction.  It requires that the labor or services be "provide[d] or obtain[ed]" "<u>by means of</u> force, threats of force, physical restraint, or threats of physical restraint" or "<u>by means of</u> serious harm or threats of serious harm" or "<u>by means of</u> the abuse or threatened abuse of law or legal process" or "<u>by means of</u> any scheme… intended to cause the person to believe that, if that person did not perform such labor or services, that person … would suffer serious harm or physical restraint."  18 U.S.C. § 1589.  That is, threats and/or harm must be the method by which the work is obtained.  Corrections officers used no such

---

[22] *See, e.g.*, 18 U.S.C. § 3624(b) (permitting up to 54 days credit for "exemplary compliance" with institutional rules); U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement P5884.03 (Mar. 31, 2006) at 2 (permitting 42 days of the 54 permitted under statute), *available at* https://www.bop.gov/PublicInfo/execute/policysearch.  The prison system rules with which a prisoner would have to comply require that prisoners work.  *See* https://www.bop.gov/inmates/custody_and_care/work_programs.jsp ("Sentenced inmates are required to work if they are medically able.").  Even to hold that labor violated § 1589 where it was obtained in connection with a sentence later deemed erroneous would result in these programs being discontinued.  It would effectively end such beneficial programs because prisoners' sentences are always subject to reversal on appeal and habeas petitions.  It would also hold prison and jail officials responsible for the judicial system's errors.

means to obtain Plaintiffs' work, and Count VII should be dismissed in full.  It must, on separate grounds, also be dismissed as to Plaintiffs Caldwell and Edwards, who do not claim to have done any work.

> **D.** **No substantial evidence suggests that the City "knowingly benefit[ed] … from participation in a venture" that obtained labor in violation of either 18 U.S.C. §§ 1581 or 1589(a).**

There is not a substantial body of case law defining what "knowingly benefits … from participation in a venture," 18 U.S.C. § 1589(b), means in the context of 18 U.S.C. §§ 1589 or 1581.[23]  However, the evidence of the City's participation in any potential venture here amounts to this, at most:  Like possibly hundreds if not thousands of other detention facilities in this country, prisoners did work at the City's jail or on a work release system under the oversight of government corrections officers.  Neither the City nor its jailers sentenced the individuals to time in jail; neither the City nor its jailers gave the individuals credit for the work they did against the sentences imposed by the Municipal Court[24]; there is no evidence that work opportunities were limited to those with commuted sentences; the corrections officers, at the request of the Municipal Court, provided the Court with the names of people who worked, which resulted, by act of the Court, in reduction of their sentences in some instances.[25]  No corrections officer threatened anyone with harm of any kind or imposed harm on them if they chose not to work.  *See* discussion, *supra*.

It was already shown above that the corrections officers' actions did not violate any of the laws pled in Count VII.  What is the offending venture then?  Is it that the judges' sentences are

---

[23] Presumably, the "knowingly benefit" principle applies to § 1581 peonage claims through 18 U.S.C. § 1593A, another statutory provision Plaintiffs pled in Count VII as explained, *supra*.

[24] (Ex. 14 (Nixon *McCullough* Dep.) at 36-37 (court administrator testifying that work list was sent from jail to "my chief bailiff" who was part of Municipal Court staff); Ex. 14 (Nixon *McCullough* Dep.) at 43:3-18 (list of people who worked would be delivered by jail weekly to bailiff).)

[25] (*See* Ex. 12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 54:6-8 (someone kept list during period Municipal Court asked for it).)

alleged to have been in error?  Neither the jailers nor the City officials "participated" in that exercise or had any power to do so.  The Judges and Municipal Court personnel were independent state actors.  The jailer does not have the authority (nor should he) of refusing to house detainees sentenced by the Court.  So, the acceptance of those inmates surely is not participation in any venture.  Nor is there evidence that the corrections officers were aware that any sentences were invalid (and none have been determined to have been invalid).  The only other even possible "participation" would be the provision of the list of inmates who worked, at the Municipal Court's behest.  The list was merely a means to reduce the time individuals spent in jail.  It was not part of any venture to threaten individuals <u>with harm for refusing to work</u> which, as explained above, would be a necessary element of any § 1589 claim.  Because § 1581 states a narrower cause of action requiring a showing of peonage, which is a version of involuntary servitude, if there is no claim under § 1589 (*see* discussion, *supra*), there is certainly no claim under § 1581.  There is also no showing that anyone was already in a "condition of peonage" to which they were "returned," as Plaintiffs allege.

These acts cannot, under any theory, be construed as participation in a venture to violate the human trafficking laws.  Compare this to the facts of *Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019).  In that case, attorneys hired by a corrupt religious organization were alleged to have knowingly participated in the organizations unlawful venture by, among other things, "represent[ing] the [organization's] Trust 'in an eviction action … to expel a family in retaliation for the mother's refusal to consent to the 'marriage' (rape) of her fifteen-year-old daughter," *id.* at 858, and affirmatively using their legal expertise to represent the principal wrongdoer in a scheme that included "ceremonial rape of little girls."  *Id.* at 875.  Here, by contrast, correctional officers charged with the oversight of inmates sent to them by the Municipal Court were merely providing

the inmates under their supervision opportunities to work, if they wished to do so.  There was no "trafficking" of any kind.

Whether the City knowingly benefited from participation in any such venture is still another step removed.  While one could certainly argue that some of the labor done by the detainees may have been a trivial benefit to the City (notwithstanding the high costs associated with obtaining it, and the possibility that much of it might have been make-work for the purpose of providing detainees something to keep them occupied), to permit that benefit to drive the equation would be, as they say, permitting the tail to wag the dog.  Clearly, without substantial evidence of an act in violation of either § 1589 or § 1581 or any participation by the City in any venture in violation of those acts, the possibility that there might have been some benefit to the City from the jail work is utterly insufficient to get these claims past this motion for summary judgment.

### E.    The claims based on the criminal statutes pled in Count VII are due to be dismissed because a municipality lacks the requisite *mens* rea.

The City has already briefed in its Motion for Judgment on the Pleadings that it cannot be held liable for violation of the criminal statutes pled in Count VII because it lacked the requisite *mens rea*.  This Court rejected that argument in its order on the City's Motion for Judgment on the Pleadings.  (Doc. 183.)  The City's argument is adopted herein as if set forth in full to preserve the record on this point for appeal.

### F.    Count VII is due to be dismissed as to all Plaintiffs.

The Court must, of course, rule individually on each Plaintiff's forced labor claims; Plaintiffs Caldwell and Edwards make no such claim, and Count VII must be dismissed as to them without further question or analysis; Plaintiffs Johnson, McCullough, Mooney, Agee and Jones each admit that they had a choice of working to receive the extra credit.  No one's sentence was lengthened by not working; no one was physically forced to work; no process of the law was used

to threaten or coerce the work.  Moreover, the program by which they received the benefit of credit off their sentences was judicially created and directed, not by some City policy or action.

Judgment for the City on these claims is due to be entered on Count VII as to each and all Plaintiffs.

III.    **As to Count VIII, Plaintiffs cannot present substantial evidence that the City had any substantive involvement with JCS apart from the signing of the Contract, nor can they present substantial evidence that either the Contract or JCS was the cause of any of the wrongs alleged.**

    A.    **Introduction**

Plaintiffs' Count VIII is also due to be dismissed on summary judgment.  The operative portion of that Count reads:

> If a person was unable to pay in full, the policy practice or custom as agreed to **in the JCS contracts** by the City and City Mayors, including Mayor Strange, acting as final policymakers for the City and under color of state law, and as adopted, ratified, administered and implemented for the Municipal Court by Presiding Judge Hayes, was to place persons on "probation," under the supervision of Defendant JCS, acting under color of state law, which included forcing the person to a[b]ide by conditions that restricted the person's liberty and purporting to subject the person to punishment if those conditions (including payment of extra fees) were violated. These policies, practices, or customs of altering punishment and deprivation of fundamental liberties of personal freedom based solely on wealth status violate fundamental principles of the 14th Amendment due process and equal protection clauses. JCS-initiated probation revocation processes and JCS initiation of charges of "failure to obey court order," pursuant to the agreed-to policy **in the JCS contracts** signed by City Mayors, including Mayor Todd Strange, result in unlawful imprisonment for nonpayment of debt and constitute unreasonable seizures of Plaintiffs by JCS and other Defendants in violation of the Fourth Amendment.

(Doc. 32 ¶ 236 (emphasis added).)

Thus, Count VIII alleges two related wrongs that Plaintiffs say implicate due process and equal protection: (1) "as agreed to in the JCS contracts," giving those who were "unable to pay" orders of probation that restricted their liberty by "purporting to subject the person to punishment if those conditions … were violated" and (2) the existence of "JCS-initiated probation revocation

processes," "pursuant to an agreed-to policy in the JCS contracts," allegedly resulting in "unlawful imprisonment for nonpayment of debt" and "initiation of charges of 'failure to obey court order.'"[26]  Plaintiffs also contend in Count VIII that the second prong of Count VIII was also a violation of the Fourth Amendment.  As noted, both prongs of Count VIII are alleged to have been acts agreed to pursuant to the JCS Contract.

This Court spoke to Count VIII in its order on the City's Motion for Judgment on the Pleadings (Doc. 183) subsequent to the Eleventh Circuit's ruling in *McCullough v. Finley,* 907 F.3d 1324 (11th Cir. 2018).  (*See* Doc. 183 at 19-21.)  Because the *Finley* Court had "described the 'probation procedure' of municipal court judges as a judicial – not administrative – act," this Court ruled that "plaintiffs' claim … depends on whether the City <u>could be independently responsible</u> for the alleged constitutional violations from JCS's probation program."  (Doc. 183 at 19-20 (emphasis added).)  In essence, this Court said that, to survive summary judgment, the Plaintiffs would have to show that the City, rather than the Municipal Court, was responsible for JCS's actions.  To that end, and for purposes of ruling on the motion for judgment on the pleadings, the Court construed the Complaint to have alleged that, "JCS was no more than the City's collection agency."  (Doc. 183 at 19.)  This Court ultimately framed the issue as whether the "City's delegation of municipal functions through its contract with JCS was the 'moving force' behind the constitutional violations alleged in Count VIII."  (Doc. 183 at 20-21.)

Plaintiffs have no evidence that the City had anything to do with how JCS operated in the Montgomery Municipal Court, much less substantial evidence that the City was the moving force behind the two wrongs that Plaintiffs identified in Count VIII (placing people on probation because

---

[26] The allegation of a charge of "failure to obey court order" appears to have just been lifted from a complaint against some other municipality, since no Plaintiff in Montgomery appears to have ever been charged with any such offense, and there is no basis in fact for making such an allegation.

they could not afford to pay, and initiating a revocation process that resulted in unlawful imprisonment).  All evidence shows that it was the Municipal Court and not the City or the Contract that dictated the actions alleged in Count VIII (probation orders, arrests, and sentencing to jail).  Moreover, the Contract was neither the moving force behind assignments to probation (prong one of Count VIII) or the moving force behind arrests or jailings related to JCS-initiated revocation procedures (prong two of Count VIII).  Therefore, Plaintiffs cannot survive summary judgment.

The Contract merely allowed JCS to make its services available to the Municipal Court.  It did not compel any judge in any case to assign any person to JCS; nor did the City supervise or control in any way how JCS processed cases.  Only the judges gave direction to JCS.  (*See, e.g.,* Ex. 31 (Strange Decl.) generally; Ex. 13 (Ennis *McCullough* Dep.) at 193 ("My interaction was with the court, court of Montgomery. … I can't recall a single time the City of Montgomery, outside of the Court, having any involvement with anything that went on with JCS."); *see also* Ex. 13 (Ennis *McCullough* Dep.) at 23-25; 30; 34; 65-66; 77-78; 92; 151-52; 193; *see also* Statement of Facts, generally (describing separation of judicial branch from City and lack of involvement by City in judicial decisions or JCS matters).)

And contrary to Plaintiffs' loose allegations, JCS neither revoked any probation, issued any warrants, arrested anyone, nor jailed anyone.  A defaulting probationer could be the subject of a petition for revocation or notice to show cause order, and nothing more.  The judge decided whether to revoke the JCS assignment, whether to issue a warrant for failure to appear at the revocation hearing, and whether to commute the unpaid fines to jail time.  Neither the City nor JCS had any authority or role in those judicial decisions.  (*See* Ex. 31 (Strange Decl.) at ¶ 2 and generally; *see generally* Statement of Undisputed Facts filed contemporaneously herewith,

particularly at ¶¶ 2-11 (separation of City and Court generally); ¶¶ 24-26 (Court exclusively determined how JCS probation would be used, who was assigned to it, etc.); ¶¶ 32 (JCS played no role in judges' decisions to commute); ¶¶ 99-100 (judges not required to use JCS and each judge made his or her own decisions as to its use); ¶¶ 118-119 (court alone made decisions regarding issuing arrest warrants); ¶¶ 125-126 (JCS played no role in any decision relative to bond, release from jail, or judges' decision to jail anyone).)

To restate the standard for City liability here, to find the City liable for any constitutional violation, this Court would have to find that a City policy or practice was the moving force behind the wrongs alleged.  *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (to support *Monell* claim, official policy must be "moving force behind the constitutional violation").  The Plaintiffs do not have substantial evidence sufficient to survive summary judgment that any City policy or practice was in fact the moving force behind the wrongs alleged.

As this Court has recognized already in connection with the City's potential liability, the City is distinct from the Municipal Court, which is a separate branch of government.  (*See* Doc. 183 at 1-14.)  Based on Alabama state law as recognized in that prior ruling, the actions of the Municipal Court, its judges and clerks in connection with exercising authority over JCS – or in connection with Municipal Court defendants assigned to JCS – does not implicate the City in any way.  The City cannot be held liable for that which it cannot control.  Indeed, as explained in Section III (F), *infra*, because Count VIII is actually an attack on the Municipal Court's orders, the Count is due to be dismissed pursuant to me *Rooker-Feldman* doctrine.

**B.  The only link between the City and JCS was the Contract.**

Aside from the existence of a Contract signed by the Mayor, Plaintiffs have no evidence of any link between JCS and the City of Montgomery.  The evidence as summarized in the City's

Statement of Undisputed Facts is to the contrary.  (*See* Ex. 31 (Strange Decl.) at ¶¶ 1-5 (neither Mayor nor City played any role, other than in executing Contract, in JCS's services to Municipal Court); *see also* Statement of Undisputed Facts generally and at ¶¶ 1-13 (summarizing testimony showing City had no authority to control Municipal Court or its judicial actions and did not do so); ¶¶ 16-25 (summarizing testimony supporting fact that City played no role in JCS's provision of services to Municipal Court); ¶ 97 (Judges were never required to use JCS or to order probation; no evidence that City played any role in that probation assignment); ¶ 93-124 (detailing JCS's practices in Municipal Court without any reference to City of Montgomery involvement therein).)

As explained below, the terms of the Contract were not even arguably what led to the wrongs alleged in this case.

### C.   The terms of the Contract did not result in either of the wrongs alleged.

#### 1.   Municipal Court Judges were not bound by the Contract Terms.

As noted above, the judges and their judicial staff are part of an independent branch of government.  They are, therefore, not subject to being controlled or fettered in their judicial roles by the City's legislative and executive officials.  *See, e.g.*, Ala. Code § 12-1-2 (municipal courts are part of Unified Judicial System of Alabama which includes municipal, district, circuit and appellate courts of this state).  As the Northern District held in *Ray v. Judicial Correction Services, Inc.*, there is no basis in Alabama law to conclude that a municipality could bind a municipal court to the terms of a contract like the one at issue here.  *See* No. 2:12-CV-2819-RDP, 2017 WL 660842, at *12, *16 (N.D. Ala. Feb. 17, 2017).  Thus, the Contract, having not been signed by the Judges, could not and did not bind them.  (*See* Exs. 9 & 10 (Mar. 2009 & July 2010 City-JCS contracts showing that no judicial officer signed the contract).)

> **2.**     **The Contract's terms unequivocally gave the Municipal Court judges discretion as to whether to use JCS to collect fines and costs.**

Second, an underpinning of the first prong of Plaintiffs' allegation in Count VIII is that the Contract somehow mandated the Municipal Court to assign to JCS those who could not pay fines and costs in full when adjudicated. It unequivocally did not. The Contract did not purport to mandate JCS assignment in cases where Municipal Court defendants did not pay in full (nor that JCS would act merely as a collection agency). Not only was the Contract denominated one for "probation services," as explained below, but at Exhibit B, Paragraph 4, it reads: "**If requested by the Court to do so** [JCS will], collect <u>from probationers</u> Court ordered fines, restitutions and other costs associated with the Court …." (Exs. 9 & 10 at Ex. B ¶ 4 (emphasis added).) This paragraph makes it clear that the judges – even had they been bound by the Contract to use JCS in probated cases (they were not) – would have had full discretion in deciding whether to use JCS to collect fines and court costs. They could have been chosen <u>never</u> to do so under the Contract terms. Thus, to the extent that the Municipal Court used JCS for that purpose, the judges' choice to do so would not have been mandated by the Contract.

> **3.**     **The Contract provided for use of JCS's services in probated cases, not every case in which fines and costs were pending.**

Third, with respect to the municipal courts of Alabama, probation is a term of art defined as the suspension of the execution of a sentence. None of the Plaintiffs contend that they had suspended sentences in connection with any municipal court case that was assigned to JCS. Alabama Code § 12-14-13 provides, in pertinent part, "(a) Municipal courts may suspend execution of sentence and place a defendant on probation for varying periods of time, not to exceed two years." In short, one has to have been given a sentence by the municipal court, not merely a fine or court costs, before probation may be imposed, and that sentence has to have been

suspended. Thus, the Municipal Court's use of JCS in the Plaintiffs' cases was outside the terms

of the Contract, under the Plaintiffs' own theory. *See, e.g.*, *Tracker Marine Retail, LLC v. Oakley*

*Land Co., L.L.C.*, 190 So. 3d 512 522 (Ala. Civ. App. 2015) (where there is a set definition in the

law for contract term, that definition is used in construing contract). Surely, Plaintiffs cannot

contend they were not subject to probation but that the Contract nonetheless mandated their

assignment to JCS.

> **4.     The Contract did not even arguably mandate JCS supervision of indigent cases merely because fines and costs were due or that JCS's fees be charged in such cases.**

With respect even to probated cases involving indigents, the Contract specifically gave the

Municipal Court discretion as to when those cases would be supervised by JCS. (Exs. 9 & 10.)

The Contract also provided that: "JCS will also supervise indigent cases <u>when determined by the</u>

<u>Court</u>. These cases will not be charged the standard probation fee, but will still be offered all JCS

services." (Exs. 9 & 10 at Ex. A ¶ 5 (emphasis added).) In other words, not only did the Contract

not provide that all people who were unable to pay would be assigned to JCS, or that JCS would

ever collect fines and costs, but the Contract provided that the Judges, even as to probated cases,

would only have JCS supervise those cases at their discretion. And the Contract specifically

provided that JCS would not charge its probation fee in connection with "indigent cases" –

meaning cases of probation involving indigent defendants.

The Contract further provided, of course, that, when authorized by the court to deal with a

convicted defendant, JCS must adhere to and follow all state and federal law, of which the

Constitution is the supreme law. (Exs. 9 & 10 at Ex. A ¶ 8.)

As the extensive evidence produced herewith shows, the choice of whether, when, and how

to use JCS was the choice of the Municipal Court judges, and was something over which the City

had no authority or control.  Nor did the City executive ever attempt to control JCS' actions in cases referred by the Court. [27]  This left only the Contract and its terms as a connection to the City, and, as shown here, nothing about the Contract – the only connection between JCS and the City – even arguably led to the first "wrong" alleged in Count VIII, the assignment to JCS of all people who could not immediately pay.

### 5.    Nothing in the Contract was the moving force behind any of the wrongs alleged in Count II.

The second prong of Count VIII – that the City was the moving force behind "JCS-initiated probation revocation processes" – likewise fails.  The terms of the Contract neither bound the Court nor mandated JCS's involvement in Plaintiffs' cases.  Moreover, even if they had, the Contracts' terms did not even arguably lead to any allegedly unlawful arrest or imprisonment.  For instance, at Contract Exhibit A, Paragraph 6, the Contract merely provides that probationers who do not comply with the terms of probation will be "returned" to court, given a "full opportunity to refute any or all points," and that the "probation officer will then comply with the Court's ruling in reference to sentencing or possible revocation of probation."  (*See* Exs. 9 & 10 at Ex. A ¶ 6.)

There was no detail in the Contract as to how that return to court would be accomplished.  To the extent any such thing occurred, it was purely the result of an interaction between the Court and JCS.  The Contract left open how it would occur.  Such return need not have resulted in any detention, lawful or otherwise.  Moreover, the Contract, as noted above, provided that JCS would comply with all federal and state laws.  (*See* Exs. 9 & 10 at Ex. A ¶ 8.)

---

[27] Montgomery's judges were never required to use JCS or to order probation.  (Ex. 3 (Hamby Decl.) at ¶ 14.)  The Montgomery municipal judges offered some defendants court-supervised probation which was not with JCS, or sometimes ordered a defendant to pay the court directly over time rather than put them on probation with JCS.  (Ex. 8 (Nixon 2014 Dep.) at 233; Ex. 3 (Hamby Decl.) at ¶ 16; Ex. 4 (Hill Decl.) at ¶ 20; Ex. 7 (Hayes Dep.) at 60; 77; Ex. 6 (Westry Dep.) at 25-26; 110.)  There is no evidence that the City of Montgomery had any role whatsoever in the decision to assign a defendant to JCS probation, in the handling of such probation, nor the decision by the Court to revoke or not revoke probation.  The evidence is to the contrary.  (*See* Ex. 31 (Strange Decl.).)

34

Additionally, the Contract explicitly provided for a full opportunity for the defendant/probationer to be heard (*see* Exs. 9 & 10 at Ex. A ¶ 6 ("full opportunity to refute any and all points")), and JCS' full compliance with the Court's subsequent ruling (Ex. 9 & 10 at Ex. A ¶ 6 (promising probation officer's compliance with the Court's ruling)).

None of these provisions suggest that any unlawful incarceration would result from the terms of the Contract. And, as noted previously, one of the Contract's terms was JCS's compliance with state and federal law. Thus, the second prong of Count VIII is also due to be dismissed.

In summary, the City's only role in any actions undertaken by JCS was in the signing of the two JCS contracts. As every witness's testimony has supported, the Contract with JCS was merely for the purpose of making a service available to be used at the Court's discretion, and the City was never involved in, nor sought to oversee, JCS's activities within the Municipal Court.[28] Because the terms of the Contract were not the proximate cause of the injuries alleged in Count VIII, the Count is due to be dismissed against the City.

### D.    It was judicial acts, not those of JCS, that resulted in the alleged wrongs.

Even if there were some alleged connection between the City and JCS, other than the Contract, summary judgment would still be due. The two wrongs Plaintiffs allege in Count VIII were purely the result of judicial acts. First, it was the Court that placed each Plaintiff on probation, not JCS, and certainly not the City, as set out above. If the Court had a policy of placing people

---

[28] (*See,* Ex. 2 (Nixon Aff.) at ¶ 114 (judges used their own discretion in assigning individuals to JCS); *see also* Ex. 31 Strange Decl. ¶¶ 1-5 (neither Mayor nor City played any role, other than in executing Contract, in JCS's services to Municipal Court); Statement of Undisputed Facts at ¶¶ 1-13 (summarizing testimony showing City had no authority to control Municipal Court or its judicial actions and did not do so); ¶¶ 16-25 (summarizing testimony supporting fact that City played no role in JCS's provision of services to Municipal Court); ¶ 97 (Judges were never required to use JCS or to order probation; no evidence that City played any role in that probation assignment); ¶ 93-124 (detailing JCS's practices in Municipal Court without any reference to City of Montgomery involvement therein).) The City's mayor is the individual who is authorized to sign contracts on the City's behalf. (Ex. 31 (Strange Decl.) at ¶ 2.) And he never had any role whatsoever in how the Court used JCS or how it carried out its process. (Ex. 31 Strange Decl.), generally.)

on probation merely because they could not afford to pay fines and costs, that was a judicial act, not one undertaken by JCS or the City.

As to the second prong of the wrongs alleged in Count VIII, allegedly unlawful jailings, it was the Court, not JCS, and not the City, that issued arrest warrants, and it was the Court, and not the City or JCS, that, in hearings held after the arrests, decided whether to commute defendants' fines and costs to jail time. (*See, e.g.,* Statement of Undisputed Facts at ¶¶ 32 (commuting) & 119 (warrants).)

Moreover, Plaintiffs cannot assert that their jailings were the necessary result of probation revocation. That was not the Court's practice. The Municipal Court's commuting practice was not dependent on whether an individual had been placed with JCS. (Ex. 2 (Nixon Aff.) at ¶¶ 2-3 (individuals never assigned to JCS were commuted); Doc. 32 (First Amended Complaint) (not alleging that any Plaintiff sentenced by Judge to jail for violating probation).) Rather, the practice, based on state statute and criminal procedural rules (Ala. Code § 15-18-62 and Ala. R. Crim. P. 26.11) was applied both to those placed with JCS and those who had not been.[29] JCS was merely one of the alternatives to commutation (along with granting more time to pay and court-supervised payment plans) that were available to the Municipal Court defendants. (*See* Ex. 2 (Nixon Aff.) at ¶ 77 (options to paying in full).) Thus, Plaintiffs cannot show that their commuted sentences were caused by their involvement with JCS. Even during the period of time before JCS was providing services to the Court, the Municipal Court judges commuted people who, though given more time to pay, were not assigned to any probation service.

---

[29] While Plaintiffs might argue that the Municipal Court judges should have held a more in-depth hearing into their ability to pay the fines and costs before they were commuted, that was purely a judicial action, and the Judges' handling of those hearings can neither be blamed on the City nor JCS.

In further support of its argument that JCS's actions were not the cause or moving force behind the constitutional wrongs alleged, the City adopts herein, as if set forth fully, JCS's Summary Judgment brief and evidentiary submissions, most particularly those portions setting out JCS's lack of involvement in assignment to JCS, arrests, and sentencing of Municipal Court defendants.

### E.      Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine.

Inherent in Plaintiffs' claims is the concept that the Court's probation orders and sentences are themselves "illegal," and thus that the down-stream consequences are constitutionally actionable.  But Plaintiffs cannot use the instant litigation as a vehicle to attack such orders; that is barred by the *Rooker-Feldman*[30] doctrine, which prohibits federal courts from adjudicating the validity of state court orders.  In yet another case in the flurry of suits against JCS involving Alabama municipal courts, the plaintiffs asserted that probation orders issued by the Montgomery Municipal Court assigning them to JCS were invalid because they were not signed by a judge.  The District Court and then the Eleventh Circuit ruled that a federal court cannot review the validity of such a state court order, and, indeed, cannot even "peer into Alabama law to determine" the validity, because the *Rooker-Feldman* doctrine bars such federal adjudication.  *Thurman v. Judicial Corr. Servs., Inc.*, 760 F. App'x 736, 737 (11th Cir.), *cert denied*, 139 S. Ct. 2646 (2019).

For those same reasons, the probation orders, orders revoking probation, arrest warrants, and orders commuting the fines to jail time must all be accepted as valid.  None of them have been set aside.  The City did not and could not cause or cancel such judicial actions or be liable for them.  Thus, because Plaintiffs' remaining claims in Count VIII actually hinge on the validity of

---

[30] *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923).

the Municipal Court's orders, Plaintiffs' claims are due to be dismissed for that independent reason.

### F.    Plaintiffs' supervision claim

At some point in Count VIII, Plaintiffs' counsel have thrown in a boilerplate "failure to train and supervise" claim.  (Doc. 32 ¶¶ 237-239.)  There is no substantial law or evidence to suggest that the City had the authority or obligation to train Municipal Court personnel or any service provider such as JCS made available to it.  Indeed, the judges were under the supervision of the various state agencies charged with overseeing the Alabama Unified Judicial System, as explained in note 2, *supra*.

For the foregoing reasons, Count VIII is due to be dismissed as to all Plaintiffs.  The City articulates below additional reasons why Count VIII is due to be dismissed as to individual Plaintiffs' claims.

### G.    Further reasons for dismissing individual Plaintiffs' claims.

#### 1.    The claims pled by Plaintiffs Mooney and McCullough are due to be dismissed as to their arrests because they would have been arrested even absent their failures to appear on JCS-related cases.

Plaintiffs Mooney and McCullough, while perhaps arrested in connection with failing to appear at a JCS-noticed revocation proceedings, were also arrested at the same time in connection with wholly unrelated tickets for failure to appear.  (*See* Statement of Undisputed Facts ¶¶ 138-39 (McCullough) and ¶¶ 230-31 (Mooney) (setting out exhibits and information necessary to show that each was arrested on non-JCS-assigned cases).)  Because they would have been arrested, even absent their failures to appear at JCS-noticed revocation proceedings, they cannot claim that JCS's revocation petition caused their arrests.  They were subject to arrest on warrants for failures to appear in cases never assigned to JCS.  JCS's involvement was, simply, not the proximate cause

38

for these Plaintiffs' arrests.  (The City, of course, as noted above, had no involvement in issuing the warrants.  The arresting officers were engaged in executing facially valid warrants issued by a judicial officer, and those officers' lawful conduct does not give rise to a claim against the City.)

### 2. Count VIII is due to be dismissed as to Plaintiff Edwards on statute of limitations grounds.

Although Plaintiff Algia Edwards was, at some point, placed under the supervision of JCS pursuant to a Probation Order entered by the Municipal Court, all of his JCS claims are barred by the two-year statute of limitations.  Mr. Edwards testified that the last time he remembered ever meeting with JCS was on May 2, 2011.  (Ex. 24 (Edwards Dep.) at 299.)  The JCS files reflect a May 23, 2011 letter in which JCS instructed Mr. Edwards that he had violated the terms and conditions of his probation and further instructed him to appear in the Municipal Court on June 30, 2011; Mr. Edwards did not recall appearing in Municipal Court on that date.  (Ex. 24 (Edwards Dep.) at 395; Ex. 54 (Ex. 72 to Edwards Dep.).)

Edwards was subsequently arrested in September 2012 for failing to appear in court on the same tickets in connection with which he had been assigned to JCS.  (*See* Ex. 56 (Ex. 76 to Edwards Dep.) at 4; Ex. 52 (Ex. 62 to Edwards Dep.) at 1; Ex. 53 (Ex. 70 to Edwards Dep.) at 1.)  The Court, without any evidence of any reference to JCS, commuted the remaining fines and costs in connection with those tickets to time in jail.  There is simply no evidence that JCS had any involvement in Mr. Edwards' Municipal Court cases by the time of the commutation in September 2012 or at any point thereafter.  Even if one were to argue that Mr. Edwards was arrested in September 2012 in connection with failing to appear for a JCS-noticed revocation hearing, that arrest and subsequent jailing are well outside the statute-of-limitations period, which extends two years prior to the filing of this lawsuit in July 2015.  *See* Statement of Facts at ¶¶ 191-195 (describing Edwards' September 18, 2012 arrest and his jail sentence that ended on September 20,

2012).  Because all JCS involvement, including any arrest ordered by the Court relative to the JCS revocation notice and any subsequent jailing, occurred outside the statute-of-limitations period, Count VIII is due to be dismissed as to Plaintiff Edwards.

The City explicitly adopts herein all summary-judgment statute-of-limitations arguments made by JCS in their contemporaneous motion, as to any of the Plaintiffs.

**3.    Count VIII is due to be dismissed as to Plaintiff Caldwell because, though he was arrested for failure to appear, his fines and costs were not commuted to jail time.**

Although Mr. Caldwell was arrested several times for failure to appear, it does not appear that those arrests can be attributed to a failure to appear for a JCS-noticed hearing on a revocation petition.  (*See* Statement of Undisputed Facts at ¶ 242.)  Mr. Caldwell never had his fines and costs commuted to jail time.  (*See* Statement of Undisputed Facts at ¶ 252.)  Thus, Mr. Caldwell can produce no evidence of any even allegedly unlawful jailing associated with his assignment to JCS.

**4.    Count VIII is due to be dismissed as to Plaintiff Johnson because her claims are also barred by the statute of limitations.**

Plaintiff Johnson's removal from assignment to JCS occurred before she was commuted by the Municipal Court in 2012.  (*See* Statement of Undisputed Facts at ¶ 154 (date of revocation hearing); Ex. 40 (COURT 00882) (showing date of her arrest prior to commutation and tickets associated with that arrest).)  There is no evidence that she has had any involvement with JCS within the statute of limitations period.  She was released from her commuted sentence in January of 2013.  (*See* Ex. 41 (COURT 008890) (Release Order noting "early release—jail work list").)  Therefore, even if she contends that the commutation of her fines and costs to jail time was the result of some action taken by JCS (she has no evidence that it was in any way caused by her assignment to JCS), her JCS-related claim would still be time barred.  As noted above, this case was filed in July of 2015, and the two-year statute of limitations only reaches back to July of 2013.

Ms. Johnson's statute of limitations began to run, at the <u>latest</u>, when she was arrested in April of 2012 on some of her JCS-related tickets as well as numerous other tickets. Her subsequent commutation was not, as explained elsewhere, proximately caused by her assignment to JCS. Commutation was not the result of a revocation of probation, and it was in no way limited to those cases assigned to JCS supervision. Moreover, even that April arrest was not proximately caused by JCS, even if she may have been issued warrants for not appearing at her JCS revocation hearing scheduled for February 2, 2012. At least five warrants issues for her arrest on April 25, 2012 were for cases never assigned to JCS. Compare Ex. 39 (Marquita Johnson Petition for Revocation) with Ex. 42 (sample of April 25, 2012 warrants). The warrants in Exhibit 42 are for cases that had never been assigned to JCS and are, therefore, not listed on the JCS Petition for Revocation. For these reasons, there can be no question as to whether Marquita Johnson's claims as to JCS probation in Count VIII are time barred. They are.

### 5. Count VIII should be dismissed as to Plaintiff Jones.

Mr. Jones has no recollection of ever being placed on probation with JCS. He simply has no knowledge or recollection of what JCS is or has allegedly done. (*See* Statement of Undisputed Facts at ¶ 168.) For that reason, Count VIII, which alleges wrongdoing by JCS and infringement by JCS on Mr. Jones' constitutional rights, should be dismissed.

Plaintiff Jones' claims are also barred by the statute of limitations. Mr. Jones' complaint in this case relates to a commutation of his fines and costs which took place in 2011. (*See* Statement of Undisputed Facts at ¶ 179.) That incarceration and any JCS involvement related to it directly or indirectly fall outside the two-year statute of limitations applicable to Count VIII.

### 6.   Count VIII is due to be dismissed as to Plaintiff McCullough.

As to Ms. McCullough's assignment to JCS there is no evidence that her assignment to JCS in any way limited her liberty.  She never appeared at a JCS appointment or made any payment to JCS.  (*See* Statement of Undisputed Facts at ¶ 179.)  In addition, when she was arrested subsequent to her JCS-noticed revocation hearing, at which she did not appear, seven of the tickets on which she was arrested were not in any way connected to the referral to JCS and had never been assigned to JCS.  (*See* Statement of Undisputed Facts at ¶ 139.)  She had failed to appear on those tickets completely independently of any involvement with JCS, and, thus, she would have been subject to the exact same arrest on July 2, 2013, absent any prior involvement with JCS.

Indeed, the only liberty implications that the Probation Order had on any Plaintiff was the requirement that he or she appear for appointments at the JCS offices.  There is no evidence that any other aspect of the terms set out in the order that could even arguably implicate a liberty interest were enforced or that Plaintiffs took any pains to comply with them.  In that sense, because requirements to appear at appointments is not an actual colorable claim of a deprivation of liberty, and because probation revocation did not result in the imposition of a suspended sentence, the first prong of Count VIII really states no due-process liberty-interest claim for any Plaintiff.

### 7.   Count VIII is due to be dismissed as to Mr. Agee.

Mr. Agee was terminated from JCS probation on March 2, 2011, far outside the two-year statute of limitations period here.  He was notified of his JCS revocation hearing in January 2011, and that was the last contact he had with JCS.[31]  Because he had no contact or interaction with JCS

---

[31] (*See* Ex. 84 (Ex. 117 to Agee Dep.) at 2; Ex. 29 (Agee Dep.) at 388:21-389:3; Ex. 29 (Agee Dep.) at 352 (acknowledging that he could not recall having shown up at Mar. 2, 2011, hearing); *see also* Ex. 34 (COURT 015909, 015911, 015913, 015915) (case action summary for sampling of Mr. Agee's cases assigned to JCS showing Mar. 15, 2011, case status change from "P" meaning "probation" to "CAP" meaning "capias warrant" and showing next action as June 13, 2013, service of alias warrants); Ex. 38 (Nixon *Carter* Dep.) at 210:5-14; 212:3-9 (testifying that "P" in old system meant pending and "CAP" in old system meant capias).)  He has no claim that he was not provided notice of the hearing, because it was mailed to the address he gave JCS.  (Ex. 29 (Agee Dep.) at 342-44.)

after early 2011 and the statute of limitations only reaches back to July 2013, his claims relative to JCS are time-barred.

<u>**Conclusion**</u>

For the foregoing reasons, Plaintiffs remaining claims against the City are due to be dismissed in their entirety pursuant to Rule 56, Fed. R. Civ. P.

Respectfully submitted this 21st day of January, 2020.

s/Shannon L. Holliday
Shannon L. Holliday [ASB-5440-Y77S]
Richard H. Gill [ASB-7945-G70R]
Robert D. Segall [ASB-7354-E68R]
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347
holliday@copelandfranco.com
gill@copelandfranco.com
segall@copelandfranco.com
**Attorneys for Defendant City of Montgomery**

43

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of January, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

| | |
|---|---|
| Martha I. Morgan<br>8800 Lodge Lane<br>Cottondale, Alabama  35453<br>mimorgan@yahoo.com<br><br>Harold C. Hirshman<br>Jennifer A. Barrett<br>Dentons US LLP<br>233 South Wacker Drive<br>Suite 5900<br>Chicago, IL  60606<br>harold.hirshman@dentons.com<br>jennifer.barrett@dentons.com<br><br>Stephen J. O'Brien<br>Dentons US LLP<br>One Metropolitan Square, Suite 3000<br>St. Louis, MO  63102<br>stephen.obrien@dentons.com<br><br>Greg Bass<br>Britney Wilson<br>National Center for Law and Economic Justice<br>275 Seventh Avenue, Suite 1506<br>New York, NY  10001<br>bass@nclej.org<br>wilson@nclej.org | Faya Rose Toure<br>Henry Sanders<br>Chestnut, Sanders & Sanders, LLC<br>P.O. Box 1290<br>Selma, AL  36702<br>fayarose@gmail.com<br>gpompey@csspca.com<br><br>Michael L. Jackson<br>Larry S. Logsdon<br>Wesley K. Winborn<br>Wallace, Jordan, Ratliff & Brandt, L.L.C.<br>P.O. Box 530910<br>Birmingham, AL  35253<br>mjackson@wallacjordan.com<br>llogsdon@wallacejordan.com<br>wwinborn@wallacejordan.com<br><br>E. Ham Wilson<br>Miland F. Simpler, III<br>Ball, Ball, Matthews & Novak, P.A.<br>P. O. Box 2148<br>Montgomery, AL  36109-5413<br>hwilson@ball-ball.com<br>msimpler@ball-ball.com<br><br>R. Bernard Harwood, Jr.<br>Rosen Harwood, P.A.<br>2200 Jack Warner Parkway<br>Suite 200<br>Tuscaloosa, AL  35401<br>bharwood@rosenharwood.com |

s/Shannon L. Holliday
Of Counsel

44