IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ANGELA MCCULLOUGH et al., on behalf of themselves, individually, and on behalf of a class of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No.  2:15-CV-463-RCL |
| | ) ) | |
| THE CITY OF MONTGOMERY, ALABAMA; EARNEST N. FINLEY, JR., Chief of Police of the City of Montgomery, in his individual capacity; KEVIN MURPHY, former Chief of Police of the City of Montgomery, in his individual capacity; LES HAYES III, Presiding Judge of the Municipal Court of the City of Montgomery, in his individual and official capacities; JUDICIAL CORRECTION SERVICES, INC., a corporation; and TODD STRANGE, Mayor of the City of Montgomery, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## Brief in Support of Judicial Correction Services' Motion for Summary Judgment

Larry S. Logsdon
Michael L. Jackson
Wesley K. Winborn
Jonathan A. Griffith
Wallace Jordan Ratliff & Brandt, LLC
P.O. Box 530910
Birmingham, Alabama 35253
Voice:  (205) 870-0555
llogsdon@wallacejordan.com
mjackson@wallacejordan.com
wwinborn@wallacejordan.com
jgriffith@wallacejordan.com

Wilson F. Green
Fleenor & Green LLP
1657 McFarland Boulevard N.
Suite G2A
Tuscaloosa, Alabama 35406
Voice:  (205) 722-1018
wgreen@fleenorgreen.com

Attorneys for Defendant Judicial Corrections Services

## Table of Contents

Introduction ................................................................................................ 1

Statement of Undisputed Material Facts ................................................. 2

   I.   JCS, the Montgomery Municipal Court, and the probation process ................ 2

     A. JCS's operations generally ............................................................... 2

     B. JCS and the Montgomery Municipal Court .................................... 4

       1.  The Municipal Court generally ................................................. 4

       2.  The Municipal Court's use of public defenders ....................... 5

       3.  The Municipal Court's indigency and inability-to-pay determinations ........................................................................ 7

     C.  The anatomy of a Montgomery Municipal Court case .................... 8

     D.  The JCS probation process ............................................................ 13

     E.  The Municipal Court's commutation orders ................................. 20

   II.  The Individual Plaintiffs ................................................................... 21

     A.  Angela McCullough .................................................................... 21

     B.  Marquita Johnson ....................................................................... 24

     C.  Kenny Jones ................................................................................ 28

     D.  Hassam Caldwell ......................................................................... 29

     E.  Algi Edwards ............................................................................... 32

     F.  Levon Agee .................................................................................. 41

     G.  Christopher Mooney ................................................................... 45

Argument ................................................................................................. 46

   I.   The Plaintiffs' federal claims fail. ..................................................... 46

     A.  There is no substantial evidence that JCS violated the Plaintiffs' constitutional rights. ................................................................... 46

       1.  JCS is not liable for any alleged violation of the Plaintiffs' Fourth Amendment rights related to the issuance and service of warrants. ..... 46

         a.  JCS is not a *Monell* policymaker ....................................... 47

         b.  There is no substantial evidence that JCS violated the Plaintiffs' Fourth Amendment rights related to the issuance and service of warrants. ................................... 49

       2.  JCS is not liable for any alleged violation of the Plaintiffs' constitutional rights related to indigency determinations .................... 52

3. JCS is not liable for any alleged violation of the Plaintiffs' constitutional rights related to probation sentences. ............................ 60

B. JCS is entitled to absolute quasi-judicial immunity. .................................... 63

C. JCS is entitled to qualified immunity. ........................................................... 67

D. Plaintiffs' claims are barred by *Rooker-Feldman* and the *Heck v. Humphrey* favorable-termination rule. ........................................................ 69

II. JCS is due summary judgment on the Plaintiffs' claims arising under Alabama statutory and common law. ................................................................. 71

A. Absolute quasi-judicial immunity bars the Plaintiffs' state-law claims. .............................................................................................................. 71

B. The evidence does not support a claim of false imprisonment against JCS. .............................................................................................. 72

C. The Plaintiffs cannot prove the essential elements of their abuse-of-process claim against JCS. ........................................................................... 75

D. The *Rooker-Feldman* doctrine, a lack of evidence, and the voluntary-payment doctrine bar the Plaintiffs' claim of money had and received. ............................................................................................... 77

III. The statute of limitations bars most of the Plaintiffs' claims. ........................ 82

Conclusion .................................................................................................................... 84

Certificate of Service ................................................................................................... 85

## Introduction

Municipal-court probationers are suing Judicial Correction Services ("JCS") and the City of Montgomery (the "City"), alleging an array of constitutional and state-law infractions similar to those alleged by the plaintiffs in *Ray v. Judicial Corr. Servs., Inc.*, 270 F. Supp. 3d 1262 (N.D. Ala. 2017). In *Ray*, Judge Proctor entered summary judgment disposing of every claim against JCS that the Plaintiffs here have pleaded. In their First Amended Complaint,[1] the Plaintiffs assert many of the § 1983 claims asserted by the *Ray* plaintiffs, including claims of due-process, equal-protection, and Fourth Amendment violations. As in *Ray*, many of their claimed wrongs are actions caused by orders from Montgomery's Municipal Court, not actions taken or not taken by JCS. As in *Ray*, Plaintiffs cannot show JCS had a custom or policy that was the moving force behind the constitutional violations they allege — because the City's Municipal Court decided whether to hold indigency hearings, to revoke their probations, and to issue arrest warrants. JCS acted only according to explicit instructions from the Municipal Court and under its control and supervision. In fact, the only federal claims against JCS which survived in *Ray* — (1) a due-process based § 1983 claim that JCS unilaterally extended probations past 24 months, and (2) two § 1983 conspiracy claims between JCS and the municipal court — are not even pleaded in this case.[2] The claims made by these Plaintiffs, in this case, cannot survive if the *Ray* summary-judgment opinion is our guide.

---

[1] References to the Complaint ("Compl.") in this brief are to the First Amended Complaint, as corrected, Doc. 34-1.

[2] Plaintiffs' only reference to any purported conspiracy is contained in RICO-based allegations (Compl. at ¶¶ 159, 255a.-d., and 259-64). This Court dismissed the RICO claims. (Doc. 132 at 2.)

The Plaintiffs' state-law claims fail as well. The arrests about which they complain occurred pursuant to lawfully-issued warrants, and in any event, JCS was not involved in their arrests, so no false imprisonment can be attributed to JCS. Similarly, Plaintiffs have no substantial evidence to support their malicious-prosecution claim. And their money-had-and-received claim is barred not only by a lack of evidence but also by the voluntary-payment doctrine.

Perhaps most importantly, the only federal claims against JCS which survived in *Ray* are absent here. There is no due-process based § 1983 claim that JCS unilaterally extended probations past 24 months, because Carter was not on probation that long. And the three § 1983 claims based on a conspiracy between JCS and the municipal court are not even pleaded in this case. Plaintiffs' claims cannot survive unless this Court rejects *Ray*.

For the reasons discussed herein, these Plaintiffs' claims lack any basis in the law or the facts. As a result, JCS is entitled to summary judgment.

## Statement of Undisputed Material Facts

## I.   JCS, the Montgomery Municipal Court, and the probation process

### A.   JCS's operations generally

1.   JCS provided probation services to various municipal courts in Alabama at various times, running in total from 2006 through 2015.

2.   When JCS began working with a court, someone from the JCS staff would meet with the judge or court staff to determine the judge's preference on how things should be handled. (Ex. D, Dep. of Wes Ennis ("Ennis Dep. I"), at 70:11–22; Ex. Q, Decl. of Colleen Ray, at ¶ 43.) JCS would solicit instructions from the judge, and the

judge would provide information, on the judge's preferred procedures, including how to mail notices or communications to probationers and the substance of forms that were used. (Ex. D (Ennis Dep. I) at 70:11–22; Ex. E, Dep. of Wes Ennis, dated Dec. 11, 2019 ("Ennis Dep. II") at 22:16 to 25:17, 136:1 to 137:11, 143:1–14.)

3.      JCS's policy was to follow the orders and directives of the judges. (Ex. Q (Ray Decl.) at ¶ 28; Ex. O, Decl. of Tonia Hamby, at ¶ 9; Ex. P, Decl. of Darleen Hill, at ¶ 9 (quoting JCS manual: "instructions and information contained in the SOP are subject to change based on court directive and circumstance").) If a judge's order conflicted with the JCS manual, JCS would do as the judge ordered. (*Id.*)

4.      It was not uncommon for defendants to request probation with JCS. (Ex. O (Hamby Decl.) at ¶ 19; Ex. M, Dep. of Judge Milton Westry, at 107:21 to 108:1; Ex. Q (Ray Decl.) at ¶ 35; Ex. R, Aff. of Kenneth H. Nixon, Jr. (Pla.'s Ex. 1 to Dep. of Kenneth H. Nixon, Jr., dated Oct. 15, 2019) at ¶¶ 9–11, 25.) The terms of probation for each probationer were decided solely by the municipal judge. (Ex. O (Hamby Decl.) at ¶¶ 10, 22.) The procedures used by the municipal judges in assigning probationers to JCS varied from judge to judge and from probationer to probationer. (Ex. Q (Ray Decl.) at ¶ 28; Ex. O (Hamby Decl.) at ¶¶ 8, 14–16; Ex. N, Decl. of Sara Gray, at ¶¶ 9–11; Ex. P (Hill Decl.) at ¶¶ 8, 14–16.) JCS also varied its practices to accommodate the particular instructions of each judge and the requirements for each probationer. (Ex. Q (Ray Decl.) at ¶¶ 24, 26, 39, 40; Ex. P (Hill Decl.) at ¶¶ 8–9, 14–16; Ex. N (Gray Decl.) at ¶¶ 9–10.)

### B.   JCS and the Montgomery Municipal Court

#### 1.   The Municipal Court generally

5.   The Montgomery Municipal Court adjudicates traffic and misdemeanor offenses committed in the City of Montgomery. Ala. Code §§ 12-12-32, 12-12-51, 12-14-1; Ala. Const. art. VI, § 145. The Municipal Court is a part of the Alabama Unified Judicial System and, thus, is subject to the oversight of both the Alabama Administrative Office of Courts and the Alabama Court of the Judiciary. (Doc. 183 at 10); Ala. Const. art. VI, §§ 139(a), 156(b), 157(a); Ala. Code § 12-1-2, 12-14-54; Ala. Jud. Ethics Op. 87-305, 1987 WL 1446594 (June 29, 1987); *Ray v. Judicial Corr. Servs., Inc.*, No. 2:12-cv-02819-RDP, 2017 WL 660842, at *11 (N.D. Ala. Feb. 17, 2012).

6.   Because of its size and the court's active docket, the Municipal Court has at most relevant times had four active judges to hear cases. (Ex. L, Dep. of Kenneth H. Nixon, Jr., dated April 18, 2014 ("Nixon Dep.") at 29:21 to 30:23.)

7.   JCS began providing private probation services to the Montgomery Municipal Court (the "Municipal Court") in March 2009 when it entered into a contract with the City. (Ex. E, (Ennis Dep. II) at 34:9 to 35:4; Ex. S (Ennis Dep. II, Ex. 2 ("March 2009 Contract")).)

8.   JCS and the City entered into a second written contract effective July 1, 2010. (Ex. E (Ennis Dep. II) at 41:14 to 42:1; Ex. T (Ennis Dep. II, Ex. 3 ("July 2010 Contract").) That contract remained operative until the City terminated its contract with JCS effective June 2014. (Ex. D (Ennis Dep. I) at 128:1–8; Ex. P (Hill Decl.) at ¶ 2; Ex. R (Nixon Aff.) at ¶34.)

9.   Montgomery's judges were never required to assign any defendant to probation with JCS. (Ex. O (Hamby Decl.) at ¶ 14; Ex. P (Hill Decl.) at ¶ 14; Ex. N (Gray Decl.) at ¶ 10.) Sometimes, the judges would offer a defendant the option of going on a non-JCS payment plan. (Ex. R (Nixon Aff.) at ¶ 77 ("At some point during the relevant time period, some people were placed on non-JCS payment plans or given the option to have a non-JCS payment plan.").)

10.   For those probationers assigned to JCS, JCS would provide its services and charge its fees, except that probationers "determined by the Court" to be indigent "[would] not be charged the standard probation fee, but [would] still be offered all JCS services." (Ex. S (March 2009 Contract) at Exhibit A, ¶ 5; *see also* Ex. T (July 2010 Contract) at Ex. A, ¶ 5.)

11.   Probationers might be treated differently by a judge based upon perception of the probationer's compliance efforts. (Ex. O (Hamby Decl.) at ¶ 18.) Judges usually treated probationers more favorably if they showed up to court dates, even if they failed to pay what the court had ordered them to pay. (*Id.*)

### 2.   The Municipal Court's use of public defenders

12.   From August 2009 to 2015, the City contracted with at least two law firms to perform Public Defender ("PD") functions for and to appear at all court proceedings. (Ex. L (Nixon Dep.) at 57:8–13, Pl.'s Exs. 4 & 5 (Barfoot and Kloess contracts with City); Ex. R (Nixon Aff.) at ¶ 40.) One or two PDs were present for each docket. (Ex. M (Westry Dep.) at 84:6–14; Ex. F (Hayes Dep.) at 91:18–20; Ex. R (Nixon Aff.) at ¶ 68; Ex. L (Nixon Dep.) at 58:3–14, 76:22 to 77:13.)

13.   PDs were made available to defendants without the requirement that they filled out affidavits of substantial hardship. (Ex. R (Nixon Aff.) at ¶ 70.) Individual defendants who appeared in court could request a consultation with the PD who could then appear on the individual's behalf. (*Id.*) Alternatively, the judge could require the PD to appear, or the PD could decide, upon consultation or otherwise, to appear for a particular defendant. (*Id.*)

14.   In Judge Westry's mind Montgomery "went overboard" in providing defendants with a public defender (Ex. M (Westry Dep.) at 84:15–18.) A case did not come before a judge until the defendant had an opportunity to speak with a PD. (Ex. M (Westry Dep.) at 39:6–8.) All defendants with tickets were granted access to a PD, and misdemeanor defendants were required to speak with the PD before the judge would even address that case. (Ex. M (Westry Dep.) at 85:18–86:22; Ex. F (Hayes Dep.) at 91:21 to 92:20; Ex. L (Nixon Dep.) at 69:4–16.) A PD represented all defendants with jailable offenses. (Ex. L (Nixon Dep.) at 69:10–15.) In cases in which sentence commutations were being considered by the judge (discussed below), a PD would generally be present. (Ex. M (Westry Dep.) at 40:20 to 41:2; Ex. F (Hayes Dep.) at 99:10–13.) Judge Westry asked everyone on the jail docket in every instance before commuting a sentence if they had spoken with a PD. (Ex. M (Westry Dep.) at 87:4–9.)

15.   If a PD was present during the hearing, the judge would ask questions to both the defendant and the PD. (*Id.* at 36:10–19.) The PDs would make arguments to the judges, and if the judge needed more information than the PD had submitted, he could ask additional questions. (*Id.* at 90:6–17.)

### 3. The Municipal Court's indigency and inability-to-pay determinations

16.   At relevant times, the judges would generally inquire as to a defendant's ability to pay the fines and costs. Judge Westry would look at various factors in making this determination. (Ex. M (Westry Dep.) at 19:11 to 31:6, 51:18–53:8, 81:4–84:1.) He also emphasized the importance of talking directly to the individual defendants to make these determinations. (*Id.* at 82:21 to 84:1 ("The best way to ascertain whether or not somebody is being truthful is to look them in the eyes and ask them to—you know, those questions which are applicable to the situation and you get a feel.").)

17.   Montgomery's judges exclusively made inability-to-pay or indigency determinations. (*See id.* at 22:11–23:19 ("we as judges, have to make a determination whether this person has a total inability to pay ..."); *see also* Ex. F (Hayes Dep.) at 58:7–12 ("Q. Do you believe that judges have an obligation to make an independent inquiry into indigency before they commute fines and costs? … A. Yes, sir."); Ex. D (Ennis Dep. I) at 46:19 to 47:4, 50:4–10; Ex. E (Ennis Dep. II) at 44:11–18, 96:14 to 97:3; 109:2–5, 179:13–23; Ex. L (Nixon Dep.) at 171:7–8.)

18.   Judges did not ask JCS personnel for any information or input into indigency determinations. (Ex. O (Hamby Decl.) at ¶ 17; Ex. Q (Ray Decl.) at ¶¶ 31–32; Ex. P (Hill Decl.) at ¶ 33.) JCS employees understood that determining a defendant's indigency was solely up to the judge. (Ex. O (Hamby Decl.) at ¶¶ 17, 33.)

19.   Since JCS had neither the power nor the responsibility to make indigency determinations, JCS would refer probationers back to the court if they were having trouble paying their court-ordered fines, costs, and fees. (Ex. Q (Ray Decl.) at ¶ 31;

Ex. O (Hamby Decl.) at ¶¶ 33, 37; Ex. N (Gray Decl.) at ¶ 20; Ex. E (Ennis Dep. II) at 97:4 to 98:19, 109:5–15; Ex. P (Hill Decl.) at ¶ 28.)  When probationers told JCS that they could not pay court-ordered fines and fees due to disability, JCS would also refer them back to the judge to let the judge decide how to proceed. (Ex. P (Hill Decl.) at ¶ 6.) JCS had no power to reduce the amount that a judge had ordered a probationer to pay; it was determined by the Order of Probation.  (Ex. O (Hamby Decl.) at ¶ 37; Ex. N (Gray Decl.) at ¶ 20; Ex. E (Ennis Dep. II) at 103:5–8; Ex. P (Hill Decl.) at ¶ 28.)

### C.   The anatomy of a Montgomery Municipal Court case

20.   Individual defendants could be brought before the Municipal Court in multiple ways. (Ex. R (Nixon Aff.) at ¶ 72.) Some received traffic tickets; others received misdemeanor charges, including drug possession, possession of a gun without a permit, DUIs, etc. (*Id.*)

21.   Defendants who received tickets were not arrested for those tickets when ticketed but were released on their own recognizance with a promise to appear on the date set out on the face of the ticket, which is also known as the Uniform Traffic Ticket and Complaint or UTTC. (*Id.*) The ticket itself provided that a failure to appear before the court on the date specified would result in an arrest. (*Id.*)

22.   Tickets for scheduled offenses could be paid for and resolved online before the court date. (*Id.* at ¶ 73.) A "scheduled" offense is an offense for which Alabama or local law creates a standard default fine. (*Id.*)

23.   Alternatively, defendants with scheduled offenses in Montgomery could submit to a process known as the "window procedure." (*Id.*) The window procedure

was a voluntary pre-trial procedure occurring outside the presence of the judge or JCS. As described in General Order 2013-0001 of the Municipal Court (the "General Order"), a defendant who had a ticket could see the clerk or magistrate at a window in the same building as the courtroom. (Ex. SSSS (Gen. Order 2013-0001); Ex. L (Nixon Dep.) at 40:18 to 41:9, 44:15 to 45:15, 161:12–19.) The clerk at the window would ask whether the defendant wished to plead guilty or not guilty. (*Id.* at 46:4–8.) If he wanted to plead not guilty, he was given a court date and signed an acknowledgment. (*Id.* at 46:11–15.) If he wanted to pay it, he would pay and sign a guilty waiver. (*Id.* at 46:15 to 47:3, 47:15–20.) The clerk also would make sure he did not have other fines due. (*Id.* at 46:15–20.)

24.   In addition, defendants pleading guilty at the window could pay over time through several different processes. If the total fines and fees were less than $250, the court's policy provided for an extension of 30 days to pay. (*Id.* at 47:21 to 48:4, 143:9 to 144:9.)

25.   Under the General Order, defendants whose potential fines, court costs, and fees in the aggregate were less than $1,500 could voluntarily elect to pay over a more extended time through entering into a JCS probation, which under the window procedure could be begun and documented at that time and outside of court. (Ex. SSSS, General Order 2013-0001; Ex. O (Hamby Decl.) at ¶ 12; Ex. P (Hill Decl.) at ¶ 11; Ex. N (Gray Decl.) at ¶ 12.) Defendants could also choose to receive a fixed extension of time to pay their fines and court costs, without being supervised by JCS and without any probation. (Ex. R (Nixon Aff.) at ¶ 73.)

26.   If the probationer chose to elect a JCS-supervised probation, the court clerk would activate the probation by using a form probation order of the court, which would be signed by the defendant probationer, containing the court's standard terms and conditions of probation set out on a Probation Order. (Ex. L (Nixon Dep.) at 161:12 to 164:23.)

27.   It was common for defendants with scheduled offenses to ask for JCS probation through the window procedure. (Ex. R (Nixon Aff.) at ¶ 73; Ex. P (Hill Decl.) at ¶ 12.)

28.   Probation activated through the window procedure was limited to situations in which the defendant's total fines and costs were under $1,500 and where the defendant elected probation rather than seeing the judge. If a defendant owed more than $1,500 but expressed the desire to have a payment plan, the clerk would schedule a hearing for the defendant to appear before a municipal judge. (Ex. L (Nixon Dep.) at 150:23 to 151:7.)

29.   Any defendant at the clerk's window who expressed an inability to pay the fines and costs would be provided a hearing date, at which time the defendant could appear before the court for an indigency determination. (*Id.* at 171:7–15.)

30.   Probation through the window procedure was voluntary. If a defendant with a scheduled offense did not want a probation using the window procedure, he or she would be scheduled for a hearing before the Municipal Court. (Ex. O (Hamby Decl) at ¶ 13; Ex. P (Hill Decl.) at ¶ 13.) Even among those defendants, once before the court some would request that the judge allow them to go on probation with

JCS. (Ex. P (Hill Decl.) at ¶ 17; Ex. O (Hamby Decl.) at ¶ 19; Ex. N (Gray Decl.) at ¶ 12.)

31.   One could also be ticketed for an unscheduled offense. (Ex. R (Nixon Aff.) at ¶ 74.) Tickets for unscheduled offenses could not be paid at the window (and thus could not be the subject of a probation activated through the window procedure) but instead required a court appearance. (*Id.*) An example of an unscheduled offense is driving with a suspended license. (*Id.*) A Municipal Court judge would generally assign a defendant with an unscheduled offense a fine within a range provided for by statute or ordinance. (*Id.*)

32.   Defendants charged with scheduled offenses on tickets not paid (or not made the subject of a window-procedure initiated probation) before the court date, and defendants with unscheduled offenses, were required by law to appear in Municipal Court on the date set out in the ticket. (*Id.* at ¶75.) In such cases, judges would generally offer a variety of options to defendants in connection with fines and costs, depending on their circumstances and the judges who saw them. (*Id.* at ¶ 77.)

33.   For example, judges would sometimes offer defendants extra time to pay court-ordered fines and fees. (*Id.*; Ex. P (Hill Decl.) at ¶ 20.) This did not include going on probation, but was instead simply extra time that the defendant could use to pay his or her fine before the court considered it delinquent. (Ex. R (Nixon Aff.) at ¶ 77 ("At some point during the relevant time period, some people were placed on non-JCS payment plans or given the option to have a non-JCS payment plan."); Ex. P (Hill Decl.) at ¶ 20; Ex. M (Westry Dep.) at 25:1–13, 109:21 to 110:10.)

11

34.   In addition, some judges offered some defendants the opportunity to perform community service as an alternative to the payment of fines. (Ex. M (Westry Dep.) at 74:14 to 76:23; Ex. F (Hayes Dep.) at 80:6 to 81:6; Ex. R (Nixon Aff.) at ¶ 77.) JCS did not oversee community-service assignments in Montgomery and had no involvement in it. (Ex. L (Nixon Dep.) at 155:6–12.)

35.   Judges also offered some defendants court-supervised probation not with JCS. (Ex. L (Nixon Dep.) at 233:6–9.) The judges made those decisions. (Ex. M (Westry Dep.) at 120:20 to 122:7.)

36.   Finally, municipal judges could place defendants on JCS probation. (Ex. R (Nixon Aff.) at ¶ 77.) In Judge Westry's experience, defendants who were going on JCS actually requested it—"nine times out of ten they request[ed] it." (Ex. M (Westry Dep.) at 107:21 to 108:19.) Judge Hayes stated that one purpose of having JCS probation in Montgomery was to provide municipal defendants a choice as to how they wanted to pay court-imposed fines and costs. (Ex. F (Hayes Dep.) at 117:12–20.)

37.   It was not necessarily the judges' practice to assign someone to JCS if he could not pay the fines. (Ex. F (Hayes Dep.) at 100:2–20.) Instead, judges looked at a variety of factors such as the "type of offenses, the amount of fines and costs, the prior history as far as criminal conduct, possible prior history with JCS, employment, income. Things of that nature. Life circumstances, their medical history." (*Id.*)

38.   In discussing JCS, however, judges would tell the defendants that the defendants would have to pay the $40 monthly probation fees for the chance to have

an extended payoff period. (*Id.* at 108:21 to 109:18; Ex. M (Westry Dep.) at 109:8–20.)

39.   If a defendant did not appear for the hearing set on his ticket, or if the defendant did not appear for any other court date, the judges could issue arrest warrants for the defendant's failure to appear. (Ex. R (Nixon Aff.) at ¶ 79; Ex. F (Hayes Dep.) at 13:19–14:1.) An alias warrant was issued for failure to appear on an initial appearance, and a capias warrant was issued for failure to appear as ordered on any appearance other than the initial appearance. (Ex. R (Nixon Aff.) at ¶ 79.)

**D.   The JCS probation process**

40.   JCS did not participate in the defendants' initial hearings or make any recommendations to the court during those hearings. (Ex. O (Hamby Decl.) at ¶ 10.) Judges would decide how to handle fines and costs, and in particular whether to require the defendant to pay through a JCS-supervised probation. (*Id.*)

41.   A JCS probation officer would sometimes sit in the courtroom when judges were hearing cases and other times would be in a room adjacent to the courtroom. (*Id.*) This would vary depending on the judge and other circumstances. (*Id.*)

42.   All defendants placed on JCS had a 30-day waiver period in which the defendant could pay off all fines and costs without having to pay any JCS fees other than the court-ordered $10 start-up fee. (Ex. P (Hill Decl.) at ¶ 24.)

43.   Occasionally, probationers who had already been placed on JCS-supervised probation would receive new tickets during the term of their probation. (Ex. O (Hamby Decl.) at ¶ 24.) The judges would either add the fines and fees associated with those tickets to the probation or process those tickets outside of the

JCS-supervised probation. (*Id.*) JCS had no input into how the various judges decided to handle new tickets received by JCS probationers. (*Id.*)

44.   Upon assignment to JCS, JCS's personnel would meet with the defendant. (*Id.* at ¶¶ 21–22.) JCS staff would discuss the terms and conditions of payment in detail with probationers. (Ex. N (Gray Decl.) at ¶ 8; Ex. O (Hamby Decl.) at ¶ 21.) The probationers would be presented a document entitled "General Conditions of Probation" and would initial ten areas of the document acknowledging that they understood the conditions.  (Ex. N (Gray Decl.) at ¶ 8 and Ex. 1; Ex. O (Hamby Decl.) at ¶ 21.) This would include items such as the amount to be paid and the time and frequency of payments owed. (Ex. N (Gray Decl.) at ¶ 8 and Ex. 1.) The JCS probation officer would ask the probationer if he or she had any questions about any of the conditions on the form. (*Id.*; Ex. O (Hamby Decl.) at ¶ 21.)  The probationer would then initial beside each condition on the form, and the probationer and the probation officer would sign the form. (Ex. N (Gray Decl.) at ¶ 8 and Ex. 1.)

45.   JCS would also have the probationer fill out an Information Sheet containing relevant contact information for both work and home. (Ex. D (Ennis Dep. I) at 214:9–22.)

46.   Keeping JCS appointments was one condition of probation. (Ex. N (Gray Decl.) at Ex. 1.) Appointments varied in frequency from probationer to probationer, and they were set according to an individual probationer's situation (such as work schedule). (Ex. P (Hill Decl.) at ¶ 7.)

47.   When a probationer asked for an appointment to be rescheduled, JCS tried to work with him to find a convenient time. (*Id.*; Ex. Q (Ray Decl.) at ¶ 7.)

48.   Because probationers were expected to make payments toward their court-ordered fines and fees at these appointments, different individuals would come more or less often based on their anticipated frequency of payments. (Ex. N (Gray Decl.) at ¶ 6; Ex. O (Hamby Decl.) at ¶ 6.) Some probationers wanted to come to JCS once per month to make payments, while others wanted to come more frequently to spread their payments out. (*Id.*)

49.   At these meetings, JCS employees would also address any changes in a probationer's information as well as any new tickets or arrests the probationer may have received. (*Id.*)

50.   JCS probation officers would exercise their individual judgments in trying to accommodate probationers' individual circumstances when it came to appointment attendance. (*Id.* at ¶ 7; Ex. N (Gray Decl.) at ¶ 7.) JCS allowed a probationer's friends or family to report to an appointment in place of a probationer if the probationer could not attend. (*Id.*) These "stand-ins" could update contact information, report on the probationer's employment, and make payments toward the probationer's account. (*Id.*)

51.   For probationers who did not live nearby, JCS allowed status updates and payments to be mailed in. (*Id.*)

52.   Some probationers had their probations successfully terminated without paying any fees beyond the $10 start-up fee. (Ex. O (Hamby Decl.) at ¶ 40; Ex. N (Gray Decl.) at ¶ 22.) This was true for any Montgomery probationer who paid all court-ordered fines, beyond the start-up fee, within 30 days of their sentence. (Ex. P (Hill Decl.) at ¶ 24.)

53.   A JCS-supervised probationer who was not paying on time or was not meeting JCS appointment obligations would first be sent multiple reminders and inquiries from JCS. (Ex. D (Ennis Dep. I) at 74:23 to 75:17.) The content of and direction to send these letters would be approved by the court when JCS began its work in a city. (*Id.*; Ex. Q (Ray Decl.) at ¶¶ 25–27.)

54.   One type of letter JCS probation officers would send was the failure-to-report ("FTR") letter, which notified probationers of missed appointments and reminded them of future appointments. (Ex. D (Ennis Dep. I) at 75:4–13; *e.g.*, Ex. FFF (Def.'s Ex. 66).) Another was the delinquency letter, which was sent to probationers after already having sent several FTR letters. (Ex. D (Ennis Dep. I) at 75:4–13; *e.g.*, Ex. KKK (Def.'s Ex. 71).)

55.   If compliance was not obtained, a JCS probation officer would then file one of two different pleadings with the Municipal Court—either a Notice to Show Cause or a Petition for Revocation. (Ex. M (Westry Dep.) at 115:2–8; Ex. P (Hill Decl.) at ¶ 21; Ex. O (Hamby Decl.) at ¶¶ 26–27; Ex. N (Gray Decl.) at ¶ 14.) Both types of filings would state with particular detail both (1) the number and date of scheduled appointments the defendant had missed with JCS, and (2) the amount of outstanding fines and fees, with a separate line-item for JCS fees owed. (Ex. O (Hamby Decl.) at ¶ 27.)

56.   Whether a Notice to Show Cause or a Petition for Revocation was filed, the pleading would also state on its face the date and time of a hearing for that probationer to appear. (Ex. O (Hamby Decl.) at ¶¶ 26–27; Ex. N (Gray Decl.) at ¶ 14.)

57. Until 2014, the Municipal Court directed JCS to serve the pleading—either the Notice to Show Cause or the Petition for Revocation. (Ex. D (Ennis Dep. I) at 68:1–5, 74:16 to 75:13, 76:3–9; Ex. R, (Nixon Aff.) at ¶ 84.) In 2014, the Municipal Court started serving these notices. (Ex. R, (Nixon Aff.) at ¶ 84.) JCS would send service of the Notice to Show Cause or the Petition for Revocation to the probationer at the address on file with JCS (Ex. P (Hill Decl.) at ¶ 21; Ex. O (Hamby Decl.) at ¶ 26; Ex. N (Gray Decl.) at ¶ 14.) JCS's training manual instructed employees to mail probation revocation petitions, along with probation violation letters, to the probationer. (Ex. TTTT, JCS Training Manual at Ray v. JCS 000111; *cf*. Ex. E (Ennis Dep. II) at 142:11–16 (probation violation letter "would be mailed to the probationer letting them know of the court hearing.")

58. Sometimes, if the probationer had provided JCS with a wrong address or failed to update his address with JCS after moving, the notices and pleadings JCS sent would be returned to JCS. (Ex. O (Hamby Decl.) at ¶ 41; Ex. Q (Ray Decl.) at ¶ 30.) In such cases, JCS would try to locate a new address through an online database like Accurint. (*Id*.) The JCS training manual specifically directed employees that if notices and pleadings were returned, they were to run a search on the "Accurint" database and mail the revocation information to the updated address found in Accurint. (Ex. MMMM (JCS Training Manual) at Ray v. JCS 000103.) The JCS Montgomery office followed this directive. (Ex. O (Hamby Decl.) at ¶ 41.)

59. If a probationer appeared at his appointed hearing time, the municipal judge usually reinstated probation and would often give him additional time to pay. (Ex. Q (Ray Decl.) at ¶ 9; Ex. P (Hill Decl.) at ¶¶ 21, 23; Ex. O (Hamby Decl.) at

17

¶ 28.) The court would ask why a defendant was not making payments and would sometimes waive payments. (Ex. O (Hamby Decl.) at ¶ 29; Ex. P (Hill Decl.) at ¶ 23; Ex. M (Westry Dep.) at 23:1–9.) In addition, the municipal judge might waive all JCS fees upon the request of either the defendant or (sometimes even) JCS. (Ex. F (Hayes Dep.) at 110:8 to 111:10.)

60.   If the probationer stated he did not have income to pay according to the terms of his Probation Order, the judge often would ask for some sort of documentation to that effect (Ex. M (Westry Dep.) at 28:6–14), and might also inquire about the probationer's expenses (*id.* at 29:20 to 30:5). Judge Hayes, for example, would inquire regarding the defendant's income and whether he had a job, how many appointments were scheduled and missed, and whether partial payments were made. (Ex. F (Hayes Dep.) at 70:17 to 71:15.)

61.   At a revocation or show-cause hearing, a JCS probation officer would not recommend to a judge that any probationer have his or her probation revoked. (Ex. Q (Ray Decl.) at ¶ 10; Ex. O (Hamby Decl.) at ¶ 30.) JCS only provided facts about each individual probationer's case and answered the judge's questions. (*Id.*)

62.   The judge made all determinations with regard to revocation of probation. (Ex. O (Hamby Decl.) at ¶10.)

63.   PDs were present at these hearings. (Ex. R (Nixon Aff.) at ¶¶ 40, 68, 70, 100; Ex. I, Dep. of Branch Kloess at 121:2–16.)

64.   JCS's witnesses uniformly do not recall any instance at a revocation hearing where a defendant who appeared had his probation revoked. (Ex. O (Hamby Decl.) at ¶ 28; Ex. P (Hill Decl.) at ¶ 21.)

65.   If the probationer did not appear for the hearing, however, judges would sometimes, but not always, issue warrants for their arrest. (Ex. P (Hill Decl.) at ¶ 21; Ex. O (Hamby Decl.) at ¶ 32; Ex. N (Gray Decl.) at ¶ 16; Ex. Q (Ray Decl.) at ¶ 9.)

66.   At the point a warrant was issued, JCS ended any active involvement with that probationer. (Ex. O (Hamby Decl.) at ¶ 43.)

67.   In no event did JCS recommend arresting probationers, issue arrest warrants, or provide warrant forms the court used. (*Id.* at ¶ 42; Ex. E (Ennis Dep. II) at 144:9–14, 193:18 to 194:4.) Whether to issue a warrant was entirely the decision of the court. (Ex. O (Hamby Decl.) at ¶ 42.)

68.   The court directed what happened after a warrant was issued, and JCS would not be informed (except anecdotally, and sporadically) when the warrant was issued or whether the probationer was arrested, appeared in court, or was placed in jail. (*Id.* at ¶ 43.; Ex. R (Nixon Aff.) at ¶ 110.)

69.   After a probationer failed to attend a probation-revocation hearing, JCS discontinued assessing its monthly probation fee. At that point, JCS ended its activity regarding the probationer until the court notified JCS that a new hearing date had been set or that the probationer had paid in full directly to the court. (*Id.* at ¶ 44.)

70.   In addition, once JCS probation was revoked, outstanding JCS fees were not collected by the court. (Ex. R (Nixon Aff.) at ¶22.)

71.   Though a warrant for a probationer's arrest would be outstanding, it would oftentimes go unexecuted for many months. (*Id.* at ¶ 39.) If it were ever

executed, it would generally be done in connection with a different detention by an officer—for example, where the former probationer was stopped or arrested for another violation, at which time outstanding warrants were discovered. (Ex. R (Nixon Aff.) at ¶ 88.) An arrest warrant for failure to appear at a revocation or show-cause hearing could also be issued with arrest warrants having nothing to do with a JCS probation, as in the case of Plaintiff Hassam Caldwell, whose December 28, 2013, arrest, as discussed below, was based on one warrant stemming from a failure to appear at his revocation hearing and multiple warrants in other cases not involving JCS-supervised probation. (Ex. LLLL (Def.'s Ex. 130) at COURT 005628–29.)

72.   If a defendant was arrested, the defendant would be brought back before the court. (Ex. R. (Nixon Aff. at ¶ 99.) The judge might then consider reinstating probation (whether JCS-supervised or not), remitting the defendant's files and costs, ordering community service, or giving them more time to pay. (*Id.*)

### E.   The Municipal Court's commutation orders

73.   The Municipal Court's judges sometimes "commuted" a defendant's sentence, which meant aggregating the defendant's fines and court costs (***not*** including JCS fees) and having the defendant go to jail, crediting the defendant with $50 for each day served in jail — a conversion of fines and court costs into jail time. (Ex. F (Hayes Dep.) at 9:16 to 10:3; Ex. M (Westry Dep.) at 11:11 to 12:4; Ex. O (Hamby Decl.) at ¶ 26.) If the defendant worked while in jail, the commuted amount increased to $75 per day. (Ex. L (Nixon Dep.) at 281:23 to 282:5.) Importantly, it was not the practice of any Municipal Court judge to jail individuals

20

solely because they were removed from JCS. (Ex. R (Nixon Aff.) at ¶¶ 29, 86.) Moreover, judges would not commute a sentence for failing to pay fines unless the judge determined that the defendant made no efforts to pay those fines and could not show a reason, to the judge's satisfaction, for failing to pay. (Ex. I (Kloess Dep.) at 146:6–15.)

74. JCS had no involvement in any decisions regarding "commuting" a sentence. (Ex. O (Hamby Decl.) at ¶ 26.) Many people who had their fines and costs converted to jail time in connection with failure to pay those fines and costs had never even been assigned to JCS. (Ex. R (Nixon Aff.) at ¶ 3.) And, if a probationer was jailed by the court, JCS had nothing to do with setting bond amounts or any other conditions to his or her release from jail. (Ex. O (Hamby Decl.) at ¶ 45.)

## II.   The Individual Plaintiffs

### A.   Angela McCullough

75.   Plaintiff Angela McCullough was ordered by the City's Municipal Court to JCS-supervised probation on November 7, 2010. (Ex. J, Dep. of Angela McCullough, at 170:9-21, 171:9-23, 172:3-10.) That probation's purpose was to address or resolve a number of prior offenses, spanning the past decade, discussed below.

76.   McCullough had a history of receiving traffic tickets before JCS began offering private probation services in Montgomery. She was ticketed in March 2001 and October 2001 for driving with no valid driver's license. (Ex. FF (Def.'s Ex. 22); Ex. GG (Def.'s Ex. 23).) She received a ticket in November 2002 for driving with improper headlights. (Ex. HH (Def.'s Ex. 24).)

77.  McCullough also had a history of non-traffic related offenses for which she had been ordered to pay fines by the Montgomery Municipal Court. She pleaded guilty to harassment in December 2002 and was ordered to pay a $250.00 fine and $74.00 in court costs. (Ex. J (McCullough Dep.) at 127:6-12; Ex. II (Def.'s Ex. 25).) In 2004, she pleaded guilty to giving false identification to a police officer. (Ex. JJ (Def.'s Ex. 26).) McCullough admits that she did this because she was afraid she might have warrants out against her real name. (Ex. J (McCullough Dep.) at 130:5-10.)

78.  At some point before November 18, 2004, McCullough was placed on probation for numerous traffic tickets, plus the harassment and false identification charges, with "Professional Probation Services, Inc.," a company that provided private probation services to the Montgomery Municipal Court before JCS. (Ex. KK (Def.'s Ex. 27); Ex. J (McCullough Dep.) at 134:23, 135:1-3.) In November 2004, Priavte Probation Services, Inc. generated a delinquency report that provided that McCullough had failed to make court-ordered payments and also failed to attend court-ordered appointments. (Ex. KK (Def.'s Ex. 27).)

79.  On November 7, 2010, the Municipal Court placed her on probation with JCS for ten offenses she had accumulated with the City beginning in 2001. (Ex. J, McCullough Dep. at 184:10 to 186:18, 187:21 to 188:10 & ; Ex. NN (Def.'s Ex. 36).) Those tickets were for charges that included, among others, no driver's license, no proof of insurance, driving with a suspended license, improper equipment, and a child restraint violation. (Ex. NN (Def.'s Ex. 36).)

80.   The order of probation stated that McCullough owed a total of $3,616 in fines on those tickets, and, it ordered her to pay those fines plus a $40 monthly supervision fee and a $10 start-up fee at the rate of $200 per month. (*Id.*) McCullough signed the probation order. (*Id.*)

81.   As part of the process of going on probation with JCS, McCullough completed a personal information sheet showing her address and phone numbers and indicating that she was employed at a Holiday Inn Express. (Ex. J (McCullough Dep.) at 179; Ex. MM (Def.'s Ex. 35).)

82.   Before going before the judge, McCullough met the PD. (Ex. J (McCullough Dep.) at 176:6 to 177:3.)

83.   McCullough admits that she missed every single appointment that was scheduled with JCS pursuant to the court's order, and she also admits that she never paid JCS any of the fines and fees that the court ordered to be paid.  (Ex. J (McCullough Dep.) at 192:2-6; Ex. LL (Def.'s Ex. 34) at 2–3.) McCullough testified that she decided upon being ordered to JCS probation that she would not do anything she was ordered to do with respect to JCS. (Ex. J (McCullough Dep.) at 192:14-20.) In keeping with this, she missed all scheduled JCS appointments, causing the JCS probation officer to send her a failure-to-report letter to the address she gave JCS on December 22, and a delinquency letter on December 30. (Ex. J (McCullough Dep.) at 195:1-6; Ex. LL (Def.'s Ex. 34) at 2; Ex. OO (Def.'s Ex. 37); Ex. PP (Def.'s Ex. 38).) McCullough did not respond. (Ex. LL, Def.'s Ex. 34 at 2.)

84.   On January 13, 2011, a petition to revoke McCullough's probation was prepared. (Ex. RR (Def.'s Ex. 40).) It indicated that she had missed all six of her

JCS appointments and had made no payments on her fines and fees as required by the probation order. (*Id*.) A hearing was set for February 23, 2011. (*Id*.) The JCS probation officer sent a letter and a copy of the petition to McCullough at the address she gave JCS informing her of the hearing. (Ex. J (McCullough Dep.) at 195:1-6; 196:8-23, 197:1-3; Ex. QQ (Def.'s Ex. 39) at 2.)

85.   McCullough did not appear for the February 23 hearing, and as a result, Judge Hayes revoked McCullough's probation. JCS recorded this revocation in Probation Tracker on March 25, 2011. (Ex. LL (Def.'s Ex. 34).)

86.   Following McCullough's failure to appear at the February 23, 2011 hearing, the court issued an alias warrant for her arrest which was executed over two years later, on July 2, 2013. (Ex. J (McCullough Dep.) at 199:1–22, 200:6-7; Ex. SS (Def.'s Ex. 41).) At the time of her arrest, JCS had not had any contact with McCullough since sending her notice of the February 23, 2011 hearing — and before then, its only contact with McCullough was at her initial assignment to JCS (because she missed every appointment). (Ex. LL (Def.'s Ex. 34) at 2.)

**B.   Marquita Johnson**

87.   Plaintiff Marquita Johnson received a significant number of traffic tickets in the City of Montgomery from 2004 through 2010. At some point, her license was suspended, and she made no effort to have it reinstated. (Ex. G, Dep. of Marquita Johnson, at 104:6–19.)

88.   Johnson was arrested in May 2011 for failing to appear at Court on the traffic tickets she had been issued. (*Id*. at 190:16 to 191:5; *Cf. id*. at 316:9–22.) At a subsequent hearing before Judge Knight, she was represented by a PD. (*Id*. at

115:13 to 116:9.) At the hearing, Judge Knight sentenced Johnson to JCS-supervised probation for the first time on 32 traffic tickets, entering two separate orders of probation. (Ex. Z (Def.'s Ex. 15); Ex. EE (Def.'s Ex. 20).)

89.   The first probation order related to 16 traffic tickets Johnson had accumulated between 2004 and 2010, including tickets for speeding, no proof of insurance, running stop signs, a child restraint violation, driving with a suspended license, improper tag, and no proof of insurance. (Ex. Z (Def.'s Ex. 15).) The fines on those tickets totaled $5,834. (*Id.*; Ex. W (Def.'s Ex. 12) at 1, 4.) The probation order required Johnson to pay those fines, a $40 monthly probation supervision fee, and a one-time $10 set-up charge at a rate of $294 per month. (Ex. Z (Def.'s Ex. 15).) Johnson signed that order. (*Id.*; Ex. G (Johnson Dep.) at 110:4–6.)

90.   The second probation order related to 16 different traffic tickets Johnson had incurred between 2007 and 2010, including tickets for running a red light, speeding, driving with a suspended license, no proof of insurance, expired tag, and child restraint violations. (Ex. EE (Def.'s Ex. 20).) The fines on those tickets totaled $5,102. (*Id.*; Ex. QQQQ (Johnson Composite Exhibit) at 2–3.) That probation order also required Johnson to pay those fines, a $40 monthly probation supervision fee, and a one-time $10 set-up charge at a rate of $270 per month. (Ex. EE (Def.'s Ex. 20).) However, the Municipal Court put the second probation order on hold as a "consecutive case." (*Id.*; Ex. QQQQ (Johnson Composite Exhibit) at 2.)

91.   As part of being placed on probation, Johnson completed a personal information sheet that listed her contact information and indicated that she was employed at a casino in Wetumpka, Alabama. (Ex. Y (Def.'s Ex. 14).) She also

signed a document listing the general conditions of her probation. (Ex. X (Def.'s Ex. 13).)

92.   At the time she was placed on probation, Johnson in fact worked for a casino in Wetumpka. (Ex. QQQQ (Johnson Composite Exhibit) at 13.) Although Johnson was unsure of when her employment with the casino was terminated, suggesting that it could have been as late as March 2012, documents produced by non-party Alabama Department of Labor relating to her application for unemployment compensation in 2011 indicate that Johnson's employment ended June 6, 2011, shortly after she had been ordered to probation. (*Compare* Ex. G (Johnson Dep.) at 151:4–17 *with* Ex. QQQQ (Johnson Composite Exhibit) at 13.) And while she testified that she was fired for excessive tardiness, the Department of Labor's investigation into her compensation claim showed that Johnson's employment was terminated because she had directed profane or abusive language toward her supervisor. (*Compare* Ex. G (Johnson Dep.) at 113:21 to 114:3, 151:17 to 152:14 *with* Ex. QQQQ (Johnson Composite Exhibit) at 18–19, 22.)

93.   Johnson didn't seek a new job after she was fired from the casino. (Ex. G (Johnson Dep.) at 260:9–18.)

94.   Johnson made some small payments while she was on probation, totaling $220 over an approximately six-month period. (Ex. U (Def.'s Ex. 3); Ex. W (Def.'s Ex. 12) at 4.) Her attendance at her JCS appointments was sporadic, resulting in two failure-to-report letters and a delinquency letter being issued to her. (Ex. W (Def.'s Ex. 12) at 3–4; Ex. AA (Def.'s Ex. 16); Ex. BB (Def.'s Ex. 17); Ex. CC (Def.'s Ex. 18); Ex. G (Johnson Dep.) at 122:7–17, 124:7–12, 371:18 to 372:8.) Johnson and

her JCS probation officer communicated with one another by phone about Johnson's missed JCS appointments. (Ex. G (Johnson Dep.) at 394:23 to 395:5.)

95.   Finally, on December 15, 2011, petitions to revoke Johnson's probations were filed, showing that she owed almost $11,000 on her 32 tickets and that she had missed 18 of her JCS appointments. (Ex. QQQQ (Johnson Composite Exhibit) at 4–5.) The JCS probation officer sent her those petitions with a letter informing her that a hearing on the petition was scheduled for February 9, 2012. (Ex. DD (Def.'s Ex. 19).)

96.   Johnson did not show up for her February 9 hearing, and as a result, the Municipal Court issued warrants to have her arrested. (Ex. W (Def.'s Ex. 12) at 2 (2/9/2012 entry reading "DEF FAILED TO REPORT TO COURT WARRANT ISSUED"; Doc. 105-10 at ECF 5–26.) JCS had no further involvement with Johnson after she missed the court hearing. (Ex. W (Def.'s Ex. 12) at 2; Ex. QQQQ (Johnson Composite Exhibit) at 3.)

97.   On April 25, 2012, Montgomery police arrested Johnson on a number of failure-to-appear warrants. (Doc. 105-10 at ECF 5–26; Ex. G (Johnson Dep.) at 151:4–7.)

98.   At a hearing later that day before Judge Hayes, Judge Hayes ordered that Johnson's fines be "commuted," converting those fines to 496 days in jail. (Ex. G (Johnson Dep.) at 127:23 to 128:4; Ex. V (Def.'s Ex. 4).)

99.   After the hearing, Johnson was taken back to jail. (Ex. G (Johnson Dep.) at 166:2–9, 172:14–17.) She was released from jail in January 2013 after serving 286 days. (*Id.* at 69:1–3, 198:10–15.)

### C.   Kenny Jones

100. Plaintiff Kenny Jones testified that he has no recollection of being placed on probation with JCS.  (Ex. H, Dep. of Kenny Jones, at 99:23 to 100:6, 100:17 to 101:6.)

101. In fact, Jones testified that he was not even familiar with a company called Judicial Correction Services or JCS. (Ex. H (Jones Dep.) at 103:6–12, 267:7 to 268:7.)

102. Similarly, Jones does not recall ever being ordered by the Montgomery Municipal Court to pay anyone, including JCS, monthly fines and fees. (Ex. H (Jones Dep.) at 103:13–17.)

103. However, Municipal Court records show that Jones received 29 municipal offenses in Montgomery from 2008 to 2014. (Ex. VVVV (Jones Composite Exhibit) at 20–22 (COURT 017075-77).) These offenses ranged from traffic violations to disorderly conduct. (*Id.* at 21–22 (COURT 01076-77).)

104. Despite his frequent citations, Jones was only ordered to JCS-supervised probation one time, and this probation involved only two traffic offenses. (*Id.* at 2.) These cases (2008TRT000209 and 2009TRT056174) both concerned tickets Jones received for driving with a suspended drivers license. (*Id.*)

105. While Jones testified to having never heard of JCS, JCS records show that Jones was placed on JCS-supervised probation on August 17, 2009. (*Id.* at 4, 8.)

106. Beginning August 2, 2010, Jones missed 3 straight court-ordered appointments with JCS and failed to answer phone calls or mail from JCS. (*Id.* at

5.) This caused JCS to generate a VOP letter on September 17, 2010, which was mailed to the address Jones had given JCS on his intake forms. (*Id*. at 9, 17.)

107.  The VOP letter stated that a court date had been set for Jones on November 4, 2010, concerning his failure to comply with the terms of his probation. (*Id*. at 17.)

108. JCS records show that Jones did not appear for the November 4 hearing and that the Municipal Court then issued a warrant for Jones's arrest. (*Id*. at 3.) The Municpal Court then revoked Jones's probation on November 4, 2010. (*Id*. at 18.)

109. JCS had no further contact with JCS after he failed to appear at the November 4, 2010, hearing. (*Id*. at 3.) On May 9, 2011, Judge Massey signed a Modified Termination of Probation order which removed Jones from JCS-supervised probation. (*Id*. at 19.)

### D.  Hassam Caldwell

110. The Municipal Court placed Plaintiff Hassam Caldwell on JCS supervised probation on only one occasion. (Ex. B, Dep. of Hassam Caldwell, at 140:8–9; 186:5–6, 304:22 to 306:22; Ex. MMMM (Def.'s Ex. 133) (collectively indicating that, although Caldwell had been placed on JCS probation on two separate occasions, once was in a different municipality).)

111. On March 17, 2013, a Montgomery police officer stopped Caldwell for speeding and ticketed him. (Ex. LLLL (Def.'s Ex. 132); Ex. B (Caldwell Dep.) at 241:10–17.)

112. On April 17, 2013, Caldwell appeared in the Montgomery Municipal Court and pleaded guilty to the speeding charge. (Ex. NNNN (Def.'s Ex. 137).) In so doing, he signed a document titled Plea of Guilty/Waiver of Rights in which he indicated that he understood that he was waiving certain constitutional rights by pleading guilty, including the right to an attorney of his choice or one appointed for him if he could not afford one. (*Id.*; Ex. B (Caldwell Dep.) at 309:10–19.) The court entered an order of probation on the speeding ticket, the fine and costs for which totaled $175. (Ex. JJJJ (Def.'s Ex. 129) at COURT 005591.) The probation order required Caldwell to pay that amount, a $40 monthly probation supervision fee, and a one-time $10 set-up charge. (*Id.*)

113. As part of being placed on probation, Caldwell completed a personal information sheet that listed his contact information. (*Id.* at COURT 005592; Ex. B (Caldwell Dep.) at 242:14–18.)

114. Throughout April, May, and June of 2013, Caldwell attended his appointments with JCS sporadically (causing two failure-to-report letters to issue), and his mother made four payments toward his fine and fees totaling $145. (Ex. RRRR (Caldwell Composite Ex.) at 2–6; Ex. B (Caldwell Dep.) at 189:13–18.)

115. He failed to attend any more JCS appointments after June 17, 2013 (Ex. RRRR (Caldwell Composite Ex.) at 3; Ex. B (Caldwell Dep.) at 190:3–13), which resulted in more failure-to-report letters (Ex. RRRR (Caldwell Composite Ex.) at 7–8), and on July 23, 2013, the filing of a petition to revoke his probation (Ex. JJJJ (Def.'s Ex. 129) at COURT 005593; Ex. B (Caldwell Dep.) at 190:14–21, 242:19 to 243:6). The petition noted that he had missed 10 JCS appointments, owed $70 on

30

the original fine and court costs, and owed $80 in monthly probation fees. (Ex. JJJJ
(Def.'s Ex. 129) at COURT 005593; Ex. B (Caldwell Dep.) at 243:7–12.) A hearing on
the petition was set for August 27, 2013. (Ex. JJJJ (Def.'s Ex. 129) at COURT
005593; Ex. B (Caldwell Dep.) at 243:13–16.) The JCS probation officer sent him a
copy of the petition along with a letter informing him of the revocation hearing. (Ex.
RRRR (Caldwell Composite Ex.) at 9.)

116. Court records show Caldwell did not appear for the hearing. (Ex. JJJJ
(Def.'s Ex. 129) at COURT 005593; Ex. B (Caldwell Dep.) at 243:17 to 244:10.) As a
result of his failure to appear, the court stamped the petition for revocation:
"Defendant Failed to Appear; Issue a Warrant of Arrest." (*Id.*) The court then issued
a warrant for his arrest for failing to appear. (Ex. KKKK (Def.'s Ex. 130) at COURT
005629.)

117. In accordance with the arrest warrant, as well as warrants in other cases
not involving JCS-supervised probation, a Montgomery police officer arrested
Caldwell on December 28, 2013. (*Id.* at COURT 005628–29.) Court records show
that this arrest was pursuant to one warrant relating to Caldwell's JCS-supervised
probation, and four other warrants that were not related to the infractions leading
to his JCS probation. (*Id.* at COURT 005629.)[3]

---

[3] Caldwell's employment history was sporadic. Since he graduated high school in 2013, he has
had four jobs, none of which lasted more than a few months. (Ex. B (Caldwell Dep.) at 16:8 to 27:9,
75:2 to 76:19, 79:3 to 88:7.) At the time of his deposition, Caldwell was unemployed and lived with
his parents. (*Id.* at 12:18 to 13:12, 16:10–11.) He testified that he has never had to pay rent or for
food or utilities anywhere he has stayed, and that his mother pays his cell phone bill. (*Id.* at 284:22
to 285:9, 295:4–17.) Additionally, during his deposition, Caldwell was asked about his 2018 tax
return in which he claimed an earned income credit to which, according to his own testimony, he was
not entitled to claim. (*Id.* at 224:12 to 225:23, 228:2 to 231:19, 235:16–21.; Ex. IIII (Def.'s Ex. 128).)
After a few questions about the return, his attorney advised him not to answer any more questions

### E.   Algi Edwards

118. Plaintiff Algi Edwards received several traffic tickets in Butler County (south of Montgomery County and the City) during his high school and college years.  On February 6, 2004, while still in high school in Butler County, he was ticketed by Greenville police for improper passing. (Ex. C, Dep. of Algi Edwards, at 158:5 to 159:23; Ex. TT (Def.'s Ex. 53).) Thereafter, for reasons Edwards could not remember (Ex. C (Edwards Dep.) at 183:18–21), his driver's license was suspended, and on June 24, 2007, he was ticketed by Greenville police for driving with a suspended license (Ex. C (Edwards Dep.) at 165:1–14; Ex. UU (Def.'s Ex. 54)). After he failed to appear in court on this latter ticket, the Butler County District Court issued a series of warrants for his arrest for failure to appear in court in December 2007, April 2008, and April 2009. (Ex. C (Edwards Dep.) at 189:4–12; Ex. VV (Def.'s Ex. 56); Ex. WW (Def.'s Ex. 57); Ex. ZZ (Def.'s Ex. 60) at 3.) Ultimately, his father paid the ticket for him. (Ex. C (Edwards Dep.) at 187:1–14, 189:13 to 190:11, 191:3–7.)

119. On April 12, 2009, Edwards was again ticketed by Greenville police for driving with a suspended license and no proof of insurance. (Ex. ZZ (Def.'s Ex. 60) at 1–2.) On September 18, 2009, the Butler County District Court issued a warrant for Edwards's arrest for failing to appear in court. (Ex. DDD (Def.'s Ex. 65.) Edwards

---

about the tax return on the ground that it could incriminate him. (Ex. B (Caldwell Dep.) at 224:12 to 239:13.)

cannot recall if he appeared in court as the tickets had directed. (Ex. C (Edwards Dep.) at 211:22 to 212:2, 213:1–3.)[4]

120. While Edwards was collecting traffic tickets in Butler County, he began being ticketed in the City of Montgomery for traffic violations as well. On August 11, 2008, Edwards was stopped and ticketed by a Montgomery police officer for driving with a suspended license (Case no. 2008TRT055434). (Ex. XX (Def.'s Ex. 58).) A court appearance on this Montgomery ticket was set for September 29, 2008. (*Id.*)

121. On February 5, 2009, Edwards was ticketed by a Montgomery police officer for running a red light (Case No. 2009TRT011665) and for driving while suspended (Case no. 2009TRT011666). (Ex. YY (Def.'s Ex. 59).) A court appearance on those tickets was set for March 16, 2009. (*Id.*) Edwards did not recall if he had appeared at court at the hearing on the tickets. (Ex. C (Edwards Dep.) at 200:11–13.)

122. On Friday, May 29, 2009, a Montgomery police officer ticketed Edwards for driving with a suspended license (Case no. 2009TRT048587) and for speeding (Case no. 2009TRT048586). (Ex. ZZ (Def.'s Ex. 60) at 4; Ex. AAA (Def.'s Ex. 61).)

123. At the May 29 stop, Edwards was arrested. (Ex. C (Edwards Dep.) at 216:15–16). Although Edwards testified that he could not remember if his arrest was based on one of the arrest warrants issued by the Butler County District Court (Ex. C (Edwards Dep.) at 220:9–15; Ex. ZZ (Def.'s Ex. 60) at 3), the tickets he was

---

[4] Despite all of these warrants, Edwards testified at his deposition that he was never arrested in Butler County. (Ex. C (Edwards Dep.) at 260:10–20.)

issued at the May 29 stop indicate that he was arrested based on previously-issued warrants (Ex. ZZ (Def.'s Ex. 60) at 4; Ex. AAA (Def.'s Ex. 61) (both tickets contain the notation "In custody (warrants)" in the place for Edwards's signature).)

124. Edwards stayed in jail for the weekend and went before the Montgomery Municipal Court judge on Monday morning, June 1, 2009. (*Id.* at 222:6–9, 223:7–12, 235:12–16.) Before going before the judge, he spoke with the PD. (*Id.* at 226:11–17, 235:17–21.) He knew that he had a right to an attorney, and he knew what that right entails. (Ex. C (Edwards Dep.) at 275:12–21.)

125. At the June 1, 2009 hearing, the judge entered a two-page order placing Edwards on JCS-supervised probation for his three Montgomery tickets noted as Case nos. 2008TRT055434, 2009TRT011665, and 2009TRT011666, in addition to three tickets he had received from Montgomery in 2007, one for driving with a suspended license and two for speeding. (Ex. BBB (Def.'s Ex. 62) at 10–11.)

126. As part of the probation, the court ordered Edwards to pay his fines and costs of $2,310, a probation fee of $40 per month, and a one-time set-up charge of $10 at a rate of $140 per month. (*Id.*) In arriving at the monthly payment amount of $140, the judge provided different options for monthly payment amounts, starting with a higher number and lowering it until he reached a level Edwards agreed he could afford. (Ex. C (Edwards Dep.) at 237:16 to 239:9.) Edwards agreed to pay the minimum amount of $140 per month because he thought he could afford it. (*Id.* at 239:2–9.)

127. The order placed Edwards on probation for a period of two years. (Ex. BBB (Def.'s Ex. 62) at 10–11.) Edwards signed the probation order and received a copy of it. (*Id.*; Ex. C (Edwards Dep.) at 239:19–22.)

128. At his first appointment with JCS, Edwards signed a document listing the general conditions of his probation, and he initialed next to each condition. (Ex. C (Edwards Dep.) at 255:4–19; Ex. CCC (Def.'s Ex. 63).) Edwards remembers reading through each of the conditions of probation and initialing them, and he testified at his deposition that he understood those conditions and understood that he needed to abide by them as part of what the judge ordered. (Ex. C (Edwards Dep.) at 249:23 to 250:9, 256:3–6.) His agreed-to conditions of probation included, among other things, that he owed the fines and fees imposed by the Court, that he would pay those fines and fees by making a minimum monthly payment of $140, and that he would comply with the instructions he received from his probation officer. (Ex. CCC (Def.'s Ex. 63).)

129. For the first several months following his placement on probation, Edwards did not miss any of his scheduled appointments with his JCS probation officer, and he made the required $140 monthly payment. (Ex. BBB (Def.'s Ex. 62) at 7–9.) Beginning in October 2009, however, Edwards did not always pay $140 every month, and after February 2010, he never made payments in a single month totaling at least the $140 ordered by the court. (*Id.* at 7–8.) Also in October 2009, he began to miss some of his JCS appointments, resulting in the issuance of a number of failure-to-report letters (Ex. BBB (Def.'s Ex. 62) at 2–5; Ex. EEE (Def.'s Ex. 66); Ex. PPPP (Edwards Composite Ex.) at 2–9) and three delinquency letters

(Ex. BBBB (Def.'s Ex. 62) at 2–4; Ex. JJJJ (Def.'s Ex. 71); Ex. PPPP (Edwards Composite Ex.) at 10–11.)

130. For his part, Edwards testified that he cannot remember when he showed up to his JCS appointments or whether he made payments to JCS as ordered by the Court. (Ex. C (Edwards Dep.) at 252:10–23, 253:1–15.) And he testified that he cannot recall whether he received text messages or phone calls from his JCS probation officer telling him that he missed JCS appointments. (*Id.* at 261:23 to 262:3.) He did recall, however, that he would receive calls from his JCS probation officer reminding him of his appointments and checking to see if he was coming in. (Ex. C (Edwards Dep.) at 277:3 to 279:4.)

131. On February 6, 2010, a Montgomery police officer stopped Edwards and ticketed him for no proof of insurance (Case no. 2010TRT012590), driving while suspended (Case no. 2010TRT012593), and driving with an expired tag (Case no. 2010TR012534). (Ex. FFF (Def.'s Ex. 67); Ex. GGG (Def.'s Ex. 68); Ex. HHH (Def.'s Ex. 69); Ex. C (Edwards Dep.) at 263:6 to 265:11, 266:9–21, and 266:22 to 267:8.)

132. At the March 8, 2010 hearing on the three tickets, the Municipal Court found him guilty on all three charges and ordered him to pay a fine of $50 and court costs of $113 on the no proof of insurance charge, a fine of $500 and court costs of $113 on the driving while suspended charge, and a fine of $25 and court costs of $113 on the improper tag charge. (Ex. FFF (Def.'s Ex. 67); Ex. GGG (Def.'s Ex. 68); Ex. HHH (Def.'s Ex. 69.)

133. The court also entered an order of probation in case nos. 2009TRT048586, 2009TRT048587, 2010TRT012590, and 2010TRT012593 that required Edwards to

pay his fines and fees, a one-time set-up charge of $10, and a monthly probation supervision fee of $40 in monthly installments of $140. (Ex. III (Def.'s Ex. 70) at 3.) The order of probation was placed on hold as a "consecutive case," however, because of the earlier term of probation that Edwards was still serving. (*Id.* at 1–3.) Edwards signed the probation order, and the next day he prepared and signed a document providing his personal information. (Ex. III (Def.'s Ex. 70) at 3, 5.)

134. Edwards has no recollection of going before the court on March 8, 2010, and he cannot recall anything that was said by him, by the judge, or by anyone else with the City or the court at that hearing. (Ex. C (Edwards Dep.) at 273:22 to 274:11.)

135. Regarding the term of probation that began in 2009, ultimately, on May 23, 2011, after Edwards had missed several JCS appointments, the JCS probation officer sent him a violation-of-probation letter enclosing a petition to revoke his probation (Ex. KKK (Def.'s Ex. 72)) and a notice that he was to appear in court to show cause why he had failed to pay his fines and court costs as ordered by the Court (Ex. OOO (Def.'s Ex. 77)). Both the letter and the notice indicated that Edwards was to appear in court on June 30, 2011. (Ex. KKK (Def.'s Ex. 72); Ex. OOO (Def.'s Ex. 77).) Edwards cannot recall if he received the violation-of-probation letter. (Ex. C (Edwards Dep.) at 281:14 to 282:10.)

136. Edwards did not appear in court on June 30, 2011, and so the court issued a warrant for his non-appearance. (Ex. BBB (Def.'s Ex. 62) at 2.) JCS had no further interactions with him on this 2009 probation or his 2010 probation. (*Id.*; Ex. III

(Def.'s Ex. 70) at 2.) The last time Edwards met with or made any payment to JCS was May 2, 2011. (Ex. BBB (Def.'s Ex. 62) at 2; Ex. III (Def.'s Ex. 70) at 2.)

137. On September 18, 2012, a Montgomery police officer stopped and ticketed Edwards for driving with a suspended license, no proof of insurance, and running a stop sign. (Ex. LLL (Def.'s Ex. 73).) The tickets set a court appearance for Edwards on October 19, 2012. (*Id.*)

138. During that stop, Edwards was arrested based on warrants the Montgomery Municipal Court had issued for his failure to appear at court on many of the charges that were the subject of the two probations. (Ex. C (Edwards Dep.) at 283:15–18; Doc. 105-2 at 2–9.)

139. Edwards went before the Municipal Court the day after he was arrested. (Ex. C (Edwards Dep.) at 287:16–18.) Edwards waived his right to an attorney at the hearing. (*Id.* at 295:3–8.) The municipal judge gave Edwards the option of paying what he still owed on the tickets for which he originally had been placed on probation or to have his sentence of fines and fees commuted to jail time. (*Id.* at 287:19 to 288:9.)

140. The municipal judge commuted Edwards's sentence but ordered that he be released from jail upon the payment of $1,900. (Ex. C (Edwards Dep.) at 353:19 to 355:3; Ex. NNN (Def.'s Ex. 76) at COURT 007473–74.) His wife paid $1,900 on September 20, 2012—two days after his arrest—to have him released from jail. (Ex. C (Edwards Dep.) at 289:4–17, 355:4 to 357:4; Ex. NNN (Def.'s Ex. 76) at COURT 007475, COURT 007477–79.)

141. On November 20, 2012, a Montgomery police officer stopped and ticketed Edwards for driving with a suspended license and failure to have insurance. (Ex. MMM (Def.'s Ex. 74.)

142. In 2014, Edwards received a tax refund of $6,000, which he used to pay the fines and fees he owed to Butler County and the City of Montgomery from the traffic tickets he had accrued and to have his driver's license reinstated. (Ex. C (Edwards Dep.) at 311:19 to 314:18.)

143. Edwards's work history is unclear. He dropped out of college with only a year left to graduate because he had a child with his girlfriend. (Ex. C (Edwards Dep. at 28:21 to 29:1, 45:3–17.) After quitting school, he worked as a cook at nightclubs, working about eight hours per week. (*Id.* at 49:13 to 52:3.) He could not recall when he worked for them or how much he was paid. (*Id.* at 50:1–6, 51:14–16, 52:10–11.)

144. Edwards testified that he worked for UPS from around 2012 to 2014, loading trucks. (Id. at 138:16–140:3.) However, on the personal information sheet he filled out on March 9, 2010, as part of his 2010 probation, he indicated that he was employed by UPS. (Ex. III (Def.'s Ex. 70) at 5.) He claims he worked only about three hours per night, earning around $230 per week. (Ex. C (Edwards Dep.) at 138:16–140:3.)

145. He left UPS because he wasn't making enough money (*id.* at 142:3–16), though he also testified that, despite the fact he was working only three hours each night, he was not doing anything during the day, he was not seeking additional

employment, and nothing prevented him from getting an additional job (*id.* at 204:1–19.)

146. After leaving UPS, Edwards went back to serving as a cook at nightclubs where, according to him, he earned more money. (*Id.* at 142:3–16.)

147. At some point, Edwards worked at a company called JD Seafood. (*Id.* at 53:17 to 56:9.) He could not recall how many hours per week he worked. (*Id.* at 56:10–20.) And although it was unclear from his deposition when he worked there, an employment application he prepared for a later employer indicated that he worked at JD Seafood from February 2015 to March 2016. (Ex. PPPP (Edwards Composite Ex.) at 13.)

148. In 2016, Edwards worked for an auto supplier plan in Hope Hull, earning $500 per week. (*Id.* at 104:3–105:15; 106:11–13.) He was fired from that job after a few months for missing work. (*Id.* at 104:3–105:15.)

149. Edwards also worked for a temp service at some point, but he could not remember the name of that company. (*Id.* at 103:10–22.)

150. From some point in 2016 to January 2018, Edwards worked for Hilton Hotel as the food and beverage manager and head chef over banquets, earning $1,500 every two weeks. (*Id.* at 100:10–12, 101:20–21 102:6–12, 310:20 to 311:5, 311:10–14.) He left Hilton because of a relationship he had had with a woman there. (*Id.* at 180:10–23.)

151. In March 2018, he started his present business, a food truck, working at festivals, concerts, and football games. (*Id.* at 71:6–21, 181:7–14, 175:6–17.) In 2018, he earned $15,000. (*Id.* at 179:19 to 180:1.)

### F.   Levon Agee

152. The Municipal Court placed Plaintiff Levon Agee on JCS-supervised probation on only one occasion. (Ex. A, Dep. of Levon Agee, at 258:5 to 259: 11 (indicating that Agee was on a payment plan with the Municipal Court before going on JCS, but that his first interaction with JCS was in 2010); Ex. DDDD (Def.'s Ex. 116); Ex. EEEE (Def.'s Ex. 117).)

153. On April 27, 2008, Agee was ticketed by a Montgomery police officer for driving while suspended (ticket number 26826). (Ex. RRR (Def.'s Ex. 104).)

154. On July 19, 2008, Agee was stopped at a roadblock by Montgomery police officers. (Ex. A (Agee Dep.) at 260:9–23.) An officer found that Agee for driving with a headlight out and ticketed Agee for "improper equipment" (ticket number 49366) and driving without a driver's license (ticket 49367). (Ex. SSS (Def.'s Ex. 105).)

155. Agee signed the ticket, saying that he understood he was ordered to attend court for the improper equipment charge on August 25, 2008. (Ex. SSS (Def.'s Ex. 105).) Agee testified that he could not remember if he appeared for this court appearance or not. (Ex. A (Agee Dep.) at 262:21 to 263:4.)

156. On September 16, 2009, Agee was pulled over again and ticketed for driving without a driver's license. (Ex. TTT (Def.'s Ex. 106).)

157. Agee signed the ticket where it directed him to attend court on October 27, 2009. (*Id.*; Ex. A (Agee Dep.) at 273:4–10). Agee does not remember if he showed up at this court date. (*Id.* at 273:8–10.)

158. Agee did not, in fact, appear for either of these court dates. (*Id.* at 281:21 to 282:16); Ex. UUU (Def.'s Ex. 107); Ex. VVV (Def.'s Ex.'s 108).) The Municipal

Court issued an alias warrant for Agee's failure to appear for his August 25, 2008, court date on October 7, 2008. (Ex. UUU (Def.'s Ex. 107).) The Municipal Court issued another alias warrant pertaining to Agee's failure to appear at his October 27, 2009, court date on December 23, 2008. (Ex. VVV (Def.'s Ex. 108).)

159. On August 29, 2009, Agee was ticketed by a Montgomery police officer for running a stop sign (ticket number 78029). (Ex. A (Agee Dep.) at 288:10–14; Ex. WWW (Def.'s Ex. 109).) Agee was assigned a court date for October 5, 2009, on this ticket and promised to appear in court on that date by signing the ticket. (Ex. WWW (Def.'s Ex. 109).) Though Agee didn't have a valid license or insurance at the time, he did not receive a citation for either of these offenses. (Ex. A (Agee Dep.) at 291:5–15.)

160. On September 29, 2009, Agee received a speeding ticket along with another citation for driving with a suspended license (ticket numbers 86578 and 86579). (Ex. A (Agee Dep.) at 294:19–23; Ex. XXX (Def.'s Ex. 110).) Agee signed the tickets, saying he understood he was supposed to appear in court in connection with the citations on November 17, 2009. (Ex. XXX (Def.'s Ex. 110); Ex. A (Agee Dep.) at 295:20 to 296: 4.)

161. Agee failed to appear for his October 5, 2009, hearing, after which the Municipal Court issued another warrant for his arrest on August 29, 2009. (Ex. A (Agee Dep.) at 297:1–6; Ex. YYY (Def.'s Ex. 111).)

162. On April 22, 2010, Agee received four tickets (ticket numbers 38836, 38837, 38838, and 38839) for obstructed view, no seat belt, no insurance, and no driver's license. (Ex. A (Agee Dep.) at 300:16 to 301:23, 303:9 to 304:3; Ex. ZZZ

(Def.'s Ex. 112).) Each of these tickets instructed Agee to appear in court on May 24, 2010. (Ex. ZZZ (Def.'s Ex. 112).)

163. Agee did not show up in court on May 24, 2010. (Ex. A (Agee Dep.) at 306:1–3). The Municipal Court issued another warrant for his arrest on June 17, 2010. (Ex. AAAA (Def.'s Ex. 113).)

164. Agee was ordered to appear before the Municipal Court on August 31, 2010.  (Ex. BBBB (Def.'s Ex. 114).) Agee claims that someone forged his signature on this document, though he still actually showed up for court on that date and talked to the judge about his multiple tickets. (Ex. A (Agee Dep.) at 307:5–16, 309:7–19.)

165. Agee testified that after speaking to the judge, the judge decided to put him on what Agee called a "payment plan." (*Id.* at 316:19 to 317:7.)

166. That same day, Agee filled out and signed a JCS personal information sheet. (Ex. CCCC (Def.'s Ex. 115); Ex. A (Agee Dep.) at 30:9–22). He also signed a probation order. (Ex. DDDD (Def.'s Ex. 116; Ex. A (Agee Dep.) at 322:14 to 323:2). The probation order put Agee on probation for all of the tickets he had received since 2008. (Ex. DDDD (Def.'s Ex. 116).)

167. The probation order placed Agee on probation for 24 months, ordered him to pay $140 per month (including $40 per month for JCS fees), and further ordered him to report to JCS as instructed. (Ex. DDDD (Def.'s Ex. 116).) Agee read the order before signing it. (Ex. A (Agee Dep.) at 324:10–12.) Agee understood that the document he was signing was an order from a judge. (*Id.* at 325:10–15.) Agee also

understood that being on probation meant that there would be consequences if he failed to follow the rules set out in the probation order. (*Id.* at 326:17 to 327:16.)

168. At his first appointment with JCS, Agee was giving a sheet showing him the general conditions of his probation. Agee admits that he initialed by each line and signed this document. (*Id.* at 344:11 to 345:17; Ex. FFFF (Def.'s Ex. 118).) His agreed-to conditions of probation included, among other things, that he owned the fines and fees imposed by the court, that he would pay those fines and fees by making a minimum monthly payment of $140, and that he would comply with instructions from his probation officer. (Ex. FFFF (Def.'s Ex. 118).)

169. Agee missed his first two appointments with JCS before appearing on September 20, 2010. (Ex. EEEE (Def.'s Ex. 117) at 2–3.) Agee only attended one other JCS appointment after this date—on October 28, 2010, he came to his JCS appointment and paid $80.00. (*Id.*)

170. Due to Agee's non-compliance with the terms of the Municipal Court's probation order, JCS wrote to Agee on January 16, 2011, and told him that he needed to appear in court on March 2, 2011. (Ex. GGGG (Def.'s Ex. 120).) At this time, Agee had missed 8 straight appointments. (Ex. EEEE (Def.'s Ex. 117) at 2–3). Agee admits the letter is addressed to the residence where he was living at the time. (Ex. A (Agee Dep.) at 351:19–21.) Agee had no contact with JCS after JCS sent him the January 16, 2011 letter. (Ex. EEEE (Def.'s Ex. 117) at 2; Ex. A (Agee Dep.) at 388:21 to 389:3.)

171. Agee says he doesn't remember if he showed up in court on March 2, 2011. (*Id.* at 352:7–11). JCS records show that Agee missed this court appearance and

44

that a warrant was issued for Agee's arrest by the Municipal Court. (Ex. EEEE (Def.'s Ex. 117) at 2.)

172. Agee was arrested over two years later, on June 13, 2013. (Ex. A (Agee Dep.) at 352:18 to 353:6; Ex. HHHH (Def.'s Ex. 121).) Agee testified that a police officer approached him on the side of the road as he and a friend were dealing with a car with an overheating engine. Agee further testified that the police officer saw "an open beer container beside the car" and then ran Agee's name. (Ex. A (Agee Dep.) at 353:9 to 354:7.) The officer arrested Agee pursuant to the outstanding warrant. (*Id.* at 355:9–17.)

173. Agee testified that he spent the weekend in jail and was taken to court on Monday morning, where he got to speak one-on-one with a PD. (*Id.* at 367:21 to 369:17, 370:9–23.)

174. Agee had steady employment with Johnson Controls from 2004 or 2005 to 2009. (Ex. A (Agee Dep.) at 144:9–15.) He received unemployment benefits for the entire time that he was on JCS probation. (*Id.* at 161:18–21.)

**G.   Christopher Mooney**

175. The Municipal Court placed Plaintiff Christopher Mooney on JCS supervised probation on October 11, 2011. (Ex. K, Dep. of Christopher Mooney, at 127:13 to 128:15; Ex. PPP (Def.'s Ex. 80); Ex. QQQ (Def.'s Ex. 92).)

176. The First Amended Complaint does not contain any allegations related to this probation. Mooney testified that he did not have much interaction with JCS, but from what little interaction he did have he did not think any JCS employee treated him unfairly. (Ex. K (Mooney Dep.) at 273:3–8.)

45

177. The conduct that Mooney complains about in his First Amended Complaint begins on May 8, 2013, when he was pulled over on a traffic stop and was arrested for unpaid ticket fines and costs. (Doc. 34-1 (Compl.) at ¶ 146.)

178. Mooney says after this arrest, Judge Les Hayes sentenced him to pay $700 and to do jail time. (*Id.* at ¶ 148.)

179. The First Amended Complaint contains no allegations that JCS violated his rights in any way whatsoever, nor does it contain any allegation that JCS was involved with the May 8, 2013 arrest or his subsequent incarceration.

## <u>Argument</u>

### I.   The Plaintiffs' federal claims fail.

#### A.   There is no substantial evidence that JCS violated the Plaintiffs' constitutional rights.

The Plaintiffs' claims under 42 U.S.C. § 1983 are premised on alleged violations of their rights arising under the Fourth and Fourteenth Amendments. The court in *Ray v. Judicial Corr. Servs., Inc.*, 270 F. Supp. 3d 1262 (N.D. Ala. 2017), addressed similar constitutional claims. What the court said there demonstrates that JCS is due summary judgment. Plaintiffs have no substantial evidence to support *Monell* liability as to JCS, and there is no substantial evidence supporting claims under § 1983 against JCS.

##### 1.   JCS is not liable for any alleged violation of the Plaintiffs' Fourth Amendment rights related to the issuance and service of warrants.

In support of their claim in Count Three that JCS violated their Fourth Amendment rights, the Plaintiffs allege that JCS employees followed a policy of issuing and serving warrants on those who had not made their monthly payments

to JCS, and that they did so without a finding of probable cause that the person had committed an offense. (Doc. 34-1 (Compl.) at ¶ 192.) Those allegations have no basis in fact, and even if they did, they do not show that JCS violated the Plaintiffs' Fourth Amendment rights.

### a.   JCS is not a *Monell* policymaker.

We begin with *Monell*, an argument which applies to all § 1983 claims asserted against JCS. Under *Monell*, a governmental entity does not bear § 1983 liability on respondeat superior grounds. *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 691, 694 (1978); *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992). *Monell* requires there to be a "policy or custom" giving rise to the constitutional wrong. The *Monell* standard applies just as strongly to private corporations that, like JCS, contract with a governmental entity to "perform[] a function traditionally within the exclusive prerogative of the state" and which thereby "become[] the functional equivalent of the municipality." *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997); *see also Harvey*, 949 F.2d at 1129–30 ("*Monell* involved a municipal corporation, but every circuit to consider the issue has extended the holding to private corporations as well."); *Mercer v. N. Broward Hosp. Dist.*, 270 F. App'x 789, 791–92 (11th Cir. 2008); *Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1325 (11th Cir. 1988) (en banc) (stating that private defendants in § 1983 actions should have at minimum the same defenses available to public defendants), vacated on other grounds, 489 U.S. 1002 (1989).

Thus, to succeed on their constitutional claims, the Plaintiffs "must prove that [JCS] had a 'policy or custom' of deliberate indifference that led to the violation of

[their] constitutional right." *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011); *Harris v. So. Health Partners, Inc.*, No. 5:11-CV-22, 2013 WL 2387740, at *9 (M.D. Ga. May 30, 2013); *accord McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); *see also Campbell v. Thomas*, No. 2:10-CV-694-WC, 2013 WL 5406800, at *12 (M.D. Ala. Sept. 25, 2013). Thus they must show an "impermissible policy" or a "constitutionally forbidden rule or procedure of [JCS] ... which was the moving force of the constitutional violation." *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (citing *Monell*, 436 U.S. at 694); *see also Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010) (using the "moving force" standard). "In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice." *McDowell*, 392 F.3d at 1290 (cleaned up).

As in *Ray*, in this case it's Montgomery's municipal judges who were (and are) the relevant policymakers for all of the actions about which the Plaintiffs here complain. *See Ray v. Judicial Corr. Servs., Inc.*, No. 2:12-CV-02819-RDP, 2017 WL 660842, at *12 (N.D. Ala. Feb. 17, 2017) (holding that the municipal judge was the relevant policymaker for purposes of § 1983 liability and had the authority under state law to "sentence defendants to probation, to set probation conditions, to impose fines on defendants, and to establish payment plans for defendants when they could not immediately pay the fines imposed," as well as to "determin[e] an appropriate punishment when an individual failed to pay fines imposed on him or her" (citing Ala. Code § 12-14-13 and Rule 26.11, Ala. R. Crim. P.)); *accord Ray v. Judicial Correction Servs., Inc.*, 270 F. Supp. 3d 1262, 1299 (N.D. Ala. 2017) (opinion on JCS's Motion for Summary Judgment) ("the court finds no custom or

48

policy attributable to JCS that was a moving force behind the named Plaintiffs' failure to receive a full revocation hearing before arrest warrants were issued"); *id.* at 1301 ("the court concludes that no reasonable jury could find that JCS instituted a policy or custom that was the moving force behind any due process violation concerning the failures to provide notice"). Especially with these Plaintiffs, the municipal judges were the drivers in decisionmaking and probation handling, not JCS. The municipal judges ordered defendants to probation and determined how probationers would be handled when they failed to abide by the terms of the probation. There is no evidence that JCS had in place a custom or policy leading to any violations of the Plaintiffs' Fourth Amendment rights.

> **b.   There is no substantial evidence that JCS violated the Plaintiffs' Fourth Amendment rights related to the issuance and service of warrants.**

Count Four asserts a Fourth Amendment claim similar in many respects to the one in *Ray* on which the District Court granted JCS a summary judgment. (Compare Doc. 34-1 (Compl.) at ¶¶ 192–96, with Fourth Amended and Restated Complaint, *Ray*, No. 2:12-cv-02819-RDP (N.D. Ala.), Doc. 305, at ¶¶ 158–67.) "Properly read, Plaintiffs' Fourth Amendment claims either present a false arrest or malicious prosecution action against JCS." *Ray*, 270 F. Supp. 3d at 1306. As in *Ray*, the evidence to back such claims isn't in this record.

***False Arrest.*** "'The existence of probable cause at the time of arrest ... constitutes an absolute bar to a section 1983 action for false arrest.'" *Case v. Eslinger*, 555 F.3d 1317, 1326–27 (11th Cir. 2009) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)). The Plaintiffs were arrested in

accordance with arrest warrants issued by the court, almost always after failing to appear at hearings for which they had been summoned. In every circumstance, there was probable cause to believe the Plaintiffs had violated the terms of their probations, specifically for refusing to appear for their JCS appointments. (Statement of Facts at ¶¶ 55, 83–85, 94–96, 106–08, 129, 135–36, & 169–71.) And Alabama law specifically permits the arrest of probationers who, like the Plaintiffs here, refused to appear in court when summoned to answer for why they had violated the terms of their probation. *See* Rule 27.4(b), Ala. R. Crim. P.  The *Ray* Court flatly rejected the same claims by the plaintiffs in that case:

> The flaw in Plaintiffs' Fourth Amendment false arrest claims is that the JCS employees responsible for issuing the revocation petitions had probable cause to believe Plaintiffs committed the probation violations reported to the Court. ... JCS employees had probable cause to believe that Plaintiffs had failed to appear to scheduled appointments and had failed to keep up with their monetary probation conditions. And, JCS employees affirmed in the revocation petitions that they had investigated the named Plaintiffs. ... Therefore, JCS employees did not violate Plaintiffs' Fourth Amendment rights by submitting revocation petitions that asked the Municipal Court to issue arrest warrants if necessary.

*Ray*, 270 F. Supp. 3d at 1306–07.

**Malicious Prosecution.** A plaintiff must prove two things to establish a § 1983 malicious-prosecution claim: (1) the elements of the common-law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010); *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004); *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). The elements of the common-law tort of malicious prosecution are: "(1) a criminal prosecution instituted or continued by

the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Wood*, 323 F.3d at 882. Under Alabama law the elements for the common-law tort of malicious prosecution are the same, except they require only a "judicial proceeding" not a "criminal prosecution." *Grider*, 618 F.3d at 1256; *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831–32 (Ala. 1999). As to the Fourth Amendment unreasonable-seizure prong, an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment. *Grider*, 618 F.3d at 1256; *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010); *Wood*, 323 F.3d at 882; *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). Accordingly, the existence of probable cause defeats a § 1983 malicious-prosecution claim. *Grider*, 618 F.3d at 1257; *Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008); *Wood*, 323 F.3d at 882.

Here, there is no evidence to support malicious-prosecution claims: JCS didn't institute a criminal prosecution against the Plaintiffs; "prosecutions" of probation violations weren't terminated in the Plaintiffs' favor; and in any event, there was probable cause to suspect probation violations. *See Ray*, 270 F. Supp. 3d at 1307 (granting summary judgment for JCS on Fourth Amendment malicious-prosecution claim because "a reasonable jury could not find from the Rule 56 record that the allegedly unlawful [failure-to-obey-court-order] charges were terminated in Plaintiffs' favor").

**2.      JCS is not liable for any alleged violation of the Plaintiffs' constitutional rights related to indigency determinations.**

In Count V, the Plaintiffs wrongly assert that JCS adopted and implemented policies, practices, or customs of failing to inquire into the Plaintiffs' indigency or ability to pay fines that the court had levied before the court imprisoned them for failing to pay those fines, did not provide an opportunity for the Plaintiffs to present evidence concerning their inability to pay the court-imposed fines, failed to give adequate notice to the Plaintiffs concerning the relevant issues at revocation hearings, and did not make findings concerning their ability to pay. (Doc. 34-1 (Compl.) at ¶ 206.) The Plaintiffs also appear to assert a violation of their right to equal protection when they allege that JCS adopted and implemented policies, practices, or customs of imprisoning indigent people when they could not afford to pay their debts. (*Id.* at ¶ 207.) All of those claims fail.

***Indigency and Willfulness Determination Claims.*** JCS had no legal duty to investigate or determine the Plaintiffs' alleged indigency or (at the revocation stage) their willfulness in failing to abide by the terms of their probation. The Municipal Court, not JCS, was required to inquire into and determine these issues. As Judge Proctor found in *Ray*, when a probationer breaches his or her probation terms by failing to pay fines or costs, ***the court***, not a probation officer, is tasked with inquiring into the probationer's financial status and determining whether he or she is indigent. *Ray v. Judicial Correction Servs., Inc.*, 270 F. Supp. 3d 1262, 1299 (N.D. Ala. 2017) (citing Ala. R. Crim. P. 27.5(a)). Thus, the *Ray* Court rejected the same indigency-related claims as here, writing:

"The Due Process Clause of the Fourteenth Amendment imposes procedural and substantive limits on the revocation of the conditional liberty created by probation." *Black v. Romano*, 471 U.S. 606, 610, 105 S. Ct. 2254, 85 L.Ed.2d 636 (1985). In *Bearden v. Georgia*, 461 U.S. 660, 103 S. Ct. 2064, 76 L.Ed.2d 221 (1983), the Supreme Court established a substantive limit on when courts may revoke probation for a probationer's failure to pay fines or restitution. *Black*, 471 U.S. at 611, 105 S. Ct. 2254. The *Bearden* opinion requires a court conducting a revocation hearing to ask a probationer why he or she failed to pay a fine or restitution ordered as a condition of probation. *Bearden*, 461 U.S. at 672, 103 S. Ct. 2064. On the one hand, "[i]f the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority." *Id.* On the other hand, "[i]f the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment." *Id.*

Here, the court finds no custom or policy *attributable to JCS* that was a moving force behind the named Plaintiffs' failure to receive a full revocation hearing before arrest warrants were issued on [failure-to-obey-a-court-order or] FTOCO charges. Indeed, JCS directed its employees to request probation revocation hearings when a probationer's mail was returned to the JCS office, a probationer missed three appointments, or a probationer failed to respond to all communications. (Doc. # 402–3 at 23). The Rule 56 record shows that JCS employees in Childersburg sought probation revocation hearings when Plaintiffs failed to show up for probation appointments. Plaintiffs claim that JCS employees (rather than Municipal Court employees) were responsible for seeking warrants based on FTOCO charges, thereby bypassing the revocation hearing required under *Bearden*. However, Plaintiffs have not pointed to any evidence in the Rule 56 record showing that JCS employees were responsible for this chicanery. Nor have Plaintiffs pointed to a JCS custom or policy of using non-existent legal charges to avoid *Bearden* hearings. Therefore, Plaintiffs have not presented a triable § 1983 claim against JCS based on this alleged due process violation.

Similarly, Plaintiffs have not presented a JCS custom or policy that was a moving force behind the Municipal Court's failures to determine Plaintiffs' indigency. Alabama law directs a court to consider a defendant's financial resources and ability to pay a fine when determining whether to impose a fine. Ala. R. Crim. P. 26.11(b). And, if a probationer breaches the terms of probation by not paying fines, costs, restitution, or other assessments, it is a court, not a probation officer, that "must inquire into the probationer's financial status and determine whether the probationer is indigent." Ala. R. Crim. P. 27.5(a). Plaintiff Timothy Fugatt's testimony

indicates that the Municipal Court often did not offer defendants an opportunity to explain their indigency during the fast-paced court proceedings. (See Doc. # 537–19 at 74). JCS's employees understood, though, that indigency determinations were to be conducted by the Municipal Court. (See Doc. # 471–31 at 10–11) (testimony by Kidd that indigency determinations were to be conducted by the Municipal Court). JCS's training manual also explained that a court would determine whether a defendant was indigent at sentencing. (Doc. # 402–3 at 47). To be sure, JCS stood to benefit financially if the Municipal Court declared fewer probationers to be indigent, as it would not be obligated to supervise those indigent probationers without payment of fees or costs—by the probationers themselves. But, Plaintiffs have not shown that JCS instituted a policy or custom that prevented the Municipal Court from performing indigency determinations (or that made such determinations less likely to occur, for that matter). Therefore, Defendants are due to be granted summary judgment on Plaintiffs' claim that they violated Plaintiffs' due process rights by preventing Plaintiffs from receiving indigency hearings at the sentencing stage or the revocation stage.

*Ray*, 270 F. Supp. 3d at 1298–1300 (emphasis in original). Plaintiffs' constitutional violation claims on indigency determinations and court hearings are without merit.[5]

This Court previously denied JCS's motion to dismiss Count V because of the Plaintiffs' allegation that JCS had a contractual duty to inquire into their financial

---

[5] *See also* Rule 6.3(b), Ala. R. Crim. P. (referencing "court responsible for determining indigency"); Rule 26.11(g), Ala. R. Crim. P. ("If a defendant fails to pay a fine or restitution as directed, *the court* may inquire and cause an investigation to be made into the defendant's financial, employment, and family standing, and the reasons for nonpayment of the fine and/or restitution, including whether nonpayment ... was contumacious or due to indigency." (emphasis added)); Rule 27.5(a), Ala. R. Crim. P. ("In cases involving breaches of conditions of probation because of nonpayment of fines, costs, restitution, or other court ordered assessments, the court, before the probationer is incarcerated, must inquire into the probationer's financial status and determine whether the probationer is indigent."); Ex. UUUU (JIC Opinion) at 4, 8 (private probation agencies should "not be delegated the authority to make indigency determinations or other determinations relative to incarceration for noncompliance," and "when a judge delegates to others his ... duty to determine a defendant's ability to pay court ordered fines and costs, he ... fails to perform the duties of his office"); *Bearden v. Georgia*, 461 U.S. 660, 672 (1983) (holding that "in revocation proceedings for failure to pay a fine or restitution, *a sentencing court* must inquire into the reasons for the failure to pay" (emphasis added)); *Harris v. City of Austin*, No. A 15 CA 956 SS, 2016 WL 1070863, at *7 (W.D. Tex. Mar. 16, 2016) ("[T]he function municipal judges ... carry out in determining whether an individual should be jailed for failure to pay is no less a judicial function, arising from the power vested in municipal judges by the state of Texas, if those judges are flouting the law in discharging it."); *Whisenant v. City of Haltom City*, 106 F. App'x 915, 917 (5th Cir. 2004) ("The City cannot be liable under § 1983 for having a 'policy' of wrongfully incarcerating indigent defendants because the relevant decisions were made by a municipal judge acting in his judicial capacity.").

situation. (Doc. 131 at 20–21.) According to the Plaintiffs, this duty arose from the language of the contracts between the City and JCS providing that JCS would not charge a probation fee to indigent probationers, which, in the Plaintiffs' view, required JCS to determine whether the probationers were indigent. (Doc. 57 at ECF p. 106–07 (citing Amended Compl. at ¶¶ 55, 61, 63).) But mere allegations about contractual duties—while arguably sufficient at the motion to dismiss stage—are not sufficient at this stage. For Plaintiffs to have such a claim at summary judgment, they must demonstrate that JCS's contractual activity, as interpreted and implemented by the contracting parties, constituted a JCS undertaking to make indigency determinations.

The evidence before this Court shows conclusively that JCS did not assume, through its contracts with the City, any duty or undertaking to make indigency assessments, either when initially placed on probation or when they later violated the terms of their probation. The contractual provision on which the Plaintiffs rely is identical in the 2009 and 2010 contracts, and it provides:

> JCS will supervise all probated cases sentenced by the Court. JCS will also supervise indigent cases **when determined by the Court**. These cases will not be charged the standard probation fee, but will still be offered all JCS services.

(Ex. S (March 2009 Contract) at Exhibit A, ¶ 5; Ex. T (July 2010 Contract) at Exhibit A, ¶ 5 (emphasis added).) Under the contracts, then, JCS's obligation to not charge probation supervision fees arose only when **the court** determined that a probationer was indigent. JCS was not contractually obligated to determine whether a probationer was indigent—the contracts make explicit what the law

clearly provides: that it is up to a court, not a probation officer, to make such a determination. That is exactly what Judge Proctor concluded in *Ray*, 270 F. Supp. 3d at 1299–1300.

Even leaving *Ray* aside, though, Plaintiffs' claims regarding indigency and willfulness hearings also fail because, even assuming that probation was revoked for the non-appearance at the revocation hearing, it was the Plaintiffs' very non-appearance which caused the court to be unable to inquire into their reasons for not paying the court-ordered fines. In *Garcia v. City of Abilene*, 890 F.2d 773, 776 (5th Cir. 1989), the municipal court convicted the plaintiff of failing to appear in court and fined her. *Id.* at 774–75. After she signed a continuance agreement promising to appear in court on a certain day to let the court know when she would be able to pay the fine, she failed to appear, and the court issued a warrant for her arrest. *Id.* at 775. She responded by filing suit in federal court under § 1983, contending, among other things, that the city's collection system was unconstitutional as applied to her under *Bearden* and *Tate v. Short*, 401 U.S. 395 (1971), because the city attempted to jail her solely because she could not pay the fine assessed against her. *Id.* at 775–76. The district court directed a verdict against the plaintiff, and, on appeal, the Fifth Circuit affirmed, writing that *Tate* and *Bearden* "rest on the assumption that the indigent appears before the court to assert his inability to pay." *Id.* at 776. The court concluded that "[e]ven assuming an individual who is fined is too poor to pay, if he does not appear and assert his indigency, the court cannot inquire into his reasons for not paying and offer alternatives." *Id.* (emphasis added).

Under *Garcia*, then, a party who doesn't show for a hearing cannot later complain that a *Bearden* inquiry should have been conducted at that hearing. *Accord Sorrells v. Warner*, 21 F.3d 1109, No. 93-8025, 1994 WL 171697, at *3 (5th Cir. Apr. 28, 1994) (unpublished) ("*Tate* is based on an assumption that the defendant has appeared before the court and asserted his indigency."). The rule of *Bearden* itself holds that arrests and jailings for reasons other than an indigent's inability to pay are not constitutionally suspect. *Bearden*, 461 U.S. at 667 (holding that a state may not "impose a fine as a sentence and then automatically convert it into a jail term ***solely*** because the defendant is indigent and cannot forthwith pay the fine in full") (emphasis added).

The evidence shows these Plaintiffs didn't show up for their revocation hearings, so they did not assert their indigency as their reason for failing to pay their fines. (Statement of Facts at ¶¶ 85, 96, 108, 136, & 171.) That deprived the Municipal Court of an opportunity to conduct a *Bearden* inquiry. The Plaintiffs can't complain that the Municipal Court did not consider the reasons for their failures to pay their fines before issuing warrants for their arrests when they did not appear before the court as ordered to explain their reasons. The Municipal Court can't be said to have violated the Plaintiffs' rights under *Bearden* when the Plaintiffs' own actions made the *Bearden* inquiry impossible. The Plaintiffs have never once explained how the Municipal Court could conduct a *Bearden* hearing for probationers who did not appear for revocation hearings. Thus, the Plaintiffs never experienced an actionable *Bearden* violation.

***Failure to Make Written Revocation Findings.*** The Plaintiffs claim JCS failed to make findings concerning their ability to pay their court-ordered fines. But JCS had no legal duty or authority to make findings regarding the reasons they could or could not pay those fines; findings are for the Municipal Court to make. And leaving that aside, the information JCS provided on revocation and compliance reports was accurate and undisputed by any of the Plaintiffs — these Plaintiffs missed dozens of appointments with JCS and failed to make the payments ordered by the Municipal Court.[6] (Statement of Facts at ¶¶ 55, 83–85, 94–96, 106–08, 129, 135–36, & 169–71.)

***Inadequate Notice of Hearings.*** The Plaintiffs complain that JCS's policies did not provide them with the required notice concerning the relevant issues at their revocation hearings. (Doc. 34-1 (Compl.) at ¶ 206.) But JCS and the Municipal Court sent notice. (Ex. N (Gray Decl.) at ¶ 14; Ex. O (Hamby Decl.) at ¶ 26; Ex. P (Hill Decl.) at ¶ 21; Statement of Facts at ¶¶ 83, 94, 106, 114–15, 129 & 170.) There is simply no evidence of a JCS-instituted policy or custom causing inadequate notice. To the contrary, JCS instructed its employees to provide probationers notice of these hearings. (Ex. TTTT (JCS Training Manual) at Ray v. JCS 000105, 000111). Yet again, Judge Proctor's holding in *Ray* is on point:

---

[6] Even if JCS's reports to the Municipal Court contained mistakes (not so), that would not demonstrate a violation of the Plaintiffs' due-process rights. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." (emphasis in original)). Thus, "an unintentional clerical error is not a proper basis on which to rest a due process claim." *Drummond v. Circuit Ct. of Walker Cty.*, No. 6:15-CV-01512-AKK-SGC, 2015 WL 9451091, at *2 (N.D. Ala. Nov. 19, 2015), report and recommendation adopted, 2015 WL 9450837 (N.D. Ala. Dec. 23, 2015). Absent a showing that JCS deliberately provided incorrect information to the Municipal Court with the intent to cause the Plaintiffs harm, they cannot base their due-process claim on the mere provision of incorrect information. *See id.* Here, no Plaintiff has contested the correctness of the information regarding missed appointments and unpaid amounts in each Plaintiff's Petition for Revocation.

> [N]o reasonable jury could find that JCS instituted a policy or custom that
> was the moving force behind any due process violation concerning the
> failures to provide notice. Indeed, JCS's training manual instructed
> employees to mail probation revocation petitions, along with probation
> violation letters, to the probationer.... Moreover, the manual directed that
> if mail sent to a probationer by JCS was returned, JCS employees were to
> "run Accurint and mail the revocation information to the address obtained
> through Accurint." ... Plaintiffs have not pointed to another official custom
> or policy that could be considered a moving factor for any of these
> particular due process violations. Nor have they claimed that a final
> policymaker was responsible for failing to send written notice of the
> revocation hearings. Because Plaintiffs have failed to provide evidence
> from which a reasonable jury could find a JCS custom or policy to be the
> moving force behind their failure to receive written notice of probation
> revocation hearings, Defendants are due to be granted summary judgment
> on this claim.

*Ray*, 270 F. Supp. 3d at 1301.

**Imprisonment when Plaintiff could not afford to pay.**   Finally, the

Plaintiffs assert what appears to be a claim that JCS violated their right to equal

protection by implementing a policy of imprisoning defendants for being unable to

afford their court-ordered fines. (Doc. 34-1 (Compl.) at ¶ 207.) The evidence doesn't

support this claim. When a probationer violated the terms of his probation and was

brought before the Municipal Court on a revocation petition, the Municipal Judge

made all decisions as to whether to revoke probation. JCS employees never

recommended to the court that it imprison a probationer.

In *Ray*, Judge Proctor rejected direct equal-protection claims against JCS

because "the Municipal Court imprisoned Plaintiffs for their perceived failure to

appear, rather than their poverty[,]" and because "there is insufficient Rule 56

evidence to show that JCS played a significant enough role in procuring warrants

on [failure-to-obey-court-order] charges." *Ray*, 270 F. Supp. 3d at 1312. The same is

true in this case. The Plaintiffs were never arrested for failing to pay court-ordered fines and fees but, instead, because of their failure to attend court-ordered hearings (and for some, for other warrants having nothing to do with a JCS probation). The record reflects that when municipal defendants did appear for those hearings, their probations were not revoked, even if they had been ordered to the hearing because of their failure to make their court-ordered payments. (Ex. P (Hill Decl.) at ¶ 21.) And, again, JCS never recommended imprisonment of probationers who violated the terms of their probation for failing to pay their court-ordered fines. JCS is due summary judgment on this claim as well.

### 3.   JCS is not liable for any alleged violation of the Plaintiffs' constitutional rights related to probation sentences.

In Count VIII, the Plaintiffs assert that their constitutional rights were violated by a policy under which municipal defendants who could pay their court-assessed fines and fees immediately were not placed on probation, but those who could not were placed on probation supervised by JCS. They also contend, similar to their contention in Count V, that they were unlawfully imprisoned based on the revocation of the probations for failing to pay their fines. As with their other claims, the evidence does not show that these assertions give rise to any liability on the part of JCS:

- JCS made no decisions regarding the initial sentencing of the Plaintiffs; the Municipal Court, which had a number of options to choose from regarding sentencing, made all sentencing decisions, including payment of fines, costs, and fees, whether a defendant would be sentenced to

probation, and whether that probation would be supervised by JCS or the Court. (Statement of Facts at ¶¶ 16–18, 32–38, 40.)

- JCS's involvement with a defendant's case did not begin until after the Municipal Court placed a defendant on probation with JCS, under a probation order the municipal judge signed and entered. (Ex. O (Hamby Decl.) at ¶ 10.)

- Although JCS probation officers reported to the Municipal Court on the status of probationers' efforts at complying with the terms of their probation, and would, at times, prepare petitions to revoke probation for noncompliance with court-ordered terms, JCS probation officers merely communicated facts to the Municipal Court and never made any recommendations that the court imprison a probationer. (Statement of Facts at ¶¶ 61–62, 67.)

- None of the Plaintiffs were even arrested for violating the terms of their probation orders; their arrests were for failure to appear for court. (Statement of Facts at ¶¶ 65, 83–86, 95–97, 108–09, 136–38, 134–35, & 171–72.)

The Plaintiffs do not plead how their due-process rights were violated by being placed on probation when they could not, or would not, pay the full amount of the court-assessed fines immediately. To the extent the Plaintiffs assert that such an arrangement violates their right to equal protection, this Court has already rejected the claim in ruling on JCS's motion to dismiss. (*See* Doc. 131 at 25 ("However, plaintiffs do not state a claim with respect to equal protection.").) Even assuming

that the Plaintiffs received disparate sentences based on wealth, that claim is foreclosed under Judge Proctor's analysis in *Ray*: "the Equal Protection Clause, as interpreted by the Supreme Court in *Williams* [*v. Illinois*, 399 U.S. 235 (1970)] and *Tate* [*v. Short*, 401 U.S. 395 (1971)], did not prohibit the Municipal Court from sentencing the named Plaintiffs to probation because they were unable to pay fines." *Ray*, 270 F. Supp. 3d at 1311–12. "Neither *Williams* nor *Tate* prohibit a court from imposing a different form of sentence on a defendant unable to pay a fine than one able to pay a fine. Indeed, the *Williams* opinion indicated in a footnote that a court could constitutionally direct an indigent defendant to perform community service in lieu of paying a fine, whereas it presumably would not sentence a defendant able to pay a fine to community service. *See* 399 U.S. at 244 n. 21, 90 S. Ct. 2018." *Id.* at 1312.

Count VIII also rehashes the Count V claim that Plaintiffs were unlawfully imprisoned after their probations were revoked for failing to pay their fines. Again, Plaintiffs' arrests were for failure to appear in court for their revocation hearings, not because they failed to pay their fines. *See Ray*, 270 F. Supp. 3d at 1312. Though no Plaintiff actually appeared for a revocation hearing, the evidence shows that no probationer who appeared for a revocation hearing ever had his or her probation revoked at that hearing. (Ex. P (Hill Decl.) at ¶ 21.) It was only when they did not appear that the court issued arrest warrants for the Plaintiffs. There is no evidence that JCS ever recommended imprisonment to the court, attempted to influence how the court resolved the Plaintiffs' probation violations, or played a role in procuring

the warrants by which the Plaintiffs were arrested. *See id.*[7] There is no evidence whatsoever involving JCS in the Montgomery municipal-court commutation process in any way.

### B. JCS is entitled to absolute quasi-judicial immunity.

JCS is entitled to absolute quasi-judicial immunity on the Plaintiffs' constitutional claims for following the Municipal Court's orders and in performing functions integral to the Plaintiffs' judicial proceedings.[8] Not only do judges enjoy absolute immunity from civil liability under § 1983 for acts performed in their judicial capacity, so long as such acts are not taken in the "clear absence of all jurisdiction," *Roland v. Phillips*, 19 F.3d 552, 555 (11th Cir. 1994), "[n]onjudicial officials are encompassed by a judge's absolute immunity when their official duties have an integral relationship with the judicial process. Like judges, these officials must be acting within the scope of their authority." *Id.* Courts "determine the absolute quasi-judicial immunity of a nonjudicial official through a functional analysis of the action taken by the official in relation to the judicial process." *Id.* In determining quasi-judicial immunity, this Court must examine "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White*, 484 U.S. 219, 229 (1988). Similarly, the Court must focus on the "nature and function" of the acts, not on the motivation of the actor. *McCullough v. Finley*, 907 F.3d 1324, 1331 (11th Cir. 2018). Finally, "when determining whether a function is

---

[7] To the extent the Plaintiffs characterize this specific claim as a violation of the Fourth Amendment (Doc. 34-1 (Compl.) at ¶ 236), the claim fails for the reasons set out in Section I. A., *supra.*

[8] JCS is also entitled to quasi-judicial immunity on the Plaintiffs' state-law claims for the same reasons discussed in this section. *See* Section II.A., *infra.*

judicial in nature, a court must focus on the 'ultimate act' rather than the constituent parts of the act. Logic compels such an extension in appropriate circumstances." *In re Castillo*, 297 F.3d 940, 952 (9th Cir. 2002).

Nonjudicial officials such as probation officers are protected by absolute quasi-judicial immunity for implementing the written or verbal orders of the court, *see Roland*, 19 F.3d at 556–57, acting at the direction of the court in preparing and submitting reports relating to sentencing proceedings, *see Hughes v. Chesser*, 731 F.2d 1489, 1490 (11th Cir. 1984), acting in accordance with instructions or requests of the court, *see Dellenbach v. Letsinger*, 889 F.2d 755, 763 (7th Cir. 1989), testifying at parole or probation revocation hearings, *see Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005), and scheduling court hearings and sending out notice of such hearings, *see Castillo*, 297 F.3d at 951–53. In the prior appeal in this case, the Eleventh Circuit stated that the performance of "probation procedures" by judges was a judicial act for purposes of judicial immunity. Applying that analysis, the performance of probation procedures by JCS, at the court's behest, is in the same way judicial or quasi-judicial in nature and provides JCS with immunity. *McCullough v. Finley*, 907 F.3d 1324, 1331 (11th Cir. 2018).

What the Plaintiffs claim is unconstitutional or tortious conduct (and allegedly attributable to JCS) falls squarely within the categories of quasi-judicial functions. The Plaintiffs even allege that "the City delegated to JCS" many of the judicial functions of the Municipal Court (Doc. 34-1 (Compl.) at ¶ 61). The evidence itself shows that JCS's actions had an integral relationship with the judicial process: JCS prepared judicial forms at the direction of the court (Statement of Facts at ¶ 2),

supervised probationers' compliance with the terms of their probation (*id.* at ¶ 44–54), notified probationers about hearing dates (*id.* at ¶ 57), reported to the court on the compliance of probationers with their probation orders (*id.* at ¶¶ 52, 55–56), and initiated probation revocation proceedings (*id.* at ¶ 55). JCS personnel properly acted within the scope of their authority in implementing the written or verbal orders of the Montgomery Municipal Court, *see Roland*, 19 F.3d at 556–57, and acting in accordance with the instructions or requests of the court, *see Dellenbach*, 889 F.2d at 763. JCS further acted within the scope of its discretionary authority in implementing and enforcing the conditions of the Plaintiffs' probation. *See United States v. Nash*, 438 F.3d 1302, 1305 (11th Cir. 2006) ("'Where the court makes the determination of whether a defendant must abide by a condition, it is permissible to delegate to the probation officer the details of where and when the condition will be satisfied.'" (quoting *United States v. Stephens*, 424 F.3d 876, 880 (9th Cir. 2005) (cleaned up))). JCS was authorized specifically under Alabama law to "requir[e] reports from the probationer" and "report thereon in writing as often as the court may require"; to "use all practicable and suitable methods, not inconsistent with the conditions imposed by the court, to aid and encourage persons on probation and to bring about improvement in their conduct and condition"; and to "keep detailed records of his work and [] make such reports in writing as the court may require." Ala. Code § 12-14-13. And Alabama law expressly allows probation officers to initiate revocation proceedings directly with the court if there is "reasonable cause to believe that probationer has violated a condition or a regulation of probation or

has acted contrary to the instructions issued by the probation officer." Rule 27.4(a)(1), Ala. R. Crim. P.

Thus, even setting aside the direct instructions and orders of the Montgomery Municipal Court, JCS would have been acting within its "general subject matter jurisdiction" by exercising the statutorily vested authority to supervise the Plaintiffs' probation, to encourage compliance, to report violations to the Montgomery Municipal Court, and, if necessary, to initiate revocation proceedings. *See Fleming v. Dowdell*, 434 F. Supp. 2d 1138, 1157 (M.D. Ala. 2005) (finding parole officials acted within the scope of their authority under Alabama law in conducting parole revocation hearings and revoking parole). JCS's preparation and communication of probation violations and statuses to the Montgomery Municipal Court or the Plaintiffs, in accordance with the Municipal Court's orders, fall within the protected conduct outlined in quasi-judicial immunity cases.

As to the Plaintiffs' allegations about JCS's purported duties in indigency and willfulness determinations, JCS had no authority to make those determinations. The municipal-court judges made clear that was their role, in both their testimony and in their conduct running their court. And even if JCS had a duty to inquire into the Plaintiffs' economic status and relay such information to the court (it didn't), it would enjoy absolute quasi-judicial immunity for any alleged harm (constitutional or tortious) related to that conduct as well. *See McCullough v. Finley*, 907 F.3d 1324, 1331 (11th Cir. 2018) (stating that indigency hearings and the appointment of counsel, or the failure to do so, are judical acts); *Fleming*, 434 F. Supp. 2d at 1171 (holding prosecutor was entitled to absolute quasi-judicial immunity for failure

66

during revocation proceedings to inform the court that the parolee's underlying conviction and parole sentence had been vacated by separate habeas proceedings); (*see also* Doc. 183 at 12 (citing *Finley*)).

Finally, JCS is entitled to absolute quasi-judicial immunity even if JCS had acted beyond the scope of its authority (which it didn't). To defeat absolute quasi-judicial immunity, the Plaintiffs must show not only that JCS personnel acted beyond the scope of their authority, but that they knew facts that placed them "on notice of the clear absence of subject matter jurisdiction ...." *Id.* at 1157–58 (citing *Dykes v. Hosemann*, 743 F.2d 1488, 1497 (11th Cir. 1984)). Put simply, "'[i]mmunity for judicial acts in the clear absence of jurisdiction is lost only if the judge knows that he lacks jurisdiction.'" *Id.* at 1157 (quoting *Dykes*, 743 F.2d at 1497). Here, there is no evidence that JCS knew facts placing it on notice of the clear absence of jurisdiction.[9]

## C.   JCS is entitled to qualified immunity.

Qualified immunity is available as a defense to a claim for damages under § 1983, *see Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263 (11th Cir. 2004), and that defense extends to private entities performing a public function, *see Filarsky v. Delia*, 132 S. Ct. 1657, 1661–68 (2012) (private lawyer hired by city to conduct interview of employee entitled to qualified immunity), and *Rosewood Servs.,*

---

[9] The *Ray* Court, addressing similar claims, held that JCS was not entitled to quasi-judicial immunity because the plaintiffs there sued JCS in its official capacity and did not assert individual-capacity claims. *Ray*, 270 F. Supp. 3d at 1289–90. JCS respectfully disagrees with the *Ray* Court's conclusion that quasi-judicial immunity does not apply under circumstances like those presented in this case. *See Anderson v. Richmond Cty. Jail*, No. CV-115-168, 2016 WL 4579982 (S.D. Ga. Aug. 9, 2016), *rpt. and rec. adopted*, 2016 WL 4582062 (S.D. Ga. Sept. 1, 2016); *Brown v. Tennessee*, No. 3:13-cv-00191, 2013 WL 4508658 (M.D. Tenn. Aug. 23, 2013), *rpt. and rec. adopted in part*, 2014 WL 1278770 (M.D. Tenn. Mar. 23, 2014).

*Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1166 (10th Cir. 2005) (holding that "there is no bar against a private corporation claiming qualified immunity," but concluding that the private entity in that case was not entitled to qualified immunity).[10] The defendant must show that it was engaged in a discretionary function when the complained-of action occurred. *Holloman*, 370 F.3d at 1264. The burden then shifts to the plaintiff to demonstrate that the action about which he complains amounted to a violation of a clearly established constitutional right. *Id.* A discretionary function, for purposes of qualified immunity, is one that falls "within the employee's job responsibilities" and does not necessarily involve the actual exercise of discretion. *Id.* at 1265. In determining whether a defendant was engaged in a discretionary function, a court asks "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.*

JCS's actions, taken in carrying out Municipal Court orders and overseen by the Municipal Court, were performed as part of the employees' discretionary functions—e.g., noticing court dates, interacting with the Plaintiffs, and communicating with the Municipal Court about their compliance with probation obligations. And the means JCS officials employed—phone calls, letters, petitions to the court, etc.—were all within their power to use. Accordingly, the Plaintiffs have

---

[10] The *Ray* Court rejected JCS's assertion of qualified immunity on the basis of *Swann v. Southern Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004), overruled on other grounds, as recognized by *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010). *See Ray*, 270 F. Supp. 3d at 1291. But in *Swann*, the parties agreed that the defendant, as a private entity, was not entitled to assert the defense of qualified immunity, and the court did not independently address that as a contested issue. Thus, *Swann* is not controlling.

the burden to demonstrate that JCS "violated a constitutional right that was clearly established at the time of the acts in question." *Holloman*, 370 F.3d at 1267.

No action of a JCS employee violated the Plaintiffs' constitutional rights, much less a "clearly established" one. For example, even if the Plaintiffs were entitled to a hearing on indigency as they have alleged, it is not clearly established that JCS's employees were required to provide that hearing. Neither can it be shown that the Montgomery Municipal Court's determination to arrest and jail the Plaintiffs for failing to appear in court as ordered constituted a violation of a clearly established constitutional right of the Plaintiffs.

### D. Plaintiffs' claims are barred by *Rooker-Feldman* and the *Heck v. Humphrey* favorable-termination rule.

The Plaintiffs' pleading directly attacks the validity of the Montgomery Municipal Court's underlying orders, judgments, and sentences. For example, they complain that the court ordered them to probation (e.g., Doc. 34-1 (Compl.) at ¶¶ 53, 93, 109, 129, 236), that the probation orders provide for a monthly probation fee (e.g., *id.* at ¶¶ 53, 56), and that the fines and fees ordered by the Municipal Court were excessive, resulting in significantly more jail time for them (e.g., *id.* at ¶ 208). All of these allegations, which underlie the Plaintiffs' constitutional claims, fall squarely within the confines of the Municipal Court judgments and orders, which, among other things, sentenced the Plaintiffs to probation, assessed fines and fees, and required the payment of probation supervision fees.

*Rooker-Feldman* bars the Plaintiffs' collateral attack on the orders and rulings of the Montgomery Municipal Court. That doctrine prohibits "lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging

state-court judgments rendered before the district court proceedings commenced."
*Lance v. Dennis*, 546 U.S. 459, 460 (2006). Put another way, "the *Rooker-Feldman*
doctrine operates as a bar to federal court jurisdiction where the issue before the
federal court was 'inextricably intertwined' with the state court judgment so that
(1) the success of the federal claim would 'effectively nullify' the state court
judgment, or that (2) the federal claim would succeed 'only to the extent that the
state court wrongly decided the issues.'" *Alvarez v. Attorney Gen. for Fla.*, 679 F.3d
1257, 1262–63 (11th Cir. 2012) (quoting *Casale v. Tillman*, 558 F.3d 1258, 1260
(11th Cir. 2009)) (cleaned up). Importantly, even claims that *indirectly* challenge a
state court's judgment are barred by *Rooker-Feldman*. *See Goodman v. Sipos*,
259 F.3d 1327, 1334 (11th Cir. 2002). To the extent the Plaintiffs' claims attack or
challenge matters contained within the orders of the Municipal Court, those claims
are barred by the *Rooker-Feldman* doctrine. *See Thurman v. Judicial Corr. Servs.,
Inc.*, 760 F. App'x 733, 736–37 (11th Cir. 2019), *cert. denied,* 139 S. Ct. 2646 (2019)
(holding that municipal-court probation orders were state-court orders and that
because the plaintiffs' claims were inextricably intertwined with those orders, the
court lacked subject-matter jurisdiction under the *Rooker-Feldman* doctrine).

Similarly, the Plaintiffs' claims are barred by the favorable-termination rule in
*Heck v. Humphrey*. That doctrine prohibits a plaintiff from recovering damages that
would render his conviction or sentence invalid, unless he can "prove that the
conviction or sentence has been reversed on direct appeal, expunged by executive
order, declared invalid by a state tribunal authorized to make such a determination,
or called into question by a federal court's issuance of a writ of habeas corpus,

28 U.S.C. § 2254." *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). After being convicted in Municipal Court, the Plaintiffs never attempted to invoke their state-court remedies of appeal or collateral relief, nor did they seek available federal habeas relief. Accordingly, *Heck's* favorable-termination rule now bars them from seeking money damages on the basis that their sentences, or any aspect thereof, were invalid. *See Vickers v. Donahue*, 137 F. App'x 285, 289 (11th Cir. 2005) (holding *Heck* barred the plaintiff's claims because he "was not without a remedy to seek post revocation relief. He could have appealed the [probation] revocation order and, had he prevailed, his § 1983 claims would not be barred by *Heck*."); *Domotor v. Wennet*, 630 F. Supp. 2d 1368, 1380 (S.D. Fla.) *aff'd*, 356 F. App'x 316 (11th Cir. 2009).

## II.   JCS is due summary judgment on the Plaintiffs' claims arising under Alabama statutory and common law.

In addition to their constitutional claims, the Plaintiffs also assert common-law claims for false imprisonment, abuse of process, and money had and received. JCS is entitled to summary judgment on those claims as well, for multiple reasons.

### A.   Absolute quasi-judicial immunity bars the Plaintiffs' state-law claims.

For the same reasons set forth in Section I.B., *supra*, the doctrine of absolute quasi-judicial immunity bars the Plaintiffs' state-law claims against JCS. *See Mooneyham v. State Bd. of Chiropractic Examiners*, 802 So. 2d 200, 206 (Ala. 2001) (applying federal caselaw regarding absolute quasi-judicial immunity in noting that "administrative officials performing duties that are characteristic of the judicial process are entitled to quasi judicial immunity," and concluding that state-law

claims of malicious prosecution and tortious interference against certain board members were barred by immunity).

**B.   The evidence does not support a claim of false imprisonment against JCS.**

The Plaintiffs allege that JCS "induced and procured, instigated or participated in, and/or aided and abetted" in their detention, apparently as a result of JCS's involvement in the probation-revocation process.   (Doc. 34-1 (Compl.) at ¶ 268.) The evidence, however, does not bear this claim out, and JCS is due a summary judgment.

"False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170. But there is no evidence that JCS "unlawful[ly] detained" any of the Plaintiffs, so JCS cannot be liable for false imprisonment. *See Byrd v. Jones*, No. 7:14 cv 01469 TMP, 2015 WL 2194697, *20 (N.D. Ala. 2015) ("Although Jones swore out the warrant that lead to the plaintiff's arrest, neither of the defendant police officers ever physically seized, detained, arrested, or imprisoned the plaintiff. She was physically arrested by Michigan police on the basis of the Tuscaloosa County warrant."). Any actions that are alleged against JCS do not rise to the level of false imprisonment because the Plaintiffs have offered no evidence that JCS directly restrained them in any way. *See id.* ("'For there to be a false imprisonment, there must be some direct restraint of the person[.]'" (citing *Crutcher v. Wendy's of North Alabama*, 857 So. 2d 82, 92 (Ala. 2003))).

With respect to determinations regarding their compliance with their probation orders, the Plaintiffs were arrested in accordance with valid warrants

issued by the Municipal Court for failing to appear for hearings regarding their probation as the Municipal Court had ordered. Under Alabama law, "if an arrest is made pursuant to a warrant issued by a lawfully authorized person, neither the arrest nor the subsequent imprisonment is 'false,'" *Blake v. Barton Williams, Inc.*, 361 So. 2d 376, 378 (Ala. Civ. App. 1978), and the fact that there may be a controversy over whether there was "reasonable cause to have the warrant issue does not affect the underlying validity of the warrant itself," *Goodwin v. Barry Miller Chevrolet, Inc.*, 543 So. 2d 1171, 1176 (Ala. 1989). Because the warrants issued were valid, JCS cannot be held liable for false imprisonment.

The Plaintiffs' only allegation of JCS's involvement in their incarceration appears to be that its employees were involved in the probation-revocation process. There is no evidence, however, that, through that involvement, JCS employees did anything other than provide accurate information to the Municipal Court about the Plaintiffs' violations of the terms of their probations, and the only warrants the Municipal Court issued in regard to revocation process pertaining to the Plaintiffs related solely to their failure to appear for their revocation hearings. There is no evidence that any Plaintiff was ever arrested as part of the revocation process for failing to pay his or her fines or fees.[11]

The mere provision of truthful information to the Municipal Court about the Plaintiffs' compliance with the Municipal Court's probation orders could not demonstrate the level of instigation or involvement by JCS necessary to attach

---

[11] And with regard to Plaintiff Hassam Caldwell, his arrest was also based on warrants issued on matters unrelated to his JCS-supervised probation, so he would have been arrested even absent the warrant issued after he failed to appear at his probation-revocation hearing. (Ex. KKKK (Def.'s Ex. 130) at COURT 0005628–005629.)

liability to JCS for the Plaintiffs' imprisonment. As the Alabama Court of Civil Appeals has written,

> Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conduct, of "Officer, arrest that man!" It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them. Likewise it is not an instigation of a false arrest where the actor has requested the authorities to make a proper and lawful arrest, and has in no way invited or encouraged an improper one, or where he has requested an arrest at a time when it would be proper and lawful, and it is subsequently made at a time when it has become improper.

*Dolgencorp, Inc. v. Pounders*, 912 So. 2d 523, 528 (Ala. Civ. App. 2005). The Municipal Court determined whether to issue arrest warrants for failure to appear. As a result, JCS is entitled to summary judgment on the Plaintiffs' false-imprisonment claim.

Further, JCS cannot be liable for false imprisonment for reporting that another person may be guilty of a crime, unless there is evidence JCS acted in bad faith. *Yabba v. Alabama Christian Academy*, 823 F. Supp. 2d 1247, 1252 (M.D. Ala. 2011) (holding that "reporting or requesting a lawful arrest falls short of [supporting a claim for false imprisonment]"); *Myles v. Screentech, Inc.*, 98 So. 3d 563, 569 (Ala. Civ. App. 2012). "A person who reports a suspicion that another person may be guilty of a crime cannot be liable for false imprisonment unless that person has acted in bad faith, without 'reasonable cause to believe' that the accused is guilty of the crime." *Myles*, 98 So. 3d at 569 (citing *Crown Cent. Petroleum Corp. v. Williams*, 679 So. 2d 651, 655 (Ala. 1996)); *see also Alabama Power Co. v. Neighbors*,

402 So. 2d 958, 962 (Ala. 1981) ("If a defendant merely gives the district attorney's office information regarding an alleged crime, leaving the decision to prosecute entirely to the uncontrolled discretion of the district attorney, who thereafter makes his own independent investigation and thereupon takes the information before the grand jury which returns indictments against the suspects, the defendant, in a malicious prosecution action, is not regarded as having instigated the criminal proceeding."). There is no evidence JCS acted in bad faith or lacked a reasonable basis to believe that the Plaintiffs had not complied with their probation orders. (That information was completely accurate.) Nor can the Plaintiffs show that it was JCS, not the Municipal Court or any of its agents, who actually made the decision to incarcerate the probationers.

Finally, JCS's reporting of probationers that failed to pay court ordered fines and fees is protected by judicial immunity. *See Hughes v. Chesser*, 731 F.2d 1489 (11th Cir. 1984) (holding that probation officer was absolutely immune from liability in connection with the delivery to the court of a court mandated report, and that "in preparing the report the probation officer acts at the direction of the court"). Similarly, JCS and its employees acted at the discretion of the Municipal Court when they returned probationers to the Municipal Court who had failed to pay their ordered fines and fees.

### C. The Plaintiffs cannot prove the essential elements of their abuse-of-process claim against JCS.

The Plaintiffs' claim that JCS committed the tort of abuse of process fails for lack of evidence. "The elements of the tort of abuse of process are 1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice." *C.C. & J., Inc. v.*

*Hagood*, 711 So. 2d 947, 950 (Ala. 1998) (citing *Triple J Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993)). Here, there is no evidence that JCS used any process wrongly or did so with malice or for a nefarious purpose.

Alabama appellate courts have explained that "a defendant cannot be liable for the tort of abuse of process "'[i]f the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint.'"" *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1025 (Ala. Civ. App. 1999) (quoting *Duncan v. Kent*, 370 So. 2d 288, 290 (Ala. 1979), quoting in turn 1 Am. Jur. 2d *Abuse of Process*, § 13). "[T]he [ulterior motive] must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect." *Dempsey v. Denman*, 442 So. 2d 63, 65 (Ala. 1983). There is no evidence that JCS's actions regarding Plaintiffs' probation orders were for anything other than accomplishing JCS's function of monitoring probationers's compliance with the terms of their orders. The probation orders, issued by the Municipal Court, required the Plaintiffs to make monthly payments to pay off their court-imposed fines and fees, and there is no evidence that JCS had any motive or ulterior purpose in supervising the Plaintiffs' probation than obtaining the Plaintiffs' compliance with those orders. In fact, the only result achieved was payment by the Plaintiffs as ordered by the Municipal Court. In short, the Plaintiffs cannot point to any evidence that would suggest JCS possessed *any* purpose other than to perform its function of supervising probation, "much less an *ulterior* purpose: *i.e.*, some attempt at 'coercion to obtain a collateral advantage.'" *Davis v. Self*, 960 F. Supp. 2d 1276, 1310 (N.D.

Ala. 2013) (quoting *Reynolds v. McEwen*, 416 So. 2d 702, 706 (Ala. 1982)). No motive is apparent other than that on the face of the probation orders.

Similarly, the Plaintiffs cannot prove the second element of their claim, that JCS employees used "a lawful process for a purpose for which it was not designed," or, put another way, that JCS "did something other than carry out the process to its authorized conclusion." *Shoney's, Inc.*, 773 So. 2d at 1025 (internal citation and quotation marks omitted). To the extent JCS used any process at all, it did so in carrying out instructions by the Municipal Court, and it did so properly, warning probationers of the potential consequences of their failure to abide by their court-ordered obligations and informing the Municipal Court of when they repeatedly ignored those obligations. JCS did not misuse the probation orders in any way as the Plaintiffs allege.  Plaintiffs' abuse-of-process claim thus fails.

### D.  The *Rooker-Feldman* doctrine, a lack of evidence, and the voluntary-payment doctrine bar the Plaintiffs' claim of money had and received.

JCS is entitled to summary judgment on (or dismissal of) the Plaintiffs' state-law claim of money had and received (Count XIV). That equitable claim is available only when a defendant has received money that rightfully belongs to the plaintiff through mistake or fraud. *Foshee v. Gen. Tel. Co. of Southeast*, 322 So. 2d 715, 716 (Ala. 1975). "[T]he remedy of restitution for 'money had and received' … requires a mistake on the part of the donor, or wrongful conduct on the part of the recipient of a benefit." *Jordan v. Mitchell*, 705 So. 2d 453, 460 (Ala. Civ. App. 1997). Here, there is no evidence that the Plaintiffs made a wrongful payment to JCS.

The only payments the Plaintiffs allege they paid wrongfully to JCS were the probation-supervision fees and set-up fee the Municipal Court ordered them to pay JCS. Since that is basis for the Plaintiffs' claim of money had and received, it falls directly in the prohibition of the *Rooker-Feldman* doctrine, because it challenges the fees expressly required in the probation orders themselves. *See Thurman v. Judicial Corr. Servs., Inc.*, 760 F. App'x 733, 737 (11th Cir. 2019) (court lacked jurisdiction under *Rooker-Feldman* over the plaintiffs' unjust-enrichment claims because the success of those claims would effectively nullify the municipal-court probation orders). Relying on *Thurman*, Judge Proctor recently dismissed a nearly identical money-had-and-received claim against JCS by several plaintiffs because the claim was barred by the *Rooker-Feldman* doctrine. *Hamilton v. Judicial Corr. Servs. LLC*, No. 2:18-CV-00933-RDP, 2019 WL 5963473, at *4 (N.D. Ala. Nov. 13, 2019). This Court should likewise conclude that the money-had-and-received claim is barred.

The Plaintiffs claim that the probation fees were wrongly paid because, they contend, the fees were not authorized by law and because the Plaintiffs were indigent and, according to them, JCS was prohibited by its contracts with the City from charging probation supervision fees to indigent probationers. (Doc. 34-1 (Compl.) at ¶¶ 279–80.) But there is no evidence or legal authority showing that the probation-supervision and set-up fees were wrongly imposed. Alabama law specifically permits the imposition of probation-supervision fees by courts against probationers. *See Wilkins v. Dan Haggerty & Assoc., Inc.*, 672 So. 2d 507, 510 (Ala. 1995); Ala. Att'y Gen. Op. No. 98-00043 (Nov. 24, 1997) (municipal judges may assess "supervision fees" to probationers who are supervised by private firms). In

addressing the money-had-and-received claim in the *Hamilton* case, Judge Proctor also concluded that the probation fees are authorized by Alabama law:

> [The money-had-and-received count] fails to state a claim because the challenged fines are authorized by Alabama law. Alabama law allows a court wide discretion to determine the conditions of probation, and those conditions may include costs imposed on the probationer. Ala. Code § 12–14–13(d)(7); Ala. R. Crim. P. 27.1, Editors' Notes, Committee Comments. Indeed, if supervised by the Board of Pardons and Paroles, a probationer must pay $40 a month, which is in effect similar to the supervision fee that was charged by JCS. Ala. Code. § 15–22–2(a)(1). "Although the court has not found an Alabama statute expressly permitting state courts to order probation fees paid to private corporations, it also has not found a statute expressly limiting a municipal court's wide discretion to determine probation conditions." *Woods v. Judicial Correction Servs., Inc.*, [No. 2:15-cv-00493-RDP,] 2019 WL 2388995, at *15 (N.D. Ala. June 5, 2019); *see also Ray v. Judicial Correction Servs., Inc.*, 270 F. Supp. 3d 1262, 1301 (N.D. Ala. 2017).

> Because the challenged fees are authorized by statute, and because they are imposed by the municipal court's Probation Orders, Plaintiffs are barred from proceeding on their [money-had-and-received] claim in Count V.

*Hamilton*, 2019 WL 5963473, at *4–5. So, another independent ground for summary judgment or dismissal of the money-had-and-received claim is that the probation fees that are the basis of the claim were authorized by law.

And, as discussed above (*see* Section I.A.2., *supra*), the contractual provision on which the Plaintiffs rest their argument provided that JCS would charge probation fees to a probationer unless ***the court*** determined that the probationer was indigent. (*See* Ex. S (March 2009 Contract) at Exhibit A, ¶ 5; Ex. T (July 2010 Contract) at Exhibit A, ¶ 5.) Here, there is no evidence that the Municipal Court determined that any of the Plaintiffs were indigent, and there is no evidence that JCS had undertaken a duty—or was even permitted—to make a judicial

determination regarding a probationer's indigency.[12] As a result, JCS did not wrongly charge the Plaintiffs the probation supervision fees about which they complain.

The Plaintiffs also allege that the supervision and set-up fees were wrongly paid because the contracts between JCS and the City violated the state laws governing public bidding for exclusive public contracts. (Doc. 34-1 (Compl.) at ¶ 279.) They fail to show, however, that any provision of those contracts indicate that they were exclusive. And the manner in which the contracts were implemented show, without dispute, that the contracts were not exclusive, given that the Municipal Court would sometimes sentence defendants to probation that was to be supervised by the court itself, rather than by JCS. (*See* Statement of Fact ¶ 35.)

Under Alabama law, "[c]laims based on theories of breach of contract, unjust enrichment, and money had and received are precluded by proof that the plaintiff voluntarily paid what he or she is seeking to recover." *Stone v. Mellon Mortg. Co.*, 771 So. 2d 451, 456 (Ala. 2000) (citation omitted). Alabama courts have recognized for almost 200 years that "'where one party, with full knowledge of all the facts, voluntarily pays money to satisfy the colorable legal demand of another, no action will lie to recover such a voluntary payment, in the absence of fraud, duress, or extortion.'" *Id.* (quoting *Mt. Airy Ins. Co. v. Doe Law Firm*, 668 So. 2d 534, 537 (Ala.

---

[12] In its ruling on a motion to dismiss by JCS, this Court stated, "If JCS was collecting money from indigent defendants when they had an obligation not to do so—and an obligation to inquire into indigency—JCS collected money that rightfully belongs to plaintiffs." (Doc. 131 at 31.) The Court should not even reach the question because, as noted, it lacks subject-matter jurisdiction over the claim under the *Rooker-Feldman* doctrine. But even if addressed, the Court was only addressing allegations of the complaint at that stage, and now the evidence shows JCS had no obligation or authority to make indigency determinations. (Statement of Facts at ¶¶ 16–19.)

1995)); *see also Town Council of Cahaba v. Burnett*, 34 Ala. 400, 402 (1859); *Jones v. Watkins*, 1 Stew. 81 (Ala. 1827). It is well settled that "money voluntarily paid with full knowledge of the facts but by reason of mistake of law cannot be recovered." *U-Haul Co. of Alabama, Inc. v. Johnson*, 893 So. 2d 307, 312 (Ala. 2004) (quotation marks and citation omitted). As Judge Proctor held in *Thurman*, "[a] mere threat of legal proceedings does not constitute duress." *Thurman v. Judicial Corr. Servs., Inc.*, No. 2:12-CV-00724-RDP-TFM, 2017 WL 4079039, at *9 (M.D. Ala. Sept. 13, 2017), *aff'd*, 760 F. App'x 733 (11th Cir. 2019), *cert. denied*, 139 S. Ct. 2646 (2019) (citing *Mt. Airy Ins. Co.*, 668 So. 2d at 538, and based on the voluntary-payment doctrine, granting summary judgment on state-law unjust-enrichment claims that sought recovery of probation fees).

In fact, Alabama courts have twice invoked the voluntary-payment doctrine to bar recovery of monetary payment for allegedly unlawful traffic tickets. In *Kruse v. City of Birmingham*, 67 So. 3d 910 (Ala. Civ. App 2011), plaintiff Kruse sued the City, seeking recovery on collected fines that were allegedly time-barred. The Alabama Court of Civil Appeals held that Kruse's claim was barred by the voluntary-payment doctrine despite the plaintiff's argument that the payment was made under duress because he was threatened with incarceration if he did not pay the fines. *Kruse*, 67 So. 3d at 915–17. The court relied on well-established law that a payment was not "involuntary or under duress" when made under the threat of "legal action." *Id.* at 916 (citing *Mt. Airy*, 668 So. 2d at 537–38). The court explained that "'"[n]o one can be heard to say, that he had the right and the law with him, but he feared his adversary would carry him in to court, and that he would be

unlawfully fined and imprisoned; that being thereby deprived of his free will, he yielded to the wrong, and the courts must assist him to a reclamation.'"" *Id.* (quoting *Mt. Airy*, 668 So. 2d at 538–39, which was quoting *Burnett*, 34 Ala. at 404).

The Alabama Supreme Court reached a similar conclusion some years before *Kruse* in *Brown v. State*, 565 So. 2d 585 (Ala. 1990). There, plaintiffs brought a putative class action for refunds of fines and costs for traffic tickets which had not been verified before a judicial officer. Although the court held that the trial court's verification procedure violated Alabama law, the court concluded there could be no recovery because (1) the suit was an untimely collateral attack on the plaintiffs' prior judgments, and (2) any payment was made under a purported mistake of law, not mistake of fact, which "cannot be recovered unless payment was induced by the fraud or the undue advantage of the one receiving it." *Brown*, 565 So. 2d at 590.

The Plaintiffs have failed to demonstrate that they lacked knowledge of the facts pertinent to the charges against them and the purpose for which they made payments to JCS, and they have not shown that their payments to JCS were anything other than voluntary. Further, they have failed to prove the kind of fraud, duress, or extortion that would defeat the voluntary-payment doctrine as a bar to their action. Thus, JCS is entitled to a summary judgment on this claim.

## III. The statute of limitations bars most of the Plaintiffs' claims.

The Supreme Court has held that § 1983 claims are subject to the statute of limitations governing personal-injury actions in the state where the action is brought. *See Wilson v. Garcia*, 471 U.S. 261 (1985). In Alabama, a two-year statute of limitations governs personal-injury actions and, therefore, governs the § 1983

82

claims here. "'[T]he time of accrual is when plaintiff knows or has reason to know of the injury which is the basis of the action.'" *Lavellee v. Listi*, 611 F.2d 1129, 1131 (5th Cir. 1980) (quoting *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)). Similarly, the Plaintiffs' state-law claims of malicious prosecution and abuse of process are subject to a two-year statute of limitations. *See* Ala. Code § 6-2-38(h) and (l).[13]

The Plaintiffs filed this action on July 1, 2015. Thus, the Plaintiffs' federal claims and their claims of malicious prosecution and abuse of process accruing before July 1, 2013, are time-barred.

Of the seven Plaintiffs, all but one of them ended all interaction with JCS before July 1, 2013. Plaintiff McCullough's last interaction with JCS occurred before her February 23, 2011, revocation hearing, which she skipped. (Statement of Facts, ¶ 86.) Plaintiff Johnson's last interaction with JCS occurred before his February 9, 2012, revocation hearing, which she skipped. (Statement of Facts, ¶ 96.) The Municipal Court terminated Plaintiff Jones's JCS-supervised probation on May 9, 2011. (Statement of Facts, ¶ 109.) Plaintiff Edwards's last interaction with JCS occurred before his June 30, 2011, revocation hearing, which he skipped. (Statement of Facts, ¶ 136.) Plaintiff Agee's last interaction with JCS occurred before his March 2, 2011, revocation hearing, which he skipped. (Statement of Facts, ¶ 170.) Plaintiff Mooney does not even allege that he had any interaction with JCS.

The only Plaintiff who had any interaction with JCS or involvement with JCS-supervised probation within two years of the commencement of this action is

---

[13] The Plaintiffs' claims of money had and received and false imprisonment are governed by a six-year statute of limitations, and JCS does not contend here that the statute of limitations bars those claims.

Plaintiff Caldwell. Even his claims, however, are barred to the extent they relate to the beginning of his probation term and the entry of the order placing him on JCS-supervised probation, since the Municipal Court sentenced him to probation with JCS on April 17, 2013, and he stopped attending his JCS appointments after June 17, 2013. (Statement of Facts, ¶¶ 114–16.)

## Conclusion

Based on the foregoing, there are no genuine issues of material fact, and JCS is due a judgment as a matter of law.

Respectfully submitted on January 21, 2020.

*s/ Michael L. Jackson*
Michael L. Jackson
mjackson@wallacejordan.com

Larry S. Logsdon
llogsdon@wallacejordan.com

Wesley K. Winborn
wwinborn@wallacejordan.com

Jonathan A. Griffith
jgriffith@wallacejordan.com

Of Counsel
Wallace, Jordan, Ratliff & Brandt, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253
(205) 870-0555

*s/ Wilson F. Green*
Wilson F. Green
wgreen@fleenorgreen.com

Of Counsel
Fleenor & Green LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, Alabama 35406
(205) 722-1018

Attorneys for Defendant Judicial Corrections Services

### Certificate of Service

I certify that on January 21, 2020, I filed this brief using the Court's CM/ECF electronic-filing system, and the Court's CM/ECF electronic-filing system is supposed to serve it on all counsel. Here is a list of current counsel:

Henry Sanders, Esq.
Faya Rose Toure, Esq.
Chestnut, Sanders & Sanders LLC
gpompey@csspca.com
fayarose@gmail.com

Martha Irene Morgan, Esq.
mimorgan@yahoo.com

Edward Hamilton Wilson Jr., Esq.
Miland Fredrick Simpler III, Esq.
Ball Ball Matthews & Novak PA
hwilson@ball-ball.com
msimpler@ball-ball.com

Gregory Lee Bass, Esq.
Britney Renee Wilson, Esq.
National Center for Law
 and Economic Justice
bass@nclej.org
wilson@nclej.org

Kimberly Owen Fehl, Esq.
Michael D. Brymer, Esq.
Montgomery City Attorney's Office
kfehl@montgomeryal.gov
mbrymer@montgomeryal.gov

Robert D. Segall, Esq.
Shannon Lynn Holliday, Esq.
Joel Thomas Caldwell, Esq.
Copeland Franco Screws & Gill
segall@copelandfranco.com
holliday@copelandfranco.com
caldwell@copelandfranco.com

Harold C. Hirshman, Esq.
Jennifer A. Barrett, Esq.
Stephen J. O'Brien, Esq.
Dentons US LLP
harold.hirshman@dentons.com
jennifer.barrett@dentons.com
stephen.obrien@dentons.com

*s/ Michael L. Jackson*
Michael L. Jackson
mjackson@wallacejordan.com