# Exhibit J



Deposition of:
## Angela McCullough

*September 20, 2019*

In the Matter of:

## McCullough, Angela, et al. v. The City of Montgomery, AL, et al.

Freedom Court Reporting
877.373.3660 | calendar-al@veritext.com | 205.397.2397

**Exhibit J**

Page 1

1        IN THE UNITED STATES DISTRICT COURT FOR

2            THE MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4

5    CASE NUMBER:  2:15-CV-00463-RCL-SMD

6

7    ANGELA MCCULLOUGH, et al.,

8              Plaintiffs,

9              vs.

10   THE CITY OF MONTGOMERY, ALABAMA,

11   et al.,

12              Defendants.

13            S T I P U L A T I O N

14            IT IS STIPULATED AND AGREED,

15   by and between the parties through their

16   respective counsel, that the deposition of

17   ANGELA MCCULLOUGH may be taken before

18   Michelle L. Parvin, Commissioner, at the

19   offices of Copeland, Franco, Screws & Gill,

20   444 South Perry Street, Montgomery, Alabama,

21   36104, on the 20th day of September, 2019.

22            IT IS FURTHER STIPULATED AND

23   AGREED that it shall not be necessary for any

**Exhibit J**

Page 2

1 objections to be made by counsel to any
2 questions, except as to form or leading
3 questions, and that counsel for the parties
4 may make objections and assign grounds at the
5 time of trial, or at the time said deposition
6 is offered in evidence, or prior thereto.
7          IT IS FURTHER STIPULATED AND
8 AGREED that notice of filing of the
9 deposition by the Commissioner is waived.
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1      Alabama Uniform Traffic Ticket and
2      Complaint
3 Exhibit 25          126
4      Notice of Order of Conditional Bond
5      Forfeiture and to Show Cause on
6      Forfeiture of Bond
7 Exhibit 26          129
8      Municipal Court of Montgomery, Alabama,
9      documents
10 Exhibit 27          134
11      Collection Delinquency Report
12 Exhibit 28          140
13      Notice to Show Cause for Failure to Pay
14      Fine, Costs, Restitution, or Other
15      Costs
16 Exhibit 29          144
17      Alabama Uniform Traffic Ticket and
18      Complaint
19 Exhibit 30          148
20      Alabama Uniform Traffic Ticket and
21      Complaint
22 Exhibit 31          152
23      City of Montgomery booking history

Page 3

1          I N D E X
2
3 EXAMINATION BY:          PAGE NUMBER:
4 Mr. Logsdon          10
5 Mr. Gill          224
6 Mr. Logsdon          345
7 Mr. Gill          373
8 Mr. Logsdon          380
9 Mr. Gill          382
10 Mr. Segall          383
11 Mr. Bass          383
12 EXHIBITS:
13 Exhibit 21          9
14      Defendant Judicial Correction Services'
15      Cross-Notice of Deposition of Angela
16      McCullough
17 Exhibit 22          11
18      Alabama Uniform Traffic Ticket and
19      Complaint
20 Exhibit 23          121
21      Alabama Uniform Traffic Ticket and
22      Complaint
23 Exhibit 24          124

Page 5

1 Exhibit 32          162
2      Warrant
3 Exhibit 33          167
4      Alabama Uniform Traffic Ticket and
5      Complaint
6 Exhibit 34          171
7      Case File Report
8 Exhibit 35          181
9      Order of Probation
10 Exhibit 36          184
11      Personal Information Sheet
12 Exhibit 37          194
13      Letter dated December 22, 2010
14 Exhibit 38          195
15      Letter
16 Exhibit 39          196
17      Petition for Revocation of Probation
18      and Statement of Delinquency Charges
19      and letter dated January 13, 2011
20 Exhibit 40          197
21      Petition for Revocation of Probation
22      and Statement of Delinquency Charges
23 Exhibit 41          197

2 (Pages 2 - 5)

**Exhibit J**

Page 6

1      Alias Warrant of Arrest
2 Exhibit 42          200
3      Montgomery Municipal Court booking
4      history
5 Exhibit 43          203
6      Alabama Uniform Traffic Ticket and
7      Complaint
8 Exhibit 44          206
9      Order of Release
10 Exhibit 45          208
11      Alabama Uniform Traffic Ticket and
12      Complaint
13 Exhibit 46          211
14      Alabama Uniform Traffic Ticket and
15      Complaint
16 Exhibit 47          301
17      List of charges
18 Exhibit 48          307
19      Excerpt from complaint
20 Exhibit 49          355
21      Certified Record Response
22 Exhibit 50          357
23      Certified Record Response

Page 7

1      IN THE UNITED STATES DISTRICT COURT FOR
2          THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5  CASE NUMBER:  2:15-CV-00463-RCL-SMD
6
7  ANGELA MCCULLOUGH, et al.,
8          Plaintiffs,
9          vs.
10 THE CITY OF MONTGOMERY, ALABAMA,
11 et al.,
12          Defendants.
13
14 BEFORE:
15      Michelle L. Parvin, Certified
16 Court Reporter
17 APPEARANCES:
18      NATIONAL CENTER FOR LAW AND
19 ECONOMIC JUSTICE by Mr. Greg Bass and Ms.
20 Britney R. Wilson, 275 Seventh Avenue, Suite
21 1506, New York, New York, 10001, appearing on
22 behalf of the Plaintiffs.
23      MARTHA I. MORGAN, Attorney at

Page 8

1  Law, 8800 Lodge Lane, Cottondale, Alabama,
2  35453, appearing on behalf of the Plaintiffs.
3      COPELAND, FRANCO, SCREWS & GILL
4  by Mr. Richard H. Gill, Ms. Shannon Holliday,
5  and Mr. Robert D. Segall, 444 South Perry
6  Street, Montgomery, Alabama, 36104, appearing
7  on behalf of the Defendants.
8      WALLACE, JORDAN, RATLIFF &
9  BRANDT, LLC, by Mr. Larry S. Logsdon, Synovus
10 Center, 800 Shades Creek Parkway, Suite 400,
11 Birmingham, Alabama, 35209, appearing on
12 behalf of the Defendants.
13
14
15
16
17
18
19
20
21
22
23

Page 9

1      I, Michelle L. Parvin, a
2  Court Reporter of Birmingham, Alabama, acting
3  as Commissioner, certify that on this date,
4  as provided by the Federal Rules of Civil
5  Procedure of the United States District
6  Court, and the foregoing stipulation of
7  counsel, there came before me at 444 South
8  Perry Street, Montgomery, Alabama, 36104,
9  beginning at 9:01 a m., ANGELA MCCULLOUGH,
10 witness in the above cause, for oral
11 examination, whereupon the following
12 proceedings were had:
13
14      (Whereupon, Defendant's Exhibit
15      21 was marked for identification
16      and copy of same is attached
17      hereto.)
18
19      ANGELA MCCULLOUGH,
20 being first duly sworn, was examined and
21 testified as follows:
22
23      THE COURT REPORTER:  Okay.  Usual

3 (Pages 6 - 9)

**Exhibit J**

Page 10

1  stipulations?
2       MR. LOGSDON:  Do y'all want to
3  read and sign?
4       MR. BASS:  Yes, we do.
5       MR. LOGSDON:  Okay.  So, other
6  than that -- other than that, usual
7  stipulations?
8       MR. BASS:  From yesterday, as
9  long as I know what they are, we agree.
10  Thank you.
11       MR. LOGSDON:  All right.
12
13  EXAMINATION BY MR. LOGSDON:
14
15     Q.   Okay.  Ms. McCullough, my name is
16  Larry Logsdon, and I'll be asking you some
17  questions today.
18     A.   Okay.
19     Q.   And if I ask you any questions
20  that you don't understand, ask me and I'll
21  try to repeat it --
22     A.   Okay.
23     Q.   -- fair enough?

Page 11

1     A.   Yes.
2     Q.   All right.  Can you tell us
3  your -- for the record, your full name, the
4  one that, you know, you got called when you
5  got in trouble or something, middle name and
6  everything.  So, can you give us that?
7     A.   My name is Angela McCullough.
8     Q.   All right.  And what about your
9  middle name or middle initial or any other
10  name?
11     A.   No middle name.
12     Q.   No middle name at all?
13     A.   No.
14     Q.   And, Ms. McCullough, do you go by
15  any -- I call them aliases.  I don't know --
16  other names or anything like that, any other
17  names?
18     A.   I do not.
19     Q.   Have you ever gone by any other
20  name like on --
21     A.   Only Angie.
22     Q.   Only Angie?
23     A.   Right.

Page 12

1     Q.   All right.  What about like on
2  Facebook or anything like that?
3     A.   No.
4     Q.   Do you go by Angela McCullough on
5  Facebook?
6     A.   Angela McCullough Williams.
7     Q.   Oh, Angela McCullough Williams.
8  Okay.  All right.  And tell me about
9  Williams.  Is there a Mr. Williams?
10     A.   Yes.
11     Q.   And what is his first name?
12     A.   Roderick.
13     Q.   Is he your husband?
14     A.   Right.  Yes.
15     Q.   Okay.  And when were you and Mr.
16  Williams married?
17     A.   2015.
18     Q.   Have you been married previously
19  before Mr. Williams?
20     A.   No.
21     Q.   His name is Roderick.  Y'all got
22  married in 2015.  Does he have a middle name
23  or a middle initial?

Page 13

1     A.   Lee.
2     Q.   L-e-e?
3     A.   Right.
4     Q.   Other than Angela McCullough and
5  Angela McCullough Williams and Angie, do you
6  go by any other nicknames or aliases or other
7  names?
8     A.   I do not.
9     Q.   Have you ever gone by any other
10  names?
11     A.   I have not.
12     Q.   All right.  So, I'm going to show
13  you what I've marked here as Defendant's
14  Exhibit 21.  And this is a copy of the notice
15  to be here today for this deposition, or one
16  of the two.  There's actually two that
17  were -- that were sent.  This is one of the
18  two.  Did you get this document?
19     A.   I did.
20     Q.   All right.  Attached to that --
21  or towards the beginning on Page 4, there's a
22  list of documents that we asked you to bring
23  with you today to the deposition.  Did you

4 (Pages 10 - 13)

**Exhibit J**

Page 14

1 bring any documents with you today to the
2 deposition?
3     A.   I believe I turned those
4 documents in early on.
5     Q.   Who did you turn those in to?
6     A.   To my attorney.
7     Q.   And you said to your attorney.
8 Who is your attorney?
9     A.   Ms. Morgan.
10    Q.   Down there on the end?
11    A.   Right.
12    Q.   All right.  We know her, yes.
13         Do you know the lady and
14 gentleman sitting just to your left?
15    A.   I've recently met them, yes.
16    Q.   Okay.  And do you know -- are
17 they your attorneys as well?
18    A.   At this point, yes.
19    Q.   Okay.  So, looking at the
20 documents here, let me ask you -- this asks
21 for a lot of things on here, and we're not
22 going to go through the entire list, but do
23 you keep a file drawer, a file cabinet, or

Page 15

1 something like that where you keep up with
2 papers?
3     A.   I do.
4     Q.   Where do you keep that?
5     A.   Usually, I just keep it in a
6 stack in folders in the closet.
7     Q.   Okay.  And tell me -- describe
8 those folders for me.  In other words, are
9 they labeled different things or how do
10 those -- how are those kept?
11    A.   They're not labeled.  It's just
12 important papers.
13    Q.   Do you keep certain papers all
14 together in one folder and then other certain
15 papers together in another folder or how is
16 that done?
17    A.   It's not done that way.
18    Q.   All right.  Tell me about it.
19 Like --
20    A.   I just keep them.  As years go
21 by, just stick information in a folder.
22    Q.   In the folder?
23    A.   Right.

Page 16

1     Q.   And let's talk -- you said
2 important papers when you were describing
3 what you keep.  And let's talk a little bit
4 about what you keep.  What would be some
5 papers that would be papers you would keep?
6     A.   Tax papers, old check stubs,
7 medical records, old appointments.
8     Q.   What was that last one?
9     A.   Appointments.  I just keep old
10 appointments to keep a record.  I keep school
11 records, any information from the government,
12 anything with debt, I keep.  Anything --
13 receipts, paperwork from work.  I do keep old
14 tickets, old insurance papers, old tag
15 papers, tag receipts.  Anything I've paid, I
16 mainly keep it.
17    Q.   Okay.  Anything else you can
18 think of?
19    A.   Not off the top of my head.
20    Q.   And so, it sounds like as you're
21 describing those to me and what you kept, you
22 called them important papers?
23    A.   Uh-huh.

Page 17

1     Q.   And I think I know what that
2 means.  There's some things you get that just
3 aren't important.  You get some brochure
4 about a cookout, and you're not going to keep
5 that.  But things that you think you might
6 need later, it sounds like you're pretty good
7 about keeping those?
8     A.   Yes.
9     Q.   And so, some of the things you
10 mentioned were receipts.  If it's a receipt
11 showing you paid something, that's something
12 you're going to keep?
13    A.   Correct.
14    Q.   And I assume -- that's usually a
15 trait that you either have or you don't have.
16 You know what I'm saying about that?
17    A.   Yeah.
18    Q.   So, I assume that you've done
19 that for your adult life --
20    A.   Yes.
21    Q.   If --
22         MR. BASS:  Object as to form.
23         MS. WILSON:  Object as to form.

5 (Pages 14 - 17)

**Exhibit J**

Page 18

1    Q.   (BY MR. LOGSDON)  If there was an
2  important paper, you keep up with it?
3    A.   Correct.
4    Q.   All right.  You said
5  appointments, one of the things I wrote down
6  on your list.  What do you mean by
7  appointments?  Would that just be any
8  appointments or meetings that you would have?
9    A.   Anything pertaining to my son
10  who's disabled.
11   Q.   Okay.
12   A.   And if I had an appointment with
13  any school, I just keep it for a record.
14   Q.   All right.  And why would
15  appointments be something that would be
16  important for you to keep, keep up with?
17   A.   For a record.  Just for a record.
18   Q.   All right.  You said anything
19  with the government.  Tell me about that.
20  What would that be?
21   A.   Like if I have an appointment
22  with DHR or if I have an appointment -- in
23  the past, if I had an appointment with the

Page 19

1  school, like FASA, something like that.  It's
2  a record to me.
3    Q.   Okay.  School with whom, now?
4    A.   FASA, you know, like Federal Aid.
5    Q.   Okay.  FASA?
6    A.   F-A-S-A.
7    Q.   F-A-S-A.  Okay.  All right.  What
8  else?
9    A.   That's pretty much it.  That --
10  anything dealing with the government, that's
11  pretty much it.
12   Q.   All right.  And the same thing,
13  that would be something that you would think
14  is important and you want to keep it?
15   A.   Correct.
16   Q.   In case somebody asks you about
17  it later, you can say, yeah, here it is, I've
18  got a record of it?
19   A.   Correct.
20       MS. WILSON:  Objection as to
21  form.
22       MR. BASS:  Objection to form.
23   Q.   (BY MR. LOGSDON)  And you

Page 20

1  mentioned school records.  Let's back up a
2  little bit on that.  And you mentioned one of
3  your sons.  And his name is?  Your son
4  that was -- you mentioned your son that was
5  disabled.  And tell me his name.
6    A.   Chadrick McCullough.
7    Q.   And that would be C-h-a-d-r-i-
8  c-k?
9    A.   Right.
10   Q.   All right.  That'll be the only
11  thing I'll spell correctly this whole time,
12  and that was just because I took a guess.
13       All right.  So, Chadrick.  And
14  how old is Chadrick currently?
15   A.   He's thirty.
16   Q.   All right.  And you said he was
17  disabled.  What is Chadrick's disability?
18   A.   Psychoschizophrenia.
19   Q.   All right.  And who is Chadrick's
20  father?
21   A.   Anthony McCullough.
22   Q.   Okay.
23       MR. GILL:  Anthony.  I didn't

Page 21

1  catch the last name.
2        THE WITNESS:  McCullough.
3        MR. GILL:  Anthony McCullough.
4  Thank you.
5        MR. SEGALL:  Ma'am, can you speak
6  up just a little bit?
7        THE WITNESS:  Sure.
8    Q.   (BY MR. LOGSDON)  None of us can
9  hear well, so --
10       MR. SEGALL:  Right.
11   Q.   (BY MR. LOGSDON)  Your attorney,
12  Ms. Morgan, she can hear well, so we put her
13  way down on the end.  All of us -- all right.
14       Now, Anthony McCullough, is he a
15  former husband?
16   A.   No.
17   Q.   Who is Anthony McCullough?
18   A.   I was a victim of incest.
19   Q.   Okay.  And tell me about that.
20  And I hate to get into too much of this, and
21  I hate to also ask it that way.  But if you
22  can, just so we'll know, if you don't mind
23  telling me --

6 (Pages 18 - 21)

**Exhibit J**



Page 22

1    A.   No.
2    Q.   Okay.  Let's hold off on that,
3 how about that?
4    A.   Right.
5    Q.   All right.  Chadrick is one
6 child.  Any other children?
7    A.   ████████.
8    Q.   Okay.  And how old is ████████?
9    A.   He's twelve.
10   Q.   All right.  Any other children?
11   A.   Lance McCullough.
12   Q.   And how old is Lance?
13   A.   He's twenty-eight.
14   Q.   Okay.  Any other children?
15   A.   ████████.
16   Q.   And how old is ████?
17   A.   She's seventeen.
18   Q.   All right.  Any other children?
19   A.   No.
20   Q.   ████████ and ████, do they have
21 the same father?
22   A.   ████ is -- her last name is
23 ████████.

Page 23

1    Q.   ████████.  Not ████?
2    A.   ████████'s last name is
3 ████████.
4    Q.   Okay.  All right.  So,
5 ████████'s last name is not ████, it's
6 ████████?
7    A.   His middle name is ████.
8    Q.   Middle name's ████.  All right.
9 And --
10   A.   And it's really the first name.
11 And it's ████████ --
12   Q.   Right.
13   A.   -- first name.
14   Q.   Got it.  And how about ████, is
15 it ████████?
16   A.   ████████.
17   Q.   ████████.  I'm sorry.
18       All right.  And who is
19 ████████'s father?
20   A.   Roderick Lee.
21   Q.   Okay.  Does he provide any
22 support for ████████?
23   A.   He really doesn't work.  He

Page 24

1 hasn't been working.  He recently got out --
2 been incarcerated.
3    Q.   Has he ever provided any support
4 for ████████?
5    A.   To some degree, yes.
6    Q.   When did he provide support to
7 ████████?
8    A.   He helps pay his fee at school,
9 like, fifty dollars for tuition, ninety
10 dollars for lunch.
11   Q.   Okay.  That fifty dollars for
12 tuition, how often is that?
13   A.   Monthly.
14   Q.   And ninety dollars for lunch, how
15 often is that?
16   A.   No, it's forty dollars.  I'm
17 sorry.  I meant to say forty dollars --
18   Q.   Forty dollars.  How much --
19   A.   -- for lunch.
20       A total of ninety dollars.
21   Q.   Okay.  Forty for tuition -- I'm
22 sorry, fifty for tuition, forty for --
23   A.   Lunch.

Page 25

1    Q.   -- lunch?
2       So, a total of ninety per month?
3    A.   Right.
4    Q.   And where is ████████ in school?
5    A.   Valiant Cross Academy.
6    Q.   Valiant --
7    A.   Cross.
8    Q.   Okay.  Like V-a-l-i-a-n-t Cross
9 Academy?
10   A.   Correct.
11   Q.   All right.  Is that a private
12 school or a public school?
13   A.   It's a private school.
14   Q.   Located in Montgomery?
15   A.   Correct.
16   Q.   All right.  Is the -- how long
17 has ████████ attended Valiant Cross Academy?
18   A.   This is his first year.
19 Previously, he went to -- this is his first
20 year.
21   Q.   Where did he go previously?
22   A.   Holy Cross Academy.
23   Q.   And what grade is ████████ in?

7 (Pages 22 - 25)

**Exhibit J**

Page 26

1  He's twelve, so --
2      A.   Seventh.
3      Q.   Seventh.  Okay.  And is Holy
4  Cross Academy in Montgomery as well?
5      A.   Yes.
6      Q.   What grades did he attend Holy
7  Cross?
8      A.   Sixth grade.
9      Q.   Okay.  And then, what about fifth
10 grade?
11     A.   Fitzpatrick Elementary.
12     Q.   And how about fourth?
13     A.   Fitzpatrick Elementary.
14     Q.   All the way back to first?
15     A.   Yes.
16     Q.   Is Fitzpatrick a public school or
17 a private school?
18     A.   It's public.
19     Q.   Okay.  I'm not -- I'm not from
20 Montgomery, so I'm going to ask some
21 questions you're going to think, why don't
22 you know that.  But Holy Cross is a private
23 school, correct?

Page 27

1      A.   Correct.
2      Q.   What's the tuition at Holy Cross?
3      A.   It's -- it was the same, five
4  hundred a year.  It's fifty dollars a month.
5      Q.   Okay.
6      A.   Well, that's what we do.
7      Q.   Same as Valiant?
8      A.   Right.
9      Q.   Okay.  Lance McCullough --
10     A.   Correct.
11     Q.   -- he's twenty-eight.
12          Is he out on his own?
13     A.   Yes.
14     Q.   And how about ▮▮▮; is she a
15 senior in high school or --
16     A.   A senior.
17     Q.   Where does she attend school?
18     A.   Lee High School.
19     Q.   And who is ▮▮▮'s father?
20     A.   Jeffrey Jackson.
21     Q.   Has Jeffrey provided any support?
22     A.   No.
23     Q.   Has he ever provided any support?

Page 28

1      A.   No.
2      Q.   You mentioned Roger Lee providing
3  some support until he got incarcerated?
4      A.   Right.
5      Q.   And then, you also told me about
6  Jeffrey but said he doesn't provide support?
7      A.   Right.
8      Q.   Has any other fathers of your
9  children helped out with support --
10     A.   No.
11     Q.   -- in any way?
12          All right.  All right.  Let me
13 jump back to the documents that we were
14 talking about and the list you said.  One of
15 the things that you wrote -- or the first
16 thing that you told me that you had was tax
17 papers.  And I think I know what you're
18 talking about there.  You're talking about
19 like your tax returns or just any kind of tax
20 document; is that right?
21     A.   Yes.
22     Q.   So, have your tax returns been
23 ones that you do yourself or do you have

Page 29

1  somebody doing it?
2      A.   I've done them myself and I've
3  had -- in the last years, I've had someone do
4  them.
5      Q.   Who's done them for you?
6      A.   Jackson Hewitt.
7      Q.   And I know they're everywhere.
8  What location did those for you?
9      A.   Southeast Boulevard.
10     Q.   Okay.  Do you know the address by
11 chance?
12     A.   I do not.
13     Q.   When did Jackson Hewitt start
14 doing those for you?
15     A.   I believe in '16.
16     Q.   And would they have done it in
17 '16 for the year of 2015?
18     A.   Yes.
19     Q.   All right.  Did you have anyone
20 else do your taxes other than doing them
21 yourself?
22     A.   I've had someone, a friend of
23 mine who do taxes, do it in the past from '14

Freedom Court Reporting
A Veritext Company
877-373-3660                                        205-397-2397

**Exhibit J**

Page 30

1  to, I think, '12, '13, '14.
2      Q.    Okay.  And who is that?
3      A.    Melanie Sankey.
4      Q.    M-e-l-a-n-i-e?
5      A.    Correct.
6      Q.    S-a-n-k-e-y?
7      A.    Correct.
8      Q.    Is she an accountant or a
9  bookkeeper or something like that?
10     A.    She has a license.
11     Q.    Okay.  What's the name -- is
12  it -- does she have a company or is it just
13  Melanie Sankey?
14     A.    She just has a license.
15     Q.    All right.  Do you know her --
16  does she live in Montgomery?
17     A.    Yes.
18     Q.    Do you know her address?
19     A.    Not the current one.
20     Q.    Do you know her prior address?
21     A.    I do not.
22     Q.    Do you know what street she lived
23  on?

Page 31

1      A.    At the time, ▮▮▮▮▮ Street.  It
2  was called Holcomb Street.
3      Q.    Would that be ▮▮▮▮▮▮▮?
4      A.    Correct.
5      Q.    Ms. Sankey, Jackson Hewitt,
6  anybody else do your taxes?
7      A.    No.
8      Q.    So, three people have done your
9  taxes, you, Jackson Hewitt, and Sankey.
10  Which one of them got you the best returns?
11  That's the real question.
12     A.    Jackson Hewitt.
13     Q.    Okay.  So, they started in 2016.
14  What was your refund?
15     A.    In 2016, I think it was like
16  eighty-five hundred.
17     Q.    All right.  And what about 2015,
18  what was the refund?
19     A.    It was basically the same.
20     Q.    And that was Jackson Hewitt as
21  well?
22     A.    Right.
23     Q.    All right.  And then, how'd Ms.

Page 32

1  Sankey do?  How about 2014?
2      A.    Somewhere around seventy-five.
3      Q.    Seventy-five hundred?
4      A.    Right.
5      Q.    And she did them for, it sounds
6  like you said, about three years.  Would it
7  be the same for each of those three years?
8      A.    Yes.
9      Q.    Seventy-five hundred?
10     A.    (Witness nods head.)
11     Q.    All right.  Now, you know I'm
12  going to ask you about you.  How did you
13  do --
14     A.    Right.
15     Q.    -- when you did yours?
16     A.    Last year, it was around fifty-
17  six hundred.
18     Q.    Okay.  That would be 2011?
19     A.    No.  Oh, last year, 2000 --
20     Q.    '17.
21     A.    -- 17.
22     Q.    Okay.  Before Ms. Sankey did your
23  returns, were you doing them then?

Page 33

1      A.    I didn't file.
2      Q.    You just didn't file?
3      A.    I had a identity theft problem.
4      Q.    Okay.  Did that mean you skipped
5  a year or you just never filed at all prior
6  to that?
7      A.    I didn't file until 2011 when
8  they solved the identity theft problem, the
9  IRS.
10     Q.    And did you prepare your tax
11  return that time?
12     A.    No, I did not.  I think Melanie
13  did my tax returns.
14     Q.    Melanie Sankey?
15     A.    Right.
16     Q.    And was your return about
17  seventy-five hundred then?
18     A.    It was a little bit more because
19  they gave me the previous years.
20     Q.    Okay.  All right.  You were able
21  to go back and recapture the previous years.
22  So, do you know about how much it was?
23     A.    Probably close to nine or

9 (Pages 30 - 33)

**Exhibit J**

Page 34

1 something.
2    Q.  Nine thousand?
3    A.  Uh-huh.
4    Q.  And that would have been -- if
5 I'm keeping up with these years right, that
6 would have been about 2011?
7    A.  Right.
8    Q.  All right. Would you have gotten
9 those early in the year, gotten your refund
10 early in the year, like, January or February
11 or something like that?
12    A.  February.
13    Q.  February. Okay. All right.
14 Well, 2011, that was a good year for a
15 refund. Do you remember what you did with
16 the refund money?
17    A.  I wasn't working, so I had to
18 take care of things that were behind.
19    Q.  Okay. All right. And I'm going
20 to get to your employment. In fact, why
21 don't -- why don't we kind of do that now so
22 we can kind of line these up with the years
23 and everything. Maybe start with your

Page 35

1 current employer and -- I tell you what,
2 let's hold off on that. Let's get to that in
3 a minute. I don't want to have too many
4 things going.
5      All right. So, on your tax
6 returns, can you get those and get them to
7 your attorneys and get them to us?
8    A.  Sure.
9    Q.  Would you have several years of
10 them? Do you keep them -- keep them back?
11    A.  The last three.
12    Q.  The last three. And did you keep
13 up with the -- okay. Well, yes, if you can
14 get those.
15      The other things that you
16 mentioned keeping records of were check
17 stubs. Can you get those and get them to
18 your attorneys?
19    A.  Yes.
20    MR. BASS: Check stubs for what?
21    MS. MORGAN: For what period?
22    Q.  (BY MR. LOGSDON) What are your
23 check stubs for?

Page 36

1    A.  My job.
2    Q.  Your jobs. All right. So, this
3 would just show when you got paid, you get a
4 stub, it shows you how much you got paid?
5    A.  Correct.
6    Q.  All right. All right. Yes, if
7 you can get those and get them to your
8 attorneys.
9      And these check stubs will
10 show -- I know what you're talking about when
11 you're talking about payment. Would it --
12 would it be just the actual stub, and then,
13 you have the check, and you deposited the
14 check or was it direct deposit or how did
15 that work?
16    A.  It's the stub. If it was direct
17 deposited, they give us the stub.
18    Q.  The stub. Okay. And that's what
19 you kept up with?
20    A.  Some.
21    Q.  All right. And your medical
22 records you mentioned, then, you mentioned
23 old appointments. Could you see if you can

Page 37

1 find your old appointment records and give
2 those to your attorneys as well?
3    A.  (Witness nods head.)
4    MR. BASS: From what period and
5 appointments for what, Counsel?
6    MS. WILSON: Yeah, what time?
7    Q.  (BY MR. LOGSDON) What
8 appointments? You kind of mentioned what you
9 had. Just any appointments that you would
10 have that you kept up with.
11    A.  For my son --
12    Q.  Okay.
13    A.  -- who's disabled.
14    Q.  For your son. Well, what about,
15 would you have kept up with appointments like
16 with court and with JCS or any of those
17 things? Would you have kept that paperwork?
18    A.  No.
19    Q.  All right. And you mentioned
20 that you'll keep up with anything from the
21 government. You told me specifically about
22 DHR and FASA. Can you get those and get them
23 to your counsel?

10 (Pages 34 - 37)

Exhibit J

Page 38

1    A.    (Witness nods head.)
2    Q.    Is there anything other than DHR
3  and FASA that you can think of that you keep
4  up with from the government?  I guess the IRS
5  would be one of those.  So, your tax return.
6    A.    The information pertaining to my
7  son.
8    Q.    Okay.  To his disability?
9    A.    Right.
10   Q.    All right.  Anything else?
11   A.    (Witness shakes head.)
12   Q.    All right.  And the other thing
13 you told me was anything with debt.  So, tell
14 me a little bit more about what you mean by
15 that.
16   A.    Like a hospital bill and student
17 loans.  That's pretty much what I have.  And
18 that's pretty much -- my student loans and I
19 have a hospital bill.
20   Q.    Oh, okay.  Is the hospital bill
21 for you or for one of your children?
22   A.    My son.
23   Q.    All right.  For Chadrick?

Page 39

1    A.    ███████.
2    Q.    ███████.  And what about any
3  car loans?
4    A.    No.
5    Q.    You just paid those outright or
6  did you have any car loans?
7    A.    Never.
8    Q.    Paid them -- paid for them in
9  cash?
10   A.    Right.
11   Q.    Okay.  Never financed a car loan?
12   A.    Never.
13   Q.    Who are your student loans
14 through?
15   A.    FedLoan Services.
16   Q.    Would that be Fed?
17   A.    FedLoan with -- that's who's
18 servicing it right now.
19   Q.    Okay.  And is that -- and is that
20 short for something?  FedLoan, is that short
21 for --
22   A.    It's just FedLoans.
23   Q.    Is that one word?

Page 40

1    A.    It is.
2    Q.    Okay.  F-e-d-L-o-a-n-s?
3    A.    Right.
4    Q.    Just like it sounds?
5    A.    Right.
6    Q.    Do you know where they're
7  located?  Are they in Montgomery or are
8  they --
9    A.    No.
10   Q.    Not Montgomery?
11   A.    I can't recall right now.
12   Q.    Why don't we -- if you can get
13 some documents -- your documents from
14 FedLoans --
15   A.    Sure.
16   Q.    -- I'll put that on my list here.
17        And so that we can remember what
18 we're talking about, this will be your
19 student loan servicing company?
20   A.    Right.
21   Q.    All right.  If I put that down on
22 my list here and you get a letter on that or
23 your attorneys do, you'll know what we're

Page 41

1  talking about, student loan service?
2    A.    Yes.
3    Q.    Okay.  I'll call it student loan
4  service paper so we'll know what we're
5  talking about.
6        MR. BASS:  Counsel, are you
7  referring to documents that you've already
8  been provided?
9        MR. LOGSDON:  Well, we can ask
10 about that.  So, I think I've got -- might
11 have some of these.  But really what I'm
12 looking for -- if I've already got it and
13 y'all look at it and I've got it --
14       MR. BASS:  We'll let you know.
15       MR. LOGSDON:  I don't need two
16 copies of it, so --
17   Q.    All right.  The student loan with
18 FedLoans you mentioned, and then, you also
19 mentioned receipts from work.  Tell me about
20 that.
21   A.    From work?
22   Q.    Did you say that?  Did you say
23 receipts from work?

11 (Pages 38 - 41)

**Exhibit J**

Page 42

1    A.   No.
2    Q.   Did you say -- you said -- I
3  thought you said receipts.  Are you talking
4  about receipts from making a payment; is that
5  right?
6    A.   Receipts, yes.
7    Q.   All right.  For payments.  Okay.
8  That's right.  You told me about that because
9  you keep those in case somebody says you
10  didn't make a payment, you can show them the
11  receipt?
12   A.   Correct.
13   Q.   All right.
14      MS. WILSON:  Object as to form.
15   Q.   (BY MR. LOGSDON) So, can you get
16  your receipts to your attorneys and anything
17  you've got on that?
18   A.   (Witness nods head.)
19   Q.   Is that a yes?
20   A.   Yes.
21   Q.   All right.
22      MR. BASS:  Again, Counsel,
23  receipts as to what and what time period?

Page 43

1    Q.   (BY MR. LOGSDON) Yeah.  So,
2  you're talking about receipts for payment
3  that you got.  And I assume you don't have
4  them -- I assume you've got them for the last
5  how many years back?
6    A.   It's particular receipts, not
7  just a --
8    Q.   Okay.  Why don't you get them to
9  your attorney.
10      MR. LOGSDON:  And then, if it's
11  something you think are objectionable, we can
12  talk about it, so --
13   Q.   All right.  So, we talked about
14  that.
15      As far as your documents go, you
16  mentioned cars, and you said you don't
17  finance those that you got.  You pay for them
18  outright.  Do you keep your title information
19  and your purchase of the car?  Would that be
20  some of the important documents you keep?
21   A.   Yes.
22   Q.   And I happened to see a couple of
23  your cars in the -- some of the documents

Page 44

1  that we've got.  And it looks like you've
2  got -- you've had -- or do you have -- what's
3  your current vehicle that you're driving?
4    A.   It's a BMW.
5    Q.   X3?
6    A.   2005.
7    Q.   All right.  So, would you have --
8  when did you purchase that?
9    A.   In October of 2017.
10   Q.   Where did you purchase it?
11   A.   From a friend.  Montgomery.
12   Q.   Who was that?
13   A.   Eli -- Elias Lee.
14   Q.   Did you have any -- how much did
15  you pay for it?
16   A.   Just five hundred.
17   Q.   All right.  And do you have any
18  kind of title work or anything like that from
19  it?
20   A.   I do.
21   Q.   All right.  Can you get that to
22  your counsel?
23   A.   (Witness nods head.)

Page 45

1    Q.   Where do you get that serviced?
2    A.   It's downtown on Madison.  I
3  can't -- Foreign Car Imports.  They service
4  foreign cars.
5    Q.   All right.  Foreign Car Imports,
6  Madison Street in Montgomery?
7    A.   Madison, yes, Avenue.
8    Q.   Avenue.  Prior to the BMW, what
9  car did you have?
10   A.   I was driving a Tahoe.
11   Q.   Okay.  Where'd you get that?
12   A.   I purchased it.
13   Q.   From whom?
14   A.   It's on the title work.  I can't
15  remember.
16   Q.   Just an individual?
17   A.   Right.
18   Q.   All right.  Unlike Mr. Elias, it
19  wasn't someone you knew?  It just --
20   A.   No.
21   Q.   All right.  How much did you pay
22  for the Tahoe?
23   A.   I think eleven hundred.

12 (Pages 42 - 45)

Exhibit J

1    Q.   Okay.  And you can get me the
2  title work for the Tahoe?
3    A.   Yes.
4    Q.   And the purchase document?
5    A.   (Witness nods head.)
6    Q.   Where do you get it serviced?
7  Where did you get it serviced?
8    A.   On McGehee Road at the -- I'm
9  drawing a blank.  I guess Quick Lube on
10  McGehee Road.
11    Q.   Okay.  All right.  And give me a
12  time frame on these.  When did you get the --
13  you told me the BMW, you got in October of
14  2017.  When did you get the Tahoe?
15    A.   The Tahoe was in 2013.
16    Q.   Okay.  And what about before the
17  Tahoe?
18    A.   Prior to the Tahoe, I drove a
19  Camry.
20    Q.   All right.  And when did you
21  drive the Camry?
22    A.   I purchased it in 2011.
23    Q.   Do you know what year Camry that

1  was?
2    A.   It was 2005.
3    Q.   Okay.  And how much did you pay
4  for the Camry?
5    A.   It was around the tax money.  So,
6  I paid three hundred -- three thousand
7  outright.
8    Q.   Three thousand.  That's a good
9  deal.  Who did you get that from?
10    A.   It was in Wetumpka.  It would be
11  on the -- on the paperwork.
12    Q.   And you can get me that?
13    A.   (Witness nods head.)
14    Q.   Is that a yes?
15    A.   Yes.
16    Q.   All right.
17    A.   Yes.
18    Q.   I understand head nods.  She --
19  she'll get mad at us --
20    A.   Okay.
21    Q.   -- if we do head nods because
22  she's kind of -- she's taking everything down
23  that we're saying, so --

1    You got the Camry in 2011 in
2  Wetumpka, but you don't remember who it was
3  from.  But we'll be able to find that from
4  the paperwork; is that right?
5    A.   Yes, it was a car dealership.
6    Q.   Okay.  And you paid cash for it?
7    A.   Yes.
8    Q.   Prior to the Camry, what car did
9  you own?
10    A.   I was without a car for a
11  while --
12    Q.   Okay.
13    A.   -- before the Camry.
14    Q.   All right.  So, what would be the
15  one just before the Camry?
16    A.   My brother had loaned me a Jeep.
17    Q.   Okay.
18    A.   Cherokee.
19    Q.   What's your brother's name?
20    A.   Anthony McCullough.
21    Q.   Does he live in Montgomery?
22    A.   He does.
23    Q.   Okay.  What year Jeep Cherokee

1  was that?
2    A.   I don't recall.
3    Q.   And when were you driving the
4  Jeep Cherokee?
5    A.   From 2007 to around 2009.
6    Q.   Okay.  Newer, older?  What year
7  Cherokee was it?
8    A.   It was not too old but not too
9  new.
10    Q.   Okay.  So, what would you -- if
11  you drove it in 2007, how old would you think
12  it was?
13    A.   Probably around a '99 or a 2000.
14    Q.   Uh-huh.  All right.  What about
15  prior to the Jeep Cherokee?
16    A.   No, it was years before I had a
17  car.  I can't --
18    Q.   Can't remember any others?
19    A.   No.
20    Q.   What about a Mercedes-Benz C
21  Class?
22    A.   Right.  That was in 2000 -- that
23  was in 2012.  I had that for like a week or

**Exhibit J**

1 two before I got locked up.
2     Q.    Where did you get that?
3     A.    It was -- it was just a car
4 that -- it wasn't registered or anything.  It
5 was one we were looking into registering.  I
6 just was driving it, doing errands.  I wasn't
7 working at the time.  I was just doing
8 errands in that car.  It wasn't my car.
9     Q.    Whose car was it?
10     A.    I think it was one Roderick had
11 brought around.  He had purchased it for a
12 couple hundred dollars.
13     Q.    What year was it?
14     A.    It was old.  It was pretty old.
15     Q.    All right.  How about an
16 Oldsmobile Ninety-eight?
17     A.    Oldsmobile Ninety-eight.
18     Q.    Brown.
19     A.    2000 and -- let's see -- 10.
20     Q.    Got that one in 2010?
21     A.    I think so.
22     Q.    Okay.
23     A.    2010.

1     Q.    And do you remember what year it
2 was?
3     A.    It had to be late '80s.  It may
4 have been -- maybe -- it was -- it was an
5 older car.
6     Q.    How much did you pay for that
7 one?
8     A.    Like, a couple hundred from
9 someone in the neighborhood.
10     Q.    Okay.  And then, how about a
11 Mitsubishi Eclipse?
12     A.    That was 2003, maybe '4.
13     Q.    Okay.  All right.  We were
14 talking -- we've kind of talked about a
15 couple of other documents, like car titles
16 and different things like that.  And as we do
17 that, you mentioned to me the one place you
18 keep documents or the place you keep
19 documents in the folders, and I think you
20 said in your closet or --
21     A.    Right.
22     Q.    Okay.  Did that refresh your
23 memory as to any other places you might keep

1 documents?
2     A.    No.
3     Q.    They would still be -- what you
4 would have, all these we've talked about, the
5 cars and stuff, would still be in the closet
6 in the folders?
7     A.    If I have it.
8     Q.    That's where it would be?
9     A.    (Witness nods head.)
10     Q.    Would you keep any documents at,
11 like, in a storage facility or at a friend's
12 house or at a relative's or anything like
13 that?
14     A.    No.
15     Q.    And I think I know the answer to
16 that.  You want to keep your documents
17 because, as you've told me, that's important
18 to you to hang on to those; is that --
19     A.    Correct.
20     Q.    Okay.  So, you wouldn't want to
21 trust leaving them at someone else's house --
22     A.    No.
23     Q.    -- would that be the reason for

1 that?
2         Is that a yes?
3     A.    No.
4     Q.    Okay.  All right.  What about
5 your current address?  Is that ███████,
6 I think your interrogatories said?
7     A.    ███████.
8     Q.    ███████?
9     A.    Correct.
10     Q.    And how long have you lived at
11 ███████?
12     A.    It will be thirteen years in
13 August.
14     Q.    Is that a house or an apartment
15 or what is that?
16     A.    It's a house.
17     Q.    How many bedrooms is it?
18     A.    It's three.
19     Q.    Who lives there with you
20 currently?
21     A.    My son; my two sons, Chadrick,
22 ███████; and ███.
23     Q.    Okay.  Are you renting?

14 (Pages 50 - 53)

**Exhibit J**

Page 54

1    A.    Yes.
2    Q.    Who's your landlord?
3    A.    Simuel Sippial.  S-i -- it's like
4 Samuel with an I.
5    Q.    Samuel with an I.  All right.
6    A.    Sippial, S-i-p-p-i-a-l.
7    Q.    How much do you pay Mr. Sippial
8 in rent?
9    A.    Three seventy-five.
10    Q.    A month?
11    A.    Correct.
12    Q.    Has that been the case for the
13 last thirteen years?
14    A.    Yes.
15    Q.    The same price?
16    A.    Yes.
17    Q.    And does that include -- what
18 about utilities and that kind of thing?
19    A.    Water and power.
20    Q.    Okay.  So, that includes water
21 and power?
22    A.    No, I pay water and power.
23    Q.    Separately?

Page 55

1    A.    Right.
2    Q.    All right.  And what about, does
3 it -- does it -- do you have any kind of
4 cable or Internet or anything like that?
5    A.    No.
6    Q.    Have you ever had any cable or
7 Internet?
8    A.    At some points, yes.
9    Q.    All right.  Who were your
10 providers when you had that?
11    A.    Charter, DIRECTV.
12    Q.    And any others?
13    A.    No.
14    Q.    Do you know when you had Charter
15 or DIRECTV, either one?
16    A.    I had Charter, I'll say, 2012,
17 between 2012 and 2013.
18    Q.    Okay.
19    A.    I had DIRECTV 2000 --
20    Q.    And, by the way, when I'm asking
21 you these dates --
22    A.    Uh-huh.
23    Q.    -- if you want to say it was when

Page 56

1 ▮▮▮▮▮▮ was in this grade through that
2 grade, if that's easier for you --
3    A.    Okay.
4    Q.    One of these other smart lawyers
5 could probably do the math on that, but
6 we'll -- I can't, but we'll -- so,
7 whatever -- all right.  How about DIRECTV;
8 when was that?
9    A.    For a while in 2013.
10    Q.    All right.  Do you know if you
11 paid your bill to Charter and DIRECTV in
12 Montgomery?
13    A.    Yes.
14    Q.    Was there a certain office you
15 went to to get those in Montgomery?
16    A.    Off of Atlanta Highway.
17    Q.    Atlanta Highway?
18    A.    (Witness nods head.)
19    Q.    Would that --
20    A.    I pay over the phone with a --
21    Q.    Yeah.
22    A.    -- card.
23    Q.    Okay.  But both Charter and

Page 57

1 DIRECT were on Atlanta Highway?
2    A.    With DIRECT, it was over the
3 phone.
4    Q.    Okay.  And tell me about your
5 phone.  Who is your phone -- are you talking
6 about a cell phone or are you talking about a
7 landline phone?
8    A.    It was a landline or a cell
9 because it came with the package.
10    Q.    The package.  So, which -- did
11 both Charter and DIRECT provide you landline
12 and cell phone?
13    A.    Not with DIRECT.  I dropped the
14 phone.
15    Q.    So, Charter had a landline and --
16 what all was included in that package?
17    A.    With Charter?
18    Q.    Yeah.
19    A.    Just like basic with maybe one
20 HBO, Internet, and phone.
21    Q.    Okay.  And that would have been
22 2012 to 2013 for Charter; is that right?
23    A.    Right.

15 (Pages 54 - 57)

**Exhibit J**

Page 58

1    Q.   Okay.  And then, how about
2 DIRECTV; what was in their package?
3    A.   It was just Internet and -- no,
4 I'm sorry.  No Internet.  It was just regular
5 cable TV was like one -- what they call a
6 tier.  It wasn't any premiums, just a tier.
7    Q.   What would the tier be?
8    A.   Like ID or something like that.
9 They put it in a tier.
10    Q.   Okay.  And you mentioned paying
11 DIRECTV by the phone using your phone.  So,
12 was DIRECTV providing that phone service or
13 was there another provider of that phone
14 service?
15    A.   Verizon Wireless prepaid.
16    Q.   Okay.  And where is the Verizon
17 location?
18    A.   You just purchased the prepaid
19 phone and pay it with a card over the phone.
20    Q.   All right.  How long have you had
21 Verizon as your provider?
22    A.   Verizon, for about seven years,
23 six, seven years.

Page 59

1    Q.   Who did you have before then?
2    A.   AT&T.
3    Q.   All right.  So, 2012 or so, you
4 had AT&T?
5    A.   2011, I transferred to Verizon.
6    Q.   To today?
7    A.   No, currently, I went to a
8 different one within the last couple of
9 months.
10    Q.   All right.  And who is that?
11    A.   Simple Mobile.
12    Q.   So, AT&T would have been 2011
13 back?
14    A.   Right.
15    Q.   How far back?
16    A.   Not that far.  Probably about two
17 or three years.
18    Q.   Okay.  Simple Mobile, I haven't
19 heard of that.  Are they in Montgomery or
20 where are they?
21    A.   Nationwide.
22    Q.   Nationwide?  Okay.  So, I
23 probably should have heard of them.

Page 60

1         And where are they -- are they --
2 do you pay -- is there a location?
3    A.   It's a prepaid.
4    Q.   Prepaid?
5    A.   Pay over the phone, yeah.
6    Q.   All right.  Tell me about your
7 cell phone.  What kind of cell phone do you
8 have currently?
9    A.   It's just a little simple mobile
10 phone.  I lost my phone.  So, I went and got
11 a twenty-five-dollar phone.
12    Q.   All right.  What did you have
13 prior to then, the simple?
14    A.   A Moto E.  It's a Motorola E.
15    Q.   All right.  Is that a smartphone?
16    A.   Yes.
17    Q.   I don't even know what a
18 smartphone is, but I know that's a -- some
19 kind of phrase for phones, so --
20         What was before the Moto E?
21    A.   I don't recall.
22    Q.   When did you have the Moto E?
23    A.   I had the Moto E for about two

Page 61

1 years.
2    Q.   All right.  And do you remember
3 what kind of phone you had prior to the Moto
4 E?
5    A.   I don't.
6    Q.   All right.  You were telling
7 me -- okay.  So, for the last thirteen years,
8 you lived at ▓▓▓▓▓▓.  And do you mind
9 telling me your age just so I can kind of
10 work back to high school or your date of
11 birth?
12    A.   Forty-five.
13    Q.   Forty-five.  Okay.  So, where did
14 you live prior to ▓▓▓▓▓▓?
15    A.   I lived briefly off of Troy
16 Highway in -- I can't think of the name of
17 that.  It was like a little small trailer
18 park area.  I lived there for, like, close to
19 a year.  It's off Troy Highway.  I can't
20 remember the name of it.
21    Q.   Okay.  During your thirteen years
22 at ▓▓▓▓▓▓, I asked you about who's
23 living there now, and you told me that.  Who

Exhibit J

Page 62

1 all has lived there in the past? Have any of
2 the children's fathers lived there?
3    A.   Roderick has lived there in the
4 past.
5    Q.   Who is that?
6    A.   Roderick Williams.
7    Q.   Okay.  And when did Roderick live
8 there?
9    A.   From 2000 and -- let's see.  I
10 think it was '12, 2013 to -- I think -- I
11 want to say it was a total of two -- almost
12 two years.
13    Q.   Okay.  When he was there, this
14 was before y'all were married, correct?
15    A.   Right.
16    Q.   Did he pay rent?
17    A.   He helped some, yeah.
18    Q.   Did he help out with groceries
19 and expenses and that kind of thing?
20    A.   Yes, he wasn't working, though.
21    Q.   Where is he working now?
22    A.   He's not working right now.
23    Q.   Has he had jobs in the past?

Page 63

1    A.   At one point, yes.
2    Q.   Where did he work?
3    A.   At Trenchless America or
4 something.  Trenchless America.  It's a
5 company out of Georgia.
6    Q.   Trenchless?
7    A.   America.
8    Q.   America.  What did he do?
9    A.   They were installing, like,
10 pipelines in the ditches around the
11 Montgomery area and Auburn.
12    Q.   When did he work there?
13    A.   He worked there briefly, off and
14 on, in 2011.  Like, two or three months at
15 best.
16    Q.   Okay.
17    A.   He was able to go and come.
18    Q.   So, when he helped you out with
19 expenses in 2012 and 2013 when he lived
20 there, where was he getting his money to do
21 that?  Was he on unemployment or --
22    A.   Oh, he would do -- his father is
23 HVAC, so he would help him on the side and

Page 64

1 make a little money like that.
2    Q.   All right.  What company is his
3 father with?
4    A.   He is -- like, work with
5 apartment complexes.  So, he's like a
6 maintenance guy, so --
7    Q.   Okay.  He's good with heating and
8 air conditioning --
9    A.   Right.
10    Q.   -- and all of that?
11       And so, Roderick would help him
12 out, and his father would pay him for that?
13    A.   Yeah, some here and there, yeah.
14    Q.   Okay.  What is his father's name?
15    A.   Lee Williams.
16    Q.   It sounded like -- when you were
17 describing that, it sounds like that's his
18 own company that he does or it's just him or
19 does he work for another company?  And I'm
20 talking about --
21    A.   He's hired --
22    Q.   -- Lee Williams.
23    A.   -- by different apartment

Page 65

1 complexes as maintenance.
2    Q.   Okay.
3    A.   Like, two or three at a time;
4 so --
5    Q.   It sounds like he's a good
6 handyman.  Is Roderick a good handyman as
7 well?
8    A.   Apprentice.
9    Q.   Apprentice, HVAC?
10    A.   Right.
11    Q.   All right.  Who else has lived in
12 the ████████ house?
13    A.   Lance, my other son, and his wife
14 stayed there briefly.
15    Q.   When were they there?
16    A.   2012.
17    Q.   And how long were they there?
18    A.   Two or three months.
19    Q.   Did they pay any rent or any --
20 or help with any expenses?
21    A.   No.
22    Q.   Anyone else that's lived there?
23    A.   That's it.

17 (Pages 62 - 65)

Exhibit J

Page 66

1   Q.   I think I asked you this, but
2 other than Mr. Williams, have you been
3 married to anyone else?
4   A.   No.
5   Q.   Have you ever tried to petition
6 the court for any child support for any of
7 your children?
8   A.   It's been filed in the past, yes.
9   Q.   And tell me about that. Who did
10 you file against, for what child, that kind
11 of thing.
12   A.   Jeffrey Jackson with ████ with
13 DHR, and, also, Roderick has been filed
14 against with DHR.
15   Q.   All right. Any others?
16   A.   No.
17   Q.   When was the Jeffrey Jackson one?
18   A.   Probably around 2003. She was
19 born in 2002.
20   Q.   Okay. What was the result of
21 that?
22   A.   Well, he is currently -- he's
23 been incarcerated since two days after she

Page 67

1 was born. So, they automatically did it just
2 in case he gets a job or something.
3   Q.   Uh-huh. Okay. Have you gotten
4 anything from that action with DHR?
5   A.   No.
6   Q.   How about with Roderick?
7   A.   Well, he has other -- well,
8 they've been -- anytime he tries to work,
9 they take out for old child support. So, it
10 goes to the older cases.
11   Q.   Okay. So, do I take it from
12 that, you were awarded child support, you
13 just haven't received any because of the
14 older cases, or received little or --
15   A.   They never brought it to court.
16   Q.   Never?
17   A.   For some reason, they never
18 brought it to court.
19   Q.   Did you have an attorney involved
20 with that or --
21   A.   No.
22   Q.   Okay. Any other petitions for
23 child support that you filed or --

Page 68

1   A.   No.
2   Q.   -- request?
3      What about just general requests
4 from the government for aid that you made?
5   A.   At some point, I had the AFDC. I
6 would get that in spurts. Like, sometimes
7 I'd get it, but, then, I'll find employment,
8 cut it off. So, I did that a few times over
9 the years.
10   Q.   AFDC?
11   A.   It's like a --
12      MR. BASS: Aid for Families with
13 Dependent Children.
14   Q.   (BY MR. LOGSDON) Does that sound
15 right?
16   A.   That's correct.
17   Q.   That guy is pretty smart, so
18 he -- Aid for Families with Dependent
19 Children. Okay. And is this a -- this is a
20 Federal Government as opposed to a state
21 program?
22   A.   I believe it's state.
23      MR. BASS: Federal.

Page 69

1      MR. LOGSDON: Federal.
2      MR. BASS: Federal and state
3 cooperative.
4      MR. LOGSDON: Okay.
5   Q.   All right. When did you first
6 apply with them?
7   A.   When my two older children were
8 young.
9   Q.   Okay. And it sounded like from
10 what you -- or it sounded like you said that
11 they would supply -- or they would give you
12 aid when you were not working?
13   A.   Correct.
14   Q.   All right. Did they -- were they
15 able to do that each time you weren't
16 working, like --
17   A.   I was in school, in college.
18   Q.   You were -- excuse me?
19   A.   I was in school.
20   Q.   And they gave it to you?
21   A.   Right.
22   Q.   Okay. And how much did they
23 give?

18 (Pages 66 - 69)

Exhibit J

1    A.    Then, when the beginning, it was
2 like ninety dollars a month.
3    Q.    And what year would that have
4 been in?
5    A.    Let's see. '91, 92, '93, I
6 think.
7    Q.    Okay. And then, let's go -- when
8 did they -- up through when did they provide
9 that?
10    A.    '91, '92, '93.
11    Q.    Anything after that?
12    A.    Not for a long while.
13    Q.    And then, when did it pick back
14 up?
15    A.    Let's see. Let me think. I
16 think it was like 2005.
17    Q.    Okay. How much was it then?
18    A.    Like -- it's been so long. Like,
19 maybe close to two hundred.
20    Q.    A month?
21    A.    Right.
22    Q.    And how many -- how many months
23 or years or what was the time frame that you

1 got -- you were able to get that?
2    A.    May have been close to a year.
3    Q.    From 2005 to 2006?
4    A.    '6, somewhere in there, yeah.
5    Q.    All right. And then, what about
6 any time after then?
7    A.    I think the last time I got it
8 was 2006.
9    Q.    Okay. Have you applied for it
10 since then?
11    A.    No.
12    Q.    Have you worked since -- I'm
13 going to ask you about your work background.
14 So, we'll cover this in a minute. But have
15 you worked pretty much at all times from 2006
16 to the present other than when you were
17 incarcerated?
18    A.    2000 and -- I worked 2004 and '5
19 and '6. And that's when I -- somewhere in
20 there, I had a break, and I did the AFDC.
21 And then, '7 and '8, I think I was
22 unemployed. I wasn't able to work because
23 there was no jobs. I think I started

1 working -- I worked -- I worked in 2005. I
2 started working in 2005, I remember that.
3    Q.    Let's do this: Why don't we
4 start back to -- why don't we go all the way
5 back to high school so we can kind of work
6 forward from there. So, tell me where you
7 went to high school.
8    A.    J.D. -- Jefferson Davis High
9 School.
10    Q.    And what grade did you go
11 through?
12    A.    I went to -- up until the
13 eleventh grade, then, I got my GED.
14    MR. LOGSDON: Martha, do you want
15 us to hang on a minute? Do you want us to
16 wait a minute?
17    MS. MORGAN: No. No.
18    MR. LOGSDON: You're okay?
19    MS. MORGAN: Yes.
20    MR. LOGSDON: Okay. We can take
21 a break if you want us to take a break.
22    MS. MORGAN: No, I'll be right
23 back.

1    MR. LOGSDON: All right.
2    MS. MORGAN: Thank you, though,
3 for asking.
4    Q.    (BY MR. LOGSDON) What year was
5 that that you got your GED?
6    A.    It was '92. '92 or '93. '93.
7    Q.    Do you remember how old you were
8 at the time?
9    A.    At the time I got my GED, I think
10 I was nineteen.
11    Q.    Okay. All right. So, after you
12 got your GED, what did you do next?
13    A.    I went to Alabama State
14 University.
15    Q.    And did you have a major?
16    A.    Mass communications.
17    Q.    Okay.
18    A.    Print journalism.
19    Q.    Excuse me?
20    A.    Print journalism.
21    Q.    Okay. How long were you at
22 Alabama State?
23    A.    I went to Alabama State for three

19 (Pages 70 - 73)

**Exhibit J**

Page 74

1 years. I didn't complete.
2    Q.   All right. You did not
3 complete --
4    A.   No.
5    Q.   -- your degree?
6        All right. And what did you do
7 next?
8    A.   I went to work. I worked at The
9 Montgomery Advertiser for a little while.
10    Q.   So, it looks like we're -- when
11 you started at Montgomery Advertising, it
12 looks like that would be about 1996?
13    A.   Maybe before. Maybe --
14    Q.   '95, '96?
15    A.   Somewhere around there, yeah.
16    Q.   All right. And how long did you
17 work at Montgomery Advertising?
18    A.   About a year and a half.
19    Q.   What did you do there?
20    A.   I was just doing apprenticeship,
21 whatever they needed me to do.
22    Q.   Okay. All right. Why did you
23 leave?

Page 75

1    A.   I actually -- with the situation
2 with Jeffrey Jackson, I had got a -- it was
3 like a -- I got attacked by him, my
4 daughter's father. So --
5    Q.   Okay.
6    A.   And I was injured really bad,
7 so --
8    Q.   Okay. And I don't want to have
9 to get into all that, but have you recovered
10 from that?
11    A.   Yes.
12    Q.   Okay.
13    A.   Yes.
14    Q.   All right. Your next job after
15 that was when?
16    A.   Let me see. I think I began
17 working -- I don't recall. Let me see. I
18 went back to the Advertiser again at some
19 point for a while, for a short while.
20    Q.   Okay. And then, what did you --
21 and you can just tell me where you -- where
22 you kind of remember, where to pick back up.
23 But if you, you know --

Page 76

1    A.   I know I picked up at -- in 2005,
2 I believe, at Holiday Inn Express.
3    Q.   Okay. What location?
4    A.   On Troy Highway.
5    Q.   What did you do there?
6    A.   I did receptionist and
7 housekeeping, whatever they needed me to do.
8 I started off with housekeeping and moved to
9 receptionist. I was there where they needed
10 me.
11    Q.   Okay. 2005 until when did you
12 work at Holiday Inn Express?
13    A.   I think, 2010.
14    Q.   It sounds like they must have
15 liked you there if you started out, and then,
16 you moved up and had you doing a lot of
17 things?
18    A.   Right.
19    Q.   Is that right, they --
20    A.   Correct.
21    Q.   -- were happy with your work
22 there?
23    A.   Yes.

Page 77

1    Q.   Do you feel like you did a good
2 job for them there?
3    A.   I did.
4    Q.   Okay. Do you remember your
5 earnings during that time from 2005 to 2010?
6    A.   Yes. It was somewhere around
7 seven, eight hundred every two weeks.
8    Q.   Is that what it ended at or
9 started at or --
10    A.   That's where it ended, yeah.
11    Q.   Okay. And do you remember where
12 you started?
13    A.   Maybe like -- in the beginning,
14 they paid us weekly. So, it was like close
15 to two ninety a week. And then, they
16 switched over with management and began to
17 pay us differently.
18    Q.   Okay. So, we kind of talked
19 about this a little bit earlier when we were
20 talking about the checks and the pay stubs
21 and all of that. When you got paid at
22 Holiday Inn Express, would you get an actual
23 check that you would go deposit or would it

20 (Pages 74 - 77)

**Exhibit J**

Page 78

1  be direct deposit or how did that work?
2      A.   We were contract workers at the
3  time.  They considered us contract workers.
4  So, we got paid a check that you cashed and
5  you didn't have a stub.
6      Q.   Okay.  So, you would get an
7  actual check, and then, you'd have to take
8  that to the bank and either cash it or
9  deposit it?
10     A.   Cash it, yes.
11     Q.   Cash it.  Would that be the case
12 during the entire time that you were at
13 Holiday Inn Express from 2005 to --
14     A.   No.  Around 2008, we had a change
15 in management.  So, they gave us -- they
16 required we did direct deposit.
17     Q.   Okay.  Do you know who owned
18 that?
19     A.   Mr. Silini owned it to begin
20 with.  He's passed on.  It's a -- it's
21 like -- it has like a parent company, so --
22 it's like worldwide or something.
23     Q.   What is it?

Page 79

1      A.   It's a -- they have a parent
2  company.  So, I don't -- I don't know who is
3  in charge of it.  They're gone now.  It's
4  another hotel at this point.
5      Q.   Okay.  Not a Holiday Inn anymore?
6      A.   Not a Holiday Inn anymore.
7      Q.   All right.  And so, 2008 until
8  you left in 2010, you were doing direct
9  deposit?
10     A.   Yes.
11     Q.   Who was your bank that you did
12 direct deposit at?
13     A.   I don't know because I ended up
14 cancelling out with them.  I think it may
15 have been Wachovia.
16     THE COURT REPORTER:  Can I get
17 you to speak up just a little bit?
18     A.   It may have been Wachovia.
19     Q.   (BY MR. LOGSDON)  Wachovia?  All
20 right.  And what about when you would go and
21 deposit or cash the check, what bank would
22 you go to?
23     A.   It was -- it wasn't direct

Page 80

1  deposit so --
2      Q.   Well --
3      A.   Before that?
4      Q.   Before that, yeah.
5      A.   It was like a pawn shop just
6  right next door on Troy Highway.  It would
7  be -- oh, it's been so long.  It's Capitol
8  City and Pawn.  They were right next door.
9      Q.   To the -- to the Holiday Inn
10 location?
11     A.   Right.
12     Q.   And they would cash the check for
13 you?
14     A.   Yes.
15     Q.   Did you go to any other bank
16 during that time or you just always went to
17 Capitol City --
18     A.   Always.
19     Q.   -- Pawn?
20     A.   Maybe one time at Walmart.
21     Q.   Okay.
22     A.   One time.
23     Q.   What about when you would get

Page 81

1  your income tax refunds, how would you get
2  those?  Would you cash them or deposit them
3  or what would you do with those?
4      A.   Direct deposit onto a card.
5      Q.   To a debit card?
6      A.   Right.
7      Q.   Who was the debit card with?
8      A.   Serve with American Express.
9      Q.   Serve, S-e-r-v-e?
10     A.   Correct.
11     Q.   Do you have any documents from
12 them?
13     A.   I think -- I think maybe I do.
14     Q.   Can you take a look and find
15 those and see if you can get them to your
16 attorneys?
17     A.   Yes.
18     Q.   What about the Wachovia account
19 that you mentioned; would you have any
20 documents with them?
21     A.   I don't believe so.
22     Q.   So, is the way that that worked,
23 you would get like your income tax return --

21 (Pages 78 - 81)

Exhibit J

1 how would you get it to American Express for
2 them to be able to tell you it's on your
3 credit card?
4     A.   You would give them -- the
5 routing and account number to the IRS.
6     Q.   You'd call them up -- call them
7 up and give it to them?
8     A.   You would put it on the -- you
9 know, when you turned -- when you turned in
10 your tax return, you had that information
11 written on it.
12    Q.   They sent it directly?
13    A.   (Witness nods head.)
14    Q.   Okay.  And would you ever deposit
15 any of your work checks onto the American
16 Express Serve debit card?
17    A.   I have my current pay going to an
18 American Express card.
19    Q.   Okay.  All right.  What about
20 back when you were working at Holiday Inn;
21 were you --
22    A.   No.
23    Q.   Okay.  And tell me about leaving

1 Holiday Inn.  How did -- how did that
2 employment come to an end?
3     A.   I was initially -- they -- the
4 company was pretty much leaving.  So, there
5 was a change in brand.
6     Q.   Do you know who the new brand is?
7     A.   No.
8     Q.   Okay.  All right.  Keep going.
9 I'm sorry.
10    A.   That's how it happened.  It was a
11 change in brand.  So, they brought in their
12 own people, their own management and their
13 own people.
14    Q.   Did you apply with the new
15 company?
16    A.   I did not.
17    Q.   Why not?
18    A.   I just went next door and went to
19 work at the other hotel.
20    Q.   Okay.  And who was the other
21 hotel?
22    A.   Home Inn and Suites.
23    Q.   And what is their address or

1 street?
2     A.   It's been a while.  It's Express
3 Drive.  That's all I can remember, Express
4 Drive.
5     Q.   Okay.  What did you do there at
6 Home Inn and Suites?
7     A.   Well, I started at the bottom
8 again.  I did housekeeping --
9     Q.   Okay.
10    A.   -- laundry.
11    Q.   Okay.  And how much were you
12 earning there?
13    A.   It was a little bit less, like,
14 three seventy-five a room.  Maybe, like, a
15 hundred and fifty, a hundred and seventy-five
16 a week.  That was bad.
17    Q.   What about that one as far as
18 your check?  Would it get deposited or how
19 did you keep up with it?
20    A.   They'd just give us a check, and
21 the same deal, went next door.
22    Q.   To the pawn shop?
23    A.   Right.

1     Q.   How long did you work at -- and
2 was there any gap between Holiday Inn and
3 Home Inn and Suites?
4     A.   Probably about two -- about a
5 month, close to two months maybe.
6     Q.   Okay.  Why did you wait two
7 months?  Just kind of rejuvenate or --
8     A.   Right.
9     Q.   -- settle in a little bit, take a
10 little break?
11    A.   Right.
12    Q.   Okay.  And kind of get some
13 energy back, that kind of thing before
14 starting there.  And then, when you went to
15 Home Inn and Suites, it sounds like you'd
16 probably be pretty experienced.  Did they
17 hire you pretty quickly?
18    A.   Yes.
19    Q.   Probably glad to see you?
20    A.   Right.
21    Q.   Okay.  Because you mention -- you
22 were talking before about 2008.  And
23 that's -- the economy was -- it was tougher

22 (Pages 82 - 85)

**Exhibit J**

1  to find jobs in 2008.  But by this time,
2  2010, all those people that were hard to find
3  jobs with, they were really wanting to see
4  you --
5      A.   Right.
6      Q.   -- is that right?
7      A.   Right.
8      Q.   Okay.  Especially somebody like
9  you that comes across well, which you do, and
10  has some experience?
11      A.   Correct.
12      Q.   Okay.  And, by the way, you've
13  got -- you've got your GED, you've got -- I
14  think you told me you didn't graduate from
15  Alabama State, but you have -- you've got
16  three years of college education?
17      A.   Right.
18      Q.   So, three-fourths of a degree; is
19  that --
20      A.   Correct.
21      Q.   Okay.  And did I cut you -- is
22  that -- was that the last college or any
23  formal classes that you went to, the Alabama

1  State back three years --
2      A.   No.
3      Q.   -- after high school?
4          What other --
5      A.   Faulkner University.
6      Q.   And when did you go to Faulkner?
7      A.   Began in 2000 -- I believe it's
8  '11 or '12.  I think it was 2011 I started
9  at --
10      Q.   Okay.
11      A.   -- Faulkner.
12      Q.   All right.  So, were you going to
13  Faulkner while you were working at Home Inn
14  and Suites?
15      A.   Yes.
16      Q.   Is Faulkner located in
17  Montgomery?
18      A.   Yes.
19      Q.   All right.  It wasn't an online
20  or anything?
21      A.   No.
22      Q.   So, I was thinking they have kind
23  of maybe different locations.  But they've

1  got a location here in Montgomery that you
2  would go to?
3      A.   Correct.
4      Q.   All right.  Were you taking --
5  how many classes were you taking at Faulkner?
6      A.   It was adult, so we took two
7  classes per semester.  I was trying to
8  complete my BA.
9      Q.   All right.  And so, how many --
10  when did you start at Faulkner?
11      A.   I believe it was 2000 and -- no,
12  I'm going to -- I think correctly, I think it
13  was 2012, like.
14      Q.   How many classes did you take?
15      A.   I took a total of four classes
16  while I was there.  I think I did a total of
17  eight classes, four per semester I was there.
18      Q.   Okay.  Did you complete -- so,
19  you did four in one semester, and then, you
20  did four in a semester after that?
21      A.   Correct.
22      Q.   This is around 2012?
23      A.   Correct.

1      Q.   All right.  So, the first four
2  classes that you took on the first semester,
3  what were you -- what were your classes?
4      A.   It's been so long, I cannot quite
5  recall.  I know we had to take our religious
6  studies, because it was a religious school.
7  We had to do, like, a history 101 and 102.
8  We had to do a writing class.  Like, I can't
9  really recall --
10      Q.   Okay.
11      A.   -- right now what I had to take.
12      Q.   All right.  How'd you do?
13      A.   I did -- I made straight A's.
14      Q.   Straight A's.  Okay.  And back in
15  Alabama State, did you make good grades as
16  well?
17      A.   I did.
18      Q.   Okay.
19      A.   Except for math.
20      Q.   Except for math.  All right.
21      A.   I made a C.
22      Q.   Okay.  And then, how about in
23  your second semester, four classes then as

23 (Pages 86 - 89)

**Exhibit J**

Page 90

1 well?
2     A.   Right.
3     Q.   Okay.  And did you complete
4 those?
5     A.   I got arrested.
6     Q.   During that?
7     A.   During that.
8     Q.   Okay.  All right.  Did you take
9 any -- at any time, either at Alabama State
10 or at Faulkner, did you take any kind of
11 criminal justice classes or legal kind of
12 classes or law classes, that kind of thing?
13     A.   Yes, with print journalism, you
14 have to take a lot of law classes.
15     Q.   Okay.  I was going to say, yeah.
16     A.   Right.
17     Q.   So, you took a lot when you were
18 at Alabama State of legal classes?
19     A.   Correct.
20     Q.   All right.  So, you know this --
21 you kind of have a decent sense as to -- I
22 know most people that just kind of watch TV,
23 they know the whole -- what the Miranda

Page 91

1 rights and all that are.
2     A.   Right.
3     Q.   You know that and more, right?
4         MR. BASS:  Objection to form.
5         MS. WILSON:  Objection to form.
6     Q.   (BY MR. LOGSDON) Correct, from
7 your classes?
8     A.   I know.
9     Q.   Okay.  You know those kind of
10 things pretty well?  For example, Miranda
11 rights, you have a right to remain silent and
12 those that kind of things, you know that kind
13 of stuff --
14         MR. BASS:  Objection.
15         MS. WILSON:  Objection to form.
16     Q.   (BY MR. LOGSDON) -- correct?
17     A.   Correct.
18     Q.   Okay.  And just -- and how many
19 classes was it that you took?
20     A.   At which school?
21     Q.   Both of them.  So, you took
22 legal -- and I'm just talking about the legal
23 law, criminal justice-related classes.

Page 92

1     A.   So, we're talking about in the
2 '90s.  So, I believe I would have taken at
3 least three classes by then.
4     Q.   Okay.  And do you remember the
5 names of the legal classes?
6     A.   I do not.
7     Q.   So, one of the -- in this case
8 here, there's a complaint that was filed that
9 has a lot of legal words in it, some factual
10 words and some legal words.  Did you take a
11 look at that and read that at any point?
12     A.   Yes.
13     Q.   Okay.  Some of the factual things
14 are about you, and that's probably where you
15 focused on, but there's also some legal
16 things in there, some things about
17 constitutional rights and those kind of
18 things.  Do you remember seeing that?
19     A.   I do.
20     Q.   Okay.  And based on your
21 background, those constitutional things,
22 constitutional rights, is that the kind of
23 thing that you looked at and you thought,

Page 93

1 okay, I've got some at least general
2 familiarity with what those are --
3         MS. WILSON:  Objection to form.
4     Q.   (BY MR. LOGSDON) --
5 constitutional rights?
6     A.   I do.
7     Q.   Okay.  So, things like, you know,
8 you've got a right for an attorney; is
9 that -- would that be one of them that you
10 would know?
11     A.   (Witness nods head.)
12         MS. WILSON:  Objection to form.
13     A.   I do understand that.
14     Q.   (BY MR. LOGSDON) You understand
15 that.  And I guess when you say you
16 understand that, that would be back since you
17 were at Alabama State at least in school
18 there, correct?
19     A.   Correct.
20     Q.   Okay.  All right.  So, you were
21 telling me about working at Home Inn and
22 Suites.  Did you work there up until you got
23 arrested?

24 (Pages 90 - 93)

Exhibit J

Page 94

1    A.    Yes.
2    Q.    All right.  What was your next
3  job?
4    A.    Where I am currently at, which is
5  going to be ASK Telemarketing.
6    Q.    Okay.  What do you do there?
7  ASK, A-S-K, Telemarketing; is that right?
8    A.    That's right.
9    Q.    What do you do there?
10   A.    Customer service.
11   Q.    Where are they located?
12   A.    Carmichael Road.
13   Q.    And what do you get paid there?
14   A.    Ten twenty-five an hour.
15   Q.    Forty hours a week?
16   A.    I don't quite make forty because
17  I just -- I have kids, so I can't -- I'm
18  scheduled for forty --
19   Q.    Okay.
20   A.    -- but I don't make forty.
21   Q.    Okay.
22        MR. LOGSDON:  Do y'all want to
23  take a break, a few minutes?

Page 95

1        (Whereupon, a brief recess was
2        taken.)
3
4    Q.    (BY MR. LOGSDON) So, Ms.
5  McCullough, when we were -- just before we
6  took a break, you were telling me about --
7  you told me about Homewood Inn and Suites,
8  and then, you told me that you got arrested,
9  and then, we were picking up after you got
10  arrested.  And so, you kind of -- you went to
11  ASK Telemarketing your current job.  Maybe we
12  can just -- you can either go there and work
13  your way back or go from -- why don't you go
14  from after you got arrested and we'll work
15  forward.
16   A.    I worked at ASK briefly through a
17  temp service.  We came in -- I came in
18  through a temp service.  And it was 2009 when
19  I went there.  For a stretch, I didn't have
20  employment.
21   Q.    Excuse me?
22   A.    For a stretch, I didn't have
23  employment.  When I left --

Page 96

1    Q.    Okay.
2    A.    -- Home Inn and Suites, I -- of
3  course, I got incarcerated.
4        So, that cut off school and that
5  cut off my job.  They said I was a no-call,
6  no-show.  So, that was the end of the job
7  from the arrest.
8    Q.    All right.  And then, what about
9  when you were released from incarceration,
10  what was your next position?
11   A.    I was unemployed for a while.
12  And I was unable to go back to school.  I
13  missed twenty-one days from being
14  incarcerated.  So, eventually, I applied at
15  ASK.  I can't remember the time frame.  It's
16  a little fuzzy.  But through a temp service.
17  I went through a temp service.
18   Q.    All right.  So that we can keep
19  it -- try to keep it straight, tell me after
20  you were released -- and how long were you
21  incarcerated for?  I think you said --
22   A.    The last time, twenty-one days.
23   Q.    Twenty-one days.  Okay.

Page 97

1        So, who was the very first
2  employer that you sought employment from when
3  you were released from incarceration?
4    A.    I went through a temp service at
5  Aspire.
6    Q.    And that would be A-s-p-i-r-e?
7    A.    Correct.
8    Q.    Where are they located?
9    A.    On Perry Hill Road.
10   Q.    And is it just called Aspire
11  Staffing?
12   A.    Correct.
13   Q.    And when did you go to them in
14  relation to the release date?
15   A.    I was arrested, I believe, in
16  2012.  I don't believe that I -- I cannot
17  recall when I started with them.
18   Q.    Okay.  Did you take some time off
19  before looking for a job?
20   A.    I believe so, yes.
21   Q.    About how long before you started
22  looking for a job?
23   A.    I can't -- I do not recall the

25 (Pages 94 - 97)

Exhibit J

1 time frame.

2    Q.   The first one would be -- or the

3 first one you went to would have been Aspire

4 Staffing, whenever that was, correct?

5    A.   Correct.

6    Q.   And do you know if it was a

7 month, a couple of months, a year?

8    A.   It may have been up to close to a

9 year. I remember my -- finding a check stub

10 from 2000 and -- early 2014 --

11    Q.   Okay.

12    A.   -- from Aspire Staffing.

13    Q.   All right. So, it would have

14 been up to a year before you went to them to

15 look for a job, to even apply for a job?

16    A.   That may be the case. I'm not

17 sure.

18    Q.   Okay. Fair enough. And, by the

19 way, you just mentioned a check stub that you

20 found from Aspire. Is that one of the ones

21 you think you still have that you might could

22 get it to us?

23    A.   From 2014, yes.

1    Q.   Excuse me?

2    A.   From 2014.

3    Q.   Okay. So, I'm going to put that

4 down on my list. And I'm going to say

5 Aspire -- would it be an Aspire Staffing

6 check stub? Would they have been --

7    A.   Aspire staffing.

8    Q.   All right. So, I'm going to put

9 that on my list of documents, and you'll know

10 what I'm talking about if I call it that,

11 fair enough?

12    A.   Yes.

13    Q.   All right. So, when you went to

14 Aspire, we'll look at -- if we can find this

15 check stub, that will tell us when you first

16 went to apply to them. Did they pretty

17 quickly hire you when you put in your

18 application?

19    A.   The next day.

20    Q.   Okay. And, again, that was a

21 time where folks were looking to see --

22    A.   Right.

23    Q.   -- bright people like you that

1 are coming in that come across well that --

2 so, I assume they were able to put you to

3 work, you said, the very next day?

4    A.   Correct.

5      MR. BASS: Object to form.

6    Q.   (BY MR. LOGSDON) Okay. And

7 Aspire is the company, the staffing company.

8 What was the job that you did, though?

9    A.   It was a customer service

10 representative.

11    Q.   For ASK?

12    A.   For ASK, yes.

13    Q.   Okay. All right. And ASK is a

14 separate company from Aspire?

15    A.   Correct.

16    Q.   These staffing companies, the way

17 they work, they just -- they kind of have

18 the -- go meet people like you that they say,

19 okay, we've met with Ms. McCullough, she's

20 capable, she would be a good employee, and

21 then, they place you somewhere; is that how

22 that worked?

23    A.   (Witness nods head.)

1      MR. BASS: Object to form.

2 Compound.

3    Q.   (BY MR. LOGSDON) Does that sound

4 right?

5    A.   Yes.

6    Q.   Okay. All right. And how long

7 did you work at ASK?

8    A.   I currently work at ASK.

9    Q.   So, from then until now?

10    A.   No. It was temporary work

11 back --

12    Q.   Okay. Who was -- who was paying

13 your check?

14    A.   I received it from Aspire

15 Staffing.

16    Q.   Okay. The whole time?

17    A.   Up until I recently went back in

18 2016.

19    Q.   Okay. So, was there a gap

20 somewhere between ASK -- you said you went

21 back. So, did you -- what was the gap in

22 employment there?

23    A.   Well, I still worked other jobs.

**Exhibit J**

1  I worked at another -- a different Holiday
2  Inn Express on Carmichael and then -- for a
3  couple months.  And then, I worked at a
4  Marriott and ASK work.  I worked two jobs.
5      Q.   Okay.  So, Holiday Inn Express
6  Carmichael Road?
7      A.   Marriott, Carmichael Road slash
8  ASK, Carmichael Road.  And then, I got
9  offered work at ASK 8:00 to 5:00.
10     Q.   Okay.
11     A.   So, I did that.
12     Q.   Once you went to -- first went to
13 Aspire Staffing in I think you said maybe
14 2014 -- is that when you --
15     A.   That was -- that was -- the first
16 time I went there was in 2008.
17     Q.   Okay.  And then, you went back in
18 2014; is that right?
19     A.   Correct.
20     Q.   All right.  From that point up
21 until today, have there been any gaps in your
22 employment?
23     A.   No.

1      Q.   And during that time, you've
2  worked either for or a combination of ASK,
3  Holiday Inn, and Marriott, correct?
4      A.   Correct.
5      Q.   And I think I know the answer to
6  this, but when you went to them at Holiday
7  Inn, the same thing, they were probably glad
8  to see you and hired you very quickly; is
9  that right?
10        MR. BASS:  Objection.
11        MS. WILSON:  Object to the form.
12     Q.   (BY MR. LOGSDON)  Is that right?
13     A.   Correct.
14     Q.   Okay.  And is the same true for
15 Marriott --
16        MR. BASS:  Objection.
17     Q.   (BY MR. LOGSDON)  -- they hired
18 you quickly, glad to see you, that kind of
19 thing?
20     A.   It was a process.
21     Q.   Okay.  Tell me -- for Marriott,
22 it was a process?
23     A.   Right.

1      Q.   All right.  Tell me about that
2  for Marriott.
3      A.   Well, we had -- I had to come
4  back a couple of times.
5      Q.   Okay.  And was that because -- I
6  know that some companies have a longer
7  process than others do.  And Marriott's
8  probably, I don't know, a bigger company or
9  something.  But is that the reason, is they
10 just had a longer process?  It wasn't that
11 they were trying to decide whether or not to
12 hire you?
13     A.   They had a lot of applications.
14        MS. WILSON:  Objection to form.
15     Q.   (BY MR. LOGSDON)  Okay.  Excuse
16 me?
17     A.   They had a lot of applications.
18     Q.   Marriott had a lot of
19 applications?
20     A.   Right.
21     Q.   Okay.  All right.  And do you
22 remember your salary at Holiday Inn and at
23 Marriott?

1      A.   Well, they pay you, like -- I
2  worked at the Holiday Inn the second time
3  probably about four weeks.  I didn't like it
4  at this particular one.  So, it was like I
5  made three fifty from that, so --
6      Q.   Per week?
7      A.   Per week.  I had two paychecks.
8  I mean, each time I got paid, it was like
9  three fifty.
10     Q.   Okay.
11     A.   It was every two-week pay.
12     Q.   All right.  And what about during
13 this time, your checks, were they direct
14 deposited or would you cash it?
15     A.   It was cash.
16     Q.   Cash?
17     A.   Cash.
18     Q.   Holiday Inn would pay you in
19 cash?
20     A.   No, I would cash the check.
21     Q.   Oh, okay.  I'm sorry.  And where
22 would you cash it?
23     A.   It was only a couple of times.  I

877-373-3660                                                         205-397-2397

**Exhibit J**

1 can't recall.
2    Q.   What about Marriott; where would
3 you cash that check?  Was it at a bank?
4    A.   No, I don't -- I don't believe
5 I -- I may have went to -- it was different
6 places with Marriott.  It wasn't cash.  It
7 was a check that they gave you, so --
8    Q.   All right.  And then, what about
9 Aspire Staffing; where would you -- and ASK,
10 where would you -- how was that check paid?
11 Was it direct deposit or given to you --
12    A.   It was a check for a while, and
13 it became direct deposit.
14    Q.   Who was the direct deposit bank?
15    A.   It goes to the American Express
16 card.
17    Q.   To the card?
18    A.   Correct.
19    Q.   All right.
20    A.   I would -- yes, it would be all
21 on American Express card.
22    Q.   All right.
23    A.   Yes.

1    Q.   So, what about -- you talked to
2 me about going to Alabama State right after
3 high school, and then, you talked to me about
4 going to Faulkner.
5    A.   Uh-huh.
6    Q.   Any other schooling that you've
7 taken that we haven't talked about?
8    A.   Briefly, at one point, I did, I
9 think it was Phoenix online.
10    Q.   Yeah.
11    A.   But it wasn't for me.
12    Q.   Okay.  When did you do Phoenix?
13    A.   I want to say 2000 and -- between
14 2009 and '10, like, one semester.  It was not
15 for me.
16    Q.   Why wasn't it for you?
17    A.   I kind of like the classroom
18 setting.
19    Q.   All right.  And then, what about
20 other than that?
21    A.   No.
22    Q.   Have you since gone back to
23 Faulkner?

1    A.   I have not.
2    Q.   When you were at Faulkner, were
3 you -- did you have a student loan for that?
4    A.   I did.
5    Q.   Who was that through?
6    A.   It was through the same companies
7 with the FedLoan Services.
8    Q.   FedLoans?
9    A.   If FASA, and then, you know --
10 went through the FASA application.
11    Q.   Okay.  Your interrogatories
12 listed Duke Energy.  Have you worked at Duke
13 Energy?
14    A.   I did.  I worked at Duke Energy.
15    Q.   All right.  Tell me about that.
16    A.   I worked at Duke Energy in 2007
17 briefly.
18    Q.   What did you do there?
19    A.   I was a customer service
20 representative.
21    Q.   Where are they located?
22    A.   In Executive Park.
23    Q.   In Montgomery?

1    A.   Yes.
2    Q.   All right.  And what do they do?
3    A.   It was a power company.  So, I
4 basically -- I did pretty much anything you
5 would have to do dealing with the customer.
6    Q.   Okay.  How much did you get --
7 did you earn there?
8    A.   Well, it was also hired through
9 the temp service.  So, it began at, like -- I
10 think it was, like, nine seventy-five or
11 something like that until you got hired -- if
12 you got hired on permanently.
13    Q.   What temp service?
14    A.   Rhastad.
15    Q.   Spell that for me if you can.
16 Run?
17    A.   R-h-a-s-t-a-d.
18    Q.   Rhastad Staffing?
19    A.   Correct.
20    Q.   And they're in Montgomery?
21    A.   No longer in Montgomery.
22    Q.   But used to be?
23    A.   Yes.

**Exhibit J**

Page 110

1    Q.   All right.  Let me ask you about
2  some tickets that you received.  And I'm
3  going to show you what I'll mark here as
4  Exhibit 22.
5
6         (Whereupon, Defendant's Exhibit
7         22 was marked for identification
8         and copy of same is attached
9         hereto.)
10
11   Q.   BY MR. LOGSDON:  Before I do
12  that, have you ever filed bankruptcy?
13   A.   No.
14   Q.   All right.  So, Ms. McCullough,
15  we're going to look at a couple of these
16  tickets.  And this one might take a little
17  bit more time on it, but this is one -- do
18  you see the very top there that has the date
19  on it of March 25th, 2001?
20   A.   Yes.
21   Q.   All right.  And this says -- it
22  has a vehicle description.  It says a red
23  LeBaron.  Do you remember that car?

Page 111

1    A.   I do.
2    Q.   All right.  Where'd you get that
3  car?
4    A.   It was Jeffrey Jackson's car.
5    Q.   Your son's or your --
6    A.   My daughter's father.
7    Q.   All right.  What year was that?
8    A.   You said 2001.
9    Q.   Okay.  2000 -- well, that was the
10  year of the ticket.  Was it a brand-new --
11   A.   Oh, the car?  I have no idea.  It
12  was an older car.
13   Q.   He would let you drive it?
14   A.   Right.
15   Q.   All right.  Did you pay him
16  anything to do that or he just did that?
17   A.   No.
18   Q.   Okay.  And this is a ticket for
19  not having a license.  Did you agree that you
20  didn't have a license?
21   A.   Correct.
22   Q.   Down at the bottom there, at the
23  bottom left, it says court appearance date of

Page 112

1  April 30th, 2001; do you see that?
2    A.   Yes.
3    Q.   And did you -- you understood
4  that that was when you were to show up for
5  the ticket?
6    A.   Yes.
7    Q.   Did you show up on April 30th,
8  2001?
9    A.   I can't recall.
10   Q.   You don't remember either way?
11   A.   I don't.
12   Q.   And let's flip over to the -- or
13  did you pay this ticket?
14   A.   I paid all of these tickets.
15   Q.   Did you pay --
16   A.   Eventually.
17   Q.   Okay.  Did you -- did you pay
18  this one here at the time?
19   A.   Not at the time.
20   Q.   Okay.  When you say eventually,
21  you're talking about back after you were
22  incarcerated?
23   A.   2012 --

Page 113

1    Q.   Okay.
2    A.   -- was it?
3    Q.   All right.
4    A.   '11.  '10.  2010.
5    Q.   Okay.  And let me -- let me ask
6  you about that because there's a word on
7  here, I think, that says commute.  Do you
8  know what that means?  If a sentence is
9  commuted, have you heard that?
10   A.   I have.
11   Q.   Or sit out your time?
12   A.   Right.
13   Q.   Tell me your understanding of
14  that.
15   A.   Commute, you are given days as
16  opposed to paying the fine.
17   Q.   Okay.  And when you said earlier
18  you paid all of them, you mean you were --
19  you paid them through getting days, serving
20  days; is that correct?
21   A.   And a total of twenty-two hundred
22  dollars.
23   Q.   Plus twenty-two hundred dollars?

29 (Pages 110 - 113)

**Exhibit J**

Page 114

1    A.   Correct.
2    Q.   All right.  The twenty-two
3 hundred dollars, do you remember when that
4 was paid?
5    A.   February 2nd, 2010.
6    Q.   And do you know where that was --
7 who that was paid to?
8    A.   It was paid to the courts.
9    Q.   To the court.  The Montgomery
10 Municipal Court?
11    A.   Correct.
12    Q.   All right.  Did you get a receipt
13 for that?
14    A.   Yes, at that time, yes.
15    Q.   Do you have that receipt?
16    A.   Those papers were destroyed.  So,
17 I don't have it.
18    Q.   Don't have that.  And where did
19 you -- did you pay in cash?
20    A.   It was cash, I believe, yes.
21    Q.   Do you remember who you handed it
22 to?
23    A.   I had to -- Western Union,

Page 115

1 someone outside of the city jail to make that
2 payment.  I was incarcerated.
3    Q.   Okay.  All right.  Where did the
4 funds come from?
5    A.   From the bank.
6    Q.   From what bank?
7    A.   Max Credit Union.
8    Q.   And who put the money in there?
9 Was it your money at Max?
10    A.   It was tax moneys.
11    Q.   That you had deposited there?
12    A.   Well, I had filed, and it
13 deposited, yes.
14    Q.   All right.  So, you had an
15 account with Max Credit Union?
16    A.   I did.  There were moneys from my
17 son there as well that had been collected
18 over the course of time.
19    Q.   So, Max Credit Union, is that --
20 how do you get an account with the credit
21 union like that?  Do you have to have some
22 kind of relationship with them or how does
23 that work?

Page 116

1    A.   It's a savings account.
2    Q.   Savings account?
3    A.   Right.
4    Q.   All right.  And what years did
5 you have an account at Max Credit Union?
6    A.   At that point, probably about
7 eight years.
8    Q.   So, from -- help me with the
9 years.
10    A.   From 2003 up until 2010, seven
11 years.
12    Q.   What was the -- and was it a
13 savings account and a checking account or
14 just a savings?
15    A.   Just a savings.
16    Q.   What was your highest balance you
17 ever had in there?
18    A.   Seven or eight hundred dollars.
19    Q.   Well, it had to be more than --
20    A.   It's where my son's money is
21 deposited into.
22    Q.   Okay.  But you said that this
23 payment from the Western Union was for

Page 117

1 twenty-two hundred?
2    A.   It was twenty-two hundred.
3    Q.   Okay.  So, you must have -- it
4 must have gotten to twenty-two hundred at
5 some point, right?
6       MS. WILSON:  Objection to form.
7    A.   It was a tax deposit.
8    Q.   (BY MR. LOGSDON)  Okay.  And
9 that's what I was asking.  If you just picked
10 your, you know, highest balance you ever
11 had --
12    A.   No.
13    Q.   Would seven hundred, would that
14 be kind of your average balance that you had
15 in there?
16    A.   They make a deposit in there on a
17 monthly basis, yeah.
18    Q.   Okay.  But your highest would
19 probably be around your tax refunds that we
20 talked about earlier?
21    A.   Correct.
22    Q.   Okay.  And I wrote those down,
23 those dates -- those amounts.  So, if we --

30 (Pages 114 - 117)

**Exhibit J**

1 if we look at those, that would probably be
2 your -- tell us your --
3     A.   Well, those go to an American
4 Express card --
5     Q.   Okay.
6     A.   -- usually.
7     Q.   All right.  So, let's look at --
8 on your Exhibit 22, take a look at Page 3.
9 First of all, is that your signature down at
10 the bottom?
11     A.   Yes.
12     Q.   And this references a company
13 called General Probation Service if you look
14 back up at the top in the second line; do you
15 see that?
16     A.   Yes.
17     Q.   Do you know who that is?
18     A.   I do.
19     Q.   Who is General Probation Service?
20     A.   It's where you report on a either
21 biweekly or monthly basis, and you give them
22 your money.
23     Q.   Okay.  Them being General

1 Probation Service?
2     A.   Correct.
3     Q.   All right.  And you understand
4 probation, you kind of just described it to
5 me, you report, and you pay money?
6     A.   Correct.
7     Q.   And --
8         MS. WILSON:  Objection to form.
9     Q.   (BY MR. LOGSDON)  And you report
10 to the probation officer; is that right?
11     A.   Correct.
12     Q.   Okay.  And the company that was
13 doing this in 2001 was General Probation
14 Service it looks like?
15     A.   It looks like it.
16     Q.   Okay.  And that's a different
17 company from JCS that we're talking about
18 here today, right --
19     A.   Yes.
20     Q.   -- as far as you know?
21     A.   I know now, yes.
22     Q.   All right.  At the very top line
23 of this third page of Exhibit 22, there's a

1 reference to Judge -- to a judge there.  Do
2 you recognize that name?
3     A.   Hardwick?
4     Q.   Yes.  Maybe, maybe not?
5     A.   What's the question?
6     Q.   Do you recognize -- do you know
7 Judge Hardwick?  Do you remember him?
8     A.   Yes.
9     Q.   Okay.  Then, there's a -- on
10 the -- and the probation that you were
11 telling me a little bit earlier about
12 probation in this situation in 2001 that
13 we're looking at on Page 3, the -- part of
14 probation is, if you don't do those things,
15 in other words, if you don't show up and you
16 don't pay, what happens, as you understood
17 it, back in 2001?
18         MS. WILSON:  Objection to form.
19     A.   If you don't show up, if you
20 don't pay?
21     Q.   (BY MR. LOGSDON)  Yeah.
22     A.   You get called back in court.
23     Q.   Okay.  All right.  Let's look at

1 the last page of Exhibit 22.  And there's a
2 plea part and a box checked; do you see that?
3 Kind of maybe fifth line down.  Can I come
4 around there and show it to you?  Oh.  Let's
5 see.  You've got a different -- you've got a
6 different last page than I have.  So, let's
7 move on to another exhibit.
8         All right.  Let me show you what
9 I'll mark as Exhibit 23.
10
11         (Whereupon, Defendant's Exhibit
12         23 was marked for identification
13         and copy of same is attached
14         hereto.)
15
16     Q.   (BY MR. LOGSDON)  Okay.  All
17 right.  This is -- looks like another ticket
18 dated January -- I'm sorry, October the 3rd,
19 2011.  Do you see that date at the top?
20     A.   Yes.
21     Q.   And down at the bottom there on
22 the bottom left, there's a court appearance
23 date of December 17, 2001; do you see that?

31 (Pages 118 - 121)

**Exhibit J**

Page 122

1      A.   Yes.
2      Q.   Do you know -- and this is for no
3  driver's license.  Do you dispute that you
4  had no driver's license at the time of this
5  ticket?
6      A.   I do not.
7      Q.   And so, would you have told the
8  judge you were guilty as charged?
9      A.   Yes.
10     Q.   The court appearance date, do you
11 know if you showed up for that court
12 appearance date?
13     A.   I did not recall.
14     Q.   Did you have an understanding of
15 what would happen if you didn't show up for
16 those court appearance dates back then?
17         MR. BASS:  Objection.  Calls for
18 a legal conclusion.
19     A.   I understood that there would be
20 fines.
21     Q.   (BY MR. LOGSDON)  There would be
22 what?
23     A.   Fines.

Page 123

1      Q.   Fines?  Okay.
2      A.   Yes.
3      Q.   Did you understand that one of
4  the consequences could be that there would be
5  a warrant issued for your arrest?
6          MR. BASS:  Calls for legal
7  conclusion.  Objection.
8      A.   Not at that time, no.
9      Q.   (BY MR. LOGSDON)  The reason I
10 ask that -- we'll get to one of these later,
11 but one of these documents kind of talks
12 about a conversation you had with one of the
13 officers and you said that.  You said, I was
14 worried that there were warrants out for my
15 arrest.  So, at some point, did you --
16         MS. WILSON:  Objection.
17     Q.   (BY MR. LOGSDON)  Did you --
18         MS. WILSON:  Is there a question?
19         MR. LOGSDON:  Yeah.
20     Q.   At some point, did you have an
21 understanding that if you didn't show up for
22 court, there would be a warrant for your
23 arrest?

Page 124

1      A.   What time frame was that?
2      Q.   I'll show you.  We'll move ahead
3  if you want to do that.
4      A.   Yes.
5      Q.   All right.  Let's look at what
6  we'll mark as Exhibit 24.
7
8          (Whereupon, Defendant's Exhibit
9          24 was marked for identification
10         and copy of same is attached
11         hereto.)
12
13     Q.   (BY MR. LOGSDON)  So, this looks
14 like it's dated November the 4th, 2002; do
15 you see that?
16     A.   Yes.
17     Q.   And there's a Mitsubishi Eclipse.
18 Have we talked about that car?
19     A.   We did.
20     Q.   Okay.  And there's a court date
21 on the bottom of December the 2nd.  Do you
22 know if you showed up for that court date?
23     A.   I do not recall.

Page 125

1      Q.   The charge here over on the right
2  says improper headlights.  Do you dispute
3  that you had improper headlights?
4      A.   I think my lights were not on at
5  that time.
6      Q.   Okay.  And not on, and they
7  should have been on because it was late at
8  night or something like that?
9      A.   Correct.
10     Q.   All right.  Flip over to the
11 second page of Exhibit 24.  So, you see the
12 fine that's kind of halfway down, it says
13 fifty dollars, and there's a fine?
14     A.   Right.
15     Q.   Now, look over to the right of
16 that, and there's another -- where it says
17 total -- it says cost, and there's a dash,
18 and then, it says total fine and cost, and
19 there's another fifty; do you see that?
20     A.   I do.
21     Q.   All right.  And then, do you see
22 below that, there's some additional numbers,
23 and it works its way to the bottom.  And the

32 (Pages 122 - 125)

Exhibit J

1 fifty grows to a one forty-nine; do you see
2 that?
3     A.   I do.
4     Q.   All right.  Was it your
5 understanding that those increased numbers
6 were due to not -- well, what was -- did you
7 have an understanding as to what the increase
8 in numbers were due to?
9     A.   The increase -- no.  We did --
10 that was not discussed.
11     Q.   Okay.  So, this one was fifty
12 dollars.  Did you try to pay the fifty
13 dollars?
14     A.   What year is this?
15     Q.   This would have been 2002.
16     A.   With that probationary company
17 back then, I made some payments.  I recall
18 making some payments to them.
19     Q.   To them?
20     A.   Yes.
21     Q.   All right.  All right.  So, let's
22 take a look at what I'll mark as Exhibit 25.
23

1         (Whereupon, Defendant's Exhibit
2         25 was marked for identification
3         and copy of same is attached
4         hereto.)
5
6     Q.   (BY MR. LOGSDON)  This is a
7 charge of harassment; do you see that?
8     A.   Yes.
9     Q.   And it was in 2002?
10     A.   Correct.
11     Q.   And did you plead guilty to that?
12     A.   I did.  I wanted to get out.
13     Q.   Excuse me?
14     A.   I wanted to be released.
15     Q.   Okay.  Tell me about that.  Did
16 you post bond?
17     A.   No.  I don't believe I -- I don't
18 believe I posted bond.  I just pleaded
19 guilty.
20     Q.   Okay.  And do you think you were
21 guilty of that?
22     A.   Definitely not.
23     Q.   Okay.  Why did you plead guilty?

1     A.   I wanted to get out.
2     Q.   Tell me about that.
3     A.   The situation?
4         MR. BASS:  Objection.  Vague.
5     Q.   (BY MR. LOGSDON)  Go ahead.
6     A.   If you plead guilty, you would
7 most likely be released.
8     Q.   That was what the judge did?
9     A.   Yes.
10     Q.   Okay.  Do you remember what judge
11 that was?
12     A.   Judge Les Hayes.
13     Q.   Okay.  All right.  And how did
14 you come to that opinion that Judge Hayes
15 would do that?
16         MR. BASS:  Objection.  Calls for
17 speculation about Judge Hayes' motivation.
18     Q.   (BY MR. LOGSDON)  You can answer.
19     A.   Because I had not been in --
20 actually, the bailiff -- the bailiff told
21 him, she's not guilty, so -- but she says
22 she's going to plead guilty.  So, he just
23 went with it.

1     Q.   The judge's bailiff?
2     A.   The judge's bailiff.
3     Q.   Okay.
4     A.   I was pregnant with my daughter
5 at the time and it was my birthday as well.
6     Q.   On that day?
7     A.   On that day.
8     Q.   All right.  All right.  Let's
9 look at -- I'll show you another exhibit here
10 that I'll mark as 26.
11
12         (Whereupon, Defendant's Exhibit
13         26 was marked for identification
14         and copy of same is attached
15         hereto.)
16
17     Q.   (BY MR. LOGSDON)  Okay.  This is
18 an arrest warrant, and it says giving false
19 identity to a law enforcement officer; do you
20 see that?
21     A.   Yes.
22     Q.   Do you remember getting arrested
23 for that?

33 (Pages 126 - 129)

**Exhibit J**

1    A.   I do.
2    Q.   This is the one we were talking
3 about just a minute ago --
4    A.   Uh-huh.
5    Q.   -- where at least this report
6 says that you told the officer that -- you
7 gave them the name Angela -- you gave them a
8 different name, and you said you were afraid
9 you had some warrants out?
10   A.   I did.
11   Q.   Excuse me?
12   A.   I did.
13   Q.   Okay.  And so, at least at that
14 point, you knew that if you didn't show up
15 for court that there could be some warrants
16 for your arrest?
17   A.   That was --
18        MS. WILSON:  Objection to form.
19   Q.   (BY MR. LOGSDON)  Excuse me?
20   A.   That was in 2005.  I had been --
21   Q.   Okay.
22   A.   -- arrested by then before.
23   Q.   Okay.  So, at that point -- you

1 asked me before when the date was that --
2 because --
3    A.   Okay.
4    Q.   And maybe you and I were trying
5 to -- you were trying to --
6    A.   Right.
7    Q.   -- think of that.
8        So, it would have been at least
9 at this point --
10   A.   It was 2001.  That was 2005.
11   Q.   Okay.  And so, here, you knew
12 that if you didn't show up for court, then,
13 there could be a warrant out for your
14 arrest --
15        MS. WILSON:  Objection to form.
16   Q.   (BY MR. LOGSDON)  -- Correct?
17   A.   Correct.
18   Q.   And you're not disputing that you
19 gave them that false name?
20   A.   No.
21   Q.   All right.  And you're not
22 surprised that that's against the law to give
23 a false name to a law enforcement officer?

1    A.   I was surprised --
2        MS. WILSON:  Objection to form.
3    A.   -- to get arrested when I didn't
4 have any warrants.
5    Q.   (BY MR. LOGSDON)  Okay.  I asked
6 you a little different question.  You're not
7 surprised that that's a punishable offense,
8 to give a false name to a law enforcement
9 officer?
10   A.   Not surprised.
11        MS. WILSON:  Objection to form.
12   Q.   (BY MR. LOGSDON)  And just you,
13 as a citizen, would agree that that's a good
14 law and a good rule that folks ought to give
15 the correct name to a law enforcement
16 officer?
17        MS. WILSON:  Objection.  And
18 you're testifying now.
19   Q.   (BY MR. LOGSDON)  Correct?
20   A.   Correct.
21   Q.   All right.  It says there --
22 here, there's a reference to you being
23 employed at Econo Lodge?

1    A.   Yes.
2    Q.   I don't think we've talked about
3 Econo Lodge.
4    A.   No, that was a brief employment,
5 yes.
6    Q.   All right.  How long were you at
7 Econo Lodge?
8    A.   Maybe -- Econo Lodge.  What year
9 was that?
10   Q.   This was -- looks like it was
11 2004, 2005.  The warrant was in January of
12 2004.  So, maybe this was just 2004.
13   A.   Just 2004 for a few months.
14   Q.   At Econo Lodge?
15   A.   Yes.
16   Q.   All right.  Flip over to the last
17 page of this Exhibit 26.  And it says
18 there -- there's a judge down at the bottom
19 where it says adjudication.  Do you recognize
20 that signature?
21   A.   I do --
22        MR. BASS:  Objection.
23   Q.   (BY MR. LOGSDON)  Excuse me?

34 (Pages 130 - 133)

**Exhibit J**

Page 134

1    A.    I do not.
2    Q.    Do you remember what judge you
3  went -- you just told me it was Judge Hayes;
4  is that right?
5    A.    Yes --
6    Q.    Okay.
7    A.    -- it was.
8    Q.    So, did you pay any money at this
9  time?
10    A.    What year was this?
11    Q.    2004.
12    A.    I don't recall.
13    Q.    Excuse me?
14    A.    I don't recall.
15    Q.    All right.  All right.  Let me
16  show you what I'll mark as Exhibit 27.
17
18          (Whereupon, Defendant's Exhibit
19          27 was marked for identification
20          and copy of same is attached
21          hereto.)
22
23    Q.    (BY MR. LOGSDON)  At the top of

Page 135

1  this one, it says Professional Probation
2  Services.  Do you remember working with them?
3    A.    Yes.
4    Q.    Okay.  And so, this is 2004.  We
5  looked -- we were looking back earlier.  I
6  think that was 2001 at another probation.
7  Fair to say that, at this point, you were
8  familiar with the probation way that this was
9  working?
10        MS. WILSON:  Objection to form.
11    A.    I became familiar that you paid
12  them a fee --
13    Q.    (BY MR. LOGSDON)  Okay.
14    A.    -- that did not go towards your
15  balance.
16    Q.    All right.  And the -- this is
17  what's called a delinquency report.
18    A.    Uh-huh.
19    Q.    And do you understand what that
20  means when it says delinquency?
21    A.    I do.
22    Q.    What is your understanding of
23  that?  Or what was your understanding of that

Page 136

1  then?
2    A.    My understanding of it now with
3  delinquency is that you -- you're delinquent.
4  You're delinquent on payments.
5    Q.    Okay.  And this talks about
6  payment, and then, it talks about failing to
7  report; do you see that?
8    A.    Yes.
9        MR. BASS:  Counsel, if she could
10  have time to review the report if you're
11  going to talk about it in total.
12    Q.    (BY MR. LOGSDON)  Would you like
13  a minute to look at it?  And really the part
14  I was asking you about now is just that
15  circumstances of delinquency, if you want to
16  take a look at that.
17    A.    Okay.
18    Q.    All right.  So, one of the things
19  it says there is that you failed to report.
20  Do you dispute that you failed to report?
21    A.    This is -- what year is this?
22    Q.    2004.
23        MR. BASS:  Where are you

Page 137

1  referring to, Counsel, in the document?
2        MR. LOGSDON:  Top right is the
3  date I'm looking at of the first page.
4    A.    I made some payments to this
5  company.
6    Q.    (BY MR. LOGSDON)  Yeah, and I was
7  asking you what about reporting, is this --
8  would you --
9    A.    That's how you make your
10  payments.
11    Q.    You made payments.  And this says
12  that you failed to report on certain number
13  of days.  Do you dispute --
14    A.    I dispute with this particular
15  company, yes, I dispute that.
16    Q.    All right.
17    A.    This is the -- what's the name of
18  this company again?
19    Q.    Professional Probation Services,
20  Inc.
21    A.    Yeah, that previous company, yes,
22  I did report with them.
23    Q.    All right.  This is Judge Massey,

35 (Pages 134 - 137)

Exhibit J

Page 138

1 if you look back at the top right, the very
2 top.
3    A.   I've never been before Judge
4 Massey.
5    Q.   You don't remember him?
6    A.   I've never been before Judge
7 Massey.
8    Q.   Okay.  Do you know all the judges
9 you've been before in Montgomery?
10    A.   Judge Hayes.
11    Q.   Only one?
12    A.   Only one.
13    Q.   Okay.  How many times have you
14 been before Judge Hayes?
15    A.   Probably around four or five
16 times.
17    Q.   Okay.  And we've kind of been
18 talking about time periods during this whole
19 thing.  What time periods did you go before
20 Judge Hayes or what --
21    A.   I went before Judge Hayes -- in
22 each of these arrests, I went before Judge
23 Hayes.

Page 139

1    Q.   Okay.
2    A.   So, the time frames are right
3 there.
4    Q.   All right.  And was it kind of
5 the same story each time you went or what?
6       MR. BASS:  Objection.  Vague.
7 Calls for a narrative.
8    A.   It changed once Todd Strange
9 became mayor.
10    Q.   (BY MR. LOGSDON)  Okay.  When did
11 Todd Strange became mayor?
12    A.   2003 or 4, somewhere in there.
13    Q.   All right.  So, tell me how it
14 changed when Todd Strange became mayor.
15    A.   Judge Les Hayes gave everybody a
16 lengthy time incarceration in the city jail.
17       THE COURT REPORTER:  Can I get
18 you to speak up just a bit?
19       THE WITNESS:  Yes.
20    A.   To repeat my answer, you started
21 receiving lengthy sentences.
22    Q.   (BY MR. LOGSDON)  When?  When did
23 you start receiving lengthy sentences?

Page 140

1    A.   After Strange became mayor.
2    Q.   All right.  Let me show you what
3 I'll mark as Exhibit 28.
4
5       (Whereupon, Defendant's Exhibit
6       28 was marked for identification
7       and copy of same is attached
8       hereto.)
9
10    Q.   (BY MR. LOGSDON)  The sentencing,
11 though, was always by Judge -- each time, was
12 by Judge Hayes?
13    A.   Correct.
14    Q.   Judge Hayes was the one that was
15 making the decisions and telling you the
16 sentence; is that -- is that right each time?
17    A.   Correct.
18    Q.   All right.  All right.  So, this
19 is something at the top that's entitled
20 Notice to Show Cause for Failure to Pay Fine,
21 Costs, Restitution, or Other Costs; do you
22 see that?
23    A.   Yes.

Page 141

1    Q.   And --
2       MS. HOLLIDAY:  What Bates stamp
3 page are you on?
4    Q.   (BY MR. LOGSDON)  Do you remember
5 getting this or do you know if you got this?
6 I'll tell you what, let's do this:  Let's
7 look at the second page of it.  And I just
8 want to ask you one thing about the second
9 page.
10       MS. MORGAN:  What exhibit?
11       MR. BASS:  28.
12    Q.   (BY MR. LOGSDON)  The second page
13 there, there's a -- this looks to be a --
14 well, it's something entitled Defendant
15 Payout Worksheet.  And it looks like
16 somebody's attempted to go through your
17 tickets and show the amount you paid on
18 those.
19       MR. BASS:  Objection to form.
20 Characterizes the exhibit.  No facts in
21 evidence.
22    Q.   (BY MR. LOGSDON)  And then,
23 there's some amounts at the bottom, some

36 (Pages 138 - 141)

**Exhibit J**

1 totals and things like that. First question,
2 do you know if you ever got this or saw this
3 like when you went to the court, the court
4 would show it to you?
5    A.   This is 2004?
6    Q.   Yes.
7    A.   I don't remember having this.
8    Q.   Okay. Fair enough. And down at
9 the bottom there, there's a category -- do
10 you mind if I walk around just to show you
11 what I'm looking at because there's a lot of
12 numbers on this page? So, there's a listing
13 there. Let's hold it down so your lawyer can
14 see where I'm pointing at. There's a
15 category that says amount paid.
16    A.   Uh-huh.
17    Q.   And then, a total that says total
18 amounts paid. And then, there's some
19 listings of some payments in there. Do
20 you -- as you look at that, do you have any
21 reason to agree or disagree with any of those
22 numbers there?
23       MR. BASS: Objection.

1    A.   I don't understand what I'm
2 looking at.
3    Q.   (BY MR. LOGSDON) Okay. Let's
4 look at just one of them. We'll look at the
5 first one. This is a ticket in 2002. And
6 the fine is a hundred and twenty-five; do you
7 see that?
8    A.   Right.
9       MR. BASS: Objection. It says
10 case number. It doesn't say ticket.
11    Q.   (BY MR. LOGSDON) Yeah, it
12 says -- lists the case number there related
13 to a ticket.
14       MR. BASS: Objection.
15    Q.   (BY MR. LOGSDON) All right. And
16 then, there's a fine of a hundred and twenty-
17 five. And then, it says amount paid, zero on
18 that, but there's a credit of a hundred and
19 twelve. And I just wanted to see on any of
20 these -- these are all listing amounts paid.
21 Do you have any reason to agree with or
22 dispute any of that?
23       MR. BASS: Objection. There's no

1 evidence about how this document was produced
2 or how it was compiled.
3    A.   I don't -- I don't have an answer
4 for you.
5    Q.   (BY MR. LOGSDON) Okay. I think
6 you might have cleared up a lot of things
7 when you told me earlier -- well, all right.
8 Let's look at Exhibit 29.
9
10       (Whereupon, Defendant's Exhibit
11       29 was marked for identification
12       and copy of same is attached
13       hereto.)
14
15    Q.   (BY MR. LOGSDON) Okay. This is
16 dated April 8 of 2006, and it's a ticket for
17 no proof of insurance. Do you remember this?
18    A.   Yes, it was in the Cherokee.
19    Q.   Okay. It was in the Cherokee up
20 top. And you told me about the Cherokee
21 earlier. That was a car that I think Mr.
22 Jackson --
23    A.   My brother.

1    Q.   Your brother let you use. Okay.
2       And do you agree there was no
3 proof of insurance for that car?
4    A.   Yes.
5    Q.   And so, are you saying you had
6 insurance but your brother didn't or what?
7       MS. WILSON: Objection to form.
8    Q.   (BY MR. LOGSDON) How did this
9 come about?
10    A.   There was -- there was no
11 insurance on the vehicle. The vehicle --
12    Q.   Okay.
13    A.   -- was not insured.
14    Q.   And it looks like there was an
15 accident that occurred where all this came
16 about --
17    A.   Correct.
18    Q.   -- do you remember that?
19       There's a traffic report and an
20 accident. And do you remember that?
21       MR. BASS: What document are you
22 referring to, Counsel?
23       MR. GILL: The third page.

37 (Pages 142 - 145)

**Exhibit J**

Page 146

1    Q.   (BY MR. LOGSDON)  Do you remember
2  the accident?
3    A.   I do.
4    Q.   And the police report, though, we
5  have here says that you were the cause of the
6  accident; do you dispute that?
7    A.   I dispute it, but they didn't.
8    Q.   Excuse me?
9    A.   I dispute it, but they -- the
10  police did not.
11    Q.   Okay.  But, in any case, there
12  was an accident.  And then, if we flip over
13  to the last page of the exhibit, do you know
14  if a judgment was entered against you by the
15  driver of that car?
16    A.   At some point, yes.
17    Q.   All right.  And you were working
18  at the Holiday Inn at the time, it looks
19  like; is that --
20    A.   Right.
21    Q.   -- right?
22         Did you pay the ticket for no
23  insurance?

Page 147

1    A.   At some point, yes, I did.
2    Q.   Okay.  And I think you've told me
3  about your payment --
4    A.   Correct.
5    Q.   -- your commuting and then the
6  payment you made, so -- but not right at this
7  time, correct?
8    A.   No.
9    Q.   Do you know if you showed up for
10  the court appearance date on the bottom?
11         MR. BASS:  Again, where are you
12  referring?
13         MR. LOGSDON:  Bottom left.
14    A.   What page?
15    Q.   (BY MR. LOGSDON)  First page.
16  Yeah.  Sorry about that.  We're switching
17  pages.  But bottom left there, it's a June 7,
18  2006, date for the court appearance.
19    A.   I'm not sure.
20    Q.   And is that your signature down
21  there at the bottom below where it says I
22  promise to appear in court?
23    A.   It says defendant signature?

Page 148

1    Q.   Yes.
2    A.   Yes, that's my signature.
3    Q.   Okay.  Here's Exhibit 30.
4
5         (Whereupon, Defendant's Exhibit
6         30 was marked for identification
7         and copy of same is attached
8         hereto.)
9
10    Q.   (BY MR. LOGSDON)  This is dated
11  September the 20th.  And there's a white
12  Honda Prelude.
13    A.   Uh-huh.
14    Q.   I don't think we've talked about
15  the Honda Prelude, have we?
16    A.   No, we haven't.
17    Q.   All right.  Tell me about the
18  Honda Prelude.
19    A.   It was something given to me by
20  my uncle.
21    Q.   What's your uncle's name?
22    A.   Willie Fuller.
23    Q.   Would he give you things from

Page 149

1  time to time here and there?
2    A.   No.
3    Q.   Where did he live?
4    A.   He lives in Regency Park.  He
5  owns a house in Regency Park.
6    Q.   Okay.  Do you know -- so, this
7  was yours, though?  He gave it to you, the
8  Prelude?
9    A.   It wasn't registered at the time.
10    Q.   Excuse me?
11    A.   It had not been registered, but,
12  yes, it was.
13    Q.   All right.  What year was the
14  Prelude?
15    A.   It was an older model.  This was
16  2008.  It could have been like '89 or '90.
17    Q.   All right.  And this is a charge
18  for no driver's license.  You agree you
19  didn't have a driver's license at that time?
20    A.   Yes, this was a road -- this was
21  a roadblock stop.
22    Q.   Okay.  And you agree you didn't
23  have a driver's license?

38 (Pages 146 - 149)

**Exhibit J**

Page 150

1    A.   Right.
2    Q.   And do you think that's a good
3 rule, to have a -- require a driver's
4 license?
5        MR. BASS:  Objection.
6        MS. WILSON:  Objection.
7    Q.   (BY MR. LOGSDON)  Yeah.  And let
8 me -- let me elaborate on that a little bit
9 because you're here today.  And as I
10 understand it, you're a plaintiff in a class
11 action lawsuit where you're going to
12 represent a class; is that -- is that your
13 understanding?
14    A.   Okay.  Yes.
15    Q.   Okay.  And so, I just want to ask
16 you some -- some of my questions are in that
17 respect.  I just want to see what your
18 opinions are about things and about you in
19 that role.  So, do you think that's a good
20 rule to require a driver's license?
21        MR. BASS:  Objection again.
22        MS. WILSON:  Objection.  Vague.
23        MR. BASS:  Calls for a legal

Page 151

1 conclusion.
2    A.   My understanding is --
3        MR. BASS:  And that's not part of
4 the lawsuit.
5    A.   -- that you're not -- you -- if
6 you're using your vehicle for work-related
7 purposes and different purposes, you're not
8 required to have a driver's license.
9        That's what the law says.
10    Q.   (BY MR. LOGSDON)  Okay.  You
11 don't have to have a driver's license --
12    A.   No.
13    Q.   -- as long as you're using your
14 vehicle for --
15    A.   Yes.  That's what the law I've
16 seen.
17    Q.   Okay.  And did you ever tell the
18 judge that?
19    A.   No.
20    Q.   All right.  And the next -- Page
21 2 of this says no proof of insurance.  Do you
22 agree you didn't have proof of insurance at
23 the time?

Page 152

1    A.   The car wasn't registered at the
2 time.
3    Q.   The car was not registered?
4    A.   Not at the time.  I had recently
5 got it.
6    Q.   Okay.  How long had you had it?
7    A.   Huh?
8    Q.   How long had you had it?
9    A.   I'd had it for a while.  It was
10 not in working condition, so -- it was just
11 up and running.  And I had it for a while.
12 I'm not -- can't really recall.  It had some
13 issues.
14    Q.   The car had some issues?
15    A.   It did.
16    Q.   Let me show you what I'll mark as
17 Exhibit 31.
18
19        (Whereupon, Defendant's Exhibit
20        31 was marked for identification
21        and copy of same is attached
22        hereto.)
23

Page 153

1    Q.   (BY MR. LOGSDON)  All right.  And
2 do you remember at some point -- we talked
3 about this a little bit earlier.  But do you
4 remember at some point getting credit for
5 days in jail?  Or let me back up and ask it a
6 different way.
7        Do you remember your first time
8 getting arrested?  Do you remember when that
9 was?
10    A.   It was November, 2009.
11    Q.   Excuse me?
12    A.   November 27th, 2009.
13    Q.   And do you -- did you serve time
14 in jail at that time?
15    A.   Sixty-six days.
16    Q.   Okay.  And did you get jail
17 credit for those sixty-six days?
18    A.   I believe so.
19    Q.   Was it Judge Hayes that sentenced
20 you to jail?
21    A.   Yes.
22    Q.   The municipal court judge?
23    A.   Yes.

39 (Pages 150 - 153)

**Exhibit J**

Page 154

1    MR. GILL: I'm just probably
2 getting older. Did you say sixty-two or
3 sixty-six days?
4    THE WITNESS: It was sixty -- I
5 believe it was sixty-six days.
6    MR. GILL: I just wanted to be
7 sure I heard correctly. Thank you.
8    Q. (BY MR. LOGSDON) Okay. Do you
9 know how much credit you got for jail days,
10 like, how much per day?
11    A. I did about eighteen hundred
12 dollars of that charge.
13    Q. All right.
14    A. Of those charges. It was
15 eighteen hundred and fifty -- one thousand,
16 eight hundred fifty dollars.
17    Q. So, if we divide one thousand,
18 eight hundred and fifty by sixty-six, that'll
19 be the daily --
20    A. No, I paid twenty-two hundred to
21 get out.
22    Q. That's when you paid the twenty-
23 two hundred?

Page 155

1    A. Right.
2    Q. Okay. And so, if we want to see
3 the date of the twenty-two hundred that that
4 was paid, would it be sixty-six days after
5 November 27, 2009?
6    A. February 2nd.
7    Q. Okay. Of 2010?
8    A. Of 2010.
9    Q. And we talked about this a little
10 bit. Let me make sure I'm clear. That
11 twenty-two hundred that you paid, was that
12 all your money from -- you had from the
13 savings account or did anybody --
14    A. It was tax money as well.
15    Q. Tax refund money?
16    A. Correct.
17    Q. Okay. But it was all --
18    A. My --
19    Q. -- Angela McCullough's money?
20    A. No, it was partially my disabled
21 son's money.
22    Q. Okay. Anything else? Did
23 anybody else contribute any money to that

Page 156

1 twenty-two hundred?
2    A. Not at all.
3    Q. All right. Your disabled son,
4 where did he get money?
5    A. From SSI. It was being deposited
6 the whole time I was in there. So, that was,
7 like, three months' worth at that time.
8    Q. How much did he get per month?
9    A. It was like seven fifty at the
10 time.
11    Q. Okay. Seven fifty per month?
12    A. Correct.
13    Q. Did that fluctuate, go up or down
14 or --
15    A. No.
16    Q. Stayed about the same?
17    A. Every month.
18    Q. And does he still get that?
19    A. Yes.
20    Q. All right. When you get those
21 checks from Social Security, do they -- how
22 does -- does it go straight to the account,
23 is it a check, how does that work?

Page 157

1    A. Straight to the account.
2    Q. All right. Is that something you
3 could just -- and that would go to the Max
4 Credit Union account?
5    A. Correct.
6    Q. I assume you got -- you're still
7 getting that, so I assume you got a document
8 on that; is that --
9    A. I can get one.
10    Q. Okay.
11    MR. BASS: You have some of those
12 documents along with --
13    MR. LOGSDON: I think I do.
14    MR. BASS: -- some of those that
15 you already talked about.
16    MR. LOGSDON: Yeah, I think I do
17 have one of those.
18    A. You should have all the documents
19 we talked about earlier.
20    Q. (BY MR. LOGSDON) All right. I
21 know that you mentioned in your complaint or
22 your interrogatories about your son -- the
23 judge -- one of the probate judges ordering

40 (Pages 154 - 157)

**Exhibit J**

Page 158

1 or issuing an order with regard to your
2 son --
3      A.   (Witness nods head.)
4      Q.   -- related to the arrest.
5           Was that at this arrest here that
6 we're talking about --
7      A.   No.
8      Q.   -- incarceration in November?
9      A.   No.
10     Q.   Which one was that?
11     A.   2013 arrest.
12     Q.   2013 arrest?
13     A.   Correct.
14     Q.   Do you remember the date in 2013?
15     A.   July 3rd.
16     Q.   And how long were you
17 incarcerated?
18     A.   From -- twenty-one days.
19     Q.   While we're on that, the arrest,
20 do you remember any other jailings other than
21 these two instances, one that started in
22 November of 2009 and the second that started
23 in July of 2013?

Page 159

1      A.   I remember, at some point, I was
2 stopped in Elmore, and they transferred me to
3 the City for two tickets.  But somewhere in
4 there -- I can't remember exactly the time
5 frame, but it was more of the same.  I did
6 four days for those two tickets.
7      Q.   And that was Elmore County?
8      A.   Right.
9      Q.   Okay.  Was it in the Elmore
10 County city -- well, was it the county
11 judge --
12     A.   It was --
13     Q.   -- county court?
14     A.   Well, they -- it wasn't -- I
15 didn't even go to court.  I was just -- the
16 police officer --
17     Q.   Brought you in?
18     A.   -- brought me to Montgomery.
19     Q.   Oh, he brought you to Montgomery?
20     A.   Right.
21     Q.   All right.  But this was the
22 Elmore County police officer?
23     A.   Yeah, they had nothing to do with

Page 160

1 it.  They just transferred me to the city in
2 Montgomery.
3      Q.   Okay.  What city in Elmore County
4 were you in?
5      A.   I don't know.  I was riding
6 through.  I went the wrong way, and I ended
7 up in the wrong area.  And they stopped me
8 and questioned me and said, well, you have
9 two tickets from up here.  They took me in.
10     Q.   What were you doing in Elmore
11 County?
12     A.   My daughter-in-law and my son
13 stay up that way.
14     Q.   Where do they stay?
15     A.   In Wetumpka area.  But I'm a bad
16 driver, I guess.
17     Q.   That's an easy place to get lost,
18 in Elmore County around Wetumpka.
19     A.   (Witness nods head.)
20     Q.   What son --
21     A.   Lance McCullough.
22     Q.   -- stays there?
23     A.   Yes.

Page 161

1      Q.   All right.  Do you remember the
2 year that this was?
3      A.   I don't.  It may have been 2011.
4 It was a brief stay in the city on that.
5 Again, Judge Hayes.
6      Q.   Did you go before Judge Hayes --
7 it sounds like the police officer -- well,
8 Judge Hayes is the one that --
9      A.   The police officer --
10     Q.   -- had you in jail?
11     A.   -- took me to the city.
12          I saw Judge Hayes.
13     Q.   Okay.  So, Judge Hayes is the one
14 that sentenced you to jail that time?
15     A.   Yes.
16     Q.   Okay.  In other words, the police
17 officer just said, I'm taking you to Judge
18 Hayes, let him decide what to do?
19     A.   No, he said, I'm taking you to
20 the city jail.
21     Q.   Okay.  And Judge Hayes made his
22 decision?
23     A.   Right.

41 (Pages 158 - 161)

**Exhibit J**

Page 162

1   Q.   All right.
2        MR. LOGSDON:  Do y'all want to
3   take just a minute break, a few minutes?
4
5        (Whereupon, a brief recess was
6        taken.)
7
8        (Whereupon, Defendant's Exhibit
9        32 was marked for identification
10       and copy of same is attached
11       hereto.)
12
13   Q.   (BY MR. LOGSDON) Okay. Ms.
14  McCullough, I placed in front of you what
15  we've marked as Exhibit 32. And these are
16  just what appear to be some warrants. And
17  really what I was getting these for is to
18  talk about what we were just talking about,
19  and that was the arrest dates. Because if
20  you look at the bottom right of these series
21  of arrest warrants, there's a date in the
22  bottom right corner for various tickets of
23  November 30th and 29th of 2008. And you said

Page 163

1   that you were arrested in 2009?
2        A.   Yes.
3        Q.   Okay. And that doesn't mean that
4   these -- sometimes these warrants will be out
5   for a year or so. But do you think that this
6   is what you were arrested for, these warrants
7   that we have in front of you? Would that
8   match up with the dates and days --
9        MR. BASS:  Counsel, if you could
10  give her a minute to review --
11       MR. LOGSDON:  Sure.
12       MR. BASS:  -- the documents.
13       MR. LOGSDON:  Uh-huh.
14       A.   Okay. This looks like the -- it
15  may have been the year of 2008 --
16       Q.   (BY MR. LOGSDON) Right.
17       A.   -- that I was arrested as opposed
18  to 2009.
19       Q.   So, let me clarify that. This is
20  when the arrest warrant was issued. So, that
21  doesn't mean you were arrested right when the
22  warrant was issued. In fact -- and I don't
23  know, but sometimes it will -- it will take

Page 164

1   awhile, you know, take till 2009 to get
2   arrested.
3        I was just showing you these to
4   see if they refresh your memory as to
5   anything or, you know -- you remember being
6   arrested because you told me the date right
7   off. You remember being arrested November
8   27th, 2009, correct? Is that right?
9        A.   That's correct.
10       Q.   Okay. And you don't remember
11  getting arrested in 2008, do you?
12       A.   I have to make sure of the year.
13       Q.   Okay.
14       A.   These are old offenses. And the
15  arrest date is November 30th, 2000 --
16       Q.   No, that's not the arrest date.
17  That's the date that the warrant was issued.
18  So, in other words, that's when the judge
19  issued the warrant to go arrest. And it
20  could have been that the arrest -- it took
21  awhile to arrest you. But I was just showing
22  them to see if they refresh your memory as to
23  anything. Maybe you look at these and say it

Page 165

1   was earlier, maybe you look at these and say,
2   I still think it was -- and where did you
3   get -- you said November 27, 2009. How do
4   you remember that date?
5        MR. BASS:  Objection. There was
6   testimony. Compound questions, vague
7   questions. It's unclear if there's even a
8   question specifically on the table. There
9   are six documents within this contained
10  exhibit. Are you questioning her about any
11  particular document?
12       Q.   (BY MR. LOGSDON) Yeah. So, just
13  trying to refresh your memory as to these.
14  And my question was: On November 27, 2009,
15  you said that was the date you got arrested.
16  How do you remember that date?
17       A.   It was a couple of days after
18  Thanksgiving.
19       Q.   Okay. And the year 2009, how do
20  you remember the year?
21       MR. BASS:  Objection. The year
22  2009 followed 2008.
23       MR. GILL:  By golly, it did.

42 (Pages 162 - 165)

Exhibit J

1     Q.   (BY MR. LOGSDON)  You can answer.
2 That's just your best memory as to the date?
3     A.   Yes, that's my --
4     Q.   Okay.  Fair enough.
5     A.   -- best memory --
6     Q.   Fair enough.
7     A.   -- of the date.
8     Q.   Okay.  And Exhibit 31, they also
9 have in them another box that says failed to
10 appear; do you see that?
11     A.   Yes.
12     Q.   And the first -- well, all of
13 these list a fail to appear date of June 7,
14 2006.  And do you have any reason to dispute
15 that you did fail -- or did not fail to
16 appear -- strike that and let me ask it a
17 different way.
18         Do you know whether or not you
19 appeared June 7, 2006, for a court date?
20         MR. BASS:  What page are you on,
21 Counsel?
22         MR. LOGSDON:  Each page.  It's
23 on -- the same on each page.  I think that's

1 a different exhibit.
2         MR. BASS:  You referred to 31
3 just now.  Are you on 31 or 32?
4         MR. LOGSDON:  32.  Yes.
5     A.   These earlier dates, 2001 -- some
6 of these dates -- I'm sure that I did appear
7 on some of these dates, some of these
8 tickets.
9     Q.   (BY MR. LOGSDON)  Okay.  All
10 right.  Do you know if you appeared on June
11 7, 2006, for a court date?
12     A.   I can't recall whether I --
13     Q.   All right.  Fair enough.  All
14 right.  Thanks.
15         Let me show you what I'll mark as
16 Exhibit 33.
17
18         (Whereupon, Defendant's Exhibit
19          33 was marked for identification
20          and copy of same is attached
21          hereto.)
22
23     Q.   (BY MR. LOGSDON)  This is a

1 ticket for no child restraint.  Do you
2 remember getting that ticket?
3     A.   Yeah.
4     Q.   And do you dispute that you did
5 not have proper child restraint?
6     A.   I had it, but my five-year-old
7 had simply not unbuckled herself.  So, yeah,
8 I dispute what happened, but that was at a
9 roadblock stop.
10     Q.   All right.  Did you tell the
11 judge that?
12     A.   No, we just -- I just pleaded
13 guilty.
14     Q.   All right.  Down at the bottom,
15 it's got a court appearance date just above
16 your signature of April 5th, 2010.  Do you
17 know if you showed up in court?
18     A.   April 5th?  This was after the
19 release?
20     Q.   Excuse me?
21     A.   I got paid out?
22     Q.   Do you know if you showed up on
23 that date?

1     A.   I believe I did --
2     Q.   Okay.
3     A.   -- show up for that date, yes.
4     Q.   All right.  When you -- okay.
5 Let me ask you about -- do you remember a
6 suit being brought to you -- brought against
7 you by a company called Cash Mart, Inc.?
8     A.   Cash Mart, Inc.
9     Q.   It sounds like a check cashing
10 card or a payday loan company.  Does that
11 ring a bell?
12     A.   It may be Cash Mart, Inc.
13     Q.   Located on 2651 East South
14 Boulevard?
15     A.   Yes.
16     Q.   Do you remember them?
17     A.   Yes.
18     Q.   All right.  And do you -- was
19 Cash Mart, Inc., the one you -- the pawn shop
20 you used or --
21     A.   No.
22     Q.   -- this is a different company?
23     A.   No.

43 (Pages 166 - 169)

**Exhibit J**

1    Q.    What did you go to Cash Mart,
2 Inc., for?
3    A.    There was a loan of a hundred
4 dollars.
5    Q.    Okay.  And what did you use the
6 proceeds of that for?
7    A.    I don't know.  Groceries,
8 something like that.
9    Q.    All right.  All right.  Let me
10 show you what I will mark as Exhibit 34.
11 I'll tell you what, let's not even mark that.
12 Hand me that back.
13    A.    (Witness complies.)
14    Q.    I might come back to this later.
15 And let me show you another exhibit -- well,
16 do you remember at some point being placed on
17 probation by one of the judges with JCS?
18    A.    Les Hayes.
19    Q.    Judge Hayes is the one that
20 placed you on probation?
21    A.    Right.
22    Q.    All right.  And do you remember
23 that?

1    A.    Yeah, it was after I paid twenty-
2 two hundred dollars --
3    Q.    Okay.
4    A.    -- to be released.
5    Q.    So, let me show you some
6 documents that maybe will refresh your memory
7 as to the dates that we can look at.
8    A.    Uh-huh.
9    Q.    And I'll show you Exhibit 34
10 here.
11
12         (Whereupon, Defendant's Exhibit
13         34 was marked for identification
14         and copy of same is attached
15         hereto.)
16
17         MR. LOGSDON:  I'm missing a copy
18 of this.  Let's either make one or -- here,
19 look on with me and I'll --
20         MR. GILL:  What's this number?
21         MR. LOGSDON:  34.
22         MR. GILL:  And it consists of
23 three pages?

1         MR. LOGSDON:  Yeah.  I'll let you
2 look on with me.  Here it is.
3    Q.    All right.  This is a -- I'll
4 represent to you that this is a document
5 printed from JCS's system called Probation
6 Tracker.  And I'd like to look at it just to
7 see on dates here.  The first date at the top
8 left says sentence date of 11/7/2010; do you
9 see that?
10    A.    Yes.
11    Q.    Do you remember going before
12 Judge Hayes on November the 7th, 2010, and
13 him placing you on probation with JCS?
14    A.    I think this was the incident
15 when I was transported from Elmore to the
16 City of Montgomery on two tickets.
17    Q.    Okay.  Maybe, maybe not, it
18 sounds like?
19    A.    It sounds like.  I believe that
20 it was that incident.
21    Q.    All right.  So, tell me
22 everything you remember about talking with --
23 or tell me what you remember about court that

1 day with Judge Hayes before you were placed
2 on JCS.
3    A.    He gave me four days for the
4 prior tickets, which I did not understand if
5 I paid twenty-two hundred dollars to --
6 thirty-eight hundred dollars to get out of
7 the city jail, why did I walk away with all
8 of these tickets?  And he said my balance was
9 thirty-eight hundred dollars.  How am I
10 walking away with a list of tickets when I
11 paid the whole thing?  Commuted some, paid
12 the rest.
13         So, he gave me four days for the
14 current tickets, suspended two.  I still did
15 the four because they didn't let me go.  And
16 perhaps he -- the day I was released in 2010,
17 February 2nd, after doing thirty-eight
18 hundred dollars of payments, I still walked
19 away with this amount of tickets.
20         So, when I went back before Judge
21 Hayes on two new tickets, I was offered JCS.
22 And I only had gotten two tickets in the
23 process.  So, I didn't go see JCS because I

44 (Pages 170 - 173)

**Exhibit J**

1 paid my fines.  I don't understand how I walk
2 away with this when I paid my fines to get
3 out.
4     Q.   Okay.  You said that -- well,
5 let's back up.  Let's talk about that day in
6 court --
7     A.   Uh-huh.
8     Q.   -- and let's just talk about
9 Judge Hayes in court because we're in 2010
10 now.
11         So, it's a little bit more
12 recent.  What would go on when you would go
13 to court?  Would the judge make an
14 announcement or how -- and let's -- if you
15 can remember the 2010 since we're here then.
16     A.   November, 2010?
17     Q.   Yeah.  What would it be like in
18 court?
19     A.   Well, you would --
20         MR. BASS:  Objection.  Vague.
21 Calls for a narrative.
22     Q.   (BY MR. LOGSDON)  You can answer.
23     A.   You would be -- come before the

1 judge, and he would call off your tickets.
2 And he would ask how you plead.  Most likely,
3 you're going to plead guilty because you know
4 the routine.  If you plead not guilty, you're
5 going to get a court date two months down the
6 road where you may or may not be able to pay
7 out.  So, I pleaded guilty, and he gave me
8 four days.
9     Q.   Okay.  Before you went before
10 Judge Hayes, was there any kind of
11 announcement for the courtroom or anything
12 like that?
13     A.   They would -- we would sit in a
14 holding cell.  And I'm not sure who it was,
15 if it was the officer of the court or --
16 would come back and give you paperwork to
17 fill out to be put on -- but if you're
18 looking to see were we offered any other
19 options, no, we were not.  We were just
20 offered this paper (indicating), or a yellow
21 piece of paper about this color (indicating),
22 to complete, say where you work and how much
23 money you're making, how much you could pay

1 them on a monthly basis or weekly or however
2 you were going to be told to pay.
3         MS. HOLLIDAY:  I'm so sorry.
4 It's real hard to understand what you're
5 saying.
6     A.   I said that you were given
7 paperwork I believe by the public defender --
8     Q.   (BY MR. LOGSDON)  Okay.
9     A.   -- to complete with your
10 employment and your phone number and your
11 address to be considered for JCS.
12         If you pleaded guilty, then, you
13 would be given JCS and told when to start
14 making payments.
15     Q.   All right.  Do you remember the
16 name of the public defender?
17     A.   I do not.
18     Q.   Do you remember what he looked
19 like?
20     A.   I really -- I -- vaguely.
21     Q.   Vaguely?
22     A.   Vaguely.
23     Q.   Okay.  So, the public defender,

1 then, would be the first one you would talk
2 with?
3     A.   Yes.
4     Q.   And then, the next person that
5 you would talk with would be Judge Hayes?
6     A.   The next person that you would
7 talk to, it may have been like a JCS person
8 who wears like a polo shirt with a badge on
9 it (indicating) with slacks.  And I believe
10 they would come back and do a worksheet with
11 you.
12     Q.   Okay.  And then, tell me about
13 Judge Hayes.  Did you say anything, did you
14 ask any questions, or anything like that?
15     A.   Not on this particular time.  Not
16 on this, November 7th, 2010, no.
17     Q.   Okay.  Had you asked questions to
18 Judge Hayes in prior cases?
19     A.   Yes.
20     Q.   Tell me what you remember asking
21 in the prior cases.
22     A.   I did ask was there -- in the
23 2000 and -- the 2009 arrest, was there any

45 (Pages 174 - 177)

**Exhibit J**

1  alternative.  And I made statements
2  concerning my children, that the agency
3  where -- that I was the only one who was
4  providing for them, getting them back and
5  forth to school, and making all the decisions
6  about that.  And he said, some fine example
7  you are not paying your tickets.  That's what
8  he said.
9     Q.   Judge Hayes said that?
10    A.   Yes.  And then, he sentenced me
11 to a hundred and fifty-two days.
12    Q.   Okay.  All right.  Anything else
13 that you said or that he said?
14    A.   There was nothing left to say.
15    Q.   Okay.  And I understand what
16 you're saying, but I just want to make sure
17 it's clear on the record.  Anything else that
18 you remember either you saying or him saying?
19    A.   No.  He just sentenced me to a
20 hundred and fifty-two days.  And I was sent
21 back in the -- you know, he spoke to the
22 people beside me and everything --
23    Q.   Okay.

1     A.   -- but not to me.
2     Q.   All right.  And we're talking
3  back -- this incident you're telling me about
4  now is the one back in 2008?
5     A.   That statement was made in
6  2000 -- was in 2000 and -- the last arrest I
7  went through, I think it was '12.  That was
8  in 2012 when that situation was going on.
9  Because I knew my son was in Beth Manor,
10 which is a mental place, and he would talk to
11 me daily.  So, I knew the effects that was
12 going to have.  He was not too long -- you
13 know, was going downhill with his -- with his
14 illness.
15    Q.   Okay.  All right.  So, this sheet
16 here lists your employer as Holiday Inn
17 Express.
18    A.   Uh-huh.
19    Q.   Is that who you were working with
20 at that time?
21    A.   In 2010?
22    Q.   Yes.
23    A.   Yes.

1     Q.   And was your supervisor -- it
2  looks like that's misspelled.  Is it Laura
3  Wright?
4     A.   Larna.
5     Q.   Larna?
6     A.   It was Larna.
7     Q.   Okay.  That was your supervisor?
8     A.   Yes.
9     Q.   And you were living on ████████
10 ████?
11    A.   Yes.
12    Q.   And you list some contacts, your
13 sister, Sandra McCullough?
14    A.   Correct.
15    Q.   Where does she live?
16    A.   She lives in Montgomery.
17    Q.   And who is Sharon Lee?
18    A.   Sharon Lee, at the time, that was
19 an acquaintance of mine.
20    Q.   All right.  And then, your
21 mother?
22    A.   Isabelle Taylor.  She remarried,
23 so her last name was Taylor.

1     Q.   Okay.  And remind me where your
2  mother lived.
3     A.   In Montgomery.
4     Q.   Okay.  All right.  Was the
5  address listed on ██████████; is that
6  correct?
7     A.   ██████████.
8     Q.   Excuse me?
9     A.   ██████████.
10    Q.   All right.  That's correct?  All
11 right.  Let me show you Exhibit 35.
12
13         (Whereupon, Defendant's Exhibit
14         35 was marked for identification
15         and copy of same is attached
16         hereto.)
17
18    Q.   (BY MR. LOGSDON)  Do you
19 recognize this?
20    A.   I think this is that yellow sheet
21 of paper --
22    Q.   All right.
23    A.   -- they give you.

46 (Pages 178 - 181)

**Exhibit J**

Page 182

1    Q.   Yes, it's kind of like what you
2  were describing.  This is what you said the
3  public defender gave to you?
4    A.   Correct.
5    Q.   And this copy's obviously not
6  yellow, but you think it was yellow
7  originally?
8    A.   Yes, I believe.
9    Q.   And so, did the public defender
10 go through this with you and ask you to fill
11 it out?
12   A.   They hand it -- slide it under
13 the door to you.  I think he did a rundown of
14 it just in general to everyone in the holding
15 cell through the -- through the door.  But at
16 some point when you were called, he would go
17 over it a little bit with you.
18   Q.   Okay.  Is that your signature at
19 the bottom?
20   A.   That is.
21   Q.   And is this your handwriting on
22 it?
23   A.   It is.

Page 183

1    Q.   All right.  Did you ask the
2  public defender any questions?
3    A.   I did not.
4    Q.   Let me show you what I'll mark as
5  Exhibit -- did you keep a copy of this, by
6  the way?
7    A.   All of that got --
8    Q.   Excuse me?
9    A.   I had this information in a safe
10 that got -- like a portable safe, and all of
11 it got -- I mean, I don't have it anymore.
12   Q.   What happened to it?
13   A.   I'm not sure.  I know someone
14 took it out of my room.  Everything that was
15 in there was lost.
16   Q.   Okay.  Do you know when that
17 occurred?
18   A.   This would have been somewhere
19 around -- during the -- 2011 or something,
20 some point in there.  I'm not sure.
21      THE COURT REPORTER:  Can you
22 speak up, please?
23   A.   It was somewhere around --

Page 184

1  between 2011, 2012.  And I had the -- my
2  payout sheet and all this information in
3  there, and it got lost.
4
5      (Whereupon, Defendant's Exhibit
6      36 was marked for identification
7      and copy of same is attached
8      hereto.)
9
10   Q.   (BY MR. LOGSDON) All right.  I'm
11 showing you what was -- all right.  Can you
12 identify Exhibit 36?
13   A.   This is -- what's the date on
14 there?
15   Q.   The date on there is December the
16 7th, 2010.  Do you recognize that as the date
17 that you --
18      MR. BASS:  If you could let her
19 have a chance to review the document --
20      MR. LOGSDON:  Sure.
21      MR. BASS:  -- Counsel.
22   A.   Is that 2012?
23   Q.   (BY MR. LOGSDON)  Yeah.  So --

Page 185

1  it's actually -- look at the date on the very
2  bottom, December 7, 2010; do you see that?
3  Let me come around here if I can.
4    A.   I do see it.
5    Q.   Okay.
6    A.   Well, this is December 14th,
7  2010, at the very bottom?
8    Q.   Yeah.  Well, December 14, 2010,
9  is actually your first appointment date.  And
10 then, if you look above that, it says
11 December 7, 2010, next to your signature; do
12 you see that?
13   A.   Right.
14   Q.   Okay.  And then, if you look
15 above that, there's another date by the
16 judge's signature that says December 7, 2010;
17 do you see that?
18   A.   Right.
19   Q.   All right.  So, do you remember
20 this document at all, this document entitled
21 Order of Probation?
22   A.   I don't remember this court date
23 at all, but that is my signature and that is

47 (Pages 182 - 185)

Exhibit J

Page 186

1 my writing. But I don't recall the court
2 date.
3    Q.   Okay. What all of this is your
4 handwriting?
5    A.   My signature, the date. I do
6 remember -- that is my handwriting. That is
7 correct, though.
8    Q.   All right. And the -- is
9 anything else your handwriting other than the
10 signature and the date?
11    A.   No.
12    Q.   Do you know who wrote in the
13 tickets that are up above?
14    A.   Do I know --
15    Q.   Yeah.
16    A.   -- who wrote in the tickets?
17       I assume the officer wrote in the
18 tickets.
19    Q.   Well, I was talking about the
20 handwriting on this exhibit.
21       MR. GILL: Y'all are talking
22 across each other. She's looking at the
23 second page.

Page 187

1    A.   No, I --
2       MR. GILL: You're looking at the
3 first page.
4       MR. LOGSDON: They're actually
5 the same.
6       MR. GILL: Are they?
7       MR. BASS: No, they're not.
8       MR. LOGSDON: Well, they're
9 close.
10       MS. WILSON: A different ticket.
11       MR. LOGSDON: They're just a
12 different ticket, yeah.
13       MR. BASS: They're close?
14       MR. LOGSDON: The same thing
15 other than just different tickets.
16    Q.   So, there's some -- there's some
17 handwriting right here (indicating) under
18 where it says case number and offense. Do
19 you know whose handwriting that is?
20    A.   No, I do not.
21    Q.   Okay. And do you remember --
22    A.   Going to court this day?
23    Q.   Yeah.

Page 188

1    A.   I suppose I did if I was ordered
2 with this.
3       MR. BASS: Don't guess, Ms.
4 McCullough. Just tell us --
5    A.   Yeah, this was after --
6       MR. BASS: -- only what you know.
7    A.   -- I went -- I was -- with the
8 November incident when I was transferred and
9 I was -- I had a court date set, and I came
10 back to court.
11    Q.   (BY MR. LOGSDON) And let me -- I
12 think Mr. Bass has a good point. We're
13 asking you about a lot of dates and a lot of
14 times. And if you don't remember, I'm okay
15 with that. I forget a lot of dates and a lot
16 of times. And, you know, we don't want you
17 to guess at something.
18       Do you know specifically on this
19 date what happened?
20    A.   I went to court after being
21 released from that November incident in 2010.
22 And it looks here that I was offered JCS.
23    Q.   Okay. Now, you -- the

Page 189

1 November -- the 2010 incident, you told me
2 earlier, that was February of 2010.
3    A.   That's when I was released from
4 the payout. Later on, in November of that
5 year, I was in Elmore and was transported to
6 the City and did the four days --
7    Q.   Okay.
8    A.   -- and had a court date to come
9 back.
10    Q.   All right.
11    A.   And this is that court date.
12    Q.   That you went before --
13    A.   Right.
14    Q.   -- the judge?
15       Okay. And do you remember
16 talking with anyone at JCS at all?
17    A.   I talked to someone at JCS to
18 complete this paperwork (indicating).
19    Q.   Okay. Do you remember anything
20 that was said either by you or by the person
21 from JCS?
22    A.   I just remember speaking with
23 them about I was going to be on the

**Exhibit J**

1  probation.
2      Q.    All right.  Do you remember
3  anything else other than that that either you
4  said or they said?
5      A.    No.
6      Q.    Do you remember if that
7  conversation was after the meeting with the
8  public defender?
9      A.    It was after it was ordered by
10  the judge.
11      Q.    Okay.  And do you remember the
12  location of that meeting with JCS?
13      A.    It's inside of the courtroom.
14      Q.    Do you -- do you -- actually in
15  the same -- the courtroom?
16      A.    Yes.
17      Q.    All right.  Was it at a table, a
18  different table, or something?
19      A.    It's on the first bench.
20      Q.    Do you remember the person's name
21  that you spoke with at JCS?
22      A.    I do not.
23      Q.    Was that the first that you had

1  heard of of JCS?
2      A.    I believe so, yes.  It was the
3  first time that I had to report to JCS.  I
4  had reported prior, but JCS.
5      Q.    Right.  And let's clarify that.
6  We looked earlier at another probation
7  company that was -- I can't even remember the
8  name of it.  But that -- you knew about that
9  one, but as far as JCS, this is your first
10  dealing with JCS; is that right?
11      A.    Correct.
12      Q.    And when I say this, I'm pointing
13  to an exhibit.  We're talking about Exhibit
14  36 in this December 7, 2010, probation order,
15  right?
16      A.    Correct.
17      Q.    Okay.  I think you might have
18  answered this earlier when you were saying
19  something, but you said that you felt that
20  you -- or you never met again with JCS; is
21  that what you said?
22      A.    No.
23      Q.    No, you never met with JCS?

1      A.    I never met with JCS again.
2      Q.    Okay.  And if JCS records show
3  that you never made -- or met with them or
4  had any appointments or paid any money, do
5  you dispute that?
6      A.    I do not.
7      Q.    All right.  So, you were asking
8  me earlier -- we were talking about this
9  first date on the bottom right there
10  (indicating) for an appointment.  And you're
11  not saying you -- you agree you didn't go to
12  that appointment, correct?
13      A.    I agree.
14      Q.    Okay.  And you sound pretty sure
15  when you're telling me these things.  And it
16  sounded like you had decided from the get-go,
17  I'm not going to -- I'm not going to do that;
18  is that fair at all?
19          MS. WILSON:  Objection to form.
20      A.    That's right.
21      Q.    (BY MR. LOGSDON)  Excuse me?
22      A.    That's correct.
23      Q.    Okay.  I know that you said you

1  never met with JCS.  Did you -- do you ever
2  remember any other discussions or
3  conversations with JCS, like, by phone or
4  anything?  And let me -- let me clarify.
5  When I say JCS, I'm not talking about that
6  earlier probation company.  I'm talking about
7  JCS.  Do you remember any other conversations
8  at all with JCS other than the one you just
9  told me about on December 7, 2010?
10      A.    They may have contacted me
11  through text.
12      Q.    Okay.  Just to tell you to show
13  up for appointments and things like that?
14      A.    Right.
15      Q.    But you don't remember talking to
16  them or telling them anything?
17      A.    Maybe once or twice.
18      Q.    Okay.  And is the general part of
19  what you remember them saying is to come to
20  the appointment?
21      A.    Correct.
22      Q.    All right.  And do you remember
23  anything that you told them?

49 (Pages 190 - 193)

**Exhibit J**

Page 194

1    A.   I may have scheduled a time or
2  something.
3    Q.   Okay.  Anything else?
4    A.   That's about it.
5    Q.   All right.  All right.
6         MR. LOGSDON:  Do y'all want to
7  break for lunch?
8         MR. GILL:  Yeah, I think it
9  should be here.
10        MR. LOGSDON:  All right.  Are
11  y'all okay with that?
12
13        (Whereupon, a brief recess was
14        taken.)
15
16    Q.   (BY MR. LOGSDON)  I've marked
17  Exhibit 37.
18
19        (Whereupon, Defendant's Exhibit
20        37 was marked for identification
21        and copy of same is attached
22        hereto.)
23

Page 195

1    Q.   (BY MR. LOGSDON)  And that should
2  be in front of you.  And this is dated
3  December 22nd, 2010.  And there's an address
4  on the bottom right on ▮▮▮▮▮▮▮▮.  Were
5  you living at ▮▮▮▮▮▮▮▮ at that time?
6    A.   That's correct.
7    Q.   And did you receive this letter?
8    A.   I do not recall.
9    Q.   All right.  Let me show you what
10  I will mark as Exhibit 38.
11
12        (Whereupon, Defendant's Exhibit
13        38 was marked for identification
14        and copy of same is attached
15        hereto.)
16
17    Q.   (BY MR. LOGSDON)  The same
18  question for 38.  Did you get this letter?
19    A.   It's been a while.  I may have
20  received it, but I do not -- I can't say I
21  recall receiving it.
22    Q.   Fair enough.  And I'm going to
23  show you what I will mark as 39, which is two

Page 196

1  documents.
2
3        (Whereupon, Defendant's Exhibit
4        39 was marked for identification
5        and copy of same is attached
6        hereto.)
7
8    Q.   (BY MR. LOGSDON)  And the second
9  of the documents is a letter.  Did you get
10  the letter in 39 or do you remember getting
11  this first page of Exhibit 39?
12    A.   I do not remember getting it.
13    Q.   You don't remember --
14        MR. GILL:  I'm sorry.  I
15  couldn't -- I couldn't hear you, Ms.
16  McCullough.
17        THE WITNESS:  Sir?
18        MR. GILL:  I couldn't hear your
19  answer.
20        THE WITNESS:  I do not remember
21  receiving it.
22    Q.   (BY MR. LOGSDON)  You don't
23  remember either way?  You're not denying you

Page 197

1  could have got it, you just don't remember?
2    A.   I just do not remember --
3    Q.   Fair enough.
4    A.   -- receiving it.
5    Q.   Okay.  Then, I'm going to show
6  you the exact same thing I just showed you.
7
8        (Whereupon, Defendant's Exhibit
9        40 was marked for identification
10        and copy of same is attached
11        hereto.)
12
13    Q.   (BY MR. LOGSDON)  The only
14  difference is this one has a signature on it
15  at the bottom.  And I assume your answer is
16  the same, you don't remember getting that?
17    A.   No, I do not.
18    Q.   Okay.  That's Exhibit 40 that
19  we're looking at right there.
20        I'll show you what I'll mark as
21  Exhibit 41.
22
23        (Whereupon, Defendant's Exhibit

50 (Pages 194 - 197)

**Exhibit J**

Page 198

1     41 was marked for identification
2     and copy of same is attached
3     hereto.)
4
5        MR. GILL:  I'm missing 40.  What
6  was 40?
7        MR. LOGSDON:  40, I didn't give
8  it to you.  It was the -- sorry.  It was
9  the -- it was that except signed by the judge
10  (indicating).  Okay.  The petition for
11  probation revocation, except it was signed.
12  So, I didn't have a copy.  So, if you want to
13  make a note to --
14        MR. GILL:  No.  I just want to be
15  sure I hadn't overlooked numbering.
16     Q.   (BY MR. LOGSDON)  Okay.  Ms.
17  McCullough Exhibit 40 is entitled Alias
18  Warrant of Arrest.
19        MR. GILL:  41.
20     Q.   (BY MR. LOGSDON)  41.  41.
21        MR. BASS:  It should be 41,
22  Counsel.
23        MR. LOGSDON:  Yeah.

Page 199

1     Q.   And the date on there is July --
2  or there's something called Certificate of
3  Execution in the middle of it.  And that date
4  is July 2nd, 2013.  And I think you told me
5  earlier, you thought your arrest date was, I
6  think you said --
7     A.   July 3rd.
8     Q.   -- July 3rd.
9        So, would this match up with --
10     A.   That would be --
11     Q.   -- what you thought?
12     A.   Yes, it would.
13     Q.   Okay.  And the top of this
14  document for -- well, warrant -- the word
15  "warrant for arrest", do you have an
16  understanding of what that means when there's
17  a warrant?
18     A.   I do.
19     Q.   And what is that?
20     A.   Well, they put out a warrant.  A
21  warrant means that you will be taken into
22  custody at some point.
23     Q.   Okay.  And then, the next part of

Page 200

1  it says for failure to appear.  Do you have
2  an understanding of what failure to appear
3  means?
4     A.   I do.
5     Q.   And what is that?
6     A.   I did not appear at the court
7  date.
8     Q.   Okay.  All right.  Let me show
9  you something else that I will mark as
10  Exhibit 42.  I'll tell you what, I'll come
11  back to that.
12        Let me just show you this before
13  I even mark it.  Is this a document you ever
14  remember seeing before or getting?  You take
15  a look at it.
16     A.   That was given to you while
17  you're -- after you've been to court.
18     Q.   Okay.  All right.  So, let me
19  mark this.
20
21        (Whereupon, Defendant's Exhibit
22        42 was marked for identification
23        and copy of same is attached

Page 201

1  hereto.)
2
3     Q.   (BY MR. LOGSDON)  So, I'll mark
4  as Exhibit 42 -- or I'll mark Exhibit 42 and
5  hand it to you.  And can you -- so, you said
6  this is something that is what, now?
7     A.   After you have seen the judge,
8  they come to you if you're incarcerated, go
9  upstairs in the jail, they bring it to you.
10     Q.   Okay.  And so, did you actually
11  get this document here or just shown this
12  document?
13     A.   They give it to you.
14     Q.   And somebody with the court staff
15  will give it to you?
16     A.   Yes.
17     Q.   All right.  And there's some --
18  this one is dated July 2nd, 2013.  So, it's
19  right around those times we've been talking
20  about of the arrest.  So, there's some -- so,
21  do you have any understanding of what this is
22  talking about here?  It looks like there's
23  some charges in the left column, some case

51 (Pages 198 - 201)

Exhibit J

Page 202

1 numbers, and --
2    A.   Yes, I understand.
3    Q.   All right.  And what is your
4 understanding of it?
5    A.   Well, it's showing -- this arrest
6 date was -- this arrest date was the 2nd of
7 July, 2013.  And I see tickets on here
8 from -- that was received before November,
9 20 -- November of 2009, which I paid off.
10 And I see them still present here.  So, that
11 meant I had to pay them again.  That's my
12 understanding.
13    Q.   Okay.  And this has got a couple
14 of pages to it.  Did you get -- if you look
15 at Page 4, that looks a little bit different
16 than the first three pages.  Did you get Page
17 4 as well?
18        MR. BASS:  Are we still on
19 Exhibit 42 -- or 41, rather?
20        MR. LOGSDON:  We're on 42.
21        MR. BASS:  42?
22        MR. LOGSDON:  Yeah.
23    A.   I don't believe I received this.

Page 203

1    Q.   (BY MR. LOGSDON) Okay.  So, the
2 first three pages of Exhibit 42 look alike,
3 and then, beginning with Page 4, to the end
4 of it, there's a different kind of form.  You
5 got the first three pages, but you don't
6 remember whether or not you got the last one,
7 two, three, four, five pages; is that -- is
8 that right?
9    A.   Correct.
10    Q.   Okay.  Here is -- let's take a
11 look at Exhibit 43.
12
13        (Whereupon, Defendant's Exhibit
14        43 was marked for identification
15        and copy of same is attached
16        hereto.)
17
18        MR. GILL:  What exhibit is this?
19        MR. LOGSDON:  43.
20    Q.   And the bottom of it has a court
21 date of April 5, 2013; do you see that?
22    A.   Yes.  I see August 5.
23    Q.   Yes, on the bottom.  And this one

Page 204

1 looks a little different.  I'm trying to find
2 the date of the ticket.
3        MR. GILL:  It's August 5, not
4 April.
5        MR. LOGSDON:  What did I say?
6        MR. GILL:  You said April.
7        MR. LOGSDON:  August 5.  Okay.
8    Q.   Do you remember getting this
9 ticket?  It's for driving without insurance.
10 Do you remember that one?
11    A.   It's the date of the arrest in
12 2013, July?
13    Q.   Yeah, I don't -- I don't know the
14 date.  It probably was -- I think it is July,
15 but I don't see the date on there.  It looks
16 like the court date is --
17    A.   Yeah, it was in the Mercedes.  It
18 was in the 1988 red Mercedes.  So, that was
19 the date of the arrest.
20    Q.   Okay.
21    A.   July 2nd, 2013.
22    Q.   Okay.  This would be the date you
23 were arrested?

Page 205

1    A.   Correct.
2    Q.   Okay.  And so, on the date you
3 got arrested, you also got another ticket for
4 operating a vehicle without insurance?
5    A.   Correct.
6    Q.   Okay.  All right.  And remind me
7 where you got the Mercedes that you were
8 driving on that day.
9    A.   It was like a -- just a car my
10 husband had got from a friend.  It wasn't
11 registered or anything yet.  We were looking
12 to buying the car.  I just drove it to class
13 that day.
14    Q.   Okay.  It's talking about Young
15 Barn and Eastern Boulevard.  Where was your
16 class located?
17    A.   Faulkner.  I was leaving class.
18    Q.   All right.
19    A.   Atlanta Highway.
20    Q.   Atlanta Highway?
21    A.   Right.
22    Q.   Okay.  All right.  Let's look at
23 what I've marked as Exhibit 44.

52 (Pages 202 - 205)

**Exhibit J**

1      (Whereupon, Defendant's Exhibit
2      44 was marked for identification
3      and copy of same is attached
4      hereto.)
5
6      Q.   (BY MR. LOGSDON)  And this is
7  another court document that I'm just kind of
8  using for our -- calculating the dates.  This
9  is entitled Order of Release from Jail; do
10  you see that?
11      A.   Yes.
12      Q.   And the date of this is July
13  22nd, 2013.  Does that sound like the date
14  you were released from jail?
15      A.   It could be.  Yes, it sounds
16  pretty close to it.
17      Q.   Okay.  And then, up top there, I
18  think you mentioned this, it said four days
19  mandatory, defendant given credit for
20  thirteen days; do you see that?
21      A.   For seventeen, that's the days I
22  was served.
23      Q.   Okay.  So, you think you were

1  seventeen days in jail?
2      A.   I did four days plus seventeen
3  days.
4      Q.   Okay.  All right.  And did you
5  pay any money when you were released that
6  time?
7      A.   Thirteen fifty.  It says paid in
8  full.
9      Q.   Do you know where that came from,
10  that money?
11      A.   Yes, it was moneys that were due
12  to go to the school, Faulkner University.
13      Q.   Well, I asked you a little bit
14  different question.  Do you know where the
15  money came from?  In other words, where --
16  what account or that kind of thing.
17      A.   It was a check that got cashed.
18      Q.   Okay.  Who was the check drawn
19  on, what financial --
20      A.   It was -- it was from financial
21  aid.
22      Q.   So, you received financial aid
23  and cashed -- that check got cashed, and

1  then, you paid thirteen fifty?
2      A.   Well, someone had it cashed that
3  knew --
4      Q.   Okay.
5      A.   -- who would -- you know, knew
6  someone that would cash it.
7          My son's grandfather knew someone
8  who would cash it.  And they cashed it.  And
9  then, he came down and paid the balance so I
10  could be released.
11      Q.   Do you know the total amount of
12  the check?
13      A.   It was around eighteen hundred.
14      Q.   All right.  And do you know --
15  did you keep the remaining amount, the
16  remaining --
17      A.   Yes.
18      Q.   What did you use that on?
19      A.   On rent.
20      Q.   Here is Exhibit 45, which is
21  another ticket.
22
23          (Whereupon, Defendant's Exhibit

1          45 was marked for identification
2          and copy of same is attached
3          hereto.)
4
5      Q.   (BY MR. LOGSDON)  And, by the
6  way, on these tickets, did you get a copy of
7  each one from the police officer each time?
8      A.   Yes.
9      Q.   This shows a date at the top,
10  some real small letters there, but it's
11  February 17th, 2015, do you see that, the top
12  left?
13      A.   Yes.
14      Q.   And then, there's -- you were
15  driving a Chevy BLK.  I guess --
16      A.   Tahoe.
17      Q.   That's the Chevy Tahoe you
18  mentioned about?
19      A.   Right.
20      Q.   All right.  So, it's a 2003 Chevy
21  Tahoe?
22      A.   Correct.
23      Q.   And where did you get that one?

53 (Pages 206 - 209)

Exhibit J

Page 210

1     A.    I purchased it.
2     Q.    Tell me where you purchased it.
3     A.    From someone private, and they
4  had it beside the road for sale.
5     Q.    Okay.  The ticket is for an
6  expired tag.  Did you, in fact, have an
7  expired tag?
8     A.    I did not.
9     Q.    Did you contest this ticket?
10    A.    I did not.  I just had the proof
11  that I didn't have the expired tag nor -- and
12  I also had insurance.
13    Q.    There's a court date on here of
14  March 23rd, 2015.  Did you show up?
15    A.    No.
16    Q.    Why not?
17    A.    I had to work.
18    Q.    Okay.  Where were you working at
19  that time?
20    A.    At ASK.
21    Q.    Here is what I'll mark as Exhibit
22  46.
23

Page 211

1        (Whereupon, Defendant's Exhibit
2        46 was marked for identification
3        and copy of same is attached
4        hereto.)
5
6     Q.    (BY MR. LOGSDON)  Okay.  This
7  is -- at the top of it, it says In The
8  District Court, Montgomery, Alabama.  Do you
9  understand there's a difference between the
10  district court and the municipal court,
11  they're two different courts?
12    A.    I do.
13    Q.    And do you remember getting -- do
14  you remember this?  Do you remember
15  getting --
16    A.    I do.
17    Q.    Okay.  Tell us about this.
18    A.    I did a U-turn on the Auburn
19  campus on a roundabout, and the police
20  campus -- the campus police stopped me for
21  that.
22    Q.    Okay.  And it says improper turn
23  and no driver's license?

Page 212

1     A.    Correct.
2     Q.    Did you not have a driver's
3  license?
4     A.    I did not.
5     Q.    You said it was on the Auburn
6  campus?
7     A.    AUM.
8     Q.    All right.
9     A.    AUM.  Auburn of Montgomery.
10    Q.    What were you doing there?
11    A.    I was just trying to get back to
12  work.  I had missed my turn coming from
13  Academy Sports.  And I just -- I missed my
14  turn getting on the interstate.  And so, I
15  was doing a turn right when you go into it.
16  And I should have went right, but I went
17  left.  And I went around the roundabout the
18  wrong way.
19    Q.    And you were going to Academy
20  Sports or coming from Academy Sports?
21    A.    Coming from on my lunch break.
22    Q.    Okay.  Where were you working at
23  this time?

Page 213

1     A.    At ASK.
2     Q.    Okay.  And did you get arrested?
3     A.    No.
4     Q.    I see some -- the reason I ask
5  that, I see some fingerprinting on the next
6  page; do you see that?
7     A.    Yeah, I was doing a background
8  check, and I forgot I had those two tickets.
9  And so, I had to do -- go get my background
10  done.  And while I was getting that done,
11  they sent over the sheriff.  And that's when
12  the arrest happened later on.  I forgot about
13  the tickets.
14    Q.    Okay.  So, did you get arrested?
15    A.    Down the road.  Not that day, but
16  down the road, yes.
17    Q.    All right.  Would it be the date
18  of this -- of Page 2 that you'd gotten
19  arrested?  It says 10/26/2016, which is the
20  same date as the first page.
21    A.    These were two very different
22  dates when I got arrested.  It says date of
23  arrest was 10/26.  The tickets had to be

Exhibit J

1  earlier on.  It was the beginning of football
2  season.  I was going to buy a football
3  helmet.  So, that's why I was at Academy
4  Sports.
5      Q.   Okay.  So, the beginning of
6  football season, that would put us back in
7  August or September?
8      A.   It was a little earlier when they
9  started with this team.
10     Q.   Okay.  Somewhere in there?
11     A.   Possibly.
12     Q.   Okay.  So, it sounds like you got
13 the tickets in July or August of 2016 but
14 arrested related to the tickets by the
15 district court in -- by a warrant --
16     A.   On the 26th.
17     Q.   -- by a warrant issued from the
18 district court in October of 2016; is that
19 correct?
20     A.   That would be correct.
21     Q.   And how long did you serve for
22 that related to the district court?
23     A.   I didn't serve.  I just -- I was

1  in there about four or five hours.
2      Q.   Okay.  You're not fussing at
3  Judge Hayes, for example, for this, are
4  you --
5          MR. BASS:  Objection as to form.
6          MS. WILSON:  Objection.
7      Q.   (BY MR. LOGSDON) -- with the
8  district court?
9      A.   This was not before Judge Hayes.
10     Q.   Okay.  Do you remember the judge
11 for that one?
12     A.   I can't recall his name.
13     Q.   I'll ask you about a few other --
14 or another banking institution.  One of the
15 documents I looked at showed Compass.  Do you
16 remember banking with Compass, having an --
17     A.   What year?
18     Q.   -- account with Compass?
19         I'll have to look, but it was
20 sometime, you know, in these time periods
21 we're talking about, like, 2000 something.
22 Do you remember a bank account with Compass?
23     A.   That's what -- earlier, I was

1  confused with where we did the direct deposit
2  with Holiday Inn Express.  It was either a
3  Wachovia or a Compass.
4      Q.   Okay.  Would you have any -- and
5  so, it sounds like it was Compass?  It could
6  have been Compass?
7      A.   During that time frame, yes.
8      Q.   Do you know what branch of
9  Compass you banked at?
10     A.   I would go to the one on Bell
11 Road, I believe it was.
12     Q.   Bell Road?
13     A.   And sometimes McGehee Road.
14     Q.   Do you remember -- do you know if
15 you've got any documentation at all from
16 Compass, such as like a statement from them
17 or anything?
18     A.   I may have some of the check
19 stubs that says this is not a check --
20     Q.   Right.
21     A.   -- that show that it was
22 deposited there.
23     Q.   All right.  I'll put that on my

1  list here.
2      A.   Okay.
3      Q.   And I'll call it Compass Bank
4  stubs.  What about any statements?
5      A.   No.
6      Q.   Another one document showed Wells
7  Fargo.  Do you remember having an account
8  with Wells Fargo?  And that was a little --
9  well, I think Wachovia was purchased by Wells
10 Fargo.  And you mentioned Wachovia.  Do you
11 know if you stayed with them when they were
12 purchased by Wells Fargo?
13     A.   It just depends on the year I
14 am -- with -- whether or not I dealt with
15 these banks with direct deposit.
16     Q.   Okay.  Do you remember a year
17 when you did have direct deposit with Wells
18 Fargo or Wachovia?
19     A.   It would have been around --
20 between 2008 and 9, somewhere in there, when
21 they were doing direct deposit.
22     Q.   Okay.  And the same thing, can
23 you see if you -- I know I asked you about

**Exhibit J**

1 documents from Wachovia.  But can we say
2 Wachovia and Wells Fargo, is that fair
3 enough, you can look for those?
4     A.    You can put that on there.
5     Q.    All right.  Who is Timothy
6 Picket?
7     A.    That's Lance father.
8     Q.    And did you file a child support
9 action against him?
10    A.    His mother did.  She had custody
11 of my son when I was in college at Alabama
12 State.  She ended up filing.
13    Q.    Who is -- what's his mother's
14 name?
15    A.    Callie Chappell.
16    Q.    Did you ever file a child support
17 suing him?
18    A.    I did not.
19    Q.    Have you ever applied for
20 unemployment compensation?
21    A.    I have.
22    Q.    When did you apply for
23 unemployment compensation?

1 would it be a couple of months each time?
2     A.    Yeah, it was a couple months each
3 time.
4     Q.    All right.  Would you get that in
5 the form of a check that you would then
6 either go deposit or go cash?
7     A.    It would be direct deposited on a
8 card they give you.  They send you the card.
9     Q.    And who was the institution that
10 issued the card?
11    A.    It was just like a Visa card that
12 was sent to you by the State of Alabama.  It
13 was the State of Alabama who sent you a --
14    Q.    Okay.
15    A.    Whoever they chose to go with.
16    Q.    All right.  The same question on
17 the documents.  Can you see if you've got any
18 documents related to unemployment --
19    A.    Sure.
20    Q.    -- compensation?
21    A.    I think I've submitted those
22 documents.
23    Q.    All right.

1     A.    I think it may have been
2 around -- when I was unemployed in 2000 -- I
3 think the last time was in -- may have been
4 in 2013.
5     Q.    Okay.
6     A.    And there was a time -- I will
7 say at least three times prior to that I may
8 have had.  Maybe 2004 --
9     Q.    Uh-huh.
10    A.    -- I may have had unemployment.
11          And, I don't know, I think
12 there's another time in between there.
13    Q.    And what was the result?
14    A.    I received unemployment.
15    Q.    How much did you get?
16    A.    About one ten a week.
17    Q.    How long did you get it for?
18    A.    I don't know.  Maybe two or three
19 months.  I really can't recall the different
20 time frames.
21    Q.    Yeah, and that was -- that was --
22 I was going to say, because you told me there
23 were several different time frames.  So,

1          MR. BASS:  Right here, Counsel
2 (indicating).
3          MR. LOGSDON:  Got those?  Okay.
4     Q.    I've seen some email addresses on
5 some of the stuff you've turned in.  Do you
6 have -- do you have an email address
7 currently?
8     A.    I do.
9     Q.    And do you have a computer?
10    A.    No.  Not -- no, not at home, no.
11    Q.    How do you get email?
12    A.    At work.  On my phone --
13    Q.    All right.
14    A.    -- and my work.
15    Q.    So, do you have a data plan for
16 your phone to get email?
17    A.    It's not a data -- it just comes
18 with so many gigabytes when you make your
19 monthly payment.  Like a one gigabyte.  And
20 then, it's always on.
21    Q.    Have you ever had a computer?
22    A.    I have.
23    Q.    When did you have a computer?

56 (Pages 218 - 221)

**Exhibit J**

Page 222

1    A.   During 2011, '12, I had a
2 computer at that point, yeah.  When I had the
3 Internet and the cable.
4    Q.   All right.  And we kind of went
5 through that earlier.  What kind of computer
6 did you have?
7    A.   It was an HP.
8    Q.   Where did you purchase it?
9    A.   I think I purchased it from the
10 pawn shop that I cashed the checks.
11    Q.   Okay.  All right.  Any other
12 computers you remember owning?
13    A.   No.
14    Q.   How about a Tablet or an iPad or
15 a -- anything like that?  Have you had --
16    A.   Most -- Kindle Fire.  I've had a
17 few Kindle Fires.
18    Q.   Okay.  Any iPads or Tablets?
19    A.   I have not.
20    Q.   Have you -- in the last twenty
21 years, have you left the State of Alabama?
22    A.   Like -- left the state in the
23 last -- like to visit, like, Atlanta or

Page 223

1 something?
2    Q.   You personally, yeah, went to
3 Florida, went to North Carolina, anything
4 like that.
5    A.   No, I may -- I think I went to --
6 in the last twenty years -- twenty years.
7 No.  No, I wouldn't say other than, like, to
8 visit maybe Atlanta or something one time and
9 maybe in the last twenty years.  But I really
10 can't recall.  It wouldn't have been long.
11    Q.   Okay.  And you've maybe visited
12 Atlanta, and when did you say that was?
13    A.   I didn't say.
14    Q.   You didn't -- you can't remember?
15    A.   No.
16    Q.   All right.
17    MR. LOGSDON:  All right.  I think
18 what we'll do is, I'll pass the witness, but
19 I might have some other questions.  But I can
20 be reading through my notes when he's going
21 and maybe that will speed things along.
22    All right.  Do you want to sit
23 here?

Page 224

1    MR. GILL:  Can you hear me from
2 here?
3    THE WITNESS:  Yes, I can.
4
5 EXAMINATION BY MR. GILL:
6
7    Q.   Ms. McCullough, I'm Richard Gill,
8 and with Shannon Holliday and Bobby Segall,
9 we represent the City of Montgomery.  And I
10 have some questions for you.
11    Who is Karen Jones?
12    A.   I know Karen to be an activist of
13 sorts.
14    Q.   What does she do?  Does she
15 have -- is her career being an activist?
16    A.   Her career?
17    Q.   I mean, you said you know her to
18 be an activist.  Is that -- that's what she
19 does for a living?
20    A.   I'm not sure if she gets paid for
21 it but --
22    Q.   Okay.  Where have you encountered
23 her?

Page 225

1    A.   She's present at court hearings
2 to take notes.
3    Q.   Was she present at any of your
4 court hearings before Judge Hayes?
5    A.   No.
6    Q.   Did she recommend to you to
7 consult Ms. Morgan and the Sanders Law Firm?
8    A.   No.
9    Q.   What did lead you to consult the
10 lawyer about this case?
11    A.   I was referred by a friend who
12 was aware of -- that it was being talked
13 about.  So, I was referred by someone else
14 who was familiar with the situation.
15    Q.   Who is that?
16    A.   Her name is Felicia Jackson.
17    Q.   Felicia Jackson?
18    A.   Yes, sir.
19    Q.   Is she just a personal friend or
20 can you help identify Ms. Jackson?
21    A.   She's just a personal friend.
22    Q.   And she was familiar with the
23 situation, you said?

Freedom Court Reporting
877-373-3660                  A Veritext Company                  205-397-2397

**Exhibit J**

1    A.   Yes, she had heard of -- seen
2  information of an invitation if you wanted to
3  take part in it, then, come and listen to
4  what was going on.  So, she referred me.
5    Q.   All right.  So, she referred you
6  because she had had or knew about an
7  invitation --
8    A.   Right.
9    Q.   -- to come to some presentation;
10  is that right?
11    A.   Correct.
12    Q.   And what did you understand the
13  presentation was about?
14    A.   If you had been incarcerated or
15  you had several tickets, if you -- and if you
16  felt like you were done wrongly by that,
17  then, just come and listen to what they had
18  to say.  There was no -- a whole lot of
19  information about it.
20    Q.   Okay.  Well, how -- in what way
21  did Ms. Jackson communicate that to you, face
22  to face or --
23    A.   Face to face.

1    Q.   Did she come to your house and
2  sort of recruit you or did y'all meet
3  somewhere by accident or what?
4        MR. BASS:  Objection.
5  Misleading.
6    A.   It was not a recruitment.  We
7  talked on -- we're friends.
8    Q.   (BY MR. GILL)  Okay.  How long
9  have you been friends with Ms. Jackson?
10    A.   I had known her at that point
11  about six years.
12    Q.   About six years.
13        And was she at your house when
14  she got to talking about this invitation?
15    A.   Yes.
16    Q.   And was she planning to attend?
17    A.   She did.
18    Q.   Did she claim to be a person who
19  was one who had been incarcerated or who had
20  had several tickets or --
21    A.   Yes.
22    Q.   She is not, in fact, one of the
23  people in this lawsuit.  Do you know why?

1        MR. BASS:  Objection.
2        MS. WILSON:  Objection.
3        MR. BASS:  That's misleading.
4    A.   I do not.
5    Q.   (BY MR. GILL)  But she's not
6  named in this lawsuit?
7    A.   She's not named.
8    Q.   And you don't know why, despite
9  her sort of getting you interested in it,
10  that she has not joined?
11        MS. WILSON:  Objection.
12        MR. BASS:  Objection.
13    A.   We don't know why.
14    Q.   (BY MR. GILL)  So, you went to a
15  presentation at the invitation that Ms.
16  Jackson described?
17    A.   Correct.
18    Q.   Where was that presentation?
19    A.   It was on the West South
20  Boulevard.
21    Q.   At some building, I assume?
22    A.   At a radio station.
23    Q.   At a radio station.  What

1  station?
2    A.   I believe it's WKXM.
3    Q.   WKXM.  And how many people were
4  in attendance?
5    A.   About --
6    Q.   More or less.
7    A.   -- thirty.
8    Q.   I know you didn't necessarily
9  count.  About how many?
10    A.   About thirty.
11    Q.   And who made a presentation?
12    A.   I think Karen was there.  She did
13  give us information.
14    Q.   Karen Jones?
15    A.   She gave us information on what
16  was going on and if we wanted to --
17    Q.   If you wanted to do what?
18    A.   -- participate.
19    Q.   Participate.  Was there anyone
20  else who made a presentation or gave
21  information?
22    A.   There were interns that --
23  lawyers that were interns that were there.

**Exhibit J**

1    Q.   Interns for who?
2    A.   Hank Sanders and Faya.
3    Q.   Okay.  Did you know Faya Rose?
4    A.   She wasn't present that day.
5    Q.   No, I know, but did you know her
6  by that time?
7    A.   No.
8    Q.   Did you know Hank Sanders?
9    A.   I knew of them.
10    Q.   You knew he had been a state
11  senator at one time?
12    A.   I did.
13    Q.   Can you -- do you know the names
14  of any of these interns?
15    A.   I do not.
16    Q.   Did any of them speak or did only
17  Ms. Jones make a presentation?
18    A.   They spoke to us individually.
19    Q.   Took information from you?
20    A.   Yes.
21    Q.   Did they get kind of a summary or
22  statement of what your claims might be as
23  opposed to, say, Ms. Jackson's claims?

1    A.   Correct.
2    Q.   All right.  Did they write them
3  down?
4    A.   Yes.
5    Q.   Do you know if these interns were
6  actually lawyers or just young people who
7  were working in the Sanders firm?
8    A.   They were all recently graduated.
9    Q.   Did they tell you that?
10    A.   Yes.
11    Q.   Did they give you a card?
12    A.   No.
13    Q.   No.  At that time, you had not
14  hired any lawyer, right?
15    A.   Correct.
16    Q.   And so, you gave information and
17  a statement of your grievances to one of
18  these interns?
19    A.   Correct.
20    MR. BASS:  Objection.
21  Misleading.
22    Q.   (BY MR. GILL)  Did you do that?
23    A.   I did.

1    Q.   You did.  All right.
2    I don't want to mislead you, but
3  I thought that's what your answer was.
4    And have you ever seen the paper
5  that they wrote down all that information on?
6    A.   It was just legal pads.
7    Q.   Did they give you a copy of it at
8  any time?
9    A.   No.
10    Q.   Tell me what Ms. Jones said in
11  her presentation.
12    A.   Well, basically, she just let us
13  know that we were going to file a grievance
14  for what we had been through.  You know, it's
15  been a few years now.  She mainly just gave
16  us paperwork.
17    Q.   Well, did she -- was it an open-
18  ended question to you, just do you have some
19  grievances in the world, or do you have
20  grievances about Judge Hayes, or do you have
21  grievances about how many tickets you've
22  gotten or whether you've gotten fines?  I
23  mean, what was it that she was trying to see

1  if you had --
2    A.   It was --
3    Q.   -- an interest in?
4    MR. BASS:  Objection.  Compound
5  question.
6    MS. WILSON:  Form.
7    Q.   (BY MR. GILL)  You may answer.
8    A.   Debtor's prison.
9    Q.   Debtor's prison?
10    A.   Yeah.
11    Q.   Is that what she called it?
12    A.   That's what it's called.
13    Q.   That's what it's called by your
14  lawyers and people like Ms. Jones, right?
15    A.   That's what it's called.
16    MS. WILSON:  Objection to form.
17    Q.   (BY MR. GILL)  The court doesn't
18  call it a debtor's prison, does it?
19    MS. WILSON:  Objection.
20    MR. BASS:  Objection.
21    Q.   (BY MR. GILL)  Does it?
22    A.   Does the court call it debtor's
23  prison?

**Exhibit J**

Page 234

1    Q.   Yeah.
2    A.   That would not be beneficial to
3 the court.
4    Q.   They don't, do they?
5        MS. WILSON:  Objection.  Calls
6 for speculation.
7        MR. GILL:  No, it's not.
8    Q.   You've never heard the court
9 refer to people who are put in jail for
10 failure to appear, for example, as going to
11 debtor's prison, have you?
12       MR. BASS:  Counsel, we can
13 stipulate to that, that the court doesn't
14 refer to itself as a debtor's prison.
15   Q.   (BY MR. GILL)  So, that's a
16 pejorative term used by activists and people
17 who want --
18       MS. WILSON:  Objection.
19   Q.   (BY MR. GILL)  -- to sue the
20 City, right?
21       Pejorative meaning unpleasant or
22 accusatory.
23       MS. WILSON:  Objection.

Page 235

1 Mischaracterizes --
2    A.   I find it to be true.
3    Q.   (BY MR. GILL)  Pardon?
4    A.   I find that term to be true.
5    Q.   Well, we're going to explore
6 about that.  But that's what Ms. Jones called
7 it in that meeting; is that right?
8    A.   Correct.
9    Q.   And so, she was interested in
10 people who had gone to jail, I assume for
11 debt since it was -- she was calling it a
12 debtor's prison, right?
13   A.   Correct.
14       MR. BASS:  Objection.  That's
15 mischaracterized as to what the testimony
16 was.  It's also misleading.
17   Q.   (BY MR. GILL)  You may answer.
18   A.   She referred to it as debtor's
19 prison.
20   Q.   And you were a person who had not
21 paid some fines and had been sentenced by the
22 municipal court to a certain number of days
23 for failure to appear and not having paid

Page 236

1 those fines, right?
2        MS. WILSON:  Objection to form.
3    A.   I had paid about five thousand
4 dollars worth of fines at that point.  That's
5 why I did it.
6    Q.   (BY MR. GILL)  But you had not
7 paid all of the fines, though?
8    A.   I had paid about five thousand
9 dollars of fines at that point.
10   Q.   But you had other amounts owed
11 besides what you had paid, right?
12   A.   Those new ones were actually old
13 ones.  The majority of them were old tickets
14 brought back.
15   Q.   Okay.  All right.  So, you felt
16 like you fit into this group of people with
17 that kind of grievance, right?
18       MS. WILSON:  Objection to form.
19   A.   I had been to prison for debt,
20 yes.
21   Q.   (BY MR. GILL)  And you were
22 willing to sign up to be a plaintiff in this
23 lawsuit that Ms. Jones was promoting; is that

Page 237

1 right?
2    A.   Correct.
3    Q.   She said that they were --
4 whoever it was she was speaking for, were
5 going to file a lawsuit about the debtor's
6 prison and did you want to be a part of it;
7 is that right?
8    A.   Yes.
9        MR. BASS:  Objection.
10   Q.   (BY MR. GILL)  I'm sorry.  The
11 answer's yes?
12   A.   Yes.
13   Q.   Okay.  When did you actually
14 engage a lawyer?
15   A.   We had -- all of the news
16 stations were there that day, and that's the
17 first time I saw a lawyer.  We did a news
18 conference.
19   Q.   Which day is that, the day of
20 this presentation by Ms. Jones?
21   A.   No.
22   Q.   There was some other date after
23 this initial presentation in which there was

60 (Pages 234 - 237)

**Exhibit J**

1 a news conference called to announce this
2 lawsuit; is that right?
3    A.   Correct.
4    Q.   And who arranged that?
5       MR. BASS:  Objection.
6       MS. WILSON:  Objection.
7    A.   I'm unaware.
8       MR. BASS:  If she has personal
9 knowledge.
10      MR. GILL:  Well, then, if she
11 doesn't, she can answer and say I don't know.
12 But if she does know, I'm interested in the
13 answer.
14   Q.   Do you know who arranged the news
15 conference to --
16   A.   I do not.
17   Q.   -- make the announcement?
18      The answer is you don't know?
19   A.   I do not know.
20   Q.   Okay.  At that time, you said
21 that's the first day you actually felt like
22 you had a lawyer?
23   A.   Correct.

1    Q.   And who was that lawyer?
2    A.   At that time, it was Faya Rose
3 and Hank Sanders and Ms. Morgan.
4    Q.   And Ms. Morgan.
5       And did you have -- have you ever
6 entered into a contract by which you retained
7 that law firm?
8    A.   Yes.
9    Q.   You have a written arrangement
10 with them?
11   A.   I do have a contract.
12   Q.   With that law firm?
13   A.   Correct.
14   Q.   Well, we'd like to see that.
15      MR. GILL:  If we can put that on
16 the list, please, Mr. Bass.
17      MR. BASS:  You can put it on the
18 list, Counselor.
19      MR. GILL:  We will.  Is there
20 some objection to the engagement letter?
21      MR. BASS:  There may well be.
22      MR. GILL:  I don't think it's
23 privileged.

1       MR. BASS:  Well, you can make
2 your request.
3       MR. GILL:  Well, I'm making it.
4    Q.   Up until then, till that news
5 conference, you had not hired or engaged a
6 lawyer; is that right?
7    A.   Correct.
8    Q.   And can you tell me the date of
9 that news conference?
10   A.   I believe it was July 2nd, 2015.
11   Q.   July 2nd, 2015?
12   A.   Correct.
13   Q.   Okay.  Had you, by that time,
14 agreed to join in the lawsuit?
15   A.   Yes.
16   Q.   Had you read the complaint that
17 was going to be filed on your behalf?
18   A.   Not at that time.
19   Q.   Okay.  But you had agreed without
20 actually reading what was going to be said on
21 your behalf; is that right?
22   A.   I had spoken about it.
23      MR. BASS:  Objection.  That

1 mischaracterizes her testimony and that's
2 misleading.  If you're talking about attorney
3 work product, that's also privileged as a
4 draft of the complaint.
5    Q.   (BY MR. GILL)  Had you read the
6 complaint that was going to be filed on your
7 behalf before --
8       MR. BASS:  Objection.  That calls
9 for --
10   Q.   (BY MR. GILL)  -- it was filed?
11      MR. BASS:  -- work product.
12      MR. GILL:  No, it doesn't.
13      MR. BASS:  I'm instructing her
14 not to answer that if you're talking about --
15      MR. GILL:  Whether she had read
16 it -- whether she had read it is not
17 privileged and is not work product.  The
18 question is, had she read it.  If I -- that's
19 not work product or privilege.
20      MR. BASS:  If you're going to ask
21 what the content of it was --
22      MR. GILL:  I haven't asked that
23 yet.  I asked her had she read it.

61 (Pages 238 - 241)

Exhibit J

1     A.   I had been informed.
2     Q.   (BY MR. GILL)  Well, I understand
3 that to be -- but the question was:  Had you
4 read the complaint that was about to be filed
5 on your behalf?
6     A.   At what point?
7     Q.   When you signed up and joined in
8 the lawsuit.
9     A.   We were given --
10        MR. BASS:  Objection.  That's
11 misleading.
12    A.   -- information prior to signing
13 to look over.
14    Q.   (BY MR. GILL)  I know you were
15 given information, but the question is, did
16 you read the complaint?
17    A.   We were given the complaint as
18 well as the contract to look over, yes.
19    Q.   Okay.  And that would have been
20 on July the 2nd?
21    A.   That may have been prior to July
22 2nd.
23    Q.   Okay.  Have you ever engaged any

1 additional or other lawyers than Faya Rose
2 and Hank Sanders and Ms. Morgan?
3     A.   I have not.
4     Q.   Okay.  Do you know anything about
5 a firm called Densons?  Dentons.  Dentons.
6     A.   Never heard of that.
7     Q.   Never heard of that one.
8        And you don't have any engagement
9 contract with a Dentons Law Firm?
10    A.   Dentons Law Firm.
11    Q.   If you've never heard of them, I
12 don't --
13    A.   No, I don't -- I don't recall a
14 Dentons Law Firm.
15    Q.   Okay.  And you've never engaged
16 them to become your lawyers in any manner,
17 have you?
18        MR. BASS:  Objection.  It calls
19 for a legal conclusion.
20        MR. GILL:  Well, she'll know.
21 She said she engaged Ms. Morgan's firm.
22        MR. BASS:  The objection stands.
23        MR. GILL:  She understands what

1 that means.
2     A.   Dentons Law Firm.  No, I'm not --
3 I'm not -- I can't say I recall a Dentons Law
4 Firm, engaging them.
5     Q.   (BY MR. GILL)  Okay.  And I'll
6 give you a specific name.  Have you ever
7 engaged a lawyer by the name of Hirshman?
8     A.   Hirshman?
9        MS. MORGAN:  Do you want to give
10 her his full name?
11        MR. GILL:  I'm not sure I know
12 his full name.
13        MR. BASS:  Harold Hirshman.
14        MS. MORGAN:  Harold Hirshman.
15    Q.   (BY MR. GILL)  Harold Hirshman.
16 He may have a middle name.
17    A.   Is this someone I hired?
18    Q.   I don't know.  I'm asking you.
19    A.   Hirshman.
20    Q.   Have you ever hired a Mr. Harold
21 Hirshman?
22    A.   I do -- no.  No.
23    Q.   Have you ever hired Mr. Stephen

1 O'Brien?
2     A.   Stephen O'Brien?  No.
3     Q.   No?  Okay.  So, you had some
4 grievances in mind when you went and talked
5 to the folks at the meeting that Ms. Jones
6 arranged, right?
7     A.   Correct.
8     Q.   And tell me, if you would, what
9 those grievances were that you were upset
10 about.
11    A.   My double incarceration.
12    Q.   Your double incarceration?
13    A.   Double.  I was incarcerated twice
14 for fines.  The second time I was
15 incarcerated, I had paid those.  And they
16 seemed to come right back.  The fact that I
17 was released with about twelve tickets after
18 paying thirty-eight hundred dollars, the
19 conditions of --
20    Q.   You're going too fast for me.
21    A.   I'm sorry.
22    Q.   That's all right.  I'm going to
23 let you have the whole list.  I just need --

62 (Pages 242 - 245)

**Exhibit J**

Page 246

1 you were released with twelve tickets
2 outstanding when you had already made
3 payments and served time; is that what the
4 second item was?
5    A.   Correct.
6    Q.   Okay.  And go ahead, please.
7    A.   The conditions under which we
8 were incarcerated.
9    Q.   You're talking about the physical
10 conditions or --
11    A.   The physical conditions.
12    Q.   All right.  Anything else?
13    A.   Yes.  The emotional damage,
14 damage caused to my children with that
15 anxiety of that separation.  Most of all,
16 what Judge Hayes said about, you know, my not
17 being a good parent because I didn't pay
18 fines.
19    Q.   Okay.
20    A.   Because all of this came about
21 due to the roadblock situation that was
22 imposed upon the City and the -- and the
23 areas where I lived, the lower income areas.

Page 247

1    Q.   All right.  Let me be sure I've
2 got them.  I've gotten down to five things.
3 Double incarceration, the release with the
4 tickets outstanding, the conditions under
5 which you were incarcerated, and the
6 emotional damage to your children especially
7 related to Judge Hayes' comment about you not
8 being a good parent because you didn't pay
9 your fines?
10    A.   Yes.
11    Q.   And then, the roadblocks?
12    A.   The roadblocks --
13    Q.   Yeah.  That's five.
14    A.   -- in the lower income areas.
15      MS. MORGAN:  That's five?
16    Q.   (BY MR. GILL)  Yeah, I have
17 roadblocks in lower income areas.
18    A.   Yes.
19    Q.   All right.  Anything else?
20    A.   That would be all.
21    Q.   That'd be it.  All right.  Let's
22 go back, then, through this.  I'm not going
23 to spend any time on the roadblocks, given

Page 248

1 the fact that Judge Lambert has dismissed
2 those claims.  I may go back at a double --
3 well, no, let's start at the top.
4      The double incarceration, you
5 felt like the first time you served time in
6 jail, you had cleared the slate; is that
7 right?
8    A.   Correct.
9    Q.   And so, that when -- the second
10 time when Judge Hayes sent you to jail, you
11 felt it was for the same offenses, and
12 therefore, it was a double incarceration?
13      MS. WILSON:  Objection.
14    A.   I left jail with a list of
15 tickets when my balance said thirty-eight
16 hundred and something dollars, and I paid
17 that.  But I walked out when I paid that with
18 a list of tickets that -- what is -- where
19 does the list of tickets come from?
20    Q.   (BY MR. GILL)  I don't know.  I'm
21 asking you.  But the point is, the nature of
22 your claim about double incarceration is that
23 you thought you had paid off the tickets, and

Page 249

1 then, you were later incarcerated for some of
2 the same tickets?
3    A.   Correct.
4    Q.   Okay.  That's a fair statement of
5 that grievance, isn't it?
6    A.   (Witness nods head.)
7    Q.   And you felt like --
8    A.   Yes.
9    Q.   -- Judge Hayes sentenced you a
10 second time or commuted you the second time
11 and should not have done that, right?
12    A.   On some of those tickets.
13      MS. WILSON:  Objection to form.
14 Can you ask a question rather than
15 summarizing what you think she said?
16      MR. GILL:  No, I can't.  I'm just
17 incorrigible, I insist on being, which is my
18 privilege.
19      MR. BASS:  Objection to the term
20 "commuted".  Calls for a legal conclusion,
21 plus, it's misleading.
22    Q.   (BY MR. GILL)  Well, you've
23 already testified you knew what commuted

63 (Pages 246 - 249)

Exhibit J

1 meant, haven't you?
2    A.   No, I do not.
3    Q.   Do you know?
4    A.   No.
5    Q.   You don't have any idea.
6         Do you not know that commuted
7 means that the court sentenced you to a
8 certain number of days in jail in lieu of the
9 fines that weren't paid?
10       MS. WILSON:  Objection to form.
11       MR. BASS:  Calls for a legal
12 conclusion and misleading.
13       MR. GILL:  Thank you.
14    Q.   You may answer.
15    A.   Can you ask the question again?
16    Q.   Sure.  Do you understand that
17 commuted simply means that you had --
18 according to the judge, you had fines that
19 were due that had not been paid and you, for
20 various reasons, were then sent to jail and
21 the dollars were converted into days in jail
22 at fifty dollars a day?
23    A.   I --

1         MS. WILSON:  Objection.
2         MR. GILL:  Excuse me.
3         MR. BASS:  Objection.
4 Misleading.
5    Q.   (BY MR. GILL)  I know you're
6 having trouble answering over the noise from
7 the objections.  Would you give me your
8 answer again, please?  I couldn't hear all of
9 it.
10        MR. BASS:  We're properly making
11 objections --
12        MR. GILL:  Sure.
13        MR. BASS:  -- noted for the
14 record, Counsel.
15        It's not noise.
16        MR. GILL:  That's fine.  That's
17 fine.  But you spoke over her answer, and I
18 can't -- I just asked her to repeat the
19 answer since I can't hear it.
20        MR. BASS:  We're allowed to lodge
21 our objections --
22        MR. GILL:  That's fine.
23        MR. BASS:  -- for the record.

1         MR. GILL:  Of course you can.
2         MR. BASS:  It's noted.
3         MR. GILL:  But I'm entitled to
4 hear the answer.
5    Q.   Would you repeat your answer?
6    A.   What was the question again?
7         MR. GILL:  Read that question
8 back to her, please, Michelle.
9
10        (Whereupon, the desired portion
11         of the transcript was read back
12         by the court reporter.)
13
14    A.   I understand today.
15    Q.   (BY MR. GILL)  Okay.  And you
16 felt that Judge Hayes inappropriately did
17 that to you; is that right?
18        MS. WILSON:  Objection to form.
19    A.   I felt the City inappropriately
20 did that to me.
21    Q.   (BY MR. GILL)  What did the City
22 do that Judge Hayes didn't do?
23    A.   The City is over Judge Hayes.

1    Q.   Well, in what way do you think
2 the City is over Judge Hayes other than what
3 lawyers may have told you?
4    A.   Well, Judge Hayes did what the
5 City allowed him to do.
6         MR. BASS:  Object to that.
7 Object to that characterization.
8    Q.   (BY MR. GILL)  You say Judge
9 Hayes did what the City allowed him to do?
10   A.   Yes.
11   Q.   What evidence do you have of
12 that?
13   A.   The day he pleaded guilty to
14 seven charges, that's what he said.
15   Q.   He pleaded guilty to what?
16   A.   Seven charges of corruption.  I
17 was present.
18   Q.   Well, let me get it clear.  Where
19 did he plead guilty to several charges of
20 corruption?
21   A.   It was on Dexter Avenue, the
22 court --
23   Q.   Oh, you're talking about before

Page 254

1 the Judicial Inquiry Commission?
2     A.   Yes.
3     Q.   And you think he pled guilty to
4 corruption?
5     A.   He said -- I was present.
6     Q.   And the question is, do you think
7 he pled guilty to corruption?  You were there
8 and heard it?
9     A.   Yes, sir.
10     Q.   And that's your belief?
11     A.   His lawyer spoke on his behalf.
12     Q.   Yes.  I understand that, but the
13 question is, is it your belief that he,
14 quote, "pled guilty to several charges of
15 corruption" --
16     A.   I believe seven.
17     Q.   Let me finish the question.
18 -- unquote?  Now, you can answer.
19     A.   Yes.
20     Q.   All right.  And what does that
21 have to do with what the City did if he was
22 acting corruptly?
23     A.   He said he was doing what he was

Page 255

1 told to do, or his lawyer said that.
2     Q.   His lawyer?  Who was the lawyer
3 that said he was doing what he was told to
4 do?
5     A.   It was someone who represented --
6 he did not speak that day.  His lawyer spoke
7 on his behalf.
8     Q.   And you believe that the lawyer
9 representing Judge Hayes said to the Judicial
10 Inquiry Commission that he did what he was
11 told to do?
12     A.   I was present when it was said.
13     Q.   Are you aware that there may be a
14 transcript of that --
15     A.   I most certainly am.
16     Q.   -- and we can verify it?
17     A.   Yes, sir.
18     Q.   All right.  And who did he say he
19 was told to do anything by?
20     A.   He did not say.
21     Q.   Oh.  All right.  Well, are you
22 complaining about what Judge Hayes did?  Is
23 that one of your complaints?

Page 256

1     A.   I'm complaining about the overall
2 system.  That's what I thought was on it.
3     Q.   So, you don't have any specific
4 complaint about the fact that Judge Hayes is
5 the one who sentenced you and he sentenced
6 you for double charges?
7     A.   He is a judge, and I understand
8 that he can only go so far.  There's some
9 overhead to a judge.  From that statement he
10 made in court.  I took that to heart when he
11 said, I was doing what I was told to do.
12     Q.   Judge Hayes didn't say that, did
13 he?
14     A.   His lawyer did.
15     Q.   Well, I'll ask the question
16 again.  Do you or do you not have a grievance
17 that Judge Hayes sentenced you to double
18 incarceration?
19     A.   Yes, I have a grievance with that
20 as well.
21     Q.   As well.  Well, that's the core
22 of what you say he did, right?
23     A.   With Judge Hayes, yes.  With

Page 257

1 Judge Hayes, yes.
2     Q.   And that he is the one who made
3 the comment that you found to be disturbing?
4     A.   That's who I was standing before
5 that day, yes.
6     Q.   Yes.  And your complaint is that
7 he made a comment about you being a poor
8 parent; is that right?
9     A.   Correct.
10     Q.   All right.  And you made a
11 statement earlier in your testimony in
12 response to Mr. Logsdon's questions that you
13 thought Mayor -- that the large sentences or
14 lengthy sentences commenced at a point that
15 coincided with Judge -- I mean, excuse me,
16 with Mayor Strange taking office; is that
17 right?
18     A.   Right.
19     Q.   Do you have any evidence
20 whatsoever that Mayor Strange had anything to
21 do with the sentences that the judges imposed
22 on people in the municipal court?
23     A.   The money that went into the --

65 (Pages 254 - 257)

**Exhibit J**

Page 258

1 the twenty-five million dollars that was in
2 the news.
3      Q.   You think the City got twenty-
4 five million dollars?
5      A.   Yes, sir.
6      Q.   From what?
7      A.   Tickets and fines and fees.
8      Q.   Over what period of time?
9      A.   2007, '8, '9, '10.
10     Q.   Excuse me.  A decade?
11     A.   Well --
12     Q.   Over ten years, fifteen years --
13     A.   -- during the time --
14     Q.   -- twenty years?
15     A.   -- I was being -- not -- no,
16 not -- not even -- I'm not going to say a
17 complete decade.
18          But during that time frame.
19     Q.   Where did you get that
20 information?
21     A.   It was a report out of
22 Birmingham.
23     Q.   And where did you see that

Page 259

1 report?
2      A.   It was in the news.  It was a
3 report of the amount of money Montgomery city
4 took in as opposed to the amount of money
5 Atlanta, Georgia, took in.  And then,
6 Montgomery took in twenty-five million, and
7 Birmingham, Atlanta, and I think another
8 large city like Mobile didn't take in that
9 amount combined as opposed to the time when
10 Strange was in office.  But these other large
11 cities did not have that type of revenue off
12 of paid fines that Montgomery had alone.
13     Q.   And tell me where this report
14 was.  You said it was reported in the news?
15     A.   Yes, it was in the news.  It
16 was -- it was out of Birmingham.  It was
17 in -- a report out of Birmingham, Alabama.
18     Q.   Was it on the television news?
19     A.   It was a post that was --
20     Q.   Pardon?
21     A.   It was a post.  I'm not sure if
22 you're -- a post.  Like on Facebook, it was a
23 post.

Page 260

1      Q.   Oh.  Oh.  Some blog site?
2      A.   No, it was not a blog.  It was a
3 newspaper post.
4      Q.   The Birmingham newspaper?
5      A.   Yes, sir.
6      Q.   Which newspaper?
7      A.   It's been -- it's been a while
8 since I saw it, but it was information that I
9 read there.  So, I did independent -- I
10 looked -- I went and did my own research on
11 it after that just to --
12     Q.   You did.  What did you find in
13 your own research?
14     A.   I found it to be true, what was
15 being said.
16     Q.   So, the City of Montgomery took
17 in twenty-five million dollars in what period
18 of time is your best judgment?
19     A.   Over the course of -- I can't
20 remember.  It was a very short period of
21 time.  It was like a year or two years.  It
22 was a very short period of time that they got
23 that amount of money.

Page 261

1      Q.   Did you know anything at all
2 about whether the City of Birmingham was
3 accounting for its receipts in the same way
4 as the City of Montgomery was?
5          MR. BASS:  Objection.  Calls for
6 facts not introduced into evidence.
7      A.   Did I know anything about how
8 Birmingham was accounting --
9      Q.   (BY MR. GILL)  No, let me
10 rephrase the question.  You said you saw some
11 article that some reporter wrote and that it
12 showed that the City of Montgomery took in
13 twenty-five million dollars while the City of
14 Birmingham and these other cities you
15 mentioned took in far less, right?
16     A.   Combined.
17     Q.   Okay.  Combined.
18          And do you know -- the question
19 is, do you know whether or not the City of
20 Birmingham accounted for its receipts from
21 its municipal court in the same way that the
22 City of Montgomery reported its receipts?
23     A.   That's how it was reported.

66 (Pages 258 - 261)

Exhibit J

Page 262

1    Q.    That's how it got in the report,
2  but do you know if that's right that they
3  recorded them in the same way?
4    A.    Do I know, a layperson, know how
5  the City of Birmingham recorded their revenue
6  from paid fines and tickets?
7    Q.    And you don't, do you?  You have
8  no idea?
9    A.    Well, it's a known fact that
10 Montgomery took in a lot of money from paid
11 fines.  So, I lean toward that information.
12   Q.    Of course.
13   A.    Right.
14   Q.    Because that's the viewpoint from
15 which you come, right?
16   A.    (Witness nods head.)
17   Q.    But the -- you have no idea
18 whether the City of Birmingham reported its
19 figures in one way and the City of Montgomery
20 reported its in a different way?
21       MR. BASS:  Objection.
22       MS. WILSON:  Objection.
23       MR. BASS:  That's now the third

Page 263

1  time you've asked that question.
2        MR. GILL:  I know it, and I want
3  to be clear that she actually has no factual
4  basis to know one way or the other about
5  that.
6    A.    I'm missing the point.
7    Q.    (BY MR. GILL)  Well, you don't
8  have to see the point.  The question is, do
9  you know how Birmingham kept its books or
10 reported its spent revenues versus how
11 Montgomery recorded its revenues?
12   A.    There's no way I can know that.
13   Q.    Okay.  That's fine.  So, you
14 don't know if you're comparing apples to
15 apples or apples to oranges, right?
16   A.    I didn't compare.
17       MR. BASS:  Objection.
18       MS. WILSON:  Objection.
19   A.    An expert somewhere compared it.
20 Someone who did report it compared it.
21   Q.    (BY MR. GILL)  Well, that's one
22 of the facts you've told me that leads you to
23 suspect that Mayor Strange had something

Page 264

1  terrible that he was doing.
2        MS. WILSON:  Objection.
3    A.    I didn't say that.
4        MS. WILSON:  That's not a
5  question.
6    Q.    (BY MR. GILL)  You don't, in
7  fact, know if Major Strange had anything to
8  do with the fines and costs of municipal
9  court, do you?
10   A.    I was led to believe that by the
11 statements that Judge Les Hayes made.  I just
12 came to that conclusion.
13   Q.    All right.
14   A.    Okay.
15   Q.    But in terms of evidence, you
16 don't have any evidence that Mayor Strange in
17 any way controlled the fines and costs in
18 municipal court, do you?
19   A.    Mayor.
20   Q.    Pardon?
21   A.    He's the mayor.
22   Q.    The mayor.
23   A.    Right.

Page 265

1    Q.    Did I call him the wrong name?
2    A.    Well, the mayor has some say in
3  that.
4    Q.    What say does he have about that?
5    A.    I'm not sure, sir, but I'm pretty
6  sure he has some say.
7    Q.    But you have no facts?
8    A.    I can get some.
9    Q.    Where can you get them?
10   A.    Not presently today, but I will
11 get some.
12   Q.    Where can you get them?
13   A.    I will get them.
14   Q.    Pardon me?
15   A.    I will get them, sir.
16   Q.    Well, where do you plan to get
17 them because that's in this lawsuit?  We'd
18 like to know where you plan to get such
19 facts.
20   A.    All right.
21   Q.    And what is your plan or what
22 source for any facts about the mayor?
23   A.    It's public records.

67 (Pages 262 - 265)

**Exhibit J**

Page 266

1    Q.   It's a public record that the
2  mayor controlled the fines and costs
3  administered or assessed in municipal court;
4  is that what you're saying?
5    A.   The mayor controls the police
6  officers, who are disbursed into certain
7  communities, who ticketed the same people
8  over and over and over and over and over,
9  which, then, they come back two months later
10  and arrest you and take you before the
11  courts.  And the courts put you in jail and
12  create a debtor's prison.  That's a fact.
13    Q.   That's the fact?
14    A.   Yes, sir.
15    Q.   But I'm going to ask you the
16  question again about your assertion that you
17  were going to come up with facts that show
18  that the mayor had something to do with
19  controlling the assessment of fines and fees
20  in the municipal court.
21    A.   Yes.
22    Q.   And what evidence of that do you
23  claim to have or where do you plan to get it?

Page 267

1    A.   I was ticketed.  It just -- break
2  it all the way down to the lowest form.  I
3  was ticketed several times in --
4    Q.   Yes, you were.
5    A.   -- lower income community.
6         Just like my recent -- my latest
7  ticket said that I didn't have a current tag
8  nor did I have insurance, but I did.  And
9  that happened three times in a row.  And why
10  did that happen three times in a row?  I have
11  a current tag.  I have insurance.  But you
12  give me a stack of tickets saying I have no
13  current tag and I have no insurance.  And
14  because you did that, now, you have a right
15  to say -- give me a ticket for not having a
16  license, which I can never get if I keep
17  getting these unwarranted tickets.  And
18  that's the system.
19    Q.   Well, you've wandered a long way
20  from the question I asked.
21    A.   I have.
22    Q.   Because the deal is whether --
23  how you handle -- if you have insurance, you

Page 268

1  just show them you have insurance and there's
2  no ticket but --
3    A.   You asked me what was my
4  reasoning.  Or what was the facts --
5    Q.   I didn't ask you the reasoning.
6    A.   -- that I had.
7    Q.   I asked you the facts.
8    A.   That was my facts, my personal
9  experience.
10    Q.   That's the facts is, that you've
11  gotten a lot of tickets, right?
12    A.   Correct.
13    Q.   And you have, right?  You've had
14  dozens of tickets?
15    A.   Correct.
16    Q.   And you have missed many court
17  appearance dates, right?
18    A.   Correct.
19    Q.   And when put on probation with
20  JCS, you made no payments?
21    A.   No payments.
22    Q.   Did not comply with the probation
23  order in any way, did you?

Page 269

1    A.   I had paid them already.  I
2  didn't see a need to comply.
3    Q.   Well, whether you saw a need to
4  or not, you had a court order that said you
5  were to do it and --
6    A.   Of course, I did.
7    Q.   -- you didn't do it, right?
8    A.   Of course.  Of course I had a
9  court order.
10    Q.   When you say the judge sentenced
11  you wrong --
12    A.   Correct.
13    Q.   -- did you appeal that?
14    A.   I did not.
15    Q.   You knew that you could, didn't
16  you?
17    A.   No.
18    Q.   You don't know you can appeal?
19    A.   I did -- I did not know that you
20  can appeal -- that you could appeal that on
21  that level.  It's misdemeanors.  I didn't
22  know that you -- I knew of an appeal, yes,
23  but I did not realize that you could appeal

68 (Pages 266 - 269)

**Exhibit J**

Page 270

1  something on that level, no.
2      Q.   And you didn't inquire?
3      A.   I did not.
4      Q.   All right.  And you've been
5  charged with a number of offenses separate
6  and apart from traffic tickets, haven't you?
7      A.   No.
8      Q.   You've been charged --
9      A.   I have a few.
10     Q.   You were once charged with
11 criminal mischief.  What was that about?
12     A.   I was about eighteen or nineteen,
13 and a friend of mine -- me and a girlfriend
14 of mine, we got into it.  And she called the
15 police.  And I wasn't an idiot and didn't
16 leave, and they charged me with criminal
17 mischief.
18     Q.   All right.  You've been charged
19 with harassment.  What was that about?
20     A.   That was Jeffrey Jackson's
21 mother, my daughter's grandmother.  He had
22 taken the car back from me, the red LeBaron
23 that I had been ticketed in.  And -- because

Page 271

1  I asked him to leave.  And I needed it to get
2  to work.  So, I went over, and I asked her --
3  she had burglar bars.  And I had an ICEE in
4  my hand, and I threw it at the door.  I was
5  pregnant.  I was six, seven months pregnant.
6  I had to walk to her house.  I needed the car
7  to get to work.  So, I took the ICEE that I
8  had in my hand, and I threw it at the glass
9  door.  But it was between burglar bars.
10         And I guess -- I didn't even know
11 she signed that.  Later on down the road,
12 they showed up at the house and arrested me.
13 I didn't even know she had did that.
14     Q.   Okay.
15     A.   Because I left there walking.  I
16 didn't even get the car.  I left there
17 walking.
18     Q.   Okay.  Well, you've had a good
19 many encounters with Montgomery Municipal
20 Court, with county district court, and at
21 least one instance with the police in Elmore
22 County, right?
23     A.   Yes.

Page 272

1      Q.   And you never have inquired of
2  anybody whether if you think the charges
3  against you are not justified and you're
4  convicted of them that you should -- you can
5  appeal?
6          MR. BASS:  Objection.
7          MS. WILSON:  Objection to form.
8          MR. BASS:  Compound.  Misleading.
9      Q.   (BY MR. GILL)  You may answer.
10     A.   No, they were misdemeanor
11 charges.  I was unaware that I could appeal
12 misdemeanor charges and --
13     Q.   And the point is, you never asked
14 in any of those various encounters with the
15 courts --
16     A.   I pled guilty --
17         MS. WILSON:  Objection to form.
18     A.   -- to the charges.
19         THE COURT REPORTER:  I can only
20 get one at a time.
21     Q.   (BY MR. GILL)  And, in fact, the
22 list of charges on which you were sent to
23 jail on the 2nd or 3rd of July of 2013, you

Page 273

1  were guilty of every one of them, weren't
2  you?
3      A.   I pled guilty.
4      Q.   And there were seventeen of them
5  at that time?
6      A.   I pled guilty.
7      Q.   Okay.  And some of them were
8  mandatory sentences where you couldn't get a
9  fine, right?
10     A.   Correct.
11         MR. BASS:  Objection.  Calls for
12 a legal conclusion.
13     Q.   (BY MR. GILL)  And so, let me
14 come back and close a circle if I can on this
15 business about your belief that somehow the
16 mayor had some control over the municipal
17 court.  And I want to try to ask you to
18 separate your beliefs or your irritations and
19 concentrate on facts.
20         MS. WILSON:  Objection.
21     Q.   (BY MR. GILL)  And the question
22 is, do you have any facts that suggest --
23 that would go to establish proof that the

69 (Pages 270 - 273)

Exhibit J

Page 274

1  mayor controlled the sentencing in the
2  district -- excuse me, in the municipal
3  court?
4       MS. WILSON: Objection. Calls
5  for a legal conclusion.
6       MR. GILL: The facts are not
7  legal conclusions.
8    A.   The facts to -- on my -- the
9  facts, to me, is that the officers were
10 dispatched in those communities, which would
11 ultimately lead you to that -- to that
12 courtroom.
13   Q.   (BY MR. GILL) Do you think the
14 mayor controlled where the officers were
15 stationed by the police chief?
16   A.   Yes. That's his -- isn't the
17 mayor their boss?
18   Q.   You think the mayor even knew
19 where officers were stationed?
20   A.   Yes.
21   Q.   What fact do you have to base
22 that belief on?
23   A.   He's their boss.

Page 275

1    Q.   Well, he may be their boss, but
2  that doesn't mean he knows where every
3  officer is stationed, does it?
4       MR. BASS: Objection.
5       MS. WILSON: Objection.
6       MR. BASS: That's testimony, not
7  really a question.
8    Q.   (BY MR. GILL) You don't have any
9  facts --
10      MR. BASS: It's misleading.
11   Q.   (BY MR. GILL) -- that the
12 mayor --
13      THE COURT REPORTER: I can only
14 get one at a time. One at a time.
15   Q.   (BY MR. GILL) You don't have any
16 facts that the mayor controlled where the
17 police were stationed, do you?
18   A.   I don't have any facts that he
19 didn't.
20   Q.   Oh, okay. But you don't have any
21 facts that he did either, do you?
22   A.   So it can rest right there.
23      THE COURT REPORTER: Excuse me?

Page 276

1    Q.   (BY MR. GILL) And you certainly
2  don't have --
3       THE WITNESS: It can rest right
4  there.
5    Q.   (BY MR. GILL) -- any facts --
6  other than this chain of reasoning you have
7  stemming from the stationing of the police,
8  you have no facts that the mayor had any
9  control over what fines and penalties the
10 judges in the municipal courts assessed, do
11 you?
12   A.   I know that you were given, like,
13 four or five tickets at a stop most of the
14 time. So, that would certainly build up a
15 high tally of fines with the court costs
16 added to each ticket. Although you were
17 showing up to court one time, there was a
18 court cost added to each ticket.
19   Q.   By the court?
20   A.   Right.
21   Q.   The court assessed those costs,
22 right?
23   A.   The police wrote the tickets.

Page 277

1    Q.   Well, the police don't set the
2  fines and costs, do they?
3    A.   Correct.
4    Q.   And so, when you went to court
5  and the fines and costs were assessed, that's
6  something the judge did, right, or you pled
7  guilty to, right?
8    A.   That's correct.
9       MR. BASS: Objection.
10      MS. WILSON: Objection.
11      MR. BASS: That's a compound
12 question.
13      MS. WILSON: That's a compound
14 question.
15   Q.   (BY MR. GILL) All right. I'll
16 take it in two parts. You've already told me
17 you pled guilty to all these offenses that
18 are listed there. And the assessment of how
19 much the fine is and setting what the court
20 costs are is something that the judge did;
21 isn't that right?
22   A.   If you had five tickets, he would
23 assess five tickets --

70 (Pages 274 - 277)

Exhibit J

Page 278

1   Q.   Okay.
2   A.   -- for that one stop.
3   Q.   But the question is, who did
4 that? And the judge is the one who did that,
5 right?
6   A.   The judge is the one who did
7 that.
8   Q.   That's right.
9      MS. HOLLIDAY:  Can we go off the
10 record for a minute?
11     MR. GILL:  Sure.
12
13     (Whereupon, a discussion was held
14     off the record.)
15
16   Q.   (BY MR. GILL)  All right.  Now,
17 do you -- did you have any complaint about
18 when you were in the municipal court and were
19 sentenced to the jail, the commuted fines we
20 went over a minute ago, that you didn't have
21 access to counsel?
22   A.   We did not have access to
23 counsel.

Page 279

1   Q.   All right.  Did you ask for a
2 lawyer?
3   A.   There was someone present during
4 that time, a public defender.
5   Q.   All right.  And did you talk to
6 him?
7   A.   He pretty much encouraged you to
8 go ahead and plead guilty.
9   Q.   But the question was whether you
10 talked to him.
11   A.   I did.
12   Q.   I can't speak to his advice.
13      But you did talk to him, and you
14 say he encouraged you to plead guilty --
15   A.   Yes.
16   Q.   -- on the basis, I assume, were
17 the facts?
18   A.   He would say plead guilty, yes.
19   Q.   Okay.  And who do you say
20 should -- well, do you have any complaint
21 about that lawyer being appointed for you?
22   A.   You cannot tell the lawyer or the
23 public defender from the, I guess you would

Page 280

1 say DA.  You don't know who is who.  It's
2 like it's the same team.
3   Q.   Well, the prosecutor didn't --
4   A.   Prosecutor.
5   Q.   -- encourage you to plead guilty,
6 did he?
7   A.   You cannot differentiate who
8 you're standing with, you know, other than he
9 may be standing -- you have one on one side
10 and one on -- you know, it's not like I go to
11 court all the time.  So, I'm really not able
12 to differentiate who is who when I'm standing
13 there.  I just know that, you know, I'm going
14 to plead guilty.
15   Q.   Okay.  And you pled guilty
16 because, in fact, you were guilty, right?
17   A.   On most of it.
18   Q.   You made payments of lump sum
19 payments twice?  You said you paid twenty-two
20 hundred dollars once; is that right?
21   A.   Yes.
22   Q.   Is it not correct that you
23 actually paid eleven hundred dollars and were

Page 281

1 allowed out because that was half of the
2 twenty-two hundred dollars that the court had
3 assessed?
4      MS. WILSON:  Objection to form.
5   A.   In 2012?
6   Q.   (BY MR. GILL)  Yes.
7   A.   It was a total of twenty-two
8 hundred dollars paid, I believe.
9   Q.   All right.  You remember that
10 there was -- you were to pay twenty-two
11 hundred dollars, but you paid eleven hundred
12 dollars and got out because there was an
13 order from the judge that you could get out
14 on half?
15   A.   That, I do not recall.
16   Q.   You don't remember that.
17      Back when you were put on a
18 payment plan before JCS, you talked for a
19 little bit about that to Mr. Logsdon earlier;
20 do you remember?
21   A.   Yes, sir.
22   Q.   Did you also fail to meet the
23 terms of that payment plan?

71 (Pages 278 - 281)

Exhibit J

Page 282

1    A.   I paid for some time until I
2  found out that my payment was only going
3  toward a fee with them and not going toward
4  the bottom line.  Then, I stopped paying
5  them.
6    Q.   Okay.  So, you're saying that
7  that probation service was using all the
8  payments you made to pay its own fees?
9    A.   I was told to pay forty
10  dollars -- I'm not sure if it was every -- it
11  was a while ago -- every month -- like,
12  monthly or biweekly.  And I came to find out
13  that that payment was not going toward the
14  bottom line.  It was going toward a fee to
15  the company.
16    Q.   How did you find that out?
17    A.   I went to get a bottom line.  I
18  went to -- I was trying to get my license.  I
19  took the written test and passed.  And they
20  said that I had a suspended -- suspension
21  that would need to be paid.  So, they didn't
22  have the number to that ticket for the
23  suspension.  So, I went to that particular

Page 283

1  company and I asked them can I pay this here.
2  Can you give me the number where I can go to
3  the City, the number of the ticket so I can
4  go to the City and make the payment where I
5  can complete getting my license?  And they
6  told me that I would have to pay the entire
7  balance before I could be released or they
8  wasn't going to give me one specific ticket
9  that I can go over to the City and pay.
10      So, I said, well, give me a
11  printout what I owe you.  It was exactly the
12  same as the day it was that I got with them.
13  So, from that point on, I decided I'm not
14  going to pay that way because it's been a
15  waste of money.  I don't -- I don't have
16  money just to hand over for no reason.
17    Q.   How many payments had you made to
18  them by that time?
19    A.   I'm not sure how many.
20    Q.   How many dollars approximately?
21    A.   I am honestly not sure.  I was
22  probably not really working at the time, but
23  I was giving what -- if I got like a --

Page 284

1  the -- whatever I could get my hands on.
2  When I could pay them to satisfy them in some
3  way, I would take money to them, some -- you
4  know, I would take money to them.
5      But, at that point, I had
6  somebody willing to help me, you know, go
7  ahead and move forward and pay this one
8  ticket and get my license so I can have them.
9  And it didn't happen because they said you
10  have to pay the entire thing.  We're not
11  going to give you the payment list for one
12  ticket.
13    Q.   Do you remember approximately
14  what year that was?
15    A.   That would have been around 2004,
16  something like that, 2004 or '5, somewhere in
17  there.
18    Q.   Well, I don't want to spend too
19  much time on ancient history that is not
20  really part of this lawsuit, but you have no
21  concept of how much money you had paid that
22  they put in their pockets and didn't give any
23  to the City?

Page 285

1    A.   I do not.  I honestly -- they
2  gave me a printout that day, but I don't have
3  it.
4    Q.   Was it in the hundreds of
5  dollars?
6    A.   It was in the hundreds of
7  dollars.
8    Q.   Thousands of dollars?
9    A.   It was not in the thousands.  It
10  was in the hundreds.
11    Q.   Did you go and complain about
12  that to anyone at the municipal court that
13  you weren't getting credit for your payments
14  pursuant to the probation order?
15    A.   I knew they knew I wasn't getting
16  credit if I was told just to pay.  So, I knew
17  that.  So, I didn't go over and complain.
18  But I knew that they knew.
19    Q.   Well --
20    A.   It just was hopeless to me.
21    Q.   Well, what you did is just to
22  stop paying, right?
23    A.   Right.

72 (Pages 282 - 285)

Exhibit J

Page 286

1        MS. WILSON: Objection.
2    Q.   (BY MR. GILL) And you didn't
3 take it up with the municipal court or the
4 municipal judge who had sentenced you to the
5 probation --
6        MS. WILSON: Objection to form.
7    Q.   (BY MR. GILL) -- or anybody else
8 in authority over that court; is that right?
9    A.   No --
10        MS. WILSON: Objection to form.
11    A.   -- I was very young.
12        I was young.  I was only in -- I
13 was in my twenties.  I didn't know.
14    Q.   (BY MR. GILL) Well, you felt
15 like they had done you wrong, didn't you?
16    A.   I felt like that was the system,
17 that's how it worked.
18    Q.   And when you felt like you had
19 been done wrong, you just said, well, I'll
20 just quit paying, and that's the end of it --
21        MS. WILSON: Objection to form.
22    Q.   (BY MR. GILL) -- I'll accept
23 that; is that right?

Page 287

1        MS. WILSON: Mischaracterization.
2    A.   I did not accept it.
3        THE COURT REPORTER: One at a
4 time.
5        MS. WILSON: Mischaracterization.
6    Q.   (BY MR. GILL) You may answer.
7    A.   I did not want to accept that,
8 no.
9    Q.   But you did?
10    A.   Yes, it was part of the system
11 was how I saw it.
12    Q.   And you never encountered Judge
13 Knight?
14    A.   No, I've never been before Judge
15 Knight.
16    Q.   You never encountered Judge
17 Hardwick?
18    A.   I don't know why they signed off
19 on those things.  I was before -- I was not
20 before those judges.
21    Q.   And there's a reference in here
22 somewhere about Judge Reed sending your son
23 to Beth Manor?

Page 288

1    A.   Yes.
2    Q.   And Judge Reed is the county
3 probate judge, right?
4    A.   Correct.
5    Q.   Okay.  When you appeared before
6 Judge Hayes and were told about the commuted
7 sentence to a hundred and fifty-two days, did
8 he tell you anything about your right to
9 counsel before he did that?
10    A.   I can't -- I can't remember.
11    Q.   Okay.  Did he tell you that you
12 had a right to appeal from his decision?
13    A.   I think he may have said that,
14 and, yes.
15    Q.   Okay.  Did he ask you whether or
16 not you had the means to pay those tickets?
17    A.   No.
18    Q.   And, of course, that sentence
19 then occurred after you had been put on a JCS
20 program to pay it, pay them in installments,
21 right?
22    A.   Yes.
23    Q.   And so -- and you had not paid

Page 289

1 the installments?
2    A.   No.
3    Q.   At the time that you were placed
4 on probation to pay in installments, did you
5 have the means to pay the installments?
6    A.   I think I was working at Holiday
7 Inn Express, but I did not have the money to
8 pay the installments.
9    Q.   Now, you said at least one of the
10 payments that you had made came out of money
11 set aside for your school?
12    A.   That was in 2013.  It was
13 something that showed up during the
14 incarceration.
15    Q.   The money just showed up?
16    A.   In the mail.  It was a check in
17 the mail.
18    Q.   And whose check was it?
19    A.   It was -- it was addressed to me.
20    Q.   Well, I mean, had you applied for
21 that money?
22    A.   I had.
23    Q.   And was it conditioned on you

73 (Pages 286 - 289)

**Exhibit J**

Page 290

1 using it for school?
2     A.    It was.  It was a student loan.
3     Q.    But you used it for tickets --
4     A.    Yes.
5     Q.    -- in part?
6     A.    Correct.
7     Q.    And I think you said you used the
8 rest of it for something else.
9           MR. LOGSDON:  Groceries.
10    Q.    (BY MR. GILL)  For groceries?
11    A.    No, that was for rent.
12    Q.    Rent.
13    A.    The rent was about --
14    Q.    That's what you said --
15    A.    -- five hundred.
16    Q.    -- was rent.
17          I'm sorry.
18    A.    And groceries, stuff like that.
19    Q.    Okay.  So, it did not get used
20 for school?
21    A.    It did not.  I withdrew.
22    Q.    Have you had to pay that back?
23    A.    I am in the process.  I'm current

Page 291

1 on my student loans.
2     Q.    I'm sorry.  I couldn't --
3     A.    Yes, I will have to pay that
4 back.  It's a part of the student loans.
5     Q.    You will have to pay it back?
6     A.    I will have to pay it back.
7     Q.    But you have not yet paid it
8 back?
9     A.    It's a part of the student loans
10 that I've been having --
11    Q.    Existing student loan?
12    A.    -- to pay.
13    Q.    Are you paying installments on
14 your student loan now?
15    A.    Right now, I'm in good standing,
16 but it's because I filed for hardship.
17    Q.    Well, I'm not suggesting that
18 you're not in good standing, but are you
19 making partial payments on those -- on that
20 student debt?
21    A.    When you file for a hardship,
22 they give you a break in payments --
23    Q.    Okay.

Page 292

1     A.    -- with it still being in good
2 standing.
3     Q.    Well, had you been making
4 payments and then reached a hardship
5 circumstance --
6     A.    I made --
7     Q.    -- and, therefore, have a hiatus?
8     A.    Mostly since the situation, I
9 have been in the hardship status.  I'll make
10 some payments, and then, I'll have to end up
11 filing again for that status, and then, I'll
12 make some.  But I try to keep it current so
13 it doesn't go into default.
14    Q.    Okay.  Assuming that you were to
15 pay in installments, what is the duration of
16 the installment payments?
17    A.    With what I'm set up with, it's
18 twenty years.
19    Q.    Twenty years.  Okay.
20          You said you were present at the
21 Judicial Inquiry Commission when Judge Hayes'
22 lawyer made certain statements; is that
23 right?

Page 293

1     A.    Yes.
2     Q.    You were sitting there?
3     A.    Yes, sir.
4     Q.    Did you initiate the complaint
5 against Judge Hayes or join in that?
6     A.    I did not initiate it.
7     Q.    Well, how did you come to be
8 there or know anything about it?
9     A.    The courts sent me a letter and
10 invited me to be there.
11    Q.    The Commission sent you a letter?
12    A.    Yes, sir.
13    Q.    Okay.  And how did they become
14 aware of your particular set of facts?
15    A.    I just know I -- I'm not sure.  I
16 just know I received an invitation and
17 that -- saying this is the court date that
18 the judge will, you know, come to plead
19 before the panel.  And I was -- I was given a
20 private invitation to be there.
21    Q.    Okay.  Had you been in contact
22 with those JIC people before that day?
23    A.    No, sir.

**Exhibit J**

Page 294

1    Q.   And so, you were given an
2  invitation to come and hear the final outcome
3  as to what he pled to; is that right?
4    A.   That's correct, yes.
5    Q.   Okay.
6         MR. GILL:  All right.  Let's take
7  a quick break.
8
9         (Whereupon, a brief recess was
10        taken.)
11
12    Q.   (BY MR. GILL) Ms. McCullough,
13  let me tie up some loose ends before I turn
14  to a new topic.
15        You testified that the lawyer at
16  the -- speaking to the judicial body said
17  that Judge Hayes, he just did what he was
18  told.  Did he say who told him?  Was that
19  something he included in his remarks?
20    A.   He did not.
21    Q.   Did not say who told him.
22        Have you ever had a driver's
23  license?

Page 295

1    A.   I have not.
2    Q.   All right.  So, have you ever had
3  automobile insurance?
4    A.   Yes.
5    Q.   How do you get insurance without
6  a driver's license?
7    A.   It's allowed.  It is allowed.
8    Q.   Pardon me?
9    A.   It is allowed to get insurance.
10    Q.   Is it?
11    A.   Yes.
12    Q.   You said your son went to, I'm
13  sorry, a school in Fitzpatrick?
14    A.   My youngest, yes.
15    Q.   Yeah.  Is that in Montgomery
16  County?
17    A.   Yes, it is.
18    Q.   Just across the line from Bullock
19  County?
20    A.   It's -- the name of the school is
21  Fitzpatrick.
22    Q.   Right.  But the school, it's the
23  Fitzpatrick school but not located in

Page 296

1  Fitzpatrick, Alabama; is that what you're
2  telling me?
3    A.   No, sir, it's not Fitzpatrick,
4  Alabama.  It's in Montgomery.
5    Q.   Where is it?
6    A.   Off of Virginia Loop Road.
7    Q.   Okay.  You had -- you said you
8  had checks that you got that were cashed and
9  used to pay the two lump sum payments that
10  you made on the fines; do you remember?
11    A.   Yes, sir.
12    Q.   Who cashed those checks?
13    A.   The first time, it was a direct
14  deposit to Max Federal Credit Union.  The
15  second payment was by my son's grandfather.
16  He knew someone who had a check cashing
17  place.  And so, they brought it to the city
18  jail and allowed me to sign it and release my
19  ID with them, and then, they took it to the
20  check cashing place and had it cashed.
21    Q.   Okay.  And the direct deposit,
22  did somebody draw a check against that
23  account?

Page 297

1    A.   My son who's disabled has a check
2  that's deposited on a monthly basis.  And
3  there was nobody there to withdraw the money.
4  So, it just piled up over that course of
5  time.
6    Q.   Well, I understand that.  But at
7  some point, you used a portion of that money
8  to pay fines, right?
9    A.   The jailer allowed me to Western
10  Union it from Max Credit Federal Union to a
11  relative to pick up at, like, a Winn Dixie.
12    Q.   Okay.  It was wire transferred
13  out, then?
14    A.   I had it wire transferred.
15    Q.   Okay.  And during the time when
16  you were assigned to JCS, did you -- I asked
17  you if you had the means to make the
18  installment payments, and you said you had
19  various difficulties.  But could you have
20  made any part of the payments due at JCS --
21    A.   Well, the --
22    Q.   -- had you wished to do so?
23    A.   Well, I was working but not

75 (Pages 294 - 297)

Exhibit J

1 making very much money and I had -- just had
2 the disability and then the job that wasn't
3 paying very much. So, that pretty much
4 consumed, you know, household money, you
5 know, toward the household and the children.
6     Q.   Well, are you telling me that
7 throughout that period, which was a number of
8 months, you could not have paid anything, or
9 that you could have, but you felt like you
10 weren't -- the system wasn't working right
11 and you weren't going to?
12     A.   What months were those?
13         MS. WILSON: Objection to form.
14     Q.   (BY MR. GILL) Well, you were
15 assigned to JCS in -- you were assigned on
16 the 11th of November -- excuse me, the 7th of
17 November of 2010 for a probationary period to
18 last twenty-four months. So, between 2010
19 and when your probation was terminated and
20 you were -- and the sentence was commuted,
21 could you have paid any part of that -- those
22 payments had you wished to do so or been
23 willing to do so? Let me rephrase it.

1     A.   I do -- I do not believe that I
2 would have been able because of the income
3 that I was receiving at that time.
4     Q.   All right. So, when you were put
5 on probation, did you tell the judge that
6 there's no reason, no point in putting me on
7 probation, I can't make those even twenty-
8 five-dollar-a-month or forty-dollar-a-month-
9 payments?
10     A.   I did not.
11     Q.   But you did testify that you felt
12 that that was all wrong anyway and you
13 weren't going to pay it?
14         MS. WILSON: Objection to form.
15     A.   I did not say I wasn't going to
16 pay it. I felt it was wrong, though.
17     Q.   (BY MR. GILL) I thought you
18 testified earlier that you decided you would
19 not pay it?
20     A.   I did not --
21         MS. WILSON: Object to form.
22     A.   -- specifically say that.
23     Q.   (BY MR. GILL) Okay. Well, the

1 record will reflect --
2         MR. LOGSDON: I think -- are you
3 saying you didn't say that to the judge?
4 He's talking about, did you tell us that.
5         MR. BASS: Objection. One
6 questioner at a time.
7         MR. GILL: Well, that's the
8 question I was going to ask.
9     Q.   Didn't you tell Mr. Logsdon that
10 earlier today, that you decided you simply
11 were not going to be back on making payments
12 to a probation service?
13     A.   I did not --
14         MS. WILSON: Objection to form.
15     A.   -- say that.
16     Q.   (BY MR. GILL) You didn't say
17 that.
18         Okay. Even though they are by a
19 different party, I'm going to number the
20 exhibits continuously to this deposition as
21 opposed to switching. And so, the next one,
22 I take it, is 47.
23

1         (Whereupon, Defendant's Exhibit
2         47 was marked for identification
3         and copy of same is attached
4         hereto.)
5
6     Q.   (BY MR. GILL) Let me show you
7 Exhibit 47, Ms. McCullough. And you see this
8 is a listing of the charges that were against
9 you and you've seen the different form of a
10 list of those charges, but do you recognize
11 them?
12     A.   I do.
13     Q.   And turn to the second page. And
14 do you see that it shows that the total paid
15 was eleven hundred dollars?
16     A.   I do.
17     Q.   And that you've served sixty-six
18 days?
19     A.   Right.
20     Q.   But that that left a balance
21 unpaid of two thousand and sixty-seven
22 dollars?
23     A.   I see the balance.

76 (Pages 298 - 301)

**Exhibit J**

1   Q.   You've never paid that balance,
2 have you?
3   A.   I did.
4   Q.   You did?
5   A.   The second time around, I paid
6 that balance.
7   Q.   Okay.  So, when you were
8 rearrested in 2012, you say you paid that
9 balance?
10   A.   I had a zero balance when I left,
11 yes.
12   Q.   Oh, okay.  By doing the days in
13 jail then on that occasion?
14   A.   And paying the --
15   Q.   And paying some --
16   A.   -- thirteen hundred.
17   Q.   Okay.  But in between 2009 and
18 2012, you did not pay those?
19   A.   No.
20   Q.   Okay.  Now, do you contend that
21 Mayor Strange had anything to do with how JCS
22 conducted its business?
23      MS. WILSON: Objection. Calls

1 for legal conclusions.
2      MR. GILL:  Explain to me what's a
3 legal conclusion about that question.
4      MS. WILSON:  You asked her to
5 explain whether she contends whether the
6 mayor had anything to do with JCS.
7      MR. GILL:  It's her contention.
8      MS. WILSON:  That supposes that
9 she would know something about a connection
10 between somebody that contracts with the
11 City.
12      MR. GILL:  I think she doesn't
13 know anything about it, but I'm entitled to
14 find that out.
15   Q.   Do you claim that or contend
16 that?
17   A.   That Mayor Strange --
18   Q.   Had something to do with how JCS
19 conducted its business.
20      MR. BASS:  Objection.  That's
21 incredibly vague.
22   Q.   (BY MR. GILL)  Well, can you
23 answer the question?

1   A.   No, I can't.
2   Q.   You can't answer it?
3   A.   No, sir.
4   Q.   JCS was a private company, as you
5 understand it, right?
6   A.   I do now, yes.
7   Q.   And do you have any facts that
8 suggest that Mayor Strange had anything to do
9 with how JCS conducted its business?
10      MS. WILSON:  Objection.
11   Q.   (BY MR. GILL)  That question
12 asks --
13   A.   I cannot answer that.
14   Q.   Pardon?
15   A.   I cannot answer that.
16   Q.   Well, the answer is, you don't
17 have any facts, do you?
18   A.   I cannot answer that is the
19 answer.
20   Q.   Well, why can't you answer
21 whether or not you have facts?
22   A.   I just cannot answer that
23 question.

1   Q.   What is it about the question
2 that's impossible to answer?
3   A.   You're asking me do I have the
4 facts of whether or not Todd Strange had
5 anything to do with the -- how JCS
6 conducted --
7   Q.   That's right.  And if you don't
8 have any such facts, you just say I don't
9 have those.
10   A.   Okay.
11   Q.   Is that the correct answer?
12   A.   I don't have the facts --
13   Q.   Okay.
14   A.   -- on how he was connected to
15 them.
16   Q.   Okay.  All right.  Let me talk
17 about when you went to jail.  And do you have
18 any facts that anybody at the City had
19 anything to do with how JCS conducted its
20 business?
21   A.   I do not --
22      MS. WILSON:  Objection.
23      MR. BASS:  Objection.  Vague.

Exhibit J

Page 306

1  That could be anyone from the janitor to
2  the --
3      MR. GILL:  It could indeed be.
4  And if she claims to have it from anybody
5  from the janitor to the mayor, I would like
6  to hear about it.
7      A.  I did not deal with JCS.
8      Q.  (BY MR. GILL) Okay.  And so, you
9  have no facts on which to base any claim that
10 JCS was controlled in its business by the
11 City, right?
12     A.  I did not deal with JCS.
13     Q.  Well, so, the short answer is,
14 no, I don't have any facts that the City
15 controlled JCS's business?
16     MS. WILSON:  Objection to form.
17     Q.  (BY MR. GILL)  That's the correct
18 answer to the question, isn't it?
19     MS. WILSON:  Objection to form.
20     Q.  (BY MR. GILL)  You can answer.
21     A.  I don't know, sir.
22     Q.  You don't know any facts --
23     A.  I don't.

Page 307

1      Q.  -- about the City having anything
2  to do with JCS's business, do you?
3      A.  I don't know.
4      Q.  Okay.  All right.  Let's talk
5  about your time in jail.  Ms. McCullough, you
6  said you read the complaint that was filed in
7  your name, right --
8      A.  Right.
9      Q.  -- or in other people's names?
10         I'm going to show you a portion
11 of that complaint marked as Exhibit 48.
12
13         (Whereupon, Defendant's Exhibit
14         48 was marked for identification
15         and copy of same is attached
16         hereto.)
17
18     Q.  (BY MR. GILL)  And you see that
19 it's headed in the middle -- it's about four
20 lines down -- Individual Plaintiff
21 Experiences.  And the first person is
22 Plaintiff Angela McCullough; do you see that?
23     A.  Yes, I do.

Page 308

1      Q.  Did you read that before it was
2  filed?
3      A.  I did.
4      Q.  You did?
5      A.  (Witness nods head.)
6      Q.  Okay.  Did you furnish the
7  information that is contained in those three
8  pages?
9      A.  I did.
10     Q.  All right.  Let's look at the
11 third page.  Maybe it's the second page.
12 Yeah, second page.  Paragraph 72, it's
13 talking about your time in jail.  Do you see
14 that, while in jail?
15     A.  Right.
16     Q.  Okay.
17     A.  I do.
18     Q.  It says you were forced to
19 perform joint -- excuse me, jail labor in
20 order to help work off her unpaid tickets,
21 fines, and court costs sooner.  Do you see
22 that's what you said?
23     A.  That's correct.

Page 309

1      Q.  And tell me who forced you to do
2  that.
3      A.  The COs, the correctional
4  officers.
5      Q.  Can you name any of them?
6      A.  No.
7      Q.  Can you identify any of them by
8  rank or any other identifying characteristics
9  that we can locate them?
10     A.  No, I cannot identify.  It's been
11 a while.  I don't recall them.
12     Q.  Okay.  What did the correction
13 officers -- how did they force you?  Did they
14 threaten you?
15     A.  They just told you.
16     Q.  Told you that there was work
17 available?
18     A.  They told you to do -- to do
19 these things, and you didn't say no.  You
20 didn't have -- you didn't have the option of
21 saying no.
22     Q.  Well, what happened -- would have
23 happened if you said no?

78 (Pages 306 - 309)

**Exhibit J**

1    A.   I don't know.  I didn't say no.
2    Q.   Did they threaten to injure you
3  in some way if you said no?
4    A.   They could put you in the drunk
5  tank if you said no.
6    Q.   Did they put you in the drunk
7  tank?
8    A.   I didn't say no.
9    Q.   Well, did they tell you if you
10  don't say yes, we're going to put you in the
11  drunk tank?
12    A.   They would say things like that
13  to other people who didn't want --
14    Q.   Did they tell you?
15    A.   No, I didn't say no.
16    Q.   You're not answering the
17  question.  Did they say to you, if you say
18  no, we're going to put you in the drunk tank?
19    A.   They did not say that to me
20  personally.
21    Q.   All right.  Did they say, we're
22  going to add time to your sentence?
23    A.   They did not say that to me.

1    Q.   Did they say, we're going to put
2  you in solitary?
3    A.   They had no reason to say that to
4  me.
5    Q.   Of course not.  And they didn't
6  say that to you, did they?
7    A.   No.
8    Q.   And did they threaten to withhold
9  your food or water if you said no?
10    A.   They did at one point.
11    Q.   Really?
12    A.   Yes.
13    Q.   Tell me -- describe that threat
14  and who made it, please.
15    A.   Well, I was -- I became ill and
16  could not work, and they had to order me
17  some -- just some Pepto.  I just needed Pepto
18  because I had been sick for going on two
19  weeks.  And the other inmates thought I was
20  going to die because I was so ill from
21  vomiting and having to relieve myself so
22  often.  So, they ordered the Pepto.  But,
23  then, after that, they gave me like a liquid

1  soup diet for three or four days.
2    Q.   Do you know if the doctor
3  prescribed that given your medical condition?
4    A.   I don't.  They gave me -- that's
5  what they did because I wasn't able to go --
6  I was working at that time.  I didn't work
7  for them.  I had to do laundry, and I stayed
8  in.  I was sick.  And they were angry.  They
9  seemed to be angry that they had to order
10  that expensive bottle of Pepto.
11    Q.   Okay.  But they did order it?
12    A.   Eventually.
13    Q.   But the question was:  Did they
14  tell you that if you don't work, we're going
15  to cut off your food?
16    A.   They didn't tell me that.  They
17  did it.
18    Q.   Well, they didn't -- was it
19  connected to you not working or connected to
20  you being sick?
21    A.   I -- it was connected -- all
22  connected.
23    Q.   In your mind?

1    A.   Yes.
2    Q.   Did any corrections officer say
3  to you, you've got to work or you're going to
4  starve?
5    A.   No.
6    Q.   Okay.  Any other way they forced
7  you to work?
8    A.   They just gave the orders to
9  work.
10    Q.   Well, you actually would get in
11  line and volunteer to work, wouldn't you?
12    MS. WILSON:  Objection.
13  Mischaracterization.
14    A.   That's not true.
15    MR. GILL:  Pardon?
16    MS. WILSON:  Mischaracterization.
17    A.   In my initial incarceration, that
18  was not true.
19    Q.   (BY MR. GILL)  You were told that
20  if you worked, you got some extra monetary
21  credit; is that right?
22    MR. BASS:  Objection.  Counsel,
23  which incarceration period are we talking

79 (Pages 310 - 313)

Exhibit J

Page 314

1  about?
2         MR. GILL:  The second one.  Let's
3  talk about that.
4     A.   The second one, yes.
5     Q.   (BY MR. GILL)  That's right.  You
6  understood that if you did work, you could
7  get an extra twenty-five dollars credit
8  against your time; is that right?
9     A.   Yes.
10    Q.   And you would go up to an officer
11 and get in line and get work assignments so
12 you could get that twenty-five dollars,
13 right?
14    A.   Correct.
15    Q.   And if you chose not to go up
16 there and get in line and get that
17 assignment, you could stay in your cell and
18 not get the twenty-five dollars; is that
19 right?
20        MS. WILSON:  Objection to form.
21    A.   That's correct.
22    Q.   (BY MR. GILL)  And you, being a
23 reasonable person, wanted to get out soon if

Page 315

1  you could --
2         MS. WILSON:  Objection.
3     Q.   (BY MR. GILL)  -- right?
4         MS. WILSON:  Mischaracterization.
5     Q.   (BY MR. GILL)  Is that correct?
6     A.   That's how it worked.
7     Q.   And you wanted to get out --
8         MS. WILSON:  Objection.
9     Q.   (BY MR. GILL)  -- right?
10    A.   Right.
11    Q.   And so, you were willing to work
12 in order to get the twenty-five dollars; is
13 that right?
14        MS. WILSON:  Objection.
15 Mischaracterization.
16        MR. GILL:  It's just
17 interrupting.
18    Q.   Go ahead.
19    A.   Correct.
20    Q.   Okay.  Now, you described -- tell
21 me what kinds of work -- and I'm going to
22 come back to the incident about the woman on
23 suicide watch.  So, putting aside that

Page 316

1  incident for the moment, what kinds of work
2  did you do?
3     A.   We did the -- we would take out
4  the garbage, like, late at night sometimes.
5  We would have to clean out the big garbage
6  cans after the men had dumped them.  We would
7  mop.  We would collect trays after meals.  We
8  would clean and mop the floors inside of the
9  cell or do the shower, clean the shower.
10    Q.   Okay.  When you were in
11 housekeeping at these various hotels, did you
12 clean showers and mop floors?
13    A.   Yes.
14    Q.   And you emptied waste out of
15 people's rooms --
16    A.   Correct.
17    Q.   -- as part of your housekeeping
18 duties?
19    A.   Yes.
20    Q.   And did you help clean up the --
21 if there was a restaurant or a snack shop or
22 coffee shop in the motel, did you help clean
23 up the tables and the trash?

Page 317

1     A.   Yes.
2     Q.   Any other kinds of work that you
3  did?
4     A.   On the second time I was in jail,
5  that was the extent of it.
6     Q.   Okay.  Now, the first time --
7  what was the year in which you were in there
8  the first time?
9     A.   The 2009 to 2010, in between the
10 month of November and February, the end of
11 November to the beginning of February.
12    Q.   Okay.  And that's when you were
13 in there -- that's the sixty-six days?
14    A.   Correct.
15    Q.   All right.  And the second time
16 you were actually in for nineteen or twenty
17 days, right?
18    A.   Correct.
19    Q.   You state in Paragraph 72 about
20 an incident in which you say you stood watch
21 over a female inmate who was known to have
22 hepatitis C; is that right?
23    A.   That's correct.

80 (Pages 314 - 317)

Exhibit J

Page 318

1    Q.   Now, was that at the first or the
2  second incarceration?
3    A.   The first.
4    Q.   First.  So, this was back in 2009
5  or --
6    A.   December of 2009.
7    Q.   No, the first incarceration was
8  in -- was in --
9       MS. MORGAN:  November.
10   Q.  (BY MR. GILL) -- was in
11 February -- excuse me, began in November of
12 2008, didn't it?
13   A.   This was --
14   Q.   Let me show you Exhibit 31 that
15 you saw earlier.  It lists the dates of that
16 incarceration.  Does that refresh your
17 recollection?
18   A.   Okay.  It was the -- the year is
19 wrong, then.  2008.
20   Q.   That's all right.  This is --
21 this is not a memory test per se, but I
22 wanted you to be able to get your memory as
23 clear as possible.  And does that refresh

Page 319

1  your recollection that that first
2  incarceration was in --
3    A.   Yes.
4    Q.   -- 2008?
5       And you say you were made to
6  stand watch.  Who made you do that?
7    A.   The COs.
8    Q.   The correction officers?
9    A.   Correct.
10   Q.   Can you name any of them?
11   A.   No.
12   Q.   Can't name them.
13      The woman you say was known to
14 have hepatitis C, how did you know that?
15   A.   The officers told us as soon as
16 she -- they brought her back.
17   Q.   Okay.  Well, did you have any
18 physical contact with her or were you just
19 watching her?
20   A.   I was -- she was in the drunk
21 tank I was watching.
22   Q.   Were you outside the cell looking
23 through the gap bars?

Page 320

1    A.   Right.
2    Q.   And were you injured in any way
3  associated with that incident?
4    A.   No.
5    Q.   You didn't contract hepatitis C?
6    A.   No.
7    Q.   And you go on to describe -- and
8  why is it relevant, by the way, that she was
9  white?
10      MR. BASS:  Objection.  Legal
11 conclusion.
12   Q.  (BY MR. GILL) It's twice alleged
13 in that paragraph that the woman was white.
14 Is that relevant in some way?
15      MR. BASS:  Whether it's relevant
16 or not, it's a legal conclusion you're asking
17 for and we object.
18   Q.  (BY MR. GILL) Was it relevant to
19 your complaint that you were making?
20      MR. BASS:  Same objection.
21   A.   Well, it could have been the same
22 as -- said it was a black female.
23   Q.  (BY MR. GILL) Right.

Page 321

1    A.   It's a description.  So, yes, it
2  was relevant because it was a description.
3    Q.   Okay.  But it's just an
4  identifier?
5    A.   Correct.
6    Q.   Okay.  Now, she, you say, had
7  slit her wrist with what looked like a crack
8  pipe?
9    A.   A stem.
10   Q.   A stem.  I don't know what a
11 crack -- I mean, I know from reading.  I
12 guess it's something that people smoke crack
13 cocaine through.
14   A.   It's made of glass.
15   Q.   Okay.  And she had cut her wrist
16 with a piece of glass from a crack pipe,
17 that's what you were told?
18   A.   That's what I saw.
19   Q.   You saw it?  You saw her do that?
20   A.   I looked away, and when I looked
21 back, she was slitting her wrist.
22   Q.   Okay.  And you called for a
23 guard?

81 (Pages 318 - 321)

**Exhibit J**

Page 322

1    A.   Yes.
2    Q.   And they took care of it?
3    A.   They -- I took care of it.
4    Q.   You took care of it?
5    A.   Well, they removed her and had me
6  clean up her blood.
7    Q.   Oh, okay.  They took care of her
8  and the slit wrist, right?
9    A.   No.
10    Q.   What did they do with her?
11    A.   They put her back in the cell.
12    Q.   How much did she bleed?
13    A.   She didn't bleed that much, but
14  she did it again.
15    Q.   Was she then taken to the medical
16  facility?
17    A.   No.
18    Q.   She was still in the drunk tank;
19  is that right?
20    A.   They moved her.
21    Q.   Where did they move her to?
22    A.   To the men's drunk tank.
23    Q.   All right.  So, you didn't see

Page 323

1  her in the men's drunk tank?
2    A.   Yes.
3    Q.   You did?
4    A.   Right.
5    Q.   You followed her over to that
6  facility?
7    A.   They put me in there with her.
8    Q.   Oh.  Okay.  And when you were in
9  there with her, did you do anything other
10  than observe her?
11    A.   That's what I did.
12    Q.   Okay.  And both times that she
13  cut her wrist, what you did in response was
14  to summon a corrections officer?
15    A.   Correct.
16    Q.   Okay.  That was unpleasant,
17  obviously, to you, was it not?
18    A.   It was not my job.
19    Q.   Well, that's right, but -- and it
20  was unpleasant?
21    A.   Right.
22    Q.   And the guards put Clorox or
23  bleach on the spilled blood, right?

Page 324

1    A.   I did.
2    Q.   Your statement in Paragraph 72
3  says the guards did that.
4    A.   Yes, and I -- and I -- and I
5  cleaned the floor.
6    Q.   Okay.  So, the Clorox or bleach
7  was put down by the guards, and then, you
8  were put to mopping it up; is that right?
9    A.   Correct.
10    Q.   Okay.  And that's an incident
11  that involved you and no other inmate; is
12  that right?
13    A.   Correct.
14    Q.   And you've never even heard of
15  any other inmate having an identical or
16  similar experience, have you?
17    A.   No.
18    Q.   And your -- were all the inmates,
19  generally speaking, required to keep their
20  own cell areas clean and tidy?
21    A.   Yes.
22    Q.   And that was irrespective of this
23  work credit program; is that right?

Page 325

1    A.   Correct.
2    Q.   The work credit program was other
3  and additional work for which the purpose was
4  to get money off your sentence, right?
5    A.   Correct.
6    Q.   Okay.  Was there a sort of
7  competitive sense of people -- there were
8  several inmates every day wanted to work in
9  order to get that credit; is that right?
10    A.   Correct.
11    MS. WILSON:  Objection to form.
12    Q.   (BY MR. GILL)  Excuse me.  Is
13  that correct?
14    A.   Right.
15    Q.   You're nodding.
16    MR. BASS:  Counsel, we're allowed
17  to make an objection.
18    MR. GILL:  Oh, I didn't realize
19  there was a pending objection.
20    Q.   Let me rephrase.  On the days
21  when you signed up for work, were there other
22  inmates who also desired to get work in order
23  to get monetary credit?

82 (Pages 322 - 325)

**Exhibit J**

Page 326

1        MS. WILSON: Objection to form.
2     A.   Yes.
3     Q.   (BY MR. GILL)  And were they
4 inmates who signed up for work simply because
5 they wanted to get a day out of the jail
6 cell?
7        MS. WILSON: Objection.
8     A.   No.
9        MS. BASS: Calls for
10 speculation.
11    Q.   (BY MR. GILL) Pardon?  You don't
12 know about that?
13    A.   No.
14    Q.   You don't know about inmates who
15 were glad to volunteer to go out and cut
16 grass so they could get some fresh air?
17        MS. WILSON: Objection.
18    A.   No.
19    Q.   (BY MR. GILL) You're not saying
20 they weren't, you just don't know about it if
21 they were?
22    A.   Correct.
23    Q.   Okay.  But guards didn't come to

Page 327

1 you, or correction officers, and say, you
2 work?  To the contrary, you would go up and
3 wait at a -- you called it the bar, right, to
4 get on the list --
5        MS. WILSON: Objection to form.
6     Q.   (BY MR. GILL) -- is that right,
7 that's how it happened?
8     A.   That's not how it happened.
9     Q.   Well, tell me how it happened.
10    A.   They'd just pick you on the spot
11 if they were going to let you do it.
12    Q.   If they were going to let you do
13 it?
14    A.   Correct.
15    Q.   You identified yourself as
16 someone who wished to do it?
17    A.   On the second --
18        MS. WILSON: Objection to form.
19    A.   -- incarceration.
20    Q.   (BY MR. GILL) Okay.  And the
21 guards or corrections officers, did they
22 report or were they supposed to report the
23 days that you worked so you would get the

Page 328

1 credit?
2     A.   I suppose, yes.
3     Q.   Okay.  And you know that they
4 would -- that they forwarded that information
5 to the bailiff of the various people who
6 elected to work and get the credit?
7        MR. BASS: Objection.
8     A.   Yes.
9        MR. BASS: Calls for actions and
10 motivations of third parties.
11    Q.   (BY MR. GILL) You can answer.
12    A.   In my case.
13    Q.   Did you work for monetary credit
14 in the first incarceration?
15    A.   No.
16    Q.   Okay.  Was there even a jail
17 credit program in effect at your first
18 incarceration?
19    A.   I'm not aware if there were or
20 weren't.
21    Q.   Okay.  Is there any other type of
22 work other than what you've already listed
23 that you did?

Page 329

1     A.   I worked the laundry room from
2 2:00 to 10:00.
3     Q.   2:00 in the morning till 10:00 in
4 the morning?
5     A.   2:00 in the afternoon till 10:00
6 at night.
7     Q.   I got the wrong end of the daily
8 calendar.  And what did you do in the
9 laundry?
10    A.   I did the laundry.
11    Q.   Did they have washing machines?
12    A.   They had washers, they had
13 dryers, they had detergent.
14    Q.   Okay.  You would have to put the
15 sheets or clothing or towels in the
16 laundry -- in the washing machines and put
17 the detergent, and when it was through, you
18 had to move it to the dryers?
19    A.   Correct.
20    Q.   Okay.  All right.  That's the
21 work you did in the laundry?
22    A.   For free.
23    Q.   Did others also do that kind of

83 (Pages 326 - 329)

**Exhibit J**

Page 330

1  work?
2      A.   I was alone.
3      Q.   All the time?  You never had
4  anybody else do that kind of work?
5      A.   The first week or two, they had
6  somebody train me, but she was leaving.  So,
7  she trained me.
8      Q.   Okay.  Well, probably you already
9  knew how to operate a washing machine and a
10 dryer, I bet you, from your own life, didn't
11 you?
12         MS. WILSON:  Objection.
13     A.   Correct.
14     Q.   (BY MR. GILL)  Did you?  I mean,
15 obviously, you're a -- you had to look after
16 your children and they make a lot of dirty
17 clothes; isn't that correct?
18         MS. WILSON:  Objection.
19     Q.   (BY MR. GILL)  You can answer.
20     A.   Correct.
21     Q.   And, Ms. McCullough, you have
22 made a claim in this lawsuit for monetary
23 damages; are you aware of that?

Page 331

1      A.   Yes.
2      Q.   And let me be clear who it is
3  that you think should pay you monetary
4  damages.
5      A.   The City of Montgomery.
6      Q.   The City should?
7      A.   Yeah.
8      Q.   All right.  And tell me what --
9  let's talk about your damages.  Have you
10 suffered any physical injury as a result of
11 the claims that you have listed in your
12 complaint?
13     A.   Not physical.
14     Q.   Have you suffered any pain for
15 which you required medical treatment?
16     A.   Required, yes.  Well, not medical
17 but required treatment, yes.
18     Q.   What kind of treatment?
19     A.   Like emotional damage.  Like, I
20 would have to have had, like, counseling.  I
21 would have needed that.
22     Q.   Have you had any counseling?
23     A.   Only one session.

Page 332

1      Q.   And who was that with?
2      A.   With the Federal judge,
3  McPherson.
4      Q.   Magistrate Judge Vanzetta
5  McPherson?
6      A.   Yes, she came to the --
7      Q.   She came to what?
8      A.   To the city jail.
9      Q.   And talked to you while you were
10 in the jail?
11     A.   Yes.
12     Q.   Did she talk to the inmates
13 collectively or you --
14     A.   Yes.
15     Q.   -- individually?
16         Which was it?
17     A.   Collectively.
18     Q.   Collectively.  She spoke to the
19 whole group of inmates; is that right?
20     A.   And then, individually.
21     Q.   And individually?
22     A.   Right.
23     Q.   You talked to her individually?

Page 333

1      A.   Yes.
2      Q.   And tell me what did you -- what
3  was your medical or psychological matter that
4  you wanted to consult with Judge McPherson
5  about it?
6      A.   It was -- I don't want to answer.
7      Q.   Well, I know you have --
8      A.   Give me a second.
9      Q.   -- family problems.
10         And I don't want to ask you about
11 that.  But I'm talking about as to matters
12 that you say you're claiming damages for in
13 this lawsuit.  Outside of that, I don't care
14 anything -- I don't care to intrude about
15 your personal information.  And we can take a
16 break, Ms. McCullough, if you want to.
17         MR. SEGALL:  Let's do take a
18 break.
19
20         (Whereupon, a brief recess was
21         taken.)
22
23     Q.   (BY MR. GILL)  Ms. McCullough, my

84 (Pages 330 - 333)

**Exhibit J**

Page 334

1 question to you -- and I want to make sure
2 that you understand the limits of it. My
3 question to you is, is there anything else in
4 the emotional distress part of your claim
5 that you are seeking damages from my client,
6 the City of Montgomery, for? And if it's --
7 if you have emotional distress on matters
8 unrelated to a claim against the City, I do
9 not wish to intrude into that at all.
10    A.   Your question is, do I have any
11 emotional distress? I was -- the first
12 arrest that I encountered, I was -- in 2008,
13 November, I was on my way to see a friend who
14 was in a distressful situation. And I ended
15 up getting arrested. And while I was
16 incarcerated, they ended up shooting
17 themselves in the head and killing
18 themselves. And I never --
19    Q.   Your friend did?
20    A.   Yes, and I was unable to contact
21 them and let them know why I didn't show up
22 or I didn't have any way to -- you know, I
23 couldn't call out. I didn't -- I didn't get

Page 335

1 in touch -- I wasn't able to get in touch
2 with them. And one day, I called home and
3 heard that they shot themselves in the head.
4    Q.   Well, that is a tragedy, and I'm
5 sorry to hear. I just want to know the dates
6 and circumstance. I won't otherwise --
7    A.   This was -- the day I heard about
8 it was January 3rd of 2009 --
9    Q.   January --
10    A.   -- the day it happened.
11    Q.   -- 3 of 2009?
12    A.   Right.
13    Q.   Okay. And were you incarcerated
14 on that date?
15    A.   Yes.
16    Q.   Okay. And so, unable to visit
17 your friend?
18    A.   Or have any communication.
19    Q.   Okay.
20    A.   I didn't even have a cell phone.
21    Q.   All right. Okay. Well, let's
22 turn -- thank you for sharing that. I'm
23 sorry for the upset, and I understand why

Page 336

1 it's upsetting to you.
2       You have not -- you said the only
3 counseling you received was from Ms. -- from
4 Judge McPherson?
5    A.   Right.
6    Q.   You've not otherwise seen a
7 counselor?
8    A.   No.
9    Q.   Or a psychologist?
10    A.   No.
11    Q.   Or a psychiatrist?
12    A.   No.
13    Q.   Or a medical person?
14    A.   No.
15    Q.   You've not been prescribed any
16 medications?
17    A.   No.
18    Q.   Okay. Have you attempted to
19 quantify how many dollars you're claiming in
20 personal damages?
21    A.   I have not. The first
22 incarceration, I had lost everything in my
23 house. It was -- everything was sold off,

Page 337

1 televisions, radios, VCRs, the car, another
2 car I had purchased for, like, three or four
3 hundred dollars that I hadn't -- it was just
4 sitting there. I didn't use. It was all
5 took through a place called Pull-A-Part where
6 they had access to the titles. And they
7 just -- to get it -- they sold it off to
8 Pull-A-Part. Everything in the house was
9 lost. It was ransacked, filthy when I came
10 home.
11    Q.   And I'm trying to understand how
12 that -- well, let me rephrase it.
13       That incarceration, that's the
14 second one, right?
15    A.   First.
16    Q.   The first. I'm sorry. That
17 occurred because of the accumulation of
18 unpaid fines and tickets and orders to appear
19 in court that you did not obey; is that
20 right? That was why you got commuted to jail
21 time?
22    A.   I went to jail, yes.
23       MR. BASS:  Object to -- object to

85 (Pages 334 - 337)

Exhibit J

Page 338

1 the term "commute". It calls for a legal
2 conclusion.
3     Q.   (BY MR. GILL) I think you
4 already answered, but let me give you a
5 chance to -- in light of Mr. Bass' objection.
6         The reason that you understood
7 you were put in the city jail was because
8 your unpaid fines and costs were commuted
9 into time and you were brought before the
10 court for failure to appear in response to
11 earlier orders to appear; is that right?
12    A.   Correct.
13    Q.   Okay. And in that interim while
14 you were incarcerated, some other people
15 took, repossessed things that were at your
16 house and sold them off or disposed of them;
17 is that right?
18    A.   Correct.
19    Q.   Okay. And you had a landlord?
20 You were renting?
21    A.   Yes.
22    Q.   And did he -- is he the one who
23 repossessed the furniture and the car and so

Page 340

1 outset -- I'm getting forgetful in my old
2 age. What did you do to prepare to come
3 testify today in response to Mr. Logsdon's
4 questions and my questions?
5     A.   Just tell the truth.
6     Q.   Well, I mean, did you meet with
7 anybody?
8     A.   Yes, I met with my lawyers.
9     Q.   You met with the lawyers. And
10 which lawyers did you meet with?
11    A.   The ones that are present.
12    Q.   All three --
13    A.   Correct.
14    Q.   -- of the lawyers here?
15        And when did you do that?
16    A.   On Wednesday.
17    Q.   On Wednesday. And today is
18 Friday, right?
19    A.   Correct.
20    Q.   And how long did you meet with
21 them?
22    A.   About two hours.
23    Q.   About two hours. And did you go

Page 339

1 forth?
2     A.   It did not belong to him, no.
3     Q.   But is he the one who did take
4 it?
5     A.   No.
6     Q.   Who did?
7     A.   It was people who were on drugs.
8     Q.   I see. They broke in the house
9 and they took your things?
10    A.   Yes.
11    Q.   Okay. I think you gave me that
12 answer in response to a question that was,
13 have you attempted to quantify, state a total
14 dollars that you're claiming against the City
15 for grievances that you've filed this
16 complaint on?
17    A.   Whatever's fair.
18    Q.   Pardon?
19    A.   Whatever will be fair. I have
20 not.
21    Q.   You have not?
22    A.   No.
23    Q.   Okay. I forgot at the very

Page 341

1 over any documents? Did you look at
2 documents?
3     A.   The same -- just the old fines,
4 tickets.
5     Q.   Some of these same records that
6 you've been shown --
7     A.   Correct.
8     Q.   -- here by us?
9         Did you -- have you met with
10 anyone else other than your lawyers to
11 prepare to testify?
12    A.   No.
13    Q.   Have you had occasion to make any
14 statement, formal statement, other than the
15 one you gave to the intern back before you
16 engaged the lawyer about the things you are
17 complaining about?
18    A.   Have I had an opportunity?
19    Q.   Have you had occasion to do it?
20 Did you actually give a statement, either in
21 writing or spoken that somebody took down
22 notes of, about the things you are
23 complaining about?

Freedom Court Reporting
A Veritext Company
877-373-3660                                                          205-397-2397

**Exhibit J**

1    A.   No.
2    Q.   Have you testified about these
3  things otherwise?
4    A.   No.
5    Q.   Okay.
6          MR. LOGSDON:  Are y'all okay?
7          MR. BASS:  Just one minute,
8  please.  May we confer?
9          MR. LOGSDON:  Sure.  Do you want
10  us to step out?
11         MR. BASS:  No, I don't think so.
12
13         (Whereupon, a discussion was held
14         off the record.)
15
16         THE WITNESS:  Yes, I would like
17  to change the answer on that.
18    Q.   (BY MR. GILL)  You've spoken with
19  one of your lawyers and you want to change
20  the answer that you just gave --
21    A.   About the -- having spoken with
22  someone.  I recall that I did speak with a
23  panel of nine judges and a layperson about

1  Judge Hayes.
2    Q.   Okay.  You spoke to a panel of
3  nine judges --
4    A.   And a layperson.
5    Q.   -- and a layperson?
6    A.   In the RSA building when they
7  were doing an inquiry before they brought the
8  charges.
9    Q.   Before they brought the charges?
10    A.   Correct.
11    Q.   Okay.  And did you speak to them
12  just in a conference or conversation or did
13  you give a formal statement of some sort to
14  them?
15    A.   I was sworn to tell the truth
16  and --
17    Q.   You were sworn?
18    A.   I was sworn in.
19    Q.   A sworn statement.  Have you ever
20  read your own statement?
21    A.   No.
22    Q.   Do you know what you said?
23    A.   No, sir.

1    Q.   Okay.  But whatever you said to
2  that group was under oath, you said?
3    A.   Yes.
4    Q.   Okay.  And so, I assume it was
5  the truth?
6    A.   Yes.
7    Q.   Okay.  In all the time from the
8  original meeting that Karen Jones invited you
9  to, which I think you said was in the summer
10  of 2015, right?
11    A.   It may have been the summer of
12  2014, I think it may have been.
13    Q.   Summer of '14?  All right.  In
14  all that time, from now, which that's about
15  five years, you gave one interview or
16  statement -- not interview -- to the interns,
17  and you've never talked to anybody again
18  except this panel and the lawyers on
19  Wednesday; is that right?
20    A.   Correct.
21    Q.   Okay.
22         MR. GILL:  All right.  Mr.
23  Logsdon may have some further questions of

1  you.
2
3  FURTHER EXAMINATION BY MR. LOGSDON:
4
5    Q.   Ms. McCullough, the meeting that
6  you just talked about at the RSA building
7  where you talked to the panel of judges, was
8  that on a weekday?
9    A.   Yes.
10    Q.   And then, you also mentioned that
11  in addition to that, you attended a
12  proceeding related to that same investigation
13  of Judge Hayes, correct?
14    A.   Correct.
15    Q.   Was that also on a weekday?
16    A.   Yes.
17    Q.   Were you able to get off work for
18  both of those two things during weekdays?
19  And I assume, were they during the workday?
20    A.   I was.  It was scheduled -- we
21  discussed it with the panel of nine judges.
22  So, they scheduled me in the evening, closer
23  to the end of the day, around 4:00 o'clock.

87 (Pages 342 - 345)

**Exhibit J**

Page 346

1    Q.   4:00 o'clock.  Okay.  And then,
2 how about the -- that's the RSA building that
3 you're talking about?
4    A.   Right.
5    Q.   All right.  And then, how about
6 the one where you attended the proceeding --
7 the next proceeding that you were telling us
8 about?
9    A.   I was -- I think I was just
10 simply off that day.  I think I was off that
11 day, like, a Wednesday or something.
12    Q.   The jobs that you've talked about
13 that you've had with either ASK or the hotels
14 that you've worked with, are you able to get
15 sick days from them?
16    A.   Yes.
17    Q.   All right.  And for those, were
18 you able to also get personal days?  If
19 you -- if you had -- needed a personal day or
20 a vacation day, were you able to get those?
21    A.   Like today, yes.
22    Q.   Okay.  And would any of them --
23 okay.  And when you said like today, you mean

Page 347

1 we're here -- we've been here a long time
2 today.  We've been here, and today's a
3 weekday, correct?
4    A.   Correct.
5    Q.   And you were able to get a day
6 off to come here for this, correct?
7    A.   Right.
8    Q.   Okay.  And same with your workers
9 that you were working for back then.  As long
10 as you weren't too bad about it, if you
11 needed to leave early or something like that
12 to handle something with your kids, would
13 they be okay about letting you do that?
14       MR. BASS:  Objection.
15    Q.   (BY MR. LOGSDON)  As long as you
16 didn't abuse it?
17       MR. BASS:  Objection.  Vague and
18 compound.
19    A.   For prior jobs, no.
20    Q.   (BY MR. LOGSDON)  All right.  So,
21 what about the hotel -- what about the
22 Holiday Inn Express; how were they about
23 that?

Page 348

1    A.   You -- no, you didn't -- you
2 didn't just up and take -- only if it's court
3 related, then, that's kind of --
4    Q.   Okay.  Then, they'd be okay with
5 it?
6    A.   Right.
7    Q.   All right.  And your shift on
8 your jobs at the hotel, was it 8:00 to 5:00
9 or 9:00 to 5:00, 9:00 to 5:00 or --
10    A.   9:00.
11    Q.   Excuse me?
12    A.   9:00 to 4:00.
13    Q.   9:00 to 4:00?
14    A.   Yeah.
15    Q.   All right.  And so -- and I'm
16 trying to kind of ask you about a bunch of
17 them here.  Would that be the case with ASK
18 now, with your job at ASK Marketing?
19    A.   8:00 to 5:00.
20    Q.   And then, there are a variety of
21 different hotels that you worked for.  Would
22 that be the case with the different hotels?
23    A.   9:00.

Page 349

1    Q.   9:00 to 5:00?
2    A.   To 4:00.
3    Q.   To 4:00?
4    A.   (Witness nods head.)
5    Q.   And would -- let's talk about the
6 hotels.  Would they be five days a week?
7    A.   Yes.
8    Q.   Monday through Friday or how did
9 that work?
10    A.   You rotate weekends.
11    Q.   Okay.  You had other people, it
12 sounds like from what you're telling me, that
13 were -- that were working there, and y'all
14 would kind of do a schedule and work out the
15 schedule; is that fair enough?
16    A.   Correct.
17    Q.   So, you didn't have to work every
18 weekend, but you had to work some weekends?
19    A.   The majority of the weekends.
20    Q.   The majority of the weekends.
21 But if you worked a weekend, then, you got
22 off a day during the week?
23    A.   Correct.

**Exhibit J**

Page 350

1   Q.   All right.  And then, if you had
2   something that comes up and you needed to
3   trade out with somebody, they were generally
4   okay with that as long as it was covered and
5   you didn't abuse it?
6   A.   Correct.
7        MR. BASS:  Objection.
8        MS. WILSON:  Objection.
9   Q.   (BY MR. LOGSDON)  The Fitzpatrick
10  school, I heard -- I heard y'all asking about
11  that.  Did you say Fitzpatrick is the school
12  in the -- for the ████████ address, the public
13  school for the ███████ address?
14  A.   It is.
15  Q.   All right.  I think we're clear
16  on this, but I just want to make sure because
17  we were talking about the booking date.  And
18  we showed -- you looked at Exhibit 31 here.
19  And you realized that it was -- the jail date
20  was November of 2008 and not November of
21  2009, correct?
22  A.   Right.
23  Q.   Okay.  And that was the time you

Page 351

1   were arrested when you were telling me it was
2   just after Thanksgiving.  So, you had the
3   Thanksgiving part right?
4   A.   Correct.
5   Q.   Okay.  Just a year off, which is
6   okay.  I just wanted to make sure we're clear
7   on that.  So, now, we -- now, we know it's
8   2008, correct?
9   A.   Correct.
10  Q.   All right.  So, Pull-A-Part you
11  mentioned just a minute ago.  Who was Pull-A-
12  Part?
13  A.   It's a business.  It's like a
14  business where you can buy parts.  Like if
15  you were a mechanic, you can buy parts to --
16  you can go in there and buy used parts.  They
17  have cars there --
18  Q.   Okay.
19  A.   -- where if you want to go and
20  take it off yourself and fix a car.
21  Q.   All right.  And so, was Pull-A-
22  Part -- and I couldn't -- was any of your
23  furniture that was repossessed, was it

Page 352

1   repossessed because it was refinanced or did
2   people steal it or a combination of both or
3   what?
4   A.   It was just stolen.  Nothing was
5   being paid for.  It was already paid for.
6   Q.   Okay.  And I was trying to write
7   down what all you said you had taken out of
8   the house.  And I wrote down televisions?
9   A.   Televisions.
10  Q.   Do you remember how many you had?
11  A.   There was three.
12  Q.   And so, I'm not good at brands of
13  television.  Tell me sizes.  What size
14  televisions did you have?
15  A.   Thirty-two inches.
16  Q.   Three thirty-two inches?
17  A.   Right.
18  Q.   And did you file a police report
19  on any of this?
20  A.   I did.
21  Q.   Who did you file that with?
22  A.   The Montgomery Police Department.
23  Q.   Okay.  And for this police

Page 353

1   report, would you have gone through and
2   listed what you had taken?
3   A.   I basically did it on the cars
4   because that's what had me the most --
5   Q.   That was the biggest?
6   A.   Right.
7   Q.   There were two cars, though, at
8   the time, correct?
9   A.   There were two cars at the time,
10  yes.
11  Q.   And which two was that?
12  A.   This was the Honda Prelude, the
13  one that I got stopped in that hadn't been
14  registered.  And then, I had recently bought
15  a Ford Expedition.  That's when I was working
16  at Duke Energy.
17  Q.   Okay.
18  A.   And it was cash.
19  Q.   All right.  What year was the
20  Ford Expedition?
21  A.   It was around a '98.
22  Q.   Where did you -- how much did you
23  pay for it?

89 (Pages 350 - 353)

**Exhibit J**

Page 354

1    A.   I paid them five -- just five
2 hundred for it.
3    Q.   All right.  Why did you buy two
4 cars?
5    A.   It was a bigger car.  And the
6 Honda Prelude was small.
7    Q.   All right.  And so, the -- so, I
8 take it from that, you had the Honda Prelude
9 first, and then, you purchased the
10 Expedition?
11    A.   My uncle gave me the Honda
12 Prelude.  It was something -- it was a fixer
13 upper.
14    Q.   Okay.  And while we're on the
15 cars, the BMW, what -- I mean, the Mercedes,
16 what year did you say that was?
17    A.   It shows there it was an '88.  I
18 wasn't familiar with that car.
19    Q.   All right.  And I thought you
20 said that it was an '88.  And this is -- I'll
21 go ahead and mark this as --
22    A.   On the ticket, it says it's an
23 '88.

Page 355

1    Q.   Well, I don't -- I don't remember
2 where that '88 came from.  I was thinking you
3 said that.
4
5        (Whereupon, Defendant's Exhibit
6        49 was marked for identification
7        and copy of same is attached
8        hereto.)
9
10    Q.   (BY MR. LOGSDON)  But let me show
11 you what's Exhibit -- I've got here as
12 Exhibit 49.  And this is from the Alabama
13 Department of Revenue.  And it shows the
14 Mercedes is a 2012 Model C registered to
15 Angie McCullough.
16    A.   Oh, that's a -- that's a identity
17 theft situation I have going there.  I don't
18 know who has that car.  I told them to kill
19 the tag.  That's not my car.
20    Q.   Okay.  So, somebody is -- you're
21 saying that's not your car?
22    A.   Never had possession of it.
23    Q.   Okay.

Page 356

1    A.   And they're aware of that.
2    Q.   So, if we check the VIN number
3 here, you're saying that would be a different
4 VIN number than your Mercedes?
5    A.   I don't own a Mercedes right now.
6    Q.   Well, I'm not saying right now.
7 At some point, you owned a Mercedes, correct?
8    A.   I didn't own that one I got
9 stopped in.  I just drove it to class that
10 day.
11    Q.   All right.  But that was a
12 Mercedes Model C, correct?
13    A.   I'm not sure what -- it was -- I
14 know it was a 1988 Mercedes from looking at
15 it on the ticket.  I was not familiar with
16 that car that -- in 2013.  This -- just a tag
17 paper popped up in the mail saying that I
18 owned that car.  I called the DMV and told
19 them I didn't and kill the tag on it.
20    Q.   Okay.  And what year did you say
21 the BMW was?
22    A.   2005.
23    Q.   Okay.  And the address 2851

Page 357

1 Peabody Road, what address is that?
2    A.   2851 Peabody Road.  I'm not
3 familiar with that address.
4    Q.   You've never heard of that one?
5 Can I show you this where I found that?  I'm
6 going to mark this --
7    A.   Sure.
8    Q.   -- as Exhibit 50.
9
10        (Whereupon, Defendant's Exhibit
11        50 was marked for identification
12        and copy of same is attached
13        hereto.)
14
15    Q.   (BY MR. LOGSDON)  And let's see
16 if y'all could just look at that together, or
17 if you could let your counsel look at it if
18 you want.  See the address down there by your
19 name?  It says owner's name.  And this is the
20 BMW.  Oh, I'm sorry.  This is the Mercedes.
21 So, yeah.  Does that ring a bell?
22    A.   No, they -- I guess they found
23 out who had the car.

90 (Pages 354 - 357)

**Exhibit J**

Page 358

1    Q.   Okay.  Thinking that might be
2 what that is.  Okay.
3    A.   Yeah, this is the 2012.
4    Q.   All right.  All right.  So, you
5 were going through what was taken, and you
6 mentioned the three televisions, and then,
7 you said some radios.  And what radios --
8 what do you -- what do you mean, like --
9    A.   Like a -- like an entertainment
10 center type situation --
11       MS. MORGAN:  You didn't have a
12 copy for us?
13       MR. LOGSDON:  I don't have a
14 copy, but we can make a copy.  I might
15 have -- I might have marked the same exhibit
16 twice.  See if I did that.  And if I did --
17 or see if it's in there (indicating).
18       MS. MORGAN:  This?  Well --
19       MR. LOGSDON:  They're close.
20       MS. MORGAN:  They're not exactly
21 the same.
22       MR. LOGSDON:  All right.  We can
23 make a copy.  It might be --

Page 359

1       MS. MORGAN:  The Mercedes-Benz
2 and Capitol --
3       MR. SEGALL:  If you give it to
4 me, I'll go make a copy now if you want me
5 to.
6       MS. MORGAN:  Maybe a copy of
7 each.
8       MR. LOGSDON:  All right.
9       MS. MORGAN:  They are different.
10    Q.   (BY MR. LOGSDON)  Okay.  So, tell
11 me, the radios were some entertainment
12 center?
13    A.   Like Blu-rays, a DVD player, Blu-
14 rays.  The sum total -- the furniture was --
15 the furniture was -- it was there, but it was
16 pretty much destroyed.  It was worthless.
17 So, I was left with one older model TV in the
18 home when I got out.  It was like one of
19 those box TVs.
20    Q.   Okay.  Let me hold you up there
21 because --
22    A.   Okay.
23    Q.   -- we can talk about what it was

Page 360

1 like after, but I want to go back to what was
2 there that you had originally, fair enough?
3    A.   Correct.
4    Q.   All right.  So, let's talk about
5 that.  And you mentioned the televisions, you
6 mentioned some Blu-ray -- rays, ray?
7    A.   Blu-ray.
8    Q.   Ray?  Okay.  Is that -- what is
9 Blu-ray?
10    A.   It's what you watch -- it's like
11 an upgrade from a DVD player.
12    Q.   Okay.  So, it looks like a DVD
13 player?
14    A.   Correct.
15    Q.   All right.  Quit laughing at me.
16       All right.  And then, you said
17 DVD players.  I do know what DVD players are.
18    A.   Right.
19    Q.   All right.  All right.  So, there
20 was some Blu-rays.  And I take it -- you said
21 Blu-rays.  That means you had more than one.
22 Did you have one for each TV?
23    A.   It was one Blu-ray and then a DVD

Page 361

1 player.
2    Q.   Got it.  Okay.  And then, what
3 else did you have?  You said radios?
4    A.   Yeah.  Well, when I say radio, I
5 mean like an entertainment system where it
6 has like the speakers and it plays a CD and
7 does, you know --
8    Q.   Yeah.  Uh-huh.
9    A.   And then, that was like connected
10 into furniture.  It was like a living room
11 suit where it was L-shaped and had the DVD
12 player made into the corner of the L.
13 That whole --
14    Q.   Okay.
15    A.   -- thing was destroyed.
16    Q.   Okay.  Where did you get that
17 living room suit you're talking about?
18    A.   I bought that living room suit --
19 it was -- it was to be a -- the flea
20 marketplace on -- you're probably not
21 familiar with it.  It was called the Mini
22 Mall.
23    Q.   Okay.

91 (Pages 358 - 361)

**Exhibit J**

Page 362

1    A.   I bought it from there with rugs
2  and mattresses, stuff like that to furnish
3  that house.
4    Q.   All right.  When would that have
5  been that you bought that to furnish the
6  house?
7    A.   In 2007 before I moved there.
8    Q.   Would that have been something
9  that you got with tax refund money or just
10 saved up here and there or what?
11   A.   I was working at Duke Energy at
12 that time.  So, you know -- and I was just
13 making a little bit extra money, so --
14   Q.   Okay.  When you were with Duke?
15   A.   Right.
16   Q.   And you told me Duke Energy was,
17 I want to say, 2000 -- well --
18   A.   '07 when I started.
19   Q.   And how long were you there?
20   A.   I worked there until -- I worked
21 there about six months.  It was a temporary
22 job.
23   Q.   Okay.  So, it gave you enough,

Page 363

1  Duke Energy, to pay your bills, save up a
2  little bit, try to get some money saved up
3  and buy the living room suite and these other
4  things you've told me about?
5    A.   Right.
6    Q.   Okay.  And you started telling me
7  about, and I kind of knocked you off track --
8  so, we talked about the living room suite.
9  What about bedroom stuff, that kind of stuff?
10   A.   It was also destroyed.  They
11 basically -- they basically had stayed in the
12 house while I was -- while I was
13 incarcerated.
14   Q.   Somebody stayed in there?
15   A.   (Witness nods head.)
16   Q.   And how do you know -- you sound
17 like you've got some pretty good details on
18 who -- maybe who it was even.  Do you know
19 who it was?
20   A.   It was somebody out of the
21 neighborhood.  Yeah, I was familiar.  They
22 told me the day that I got out --
23   Q.   Okay.

Page 364

1    A.   -- as soon as they heard you were
2  leaving jail, they all packed up and ran.
3    Q.   Okay.  Okay.  So, the bedroom --
4  and let's go back to what it was when you got
5  it or when it was new.  What all did you
6  have?  Was it beds and end tables or what all
7  was that?
8    A.   Like a chest of drawers,
9  nightstand, and headboard, footboard, and
10 mattress set.
11   Q.   Mattress, box springs?
12   A.   Correct.
13   Q.   How many rooms for that?
14   A.   It was two rooms.  It was a
15 three-bedroom house with two rooms.  It was
16 two bedrooms.
17   Q.   Okay.  And same question on that.
18 Did you get -- where did you get the chest of
19 drawers, the nightstand, the mattress, and
20 box springs?
21   A.   From that Mini Mall spot.
22   Q.   Mini Mall.  And was that also in
23 2007 with some extra money that you had from

Page 365

1  Duke Energy?
2    A.   Correct.
3    Q.   And we're saying Duke Energy.
4  You had another job just before Duke Energy.
5  It sounded like that was a pretty good job as
6  well, right?
7    A.   Before Duke Energy, no, I had a
8  really -- it was -- it was not a good job at
9  all --
10   Q.   Okay.
11   A.   -- that I had before that.
12   Q.   All right.  And what else?  What
13 about kitchen stuff, utensils, stove,
14 microwave?
15   A.   Microwave and pretty much
16 everything in there was gone.  The table set
17 was destroyed.
18   Q.   Table set, meaning, a dining room
19 table?
20   A.   Like a kitchen table set.  Not
21 just a big dining -- kitchen table set.
22   Q.   Table and chairs for the kitchen;
23 is that right?

92 (Pages 362 - 365)

**Exhibit J**

Page 366

1   A.   Correct.
2   Q.   And then, microwave you
3 mentioned.  What about a stove and all that?
4   A.   The stove was -- my son that was
5 staying there, he -- who was -- he wasn't in
6 the best manner at this time.  He had
7 destroyed the stove.  He almost burned down
8 the house --
9   Q.   Uh-oh.
10   A.   -- because he started a grease
11 fire.
12   Q.   Okay.
13   A.   And it burned a hole in the
14 ceiling over the kitchen.
15   Q.   Well, where did you get the --
16 where did you get the stove from?
17   A.   Well, this one came with the
18 house, but --
19   Q.   Got it.
20   A.   -- the damage that was done --
21   Q.   Yeah.
22   A.   -- I was responsible for.
23   Q.   Okay.  And the -- these

Page 367

1 furnishings that you got here, you got these
2 for the house.  And were you able to -- did
3 you get some -- it sounds like Duke was a
4 good company.  And I don't know much about
5 them.  I assume they're like the power
6 company, which is a good company.
7   A.   It's out of the Carolinas.
8   Q.   They're kind of the Carolinas of
9 Alabama Power Company, I think, aren't they?
10 Okay.  You know more than I do.
11   A.   They outsource here.
12   Q.   All right.  So, were you able to,
13 in addition to this, at that time, get a
14 little bit of some other things as well that
15 you were able to purchase in addition to
16 these things you're telling me about?
17   A.   No, I just -- I just had enough
18 to furnish the house.
19   Q.   Furnish the house.  Okay.
20      Your schooling that you went to
21 that you told me about at Faulkner.  I'm not
22 talking about back early on, but Faulkner,
23 was all of that paid for either by a loan or

Page 368

1 a grant?
2   A.   Mostly, yes.
3   Q.   Just about.  So, just about --
4   A.   Just about.
5   Q.   -- all, if not all?
6   A.   Not all.  We had -- some books, I
7 had to purchase while waiting on the loan.
8   Q.   Okay.  But even at that, did you
9 get either a loan or --
10   A.   A grant.
11   Q.   -- a grant to cover those books?
12   A.   Correct.
13   Q.   All right.  It just took a little
14 while for those to get to you?
15   A.   Correct.
16   Q.   Who is -- I'm going to -- who is
17 Bernard Sander?
18   A.   That's someone I've known from
19 years ago.
20   Q.   Okay.  Who is that?
21   A.   It's someone that grew up around
22 my family from Ramer, Alabama.
23   Q.   His name -- he goes by B.J.

Page 369

1 Sanders or Sander sometime or Bernard?
2   A.   I have no idea what his nickname
3 is.
4   Q.   Okay.
5   A.   I just know Bernard Sanders.
6   Q.   All right.  And the reason I was
7 asking you about that is, it looks like there
8 was a lawsuit by Wildwood Apartments against
9 you and Bernard in 1995.  That would have
10 been three years out of college, I guess, for
11 you.
12   A.   I was in college at that time.
13   Q.   In college --
14   A.   Right.
15   Q.   -- at the time?
16      Do you remember that suit against
17 you and Bernard Sander in 1995?
18   A.   First I've heard of it.
19   Q.   Okay.  It was by Windwood
20 Apartments.  It sounds like a -- do you
21 remember where you lived in 19 --
22   A.   I remember Windwood.  I stayed
23 there briefly.

Freedom Court Reporting
A Veritext Company

877-373-3660                                                                205-397-2397

**Exhibit J**

Page 370

1    Q.   Okay.  Did you get evicted from
2 Windwood?
3    A.   I just left.  I thought it was in
4 his and his mom's name.
5    Q.   All right.
6    A.   I didn't know my name was even on
7 the lease.
8    Q.   Okay.  Was Bernard a roommate of
9 yours there?
10    A.   He was supposed to be, but he
11 never really stayed there.
12    Q.   All right.  And then, I'm going
13 to ask you about another one.  It looks like
14 it was a little bit later in 1995 by Ballard
15 Realty Windwood Apartments.  And it's a suit
16 against you and Bernard.
17    A.   That's the same -- that's the
18 same thing.
19    Q.   You're saying they would go by
20 that name or same company, same name?
21    A.   Right.
22    Q.   All right.
23    A.   That's the same apartment.

Page 371

1    Q.   Same apartment.  Okay.  I'm
2 following you.  Here it is.  Palisades
3 Apartments.
4    A.   Uh-huh.
5    Q.   This is in 1998.  So, this would
6 be three years later.  So, do you remember an
7 eviction suit by Palisades Apartment?
8    A.   No, I don't remember an eviction
9 suit.
10    Q.   Do you remember living at
11 Palisades Apartment?
12    A.   I did.
13    Q.   And how did you leave Palisades
14 Apartment?
15    A.   Oh, that's when I had gotten
16 attacked by Jeffrey Jackson, my daughter's
17 father.
18    Q.   Yeah.
19    A.   And I had left and went home to
20 my parents from that apartment.
21    Q.   Okay.  Do you know that there was
22 an eviction suit filed at that time?
23    A.   I was unaware until today.

Page 372

1    Q.   Okay.
2         MR. BASS:  Objection.  That
3 assumes facts not in evidence.
4    Q.   (BY MR. LOGSDON)  This looks like
5 a different -- ▓▓▓▓▓ Square, where is
6 that?
7    A.   That would be Palisades.
8    Q.   Okay.  That's where you were
9 living?  All right.
10    A.   At that time.
11    Q.   But your address now is ▓▓▓▓
12 what?
13    A.   ▓▓▓.
14    Q.   ▓▓▓▓▓▓.  All right.
15         In 2009, when you were arrested,
16 with that arrest, who was living in the house
17 with you at that time?
18    A.   It was myself; my older son,
19 Chad; Roderick Lee; and ▓▓▓▓.
20    Q.   Okay.  How about July of 2013,
21 who was living with you?
22    A.   Myself, my son and his wife had
23 moved in briefly.  They were there probably

Page 373

1 about two weeks before.  You know, I had
2 given them, like, two or three weeks to stay
3 there until they got somewhere else.  So,
4 they were there.  And my younger, Roderick
5 Lee Williams, and ▓▓▓▓.
6    Q.   All right.  If I say the words
7 "mental anguish", do you know what I'm
8 talking about?
9    A.   I do.
10    Q.   All right.  Is that something
11 you're claiming in this suit, mental anguish?
12    A.   Yes.
13    Q.   Okay.
14         MR. LOGSDON:  All right.
15
16 FURTHER EXAMINATION BY MR. GILL:
17
18    Q.   Why have you never gotten a
19 driver's license?
20    A.   I have attempted.
21    Q.   Pardon?
22    A.   I have attempted to --
23    Q.   You have attempted?

94 (Pages 370 - 373)

**Exhibit J**

1    A.   I explained earlier that they
2 would not give me the suspended ticket number
3 so I can pay that off to get my license.
4    Q.   What have you done recently to
5 get a driver's license?
6    A.   I called them to -- after I was
7 released in 2013.  And they said that they
8 had a hold.  I paid off all my tickets, for
9 one, at that point.  And I called the
10 Department of Public Safety.  And that
11 accident I had was still -- had some moneys
12 left.  I paid the majority of it.  It still
13 had some moneys left owing on it before I can
14 get a clearance from that accident.  It's
15 still being paid off.
16    Q.   And that's the Alabama Law
17 Enforcement Agency that says they won't
18 restore your -- or give you a license until
19 those things are done?
20    A.   Well, I spoke with the Department
21 of Public Safety.  They were the ones who
22 gave me that information.
23    Q.   I think -- I think it's -- they

1 just changed their names now to Alabama Law
2 Enforcement Agency, but it's the same people
3 of the state, right?
4    A.   Okay.
5    Q.   Why have you not returned to
6 school?
7    A.   That year I got arrested would
8 have been -- I would have been going into my
9 graduate year, but the moneys from that year
10 would have been -- I had just enough left on
11 financial aid to pay to graduate.  So, even
12 if I went back, I'll still be short a
13 semester because my money that I'm allowed
14 over the course of your life ran out.
15    Q.   There's a life --
16    A.   I have one semester left, but,
17 then, I don't have it to complete.  So, I
18 don't have the other semester because I
19 missed that one.
20    Q.   There's a lifetime cap?
21    A.   There is.
22    Q.   Okay.  And you would have
23 exhausted that cap and still come up a

1 semester short?
2    A.   Correct.
3    Q.   Okay.  As you collected these
4 tickets through the years, did you keep up
5 with the fines and the costs that you had
6 been assessed, keep your own tally of them?
7    A.   I kept up with a lot of the
8 tickets.  I had, like, tickets per se.  But
9 the fines afterwards because you have to go
10 to court and get the tally --
11    Q.   Okay.
12    A.   -- and so --
13    Q.   So, you didn't maintain the
14 tally?
15    A.   No, not until I would see the
16 judge.
17    Q.   Okay.  Did you ever encounter
18 Judge Henley?
19    A.   Henley?  Judge Henley?  I did
20 not.  I've never been before a Judge Henley.
21    Q.   You don't know whether Judge
22 Henley entered an order allowing you to be
23 released on half of the twenty-two hundred

1 dollars?
2    A.   I went before --
3       MR. BASS:  Object to the form.
4    A.   -- Hayes.
5    Q.   (BY MR. GILL)  You think Hayes
6 entered that order?
7    A.   Yes, I've only been before Hayes.
8    Q.   Okay.  And I had forgotten, but
9 one of the things you've listed as your -- do
10 you have Exhibit 31?
11       MR. LOGSDON:  That's hers.
12    Q.   (BY MR. GILL)  This is her copy.
13 All right.  I'm going to show you Exhibit 31.
14 And it's the page numbered 009377, because
15 there's several pages in that exhibit.  Do
16 you see down at the bottom where it says
17 release on half, and it's signed by Judge
18 Henley?
19    A.   I do.
20    Q.   But you don't know anything about
21 that?
22    A.   I wasn't before --
23    Q.   Pardon?

Freedom Court Reporting
A Veritext Company

877-373-3660                                        205-397-2397

**Exhibit J**

1    A.   I didn't go before Henley.
2    Q.   Okay.  And you don't know why he
3 signed that order or when?
4    A.   Correct.
5    Q.   Okay.  One of the things that you
6 said you complained about was Judge Hayes'
7 insensitive comment about you setting an
8 example for your children when you didn't pay
9 your tickets; do you remember that?
10    A.   Yes.
11    Q.   And you feel -- do you feel that
12 that was, in fact, insensitive and unkind for
13 him to say a thing like that?
14    A.   Yes.
15    Q.   But he did say it?
16    A.   Yes.
17    Q.   But it was Judge Hayes who said
18 it and not Mayor Strange or the City?
19    A.   Correct.
20    Q.   Do you have current car
21 insurance?
22    A.   I do.
23    Q.   You said you kept that.  Who is

1 that with?
2    A.   USA Agency.
3    Q.   USA Agency?
4    A.   Yes, sir.
5    Q.   That's not the same thing as USAA
6 that issues --
7    A.   That's a different --
8    Q.   Different company?
9    A.   Right.
10    Q.   And did you tell them that you
11 had no driver's license?
12    A.   Yes.
13    Q.   And they issued the policy
14 anyway?
15    A.   Correct.
16    Q.   Is it an assigned risk proven
17 policy?
18    A.   It's -- I'm not sure.  That's not
19 something I discussed with them.
20    Q.   Okay.  Have you had insurance
21 with anybody before USA Agency?
22    A.   It was with USA Agency on all
23 vehicles.

1    Q.   On all the vehicles --
2    A.   Correct.
3    Q.   -- that you've had it on?
4       MR. GILL:  Okay.
5
6 FURTHER EXAMINATION BY MR. LOGSDON:
7
8    Q.   Do you have any documents for
9 that, for your insurance from USA Agency that
10 you can get to us?
11    A.   I submitted it.
12       MR. BASS:  I believe you've got
13 some, Counsel.
14       MR. LOGSDON:  Got those?  Okay.
15       So, speaking of that, why
16 don't -- I'll put the documents that I've
17 written down on the record just so we will
18 have something to be able to look at to
19 remember them.  I've got tax returns, check
20 stubs, anything from the government, Federal
21 loans, Student Loans Service, Foreign Car
22 Imports, Madison Avenue Montgomery
23 documentation, Serve slash American Express;

1 next, Aspire Staffing check stub; next,
2 Social Security disability; next, Compass
3 Bank stubs or statement; next, Wells Fargo or
4 Wachovia documents; next, unemployment
5 compensation; next, engagement letter; and
6 next, USA Agency.  So --
7       MR. BASS:  Well, before we go
8 looking for documents again, Counsel, why
9 don't you check what documents you already
10 have, and then, we'll supply to the best of
11 our ability what we can to some --
12       MR. LOGSDON:  Well, I'll do that,
13 but I'll ask you as well.  There's certainly
14 things that I'm missing.  And I'll ask you as
15 well to look at this list and see and do the
16 same.  And I'm not -- I don't -- we obviously
17 don't want anything that you've already
18 produced.  But I can't imagine I've got all
19 these for all the years and -- so, let's
20 just -- we'll just look and see.  All right.
21 And then, I will reserve our rights to ask
22 questions about these documents because we do
23 think that they have been previously

**Exhibit J**

Page 382

1 requested, like we did yesterday.
2          MR. GILL:  And in connection with
3 that --
4          MR. BASS:  And we'll reserve our
5 right to object to a continuance of this
6 deposition.
7
8 FURTHER EXAMINATION BY MR. GILL:
9
10     Q.    When did you make the search for
11 documents that you've turned over to counsel,
12 that have been turned over to the lawyers,
13 all the lawyers, opposing lawyers?
14     A.    About two weeks -- two or three
15 weeks ago.
16     Q.    One of the lawyers instructed you
17 to make a search?
18     A.    Correct.
19     Q.    Okay.  And gave you a list that
20 you were to search for?
21     A.    Correct.
22          MR. GILL:  Okay.  Bobby?
23

Page 383

1 EXAMINATION BY MR. SEGALL:
2
3     Q.    What does it mean that a car is
4 not registered, Ms. McCullough?  You said a
5 couple of times a car that wasn't registered.
6     A.    You haven't --
7     Q.    What does that mean?
8     A.    -- taken the title to the DMV.
9     Q.    It means you don't have title; is
10 that what you --
11     A.    I have the title, but I have not
12 taken it to the DMV and registered.
13     Q.    Okay.
14          MR. BASS:  I have just one, maybe
15 two questions just to clarify.
16
17 EXAMINATION BY MR. BASS:
18
19     Q.    You mentioned that you'd been
20 before Judge Hayes; is that correct?
21     A.    Yes.
22     Q.    Is it also true that you were
23 before Judge Ford in July and September of

Page 384

1 this year; does that ring a bell?
2     A.    Yes.
3          MR. LOGSDON:  Object to the form.
4 Leading the witness.
5     Q.    (BY MR. BASS)  You can answer.
6     A.    Yes.
7          MR. BASS:  It's a matter of
8 record, Counsel.
9          MR. LOGSDON:  Object to form.
10         MR. GILL:  It's not a court
11 record.
12         MR. BASS:  It actually is a
13 matter of record, Counsel.
14         MR. GILL:  I'm joking with you.
15     Q.    (BY MR. BASS)  Have you been
16 before Judge Westry?
17     A.    Westry?
18     Q.    To the best of your knowledge.
19     A.    No.  No, not that I can recall.
20         MR. BASS:  That's all.
21         FURTHER DEPONENT SAITH NOT.
22
23

Page 385

1          C E R T I F I C A T E
2
3 STATE OF ALABAMA    )
4 JEFFERSON COUNTY    )
5          I hereby certify that the above
6 and foregoing deposition was taken down by me
7 in stenotype, and the questions and answers
8 thereto were transcribed by means of
9 computer-aided transcription, and that the
10 foregoing represents a true and correct
11 transcript of the testimony given by said
12 witness upon said hearing.
13         I further certify that I am
14 neither of counsel, nor of kin to the parties
15 to the action, nor am I an anywise interested
16 in the result of said cause.
17
18         _____
19         MICHELLE L. PARVIN
20         Certified Court Reporter
21         License Number 126
22         Commission expires 9/30/19
23         Notary Public expires 1/26/22

97 (Pages 382 - 385)

**Exhibit J**

Page 386

1　1　To: Angela McCullough

2　2　Re: Signature of Deponent Angela McCullough

3　3　Date Errata due back at our offices:  11/9/2019

4　4

5　5　Greetings:

6　6　This deposition has been requested for read and sign by
　　　the deponent.  It is the deponent's responsibility to

7　7　review the transcript, noting any changes or corrections
　　　on the attached PDF Errata.  The deponent may fill

8　8　out the Errata electronically or print and fill out
　　　manually.

9　9

10　10　Once the Errata is signed by the deponent and notarized,
　　　please mail it to the offices of Veritext (below).

11　11

12　12　When the signed Errata is returned to us, we will seal
　　　and forward to the taking attorney to file with the

13　13　original transcript.  We will also send copies of the
　　　Errata to all ordering parties.

14　14

15　15　If the signed Errata is not returned within the time
　　　above, the original transcript may be filed with the

16　16　court without the signature of the deponent.

17　17

18　18　Please Email the completed errata/witness cert page
　　　to readandsign@veritext.com

19　19　or mail to

20　20　Veritext Production Facility

21　21　2031 Shady Crest Drive

22　22　Hoover, AL 35216

23　23　205-397-2397

---

Page 388

1　1　Page _____ Line _____ Change _____

2　2

3　3　Reason for change _____

4　4　Page _____ Line _____ Change _____

5　5

6　6　Reason for change _____

7　7　Page _____ Line _____ Change _____

8　8

9　9　Reason for change _____

10　10　Page _____ Line _____ Change _____

11　11

12　12　Reason for change _____

13　13　Page _____ Line _____ Change _____

14　14

15　15　Reason for change _____

16　16

17　17

18　18　_____

　　　　　DEPONENT'S SIGNATURE

19　19

　　　Sworn to and subscribed before me this ___ day of

20　20

　　　_____, _____

21　21

22　22　_____

23　23　NOTARY PUBLIC / My Commission Expires:_____

---

Page 387

1　1　ERRATA for ASSIGNMENT #3520752

2　2　I, the undersigned, do hereby certify that I have read the
　　　transcript of my testimony, and that

3　3

4　4　____ There are no changes noted

5　5　____ The following changes are noted:

6　6

　　　Pursuant to Civil Procedure, Rule 30  ALA  CODE § 5-30(e)

7　7　(2017) Rule 30(e) states any changes in form or
　　　substance which you desire to make to your testimony shall

8　8　be entered upon the deposition with a statement of the
　　　reasons given for making them  To assist you in making any

9　9　such corrections, please use the form below  If additional
　　　pages are necessary, please furnish same and attach

10　10

11　11　Page _____ Line _____ Change _____

12　12　_____

13　13　Reason for change _____

14　14　Page _____ Line _____ Change _____

15　15　_____

16　16　Reason for change _____

17　17　Page _____ Line _____ Change _____

18　18　_____

19　19　Reason for change _____

20　20　Page _____ Line _____ Change _____

21　21　_____

22　22　Reason for change _____

23　23　Page _____ Line _____ Change _____

---

Freedom Court Reporting
A Veritext Company

877-373-3660

205-397-2397

**Exhibit J**