# Exhibit A



Deposition of:

**Levon Agee**

*October 2, 2019*

In the Matter of:

**McCullough, Angela, Et Al. Vs. The City Of Montgomery, Alabama, Et Al.**

Freedom Court Reporting
877.373.3660 | calendar-al@veritext.com | 205.397.2397

**Exhibit A**

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR

2             THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    CASE NUMBER:  2:15-CV-00463-RCL-SMD

6

7    ANGELA MCCULLOUGH, et al.,

8                  Plaintiffs,

9                  vs.

10   THE CITY OF MONTGOMERY, ALABAMA,

11   et al.,

12                  Defendants.

13                  S T I P U L A T I O N

14               IT IS STIPULATED AND AGREED,

15   by and between the parties through their

16   respective counsel, that the deposition of

17   LEVON AGEE may be taken before Michelle L.

18   Parvin, Commissioner, at the offices of

19   Copeland, Franco, Screws & Gill, 444 South

20   Perry Street, Montgomery, Alabama, 36104, on

21   the 2nd day of October, 2019.

22               IT IS FURTHER STIPULATED AND

23   AGREED that it shall not be necessary for any

Exhibit A

Page 2

1  objections to be made by counsel to any
2  questions, except as to form or leading
3  questions, and that counsel for the parties
4  may make objections and assign grounds at the
5  time of trial, or at the time said deposition
6  is offered in evidence, or prior thereto.
7          IT IS FURTHER STIPULATED AND
8  AGREED that notice of filing of the
9  deposition by the Commissioner is waived.
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1            I N D E X
2
3  EXAMINATION BY:        PAGE NUMBER:
4  Mr. Logsdon        9
5  Ms. Holliday       396
6  Mr. Logsdon        462
7  Ms. Holliday       495
8  Mr. Logsdon        528
9
10  DEFENDANT'S EXHIBITS:
11  Exhibit 101        8
12      Judicial Correction Services' Cross-
13      Notice of Deposition of Levon Agee
14  Exhibit 102        237
15      Summary of Agee Levon Vehicle History
16  Exhibit 103        243
17      Alabama Uniform Traffic Ticket and
18      Complaint
19  Exhibit 104        251
20      Alabama Uniform Traffic Ticket and
21      Complaint
22  Exhibit 105        260
23      Alabama Uniform Traffic Ticket and

Page 4

1      Complaint
2  Exhibit 106        267
3      Alabama Uniform Traffic Ticket and
4      Complaint
5  Exhibit 107        278
6      Alias Warrant
7  Exhibit 108        283
8      Alias Warrant
9  Exhibit 109        286
10      Alabama Uniform Traffic Ticket and
11      Complaint
12  Exhibit 110        292
13      Alabama Uniform Traffic Ticket and
14      Complaint
15  Exhibit 111        296
16      Alias Warrant
17  Exhibit 112        300
18      Alabama Uniform Traffic Ticket and
19      Complaint
20  Exhibit 113        305
21      Alias Warrants
22  Exhibit 114        306
23      Order to Appear

Page 5

1  Exhibit 115        320
2      Personal Information Sheet
3  Exhibit 116        322
4      Orders of Probation
5  Exhibit 117        329
6      Case File Report For Levon Agee
7  Exhibit 118        344
8      General Condition of Probation
9  Exhibit 119        347
10      Letter
11  Exhibit 120        349
12      Letter dated January 16, 2011
13  Exhibit 121        376
14      Booking record
15
16
17
18
19
20
21
22
23

**Exhibit A**

Page 6

1   IN THE UNITED STATES DISTRICT COURT FOR
2       THE MIDDLE DISTRICT OF ALABAMA
3           NORTHERN DIVISION
4
5   CASE NUMBER: 2:15-CV-00463-RCL-SMD
6
7   ANGELA MCCULLOUGH, et al.,
8       Plaintiffs,
9       vs.
10  THE CITY OF MONTGOMERY, ALABAMA,
11  et al.,
12      Defendants.
13
14  BEFORE:
15      Michelle L. Parvin, Certified
16  Court Reporter
17  APPEARANCES:
18      CHESTNUT, SANDERS & SANDERS, LLC,
19  by Faya Rose Toure, 1 Union Street, Selma,
20  Alabama, 36701, appearing on behalf of the
21  Plaintiffs.
22      MARTHA I. MORGAN, Attorney at
23  Law, 8800 Lodge Lane, Cottondale, Alabama,

Page 7

1   35453, appearing on behalf of the Plaintiffs.
2       COPELAND FRANCO SCREWS & GILL,
3   P.A., by Mr. Richard H. Gill and Ms. Shannon
4   Holliday, 444 South Perry Street, Montgomery,
5   Alabama, 36104, appearing on behalf of the
6   Defendants.
7       WALLACE, JORDAN, RATLIFF &
8   BRANDT, LLC, by Mr. Larry S. Logsdon, Synovus
9   Center, 800 Shades Creek Parkway, Suite 400,
10  Birmingham, Alabama, 35209, appearing on
11  behalf of the Defendants.
12
13
14
15
16
17
18
19
20
21
22
23

Page 8

1       I, Michelle L. Parvin, a
2   Court Reporter of Birmingham, Alabama, acting
3   as Commissioner, certify that on this date,
4   as provided by the Federal Rules of Civil
5   Procedure of the United States District
6   Court, and the foregoing stipulation of
7   counsel, there came before me at 444 South
8   Perry Street, Montgomery, Alabama, 36104
9   beginning at 9:05 a.m., LEVON AGEE, witness
10  in the above cause, for oral examination,
11  whereupon the following proceedings were had:
12
13          LEVON AGEE,
14  being first duly sworn, was examined and
15  testified as follows:
16
17      THE COURT REPORTER:  Okay.  Usual
18  stipulations?
19      MS. MORGAN:  Yes, but we also
20  would like to review the -- he would like to
21  review it.
22
23      (Whereupon, Defendant's Exhibit

Page 9

1       101 was marked for identification
2       and copy of same is attached
3       hereto.)
4
5   EXAMINATION BY MR. LOGSDON:
6
7       Q.   All right.  Mr. Agee, can you
8   give us your full name for the record?
9       A.   Levon Agee, and I'm the Third.
10      Q.   All right.  Do you have a middle
11  name or middle initial?
12      A.   No, sir.
13      Q.   All right.  In front of you
14  there, I've marked an exhibit as 101, and
15  it's a notice of your deposition that we're
16  here today.
17      A.   Right.
18      Q.   The first question, have you ever
19  had your deposition taken before?
20      A.   Yes.
21      Q.   When have you had your deposition
22  taken?
23      A.   Me and Ms. Morgan --

3 (Pages 6 - 9)

**Exhibit A**

Page 10

1      MS. MORGAN:  No, have -- not have
2  you seen it.  Have you been deposed?
3      THE WITNESS:  Oh, no, no, no.
4      MS. MORGAN:  State question
5  again.  I think he's confused.
6      A.   Oh, I don't think I have, no,
7  sir.
8      Q.   (BY MR. LOGSDON)  All right.
9      A.   Yes.  I'm sorry.
10     Q.   No, no.  Okay.  Have you seen
11  what's in front of you as Exhibit 101?  Have
12  you seen that?
13     A.   Yes.
14     Q.   Attached to that, beginning on
15  Pages 3 through the end, is a request for
16  some documents that we've asked you to bring
17  today.  Actually, it starts on Page 4 of
18  Exhibit 101.  Did you bring any documents
19  with you today?
20     A.   No, sir.
21     Q.   Have you provided any documents
22  to your attorneys --
23     A.   Yes, sir.

Page 11

1      Q.   -- for this case?
2          What all have you provided?
3      A.   I provided everything that she
4  was asking, I guess.
5      Q.   Tell me what -- some examples of
6  what all you provided would be.
7      A.   Well, I provided the old ticket
8  records that were showing -- that were still
9  showing saying that I owed.  And that's --
10     Q.   Anything else?
11     A.   As far as the medical records, I
12  had the debt that I was behind this.
13     Q.   All right.  Do you --
14         MS. MORGAN:  We have forwarded
15  all that to y'all with --
16     Q.   (BY MR. LOGSDON)  All right.  So
17  you provided some old ticket records is the
18  first thing you told me about.  Is that one
19  page or two pages or how many pages would
20  that be?
21     A.   It isn't many.  So, I'm not aware
22  of it.  I think it's, like, one or two pages.
23     Q.   One or two pages?

Page 12

1      A.   Yes, sir.
2      Q.   And then, the second thing you
3  told me about is some medical --
4      A.   Issues that I had, yeah.
5      Q.   All right.  And describe that for
6  me a little bit more.
7      A.   Like high blood pressure.  I was
8  not getting proper treatment in there.
9      Q.   Okay.  And the documents
10  themselves, were they doctor bills or doctor
11  records or what are they?
12     A.   At that time, I was going to the
13  emergency room, sir.
14     Q.   Okay.  And the documents -- I'm
15  talking about the paper, the actual paper or
16  the document, what was on that piece of
17  paper?
18     A.   I'm not aware of what was on that
19  document because it's been so long.
20     Q.   All right.  And what I was asking
21  you about now is the documents that you've
22  given to your attorneys for this case.  Is
23  that a document that you would have given to

Page 13

1  your attorneys?
2      A.   Yes.  Yes.  Yes.  Yes.  Okay.
3  Yes.  Yes.
4      Q.   Yeah.  And I'm just trying to --
5      A.   Yes.  Okay.
6      Q.   Can you describe it for me?  In
7  other words, is it a doctor bill, is it --
8  what is it?
9      A.   It was doctor bills, child
10  support, unpaid tickets that I thought I paid
11  off, which we discovered they was saying I
12  was still owing.
13     Q.   All right.  Anything else?
14     A.   No, I don't think so.
15     Q.   All right.  And these doctor
16  bills that you gave to your attorneys, what
17  doctor would that be from?
18     A.   I think it was, like, in the
19  emergency room and, at the time, when I did
20  have insurance, I was going to Dr. Adams.
21  And that's when I found out that I was a
22  diabetic and had high blood pressure
23  problems.

4 (Pages 10 - 13)

**Exhibit A**

Page 14

1    Q.   Okay.  Where is Dr. Adams
2  located?
3    A.   At that time, he was on Taylor
4  Road, across the street from Baptist East.
5    Q.   Do you remember his first name?
6    A.   No, sir.
7    Q.   Just Dr. Adams?
8    A.   That's just what I called him,
9  Dr. Adams.  That's mainly what it was.
10    Q.   And Taylor Road near --
11    A.   Baptist East.
12    Q.   Baptist East in Montgomery?
13    A.   Yes, sir.
14    Q.   All right.  And when did you go
15  to Dr. Adams?
16    A.   That was some years.  I think
17  probably, like, three or four years ago.
18    Q.   Okay.  What other documents did
19  you have other than the Dr. Adams related --
20  what other medical documents did you have
21  other than that from Dr. Adams?
22    A.   That's about it.  Everything that
23  I was going from the emergency room, what I

Page 15

1  was going for, for, like I said, my high
2  blood pressure, trying to get medicine, for
3  my sugar.
4    Q.   Okay.
5    A.   Diabetes.
6    Q.   And what emergency room did you
7  go to?
8    A.   That's Baptist South.
9    Q.   Do you remember, by chance, the
10  doctor that you went to?
11    A.   No, sir.
12    Q.   You mentioned something about
13  having medical insurance, and I think you
14  said you had it at one time.
15    A.   Uh-huh.
16    Q.   Is that right?
17    A.   Uh-huh.
18    Q.   And if I can, this is hard to
19  remember, but say yes or no and not uh-huh.
20    A.   Oh, I'm sorry.
21    Q.   I understand -- I understand --
22  no, no, I understand uh-huh perfectly, but
23  everything is being written down.

Page 16

1    A.   Yes.
2    Q.   So, we want to make sure it's
3  clear.  And sometimes you can't tell on
4  uh-huh.
5    A.   Yes.
6    Q.   I'll try to remind you.
7    A.   Okay.
8    Q.   And then, I'll -- and then, when
9  you get it down, I'll start doing it and then
10  mess us all up.
11    A.   Yes, sir.
12    Q.   All right.  So, do you know any
13  other doctors that you went -- oh, I'm sorry.
14  You were telling me about insurance.  Who was
15  your insurance with?
16    A.   Blue Cross/Blue Shield.
17    Q.   And do you have any documents
18  from Blue Cross?
19    A.   Yes, I think I had in the files.
20      MS. MORGAN:  I think there was.
21      MR. LOGSDON:  Okay.
22      MS. MORGAN:  I don't have that
23  with us.  But, again, y'all should -- y'all

Page 17

1  were provided it --
2      MR. LOGSDON:  Okay.
3      MS. MORGAN:  -- sometime ago,
4  so --
5      MR. LOGSDON:  All right.
6      MS. MORGAN:  -- you could look at
7  your own records for this.
8    Q.   (BY MR. LOGSDON)  Do you have any
9  other insurance -- have you had any other
10  insurance other than Blue Cross?
11    A.   No, sir.
12    Q.   Have you had any insurance other
13  than medical insurance, in other words, car
14  insurance, property insurance, any other
15  insurance at all?
16    A.   Car insurance.
17    Q.   Who's your car insurance with?
18    A.   It was with Mims.  That's the
19  name of the insurance, Mims Insurance.
20    Q.   Do you know what street they're
21  on?
22    A.   I think it was Perry Hill.
23    Q.   In Montgomery?

5 (Pages 14 - 17)

**Exhibit A**

Page 18

1     A.   Yes, sir.
2     Q.   Do you have any documents from
3  Mims Insurance?
4     A.   No, sir.
5     Q.   What did you do with those?
6     A.   Never had them.  I mean, you
7  know, I lost my car, I lost my job.  So,
8  there was a lot of stuff I lost.  I never
9  could find it.
10    Q.   All right.  So, you kept your
11 insurance in your car or --
12    A.   No, I never did.  I lost the
13 insurance on my car because I wasn't able to
14 pay for it.
15    Q.   All right.  When did you have
16 this -- I assume this is automobile insurance
17 you're telling me about --
18    A.   Yes, sir.
19    Q.   -- that you had with Mims?
20    A.   Uh-huh.
21    Q.   When did you have that insurance?
22    A.   I think it was 2014.
23    Q.   That's when you first got it?

Page 19

1     A.   Yes, sir.
2     Q.   All right.  Any other insurance
3  other than Blue Cross and the auto insurance
4  that you got from Mims?
5     A.   No, sir.
6     Q.   The Blue Cross insurance, was
7  that something that you got through a company
8  that you worked for?
9     A.   Yes.
10    Q.   What company was that?
11    A.   DAS North America.
12    Q.   Okay.  Would that be spelled D-o-
13 s-s?
14    A.   No, D-A-S.
15    Q.   All right.  See, I thought if it
16 was one syllable, I could spell it --
17    A.   Yeah.
18    Q.   -- but I couldn't.
19       D-A-S North America?
20    A.   Uh-huh.
21    Q.   Where are they located?
22    A.   Right now, they're out on the Mt.
23 Meigs exit.

Page 20

1     Q.   What is that?
2     A.   Mt. Meigs.
3     Q.   Where is that?
4        MS. HOLLIDAY:  It's off of
5  I-65 -- I-85.
6     A.   I-85.
7        MR. LOGSDON:  Between the two of
8  y'all, how do you spell it?
9        MS. MORGAN:  M-t period M-e-i-
10 g-s.
11    Q.   (BY MR. LOGSDON)  Does that sound
12 right?
13    A.   Uh-huh.
14    Q.   All right.  Mt. Meigs.  And would
15 that be in Montgomery?
16    A.   Yes, sir.
17    Q.   All right.  All right.  Looking
18 back at Exhibit 101 in front of you there,
19 let's talk about -- and did you read all of
20 these pages and see if you had any documents
21 that are asked for here before you showed up
22 today?
23    A.   Yes.

Page 21

1     Q.   All right.  Let me ask you about
2  some of these.  One of the things that we're
3  asking for here are pay stubs or pay --
4  employment stubs.  Do you have any of those?
5     A.   No, sir.  All those were, like,
6  electronic, which the jobs I was working for,
7  you had to download an app on your phone.
8     Q.   Okay.
9     A.   And it was electronic.
10    Q.   All right.  So, explain that to
11 me.  You would get your pay stub through the
12 app --
13    A.   Yes, sir.
14    Q.   -- is that how that would work?
15    A.   Yes, sir.
16    Q.   And how would you get the money?
17 More important than the pay stub is the
18 money.  How did you get the money?
19    A.   They provided a pay card or
20 you'll have a pay card of your own.
21    Q.   How did yours work?
22    A.   I had a pay card on my own, which
23 was -- well, I had one -- I had several, one

Freedom Court Reporting
877-373-3660          A Veritext Company          205-397-2397

**Exhibit A**

1  through the company and one on my own.
2     Q.   Who were they with?
3     A.   You know, little prepaid cards
4  through Visa.
5     Q.   Okay.  So, how did -- and who
6  else?
7     A.   And whatever the job provided,
8  which was a Visa card.
9     Q.   So, do you have any documents
10 related to the Visa card?
11    A.   No, sir.
12    Q.   This would be just a regular old
13 Visa either credit or debit card?
14    A.   Yes, sir, pay card.
15    Q.   Okay.  And do you know if it was
16 a credit card or a debit card?
17    A.   It was a debit card.
18    Q.   All right.  So, these pay stubs
19 that you're telling me about, is this every
20 company you worked for or DAS or --
21    A.   Pretty much every company I
22 worked for except for some temp services.
23    Q.   Okay.  And I'm going to go

1  through your employment in a minute, but I
2  want to check on the documents.  So, none of
3  the -- none of the companies that you worked
4  for gave you an actual pay stub?
5     A.   The temp services, some of the
6  temp services I worked for.
7     Q.   Okay.  What temp services did you
8  work for?
9     A.   I worked for Onin Staffing.
10 Onin.  O-n-i-n --
11    Q.   Okay.
12    A.   -- Staffing.
13    Q.   All right.
14    A.   OmniSource.
15    Q.   Hold on a second.  Onin, where
16 are they located?
17    A.   They're not existing anymore, but
18 they was on Carmichael Road.
19    Q.   In Montgomery?
20    A.   Yes, sir.
21    Q.   All right.  And the second one
22 was Omni?
23    A.   Uh-huh.

1     Q.   O-m-n-i?
2     A.   Source.
3     Q.   Source.  Where was Omni located?
4     A.   Same, Carmichael Road.
5     Q.   All right.  Who else?
6     A.   DAS, Ambassador.
7     Q.   Was DAS a temporary?
8     A.   No.
9     Q.   They were a -- okay.  Ambassador.
10    A.   Ambassador was a temp service.
11    Q.   Where were they located?
12    A.   Perry Hill Road.
13    Q.   Any others?
14    A.   No.
15    Q.   Do you have any documents at all
16 from either -- let me -- we've talked about a
17 couple, so I'm going to read them all out --
18 your Visa pay cards that you mentioned, Onin
19 Staffing, OmniSource Staffing, DAS, or
20 Ambassador Temp Service?  When I say any
21 documents, any pay stubs --
22    A.   No.
23    Q.   -- applications, letters from

1  them, anything.
2     A.   No, sir.
3     Q.   When you had your -- you got
4  payment on your phone through the -- was it
5  through your phone --
6     A.   Yes.
7     Q.   -- an app on your phone?
8     A.   Uh-huh.  They would text us.
9     Q.   They would text you?
10    A.   Uh-huh.  Let us know --
11    Q.   Okay.
12    A.   -- when your money was deposited.
13    Q.   All right.  Is that a yes?
14    A.   Yes.
15    Q.   Okay.
16    A.   Yes.
17    Q.   You're doing good.
18         Who was your service with, your
19 cell phone service?
20    A.   At that time, I was with -- I was
21 probably with two services -- I think
22 T-Mobile and AT&T.
23    Q.   All right.  What are you with

7 (Pages 22 - 25)

**Exhibit A**

Page 26

1  now?
2      A.   Metro.
3      Q.   What's the full name?
4      A.   Metro PC.
5      Q.   And they're in Montgomery or
6  where are they located?
7      A.   Yes, Montgomery, Norman Bridge
8  Road.
9      Q.   Norman Bridge?
10     A.   Uh-huh.
11     Q.   And sorry to keep asking you the
12  Montgomery streets.  I'm not from Montgomery,
13  so --
14     A.   Yes, sir.
15     Q.   Not that I know streets in
16  Birmingham where I'm from, but at least I
17  have an excuse.
18         All right.  So, I know about
19  T-Mobile, I know about AT&T, and I know about
20  Metro.
21     A.   And Verizon, too.
22     Q.   And Verizon.
23     A.   Yes.

Page 27

1      Q.   All right.  Anybody else?
2      A.   No, sir.
3      Q.   You covered the waterfront on
4  those.  Which ones did you like the best?
5      A.   Verizon.
6      Q.   Verizon.
7         MS. TOURE:  I hate to say it, but
8  it's true.
9      Q.   (BY MR. LOGSDON)  I was going to
10  say, if you said T-Mobile, I could tell you
11  that, you know --
12         MS. TOURE:  Out of them all.
13     Q.   (BY MR. LOGSDON)  -- I could tell
14  you that you've got more patience than I've
15  got.
16     A.   Love Verizon, man.
17     Q.   Yeah.  T-Mobile is great unless
18  you have to, like, make a phone call.
19     A.   Exactly.
20     Q.   And then, there's --
21         MS. TOURE:  As long as you're in
22  the city, you're fine with T-Mobile.
23         MR. LOGSDON:  Off the record.

Page 28

1         (Whereupon, a discussion was held
2         off the record.)
3
4      Q.   (BY MR. LOGSDON)  So, when did
5  you have Verizon?  Tell me that.
6      A.   I had Verizon when I was working
7  with DAS.  That was probably in 2013.  I had
8  it again but not that long.
9      Q.   All right.
10     A.   I can't remember.
11     Q.   And when did you have T-Mobile?
12     A.   I had T-Mobile probably a couple
13  of years after that, around 2000 maybe 16.
14     Q.   And when did you have AT&T?
15     A.   Before 2013.  Probably 2011,
16  somewhere in there.
17     Q.   How about Metro PC?
18     A.   Every year.
19     Q.   You've had that one --
20     A.   Ever since I couldn't get back
21  with Verizon or AT&T or T-Mobile.
22     Q.   Okay.
23     A.   Yeah.

Page 29

1      Q.   All right.  So, the T-Mobile,
2  what office did you go to?
3      A.   Right here on the Eastern
4  Boulevard.
5      Q.   All right.  How about AT&T?
6      A.   The Eastern Boulevard.
7      Q.   All right.  How about Verizon?
8      A.   Eastchase.
9      Q.   Okay.  And you can take these one
10  at a time.  What I'd like -- were these
11  packages, like, with a -- with something
12  else, like, you know, you got your, you know, cable
13  with it or --
14     A.   Oh, no, sir.  It was --
15     Q.   -- or a landline with it or
16  anything else?
17     A.   No, sir, it was just me and my
18  wife, girlfriends at the time.
19     Q.   Would have the cell service --
20     A.   Yes, sir.
21     Q.   -- is that right?
22         And were they company provided or
23  is this something you --

8 (Pages 26 - 29)

Exhibit A

Page 30

1    A.    No --
2    Q.    -- provided?
3    A.    -- something I provided.
4    Q.    Okay.  So, it would be in your
5  name or your wife's or --
6    A.    My name.
7    Q.    Just your name?
8    A.    Uh-huh.
9    Q.    Is that a yes?
10    A.    Yes.
11    Q.    And not your wife's name?
12    A.    No, sir.
13    Q.    And then, tell me about that.
14  What is your wife's name?
15    A.    Latasha Rose Agee.
16    Q.    When did you and Latasha get
17  married?
18    A.    We got married last year.
19    Q.    All right.
20    A.    And my first wife -- I was
21  married two times.
22    Q.    Okay.
23    A.    My first wife, her name is Kesha

Page 31

1  Daniels now.  And we got married in 2008.
2    Q.    How long were y'all married?
3    A.    For five years.
4    Q.    Okay.  And was her name
5  Lakesha --
6    A.    Agee at that time.
7    Q.    And what is her maiden name?
8    A.    Lakesha Daniels.
9    Q.    Were y'all separated or divorced?
10    A.    We were separated.  Yeah, we were
11  separated.
12    Q.    All right.  Was there a legal
13  proceeding for the divorce?
14    A.    Yes, sir.
15    Q.    And tell me about that.  First of
16  all, tell me who represented you.
17    A.    Wow.  I really can't remember the
18  guy's name, but it was out in Eastchase.  It
19  was someone that she knew that represented
20  us.
21    Q.    Okay.  Did he represent both of
22  y'all?
23    A.    Yes, sir.

Page 32

1    Q.    Okay.  And I think I remember,
2  there was a court case filed; is that right?
3    A.    Yes, sir.
4    Q.    All right.  And so, who filed the
5  court case?
6    A.    She did.
7    Q.    What year would this have been?
8    A.    '14.  '13, '14, one of them.
9    Q.    I'm not asking you what your
10  attorney told you, but how much did you wind
11  up having to pay your attorney?
12    A.    Anything.
13    Q.    You didn't have to pay him
14  anything?
15    A.    No.
16    Q.    She paid it?
17    A.    Yes.
18    Q.    All right.
19    A.    I was on child support.  That's
20  the only thing I left out with.
21    Q.    Okay.  All right.  And so, for
22  the -- for the settlement or for the -- the
23  way the divorce ended, was it a settlement

Page 33

1  agreement or did y'all go to court?
2    A.    Settlement agreement.
3    Q.    And so, you were telling me your
4  part of the settlement agreement was you had
5  to pay child support?
6    A.    Yes, sir.
7    Q.    What children did you have to
8  support?
9    A.    One.  Her name was ███.  That's
10  my daughter's name, █████████.
11    Q.    All right.  Can you spell ███?
12    A.    █████.
13    Q.    All right.  Just like it sounds.
14    A.    Uh-huh.
15    Q.    How old is ████?
16    A.    She's eleven now.
17    Q.    And so, how much do you pay in
18  child support for ████?
19    A.    Well, the regular pay was three
20  sixty-four, but since I'm so far behind, I
21  think it's, like, right at five because I try
22  to throw extra to knock down the back pay
23  balance.

Freedom Court Reporting
877-373-3660                A Veritext Company                205-397-2397

**Exhibit A**

Page 34

1    Q.    Okay.  So, the order -- the
2  settlement agreement says you'll pay three
3  sixty-four per month?
4    A.    Uh-huh.
5    Q.    Is that a yes?
6    A.    Yes.
7    Q.    But you've gotten behind.  So, to
8  try to catch up, you're trying to pay five
9  hundred a month?
10   A.    Yes.
11   Q.    Sometimes you do, sometimes you
12  don't?
13   A.    Sometimes I do, sometimes I
14  don't.
15   Q.    Okay.  And does ▮▮▮ live with
16  her mom?
17   A.    Her mom.  Yes, sir.
18   Q.    Who do you make the payments to?
19   A.    Montgomery Child Support
20  Department, Health Department.
21   Q.    All right.  Do you remember the
22  month that the divorce was finalized in 2014?
23   A.    I would say in August if I'm not

Page 35

1  mistaken.
2    Q.    Do you remember when it was
3  filed?
4    A.    No, sir.  I just knew the time to
5  show up.
6    Q.    Would it have been sometime -- I
7  mean, did it take a year, two years, or --
8    A.    No --
9    Q.    -- was it quick?
10   A.    -- a couple months.
11   Q.    A couple months.  So, if it was
12  finalized in August, do you think it might
13  have been --
14   A.    About July.
15   Q.    About July?
16   A.    Sometime in that time.  Yes, sir.
17   Q.    Who paid the lawyer?
18   A.    She did.
19   Q.    Where did she work?
20   A.    She works for the Department of
21  Human Resource downtown.  Department of
22  Revenue.  I'm sorry.
23   Q.    Department of Revenue?

Page 36

1    A.    Yes, sir.  Which is around the
2  street, down the street.
3    Q.    Which street is that on?
4    A.    Madison.
5    Q.    Madison Street?
6    A.    Yes, the main street.
7    Q.    Does she -- she works there now?
8    A.    Yes, sir.
9    Q.    Did she work there --
10   A.    Yes, sir.
11   Q.    -- since y'all got married in
12  2008?
13   A.    Yes, sir.
14   Q.    Okay.  Is that a pretty good job?
15   A.    I guess.  She's still there.
16  Yes, sir.
17   Q.    All right.  Do you know what her
18  earnings were when she was there?
19   A.    No, I never got in her personal
20  business.
21   Q.    But, in any case, she paid for
22  the lawyer that you're talking about?
23   A.    Yes, sir, she provided all that.

Page 37

1    Q.    You had to pay the child support?
2    A.    Yes, sir.
3    Q.    And how else -- what were the
4  other parts?
5    A.    We had to come to a mutual
6  agreement with school she goes to.  I was
7  paying day care.  And the visit at the time
8  was between me and her.
9    Q.    Okay.  Where were you paying for
10  day care?
11   A.    At that time, probably, like, one
12  seventy-five a month.
13   Q.    At that time, meaning -- at that
14  time meaning 2014?
15   A.    Uh-huh.
16   Q.    All right.  Is that a yes?
17   A.    Yes.  I'm so sorry.  Sorry about
18  that.
19   Q.    And how long were they -- was
20  your daughter in day care?
21   A.    Until she started school, pre-K.
22   Q.    All right.  So, when would that
23  have started?

10 (Pages 34 - 37)

**Exhibit A**

Page 38

1    A.   I'm not accurate on that. I
2 really don't know because she was staying
3 with her mom at that time. So, you know, it
4 was kind of, like, a --
5    Q.   All right.
6    A.   -- dysfunctional thing going on.
7    Q.   I understand. Let me ask it a
8 different way. When did you remember
9 starting to pay the day care?
10   A.   Oh, I started paying day care
11 ever since she was -- we were married. I was
12 paying day care then. I never stopped.
13   Q.   In 2008?
14   A.   Uh-huh.
15   Q.   All right. Yes? That's a yes?
16   A.   Yes.
17   Q.   What's the name of the day care?
18   A.   She went to several at that time
19 because we was moving around. I know one of
20 them was Century 2000. And that was located
21 on Virginia Loop Road. And she went to
22 another one. It was called Sunshine. And
23 that was located on South Court Street.

Page 39

1    Q.   All right. Did she go to any
2 other day cares?
3    A.   Yes, but I can't remember because
4 I wasn't picking her up after the divorce.
5 So --
6    Q.   Was it always around a hundred
7 and seventy-five a month?
8    A.   Yeah. Well, Century 2000 was a
9 hundred and seventy-five because that was the
10 pre-K also --
11   Q.   Uh-huh.
12   A.   -- qualified into it.
13        And the other ones was probably,
14 like, a hundred, a hundred and ten, something
15 like that.
16   Q.   So, you were paying that out of
17 your check?
18   A.   Yes, sir.
19   Q.   And the reason she was in day
20 care is because you were working and your
21 wife was working?
22   A.   Yes, sir.
23   Q.   Y'all had one child?

Page 40

1    A.   Well, she has two that's not
2 mine.
3    Q.   All right. You didn't have to
4 support her two?
5    A.   Well, no, their father wasn't
6 there.
7    Q.   Excuse me?
8    A.   Their father wasn't present.
9    Q.   Okay. But did you have to, I
10 mean, pay day care for the other two?
11   A.   Oh, no.
12   Q.   And did you have any --
13   A.   School clothes, food, medicine.
14   Q.   Okay. All right. So, I guess
15 once the divorce came or even before the
16 divorce --
17   A.   Uh-huh.
18   Q.   -- you didn't -- you didn't have
19 to pay to support them?
20   A.   I really didn't. But just by me
21 building a bond with them, I still tried to
22 take care of them.
23   Q.   Tried to --

Page 41

1    A.   Yes, sir.
2    Q.   -- here and there?
3    A.   Yes, sir.
4    Q.   All right. So, what about
5 property in the divorce, who got --
6    A.   We don't have property. The only
7 thing we probably had was maybe a vehicle and
8 our rings and that's about it.
9    Q.   Who got the vehicle?
10   A.   She did.
11   Q.   What was it?
12   A.   It was a 2000, I think, 6 Impala.
13   Q.   Okay.
14   A.   I was just a co-signer on it.
15   Q.   Who was it financed with?
16   A.   Credit Acceptance.
17   Q.   Credit?
18   A.   Credit -- I can't even say it.
19 Credit Acceptance.
20   Q.   Acceptance?
21   A.   Uh-huh.
22   Q.   Where are they located?
23   A.   It was -- really, she got the car

11 (Pages 38 - 41)

Exhibit A

Page 42

1 from, I think, Jack Ingram.  It was a finance
2 company.  That's the finance company, Credit
3 Acceptance.
4      Q.   Jack Ingram here in Montgomery?
5      A.   Yes, sir, Eastern Boulevard.  Or
6 Northern Boulevard, I'm sorry.
7      Q.   And this car would be in your
8 wife's name?
9      A.   Yes, sir.
10     Q.   And the Credit Acceptance would
11 be in your wife's name and your name?
12     A.   Yes, sir, financed.
13     Q.   All right.  What about -- we've
14 talked about a few more things, and I want to
15 see if this refreshes your memory as to
16 documents.  So, we've talked about day cares.
17     A.   Uh-huh.
18     Q.   And we've talked about the car at
19 Jack Ingram.
20     A.   Uh-huh.
21     Q.   And we've talked about the cell
22 phone bills.
23     A.   Right.

Page 43

1      Q.   Or documents.  Do you have any
2 cell phone bills or any documents from the
3 day care or any documents related to either
4 these car -- either this car we're talking
5 about or any cars?
6      A.   No, sir.
7      Q.   None?
8      A.   The only car I will -- could
9 document is, I had a Lincoln in my name.  And
10 that was way after me and her was divorced.
11 That's the only thing I can provide.  Well, I
12 had another car, too.  It was a, I think, a
13 2011 Santa Fe truck.
14     Q.   Okay.
15     A.   Yeah.  Which that was my
16 girlfriend at that time.
17     Q.   Was that a Hyundai Santa Fe?
18     A.   Yes, sir.
19     Q.   And it was 2011?
20     A.   I think so.  It was the '11 or a
21 '10, one of them.
22     Q.   All right.  When did you get the
23 Hyundai, the 2010 Hyundai Santa Fe?

Page 44

1      A.   I got that probably in 2012.
2      Q.   Where did you get it?
3      A.   At Auto Mart on the Northern
4 Boulevard.  It's by Jack Ingram.
5      Q.   And did you finance it through --
6      A.   Credit Acceptance.
7      Q.   Credit Acceptance?
8      A.   Yes, sir.
9      Q.   And is Credit Acceptance, it
10 sounds like they're kind of an arm of both
11 Jack Ingram and Auto Mart?
12     A.   Yes, sir.  Like, if you want to
13 finance a car, that's mainly who you probably
14 go through with as far as banking.
15     Q.   All right.  So, you figure out
16 here's the car I like and see if we can make
17 the money work, okay, go talk to these guys?
18     A.   Yeah.
19     Q.   And they're called Credit
20 Acceptance?
21     A.   Yes, sir.
22     Q.   All right.  And so -- okay.  And
23 so, I assume from that, you financed the car?

Page 45

1      A.   Uh-huh.
2      Q.   Is that a yes?
3      A.   Yes.
4      Q.   Was the Hyundai in your name and
5 her name or just --
6      A.   It was both in names.  I was the
7 primary.  She was the secondary.
8      Q.   Okay.  Tell me her name.
9      A.   Lamonica Pinkard.
10     Q.   Does she live in Montgomery?
11     A.   Yes.
12     Q.   When did you and Lamonica get
13 together?
14     A.   Early -- probably around 2000,
15 I'll say 12, somewhere around there.
16     Q.   And does Lamonica live in
17 Montgomery?
18     A.   I really don't know now.  At that
19 time, she did.
20     Q.   Where was she living or were
21 y'all living together?
22     A.   Yeah, we was living together.  At
23 that time, she was living off Atlanta Highway

12 (Pages 42 - 45)

Exhibit A

1  I think at the apartment complex called
2  Marks.
3      Q.   All right.  And were you living
4  with her in 2012?
5      A.   Yes, but before I was staying
6  with her, I was a roommate with my best
7  friend.  I was staying in The Woods.
8      Q.   Okay.
9      A.   That's on North Burbank off
10 Atlanta Highway.
11     Q.   Okay.
12     A.   Yeah.
13     Q.   All right.  When you were living
14 with Lamonica in early 2012, how did that
15 work?  Were you paying her any rent or was
16 she paying the rent?
17     A.   We was both going half on the
18 rent and the bills.  Well, she was making
19 more than me, though.  She was a manager at
20 Cracker Barrel, a store manager.
21     Q.   Okay.  What Cracker Barrel?
22     A.   The one in Eastchase.
23     Q.   Okay.  So, I know that you and

1  Lamonica weren't married in 2012, but y'all
2  were helping each other out with bills and
3  that kind of thing?
4      A.   And she was pregnant, too.
5      Q.   She was pregnant?
6      A.   Yes.
7      Q.   Okay.
8      A.   With my --
9      Q.   To your child?
10     A.   Yeah.
11     Q.   And you nodded there.  So, I want
12 to make sure we're clear on the record.
13     A.   Yes, sir.
14     Q.   You were helping -- you and
15 Lamonica were helping out each other with the
16 bills?
17     A.   Yes, sir.
18     Q.   All right.  So, she's earning
19 money at Cracker Barrel, you're trying to
20 earn money?
21     A.   Trying.
22     Q.   Trying.  And y'all are working
23 together to pay your expenses?

1      A.   At that time, it was -- what she
2  was making was enough to just provide the
3  household.
4      Q.   Okay.
5      A.   Yeah.
6      Q.   All right.
7      A.   Because I was in and out of jobs.
8      Q.   All right.  What was she making
9  at Cracker Barrel as a manager?
10     A.   I really don't know.  I really
11 try to stay out of their personal business.
12 But she was making -- it was okay.  She
13 provided.
14     Q.   She was able to provide?
15     A.   Yes, sir.
16     Q.   All right.
17     A.   Until she got, you know -- she --
18 we had twins.  And, man, you know, that --
19 they were stillborn.  So, you know, it was --
20 due to me -- prior to the arrest that I had
21 in 2013, she lost them because I was gone for
22 a minute.
23     Q.   Okay.  All right.  Do you

1  remember when in 2012 you and Lamonica got
2  together and you moved in with her or when
3  y'all started sharing expenses?
4      A.   We moved in probably 2013
5  together.  We stayed off Bullard Street,
6  which is over by Alabama State.
7      Q.   Do you remember what that -- was
8  it an apartment?
9      A.   No, it was a house.
10     Q.   House?
11     A.   Yes, sir.
12     Q.   Were y'all renting?
13     A.   Yes, sir.
14     Q.   Do you know who the landlord was?
15     A.   Wow.  I think his name was Mr. --
16 is it Morgan?  We'll say it was Mr. Morgan, I
17 think.
18     Q.   Okay.
19     A.   He was an older white guy.
20     Q.   Okay.
21     A.   Yes, sir.
22     Q.   All right.  So, the -- when
23 you're living with Lamonica -- I think I

13 (Pages 46 - 49)

**Exhibit A**

1  followed what you said -- she had pretty good
2  job at the time?
3      A.   Uh-huh.
4      Q.   You were working to get a good
5  job?
6      A.   Uh-huh.
7      Q.   It sounds like it may have been
8  on and off.  We'll talk about that later.
9      A.   Uh-huh.
10     Q.   But Lamonica was good about
11 helping out and paying -- covering the bills?
12     A.   Yes, sir.
13     Q.   And that would have been from
14 2012 until when that you and Lamonica were
15 doing that in that arrangement?
16     A.   Say, between -- about '14, '15.
17 That's when we split up.
18     Q.   Okay.
19     A.   There was a lot of problems then.
20     Q.   Okay.  So, either late 2014 or
21 early 2015?
22     A.   '15, yes, sir.
23     Q.   All right.  And would the

1  utilities have been in Lamonica's name or
2  your name?
3      A.   Both.
4      Q.   Both?
5      A.   Uh-huh.
6      Q.   How about that -- well --
7      A.   I still have a bill -- I have a
8  light bill that is still, like, a thousand
9  dollars in our name because, like I said,
10 when I went to jail due to these tickets, she
11 was, like, going through some problems.  She
12 couldn't work.  So, she probably had to move
13 back with her stepmom --
14     Q.   Okay.
15     A.   -- you know.
16          And the way I got arrested, it
17 was kind of messed up because I couldn't get
18 in contact with her in probably two weeks.
19     Q.   Okay.
20     A.   I'd just got off of work.
21     Q.   All right.
22     A.   I don't want to talk about that,
23 man.

1      Q.   No, we'll talk about that.
2           So, you mentioned something,
3  though, that you still have a bill.
4      A.   Uh-huh.
5      Q.   And that's -- as we -- as we go
6  through here and we say -- talk about
7  something, if you think of a document that
8  you have --
9      A.   Yes.
10     Q.   -- just like you just did --
11     A.   Yes.
12     Q.   -- let me know.
13          Do you think you could find that
14 bill that you just mentioned?
15     A.   I called down there because I was
16 trying to get on my own.
17     Q.   Yeah.
18     A.   And they're saying that I was
19 owing a bill from which we stayed on Bullard
20 Street.  It was, like, a thousand dollars.
21     Q.   This is the power company?
22     A.   Yes, sir.
23     Q.   Do you have the actual bill in

1  your possession?
2      A.   No, sir.
3      Q.   All right.  Do you have any
4  documents related to any leases or any
5  payments for rent or anything like that?
6      A.   No, sir.
7      Q.   Did you sign the leases or did --
8      A.   We both signed the leases at that
9  time.
10     Q.   Okay.  But you don't have any
11 copies?
12     A.   No, sir.
13     Q.   All right.  What about -- you
14 mentioned that your pay would -- you were
15 telling me about how your pay would come --
16     A.   Uh-huh.
17     Q.   -- on an app.
18     A.   Uh-huh.
19     Q.   You gave me some examples of that
20 that you had on your phone.
21     A.   Yes, sir.
22     Q.   Did you ever access it with a
23 computer as opposed to your phone?

**Exhibit A**

Page 54

1    A.   Yes, when I had to get a vehicle,
2  I, you know, accessed it through the company
3  to show them my records of payment history.
4    Q.   Okay.  Was it your computer or
5  somebody else's computer?
6    A.   Somebody else's.
7    Q.   All right.  Did you ever have a
8  computer?
9    A.   No, I never owned a computer.
10    Q.   Did you ever have Internet
11  service at home?
12    A.   Yes.
13    Q.   Who did you have that through?
14    A.   Spectrum.
15    Q.   All right.
16    A.   And which was Charter, I guess --
17    Q.   Yeah.
18    A.   -- at that time.
19    Q.   Neither of them are any good.
20    A.   Yeah.
21    Q.   All right.  Did you have --
22  Charter Spectrum, did you have an Internet
23  cable package with them?

Page 55

1    A.   Yes, sir.
2    Q.   And tell me about that.
3    A.   The Internet, the cable, and
4  phone.  You know, the first time is -- it was
5  cheap, and then, after that, it's outrageous.
6  Yeah.
7    Q.   How much was it?
8    A.   Oh, man, the first month, I loved
9  it.  Probably, like, a hundred and ten
10  dollars or something.  And then, after that,
11  it was, like, two hundred and something.
12    Q.   Okay.  And I know we're laughing
13  about that, and it seems like it's one month,
14  because I've been -- I've been there with you
15  before.  And you go back and look, and it's
16  actually longer than a month.
17    A.   Exactly.
18    Q.   It seems like it's a month, but
19  it seems like it's a day --
20    A.   Yeah, exactly.
21    Q.   -- that it's a hundred and one,
22  but it's actually longer than that.
23        How long was it a hundred and

Page 56

1  ten; do you know?  Maybe a year?
2    A.   Yeah, I'll give it -- I'll give
3  it about a year.
4    Q.   And then, it jumps up.  And tell
5  me how much it jumped up to.
6    A.   Oh, to the extra hundred dollars,
7  to probably, like, between the two thirty
8  mark.
9    Q.   Two thirty?
10    A.   Yeah, two thirty mark.
11    Q.   Or more?
12    A.   Yeah.
13    Q.   And then, when did you have the
14  Charter Spectrum?
15    A.   I had it -- truthfully, I had it
16  that year when I was working, and she had to
17  pay for it, which it was still in my name,
18  but I was able to cover the first year.  And
19  that was probably, like, 2012 to '13 because
20  it was a hundred and something.  I was a
21  temp.
22    Q.   Okay.
23    A.   And she took over.

Page 57

1    Q.   All right.  And how long did you
2  keep Charter Spectrum, either you or you and
3  her?
4    A.   Well --
5    Q.   Three or four years?
6    A.   No, probably about two.
7    Q.   Two?
8    A.   Probably that first year, I took
9  over, and the second year, she took over.
10    Q.   Okay.  Any other Internet service
11  other than Charter Spectrum?
12    A.   That's all.  Knology.  I'm sorry.
13  Knology.
14    Q.   Knology?
15    A.   Yeah.  I'm sorry.
16    Q.   And tell me about your plan with
17  Knology.
18    A.   The same as Spectrum.
19    Q.   Internet, cable, and phone?
20    A.   Yeah.
21    Q.   And tell me about the --
22    A.   I didn't have that that long.  I
23  don't even think I had that a year.

15 (Pages 54 - 57)

**Exhibit A**

1    Q.    What year would that have been?
2    A.    Probably about 2014, I think.  I
3  have a balance on both of them.
4    Q.    Okay.  And was Knology in your
5  name?
6    A.    Yes.
7    Q.    And was Charter Spectrum in your
8  name?
9    A.    Both our names.
10    Q.    Both you and Lamonica?
11    A.    Uh-huh, because our name was on
12  the lease.  That's the only way we could have
13  got it at that time.
14    Q.    All right.
15    A.    Because her credit was kind of
16  jacked up at that time and mine wasn't.  But
17  she had the job and I didn't.  It was --
18    Q.    Uh-huh.
19    A.    It was like that.
20    Q.    When you say her credit was kind
21  of jacked up, I think I know what you mean,
22  but tell me what you mean by that.
23    A.    Like, she had student loans --

1  well, her mom and dad passed when she was in
2  high school.  And she kind of like had to --
3  she was adopted.  So, she stayed in Tennessee
4  until she went to the University of Alabama.
5  And she came back home.  And I think her
6  adopted parents -- her first job was at
7  Zaxby's when she came back to Montgomery.
8    Q.    Uh-huh.
9    A.    So, you know, by then, she was
10  going through a lot of problems, which I
11  didn't know about until later on, like,
12  medical problems and you, know, her parents
13  passing on her.  She didn't have nobody to
14  lean on.  So, she was in and out of apartment
15  complexes.  She would just, I guess, get in
16  the type of mode and she'll think about them
17  and get up and run.  Because that's what
18  happened to us, you know.  I thought
19  everything was perfect, and, you know, it
20  just, boom, out of the blue, you know, she'll
21  just go berserk, crying and all type of
22  stuff.  So --
23    Q.    Okay.

1    A.    Yeah.
2    Q.    When was she at Alabama?
3    A.    I really don't know.  That's -- I
4  think that's when she graduated high school.
5  She went to St. Jude's on Fairview.  So, I
6  think she probably left -- I mean, her
7  parents died before she graduated.  So, we'll
8  say 2000 and -- she was class of 2004.  So,
9  she probably was there in 2005 at Alabama --
10    Q.    Okay.
11    A.    -- yeah.
12    Q.    And how long was she at Alabama?
13    A.    I think she did two years.
14    Q.    Okay.  Other than Charter
15  Spectrum and Knology, did you have any other
16  Internet --
17    A.    No.
18    Q.    -- service?
19        And do you have any paperwork
20  from Charter Spectrum or Knology?
21    A.    No, but I can call and get them.
22  Everything you've asked me for, I can call
23  and get it.

1    Q.    Okay.
2    A.    I just haven't got the paperwork.
3    Q.    Can you do that, see what you can
4  get from them --
5        MS. MORGAN:  Object.
6    Q.    (BY MR. LOGSDON) -- and get it
7  to your attorney?
8        MS. MORGAN:  I don't think he has
9  an obligation to do that.  We've produced
10  what he's in his possession.  You already
11  probably have the other anyway.  And that's
12  not our duty.
13        MR. LOGSDON:  All right.  Well,
14  we can talk about that.
15        MS. MORGAN:  Okay.  We can talk
16  off the record.
17        MR. LOGSDON:  Yeah.  But I do
18  think he's got to provide --
19        THE COURT REPORTER:  I can only
20  get one at a time.
21        MS. MORGAN:  Things in your
22  possession, you do have to provide as we've
23  told you and we have done.

Exhibit A

Page 62

1    THE WITNESS:  Oh, yes.
2    MR. LOGSDON:  Yeah.
3    THE WITNESS:  Everything I
4  provided to her is what y'all have that was
5  in my possession.
6    MR. LOGSDON:  So, I think you
7  have to provide what is in your possession,
8  custody, and control.
9    MS. MORGAN:  Exactly.
10    MR. LOGSDON:  I'm talking to your
11  attorney here.
12    MS. MORGAN:  And that's what
13  we've told him.  We may -- you may --
14    MR. LOGSDON:  Yeah.
15    MS. MORGAN:  -- understand
16  differently what that means, but we don't
17  agree with you on that.
18    MR. LOGSDON:  That's okay.
19    Q.    But as we're talking through
20  these questions, Mr. Agee, if there's
21  something like you just said that you can get
22  if you make a call, you know, call somebody,
23  then, let me know that.  We can talk about

Page 63

1  that.  But I'd like to know, for purposes of
2  now, things like that, that if you can get a
3  document -- you know, if you can say -- for
4  example, we've talked about some bills, you
5  know.
6    A.    Uh-huh.
7    Q.    You can say, yeah, I can get
8  those if I make a call, I've done that
9  before.  You've talked about the power
10  company bill.  And that's one you could get a
11  copy of if you called, right?
12    A.    Right.
13    Q.    All right.  And even these leases
14  that we've talked about, you know --
15    A.    I probably can't on the lease --
16    Q.    Yeah.
17    A.    -- because dealing with me and
18  Monica, the guy, he was old.
19    So, I don't know if he's living
20  or not.
21    Q.    He might not -- he might not have
22  it?
23    A.    Yeah.

Page 64

1    Q.    All right.
2    A.    He was old an guy.
3    Q.    Do you have his number?
4    A.    No, sir.
5    Q.    All right.  Okay.  What about tax
6  returns?  Have you filed tax returns over the
7  last ten years or so?
8    A.    No.
9    Q.    Have you ever filed one?
10    A.    Yes, I have filed one, but after
11  that, I couldn't able to get them.  I was
12  always owing.  And truthfully, I couldn't
13  hold a job down due to the fact of tickets.
14    Q.    When did you first file a tax
15  return?
16    A.    I think my first tax return in
17  2003.
18    MS. MORGAN:  If I could just say
19  one thing, going back to our prior discussion
20  where I -- that I do hope that Larry's taking
21  the same definition of what's in possession
22  and control for JCS that you're having all
23  your clients, and that Shannon is, call and

Page 65

1  get any information they could get through
2  calling rather than just providing things.
3    Q.    (BY MR. LOGSDON)  So, 2003, you
4  filed an income tax return.  Did you prepare
5  that yourself or did you have somebody help
6  you with it?
7    A.    I went to H&R Block.
8    Q.    Do you know what location?
9    A.    At that time, there was one
10  location on Fairview, but they're no longer
11  there.
12    Q.    And this would have been what
13  year?
14    A.    2003.
15    Q.    And so, tell me what happened
16  with that.  Did you complete it and fill it
17  out and send it in?
18    A.    No, I actually went to them.
19  They completed it.  They filled it out.
20    Q.    And then, what happened?
21    A.    I got my return.
22    Q.    Okay.  And did you get a refund?
23    A.    Yes, sir.

17 (Pages 62 - 65)

Exhibit A

Page 66

1    Q.   How much was your refund?
2    A.   Probably about thirteen hundred
3  dollars or something like that.
4    Q.   All right.  Well, that was good.
5    A.   Yeah.  The first time, last time.
6    Q.   How much did you have to pay them
7  to get the -- do the return?
8    A.   I really don't know.  I was
9  really young.  I was just graduating -- I
10  really didn't graduate high school, but I was
11  out of high school --
12    Q.   All right.
13    A.   -- at that time.
14    Q.   All right.  How old are you?
15    A.   I'm thirty-seven.
16    Q.   Was that the only year you've
17  ever filed a tax return?
18    A.   No, I tried to file, I think, a
19  couple years on down the road, somewhere,
20  like, 2005 when I really got me a good job,
21  and I had to end up owing, because I
22  didn't -- I guess they said I didn't have
23  enough dependents taken off.

Page 67

1    Q.   Okay.  Enough of --
2    A.   Of dependents.
3    Q.   Of dependents?
4    A.   Uh-huh.
5    Q.   Okay.  Who did you go to?
6    A.   Wow.  It was somebody on Zelda
7  Road at that time.  I really don't remember.
8    Q.   All right.  So, you went 2003,
9  you skipped 2004, didn't file a return?
10    A.   No, because I wasn't working.
11    Q.   All right.
12    A.   Well, I was working, but I didn't
13  work that long --
14    Q.   Okay.
15    A.   -- to file.
16    Q.   And then, 2005, you --
17    A.   Barely made it over the six-month
18  mark, and so, I filed one.
19    Q.   And did you -- did you -- did you
20  wind up -- did you actually file it or did
21  you just have them prepare it and --
22    A.   I had them prepare it and see,
23  and they said I was end up owing.  So, I

Page 68

1  never -- I mean, as a matter of fact, I did
2  file that one.  And I think I owed them,
3  like, two hundred -- no -- two to three
4  hundred dollars.
5    Q.   If you filed that one and you
6  owed, you'd be hearing about that?
7    A.   Yeah, I actually paid for that
8  one.
9    Q.   Okay.  You paid it?
10    A.   Yeah, I actually paid for that
11  one.
12    Q.   Okay.  So, you paid two hundred
13  dollars?
14    A.   Uh-huh.
15    Q.   Is that yes?
16    A.   Yes.
17    Q.   All right.  So, the IRS records,
18  if we send them a letter, it will show --
19  2005, it will show you paid two hundred
20  bucks?
21    A.   Yeah.
22    Q.   All right.  All right.  And then,
23  tell me about -- tell me about 2006.

Page 69

1    A.   2006, I did the same thing, and I
2  end up owing more.  I think I owed them
3  almost probably a thousand or more.  And I
4  didn't file that one because I didn't have
5  it.
6    Q.   All right.  Who did it?  Who
7  prepared it?
8    A.   I think H&R Block, once again.  I
9  went back to H&R Block.
10    Q.   What location?
11    A.   The same location, West Fairview.
12    Q.   All right.  So, no return filed
13  at all in 2006 --
14    A.   No.
15    Q.   -- because you owed and you
16  didn't have the money, so you didn't file it?
17    A.   I didn't file it.
18    Q.   Have you ever filed it?  I know
19  you didn't file it then, but have you ever
20  filed it?
21    A.   No.
22    Q.   How about 2007?
23    A.   No.

18 (Pages 66 - 69)

Exhibit A

Page 70

1    Q.   Why not then?
2    A.   I didn't work that long.
3    Q.   All right.  How about -- well,
4  have you ever filed a return since the ones
5  you've told me about in 2003 and 2005?
6    A.   That's the only time.
7    Q.   Have you ever gotten somebody to
8  prepare a return for you?
9    A.   I did in -- probably in the
10  2000 -- when I got married, I tried to
11  straighten it out, like, in 2008 or '9.  I'm
12  not accurate about that.  I went to the IRS,
13  which they had over there off Carmichael
14  Road.  I went to them and tried to get it
15  straightened out.  But, at that time, I owed
16  too much.  I was just barely making ends
17  meet.
18    Q.   Okay.  So, tell me about that.
19  2008, 2009 --
20    A.   Yeah.
21    Q.   -- did you go to somebody before
22  going to the IRS or you just went straight to
23  the IRS?

Page 71

1    A.   I went straight to the IRS
2  because I think I had got a letter from them.
3    Q.   What did the letter say?
4    A.   I'm not accurate on that letter.
5  It was so long ago.  But I know I went.  And
6  I was present with one of the clients -- I
7  mean, clerks.  And we was kind of
8  straightening it out.  And I think it came
9  out to be something I know I couldn't pay
10  because of me not filing or me not putting
11  the correct information or the -- like, what
12  you would say, the dependents on there.
13  Because I was doing two and -- no, I was
14  doing four, which I should have been doing
15  two.  I wasn't married then with my first
16  wife, but we was together.  And we still
17  putting her on there.  And I couldn't provide
18  that marry -- I mean, that -- at that period
19  of time.  But on that -- when you're filling
20  out, I was, you know, head of household, me,
21  her, and her two kids.  But what they were
22  saying was, I had to have been married in
23  order to put me, her, and the two kids on

Page 72

1  there --
2    Q.   Okay.
3    A.   -- which I didn't understand
4  that.
5    Q.   All right.  And I don't -- I
6  don't profess to know anything about taxes,
7  but --
8    A.   Yeah.
9    Q.   -- it sounds like what you're
10  saying is that you had four that you put
11  down, and because you put down four, they
12  didn't take too much out of your paycheck?
13    A.   Yeah, exactly.
14    Q.   So, when it came refund time --
15    A.   Exactly.
16    Q.   -- they said it shouldn't have
17  been four, it should have been something
18  else?
19    A.   Just me on there because I wasn't
20  married at the time.
21    Q.   So, instead of getting a refund,
22  you actually owed money?
23    A.   Exactly.

Page 73

1    Q.   And it sounds like you owed --
2  they were saying you owed a good bit of
3  money?
4    A.   A good bit of money.
5    Q.   How much did they say you owed?
6    A.   At that time, probably about
7  seven thousand.
8    Q.   Okay.
9    A.   That's the years.
10    Q.   Okay.
11    A.   That's years.
12    Q.   And I -- and I know the IRS
13  doesn't let up.
14    A.   Oh, no, they didn't.  They
15  didn't.  They held my check.  What made me go
16  to them because they was -- during the years,
17  I used to get garnished and never knew what I
18  was getting garnished for, you know what I'm
19  saying.  Because I wasn't kind of hip onto
20  what that means.  But I just took upon myself
21  to realize and see what the garnishment was
22  about, and it was the IRS taking it out.  So,
23  that's when I really got stable.  And they

19 (Pages 70 - 73)

Exhibit A

1 really sent me an actual letter.  Because I
2 was house to house, house to house, house to
3 house, house to house.
4     Q.    When did the IRS start
5 garnishing?  And it sounds like you -- it was
6 happening, and you didn't even know it was
7 happening?
8     A.    I'm thinking it's child support,
9 you know, at the time, you know.
10     Q.    So, when did it -- when do you
11 think they started it?
12     A.    I will say they probably started
13 in 2005.
14     Q.    Okay.  All right.
15     A.    But I noticed it after probably
16 2008 or something like that.
17     Q.    Started in 2005 but noticed it in
18 2008?
19     A.    Yeah.
20     Q.    And I guess you noticed some
21 money coming out of your check, you just
22 didn't think it was --
23     A.    No, it was, like, insurance, you

1 know --
2     Q.    Yeah.
3     A.    -- stuff like that, I was, okay,
4 well, cool, I'll just get more overtime.
5         I'll just work.
6     Q.    Uh-huh.
7     A.    And -- which is how I said.  I
8 just was like that.
9     Q.    Right.  And what about now?  Are
10 you still -- is the IRS still sending you
11 stuff?
12     A.    No.
13     Q.    When did they stop?
14     A.    I'm not accurate about that.  I
15 just know I just filed exempt.
16     Q.    What's that?
17     A.    I file exempt.
18     Q.    All right.  All right.  So, let's
19 go back to -- I think you said 2008 or
20 2009 --
21     A.    Uh-huh.
22     Q.    -- you went into the IRS office.
23     A.    Uh-huh.

1     Q.    They told you you owe around
2 seven thousand dollars --
3     A.    Yeah.
4     Q.    -- and I -- and told you about
5 the dependents thing.
6     A.    Uh-huh.
7     Q.    So, I -- did you not file in 2008
8 or 2009?
9     A.    No, because, like I said, my
10 living standards, I was trying to take care
11 of a household.  So, every dollar I needed, I
12 had to do what I had to do --
13     Q.    Okay.
14     A.    -- seriously.
15     Q.    All right.  Did you ever file
16 another return?
17     A.    No, I never did.  I just always
18 just file exempt and just don't file.
19     Q.    All right.  So --
20     A.    Because I'm knowing that if I do
21 file, I wasn't going to have enough money to
22 even meet the means as a man in my house.
23     Q.    All right.  And when you say you

1 file exempt, you're not saying you actually
2 fill something out and say exempt, you
3 just --
4     A.    Yeah.
5     Q.    -- you just don't file anything?
6     A.    No.  Yes, I file exempt.
7     Q.    Oh, you do file exempt?
8     A.    Yeah.
9     Q.    All right.  And when did you
10 first file exempt?
11     A.    I do that on every job.  Every
12 job I used to have, I used to have to file
13 exempt just in order to meet my part of the
14 bills.
15     Q.    Okay.
16     A.    And I don't work -- I mean, at
17 that time, I wasn't even -- when I do file
18 exempt, it's probably, like, three or four
19 months, because working with a temp service,
20 you can work a good two, three months, and
21 they can call you and let you go or they
22 might -- you know, dealing with Hyundai,
23 they'll cancel out a contract, so you have to

**Exhibit A**

1   go to another temp service that's picking up
2   the same contract in order to keep your job.
3   So, it was like that for the last seven,
4   eight years for me.
5       Q.   All right.  So, when you're
6   talking about filing exempt, you're
7   talking about putting something on the -- a document
8   with your employer that says exempt?
9       A.   Exempt, yes.
10      Q.   But you're not talking about
11  sending something into the IRS?
12      A.   No.
13      Q.   You haven't done that since 2006?
14      A.   Yes.
15      Q.   I'm sorry.  You hadn't done that
16  since 2000 --
17      A.   '5, something like that.
18      Q.   Well, '5 is the year you didn't
19  file it.
20      A.   Yeah.
21      Q.   So, 2003?
22      A.   Yeah.
23      Q.   All right.  Okay.  Have you gone

1   to anyone else about taxes, either the IRS or
2   an accountant or anyone else?
3       A.   No.
4       Q.   The last conversation you had
5   with the IRS was that one in 2008 when you
6   went into their office?
7       A.   Right.
8       Q.   I assume you got some letters
9   after that --
10      A.   Right.
11      Q.   -- it sounds like?
12      A.   Probably one that year, that next
13  year, like, 2009.
14      Q.   Yeah.
15      A.   And after that, like I said, I
16  think the point of the little money they was
17  taking out of it, it stopped.
18      Q.   All right.
19      A.   They stopped garnishing me and
20  they -- just it was it.
21      Q.   That's it.
22      A.   And I never just went back.  I
23  never said anything.  I just --

1       Q.   All right.  As far as these
2   dealings that you've had -- we've talked
3   about a lot of different things with the
4   cable company, the IRS, all those things.
5       A.   Right.
6       Q.   Would all of them show your name
7   as Levon Agee, III?
8       A.   Some.  Some will say Levon Agee.
9       Q.   One of those two?
10      A.   Yeah.
11      Q.   All right.  You mentioned the IRS
12  garnishing your wages.
13      A.   Uh-huh.
14      Q.   And you also mentioned child
15  support.  That wasn't really a garnishment.
16      A.   Baptist South?
17      Q.   Excuse me?
18      A.   Baptist South?  Baptist?
19      Q.   Okay.  Yeah, who else has
20  garnished?
21      A.   Baptist.
22      Q.   Baptist South?
23      A.   Uh-huh.  A couple check cashing

1   places I had to do.
2       Q.   All right.  Hold on just a
3   minute.  Let me -- let's talk about Baptist
4   South.  What did they garnish for?
5       A.   Hey, they just garnished because
6   I wasn't paying my medical records.  I didn't
7   have enough to pay my medical -- I'll go to
8   the emergency room, you know, they'll run a
9   CAT scan, they'll do this and do that, give
10  you a prescription.  You know, that's all I
11  can do at that time.
12      Q.   When did you first start getting
13  garnished by Baptist South?  It sounds
14  like -- has that been a good ways back?
15      A.   Yeah, that's been some years.
16  That's probably been ever since I first got
17  my warehouse job.  That was probably, like,
18  in 2004.
19      Q.   Okay.
20      A.   Well, they haven't garnished me
21  in 2004, but this is probably, like, 2005 or
22  somewhere when they started garnishing me or
23  something like that.

21 (Pages 78 - 81)

**Exhibit A**

Page 82

1    Q.   Okay.  And has Baptist South
2 garnished you for anything other than
3 emergency room visits?
4    A.   Yeah, that's probably about it.
5 Well, I had a shoulder injury, a knee injury,
6 and -- yeah, I think that's probably about
7 it, yeah.
8    Q.   Okay.
9    A.   Yes.
10    Q.   Shoulder injury and a knee
11 injury?
12    A.   Uh-huh.  And high blood pressure
13 and stuff like that.  Because at one point in
14 time, I had to stay overnight a couple of
15 times --
16    Q.   Okay.
17    A.   -- in my life, yeah.
18    Q.   Would these things you're telling
19 me about, the high blood pressure and the
20 shoulder injury and that, would that be back
21 in 2004?
22    A.   No, like, in '8, like --
23    Q.   2008?

Page 83

1    A.   Yeah.
2    Q.   What did you go for in 2004?
3    A.   My knee playing basketball.  I
4 had a little knee injury.
5    Q.   Okay.
6    A.   Yeah.
7    Q.   Did you have surgery on it or --
8    A.   No, just real bad swelling,
9 tendonitis.
10    Q.   Okay.  And then, what else did
11 you go to the emergency room for?
12    A.   My shoulder.
13    Q.   2004?
14    A.   Yeah.  Also, I hurt my shoulder.
15    Q.   Okay.
16    A.   It kind of, like, came out of
17 place a little bit.
18    Q.   Playing basketball?
19    A.   This come from the job.  I was
20 doing cement work.
21    Q.   Did you file a Workers' Comp
22 claim?
23    A.   No.

Page 84

1    Q.   Did you try to get your company
2 to pay for your medical?
3    A.   It was a under-the-table job.
4    Q.   It was a what?
5    A.   Under-the-table job.
6    Q.   And I think I know what you mean
7 by that, but tell me what you mean by that.
8    A.   Like, I was just giving out a
9 helping hand, trying to make a couple dollars
10 that day.  And I didn't do no work history
11 form or nothing like that.  It was just come
12 out, show up, make sure you have your boots
13 on and whatever tools you've got, just show
14 up and just come out there, you know, and
15 work.
16    Q.   And paid in cash?
17    A.   Yeah.  That day.
18    Q.   All right.  So, the shoulder and
19 the knee.  What else did you go to the
20 emergency room for?
21    A.   High blood pressure, like I was
22 saying.
23    Q.   And when did -- when did you

Page 85

1 first go for that?
2    A.   I found out I had high blood
3 pressure probably 2007.  And I found out I
4 was a diabetic probably, like, what, three
5 years ago, 2016.
6    Q.   Okay.  All right.  And so, you
7 went to the emergency room for high blood
8 pressure?
9    A.   Uh-huh.
10    Q.   Is that a yes?
11    A.   Yes.
12    Q.   Did you go to any other doctor
13 for your high blood pressure?
14    A.   Like I said, Dr. Adams at that
15 time.
16    Q.   I forgot about him.
17    A.   Yeah, Dr. Adams.
18    Q.   All right.  All right.  Any other
19 garnishments other than Baptist?
20    A.   Guardian Bank.
21    Q.   When was that?
22    A.   That was -- which it's going on
23 now.  So, what did I say, three years ago?

22 (Pages 82 - 85)

Exhibit A

Page 86

1   2016.  About the car I was telling y'all
2   about, the Lincoln.
3        Q.   All right.  So, that was 2016?
4        A.   Yeah.  It's -- well, they're
5   fixing to start garnishing me now, so --
6        Q.   Okay.  That started in 2016?
7        A.   Well, the case I had to go court
8   for started in 2016.  And I went a couple of
9   times.  Like I was saying, I was jobless and
10  I just stopped going because I'm in a lose
11  situation.  I can't be able to pay for it.
12  So, they sent me letters, which they are
13  still sending me letters, saying if I don't
14  do this or get in contact with them or at
15  least try to make a payment, they was going
16  to start garnishing my wages.
17       Q.   Okay.  Do you feel like Guardian
18  is not doing you right or what --
19       A.   No, it's prior to this, you know.
20  And by me getting my license, you know, I
21  had -- I can't drive like that, you know.
22  Like when I got locked up, this situation
23  kind of, like, messed a lot of things up.

Page 87

1        Q.   Okay.  All right.  So, tell me
2   more.  Any other garnishments?
3        A.   Easy Money Check Cashing.
4        Q.   Where are they located?
5        A.   Ann Street.
6        Q.   And --
7        A.   Speedy Cash.
8        Q.   Hold on just a minute.  Easy
9   Money on Ann Street --
10       A.   Yes.
11       Q.   -- what are they garnishing you
12  for?
13       A.   Loans.
14       Q.   When did you make loans?
15       A.   Oh, man.
16       Q.   Or get a loan.  When did you get
17  a loan?
18       A.   Probably started in 2008.
19  Probably 2006 when I was married, trying to
20  pay my end of the bills.
21       Q.   Okay.
22       A.   Yeah.
23       Q.   Did you pawn something?

Page 88

1        A.   Pawn shop?  Yeah.
2        Q.   At Easy Money.
3        A.   No, it's not a pawn shop.  It's a
4   check cashing place, which they do loans,
5   too.
6        Q.   Did they file suit against you?
7        A.   Yeah.
8        Q.   In Montgomery?
9        A.   Yes.
10       Q.   Did they get a judgment?
11       A.   Yes.
12       Q.   How much did you borrow?  Or how
13  much was the judgment for?
14       A.   The judgment came out to be,
15  like, a thousand, but I borrowed, like, five
16  hundred and fifty dollars from them.
17       Q.   Okay.  All right.  Other than
18  Easy Money, who else?
19       A.   Speedy Cash.
20       Q.   Where are they located?
21       A.   Eastern Boulevard.
22       Q.   When did you --
23       A.   Around the same time.

Page 89

1        Q.   All right.  2000 --
2        A.   Yeah.
3        Q.   -- 8?
4        A.   To now.
5        Q.   Still going on?
6        A.   Yeah.
7        Q.   And did they file suit?
8        A.   I really didn't heard from them,
9   so I don't know about them.
10       Q.   Holding your breath?
11       A.   Yeah.
12       Q.   All right.  All right.  Who else?
13       A.   Rice Bank, which that's on the
14  Southern Boulevard.
15       Q.   R-i-c-e?
16       A.   Uh-huh.
17       Q.   And what's going on with Rice?
18       A.   The same thing.  At that time,
19  they was giving out loans, and I went and got
20  one.  And I was -- I made a couple payments,
21  but, like I said, due to my status, I
22  couldn't be able to pay for them.  So -- I
23  think they -- they -- they -- that was part

23 (Pages 86 - 89)

Exhibit A

1 of the garnishment, too. I think they had
2 got their money back. But I think I had owed
3 them -- I borrowed, like, four, and I think
4 it was, like, a thousand I had to owe them
5 back to.
6     Q.   When would this have been?
7     A.   Probably about 2007. I know it
8 was 2007 for them.
9     Q.   And when were the garnishments
10 taking place?
11     A.   The garnishment took place
12 probably in 2009.
13     Q.   How much did you borrow?
14     A.   Like, probably about four fifty
15 to five hundred dollars from them, too.
16     Q.   All right. Who else?
17     A.   That's all I can think of right
18 now.
19     Q.   We were talking about
20 garnishments, but what about just other
21 companies that you borrowed money from, like,
22 pawn shops or banks or --
23     A.   Yeah, a pawn shop. Norman Bridge

1 Pawn Shop. That's on Norman Bridge Road. I
2 had to pawn my wedding ring, engagement
3 rings, and stuff like that, TVs.
4     Q.   All right. When was this?
5     A.   Around the 2009, '8 area.
6     Q.   How much money did you -- did you
7 get for the pawn?
8     A.   My rings, man, they -- I'll say
9 probably about three hundred dollars, man.
10 They wouldn't give me nothing.
11     Q.   All right.
12     A.   I ended up losing them, trying to
13 pay them back.
14     Q.   And then, what about the --
15     A.   TVs.
16     Q.   -- TVs?
17     A.   Probably a hundred and fifty
18 dollars. It was, like, two TVs. A hundred
19 and fifty dollars apiece per TV.
20     Q.   What kind of TVs were they?
21     A.   At that time, they was -- it was
22 Samsungs before the smart TV was out.
23     Q.   Okay.

1     A.   Yeah.
2     Q.   What size?
3     A.   Forty-two, the little flat forty-
4 two.
5     Q.   Flat forty-two?
6     A.   Uh-huh.
7     Q.   Both of them flat forty-two?
8     A.   Uh-huh.
9     Q.   Where did you get those?
10     A.   Walmart.
11     Q.   And you got them in 2008?
12     A.   Yeah.
13     Q.   All right. Got them new?
14     A.   Huh?
15     Q.   All right.
16     A.   Yeah. Well, you know, layaway.
17     Q.   Layaway?
18     A.   Yeah.
19     Q.   All right. What else did you
20 pawn?
21     A.   That's all I can remember right
22 now, sir.
23     Q.   Rings and the televisions?

1     A.   Yeah. Little common stuff.
2 Video games. I'm sorry. Xboxes and stuff,
3 you know.
4     Q.   Okay. Well, that's okay. So,
5 tell me the -- Xbox, what -- you're getting
6 way out of my league when you're talking
7 about Xbox. But I do -- I do know what it
8 is.
9     A.   Yeah.
10     Q.   What kind of Xbox?
11     A.   The Xbox 360.
12     Q.   Okay. And video games that go
13 with the Xbox?
14     A.   Yes, sir.
15     Q.   All right. And where'd you get
16 the Xbox?
17     A.   One -- I had two of them. One,
18 she got at her job. That was my wife -- she
19 won it at her job. So, she gave it to me as
20 a gift.
21     Q.   Okay.
22     A.   Yeah.
23     Q.   Good gift?

24 (Pages 90 - 93)

**Exhibit A**

Page 94

1    A.   And another one --
2    Q.   What wife was that?
3    A.   Kesha.
4    Q.   All right.  And the other one?
5    A.   I think that we went half.  We
6  had it on layaway.  It was a Christmas
7  present.
8    Q.   Yeah.
9    A.   Yeah.  And the kids didn't want
10  it or something like -- it was something to
11  do -- I think they -- one of their fathers
12  had brought one, and we just had an extra
13  one.
14    Q.   Had an extra one?
15    A.   Yeah.
16    Q.   How much did that one run, the
17  Xbox?
18    A.   I can't remember.  That was so
19  long ago.
20    Q.   And I have no idea how much --
21    A.   Yeah.
22    Q.   -- they cost.
23         How much do they cost?

Page 95

1    A.   I don't know.  I don't even know.
2  I haven't played a video game in so long, but
3  I think, at that time, what, two, three
4  hundred dollars.
5    Q.   Okay.  And that time would be
6  2000 --
7    A.   Like, '8, '7, yeah.
8    Q.   '8?
9    A.   Yeah.
10    Q.   Okay.  What else -- who else did
11  you borrow money from?
12    A.   As far as businesses, I mean,
13  that's about it.  I borrowed from people.
14    Q.   People?
15    A.   Yeah.
16    Q.   Tell me about that.
17    A.   You know, my mom, she's the only
18  one that's living.  My grandmom.  I used to
19  have to borrow money from them sometimes.  A
20  couple of my best friends --
21    Q.   Okay.
22    A.   -- you know, borrowed money from.
23    Q.   All right.  Anybody else?  You

Page 96

1  said something about businesses.
2    A.   No, I'm saying that was it as far
3  as --
4    Q.   As far as businesses?
5    A.   Yeah, as far as business-wise.
6    Q.   All right.  And tell me your
7  mom's name.
8    A.   Idella R. Agee.
9    Q.   And where does Ms. Agee live?
10    A.   In Montgomery, Alabama.
11    Q.   What is her address?
12    A.   ███████ Drive.
13    Q.   Is that the house you grew up in?
14    A.   No, sir.  I'm originally from
15  Brewton, Alabama.
16    Q.   Brewton?
17    A.   Yes, sir.
18    Q.   All right.  Did you go to high
19  school in Brewton?
20    A.   No, sir, I went up here.
21    Q.   You went in Montgomery?
22    A.   Yes, sir.
23    Q.   But you were born in Brewton?

Page 97

1    A.   Yes, sir.
2    Q.   How long did you live in Brewton?
3    A.   I came to Brewton when I was five
4  years old.  I mean, came to Montgomery when I
5  was five years old.
6    Q.   Okay.
7    A.   So, I lived in Brewton until I
8  was about five.  Because my dad was in
9  Vietnam, and that kind of, like, messed him
10  up in the head.
11    Q.   Yeah.
12    A.   So, we had to move because he
13  went crazy, man.  And --
14    Q.   Uh-huh.
15    A.   I had a rough life, yeah.
16    Q.   Okay.
17    A.   So, he went crazy.  So, my mom
18  escaped from him and came to Montgomery.
19    Q.   Okay.  Just to get away?
20    A.   She had to.
21    Q.   All right.  And so, that was --
22  you were young then?
23    A.   Yeah, I was very young.

25 (Pages 94 - 97)

Exhibit A

1    Q.    Did you move to the Lynnwood
2  house then or where did you move?
3    A.    No, sir.  When I moved up here,
4  we were staying in Hope Hull.  We moved with
5  some family members.  They were staying in
6  Hope Hull, deep off in the country, which is
7  the Luverne area.
8    Q.    Okay.
9    A.    Yeah.  Yeah.
10    Q.    How far is Hope Hull from
11  Luverne?
12    A.    It's not that far because --
13    Q.    Not that far?
14    A.    -- it's --
15        MS. MORGAN:  Forty --
16        THE WITNESS:  Yeah.
17        MS. MORGAN:  -- miles or so.
18        MR. LOGSDON:  Yeah.
19        THE WITNESS:  Yeah.
20    Q.    (BY MR. LOGSDON)  East west?
21    A.    Yeah.
22    Q.    Okay.
23        MS. MORGAN:  Maybe --

1    Q.    (BY MR. LOGSDON)  I guess that
2  makes sense?
3        MS. MORGAN:  -- not even that.
4        I don't know.
5    A.    Yeah, because it's like the road
6  divides --
7    Q.    (BY MR. LOGSDON)  Coming from two
8  different directions --
9    A.    Yeah.
10    Q.    -- but I guess that's --
11        All right.  So, did you -- how
12  long did you live in Hope Hull?
13    A.    Well, from my memory, at that
14  age, I went to a school called Danley for two
15  years, which I was kindergarten and first
16  grade.  So, I can say two years.
17    Q.    Okay.
18    A.    Which I was young.  And then, my
19  mom and my stepdad, I think, got together at
20  that time.  And I -- we moved to Smiley
21  Court, which that was my stepdad's sister, we
22  stayed with for a minute.  Like I said, I was
23  real young.  And I think we stayed with them

1  until I was probably about seven.  And then,
2  my mom moved to -- it was a trailer park
3  on -- by Air Base Boulevard.  I think it was
4  called Cruise Trailer Park.
5    Q.    Okay.
6    A.    Which, I went to Daisy Lawrence
7  for a year.  And she also moved to --
8    Q.    How about high school?  You can
9  jump ahead.
10    A.    Yeah, I can go ahead and jump
11  ahead.  Because we stayed in a place called
12  Brigdale.  I know we stayed in Brigdale,
13  which is another trailer park.  We stayed
14  there from my elementary years.  I can
15  remember from third grade all the way to
16  sixth grade.
17    Q.    Okay.
18    A.    Yeah.  And my high school years,
19  we moved down the street, which was Old Selma
20  Road.  I stayed there all the way until, you
21  know, I got -- after I had to drop out of
22  school because I had to take care of -- we
23  had to work because my mom and my stepdad --

1  well, my stepdad got sick, and my mom, you
2  know, she needed help.  So, we had to do what
3  we had to do.  My sister had kids.  So, I had
4  to kind of like put the education to the side
5  and get a job and make sure everything was
6  functioning around the house.
7    Q.    What year would that have been
8  in?
9    A.    '99, 2000.  I was supposed to
10  have been graduating in 2002.
11    Q.    So, you would have been a -- how
12  far high school did you finish, freshman year
13  or sophomore year?
14    A.    Yeah, sophomore.  Well,
15  sophomore.  Eleventh grade, I had to drop
16  out.
17    Q.    Eleventh grade?  Dropped out --
18  okay.  Finished sophomore year, dropped out
19  in the eleventh grade?
20    A.    Yeah.
21    Q.    All right.  What high school?
22    A.    Carver.
23    Q.    Did you play basketball for

**Exhibit A**

1 Carver?
2     A.   Yeah.  I played basketball and
3 football at Carver.
4     Q.   And football?
5     A.   Yeah.
6     Q.   Okay.  I can tell a basketball
7 player when I see a basketball player.
8     A.   Yeah, I can play.
9     Q.   And you're probably looking at me
10 and say I can tell somebody not a basketball
11 player.
12     A.   I don't know.  You look like you
13 used to be a pretty sure guy, now.
14         MS. TOURE:  I was a basketball
15 player.
16         MR. LOGSDON:  You were a
17 basketball player?
18         MS. TOURE:  A good one.
19         MS. HOLLIDAY:  There were
20 fourteen people in your high school.
21         MR. LOGSDON:  Fourteen people,
22 that's right.  You caught yourself there.
23 Uh-huh.

1         MS. TOURE:  I went to the state
2 championship and came in second --
3         MR. LOGSDON:  Well, that's good.
4         MS. TOURE:  -- in Tennessee back
5 when women weren't playing basketball.
6         MS. MORGAN:  Have you seen what
7 Hank wrote about you this week?
8         MS. TOURE:  No.
9         MS. MORGAN:  You've got to see
10 it.  It beautifully talks about that.
11         MR. LOGSDON:  About that?
12         MS. TOURE:  I played in the
13 '60s -- in the late '50s and the early '60s
14 when girls basketball was --
15         MR. LOGSDON:  Didn't do it.
16         MS. TOURE:  In Tennessee.  I was
17 in Tennessee.
18         MS. MORGAN:  He said your coach
19 said if he had just two of you on any team,
20 he'd go to the championship.
21         MR. LOGSDON:  There you go.
22         MS. TOURE:  I fought to the end,
23 you know that.

1         MR. LOGSDON:  Hank's doing you
2 right.
3         MS. TOURE:  All the time.  That's
4 why I went home last night.  We're going to
5 take that minute from your time.  We're not
6 going to take that minute from your time.
7     Q.   (BY MR. LOGSDON)  The Carver High
8 School when you were -- when you were going
9 there --
10     A.   Uh-huh.
11     Q.   -- where were you living then?
12     A.   Old Selma Road.
13     Q.   Off where?
14     A.   Old Selma Road.
15     Q.   Okay.  And when you dropped out,
16 where did you start working?
17     A.   I was already working when I was
18 in high school.  I had to play ball and work.
19     Q.   All right.
20     A.   Yeah.
21     Q.   Where'd you work?
22     A.   I worked at Subway, end up
23 working at a little warehouse, too, called

1 Picnic and McDonald's.
2     Q.   Okay.  I like all three of those.
3     A.   Yeah.  I had to get it in, man.
4     Q.   All right.  How long did you work
5 at --
6     A.   Subway was my first job.  So, I
7 worked there probably, like, a year.  I got
8 fired because I didn't know what I was doing.
9 And Picnic, I only worked there for the
10 summertime.
11     Q.   Okay.
12     A.   I wasn't able to go to school and
13 work for them.  So, I had picked up the
14 McDonald's.  I worked at McDonald's probably,
15 like, three years.
16     Q.   Okay.  What McDonald's did you
17 work at?
18     A.   On Fairview.
19     Q.   And so, would that have -- help
20 me with the years now.  What years would that
21 have been that you were at McDonald's?
22     A.   I was probably was at McDonald's,
23 like I say, between '99 and all the way to

27 (Pages 102 - 105)

**Exhibit A**

1  2001.
2     Q.   All right.
3     A.   Somewhere like that.
4     Q.   All right.
5        MR. LOGSDON: It's 10:25. Do
6  y'all want to take a break, maybe three
7  minutes or so, and then, we'll come right
8  back?
9        MS. TOURE: What time is it,
10  12:45?
11       MS. MORGAN: 10:25.
12       MS. TOURE: 10:25.
13
14       (Whereupon, a brief recess was
15       taken.)
16
17    Q.   (BY MR. LOGSDON) You were
18  telling me about your mom. And is she --
19  she's living currently --
20    A.   Yes, sir.
21    Q.   -- correct?
22       All right. And you told me her
23  address. What does she do for employment?

1     A.   She's on disability now.
2     Q.   Okay. And how long has she been
3  getting disability?
4     A.   Just by my understanding, I will
5  say about the last five years now.
6     Q.   What does she get disability for?
7     A.   I really don't know. I just know
8  she get disability.
9     Q.   Okay.
10    A.   I know she's full covered.
11    Q.   Full covered?
12    A.   Yeah.
13    Q.   And what did she do before
14  getting disability?
15    A.   She was working at the
16  convenience stores.
17    Q.   What did she do there?
18    A.   Managed.
19    Q.   How long prior to the last five
20  years did she work at the convenience stores?
21    A.   She's been working ever since
22  we've been in Montgomery. She's been working
23  at -- which, Shells and Stop-N-Go.

1     Q.   Just as a manager?
2     A.   Yes, ma'am. I mean, yes, sir.
3  Sorry about that.
4     Q.   All right. All right. Tell me
5  about brothers and sisters.
6     A.   My sister, she gets disability
7  because, I think, due to her last child, she
8  went through a depression. And she had to
9  get disability because kind of like --
10       MS. TOURE: Could you speak just
11  a little louder, Mr. Agee?
12    A.   Yeah, she went through postpartum
13  depression after her last child. So, she had
14  to get disability. Yeah.
15    Q.   (BY MR. LOGSDON) Okay.
16    A.   And my brother, he was also like
17  me. He had to, you know, step up also to be
18  a man and had to stop working for a minute.
19    Q.   Older or younger?
20    A.   Younger. I'm the middle child.
21    Q.   All right. And what's your
22  sister's name?
23    A.   Her name is Tameka Agee.

1     Q.   And what's your brother's name?
2     A.   Darell Agee.
3     Q.   All right. What does your
4  brother do?
5     A.   Right now, he works for Sylvest.
6  I mean, it's Koch Food, the chicken house.
7     Q.   Okay.
8     A.   Yeah, he works there.
9     Q.   What does he do over there?
10    A.   I really don't know. He's been
11  working there for the last five to six years.
12    Q.   Good job?
13    A.   Yeah, he love it.
14    Q.   Okay. Earn pretty good?
15       MS. MORGAN: Could we go off or
16  just a minute, the record?
17
18       (Whereupon, a discussion was held
19       off the record.)
20
21       MR. LOGSDON: All right. Let's
22  go back on the record.
23    Q.   You've used the expression twice

28 (Pages 106 - 109)

**Exhibit A**

Page 110

1 that somebody has done something for a
2 minute.
3     A.   Yeah.
4     Q.   What do you mean when you say a
5 minute?
6     A.   A long time.
7     Q.   A long time?
8     A.   Yeah.
9     Q.   Okay.
10     A.   That's an old folks' term.  I'm
11 so used to being around old folks.
12     Q.   All right.  And so, explain that
13 to me a little bit more.  A long time, like,
14 several years?
15     A.   Yeah, several years.
16     Q.   Okay.  And I think you were
17 telling me -- so, your brother --
18     A.   Been there about five or six
19 years now.
20     Q.   And that's a good job he's got?
21     A.   Yeah.
22     Q.   Earns pretty well?
23     A.   I guess for him.  He likes it.

Page 111

1 He goes there.
2     Q.   All right.  What did he do before
3 then?
4     A.   In and out of jobs.  Temp
5 services, also.
6     Q.   All right.
7     A.   Trying to find his way, you know.
8 He doesn't have an educational background
9 and, you know, some -- we was the same -- all
10 three of us in the same boat.  You know, we'd
11 start trying to get our GED, and life, you
12 know.  Sometimes you have to pick which
13 one -- what's important, you know.
14     Q.   Okay.
15     A.   So --
16     Q.   All right.  Do you have your GED?
17     A.   No, sir.
18     Q.   Have you tried to get it?
19     A.   Yeah.  I went to Job Corps.  I
20 went to Job Corps in 2000 -- 2002.
21     Q.   Okay.  All right.  And before
22 your sister was on disability, what did she
23 do?

Page 112

1     A.   She was also working at the --
2 well, she first started working at the meat
3 process over by South Lawn --
4     Q.   Yeah.
5     A.   -- on Mobile Highway.
6         She used to work there because I
7 used to have to help her with her kids --
8     Q.   Okay.
9     A.   -- when she works.
10     Q.   And have you ever tried to get
11 disability?
12     A.   No, sir.
13     Q.   Have you ever applied for
14 unemployment?
15     A.   Yes, sir.
16     Q.   Did you ever get unemployment?
17     A.   Yeah.  Yeah.
18     Q.   When did you get unemployment?
19     A.   One or two times.  I think I got
20 it in 2000, I'll say, 8, 9, because the job I
21 was working for, they had closed down on us
22 And that was the only time I really got it.
23 It was called Johnson Control.  It was a

Page 113

1 supplier for Hyundai.
2     Q.   All right.
3     A.   And that's where one of the
4 packages we had to get, you know.
5     Q.   Johnson Control was the company
6 you worked for?
7     A.   Yes, sir.
8     Q.   All right.  So, what -- how much
9 did you get for unemployment?
10     A.   At that time, I think it was
11 probably a minimum of two ten a week.
12     Q.   Did you get it in a lump sum or
13 what?
14     A.   No.  It automatically kicked in.
15     Q.   Once you left Johnson Controls?
16     A.   Once they left us.
17     Q.   All right.
18     A.   Yeah.
19     Q.   Explain that to me.
20     A.   I went to work one night, and
21 they was -- we had a meeting.  And they was
22 telling us about how they was planning on
23 moving and whatever.  We got off early that

**Exhibit A**

Page 114

1  night. And the next day when it was time for
2  us to go to work, we had tape on the door.
3       MS. TOURE: Wow.
4       A.   And they gave -- they left a
5  letter and a number that we should contact,
6  which they was out of Detroit, Michigan.
7       Q.   (BY MR. LOGSDON) Yeah.
8       A.   So, we had to, you know, call
9  them. They gave us -- they gave us a nice
10  little -- well, I ain't going to say a nice
11  little lump sum. But they gave us, you know,
12  like, almost a month's pay. And by the time
13  that kicked out, the unemployment kicked in.
14       Q.   Okay. And what was your lump sum
15  that you got?
16       A.   I can't remember. It was -- it
17  was enough to get by for a month.
18       Q.   All right. What did you do with
19  it?
20       A.   Household. I was -- I was in the
21  process of getting married.
22       Q.   What year would this have been
23  in?

Page 115

1       A.   2007, '8. They left in the end
2  of 2008.
3       Q.   Okay. And Johnson Controls,
4  that's a big company, isn't it?
5       A.   Yeah, it's in Clanton now.
6       Q.   In Clanton?
7       A.   Uh-huh.
8       Q.   And they just closed up?
9       A.   Yeah. Yeah. Because, at that
10  time, they was going through different -- I
11  guess, with different mayors or something.
12  And the contract that Hyundai had and all
13  type of stuff was going --
14       Q.   Yeah.
15       A.   -- on around that time.
16           And that was one of the companies
17  that had to go immediately.
18       Q.   Okay. All right. The place your
19  mom lives now, how long has she lived there?
20       A.   She's been there probably from,
21  I'll say, five to ten years now.
22       Q.   And does she rent or own?
23       A.   Yeah, she rent.

Page 116

1       Q.   Is she okay paying rent and all
2  that with her disability covering her
3  expenses?
4       A.   Every now and then, I still have
5  to -- I'm with her now.
6       Q.   Okay. Living there?
7       A.   Yeah.
8       Q.   She's okay letting you live there
9  if you need to live there?
10       A.   You know, I don't want to -- I
11  don't want to get too personal on that.
12       Q.   Okay. Well, I don't want you to
13  get too personal, but is that okay to do
14  that? I mean, is she okay with you living
15  there if you need to live there?
16       A.   It's a time frame.
17       Q.   As long as it's for a certain
18  amount of time?
19       A.   (Witness nods head.)
20       Q.   And then, what happens after that
21  time frame? Does she want you out?
22       A.   Yeah.
23       Q.   Okay. Why is that? She just --

Page 117

1       A.   Grown man.
2       Q.   Okay. All right. But you are
3  living there now?
4       A.   Yeah.
5       Q.   Do you have any kids with you
6  there?
7       A.   No.
8       Q.   All right. Tell me -- let's --
9  we were talking about where you worked, and
10  we left off with working when you were at
11  McDonald's where you worked for three years.
12       A.   Uh-huh.
13       Q.   And what location was that
14  McDonald's?
15       A.   West Fairview.
16       Q.   What years were you there?
17       A.   '99, 2001.
18       Q.   Did you work full time there?
19       A.   I had to, yes.
20       Q.   Okay. And what did you earn?
21       A.   Around that time, minimum wage
22  was probably, like, six twenty-five.
23       Q.   Okay. You were working forty

30 (Pages 114 - 117)

**Exhibit A**

Page 118

1  hours a week?
2      A.   Yeah.  A little more, too.
3      Q.   Sometimes you'd get overtime?
4      A.   Yeah.
5      Q.   Would you get paid time and a
6  half for overtime?
7      A.   I was so young, I can't really
8  tell you that.  I really didn't know.  They
9  was just helping me out because they knew my
10  standards, what I was trying to do.
11      Q.   All right.
12      A.   Yeah.
13      Q.   After McDonald's, where'd you go?
14      A.   I was jobless for a minute.  I
15  went to Job Corps.
16      Q.   Okay.  Why did you leave
17  McDonald's?
18      A.   I actually got fired at
19  McDonald's.
20      Q.   And why did you get fired?
21      A.   At that time, we was -- got into
22  it with an employee that didn't want to do
23  his job.  And we had a little disagreement.

Page 119

1      Q.   Okay.
2      A.   And they fired both of us.
3      Q.   Okay.  When you say got into it,
4  were y'all -- were y'all --
5      A.   It was -- it was about to be a
6  physical.
7      Q.   About to be physical?
8      A.   Yeah, it was about to be
9  physical, but it didn't come to that.  But I
10  think the point that we was in the public
11  with it, it came from the back to the public
12  with it.
13      Q.   Okay.  So, after McDonald's,
14  where did you first apply?
15      A.   I applied everywhere.  I applied
16  at a lot of places.  I can't remember.  The
17  other McDonald's, other fast food
18  restaurants, warehouses.  And I didn't get no
19  calls.  So, my next option, like I said, I
20  went to Job Corps, which was in Albany,
21  Georgia.  Turner Job Corps.
22      Q.   What is Job Corps?
23      A.   It's a place for a second chance

Page 120

1  of getting your high school diploma, a trade,
2  you know, rebuilding yourself.
3      Q.   Yeah.  So, this would have been
4  2001?
5      A.   '2.  Yeah, 2002.
6      Q.   2000?
7      A.   '1 and '2.
8      Q.   '1 and '2?
9      A.   Yeah.
10      Q.   So, did you move over to Albany?
11      A.   Yeah.  I think I stayed there
12  for, like, a year and -- I think a little
13  over a year.
14      Q.   And were you in an apartment or
15  what?
16      A.   No, it was on campus, an old,
17  what is that, the old military base, Fort
18  Benning.
19      Q.   Okay.  Yeah.  Yeah.
20      A.   Uh-huh.
21      Q.   All right.  And did they -- how
22  did you -- did that cost anything or --
23      A.   No, it was actually government

Page 121

1  assistance.
2      Q.   Okay.
3      A.   Yeah.
4      Q.   So, they let you go over there,
5  they'll put you up?
6      A.   Yeah, they'll put you in a dorm.
7      Q.   Cover your school?
8      A.   Yeah, cover your school, give you
9  a little allowance for every two weeks,
10  provide you with uniforms, healthcare.
11      Q.   Okay.  So, you had all your
12  expenses covered --
13      A.   Yeah.
14      Q.   -- at that time?
15      A.   Yes, sir.
16      Q.   And what about food?
17      A.   Yeah, they provided us three
18  meals a day.
19      Q.   Okay.  And you had a little
20  spending money on the side?
21      A.   Yes, sir.
22      Q.   And what did you -- how long did
23  you stay?  You said till 2002?

31 (Pages 118 - 121)

**Exhibit A**

Page 122

1    A.   Uh-huh.
2    Q.   Is that a yes?
3    A.   Yes, sir.
4    Q.   And why did you leave?
5    A.   Man, I had gotten into some
6 trouble.  Well, I ain't going to say no
7 trouble.  Got into it with a couple of guys
8 from different states on some bullying.  I
9 had to defend myself, and it led to a
10 termination.
11    Q.   Who terminated you?
12    A.   The school director, Mr. Young.
13    Q.   Okay.  Is it called -- is the
14 name of it Job Corps?  Is that what it's
15 called?
16    A.   Yes, sir.
17    Q.   Like if you're writing a letter
18 to them, would you write it to just Job
19 Corps?
20    A.   Well, you will, but it depend
21 on -- they give you options where you want to
22 go.  You can go to the one -- I think every
23 state has one.

Page 123

1    Q.   The one in Albany --
2    A.   Yeah.
3    Q.   -- is that just called Job Corps?
4    A.   It's Turner Job Corps.
5    Q.   Turner Job Corps?
6    A.   Yes, sir.
7    Q.   Okay.  In Albany, Georgia?
8    A.   Uh-huh.
9    Q.   And you said there was an issue
10 that led to bullying?
11    A.   Uh-huh.
12    Q.   And what do you mean by that?
13 Somebody was bullying you or what happened?
14    A.   The thing is, you know, by us
15 being in Georgia, and Alabama is so small,
16 and coming from different -- you've got
17 different cultures, states.  They come in a
18 large group.  So, I went to the one that
19 Alabama was a small --
20    Q.   Uh-huh.
21    A.   We were just small.  Selma, we
22 all stuck together because we're from
23 Alabama.

Page 124

1    Q.   Okay.
2    A.   So, you might have a group of
3 people from New York just on the same thing
4 they left from home.
5    Q.   Uh-huh.
6    A.   You know, because you're on the
7 campus.  You're surrounded.  It feels like
8 prison some days, you know what I'm saying?
9    Q.   Yeah.
10    A.   I never went to prison, but, you
11 know, it's the concept that, you know, you've
12 got this group of people over here and you've
13 got this group of people, and it's a
14 territorial thing.
15    Q.   Right.
16    A.   So, that's how it was.  They
17 might -- we might be outside playing
18 basketball, and they might come and take the
19 ball to the other side of the court, you
20 know, or there's a chick that you like, and,
21 hey, he likes her, but, you know --
22    Q.   Okay.
23    A.   You know, just stuff like that.

Page 125

1 It led to stuff like that.
2    Q.   So, what was the -- what was the
3 thing that you were -- actually got you
4 kicked out of it?
5    A.   It was bullying because we had a
6 dance.  And it led to -- which I had a child.
7 I had -- my first child mom was from Job
8 Corps.  And it was -- like I said, a guy was
9 harassing her.  And, you know, I kind of,
10 like, had to put my foot down about him
11 harassing my girlfriend at the time.
12    Q.   Uh-huh.
13    A.   And so, I guess he didn't like
14 it.  And days on, he used to come.  And, you
15 know, I used to avoid him.  He used to do
16 stuff.  I used to avoid him, but he just
17 pushed a button that day.  And we kind of
18 like -- we went at it, you know.  So --
19    Q.   This one did go to blows?
20    A.   Yeah, this one went to blows.
21    Q.   All right.  When did you have
22 your child, what year?
23    A.   2002.

32 (Pages 122 - 125)

**Exhibit A**

Page 126

1    Q.    2002?
2    A.    Uh-huh.
3    Q.    And what was your child's name?
4    A.    Her name is ███████.
5    Q.    ████?
6    A.    Yeah.  ████.  █████.  I'm
7  sorry.
8    Q.    And last name?
9    A.    ███████, spelled as it sounds.
10   Q.    Okay.  Have you had to support
11 ██?
12   A.    Yes, sir.
13   Q.    Do you still support her?
14   A.    Yes, sir.
15   Q.    Where does she live?
16   A.    In Georgia.  Decatur, Georgia.
17   Q.    Who does she live with?
18   A.    Her mom.
19   Q.    Has she ever lived with you?
20   A.    No, sir.
21   Q.    Do you just send her money here
22 and there?
23   A.    Yeah, I go get her.  She visits.

Page 127

1    Q.    Okay.  You go up to Decatur and
2  get her?
3    A.    Uh-huh.
4    Q.    I should know where Decatur is in
5  Georgia.  Where is Decatur in Georgia?  I
6  know where Luverne is.
7    A.    I think it's, like, the outside
8  of Atlanta.
9    Q.    Decatur is east --
10   A.    East Point.
11   Q.    -- of Atlanta --
12   A.    Yeah.
13   Q.    -- by Stone Mountain?
14   A.    Yeah.  East Point.  Which, when
15 they say East Point --
16   Q.    Okay.
17   A.    -- that's what that mean.
18   Q.    East Point?
19   A.    Yeah.
20   Q.    So, since 2000 -- in 2002, was
21 she living on campus with you or was she
22 living with her mom in Decatur?
23   A.    She was living on campus.  And

Page 128

1  when she found out she was pregnant, she went
2  home.
3    Q.    Oh, okay.  Her mother was living
4  on campus?
5    A.    Uh-huh.
6    Q.    And when she found out she was
7  pregnant, she went home to Decatur?
8    A.    Uh-huh.
9    Q.    Is that a yes?
10   A.    Yes.  I'm sorry.
11   Q.    All right.  And since 2002 or so
12 when she was born, have you made visits over
13 there to Decatur --
14   A.    Yes.
15   Q.    -- to see her?
16   A.    Yes.
17   Q.    How often do you go?
18   A.    At the time, I was young.  So, it
19 took me a minute because I wasn't financially
20 stable, which, when I had got expelled, you
21 know, I had to come back home.  And my mom, I
22 guess I was a downfall to her.  So, I didn't
23 stay with her.  I was living on the streets

Page 129

1  then.  And so, I really didn't get into her
2  life until she was probably about five.
3    Q.    ████'s?
4    A.    Yes.
5    Q.    So, that puts us at around 2008?
6    A.    Yeah.
7    Q.    All right.
8    A.    That's when my other child,
9  ████, was born.
10   Q.    All right.  Okay.  I'm following
11 you now.  So, 2008, that's when you started
12 going over to Decatur?
13   A.    I was speaking to her, but I
14 didn't really visit her until 2005.
15   Q.    You'd call her?
16   A.    Yeah, call her.
17   Q.    And then, 2005, you started
18 traveling over there to Decatur?
19   A.    Yeah.  Well, she -- the first
20 time I came, they -- well, I ain't going to
21 say the first time.  The first couple times,
22 like I said, they came and got me to come
23 visit them --

33 (Pages 126 - 129)

Exhibit A

Page 130

1    Q.    Okay.
2    A.    -- because I didn't have the
3  means to.
4    Q.    All right.  But since then --
5    A.    Yeah, I've been --
6    Q.    -- you go --
7    A.    Yeah.
8    Q.    -- up until now?
9    A.    Yeah.
10    Q.    And how often would you go?  How
11  many times a year?
12    A.    Probably about twice out of the
13  year.
14    Q.    Okay.  And how long do you stay?
15    A.    Sometimes a day or two.
16    Q.    All right.
17    A.    No more than two days.  It depend
18  because job function, you know.
19    Q.    Go over there on the weekends and
20  that kind of thing?
21    A.    Yeah.  Yeah.
22    Q.    And would you -- what do y'all
23  do, just go --

Page 131

1    A.    Visit.  Just they'll cook and,
2  you know, we'll just sit till -- I stay at
3  her mom house.  She have her own house.  Her
4  mom let me come stay so I don't have to buy a
5  hotel room and everything.  So, they just
6  cook and just have a ball.
7    Q.    All right.  All right.  So, we're
8  back at 2002?
9    A.    Right.
10    Q.    And you've told me about Job
11  Corps.  And you started to tell me what you
12  did next --
13    A.    Uh-huh.
14    Q.    -- after Job Corps.
15    A.    Came back, kind of hard for me to
16  find a job.  It took me -- I ain't going to
17  lie, it took me, like, two years to even find
18  a job because I didn't have no high school
19  diploma or nothing like that.  And then --
20    Q.    Did it hurt -- I guess you had to
21  tell them you had gotten kicked out of the
22  Job Corps?
23    A.    Yeah.

Page 132

1    Q.    And did that -- they kind of not
2  like that when you'd try to get a job?
3    A.    Yeah.  Yeah.  Yeah.
4    Q.    All right.  And so, when did
5  you -- when were you first able to find
6  something?
7    A.    It's probably about, like I said,
8  two years back from that.  2004, I worked at
9  T and A Truck Stop.
10    Q.    Okay.  So, between 2002 and 2004,
11  I think you started to say this, your mom --
12    A.    Yeah.
13    Q.    -- she was kind of --
14    A.    Yeah.
15    Q.    -- she --
16    A.    I was doing music.  Me and my
17  brother and a couple guys, we was doing
18  music.  So, that's how we was really getting
19  by.
20    Q.    All right.
21    A.    We was just -- that was our
22  passion at that time.
23    Q.    You were what?

Page 133

1    A.    Rapping at that time --
2    Q.    Yeah.
3    A.    -- rap music at that time.
4    Q.    What did you call it?
5    A.    Rapping.
6    Q.    What did you call it before
7  rapping, though?
8    A.    Music.
9    Q.    Okay.  I thought you said
10  something else.
11    A.    No, we was doing music at that
12  time.
13    Q.    Okay.
14    A.    So, we would make CDs and try to
15  perform at different shows and stuff like
16  that.
17    Q.    Yeah.  Yeah.
18    A.    So --
19    Q.    Where all were y'all performing?
20    A.    Just local around Montgomery,
21  Selma, a couple of Selma spots, you know --
22    Q.    Yeah.
23    A.    -- Lowndes County, and stuff like

34 (Pages 130 - 133)

**Exhibit A**

Page 134

1  that.
2          MR. LOGSDON:  She was probably at
3  all of them.
4          MS. TOURE:  I love rap music as
5  long as it doesn't have profanity in it.
6          MS. MORGAN:  Don't ask him about
7  that.  I object.
8      Q.   (BY MR. LOGSDON)  All right.  So,
9  first rap band, who's the first rap band?
10  Who started it?
11     A.   I will say Run-DMC.
12     Q.   Run-DMC.
13     A.   That's what I remember.
14     Q.   All right.  So, what were y'all
15  earning doing that?
16     A.   Man, at that time, CDs was -- we
17  tried to get five dollars.  We'd probably get
18  a dollar a CD.  So, we was probably earning,
19  like, forty, fifty dollars maybe a week or
20  maybe a month.
21     Q.   Okay.  Just doing enough to
22  support yourself?
23     A.   Yeah.

Page 135

1      Q.   Playing around at --
2      A.   Yeah.  Different spots.
3      Q.   -- Montgomery, Selma, just all
4  around?
5          What was the name of your group?
6      A.   12 Round Gs.
7      Q.   Okay.
8      A.   Yeah.  It was just --
9      Q.   Okay.  But where were you living?
10     A.   I was staying with my friends at
11  that time, when I came back from Job Corps.
12     Q.   Okay.
13     A.   Because I had a guy that went
14  to -- his name was Cortez Collins.  And his
15  mom let me stay with them for a minute --
16     Q.   Okay.
17     A.   -- because I didn't have nowhere
18  to go.
19     Q.   All right.
20     A.   Yeah.
21     Q.   All right.  But 12 Round Gs, you
22  didn't become Run-DMC, but you --
23     A.   Yeah.

Page 136

1      Q.   -- paid the bills?
2      A.   Yeah, we paid the bills.
3      Q.   Okay.
4      A.   It feel like if you wanted to be
5  a rapper, you had to go twelve rounds on the
6  mike, you know.
7      Q.   Uh-huh.
8      A.   You just can't sit there and
9  just -- you had to put passion in it.
10     Q.   Yeah.
11     A.   Yeah.
12     Q.   That's what I was going to ask
13  you.  What is 12 Round Gs?  What does that
14  mean?
15     A.   It's just like being in the
16  boxing ring, you go twelve rounds, you know.
17     Q.   Okay.
18     A.   Yeah.
19     Q.   And then, Gs?
20     A.   Yeah, we was just young
21  gangsters --
22     Q.   Okay.
23     A.   -- as we say.

Page 137

1      Q.   Okay.  G stood for --
2      A.   Gangsters.
3      Q.   -- gangsters?
4      A.   Yeah.
5      Q.   All right.  All right.  So, while
6  you were doing this -- or what did you do
7  next?
8      A.   Still trying to -- going back and
9  forth to Job Corps.  I was still trying to
10  maintain to get me my GED and putting in
11  applications at different spots.  And, like I
12  said, Mr. Norman at TA Truck Spot --
13     Q.   Okay.
14     A.   -- he broke the ice for me.
15          He gave me a job.
16     Q.   All right.  Are you still doing
17  any rapping on the side?
18     A.   No, that's -- I was young, man.
19  I was young.
20     Q.   All right.
21     A.   I was young.  I'm a father.  I'm
22  trying to be a good father, man.
23     Q.   Okay.  T and A Truck Stop, where

35 (Pages 134 - 137)

Exhibit A

Page 138

1  is that located?
2      A.   On the Southern Boulevard.
3      Q.   And you said your supervisor
4  was --
5      A.   Mr. Norman.
6      Q.   What did you do there?
7      A.   Cleaned showers, janitorial
8  really.
9      Q.   Okay.  How long did you work
10 there?
11     A.   Probably a year.
12     Q.   And what did you earn?
13     A.   At that time, still, like, six
14 twenty-five.  Yeah.  About six twenty-five.
15     Q.   All right.  What did you do --
16 why'd you leave?
17     A.   Actually, end up -- when I was
18 staying at my best friend, they got
19 evicted.  So, it was kind of hard for me to
20 get back and forth to work because we kind of
21 moved, like, on the opposite side of town.
22     Q.   Okay.  So, you left T and A?
23     A.   Yeah.  I got fired.

Page 139

1      Q.   Okay.  And tell me why you got
2  fired.
3      A.   Tardiness.  Like I said, I -- at
4  that time, I don't even think Montgomery had
5  a real dependable bus route.  So, it was --
6  it was -- I was a little league out of my
7  walking distance.  So, like I said, you know,
8  the vehicles we -- I was trying, but I
9  couldn't.
10     Q.   All right.  And then, what'd you
11 do next?
12     A.   That's when I finally got a job,
13 a real job, at Johnson Control.
14     Q.   Okay.  And that would have been
15 2005?
16     A.   Yeah, '4.
17     Q.   I'm calling your rap job a real
18 job.  All right.  2004 --
19     A.   Yeah.
20     Q.   -- Johnson Controls?
21     A.   Johnson Control.
22     Q.   And tell me what you did.
23     A.   I was production assembly line.

Page 140

1      Q.   At Hyundai?
2      A.   Yeah.  Well, it's not -- well, we
3  was building the consoles -- the consoles,
4  the headrests, the armrests.  We was making
5  the frame of the dashboard.  That's what I
6  was doing.
7      Q.   What location was that?
8      A.   That was over there on Sixth
9  Street.
10     Q.   In --
11     A.   In Montgomery, Alabama.
12     Q.   Was it --
13     A.   On the north side of Montgomery.
14     Q.   Okay.  And would it be in the
15 Hyundai facility or would it be in the
16 Johnson Controls?
17     A.   It was the Johnson Controls
18 facility.
19     Q.   Okay.
20     A.   Yeah.
21     Q.   And I guess when you said Johnson
22 Controls, some reason, I was thinking like --
23     A.   Heating and air?

Page 141

1      Q.   Heating and air.
2      A.   Yeah.
3      Q.   This is a different company?
4      A.   Uh-huh.
5      Q.   All right.
6      A.   They had so many going on --
7  like, they still have heating and air down
8  here, but they was also part of the
9  suppliers.
10     Q.   Okay.  And is it a different
11 company than the heating and air or --
12     A.   Yeah, it's way different.
13     Q.   It's just a completely different
14 one?
15     A.   Uh-huh.  It's way different.
16     Q.   And where is that company based
17 out of, the Johnson Controls company you're
18 talking about?
19     A.   The one I was talking about?
20     Q.   Yeah.
21     A.   It's an automotive manufacturer.
22 They was a subcontract with Hyundai and the
23 top Hyundai suppliers, like, Lear, Mobis, and

36 (Pages 138 - 141)

**Exhibit A**

1   Glovis.
2       Q.   Uh-huh.
3       A.   Because, like, Glovis would make
4   the seats, but we make the springs for the
5   seats.
6       Q.   Okay.
7       A.   So, it was, like, a -- what you
8   call that, a subcontractor, something like
9   that?
10      Q.   Uh-huh.
11      A.   Yeah.
12      Q.   All right.  And so, Johnson --
13  but where was the -- where is Johnson
14  Controls?  Where are they headquartered?
15      A.   Detroit, Michigan.
16      Q.   Okay.
17      A.   Because they used to be a part of
18  the Ford, GMC.
19      Q.   Okay.  All right.  And that
20  sounds like a good job.  How did you get that
21  job?
22      A.   I went through Kelly Temp
23  Service.

1       Q.   Okay.
2       A.   I had to work my butt off.  I had
3   to work, like, over six hundred and something
4   hours.
5       Q.   Work six hundred hours --
6       A.   To get hired on.
7       Q.   -- for Johnson --
8       A.   No.
9       Q.   -- as a temp --
10      A.   As a temp, yeah.
11      Q.   -- for Kelly, and then, they
12  liked you and hired you on?
13      A.   Uh-huh.
14      Q.   When you were working for
15  Kelly -- is Kelly -- Kelly's out of
16  Montgomery?
17      A.   Yes, sir.  That's on Carmichael
18  Road, too.
19      Q.   And what did you -- what was your
20  starting pay?
21      A.   I think it was eight fifty.
22      Q.   All right.  And how many hours a
23  week were you working?

1       A.   Starting off, right at forty.
2       Q.   And what'd you work your way up
3   to?
4       A.   Probably doing about fifty, fifty
5   hours --
6       Q.   Okay.
7       A.   -- After I got hired on.
8       Q.   How long did you work there?
9       A.   I worked at Johnson Control for
10  maybe three and a half years.
11      Q.   Okay.  2004 to 2007 or '8?
12      A.   Yeah, '9 because that's when they
13  left, yeah.
14      Q.   2004 to 2009?
15      A.   Yeah.
16      Q.   Whenever it is, it was just
17  before you started the unemployment --
18      A.   Yeah.
19      Q.   -- that you told me about?
20      A.   Uh-huh.
21      Q.   All right.  And so, when you
22  finished working there, what were you making?
23      A.   I will say, like, thirteen

1   sixty-five.
2       Q.   Okay.  And is that forty hours a
3   week or sometime overtime?
4       A.   Forty hours a week, sometime
5   overtime.  Well, we were based off Hyundai
6   schedule.  We didn't know because the way
7   they was doing it at that time, when Hyundai
8   first came, Hyundai will call.  Like, you'll
9   get your forty hours, but they'll call
10  everybody around, hey, we need y'all to stay
11  because we got this going on.
12      Q.   Uh-huh.
13      A.   So, that's how it would function
14  with us.
15      Q.   Okay.
16      A.   We were just on call.
17      Q.   All right.  When you worked over
18  forty hours, would you get more than thirteen
19  sixty-five?
20      A.   Yeah.
21      Q.   What would you get then?
22      A.   Half of thirteen sixty-five.
23      Q.   Time and a half?

37 (Pages 142 - 145)

**Exhibit A**

Page 146

1   A.   Yeah, time and a half.
2   Q.   So, on average, how many -- how
3 much were you earning -- or how many -- how
4 many -- much overtime work were you getting?
5   A.   Man, it's been so long.  I will
6 say --
7   Q.   Maybe you can tell me average per
8 month overtime hours.
9   A.   Overtime hours, I was probably
10 getting about between ten and fifteen hours
11 overtime a month.
12   Q.   A month.  Okay.
13      Did you take the overtime any
14 chance you could get it?
15   A.   Yeah.
16   Q.   Okay.
17   A.   I had no choice.
18   Q.   Yeah, you kind of -- you
19 kind of had to --
20   A.   Yeah.
21   Q.   -- because when Hyundai needed
22 something --
23   A.   Yeah, we had no choice.  You had

Page 147

1 to be on call, because if you didn't -- I
2 mean, just say if you leave, you know --
3   Q.   Yeah.
4   A.   -- you only do that so many
5 tires, you're fired.
6   Q.   Yeah.
7   A.   So, you have to stay.
8   Q.   All right.  And when you were
9 getting paid then, were you have -- did you
10 have direct deposit?
11   A.   No, I think I was getting a check
12 then, yeah.
13   Q.   Where were you depositing it?
14   A.   At different cash spots,
15 different check cashing places.
16   Q.   Did you ever put it in the bank?
17   A.   No, I didn't have a bank account
18 because I didn't have a stable household.  I
19 was -- like I say, I was living with my
20 friend.  And then, you know, just going
21 places every now and then until I decided,
22 you know, it was time for me to get something
23 on my own, which I -- at that time, I met my

Page 148

1 first wife.  And me and her, we -- I moved in
2 with her.  She stayed on Norman Bridge Road.
3   Q.   Okay.
4   A.   So, I moved in with her.
5   Q.   All right.  And I'll get to that
6 in a minute.
7      But any of the time you worked at
8 Johnson Controls, were you ever putting or
9 did you ever have any bank account, either a
10 credit union or anything?
11   A.   (Witness shakes head.)
12      The only thing I had was a
13 401(k).  And that's probably it.  That's the
14 only thing my money was fluctuating in was
15 coming out my check.  But everything else, I
16 was cashing my check.
17   Q.   Okay.  So, they would take money
18 out for 401(k) --
19   A.   Yes, sir.
20   Q.   -- you'd get your check, and
21 you'd just go cash it --
22   A.   Yes, sir.
23   Q.   -- at a check cashing spot?

Page 149

1   A.   Yes, sir.
2   Q.   And I guess Johnson Controls is a
3 pretty big company and it was pretty easy to
4 get your check cashed?
5   A.   Uh-huh.
6   Q.   And how much did you build up in
7 the 401(k)?
8   A.   I really didn't -- I don't -- I
9 think I got probably, like, twenty-five
10 hundred because I did it almost at the end of
11 their closing because I really didn't know
12 what a 401(k) was --
13   Q.   Uh-huh.
14   A.   -- until I got help from an
15 employee, an older employee, and he told me
16 to start doing it.
17      So, I think I did it for, like, a
18 year and probably six months.  And it
19 fluctuated probably like twenty-five hundred
20 dollars.
21   Q.   All right.  The way that works,
22 you could -- you can opt out, you don't have
23 to do it --

Freedom Court Reporting
877-373-3660          A Veritext Company          205-397-2397

**Exhibit A**

Page 150

1   A.   Yeah.
2   Q.   -- but if you do it, they'll
3  match it or give you --
4   A.   Yeah.
5   Q.   -- some money?
6   A.   Yeah, they matched it.
7   Q.   Okay.
8   A.   So, I had to -- when I got that,
9  I had to get my 401(k) because it was bills
10 and stuff due.  So, I kind of, like, took
11 that route, too, as a little package.
12   Q.   All right.  Did you -- did you --
13 is that money still in there or --
14   A.   No, I mean, it was gone when they
15 closed.  Like I said, when they closed down,
16 you can take it out or you could have rolled
17 over --
18   Q.   Yeah.
19   A.   -- into something else.
20      So, I had to take it out because
21 I -- like I said, I had bills, children.  I
22 had stuff to do.
23   Q.   Okay.  And so, you got -- you

Page 151

1  told me you got the severance from them, and
2  then, you also got your 401(k)?
3   A.   Uh-huh.
4   Q.   Is that right?
5   A.   Yeah.
6   Q.   And you said the 401(k) was --
7   A.   Right.
8   Q.   -- twenty-five hundred?
9   A.   Yeah, about twenty-five hundred
10 dollars.
11   Q.   And the month's salary would have
12 been what?
13   A.   Probably about a little more than
14 that.  Probably about thirty -- about almost
15 thirty -- three.  I'll say almost -- almost
16 three.
17   Q.   Three?
18   A.   Between twenty-five and three.
19   Q.   So, you had about five thousand?
20   A.   Yeah, about five thousand.
21   Q.   Tell me what you remember
22 spending that on.  It's a lot of cash.
23   A.   Yeah, it was.  At that time, like

Page 152

1  I said, I was getting married.  Some went to
2  the marriage.  Some -- like I said, she was
3  pregnant -- towards the kids.  And the rest,
4  I know was bills.  The majority was bills,
5  because, like I said, at that time, you know,
6  it was tight for us.
7   Q.   All right.
8   A.   It was real tight.
9   Q.   So, bills were some?
10   A.   Uh-huh.
11   Q.   Some went to the marriage?
12   A.   Uh-huh.
13   Q.   Do anything fun with any of it?
14   A.   No, we didn't even have a
15 honeymoon.
16   Q.   When you said it went to the
17 marriage, what do you mean by that?
18   A.   Rings, marriage license, and the
19 deposit of where we had our marriage, which
20 it was right down the street at a hotel.
21   Q.   Okay.  And how much was that?
22   A.   Seven fifty for the --
23   Q.   For the hotel?

Page 153

1   A.   Uh-huh.
2   Q.   What bills were you paying, did
3  they go to?
4   A.   Rent.  Rent got behind because
5  we -- rent got behind, car note got behind,
6  light bill.
7   Q.   Okay.
8   A.   Groceries.
9   Q.   All right.
10   A.   Day care, kids' school clothes,
11 supplies.
12   Q.   Okay.  What else?
13   A.   That's about it.  That's all I
14 could do.  It was five thousand, but it's a
15 lot -- it was not much to do with it.
16   Q.   All right.  Where were you living
17 at the time for the rent?
18   A.   We was living in -- like I say, I
19 was living with her.  It was in -- it was
20 Norman Bridge Road.  What's the name of that
21 apartment complex?
22   Q.   Do you know what y'all were
23 paying for rent?

39 (Pages 150 - 153)

**Exhibit A**

Page 154

1    A.    Seven fifty.  It was a townhouse.
2    Q.    Seven fifty per month?
3    A.    Uh-huh.
4    Q.    Is that a yes?
5    A.    Yeah.  Yes.  I'm sorry.
6    Q.    And was it a two-bedroom
7  townhouse?
8    A.    Yeah, a two-bedroom.
9    Q.    And who all did you have living
10 there with you?
11   A.    At that time, before my younger
12 daughter was born, it was just me, her, and
13 her two sons.
14   Q.    All right.  And was she working
15 at Cracker Barrel at the time?
16   A.    No, that's not Monica.  That's my
17 first wife.
18   Q.    Oh, I'm sorry.
19      MS. HOLLIDAY:  Revenue
20 Department.
21   Q.    (BY MR. LOGSDON)  Revenue
22 Department.
23   A.    Yeah.

Page 155

1    Q.    See, she's listening.
2    A.    Yeah.
3    Q.    All right.  After Johnson
4  Controls, you told me that you drew
5  unemployment?
6    A.    Uh-huh.
7    Q.    And how long did you say you drew
8  unemployment?
9    A.    Probably about two and a half
10 years.  They gave it to us about two and a
11 half years.
12   Q.    The unemployment?
13   A.    Yes, sir.
14   Q.    And did the amount fluctuate?
15   A.    No.
16   Q.    Two hundred a month?
17   A.    Yeah, about two ten a month.  Two
18 ten a week.
19   Q.    Two ten per week?
20   A.    Uh-huh.
21   Q.    And I think unemployment, they --
22 don't they require it going to some kind of
23 account, direct deposit, or something like

Page 156

1  that?
2    A.    No, they give you a card.  At
3  that time, they give you a card.  That's what
4  it was going on, a debit card, a Visa debit
5  card.
6    Q.    A Visa?
7    A.    Uh-huh.
8    Q.    All right.  And it just would
9  show up every --
10   A.    Wednesday.
11   Q.    -- Wednesday on the debit card?
12   A.    Uh-huh.
13   Q.    Would it be -- okay.
14      Would you get anything other than
15 the two ten per week?
16   A.    That's it.
17   Q.    Did they require that you do
18 interviews and things like that?
19   A.    Yes, sir.
20   Q.    Who were you -- were you meeting
21 with someone?
22   A.    No.  You just go to the
23 unemployment office, go to their unemployment

Page 157

1  center, and you'll go, get online, fill in
2  applications.  Then, they'll give you an
3  option to go to school, get your GED, stuff
4  like that.
5    Q.    Okay.  What location?
6    A.    Southern Boulevard.
7    Q.    So, did you take the option of
8  getting your GED?
9    A.    Yeah.
10   Q.    Tell me about that.
11   A.    Like I said, I did, but I still
12 had to look for a job.  So --
13   Q.    All right.  So, during this two
14 and a half years, take me through that.
15 You've told me one of the things that you
16 were doing is you'd go down and meet with
17 them.
18   A.    Uh-huh.  Well --
19   Q.    And how often would you meet with
20 them?
21   A.    When I first started off getting
22 it, I didn't.  I didn't.  I just got it.  I
23 was a house father as you'll say.  I just be

40 (Pages 154 - 157)

**Exhibit A**

Page 158

1  at home all the time doing the housework
2  while she was at work.  Because, at that
3  time, it was kind of hard for the day care.
4  So, after she had the baby, she went back to
5  work and I stayed home with the kids.
6      Q.   Okay.  And what kids were at
7  home?
8      A.   Her two sons, and then, our
9  daughter was born.
10     Q.   Okay.  Were you good with that or
11 were you trying to get work?
12     A.   I was -- I was good with that.  I
13 was good with that.  We was good for a
14 minute.
15     Q.   Okay.  A minute means awhile?
16     A.   Yeah.  I'm sorry.  We were good
17 probably, I'll say, a year.  I did it for a
18 year, because, you know, it was --
19     Q.   Yeah.
20     A.   -- it was a newborn baby.
21          So, you know, we was -- we both
22 were shaky about putting her in day care.
23     Q.   Okay.

Page 159

1      A.   And it --
2      Q.   So, she -- you told me you were
3  on unemployment for two and a half years?
4      A.   Right.
5      Q.   So, would that have been the
6  first year?
7      A.   Yeah, the first year.
8      Q.   All right.  And then, you -- and
9  then, after the first year, you put her in
10 day care?
11     A.   Uh-huh.
12     Q.   At which day care?
13     A.   It was Century 2000.
14     Q.   And they charged two hundred?
15     A.   Yeah.
16     Q.   Per month?
17     A.   Uh-huh.
18     Q.   Okay.  And what did you do then?
19     A.   As I say, I started going to the
20 center trying to get a job and get my GED.
21     Q.   The center meaning the
22 unemployment center?
23     A.   Yes, sir.

Page 160

1      Q.   And what all did you do to try
2  to -- after that first year, what all did you
3  do to go to the center to try to get a job
4  and get your GED?
5      A.   We'll go, you'll talk to a
6  representative, and he'll try to get you a
7  job.  At that time, the job that was
8  available was high school diplomas, GED.  I
9  didn't have them.  So, I had to go through --
10 you know, you go out twice a week.  It was --
11 you can on a Monday to your GED class for two
12 hours and a Thursday for two hours, and then,
13 you'll go, you'll fill out an application,
14 and stuff like that.
15     Q.   Did you get your GED during this
16 time?
17     A.   I didn't.
18     Q.   And tell me about that.  What
19 happened with that?
20     A.   Just stopped going.  It was --
21 mainly, it got rough.  The bills got rough.
22 Our relationship got rough.  And, you know,
23 just had to try to fix it.  And it just went

Page 161

1  south.
2      Q.   Okay.  And tell me what you mean
3  by that.
4      A.   Like I say, after the year when
5  we started putting her in day care, day care
6  got expensive.  So, I couldn't afford it.
7  And, at that time, when I was trying to look
8  for a job, you know, we was going through a
9  recession then, you know.  It wasn't no jobs
10 fluctuating at that time.
11     Q.   Okay.
12     A.   So, unemployment was the best
13 thing I had to keep something coming in the
14 house.  And, you know, when the bills get a
15 burden on them, you know, you kind of start
16 kind of different arguments and distance from
17 each other.  And so --
18     Q.   So, the unemployment would have
19 been -- when you were on unemployment, that
20 would have been from 2009 until about 2012?
21     A.   Uh-huh.
22     Q.   Is that a yes?
23     A.   Yes.

41 (Pages 158 - 161)

Exhibit A

Page 162

1    Q.   The --
2    A.   And it was hard to get a job in
3  Montgomery because when the recession started
4  to hit, I mean, like, it was a lot of people
5  jobless.
6    Q.   What was -- what was your wife
7  earning at the time?
8    A.   I really don't even know.  I
9  really didn't get in her money situation like
10  that --
11    Q.   Okay.
12    A.   -- as far as her earnings.
13    Q.   And then, 2009 to 2012, what
14  children were you -- were living at home?
15    A.   Like I said, her two sons and my
16  daughter.
17    Q.   How old were her two sons?
18    A.   At that time, her oldest son, at
19  that time, he was probably, like, maybe
20  nine -- no, I'm not going to say nine --
21  probably ten or eleven.  And the middle boy,
22  he was probably, like, four or five.
23    Q.   Okay.  But they were in school?

Page 163

1    A.   Yes, sir.
2    Q.   Do you remember anywhere that you
3  could tell me you applied between 2009 and
4  2012?
5    A.   I applied, like I said,
6  everywhere in Montgomery, McDonald's,
7  Hardee's, Arby's, Baptist South, Jackson
8  Hospital, Citgo gas stations, Hyundai
9  suppliers, Hyundai.  You name it, I was out
10  there.
11    Q.   How about the Kelly Temp Service?
12    A.   Yeah.  I mean, they even -- you
13  know, at the time, it was so bad, the temp
14  service will go ahead and tell you -- they'll
15  have letters outside the door, we're not
16  hiring.  So, there's no sense in you even
17  pulling up.
18    Q.   Okay.
19    A.   You had to call before you even
20  attempt to even try to come and fill an
21  application out.
22    Q.   All right.  Now, the GED -- as
23  far as getting your GED --

Page 164

1    A.   Uh-huh.
2    Q.   -- what -- was that the way that
3  worked, could you do some of it at home?
4    A.   No.  At that time -- now, you can
5  do it at home.  But around then, you had to
6  go.  And, like I said, we only had one
7  vehicle.  So, that was a -- she had to go to
8  work.  I mean, I had to make a decision.  I
9  couldn't just, you know --
10    Q.   Okay.  Did you take any of the
11  classes for the GED?
12    A.   Yeah, I took some.  I took some.
13    Q.   Did you take any tests or
14  anything?
15    A.   Yeah, I got -- I got all the way
16  up to the practice test, until things got
17  harder for me to actually take the test.
18  Because, at that time, you had to pay.  And I
19  really didn't have the money to just put to
20  the side to take my GED and take care of my
21  household.
22    Q.   Okay.
23    A.   Because I was just getting

Page 165

1  unemployment then.
2    Q.   Did you try to get any government
3  assistance for the GED?
4    A.   No, they wasn't giving none at
5  that time.
6    Q.   All right.
7    A.   They weren't even giving food
8  stamps at that time.
9    Q.   They were not?
10    A.   They were not.
11    Q.   Okay.  So, 2012, things were
12  getting better, fortunately, with the
13  economy.  It started improving a whole lot.
14    A.   For the economy but not for me.
15    Q.   All right.  So, tell me about
16  that.  The economy was getting better, but
17  for you, it wasn't getting better?
18    A.   It wasn't getting better, you
19  know.  I mean, I'm still starting from the
20  bottom.
21    Q.   All right.
22    A.   Even though the jobs were hiring,
23  I couldn't get to.

42 (Pages 162 - 165)

**Exhibit A**

Page 166

1    Q.   So, tell me what you started
2  doing in 2012.
3    A.   The same thing I was doing,
4  filing, go looking for a job, trying to get
5  my GED.  Because me and her, we split up.
6  And, like I say, I had to end up -- I was
7  staying with my sister at that time, after we
8  split up.  I let her -- you know, just let
9  her go by her way because I was tired of
10  fighting.  I split.  I just -- it was hard,
11  man.  It was just me trying to get back and
12  forth to Hyundai or they'll have a job out on
13  Mt. Meigs Road.  I don't have a ride.  So, it
14  was just me in and out of jobs.
15    Q.   Tell me your -- I'm sorry.
16    A.   Oh, you're good.
17    Q.   Tell me your first job.
18    A.   After that?
19    Q.   Yeah.
20    A.   It was -- my first job was
21  Picnic.  I mean, not Picnic but Genpak.
22    Q.   Spell that.
23    A.   G-e-n-p-a-k.

Page 167

1    Q.   Where is Genpak?
2    A.   In Hope Hull.
3    Q.   And what did you do for Genpak?
4    A.   I was a production line, watching
5  production line, assembly line.  Just
6  watching bottles go down the line.
7    Q.   Is it Genpak?  What else is it
8  Genpak Bottling Company or --
9    A.   No, it's just Genpak.  That's
10  all I -- at that time.
11    Q.   When did you start there?
12    A.   Somewhere between 2000 -- the end
13  of 2011, 2012.
14    Q.   How long were you at Genpak?
15    A.   Not that long.
16    Q.   What did you earn?
17    A.   Probably about eight fifty.  I
18  was a temp.
19    Q.   Who were you temping through?
20    A.   The same ones, OmniSource, I
21  think I was, or Ambassador, one of them.
22    Q.   All right.  And you said not that
23  long.

Page 168

1    A.   Uh-huh.
2    Q.   We know what a minute is.
3    A.   Yeah.
4    Q.   We don't know what not that long
5  is.
6    A.   Not that long.  What I mean by
7  that, it's probably about three months.  I
8  survived three months before it came a
9  problem me getting back and forth to work.
10    Q.   Okay.  Did you get laid off or
11  what happened?
12    A.   Yeah, I got laid off.
13    Q.   For tardiness or absences?
14    A.   Yes, tardiness.
15    Q.   How were you getting to work at
16  the time?
17    A.   Sometimes walking, sometimes I'll
18  find a ride.
19    Q.   Were you living in Hope Hull?
20    A.   No.
21    Q.   Where were you living?
22    A.   I was living, at that time --
23  what that was -- Virginia Meadows.

Page 169

1    Q.   What city?
2    A.   Montgomery.
3    Q.   Well, you weren't walking from
4  Montgomery to Hope Hull, were you?
5    A.   (Witness nods head.)
6    Q.   Walking?
7    A.   Yeah.
8    Q.   All right.  How far is that?
9    A.   That's a walk.  That's probably
10  about ten to twelve miles.
11    Q.   Okay.
12    A.   I had to choose night shift in
13  order to get there and get some sleep, make
14  sure I get up in time.  I'd probably get
15  around probably about 4:00 that evening.  I
16  had to be to work at what, 8:00.
17    Q.   Okay.
18    A.   So, I might end up catching a
19  blessing on the way there.  Somebody might
20  see me walking and, hey, man, where you
21  going, you know.
22    Q.   Give you a ride?
23    A.   Or drop me off halfway.

43 (Pages 166 - 169)

**Exhibit A**

Page 170

1    Q.   Yeah.  All right.  So, what car
2  did y'all have at the time?
3    A.   At that time, we split up.  She
4  had the Impala.  I didn't have no car.
5    Q.   And what was the Impala?  What
6  year was that?
7    A.   Probably a 2000 and -- I mean, we
8  got it in '06, but I think it was an older
9  model, like, a 2001, '2, 2002 model.
10    Q.   2002 --
11    A.   Yeah.
12    Q.   -- Impala, and y'all bought it in
13  2006?
14    A.   Yeah.
15    Q.   What'd you pay for it?
16    A.   I think it was, like, what -- we
17  got it financed, but I think in all, it was,
18  like, forty-five hundred -- forty-five
19  hundred dollars or something like that.
20    Q.   Where'd you get it?
21    A.   I think it was Jack Ingram.  We
22  had to put, like, five hundred down.  It had
23  so many miles on it.

Page 171

1    Q.   All right.  All right.  What'd
2  you -- what was your next job?
3    A.   My next job, I was -- after I
4  lost that job, it was a minute before I got
5  another job due to, like I say,
6  transportation.  So, after that, I think I
7  worked at Hyundai.
8    Q.   After Genpak --
9    A.   Uh-huh.
10    Q.   -- and before Hyundai, did you
11  apply for unemployment?
12    A.   Yeah.
13    Q.   Did you get it?
14    A.   Yeah.
15    Q.   How long were you on unemployment
16  at that time?
17    A.   Probably about -- I'll try to say
18  a quarter.  So, their quarters run about six
19  months.  That's how it runs, in quarters.
20    Q.   How much did you make a week?
21    A.   A little less than what I had.
22  Probably, like, a hundred and seventy, eighty
23  dollars or something like that.

Page 172

1    Q.   And were you meeting with an
2  employment person at the time?
3    A.   Yeah.
4    Q.   And were they wanting you to try
5  to get a job?
6    A.   Yeah.
7    Q.   And were you applying?
8    A.   Yeah, and I end up getting at
9  Hyundai, probably about, like I said, six
10  months on down the road.
11    Q.   And what'd you do at Hyundai?
12    A.   I was a temp.  So, I was an on-
13  call temp.  Every -- forklift, tugger driver,
14  shipping and receiving, assembly line, body
15  and paint shop, whatever position they needed
16  filled in.
17    Q.   Were you working directly for
18  Hyundai?
19    A.   No.
20    Q.   Who were you working for?
21    A.   The same temp service you've got
22  wrote down.
23    Q.   Was it Omni or was it --

Page 173

1    A.   All of them was there.
2    Q.   Okay.  Which one were you working
3  for, though?
4    A.   All of them.  Because the one --
5  like I said, the one -- I might work for
6  OmniSource for three months, Hyundai might
7  drop their contract, a guy from Ambassador
8  might come to the ones he feels like that's
9  working, and we'll fill out an application
10  there, and we'll be Ambassador, you know.
11  And Ambassador might lose their contract and
12  we might have to go to Onin Staffing.  So,
13  that's how it was for the last seven years.
14    Q.   All right.  Ambassador is another
15  temp service?
16    A.   Yes, sir.
17    Q.   All right.  And how much were you
18  making?
19    A.   Eight fifty.
20    Q.   Forty hours a week?
21    A.   No, I ain't going to say that
22  because they was just getting back to the
23  point of, you know, coming out of the

44 (Pages 170 - 173)

**Exhibit A**

1  recession.  You might get twenty, twenty-
2  five, maybe thirty-two at the most.
3      Q.   Okay.  How long did you do that?
4      A.   I did that for probably, like,
5  two, three years.
6      Q.   What was your -- so, from
7  2000 and --
8      A.   '12 to '15.
9      Q.   All right.  So, you started at
10  eight fifty working twenty to thirty-two
11  hours a week?
12     A.   Yeah, and ended up the same
13  thing, eight fifty, working twenty to --
14  because I got on at DAS.  I finally got a
15  full-time job in 2015.
16     Q.   At DAS?
17     A.   At DAS North America, yes.  No, I
18  worked at -- no.  No.  At 2013, I'm sorry.
19  I'm sorry.  I was working -- I was working at
20  a temp service and working at DAS --
21     Q.   Okay.
22     A.   -- in 2013.
23          I left the temp service as I got

1  full time at DAS.
2      Q.   Okay.  So, in 2013, between DAS
3  and the temp service --
4      A.   Yeah.
5      Q.   -- you were working full time?
6      A.   I was working full time.
7      Q.   What temp service was it then?
8      A.   Ambassador.
9      Q.   And was that at Hyundai?
10     A.   Uh-huh.
11     Q.   All right.  So, just before -- or
12  during the time before you started with DAS
13  and the temp service in 2012, did you ever
14  get a forty-hour week?
15     A.   Every blue moon.
16     Q.   Okay.  And then, 2013 at DAS,
17  what did you do?
18     A.   I was working for OmniSource when
19  I got that job.  I was working for Ambassador
20  and OmniSource, because a friend of mine
21  named Monique kind of put me onto that job.
22  And I was then getting forty hours.
23     Q.   And how much were you earning an

1  hour?
2      A.   Eight fifty.
3      Q.   Did you get any overtime?
4      A.   No.  Straight forty.
5      Q.   How long did you do that?
6      A.   Probably a year.
7      Q.   2013 to 2014?
8      A.   No, 2012 to 2013.  I got hired on
9  in 2013.
10     Q.   Okay.  You got -- you got hired
11  on in 2013 --
12     A.   At DAS --
13     Q.   -- at DAS?
14     A.   -- permanent --
15     Q.   Okay.
16     A.   -- yeah.
17     Q.   2012 to 2013, you were working
18  temp and DAS?
19     A.   Yeah.
20     Q.   2013, DAS?
21     A.   Yes.
22     Q.   You started DAS?
23     A.   Yes, because I had a full-time

1  job then.
2      Q.   Okay.  And when you were full
3  time at DAS, what were you earning?
4      A.   Ten fifty starting off.
5      Q.   How many hours a week?
6      A.   Forty, forty-five.
7      Q.   And when you worked forty-five,
8  would you get time and a half?
9      A.   Yeah.
10     Q.   And how many hours a month were
11  you getting forty before you would get
12  overtime?
13     A.   Because they were just opening.
14  We was getting major over -- I ain't going to
15  say major.  I'll say probably two weeks out
16  of the month, we was getting probably about
17  forty hours -- over forty hours.
18     Q.   Of overtime?
19     A.   Yeah, of overtime.
20     Q.   And how long did that last?
21  Starting in 2013, how long did that last?
22     A.   If y'all have my records, I got
23  locked up, man.

45 (Pages 174 - 177)

**Exhibit A**

Page 178

1    Q.   Huh?
2    A.   That's when I got locked up.
3    Q.   All right.  So, 2013 until you
4  were incarcerated?
5    A.   Yeah.
6    Q.   Which I think I looked at
7  something showing that that was June 13,
8  2013.
9    A.   Yeah.
10   Q.   Does that sound right or do you
11 know that that's right?
12   A.   That's right.
13   Q.   How do you know that's right?
14 You just remember the date?
15   A.   Yeah, I remember that day.
16   Q.   All right.  So, June 13, 2013?
17   A.   Yeah.
18   Q.   All right.
19   A.   I remember that day.
20   Q.   All right.  So, when you started
21 at DAS, would that have been the first of the
22 year, January of 2013?
23   A.   Yeah, when I got hired on.

Page 179

1    Q.   But is January?
2    A.   Uh-huh.
3    Q.   Is that a yes?
4    A.   December of 2012 --
5    Q.   '12?
6    A.   -- I got hired on.
7    Q.   Okay.  Got it.
8    A.   Two weeks before Christmas, I got
9  hired on.
10   Q.   Okay.  All right.  So, you
11 remember that?
12   A.   Yeah.
13   Q.   And so, during that time, what
14 were you earning a month with your overtime
15 and everything?
16   A.   From -- I'll say from seventeen
17 to probably eighteen hundred dollars a month.
18   Q.   What was your shift?
19   A.   I was working from -- it was
20 rotated because you'll come in from 6:00 to
21 4:00, and then, one month, you'll come in
22 from 4:00 to 6:00.
23   Q.   Give me a.m. and p.m. on that.

Page 180

1    A.   Yeah.  6:00 a.m. to 4:00 p.m.
2    Q.   Okay.
3    A.   And then, night shift was, I
4  think, 6:00 p.m. to 4:00 a.m., something like
5  that.
6    Q.   Okay.
7    A.   It was around Hyundai schedule.
8  We fluctuated like Hyundai did.
9    Q.   You worked one of those two --
10   A.   Yeah.
11   Q.   -- shifts?
12   A.   Every month, you'll work morning
13 shift one month, and then, you'll rotate to
14 night shift a month.
15   Q.   Okay.  And what about days?  Was
16 it Monday through Friday or --
17   A.   Yes, Monday through Friday.
18   Q.   You had Saturdays and Sundays
19 off?
20   A.   Every other Saturday.  We worked
21 two Saturdays out of the month.
22   Q.   And you got overtime for that?
23   A.   Yeah.

Page 181

1    Q.   And off Sunday?
2    A.   Yeah, off every Sunday.
3    Q.   Did they have -- were they
4  flexible with -- could you switch with
5  somebody and work night shift --
6    A.   No.
7    Q.   -- or you had to work whatever
8  shift that you were assigned?
9    A.   No.  They was never functional.
10   Q.   Excuse me?
11   A.   I said they was never functional
12 about -- whatever you're scheduled, you had
13 to work it.
14   Q.   Okay.  Was your check actually
15 coming from DAS or was it coming from the
16 temp service?
17   A.   The temp service.  Before I got
18 hired on, it was coming from the temp
19 service.  We was getting paid on a card.
20   Q.   Yeah.
21   A.   And when you get hired on, you
22 can get -- like I said, I went to -- you can
23 have a credit card or a bank account or

46 (Pages 178 - 181)

Exhibit A

Page 182

1  whatever or you can have a live check.
2  That's when I had got a Visa card.  I had
3  mine direct deposit on a Visa card, which I
4  got one of those little pay debit cards.
5      Q.   Did you get any kind of
6  insurance?
7      A.   Yeah.
8      Q.   Was that the Blue Cross you told
9  me about?
10      A.   Yes, sir.
11      Q.   Did you get any kind of 401(k)
12  there?
13      A.   Yeah, but you had to work, like,
14  a year for it to kick in.
15      Q.   All right.  Did you get any other
16  benefits when you went full time with DAS?
17      A.   Yeah, cell phone, like, you get a
18  discount with Verizon.  I think that's who
19  they was with then, Verizon.
20      Q.   Okay.
21      A.   Yeah.
22      Q.   So, your cell phone was -- the
23  cell phone itself was paid for or the monthly

Page 183

1  service or both?
2      A.   It's just a little discount.  It
3  wasn't paid for.  I still had to pay for it
4  out of my pocket.  You just probably get
5  maybe a couple dollars off a month --
6      Q.   Okay.
7      A.   -- you just tell them you work
8  for DAS or show them your DAS ID every time
9  you go in to pay it, yeah.
10      Q.   And you did that --
11      A.   Yeah.
12      Q.   -- with Verizon?
13          All right.  And that -- did you
14  have Verizon, and then, what were you --
15  where were you living at that time?
16      A.   At that time, I was staying --
17  where I staying?  I was living on Ironwood
18  when I got at DAS.  I was living with my best
19  friend.
20      Q.   Cortez?
21      A.   Huh-uh.  It was another friend.
22  His name is Kevin.
23      Q.   I won't tell Cortez that he's not

Page 184

1  your best friend.
2      A.   Both of them really is.  We all
3  grew up -- we was just a group of guys.
4      Q.   Kevin Cain?
5      A.   Kevin McCain.  McCain.
6      Q.   So, you were living with Kevin
7  McCain?
8      A.   Yeah.
9      Q.   And where did you say he lived?
10      A.   On ███████ in the Woods.  That's
11  the name of the neighborhood.  It's called
12  Woods.
13      Q.   In Montgomery?
14      A.   Uh-huh.
15      Q.   And you started there when you
16  started working at DAS?
17      A.   Uh-huh.
18      Q.   In December, 2012?
19      A.   Uh-huh.
20      Q.   Is that a yes?
21      A.   Yes.
22      Q.   All right.
23      A.   Sorry about that.

Page 185

1      Q.   And then, was Kevin charging you
2  any rent?
3      A.   Yeah.  I was paying four fifty --
4      Q.   Okay.
5      A.   -- for rent.
6      Q.   And y'all were splitting --
7      A.   No, he was just charging me for
8  rent.
9      Q.   That's it?
10      A.   That's it.  Because, at that
11  time, I was a temp, and I still had child,
12  you know, support, whatever.  He wasn't -- he
13  was trying to help me come on my feet.
14      Q.   All right.  So, charging you four
15  fifty in rent.  And that covered your
16  utilities and a place to stay?
17      A.   Uh-huh.
18      Q.   And were you -- what about food
19  and groceries and all that?
20      A.   Yeah.  And getting back and forth
21  to work.
22      Q.   And you paid for that?
23      A.   Yeah.

47 (Pages 182 - 185)

**Exhibit A**

1    Q.   All right.  And how would you get
2  back and forth to work?
3    A.   Catching a bus, sometimes a
4  co-worker.
5    Q.   Okay.
6    A.   That was my main --
7    Q.   Bus --
8    A.   Bus route, uh-huh.
9    Q.   -- route?
10       I think you told me the bus,
11  sometimes it -- or, at some point, it
12  started --
13    A.   Yeah.
14    Q.   -- at least started right here.
15       When did it first start?
16    A.   I had to catch the bus when I was
17  on night shift.  That's the only way I could
18  catch it.  Because in the morning time, the
19  bus route wasn't starting at 6:00 o'clock.
20    Q.   Okay.
21    A.   So, I had to pay a co-worker that
22  was working morning shift with me.  I'd catch
23  a ride with him.

1    Q.   Okay.  All right.  But you were
2  able to get there?
3    A.   Yes, sir.
4    Q.   All right.  One of the two,
5  either the bus or the co-worker?
6    A.   Yes, sir.
7    Q.   When did you -- when did the bus
8  route first start working where you could
9  take the bus?
10    A.   I learned about it, like I said,
11  when I moved with Kevin, he used to tell me
12  come up there, like, 2:00, 3:00 in the
13  evening.  So --
14    Q.   Yeah.
15    A.   -- I used to catch it then.
16    Q.   Okay.
17    A.   And he showed me where to be.
18    Q.   Yeah.
19    A.   Yeah.
20    Q.   You said earlier that -- I may
21  have misheard you, but I thought I heard you
22  say that it wasn't running, the bus wasn't
23  running?

1    A.   Not in the morning time.
2    Q.   In the morning time?
3    A.   Yeah.
4    Q.   But the bus -- the City of
5  Montgomery has had bus service --
6    A.   Yeah.
7    Q.   -- including out to the Hyundai
8  plant --
9    A.   Yeah.
10    Q.   -- for a while, right?
11    A.   Well, not to the Hyundai plant.
12  That's the thing, see.  They'll drop you off
13  close to the Hyundai plant.
14    Q.   Close to the Hyundai plant.
15  Okay.
16    A.   You had to walk.
17    Q.   Yeah.
18    A.   So, I had to get up early to
19  catch the bus early and make sure I have
20  enough time to walk to the place.
21    Q.   I'm following you.  How far did
22  you have to walk?
23    A.   Probably about a mile or two.

1    Q.   Okay.
2    A.   Yeah.  South Court Street.
3    Q.   All right.  And how much were you
4  paying your co-worker?
5    A.   At that time, I would say what,
6  forty dollars a week.
7    Q.   To give you a ride in?
8    A.   And back home.
9    Q.   Okay.
10    A.   Because he was coming from the
11  other side of town.
12    Q.   Okay.  Did you try to buy a car
13  at that time?
14    A.   It was tight.  I mean --
15    Q.   Yeah.  Now, at this time, as far
16  as -- you didn't have any kids living with
17  you?
18    A.   No, I was --
19    Q.   And no wife living with you?
20    A.   -- separated.
21       I was single.  That's when I met
22  Monica.  I was single.
23    Q.   Okay.

48 (Pages 186 - 189)

**Exhibit A**

Page 190

1      A.    You know, me and Kevin, we was
2   roommates.
3      Q.    Okay.
4      A.    He just started owing his own
5   house, so he had an extra room before he met
6   his wife now.  So, he just let me stay there
7   until I got on my feet.
8      Q.    Did Kevin own the house or was he
9   renting?
10     A.    Yeah, he was buying the house.
11     Q.    And did you have your own bedroom
12  or --
13     A.    Yes, sir.
14     Q.    I know that you told me you got
15  arrested, and we're going to talk about that.
16  But while we're on your employers --
17     A.    Uh-huh.
18     Q.    -- let's keep going with that.
19     A.    Let's go.
20     Q.    And so, you told me about getting
21  arrested.  And I showed that you were
22  incarcerated from June 13 to July 7; is
23  that -- or do you remember?  How long were

Page 191

1   you incarcerated?
2      A.    I thought I was incarcerated --
3      Q.    I may be wrong.
4      A.    It was for a little longer than
5   that.
6      Q.    Okay.
7      A.    I thought it probably was in
8   August.
9      Q.    All right.  We'll look at some
10  records on that.  But whenever it was that
11  you got out, tell me what you did next.
12     A.    I was jobless for a minute.  I
13  was probably jobless another six months.
14  Because, at that time, like I said, when I
15  got incarcerated, I was in there.  Monica was
16  pregnant with my twins.  And that went south.
17  She had a -- she went through her little
18  depression stage, which we lost the kids.
19  And it was just rough, man.  It was just --
20  it was life.  You know, I tried to fill out a
21  job, I tried to do this, I tried to do that,
22  and it just wasn't working at that time, you
23  know, because by me being arrested, man, I

Page 192

1   got out, I had to walk back in front of the
2   same job I got arrested from.
3      Q.    All right.
4      A.    So, I tried to go back out there
5   to get a job, and it made it seem like I was
6   a criminal, man.  You know, they didn't want
7   to have no dealings with me.
8      Q.    Who didn't want to have any
9   dealings with you?
10     A.    DAS.
11     Q.    DAS.  What did they say?
12     A.    I mean, they was looking at the
13  fact that I was in black and white.  And I
14  had to come every day for seven days out of
15  the week to pick trash up in front of a place
16  I just got -- you know, I was working from.
17  So, you know, whatever coming out of my
18  mouth, it don't look believable, you see what
19  I'm saying?  They -- I can say I'm arrested
20  about tickets, but just by me walking by
21  somebody who is a murderer, you know what I'm
22  saying, or whatever got going on, you know.
23  And then, dealing with the Koreans, they

Page 193

1   already going to -- you probably don't work
2   with them.  But they already stereotype when
3   they came over here, just to be honest with
4   you.
5      Q.    The Hyundai folks?
6      A.    Yeah.
7      Q.    Yeah.
8      A.    Just to be honest with you.  So,
9   you know, they're looking at me as far as
10  like I done did something very bad, because
11  that's who -- the guy I had to talk to, I
12  think his name was Mr. Kim something.  I had
13  to talk to him to try to get my job back.
14  But he's like, no, no, no, you know, you bad
15  guy.  And, you know, don't even know what's
16  the purpose I got locked up for.
17     Q.    Okay.  All right.  Did you try to
18  work anywhere else other than with Mr. Kim at
19  Hyundai?
20     A.    Yeah, I did.  I tried.  I tried a
21  lot of places.
22     Q.    Where'd you work next?
23     A.    After I got out, it took me about

**Exhibit A**

Page 194

1 four months and got back on at Hyundai as a
2 temp. But I was only working on the weekends
3 doing clean-up work. I had to take the first
4 thing because, at that time, man, my child
5 support was out the roof, then, and I was
6 about to get locked up for that.
7     Q.   When you say your child support
8 was out the roof, do you mean for your --
9     A.   Back pay. I had back pay, like,
10 major back pay.
11    Q.   For the divorce settlement that
12 we were talking --
13    A.   Yeah.
14    Q.   -- about earlier?
15    A.   Uh-huh.
16    Q.   All right. So, you started
17 working at Hyundai as a temp. And when was
18 that?
19    A.   That was probably about October,
20 October, November.
21    Q.   2013?
22    A.   Yeah, about October, November,
23 somewhere around there.

Page 195

1     Q.   How many hours a week were you
2 working there?
3     A.   Probably about twenty-five to
4 thirty, because I was only doing weekend
5 work.
6     Q.   And how much were you earning?
7     A.   That was probably about what,
8 eight fifty, nine dollars.
9     Q.   Were you working for Hyundai or
10 the temp or both?
11    A.   No, I was working for a temp.
12    Q.   Which one?
13    A.   Onin Staffing.
14    Q.   You told me about -- before you
15 started in -- you told me about after your
16 incarceration going to talk to Mr. Kim at
17 Hyundai.
18    A.   Uh-huh. At DAS.
19    Q.   At DAS?
20    A.   Right.
21    Q.   Did you -- did Mr. Kim work for
22 DAS or did he work for --
23    A.   Yeah, he worked for DAS.

Page 196

1     Q.   Okay. Is DAS -- because there
2 was a Doss out there at Hyundai that was
3 D-o-s-s, I think, that was a Korean company.
4     A.   Uh-huh.
5     Q.   Is that the one you're talking
6 about?
7     A.   No, DAS --
8     Q.   This is a different one?
9     A.   -- is D-A-S.
10    Q.   This is D-A-S?
11    A.   Yes.
12    Q.   Okay. Do you know which one I'm
13 talking about?
14    A.   Yeah, I know exactly the one
15 you're talking about.
16    Q.   Okay. Kind of -- all right.
17    A.   Uh-huh.
18    Q.   And they're kind of like a --
19 where are they from, Germany or somewhere?
20    A.   I don't know where they're from.
21 I know exactly who you're talking about,
22 though. I worked for DAS.
23    Q.   Okay. Other than talking with

Page 197

1 Mr. Kim, did you -- did you try to get a job
2 with anyone else before you got the job with
3 the temp, Omni, in October of 2013 working at
4 Hyundai?
5     A.   No, because when I got out, I had
6 to, you know, find myself, man. I had to,
7 you know, find somewhere to stay. You know,
8 me and her, she kind of, like, left me
9 because she felt like it was something I
10 could avoid of getting locked up.
11    Q.   Okay. All right. And did Mr.
12 Kim, did he work for DAS or did he work --
13    A.   Yes --
14    Q.   -- for Hyundai?
15    A.   -- he was a plant manager.
16         He was the, like, one of the head
17 guys of DAS.
18    Q.   All right. And you started with
19 Hyundai and Omni in October of '13?
20    A.   Uh-huh.
21    Q.   When did you first go talk to
22 them in relation to then? Like was it the
23 day before?

50 (Pages 194 - 197)

**Exhibit A**

Page 198

1     A.   No, when I got out, it was
2  probably about -- I'll say probably about two
3  or three weeks after I got out because I
4  really didn't have no functional where to
5  stay, you know.
6     Q.   All right.  So, what I was --
7  what I was asking you about, you said you
8  started with Hyundai in October of 2013.
9     A.   Uh-huh.
10    Q.   And I just wanted to see when you
11 first went to the temp agency prior -- how
12 soon prior to when you started?
13    A.   When I moved in, like I said,
14 with my sister, she let me move in with her.
15 I had somewhere to stay.
16    Q.   Okay.
17    A.   And I didn't have no phone or
18 anything.  So, when I stayed with her, that's
19 the only way I could communicate --
20    Q.   Yeah.
21    A.   -- off her house phone.
22         So, yeah, that was the only time
23 I --

Page 199

1     Q.   All right.
2     A.   -- got in contact with jobs.
3     Q.   But when you went to Omni --
4     A.   Uh-huh.
5     Q.   -- when did they tell you you
6  could start work?
7     A.   Probably about two weeks later.
8     Q.   All right.  And they're the only
9  ones you went to talk to?
10    A.   Uh-huh.
11    Q.   Is that a yes?
12    A.   Yes.  I'm sorry.
13    Q.   All right.  How long were you
14 there after October of 2013?
15    A.   I worked there probably till --
16 probably -- it was, I think, January █████
17 ████████ of 2014.
18    Q.   What were you -- how many hours a
19 week were you working in January?
20    A.   The same.  It was the same
21 concept, weekend, about twenty, thirty hours.
22    Q.   What was the most you ever
23 earned?

Page 200

1     A.   Thirty.
2     Q.   And what happened in January?
3     A.   I end up getting on at Winn-Dixie
4  warehouse, an order selector.
5     Q.   How much were you earning there?
6     A.   They started me off at eleven
7  seventy-five.
8     Q.   Where is that located?
9     A.   Near Hope Hull.
10    Q.   Do you remember what street?
11    A.   Mobile Highway.
12    Q.   Forty hours a week?
13    A.   Uh-huh.
14    Q.   So, that would have been January
15 of 2014?
16    A.   Uh-huh.
17    Q.   Did you put in any applications
18 anywhere else between October of 2013 and
19 January of 2014?
20    A.   Yeah, Food -- U.S. Food
21 Service --
22    Q.   Okay.
23    A.   -- Big Lots.

Page 201

1     Q.   U.S. Food Service?
2     A.   Uh-huh.
3     Q.   Big Lots.
4     A.   Koch Foods.
5     Q.   Koch Foods.
6     A.   Uh-huh.  Like I say, McDonald's,
7  Hardee's.
8     Q.   And I'm just talking about
9  between October of 2013 and January of --
10    A.   That's what I'm talking about,
11 too.
12    Q.   Okay.  McDonald's.
13    A.   Yeah, I was just putting in
14 applications.  Everything -- that's when
15 Indeed start.  Indeed got popular as -- the
16 app Indeed.
17    Q.   I don't know what that is.
18    A.   You don't know what Indeed is?
19 That's an app you can go on and fill out
20 applications.
21    Q.   Okay.
22    A.   And that's, like, a second party
23 that help you.

51 (Pages 198 - 201)

**Exhibit A**

Page 202

1    Q.   Oh, it's a job placement thing?
2    A.   Yeah.
3    Q.   Indeed?  Okay.
4    A.   Yeah.  It was the quickest way
5  because that's what everybody used to say, go
6  on Indeed and fill out this and go on Indeed
7  and fill out that.
8    Q.   Okay.
9    A.   They help you with your resume
10  and everything.
11    Q.   All right.  And you were doing
12  that on your phone?
13    A.   Yeah.  Well, not my phone, the
14  library.
15    Q.   Okay.  Is your resume still on
16  Indeed?
17    A.   Yes.
18    Q.   So, these job applications you're
19  talking about, it's not you going in to them,
20  it's you putting something on Indeed --
21    A.   Yes, and waiting --
22    Q.   -- and relying on Indeed to send
23  it out to all these people?

Page 203

1    A.   That's the only way it was -- I
2  mean, as far as trying to find a good job, a
3  good job that's going to pay, that's the only
4  way they wanted you to do it.
5    Q.   Okay.
6    A.   Like, you can go -- you'll go to
7  the place, they'll give you a website and
8  tell you to fill it out on Indeed, which
9  you'll go on Indeed.  You'll type in the name
10  of the job, and they'll pull up the job
11  application.  And Indeed will help you with
12  the process and help you put the resume, the
13  qualifications, you know.  And you'll submit
14  it.  And then, you just call and tell them
15  you submitted it and wait on the call.
16    Q.   All right.  And you obviously
17  know more about Indeed than I do since I'd
18  never heard of it.  But it sounds like what
19  you're telling me, you knew then that was the
20  way you do it --
21    A.   Yeah.
22    Q.   -- is you put your --
23    A.   Yeah.

Page 204

1    Q.   -- application on Indeed?
2    A.   That's the way -- that's how I
3  got this job I'm with now.
4    Q.   Okay.  Got the job you're with
5  now?
6    A.   Yeah.
7    Q.   So, you didn't -- you didn't go
8  in anywhere personally, it was all just what
9  you put on Indeed?
10    A.   Because they wasn't doing
11  personally anymore.
12    Q.   Okay.
13    A.   You just go, and they give you a
14  card, like I say, or a piece --
15    Q.   Right.
16    A.   -- of paper and tell you when
17  to --
18    Q.   Okay.  I want to make sure,
19  because you shook your head.  You didn't go
20  anywhere personally?
21    A.   No --
22    Q.   Okay.
23    A.   -- I didn't.

Page 205

1    Well, yeah.  I mean, hold on.
2  Let me rephrase that.  Yeah, that's the only
3  way I knew about Indeed, by going in person.
4    Q.   All right.  Which one did you go
5  to personally?
6    A.   Like I said, all these jobs I was
7  telling you about, Winn-Dixie warehouse,
8  U.S. Food Service, Big Lots.  Even McDonald's
9  on Indeed, Hardee's on Indeed.
10    Q.   But did you walk into them
11  personally?
12    A.   Yes.
13    Q.   All right.
14    A.   Yes.  Yes.
15    Q.   All right.  So, Winn-Dixie, you
16  were there January of 2014, eleven seventy-
17  five an hour?
18    A.   Yes.
19    Q.   Any overtime at Winn-Dixie?
20    A.   Yes.
21    Q.   And how much overtime?
22    A.   It was seasonal.  We get our
23  overtime during the seasonal peak, which is

**Exhibit A**

1  called peak seasonal.  It's Thanksgiving
2  through Valentine's.  So, we'll probably get
3  from forty-five to sixty hours a week.
4       Q.   During those months?
5       A.   Yeah.
6       Q.   And what did you get, time and a
7  half or --
8       A.   Yeah.
9       Q.   And how long were you at Winn-
10  Dixie?
11       A.   Probably about eight months.
12       Q.   Why did you leave Winn-Dixie?
13       A.   Personal issues.
14       Q.   Tell me about that.
15            MS. TOURE:  I'm sorry.  I didn't
16  hear you.
17            THE WITNESS:  Personal issues.
18       A.   I had to move out my sister
19  house.  Just I had to try to find my way.
20  And when I did -- when I really found my way,
21  it was too far out.  I didn't have a car to
22  get back and forth to it.  And I kind of,
23  like, lost that one.

1       Q.   Did you -- were you terminated or
2  did you leave voluntarily?
3       A.   No, I was terminated.  I never
4  voluntarily leave nothing.
5       Q.   You've never voluntarily left any
6  job?
7       A.   No.
8       Q.   Every job you've ever had, you've
9  been terminated?
10       A.   Yeah.
11       Q.   And what was the reason given to
12  you for termination?
13       A.   Tardiness.
14       Q.   You say -- you're saying
15  tardiness.  Was it sometimes tardy and
16  sometimes just completely missing?
17       A.   No, tardiness.  Like --
18       Q.   You were late?
19       A.   Yeah, I make it to work, but I
20  might be an hour late because I might have to
21  walk.
22       Q.   Okay.
23       A.   Or I might be an hour -- I mean,

1  two hours late because I might be waiting on
2  this person saying they was going to come
3  pick me up, and I had to find another route
4  to get there.
5       Q.   All right.  So, you did -- you
6  were at Winn-Dixie until September of 2014.
7  What'd you do next?
8       A.   Then --
9       Q.   Did you draw any unemployment?
10       A.   No.
11       Q.   Did I -- did we skip an
12  unemployment back after you were
13  incarcerated?  Did you apply for unemployment
14  then?
15       A.   No, because I didn't feel like I
16  couldn't get it because of the way I got
17  locked up.
18       Q.   All right.  So, no unemployment.
19  You didn't --
20       A.   No.
21       Q.   -- draw unemployment then?
22            So, Winn-Dixie from September --
23  I'm sorry, from January, 2014 to September,

1  2014?
2       A.   Uh-huh.
3       Q.   What next?
4       A.   Then, I -- the next, I was -- to
5  the end of the year, I didn't have no job.
6  Then, I got on at -- I got on at -- what was
7  I doing?  I was working for -- I did --
8            MR. LOGSDON:  Tell me when it's
9  time to break.
10            MS. MORGAN:  In about three --
11            MR. LOGSDON:  Whenever is fine
12  with me.
13            MS. MORGAN:  -- to four
14  minutes --
15            MR. LOGSDON:  Yeah.
16            MR. MORGAN:  -- we need to call
17  in.
18            MR. LOGSDON:  Just whenever.  Do
19  you need to break?  Do you want to break now?
20            MS. MORGAN:  Is this a good time
21  to go ahead and break for lunch?  Is it for
22  y'all?
23            MR. LOGSDON:  I don't care.

**Exhibit A**

Page 210

1    Yeah, if it's good for y'all.
2         MS. MORGAN:  Okay.  Yeah, we're
3    sort of at the end --
4         MR. LOGSDON:  Yeah.
5         MS. MORGAN:  -- of one year, I
6    think, of your going through this.
7         THE WITNESS:  Yeah.
8         MR. LOGSDON:  Yeah, that's a good
9    way to remember that.  So, we left off in
10   December.  Y'all help to remember we left off
11   in December, 2014.  Do you see how we plan
12   these things?  We're down to the minute.
13        THE WITNESS:  Yeah, I got you.  I
14   got you.
15
16        (Whereupon, a lunch recess was
17        taken.)
18
19    Q.   (BY MR. LOGSDON)  All right.
20   Mr. Agee, are you ready to go?
21    A.   Uh-huh.
22    Q.   We were talking about earlier in
23   the deposition about documents.  Do you have

Page 211

1    any W-2s or 1099s?
2    A.   No.
3    Q.   Do you have any of those?
4    A.   No.
5    Q.   All right.  What do you do with
6    those, like, your W-2s, your 1099s?
7    A.   Really, I don't.  I really don't
8    have them.  I never had them like that.  I
9    just fill them out.  And, like I say, I was
10   moving from house to house so much, my mail,
11   it would be so fluctuated, you know.  It
12   would be in different places, so I guess it'd
13   just go back.
14    Q.   All right.  We were -- we left
15   off in the end of December, 2014.  And you
16   were telling me you were out of work from
17   September to December of 2014?
18    A.   Uh-huh.
19    Q.   What did you do -- or did you do
20   any unemployment during that time?
21    A.   No, sir.
22    Q.   Did you try to get unemployment?
23    A.   Yes, sir.

Page 212

1    Q.   You filed for it?
2    A.   Yes, sir.
3    Q.   And what did they say?
4    A.   I didn't get it.
5    Q.   What was the reason?
6    A.   I guess the employee didn't give
7    it to me.
8    Q.   Okay.
9    A.   They fought against it.
10   Q.   Excuse me?
11   A.   I guess the employee fought
12   against it.
13   Q.   All right.  And did you -- did
14   you have a hearing or anything?
15   A.   No.
16   Q.   Do you know why the employee
17   fought against it?
18   A.   No.  I really don't.  I just
19   didn't try no more.
20   Q.   All right.  But you did take that
21   one time and --
22   A.   Yes, sir.
23   Q.   -- were denied?

Page 213

1    A.   Yes, sir.
2    Q.   All right.  After December of
3    2014, what did you do?
4    A.   I had one more -- one more job.
5    It was called EnovaPremier.
6    Q.   Excuse me?
7    A.   EnovaPremier.
8    Q.   Can you spell that?
9    A.   E-n-o-v-a.  Premier, P-e-r-i-m-
10   e-r.
11   Q.   And where is that located?
12   A.   On 80, Highway 80.
13   Q.   What did you do?
14   A.   That's another Hyundai supplier.
15   Q.   When did you start working there?
16   A.   Around maybe January, February
17   sometime.  I'm not exact.
18   Q.   Of --
19   A.   It was at the beginning of the
20   year, around --
21   Q.   2015?
22   A.   Yeah.  As a temp.
23   Q.   How many hours?

54 (Pages 210 - 213)

Exhibit A

Page 214

1    A.   Probably about -- from thirty to
2  thirty-four hours.  Thirty, thirty-five
3  hours.
4    Q.   What was your pay?
5    A.   Eight fifty.
6    Q.   How long did you work with them?
7    A.   I worked with them a full year as
8  a temp.
9    Q.   Why did you leave?
10   A.   I got -- actually got hired on.
11   Q.   With who?
12   A.   EnovaPremier.
13   Q.   E-n-d-o-a?
14   A.   E-n. Enova.
15   Q.   Yeah.
16   A.   Yeah.
17   Q.   Spell it one more time.
18   A.   E-n-o-v-a.
19   Q.   Oh.  All right.  And, by the way,
20  Genpak that you mentioned earlier --
21   A.   Uh-huh.
22   Q.   -- is that G-e-n-p-a-c?
23   A.   Uh-huh.

Page 215

1    Q.   P-a-k?
2    A.   P-a-k.
3    Q.   All right.  All right.  Enova.
4  So, you started with a temp, and what temp
5  was that?
6    A.   OmniSource.
7    Q.   And then, you got hired on by
8  Enova directly?
9    A.   Uh-huh.
10   Q.   When?
11   A.   Oh, man, I forgot the date.  I'm
12  not exact, but it took me a year to get hired
13  on, though.
14   Q.   All right.  But you worked there
15  from roughly January, 2015 to January, 2016
16  through the temp --
17   A.   Uh-huh.
18   Q.   -- then, you got hired on
19  permanently --
20   A.   Uh-huh.
21   Q.   -- at Enova?
22       And how much were you making when
23  you got hired on at Enova?

Page 216

1    A.   I think it was, like, twelve
2  dollars.
3    Q.   Forty hours a week?
4    A.   Barely.
5    Q.   Any overtime ever?
6    A.   No.
7    Q.   How long did you work at Enova?
8    A.   Not that long.  I worked probably
9  about six, six months.
10   Q.   Did you have any -- did you have
11  direct deposit when you were there?
12   A.   Yeah, I think I had direct
13  deposit.  I think I was at -- with PNC Bank
14  at that time, I think.
15   Q.   Okay.  What location?
16   A.   The Eastern Boulevard.
17   Q.   Did you keep any statements from
18  PNC Bank?
19   A.   No, sir.
20   Q.   And I think PNC is a new one.  As
21  we've gone through these employers, did you
22  remember any other bank that you might have
23  banked with?

Page 217

1    A.   No, I remember banks that I had
2  to get a loan from.
3    Q.   Okay.  Tell me about that.
4    A.   You know, I got one from MAX, the
5  Federal bank.
6    Q.   MAX Federal Credit Union?
7    A.   Uh-huh.
8    Q.   How much was your loan?
9    A.   I think it was probably about a
10  thousand.
11   Q.   And when was that?
12   A.   That was probably between 2005 or
13  '6, somewhere around that area.
14   Q.   Did you pay it back?
15   A.   No.
16   Q.   Did they file suit?
17   A.   I don't even know.  I think that
18  was part of the garnishment, too.
19   Q.   All right.  It sounds like you
20  had a lot of garnishments --
21   A.   Yeah.
22   Q.   -- going?
23       You had the IRS, you had MAX, you

55 (Pages 214 - 217)

**Exhibit A**

Page 218

1  had -- the third one, there was a third one,
2  I think.
3      A.    Child support.
4      Q.    Child support?
5      A.    Uh-huh.
6      Q.    And you had maybe another one?
7      A.    Baptist Hospital.
8      Q.    Baptist Hospital?
9      A.    Uh-huh.
10     Q.    Is that right?
11     A.    Yeah.  Yes, sir.
12     Q.    All right.  And MAX, by the way,
13 you said your loan was a thousand.
14     A.    Uh-huh.
15     Q.    They wanted more than a thousand
16 back --
17     A.    Yes.
18     Q.    -- right?
19     A.    Right.  Right.
20     Q.    Do you know how much they wanted
21 back?
22     A.    It was, like, three percent of
23 the -- something like that.

Page 219

1      Q.    All right.
2      A.    So, that's probably about, like,
3  an extra five hundred back or something like
4  that, seven fifty with that, seventeen
5  hundred dollars.
6      Q.    All right.
7      A.    Yeah.
8      Q.    Well, it's more than five percent
9  if it was that much.
10     A.    Yeah, I think it probably was.
11     Q.    Almost doubled, right?
12     A.    Yeah.  Yeah --
13     Q.    All right.
14     A.    -- at that time.
15     Q.    Did you know that going on?
16     A.    No, I just needed to pay some
17 bills --
18     Q.    All right.
19     A.    -- truthfully, yeah.
20           Just trying to find a better way
21 to, you know --
22     Q.    Okay.
23     A.    -- support my household.

Page 220

1      Q.    You just needed the money at the
2  time?
3      A.    Yeah.
4      Q.    Not sure what the interest was?
5      A.    I wasn't worried about the
6  interest at that time to tell you the truth.
7      Q.    I understand.  All right.  Who
8  else did you get a loan from?  You mentioned
9  MAX.
10     A.    That's about it.  That's all the
11 banks I know.
12     Q.    Did you have any kind of checking
13 account at all with MAX?
14     A.    No.  Yeah, to get the loan, I had
15 to.
16     Q.    You had a checking account?
17     A.    Yeah, I had to.
18     Q.    Okay.  And did you have any kind
19 of credit card?
20     A.    No, never.
21     Q.    We're at Enova.  Did you have a
22 401(k) at Enova?
23     A.    Yes.

Page 221

1      Q.    Who was that with?
2      A.    What is that?  Infidelity?
3      Q.    Fidelity?
4      A.    Yeah, Fidelity, yeah.
5      Q.    Uh-huh.  Okay.  And when you left
6  Enova, did you cash out of the 401(k)?
7      A.    Yeah, it wasn't -- I had got that
8  probably, like, at the last ending or
9  something.  It was probably, like, two
10 hundred dollars or something like that.
11     Q.    And you cashed it out?
12     A.    Yeah, I cashed it out.
13     Q.    And how long were you at Enova?
14     A.    Probably about six months.
15     Q.    Why did you leave?
16     A.    It was hard for me to get back
17 and forth.
18     Q.    To work?
19     A.    Yes.
20     Q.    Okay.  Did you get terminated for
21 tardiness?
22     A.    Yes.  And prior to it -- and I
23 had got sick, too, at one point in time

56 (Pages 218 - 221)

Exhibit A

Page 222

1  dealing with my high blood pressure.  I was
2  going back and forth to the doctor and stuff
3  like that.  So, that's part of my tardiness,
4  too, of getting terminated.
5      Q.   What doctor were you going to?
6      A.   Dr. Adams at that time.
7      Q.   Adams?
8      A.   Yeah, I was still going to Adams.
9      Q.   All right.  Did he give you
10  medicine for it?
11     A.   Yes.
12     Q.   What kind of medicine?
13     A.   What is that, Claritin?  High
14  blood pressure, Claritin.  Clarison,
15  something.  I can't pronounce it --
16     Q.   All right.
17     A.   -- yeah.
18     Q.   I don't know anything about
19  medicines, but I know it's not Claritin
20  because that's an allergy medicine.
21     A.   I mean, not Claritin but --
22     Q.   Something with a C?
23     A.   Yes, yes, yes, yes.  Something

Page 223

1  with a C.  I forgot the name of it.
2      Q.   Do you still take that?
3      A.   Yes.
4      Q.   And it sounds like you've been
5  taking that back since 2000 --
6      A.   Yeah.
7      Q.   -- 8?
8      A.   Yeah.
9      Q.   Whatever the C is --
10     A.   Yeah.
11     Q.   -- the high blood pressure
12  medicine --
13     A.   Yes, sir.
14     Q.   -- with a C?
15         When we were talking earlier, you
16  told me when you -- when Johnson Controls
17  closed up, they gave you a little package
18  deal.
19     A.   Uh-huh.
20     Q.   Did any of these other jobs give
21  you that --
22     A.   No.
23     Q.   -- when you left?

Page 224

1          After you left Enova in 2016,
2  what did you do?
3      A.   I was unemployed for a while.
4      Q.   Did you try to get unemployment?
5      A.   No.
6      Q.   Is it your understanding that if
7  you get terminated for cause that you can't
8  get unemployment, or do you know?
9      A.   I don't know.  I mean, I just
10  been rejected so many times, I just don't --
11     Q.   All right.
12     A.   I just got tired of rejection.
13     Q.   All right.
14     A.   I just didn't ever try.
15     Q.   So, you were unemployed from June
16  of 2016 until when?
17     A.   Oh, for a minute.  I would say
18  almost a year.  Because I got on at Big Lot
19  at the end of 2016, early '17, 2017.
20     Q.   How much were you making at Big
21  Lots?
22     A.   Ten fifty.
23     Q.   How long were you there?

Page 225

1      A.   A short period of time, too.
2  It's the same -- it was down the street from
3  Enova.
4      Q.   All right.  How long were you
5  there?
6      A.   Probably about six months to --
7  about six months -- about a year.  I'll say
8  about a year.  About a year.
9      Q.   What street was it on?
10     A.   80, Highway 80.
11     Q.   How much were you making?
12     A.   Ten fifty.
13     Q.   Why did you leave?
14     A.   Got terminated for --
15     Q.   Tardiness?
16     A.   Yeah.
17     Q.   Tardiness and absence?
18     A.   Yeah.
19     Q.   And the same with Enova,
20  tardiness and absences?
21     A.   Yes.
22     Q.   Is that a yes?
23     A.   Yes.

57 (Pages 222 - 225)

Exhibit A

Page 226

1    Q.   After Big Lots, you were there
2  for about a year.  So, I got that from June,
3  2017, about two --
4    A.   Uh-huh.
5    Q.   And what did you do next?
6    A.   I was working at -- I went back
7  to Genpak.
8    Q.   Okay.
9    A.   And I was in a car accident.
10    Q.   All right.  Let's talk about the
11  Genpak first.  When did you start there?
12    A.   I started there in August of
13  2017.
14    Q.   How long did you work there?
15    A.   I was a temp from 2017 till
16  August of 2018.  And I got hired on, once
17  again, the same pattern, as a full-time
18  employee.
19    Q.   Okay.  Tell me the salaries both
20  times.
21    A.   It was a little better as a temp
22  at Genpak.  I was getting paid nine fifty.
23    Q.   Forty hours?

Page 227

1    A.   Yes.
2    Q.   All right.  And then, what about
3  when you were full time?
4    A.   Well, one week, it's forty hours,
5  and one week, it's thirty-six hours.
6    Q.   Okay.  Roughly forty?
7    A.   Yeah.
8    Q.   All right.  What about when you
9  go full time?
10    A.   The same.  I went up about a
11  dollar or two.  I think, I was, like, eleven,
12  eleven dollars and something.  Eleven
13  dollars.
14    Q.   Forty hours?
15    A.   The same.
16    Q.   And so, you started full time in
17  August of 2018?
18    A.   Uh-huh.
19    Q.   And how long were you there?
20    A.   What is it?  April of this year.
21    Q.   Till April of 2019?
22    A.   Yeah.
23    Q.   Tell me about the car wreck.

Page 228

1    A.   Yeah, I was in a car wreck going
2  to work.  I got hit from the back.
3    Q.   Okay.  And did you have some
4  injuries?
5    A.   Yeah.
6    Q.   Did you file a lawsuit over that?
7    A.   Yes.  We're still going through
8  it now.
9    Q.   Who do you -- who's representing
10  you?
11    A.   What his name is?  3333.  Advance
12  Law Firm.
13    Q.   Advance?
14    A.   Yes.
15       MR. GILL:  No, Vance.
16       THE WITNESS:  Vance?
17       MR. GILL:  I think it's Vance.
18    A.   Vance Law Firm.
19    Q.   (BY MR. LOGSDON)  What's his
20  first name?
21       MR. GILL:  I don't know what
22  Vance's first name is.
23    Q.   (BY MR. LOGSDON)  Do you know his

Page 229

1  first name?
2    A.   No, I don't.  He sucks, though.
3    Q.   Why is that?
4    A.   Because that's been six months
5  ago, and I still haven't got my claim.
6    Q.   Still hadn't gotten paid?
7    A.   Still haven't.
8    Q.   All right.
9    A.   I'm still going through pain,
10  injuries, and all.  They act like they don't
11  want to pay, so --
12    Q.   Okay.
13    A.   -- it's been falling on me
14  lately.
15    Q.   Vance isn't doing a good job for
16  you?
17    A.   No.
18    Q.   You started telling me the phone
19  number.  That might help.
20    A.   Yeah.
21    Q.   What's the phone number, 334?
22    A.   334-333-3333.
23    Q.   Okay.  And it sounds like you've

58 (Pages 226 - 229)

**Exhibit A**

Page 230

1 been trying to call him to get things going?
2     A.   I've been trying to call now.
3     Q.   Okay.  Whose car were you
4 driving?
5     A.   My nephew's.  My nephew was
6 driving.  I wasn't driving.
7     Q.   How much are you claiming?
8     A.   They said a hundred dollars every
9 time I went to the chiropractor.  It's about
10 fourteen, I think.
11     Q.   What chiropractor did you go to?
12     A.   King's Chiropractor on Zelda
13 Road.
14     Q.   K-i-n-g-s?
15     A.   Yes, sir.
16     Q.   See, I'm getting better at my
17 spelling as we go along.
18         Zelda Road?
19     A.   Yes, sir.
20     Q.   How many times have you been?
21     A.   I had to go for a -- what, two
22 weeks.
23     Q.   All right.  Who paid for that?

Page 231

1     A.   They're supposed to be paying it
2 right now.  The balance is still out there.
3     Q.   Vance or who?
4     A.   Yeah, Vance and the -- I guess
5 the insurance company.
6     Q.   Okay.  Did you file any -- a
7 claim on your insurance or anything?
8     A.   No.
9     Q.   Have you filed -- you told me
10 about -- you just told me about that lawsuit
11 and you told me about your divorce
12 proceeding.
13     A.   Uh-huh.
14     Q.   And I know about this one.  Any
15 other lawsuits you've been involved in?
16     A.   No, sir.
17     Q.   Were you out of work any for the
18 car wreck?
19     A.   Yes, I just recently started back
20 working.
21     Q.   Okay.  So, the accident would
22 have been in April of 2019?
23     A.   Yes, sir.

Page 232

1     Q.   And how long were you out?
2     A.   Till now.  I just started working
3 two weeks ago.
4     Q.   Were you out because of the
5 accident?
6     A.   Yes, sir.
7     Q.   Just because of the injuries?
8     A.   Yes, sir.
9     Q.   In other words, you couldn't work
10 from April of 2019 to now, which we're in --
11 where are we -- October of 2019?
12     A.   Right.
13     Q.   All right.  And what were your
14 injuries?
15     A.   Back, shoulder, you name it.
16     Q.   From the wreck?
17     A.   Arm.  Yeah.
18     Q.   All right.  Have you gone to any
19 doctors other than the chiropractor?
20     A.   Emergency room.
21     Q.   At Baptist?
22     A.   Baptist South.
23     Q.   All right.  Any others?

Page 233

1     A.   No, sir, I couldn't afford it.
2     Q.   Did you have any surgeries?
3     A.   No, sir.
4     Q.   And where did you -- where are
5 you working right now?
6     A.   At Flowers Bakery, which is
7 Aramark is the company that's inside of
8 Flower Bakery.
9     Q.   Arab?
10     A.   Aramark.
11     Q.   Aramark?
12     A.   Uh-huh.
13     Q.   Okay.  And what do you do there?
14     A.   Right now, I do a position called
15 pans.
16     Q.   What city?
17     A.   Montgomery, Alabama.
18     Q.   What street?
19     A.   It's in Hope Hull.
20     Q.   Hope Hull?
21     A.   Uh-huh.
22     Q.   Is the city or the street?
23     A.   I mean, well, the area, that's

59 (Pages 230 - 233)

Exhibit A

Page 234

1  what it's in.
2      Q.   All right.
3          MS. TOURE:  I think that's
4  Lowndes County, isn't it?
5          THE WITNESS:  Is it?
6      Q.   (BY MR. LOGSDON)  So, is it in
7  Hope Hull, Alabama, or Montgomery, Alabama?
8      A.   Hope Hull.
9      Q.   Do you know what street it's on?
10     A.   No, it's called Industrial Park,
11  though.
12     Q.   Is your employer Aramark or
13  Flowers?
14     A.   It's both because you have -- the
15  Aramark is in the inside.  We're like the
16  sub -- it's a -- it's a -- it's a permanent
17  position, because it got me -- we start from,
18  like, doing the little stuff and work our way
19  up to Flowers.
20     Q.   Okay.  Your check that you get,
21  who does it say it's from?
22     A.   Aramark.
23     Q.   And is that a direct deposit?

Page 235

1      A.   Yes.  No.  Payday card.  It's on
2  a card.  Chimes.
3      Q.   Do you have your card with you so
4  I can see what you're talking about?
5          MS. TOURE:  Let me see it first.
6      Q.   (BY MR. LOGSDON)  All right.  So,
7  you were mentioning earlier -- this is --
8  this says Chime, C-h-i-m-e?
9      A.   Right.
10     Q.   And it's a debit --
11     A.   Right.
12     Q.   -- Visa?
13         And you were mentioning earlier
14  that you've had these in the past?
15     A.   Right.
16     Q.   Has it always been Chime or has
17  it been other things?
18     A.   No, it's been different.  There's
19  like Rush cards, stuff like that.
20     Q.   So, it would be Visa, but it
21  might be Rush instead of Chime?
22     A.   Yes, sir.
23     Q.   And what else other than Rush and

Page 236

1  Chime?
2      A.   That's about it.  The reason why
3  I get those, because they pay you two days
4  earlier.
5      Q.   To go on here?
6      A.   Yes.
7      Q.   All right.  Speaking of that,
8  we've talked about some other cards that
9  you've had and things like that.
10     A.   Uh-huh.
11     Q.   I see you pulled out your
12  driver's license.  You've got that there.
13     A.   An ID.
14     Q.   That looks like you.  Do you have
15  any other cards or anything with you today
16  other than those two --
17     A.   No.
18     Q.   -- things right there?
19     A.   That's all.
20     Q.   I'm not going to ask you about
21  those goldfish, but that's -- okay.
22         Okay.  And so, have we gone
23  through all your employment?

Page 237

1      A.   Yes.
2      Q.   All right.  Let me ask you about
3  your vehicles.  You've talked about those a
4  little bit.
5      A.   Uh-huh.
6      Q.   And I'm going to ask you about a
7  few vehicles.  I tell you what, I'm just
8  going to -- I'm just going to mark this.
9  This is just a sheet that I'm going to mark
10  that we can use to reference from.  And I'll
11  mark it as Exhibit 102.
12     A.   Uh-huh.
13
14         (Whereupon, Defendant's Exhibit
15          102 was marked for identification
16          and copy of same is attached
17          hereto.)
18
19     Q.   (BY MR. LOGSDON)  You told me
20  about one that's not on here, and that was a
21  2010 Hyundai Santa Fe.
22     A.   That's it, the 2017 Santa Fe.  I
23  mean, 2007 Santa Fe.  I'm sorry.

60 (Pages 234 - 237)

Exhibit A

Page 238

1    Q.   Oh, it's a 2007?
2    A.   Yes.
3    Q.   All right.  And how much did you
4  pay for that one?
5    A.   Well, she end up paying for it.
6  I think it was, like, nine thousand in all --
7    Q.   Okay.
8    A.   -- finance and everything.
9    Q.   Did you contribute to any of the
10  down payment?
11    A.   Yes.
12    Q.   How much did you contribute?
13    A.   Probably about four or five
14  hundred dollars at that time.
15    Q.   All right.  How about the Pontiac
16  Grand Am?
17    A.   No, that's not my car.
18    Q.   Whose is that?
19    A.   That was by best friend's mom
20  car.
21    Q.   Remind of your best friend's
22  name.
23    A.   Cortez.  At that time, I was

Page 239

1  staying with him.
2    Q.   Okay.  And you weren't ever on
3  the paperwork for that?
4    A.   No, sir.
5    Q.   Do you know why the state would
6  have you on the paperwork for that?
7    A.   I really don't know.  I'm looking
8  at it.  Like, I really don't know.  I
9  never --
10    Q.   It says McCall's Auto Sales is
11  a -- holds a mortgage on it.  Do you know
12  them?
13    A.   No.
14    Q.   Have you ever gotten a car from
15  McCall's?
16    A.   No, never.
17    Q.   Okay.  Another one, Pontiac
18  Parisian.
19    A.   No, never.
20    Q.   Okay.
21    A.   First National Bank?
22    Q.   First National Bank, have you
23  ever heard of that?

Page 240

1    A.   No.
2    Q.   All right.  Toyota Camry?
3    A.   No.
4    Q.   And Chevy Cavalier?
5    A.   No.
6    Q.   Any cars that you know about
7  other than the Hyundai that you've either
8  owned or part owned or been on a note for?
9    A.   No, that's all I have, the Santa
10  Fe.  And I had a Lincoln two years ago, but
11  somebody stole that.
12    Q.   All right.  Tell me about the
13  Lincoln.
14    A.   Yeah, I got a -- bought a Lincoln
15  from a guy named Alonzi.  And I had to get it
16  financed through Guardian Credit Bank.  And
17  prior to that, someone stole it.
18    Q.   Okay.  Where is Guardian Credit
19  Bank located?
20    A.   It's downtown.
21    Q.   How much did you buy it for?
22    A.   In all, it came out to be, like,
23  six thousand.  I never paid it off, though.

Page 241

1    Q.   When was this that you got this
2  Lincoln?
3    A.   2016.
4    Q.   And when was it stolen?
5    A.   2016.
6    Q.   The same year?
7    A.   Uh-huh.
8    Q.   Did Guardian file suit?
9    A.   Yes, against me.
10    Q.   Okay.  All right.
11    A.   Can I keep this?
12    Q.   You can't keep that one, but we
13  can make a copy for you.
14      MS. TOURE:  I've got a copy.
15      MS. MORGAN:  We have a copy.
16      MR. LOGSDON:  Yeah, we've got a
17  copy.
18      MS. MORGAN:  They gave us a copy.
19    A.   Yeah, because this right here --
20    Q.   (BY MR. LOGSDON)  Yeah, because
21  that --
22    A.   -- is bogus, man.
23    Q.   Yeah.  So, that -- this is the

61 (Pages 238 - 241)

Exhibit A

Page 242

1 first you've seen of having anything --
2 record of those cars being in your name?
3    A.   Right.
4    Q.   Other than the Hyundai?
5    A.   That's it.
6    Q.   Yeah.
7    A.   I don't even understand --
8    Q.   Okay.
9       MS. HOLLIDAY:  Could it be your
10 dad's name?
11       THE WITNESS:  No, my dad --
12       MS. HOLLIDAY:  Passed?
13       THE WITNESS:  Yeah.  He's been
14 passed.  He was -- he never owned a car
15 because he was, like I say, with the Vietnam
16 and all.
17    Q.   (BY MR. LOGSDON)  Yeah.  Anybody
18 else you know with the same name?
19    A.   My granddad.
20    Q.   Granddad?
21    A.   Yeah.
22    Q.   And you're the third, so --
23    A.   Yeah.

Page 243

1       MS. TOURE:  Same name.
2    Q.   (BY MR. LOGSDON)  Where does your
3 granddad live?
4       THE WITNESS:  Uh-huh.
5       MS. TOURE:  Uh-huh.
6    Q.   (BY MR. LOGSDON)  Where does your
7 granddad live?
8    A.   He died.
9    Q.   When did he pass away?
10    A.   Probably about six, seven years
11 ago.
12    Q.   Okay.  Where did he live?
13    A.   In Brewton, Alabama.
14    Q.   Yeah.  All right.
15    A.   My dad also lived in Brewton,
16 Alabama, too.
17    Q.   Uh-huh.  All right.  Let me show
18 you what I'll mark as Exhibit 103.
19
20       (Whereupon, Defendant's Exhibit
21       103 was marked for identification
22       and copy of same is attached
23       hereto.)

Page 244

1    Q.   (BY MR. LOGSDON)  So, this is a
2 couple of tickets dated March of 2004.  So,
3 the date of the ticket is real small.  It's
4 on the top right and it's highlighted.
5    A.   Uh-huh.
6    Q.   Do you see that?
7    A.   Yes, sir.
8    Q.   And it lists an address of ███
9 Drive.
10    A.   Right.
11    Q.   Where is ███ Drive?
12    A.   The Eastern Boulevard.
13    Q.   Did you live there?
14    A.   Yes, sir.
15    Q.   Who were you living there with?
16    A.   Like I say, I was living with my
17 friend.
18    Q.   Remind me what friend.
19    A.   Cortez.
20    Q.   Okay.  That was -- was that the
21 one that was his house?
22    A.   No, that was his -- that's Kevin.
23    Q.   Kevin.

Page 245

1    A.   Kevin owned the house.
2       We were just with Cortez and his
3 mom, and we had -- they got evicted, so we
4 moved out here.  That's why I was losing
5 jobs, because we moved up farther from where
6 I was working from.
7    Q.   All right.  Was Cortez's mom
8 charging you any rent?
9    A.   Yes.
10    Q.   How much was she charging you?
11    A.   About two fifty a month.
12    Q.   Was it just you there or did you
13 have any kids there?
14    A.   No, it was -- it was me, Cortez,
15 and his brother and sister.
16    Q.   Okay.  Your kids have -- it
17 sounds like they've lived with you some?
18    A.   They visit.
19    Q.   Visit?
20    A.   They visit.
21    Q.   But they never permanently stayed
22 with you?
23    A.   Well, my youngest, she only

Freedom Court Reporting
877-373-3660    A Veritext Company    205-397-2397

**Exhibit A**

Page 246

1  stayed with us when me and her mom was
2  together.  After we split, she always stay
3  with her mom, but she'll come visit me.
4      Q.   I got you.  Okay.  But other than
5  when she was first born, you've never had
6  kids live with you?
7      A.   No.
8      Q.   And when she was first born, it
9  sounds like y'all split up pretty soon; is
10 that --
11     A.   Yeah, probably when she was
12 probably about two.
13     Q.   Two years old.  Okay.
14         All right.  The vehicle listed is
15 an M-I-T-S gray.  Do you know what car that
16 was?
17     A.   M-I-T-S gray?  I think it was a
18 Grand Am.
19     Q.   Whose car was that?
20     A.   That was Cortez mom's car.
21     Q.   Okay.  And it says on here, seat
22 belt violation, no driver's license, and
23 failure to possess insurance.  Do you

Page 247

1  remember getting this ticket?
2      A.   Yes.
3      Q.   Tell me about that.  Where were
4  you going?
5      A.   To work.
6      Q.   Where at?
7      A.   I was working at -- at that time,
8  I think, at the truck stop.
9      Q.   Okay.
10     A.   I think so.
11     Q.   Wherever you were working --
12     A.   Yeah.
13     Q.   -- you were just borrowing his
14 mom's car?
15     A.   Yeah.  That was an old car she
16 had she was letting us use to get back and
17 forth to work.
18     Q.   Okay.  Do you dispute these three
19 things, that you weren't -- you didn't have a
20 seat belt, you didn't have a driver's
21 license, and you didn't have insurance?
22     A.   No, I didn't have either one of
23 them.

Page 248

1      Q.   All right.  There's a -- did you
2  show up for court --
3      A.   Yes.
4      Q.   -- on this?
5          And what happened at court when
6  you got to court?
7      A.   By me being so young, I think
8  they just told us to plead guilty and get on
9  a payment plan and we was required to pay
10 forty dollars.
11     Q.   Okay.  Who told you that?
12     A.   What is it, the attorney?
13     Q.   Public defender?
14     A.   Yeah, public defender.  Yeah.
15     Q.   And he's an attorney -- an
16 attorney, but he's known as a public
17 defender?
18     A.   Yeah.
19     Q.   And he's the one that told you
20 that?
21     A.   Yes, sir.
22     Q.   And you went along with that or
23 took that advice?

Page 249

1      A.   Yeah, because he was saying
2  that's what we need to do to make it safe
3  and --
4      Q.   Okay.
5      A.   Yeah.
6      Q.   Do you remember his name?
7      A.   No, sir, that's a long time ago.
8      Q.   Did you pay the forty dollars a
9  month?
10     A.   Oh, yeah.
11     Q.   You did pay it?
12     A.   Yes.
13     Q.   Each month?
14     A.   Yes.  At that time, starting off,
15 yes.
16     Q.   So, did you pay it off
17 completely?
18     A.   No, I didn't pay it off, but I
19 was paying.
20     Q.   All right.  So, the ticket here
21 on the right, it lists -- the amount's ninety
22 dollars; do you see that?  Ninety-nine
23 dollars?

63 (Pages 246 - 249)

**Exhibit A**

Page 250

1    A.    Yeah, ninety-nine dollars, yes,
2  sir.
3    Q.    Okay.
4    A.    Minimum was twenty-five.
5    Q.    Okay.  And there's actually three
6  tickets.  There's one for ninety-nine, then,
7  there's some other tickets.
8    A.    Uh-huh.
9    Q.    And you were paying forty a
10 month --
11   A.    Right.
12   Q.    -- on those?
13         Do you know how much you paid?
14   A.    I really don't know.  I was just
15 paying what I can every month.
16   Q.    Okay.  Do you remember seeing the
17 judge or did you just talk to the public
18 defender?
19   A.    I was talking to the public
20 defender and seeing the judge at that time.
21   Q.    What judge did you see for this
22 one?
23   A.    I don't know.  I -- that was --

Page 251

1  that's a long time ago.
2    Q.    I know.  A black judge, white
3  judge?
4    A.    It was a white judge.
5    Q.    Male or female?
6    A.    Male.
7    Q.    Okay.  All right.  Let me show
8  you what I'll mark as Exhibit 104.
9
10         (Whereupon, Defendant's Exhibit
11         104 was marked for identification
12         and copy of same is attached
13         hereto.)
14
15   Q.    (BY MR. LOGSDON) This is a --
16 and I'm standing up not to hover over you,
17 but I can't sit down long.
18   A.    Oh, you're good.
19   Q.    I've just got a bad back.  So, if
20 it bothers you, let me know.
21   A.    No, you're good.
22         MS. HOLLIDAY:  I'm doing the
23 same.  Sorry.  We're old.

Page 252

1         MR. LOGSDON:  Off the record.
2
3         (Whereupon, a discussion was held
4         off the record.)
5
6         MR. LOGSDON:  All right.  Back
7  on.
8    Q.    This is another -- these are two
9  tickets dated April 27, 2008.  And they're
10 actually two different times in the day,
11 okay?  So, one is at -- the second one is at
12 12:00 a.m. and the other one is at 4:00 p.m.
13   A.    Uh-huh.
14   Q.    So, the same day.
15   A.    Roadblock.
16   Q.    Huh?
17   A.    Roadblocks.
18   Q.    So, you remember it?
19   A.    Yes.
20   Q.    All right.  I thought you'd
21 remember that --
22   A.    Yes.
23   Q.    -- since it's two in one day.

Page 253

1    A.    Yes.
2    Q.    The same day.
3    A.    Going to work --
4    Q.    Okay.
5    A.    -- coming from work.
6    Q.    Coming from work.  All right.
7  And tell me that -- which -- there's one at
8  12:00 a.m. --
9    A.    Uh-huh.
10   Q.    -- and one at 4:00 p.m.
11         Which one's going and which one's
12 coming?
13   A.    No, 12:00 is going.
14   Q.    Is that noon or is that midnight?
15   A.    Midnight.
16   Q.    All right.  12:00 midnight,
17 you're heading to work where?
18   A.    Uh-huh.  I think it was -- what
19 year this is?  2008, I think that was, like,
20 Johnson Control.  Yeah.
21   Q.    All right.  And whose car is the
22 Chevy?
23   A.    Impala, that's what I'm saying,

64 (Pages 250 - 253)

**Exhibit A**

Page 254

1  my wife, Kesha.
2      Q.   All right.  Well, there's one
3  that says Chevy tan and one says Chevy
4  Impala.  I'm assuming that's the same car?
5      A.   That's the same car.
6      Q.   All right.  So, a tan Chevy
7  Impala?
8      A.   Uh-huh.
9      Q.   And so, that's Kesha's car that
10  you're driving then?
11      A.   Uh-huh.
12      Q.   So, you would drive it some to
13  work, it sounds like?
14      A.   Uh-huh.
15      Q.   At least you drove it here?
16      A.   Uh-huh.
17      Q.   How often would you drive it?
18      A.   Like I said, at that night, I'll
19  drive it probably going to work at night
20  because we rotated.
21      Q.   Right.
22      A.   And on my lunch break, I had to
23  come in the morning and drop it back off.

Page 255

1  She'll drop me off to work so she can take
2  the kids and she can go to work.
3      Q.   Okay.  So, that worked out good
4  with you having night shift and her having
5  day shift with the car?
6      A.   Yes, sir.
7      Q.   You could use the car for work --
8      A.   Yes, sir.
9      Q.   -- bring it back to her, and
10  then, she could use it?
11      A.   Yes, sir.
12      Q.   All right.  And the Impala,
13  remind me how much you paid for that, how
14  much y'all paid for that.
15      A.   It was probably about -- like I
16  said, I think it was about six, seven, forty-
17  five hundred, somewhere between forty-five
18  and six thousand.
19      Q.   Okay.  One of these says a
20  failure to pay insurance and the other one
21  says driving with a suspended license.
22          MS. HOLLIDAY:  Failure to display
23  insurance.

Page 256

1          MR. LOGSDON:  What did I say?
2          THE WITNESS:  To display.
3          MS. HOLLIDAY:  To pay insurance.
4          MR. LOGSDON:  Pay insurance.
5  Display insurance.
6          MS. HOLLIDAY:  Right.
7          MR. LOGSDON:  She probably got it
8  right, though.
9      Q.   Do you agree that you didn't have
10  insurance, you didn't have a license?
11      A.   Right.  Because, at that time,
12  you know, you had to have an insurance card.
13  And she had the possession of it, so I
14  didn't.
15      Q.   Okay.  I've had that same thing
16  happen, and this is what the police officer
17  told me:  So, why don't you have it in the
18  car?  So, I'm going to ask you --
19      A.   Yeah.
20      Q.   -- why didn't you have it in the
21  car?
22      A.   Because it was -- it was in her
23  wallet, I guess.

Page 257

1      Q.   Okay.
2      A.   Yeah.
3      Q.   But you --
4      A.   Where we stayed, it was normally
5  a roadblock every day --
6      Q.   Uh-huh.
7      A.   -- or every other day.
8      Q.   A roadblock.
9      A.   And I guess she didn't leave it
10  in the car or she was renewing it --
11      Q.   Okay.
12      A.   -- that day.
13      Q.   Who did she have her insurance
14  with?
15      A.   I'm not familiar.  That's so long
16  ago.  Probably -- I don't know.
17      Q.   Did you -- and did you -- did you
18  go tell the judge, here's my card, just my
19  wife had it, I do have it?
20      A.   No, I didn't.
21      Q.   Why not?
22      A.   I felt like -- this is just my
23  understanding, it wasn't going to help

65 (Pages 254 - 257)

**Exhibit A**

Page 258

1 because it wasn't in my name.
2     Q.   Did you go talk to the -- did you
3 go to court on this one?
4     A.   Yes.
5     Q.   And what happened?
6     A.   Once again, I had to extend the
7 old tickets with this ticket and got put back
8 on the payment plan because they was going to
9 put me in jail.  So, I had to plead what the
10 prosecutor said once again --
11     Q.   Okay.
12     A.   -- and pay the forty dollars and
13 get back --
14     Q.   All right.
15     A.   -- on JCS.
16     Q.   And not the prosecutor but the --
17     A.   I mean, the --
18     Q.   -- public defender?
19     A.   -- public defender.
20        I'm sorry.
21     Q.   All right.  And then, you said
22 another thing about JCS.  This is actually
23 before JCS.

Page 259

1     A.   Oh, okay.
2     Q.   Did you know that?
3     A.   I didn't know that.
4     Q.   Okay.  This is just a payment
5 plan.
6     A.   Yeah.
7     Q.   But you don't dispute that this
8 was before JCS?  Because I've got something
9 on JCS, and that's not until 2010.  Does
10 that --
11     A.   Okay.
12     Q.   -- refresh your memory?
13     A.   Right, right, right.
14        MS. MORGAN:  But if you don't
15 remember, tell him I don't know.
16     Q.   (BY MR. LOGSDON)  But you do
17 remember a payment plan?
18     A.   Yes, I remember a payment plan.
19     Q.   Okay.  And you also know that JCS
20 is a payment plan?
21     A.   Yes.
22     Q.   All right.  Okay.  All right.
23 All right.  So, do you know how much you paid

Page 260

1 on this one?
2     A.   It's probably the same, combined
3 the both of them, because, at that time, like
4 I said, I was in and out of jobs.  So, it was
5 forty dollars.  That's the best I can do.
6     Q.   Okay.
7     A.   Or maybe a little less than that
8 at that time.
9     Q.   All right.  Here's Exhibit 105.
10
11        (Whereupon, Defendant's Exhibit
12        105 was marked for identification
13        and copy of same is attached
14        hereto.)
15
16     Q.   (BY MR. LOGSDON)  This is
17 dated -- these are two tickets, both dated
18 July 19th, 2008.
19     A.   Yeah.  The same area.  Roadblock.
20     Q.   One's at 9:30 p.m. and the other
21 one is at -- well, they're the same time.
22 Yeah.
23     A.   Yeah.

Page 261

1     Q.   One says headlight out.  Did you
2 have a headlight out?
3     A.   I don't remember about a
4 headlight.  I know this right here was --
5 like I said, these tickets from this area was
6 a roadblock.  They say in the headlight, but
7 it isn't no bad headlight because I'm good at
8 doing work like that myself.
9     Q.   You're good at changing out the
10 headlights?
11     A.   Yes, sir.
12     Q.   All right.  Did you go to court
13 and tell the judge the headlight's out?  I
14 mean, the headlight's okay?
15     A.   I think I did.  I don't -- I
16 can't remember.  I can't remember.
17     Q.   That would make sense for you to
18 do that --
19     A.   Yeah.
20     Q.   -- since you didn't think your
21 headlight was out?
22     A.   Right.
23     Q.   And what did the judge say?

66 (Pages 258 - 261)

Exhibit A

Page 262

1     A.   I think I still got put on the
2  payment plan for this.
3     Q.   Okay.  Nesha Daniel --
4     A.   Kesha.
5     Q.   Okay.  Kesha.
6     A.   The same person.
7     Q.   Is -- yeah.
8     A.   My wife.  Ex-wife, I mean.
9     Q.   Do you know where you were either
10  going to or coming from?
11     A.   I think I was probably coming
12  from work at that time, because we was about
13  to the point of shutting down.  They was
14  closing.
15     Q.   At this time of day?
16     A.   Yes.
17     Q.   All right.  And did you show up
18  at court on August 25th, 2008?
19     A.   Yes, I showed up on all these
20  tickets I got on roadblocks.
21     Q.   All right.  So, what I'm -- what
22  I'm saying, did you show up at court?  In
23  other words, the ticket is July 19, 2008, and

Page 263

1  the court date down at the bottom is August
2  25th, 2008.  So, did you show up at court?
3     A.   I can't remember.  I can't
4  remember.
5     Q.   All right.  And the same thing,
6  it says no driver's license.  You don't deny
7  you didn't have a driver's license?
8     A.   No.
9     Q.   Did you ever get a driver's
10  license?
11     A.   No.
12     Q.   Did you ever try to get a
13  driver's license?
14     A.   Yes.
15     Q.   When did you try the first time?
16     A.   The first time I tried was
17  probably like 2000 and -- around this time,
18  2008.
19     Q.   Okay.
20     A.   And they said I had an
21  outstanding ticket, so that's when I was
22  trying to get the tickets -- get myself in
23  the process of working these tickets off.

Page 264

1     Q.   But 2008 is the first time ever
2  you ever made an attempt to get a driver's
3  license?
4     A.   Yes.
5     Q.   Did any -- when did you start
6  driving?
7     A.   I've been driving.  I've been
8  driving since I was, you know, learning
9  school, driver's ed.
10     Q.   Okay.  When did you start driving
11  out on your own?
12     A.   When I actually got moved out
13  of -- kicked out of my mom's house, I had
14  to -- I had to learn how to drive to get back
15  and forth to work, like I was saying, because
16  I was staying with Cortez and his mom.
17  That's why the Pontiac --
18     Q.   Okay.  This would be -- you're
19  talking about getting kicked out of the
20  school in Georgia?
21     A.   Huh-uh.  No, high school.
22     Q.   Oh, high school?
23     A.   At home.

Page 265

1     Q.   At home.  Okay.  So, you started
2  driving after your -- about your junior year
3  of high school?
4     A.   Yes.
5     Q.   All right.  And you said you got
6  kicked out?
7     A.   Uh-huh.
8     Q.   Kicked out, meaning, you had to
9  come home and work?
10     A.   Yeah.
11     Q.   All right.  Is that your
12  signature down at the bottom?
13     A.   Yes.
14     Q.   We're going to look in a minute,
15  but there's a -- there's a court document
16  showing that you did not show up for court on
17  this date.
18     A.   Okay.  Like I said, it's been a
19  minute.  I probably didn't.
20     Q.   Okay.  And you knew then that if
21  you don't show up for court --
22     A.   No, I didn't know.
23     Q.   Well, I mean, you knew that if --

67 (Pages 262 - 265)

**Exhibit A**

Page 266

1  you knew that if it says show up for court,
2  you needed to show up for court, right?
3      A.  Right.
4      Q.  And you knew you signed it where
5  it says I promise to appear in court, right?
6      A.  Right.
7      Q.  And you knew from your previous
8  ticket that that's how it works, you go to
9  court after you get a ticket, right?
10     A.  Right, but I was just thinking,
11  like, when I had got that ticket, they was
12  going to add it on to that ticket.  Like I
13  said, I wasn't familiar how the court
14  system --
15     Q.  Uh-huh.
16     A.  -- was working at that time.
17         So, when I probably got this
18  ticket, I'm just thinking, hey, I was just
19  going to go down there -- like I said, I was
20  putting forty dollars on each ticket.  I was
21  getting tickets, like, back to back, back to
22  back.
23     Q.  Okay.  But you knew that if you

Page 267

1  didn't show up at court, it was at least a
2  possibility that --
3      A.  No, I didn't know --
4      Q.  -- you could get in trouble?
5      A.  I didn't know that.
6      Q.  Okay.
7      A.  I really didn't.
8      Q.  Did you suspect that?
9      A.  No, I really didn't.
10     Q.  You didn't think anything would
11  happen if you didn't show up to court?
12     A.  No, because if you look at my
13  records, I'm getting tickets.  If I had so
14  many tickets, they didn't take me to jail
15  then.
16     Q.  Okay.
17     A.  They waited until 2013 for them
18  to get accumulated more to take me to jail.
19     Q.  Okay.  All right.  Let's look at
20  106.
21
22         (Whereupon, Defendant's Exhibit
23         106 was marked for identification

Page 268

1      and copy of same is attached
2      hereto.)
3
4      Q.  (BY MR. LOGSDON)  This one is
5  dated 9/16/2008; do you see that?
6      A.  Uh-huh.
7      Q.  And tell me about the address.
8  Where's ▆▆▆▆▆▆▆?
9      A.  It's on the Southern Boulevard,
10  past my mom's old house.
11     Q.  Is that where you were living?
12     A.  No, that's where I was coming
13  from.
14     Q.  Okay.  Why is that listed as your
15  address?
16     A.  Because -- man, I really don't
17  want to put my business out there.  My mom
18  put it in my name.
19     Q.  Put what in your name?
20     A.  This address.
21     Q.  I'm not following that.  How
22  was -- how did the police officer have ▆▆▆
23  ▆▆▆▆▆▆ as your address?

Page 269

1      A.  Because she put it in my name.
2  That's how.
3      Q.  Your mom was there with you when
4  you got the ticket?
5      A.  No.  My wife was with me, but the
6  address they had in the system, like you're
7  saying, my mom put a house in my name.
8      Q.  Okay.  When did she do that?
9      A.  I really didn't know.  I had to
10  get that off my credit.
11     Q.  Okay.  It lists a vehicle tag
12  number as KESH3; do you see that?
13     A.  Yeah, that's Kesha Daniels.
14  That's my wife.
15     Q.  Okay.
16     A.  My ex-wife, I mean.
17     Q.  Is that a -- I assume that's a
18  personalized tag, she didn't just
19  coincidentally get a tag --
20     A.  Yeah, that's when we had our
21  third child, Kesh3.
22     Q.  Three?
23     A.  Third child, yeah.

68 (Pages 266 - 269)

**Exhibit A**

Page 270

1    Q.   All right.  How much does that
2  tag cost?
3    A.   I really don't know.  She did it.
4  I didn't.
5    Q.   Okay.  You know it's extra to get
6  a personalized tag like that?
7    A.   I never had one, so I don't know.
8    Q.   All right.  And there's a
9  driver's license number listed above; do you
10 see that?
11   A.   Uh-huh.
12   Q.   Is that your driver's license
13 number?
14   A.   I never had a license.  That's ID
15 number.
16   Q.   Okay.  What ID would that be?
17   A.   The same one in my pocket.
18   Q.   Let me see that.
19   A.   (Witness complies.)
20        Oops.  Sorry about that, sir.
21   Q.   Okay.  This says nondriver
22 identification.
23   A.   Exactly.

Page 271

1    Q.   I think we've got a picture of
2  this in one of your something or other, but
3  my picture is not very clear.
4    A.   That's why I was trying to see
5  why they keep putting it as a driver's
6  license, but I'm -- it's a nondriver's
7  license.
8    Q.   Okay.  The number on it is --
9    A.   The same shown on here.
10   Q.   Yeah.  1509 --
11   A.   That's I.  It's not --
12   Q.   All right.  I'm sorry.  It's I --
13   A.   509525.
14   Q.   Okay.  And when did you get this?
15 This one says issued 2016, but --
16   A.   Uh-huh.
17   Q.   -- I assume you had one --
18   A.   Before then.  I renewed it.
19   Q.   When did you first get it?
20   A.   When I first started working.
21 That's when I first got my ID.
22   Q.   Way back when --
23   A.   Yeah.  In 2004, '3, '2, something

Page 272

1  like that.
2    Q.   And what I understand on that,
3  that they'll give you one of those?  It's not
4  that big of a deal to go down and get a --
5    A.   Right.
6    Q.   -- ID?
7         Do you even have to pay for it?
8    A.   Yes.
9    Q.   Okay.
10   A.   At that time, it was twenty-six
11 dollars.
12   Q.   All right.  That's not too bad.
13   A.   Yeah.
14   Q.   And it's good for a couple of
15 years for twenty-six bucks?
16   A.   Uh-huh.
17   Q.   And is that what you would use
18 when you would go get a job or something like
19 that?  They'd say, hey, Mr. Agee, can I see
20 your ID?
21   A.   Yes, sir.
22   Q.   You'd hand over that?
23   A.   Yes, sir.

Page 273

1    Q.   Okay.
2    A.   And when I get pulled over,
3  that's what I hand them.
4    Q.   Okay.  All right.  The note here
5  down at the bottom says, court appearance
6  date of October 27, 2008; do you see that?
7    A.   Uh-huh.
8    Q.   Do you know whether or not you
9  showed up?
10   A.   No, I can't remember.
11   Q.   All right.
12        MR. LOGSDON:  Are you putting
13 nodding affirmatively when he says uh-huh?
14        THE COURT REPORTER:  No, I put
15 witness nods head or witness shakes head.
16   Q.   (BY MR. LOGSDON)  All right.  Let
17 me ask you this --
18        MR. LOGSDON:  Can you help us
19 with this, Martha?
20        Because I thought you were
21 putting nodding affirmatively and I just felt
22 like I was bugging Mr. Agee.
23   Q.   You've said uh-huh during this

69 (Pages 270 - 273)

Exhibit A

Page 274

1  deposition on a lot of occasions.  When you
2  said uh-huh, sometimes --
3         MS. MORGAN:  Well, that's hard --
4  I mean, he can't remember every time.
5         MR. LOGSDON:  We're going to have
6  to go back and ask every one.
7         MS. HOLLIDAY:  We're going to
8  have to just read it back --
9         MR. LOGSDON:  We're going to have
10  to redepose him.
11         MS. HOLLIDAY:  -- from the court
12  reporter's --
13         MR. LOGSDON:  Yeah.
14         MS. HOLLIDAY:  -- transcript --
15         MR. LOGSDON:  We're going to have
16  to go back --
17         MS. HOLLIDAY:  -- and reask every
18  question --
19         MR. LOGSDON:  Uh-huh.
20         MS. HOLLIDAY:  -- for the last --
21  I think it's only been the last ten minutes.
22         Do you think it's been --
23         MR. LOGSDON:  No, it's not been

Page 275

1  the last ten minutes.
2         MS. HOLLIDAY:  Okay.
3         MR. LOGSDON:  If you're not
4  putting nodding affirmatively, then --
5     Q.   Mr. Agee, when you said uh-huh
6  each time in this deposition, have you meant
7  yes?
8     A.   No.  That's just a --
9         MR. LOGSDON:  All right.  We're
10  going to have to go back from the beginning.
11  We're going to have to ask the court for more
12  time if that's the case.
13         MS. MORGAN:  Well, y'all are the
14  ones that -- we're not going to agree to more
15  time today.  If you want to ask, you know,
16  you can see, but it's your mistake.
17         MR. LOGSDON:  Well --
18         MR. GILL:  Well, the witness
19  didn't answer.
20         MR. LOGSDON:  The witness didn't
21  answer.  I'm trying to help him.
22         MS. MORGAN:  Well, if the witness
23  didn't answer, you should have raised it

Page 276

1  at --
2         MR. LOGSDON:  All right.
3         MR. MORGAN:  -- that point.
4         You waited --
5         MR. LOGSDON:  Yeah.  So, we'll --
6         MS. MORGAN:  -- till afternoon.
7         MR. LOGSDON:  -- be -- we'll be
8  more of a jerk about it, then --
9         MS. MORGAN:  I mean, I don't know
10  what else to do.
11         MR. LOGSDON:  -- if you're going
12  to force us to do that.
13         MS. MORGAN:  You can't ask him
14  to --
15         THE COURT REPORTER:  I can only
16  get one at a time.
17         MR. LOGSDON:  All right.  Let's
18  go --
19         MS. MORGAN:  I mean, I don't know
20  what else to do.  He can't say that every
21  time he's nodded his head, he meant a certain
22  thing.  If they --
23         MR. LOGSDON:  All right.

Page 277

1         MS. MORGAN:  -- didn't ask him --
2         MR. LOGSDON:  Well, maybe I'll
3  help --
4         MS. MORGAN:  -- I can't ask him
5  to say that just because it would save them
6  some time.
7         I can't --
8         MR. LOGSDON:  Okay.
9         MS. MORGAN:  -- do that.
10         I'm sorry.  I agree, it would be
11  easier.
12         MR. LOGSDON:  Y'all help me.
13         If you don't know if he's saying
14  yes or no, can you tell me?
15         THE COURT REPORTER:  No.
16         MR. LOGSDON:  Y'all help me out,
17  then.
18         MS. MORGAN:  There's three of
19  y'all in here.
20         MR. LOGSDON:  Yeah.
21         THE COURT REPORTER:  I can only
22  take one at a time.
23         MS. HOLLIDAY:  There hasn't been

70 (Pages 274 - 277)

**Exhibit A**

1   three the whole time.
2           MS. MORGAN:  Well, there have
3   been two the whole time.
4           MR. LOGSDON:  All right.  So,
5   mark the time here because we're going to
6   literally -- well, never find.
7       Q.   All right.  Do you know if you
8   showed up at court?
9       A.   No, I do not remember.
10      Q.   If the court record show you
11  didn't show up, do you dispute that?
12      A.   Say that again.
13      Q.   You don't remember one way or the
14  other?
15      A.   No, I do not remember.
16      Q.   All right.  And let me show you
17  what I'll mark as 107.
18
19          (Whereupon, Defendant's Exhibit
20          107 was marked for identification
21          and copy of same is attached
22          hereto.)
23

1       Q.   (BY MR. LOGSDON)  This is a
2   document entitled -- well, there's an address
3   here of ████████████████.
4       A.   Right.
5       Q.   Is that -- whose house is that?
6       A.   That's where my mom was staying.
7       Q.   Okay.  And this is a document
8   called warrant.
9       A.   Right.
10      Q.   And if you look up at the top
11  right there --
12      A.   Uh-huh.
13      Q.   -- there's an offense date of
14  July 19, 2008.
15      A.   Right.
16      Q.   And we looked at a ticket
17  earlier.  Yeah, you're right.  That's what
18  I'm talking about.  And we looked at a ticket
19  earlier that was dated July 19, 2008?
20      A.   2008.  Right.
21      Q.   And there's a court appearance
22  date on that one that we looked at the
23  bottom.

1       A.   Right.
2       Q.   And then, if you look on this
3   down --
4       A.   Right here (indicating)?
5       Q.   Yeah.  It says failed to
6   appear --
7       A.   Right.
8       Q.   -- and it has that date.
9           So, would that refresh your
10  memory that you probably did not appear on
11  that date?
12      A.   I probably didn't.  But it says
13  alias warrant, I never got either.
14      Q.   Okay.  But you agree that the
15  address here for you is the one that's on
16  your ticket that you signed, correct?
17      A.   At this time, that was the
18  address my mom was staying at.  So, that's
19  what my ID was sent to.  I was not staying
20  there.  I was staying with my wife.
21      Q.   Did your ID that you had at the
22  time list that address as your address --
23      A.   Yes --

1       Q.   -- the --
2       A.   -- because I had my ID sent to my
3   mom's house.
4       Q.   The ██████ Drive?
5       A.   Yes.
6       Q.   All right.  And did you sign the
7   ticket saying that ██████ Drive was your
8   address?
9       A.   Yes.
10      Q.   Did you ever ask your mom about
11  getting any mail there?
12      A.   Yes.
13      Q.   And would she tell you when you
14  got mail?
15      A.   No.
16      Q.   All right.
17      A.   Well, yes.  She would tell me
18  when I got mail and when I don't have mail.
19      Q.   She would?
20      A.   Yes.
21      Q.   All right.  And the warrant here
22  for failed to appear, I know you said you
23  didn't get this, but does it now make sense

**Exhibit A**

Page 282

1  to you that a warrant was issued when you
2  didn't show up in court?
3      A.   Yeah, I -- as I can see now.
4      Q.   Okay.  And there's actually -- if
5  you flip the page, there's actually two
6  warrants that were issued for failing to
7  appear; do you see that?
8      A.   Exactly.
9      Q.   Okay.  And can you see how a
10 judge -- he has court and he has a list of
11 people to show up, and one of them doesn't
12 show up --
13     A.   Uh-huh.
14     Q.   -- does it surprise you that a
15 warrant would be issued?
16     A.   I could see now, yes --
17     Q.   Okay.
18     A.   -- I see.
19     Q.   And if you were a judge --
20     A.   Right.  Right.
21     Q.   -- and somebody was to show up
22 and they didn't show up --
23     A.   Right.

Page 283

1      Q.   -- is that what you'd do?
2      A.   Right.  That's proper procedure.
3      Q.   Okay.  All right.  Let's take a
4  look at -- and because the judge is -- he
5  wants to -- if you were the judge, you'd want
6  to hear the person and hear what they've got
7  to say and rule fairly, right?
8      A.   (Witness nods head.)
9      Q.   But if they don't show up, you
10 can't make a decision because they're not
11 there to tell you, right?
12     A.   Right.
13     Q.   And all you can do is this, is
14 issue a warrant?
15     A.   Right.
16     Q.   All right.  All right.  Let's
17 take a look at what we'll mark as Exhibit
18 108.
19
20          (Whereupon, Defendant's Exhibit
21          108 was marked for identification
22          and copy of same is attached
23          hereto.)

Page 284

1      Q.   (BY MR. LOGSDON)  This is another
2  one dated September the 16th, 2008.  And down
3  there --
4      A.   I see.
5      Q.   -- is a failure to appear on
6  October 27, 2000, date.
7      A.   Uh-huh.
8      Q.   You agree you didn't show up
9  then?
10     A.   Right.
11     Q.   Right, you didn't show up?
12     A.   Right, I did not show up.
13     Q.   All right.  All right.
14     A.   But can I say one thing?
15     Q.   You sure can.
16     A.   The name is wrong.
17     Q.   Okay.  It says Levon II Agee,
18 correct?
19     A.   Right.
20     Q.   And you're Levon Agee, III,
21 right?
22     A.   Right.
23     Q.   Okay.  But you're not saying you

Page 285

1  would get this and look at it and go that's
2  not me, that's my father?  He was -- he was,
3  unfortunately, deceased at the time, correct?
4      A.   Right.
5      Q.   But you're not using that as an
6  excuse for not showing up for court?
7      A.   Well, I'm saying if the warrant
8  was issued to this address, of course, they
9  would deny it because my father is dead.
10     Q.   Okay.  Are you -- are you saying
11 you got this and saw that and --
12     A.   No, I'm just saying, just say if
13 they did send the warrant to this address,
14 which my mom was staying here --
15     Q.   Okay.
16     A.   -- and they was, like, hey, we
17 have a warrant for Levon Agee, II, well,
18 don't you think she would deny it because her
19 ex-husband is dead?
20     Q.   Yeah.  No, I don't if you're
21 asking me.
22     A.   Well --
23     Q.   But fair enough.

72 (Pages 282 - 285)

**Exhibit A**

Page 286

1    All right. Let me show you what
2 I'll mark as Exhibit 109.
3
4    (Whereupon, Defendant's Exhibit
5    109 was marked for identification
6    and copy of same is attached
7    hereto.)
8
9    Q.  (BY MR. LOGSDON) And this one
10 here has another address of ████████ Drive;
11 do you see that?
12    A.  Yes.
13    Q.  Whose house is that?
14    A.  My sister's house.
15    Q.  Is this when you were staying
16 with your sister?
17    A.  Yes. We were going through a
18 separation, and she was helping you out,
19    Q.  And she was helping you out,
20 letting you stay there?
21    A.  Yes.
22    Q.  And would you be -- this is on
23 August 29th, 2009. And it's about 9:00 p.m.

Page 287

1 Would you have been going to work?
2    A.  Or taking my daughter back home
3 in her car.
4    Q.  Excuse me?
5    A.  I probably was using her car to
6 take her -- my daughter back home.
7    Q.  Okay. Using Kesha's car?
8    A.  Yes.
9    Q.  And it says here that you were --
10 so, let me -- let me ask you, did your --
11 does your ID, your vehicle ID that you showed
12 them, did it always have the address on
13 ████████ --
14    A.  No.
15    Q.  -- on it?
16    A.  Not always.
17    Q.  Sometimes that would change?
18    A.  No, I'll change it -- I'll change
19 it -- like, if I stayed with my mom or if I
20 stayed with my sister, wherever I stayed at,
21 I'll change it.
22    Q.  Okay. When you would get your
23 new ID?

Page 288

1    A.  Right.
2    Q.  All right. Did you ever tell any
3 of the police officers that you were staying
4 at a different place than what they listed on
5 the ticket?
6    A.  They never asked.
7    Q.  And I didn't you ask that. I
8 just said, did you ever tell them that?
9    A.  No, I didn't.
10    Q.  All right. And this says you
11 were running a stop sign. Do you dispute
12 that you were running a stop sign?
13    A.  Yes, I dispute that because it
14 was a roadblock.
15    Q.  Tell me about that.
16    A.  They set up a roadblock, like, in
17 the middle of this neighborhood I had. And
18 as I was coming up stopped, they -- it was
19 not just only me they pulled over at that
20 time, it was two other cars. It was, like,
21 four police officers just came out of the
22 blue. They used to sit in the abandoned
23 houses. It was at a four-way stop sign. You

Page 289

1 might got an abandoned house on this side,
2 abandoned house on this side, someone stayed
3 right here, and there's a bush right here
4 (indicating). Well, the blind side you can't
5 see is where the police officer was.
6    Q.  Okay.
7    A.  So, you'll do like this, pull
8 off, whoop, do like this, pull off, whoop
9 (indicating), and I was one of them.
10    Q.  You said a roadblock. Were they
11 blocking the road?
12    A.  Yes.
13    Q.  Or were they -- it sounds like
14 you said they were from behind the bushes?
15    A.  Yes. Well --
16    Q.  Which one was it?
17    A.  It's -- it actually is. Because
18 when they pulled you over, you can -- after
19 you come from seeing from your blind side,
20 you can actually see the little sign say
21 roadblock.
22    Q.  Okay.
23    A.  But you can't see it visible as

73 (Pages 286 - 289)

**Exhibit A**

Page 290

1  you're driving, just put it like that.  If I
2  would have went through the stop sign without
3  getting pulled over, I would have been able
4  to see the roadblock sign.
5      Q.   Okay.
6      A.   But as I got pulled over and they
7  go this way (indicating), well, there's a
8  roadblock sign.
9      Q.   All right.  Are you saying,
10  though, that you did not run a stop sign?
11      A.   No, I never did.
12      Q.   Did you tell the judge that?
13      A.   Yes.  Well, I don't even know if
14  I went to court on this one or not --
15      Q.   Okay.
16      A.   -- to be honest with you because
17  I didn't have a job or anything.
18      Q.   Did anything prevent you from
19  going to court?
20      A.   Transportation.
21      Q.   Other than that?
22      A.   No, that's about it.
23      Q.   Did you call up there and say, I

Page 291

1  can't get up there, can you make it another
2  day?
3      A.   No, I didn't even know you can do
4  all of that.
5      Q.   All right.  And were you driving
6  without a license at this time?
7      A.   Yes.
8      Q.   Did they -- they didn't give you
9  a ticket for that, though?
10      A.   No.
11      Q.   Okay.  Did you have insurance?
12      A.   No.
13      Q.   Okay.  They didn't give you a
14  ticket for that either?
15      A.   No.
16      Q.   Did they let you off?
17      A.   That's what I'm trying to tell
18  you.  They let my tickets accumulated.
19      Q.   No, I mean, I'm just saying, they
20  didn't -- they could have given you a ticket
21  for not having a driver's license?
22      A.   Right.  But they --
23      Q.   And they could have given you a

Page 292

1  ticket for not having insurance?
2      A.   Right.  And if you look, it's
3  probably the same officer that was doing
4  this.
5      Q.   But he didn't give you a ticket
6  for that?
7      A.   No, he didn't.
8      Q.   Did he tell you that?  Did he
9  say, hey, Mr. Agee, you know, look, I could
10  write you up three times, but I'm going to
11  cut you some slack and only write you for
12  one?
13      A.   (Witness shakes head.)
14      Q.   He just didn't say anything?
15      A.   He just didn't say anything.  He
16  just wrote me up for that and made me move on
17  about my way.
18      Q.   Okay.  Let me show you another.
19  I'll mark it as 110.
20
21          (Whereupon, Defendant's Exhibit
22          110 was marked for identification
23          and copy of same is attached

Page 293

1          hereto.)
2
3      Q.   (BY MR. LOGSDON)  And we've got
4  the green Ford Expedition on this one.
5      A.   Yes, that's my sister's vehicle.
6      Q.   She would let you drive that?
7      A.   At that time, when she was trying
8  to get her disability, I had to take her to
9  her appointment.  She wasn't able to drive at
10  that time --
11      Q.   Okay.
12      A.   -- due to her medicine.
13      Q.   And you were driving her around?
14      A.   Yes, sir.
15      Q.   And this Calmar apartment, is
16  that your sister's?
17      A.   No, that's where me and Kesha
18  used to stay.  That's my address.
19      Q.   Okay.  And so, were you going to
20  work here or were you driving your --
21      A.   No --
22      Q.   -- sister?
23      A.   -- I was driving my sister

74 (Pages 290 - 293)

Exhibit A

Page 294

1  around.
2  Q.  Would your sister let you use her
3  car some when you would drive around?
4  A.  No, I was just taking her that
5  day because she had to get to an appointment.
6  Q.  She couldn't drive?
7  A.  No, she couldn't drive.  She was
8  up under postpartum depression medicine.
9  Q.  How did you get to her house?
10  A.  I stayed with her.
11  Q.  You were staying with her?
12  A.  Yeah, the address that's showing
13  on here was what my ID was saying at that
14  time.
15  Q.  Okay.
16  A.  That's why I was like, the
17  ██████████, I didn't understand that at
18  first or whatever.
19  Q.  All right.  Let's look at the
20  next -- Page 3 of that Exhibit 110.  This
21  one's for speeding.  Do you dispute that you
22  were speeding?
23  A.  No, I wasn't.

Page 295

1  Q.  Did you show up to court and tell
2  the judge that?
3  A.  I can't remember.
4  Q.  If you weren't speeding, why
5  wouldn't you have shown up for court to tell
6  the judge?
7  A.  Because, like I said, it was
8  targeting.  That's what they does.  At that
9  time, that's what the police officers do.
10  They point you out.  Like, my sister put her
11  seat belt on and visible in front of the
12  police officer, and whoop, he hit the lights.
13  Q.  All right.  Well, why didn't you
14  go tell the judge that you weren't speeding,
15  though?
16  A.  I didn't know at the time.  Like
17  I said, I didn't have proper means and didn't
18  really know -- have the knowledge of going
19  down there telling them this.
20  Q.  Well, you do agree, though, that
21  you signed something saying I promise to
22  appear in court?
23  A.  Right.

Page 296

1  Q.  And there's a date above it?
2  A.  Right.
3  Q.  And you knew what that meant?
4  A.  Right.
5  Q.  And you'd already been to court
6  once --
7  A.  Once.
8  Q.  -- on the first one?
9  A.  Right.
10  Q.  And you knew that to go to court,
11  you could go before the judge, right?
12  A.  Right.
13  Q.  And you know enough from watching
14  TV that the judge is the one that decides
15  whether you did it or didn't do it?
16  A.  Right.
17  Q.  All right.  And let's look at
18  what we'll mark as Exhibit 111.
19
20       (Whereupon, Defendant's Exhibit
21       111 was marked for identification
22       and copy of same is attached
23       hereto.)

Page 297

1  Q.  (BY MR. LOGSDON)  And this is
2  another warrant for failing to appear on
3  October 5th, 2009.  And I think I've already
4  asked you this.  You don't dispute -- you
5  weren't at court on October the 5th, 2009?
6  A.  No.
7  Q.  And this one does have an address
8  of the ███████████ number --
9  A.  Right.
10  Q.  -- do you see that?
11  A.  Yes.
12  Q.  And the -- so, did you get this?
13  A.  No.
14  Q.  Why not?  Or do you know why you
15  wouldn't have gotten it?
16  A.  I wasn't staying there.
17  Q.  All right.  Remind me whose house
18  the Calmar house was.
19  A.  Cortez and his mom and them.  And
20  they probably wasn't staying there at the
21  time because I had moved out.
22  Q.  Okay.
23  A.  Probably got evicted or

75 (Pages 294 - 297)

**Exhibit A**

Page 298

1  something.
2      Q.   All right.
3      A.   That's around, like I said, the
4  recession.
5      Q.   At this point, Mr. Agee, it's not
6  surprising to you that there's some warrants
7  that are out since you've had these court
8  dates and you haven't gone to court?  You're
9  not going to be surprised if you get pulled
10 over one day and there were some outstanding
11 warrants, are you?
12     A.   But my thing is -- yes, it's a
13 surprise.  But every time I get pulled over,
14 I'm not no -- they're not informing me that,
15 hey, you have an outstanding warrant or
16 they're not taking me to jail.
17     Q.   Right.  They're not taking you to
18 jail?
19     A.   So, by me thinking, okay, there's
20 not an outstanding warrant.  Every time I get
21 pulled over, you're letting me go.  You're
22 letting my tickets accumulate.
23     Q.   Okay.  I think I'm following you.

Page 299

1  So, you're thinking in the back of your mind,
2  there's probably some warrants out there,
3  but, then, you're --
4      A.   Or you're harassing me.
5      Q.   -- then, you're getting pulled
6  over and they're not saying anything about
7  warrants?
8      A.   Because you're harassing me.
9      Q.   And you start thinking, well,
10 maybe there are no warrants or they're not
11 going to take me to jail?
12     A.   No, because I'm thinking, like,
13 you're just harassing me because I'm just a
14 black male in this type of car in this area
15 at this time in possession of drugs or
16 anything.  You're trying to see.
17     Q.   You're talking about the police
18 officers?
19     A.   Yes, that's how I was taking it.
20 Because every time I ask them, what do you
21 pull me over for.
22     Q.   Okay.  And when you say a black
23 male in this type of car, what kind of --

Page 300

1  what type of car?
2      A.   The Impala.  She got a
3  personalized tag, Kesh3, tinted windows.
4  You're in a dominant black area where drugs
5  are known to be at and it's a certain time of
6  day.  That, hey, you know, they be out there.
7  The police be out there.  They'll roadblock
8  or they'll harass you or, hey, you have to be
9  on your porch or -- I was going through that,
10 you know.  And that's just from this area
11 where I was living in all the way down to the
12 Western Boulevard.  They were just -- they
13 were just doing that.
14     Q.   Okay.
15     A.   Stereotyping.
16     Q.   Let me show you what I'll mark as
17 112.
18
19          (Whereupon, Defendant's Exhibit
20          112 was marked for identification
21          and copy of same is attached
22          hereto.)
23

Page 301

1      Q.   (BY MR. LOGSDON)  This is --
2  lists the ████ Street, also, correct?
3      A.   Right.
4      Q.   And it says obstructive
5  windshield.  Is that the tinted windows or do
6  you know what that is?
7      A.   Yes, that's on my sister's truck,
8  I think.
9      Q.   The Ford Expedition?
10     A.   Yes.
11     Q.   So, you were driving that again
12 at this time?
13     A.   That's the same day.
14     Q.   Okay.  Do you know what you were
15 driving -- do you know what that means?
16     A.   Yeah, the windows on her side,
17 someone had threw a brick and busted her --
18 cracked the windshield real bad.
19     Q.   All right.  And there's
20 actually -- and there's another ticket for no
21 seat belt; do you see that?
22     A.   That's what I was telling you, he
23 got for my sister.

76 (Pages 298 - 301)

**Exhibit A**

Page 302

1    Q.   You said she wasn't -- she didn't
2  have on a seat belt?
3    A.   She didn't have it on.
4    Q.   Okay.
5    A.   So, when he came to the car --
6  well, he stopped us, pulled us over. And as
7  he was coming to the car, I take my seat belt
8  off. So, he asked me, do you have your seat
9  belt on? Yes. Why you not have it on now?
10   Q.   Okay. And so, did you get the
11 ticket for a seat belt --
12   A.   Yes.
13   Q.   -- or did she?
14      Did you talk to the judge about
15 that?
16   A.   I don't remember. I don't even
17 think I did go to court on this one.
18   Q.   Okay.
19   A.   It was around the same ticket.
20   Q.   Okay. Look at 110, I thought, is
21 when you told me -- look at Exhibit 110. So,
22 that's 111. Go back one more. I thought
23 that's where you were telling us that the

Page 303

1  incident happened with the seat belt. Is
2  that what you were -- when you were talking
3  about the seat belt? Which --
4    A.   Yeah, coming out of Buckingham --
5    Q.   Yeah.
6    A.   -- I think?
7      Yeah, I think that's it. I think
8  it was prior to all this.
9    Q.   All right. So, what about this
10 one here, this other one for no seat belt?
11   A.   I think this is two police cars.
12 One of them was leaving out the neighborhood
13 and the other one was going to almost her --
14 I was about at her doctor's appointment.
15   Q.   Okay.
16   A.   I think.
17   Q.   Do you dispute that you were
18 operating the vehicle without insurance?
19   A.   Yes.
20   Q.   You did have insurance?
21   A.   No, I didn't have insurance. I'm
22 sorry.
23   Q.   All right. And do you dispute

Page 304

1  that you had no driver's license?
2    A.   No driver's license, I did not
3  have it.
4    Q.   And let's make you -- we had you
5  a judge before. Let's make you a police
6  officer now. You think that that's a fair
7  rule to require people to have a driver's
8  license to drive?
9    A.   Right.
10   Q.   And you agree that driving is a
11 privilege?
12   A.   Right.
13   Q.   And you agree that if somebody is
14 not following that rule of not having a
15 driver's license, you agree it's a fair thing
16 to do to give them a ticket for that?
17   A.   Right.
18   Q.   You're not fussing about that
19 with anyone, are you?
20   A.   Yes, I was fussing about it
21 because I was doing the right thing. He
22 wouldn't never know if he weren't harassing
23 me, because I didn't do anything illegal.

Page 305

1    Q.   Okay. But you were driving
2  without a license?
3    A.   True, I was.
4    Q.   Okay. All right. And let me
5  show you 113.
6
7      (Whereupon, Defendant's Exhibit
8      113 was marked for identification
9      and copy of same is attached
10     hereto.)
11
12   Q.   (BY MR. LOGSDON) Have you ever
13 gotten any of these documents, any of these
14 warrants?
15   A.   No.
16   Q.   Has anybody ever told you that
17 there's some warrants over here?
18   A.   No.
19   Q.   And do you -- you dispute -- this
20 one says you've got a warrant for not showing
21 up at court on May 24th, and there's four of
22 them.
23   A.   Uh-huh.

77 (Pages 302 - 305)

Exhibit A

1     Q.    You agree they had court for you
2  on that day and you didn't show up?
3     A.    I did not show up.
4     Q.    All right.  All right.  Let's
5  see -- and are you doing anything at this
6  time?  In other words, are you calling up,
7  are you saying, am I ever going to have to
8  pay these?
9     A.    I'm doing better now because I
10  only owe a certain amount and I'm paying on
11  them.  I really don't owe that much now.  I'm
12  trying to get my license because --
13     Q.    You're talking about at this time
14  or are you talking about right now?
15     A.    Right now as we speak.
16     Q.    I'm talking about at this time,
17  back when this was going on in 2010.
18     A.    No, I wasn't.  It was -- I mean,
19  I didn't have no job.
20     Q.    All right.
21     A.    No ends meet.
22
23          (Whereupon, Defendant's Exhibit

1          114 was marked for identification
2          and copy of same is attached
3          hereto.)
4
5     Q.    (BY MR. LOGSDON)  Okay.  Let's
6  look at what I've marked as 114.  Did you get
7  this document?
8     A.    No.
9     Q.    All right.  And we're in August
10  of 2010 right now.  Do you remember --
11  well --
12     A.    I don't even think -- that's not
13  even my signature, man.
14     Q.    Yeah, I don't think that -- all
15  right.  Let's look at --
16     A.    Someone forged my signature.
17     Q.    Did you ever pay any payments
18  with a credit card to the court?
19     A.    No.  Well, yes, I did.  Yes.
20  Yes.  Yes.  Yes.  Yes.
21     Q.    All right.  Tell me about that.
22     A.    I had paid -- I think it was --
23  was it almost a thousand?  I was trying to

1  get my tickets down at that time because I
2  had -- I got back a little lump sum for -- I
3  don't know what it was, but I came down there
4  to pay a nice little lump sum on my tickets,
5  though.
6     Q.    Okay.
7     A.    Yeah.
8     Q.    What credit card did you pay on?
9     A.    It was a prepaid card, a Visa
10  card.
11     Q.    How much did you pay?
12     A.    I'm not for sure.  I know -- I
13  can't give you an accurate number.
14     Q.    All right.  And what lump sum did
15  you get?
16     A.    I don't know if it was -- I don't
17  know.  I don't know.  All I know is, it
18  was -- I tried to get my license.  I was
19  trying to go down there and do right and pay
20  my tickets off.
21     Q.    Okay.
22     A.    I didn't have enough.  So, I
23  think they let me pay half.  I had to see the

1  judge or --
2     Q.    Okay.
3     A.    -- something that day.
4     Q.    All right.
5     A.    And he let me put half down or
6  whatever I could that day.
7     Q.    Okay.  Tell me what you remember
8  talking to the judge about.
9     A.    As I was talking to you right
10  now, I was telling him I was trying to get my
11  license straight because it was a couple job
12  opportunities at Hyundai I wanted to take.
13  And I couldn't do it without having my
14  license.  So -- and I think he gave me a
15  waiver or something, or something like that,
16  when I met him that day.  And he was, like,
17  what you got?  I forgot the amount I had.
18  And he accepted it and told me to go to the
19  window and pay.
20     Q.    Okay.
21     A.    And throwed me back on, I think,
22  the JCI plan.  Or I ain't going to say
23  throwed, but he put me on the JCI plan.

**Exhibit A**

1   Q.   The judge did?
2   A.   Yeah.
3   Q.   Do you remember what the judge's
4  name was?
5   A.   I think it was Hayes if I'm not
6  remember -- is it Hayes or Williams?
7   Q.   Okay.
8   A.   Something like that at that time.
9   Q.   Male or female?
10   A.   I think it was a male.
11   Q.   And black or white?
12   A.   White.
13   Q.   Okay.  So, tell me what -- first
14  of all, what were you even doing in court
15  then on that day?  How did you -- did you go
16  down there voluntarily or --
17   A.   No, my mom -- when I got the
18  money back, I asked my mom to come with me
19  because I was going down there, like I said,
20  was trying to straighten my license out
21  because I was -- someone gave me a job
22  opportunity at Hyundai and I needed my
23  license.  So, I asked my mom to come down

1  there just in case if anything went left or
2  however, because she was telling me, you
3  know, they might lock you up or whatever.
4  So, she came down there with me.
5        And that's when I learned, I
6  think, yeah, 2014 or something, I had to go
7  to the window or something and ask to speak
8  to the judge at that time because they
9  wouldn't let me pay right then.  And so, what
10  they did was schedule me a court date that
11  day, and I talked to the judge that day.  And
12  he agreed on to whatever amount I had that
13  day to pay and put me on the payment plan.
14        And I didn't know about none of
15  these warrants at that time until he was
16  like, okay, we drop this, we drop that.  I'm
17  just going to put you back on the payment
18  plan, make sure you do this and you'll be all
19  right.  So, that's what I did.
20   Q.   Tell me about your mom -- I know
21  you told me she went down there with you.
22  Did she drive you there?
23   A.   Yeah, she drove me there.

1   Q.   Would she give you rides here and
2  there?
3   A.   When she could.
4   Q.   And what was she telling you?
5  Your mom was -- what was she telling you to
6  get you down there?
7   A.   No, she was just letting me
8  know -- she was asking me, because she's
9  not -- she was not familiar with how many
10  tickets I had.  I didn't even know.  And she
11  was like, well, you better not have too many
12  or whatever or something she was saying.  And
13  they might do this and they might do that.
14  And she was like, well, I'll just go down
15  there with you and we'll just see, go to the
16  window or whatever.
17   Q.   Okay.  Did your mom -- how was
18  your mom even knowing you had tickets?
19   A.   I asked her to come.  Like I
20  said, I asked her to take me down there
21  because I needed a ride.
22   Q.   All right.  And were you -- was
23  she worried that you had some warrants out

1  for your arrest?
2   A.   No, she never told me I had
3  warrants out for my arrest.
4   Q.   All right.  And why did your mom
5  think they were going to put you in jail or
6  could put you in jail?
7   A.   Well, that was just a suggestion
8  she was just throwing out, a conversation we
9  had.  So, I just actually -- for real, the
10  conversation was really just take me down
11  there because I didn't have a ride.  I stayed
12  too far from where I needed to go to pay for
13  the tickets.
14   Q.   Okay.
15   A.   So, I asked her, you know, if she
16  didn't mind, if she didn't have nothing to do
17  that day, can she take me.
18   Q.   All right.
19   A.   And so, we just got on that
20  subject as far as don't have too many
21  tickets because you know -- that's when I'm
22  learning going down there, you know if you've
23  got too many tickets, such and such, you

Exhibit A

1  haven't been paying on this, you might get
2  locked up.  It just so happened, gladly, she
3  was there with me, letting me know what I
4  needed to do.
5      Q.   Okay.  All right.  And so, you
6  walked in, and you said the first place you
7  went was to a window?
8      A.   To the clerk window, yes.
9      Q.   To the clerk window.  And you
10 talked to somebody with the court there at
11 the --
12     A.   At the clerk.  I was asking them
13 how much my tickets was.  And I was asking,
14 can I put such and such.  And she was like,
15 well, you have to see the judge.
16     Q.   Okay.
17     A.   And that was around, like, 7:00
18 o'clock.  I think court started at 8:00.  So,
19 luckily, they got me in at the -- at that
20 time.
21     Q.   All right.
22     A.   That was like, you can go see the
23 judge.  What we're going to do is schedule

1  you to go see the judge now.
2      Q.   Is this a.m. or p.m.?
3      A.   A.m.
4      Q.   All right.  So, you show up at
5  7:00 a.m.?
6      A.   Yes.
7      Q.   And you go talk to somebody from
8  the -- you talked to the court clerk?
9      A.   Uh-huh.
10     Q.   And she says -- is that a yes?
11     A.   Yes.
12     Q.   And she says --
13     A.   Sorry about that.
14     Q.   -- you need to go talk to the
15 judge?
16     A.   Right.
17     Q.   And you were able to get in and
18 see the judge?
19     A.   See the judge, yes.
20     Q.   That very day?
21     A.   That day.
22     Q.   Didn't have to wait long?
23     A.   No.

1      Q.   And so, you went to see the
2  judge, and was your mom with you?
3      A.   Yes, she was present.
4      Q.   And then, tell me what happened,
5  everything.
6      A.   The judge was asking me, man, you
7  know you've got tickets from 2004 and all
8  this?  I'm like, yeah.  And he was like, man,
9  you know, I could do this, I could lock you
10 up.  That's when I'm saying, I'm just now
11 learning about this.  I could lock you up and
12 all this.  He was like, what do you got now
13 on you?  I was like, well, I don't know.  I
14 think I had, like, eight hundred probably to
15 a thousand at that time.  I don't know.  But
16 I told him I had that amount, and he was cool
17 with it.  And he was like, give me a moment.
18 And he made me sit back down.
19          And he was doing something, I
20 guess, you know (indicating).  And he told --
21 called me back up there.  And he was like,
22 yeah.  So, what I want you to do is go to the
23 window, pay that amount.  I'm going to throw

1  you back on the payment plan and that was
2  about it.
3      Q.   Okay.  And did he come up with --
4  the judge come up with a monthly amount you
5  were to pay on the payment plan?
6      A.   Yeah, the minimum was forty
7  dollars.
8      Q.   Okay.  And let me show you -- and
9  did he give you any paperwork?
10     A.   I can't remember at that time.
11     Q.   All right.  But you understand
12 you were to be paying monthly --
13     A.   Right.
14     Q.   -- correct?
15          Okay.  And I know you don't know
16 the exact number, but you remember him
17 talking about a monthly amount for you to
18 pay?
19     A.   Right.  The minimum was forty
20 dollars, I think, at that time.
21     Q.   All right.  Whatever it was,
22 whatever you were to pay, y'all talked about
23 it with the judge?

**Exhibit A**

Page 318

1    A.   Right.
2    Q.   And the judge ordered that, so to
3  speak?
4    A.   Right.  Right.
5    Q.   And you understand that the
6  judge -- did he have a robe on?
7    A.   Yes, he did.
8    Q.   All right.  And you understand
9  that these municipal court judges, they're --
10  they issue orders just like any other judge,
11  right?
12    A.   Well, you know, I haven't done
13  any other crime --
14    Q.   Yeah.
15    A.   -- so I don't know.
16    Q.   You knew he was a judge?
17    A.   Yeah, he was the judge.
18    Q.   Okay.  Let me show you what I'll
19  mark as 115.
20         Well, tell me this:  What did you
21  do next after that, after the judge told you
22  that and -- did you sign -- did you sign --
23  did he give you this (indicating) at the

Page 319

1  time?
2    A.   I can't remember.
3    Q.   All right.  Do you remember what
4  happened next?
5    A.   Like I said, I went to the
6  window.
7    Q.   Okay.
8    A.   And they threw me on the payment
9  plan.  I gave them the money I had.  And I
10  think they did give me a list of the tickets
11  that was pending, still pending on there.
12    Q.   Okay.
13    A.   And that was about it.
14    Q.   All right.  Do you remember
15  anything that was said -- I know you've
16  already told me that the people -- the people
17  at the window first sent you to the judge.
18    A.   Uh-huh.
19    Q.   And then, you just then told me
20  that they gave you a list of the tickets.
21  But do you remember anything when you came
22  back to the window that was said at all?
23    A.   No.

Page 320

1    Q.   All right.
2    A.   No.
3    Q.   And you left then?
4    A.   Yeah, left then with my mom.
5    Q.   All right.  And did you -- let me
6  show you what I'll mark as 115.
7    A.   Uh-huh.
8
9         (Whereupon, Defendant's Exhibit
10         115 was marked for identification
11         and copy of same is attached
12         hereto.)
13
14    Q.   (BY MR. LOGSDON)  Do you remember
15  this document at all?
16    A.   Yeah, this is my handwriting.
17  Yeah.
18    Q.   All of this is your handwriting?
19    A.   Yes, sir.
20    Q.   And that's your signature down at
21  the bottom?
22    A.   Yes, sir.
23    Q.   And the address, what address is

Page 321

1  that?
2    A.   That's when my sister had moved
3  on ████████.  I was staying with her then.
4    Q.   Okay.  And you gave them that
5  address?
6    A.   Yes, sir.
7    Q.   And that was the best place for
8  you to get mail at the time?
9    A.   Yes, sir, I think.
10    Q.   And these two phones here, what's
11  the first number that says home phone?
12    A.   That's my mom's number.
13    Q.   Okay.  And she was with you,
14  right?
15    A.   Right.
16    Q.   And then -- and where was your
17  mom living at the time?
18    A.   I would say -- I can't remember.
19  I want to say Rainbow Curve or --
20    Q.   The cell number, is that your
21  number?
22    A.   Yes, that was my number at the
23  time.

Freedom Court Reporting
A Veritext Company
877-373-3660                                                           205-397-2397

**Exhibit A**

1    Q.   Who was your service with?
2    A.   I think I was with Boost Mobile.
3    Q.   And the emergency contacts down
4  there, your mom and Tameka?
5    A.   Right.
6    Q.   Your sister?
7    A.   Right.
8    Q.   All right.  And you don't
9  remember anything about this, like, who gave
10  it to you or anything like that?
11    A.   No, sir.
12    Q.   You just recognize your writing?
13    A.   Right.
14    Q.   Okay.  Let me show you what I'll
15  mark as Exhibit 116.
16
17         (Whereupon, Defendant's Exhibit
18         116 was marked for identification
19         and copy of same is attached
20         hereto.)
21
22    Q.   (BY MR. LOGSDON)  Let's start
23  with your signature.  Is that your signature

1  down at the bottom?
2    A.   Yes.
3    Q.   And the -- this is dated August
4  31, 2010.  Could this have been something the
5  judge gave you then?
6    A.   I can't remember.
7    Q.   All right.  And there's an amount
8  there of -- do you see Number -- do you see
9  the Number 8 there on the first page?
10    A.   Uh-huh.
11    Q.   It says you'll pay fines and
12  costs totaling two thousand, three hundred
13  and sixty-five dollars?
14    A.   Right.
15    Q.   And then, it says at a rate of
16  one forty per month; do you see that?
17    A.   Right.
18    Q.   All right.  And that's the amount
19  you were talking about with the -- when you
20  talked to the judge?
21    A.   That's the amount the judge gave
22  me.
23    Q.   Okay.  All right.  Look at the

1  second page and the third page.  Or look at
2  all these pages.  Do those all look like your
3  signature?
4    A.   Yes.
5    Q.   All right.  There is a note down
6  at the bottom -- you can just look on the
7  first page -- where it says probation
8  officer, and it says Branham.
9    A.   Right.
10    Q.   Well, did you read this before
11  you signed it?
12    A.   Yes.
13    Q.   Did you read all the way through
14  it?
15    A.   I can't remember.
16    Q.   You had a chance to read it,
17  though, right?
18    A.   Yes, I had a chance to read it.
19    Q.   And did --
20    A.   Yeah, and I showed up there.
21    Q.   Okay.  Yeah, you had a -- you
22  showed up at your appointment down there?
23    A.   Yes.

1    Q.   All right.  And we're talking
2  about the September 14th appointment there,
3  right?
4    A.   Right.
5    Q.   And you knew you had to show
6  up --
7    A.   Yes.
8    Q.   -- for these appointments, right?
9    A.   Right.
10    Q.   And this says Order of Probation
11  at the top, the judge's order, right?
12    A.   Right.
13    Q.   And you understood this was a
14  judge's order, right?
15    A.   Right.
16    Q.   All right.  And do you know what
17  probation means, like --
18    A.   Right.
19    Q.   -- when it says probation?
20         Tell me what you -- what you
21  understand that to mean.
22    A.   Suspended without driving.  I
23  mean, I couldn't drive until --

**Exhibit A**

Page 326

1    Q.   Follow some rules?
2    A.   Yeah.
3    Q.   As long as you follow the
4  rules --
5    A.   Rules, yeah.
6    Q.   -- make your payments --
7         MS. MORGAN:  You're putting --
8         THE COURT REPORTER:  I can only
9  get one at a time.
10        MS. MORGAN:  -- words in his
11  mouth.
12        Objection.
13   Q.   (BY MR. LOGSDON)  Yeah, you
14  can -- you can answer.
15        MS. MORGAN:  You can ask him what
16  he understands.
17   Q.   (BY MR. LOGSDON)  Yeah,
18  probation, you're there to follow a list of
19  things that you're to do, like show up for
20  the appointments, various things like that?
21   A.   Yes.
22   Q.   And as long as you do that, it'll
23  be okay?

Page 327

1    A.   Yes.
2    Q.   But if you violate that, that's a
3  problem?
4    A.   Right.
5    Q.   Okay.  And kind of like when the
6  football teams get put on probation?
7    A.   Right.  Right.
8    Q.   They give them a list of things
9  to do.  They've got to follow them --
10   A.   Right.
11   Q.   -- right?
12        They're watching them closely?
13   A.   Right.
14   Q.   And if they step out of line,
15  there's going to be consequences?
16   A.   Consequences, right.
17   Q.   And you understood that here,
18  right?
19   A.   Yes.
20   Q.   All right.  And you said you --
21  one of the things you were to do was to show
22  up.  And you said you remembered showing up
23  for your first appointment, correct?

Page 328

1    A.   Yes.
2    Q.   All right.  And where -- do you
3  know -- it says Branham.  Branham there is
4  your probation officer.  Do you remember --
5    A.   Yes.
6    Q.   -- him or her?
7    A.   I think it was a she.
8    Q.   She?
9    A.   Yes.
10   Q.   And did she -- is she the only
11  one you ever met?  Did you know she was with
12  JCS?
13   A.   No.  I really thought she was a
14  police officer.
15   Q.   Okay.  Did you meet with anyone
16  at JCS other than Ms. Branham?
17   A.   No.
18   Q.   That was the only one?
19   A.   Yes.
20   Q.   Do you remember her -- do you
21  remember any conversations either that you
22  told her or she told you at any of the times
23  you met?

Page 329

1    A.   Come in, make sure you meet your
2  day, make sure you pay your money.  If you
3  don't, we're going to come see you.
4    Q.   Okay.  Anything else?
5    A.   That's about it.  She wasn't --
6  she was -- she was not friendly.
7    Q.   Okay.  Not friendly.  All right.
8    A.   Yeah.
9    Q.   Let me show you what I will mark
10  as -- and when you say that, you mean -- it
11  sounds she's kind of really no nonsense,
12  right?
13   A.   Right.  Straight and direct.
14
15        (Whereupon, Defendant's Exhibit
16        117 was marked for identification
17        and copy of same is attached
18        hereto.)
19
20        MR. LOGSDON:  Off the record.
21
22        (Whereupon, a discussion was held
23        off the record.)

83 (Pages 326 - 329)

Exhibit A

Page 330

1          MR. LOGSDON:  All right.  Back
2  on.
3      Q.    Let me show you what I've marked
4  as Exhibit 117.  And let's look at -- what
5  I'd like to look at on this -- if you look
6  at -- these are -- these are from JCS
7  records.  And what I'd like you to look at is
8  Page 2 from this Exhibit 117.  Do you see
9  that?
10     A.    Yes.
11     Q.    And do you see down near the
12 bottom, there's a block that says appointment
13 details?
14     A.    Yes.
15     Q.    Okay.  And if you flip over to
16 the last page of the exhibit, there's another
17 block.  That one kind of continues for the
18 appointments.
19     A.    Yes.
20     Q.    Okay.  And then, flip back a page
21 to Page 2.  And under the appointment
22 details, there's a date in the far left
23 column; do you see that?

Page 331

1      A.    Yes.
2      Q.    And then, there's a heading that
3  says showed, and beneath that, there's either
4  an N or a Y; do you see that?
5      A.    Yes.
6      Q.    And so, on this page, on Page 2,
7  all of the dates -- and I'll tell you that
8  this is JCS records of appointments showing
9  days you -- they say you had appointments and
10 whether or not you showed.  And I just wanted
11 to see as you look at this, do you have any
12 reason to dispute the date shown and whether
13 or not you showed listed on -- first, on the
14 second page?
15     A.    I can't remember, but I know that
16 the point was, they were so low down, if you
17 didn't come down there at a certain time,
18 they don't even accept you.
19     Q.    All right.  And we'll get to
20 that, but I want to ask you this now:  If
21 they say -- if JCS says that on the dates
22 listed here on Page 2 of Exhibit 117, any of
23 the dates that have an N by it are dates that

Page 332

1  you had an appointment but you didn't show
2  up, do you have any reason to dispute that?
3      A.    Yes.
4      Q.    Okay.  So, do you know
5  specifically that you're testifying here
6  today a date that is wrong on here where you
7  said there was a date and you said you
8  actually did show up?
9      A.    I'm not accurate because it's
10 been so long --
11     Q.    Okay.
12     A.    -- I can't really say that.
13     Q.    And I wouldn't expect that you
14 would, but I just wanted to see.  I didn't
15 know if you would look at this and say, oh,
16 there's this date that was my birthday --
17     A.    Yeah.
18     Q.    -- and I remember being there, or
19 there's this date where they show me as being
20 there and I remember not being there.
21     A.    Right.
22     Q.    You don't know of that, do you?
23     A.    No, I don't know of that.

Page 333

1      Q.    Okay.  And then, the same thing
2  for Page 3, there's only three of them on
3  Page 3.
4      A.    Right.
5      Q.    You don't dispute those dates
6  or --
7      A.    I can't -- I can't remember.
8  Like I said, it's been -- it's been a minute.
9      Q.    All right.  And what they show as
10 to whether you were there or not there, you
11 don't dispute that --
12     A.    Right.
13     Q.    -- correct?
14         Right, you don't dispute it?
15         MS. MORGAN:  I believe he said he
16 didn't remember.  He said --
17     A.    Yes, I do not remember.
18     Q.    (BY MR. LOGSDON)  And the reason
19 I'm asking you that is, if someone from JCS
20 testifies in court and says, Mr. Agee was
21 here on this day but Mr. Agee was not here on
22 that day, I just wanted to see if you had any
23 evidence to show, yeah, I was, or, no, I

84 (Pages 330 - 333)

Exhibit A

Page 334

1  wasn't or anything like that.
2      A.   Right.
3      Q.   If you do, now's the time to tell
4  me.
5      A.   Like I said, every time I
6  showed -- I can't remember the exact dates.
7  I can't remember.
8      Q.   Okay.
9      A.   But I know I showed more than how
10  many times they're showing because they give
11  you a receipt.
12      Q.   Okay.
13      A.   And, at that time, the receipt
14  they would give you was one they write out.
15      Q.   All right.
16      A.   It wasn't typed up like this.
17      Q.   Handwritten?
18      A.   Handwritten.
19      Q.   Okay.  So, you would have showed
20  up on dates when you got a handwritten
21  receipt?
22      A.   Right.
23      Q.   All right.  Anything else?  Any

Page 335

1  other evidence you had --
2      A.   No, sir.
3      Q.   All right.  And the next -- the
4  third page, Mr. Agee, shows your payments
5  under a category that says payments; do you
6  see that?
7      A.   Yes.
8      Q.   And it shows payments on
9  10/28/2010 of eighty dollars.
10      A.   Really?
11      Q.   Yeah.
12      A.   Okay.
13      Q.   Do you have any reason to dispute
14  that?  And let me -- let me hold you up here,
15  because, earlier, I was asking you about
16  payments that you made, and you mentioned
17  that you were making a payment plan.  I'm
18  only talking about since you went on JCS.
19      A.   Right.  And you said JCS started
20  in 2010, right?
21      Q.   This started in -- if you look
22  there, on the exhibit, on August 31, 2010.
23      A.   Right.

Page 336

1      Q.   So --
2      A.   So, you know, JCS had two
3  locations, right?
4      Q.   Well, tell about -- let me ask --
5  I'll get to that but tell me about this
6  first.  Do you remember making any payments
7  to JCS other than this one payment of eighty
8  dollars on October 28, 2010?
9      A.   I can't remember the day or the
10  time, but they had got more than eighty
11  dollars out of me.
12      Q.   Okay.
13      A.   I can say that.
14      Q.   Do you know how much you think
15  they got?
16      A.   Man, it was more than eighty
17  dollars.
18      Q.   Okay.
19      A.   I can't give you the exact
20  amount.
21      Q.   All right.
22      A.   But I know, at one point in time,
23  I was coming down there consistently.  And,

Page 337

1  like I said, it was to the point that the
2  same police officers that were writing the
3  ticket was down there waiting on us.
4      Q.   All right.  Do you have -- and
5  I'm not talking about a credit card payment.
6      A.   No, I don't have no kind of
7  payment stubs --
8      Q.   All right.
9      A.   -- or anything like that.
10      Q.   Do you have any evidence to show
11  that you paid more than eighty dollars?
12      A.   No, sir, I really don't.
13      Q.   All right.  If you learn that
14  before we go to trial, will you give it to
15  your attorney?
16      A.   If I have it?
17      Q.   Yeah.
18      A.   Yes, I would.
19      Q.   Okay.  And if we don't -- if you
20  don't give me anything before we start the
21  trial, can I assume you don't -- you haven't
22  found any --
23      A.   I haven't found nothing.

85 (Pages 334 - 337)

**Exhibit A**

Page 338

1    Q.   -- receipts?
2    A.   No, I don't have no receipts.
3    Q.   Or other evidence?
4    A.   No.
5    Q.   All right.  You said they had two
6  locations.  Where were the two locations?
7    A.   I think the first location was --
8  this one was on -- around the street, I
9  think, Dexter.
10   Q.   Dexter?
11   A.   Yes.
12   Q.   Okay.  And where was the other
13 location?
14   A.   On Ripley Street.  It was down
15 from the courthouse.
16   Q.   Okay.  Which location did you go
17 to?
18   A.   Both.
19   Q.   Okay.
20   A.   Because, at one time, I mean,
21 they had it set up at 8:00 o'clock to 12:00.
22 If you couldn't catch this one, you had to go
23 down to the one on Ripley Street from such

Page 339

1  and such time to such and such time.
2    Q.   Okay.  And so, there would be
3  times where you would go to one, it sounds
4  like, but they weren't --
5    A.   Yeah.
6    Q.   -- open?
7    A.   No, it would be open, but it
8  might be too packed.  You might have a line.
9    Q.   Okay.
10   A.   But trust me, they'll cut it off
11 at 12:00 --
12   Q.   Okay.
13   A.   -- because it's lunchtime for
14 them.
15   Q.   Okay.
16   A.   So, you had to get back in your
17 car and make it to Ripley Street.
18   Q.   All right.
19   A.   Which the other folks are coming
20 back off break.
21   Q.   All right.  How far away was
22 Ripley Street?
23   A.   Right around the street.

Page 340

1    Q.   Okay.
2    A.   I'll probably say five to ten
3  minutes.  Well, I'll give it ten to fifteen
4  minutes --
5    Q.   All right.
6    A.   -- because of the traffic.
7    Q.   Okay.  Do you have any evidence
8  to show that -- okay.
9         Do you remember getting calls
10 from JCS?
11   A.   I never got a call from JCS.
12   Q.   Okay.
13   A.   Never.
14   Q.   Do you remember getting any
15 letters from JCS?
16   A.   Never got a letter from JCS.
17   Q.   Okay.
18   A.   I -- and I'm going to tell you
19 this:  I -- it got to the point, I still
20 thought JCS existed.  Seriously.  I didn't
21 even know they left.  I didn't even know they
22 moved.  I was still coming to -- over on
23 Ripley Street trying to pay my tickets.

Page 341

1  I had to learn that we had to go back to the
2  court system and pay our tickets off.
3    Q.   Okay.  All right.  Now, did you
4  ever give JCS a different address other than
5  the             Drive --
6    A.   No.
7    Q.   -- address?
8         Did you ever -- when did you move
9  from          Drive?
10   A.   I stayed there probably, like,
11 three to four years.
12   Q.   Okay.          Drive?
13   A.         Drive.
14   Q.   And remind me whose house that
15 was.
16   A.   That's my sister house.
17   Q.   Okay.  You were staying with your
18 sister for about three or four years?
19   A.   Yes.
20   Q.   And including between 2010,
21 2011 --
22   A.   Yes.
23   Q.   -- 2012?

**Exhibit A**

Page 342

1    A.   Yes.
2    Q.   All right.  And so, that'd be the
3  best place for you to get mail between 2010
4  and 2012?
5    A.   Yes.
6    Q.   All right.  And then, what about
7  the -- we looked before at the ███████
8  Drive address.  How long did you stay there?
9    A.   Not really -- not that long.  I
10  probably stayed there probably about two
11  months.
12    Q.   Okay.  When you moved, did you
13  tell JCS you were moving?
14    A.   No.
15    Q.   Why not?
16    A.   Because I was still making
17  payments and it was still accurate.
18    Q.   Okay.  Well, you were still
19  making payments and still accurate.  In other
20  words -- what do you mean it was still
21  accurate?
22    A.   The address, like, my sister, she
23  stayed there.

Page 343

1    Q.   Okay.
2    A.   We had to -- it was, like, two or
3  three months.  The only reason why it was
4  like that is because when she moved, her mail
5  was still getting -- coming over there.  And
6  our people -- well, our family members were
7  still staying there.
8    Q.   Okay.  You're not fussing at JCS
9  if they sent something to ███████ because
10  that's the address you gave them?
11    A.   Right.  If they sent it to
12  Worchester, I should have got it because I --
13    Q.   Fair enough.
14    A.   -- still had -- my brother, my
15  youngest brother, was staying there.
16    Q.   And if anything on that changed,
17  you knew it was your responsibility to tell
18  them, don't send it to ███████ anymore --
19    A.   I mean --
20    Q.   -- right?
21    A.   Well, I didn't know.
22    Q.   Okay.  Well, I mean, just common
23  sense will tell you if --

Page 344

1    A.   You're right.
2    Q.   -- if you give somebody --
3      THE COURT REPORTER:  I can only
4  get one at a time.
5    Q.   (BY MR. LOGSDON)  If you give
6  somebody your address and you know they're
7  sending you stuff and you move, that it's
8  your responsibility to tell them, hey, I
9  moved, right?
10    A.   Right.
11    Q.   Okay.  Let me show you what I'll
12  mark as Exhibit 118.
13
14      (Whereupon, Defendant's Exhibit
15      118 was marked for identification
16      and copy of same is attached
17      hereto.)
18
19    Q.   (BY MR. LOGSDON)  Is that your
20  signature?
21    A.   Yes.
22    Q.   This is dated -- do you remember
23  going through this or signing this?

Page 345

1    A.   I think that was the point when I
2  was -- I met with JCS, JCI or whatever.
3    Q.   Okay.
4    A.   I'm not for sure.  I think it is.
5    Q.   All right.
6    A.   I think.  I think so.  Not
7  accurate, but I think so.
8    Q.   All right.  These are all your
9  initials in the left-hand column over there?
10    A.   Right.
11    Q.   And makes sense that you met with
12  JCS, you went through these and read them and
13  signed --
14    A.   Right.
15    Q.   -- and initialed and then signed
16  at the bottom?
17    A.   Right.
18    Q.   And if you had any questions, you
19  asked questions, that kind of thing?
20    A.   Right.
21    Q.   And did you keep a copy of this,
22  of 118?
23    A.   I can't remember.

87 (Pages 342 - 345)

**Exhibit A**

Page 346

1    Q.   All right.  Did you ask them any
2  questions about any of these that you
3  remember?
4    A.   No, sir.
5    Q.   All right.  And this one's got
6  the ▓▓▓▓▓▓ address?
7    A.   Right.
8    Q.   And on 9/27, as you've just been
9  telling me --
10    A.   Right.
11    Q.   -- you looked at -- you looked at
12  that and you'd say, yeah, that's right?
13    A.   Right.
14        MR. LOGSDON:  Do y'all want to
15  take a break?  Take a break?
16        MS. MORGAN:  Huh?
17        MR. LOGSDON:  Do you want to take
18  a break?
19        THE WITNESS:  I'm good.
20        MR. LOGSDON:  Let's just take
21  about three minutes.
22
23        (Whereupon, a brief recess was

Page 347

1        taken.)
2
3        (Whereupon, Defendant's Exhibit
4        119 was marked for identification
5        and copy of same is attached
6        hereto.)
7
8    Q.   (BY MR. LOGSDON)  Here is Exhibit
9  119.  Do you remember getting that?
10    A.   No.  Supposed to have came to
11  Worchester?
12    Q.   Yeah.
13    A.   No.
14    Q.   You don't remember getting it?
15    A.   No.  Especially with this date,
16  because I was still around that time.
17    Q.   All right.  Do you remember
18  getting any letters from JCS?
19    A.   No.
20    Q.   Do you remember getting any texts
21  from JCS?
22    A.   No.
23    Q.   Did you have this cell number

Page 348

1  that you -- that we called out earlier?  Did
2  you have that --
3    A.   Yes, I had that about a year or
4  two.
5    Q.   A year or two?
6    A.   Yeah.
7    Q.   All right.
8    A.   Well, you know, Boost Mobile, at
9  that time, they was merging with -- I don't
10  know.  But that's who I got it through, the
11  chirp.
12    Q.   All right.  The what?
13    A.   The chirp at that time with Boost
14  Mobile.
15    Q.   Okay.
16    A.   The chirp phone.
17    Q.   All right.  You mentioned
18  something about receipts.  Do you have any
19  receipts that you got from JCS?
20    A.   No, sir, I don't have no
21  receipts.
22    Q.   All right.  And Buckingham Drive
23  is where you said you --

Page 349

1    A.   Moved to.
2    Q.   -- moved to?
3        And tell me that address on
4  ▓▓▓▓▓▓.
5    A.   I can't remember.
6    Q.   ▓▓▓▓?
7    A.   Yeah, I think -- yeah, ▓▓▓▓▓▓
8  ▓▓▓▓▓▓ Drive.
9    Q.   All right.  Let me show you this
10  Exhibit 120.
11
12        (Whereupon, Defendant's Exhibit
13        120 was marked for identification
14        and copy of same is attached
15        hereto.)
16
17    Q.   (BY MR. LOGSDON)  All right.  Let
18  me show you this Exhibit 120.  This is the
19  one that was your sister's house.  You stayed
20  there about three years?
21    A.   Yes, sir.
22    Q.   All right.  What did she do on
23  rent for you when you were there?

88 (Pages 346 - 349)

Exhibit A

Page 350

1    A.   Like I said, she was jobless.
2  She was trying to get her disability.
3    Q.   Okay.
4    A.   Yeah.
5    Q.   And did she charge you anything
6  on rent?
7    A.   Yeah, she did.
8    Q.   How much was she charging you?
9    A.   I think, around that time, it was
10  three hundred, three fifty.
11    Q.   Okay.
12    A.   Somewhere around there.
13    Q.   And that was just you living
14  there, right?
15    A.   Yeah.  And I paid for my own
16  food.
17    Q.   That covered utilities?
18    A.   No.
19    Q.   Did you pay for some of that,
20  too?
21    A.   Yeah.
22    Q.   And it sounds like something you
23  said, she's charged you some of the time, and

Page 351

1  other times, she didn't charge you?  Maybe
2  give her rides and --
3    A.   Yeah.
4    Q.   -- that kind of thing?
5    A.   Yeah, as far as driving, going
6  back and forth to work, she'll charge me
7  sometimes.  Sometimes she didn't.
8    Q.   Okay.  All right.  Take a look at
9  what we've got as 120 there.  This is dated
10  to the ▓▓▓▓▓▓ address.
11    A.   Right.
12    Q.   Any reason to dispute that you
13  didn't get this?
14    A.   No, I didn't.
15    Q.   Excuse me?
16    A.   I didn't get this.
17    Q.   You didn't get it?
18    A.   No.
19    Q.   But this is where you were living
20  at the time, correct?
21    A.   Yes.
22    Q.   All right.  And this one, if you
23  look on the Page 2 of it --

Page 352

1    A.   Uh-huh.
2    Q.   -- it shows a court date of March
3  2nd, 2011; do you see that?
4    A.   Right.
5    Q.   Down at the very bottom.
6    A.   Uh-huh.
7    Q.   Did you show up at court on March
8  2nd, 2011?
9    A.   I can't remember.
10    Q.   You can't remember?
11    A.   No, sir.
12    Q.   All right.  All right.  You were
13  telling me earlier in the deposition about
14  the day you got arrested, and you were going
15  to tell me about that.  So, let me ask you
16  about that now.
17    A.   Yes, sir.
18    Q.   The day you got arrested.  And
19  remind of the date first.
20    A.   Was it June -- July or June, one
21  of them, I think.  I'm not accurate --
22    Q.   Okay.
23    A.   -- as far as the date.

Page 353

1        But the month, I know it was
2  probably in June.
3    Q.   You think it was in June?
4    A.   Yes, I think it was.
5    Q.   And do you remember the year?
6    A.   Yes, 2013.
7    Q.   Okay.  Tell me what you remember
8  about the arrest, about being arrested.
9    A.   Well, my partner, the guy,
10  employee, he was my partner, he was -- his
11  car ran hot because he was taking me home.
12  And we were standing there putting water in
13  his car because the radiator ran hot.  And
14  the police car pulled up.  Hey, are y'all all
15  right?  That's how he replied it.
16        He seen an open beer container
17  beside the car, which is probably about two,
18  three feet or something like that.  And he
19  was like, oh, y'all are having a good time,
20  huh?  I guess y'all out here fixing the car.
21  Y'all drinking a couple, huh?  No.  I didn't
22  reply, but my partner replied as no.
23        So, what he did was, was like,

89 (Pages 350 - 353)

**Exhibit A**

Page 354

1  hey, well, y'all stay there for a second.
2  Pull out your IDs. I'm going to run your
3  name, just something, you know, and staying
4  calm. Because he was like, there's been a
5  lot of break-in entries over here or
6  something at this hotel, which was InTown
7  Suites on the Eastern Boulevard.
8          And he got my partner's ID. I'm
9  not trying to put his business out there.
10  But I know he had a couple of warrants on
11  him. And it's not tickets. So, he got his
12  ID and asked me for mine's. I replied, I
13  don't have mine's, but I can give it to you
14  because my room is right here. I was staying
15  at InTown Suite. He was like, no, cool,
16  chill. What's your name? Levon Agee, III.
17          So, he went to the car with my
18  partner's ID. And I'm looking at this police
19  officer type in my name and did not run my
20  partner's name. Because my partner was
21  scared and gave me his phone, which the
22  police rolled -- I mean, not rolled the
23  window down, but opened the door and told us

Page 355

1  to stop trading whatever we're doing.
2          My partner gave me his phone to
3  contact his mom because he knew he was going
4  to go to jail. I did not get the phone
5  because the police officer told us not to do
6  it. So, when the police officer was running
7  my name, he got out the car --
8      Q.  Who got out of the car?
9      A.  The police officer. -- gave the
10  license back to my partner, told him to drop
11  the hood, make it home, and don't drive this
12  car no more. He grabbed me, told me, hey,
13  you've got outstanding warrants, tickets, or
14  something, five -- more than five or more
15  capias. Hey, sit right here on top of the
16  car. I did. About twenty to thirty minutes
17  later, it's six police cars and a dog.
18          I had to get down on my stomach.
19  They took my food. They took my food. They
20  took my work bag and gave it to the hotel
21  clerk, whoever was working there at that
22  time, because me and Monica -- that's where
23  we were staying because we were waiting on

Page 356

1  our house to get finished, painted, or
2  whatever before we moved in. And they told
3  him to leave it there for Monica, which she
4  wasn't there at the time. I don't even think
5  the clerk even told her because by the time
6  she got there, I think the clerk -- his shift
7  was over there.
8          So, they took me down. And
9  that's what they supposed to have been ran --
10  I mean, supposed to have booked me for,
11  public intoxication or something like that.
12  The next thing you know, I'm getting --
13  saying that I have outstanding warrants or
14  whatever. But I wasn't even driving. I
15  wasn't even in the driver's seat. I just --
16  I just didn't understand that, you know what
17  I'm saying? I felt -- I knew I was targeted,
18  you know what I'm saying?
19          And, like I said, when I got
20  booked in and, man, I wasn't even in the
21  cell. You know where we was? We was in the
22  area -- what's that little waiting area
23  before you go in the courtroom?

Page 357

1      Q.  Yeah.
2      A.  Yeah. I slept down there for
3  three days. I didn't get no phone call. I
4  didn't even dress out until the day I seen
5  the judge and knew I had to do mandatory day.
6  That's the first time I ever dressed out. In
7  those three days, I was still in my work
8  clothes.
9      Q.  Okay. All right. Can I back up
10  and ask you a couple of questions? You gave
11  me a lot there.
12      A.  I know.
13      Q.  So, you mentioned that your
14  partner was taking you home from work. You
15  were working at DAS at the time?
16      A.  Right.
17      Q.  And tell me your partner's name.
18      A.  His name was Nathan. I don't
19  know his last name, but his first name was
20  Nathan.
21      Q.  And you say your partner.
22      A.  Yeah. Well, you know, a guy, you
23  know, just chill with at work, you know.

90 (Pages 354 - 357)

**Exhibit A**

Page 358

1   Q.   A co-worker?
2   A.   Co-worker, yeah.
3   Q.   All right.  And what did he have
4   warrants for?
5   A.   I know he had warrants for -- I
6   don't -- I think one of them was theft of
7   property, I think it was, or theft of
8   property and some more.  I don't know.
9   Q.   You mentioned -- well, you
10  mentioned warrants and you mentioned capias.
11  A.   Yeah.
12  Q.   What is your understanding of
13  capias?
14  A.   My understanding of capias is
15  what, like, theft of -- something real
16  serious --
17  Q.   Okay.
18  A.   -- you know.
19  Q.   And what about warrants?
20  A.   Just fines.
21  Q.   Okay.  Warrants is when you don't
22  show up for court and they'll issue a warrant
23  like --

Page 359

1   A.   Yeah.
2   Q.   -- we talked about earlier?
3   A.   Fines, yeah.
4   Q.   All right.  And --
5   MS. TOURE:  Wait.  Wait.  Wait
6   just a moment.  You say --
7   MR. LOGSDON:  Yeah, I think --
8   I think you're right.
9   Q.   You said fines.  Warrants is when
10  you -- you get a warrant when you don't show
11  up for court would be an example like we
12  looked at?
13  MS. TOURE:  An example --
14  MR. LOGSDON:  Yeah.
15  MS. TOURE:  -- but that's not
16  what a warrant is per se.
17  MR. LOGSDON:  Right, but that's
18  why you get a warrant.
19  MS. TOURE:  That's how he
20  responded.
21  THE COURT REPORTER:  I can only
22  get one at a time.
23  MS. TOURE:  No, I'm saying you

Page 360

1   said -- anyway, I think you cleared it up.
2   MR. LOGSDON:  Yeah.
3   MS. TOURE:  Just listen carefully
4   to what he's saying.
5   Q.   (BY MR. LOGSDON)  Yeah, let me --
6   let me make sure we're clear.  A warrant --
7   you get a warrant for things like if you
8   don't show up for court.
9   A.   Like I said, fines.
10  Q.   Yeah.
11  A.   That's what I meant by that,
12  fines.
13  MS. TOURE:  That's not the only
14  thing you get a warrant for.
15  THE WITNESS:  Okay.
16  MR. LOGSDON:  Right.
17  THE WITNESS:  Okay.
18  Q.   (BY MR. LOGSDON)  Yeah.  It could
19  be for not showing up for court.
20  A.   Okay.
21  Q.   Fair enough?
22  A.   Fair enough.
23  Q.   And you understand that?

Page 361

1   A.   I understand now.
2   Q.   All right.  And you were living
3   at InTown Suites at the time?
4   A.   Right.
5   Q.   I missed that one when I was
6   going through where you were living
7   previously.  When did you move to InTown
8   Suites?
9   A.   I can't remember.  I wasn't
10  accurate.  It was just for, like, a week or
11  two, because it was only -- the guy -- like I
12  said, when I was staying on Bullard Street
13  with Monica, my girlfriend at the time, we
14  was moving in on Bullard Street, and the guy
15  was painting the house.  And he told us, you
16  know, he was going to pay for the room, which
17  he did.  He gave us two weeks because he just
18  wanted to make sure everything that he was
19  fixing on it was fixed and proper for her to
20  move because she was pregnant at the time.
21  Q.   Okay.  And what InTown Suites
22  were you talking about?
23  A.   The one on the Boulevard by

91 (Pages 358 - 361)

Exhibit A

1  Stivers Ford.
2      Q.   What boulevard?
3      A.   Eastern Boulevard.
4      Q.   All right.
5          MS. HOLLIDAY:  Just so you
6  understand, the Boulevard is a big circle.
7          THE WITNESS:  Yeah.
8          MR. LOGSDON:  Tell me that.
9          MS. HOLLIDAY:  So, there's an
10 Eastern and a Southern and a Northern.
11         THE WITNESS:  Northern, yeah.
12         MS. HOLLIDAY:  So, that's why
13 it's confusing to you.
14         MR. LOGSDON:  All right.
15     Q.   And do you remember what y'all
16 were paying?
17     A.   What he was paying?  I don't know
18 what he paid.  He paid for the room.
19     Q.   At InTown Suites?
20     A.   Yeah.  He put us in there because
21 he wasn't finished painting the house.
22     Q.   Oh.
23         MS. TOURE:  He testified to that.

1      Q.   (BY MR. LOGSDON)  Okay.  The
2  landlord --
3      A.   Yes.
4      Q.   -- paid -- put y'all up at InTown
5  Suites --
6      A.   Yes.
7      Q.   -- while he was finishing the
8  house?
9      A.   Yes.
10     Q.   I got you now.  And where had you
11 been living just before InTown Suites?
12     A.   Like I say, I was staying with my
13 friend, Kevin, and she still had her
14 apartment at the Marks.
15     Q.   Okay.  And then, tell me about
16 the Bullard Street place.  First of all,
17 what's the landlord's name?
18     A.   I really can't remember his name.
19 I really don't know his -- I would say it was
20 Morgan, but I'm not accurate --
21     Q.   All right.
22     A.   -- with that.
23     Q.   And this was a house that y'all

1  were going to be renting from him?
2      A.   Yes, sir.
3      Q.   And what was the rent?
4      A.   Seven hundred.
5      Q.   Had he -- had you moved in at all
6  or --
7      A.   Yes, we moved -- we moved our
8  bedroom in and a refrigerator, but he didn't
9  have the living room painted or the bathrooms
10 and the front door.  He was still trying to
11 replace the frame of it.
12     Q.   All right.  And so, where did you
13 your partner, Nathan, where did he live?
14     A.   He stayed in Buckingham.
15     Q.   Is that near the InTown Suites?
16     A.   Yes, sir.  It was down the street
17 before you get to InTown Suite.
18     Q.   All right.  And what day of the
19 week was this?
20     A.   I think I got arrested on a
21 Thursday or a Friday.
22     Q.   And what time?
23     A.   Oh.  Was it -- man.  Well, they

1  stopped -- well, it started at probably,
2  like, 4:00 o'clock.  I'll say 4:30 because I
3  got off work at 4:00 o'clock.
4      Q.   P.m.?
5      A.   P.m.
6      Q.   Okay.
7      A.   Yeah.
8      Q.   And drove from DAS back to your
9  house?
10     A.   Right.
11     Q.   Did y'all go anywhere?
12     A.   We only stopped at the gas
13 station because he put gas in his car and I
14 got me a chicken box.
15     Q.   Okay.  And had y'all had --
16 either of y'all had anything to drink?
17     A.   Well, no, I don't drink.
18     Q.   Okay.  Had he had anything to
19 drink?
20     A.   No.
21     Q.   The beer can that was nearby or
22 beer -- what did you say beer or something?
23     A.   Yeah.

Exhibit A

Page 366

1    Q.    Was that his, yours, or whose was
2  that?
3    A.    It could have been any random.
4  It was just -- it was a hotel.  Just the
5  hotel where people just chill and do their
6  thing.  Like, you can probably walk up to a
7  beer can.
8    Q.    It was on the hotel grounds?
9    A.    Yes.
10    Q.    All right.
11    A.    Yes.  And he was -- like he say,
12  he was stating -- he didn't say -- he was
13  stating it had been breaking and entries,
14  people getting in.  That's how he was putting
15  it.  And as he was putting it, he seen it on
16  the ground, like, oh, y'all are having a good
17  time, too, huh?
18    Q.    Okay.
19    A.    Like, he just seen a random beer
20  can.  And it had been out there so long, I
21  know there was no kind of liquid in it.  The
22  beer can was desert dry.
23    Q.    All right.  All right.  And then,

Page 367

1  you went -- did he accuse you of being
2  intoxicated?
3    A.    No, but he tried to accuse us of
4  public drinking so he could get our ID, a
5  proper cause to harass us right then.
6    Q.    Did he give you any kind of
7  sobriety test or anything like that?
8    A.    No.
9    Q.    All right.  Took you down to the
10  station, you told me that?
11    A.    Right.
12    Q.    And --
13    A.    When he took me in and as you sit
14  there as they book you in, I'm thinking,
15  okay, you're fixing to book me in for what,
16  public intoxication or whatever.  No, you say
17  outstanding warrants, capias, and everything,
18  whatever he was saying.
19    Q.    Who was saying that?
20    A.    The police officer.
21    Q.    All right.  And then, how long
22  were you there before you saw anybody from
23  the court?

Page 368

1    A.    I was there for the whole
2  weekend.
3    Q.    All right.  And then, Monday
4  morning --
5    A.    Yeah.
6    Q.    -- you saw -- and do you remember
7  which judge you went before?
8    A.    I think it was -- it was -- if it
9  wasn't --
10    Q.    Give me male or female first.
11    A.    It was a male.
12    Q.    And --
13    A.    It was a male.  I would say it
14  was Knight or Hayes.
15    Q.    Okay.  Was the judge --
16    A.    White.
17    Q.    A white judge?
18    A.    Right.
19    Q.    All right.  And so, you went
20  before the judge.  And what happened?
21    A.    Before I went before the judge,
22  as we were sitting in this room -- this is a
23  true story.  We sit -- we was down here in

Page 369

1  this room.  If you guys -- what y'all call
2  him, the public defender?  He yelled out, if
3  you guys want to go home, if I was y'all, I
4  would plead guilty, blam, blam, and you will
5  go home.  Cool.  I took it.  I ran with it.
6        He called my name.  He pulled me
7  to the side, which is a bathroom before you
8  hit the courtroom.  Hey, make sure you plead
9  guilty.  Once again, he reminded me, one on
10  one, if you plead guilty, he's going to
11  eventually give you a fine or whatever, put
12  you on the payment plan, you can go home.
13    Q.    Okay.
14    A.    Cool.
15    Q.    All right.  That was the public
16  defender?
17    A.    Yes.
18    Q.    Was it the -- had you talked to
19  him before?
20    A.    No.
21    Q.    This would be the first time you
22  talked to him?
23    A.    The first time I seen him, Monday

93 (Pages 366 - 369)

**Exhibit A**

Page 370

1  morning.
2      Q.   Okay.  And you mentioned
3  something earlier when we were talking about
4  a public defender.  Is that the first time
5  ever in your life you'd seen a public
6  defender, this situation here you're telling
7  me about?
8      A.   Yes.
9      Q.   Okay.  So, when you were talking
10  about before being with a public defender,
11  you're talking about this guy right now?
12      A.   Right.
13      Q.   And it sounds like you said he
14  talked to maybe a group of people --
15      A.   Yes.
16      Q.   -- and then, he talked to you
17  personally?
18      A.   Right.  He was talking to
19  everybody as a group.  And as he call you,
20  he's going to pull you to the bathroom, which
21  is before you walk into the courtroom, and
22  make sure that you agree to what he said when
23  he yelled out.

Page 371

1      Q.   All right.  Did he -- did you ask
2  him any questions?
3      A.   No, because he was -- he didn't
4  want to hear nothing else.
5      Q.   How did you know he was a -- who
6  he was?
7      A.   That's what he said he was.
8      Q.   A public defender?
9      A.   Yes.
10      Q.   Did he tell you his name?
11      A.   I'm representing you.
12           I mean, he probably did, but I
13  can't remember at that time.
14      Q.   Okay.  All right.  Okay.  And
15  anything else?
16      A.   As I went to court, as the judge
17  said, they called my name.  He asked me how I
18  plead.  I said guilty.
19      Q.   Let me back you up just a little
20  bit.  When you went into the courtroom, I
21  assume there was a group of people in there?
22      A.   There was a whole -- there was a
23  crowd, an audience.

Page 372

1      Q.   All right.  Did the -- were any
2  kind of announcements made before court
3  started?
4      A.   You know -- you know how -- what
5  they say, such and such judge, please stand
6  up.  This such and such judge, no eating, no
7  drinking, no speaking, you will give such and
8  such.  I guess they was talking to the
9  people, because I was already in chains or
10  whatever they had to have you, you know.
11      Q.   All right.
12      A.   And so, that was it.  We sat
13  down.  The judge came out.  He started on not
14  our case right then but the -- I guess the
15  other people who was there who was showing up
16  for tickets.
17      Q.   Okay.  And tell me what happened
18  after you were called up.
19      A.   He asked me -- he was like,
20  man -- he really made a joke about it.  He
21  said, man, from 2004 to now, I guess you
22  decided to come see me, huh?  I said, yeah, I
23  guess so, huh?  I said, I've been getting

Page 373

1  pulled over so many times, you know.  I mean,
2  I didn't -- I didn't know, you know.  And he
3  was like, man, how you got away with all
4  these tickets?  I say, hey, they write them
5  and they let me go.  And He was like, really?
6  He was like -- he -- the same question you
7  was asking me, you know, how was you getting
8  them?  I said, man, you know, roadblocks,
9  man, you know, harassment.  I mean, you know,
10  just -- they were just giving random tickets
11  out.
12           So, he asked me -- he was like --
13  he paused for a minute.  And I guess he was
14  doing something on the computer or whatever.
15  And he was like, how much you got?  And my
16  girlfriend was there at that time, Monica,
17  you know what I'm saying.  And she was
18  standing right there beside me.  And she
19  borrowed a couple dollars from her job.  So,
20  I guess she gave him an amount, and that
21  wasn't enough.
22      Q.   How much was it; do you know?
23      A.   I think about a thousand.

94 (Pages 370 - 373)

Exhibit A

Page 374

1    Q.   What was Monica's job at the
2  time?
3    A.   She was working at -- I think she
4  was an assistant manager at Zaxby's before
5  she came to Cracker Barrel.  I think Zaxby's.
6    Q.   Zaxby's?
7    A.   Yeah.
8    Q.   All right.  But you don't
9  remember the amount that Monica --
10   A.   Huh-uh.  I can't remember the
11  amount, because I thought he was going to let
12  me go.
13   Q.   All right.  And then, what
14  happened?
15   A.   And then, I think when she said
16  that amount, he was like, hold that, hold
17  that thought or whatever, or something, and
18  you sit down or whatever.  Just wait till
19  your paper come and we'll work things out for
20  you, and he smiled.  So, in my head, I'm like
21  okay, cool.
22      So, I guess when she went to the
23  window, that was my last time seeing her when

Page 375

1  he told her to hold that thought, she can go
2  to the window, whatever, I never seen her
3  again after that.  Because when I went
4  upstairs, I had got a paper saying I had to
5  do such and such mandatory days.
6    Q.   All right.  We skipped ahead a
7  little bit.  Tell me what happened now.  So,
8  he said, hold that thought.  You went and sat
9  back down?
10   A.   Yes.
11   Q.   And then -- and then, tell me the
12  next thing you remember.
13   A.   The next thing I remember, when
14  they called you -- you know, when they
15  called -- they call your name.
16   Q.   Okay.
17   A.   Yeah, which, that paper you've
18  got in your hand right there, they give you
19  that paper right there.
20   Q.   All right.  Let's mark this so we
21  know what we're talking about.
22   A.   Exactly.
23   Q.   Who called you?

Page 376

1    A.   What's that -- the clerk is on
2  the side of the judge?
3    Q.   Yeah, somebody with the court?
4    A.   Yeah, somebody with the court.
5    Q.   All right.
6    A.   They called my name, which I got
7  this paper.
8
9      (Whereupon, Defendant's Exhibit
10     121 was marked for identification
11     and copy of same is attached
12     hereto.)
13
14   Q.   (BY MR. LOGSDON)  And this is
15  Exhibit 121?
16   A.   Exactly.  And they -- that's when
17  I found out I had to do mandatory days, which
18  y'all don't even have the check mark on there
19  or the days I had to do.
20   Q.   All right.  So, tell me what the
21  court person told you.
22   A.   Yeah.  And I think it was, like,
23  eighty-three to a hundred and something days

Page 377

1  that was marked.
2    Q.   Okay.  So, you said the one you
3  had had eighty-three days marked on this
4  exhibit?
5    A.   Yeah, it was like -- it was
6  almost three -- almost three months.
7    Q.   Okay.  And --
8    A.   If I never paid or did any jail
9  time, I would have sat down almost three
10  months, like, day for day.
11   Q.   Okay.
12   A.   If I wouldn't even attempt to do
13  any kind of work or pay anything.
14   Q.   All right.  And so, do you
15  remember anything else the court person told
16  you?
17   A.   Have a nice day.
18   Q.   All right.  Just gave you this,
19  and then, what happened?
20   A.   That's it.
21   Q.   Okay.
22   A.   Have a nice day.
23   Q.   And did you pay anything at that

95 (Pages 374 - 377)

**Exhibit A**

1 time?
2      A.   I don't know if she paid or not.
3 I didn't have possession of the money because
4 I was booked.  I didn't know if she had paid
5 or not.  I don't know.  I was still doing day
6 for day.
7      Q.   All right.  And then, what
8 happened next?
9      A.   Okay.  So, as I got in there,
10 like I said, when they finally booked us in,
11 I still didn't have a bunk.  We was sleeping
12 up on the floor.  We didn't have proper, you
13 know, pillows or anything.  We was sleeping
14 on tampons, which they give the females in
15 there.  They fill the pillow case up with
16 tampons.  And they didn't -- you know, people
17 was hollering about high blood pressure.
18 They didn't give out medicine --
19      Q.   All right.
20      A.   -- you know.
21         You know, a guy died.
22      Q.   All right.
23      A.   And that's the day I got on work

1 duty, because I had to clean up behind that
2 mess.
3      Q.   All right.  And we'll talk about
4 that, but let's -- it looks like you were
5 there until -- it looks like your first day
6 was June 14, 2013.
7      A.   Probably was.
8      Q.   And it looks like you got out
9 July 12, 2013.
10      A.   It probably was something like
11 that --
12      Q.   All right.
13      A.   -- just because I had to do work
14 detail.
15      Q.   All right.  And then, tell me,
16 was this the first time you'd ever been
17 arrested?
18      A.   No.
19      Q.   When had you been arrested prior
20 to this?
21      A.   When I was younger, a teenager.
22      Q.   And tell me about that.
23      A.   A little theft of property when I

1 was about seventeen.
2      Q.   And what was the result of that?
3      A.   Homeless.  I had to get some
4 clothes.  So, I was at the mall, and, you
5 know, I got caught stealing at Dillard's.
6      Q.   All right.  Did you serve any
7 time or what happened?
8      A.   No, just a youth offender.  They
9 just gave me a little what they call work
10 detail or something.
11      Q.   Okay.
12      A.   Yeah.
13      Q.   All right.  Any other times that
14 you got arrested?
15      A.   No.
16      Q.   And never again either before or
17 after this situation?
18      A.   (Witness shakes head.)
19      Q.   Is that a no?
20      A.   No.
21      Q.   All right.
22      A.   I haven't.
23      Q.   All right.  So, the one time you

1 got arrested as a teenager, you just got work
2 detail?
3      A.   Uh-huh.
4      Q.   Is that a yes?
5      A.   Yes.
6      Q.   And then -- and then, there was
7 this situation between June of 2013 and July
8 of 2013?
9      A.   Right.
10      Q.   And that's it?
11      A.   That's it.  Well, after -- after
12 that, I got arrested again, which they were
13 showing the same tickets saying I didn't pay
14 off or I didn't serve time for.
15      Q.   All right.  When was that?
16      A.   Oh, that was probably like 2014,
17 '15.
18      Q.   Okay.
19      A.   4th of July.
20      Q.   4th of July?
21      A.   Yeah.
22      Q.   Okay.  And is that the one -- did
23 you -- did you bond out that day?

96 (Pages 378 - 381)

**Exhibit A**

Page 382

1     A.   No.
2     Q.   Tell me about that, then.
3     A.   I think I went to court that day.
4  No.  Yes, I did.  I did.  I bond out that
5  Sunday.  I'm sorry.  Yes, I did.  I bond out
6  that Sunday.
7     Q.   July 4th, 2014?
8     A.   I think so, yeah.
9     Q.   That was a Sunday?
10    A.   Yeah.
11    Q.   And you bonded out that Sunday?
12    A.   Uh-huh.
13    Q.   Is that a yes?
14    A.   Yes.  I'm sorry.
15    Q.   See, we're back in our bad
16  habits.
17    A.   Yeah.  Yeah.  I'm sorry.
18    Q.   And the bond in 2014, where'd you
19  get the money for that?
20    A.   My mom paid it.
21    Q.   Okay.  Did you call your mom when
22  you were in jail -- when you got arrested --
23    A.   No.

Page 383

1     Q.   -- in 2014?
2     A.   My girlfriend did.
3     Q.   She did call your mom?
4     A.   Yeah, she called my mom.
5     Q.   All right.  Did y'all call
6  anybody else to try to get some money?
7     A.   No.  I don't have anybody else.
8     Q.   All right.  Other than that 2014
9  thing when you bonded out -- and let me back
10  up on that.
11         Did you -- did you ever -- were
12  you ever -- did you even go in jail or
13  anything or did you just get arrested and
14  then --
15    A.   No, I went to jail.
16    Q.   How long were you in jail?
17    A.   I want to say -- whatever that
18  day, that 4th falled on, I think I stayed
19  overnight that day.
20    Q.   How did you get picked up then?
21    A.   Relationships.  Me and her, we
22  got into it.  And I was trying to leave home.
23  And she end up calling the police, like I

Page 384

1  said, because she was going through this
2  postpartum depression with the kids dying
3  after I got out.  And, you know, her mom and
4  dad dying, everything was falling in that
5  day -- year, the day her dad died, then, her
6  mom died, then, the kids.  So, you know, it
7  was -- I was battling a lot.
8         I was trying to work, make sure
9  things were -- because she wasn't working at
10  the time because she was actually losing it,
11  man.  I mean, like, she was just going
12  through emotions.  And, you know, I was
13  trying the best I could to be there for her.
14    Q.   This was Monica?
15    A.   Yeah, Monica.
16    Q.   And so, tell me how you got
17  arrested, though.
18    A.   She called the police and told
19  them, you know, I was, I guess, trying to
20  steal the car or whatever or something and --
21  you know, and they came.  They pulled up.  I
22  was backing out the driveway.  I sat in the
23  driveway for a minute because I wasn't going

Page 385

1  to leave because I realized I know that, hey,
2  they're going to pull up.  So, let me state
3  my statement or whatever.  But, then, as she
4  was coming out the house, hitting on me and
5  everything, just flipping out and losing it,
6  I started backing out of the driveway, that's
7  when they came.
8     Q.   Okay.  So, she called and --
9     A.   Yeah.
10    Q.   -- said you were stealing or
11  harassing --
12    A.   Yeah.
13    Q.   -- or something?
14    A.   Yeah, it was -- we were just
15  going through a whole lot, man.
16    Q.   All right.  Did she wind up
17  pressing charges?
18    A.   No, she couldn't because they
19  caught her in a lie.
20    Q.   Okay.
21    A.   No, she was telling them that I
22  was -- I was verbally abusing her or
23  whatever.  You know, we was in an argument.

97 (Pages 382 - 385)

**Exhibit A**

1  I probably said some things to her, but I
2  never physically hit her or whatever like
3  that. And she tried to make the story seem
4  like I jumped on her or, you know, just --
5  you know, I just told her I was through. My
6  hands was up, you know what I'm saying. I
7  couldn't -- I can't do this because I'm
8  losing it.
9      Q.  So, they -- so, they took you
10 down for that?
11     A.  Well, the thing is, when she
12 called them for that, they couldn't take me
13 down for that, like I said, because they
14 questioned her. But one police officer, once
15 again, smart ass, he ran my name. Oh, you're
16 a day late. I mean, you was a day not -- I
17 guess a court appearance or whatever. So,
18 we're gonna take you down. There's a
19 warrant issued for you.
20     Q.  All right.
21     A.  So, they took me down.
22     Q.  All right. And then -- so, you
23 bonded out, you got out?

1      A.  Yeah.
2      Q.  And then, did you go back and see
3  the judge again?
4      A.  Yeah.
5      Q.  And tell me about that.
6      A.  He put me back on the payment
7  plan.
8      Q.  All right. And what judge did
9  you see that time?
10     A.  I can't remember.
11     Q.  Male or female?
12     A.  I think it was -- every time, it
13 was a male.
14     Q.  And white or black?
15     A.  White.
16     Q.  All right. And they put you on a
17 payment plan. The court records say it was
18 Judge Westry on that -- it was October 1,
19 2014. It says Judge Westry. If the court
20 records say that, have you got any reason to
21 dispute that?
22     A.  It probably was. I can't
23 remember that. I was going through a whole

1  lot, man.
2      Q.  Yeah, I understand.
3      A.  Yeah.
4          MS. MORGAN:  He did say that it
5  was a white male.
6      Q.  (BY MR. LOGSDON)  But if the
7  court records show Judge Westry, any reason
8  to dispute that it was Judge Westry?
9          MS. MORGAN:  Well, he's not a
10 white male. You're trying to mislead him.
11         MR. LOGSDON:  I don't think you
12 can be testifying.
13     A.  I mean, if he was a black male --
14         MS. MORGAN:  I don't think you
15 can be asking confusing questions.
16     A.  Well, I can't -- I guess it was a
17 black male at the time, you know.
18     Q.  (BY MR. LOGSDON)  Okay.
19     A.  But, like I was saying, there was
20 so much going on at that time.
21     Q.  I understand. And you said you
22 went back on a payment plan. And that was
23 just paying the court, not JCS? You didn't

1  go back to the JCS folks?
2      A.  No, just going -- yeah, paying
3  the court.
4      Q.  Just the court, not JCS?
5      A.  Yeah. I thought JCS was the
6  court, because like I say, when you go -- you
7  know, you was paying on Ripley Street.
8      Q.  Right.
9      A.  And I felt like they just
10 combined it inside the court. Like, you just
11 go to the window and pay because --
12     Q.  They were all downtown?
13     A.  They was all downtown. They was
14 all connected.
15     Q.  All right. And then, did you
16 make your payments over time?
17     A.  No, not over time. I did the
18 best I could because I was jobless.
19     Q.  Okay. All right. You said 4th
20 of July. If the court records show it was
21 July 5th, would that make sense?
22     A.  Well, yeah, that was the night of
23 the 4th of July, going into, I guess, the

**Exhibit A**

Page 390

1  5th, but it happened on the 4th of July. It
2  happened that night.
3      Q.    The incident that you're talking
4  about?
5      A.    Yeah, it happened that night of
6  the 4th of July.
7      Q.    All right. And had you had --
8  had you been arrested anymore after that,
9  after --
10     A.    One more time, I got an
11 incident -- a family incident with my sister
12 on Christmas Day.
13     Q.    What sister?
14     A.    Tameka Agee.
15     Q.    And tell me about that.
16     A.    Her and her boyfriend was in a
17 argument, whatever, and I went over there to
18 protect my sister.
19     Q.    Okay.
20     A.    And we didn't -- we didn't get in
21 a fight or anything, but words was said. He
22 was drunk. And they thought I was drunk
23 because how highly upset I was. So, they

Page 391

1  took us to jail. And they throwed me in the
2  drunk train -- I mean, the drunk -- the
3  drinking chamber they have. But they didn't
4  never gave me a breathalyzer test or
5  anything.
6      Q.    Okay. This was, you said,
7  Christmas?
8      A.    Yes.
9      Q.    Christmas Day, December 25th?
10     A.    Yeah, I think that night.
11     Q.    And what year?
12     A.    What was it, '17, '16, '17, one
13 of them.
14     Q.    Okay. And then, what happened?
15     A.    That's it. I mean, I went -- I
16 went. I had to stay what, three hours. I
17 got out the same night. In the drunken
18 chamber, they were saying I was drunk or
19 whatever. They couldn't prosecute me with
20 everything. I was just trying to defend my
21 sister because a guy was trying to jump on my
22 sister.
23     Q.    Okay. Did he press charges?

Page 392

1      A.    No, he couldn't. He was drunk.
2  He was drunk. He came home real drunk.
3      Q.    Did you bond out or did they just
4  let you go?
5      A.    They just let me go.
6      Q.    All right. Any other times ever
7  that you've been arrested?
8      A.    No.
9      Q.    Have you ever filed for
10 bankruptcy?
11     A.    No.
12     Q.    Have you been arrested any -- but
13 no other times you've ever been -- or have
14 you ever been arrested any other time we
15 haven't talked about?
16     A.    No. Well, I went to jail in --
17 well, in Georgia, taking my daughter home one
18 time for no license. And that was, I think,
19 in Cottondale, Georgia.
20     Q.    Okay.
21     A.    Somewhere by LaGrange. But, you
22 know, if you don't have your license, you
23 automatically go to jail in that state, so --

Page 393

1      Q.    In Georgia?
2      A.    Yeah.
3      Q.    How long were you in jail there?
4      A.    Just a couple of hours.
5      Q.    Okay.
6      A.    I bailed out.
7      Q.    You did what, you bailed out?
8      A.    Uh-huh.
9      Q.    And when was this?
10     A.    I can't remember. I think it was
11 around 2015, something like that.
12     Q.    Okay.
13     A.    Thanksgiving.
14     Q.    Thanksgiving?
15     A.    After Thanksgiving. Yeah.
16     Q.    Did you have to pay anything?
17     A.    No. Well, my girlfriend at the
18 time, Monica, and her cousin bonded me out
19 because we was all in the car at that time.
20 I just took over driving because they were
21 sleepy.
22     Q.    How much did they pay?
23     A.    I don't know. I can't remember.

99 (Pages 390 - 393)

**Exhibit A**

1    Q.    Did you pay them back?
2    A.    Yeah.
3    Q.    I mean, it's -- was it a couple
4  hundred dollars or --
5    A.    At that time, I really don't
6  know. It wasn't -- I paid him back. I mean,
7  he didn't put that much in there. She paid.
8  But I paid, you know, whatever he put in.
9  Whatever she didn't have, he put in. So, it
10  was probably, like, a hundred dollars or a
11  hundred and twenty-five dollars or something
12  like that.
13    Q.    All right. So, over there in
14  Georgia, they'll bring you right in --
15    A.    Yeah.
16    Q.    -- if you don't have a license to
17  jail?
18    A.    Right.
19    Q.    What do you -- what do you -- do
20  you think that's the way that they ought to
21  do it? Do you think that's a better plan
22  over there in Georgia or what do you think?
23    A.    I mean, I don't know. I don't

1  know. I don't know. I can't answer that for
2  you.
3    Q.    If you were running things, how
4  would you do it?
5    MS. TOURE:  That's an irrelevant
6  question. It calls for speculation.
7    Q.    (BY MR. LOGSDON)  You can answer.
8    A.    I don't want to answer that.
9    Q.    Huh?
10    A.    I don't want to answer that.
11    Q.    Well, you can answer. And the
12  reason I'm asking that is, you're here as a
13  class representative; did you know that?
14    A.    No.
15    MS. TOURE:  Yes, but --
16    A.    No.
17    MS. TOURE:  -- he's not
18  representing a class in Georgia.
19    Q.    (BY MR. LOGSDON)  So, I just
20  wanted to see if you had any thoughts on
21  maybe how it should be done.
22    A.    I mean, you know, I don't think
23  so because, you know, the system is so messed

1  up for you to mess up. That's how I feel.
2    Q.    What do you mean?
3    A.    Like, even though 2004, I started
4  getting tickets. And, you know, I felt like
5  I was a target, man. You know, you've got
6  police officers sitting by your house. As we
7  speak today, where I stay at now, you've got
8  police officers that sit by your house and
9  know who you are. I clean the cars out. The
10  computer system y'all have in those cars or
11  whatever, man, they'll raise you down without
12  even pulling you over. They'll take pictures
13  of you. You'll pull up on the screen. So, I
14  know they know.
15    Q.    All right.
16    MR. LOGSDON:  I'm going to let
17  y'all go, and then, I'll probably have some
18  other questions for you.
19    THE WITNESS:  Yes, sir.
20
21  EXAMINATION BY MS. HOLLIDAY:
22
23    Q.    Mr. Agee, I'm Shannon Holiday.

1    A.    How do you do, Shannon?
2    Q.    I represent the City.
3    A.    Yes, ma'am.
4    Q.    As far as your interactions with
5  JCS, JCS didn't do anything that restricted
6  your liberty or your freedom, correct?
7    A.    Can you repeat that again?
8    Q.    JCS, the company that you paid
9  your money to, to your knowledge, did they do
10  anything, any of those employees do anything
11  to restrict your liberty?
12    MS. TOURE:  Do you understand the
13  question about restrict your liberty?
14    MS. MORGAN:  That calls for a
15  legal --
16    MR. GILL:  Y'all don't need to be
17  interrupting.
18    MS. TOURE:  I am asking him does
19  he understand --
20    MS. HOLLIDAY:  He can ask --
21    MS. TOURE:  -- restrict your
22  liberty.
23    Q.    (BY MS. HOLLIDAY)  You can ask me

Exhibit A

Page 398

1 to rephrase it if you don't.
2     A. Yes, can you rephrase that for
3 me?
4     Q. Sure. Did they do anything to
5 restrict your freedom, your ability to go
6 about your daily life?
7     A. Yes, I think they did, because,
8 like I said, as I go down there and report to
9 them, I felt like they was working with some
10 of the police officers which was present at
11 that time. You know, every time you go
12 down -- every time I used to go down, it's
13 the same police officer. He can sit inside
14 the building, outside the building, or
15 sitting at a desk with one of these police
16 officers. And as soon as I leave, he can be
17 following me two, three cars behind. And as
18 you can see, all my tickets are in one area.
19 It's a black dominant area.
20     Q. Okay. I'm asking about JCS,
21 though. Let's talk about --
22        MS. MORGAN: That's what he was
23 answering.

Page 399

1        THE COURT REPORTER: I can only
2 get one at a time.
3        MS. HOLLIDAY: Y'all, really,
4 really, please let me ask the question.
5        MS. TOURE: Okay. But I'm
6 saying -- you're saying I'm talking about
7 this. He didn't answer your question.
8        MS. HOLLIDAY: No, no, no, I want
9 to --
10        MS. TOURE: Wait a minute.
11        MS. HOLLIDAY: I want to focus --
12        MS. TOURE: Let me put it on the
13 record. You asked how was his liberty
14 restricted, and he was talking about how the
15 cops were present.
16        MR. LOGSDON: Must be some
17 question. I walked out.
18        MS. HOLLIDAY: I'm sorry. I
19 didn't -- I've got very little time. At
20 least you don't get an answer to the question
21 while you walked out.
22     Q. Let's talk about the police
23 officer that you're talking about. Was it

Page 400

1 the same police officer --
2     A. I don't know.
3     Q. -- every single time?
4     A. To me, yeah. I don't know his
5 name, but, yeah, looked like it.
6     Q. Was that at the Ripley Street
7 address that was attached to the court?
8     A. Yes, ma'am.
9     Q. Okay. So, there was a police
10 officer at the Ripley Street address --
11     A. There's more than one police
12 officer. That's what I'm saying.
13     Q. Okay.
14     A. It's more than one police officer
15 surrounding that area. But nine times out of
16 ten, they're the same police officers that
17 surround this area doing the roadblocks,
18 doing the harassment, waiting on you to even
19 just pull out your yard. They still do that
20 to today.
21     Q. Okay. I'm talking about when you
22 went to pay your JCS payments, though.
23     A. Yes, when I make my JCS payments,

Page 401

1 I can see the same police officer, white guy,
2 or black guy, sitting on the outside or in
3 the inside as I walk in. They can call my
4 name and I don't know your name. Which I
5 probably didn't have the time to sit down and
6 learn their name. But you can call my name
7 as I come in and come out and as I leave to
8 go back home and you're waiting on me to get
9 behind this wheel?
10     Q. And we're talking about the
11 Ripley Street address?
12     A. Right.
13     Q. Okay. And you said it was the
14 same police officer, but, now, you just said
15 it was a black police officer or a white
16 police officer?
17     A. I'm saying -- oh, look, this is
18 what I'm saying: They're black and white.
19 That's what I'm saying. I'm just -- I said
20 police officer just in general because that's
21 what they are.
22     Q. Okay. So, when you went to
23 Ripley Street to pay the JCS person in that

101 (Pages 398 - 401)

Exhibit A

Page 402

1   office, which is attached to the court, there
2   was a police officer there?
3       MS. TOURE: Asked and answered --
4   A.   Right.
5       MS. TOURE: -- several times.
6   A.   Yes.
7   Q.   (BY MS. HOLLIDAY) Okay. And
8   what was the address of the other JCS office?
9   A.   I think it was on Dexter Avenue.
10  Q.   Okay. And when you went to
11  Dexter Avenue, you said earlier that you
12  thought -- I think you said -- that for
13  sometime, you thought the JCS employee was a
14  police officer, correct?
15  A.   Yes.
16  Q.   Okay.
17  A.   Because they were dressed like a
18  police officer. They did not have no kind of
19  logo JCS on them. They had Montgomery Police
20  Department and they were sitting at a desk
21  taking your money.
22  Q.   Okay. And was there a police
23  vehicle outside that office?

Page 403

1   A.   Always.
2   Q.   There was always a police officer
3   or something you recognized as a police
4   vehicle --
5   A.   Montgomery Police Department
6   always, that's what it says on the car.
7   Q.   Outside of the --
8   A.   The building.
9   Q.   -- the Dexter Avenue building?
10  A.   Yes. And Ripley Street.
11  Q.   Okay. Well, Ripley Street, you
12  understand, is the police department?
13  A.   Well, I didn't -- you know --
14  these days, you don't even know.
15  Q.   Okay. So, you didn't know that
16  Ripley Street was the police department?
17  A.   I mean, I did know it's the
18  police department, but I'm just saying Dexter
19  Avenue, too, you would think it was the
20  police department the way they sit outside.
21  Q.   Okay. And how many times did you
22  see the police officer outside --
23  A.   I'm not familiar --

Page 404

1   Q.   -- according to you?
2   A.   -- with the many times.
3       But I just know when I -- by the
4   record when I do go, I know I see them.
5   Q.   Okay.
6   A.   I don't know how many times,
7   though.
8   Q.   Okay. So, it might have been one
9   time and it might have been --
10  A.   I can't be --
11  Q.   -- more than one time?
12      THE COURT REPORTER: I can only
13  get one at a time.
14      THE WITNESS: Yes, ma'am. I'm
15  sorry.
16  Q.   (BY MS. HOLLIDAY) Yeah. So, the
17  question was: It might have been once that
18  you saw a police officer car at the Dexter
19  Avenue location or it might have been more
20  than one time?
21  A.   I can't remember.
22  Q.   Okay. What facts, if any, do you
23  have or know about that suggests that the

Page 405

1   City of Montgomery had control over JCS's
2   interactions with you?
3   A.   Like I said, first of all, JCS
4   wasn't even -- they wasn't even visible.
5   Like I'm saying, I'm thinking I'm -- you
6   know, they didn't even have a logo on. You
7   know, it was just Montgomery Police
8   Department. How would I know I was dealing
9   with JCS? And then, as far as these
10  warrants, y'all trying to make it seem like I
11  wasn't accurate. They wasn't accurate.
12  Q.   Well, did JCS have anything to do
13  with your warrants, to your knowledge?
14  A.   I mean, if I did come down there
15  and pay, they should have told me I had a
16  warrant. That's how I felt like.
17  Q.   Okay.
18  A.   I didn't know.
19  Q.   So --
20  A.   They let me go.
21  Q.   Right.
22  A.   You let me back in the free
23  world.

102 (Pages 402 - 405)

**Exhibit A**

Page 406

1        MS. TOURE:  Let him finish,
2  please.
3        Q.   (BY MS. HOLLIDAY)  So, one of
4  your complaints in this case is that JCS
5  didn't tell you that you had warrants?
6        A.   No, they never did.
7        Q.   Okay.  And anything else that you
8  have, facts that you have, information that
9  you have that suggests the City had some
10  control over JCS's interactions with you?
11        A.   No.
12        Q.   Okay.  Let's talk about the
13  claims that you had or the complaints you had
14  about how you were treated at the court or by
15  the City that you went -- or JCS that you
16  went to see a lawyer about.  Let's start with
17  this:  When did you first seek out a lawyer?
18        A.   After I got out of the case of
19  the 2013, which is who's representing me now.
20        Q.   Okay.  And how did you come to
21  locate those lawyers?
22        A.   Well, it was an ad they had on
23  the radio.  And they said come down.  I came

Page 407

1  down, and I met them.
2        Q.   Okay.  And the two -- the record
3  will show that the two women here who are
4  your lawyers are Ms. Toure and Ms. Morgan,
5  correct?
6        A.   Right.
7        Q.   Okay.
8        MS. TOURE:  Let the record show
9  I've never made a radio ad, neither has Ms.
10  Morgan.
11        MS. HOLLIDAY:  I wasn't trying to
12  indicate that.
13        MS. TOURE:  Okay.
14        MS. HOLLIDAY:  He said he met you
15  after --
16        MS. TOURE:  Okay.
17        MS. HOLLIDAY:  -- responding to
18  the ad.
19        MS. TOURE:  Okay.
20        Q.   (BY MS. HOLLIDAY)  Is that
21  correct?
22        A.   Right.
23        Q.   Okay.  And tell me what

Page 408

1  complaints you had in your mind when you went
2  to look at -- to seek out a lawyer in
3  responding to this ad.
4        A.   Well, like I said, to the ad, it
5  wasn't them who made -- that's correct that
6  it wasn't them who made the ad.  I think it
7  was --
8        MS. TOURE:  She didn't ask you
9  that.  Just listen to her question.
10        Q.   (BY MS. HOLLIDAY)  Was it Thad
11  McClammy?
12        A.   I can't remember.  But, like I
13  said, my complaints was how did I get
14  arrested, you know, how the way they came by
15  arresting me when I wasn't behind the
16  vehicle.  And as you was booking me in, you
17  lied to me the way you booked me in.  You're
18  saying public intoxication, but, really,
19  you're just stereotype me, who I was, and
20  found out I have warrants and lock me up.
21        I slept on the floor like a dog,
22  you know what I'm saying, for three days
23  before I even seen the judge, and then, I

Page 409

1  still slept on the floor after I seen the
2  judge.  You lied to me when you said, you
3  know -- knowing that I didn't know no kind of
4  law or anything, just plead guilty.
5        You know, I felt like y'all
6  baited me in.  That's what they did.  They
7  baited me in.  Just another statistic.
8  That's how it was.
9        Q.   Okay.  Have you listed the
10  complaints that you had that you brought to a
11  lawyer?
12        A.   Yes.
13        Q.   Okay.  Sitting here today, do you
14  have any other complaints that you seek?
15        A.   Yes, I mean, I lost a good job.
16        Q.   Well, can we -- can we talk about
17  damages separately?  I'm trying to now say
18  what the wrongs -- I want to divide it up
19  into two, what are the wrongs that were done
20  to you.  That's kind of a legal issue, what
21  wrong was done to you, and then, how did it
22  hurt you.  I'm going to ask you that question
23  later, what are the ways that it hurt you.

103 (Pages 406 - 409)

**Exhibit A**

Page 410

1      So, if you can divide it up a
2  little bit or help me divide it up, it might
3  help us just get some clearer answers --
4      A.   Okay.
5      Q.   -- on the record; is that okay?
6      A.   Okay.
7      Q.   So, have you listed all the
8  things that you think were wrongs that were
9  done to you?
10     A.   Yes.  I was lied to.
11     Q.   Okay.  Let's kind of break it up
12 a little bit.  I've got them listed out here,
13 okay?
14     A.   Right.  What do you have listed?
15     Q.   Well, the first thing I have -- I
16 have five things on my list, and we'll go
17 through and you can tell me if you've got
18 more.  And your lawyer's writing you a note
19 that says you --
20     MS. TOURE:  No, I'm making a
21 note --
22     MS. HOLLIDAY:  Yeah.
23     MS. TOURE:  -- for me to ask

Page 411

1  him --
2      MS. HOLLIDAY:  Okay.
3      MS. TOURE:  -- when I finish
4  because I want the record to show he's
5  already talked about some things that were
6  wrong.
7      Legally, they might not be in his
8  mind as the wrong, but he's already talked
9  and the record will show.
10     MS. HOLLIDAY:  Okay.  Right.  So,
11 you'll have some, if you need to ask him
12 questions, too.
13     Q.   And I'm not -- I'm here to find
14 out all the wrongs.  I'm not trying to limit
15 you.  I want to know --
16     A.   Right.
17     Q.   -- because this is our one
18 opportunity before trial to get this
19 information.
20     A.   Right.
21     Q.   So, the first thing you said is,
22 how -- and this is my notes.  You correct
23 me -- how I got arrested when I was not

Page 412

1  behind the wheel of the vehicle --
2      A.   Right.
3      Q.   -- right?
4      So, you feel that your arrest --
5  and tell me if I'm wrong.  I'm just trying to
6  clarify for the record.  You feel that your
7  arrest was not with probable cause?
8      A.   It wasn't.
9      Q.   Okay.  But that's a fair
10 characterization or description of what you
11 think was done wrong with respect to that
12 point, that you feel like it was without
13 probable cause?
14     A.   Right.
15     MS. MORGAN:  That calls for a
16 legal conclusion but --
17     Q.   (BY MS. HOLLIDAY)  Well, I think
18 you -- yeah.  Then, I think you said -- my
19 notes say lied to him.  They lied to you as
20 to public intoxication?
21     A.   Right.
22     Q.   Is that -- you're talking about
23 now in --

Page 413

1      A.   Not the Christmas incident.
2      Q.   Not the Christmas --
3      A.   No.
4      Q.   -- exactly.
5      That's what I was going to ask.
6      A.   We're talking about the 2013.
7  And when he seen this beer can right here
8  beside this car --
9      Q.   Uh-huh.
10     A.   -- that's what made him ask us
11 for our IDs.
12     Because he's saying that the
13 front desk called on them saying there were
14 some guys out here or whatever kind of
15 breaking in or drinking or whatever.  But we
16 was not drinking.  You never gave us a
17 breathalyzer test.  You never did none of
18 the -- their procedures that supposed to have
19 been done.  All you did was ask for
20 identification, and one of us did not have
21 it, which was me.  But the guy, my co-worker,
22 who has, I know, warrants, serious warrants
23 that's way worser than tickets, ride home

104 (Pages 410 - 413)

Exhibit A

Page 414

1  with his family and I'm a guy who just got
2  off work, just because I didn't have ID?
3      Q.   Right.  And so, that -- doesn't
4  that all kind of fold into and part of that
5  you were arrested without -- you were -- you
6  were asked for your ID without probable
7  cause?
8      A.   Right.
9      Q.   Okay.
10     A.   Right.  And then, like I said, as
11 you're taking me down, I don't know what I'm
12 getting arrested for.  You don't tell me.
13 You don't tell me what I get arrested for
14 until you start putting it in the computer.
15     Q.   Okay.  So, a third thing that
16 you're complaining about --
17     A.   Yes.
18     Q.   Well, the first thing is probable
19 cause?
20     A.   Right.
21     Q.   The second thing is failure to
22 notify you as to what you're being --
23     A.   Right.

Page 415

1      Q.   -- arrested for?
2           Okay.  And then --
3      A.   The way I had to work my time
4  off, that's slavery, man.
5      Q.   Okay.  Well, I'm going to add
6  that.  Work time off.  But let's go
7  through -- you said you slept on the floor
8  like a dog?
9      A.   Right.  Until I seen the judge.
10     Q.   Okay.  Tell me about that.  Now,
11 when you slept on the floor --
12     A.   It was overcapacity.
13     Q.   It was --
14     A.   There was no room in the holding
15 cell, the drunken cell, or any cells.  It was
16 people in cells with prisoners that's
17 supposed to have been going to prison,
18 murderers, rapers.  I was downstairs with
19 thirty other folks in a holding -- I mean,
20 whatever you call that, the little part
21 before you go in the courtroom.  We slept
22 down there for three days, or whatever the
23 day -- that day they arrested me on until I

Page 416

1  seen the judge.
2      Q.   Okay.  Well, would it surprise
3  you that you saw the judge the next day after
4  you were arrested?
5      A.   No.
6      Q.   You don't -- if I showed you a
7  document that said you were arrested on June
8  13th and you saw the judge on June 14th, that
9  would --
10     A.   No.
11     Q.   -- that's not accurate?
12     A.   That's not accurate, no.
13     Q.   Okay.  You were --
14     A.   No.
15     Q.   And when you slept on -- you say
16 you slept on the floor.  Were you provided a
17 mattress type --
18     A.   No.
19     Q.   -- thing to sleep on?
20     A.   A pillow case full of tampons.
21     Q.   So, you slept on a cold floor?
22     A.   A cold floor up under the bench
23 with tampons to lay my head on.

Page 417

1      Q.   Okay.  And that was for three
2  days?
3      A.   Yes.
4      Q.   Okay.  So, that is a complaint.
5  And you complained that it took three days to
6  see the judge, correct?
7      A.   Right.
8      Q.   Okay.
9      A.   Didn't never get a phone call.
10     Q.   All right.
11     A.   As I was in there, never called
12 anyone, couldn't get a phone call.
13     Q.   Did anyone contact you --
14     A.   How?
15     Q.   -- from outside?
16          I'm just asking.
17     A.   I'm asking, too, because I never
18 knew.
19     Q.   So, the answer's no, then?
20     A.   Yeah.  That's what I'm saying,
21 no.
22     Q.   And I have here -- so, I'm adding
23 never got a phone call.  I have here that you

105 (Pages 414 - 417)

Exhibit A

Page 418

1  were lied to to get you to plead guilty?
2     A.   Right.
3     Q.   Okay.  That's one of your
4  complaints?
5     A.   Right.
6     Q.   And that's a complaint with
7  respect to the public defender, right?
8     A.   Right.
9     Q.   Okay.  And not anybody else?
10  It's the public defender that that complaint
11  is about, correct?
12     A.   From my understanding, yes --
13     Q.   Okay.
14     A.   -- that's what it is.
15     Q.   And as far as you know, the fact
16  that it took three days to see a judge,
17  that's a -- it was the judge's schedule and
18  the judge's courtroom schedule that caused
19  you to wait for three days to see a judge?
20     MS. TOURE:  Well, that's not --
21     A.   I don't know.
22     Q.   (BY MS. HOLLIDAY)  You don't
23  know?

Page 419

1     A.   I don't know.
2     THE COURT REPORTER:  I can't get
3  everybody.  Hold on.  Hold on.  All I got was
4  her question.  I got nothing after that.
5     MS. TOURE:  Well, the objection
6  is, she's putting facts that's not in
7  evidence, asking him a question, which is not
8  just misleading but untrue in terms of what
9  his personal knowledge is.
10     Q.   (BY MS. HOLLIDAY)  I'm just
11  asking what your knowledge is.
12     A.   I don't know.  I don't know.  I
13  was locked up.  Don't know.  That's it.
14     Q.   Got it.
15     MR. GILL:  Let me make one quick
16  suggestion.  One of the other of y'all is
17  free to object.  Take your pick.  We don't
18  care.  But this business of a chorus of both
19  of you jumping in and starting to tell him
20  things about what are true and not true
21  really is inappropriate, and y'all need not
22  to do that.
23     MS. TOURE:  And what she is doing

Page 420

1  is inappropriate.  Let me put mine.  She is
2  dealing with a person who doesn't even have a
3  high school diploma.  She's using legal words
4  like probable cause and using other language
5  that can be very confusing.  So, if you want
6  to give us a lecture, give your cohort a
7  lecture.  So, let's proceed --
8     MR. GILL:  No, I'm not --
9     MS. TOURE:  Let's proceed with
10  the deposition.
11     MR. GILL:  That statement is
12  entirely --
13     MS. TOURE:  Let's proceed with
14  the deposition.
15     MR. GILL:  -- out of order.
16     MS. TOURE:  You are out of order.
17     Q.   (BY MS. HOLLIDAY)  Mr. Agee, I
18  have also on my list --
19     MS. TOURE:  For the third time.
20     Q.   (BY MS. HOLLIDAY)  I have also on
21  my list that you have complaints about the
22  work you did in jail --
23     A.   Right.

Page 421

1     Q.   -- or with your work time.
2     Can you elaborate on that?  You
3  know what I mean by elaborate?
4     A.   Yes, I know what you mean by
5  elaborate.
6     Q.   You seem to have understood all
7  the questions pretty well so far, but please
8  tell me if you don't, okay?
9     A.   All right.  After I got locked
10  up, as I said, after I got my mandatory days,
11  I didn't even know -- I had to learn -- well,
12  I ain't going to say even know.  I was put in
13  the position to do this because that's the
14  only way I could speed the process up of me
15  getting out of jail was cleaning up, roadside
16  assistance, working for the City, washing
17  cars, cutting grass.  I did that seven
18  days -- seven days out the week.  I went
19  every day.  The only time I didn't go if it
20  was a bad storm, and that was rare.
21     Q.   And did you have to put your name
22  on a list to get --
23     A.   Yes.

106 (Pages 418 - 421)

Exhibit A

Page 422

1    Q.   -- the opportunity to work?
2         Okay.  And who took those names;
3  do you recall?
4    A.   The officers.  I don't know their
5  name.
6    Q.   All right.  And so, you saw it as
7  an opportunity to get out earlier, correct?
8    A.   No, really, it was not an
9  opportunity to get out.  It was -- you know,
10 it's just how y'all -- I mean, I ain't going
11 to say y'all, put y'all in the category.  But
12 it's how they -- how they do you in there.
13 It's a game.  It's a gimmick, you know.  Hey,
14 do this and you get seventy-five dollars a
15 day.  Or they'll come to you, hey, do this,
16 you'll get seventy-five dollars a day.  It's
17 like a reputation you start getting --
18   Q.   Okay.
19   A.   -- used to it.
20   Q.   I got it.  So, you would have
21 preferred if they had just given -- stuck
22 with the fifty dollars a day and let you sit
23 it out at fifty dollars a day, right?

Page 423

1    A.   I would prefer they would have
2  gave me an option better than what they did,
3  truthfully, because I didn't want to sit down
4  there, period.
5    Q.   Okay.
6    A.   I didn't really want to go to
7  jail.
8    Q.   Right.  But I'm saying if you
9  were -- if the judge -- the judge commuted
10 you.  Do you know what that means?
11   A.   Yes.
12   Q.   Okay.  And am I right -- do you
13 understand it to mean that you were ordered
14 to sit in jail one day for every fifty
15 dollars you owed?  Do you understand that?
16 If you didn't, you know, that's the answer.
17   A.   No, I didn't.  I didn't.  I did
18 not want to sit in there for no fifty dollars
19 a day.
20   Q.   No, I didn't ask you --
21       MS. TOURE:  She said do you
22 understand it.
23   A.   Yes, I understand it --

Page 424

1    Q.   (BY MS. HOLLIDAY)  You understood
2  that's what the judge --
3    A.   -- but I'm --
4    Q.   -- did, right?
5    A.   Right.
6    Q.   And that's a sentence that the
7  judge gave you when you went to appear --
8    A.   Right --
9    Q.   -- for court?
10   A.   -- I understand that.
11   Q.   Okay.
12   A.   But you're asking me -- you asked
13 me did I prefer that, like, if I wanted that.
14 I was just --
15   Q.   No, no, no.
16   A.   Okay.  Okay.
17   Q.   Well, let me rephrase so it will
18 be clearer.  You're saying it was wrong --
19   A.   To even put me in that
20 predicament.
21   Q.   Right.  You thought you were
22 wronged by being commuted at all --
23   A.   Yes.

Page 425

1    Q.   -- correct, that the judge's --
2    A.   Yes.
3    Q.   -- actions were wrong?
4    A.   Not even asking me how, why, or
5  why did this officer do this or --
6    Q.   Okay.
7    A.   I never --
8    Q.   So, that's another wrong --
9    A.   Yeah, that's another -- that's
10 what I'm saying.
11   Q.   -- we need to add that to the
12 list?
13   A.   I never got questioned on that.
14 Man, the day I good booked, I mean, it was
15 their words, not mine.
16   Q.   Right.  And when you said the
17 day, the day --
18   A.   The day --
19   Q.   -- you got booked?
20   A.   -- booked in, the day they
21 locked -- arrested me that day --
22   Q.   Yes.
23   A.   -- I didn't have no words.

107 (Pages 422 - 425)

Exhibit A

Page 426

1    Q.    Okay.
2    A.    That's what I'm saying.  Even
3 when I seen the judge, he never asked me, all
4 right, what's the reason for this guy to pull
5 you over or anything or the situation or what
6 was the cause of the police officer even come
7 up to you guys.  I never got questioned.
8 They never heard my side of the story.
9    Q.    Okay.  And so, you thought -- and
10 I know -- you thought you should have been
11 able to tell the judge --
12    A.    At least hear me out.
13    Q.    -- they shouldn't have asked for
14 my ID?
15    A.    No, they should at least hear me
16 out on everything --
17    Q.    Okay.
18    A.    -- even not ask for my ID or why
19 did this guy do this or even -- like they do
20 now, they didn't even have -- the police
21 officer even -- was even not even present --
22    Q.    Okay.  But you --
23    A.    -- at the court date.

Page 427

1    Q.    Right.  But you don't dispute or
2 you don't disagree with me, you didn't get
3 jail time for public intoxication?
4    A.    Right.
5    Q.    You understand that?
6    A.    I understand that.
7    Q.    Okay.  And so, the judge, did he
8 ask you --
9    A.    No.
10        MS. TOURE:  Let her finish the
11 question.
12        THE WITNESS:  I know what she was
13 going to ask.
14    A.    But go ahead.
15    Q.    (BY MS. HOLLIDAY)  Did he ask you
16 if you had a job?
17    A.    No.
18    Q.    Okay.  You've talked already
19 about what that interaction was in court,
20 right?
21    A.    Yes.
22    Q.    And that's all that you can
23 remember sitting --

Page 428

1    A.    Yes, because --
2    Q.    -- here today?
3    A.    -- it was so many people there,
4 he had to get them in and out.
5    Q.    Okay.
6    A.    Everybody got locked up that day.
7    Q.    Okay.  And do you dispute that
8 you hadn't paid any money on these tickets
9 for approximately two years?
10    A.    No.
11    Q.    Okay.  Oh, you don't -- you do
12 dispute that?
13    A.    Yes, I do dispute --
14    Q.    Okay.
15    A.    -- that because I have paid.
16    Q.    All right.  But that's one of
17 your complaints, is that you -- the judge
18 didn't ask you enough questions and didn't --
19 you didn't have enough opportunities to
20 speak?
21    A.    Right.
22    Q.    Okay.  And you feel like you were
23 wrongfully commuted?

Page 429

1    A.    Right.
2    Q.    Okay.  Now, but my question about
3 the jail work is, you felt that it was an
4 additional wrong to provide a work
5 opportunity in the jail situation that would
6 permit you to get out earlier?
7        MS. TOURE:  Wait a minute.
8        MR. GILL:  Now, what's wrong with
9 that?  She's entitled to lead.
10        MS. TOURE:  Listen.  You listen.
11 I'm trying to get clarification so that I can
12 understand to make sure he understands
13 because I didn't understand.
14        MS. HOLLIDAY:  Well, then, just
15 ask me to ask it again if you don't
16 understand.
17        MS. TOURE:  You've asked several
18 questions in one.  Opportunities.  You're
19 talking to a layman.  At least break it down
20 and simplify the question.
21        MS. HOLLIDAY:  Well, I think he
22 can understand the question, but I'll ask it
23 a different way.

108 (Pages 426 - 429)

Exhibit A

Page 430

1       MS. TOURE: Well, you used the
2   word "opportunity".
3       Q.   (BY MS. HOLLIDAY) Well, could
4   you have told the folks in the jail, the
5   employees in the jail, no, I'm not going to
6   work today?
7       A.   Right.
8       Q.   Okay. And if you had told them
9   you're not going to work today, you wouldn't
10  have gotten that twenty-five dollars extra
11  credit, right?
12      A.   Right.
13      Q.   Okay. But you wouldn't have been
14  put in solitary confinement just because you
15  didn't choose to work that day, correct?
16      A.   I wouldn't say that.
17      Q.   Well, you don't know one way or
18  another?
19      A.   I don't know one way or another.
20      Q.   Okay. Did you ever see anybody
21  get punished for saying I don't want to go on
22  work detail today?
23      A.   No, there's some rude officers in

Page 431

1   there. That's what I'm telling you, yeah.
2       Q.   Did they punish the people,
3   though?
4       A.   Yeah, you know, they even got
5   pepper sprayed.
6       Q.   Okay. Do you know a single
7   person in the jail who got pepper sprayed for
8   saying I'm not going to go -- I don't want
9   to --
10      A.   Well, I'm not going to say --
11      Q.   -- be on work detail today?
12      A.   -- not going to do work detail,
13  but as you -- you know, if you're saying no,
14  they feel offended by you saying no, like,
15  you know, you can't talk to me like that.
16      You're going to do this or -- you
17  know, they treat you like you're a child,
18  criminal. You might not understand because
19  you probably haven't been locked up. But if
20  you was an officer -- just say it's me, I'm
21  telling you, hey, you've got work detail
22  today. Say no. Just say no. I'm going to
23  tell you how they're going to react.

Page 432

1       MS. TOURE: No, you can't do
2   that.
3       Q.   (BY MS. HOLLIDAY) It's not a --
4       A.   I'm just saying, but they --
5       THE COURT REPORTER: One at a
6   time.
7       A.   But that's how they treat you.
8   That's how they was treating us in there.
9       Q.   (BY MS. HOLLIDAY) Okay. But did
10  any officer demand that you work on any
11  particular day?
12      A.   Well, no, not for real. Well,
13  yeah. Yeah. Yeah. I can say one -- one
14  did. I think her name was -- I can't
15  remember her name. It was a lady. She was
16  like, hey, clean that up. Just give me the
17  rag or whatever, clean that up. And then,
18  after I got through cleaning it up, that's
19  when she was like, I'll put -- I'm going to
20  put this in this book. That's how I learnt
21  about it, you got another twenty-five
22  dollars, you know what I'm saying?
23      Q.   Okay. Well, let's start from the

Page 433

1   very first day you got in there. At what
2   point did you know that there was a
3   possibility to work for credit?
4       A.   After I got in the cell. I
5   didn't -- the first day I was there, I didn't
6   know nothing about nothing. I was --
7       Q.   Okay.
8       A.   -- not anything.
9       Q.   After the first three days when
10  you were sleeping in the --
11      A.   Yeah, and a week after I got
12  booked.
13      THE WITNESS: I'm sorry. I'm so
14  sorry. I'm so sorry.
15      MS. TOURE: Just calm down.
16      THE WITNESS: I'm so sorry.
17      A.   Go ahead.
18      Q.   (BY MS. HOLLIDAY) When did you
19  first learn about the possibility to work,
20  get credit --
21      MS. TOURE: Asked and answered.
22      Q.   (BY MS. HOLLIDAY) -- on what you
23  owed?

109 (Pages 430 - 433)

Exhibit A

1    MS. HOLLIDAY: He can answer.
2    MS. TOURE: Just repeat the
3 answer.
4    A.   As I said, I learned about the
5 work detail after I got this (indicating).
6    Q.   (BY MS. HOLLIDAY) Okay. How
7 long after?
8    A.   A week after.
9    Q.   Okay. So, you were in jail for a
10 week before you learned about the work
11 detail?
12    A.   Right.
13    Q.   And how did you learn about the
14 work detail? And by work detail, we mean
15 that you could work the --
16    A.   Work the time off.
17        The guys that was probably
18 already in there doing their work detail and
19 some of the security guards that was coming
20 around, you know, preferring, hey, do you
21 want to work in the lunchroom, or, hey, do
22 you want to pass out the meals or, hey, do
23 you want to mop the hallway for the night,

1 or, hey, put your name on this, you can catch
2 the roadside assistance. That's how I
3 learned about it.
4    Q.   Okay. And you're saying there
5 was one time that you recall where you felt
6 like someone asked you to do something and
7 you didn't volunteer for it?
8    A.   Right. That's when -- yeah.
9    Q.   Okay. Any other occasion?
10    A.   No.
11    Q.   Now, what kind of work did you
12 do?
13    A.   Okay. Clean the cells, mop the
14 hallways, went outside and cut grass that's
15 around the jail. That's for -- that's the
16 first week. Go outside, cut the grass around
17 the jail, the courtroom, picking up papers.
18 And the next following week, I thought I was
19 going to do that, but they throwed -- I ain't
20 going to say throwed me. Excuse me for
21 saying that. But they put me on the roadside
22 assistance, which I had to go downtown to the
23 City, wash cars. It was an option to wash

1 cars, cut grass, or walk down the highways
2 picking up paper every day. That's all we
3 had to do.
4    Q.   Okay. And so, which option did
5 you choose?
6    A.   I didn't. There was no choose.
7 You go here, you go there, you go there
8 (indicating).
9    Q.   Okay. So, if you -- if you -- if
10 you signed up for the work detail outside --
11    A.   Right.
12    Q.   -- there wasn't an option?
13    A.   There wasn't an option.
14    Q.   Okay. Did you prefer to work
15 outside the jail or inside the jail?
16    A.   I preferred neither one of them.
17    Q.   Well, I understand. But you
18 could have chosen not to work, correct?
19    A.   Sure.
20    Q.   Did you -- is there anything else
21 that you did work-wise?
22    A.   No.
23    Q.   Do you have any complaint with

1 whether you were given --
2    A.   I was embarrassed because I had
3 to go -- the same work detail I had to do,
4 you know, I did this for two weeks. I had to
5 go in front of my job that I just lost
6 because I got locked up and pick up paper,
7 you know.
8    Q.   Right.
9    A.   And my boss man, my HR lady, you
10 know, they see me for two weeks, seven days.
11 And that's what I said -- that's what I was
12 telling him, when I was trying to get my job
13 back, it don't look good. You know you can't
14 talk to them for real. It don't look good.
15    Q.   My question that I was trying to
16 ask, and I appreciate that information,
17 because we want all the information that you
18 have --
19    A.   Right.
20    Q.   -- is, do you have any concern or
21 complaint that you didn't get the proper
22 credit for the days that you did work while
23 you were in jail?

Exhibit A

1    A.   Yeah, I think I did.  I think it
2  was, like, one or two days I didn't.  But I
3  think -- I think they didn't record it
4  because I felt like I was supposed to done
5  got out the quicker time than, you know --
6    Q.   Okay.
7    A.   I get seventy-five dollars a day
8  and I'm in there a month, you know.  And I
9  know that she done paid some money on it, not
10  knowing the amount how much she done paid on
11  it.  Because which y'all are not showing that
12  she even put a dime since -- you know, when I
13  was booked when I know she did.  So, I felt
14  like I was tricked, you know, like, that's
15  money wasted.  So, you know, I -- yeah, I
16  felt like it was probably a week or two or
17  something.
18    Q.   Right, but that had to do with
19  your belief that Monica had paid some money?
20    A.   Yes.
21    Q.   Okay.  And do you know, sitting
22  here today, whether Monica had paid any
23  money --

1    A.   Yes.
2    Q.   -- at the court?
3    A.   I mean, at that time when I was
4  there, she said she did.  Yes, she said she
5  did.  She would come visit me every Sunday.
6  That was visiting hours.
7    Q.   Right.  You mean you were under
8  the understanding that Monica took money to
9  the court, municipal court, and paid some of
10  your fines off?
11    A.   Right.
12    Q.   Okay.  But you don't know how
13  much that was?
14    A.   No, I really don't.
15    Q.   And you haven't seen a receipt
16  for that?
17    A.   No, I haven't.
18    Q.   Okay.  Now, as far as the things
19  that you thought were wrongs done to you, can
20  you think of anything else, sitting here
21  today, that --
22    A.   I reported my medical, and I
23  didn't get assistance --

1    Q.   Okay.
2    A.   -- till the day I left.
3        I told them I had high blood
4  pressure, you know.  I didn't get that until
5  the night before I left.  The night when I
6  found out, you know, they was fixing to
7  release me.  And then, a lady came by, a
8  black lady, if you want to know the color,
9  came by and gave me one blood pressure pill
10  since I've been there.  But the whole time, I
11  never got it.  I used to tell them every
12  night.  Because my hands, they'll swell up.
13  My feet will swell up, you know.  I was
14  constantly using the bathroom.  So, you
15  know --
16    Q.   Okay.  Who did you complain to or
17  who did you report to --
18    A.   To the officers that was ever on
19  that duty that night.
20    Q.   On your first night?
21    A.   On every night.
22    Q.   Okay.  And did you complain to
23  anybody above the officers who were there?

1  Did you ask for --
2    A.   They won't -- I mean, they don't
3  do that.
4    Q.   Okay.
5    A.   They don't do that.
6    Q.   Anything else that you can think
7  of?
8    A.   That's -- as far as that, that's
9  all.
10    Q.   Well, I mean, anything else that
11  you're complaining about?  Because we've
12  talked about jail work and, you know --
13    A.   Yeah.
14    Q.   -- the medical and so forth.
15    A.   And I didn't like the way that
16  when the fire marshal came that day, when the
17  news folks came, they was hiding us out.
18  They made us go down -- some people went
19  downstairs.  Some people was asked to -- I
20  don't know.  I know they had me downstairs
21  like I -- they was hiding me out.
22    Q.   And this is 2013 --
23    A.   Yeah.

111 (Pages 438 - 441)

**Exhibit A**

1    Q.    -- in June?
2    A.    Yeah.  They hide -- they hid us
3  out.
4    Q.    Okay.
5    A.    Because they found out the jail
6  was overcapacity.  Yeah, they hid us out.
7    Q.    And do you know what day that
8  was?
9    A.    No, I really don't know.  You can
10  check the news.
11    Q.    All right.
12    A.    I know he was down there.
13    Q.    Oh, it was on the news?
14    A.    Yeah, when he was supposed to
15  have came, whoever the fire marshal person
16  was at that time.  And I guess he got a
17  complaint saying that they was overcapacity,
18  and he came down there to check.  Prior to
19  that morning, they was already releasing
20  folks -- I'm just saying just releasing folks
21  and putting folks here, sending folks there,
22  and it was crazy.
23    Q.    All right.  So, does that -- as

1  far as you -- as far as your complaints, does
2  that kind of close them out?  Is that --
3    A.    Yeah.
4    Q.    -- all you can recall?
5    A.    I think, yeah.
6    Q.    Okay.
7    A.    I mean, you say about me losing
8  my job, that's not it, so --
9    Q.    Well, let's talk about damages,
10  then.
11    A.    Right.
12    Q.    Let's move on and talk about --
13  talk about damages.  What are your damages?
14  And we can start with money damages.  And
15  what I mean by that -- because, again, if we
16  could break it up, maybe it will make it a
17  little tidier.  I know you've probably got
18  emotional pain and suffering and that kind of
19  thing.  We'll talk about that.  But what
20  about money damages, actual money that you
21  feel that you lost as a result of your --
22    A.    I lost --
23    Q.    -- of the wrongs -- any of the

1  wrongs that you're --
2    A.    Okay.  Well, I lost a good job.
3  I was at eleven seventy-five.  And I was
4  getting back and forth to it.  And, like I
5  said, that's been, like, six years ago.  I
6  could have been a team leader or whatever
7  because, I mean, that was my source of means
8  of paying my tickets off.  I lost good
9  insurance.  Man, like I said, bills and debt.
10  I got -- when I got out, I'm in debt, behind
11  child support, light bill due, car note due,
12  cell phone due.  Hey, even y'all were due.
13  The police officer -- I mean, the tickets
14  were due, you know.  Man, it just -- it was
15  just a whole lot I was facing.  I couldn't
16  find a job anymore.  I couldn't find a job.
17  Didn't have nowhere to go.  Got eviction.  I
18  got evicted.
19    Q.    Okay.  Well, you can keep going
20  but -- yeah.  When you pause, I'll break it
21  down.  Keep going.
22    A.    Yeah, I got an eviction.  It's
23  just like I said, man, I lost a lot, man, you

1  know.  Man, I just lost a lot, man.
2    Q.    Okay.  So, you've testified, I
3  think already, about the loss of your job,
4  right?
5    A.    Right.
6    Q.    You said it's DAS; is that how
7  you say --
8    A.    DAS.
9    Q.    -- the employer?
10    A.    DAS.  That's how they say it,
11  DAS.  I mean, it's a real --
12    Q.    She can't catch that on the --
13    A.    D-A-S.  D-A-S, that's how --
14    Q.    And so, the manager at DAS was
15  not interested in hiring you back?
16    A.    No.
17    Q.    Okay.
18    A.    Because -- actually, she seen
19  me -- they took pictures of me.  Do you see
20  what I'm saying?  They took pictures of me as
21  I was walking as they're going on lunch
22  break.  I was already embarrassed hoping
23  that, hey, man, we need to hurry up and get

**Exhibit A**

Page 446

1   through picking this paper before they go on
2   lunch break.  Man, we made it down there
3   exactly on lunch break, and everybody just,
4   man, there go Agee right there.  There go
5   Levon right there.  And they went and got the
6   HR lady, Mr. Kim, and his assistants.
7       Q.   Uh-huh.
8       A.   That's all I can see.  And that
9   was an everyday process.
10      Q.   You were -- you were down that
11  road for seven days straight?
12      A.   For seven days straight, from
13  Hope Hull exit all the way to the Selma exit,
14  we had to walk every day picking up paper.
15  We only had probably three breaks that day,
16  every time we go.
17      Q.   Okay.  And in addition to the
18  job, you lost the benefits that went with the
19  job, correct?
20      A.   Yes.
21      Q.   And you already had bills due.
22  Were there additional bills that were due as
23  a result of you being in the jail?

Page 447

1       A.   Accumulated, yes.
2       Q.   They just accumulated?
3       A.   Yes.  I mean, you know, child
4   support.  I mean, I really got behind.  I'm
5   twelve thousand -- even though it don't seem
6   like it, just because I got locked 2013, I
7   mean, I felt like I had a job that I could
8   have been consistent and, you know, came up.
9   But when I got locked up in 2013, that one
10  month, I'm twelve thousand behind right now
11  because I'm trying to play catchup on a lot
12  of stuff.
13      Q.   Right.  And you're saying that's
14  because you couldn't get a job?
15      A.   Right.
16      Q.   And you didn't work that month?
17      A.   Right.  I didn't work more than a
18  month.
19      Q.   Right.
20      A.   Not just that month.
21      Q.   No, I understand.  You testified
22  to that earlier.
23      A.   Yes, ma'am.

Page 448

1       Q.   What about the eviction?  Tell me
2   about that.
3       A.   Like I said, she couldn't work.
4   She was already going through, you know, her
5   postpartum depression.  She lost the kids.
6   So, she couldn't work.  I didn't have a job.
7   I mean, we did the best way by, you know,
8   hey, trying to get ends meet to pay these
9   bills.  So, that's when the really breakup
10  came.  She had to go one way, I had to go one
11  way because she felt like I wasn't a man.
12  But she didn't never knew what I was facing.
13      Q.   And the eviction was from which
14  house?
15      A.   The one on Bullard.
16      Q.   Bullard.  Okay.  And do you still
17  owe any money in connection with that?
18      A.   No, she end up paying that off.
19      Q.   And did she pay the other bills
20  as well related --
21      A.   Right, she caught up the truck
22  note that we had, the Santa Fe.  Everything
23  else -- the light bill is on me.  The cell

Page 449

1   phone bill was on me.  The cable bill was on
2   me.  The water bill was on me.
3       Q.   Okay.  Did you -- anything else
4   that you lost property-wise, money-wise in
5   connection with the incarceration, I guess?
6       A.   Like I said -- yeah, I had to
7   pawn everything to pay my bills.  That's how
8   I felt.  I lost a TV, game systems, and stuff
9   like that.  I lost my jewelry.
10      Q.   That was the -- that was the
11  point when you pawed --
12      A.   Yeah.
13      Q.   -- your items?
14      A.   Yeah.
15      Q.   Okay.  And you talked about that
16  earlier, also --
17      A.   Yeah.
18      Q.   -- right?
19      A.   Yes, ma'am.
20      Q.   Your rings, your wedding ring?
21      A.   Yeah.  From my old previous
22  marriage, I kept it.
23      Q.   Okay.

113 (Pages 446 - 449)

Exhibit A

Page 450

1    A.   But I had to pawn it, you know.
2    Q.   And you told us already what pawn
3    shop that was, right?
4    A.   Yes, on Norman Bridge Road.
5    Q.   Okay.  And, at that point, you
6    didn't have your own vehicle, you shared a
7    vehicle with your wife?
8    A.   Yes.
9    Q.   Okay.  Or was she your wife?
10   A.   No, girlfriend.
11   Q.   Girlfriend.  Okay.  And when
12   did -- I'm very sorry about your loss.  When
13   did she lose the twins; do you remember?
14   A.   ████████████████████████.
15   They died, like, January the 13th.
16   ██████████████████████
17   Q.   Okay.  I'm very sorry.
18   A.   And her dad -- her dad died
19   February the 6th.  Her mamma died March, I
20   will say the 11th because --
21   Q.   But not all -- not all in the
22   same year?
23   A.   No.

Page 451

1    Q.   Okay.
2    A.   I'm just saying in that same --
3    you've got to think about it.  In that same
4    year, she's facing death the beginning of the
5    year, January --
6    Q.   Right.
7    A.   -- February, March.
8    Q.   Okay.  And the twins were
9    stillborn January 13 --
10   A.   Yes.
11   Q.   -- 2013?
12   A.   Yes.
13   Q.   And then -- but her parents had
14   died years ago?
15   A.   Yeah.
16   Q.   Okay.
17   A.   Yeah.  But she never got over it.
18   Q.   Understood.
19        MS. HOLLIDAY:  It should be 2013,
20   right.
21   Q.   Okay.
22        MS. MORGAN:  No.
23        MS. HOLLIDAY:  Yeah.  Do you have

Page 452

1    a different date for that?
2        MS. MORGAN:  Well, 2013 was --
3        MS. HOLLIDAY:  I'll just go
4    ahead.
5    Q.   So, Mr. Agee, does that cover
6    sort of the money or the items that you lost
7    as a result of the things that you were
8    wronged about?  Can we move on to the
9    emotional pain and suffering and any sort
10   of other --
11   A.   Yeah, we can move on.
12   Q.   -- complaints?
13   A.   We can move on.
14   Q.   I mean, do you have anything
15   else?  If you remember anything else during
16   the deposition, just let us know.
17   A.   Okay.
18   Q.   Okay.  That's good?
19   A.   Yeah.
20   Q.   Okay.  And I'm going to ask you
21   to let us know, because, again, this is our
22   last time talking to you.
23   A.   Right.

Page 453

1    Q.   Okay.  Tell me about what
2    emotional pain and suffering you are claiming
3    in connection with the wrongs you allege in
4    this litigation.
5    A.   I felt like the wrongs is, man,
6    y'all took an opportunity from me because I
7    had a job that I really liked.  And I was
8    really doing my thing with that job.  And,
9    like I say, I don't know where I would have
10   been today as of now, but I felt like, at
11   that time, that was for me.  It was the most
12   consistent thing that I had going and I was
13   seeing myself, you know.
14        And I just don't -- I mean,
15   everything else after this -- this right
16   here, I just -- it's been in and out.  I
17   don't -- I rarely have opportunities.  You
18   know, I can't get a driving job, you know,
19   because I'm still facing trying to battle
20   these tickets.  You know, I have
21   opportunities, but I can't -- you know what
22   I'm saying?  I have to turn them down because
23   it's so hard for me to get a license, you

114 (Pages 450 - 453)

**Exhibit A**

Page 454

1 know.
2        And then, by me staying in
3 certain areas where I stay at, that's where
4 the police be, you know what I'm saying?  You
5 don't -- you don't want to get behind the
6 wheel, you know.
7    Q.   When was the last time you tried
8 to get a license?
9    A.   Right now, it's -- I'll say what,
10 last week I'm trying to because I told them I
11 was going to come down there and pay whatever
12 the balance is after -- what his name is, the
13 judge -- whatever, he finalized how much I
14 owe.
15    Q.   You understand you don't have to
16 pay anything to the municipal court --
17    A.   Well --
18    Q.   -- to get your license back?
19    A.   -- I didn't know that at the
20 time; you see what I'm saying?
21    Q.   I understand.  I understand.
22    A.   Yes.
23    Q.   I'm asking -- well, let's -- tell

Page 455

1 me all the times after --
2    A.   Never.  I never did because I
3 always owed the tickets.  I thought I never
4 could get a license.  They never told me
5 that -- you know, in the municipal court that
6 I can get a license with owing tickets.  In
7 my mind, I'm always thinking that I can't get
8 tickets until my license are paid -- I mean,
9 until my -- I mean, I can't get a license
10 until my tickets are paid.
11    Q.   All right.  And when did you
12 learn otherwise?
13    A.   This year.  Like I said, going to
14 court with my lawyers.
15    Q.   Okay.  And have you gotten a
16 license this year?  It's October.
17    A.   No, but I am because I'm in a
18 better stable -- I have a job.
19    Q.   Okay.
20    A.   At that time, I didn't have a
21 job, so I couldn't get them.
22    Q.   Do you know what you have to do
23 to get your license back --

Page 456

1    A.   Now, I do.
2    Q.   -- at this point?
3        Okay.  What is it?
4    A.   I have to pay my restitution fee
5 was a hundred and fifty dollars and just go
6 down there and take it, take the written part
7 and take the driver's part.
8    Q.   Okay.  Right.  Because you have
9 to pay a fee to get the suspension removed to
10 the state; is that right?  Is that what
11 you're saying when you say restitution fee?
12    A.   I think that is.
13    Q.   Okay.
14    A.   Yes, I think.
15    Q.   All right.
16    A.   Yes.
17    Q.   And you have to take a driver's
18 test?
19    A.   Right.
20    Q.   The written and the driving?
21    A.   Right.
22    Q.   Okay.  And you plan to do that at
23 some point?

Page 457

1    A.   Right, like, this week.
2    Q.   All right.  And which -- I don't
3 think there's been testimony about this.  Can
4 you tell me what opportunities you turned
5 down because you didn't have a driver's
6 license?
7    A.   At Hyundai, a forklift driver,
8 because, now, you know -- back then -- I
9 mean, I ain't going to say back then, but you
10 always have to have a license to drive a
11 forklift.
12    Q.   Okay.  And when did you turn down
13 the forklift driver job?
14    A.   All the time.  Every job I had,
15 not just Hyundai.  Winn-Dixie warehouse,
16 Genpak.
17    Q.   Okay.
18    A.   You know, those are the
19 opportunities I had to move up, and I had to
20 turn them down.
21    Q.   Okay.  And that would have come,
22 you say, with some advantage?
23    A.   Yes, ma'am.

115 (Pages 454 - 457)

Exhibit A

Page 458

1    Q.   And what would be that advantage?
2    A.   More pay, more -- just more pay,
3  you know, better living.
4    Q.   Okay.  Do you know how much more?
5    A.   Probably a couple dollars.
6    Q.   Okay.  And that had to do with
7  your driver's license, correct?
8    A.   Right.
9    Q.   Okay.  Now, anything else that
10  you say supports your claim for mental health
11  or emotional pain and distress damages?
12    A.   Man, just -- I don't know, man.
13  I just know just in these six years, I lost a
14  lot.  I don't know.  I can't say.  I mean, I
15  can't put no price on it.
16    Q.   Right.
17    A.   You know, just be real with you,
18  there's no price on it.  I just lost time.
19  Just, you know --
20    Q.   All right.
21    A.   I feel --
22    Q.   But you've testified --
23    A.   I'm broke.

Page 459

1    Q.   -- about that?
2    MS. TOURE:  Let him finish.
3    MS. HOLLIDAY:  Okay.
4    MS. TOURE:  He said I feel, and I
5  didn't hear the rest of it.
6    A.   You know, I just -- I just feel
7  like it was just lost time, man.  I feel like
8  you can't put a price on it.
9    Q.   (BY MS. HOLLIDAY)  Got it.
10    A.   There's no price for lost time.
11    Q.   Right.  Are you seeing anyone for
12  counseling or going to counseling anywhere?
13    A.   I counsel myself.
14    Q.   Okay.  Now, when you talk about
15  the suffering that you've been through, was
16  it due to your belief that your arrest was
17  improper and unlawful and that your situation
18  was spiraling downhill because you couldn't
19  pay the tickets?
20    A.   Yes.
21    Q.   And then, the judge commuted you
22  to jail time?
23    A.   Yes.

Page 460

1    Q.   Okay.
2    MS. TOURE:  And that's not to
3  imply that that's the only reason.  The way
4  you posed the question --
5    MR. GILL:  Wait a minute.  Just a
6  minute.  You've got no right --
7    MS. TOURE:  No, you wait a
8  minute.
9    MR. GILL:  -- to supplement his
10  testimony.
11    MS. TOURE:  You wait a minute.
12  You wait a minute.
13    MR. GILL:  I'm not going to wait.
14    MS. TOURE:  You cannot counsel
15  me.  You cannot counsel me.  I'm just trying
16  to clarify.  The way --
17    MR. GILL:  No, you're not.
18    MS. TOURE:  -- she asked the
19  question --
20    MR. GILL:  No, you're not.
21  You're trying to instruct --
22    MS. TOURE:  The way she asked the
23  question --

Page 461

1    MR. GILL:  -- or testify.
2    MS. TOURE:  The way she asked the
3  question, I just want the record to show that
4  the whole record should be included because
5  the way she asked the question is as if that
6  was the only reason.
7    THE WITNESS:  To be honest with
8  you, I don't understand all that.
9    MR. GILL:  Move to strike these
10  remarks of counsel and her comments on the
11  evidence and her instructions to the witness.
12    MS. TOURE:  And move to strike
13  his prior comments.
14    MS. HOLLIDAY:  Can you take this
15  for a little while while I look?
16    MR. LOGSDON:  Uh-huh.  Do you
17  want me to?
18    MS. HOLLIDAY:  Well, just because
19  our time --
20    MR. GILL:  If y'all keep this up,
21  we are going to take it up with the judge if
22  you insist on doing this, interrupting and
23  talking.

116 (Pages 458 - 461)

**Exhibit A**

Page 462

1      MS. TOURE:  Because you're acting
2  very, very, very much disrespectful, I have
3  no problems in taking it up with the judge.
4      MR. GILL:  Good.
5      MS. TOURE:  I've done it before.
6      MR. GILL:  I'm sure you have.
7      MS. TOURE:  Uh-huh.  And I won.
8      MR. GILL:  I'm sure more than
9  other --
10     MS. TOURE:  And I won.  He ruled
11 in my favor.
12     MR. LOGSDON:  Do you want to
13 switch to me so we can move along?
14     MS. HOLLIDAY:  Yeah, so we don't
15 have to take a break.
16     MR. LOGSDON:  Are you okay to
17 keep going?
18     THE WITNESS:  Let's go.
19
20 FURTHER EXAMINATION BY MR. LOGSDON:
21
22    Q.  All right.  Mr. Agee, who is
23 Century Cleaning Services?

Page 463

1    A.  Who?
2    Q.  Century Cleaning Services.
3    A.  That's Centaur.
4    Q.  Centaur?
5    A.  Yeah.
6    Q.  Can you spell that?
7    A.  That's C-e-n-t-u-r-e-y, something
8  like that, I think it is.
9    Q.  Okay.  C-e-n -- okay.  And
10 that's -- is that another employer where
11 you've worked?
12    A.  Yeah, for a short period of time.
13    Q.  All right.  Is it Centaur
14 Cleaning Services?
15    A.  Yes.
16    Q.  In Montgomery?
17    A.  In Montgomery, Alabama.
18    Q.  I don't think we've talked about
19 them today.  When did you work there?
20    A.  I can't remember.  That was so
21 short.  I think I worked -- I don't even
22 know.  It was 2011, '12, something like that.
23    Q.  How long were you there?

Page 464

1    A.  Not that long.  Probably, like,
2  maybe five months or something.
3    Q.  Okay.
4    A.  Or maybe less than five months.
5    Q.  What did you do?
6    A.  I was just floor tech.  Well,
7  first, I started off taking out trash.
8    Q.  Okay.
9    A.  And then, I started off -- I
10 mean, ended up doing floor tech.
11    Q.  Like stripping and waxing floors?
12    A.  Yeah.
13    Q.  And how much did you earn?
14    A.  I can't remember.  I can't.  I
15 think it was probably, like, eight twenty-
16 five, seven twenty-five.
17    Q.  All right.  What about Match
18 Staffing?  Did you ever work at Match, M-a-t-
19 c-h?
20    A.  Yes.  Yes, yes, yes.  I was a --
21 I mean, Match Staffing was on-call.  I really
22 didn't have too many jobs with them.  They
23 just called me every now and then or whatever

Page 465

1  they had going on.
2    Q.  Okay.  Match Staffing, are they
3  located in Montgomery?
4    A.  Yes, sir.
5    Q.  And when did you work there?
6    A.  I can't remember.  I think I'm
7  still present with them now.  I still can't
8  remember.  They still call me now ever since
9  I've got a job.  But every job they had was,
10 like, in Hope Hull or further out than Hope
11 Hull.
12    Q.  All right.  So, it sounds like
13 Match Staffing would call you during the
14 years, and sometimes you would tell them
15 you're not interested or something like that?
16    A.  No, I tell them I can't.  I mean,
17 I had to turn a job, because the job -- like
18 I said, forklift, you have to have a license,
19 or maybe the job is out too far.  I can't get
20 to it.
21    Q.  Okay.  Did you ever hold yourself
22 out --
23    A.  No.

117 (Pages 462 - 465)

Exhibit A

Page 466

1    Q.   -- as being able to operate a
2  forklift?
3    A.   No, never.  I took the test and
4  all.  I just couldn't present my driver's
5  license.
6    Q.   Okay.  I'm not sure I followed
7  your answer.  Have you ever held yourself out
8  as being able to operate a forklift, that
9  being one of your skills?
10   A.   What you mean held out?
11   Q.   Have you ever put on an
12 application as one of your qualifications
13 forklift?
14   A.   Yeah.  Yeah, because some folks
15 don't ask for forklift verification -- I
16 mean, forklift certificates.  So, I put that
17 one down.  But the ones that do, they want
18 you to supply the certificate and a state ID
19 with that.
20   Q.   All right.
21   A.   Or a state driver's license.  My
22 bad.  It's a state driver's license, not an
23 ID.

Page 467

1    Q.   All right.  So, you agree you
2  have, in applications, told -- or when you're
3  trying to get a job, you agree you've told
4  people that one of your qualifications is as
5  a forklift operator?
6    A.   Yes, I've told them I know how to
7  operate a forklift.  They ask what is your
8  skill sets.  I can operate a forklift.
9    Q.   How did you learn how to do that?
10   A.   Working at Hyundai.  That's one
11 of the things you have to do when you go
12 through orientation.  Tugger drivers,
13 forklift drivers, shuttle drivers, the
14 position they put you in, you have to go
15 through a class.
16   Q.   And you did all that?
17   A.   I did all that.  But I
18 couldn't -- to me, for me to hold a job down,
19 I don't have a license.  So, they was not
20 able to put me on there.
21   Q.   Let's go back to Match Staffing.
22 When all have they called you and asked you
23 about a position?

Page 468

1    A.   They called me for a couple of
2  positions in Hope Hull.  But the last one
3  they called me was Genpak.
4    Q.   All right.  I think you said they
5  called you for some and you turned them down?
6    A.   Yeah.
7    Q.   Have you ever put on a resume
8  that you worked with Match -- well, when did
9  you work for Match Staffing?
10   A.   The last time I remember, it was
11 2018 when I got on at Genpak.
12   Q.   Okay.  Have you ever put on an
13 application listing your employment that you
14 worked for Match Staffing?
15   A.   Yeah.
16   Q.   And when did you say you worked
17 for Match Staffing?
18   A.   I can't remember.
19   Q.   Well, would you have ever listed
20 on an application that you worked at Match
21 Staffing from April, '16 to the present?
22   A.   I can't remember.  I promise, I
23 can't remember.

Page 469

1    Q.   Well, would you -- would you
2  have?  Did you work at Match Staffing from
3  8/16 to the present?
4        MS. TOURE:  Are you talking about
5  this year just for clarification?
6        MS. MORGAN:  Present of when?
7  What's present?
8    Q.   (BY MR. LOGSDON)  April, 2016 --
9        MS. TOURE:  Okay.
10   A.   Till now?
11   Q.   (BY MR. LOGSDON)  -- until now --
12   A.   Yes.
13   Q.   -- present.
14   A.   Yes, I put that on there because
15 I still can call them and get a job.
16   Q.   Okay.
17   A.   The only way you can't do that if
18 you're terminated.  That means you're not in
19 their system.  If you call them right now,
20 I'm still showing in their system.
21   Q.   All right.  I think I'm following
22 you.  So, since April of 2016, you've had --
23 you've been on Match Staffing's program --

118 (Pages 466 - 469)

Exhibit A

1    A.    Right.
2    Q.    -- is that correct?
3    A.    Well, which it was Snelling. I
4 was automatically at Snelling, and it just
5 switched over because Match bought Snelling
6 out.
7    Q.    Snelly, that's another new one.
8 Spell that for me.
9    A.    S-n-e-l-l-i-n-g.
10    Q.    Snelling. And where are they
11 located?
12    A.    They no longer exist. It's Match
13 Staffing.
14    Q.    Okay. Snelling is now Match
15 Staffing?
16    A.    Yes.
17    Q.    All right. And so, since April
18 of 2016, you've been with them?
19    A.    Yes.
20    Q.    And sometimes -- back -- if we go
21 back in April of 2016, look at their records,
22 they're got instances where they'll call you
23 about a job, but you've turned them down?

1    A.    I can't answer that because I'm
2 not the one putting the information in the
3 computer. But all I know is, when they call
4 me, I tell them the truth, and they'll call
5 me back, which they --
6    Q.    All right.
7    A.    -- still got me in the system.
8    Q.    Who put your information on the
9 computer?
10    A.    Where, at Match Staffing?
11    Q.    Oh, you're talking about at Match
12 Staffing?
13    A.    Yes. I can put my own
14 information on the computer --
15    Q.    Okay.
16    A.    -- but as far as what they put
17 down, the secretary does that.
18    Q.    Have you ever put on an
19 application that you've worked at Century
20 Cleaning Services from September, '4 to
21 September, 2010?
22    A.    No.
23    Q.    That wouldn't be correct if you

1 put that?
2    A.    I mean, yeah, but the jobs I was
3 applying for, that's a cleaning service. The
4 other jobs I be applying for doesn't have
5 the -- nothing to do with that. They be
6 looking for the qualification for those jobs.
7 So, I use my Hyundai experience for jobs --
8 warehouse jobs, as far as, you know, Genpak,
9 machine operator. That's what I have done.
10 I mean, I don't put Centaur because that's
11 just a cleaning company. That's not going to
12 get me the job.
13    Q.    Okay. So, have you or haven't
14 you put down on an application that you
15 worked at Centaur from 2004 to 2010?
16    A.    Yes, I have. I have a resume. I
17 have it on a resume. I have two or three
18 resumes.
19    Q.    Okay. And one of your resumes
20 you're saying --
21    A.    It's on Indeed.
22    MS. TOURE: Let him finish the
23 question.

1    Q.    (BY MR. LOGSDON) One of your
2 resumes at least says that you worked at
3 Centaur --
4    A.    Yes.
5    Q.    -- from 2004 to 2010?
6    A.    I can't remember. I can't
7 remember from 2004, 2010. I can't remember
8 what I put on there.
9    Q.    Well, did you, in fact, work for
10 Centaur from 2004 to 2010?
11    A.    I don't think I did, no.
12    Q.    Okay. And I'm a little surprised
13 by that because I asked you to death a bunch
14 of questions about --
15    A.    Okay.
16    Q.    -- your jobs.
17    A.    Yeah. Yeah. I don't think I
18 did. I think I just mainly was filling it
19 out. I probably wasn't accurate with the
20 years or whatever or something. But I wasn't
21 working there in 2004, no.
22    Q.    Well, when were you there?
23    A.    I think -- I can't remember

119 (Pages 470 - 473)

Exhibit A

Page 474

1  because I wasn't there that long.
2      Q.   All right.  Did you have a theft
3  of property charge in 2002, fourth degree
4  theft of property charge?
5      A.   Yeah, that's what I -- I was a
6  teenager, yes.
7      Q.   All right.  In 2002?
8      A.   Yes.
9      Q.   So, how old would you have been
10  in 2002?
11         MS. MORGAN:  Asked and answered.
12         MS. TOURE:  That was up under
13  you.  You asked -- you asked him that on
14  direct.
15         MR. LOGSDON:  Yeah --
16         MS. TOURE:  You can go ahead and
17  answer.
18         MR. LOGSDON:  -- I asked him, but
19  I didn't ask him how old he was.
20      Q.   How old were you --
21         MS. TOURE:  Yes, you did.
22         MS. MORGAN:  You did.
23         MS. TOURE:  He told you.

Page 475

1      A.   I told you I was probably, like,
2  seventeen or eighteen.
3      Q.   (BY MR. LOGSDON)  All right.  And
4  did you have two charges, theft of property
5  fourth degree and theft shoplifting?
6      A.   Yes.
7      Q.   All right.
8      A.   Question:  What does that have to
9  do --
10         MS. TOURE:  You can't ask him
11  questions.
12         THE WITNESS:  Oh, okay.  I be
13  wanting to know why is -- why -- why -- what
14  is this?  What is all that?
15         MS. TOURE:  It's not admissible
16  in court, but this is just a deposition.
17         THE WITNESS:  Okay.
18         MS. TOURE:  Okay.
19      Q.   (BY MR. LOGSDON)  Your child
20  support, I know that you told me that was
21  sometimes garnished from your checking
22  account.
23      A.   Uh-huh.  No, my check.  It'll

Page 476

1  automatically come out my check.  That
2  doesn't come out my account.
3      Q.   Right.  Yeah, your check, not
4  your checking account.
5      A.   Right.
6      Q.   How else have you paid child
7  support?  In other words, have you written a
8  check?
9      A.   No, never.
10      Q.   The only times you ever paid --
11      A.   Is out my check, my working
12  check.
13      Q.   -- child support --
14      A.   Child support.
15      Q.   -- is out of your check?
16      A.   Out of my check.
17      Q.   Being deducted from your check?
18      A.   Yes.
19      Q.   Is one of your claims in this
20  case mental anguish or mental -- emotional
21  anguish?  Is that one of your claims?
22      A.   What are you saying, like --
23         MS. MORGAN:  Asked and answered

Page 477

1  by Shannon.
2         MR. LOGSDON:  What was the
3  answer?
4         MS. TOURE:  No.  No, really,
5  Martha, he didn't answer that question.
6         MS. MORGAN:  Oh, okay.  I'm
7  sorry.
8      Q.   (BY MR. LOGSDON)  Is that one of
9  your claims, mental distress --
10      A.   Yes.
11      Q.   -- mental anguish?
12      A.   Yes, yes, yes, yes.
13         MS. TOURE:  She asked it, but you
14  never answered it.
15         THE WITNESS:  Oh, okay.  I'm
16  sorry.
17      Q.   (BY MR. LOGSDON)  So, you're
18  claiming that here, mental distress?
19      A.   Yes.
20      Q.   All right.  Okay.
21         MS. HOLLIDAY:  He did answer it.
22      Q.   (BY MR. LOGSDON)  One of the
23  things you were talking about is the JCS

120 (Pages 474 - 477)

Exhibit A

1    shirt that they wore.
2         A.   Right.
3         Q.   All right.  And we looked at a
4    while back -- you've done a good job of
5    keeping these exhibits in order, by the way.
6         A.   Right.
7         Q.   So, the one right there, Exhibit
8    120, has this little logo --
9         A.   Right.
10        Q.   -- that says Judicial Correction
11   Services, Inc., on it; do you see that?
12        A.   Right.
13        Q.   Is that what they had on their
14   shirt?
15        A.   Well, one time.
16        Q.   Okay.
17        A.   That's not -- like I said, that
18   was the first day.  Then, like I say, after
19   that, it was just, like, a Montgomery Police
20   Department badge, cop uniform.  They didn't
21   have that.  They had the full uniform, the
22   badge, the gun.
23        Q.   You're saying the JCS person had

1    that?
2         A.   I guess that was JCS.  But I'm
3    thinking --
4         Q.   Okay.
5         A.   -- it was the Montgomery Police
6    Department.
7         Q.   Okay.  I'm --
8         A.   Do you get what I'm saying now?
9         Q.   I'm getting what you're saying.
10   If JCS says we -- nobody's ever worn a police
11   thing with a badge and gun but they wore
12   maybe that logo there --
13        A.   No.  That's not --
14             MS. TOURE:  Well, that's --
15   excuse me, let me object.  You're --
16             MR. LOGSDON:  Let me finish my
17   question --
18             MS. TOURE:  Okay.
19             MR. LOGSDON:  -- and then, you
20   can object.
21             MS. TOURE:  Okay.
22        Q.   (BY MR. LOGSDON)  If the
23   testimony from JCS is that they wore a shirt

1    with this logo, but they've never worn a
2    shirt saying Montgomery Police Department --
3         A.   Yes, they have.  That was a --
4    Montgomery Police Department.
5         Q.   Okay.
6         A.   I mean, I can read.
7         Q.   I'm with you.
8         A.   Okay.
9         Q.   Do you know for sure that it was
10   a JCS person that had --
11        A.   That's what I'm telling you.  I
12   didn't know if it was a JCS person --
13        Q.   Okay.
14        A.   -- or whatever.
15             I'm just thinking, like, hey, I'm
16   paying this money to you and it's going to
17   them --
18        Q.   All right.
19        A.   -- or going to my tickets.
20        Q.   All right.  And this Exhibit 116,
21   Number 2 there says you will pay Judicial
22   Correction Services, Inc., forty dollars; do
23   you see that?

1         A.   Right.
2         Q.   And we're looking at the order,
3    the court's order, Exhibit 116 --
4         A.   Right.
5         Q.   -- do you see that?
6              So, you knew at least then -- and
7    I know this was a couple of years ago.  But
8    at least then, you knew that --
9         A.   Forty dollars will keep you out
10   of jail.
11        Q.   You knew you were paying the
12   one -- you were paying that to a company
13   called Judicial Correction Services, Inc.?
14        A.   No, I did not.
15        Q.   You didn't know?
16        A.   No, I did not.
17        Q.   Okay.  You agree it says that,
18   though?
19        A.   I mean, I see it now, but, at
20   that time, I didn't agree to, you know, I was
21   paying towards them.
22        Q.   Okay.
23        A.   I thought the forty dollars was

121 (Pages 478 - 481)

**Exhibit A**

Page 482

1  going towards my tickets.  I mean, that's
2  what they were saying.
3      Q.   I understand.
4      A.   That's the bare minimum.
5      Q.   You knew you were meeting with a
6  company called --
7      A.   Yes, meeting with them --
8      Q.   Yeah.
9      A.   -- but not knowing I was paying
10 them.
11     Q.   Okay.  I think I'm following you.
12          And, by the way, we've called --
13 sometimes today, we've called Judicial
14 Corrections Services, Inc., we've been
15 calling them JCS.  You understand that's a
16 nickname?
17     A.   Okay.
18     Q.   But you knew that -- you didn't
19 know who the money was going to ultimately,
20 but you knew that you were -- at least at
21 this time, you were meeting with Judicial
22 Correction Services, Inc., and paying them --
23     A.   Right.

Page 483

1      Q.   -- right?
2          Okay.
3          MS. TOURE:  Can we just take a
4  five-minute break?
5          MR. LOGSDON:  Yeah.  Uh-huh.
6          MS. TOURE:  Just five minutes.
7          MR. LOGSDON:  Yeah.  All right.
8  So, what time is it?
9          MS. TOURE:  You've got the hang
10 of it.  4:33.
11
12          (Whereupon, a brief recess was
13          taken.)
14
15     Q.   (BY MR. LOGSDON)  Mr. Agee,
16 the -- let me clarify something about the
17 payments that you made when you would visit
18 JCS.  We were talking about that earlier.
19 And I just want to clarify, you're not --
20 you're not saying that you would make -- that
21 there would be a police officer standing --
22 sitting in the JCS desk that you would make
23 payments to, are you?

Page 484

1      A.   I mean, yeah, if you don't have a
2  JCS logo on.  That's what I'm saying.  It was
3  a police officer.
4      Q.   Explain that to me.
5      A.   I mean, you go in.  There's a guy
6  with a badge or a female with a badge.  It
7  doesn't say JCS.  It say Montgomery Police
8  Department.  They'd be sitting there.
9      Q.   Okay.
10     A.   You come in.  You tell them your
11 name, which they'll pull out a paper with a
12 list, your name and what time you're supposed
13 to come and pay.  You give them what you can,
14 like you said, the forty-dollar bare minimum.
15 They'll write you a receipt and let you know
16 when the next time you go to show back up for
17 the next payment, what's your deadline.
18     Q.   All right.  And you're saying
19 that that was a police --
20     A.   All the time --
21     Q.   -- officer?
22     A.   -- I thought it was a police
23 officer.

Page 485

1      Q.   All right.  And why did you think
2  it was a police officer?
3      A.   A badge.
4      Q.   You're not talking about a logo,
5  you're talking about a badge?
6      A.   A badge, a real badge.  Well, I
7  guess that's a real badge.  A badge.  And
8  then, you have a gun.  But they don't have
9  no -- I didn't see no symbols -- I see it on
10 this paper.  Like I was telling you, I see it
11 on the paper.
12     Q.   Okay.
13     A.   But they say they wore a shirt.
14 There was no shirt.
15     Q.   All right.  Now, do you know --
16 because you've paid different payments at
17 different times and you paid different people
18 on payment plans during the year.
19     A.   Right.
20     Q.   And you were only with JCS for --
21 let me see that right there.
22     A.   A short period of time.
23     Q.   Yeah, a short period of time.

122 (Pages 482 - 485)

Exhibit A

Page 486

1 And JCS, frankly, shows you were only
2 there --
3      A.   One time.
4      Q.   -- twice.
5      So, are you -- are you sure that
6 this payment that you're talking about, one
7 of these two payments, wasn't to one of
8 the -- before you were on JCS or after you
9 were on JCS?
10     A.   I really don't know, but all I
11 know is, I did what they told me to do.
12     Q.   Okay.
13     A.   That's all I can tell you.
14 Whatever they told me to do, I did it.  I
15 tried the best of my ability to pay and get
16 this off my record.  That's all I can say.
17     Q.   When you -- when did you first --
18 you mentioned hearing an advertisement on the
19 radio about -- from a lawyer.
20     A.   Right.
21     Q.   And --
22     A.   Well, it's not by the lawyer.
23 They asked us from the -- I think it was --

Page 487

1 they had a -- Killer Diller Roscoe Miller was
2 having a campaign boycotting the Montgomery
3 Police Department about the unnecessary
4 roadblocks and have you ever been in a
5 roadblock or whatever, can you come down and
6 voice your opinion.  And that's what it was.
7 I came down and voiced my opinion.
8      Q.   When was that?
9      A.   I can't remember.  I know it was
10 after the fact that I got out.
11     Q.   In 2013?
12     A.   Yes.  Yes.
13     Q.   All right.  What's the -- what's
14 the name?
15     A.   The radio station was Killer
16 Diller Roscoe Miller.  That's his -- that's
17 the DJ name.
18     Q.   The DJ's name?
19     A.   Yeah.
20     Q.   All right.
21     A.   And so, that's -- all right.
22 Yeah.
23     Q.   And --

Page 488

1      A.   And his radio station was located
2 on the Southern Boulevard.
3      Q.   And when did you go down there?
4      MS. TOURE:  He's good at
5 anticipating your questions, isn't he?
6      A.   Like I said, I don't know if it
7 was a month after I got out or two months.
8      Q.   (BY MR. LOGSDON)  A month or two
9 after you got out?
10     A.   I'm not accurate, but that's when
11 I went, after I got out.
12     Q.   All right.  Did you feel like you
13 had a claim for a lawsuit at that point?
14     A.   No, I had a voice of how I got
15 arrested and wanted to say something about
16 these unnecessary roadblocks.
17     Q.   Okay.  When did you first meet
18 with a lawyer?
19     A.   Oh, after I voiced my opinion and
20 wrote my statement, it took a quite -- I'm
21 not accurate on the time, but it took a long
22 time.  Not that long, but it took a long
23 time.

Page 489

1      Q.   Who did you write a -- give a
2 written statement to?
3      A.   To the campaign that was down
4 there at the radio station.
5      Q.   And who was the campaign, Killer?
6      A.   Killer Diller Roscoe Miller.
7      Q.   Killer Diller Roscoe Miller?
8      A.   Yeah.
9      Q.   All right.  Did you keep a copy
10 of the statement you gave Killer?
11     A.   I -- no, I didn't.  I really
12 didn't.
13     Q.   All right.
14     A.   I had it, but I don't have it.  I
15 had it.  That was so long.  I had it, and,
16 like I said, by moving, it probably got
17 misplaced.  But I wrote it.
18     Q.   Who was the first lawyer you met
19 with?
20     A.   This is the only lawyer I met
21 with, first and last (indicating).  Nobody
22 else.
23     Q.   Who was -- you looked at two of

123 (Pages 486 - 489)

Exhibit A

1 them, so --
2    A.   I always thought they worked
3 together.
4    Q.   You met with both of them at the
5 same time together?
6    A.   Well, I think I met Ms. -- I
7 really don't know.
8       MS. TOURE:  I don't either.
9    A.   I really don't know.
10    Q.   (BY MR. LOGSDON)  Met with one of
11 the two?
12    A.   One of the two.  One of the two,
13 I know.  I always thought they worked
14 together.
15    Q.   They look alike.
16    A.   They're a team.
17       MS. TOURE:  We do.  We're sisters
18 under the skin.
19    A.   They're a team.  They're a team.
20    Q.   (BY MR. LOGSDON)  All right.
21 And --
22       MS. MORGAN:  And others --
23    Q.   (BY MR. LOGSDON)  Where did you

1 meet with them?
2       MS. MORGAN:  -- that he's met
3 with.
4    A.   I think I came to the office --
5       THE WITNESS:  Was it that
6 South -- on South Perry Court Street?
7       MS. TOURE:  You can't ask me.
8       THE WITNESS:  Oh, I'm sorry.
9    A.   Yes, I think it was on South
10 Perry Court Street at their office.
11    Q.   (BY MR. LOGSDON)  All right.  And
12 how many times -- or do you know any of the
13 other plaintiffs in the case?
14    A.   I know quite a few.  I know Chris
15 Mooney.  I don't know him personally, but I
16 just know him by meeting him at the campaign.
17 What is her name?  I'm bad with names.  I
18 know them, but I --
19    Q.   Angela McCullough?
20    A.   Yeah, Angela McCullough, I met
21 her.  We met at the --
22    Q.   At the campaign?
23    A.   -- lawyer's office.

1       No, I met her at the lawyer's
2 office, at their office.
3    Q.   All right.  And who else do you
4 know?
5    A.   That's about it.  Everybody else
6 is, you know -- sometimes they're there,
7 sometimes they're not, so --
8    Q.   When you say sometimes they're
9 there, sometimes they're not, sometimes at
10 the lawyer's office or where?
11    A.   Whenever we're supposed to meet
12 and have a meeting.
13    Q.   All right.  How often do y'all
14 meet?
15    A.   Very seldom.  Probably -- I'll
16 say once -- one -- once out of a month.
17 Sometimes like three months, we meet one
18 time, and three months later, we'll meet
19 again.  It's --
20    Q.   Okay.
21    A.   -- very seldom.
22    Q.   All right.  Do you ever talk to
23 either Chris or Angela?

1    A.   No.
2    Q.   When's the last time you talked
3 to Chris?
4    A.   Talking about at the last
5 meeting, at the courtroom?
6    Q.   Okay.  And how about Angela?
7    A.   At the courtroom.
8    Q.   All right.  Have you ever met
9 with any other lawyers --
10    A.   No.
11    Q.   -- other than --
12    A.   Well, I have --
13    Q.   -- the two in the room here?
14    A.   -- in the accident but not
15 dealing with this case.
16    Q.   Yeah.  Okay.
17    A.   Just put that out there.  Yeah.
18    Q.   Yeah.  Okay.  What did you do --
19 did you review any documents before you came
20 here today?
21    A.   No.
22    Q.   If you were going to go -- we've
23 talked about a lot of different things today,

124 (Pages 490 - 493)

**Exhibit A**

Page 494

1  like your work history and your banks and
2  other lawsuits and those kind of things.  And
3  we've talked about trying to find some kind
4  of paperwork.
5      A.  Uh-huh.
6      Q.  When you keep papers, where do
7  you keep them?
8      A.  In my -- like in an envelope.
9  I'll put it in my closet or in my drawer.
10     Q.  So, if you were going home and --
11 because we talked about you looking for some
12 papers.
13     A.  Right.
14     Q.  If you were going home and going
15 to look for some papers --
16     A.  They're not there.
17     Q.  You don't have any papers?
18     A.  I don't have any papers that
19 you're asking for.  They're not there.
20 Everything I have, I have gave it to my
21 lawyer.
22     Q.  Oh, gave them the originals?
23     A.  Yes.  Right.

Page 495

1      Q.  So, you don't have any checking
2  account documents or anything?
3      A.  No.
4      Q.  Any pay stubs or anything like
5  that?
6      A.  No.
7      Q.  All right.  So, the envelope you
8  were talking about, you wouldn't have
9  anything in an envelope?
10     A.  No.
11     Q.  All right.
12     MR. LOGSDON:  Y'all go ahead.
13     MS. HOLLIDAY:  Sure.
14
15 FURTHER EXAMINATION BY MS. HOLLIDAY:
16
17     Q.  On the occasions up through the
18 time in June of 2013 when you were in the
19 municipal court --
20     A.  Uh-huh.
21     Q.  -- let's talk about who you
22 encountered in the courtroom.
23     I think we've talked about it,

Page 496

1  but I just want to get some clarification.
2  In the courtroom, you saw the public
3  defender?
4      A.  Right.
5      Q.  Okay.  You saw the judge,
6  correct?
7      A.  Uh-huh.
8      Q.  Yes?
9      A.  Yes.  I'm sorry.
10     Q.  You saw the judge's clerks,
11 right?
12     A.  Right.
13     Q.  Was there anyone else other than
14 the people who were waiting on the judge that
15 you saw in the courtroom at the municipal
16 court?
17     A.  No.
18     Q.  Okay.  Do you have any social
19 media web pages or sites that you use?
20     A.  Yes, Facebook.
21     Q.  Okay.  And is that the only one?
22     A.  Tagged and that's it.
23     Q.  Okay.  And how long have you had

Page 497

1  those?
2      A.  For a minute.
3      Q.  Okay.  For a little while?
4      A.  Yeah.
5      Q.  For a few years?
6      A.  For some years.  For some years,
7  I will say, yes.
8      Q.  Have you erased anything from
9  either of those social media sites?
10     A.  No.
11     Q.  Ever?
12     A.  Ever.
13     Q.  Okay.  I believe -- you know,
14 we're probably entitled to that in discovery.
15 So, we ask you not to get rid any of the
16 entries on the social media sites.
17     Do you recall if you wrote
18 anything about the complaints you're bringing
19 in this lawsuit or your grievances?
20     A.  Don't nobody know about this.
21     Q.  Okay.  Or even the things you
22 went through?
23     A.  Nobody.

125 (Pages 494 - 497)

**Exhibit A**

Page 498

1    Q.   Okay.  You keep that to yourself?
2    A.   And to my lawyers.
3    Q.   Right.  But even having been --
4    A.   No.
5    Q.   -- having had to go to jail and
6  those kinds of things.
7    A.   No, I don't talk to nobody about
8  that.
9    Q.   Got it.  Have you talked about
10  all of your family members in this area?
11    A.   Yes.
12    Q.   Okay.  Do you have any family
13  members living still in Brewton?
14    A.   Yes.  The majority of my family
15  from both sides, my mom and dad, that's where
16  we're from.
17    Q.   Okay.  What county is that in?
18    A.   Castleberry.
19    MS. TOURE:  I thought it was --
20    MS. HOLLIDAY:  It's Escambia.
21    MS. TOURE:  It's Escambia.
22    MS. HOLLIDAY:  Yeah.
23    MS. TOURE:  I think it's

Page 499

1  Escambia.
2    Q.   (BY MS. HOLLIDAY)  That sounds
3  right.  It's really far away, right?
4    MS. TOURE:  It's not that far.
5    A.   Not that far.  It's, like, an
6  hour and thirty minutes.
7    Q.   (BY MS. HOLLIDAY)  We're asking
8  for jury purposes.  So, my question is --
9    MS. TOURE:  It's in -- it is in
10  the Southern District.
11    MS. HOLLIDAY:  I think so, too.
12  If not, we'll augment, okay?
13    MS. TOURE:  Right.
14    Q.   (BY MS. HOLLIDAY)  But we really
15  don't need to have everybody in your whole
16  family tree on this deposition if we don't
17  need it.
18    A.   Yes.
19    Q.   The reason we ask is because the
20  jury pool comes from a certain area and we
21  need to know your family members who live in
22  that area.
23    A.   Yes.

Page 500

1    Q.   So, as far as the Montgomery
2  area, you've told us, right --
3    A.   Right.
4    Q.   -- who your family members are?
5    A.   Right.
6    Q.   And it's a limited group because
7  only a few of you moved up?
8    A.   Right.
9    Q.   Aunts and uncles in the
10  Montgomery area?
11    A.   I have two aunts --
12    Q.   Okay.
13    A.   -- and their kids.
14    Q.   And who are -- what are their
15  names?
16    A.   Well, my mom's sister, which is
17  her sister from the same parent, her name is
18  Gail Robbins.
19    Q.   Okay.  Robinson?
20    A.   Uh-huh.  Robbins.
21    Q.   Robbins?
22    A.   Uh-huh.
23    Q.   And does she have any --

Page 501

1    A.   Yes.
2    Q.   -- adult children?
3    A.   Uh-huh.
4    Q.   Okay.
5    A.   Her oldest son, his name is
6  Connie Ray Robbins.
7    Q.   Okay.
8    A.   Next daughter is Akaya Robbins.
9    Q.   K-a-y-a?
10    A.   Akaya.
11    Q.   Okay.
12    A.   I think she spell it A-k-a-y-a,
13  something like that.
14    Q.   All right.  Robbins.
15    A.   And Adazia Robbins.
16    Q.   And where do they live?  Do you
17  have any idea?
18    A.   They're spread out.  They live
19  somewhere on Atlanta Highway.
20    Q.   Okay.  I couldn't tell you where
21  my cousins live either.
22    Other aunt?
23    A.   And my other aunt, she's married

126 (Pages 498 - 501)

**Exhibit A**

Page 502

1  in on my dad's side, her name is Harriet
2  Speers.
3       Q.   And she's got a husband, adult
4  children, anything like that?
5       A.   She only have one child up here.
6       Q.   Okay.
7       A.   Her name is Cory Speers, I think,
8  if she haven't got married yet.  But her last
9  name is Speers.  I don't know.
10      Q.   Yeah, the maiden name thing is a
11 problem, right?
12      A.   Yes.
13      Q.   Okay.
14           MS. TOURE:  At least you've got
15 him laughing.
16           THE WITNESS:  Yeah.
17           MS. HOLLIDAY:  He can see the
18 light at the end of the tunnel.
19      Q.   Is there a Mr. Speers?
20      A.   I don't know.  I stay to myself
21 on that.  I don't know.
22      Q.   Any other family members that we
23 have -- we've missed, who are adults over

Page 503

1  eighteen?
2       A.   My grandma.  She's -- she come
3  from Brewton.
4       Q.   She's up here?
5       A.   She's in a nursing home.  Yes.
6  Her name is Savara Robbins.
7       Q.   Okay.  How do you spell that?
8       A.   Oh.
9       Q.   That's okay.
10      A.   Yeah.
11      Q.   Savala?
12      A.   Savara.  I think it's S-a-r-r --
13 no, I think it's S-a-v-a-r --
14      Q.   Okay.  If we see anything like
15 that, we'll know --
16      A.   Okay.
17      Q.   -- what we're talking about.
18      A.   Because I need to know that.
19      Q.   Anybody else?
20      A.   I mean, I have -- well, my
21 understanding, I do have people up here, but
22 I never met them.
23      Q.   Okay.

Page 504

1       A.   I'm just being honest.  I'm --
2  when my mom moved up here, it was just
3  certain folks she brought us around to,
4  so --
5       Q.   All right.
6       A.   -- we've just been like that ever
7  since.
8       Q.   Okay.  And as far as they know,
9  they may never have met you?
10      A.   Yeah, they never.
11      Q.   Okay.  And I asked you about your
12 emotional distress earlier, right?
13      A.   Yes, ma'am.
14      Q.   Can you tell me -- I don't think
15 I covered it sufficiently to ask if you've
16 had any symptoms that -- have you -- have you
17 had any symptoms of emotional distress --
18      A.   Yes.
19      Q.   -- related to this?
20      A.   High blood pressure, my diabetes.
21      Q.   Now, you'd agree with me that you
22 had high blood pressure before any of these
23 incidents occurred --

Page 505

1       A.   Well --
2       Q.   -- right?
3       A.   -- yeah, but it got -- I mean, I
4  found out.
5           But, like I say, it got serious
6  during this, this depression time.  Well, I
7  really found out I had diabetes after I came
8  out of this because my pressure was so high.
9  And, like I said, I had to go to the
10 emergency room.  I know I didn't have the
11 perfect means to -- the insurance that I
12 lost.  And when I went to the emergency room,
13 I was -- you know, they diagnosed me, saying
14 I had diabetes.  And when I went to Dr. Adams
15 for the little insurance I did have at that
16 short period of time is when I learned I had
17 it.
18      Q.   Right, but you went to Dr. Adams,
19 I thought, when you had insurance before
20 in --
21      A.   Yeah, but --
22      Q.   -- June, 2013?
23      A.   -- Dr. Adams is the only

127 (Pages 502 - 505)

**Exhibit A**

1 doctor -- that's what I meant by I have
2 records of showing that.
3          Everything else is emergency room
4 where I --
5      Q.   Okay.
6      A.   When I was going to Dr. Adams, I
7 had insurance, you get what I'm saying --
8      Q.   Yeah.
9      A.   -- through a job.
10          When I learnt I had my diabetes,
11 I was hired on with -- I forgot.  I think it
12 was Winn-Dixie warehouse or something like
13 that for that short period of time or
14 something.
15      Q.   When you got on permanent, you
16 got some benefits?
17      A.   Yeah, I got some benefits.  And,
18 you know, like I said, I found out I had
19 diabetes because of my blood pressure, I
20 mean, had got super high.  That's why I was
21 telling you about the personal issues I had.
22 I had to quick to sit down and get myself
23 back right.

1      Q.   Okay.
2      A.   Yeah.
3      Q.   And those personal issues had to
4 do --
5      A.   Yeah, I didn't --
6      Q.   -- with everything that happened
7 in 2013?
8      A.   Yeah, because I had -- like I
9 say, I only took my blood pressure -- they
10 only gave me a pill to take my blood
11 pressure, and they asked me -- I forgot what
12 they asked me, but they only gave me one
13 tablet since I been in there.  When I was
14 locked up, I told them every day that my
15 pressure was up, I was feeling dizzy, I was
16 feeling woozy, You know, can I get some more
17 water.  The water in the cell was nasty.  I
18 couldn't drink it, you know.  You know, then,
19 they always denied it.  They, hey, we're
20 going to come.  They even lied to me, hey,
21 we're going to give it to you.  They never
22 gave it to me.
23      Q.   When did you go first to the

1 doctor after you were released from the jail
2 in July, 2013?
3      A.   I think I went two days because I
4 couldn't use the bathroom because of the
5 food.  It locked my system up, man.  That
6 food was terrible.  I had to go get some
7 medicine to, you know, loosen my bowels and
8 everything.  And that's when I found out, you
9 know, dealing prior with the emergency room,
10 they was telling me I need to find me a
11 doctor to go check because I might be a
12 diabetic.
13      Q.   Okay.  So, about two days after
14 you got out, you went to the ER?
15      A.   Yes, because I couldn't use the
16 bathroom.
17      Q.   And at that ER visit -- that was
18 Baptist South?
19      A.   Yes, ma'am.
20      Q.   Okay.  So, that should be in July
21 of 2013?
22      A.   Yes, I think.  Yeah.
23 Somewhere --

1      Q.   Okay.
2      A.   -- around there.
3      Q.   And you went because of stomach
4 issues --
5      A.   Yes.
6      Q.   -- right?
7      A.   And high blood pressure.
8      Q.   Okay.
9      A.   You know, when you can't use
10 that, that brings your pressure up, too.
11 When you can't release, your pressure go up.
12 So, they had to give me some medicine to work
13 myself out, you know what I'm saying?  They
14 was like, well, I think we see something
15 else, too.  Your sugar's high.
16      Q.   Okay.
17      A.   Yeah.
18      Q.   And so, that was the first time
19 you were diagnosed with diabetes?
20      A.   Yes, ma'am.
21      Q.   Okay.  And did the doctor tell
22 you that the diabetes was related somehow to
23 the high blood pressure?

128 (Pages 506 - 509)

Exhibit A

1      A.   Yes.  Not taking my medicine.
2  Not eating the proper foods, exercising,
3  stuff like that.
4      Q.   Right, but that's for a whole
5  period of time, not just the twenty-eight
6  days you were in jail?
7          MS. TOURE:  We object to that.
8  He's not a doctor.  He cannot decide what
9  time it was.
10         MS. HOLLIDAY:  I'm asking him
11  what the doctor told him.
12     A.   I'm just telling you, after I got
13  out, that's what he was saying at that time.
14  I'm not saying it was the whole period of
15  time.  Just letting you know it was up at
16  that time when I got out.
17     Q.   (BY MS. HOLLIDAY)  Got it.
18     A.   Yeah.
19     Q.   But did he say to you the
20  diabetes is a result of not eating properly
21  for a several years or for a period of time?
22     A.   No, he didn't.  He didn't.  He
23  just -- he was just explaining how it come --

1  where it comes from, but he was not saying
2  that.  He was just letting me know -- I told
3  him my situation, that I was -- I just got
4  out and my stomach was messed up.  And he was
5  like, I can see because your pressure was up.
6  And he was like, let me see if you've got
7  sugar.  So, they ran, you know, the diabetes
8  test.  He was like, yeah, man, you know, you
9  need to start exercising.  You know, he was
10  just giving me, you know, examples of how
11  this may cause, you know.
12     Q.   Right.  But you'd been exercising
13  pretty steadily --
14     A.   Yeah.
15     Q.   -- correct?
16     A.   Not in jail.
17     Q.   Well, you walked ten miles down
18  I --
19     A.   Well --
20     Q.   -- 80 every day.
21     A.   Yeah, but I didn't have the --
22  but, still, that's not having high blood
23  pressure medicine in me.  I just walked.

1      Q.   I understand.
2      A.   Yeah.
3      Q.   No, no, I understand.  I'm just
4  talking about the exercise.
5      A.   Yeah.
6      Q.   So, did he prescribe you blood
7  pressure medicine that day?
8      A.   Yes.
9      Q.   And you had had blood pressure
10  medicine before?
11     A.   Well, the emergency prescribed me
12  a low dose because they didn't have records
13  of the actual dose I supposed to have been
14  on.  So, you know, they only give you what's
15  safe for you --
16     Q.   Okay.
17     A.   -- and told me to go see a
18  doctor.
19     Q.   And were you able to go see a
20  doctor?
21     A.   No, I didn't have no insurance at
22  that time.
23     Q.   Okay.

1      A.   It took me a minute to go see the
2  doctor.  I had to be in and out, in and out.
3  I didn't want to keep going to the emergency
4  room, running my bill up because I was scared
5  I was going to get garnished again, but I had
6  to do what I had to do.
7      Q.   And they didn't give you anything
8  for the diabetes at that point in time?
9      A.   No, they'll give you something
10  there, which they'll give you a shot right
11  there, but they never gave me no medicine.
12  They'll give me something to bring it down
13  enough so I could leave and go find me a
14  doctor.
15     Q.   And when were you able to see a
16  doctor next?
17     A.   Man, I --
18     Q.   Not until Winn-Dixie, right?  I
19  mean, is that --
20     A.   Yeah, that was like some years
21  later.  That was like a year, almost a year
22  or two later because I was working at a temp
23  service after I got out.

129 (Pages 510 - 513)

Exhibit A

Page 514

1  Q.   And what doctor did you go see?
2  A.   Adams.
3  Q.   Adams?
4  A.   Yes.
5  Q.   You went back to the same doctor?
6  A.   Yes.
7  Q.   Okay.
8  A.   That's the only doctor I knew in
9  Montgomery.
10  Q.   Any other symptoms that you have
11  that support your --
12  A.   No.
13  Q.   -- mental distress?
14  A.   No.
15  Q.   Okay. I'm going to try to get
16  that to be one question and one no. I think
17  that's fine.
18  A.   Okay.
19  Q.   It will be readable. When you
20  interrupt, it looks real funny on the
21  transcript. It looks like three of my words
22  and two of your words and three of my words.
23  A.   I'm sorry.

Page 515

1  Q.   No problem. It's so hard to
2  wait.
3  A.   Yes, ma'am.
4  Q.   Did you at any point seek
5  government benefits? I know we've asked
6  about disability.
7  A.   No.
8  Q.   That's a no?
9  A.   No, I didn't.
10  Q.   Okay. And no food stamps?
11  A.   No.
12  Q.   Even when you were on your own
13  and --
14  A.   No.
15  Q.   -- homeless?
16  A.   I didn't.
17  Q.   No?
18       MS. TOURE: Excuse me. This is
19  just a point of clarification. If I'm wrong,
20  you can tell me. You said seek. I want to
21  make sure he understands between seek and
22  get. Because I thought he testified that he
23  tried to get food stamps.

Page 516

1       THE WITNESS: I did.
2  Q.   (BY MS. HOLLIDAY) Oh, did you?
3  I'm sorry. I missed that.
4       MS. TOURE: I thought I heard him
5  say that earlier.
6       THE WITNESS: I did.
7  Q.   (BY MS. HOLLIDAY) I wouldn't
8  have asked if I had known that you had.
9  A.   Yeah, I got turned down.
10  Q.   Okay.
11  A.   Yeah.
12  Q.   And is that testimony about when
13  you tried --
14  A.   Because, at that time, I mean,
15  you had to have a job to get food stamps.
16  Q.   You had to be seeking a job or
17  you actually had to have a job?
18  A.   No, you had to have a job. You
19  had to have so much income coming in to get
20  food stamps. I didn't have anything coming
21  in.
22  Q.   Now, you got a copy of the
23  tickets from the Montgomery Police Department

Page 517

1  when you were pulled over and written up a
2  ticket, right? You got a copy?
3  A.   Right.
4  Q.   Okay. And correct me if I'm
5  wrong, but you said the same police officer
6  who wrote your tickets was the police officer
7  down at the JCS that you said was waiting on
8  you down there?
9  A.   Yes. Yes.
10  Q.   Okay. And do you know who that
11  officer was?
12  A.   No, I just know one of them was
13  white and one of them was black. I --
14  Q.   So, you really are -- I'm sorry.
15  A.   Two officers. What I mean by two
16  officers working at different times. Like,
17  hey, one day, it might be this white guy here
18  this day and the black guy. They was working
19  together.
20  Q.   At JCS?
21  A.   At JCS. I mean, you'll see them.
22  They'll be sitting outside. Or one might be
23  sitting outside or one might be sitting

130 (Pages 514 - 517)

**Exhibit A**

Page 518

1 inside the building.
2     Q.   Right.  And are you talking
3 Ripley Street?
4     A.   Yes.
5     Q.   Okay.
6     A.   I mean, Dexter, too.
7     Q.   Okay.  Was it the same white guy
8 and the same black guy --
9     A.   Yes.
10     Q.   -- at Ripley and Dexter, also?
11     A.   Uh-huh.
12     Q.   Yes?  Is that yes?
13     A.   Yes.  Several of them.  It's just
14 not just those.  Those are the two I can
15 remember.  But there are several officers
16 sitting around there just waiting.
17     Q.   Uh-huh.  At Dexter Avenue?
18     A.   Yes.
19     Q.   Okay.  And it's the same officers
20 who gave you tickets every time?
21     A.   Yes, I think so.  Well -- because
22 every time you see a road -- I mean, every
23 time I got caught up in a roadblock, I see --

Page 519

1 I be seeing them.  If it's not the black
2 police officer -- I don't know his name -- or
3 the white police officer -- I don't know his
4 name -- but they're there on the scene --
5     Q.   Okay.
6     A.   -- always.
7     Q.   And have you always -- well, let
8 me retract that.
9         You never saw their names, but
10 you're saying their names will be on your
11 tickets?
12     A.   Yeah.  I mean, well, to be
13 honest, I never -- I can remember a face.  I
14 never -- I'm not saying I can't read.  I just
15 never pay attention because, you know, you
16 just -- at that time, you don't think like
17 that.  You know, you just think like, man,
18 what's up, man?  Why are you doing me like
19 this, you know what I'm saying?  You're
20 trying to see what the why and all this, you
21 know.  But I never -- I never got their name,
22 never, you know.  But I know -- I know their
23 faces.  But I don't even -- I think they're

Page 520

1 fired now.  They don't even -- they're not
2 even down there no more.
3     Q.   Okay.  And why do you think
4 they're fired?
5     A.   Well, racial profile.
6     Q.   Okay.  So, you think that --
7     A.   A lot of them -- a lot of them --
8     Q.   Okay.
9     A.   -- this is black and white police
10 officers are gone for racial profile.
11     Q.   Okay.  And you saw that on the
12 news, I'm assuming?
13     A.   Yeah, I saw it on the news and
14 the cases -- I mean, even with us going to
15 court about these tickets, they couldn't show
16 up.  They wasn't present.  They was no longer
17 on the force.  Even the judge today said
18 that.
19     Q.   Okay.  So, you -- let's be clear.
20 You've now been to court with the attorneys
21 who are sitting with you today, right?
22     A.   Right, understanding.
23     Q.   To the municipal court?

Page 521

1     A.   Right.
2     Q.   And you've had -- you've
3 scheduled some trials on the tickets --
4     A.   Right.
5     Q.   -- that are outstanding, right?
6     A.   We have, yes.
7     Q.   And you're saying that some of
8 the police officers who wrote you the tickets
9 are no longer there?
10     A.   Yeah.
11     Q.   And you're assumption is they
12 were fired for racial profiling?
13     A.   Yes.
14     Q.   Okay.  And what evidence do you
15 have of that?
16     A.   Just by listening to the news.
17     Q.   Okay.  And when did you hear a
18 news report about people being fired for
19 racial profiling?
20     A.   They had a complaint a while
21 back, I think it was sometime this year or
22 last year.  They were saying all the police
23 was racial profiling in the black

131 (Pages 518 - 521)

Exhibit A

Page 522

1 neighborhoods, not on the white supremacy
2 side.
3    Q.   Okay.
4    A.   Yeah, they was always in the
5 black dominant, yeah.  And a lot of them got
6 caught up in the mix of just messing with
7 black folks.  And I felt like, yeah, that's
8 what they was doing.  They was doing that to
9 me, too, because I stayed in a dominant black
10 area.
11    Q.   Right.  And you believe those
12 police officers got terminated?
13    A.   I think so, yes, because when we
14 went to court -- I forgot the judge's name.
15 What his name?  Woods or whatever -- I mean,
16 not Woods.
17    Q.   Judge Ford maybe?
18    A.   Ford.  The ones that we went to
19 see now, even he said out his mouth they're
20 no longer present because they probably been
21 racial profiling they got fired for it.
22 They're not no longer on the force.
23    Q.   Okay.  So, Judge Ford told you

Page 523

1 that there was racial profiling that --
2    A.   Yes, he told everybody, not just
3 me.  Everybody in the courtroom.  If they
4 don't show, they're not -- they're not no
5 longer on the force.  He'll tell you that.
6    Q.   Right, but that doesn't mean,
7 does it, that they were fired for racial
8 profiling?
9    A.   Well, I'm just going by what he
10 says.
11    Q.   I know, but he didn't use the
12 word "racial profiling", did he?
13    A.   Yes, he did.
14    Q.   He did?
15    A.   Yes, he did.
16    Q.   Okay.
17       MS. MORGAN:  There's a transcript
18 of the hearing.
19       MR. GILL:  Yes, there sure is,
20 and I don't believe he said anything like
21 that.
22       MS. TOURE:  I don't think so.
23       THE WITNESS:  I think he did say

Page 524

1 something about a lot of them was not on the
2 force because they --
3       MS. MORGAN:  Yeah, he did say
4 that, but I don't -- well, we don't need to
5 get into that here.  Yeah.  That's your
6 memory and that's okay.
7    Q.   (BY MS. HOLLIDAY)  Now, have
8 you -- is it your recollection that during
9 the period from 2010 to about 2014 that you
10 did not receive any tickets from the
11 Montgomery Police Department?
12    A.   Yes, I did.
13    Q.   You received tickets between 2010
14 and 2014?
15    A.   Yes.
16    Q.   Okay.  If the municipal courts
17 don't reflect any tickets between 2010 and
18 2014, you dispute that?
19    A.   Yeah, I will dispute that because
20 on record, they do show I have tickets from
21 2010, 2014.
22    Q.   Well, let me be clear.  You're
23 right.  You got tickets in -- you're right.

Page 525

1 That's a dang fine point.
2       The records appear to show that
3 you got your last ticket in 2010, on April
4 22nd, 2010 --
5    A.   Okay.
6    Q.   -- and you didn't get another
7 ticket until May 25th, 2014.
8    A.   Right.
9    Q.   Now, does that seem accurate to
10 you?
11    A.   Yes.
12    Q.   Okay.
13    A.   It does.
14    Q.   And I'm just curious about how it
15 was that you went for that long period of
16 time without getting any traffic tickets.
17    A.   Not driving.
18    Q.   Okay.
19    A.   Like I said, 2010, they were
20 doing the roadblock.  I was scared to drive.
21 Like I said, mainly, that's how I lost plenty
22 of jobs from 2010 to 2014 because I had to
23 walk or I had to pay somebody to take me to

132 (Pages 522 - 525)

Exhibit A

1  work.
2     Q.   Okay.
3     A.   And I got tired of that.  So,
4  that's why you see me accumulating more
5  tickets because I had to do what I had to do
6  because I had to survive for my family.  I
7  was -- I mean, I'm in and out of marriages,
8  man, because I can't provide or go to my job,
9  you see what I'm saying?
10    Q.   All right.
11    A.   So, it was a risk I had to take.
12    Q.   All right.
13        MS. HOLLIDAY:  Do you have more
14  questions?
15        MR. LOGSDON:  Huh-uh.
16        MS. HOLLIDAY:  We have to confer.
17
18        (Whereupon, a discussion was held
19         off the record.)
20
21    Q.   (BY MS. HOLLIDAY)  Now, have you
22  entered into any agreement with the two
23  lawyers who are here with you today in terms

1  of representing you in this lawsuit?
2     A.   Yes.
3     Q.   Okay.  You've signed an agreement
4  with them?
5     A.   Yes.
6     Q.   Okay.  And when did you sign that
7  agreement?
8     A.   I can't remember.  I know I did.
9  These the only two lawyers I've been dealing
10  with on this case.
11    Q.   Right.  And nobody else, right?
12    A.   Nobody else.
13    Q.   Okay.
14        MS. HOLLIDAY:  I think that's it.
15        You don't have anything?
16        MR. LOGSDON:  Huh-uh.
17        MS. HOLLIDAY:  Y'all just give me
18  thirty seconds.
19        MR. LOGSDON:  Oh, I do have --
20        MS. TOURE:  I thought I had a
21  question, but you cleared it up.  So, I don't
22  have any.
23        MR. LOGSDON:  I do have ne thing.

1
2  FURTHER EXAMINATION BY MR. LOGSDON:
3
4     Q.   Have you ever gone by Levon
5  Tramaine, T-r-a-m-a-i-n-e?
6     A.   No, that's my wife did that.  My
7  ex-wife, Kesha, she -- when I say I'm the
8  third, she just put the T because she think
9  it spelled out Levon, the III, Agee, Jr.
10  Yeah.
11        MS. MORGAN:  Oh, like Trey?
12        THE WITNESS:  Yeah.
13    Q.   (BY MR. LOGSDON)  Trey?
14    A.   Yeah.
15    Q.   So, she calls you -- she uses
16  Tramaine as --
17    A.   Yeah.
18    Q.   All right.  Okay.
19    A.   Yeah.
20    Q.   All right.
21    A.   She does that.
22    Q.   So, you have gone by that?
23    A.   No.  I mean, that's only with

1  her.  She only did that, like, as far as
2  child support.  I know that's where you got
3  it from.  She wrote that down.  I guess she
4  put Tramaine down.  But I corrected that.  I
5  didn't know y'all still had that in the
6  system.  It's supposed to be Levon Agee, III.
7     Q.   Okay.
8     A.   I never went by Tramaine.
9        MS. HOLLIDAY:  I think that's
10  all.
11        FURTHER DEPONENT SAITH NOT.
12
13
14
15
16
17
18
19
20
21
22
23

**Exhibit A**

Page 530

```
1           C E R T I F I C A T E
2
3    STATE OF ALABAMA    )
4    JEFFERSON COUNTY    )
5          I hereby certify that the above
6    and foregoing deposition was taken down by me
7    in stenotype, and the questions and answers
8    thereto were transcribed by means of
9    computer-aided transcription, and that the
10   foregoing represents a true and correct
11   transcript of the testimony given by said
12   witness upon said hearing.
13          I further certify that I am
14   neither of counsel, nor of kin to the parties
15   to the action, nor am I an anywise interested
16   in the result of said cause.
17
18
                    [signature]
19            MICHELLE L. PARVIN
20          Certified Court Reporter
21            License Number 126
22         Commission expires 9/30/19
23         Notary Public expires 1/26/22
```

Page 531

```
1    To: MARTHA I. MORGAN, ESQ.
2    Re: Signature of Deponent Levon Agee
3    Date Errata due back at our offices: 11/20/2019
4
5    Greetings:
6    This deposition has been requested for read and sign by
     the deponent.  It is the deponent's responsibility to
7    review the transcript, noting any changes or corrections
     on the attached PDF Errata.  The deponent may fill
8    out the Errata electronically or print and fill out
     manually.
9
10   Once the Errata is signed by the deponent and notarized,
     please mail it to the offices of Veritext (below).
11
12   When the signed Errata is returned to us, we will seal
     and forward to the taking attorney to file with the
13   original transcript.  We will also send copies of the
     Errata to all ordering parties.
14
15   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the
16   court without the signature of the deponent.
17
18   Please Email the completed errata/witness cert page
     to readandsign@veritext.com
19   or mail to
20   Veritext Production Facility
21   2031 Shady Crest Drive
22   Hoover, AL 35216
23   205-397-2397
```

Page 532

```
1    ERRATA for ASSIGNMENT #3567168
2    I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that
3
4    ___ There are no changes noted.
5    ___ The following changes are noted:
6
     Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7    (2017). Rule 30(e) states any changes in form or
     substance which you desire to make to your testimony shall
8    be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any
9    such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.
10
11   Page _____ Line _____ Change _____
12   _____
13   Reason for change _____
14   Page _____ Line _____ Change _____
15   _____
16   Reason for change _____
17   Page _____ Line _____ Change _____
18   _____
19   Reason for change _____
20   Page _____ Line _____ Change _____
21   _____
22   Reason for change _____
23   Page _____ Line _____ Change _____
```

Page 533

```
1    Page _____ Line _____ Change _____
2    _____
3    Reason for change _____
4    Page _____ Line _____ Change _____
5    _____
6    Reason for change _____
7    Page _____ Line _____ Change _____
8    _____
9    Reason for change _____
10   Page _____ Line _____ Change _____
11   _____
12   Reason for change _____
13   Page _____ Line _____ Change _____
14   _____
15   Reason for change _____
16
17
18   _____
             DEPONENT'S SIGNATURE
19
     Sworn to and subscribed before me this ___ day of
20
     _____, _____.
21
     _____
22   _____
23   NOTARY PUBLIC / My Commission Expires:_____
```

134 (Pages 530 - 533)

**Exhibit A**