**THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANGELA MCCULLOUGH, et al.,** | ) | |
| **ON BEHALF OF THEMSELVES,** | ) | |
| **INDIVIDUALLY, AND ON BEHALF OF A** | ) | |
| **CLASS OF ALL OTHERS SIMILARLY** | ) | |
| **SITUATED,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO: 2:15-CV-463-RCL-SMD** |
| | ) | |
| | ) | **CLASS ACTION** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE CITY OF MONTGOMERY, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST THE CITY OF MONTGOMERY, ALABAMA**

## Table of Contents

*Page*

Table of Authorities ................................................................................ ii

INTRODUCTION ....................................................................................... 1

STATEMENT OF FACTS ........................................................................... 2

    Modern Day Debtor's Prison in Montgomery, Alabama ............................ 2

    Jail Work Program ................................................................................... 4

    Plaintiffs' Facts ....................................................................................... 6

        Marquita Johnson ............................................................................... 7

        Angela McCullough ............................................................................. 8

        Kenny Jones ....................................................................................... 10

        Levon Agee ........................................................................................ 10

        Christopher Mooney ........................................................................... 12

ARGUMENT

I.     LEGAL STANDARD FOR GRANTING SUMMARY
       JUDGMENT ........................................................................................... 13

II.    THE CITY'S JAIL WORK PROGRAM VIOLATED
       FEDERAL LAWS PROHIBITING PEONAGE AND FORCED
       LABOR ................................................................................................. 14

       A.    The City Violated § 1581 by Holding Plaintiffs in a
             Condition of Peonage ................................................................. 15

       B.    The City Violated § 1589(a) by Knowingly
             Obtaining Plaintiffs' Labor through Prohibited
             Means ........................................................................................ 18

       C.    The City Violated §§ 1589(b) and 1593A by
             Benefiting from its Participation in a Venture
             Engaged in Violations of Sections 1581 and 1589(a) ................. 22

    CONCLUSION ....................................................................................... 23

**Table of Authorities**

*Page*

**Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ........................................................ 13

*Arreguin v. Sanchez*, 398 F. Supp. 3d 1314 (S.D. Ga. 2019) ................................... 19

*Bailey v. Alabama*, 219 U.S. 219 (1911) ............................................................. 15, 16

*Barrientos v. Corecivic, Inc.*, 332 F. Supp. 3d 1305, 1310 (M.D. Ga. 2018),
  *appeal docketed*, No. 18-90025-G (11th Cir. Dec. 12, 2018) ............................... 14

*Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019) ..................................................... 22

*Bonds v. Hyundai Motor Co.*, 2019 U.S.Dist. LEXIS 43561 (M.D.Ala. Mar.
  18, 2019) ...................................................................................................................... 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................... 13

*Chapman v. AI Transp.*, 229 F.3d 1012 (11th Cir. 2000) ........................................ 13

*Clyatt v. United States*, 197 U.S. 207 (1904) ............................................................ 16

*Guobadia v. Irowa*, 103 F. Supp. 3d 325 (E.D.N.Y. 2015) ..................................... 19

*Laincy v. Chatham County Bd. of Assessors*, 520 Fed. Appx. 780 (11th Cir.
  2013) ............................................................................................................................. 13

*Marchisio v. Carrington Mortg. Servs. LLC*, 919 F.3d 1288 (11th Cir. 2019) .......... 13

*Muchira v. Al-Rawaf*, 2015 U.S. Dist. LEXIS 49806 (E.D. Va. Apr. 15, 2015) ........ 22

*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) ..................................................... 22

*Ross v. Jenkins*, 325 F. Supp. 3d 1141 (D. Kan. 2018) ............................................ 19

*United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) ...................................... 18, 20

*United States. ex rel. Elgasim Mohamed Fadlalla v. Dyncorp Int'l LLC*, 402 F.
  Supp. 3d 162 (D. Md. 2019) ....................................................................................... 22

*United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009) ............................................ 15

*United States v. Kaufman*, 546 F.3d 1242 (10th Cir. 2008) ..................................... 18

*United States v. Kozminski*, 487 U.S. 931 (1988) ............................................... 15, 18

*United States v. Peterson*, 627 F. Supp. 2d 1359 (M.D. Ga. 2008) ......................... 21

*United States v. Reynolds*, 235 U.S. 133 (1914) ................................................. 16, 17

*Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990) .............................................. 16, 17

*Young v. United Parcel Service*, 575 U.S. 206 (2015) ............................................. 13

**Statutes**

18 U.S.C. § 1581 .................................................................................... 1, 14, 15, 18

18 U.S.C. § 1589 ................................................................................................. *passim*

18 U.S.C. § 1591(e)(5) ............................................................................................... 22

18 U.S.C. § 1593A ............................................................................................ 1, 14, 22

18 U.S.C. § 1595(a) ................................................................................................ 14

42 U.S.C. § 1983 ...................................................................................................... 1

**Rules**

Ala. R. Crim. P. 26.11 ............................................................................................ 21

Fed. R. Civ. P. 56(a) ........................................................................................ 13, 14

Fed. R. Civ. P. 56(c)(1) ............................................................................................ 2

**Regulations**

20 C.F.R. § 416.110 ............................................................................................... 20

**Constitutional Provisions**

U.S. Const. Amend. XIII ......................................................................................... 1

**Other Authorities**

Blackmon, Douglas, *Slavery by Another Name*, Random House (2008) ...................................... 1

**INTRODUCTION**

In a modern-day adaptation of some of the darkest chapters of our Nation's history,[1] the City of Montgomery coerced the labor of Plaintiffs and hundreds of other low-income residents, primarily people of color, who could not afford to pay traffic fines and costs owed to the City. Plaintiffs were first jailed for nonpayment, then told that they could hasten their release by laboring for their creditor, the City. While in the Municipal Jail of the City of Montgomery (the "Jail"), Plaintiffs were separated from their dependent children and loved ones for weeks or months and endured inhumane physical and psychological conditions.

With no other recourse to get home to their families, Plaintiffs worked. They worked because if they did not, they would stay in jail longer. They worked both inside and outside of the Jail, performing labor that the City would otherwise have had to pay jail staff and other municipal employees to accomplish.

The moving Plaintiffs, Angela McCullough, Marquita Johnson, Kenny Jones, Levon Agee, and Christopher Mooney, submit this Memorandum of Law in support of their motion for partial summary judgment as to liability on their peonage-based claims arising under 18 U.S.C. §§1581, 1589, 1593A. Plaintiffs reserve for trial (a) all claims against JCS, (b) Count VIII against the City, and (c) that portion of Count VII that asserts non-peonage-based forced labor claims under 18 U.S.C. § 1589 and claims under 42 U.S.C. § 1983 for violations of the Thirteenth Amendment to the United States Constitution. Submitted herewith are a Statement of Material Facts as to Which There Is No Genuine Dispute (cited "SUF ¶ xx"), which is supported by

---

[1] *See* Blackmon, Douglas, *Slavery by Another Name*, Random House (2008) (discussing the history of peonage and convict leasing).

volumes of deposition excerpts, of documentary exhibits, and of Declarations of each of the moving Plaintiffs.

Plaintiffs are entitled to summary judgment because the factual record establishes beyond dispute that the City, including several of its departments, operated and benefited from a peonage-based jail work program. As a matter of law, and as this Court has previously held (ECF #131 at 23), coercion of debtors to work off their debt violates federal law.

## STATEMENT OF FACTS

This Statement of Facts is drawn from the SUF and citations are to that document. Pursuant to Fed. R. Civ. P. 56(c)(1), the SUF identifies the record support for each factual assertion.

### Modern Day Debtor's Prison in Montgomery, Alabama

Both the current and prior presiding judge of the Montgomery Municipal Court have admitted publicly and under oath the details of the debtors' prison scheme that existed in Montgomery, Alabama since before the turn of the century (SUF ¶¶ 5, 12-48). On November 17, 2016, the Alabama Judicial Inquiry Commission (the "Commission") issued a complaint against Judge A. Lester Hayes III of the Municipal Court for the City of Montgomery, alleging multiple violations of the Canons of Judicial Ethics. Judge Hayes ultimately stipulated that the Commission could prove these violations "by clear and convincing evidence." (SUF ¶ 14). Based on this admission, the Alabama Court of the Judiciary held that Judge Hayes violated seven provisions of the Canons of Judicial Ethics (SUF ¶ 16) and suspended him from the bench (SUF ¶ 17).

Judge Hayes's admissions establish that for many years the City maintained a modern day debtors' prison. Judge Hayes admitted that "[on] many occasions prior to 2014, [he] incarcerated traffic offenders for failure to pay fines and costs without first . . . making sufficient inquiry into the offenders' . . . ability to pay" (SUF ¶¶ 23-27). This involved the "commuting (i.e.,

2

converting) of fines and costs to jail time" by "giv[ing] oral instructions to the [court] clerks and in some instances written notations to the effect that individuals' fines and costs, or certain portions thereof, for certain cases were to be commuted (converted) to days in jail at a set rate per day" (SUF ¶ 38).

When this practice was first implemented, municipal court judges "commuted" persons' unpaid traffic fines and court costs to jail times by calculating a duration of incarceration using a rate of one day in jail for every $25 owed to the City. (SUF ¶ 8). The rate later increased to one day in jail for every $50 owed to the City. (SUF ¶¶ 9-10). This change in rate occurred no earlier than July 2012 and possibly applied only to those arrested after August 6, 2012 (SUF ¶¶ 10-11). Regardless of amount, however, throughout the 2010-2014 time period people who could not pay their traffic fines and costs received credit against their outstanding debts to the City for every day they spent sitting in jail. (SUF ¶¶ 5-6).

When judges at the Municipal Court "convert[ed] fines and costs to jail time and incarcerat[ed] traffic and misdemeanor defendants," there was generally neither a written order nor a general oral pronouncement setting out the basis for the court's decision to convert fines and costs to jail time (SUF ¶¶ 28-38).

In lieu of a signed judicial order, a court clerk would generate a "jail transcript": a document presented to the jail upon receiving an inmate from court. (SUF ¶¶ 39). The jail transcript indicated, for each charge, whether the defendant must serve "mandatory time (those days that were part of a sentence) and/or "commuted time" (which indicated a period of incarceration that resulted from converting outstanding fines and costs to jail time)." (SUF ¶¶ 40-41). This distinction in the jail transcripts between mandatory time and commuted time (*i.e.*, the sitting out of debt to the City) was central to the operation of the debtor's prison, because only "commuted

time" was eligible for reduction through labor. (SUF ¶¶ 95-97). The credit-for-labor program thus related solely to the incarcerated individual's debt to the City; it had nothing to do with punishment for any offense. Some jail transcripts expressly reinforced that this was imprisonment for debt by noting that a defendant "could be released early with the payment of a specific portion (with the remainder due within a set period of time) or the full amount of the fine due." (SUF ¶ 43).

This practice of "commuting" fines was widespread among Municipal Court judges. (SUF ¶¶ 33-38, 48). And it only impacted people who lacked the ability to pay. Payment of a traffic fine before the date listed for the initial court appearance obviated the need for any appearance before a judge at all. (SUF ¶ 3). Accordingly, people who had the means to pay their fines faced no risk of incarceration. In contrast, persons who could not pay traffic fines and costs faced the risk—and, as this case demonstrates, the frequent actuality—of being incarcerated to "sit out" their debts in jail.

**Jail Work Program**

Following the Municipal Court's "commutation" of an individual's unpaid fines and costs to jail time, the person was locked up in the Jail for the duration of his or her "commuted" jail sentence, as set forth in the "jail transcript" described above.

The Jail promulgated a "Prisoner Work Program" policy, beginning at least in June 2003, to "utilize prisoner labor to perform laundry service, kitchen duty and jail sanitation . . . [and] outside work details." (SUF ¶ 52). The Jail also published and posted a policy detailing the rules and regulations that apply when an inmate is assigned to perform work "outside" the jail area. (SUF ¶¶ 82-85).

At some time prior to 2014, and at least as early as January 2012, the jail work program took on an additional aspect. Individuals serving "commuted time" could perform labor to reduce their debt, and thus their total jail time. (SUF ¶¶ 86, 88). As mentioned above, this program applied only to "commuted" jail time, not to "mandatory time."

Through the jail work program, each day an eligible incarcerated individual spent performing jail labor, they earned $25 of credit toward the unpaid amount to the City (*id.*). Since they were sitting out their debt to the City at the basic rate of $50/day, doing jail labor reduced the debtors' "commuted" jail time by one day for every two days of work performed.[2]

In its Answer, the City has admitted that the jail-work-for-credit program existed (ECF #138 ¶ 50) and that individuals "performed labor to reduce [their] debt faster" (*id.* ¶ 84; *see id*. ¶¶ 94, 107, 150).

Incarcerated individuals who participated in the jail work program were assigned to several types of work details, including cleaning jail areas, including other inmates' cells, toilets, kitchens, hallways, the court holding area, and other common areas; performing kitchen duty; washing police department vehicles; collecting trash with the City's Sanitation Department; cutting grass; trimming hedges; cleaning the ball park/field; and washing inmates' clothes (SUF ¶¶ 51-71, 74-77, 81).

The City's correctional officers routinely kept a record of jail work performed by inmates and reported this information in weekly emails to the Municipal Court with weekly jail work lists attached, indicating which inmates performed work and for how many days (SUF ¶¶ 89-92). The Jail and the Municipal Court used these lists for the sole purpose of tracking work performed by

---

[2] Those arrested prior to August 6, 2012, like Ms. Johnson, sat out their debt at a rate of $25/day; doing jail labor thus reduced their "commuted time" by one day for every day of work performed.

inmates who owed money to the City; inmates who worked but did not have "commuted" sentences were "left off" these lists. (SUF ¶¶ 93-97). Upon receiving jail work lists from the Jail, the Municipal Court reduced the amounts owed by and/or issued orders of early release for individuals participating in the jail work program (SUF ¶ 98).

The City benefited financially from the jail work program. The work inmates performed was economically valuable to the City (SUF ¶¶ 62-63). The Jail had no paid janitorial staff because inmates performed the janitorial work (SUF ¶¶ 57-60, 66-68). Inmates also worked in the Jail kitchen and laundry (SUF ¶¶ 57-58, 65, 88). Any Jail work not performed by an inmate would have to be completed by correctional officers (SUF ¶¶ 61, 64). Inmates regularly formed work details for other City departments, such as the Sanitation Department and the City's codes enforcement department (SUF ¶¶ 76-77, 79-80, 142, 187). The City has never paid money to inmates in exchange for their work (SUF ¶ 104).

**Plaintiffs' Facts**

The moving Plaintiffs in this matter all performed jail work as described above in order to reduce the "commuted" time they were forced to spend in the Jail to sit out their debts to the City. As a result of a variety of traffic violations, some of which the City assessed against the Plaintiffs on multiple occasions, each Plaintiff owed the City money on account of unpaid tickets and court costs. (SUF ¶¶ 107, 124-25, 148-49, 171-72, 200). Plaintiffs struggled financially and often lacked the means to meet their basic needs (SUF ¶¶ 109, 126-28, 150, 174-75, 198-99); they could not pay traffic fines and the associated fees and court costs that inevitably accrue over time. Eventually, those debts were "commuted" to jail time (SUF ¶¶ 111, 131, 155, 181, 203).

While in the Jail, Plaintiffs learned of the jail work program from other inmates and the correctional officers (SUF ¶¶ 115, 135, 161, 183). They each participated in the program

throughout their time in the Jail. (SUF ¶¶ 117, 138, 158, 163, 185-86, 206-07). Plaintiffs under-stood that by performing jail labor, they could earn credit toward their unpaid debts to the City and obtain a court order of release from the Jail earlier, so they worked in order to get out sooner (SUF ¶¶ 116, 120, 139, 144, 157, 162, 184-85, 190). To the Plaintiffs, this was the only viable way for them to get out of the Jail (SUF ¶¶ 120, 144, 166, 190). Plaintiffs did not have the means to pay the total outstanding tickets and court costs assessed against them (SUF ¶¶ 110, 134, 155, 179, 196). While in the Jail, Plaintiffs could not care and provide for their families and were not allowed to see their children. (SUF ¶¶ 114, 158-59, 192-93). Some Plaintiffs feared that their ex-tended absence from their families would cause serious harm to their children, and it did result in serious physical and psychological harm to some of their children (SUF ¶¶ 114, 158-60, 190-91, 192).

### *Marquita Johnson*

Marquita Johnson is a 36-year-old African American woman (SUF ¶ 147). In 2011, she was a single mother supporting three children by working full-time as a cocktail server at Wind Creek Casino where she earned $6.66 per hour plus tips (SUF ¶ 150). She received little financial support from the fathers of her daughters and barely met her basic living expenses (*Id.*).

On May 24, 2011, Judge Knight of the Montgomery Municipal Court placed Ms. Johnson "on probation" with JCS due to several unpaid traffic tickets. (SUF ¶ 148). Despite her limited resources, Ms. Johnson paid JCS when she could, until she lost her job and fell behind on her payments (SUF ¶¶ 151-52).

Ms. Johnson was arrested in April 2012 for unpaid traffic fines and costs (SUF ¶ 153). She appeared before Judge Hayes, who ordered her to pay $12,410 or serve 496 days in jail

(SUF ¶ 154). Ms. Johnson did not have the money to pay, and Judge Hayes "commuted" her outstanding fines and costs to an order of incarceration (SUF ¶ 155). Judge Hayes did not inquire into Ms. Johnson's ability to pay prior to issuing this order (SUF ¶ 156), nor does any document indicate that he ever found that she willfully refused to pay (SUF ¶ 157).

While in the Jail, Ms. Johnson learned about the jail work program from other inmates and corrections officers (SUF ¶ 161). Ms. Johnson understood that if she worked in the Jail, she would receive credit at a rate of $25 per day to get out of jail sooner (SUF ¶ 162). Ms. Johnson worked for 183 days (SUF ¶ 163). She swept hallways, mopped floors, washed dishes, helped to prepare and serve food, washed inmates' clothing, cleaned officers' lockers in the courtroom, and washed police cars outside the jail (SUF ¶164). She received no payment for this work (SUF ¶ 165).

While Ms. Johnson was in the Jail, she could not see her children for nine months, and she feared for their health and safety (SUF ¶ 158-59). Her children—aged 10 months, 18 months, and 8 years old—were separated and cared for by different relatives (SUF ¶ 158, 160). Her oldest child was sexually abused by a neighbor of the person taking care of her (SUF ¶ 160). Her middle child was beaten by her caregiver, and she developed a stutter because of the beatings (*id.*).

Ms. Johnson did not "volunteer" to work in the Jail (SUF ¶ 166). She worked because she understood that she would be released sooner for each day that she worked (*Id.*)

### Angela McCullough

Ms. McCullough is a 45-year-old African American woman with four children, one of whom is an adult but cannot live independently due to a serious psychiatric disability (SUF ¶ 105). Ms. McCullough has received numerous traffic tickets from the City of Montgomery (SUF ¶ 106). In 2013, she was balancing work as a student at Faulkner University and working in

housekeeping at Home Inn & Suites where she earned $175 per week, barely enough to meet basic survival needs (SUF ¶ 109).

On or about July 2, 2013, Ms. McCullough was ticketed and arrested for warrants for unpaid traffic fines (SUF ¶ 107). She later appeared before Judge Hayes, who ordered her to pay her outstanding balance of $5,760 immediately or serve jail time of 83 days (SUF ¶¶ 107-08). Ms. McCullough did not have the means to pay her balance in full, and Judge Hayes "commuted" her fines to an order of incarceration (SUF ¶¶ 10-11). Judge Hayes did not inquire as to her ability to pay prior to issuing this order (SUF ¶ 112), nor does any document indicate that he ever found that Ms. McCullough willfully refused to pay (SUF ¶ 113).

While in the Jail, Ms. McCullough learned about the jail work program from other inmates (SUF ¶ 115). Ms. McCullough understood that if she worked in the Jail, she would earn a credit at a rate of $25 per day (SUF ¶ 116). Ms. McCullough worked for 17 days in and around the Jail (SUF ¶ 117). She collected garbage in the Jail, washed garbage bins, cleaned showers, mopped floors, and collected kitchen trays after meals (SUF ¶ 118). Ms. McCullough received no payment for this work (SUF ¶ 119).

While Ms. McCullough was in jail, her disabled son had to remain institutionalized for a month longer than he otherwise needed because she was not able to pick him up and care for him herself (SUF ¶ 114).  Ms. McCullough could not speak to her son by phone, and his psychiatric condition deteriorated because he could not see and speak to her as he usually did (*id.*). Ms. McCullough did not "volunteer" to work in the Jail (SUF ¶ 120). She worked because she understood that if she did not work, she would have to spend more days in jail. (*id.*).

**Kenny Jones**

Mr. Jones is a 35-year-old African American man with an intellectual disability (SUF ¶¶ 196-97). He has received Supplemental Security Income (SSI) because of his disability since he was six or seven years old (SUF ¶ 198). Because of his disability, Mr. Jones cannot read and comprehend documents, work a regular job, or manage his own money (SUF ¶¶ 197, 199). Mr. Jones relies on his brother, who receives his SSI payments on his behalf, to make sure that he has money for food, clothing, and shelter (SUF ¶ 199).

On May 3, 2013, Mr. Jones was arrested and booked on warrants for six unpaid traffic tickets (SUF ¶ 200). The total fines and costs for those tickets was $1,966.00 (SUF ¶ 201). Mr. Jones could not afford to pay this amount because his only source of income was and is SSI ben-efits (SUF ¶ 202). Of those six traffic tickets, the court "commuted" two of his charges to an or-der of incarceration in the Jail (SUF ¶ 203). The total of Mr. Jones' "commuted" fines and costs was $458 (SUF ¶ 204). Mr. Jones was also sentenced to two "mandatory days" in jail based on other charges (SUF ¶ 203). There is no document stating that a Montgomery Municipal Court judge ever found that Mr. Jones ever willfully failed to pay the fines and costs for which he was commuted (SUF ¶ 205).

While in the Jail, Mr. Jones worked (SUF ¶ 206-07). Credit for his work was not avail-able for his two "mandatory days," but Mr. Jones worked for six other days for which he did re-ceive credit. Mr. Jones was released early from the Jail after being credited for his jail work (*Id.*).

**Levon Agee**

Mr. Agee is a 37-year-old African American man with two children (SUF ¶ 123). In 2010, he had 11 unpaid traffic tickets for which he was placed on probation with JCS by Judge

Karen Knight (SUF ¶ 124). However, Mr. Agee was unemployed at the time and could not af-
ford to pay (SUF ¶ 126, 128). He had lost his job at Johnson Controls manufacturing plant when
the plant shut down (SUF ¶ 126). Mr. Agee's monthly expenses—including payments to JCS—
exceeded his income from unemployment benefits (SUF ¶ 128). Nevertheless, he paid JCS when
he could (SUF ¶ 129).

Mr. Agee was arrested on June 13, 2013 (SUF ¶ 130). Following his arrest, Mr. Agee ap-
peared before a judge, who "commuted" his outstanding traffic fines and court costs to an order
of incarceration in the Jail (SUF ¶ 131). The judge did not inquire into Mr. Agee's ability to pay
prior to issuing this order (SUF ¶ 132), nor does any document indicate that the judge ever found
that Mr. Agee willfully refused to pay (SUF ¶ 133). Mr. Agee did not have the money to pay his
outstanding traffic debts, so he was sent to the Jail pursuant to the judge's order (SUF ¶ 134).

While incarcerated, Mr. Agee learned about the jail work program from other inmates
and from jail corrections officers (SUF ¶ 135). Mr. Agee understood that if he worked in and
around the Jail, he would receive credit at a rate of $25 per day against his outstanding traffic
debt (SUF ¶ 139). Mr. Agee performed labor both in the Jail and outside the Jail for at least 19
days during his incarceration (SUF ¶ 140). Mr. Agee's work included cleaning jail cells, mop-
ping floors, cutting grass, picking up papers, washing cars, picking up litter along the interstate,
washing cars, and working on roadside assistance (SUF ¶ 141), as well as working outside the
Jail picking up trash under the supervision of the City Sanitation Department (SUF ¶ 142).

Mr. Agee did not receive any payment for his work in and around the Jail or on the City
work detail (SUF ¶ 143). At no time did he "volunteer" for this work (SUF ¶ 144). He worked
because, if he did not, he would have had to spend more time in jail (SUF ¶ 144).

### Christopher Mooney

Christopher Mooney is a 42-year-old African American man (SUF ¶ 170). On October 11, 2011, Judge Karen Knight placed Mr. Mooney on probation with Judicial Correction Services (JCS) for unpaid traffic tickets (SUF ¶ 171). At the time that Mr. Mooney was placed on probation with JCS, he was the single father of four children for whom he was their sole support and provider (SUF ¶ 174). He was earning minimum wage for performing plumbing, maintenance, cleaning, and security tasks, which were also performed in exchange for his rent (SUF ¶ 174). Mr. Mooney's basic living expenses, in addition to the payments owed to JCS, exceeded his income (SUF ¶ 175). Despite his limited financial resources, Mr. Mooney made payments to JCS when he could (SUF ¶ 176).

On May 8, 2013, Mr. Mooney was stopped by City police for a traffic violation and arrested on warrants for unpaid traffic tickets (SUF ¶ 177). Following his arrest, Mr. Mooney appeared before Judge Hayes (SUF ¶ 178). Judge Hayes ordered him to pay his outstanding fines and court costs related to traffic violations, which totaled more than $4,000, or serve time in jail (SUF ¶ 178). Mr. Mooney offered to pay $1,000 towards his traffic debt, but Judge Hayes did not accept this offer (SUF ¶ 179). Judge Hayes did not inquire into Mr. Mooney's ability to pay his traffic debts (SUF ¶ 180), nor does any document indicate that he ever found that Mr. Mooney willfully refused to pay (SUF ¶ 182). Judge Hayes "commuted" Mr. Mooney's fines and court costs related to traffic violations to an order of incarceration in the Jail (SUF ¶ 181).

While incarcerated, Mr. Mooney learned about the jail work program from other inmates and from correctional officers (SUF ¶ 183). Mr. Mooney understood that if he performed work in the Jail, he could be released early (SUF ¶¶ 184-85), and he worked at least 22 days during his

incarceration (SUF ¶ 186). Mr. Mooney performed work both in the Jail and outside the Jail, including cutting grass, washing and waxing cars for the Montgomery Police Department, picking up litter on the side of the highway, painting, and mopping the jail building (SUF ¶ 187).

Mr. Mooney did not receive any payment for his work in or outside of the Jail (SUF ¶ 189). He did not "volunteer" to work in the Jail; he worked because he understood that he would be released sooner for each day he worked, and he had to get home to his family as soon as possible (SUF ¶ 190). While Mr. Mooney was in the Jail, he feared that his absence from his children and inability to provide financial support to them would cause them serious harm (SUF ¶ 192). His four children had to be separated and cared for in different places, with three staying in Montgomery and one having to go to Ohio to stay with their grandparents (SUF ¶ 193).

## ARGUMENT

### I.    Legal Standard for Granting Summary Judgment

Plaintiffs are entitled to summary judgment when there is no genuine issue as to any fact material to Plaintiffs' claims and when, based upon such facts, they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Young v. United Parcel Service*, 575 U.S. 206, 231 (2015); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986) (emphasis in the original). A genuine issue of fact exists only if there is sufficient evidence favoring the nonmoving party such that a reasonable jury could find in its favor. *Id*. at 248. When deciding a motion for summary judgment, a court must "make all reasonable inferences in favor of the nonmoving party." *Laincy v. Chatham County Bd. of Assessors*, 520 Fed. Appx. 780, 781 (11th Cir. 2013) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)).

13

Here, Plaintiffs move for partial summary judgment on liability as to their peonage-based claims under the federal peonage/forced labor statutes.  Partial summary judgment is expressly authorized by Rule 56(a). *E.g.*, *Marchisio v. Carrington Mortg. Servs. LLC*, 919 F.3d 1288 (11th Cir. 2019) (affirming partial summary judgment for plaintiffs); *Bonds v. Hyundai Motor Co*., 2019 U.S.Dist. LEXIS 43561, at *3 (M.D.Ala. Mar. 18, 2019) ("A court may enter partial summary judgment to address critical, but not dispositive, parts of a case. *See* Fed. R. Civ. P. 56(a). The same standard that applies to full motions for summary judgment applies to motions for partial summary judgment.")

Viewing the undisputed facts in the light most favorable to the City, Plaintiffs are entitled to partial summary judgment against the City with respect to the peonage-based statutory claims set forth in Count VII of the First Amended Complaint (ECF #32 ¶¶ 222-34).

## II.   The City's Jail Work Program Violated Federal Laws Prohibiting Peonage and Forced Labor

The undisputed facts show that the City's jail work program violated federal statutes prohibiting peonage and forced labor. These statutes broadly prohibit "whoever" from "hold[ing] or return[ing] any person to a condition of peonage," 18 U.S.C. § 1581(a), from "obtain[ing] labor" by a list of proscribed means, *id.* § 1589(a), or from "knowingly benefi[ting], financially or by receiving anything of value, from participation in a venture" that has engaged in violations of either of these provisions, *id.* §§ 1589(b), 1593A. Although the statutes are under the umbrella of the "Trafficking Victims Protection Act," the intentionally broad language in the statutory text goes far beyond human trafficking. *See, e.g., Barrientos v. Corecivic, Inc.*, 332 F. Supp. 3d 1305, 1310 (M.D. Ga. 2018) (applying TVPA to work program in federal immigration detention facility), *appeal docketed*, No. 18-90025-G (11th Cir. Dec. 12, 2018).

The statute provides a civil damages remedy for aggrieved persons. Under 18 U.S.C. § 1595(a), a person who has been placed in a condition of peonage in violation of § 1581, or coerced into performing labor for another in violation of § 1589, may bring a civil action against the perpetrator and whoever benefited from "participat[ing] in a venture" engaged in those violations, as set forth in §§ 1589(B) and 1593A. Plaintiffs here seek relief against the City for violating these three provisions of the TVPA—18 U.S.C. §§ 1581, 1589, and 1593A—both as a perpetrator and a knowing beneficiary of the labor it coerced Plaintiffs to perform.

## A.  The City Violated § 1581 by Holding Plaintiffs in a Condition of Peonage

Section 1581(a) provides: "Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both." Peonage means "compulsory service in payment of a debt." *United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009) (quoting *Bailey v. Alabama*, 219 U.S. 219, 242 (1911)). "A peon is one who is compelled to work for his creditor until his debt is paid." *Bailey*, 219 U.S. at 242. To establish peonage under 18 U.S.C. § 1581, a Plaintiff must prove that the Defendant "intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force; (2) legal coercion; or (3) threats of legal coercion or physical force." *Farrell*, 563 F.3d at 372 (citing *United States v. Kozminski*, 487 U.S. 931 (1988)).

Here, the undisputed facts show that Plaintiffs owed debts to the City, that Plaintiffs could not afford to pay those debts, that Plaintiffs were incarcerated in the City Jail to "sit out" their debts at the rate of $25 or $50 per day, that the City operated a jail work program under which Plaintiffs could reduce their debts by an additional $25 per day by laboring for the City, and that Plaintiffs worked in order to receive this credit. The length of Plaintiffs' incarceration

15

was directly tied to the amount of work they performed for their creditor, the City. Those who did not work had to stay in jail longer.

Unquestionably, the City restrained Plaintiffs against their will because Plaintiffs owed debts to the City, and Plaintiffs worked for the City in order to satisfy those debts and thereby regain their liberty. The question before this Court is whether such a circumstance constitutes the requisite "coercion."

As this Court has recognized (ECF #131 at 22-23), the Supreme Court answered a very similar question more than a century ago in *United States v. Reynolds*, 235 U.S. 133 (1914). There, the Supreme Court explained:

> A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject like any other contractor to an action for damages for breach of that contract, can elect at any time to break it, *and no law or force compels performance or a continuance of the service*."

*Id.* at 167 (quoting *Clyatt v. United States*, 197 U.S. 207, 215 (1904)) (emphasis added); *accord Bailey v. Alabama*, 219 U.S. at 243.

Here, the force of continued incarceration compelled Plaintiffs to work, creating a condition of peonage. *See Reynolds*, 235 U.S. at 146 (recognizing "constant fear of imprisonment" and "authority to arrest and hold his person" as factors that "rendor[] the work compulsory"). Plaintiffs learned about the jail work program from other inmates and the correctional officers only after they were imprisoned (SUF ¶¶ 115, 135, 161, 183). At the time Plaintiffs learned of the jail work program, they understood that if they performed labor while incarcerated, they would earn an additional $25 toward their unpaid debts to the City for each day they worked, thereby obtaining earlier release (SUF ¶¶ 116, 120, 139, 144, 162, 166, 184-85). The laborers in *Reynolds* feared a future incarceration should they stop working, whereas Plaintiffs in this case found

themselves already behind bars at the moment of compulsion. But, as this Court has already held, "[t]his is not a meaningful distinction." ECF #131 at 23.

Defendants will likely attempt, yet again, to argue that Plaintiffs worked "voluntarily," as referenced in *Watson v. Graves*, 909 F.2d 1549, 1552 (5th Cir. 1990) ("When the employee has a choice, even though it is a painful one, there is no involuntary servitude."). But this case differs from *Watson* in three important respects. First, the plaintiffs in *Watson* were incarcerated as part of their criminal punishment, whereas Plaintiffs here were jailed because they owed money to the City that they could not afford to pay. For example, despite Mr. Mooney's offer to pay $1,000 of the more than $4,000 that he owed to the City, his inability to pay the full amount resulted in the "commutation" of his fines to jail time (SUF ¶¶ 178-79, 181). Second, the *Watson* plaintiffs did not work in satisfaction of a debt owed to their employer, as Plaintiffs did here. Plaintiffs participated in the jail work program in order to earn an additional $25 for each day they worked, an amount "credited" toward their debts, as recognized on the court orders of early release they received (SUF ¶¶ 121-22, 145-46, 168, 194-95, 206-07). Third, if the *Watson* plaintiffs chose not to work, they would lose the opportunity to earn money but would not prolong their incarceration. In sum, the very condition identified in *Reynolds* as creating unlawful compulsion—requiring work to stave off future or continued incarceration—existed here but not in *Watson.*

This Court has already rejected the City's *Watson*-based argument: "Under defendants' understanding wherein the choice between work and continued incarceration is voluntary, it is not clear what would be involuntary." ECF #131 at 23. Thus, "Defendants maintain that this choice may have been a painful one. The law maintains that it was no choice at all." *Id*.

### B. The City Violated § 1589(a) by Knowingly Obtaining Plaintiffs' Labor through Prohibited Means

Section 1589(a) provides:

Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

>   (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

>   (2) by means of serious harm or threats of serious harm to that person or another person;

>   (3) by means of the abuse or threatened abuse of law or legal process; or

>   (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint

shall be punished as provided under subsection (d).

This section bars forced labor and does not require the peonage element specifically addressed by § 1581. Because of the broad prohibition set forth in § 1589(a), a violation of § 1581 would also constitute a violation of § 1589(a). In other words, the coercion created by conditioning Plaintiffs' earlier release from jail on their laboring in service of a debt, as discussed above, constitutes a *per se* violation of § 1589(a).

Congress, however, enacted § 1589 in response to the Supreme Court's decision in *Kozminski*, with the explicit goal of expanding the definition of coercion beyond threats of force, imprisonment, or criminal prosecution. *United States v. Kaufman*, 546 F.3d 1242, 1261 (10th Cir. 2008) ("The legislative history reveals that, in enacting § 1589, Congress sought to expand Kozminski's limited definition of coercion under § 1584 . . . ."). Accordingly, Plaintiffs discuss below two additional ways that the City coerced their labor in violation of § 1589(a).  These violations stand independently from the peonage-related violations discussed above.

First, the TVPA prohibits coercion "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person

or another person would suffer serious harm or physical restraint . . . ." 18 U.S.C § 1589(a)(4). A "scheme, plan, or pattern" violates 18 U.S.C. § 1589(a)(4) when it is intended to cause an individual to believe that, if he or she did not perform labor, the person themselves—or even another person—would suffer serious harm. *See United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) (Defendants' threats "could reasonably be viewed as a scheme to make her believe that she *or her family* would be harmed . . .") (emphasis added).

"Serious harm," in turn, means

*any* harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2) (emphasis added). This includes "threats of any consequences, whether physical or non-physical, that are sufficient under all of the surrounding circumstances to compel or coerce a reasonable person in the same situation to provide or to continue providing labor or services." *Guobadia v. Irowa*, 103 F. Supp. 3d 325, 334 (E.D.N.Y. 2015). In reviewing a claim under this section, the court must consider "all the surrounding circumstances." *Id*. at 335 (quoting 18 U.S.C. § 1589(a)(4)(emphasis omitted).

In assessing a Plaintiff's claim of forced labor under § 1589(a), "the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that case another to acquiesce in providing forced labor." *Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1325 (S.D. Ga. 2019) (quoting *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1164 (D. Kan. 2018)). The critical inquiry here is "whether the defendant intentionally caused the oppressed person reasonably to believe, given [his or] her special vulnerabilities, that [he or ]she ha[d] no alternative but to remain in involuntary service for a time." *Id.* (internal citation and quotation marks omitted).

19

Here, the Plaintiffs' dire economic circumstances magnified the very stark circumstances they faced while jailed. This particular "vulnerability"—their lack of financial means—must be taken into account in the context of this claim because were Plaintiffs able to pay their debts in the first place, they would not have been incarcerated at all. For example, Mr. Jones, who has a disability and relies only on his monthly SSI benefits to meet his basic needs, did not have the ability to pay $458, the amount for which he was sent to jail (SUF ¶¶ 198, 202-04). (The purpose of the SSI program is to "assure a minimum level of income" for people who are elderly, blind, or disabled. 20 C.F.R. § 416.110.)

Many Plaintiffs reasonably feared that their loved ones—including their minor and disabled adult children who relied on them for care and support—would experience serious harm as a result of their prolonged absence from home. *See Calimlim*, 538 F.3d at 710-11 (recognizing a person's inability to provide financial support to family members as a "serious harm"). Some Plaintiffs were single parents who had no other person to care for their children while they were in jail—to feed them, take them to school, and keep them from harm (SUF ¶¶ 150, 158, 174). Jail visitation rules prohibited Plaintiffs like Ms. Johnson from seeing their children during their incarceration (SUF ¶ 159).

Plaintiffs had every reason to believe that harm would befall their children in their absence. While Ms. McCullough was in jail for months, the condition of her adult son with a disability significantly worsened because she was not able to visit or speak to him regularly, and his institutionalization was prolonged for an additional month because she could not pick him up and take him home to care for him (SUF ¶ 114). Ms. Johnson could not see her three children for the entire nine months of her incarceration (SUF ¶ 159). Her children were separated and placed into

the homes of different relatives; two of them suffered abuse (SUF ¶ 160). And Mr. Mooney's

children were also dispersed to homes of different relatives (SUF ¶ 193).

Accordingly, since Plaintiffs had no ability to buy their way out of jail and could not support, care for and try to protect their children while in jail, they were highly motivated to work as much as possible in order to shorten the duration of their incarceration. The City's manipulation of Plaintiffs' impoverished economic circumstances and love for their children worked an unlawful coercion within the meaning of § 1589(a)(4).

Second, the TVPA prohibits coercion "by means of the abuse or threatened abuse of law or legal process," 18 U.S.C. § 1589(a)(3), which in turn means the "use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). This section "prohibits misusing the legal process to coerce, or pressure, somebody into providing labor." *United States v. Peterson*, 627 F. Supp. 2d 1359, 1371 (M.D. Ga. 2008).

Judge Hayes has already admitted to incarcerating indigent individuals for nonpayment of traffic tickets without any inquiry as to their ability to pay, in direct violation of Rule 26.11 of the Alabama Rules of Criminal Procedure (SUF ¶¶ 14, 23-27). Certainly, this was Plaintiffs' experience (SUF ¶¶ 111-12, 131-32, 155-56, 180-81, 203). Judge Hayes' abuse of Rule 26.11, which prohibits imprisonment for a non-willful failure to pay fines, created the "modern day debtor's prison," ECF #131 at 23, that forced Plaintiffs to work off their debts to the City.

Critically, the City need not have directly engaged in the abuse of process in order to be held liable for knowingly obtaining Plaintiffs' labor "by means of" it. The undisputed facts show that the jail work program, providing $25 per day as a credit against their fines and costs, applied

exclusively for people serving "commuted" time for debts owed to the City (SUF ¶¶ 86, 95-97). The City knew that these inmates could not afford to buy their way out of jail because they did not have the money—and thus that they should not have been in jail in the first place. The City took advantage of this abuse of process to coerce Plaintiffs' labor in violation of § 1589(a)(3).

### C.   The City Violated §§ 1589(b) and 1593A by Benefiting from its Participation in a Venture Engaged in Violations of Sections 1581 and 1589(a)

Section 1589(b) imposes liability not only on direct perpetrators but on anyone who "benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in [§ 1589(a)] . . .." And § 1593A extends this same "knowing beneficiary" liability to actions in violation of *any* provision of the TVPA. *Muchira v. Al-Rawaf*, 2015 U.S. Dist. LEXIS 49806, at *40 n. 27 (E.D. Va. Apr. 15, 2015) ("Section 1593A requires a violation of . . . [Section] 1595(a)" which, in turn, "require[s] the showing of other actions in "violation of this chapter.").

Thus, "[o]ne can violate the statute either as a primary offender or simply by benefiting financially from participation in a "venture" with the primary offender." *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). Although not defined in 18 U.S.C § 1589, "venture" is used elsewhere in the TVPA to mean "any group of two or more individuals associated in fact, whether or not a legal entity." *United States ex rel. Elgasim Mohamed Fadlalla v. Dyncorp Int'l LLC*, 402 F. Supp. 3d 162, 196 (D. Md. 2019) (citing *Bistline*, 918 F.3d at 873); *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (using "venture" in § 1591(e)(5) to analyze definition in § 1589(b)).

The City financially benefited from labor of Plaintiffs and other incarcerated individuals, work coerced by its own jail personnel, overseen by the City's police and sanitation departments and municipal court (SUF ¶¶ 62, 74-78, 83-101), and ultimately within the responsibility of the Mayor (SUF ¶ 49). Plaintiffs and many other inmates incarcerated as a result of "commuted"

sentences cleaned all parts of the jail, worked in the kitchen, and staffed the jail laundry (SUF ¶¶ 52-73). Mr. Agee and Mr. Mooney joined work crews for the City Sanitation department in which they walked the highways to pick up trash (SUF 141, 187-88), and Mr. Mooney also worked for City codes enforcement (SUF ¶ 187). They cut grass and trimmed hedges around the courthouse, helped to maintain city ball parks, and even washed the City's police department vehicles (SUF ¶¶ 74-76, 141, 164, 187).

Moreover, City officials testified to the *value* of the work performed by Plaintiffs and others as part of the jail work program (SUF ¶ 62). They made clear that corrections officers would have been required to complete work not undertaken by incarcerated individuals in the Jail (SUF ¶ 61, 64, 73), and they worried about a possible loss of inmate labor (SUF ¶ 63). Without jail work program participants to do the work for free (SUF ¶ 104), the City would have had to pay for these services, whether through the labor of its own employees or through contracted vendors. Plaintiffs' coerced labor thus provided a clear financial benefit to the City.

## CONCLUSION

The Court should enter partial summary judgment as to liability for Plaintiffs McCullough, Johnson, Jones, Agee, and Mooney on the peonage-based portions of Count VII brought under 18 U.S.C. §§ 1581, 1589, and 1593A.

Dated:  January 21, 2020                    Respectfully submitted,


                                   By: s/ Gregory L. Bass


Martha I. Morgan (ASB-3038-A46M)
8800 Lodge Lane
Cottondale, AL  35453
Telephone: (205) 799-2692
Email: mimorgan@yahoo.com

Faya Rose Toure (ASB-5931-R78R)
Henry Sanders (ASB-6179A34H)
CHESTNUT, SANDERS &
  SANDERS LLC
P.O. Box 1290
Selma, AL  36702
Telephone:  (334) 526-4531
Fax:  (334) 526-4535
Email:  fayarose@gmail.com
Email:  gpompey@csspca.com

Harold C. Hirshman, *pro hac vice*
Jennifer A. Barrett, *pro hac vice*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Telephone:  (312) 876-8000
Fax:  (312) 876-7934
harold.hirshman@dentons.com
jennifer.barrett@dentons.com

Stephen J. O'Brien, *pro hac vice*
DENTONS US LLP
One Metropolitan Square, Suite 3000
St. Louis, MO 63102
Telephone:  (314) 259-5904
Fax:  (314) 259-5959
stephen.obrien@dentons.com

Gregory Lee Bass, *pro hac vice*
Britney Wilson, *pro hac vice*
National Center for Law and Economic
  Justice
275 Seventh Avenue, Suite 1506
New York, NY 10001
Telephone: (212) 633-6967
bass@nclej.org
wilson@nclej.org

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of Record, on this 21st day of January, 2020.

 s/  Gregory L. Bass