## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ANGELA MCCULLOUGH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.:  2:15-cv-00463-RCL-SMD |
| | ) | |
| vs. | ) | |
| | ) | |
| THE CITY OF MONTGOMERY, ALABAMA, | ) | ORAL ARGUMENT |
| et al., | ) | REQUESTED |
| | ) | |
| Defendants. | ) | |

—————————————————————————

## CITY OF MONTGOMERY'S BRIEF IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

—————————————————————————

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................1

II.    THE CITY'S RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS.......................9

    A.    Plaintiffs' focus is on judicial actions, not conduct that can be attributed to the City .....................................................9

    B.    Even in their attack on the Municipal Court, Plaintiffs blatantly mischaracterize the documentary evidence ...........................14

    C.    Plaintiffs' "factual" assertions about commuted sentences, though having no relevance to the City's liability, reflect their fundamental misunderstanding of the law and facts here..........................16

    D.    Whether a detainee's work benefited the City would, if the statutory claims remain in the case, necessarily be a jury question.....................................17

    E.    Whether these Plaintiffs would have worked, even without the so-called "coercive" work credit, is also a jury question.......................................18

    F.    There is no evidence that corrections officers told Plaintiffs or anyone of the credit given by the Court................................19

    G.    Plaintiffs' own facts highlight the irony of their statutory claims against the City ....................................................19

    H.    Plaintiffs' careful effort to testify that they did not "volunteer" to work because there was a benefit associated with it is not relevant, as such, to their legal claim.............................................20

    I.    Plaintiffs' focus on how the sentences entered by the Municipal Court affected their children does not make the corrections officers' actions criminal.............................................20

III.   THE CITY'S RESPONSE TO THE PLAINTIFFS' ARGUMENTS ...............................21

    A.    Plaintiffs' claims fail because the statutes at issue do not apply to governmental entities ............................................21

    B.    Even if TVPA did apply to a governmental entity, Plaintiffs' § 1581 claims would fail here as a matter of law ...........................25

        1.    Plaintiffs' § 1581 claims fail because they challenge judicial conduct and judicial orders .........................................25

i

2.  Plaintiffs' § 1581 claims also fail because the City did
not obtain the work by means of harm or threats of harm ........................25

    a.  Inmates can be required to work and such requirement
does not amount to involuntary servitude ...............................................26

    b.  The corrections officers neither harmed nor threatened
harm and so cannot be liable under the peonage statute ....................28

3.  The corrections officers' actions (the only conduct attributable
to the City) was not culpable ....................................................................31

4.  Summary of City's Argument relative to Plaintiffs'
18 U.S.C. § 1581 claim............................................................................32

C.  The City's Response to Plaintiffs' 18 U.S.C. § 1589(a) argument ........................34

1.  Plaintiffs' § 1589(a) claim fails for the same reasons their
§ 11581 claim fails....................................................................................34

2.  Plaintiffs' separately asserted § 1589(a)(4) claim fails because
the City actors neither threatened nor caused any harm, nor
was their conduct in any way culpable ......................................................34

3.  Plaintiffs' § 1589(a)(3) abuse-of-process claim fails because
no City actor threatened or abused any legal process ...............................36

4.  The Plaintiffs' § 1589 claims that the City may be liable as
a perpetrator for "knowingly" obtaining labor by means of
an abuse of process also fail for lack of evidence......................................37

5.  Summary of City's arguments relative to Plaintiffs' § 1589 claims..........39

D.  Plaintiffs' argument that the City is liable for benefiting from
participation in a venture that violated §§ 1581 or 1589(a) also fails .................39

1.  There is not substantial (or any) evidence of a venture nor law
cited to support the proposition that independent branches of
government amount to a venture................................................................39

2.  There is a genuine issue of material fact in dispute as to whether
the work Plaintiffs did resulted in a benefit to the City ...........................41

CONCLUSION....................................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

*Ankenbrandt v. Richards*,
    504 U.S. 689 (1992)........................................................................................................22

*Bailey v. Alabama*,
    219 U.S. 219 (1911)..................................................................................................28, 29

*Bearden v. Georgia*,
    461 U.S. 660 (1983)................................................................................11, 14,15, 38

*Bistline v. Parker*,
    918 F. 3d 849 (10th Cir. 2019) ..............................................................40, 41

*Comer v. City of Palm Bay, Florida*,
    265 F. 3d 1186 (11th Cir. 2001) .....................................................................18

*D.C. Court of Appeals v. Feldman*,
    460 U.S. 462 (1983)........................................................................................10

*Draper v. Rhay*,
    315 F. 2d 193 (9th Cir.), *cert. denied* 375 U.S. 915 (1963).......................26, 27

*Flores-Figueroa v. United States*,
    556 U.S. 646 (2009)..........................................................................................6

*Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund*,
    500 U.S. 72 (1991)....................................................................................22, 23

*Liparota v. United States*,
    471 U.S. 419 (1985)........................................................................6, 7, 31, 33

*McCullough v. Finley*,
    907 F. 3d 1324 (11th Cir. 2018) ...........................................................7, 16, 36

*Menocal v. Geo Group, Inc.*,
    113 F. Supp. 3d 1125 (D. Colo. 2015)................................................................30

*Nuñag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
    No. 8:10-cv-1172, 2011 WL 13153190, at *10 (C.D. Cal. May 12, 2011)...21,22,23,24,25

*Omasta v. Wainwright*,
    696 F. 2d 1304 (11th Cir. 1983) .....................................................................27

*Palsgraf v. Long Island Railroad Co.*,
    248 N.Y. 339, 162 N.E. 99 (1928)....................................................................20

*Pierce v. United States*,
    146 F. 2d 84 (5th Cir. 1944) ..........................................................................29

*Ricchio v. McLean*,
    853 F. 3d 553 (1st Cir. 2017) ........................................................................40

*Rooker v. Fid. Trust Co.*,
    263 U.S. 413 (1923)........................................................................................10

*Sigler v. Lowrie*,
    404 F. 2d 659 (8th Cir. 1968), *cert. denied* 395 U.S. 940 (1969).....................27

*Taylor v. Georgia*,
    315 U.S. 25 (1942).........................................................................................27

*Thurman v. Judicial Corr. Servs., Inc.*,
    760 F. App'x 736 (11th Cir.), *cert denied*, 139 S. Ct. 2646 (2019).................10

*United States v. Bly,*
    510 F. 3d 453 (4th Cir. 2007) ...................................................................22, 23

*United States v. Calimlim*,
    538 F. 3d 706 (7th Cir. 2008) ...................................................................34, 35

*United States v. Errol*,
    292 F. 3d 1159 (9th Cir. 2002) .....................................................................25

*United States v. Figueroa*,
    165 F. 3d 111 (2d Cir. 1998)...........................................................................6

*United States v. Kozminski*,
    487 U.S. 931 (1981)..................................................................................27, 29

*United States v. United Mine Workers of Am.,*
    330 U.S. 258 (1947).......................................................................................22

*United States v. Miranda-Lopez*,
    532 F. 3d 1034 (9th Cir. 2008) .......................................................................6

*United States v. Montejo*,
    442 F. 3d 213 (4th Cir. 2006) .........................................................................6

*U.S. v. Peterson*,
    627 F. Supp. 2d 1359 (M.D. Ga. 2008) ...........................................31, 35, 39

*United States v. Reynolds*,
    235 U.S. 133 (1914)........................................................................................28

*United States v. Shackney*,
    333 F. 2d 475 (2d Cir. 1964)........................................................................27

*Vanskike v. Peters*,
    974 F. 2d 806 (7th Cir. 1992), *cert. denied* 507 U.S. 928 (1993).....................26

*Watson v. Graves*,
    909 F. 2d 1549 (5th Cir. 1990) ...............................................................27, 28

*Wendt v. Lynaugh*,
    841 F. 2d 619 (5th Cir. 1988) ........................................................................27

## RULES AND STATUTES

Ala. Code § 15-18-62...........................................................................16, 17, 38

Rule 26.11, Ala. R. Crim. P. .............................................14, 15, 16, 17, 36, 38

1 U.S.C. § 1.....................................................................................21, 22

18 U.S.C. § 1581...............................................1, 3, 8, 21,24, 25, 26, 32, 33, 34, 39, 42

18 U.S.C. § 1589...............................1, 3, 8, 21, 24, 27, 31, 32, 35, 37, 39, 40

18 U.S.C. § 1589(a)...............................................................34, 37, 39, 42

18 U.S.C. § 1589(a)(1)..................................................................................37

18 U.S.C. § 1589(a)(2)..................................................................................37

18 U.S.C. § 1589(a)(3)......................................................................36, 37, 39

18 U.S.C. § 1589(a)(4)......................................................................34, 35, 37

18 U.S.C. § 1589(b)......................................................................................39

18 U.S.C. § 1590.......................................................................................24

18 U.S.C. § 1595...............................................................1, 21,24, 32, 40

18 U.S.C. § 1595(a)...............................................................................23, 24, 39

## ADDITIONAL AUTHORITIES

Black's Law Dictionary (11th ed. 2019)..................................................................41

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANGELA MCCULLOUGH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO: 2:15-CV-463-RCL |
| | ) | |
| VS. | ) | |
| | ) | ORAL ARGUMENT |
| THE CITY OF MONTGOMERY, | ) | REQUESTED |
| ALABAMA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CITY OF MONTGOMERY'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Plaintiffs have filed an affirmative summary judgment motion seeking a ruling from this Court that the City of Montgomery is civilly liable under 18 U.S.C. § 1595 for criminal violations of 18 U.S.C. §§ 1581 (peonage) and 1589 (forced labor).  Plaintiffs' Motion boils down to this: that the City should be held civilly liable for the federal crimes of forced labor and peonage because corrections officers complied with the Municipal Court's request that they report the days on which detainees took part in a voluntary work program. However, as explained in section III.A., *infra*, these statutory provisions do not apply to governmental entities, and therefore Plaintiffs' motion must be denied (and the claims dismissed against the City).  The City also adopts all arguments and evidentiary submissions made in connection with its own Motion for Summary Judgment.

Even if these statutes applied to governmental entities, Plaintiffs could not prevail under these facts or their argument here.  To be clear, they do **not** argue:

- That corrections officers violated either 18 U.S.C. § 1581 or § 1589 merely by providing detainees an opportunity to work.
- That corrections officers (or anyone) ever threatened any detainee with any harm if the detainee chose not to work.

1

- That corrections officers (or anyone) ever took any harmful action against any detainee because he or she chose not to work.
- That anyone other than the Municipal Court Judges commuted Plaintiffs' fines and costs to jail time.
- That corrections officers had any authority to decline to accept the detainees sentenced by the Municipal Court.

Rather, Plaintiffs' argument actually comes down to the theory that if a detainee chose to shorten his or her jail time by volunteering to work – that is, by accepting the benefit of the Court program giving a half-day off the jail sentence for every day of volunteered work – the detainee's choice was "coerced," and that such "coerced choice" is a violation of the anti-peonage and forced labor statutes.

To put Plaintiffs' argument into context, it is important also to understand the uncontested facts about the history of the work program in the Montgomery City Jail. Plaintiffs acknowledge that the Jail had been giving detainees the opportunity to work since as early as 2003. (*See* Doc. 249 (Pls.' Statement of Material Facts) ¶ 52; *see also* Ex. 1 (Smith Decl.) ¶ 2 (noting also that detainees worked prior to 2003).) It is likewise an uncontested fact that many detainees from that time forward, and before, regularly chose to work pursuant to those opportunities without the Court (or anyone) giving them the credit against their sentences that is at issue in this litigation. (*See* Ex. 1 (Smith Decl.) ¶¶ 3 & 8 (generally the majority of detainees worked even outside the time the Court gave credit off their sentences).) The Municipal Court did not start giving that credit until, at the very earliest, 2009 or 2010, though the Court's practice likely started around January 2012.[1]

---

[1] (*See* Ex. 1 (Smith Decl.) ¶¶ 6-7 (credit started as early as 2009 but perhaps 2012); *see also* Doc. 252-12 (Plaintiffs' "compendium" of all jail work lists, none of which precede 2012); *see also* Doc. 241-14 (Nixon *McCullough* Dep.) at 35:1-14) (believed Judges began giving credit in 2010 or 2011).)

In fact, there is no evidence that there was ever any time before the Court gave the credit at issue here (or after it was no longer in effect) when detainees did not readily volunteer for work.[2] So many detainees wanted to work that opportunities were made available for individuals to work outside the jail even before the credit was given. (*See* Ex. 1 (Smith Decl.) ¶ 8.)  And it is worth reiterating here that, in their Motion for Partial Summary Judgment, Plaintiffs take no issue with the work program prior to the Court's decision to give detainees credit against their sentences.[3] In short, the jail functioned for at least six years (by even Plaintiffs' concession of fact) without there being a peonage or forced labor problem, under Plaintiffs' own theory.

What suddenly made the corrections officers' actions criminal – and, after all, §§ 1581 and 1589 are criminal statutes – was nothing they did differently from what they had done for at least six years before, *except that, upon request of the Municipal Court, they provided the Court a list of individuals who had worked*.[4]  Nothing changed about which detainees were working or what work they were doing.[5]

---

[2] (*See* Ex. 1 (Smith Decl.) ¶¶ 2-3 (majority of prisoners worked throughout his tenure (both before and after credit was given); *see also* Doc. 241-22 (Hopkins Dep.) at 11:18-12:1 (Hopkins, whose years with the Jail largely preceded the Court credit, testified that detainees who were "eligible to go out" were given opportunity to volunteer); Doc. 241-22 (Hopkins Dep.) at 16-18 (officers asked for volunteers); *see also* Doc.241-22 (Hopkins Dep.) at 31:19-32:3.)

[3] And, as noted above, the record is absolutely clear that both before, during and after the period during which the Court gave the credit, no corrections officer harmed any detainee who chose not to work, or threatened harm of any kind nor do Plaintiffs allege anything of the kind.  (*See, e.g.*, Ex. 1 (Smith Decl.) ¶ 9; Ex. 2 (Reaves Decl.) ¶¶ 3 & 9.)

[4] (*See* Ex. 1 (Smith Decl.) ¶¶ 4-5 (Court asked for list); *see also* Doc. 241-12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 48:20-49:3 (Jail stopped providing a list in 2015 because Court stopped asking for it); Doc.241-12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 63:10-18) (Lt. Smith testified that the jail was asked to provide detainee work records to the Court); *see also* Doc. 241-14 (Nixon *McCullough* Dep.) at 43:3-11 (Court started jail-work program and Jail was asked to provide the work list); Doc. 241-23 (Lewis Dep.) at 21:17-22:4 ("As far as credit is concerned all that [credit for work] was handled through the court. The only thing I can testify is that we had a list.").)

[5] Before the Court decided to give work credit and after, detainees with both commuted and mandatory sentences were working. (*See* Ex. 1 (Smith Decl.) ¶ 10; *see also* Doc. 241-30 (Johnson Dep.) at 173:21-

To give further important context, the corrections officers played no role in applying the credit to the detainees' sentences; it was the Municipal Court alone that did that. (*See* Ex. 1 (Smith Decl.) ¶ 7; *see also* Doc. 242 (City's Statement of Undisputed Facts) ¶¶ 50-55 (citing testimony showing Jail relied exclusively on the Court for release dates).) In fact, each jail supervisor who testified said they had no idea what kind of credit the Court was giving in connection with jail work.[6]  (The police officers and police chiefs deposed knew even less.[7] The Mayor knew nothing at all.[8])

Given this uncontested context, under Plaintiffs' legal theory, if these statutes even applied to governmental entities, corrections officers could only have avoided criminal liability by making one of three equally problematic choices – each of which would have injured the five Movants here:

(a) The corrections officers could have refused to provide any work opportunities to anyone once they realized that any kind of credit was being given for that work by the Court.  This, of course, would have left detainees who would rather work without that opportunity. (As noted

---

174:9 (testifying that some inmates elected to work to get $25 credit, while some volunteered just to get out of their cells, whether or not they owed any money balance on tickets, i.e., inmates with mandatory time).)

[6] (*See, e.g.,* Doc. 241-12 (Smith *McCullough* Rule 30(b)(6) Dep.) at 83:3-17 (supervisor testifying he could not answer question about value given for work done); Doc. 241-23 (Lewis Dep.) at 21:12-16 (warden testifying if any credit was given for inmate work, that was handled by the Municipal Court, not through the jail; she had nothing to do with any such credit being given); Doc. 241-23 (Lewis Dep.) at 46:20-47:7 (reiterating that she did not know the way the Municipal Court figured credit for jail work).)

[7] (*See* Doc. 241-17 (Baylor Dep.) at 11:19-12:3 & 21:4-6) (Police Chief aware of detainee work but not of credit given); *see also* 241-18 (Murphy Dep.) at 13:5-14:15 (Chief Murphy, Police Chief from 2010 to 2014 (the year program stopped), testifying that he understood that detainees cleaned and worked in kitchen on a voluntary basis but that he was not "aware of what the arrangement was" regarding credit for jail work); *see also* 241-18 (Murphy Dep.) at 20:12-21:2 (he did not know "specifically," and there were "no discussions" when he was chief about any rate people were receiving for jail work).)

[8] (*See* Doc. 241-16 (Strange Dep.) at 24:4-10 (Mayor testifying that he did not know whether he was ever informed that detainees were getting credit for jail work); *see also* Doc. 241-16 (Strange Dep.) at 23 (Mayor testifying that he did not know if he was informed that inmates worked at all).)

above, most detainees, even before the Court gave credit, chose to work. (See Ex. 1 (Smith Decl.)

¶ 3).) But, even more problematically, it would have prevented the Plaintiffs themselves from

having the chance to be released before the end of their sentences. One can only imagine the outcry

of these same five Plaintiffs who worked had the corrections officers taken this path.[9]

      (b) Second, the corrections officers could have refused to provide work opportunities just

to those with commuted time.  As with option (a) above, this would have left commuted detainees

who would rather have worked without that option.  But, more critically, it would have resulted in

an injury to them and the five Movants by depriving them of the opportunity to be released early.

Again, one can imagine the Plaintiffs' outrage had the corrections officers taken this route.

      (c) Finally, the corrections officers, though continuing to give people work opportunities,

(arguably) could have refused to provide the list of individuals who worked to the Court.[10]  Though

detainees would have had the option to work, if they preferred to, as with the other two options

above, they would have been injured by the corrections' officers' actions in refusing to provide

the Court the list.

      Put into this context, it is impossible to believe that criminal or civil liability could flow

from the corrections officers' actions here.  (And, of course, Congress did not intend that it would

flow at all to governmental entities as explained, *infra*.)  The corrections officers (and the City)

were presented with detainees who were sentenced by the Court to a certain number of days.  Those

corrections officers were not responsible for imposing those sentences or calculating the detainees'

release dates.  That was all determined by the Court.  The City and the Municipal Court are distinct

---

[9] In fact, one of the claims Johnson thought her attorneys were asserting in this lawsuit was that she was not given all the credits she was due for work performed in jail. (*See* Doc. 241-30 (Johnson Dep.) at 73-79 and Ex. 6 (Johnson Dep.) at 175-176.)

[10] Of course, the Municipal Court could have ordered that it be produced.

branches of government, and the Court is part of the independent state judicial system.[11]  Because providing work opportunities was not culpable conduct, under the law or even under Plaintiffs' theory, the sole nexus leading to the corrections officers' liability (and thus any basis for liability as to the City), therefore, was the provision of the jail work list to the Municipal Court upon that Court's direction – which was also not culpable.

The case law is clear that criminal statutes cannot be interpreted to criminalize innocent conduct.  *See, e.g., Liparota v. United States*, 471 U.S. 419, 426-27 (1985) (noting in the context of statutory construction that "to interpret the statute [at issue there] otherwise would be to criminalize a broad range of apparently innocent conduct" and rejecting such a construction on that basis);  *United States v. Montejo*, 442 F.3d 213, 216 (4th Cir. 2006) (describing *Liparota's* "primary stated concern: avoiding criminalization of otherwise non-culpable conduct"), *abrogated on other grounds by Flores-Figueroa v. United States*, 556 U.S. 646 (2009).)  "Congress did not intend to criminalize conduct that we regard as morally innocent." *United States v. Miranda-Lopez*, 532 F.3d 1034, 1044 (9th Cir. 2008); *see also United States v. Figueroa*, 165 F.3d 111, 116 (2d Cir. 1998) ("[C]riminal statutes should be presumed to criminalize only conduct that is accompanied by a non-innocent state of mind ….").

Given this context, Plaintiffs' motion fails for several independent reasons discussed in more detail below:

(i)     Because the City is a governmental entity, the statutes at issue do not apply to it.

---

[11] (*See* Doc. 183 at 1-14 (this Court's recognition that the City is distinct from the Municipal Court, which is a separate branch of government as part of the state Unified Judicial System); *see also* Doc. 242 (City's Statement of Undisputed Facts) ¶¶ 2-26 (describing various indicia of separation between the City and the Municipal Court).)

(ii)      The motion fails to recognize the separation of powers between the City and the Court, and this Court's directive, i.e., that Plaintiffs would have to show that *City corrections officers* actually forced inmates to work, separate from any action taken by the Court.[12]  It also fails to recognize that, by premising the claim on an alleged error the Court made in commuting their fines and costs to jail time or issuing early release orders, the claim runs afoul of the *Rooker-Feldman* doctrine.

(iii)     The motion seeks to base criminal liability on City employees' innocent and non-culpable conduct.  *See Liparota, supra*.

(iv)     Plaintiffs' theory is inconsistent with case law which requires, across the board, that in order to violate the anti-peonage and forced labor statutes, the work at issue must have been obtained by means of harm or threat of harm, and there was none here – certainly none attributable to the City.  Detainees appeared in the jail with sentences imposed by the Municipal Court; neither the City nor the jailers enhanced those sentences nor threatened to enhance them or otherwise harm them.

(v)      The motion fails to recognize that there is a valid jury question regarding whether any of the five Plaintiffs would have worked even had early release been unavailable, as evidenced by the fact that many people (including at least one of these Plaintiffs) worked when no credit was available.

---

[12] In its memorandum opinion following remand from the Eleventh Circuit, this Court noted that *Finley*'s [*McCullough v. Finley*, 907 F. 3d 1324 (11th Cir. 2018)] "holding eliminate[d] the possibility that the municipal judge acted as a *de facto* city official in reducing sentences based on work completed in jail." (Doc. 183 at 15.) But this Court did not dismiss the remaining Count VII claims because "[t]he amended complaint contains detailed allegations of plaintiffs being forced or coerced to work while in jail."  (Doc. 183 at 15.)  Thereafter, this Court cited the language in the Amended Complaint using the word "forced" in connection with Plaintiffs' jail work allegations, stating that "whether the judge reduced the plaintiffs' sentences – clearly a judicial act – is separate from the actual forced labor [allegations]."  (Doc. 183 at 16.)

(vi)  In connection with the somewhat separate basis for liability based on "benefiting" from "participation in a venture" – – even assuming that this Court were to conclude that there was no dispute of material fact as to whether the Municipal Court judges themselves were somehow violating §§ 1581 and 1589 by giving the work credit against Plaintiffs' sentences (they were not) – – Plaintiffs cannot show that what the corrections officers (or anyone in authority at the City) did arose to "participation in a venture" as defined by these statutes.  Indeed, the notion of a venture itself implies a business activity and not a governmental function.  While this is an independent ground for denying summary judgment here (and granting it to the City), the point is consistent with the City's first argument that these statutes were never intended to apply to governmental entities.

(vii) Finally, even if these statutes applied to governmental entities and there were no dispute of material fact as to whether non-Court personnel "participated in a venture," there would be a jury question as to whether the City benefited from that so-called venture, as to the work done by each of the individual Plaintiffs here.

Below, the City responds first to the "Statement of Facts" set out in Plaintiffs' brief and then to Plaintiffs' specific legal arguments and, in doing so, explains more fully the seven points set out above.  The arguments set out herein, of course, also further support the City's Motion for Summary Judgment as to these statutory claims.  (*See* Docs. 240-243 (City's Motion, Evidentiary Submissions, Statement of Undisputed Facts, and Brief).)  *See* Fed. R. Civ. P. 56(f) (providing that a Court may rely on evidence and arguments not made in the movant's motion to grant summary judgment and the Court may grant summary judgment to the non-movant).

## II.      THE CITY'S RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS

The City takes issue with the heavy-handed and unsupported assertions in the Introduction and Statements of Facts included within Plaintiffs' Brief.  (*See* Doc. 248 at 2-13 (ECF pp. 6-17).[13]) Many of the "facts" are irrelevant and immaterial attempts to muddy the waters or cast aspersions without support in the record.

### A.      Plaintiffs' focus is on judicial actions, not conduct that can be attributed to the City.

After obliquely and without factual support accusing the City of re-inventing slavery[14], the Plaintiffs begin their substantive contentions.  Many are not material to the City's liability but are nonetheless addressed herein in an abundance of caution.  They start with their assertion that there was a system in connection with which people were jailed for failure to pay fines and costs "who could not afford to pay traffic fines and costs owed to the City." (Doc. 248 at 1 (ECF p. 5).)

---

[13] The City addresses its disputes to many of Plaintiffs' Statements of Undisputed Fact in a separate document filed contemporaneously herewith.

[14] The introduction to Plaintiffs' Brief tries to paint the City of Montgomery as running a modern-day slavery operation.  Of course, there are no facts cited in support for this overreach.  Certainly, the three African-American corrections officers whom Plaintiffs deposed and who supervised the jail during the relevant periods would take issue with being implicated in reinventing a system of slavery.  (*See* deposition excerpts of the three African-American corrections supervisors deposed at Doc. 241-12 (Lt. Smith Dep.); Doc. 241-22 (Hopkins Dep.); Doc. 241-23 (Lewis Dep.)) as would the at least five African American City Council members who served during the relevant period **and** as would the two African-American police chiefs who served during the relevant period – Chief Baylor and Chief Finley.  (*See* deposition excerpts of Police Chief Baylor at Doc. 241-17 (Baylor Dep.) at 8, 10-11 (Baylor was Chief of Police from 2004 to 2010, and then U.S. Marshall); *see also* Doc. 32 ¶ 31 (naming Finley, who was Police Chief in 2015 when the case was filed, as a Defendant in the litigation).)  While the actions of the judges are not at issue in this lawsuit, Judge Milton Westry, a full-time Municipal Court judge (now the Presiding Judge), and Judge Lloria James, a part-time Municipal Court judge, who both served during the relevant period, are African-American.  Both of them would certainly take issue with the Plaintiffs' claims.  Judge Knight, who is now deceased, another African-American judge who served during that time would likewise have been highly offended by Plaintiffs' assertions.  (*See* Doc. 241-2 (Nixon Aff.) at 4, ¶ 26 (noting six judges active during the relevant period in this litigation: Knight, Massey, Hendley, James, Westry and Hayes); *see also*, *e.g.*, Doc. 241-27 (Caldwell Dep.) at 57-58 & 251-259 (describing interaction with Judges James, Hendley and Westry); Doc. 241-30 (Johnson Dep.) at 115-17 (acknowledging Knight's signature on probation order.).)

However, Municipal Court judges, whose actions are not at issue in this case and whose acts cannot be laid at the City's feet, entered those sentences. (*See, e.g.,* Doc. 183 at 1-16.)

As the City explained in its Brief in Support of Summary Judgment (Doc. 243 at 37-38 (ECF pp. 45-46)), the *Rooker-Feldman*[15] doctrine bars adjudication of the validity of the Municipal Court's orders at issue.  This would include any challenge to the commuted sentences or jail transcripts reflecting them.  *See Thurman v. Judicial Corr. Servs., Inc.*, 760 F. App'x 736, 737 (11th Cir.), *cert denied*, 139 S. Ct. 2646 (2019) (finding even unsigned orders fall within the *Rooker-Feldman* doctrine).

For those same reasons, the orders commuting the fines to jail time must all be accepted as valid. None of them have been set aside. The City did not and could not cause or cancel such judicial actions or be liable for them. Thus, to the extent that Plaintiffs' statutory claims in Count VII, as framed in their Motion for Summary Judgment, actually hinge on the validity of the Municipal Court's orders, Plaintiffs' claims are due to be dismissed for that independent reason.

And Plaintiffs have framed their claims in that way.  In essence, what they argue is that because they were commuted erroneously by the Court, they should not have been in jail in the first place (and that the corrections officers/City should have known that). (Doc. 248 at 22 (ECF p. 26) (arguing that Plaintiffs could not afford to pay their fines and costs "and thus that they should not have been in jail in the first place").)

*Rooker-Feldman* aside, even if the City could be held liable based on errors in the Court's rulings (it cannot be), it is not a simple or undisputed "factual" proposition that the Judges erred in commuting these five Plaintiffs.  The issue before those Municipal Court judges was not, as

---

[15] *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923).

Plaintiffs would have it, merely whether the individuals who appeared before them could have paid in full the fines and costs they owed on the day they appeared in Court.   Rather, as a constitutional and statutory matter, the issue was whether the individual appearing before the Municipal Court judges had made a bona fide effort to pay during the time the fines and costs were owed, including an effort to find work, to borrow the money and/or, presumably, to reduce their expenses.[16]

Even if the Judges' sentences here were at issue, whether Plaintiffs were wrongfully jailed would not be a matter for summary judgment in their favor.   Plaintiffs here had been given years to pay most of the fines and costs they had incurred before having them commuted, and most had made minimal efforts to pay (*see, e.g.,* Exs. 252-16, 252-22, 252-28, 252-34 (Plaintiffs' jail transcripts showing date of cases in the case numbers and the date cases were commuted and amounts owed)); that and other evidence exists to support the Court's ruling, some of which is set

---

[16] *See Bearden v. Georgia*, 461 U.S. 660, 668, 673 (1983); *see also id.* at 660 (syllabus, concisely summarizing holding as follows: "If the probationer has willfully refused to pay the fine or restitution when he has the resources to pay or has failed to make sufficient bona fide efforts to seek employment or borrow money to pay, the State is justified in using imprisonment as a sanction to enforce collection.").

out in the footnote below.[17]  All of the Plaintiffs, but one, worked or had the capacity to work.[18]

None of them bothered to show up regularly in Court, if ever, when they were ordered to do so.

---

[17] Ms. McCullough had three years of college education toward a degree in print journalism.  (*See* Ex. 5 (McCullough Dep.) at 73-76.)  In 2009, Mrs. McCullough owed a balance of $2,067.00 to the Court.  (Doc. 241-25 (McCullough Dep.) at 301-02; Doc. 241-73 (Ex. 47 to McCullough Dep.).)  She acknowledges that, despite being given time to pay this balance, she did not pay *anything* toward the tickets associated with that balance between 2009 and 2012.  (Doc. 241-25 (McCullough Dep.) at 301-02.)  Ms. McCullough essentially admitted not having made a bona fide effort to pay, in fact.  Ms. McCullough testified that she decided from the outset that she would not comply with the terms of her assignment to JCS.  (*See* Doc. 241-25 (McCullough Dep.) at 192 (stating that she never attended any appointments or made any payments and that her decision that "I'm not going to do that" was made "from the get-go").)  In other words, she acknowledged that her refusal to pay was deliberate and willful, and that she did not meet with JCS or pay it any money.  (Doc. 241-25 (McCullough Dep.) at 192; 268-69.)  She did not even appear at her initial appointment with JCS.  (Doc. 241-25 (McCullough Dep.) at 189; 191-92 (or, alternatively, she only met with JCS to complete initial paperwork and never met with them again).)  Although she did not pay JCS, she did not take this up with the Municipal Court or anybody else.  (Doc. 241-25 (McCullough Dep.) at 285:11-286:9.).

Ms. McCullough testified that she never in her entire life had a driver's license.  (Doc. 241-25 (McCullough Dep.) at 294-95.)  Yet, she was clearly willfully driving constantly during her entire adult life. (*See, e.g.*, Doc. 241-57 to Doc. 241-59, Doc. 241-61, Doc. 241-63, Doc. 241-65 to Doc. 241-66 (selected exhibits to McCullough Dep.) (documenting traffic tickets between 1999 and 2010).  Ms. McCullough regularly received sizable income tax refunds during the relevant period.  (*See* Ex. 5 (McCullough Dep.) at 30-32.)

Ms. Johnson's history is similar. (*See* Doc. 242 ¶¶ 151-155, 160 (habitually failed to appear in Court; lost job because of habitual tardiness; did not appear at JCS appointments because she did not want to wait in line; could only produce three receipts for JCS payments).)  She had discretionary expenses, such as cable bills, which funds could have gone toward paying JCS.  (*See, e.g.,* Ex. 6 (Johnson Dep.) at 407-08.)  She also bought, during the relevant period, a car for $20,000.  (*See, e.g.,* Ex. 6 (Johnson Dep.) at 360-61; *see also* Ex. 6 (Johnson Dep.) at 14-15 (testifying that none of her several children's fathers have court-ordered child support; she just gets money from them on an as-needed basis).)

Mr. Jones could not even testify as to whether any effort was made to pay his tickets, but he did testify that there were months when money was available to pay his tickets.  He does not know whether that money was applied to his tickets, however.  (*See* Doc. 241-28 (Jones Dep.) at 238:10-23 (while Mr. Jones testified that he sometimes did have extra money that could have been paid on his tickets, there is no indication that he, himself, made any attempt to ensure that the tickets were paid); Doc. 241-28 (Jones Dep.) at 107:12-108:1, 146:20-147:2 (rather, he relied on his mother to take care of them).)

Like Ms. McCullough, Mr. Agee drove his entire life without ever bothering to get a driver's license.  (Doc. 241-29 (Agee Dep.) at 263, 291, 303-04.)

Mr. Mooney testified that he had access to $1000 on the day he appeared before the Court.  (Doc. 249 (Plaintiffs' Statement of Facts) at ¶ 179.)  A judge could certainly have wondered why he had not willingly applied any of those funds toward his tickets.  Mr. Mooney trained as a plumber and has had his journeyman's rating since 2001.  (Doc. 241-26 (Mooney Dep.) at 59-60.)  He was employed as a plumber from 2001 to 2017.  (Doc. 241-26 (Mooney Dep.) at 62-63 (acknowledging that he worked off-and-on for Edwards Plumbing from 2001 to about 2017); Doc. 241-26 (Mooney Dep.) at 69 (work for Edwards

(*See* Doc. 242 (City's Statement of Undisputed Facts) ¶¶ 127-252 (generally).)  All willfully drove without drivers' licenses or with suspended licenses, unnecessarily incurring additional fines and costs (about which they now complain).[19]  Were the Judges' sentences an issue before this Court, a jury would be entitled to determine whether each of the Plaintiffs, or any of them, actually did, over the time the fines and costs were due, make a bona fide effort to pay them.  As discussed above, to the extent Plaintiffs' theory of liability rests on their having been erroneously sentenced (and it apparently does) or released early, their claims are likewise barred under *Rooker-Feldman*.

---

Plumbing was always full time); Doc. 241-26 (Mooney Dep.) at 72-73 (worked for North Georgia Plumbing when he was laid off from Edwards).)  He testified that his highest income for any year between 2011 and 2017 was $32,000.  (Doc. 241-26 (Mooney Dep.) at 107-09.)  He has also done freelance plumbing, for which he was compensated.  (Doc. 241-26 (Mooney Dep.) at 68.)  Mr. Mooney had a history of failing to appear on traffic tickets, and he was placed on two different payment plans.  (*See* Doc. 242 at ¶¶ 221-228.)

[18] (*See* Doc. 242 at ¶ 143 (McCullough worked at a motel); Ex. 5 (McCullough Dep.) at 73-86 (employment and education history showing that McCullough had three years of college education); Doc. 242 at ¶ 153 (Johnson lost job for tardiness); Ex. 3 (Edwards Dep.) at 39-71 (Edwards' college education and employment history); Ex. 4 (Agee Dep.) at 175-77 (Agee was working full-time between 2012 and 2015); Doc. 242 at ¶ 220 (Mooney was a licensed plumber throughout relevant period).)  Only Mr. Jones testified that he had a disability that prevented him from working or, rather, the disability office told him he could not work, but even he was able to do yard work and car repair work to earn extra money.  (*See* Doc. 242 at ¶ 173.)

[19] As noted above, Ms. McCullough never had a driver's license, yet she willfully drove throughout her adult life.  (*See* n. 19, *supra*.)  (*See* Doc. 241-25 McCullough Dep.) at 294-95.) (*See, e.g.,* Doc. 241-57 to Doc. 241-59, Doc. 241-61, Doc. 241-63, Doc. 241-65 to Doc. 241-66 selected exhibits to McCullough Dep.) (documenting traffic tickets between 1999 and 2010.)

  Like Ms. McCullough, Mr. Agee drove his entire life without ever bothering to get a driver's license.  (Doc. 241-29 (Agee Dep.) at 263; 291; 303-04.)  Mr. Mooney acknowledged that he was without a driver's license throughout 2011 and 2012.  (Doc. 241-26 (Mooney Dep.) at 64:12-14.)  He was also ticketed numerous times during this period and in 2009 and 2010 for driving without a license.  (*See* Doc. 241-76 (Ex. 87 to Mooney Dep.) (listing seven charges for driving with revoked license).)

  Ms. Johnson also drove without a valid license. (*See* Ex. 6 (Johnson Dep.) at 104 (she received several tickets for driving with a suspended license; she had no license; she did not try to get her license back).)

  Mr. Jones's story is somewhat different.  He never knew the nature of his traffic tickets because he gave them to his mother to handle, as explained elsewhere.  He drove without his license nonetheless.  (*See* Doc. 241-28 (Jones Dep.) at 132:9-18; Doc. 241-77 (Ex. 146 to Jones Dep.) (driving while suspended ticket issued to Jones in 2010).)  And Mr. Jones clearly was not driving to work on these occasions. (*See* Doc. 242 ¶ 173.)

But, even absent that insurmountable problem, the Judges' actions are not before the Court.  The

sole issue here is whether a City actor violated the peonage or forced labor statute and whether the

City can be held liable for said violation.[20]

**B.**     **Even in their attack on the Municipal Court, Plaintiffs blatantly mischaracterize the documentary evidence.**

In their Fact section, Plaintiffs blatantly misconstrue deposition testimony given in prior

cases by the two full-time judges in the Municipal Court – Judges Westry and Hayes.  They say

that the judges "admitted publicly and under oath the details of the debtors' prison scheme that

existed in Montgomery, Alabama since before the turn of the 21st century."  (Doc. 248 at 2 (ECF

p. 6).)  (This testimony, by the way, was given in 2014, after any commutations in this case

occurred.)  The judges in no way admitted in their depositions to a debtors' prison scheme, but,

rather, testified that they held hearings during which they asked individuals why they had not paid,

and took that testimony into account before commuting their fines and costs into jail time.[21]  They

further testified that they always gave people time to pay their fines and costs.  (*See* Ex. 9 (Hayes

Dep.) at 100-01 (if people could not pay, Hayes would give them time to pay with a date certain

---

[20] This means that, *even if* Plaintiffs could somehow establish that the Municipal Court's sentences were at issue *and* could meet the summary judgment standard as to whether those sentences violated *Bearden*, they would still need to show that a City decision-maker knew or should have known that the sentences had been imposed in violation of *Bearden*.  At best, that would constitute a jury question.  More likely, the issue would be subject to summary judgment in favor of the City, since it is absurd to suggest that a corrections officer who is not a lawyer and not generally authorized to question court orders would even know what *Bearden* is – much less have an obligation or ability to parse the *Bearden* implications of a sentence that is valid on its face.

[21] Montgomery's judges made ability-to-pay or indigency determinations.  (Doc. 241-6 (Westry *Cleveland* Dep.) at 22:11–23:19 ("[W]e as judges, have to make a determination whether this person has a total inability to pay …."); *see also* Doc. 241-7 (Hayes *Cleveland* Dep.) at 58:7-12 ("Q. Do you believe that judges have an obligation to make an independent inquiry into indigency before they commute fines and costs? A. Yes, sir.").)  As Mr. Nixon testified, "I believe consistent with Rule 26.11, upon a judge's inquiry as to one's ability to pay and they determine willful noncompliance, that those unpaid fines can be commuted to a jail sentence for time."  (Doc. 241-14 (Nixon *McCullough* Dep.) at 87:1-9.)  Mr. Nixon testified that there would be an inquiry as to why the fine and costs were not paid before individuals were commuted. (Doc. 241-14 (Nixon *McCullough* Dep.) at 100:1-11.)

or place them on JCS payment plan); Ex. 7 (Westry Dep.) at 24-25 (judges always give people time to pay).)

Next, Plaintiffs take another death-defying leap of logic and make what amounts to an emotion-packed closing argument saying, "Judge Hayes's admissions [before the Court of the Judiciary] establish that for many years the City maintained a modern day debtors' prison." (Doc. 248 at 2 (ECF p. 6).)   Plaintiffs' only support for this is that Judge Hayes individually stipulated that on "many occasions" he did not make sufficient inquiry into an offender's ability to pay or sufficiently consider alternatives to jail. (Doc. 248 at 3 (ECF p. 7).)   His failing to make sufficient inquiry on "many occasions" does not establish the existence of a debtors' prison. Moreover, "many" could mean ten or fifteen or twenty-five over any number of years.[22]   The admission is merely, at most, an admission of legal errors by a judicial actor. It certainly does not create an undisputed material fact that there was anything that could be described as a debtors' prison, much less that the City was knowingly running a debtors' prison. No other judge's practices were challenged before the Court of Judiciary, and many of the Plaintiffs' encounters with the judiciary were with other judges. Judge Hayes was just one of at least six active Municipal Court judges during the relevant period (Knight, Hendley, James, Westry, Massey), including one other full-

---

[22] In reality, the language of Judges Hayes' stipulation is more nuanced than that. Judge Hayes' plea cannot be read to mean that he necessarily committed all three errors set out in Par. 1(f) of his stipulation. Rather, his plea uses the conjunction "and/or" meaning that he may have made one, two or all three of the errors set out. Thus, he pled that on "many occasions" in violation of the Alabama Rule of Criminal Procedure, Rule 26.11, he *either* failed to inquire into ability to pay "and/or" failed to determine reasons for inability to pay, "and/or failed to consider alternatives to incarceration other than providing additional time to pay." (*See* Doc. 241-33 (Hayes Stipulation) at 2.) Thus, he did not specify which of the three errors he may have made. His plea could merely be to a failure in "many cases" to consider alternatives other than providing more time to pay. It is not clear that, under *Bearden,* considering any further alternatives was necessary. *See Bearden v. Georgia*, 461 U.S. 660, 674 (1983) (requiring courts to consider as alternatives "the propriety of reducing the fine or extending the time for payments or making alternative orders"). It is undisputed that more time was always considered as one alternative. (*See* Ex. 9 (Hayes Dep.) at 100-01 (if people could not pay, Hayes would give them time to pay with a date certain or place them on JCS payment plan); *see* Ex. 7 (Westry Dep.) at 24-25 (judges always give people time to pay).)

time judge (Westry).[23]  But, again, the Judges' actions are not at issue here.  And it is clear that

the City did not control the Judges' actions or the Court,[24] as is the import of *McCullough v. Finley*,

907 F.3d 1324 (11th Cir. 2018) (hereinafter referred to as *Finley*).

> ### C.     Plaintiffs' "factual" assertions about commuted sentences, though having no relevance to the City's liability, reflect their fundamental misunderstanding of the law and facts here.

Ultimately, what Plaintiffs say violated the two statutes at issue here was that individuals

with commuted sentences were given credit by the Court for the work they did in the jail.  (Doc.

248 at 3-4 (ECF pp. 7-8).)   It is, according to Plaintiffs, because the sentences represented

converted fines and costs that Plaintiffs distinguish this program from countless programs

providing work or good-time credits to inmates who work: "The credit-for-labor program thus

related solely to the incarcerated individual's debt to the City; it had nothing to do with punishment

for any offense."  (Doc. 248 at 3-4 (ECF pp. 7-8).)  This statement, too, is inaccurate.  The entire

idea behind Rule 26.11 and Ala. Code § 15-18-62 is that monetary fines and costs can be converted

to jail time, not because a debt is owed, but because one type of <u>punishment</u> may be converted into

a different form of <u>punishment</u>.[25]   Thus, commutation had everything to do with punishment for

an offense.

At page four of their brief, Plaintiffs refocus their attention on commutation – which is, in

the end, what they really seem to take issue with – and say that it only affected those people who

"lacked the ability to pay."  (Doc. 248 at 4 (ECF p. 8).)  Again, commutation was a Court action.

---

[23] (*See* Doc. 241-2 (Nixon Aff.) at 4, ¶ 26 (noting six judges active during the relevant period in this litigation: Knight, Massey, Hendley, James, Westry and Hayes).)

[24] (*See, generally,* Doc. 183 at 1-14 (Court's actions not at issue); Doc. 242 ¶¶ 2-26.)

[25] Alabama Code § 15-18-62 allows for the nonpayment of fines and costs to be converted into a jail sentence or hard labor and provides for the conversion of fines and costs to either sentence.  Rule 26.11, Ala. R. Crim. P., provides for a "period of incarceration" not to "exceed one (1) day for each fifteen dollars ($15.00) of the fine."

What the Court did is not a basis for City liability.  Moreover, even if the Judges' sentences were material here, the issue is far more complex than the Plaintiffs' present it to be.[26]  These are, of course, all issues relating solely to Court actions, not anything done by corrections officers or the City, who had no involvement in sentencing.

### D.   Whether a detainee's work benefited the City would, if the statutory claims remain in the case, necessarily be a jury question.

Finally, Plaintiffs attempt to make the issue of the benefit to the City an undisputed fact by saying that, because inmates did work, any work they did must have been a benefit to the City. (*See* Doc. 248 at 6 (ECF p. 10).) Plaintiffs have not shown as a dispositive fact that any of the labor they did was anything more than make-work for the purpose of giving them and other detainees structured activities, or that the work created any overall benefit to the City.  (*See* Ex. 2 (Reaves Decl.) at ¶¶ 5-8.)  For instance, if the jail has to send a corrections officer to oversee a detainee doing the laundry, it is certainly just as cost-effective to have the corrections officer do

---

[26] In fact, taking Plaintiffs' theory to its logical end, any conversion of fines and costs to jail time under Ala. R. Crim. P. 26.11 or Ala. Code § 15-18-62 would be unconstitutional; under Plaintiffs' theory, neither the rule nor the code section would ever have any legal application because, they reason, anyone jailed lacked the funds to pay the fines and costs on the day their fines and costs were converted; ergo, they were jailed because they could not pay.  But this line of reasoning ignores the law. The question is not whether one has the money in his pocket on the day he arrived in court, but whether he made a bona fide effort to pay during the time the fines and costs were pending, as discussed elsewhere herein.

In a similar vein, Plaintiffs, at some point, make the bold and contested statement that they did not have the funds to be released from jail.  Were this relevant (it is not, because it relates to the Court's decision to commute them, not the jail's obligation to house them), that would also be a jury question.  For instance, Ms. Johnson alleged in the Amended Complaint that she had the $5,000 needed to secure her release, and there was in her file a Court order indicating that she was to be released with that amount.  She merely says that the Court officials failed to comply with that order when her family came to pay the funds. (*See* Doc. 32 (Am. Compl.) ¶ 82 ("Plaintiff Johnson's family hired an attorney and brought the money within a week's time to Judge Hayes in court. Judge Hayes refused to accept the $5000 payment …"); Doc. 252-28 (Johnson Jail Tr. submitted in Pls.' evidentiary submissions) (showing judicial order that Johnson be released with $5,000, per Judge Hendley).)  That the Municipal Court allegedly refused to follow Judge Hendley's order and release her is a judicial matter; but it does not negate the fact that she was, in fact, able to pay.  Whether the others could have borrowed the money or obtained it elsewhere, had they attempted to, is certainly an issue for the jury.

that laundry; while a number of people worked in the jail's kitchen, the jury should be permitted to decide whether it was a benefit to the City to permit people to work in the kitchen or whether the corrections officers who monitored them there could have accomplished whatever work was done. (*See*, *id.* generally.)  The jury would also be allowed to determine whether the inmates in the kitchen or elsewhere were even doing beneficial work, or, as discussed above, whether it was make-work. (*See* Ex. 2 (Reaves Decl.) at ¶¶ 5-8 (work was often make-work or work that could have been done by others, giving examples).)

Even the work details handled by inmates for other departments were not necessarily anything that the City's employees could not have handled absent the preference for keeping inmates busy. (*See*, *generally*, Ex. 2 (Reaves Decl.) Par. ¶¶ 5-8.)  At the very least, whether any given activity benefited the City is an issue for the jury.

**E.      Whether these Plaintiffs would have worked, even without the so-called "coercive" work credit, is also a jury question.**

In the Statement of Facts portion of their brief, Plaintiffs contend that they worked "in order to reduce the 'commuted' time."  (Doc. 248 at 6 (ECF p. 10).)  However, as noted above, despite their self-serving statement, it should be up to the jury to determine whether they would have worked anyway, given the fact that most inmates chose to work even when no credit was given. (*See, e.g.*, Ex. 1 (Smith Decl.) ¶ 3.)  A jury could easily conclude that Plaintiffs cannot prove that they only worked because they were offered credit toward their fines and costs.   Indeed, Ms. McCullough acknowledged working in jail before the Court was giving any work credit.[27]

---

[27] When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party."  *Comer v. City of Palm Bay, Florida*, 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam). The City's evidence creates such a reasonable doubt. Because the City's evidence shows that most detainees worked both before and after the period during which the Court gave work credit, a jury could easily conclude that any of these detainees would have worked even if no credit had been available.  That Ms. McCullough did work during a period when she

**F.      There is no evidence that corrections officers told Plaintiffs or anyone of the credit given by the Court.**

Finally, Plaintiffs vaguely assert that they learned of the jail work program from "other inmates and correctional officers." (Doc. 248 at 6 (ECF p. 10).)  None of them actually say that they learned about the *credit given by the Judges* from corrections officers.  Rather, given the vague nature of their statements, there is literally no evidence that any corrections officer informed them that, if they worked, the Municipal Court would give them credit for it.  In fact, the only clear testimony from any of the Plaintiffs about where they learned about the work program indicates that the information came from other detainees.  (*See* Doc. 241-31 (Johnson Dep.) at 172-173 (Johnson testifying that she learned of the jail work program from other inmates); Doc. 249 (Pls.' Statement of Material Facts) ¶ 115 (McCullough learned of work credit from other inmates).) There is certainly no evidence that anyone in the jail affirmatively promoted the work by means of promising any reduced sentences.  The evidence is to the contrary.[28]

**G.      Plaintiffs' own facts highlight the irony of their statutory claims against the City.**

The irony of Plaintiffs' argument – that, in reporting jail work to the Court, the corrections officers harmed the Plaintiffs – is at high relief in their fact statements.  The individual Plaintiffs' fact sections talk about the harm that befell them or their family as a result of each day they were

---

says no credit was given further strengthens the City's position.  (Doc. 241-25 (McCullough Dep.) at 328-29 (despite there being no program of credit for jail work during her first incarceration, Ms. McCullough says she worked in laundry.).)

[28] (*See* Ex. 1 (Smith Decl.) at ¶ 12; *see also* Doc. 241-29 (Agee Dep.) at 434 (Agee was in jail for a week before he learned about $25 credit program; describing corrections officers as merely offering opportunities to pass out meals and the like); Doc. 241-26 (Mooney Dep.) at 194:15-195:2 (Mooney never knew amounts Court was going to credit him, but merely understood that there would be credit given to reduce his time in jail).)

in jail.[29]  (*See* Doc. 249 ¶ 192 (Mooney); ¶ 160 (Johnson); ¶ 114 (McCullough)).)   Yet, had

corrections officers done what Plaintiffs argue they should have (i.e., refused to provide or report

work), each of the five Plaintiffs seeking summary judgment would have served longer, and thus

have suffered further injury, by their own account.

> **H.    Plaintiffs' careful effort to testify that they did not "volunteer" to work
> because there was a benefit associated with it is not relevant, as such, to their
> legal claim.**

Each individual Plaintiff dutifully asserts in his or her declaration that he or she did not

"volunteer," but that he or she worked only in order to be released earlier.  (*See* Doc. 249 ¶¶ 120,

144, 166, 190.) The ultimate issue is not how Plaintiffs choose to define the term "volunteer."

(Their apparent definition would be that one can only "volunteer" or even choose to work if there

is no benefit associated with the work one volunteers to do.)   The legal question in the case, as

explained below and in the City's Summary Judgment Brief, is whether the work was obtained *by*

*means of* harm or the threat of harm.  Providing the jail work list to the Court was neither.  (*See*

Doc. 243 (City's Br. in Supp. of Summ. J.) at 13-24 (ECF pp. 21-32).)

> **I.    Plaintiffs' focus on how the sentences entered by the Municipal Court affected
> their children does not make the corrections officers' actions criminal.**

Plaintiffs' repeated refrain about their children and their children's needs is a totally

separate and distinct issue from whether the corrections officers or anyone at the City committed

the crime of involuntary servitude, forced labor or peonage.  The separation of Plaintiffs from their

families was obviously unfortunate but was the result of a sentence issued by a court and of their

own conduct.  Plaintiffs' position, taken to its logical conclusion, appears to be that no custodial

---

[29] While unpredictable collateral harm to a family member is not actually relevant to any Plaintiff's legal
claim, and is obviously included in the Statement of Facts simply for emotional reasons, those collateral
events would not be admissible under any proximate causation analysis dating back to *Palsgraf v. Long
Island Railroad*, 248 N.Y. 339, 162 N.E. 99 (1928).

parent can ever lawfully be jailed, which is certainly not the law.  The focus on the Plaintiffs'

children is part and parcel of Plaintiffs' attempts to muddy the waters and introduce a highly

individualized, emotionally charged issue.  The pressure they may have felt as a result of parental

obligations, at most, goes to individual damages, not to summary judgment (and greatly

undermines any chance that these statutory claims could, if they survive summary judgment, be

certified for class treatment).  It also further highlights the irony of Plaintiffs' position, i.e., that

the corrections officers should have refused them the opportunity to get work credit from the Court.

## III.    THE CITY'S RESPONSE TO PLAINTIFFS' ARGUMENTS

### A.    Plaintiffs' claims fail because the statutes at issue do not apply to governmental entities.

The Plaintiffs' summary judgment motion as to civil liability under 18 U.S.C. § 1595 (for

violations of 18 U.S.C. §§ 1581 and 1589) fails, and the City is likewise entitled to a dismissal of

these claims as a matter of law, because a governmental entity cannot be held liable under 18

U.S.C. § 1595 for a Trafficking Victims Protection Act (TVPA) violation.

Section 1595 provides for liability against "whoever knowingly benefits" from a TVPA

violation.  "Whoever" is nowhere defined in the TVPA. One must look to the federal Dictionary

Act for the definition. The federal Dictionary Act provides rules for "determining the meaning of

any Act of Congress, unless the [Act's] context indicates otherwise." 1 U.S.C. § 1.  The Dictionary

Act explicitly provides that "the words 'person' **and 'whoever'** include corporations, companies,

associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1

U.S.C. § 1 (emphasis added).  "Notably absent from this list is any form of a governmental entity."

*Nuñag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. 8:10-cv-1172, 2011 WL 13153190, at *10

(C.D. Cal. May 12, 2011). Obviously, the terms "person" and "whoever" are defined to mean the

same thing in the Dictionary Act, as evidenced by the language of that Act quoted above. Therefore, case law addressing who is a "person" under the Act is relevant here.

Regarding the conspicuous absence of governmental entities in the Dictionary Act, the U.S. Supreme Court has held that:

> "In common usage [the term person] does not include the sovereign, and statutes employing it will ordinarily not be construed to do so. Congress made express provision, R.S. § 1, 1 U.S.C. § 1, 1 U.S.C.A. § 1, for the term to extend to partnerships and corporations, and in § 13 of the [Norris-LaGuardia] Act itself for it to extend to associations. The absence of any comparable provision extending the term to sovereign governments implies that Congress did not desire the term to extend to them.

*United States v. United Mine Workers of Am.*, 330 U.S. 258, 275 (1947).

Shortly after *United Mine Workers*, "Congress appeared to ratify this position when it amended the [Dictionary] Act by expanding the term 'person' to include numerous other legal entities but declining to include sovereign entities as 'persons.'" *United States v. Bly*, 510 F.3d 453, 464–65 (4th Cir. 2007) (Motz, J. concurring) (citing 1948 amendments to Dictionary Act) and citing *Ankenbrandt v. Richards*, 504 U.S. 689, 700–01 (1992) for proposition that "when Congress makes other substantive changes to a statute but does not indicate an intent to change a prior construction, Congress has adopted that interpretation"); *accord Nuñag-Tanedo,* 2011 WL 13153190 at *10.

Thus, "in common usage, the term 'person' [or whoever] does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it." *Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 82–83 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989)) (internal brackets omitted). Nonetheless, the "conventional reading of 'person' may … be disregarded if the purpose, the subject matter, the context, the legislative history, or the executive interpretation of the statute indicate an intent, by the use of the term, to bring state or nation within the scope of the law." *Id.* (quoting *United States*

22

*v. Cooper Corp.*, 312 U.S. 600, 605 (1941)) (internal marks and alterations omitted).  In other words, the general rule that the term "person" or "whoever" does not include the sovereign can be disregarded if Congress has shown an intent to allow liability against the government. But there is no indication that Congress has done so with regard to the TVPA.  *See Nuñag-Tanedo*, 2011 WL 13153190, at *10-11.

Moreover, Congress has not only excluded sovereign government entities from the definition of "person" (or "whoever"), but, as explained in *Nuñag-Tanedo*, it has extended this rule to include "government entities generally":

> "While *Mine Workers, Bly*, and *International Primate* all state that 'person' generally does not include the 'sovereign,' Congress has also applied this exclusionary rule to <u>governmental entities generally</u> when crafting its numerous statutes.  For example, 31 U.S.C. § 5312, listing definitions for certain statutes concerning reports and records, specifically states that " [i]n this subchapter ... 'person', *in addition to its meaning under section 1 of title 1*, includes ..., when the Secretary prescribes, *a governmental entity*." § 5312(a)(5) (emphasis added). Thus, by stating that "person" includes governmental entities for purposes of that subchapter, Congress acknowledged that "person" generally does not include such an entity.  *See also, e.g.*, 49 U.S.C. § 60101 ("'person,' *in addition to its meaning under section 1 of title 1* (except as to societies), includes *a State [and] a municipality* ...") (emphasis added).
>
> Given Congress's omission of governmental entities when defining "person" and "whoever" in 1 U.S.C. § 1, and given Congress's addition of governmental entities to its definition of "person" in other statutes, Congress has shown that governmental entities are generally excluded from "persons" or "whoever."  *See* 1 U.S.C. § 1.  And since the TVPA extends civil liability to "whoever knowingly benefits ...," liability against a governmental entity is precluded under the TVPA unless Congress has shown an intent to allow such liability.
>
> But here, no such intent is found.  Most notably, Congress provided no separate definitions for "person," or "whoever" anywhere in the TVPA that shows an extension of liability to governmental entities.  …. Further, the statutes and legislative history of the TVPA appear to lack any other persuasive evidence that Congress intended to extend liability to governmental entities. Thus, the term 'whoever' in § 1595 does not include governmental entities.

*Nuñag-Tanedo,* 2011 WL 13153190, at * 10-11 (first emphasis and final ellipsis added).

While 18 U.S.C. § 1595(a) provides for civil liability as to both "the perpetrator" and

"whoever knowingly benefits …", the TVPA also excludes the possibility that a governmental entity could be held liable as a perpetrator.  Although neither the Dictionary Act nor the TVPA states who or what entities the term 'perpetrator' includes, "a review of the TVPA makes it clear that 'perpetrator' liability does not extend to governmental entities." *Nuñag-Tanedo,* 2011 WL 13153190, at *11.  This is the case because "the term 'whoever' is consistently used in TVPA statutes outside of § 1595 when explaining who may be liable for TVPA violations." *Id.*  For example, 18 U.S.C. § 1589 defines the perpetrator as "**Whoever** knowingly provides or obtains the labor or services of a person" (emphasis added).  *See also* 18 U.S.C. § 1590 ("**Whoever** knowingly recruits, harbors, transports, provides, or obtains") (emphasis added); *id.* § 1581 ("Whoever holds or returns any person to peonage…".).

Because, as explained above, "whoever" does not include governmental entities under the TVPA, although § 1595 states that it allows liability against a "perpetrator," the various TVPA statutes define perpetrator in such a way (by using the term "whoever") as to exclude governmental entities.  Thus, perpetrator liability does not extend to governmental entities.  (This does not preclude, of course, application of the Act to individuals who happen to be government employees or agents.)

In short, both perpetrator and passive entity liability under the TVPA are premised on there being an entity that falls within the Dictionary Act definition of "whoever."  Because nothing shows that Congress used the term "whoever" in § 1595 or elsewhere in the TVPA to extend liability to governmental entities, especially when Congress could have clearly stated its intent to do so, Plaintiffs' statutory claims in Count VII fail.  See also discussion, *infra*, regarding the likelihood that multiple government requirements would violate the Act – community service, jury

duty, the draft.[30]  This issue is dispositive and the Court need not read further to rule conclusively in the City's favor on this issue.

      **B.**    **Even if TVPA did apply to a governmental entity, Plaintiffs' § 1581 claim would fail here as a matter of law.**

          **1.**    **Plaintiffs' § 1581 claims fail because they challenge judicial conduct and judicial orders.**

Fifteen pages into their brief, Plaintiffs finally set out their substantive arguments, and they begin by describing what actions they contend violated 18 U.S.C. § 1581, the criminal anti-peonage statute.  As noted earlier, the wrong alleged is the Court's practice of awarding credit against their sentences for work done in jail.  (*See* Doc. 248 at 15 (ECF p. 19) (describing as the substantive wrong "that the City operated a jail work program under which Plaintiffs could reduce their debts by an additional $25 per day by laboring for the City, and that Plaintiffs worked in order to receive this credit.").)  While Plaintiffs' reference the program as a "City" program, the undisputed evidence is that it was an initiative of the Court and the Court only.

Of course, the response to this is that the Plaintiffs' challenge relates to judicial actions, not those of a City actor, a problem already discussed, and an independent basis for dismissal of their claims.  In addition, the Court's sentencing orders and release orders cannot be challenged here under *Rooker-Feldman* as discussed earlier.

          **2.**    **Plaintiffs' § 1581 claims also fail because the City did not obtain the work by means of harm or threats of harm.**

---

[30] The *Nuñag-Tanedo* District Court in California is certainly not alone in finding that Courts must look to the Dictionary Act where the statute at issue is silent as to the definition of "person" or, in the case at bar, the definition of "whoever."  In one example, the Ninth Circuit in *United States v. Errol*, 292 F.3d 1159 (9th Cir. 2002), dismissed a criminal case on jurisdictional grounds ruling that the Bureau of Indian Affairs was not a "person" under the Indian Major Crimes Act because the Act did not define person to include government agencies or otherwise indicate that government agencies should be included in the definition of "person."  *Id*. at 1161-62. The case there involved a burglary not of the property of a "person" as required under the act in question but of a governmental facility. *Id.*

The close of the § 1581/peonage section of Plaintiffs' brief makes it clear that Plaintiffs are resting on the language this Court used in its order on Motion to Dismiss, wherein it stated if the choice between "work and continued incarceration is voluntary, it is not clear what would be involuntary." (Doc. 248 at 17 (ECF p. 21) (citing Doc. 131 at 23).) But, as the City has now explained in more detail in its Motion for Summary Judgment, the issue is not merely how one defines "voluntary," although the case law cited herein supports the City's position. The issue as laid out in the case law, described in the City's summary judgment brief and summarized below, is whether the alleged perpetrator obtained the labor by means of harm or threats of harm. It is the means of obtaining labor which is the focus, and, to render the labor involuntary, those means must be threats of harm or actual harm, none of which are present here. That a Plaintiff may perceive a benefit from choosing to perform labor that is otherwise not compelled does not impose liability.

### a.   Inmates can be required to work and such requirement does not amount to involuntary servitude.

Separate and apart from the fact that no Plaintiff was forced or coerced by threats of force or legal process to work, and apart from the fact that the Court's jail-work-credit program conferred a benefit on those detainees who elected to work, jail work is not prohibited even if no benefit accrues to the detainee. Even if Plaintiffs here were correct – and they are not – that the commuted sentence was somehow legally erroneous,[31] prisoners may be <u>required</u> to work, without compensation of any kind. Plaintiffs recite in their Statement of [purportedly] Undisputed Facts that the five Plaintiffs who worked were not paid for such work. But compensation or payment for work is wholly irrelevant. Any compensation would be by grace of the State. *Vanskike v. Peters*, 974 F.2d 806, 809 (7th Cir. 1992), *cert. denied* 507 U.S. 928 (1993); *Draper v. Rhay*, 315

---

[31] As noted elsewhere in this brief, a collateral attack on the sentence, absent a proceeding for writ of habeas corpus, is barred by the *Rooker-Feldman* doctrine.

26

F.2d 193, 197 (9th Cir.), *cert. denied* 375 U.S. 915 (1963); *Sigler v. Lowrie*, 404 F.2d 659 (8th Cir.

1968), *cert. denied* 395 U.S. 940 (1969).  The Eleventh Circuit also has ruled that requiring work

in prison is not involuntary servitude (even if the inmate's sentence is eventually reversed).

*Omasta v. Wainwright*, 696 F.2d 1304 (11th Cir. 1983) (per curiam).  A prisoner sentenced to ten

years in jail is no different than one sentenced to 28 days (Mr. Agee); both could be required to

work, although no one was required to here.

      The requirement that incarcerated prisoners "work without pay while in prison" does not

constitute involuntary servitude "in violation of the Thirteenth Amendment."  *Wendt v. Lynaugh*,

841 F.2d 619, 620 (5th Cir. 1988) (finding argument "frivolous").  Moreover, "peonage" is defined

by the courts as simply a species of involuntary servitude. *Taylor v. Georgia*, 315 U.S. 25, 29

(1942).[32]  Plaintiffs go on to attempt to distinguish the cases that have held that a choice, even a

painful choice, is still a choice and cannot constitute peonage (a subset of involuntary servitude).

The case on this point that Plaintiffs seek to distinguish is *Watson v. Graves*, 909 F.2d 1549 (5th

Cir. 1990).  Plaintiffs say that the case is distinguishable on three grounds.  (See Doc. 248 at 17

(ECF p. 21).)  First, they say that in that case incarceration was a criminal punishment, whereas

incarceration here was for failure to pay a debt Plaintiffs could not pay.  As noted earlier,

incarceration here was a criminal punishment; it was the conversion of one criminal punishment

(fines and costs) into the criminal punishment of a jail sentence.  Plaintiffs' next distinction is the

same one in a different cloak – the *Watson* plaintiffs, they say, were not working to pay off a debt

owed to their employer.  Again, though connected to a delinquent fine, the Plaintiffs' sentences

---

[32] *United States v. Kozminski*, 487 U.S. 931 (1981), set out the elements of the definition of involuntary servitude, and § 1589 essentially adopts those elements.  All of the anti-peonage statutes are required to be read narrowly, with any "ambiguity … resolved in favor of lenity."  *See United States v. Shackney*, 333 F.2d 475, 487 (2d Cir. 1964) (Friendly, J.) (quoting *Bell v. United States*, 349 U.S. 81, 83 (1955)).

were criminal sanctions issued by a Court, not in any sense merely a debt to an employer.  These Plaintiffs were not, therefore, working off a debt to an employer.   In their third attempt to distinguish *Watson*, Plaintiffs say that if the plaintiffs there "chose not to work, they would lose the opportunity to earn money but would not prolong their incarceration."  (Doc. 248 at 17 (ECF p. 21).)  There is no distinction there, either.  If these Plaintiffs chose not to work, that choice "would not prolong their incarceration."  It merely would not shorten it.  That – as the City has pointed out in its Motion for Summary Judgment – is a crucial point, certainly as it relates to the City's actions.  (See generally Doc. 243 at 13-24 (ECF pp. 21-32).)  As explained earlier, Plaintiffs' theory is that to avoid liability, corrections officers would have had to deny Plaintiffs' access to the benefit of early release – a choice that ironically would have harmed the Plaintiffs.

<div align="center">

**b.**  **The corrections officers neither harmed nor threatened harm and so cannot be liable under the peonage statute.**

</div>

But even if a government entity could be liable under the peonage statute at issue here, the case law shows that that the jail work program was not peonage.  In its brief in support of summary judgment (Doc. 243), the City summarized the leading peonage and involuntary servitude case law. (Peonage, of course, is a form of involuntary servitude under that case law as noted above.)  In each instance, the work forming the basis of the plaintiff's claim was obtained in the first instance through threats of legal sanction or harm.  In no instance was there a legal sanction on the front end, unrelated to failure to work, that served as the basis for the claim.  (*See, e.g.,* Doc. 243 at 18-22 (ECF pp. 26-30) (discussing, among other cases, *United States v. Reynolds*, 235 U.S. 133 (1914) (peonage) (under surety contract, plaintiff arrested and charged criminally, and subject to future arrests and criminal charges, for failure to complete work for employer); *Bailey v. Alabama*, 219 U.S. 219 (1911) (under prepaid service contract, plaintiff subject to virtually automatic criminal conviction for failing to complete work required under contract; crime leading to

<div align="center">

28

</div>

incarceration was "to refuse or fail perform the work"); *Pierce v. United States*, 146 F.2d 84 (5th Cir. 1944) (peonage) (forcing women to work off a debt through threats of physical violence)).)

> Plaintiffs say that:
>
> To establish peonage under 18 U.S.C. § 1581, a Plaintiff must prove that the Defendant 'intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force; (2) legal coercion; or (3) threats of legal coercion or physical force.'   [*United States v.] Farrell*, 563 F.3d [364,] 372 [(8th Cir. 2009)) (citing *United States v. Kozminski*, 487 U.S. 931 (1988)).

(Doc. 248 at 15 (ECF p. 19).)   But the elements of peonage as cited by Plaintiffs must be understood in the larger context of the case law.  The *Kozminksi* Court*,* cited by Plaintiffs above, *itself* found "in every case in which [the U.S. Supreme] Court has found a condition of involuntary servitude, the victim had no available choice but to work **or be subject to legal sanction**."  487 U.S. at 942-43 (emphasis added).  Here the legal sanction came at the front end in the form of a jail sentence for prior criminal conduct, *not* because of the Plaintiffs' refusal to work, and was utterly unrelated to the work at issue here.

The existence of a so-called debt to the government related to the sentence does not magically alter the equation.  First, that so-called debt had been converted under statutes, the validity of which are not challenged, into an actual sentence.  Second, imagine that someone is sentenced to federal prison in connection with failure to pay income taxes or some other governmental debt (restitution, for instance).  Plaintiffs would have this Court hold that a work program in the federal prison that would result in good time and in a reduced sentence would constitute peonage.  Likewise any good-time program would be peonage, under Plaintiffs' theory, whenever a criminal defendant has probation revoked for failure to pay costs, fines or restitution.

In this case, Plaintiffs came to the jail with a jail sentence issued by a separate branch of government.  Corrections officers, who had no choice but to house the sentenced detainees until

released by the Court, offered them opportunities to work.  Such opportunities had always been offered and were not limited to when the Court gave work credit. No officers threatened any Plaintiff with harm if they chose not to work, nor did they harm anyone who did not work.[33]  As explained previously, the correction officers merely complied with the Court's request for a work-list, and followed the Court's orders to release early where the Court gave work credit.[34]

No one was lurking within the jail, taking names of people who refused to work and placing them in solitary confinement, beating them, or threatening to do so, or extending the sentence of anyone who did not work.  *Cf. Menocal v. Geo Group, Inc.*, 113 F.Supp. 3d 1125, 1128 (D. Colo. 2015) (threat of solitary confinement made by private detention facility if detainees refused to work).  No corrections officer filed any legal process seeking any sanction against detainees who chose not to work, or threatened to do so.  There is no evidence that any corrections officer was involved in any way with collection of fines or costs, nor was such within their jurisdiction or concern; the uncontested evidence is that all three supervisors deposed did not know what a commuted sentence even meant, nor have any idea what kind of credit was being given for work.[35] Had no detainee chosen to work, the jail, the jailers and the City would have made do and would have taken no action of any kind against them.  (*See* Ex. 1 (Smith Decl.) ¶ 14.)  There is no evidence at all to the contrary.

---

[33] (*See* Ex. 1 (Smith Decl.) ¶ 9; Ex. 2 (Reaves Decl.) ¶ 9); *see also* Doc. 242 (City's Statement of Undisputed Facts) at at 12-15 ((discussing voluntary nature of work program).)

[34] (*See* Ex. 1 (Smith Decl.) Pars. 2-7, 11 (request for work list came from Municipal Court; jail provided work opportunities before Court requested list or gave credit; jail relied on Court for release dates; a work list had been maintained before Court requested it); (Doc. 241-14 (Nixon *McCullough* Dep.) at 43:3-11 (Presiding Judge initiated credit for jail work program, and jail was to communicate to Municipal Court the days an inmate worked.).)

[35] (*See* Doc. 241-22 (Hopkins Dep.) 38:15-21 ("I have no idea what [commuted] means."); Doc. 241-22 (Hopkins Dep.) at 42:2-11 (not familiar with concept of "sitting out" fines and costs.); Doc 241-23 (Lewis Dep.) at 54:18-55:1 & 78:1-3 (same); Doc. 241-37 (Smith *Carter* Dep.) at 28:11-19 (same).)

Ironically, the jailer, who had no option but to house the detainees, had, under Plaintiffs' theory of the law, only one option to avoid legal liability – to tell Plaintiffs, "I am sorry, but I cannot offer you work or report that work to the Court, because it might result in the Court letting you get out of jail earlier."   Surely, no Court would hold that, to avoid liability, the City's corrections officers had to make a choice that would have harmed the Plaintiffs.  Statutes should not be read to make innocent conduct criminal. *See, e.g.*, *Liparota v. United States*, 471 U.S. 419 (1985), cited *supra*.  As the Court in *U.S. v. Peterson*, 627 F.  Supp. 2d 1359, 1371 (M.D. Ga. 2008) expressed it in connection with application of 18 U.S.C. § 1589, it "would be absurd to say" that the statute prohibits a program that was for the laborer's benefit.

> ### 3.    The corrections officers' actions (the only conduct attributable to   the City) was not culpable.

The anti-trafficking statutes under which Plaintiffs seek to travel have nothing to do with the facts in the instant case. As noted, the Municipal Court sentenced these Plaintiffs, and the Court created the relief afforded by the jail-work credit. The only role of the City corrections officers was to supply a list to the Municipal Court.  A voluntary work program already existed and was plainly lawful and not involuntary servitude or illegal forced labor.

How can it be that, on one day while in jail, a Plaintiff such as Ms. McCullough, could work in the laundry (as she testifies she did) for no credit and no compensation, and there be no civil or criminal liability against the jailers or the City for such labor, but the next week –when *the Municipal Court* creates a program to benefit her, under which she performs the same labor and receives a shortened jail sentence *from the Municipal Court* – the City can be sued civilly for the violation of a criminal anti-peonage or anti-trafficking statute? She could have been required to do that same work for no compensation or benefit to her, but when she performs it voluntarily and

receives a benefit from the Court, the jailers (who are the only City actors) can be both criminally prosecuted and civilly sued, under Plaintiffs' logic.[36]

Plaintiffs' theory – particularly under § 1589 – would render work-release or good-time programs illegal, and all levels of government which maintain jails or prisons liable as participants in some "venture" of having a jail.  (*See* Doc. 243 (City's Summ. J. Br.) at 22–23 & n.22 (ECF p. 30–31).)  That theory could reach to federal as well as state, county and municipal jails. Such an interpretation of the peonage and trafficking statutes would certainly come as a surprise to every level of government in the nation.  Of course, as explained earlier, the statutes do not reach government entities, and for good reason.  The terms of the statutes, as interpreted by Plaintiffs, would render criminal jury service, prison work programs, continuing legal education requirements, community service orders, and most, certainly, the military draft.

What the City's corrections officers did in providing the work list to the Court was neither peonage nor participation in a venture that involved peonage.  Plaintiffs have played word games here in a case of "gotcha" with a facile presentation of the facts and law, which mischaracterizes the context of the corrections officers' actions and, thus, any basis for City liability.

       **4.**       **Summary of City's Argument relative to Plaintiffs' 18 U.S.C. § 1581 claim**

---

[36] There is also no evidence that any policy maker for the City directed or even knew of the Court's request to have the jail maintain and furnish to the Court a list of those detainees who elected to work.  (*See* citations *supra* at nn.6-8 & accompanying text.)  If this Court ultimately holds that a governmental entity can be liable under 18 U.S.C. § 1595, 1581 or 1589, this Court should not permit liability on a *respondent superior* basis, but should apply the *Monell* standard, under reasoning similar to that applied by the Supreme Court in *Monell*.

As set out in the City's introduction, in addition to the dispositive ground for denying the motion (and dismissal of these statutory claims) because the TVPA does not apply to governmental entities, the following additional and independent grounds for denying this motion apply:

(i)      Plaintiffs' § 1581 claims fail because they do not identify any action other than the Judges' actions as the bases for their claims, and the City cannot be held liable for the Municipal Court's orders.  Plaintiffs' basic complaint is that the Court commuted them and provided them a means to be released early, but neither were City acts.  Not only can the City not be held liable for the Judges' actions, but Plaintiffs' have framed the peonage claim such that it is barred by *Rooker-Feldman* in that it is an attack on the Municipal Court's commutation and release orders.  (*See generally* Doc. 243 (City's Br. in Supp. Of Mot. for Summ. J.) at 37-38 (ECF pp. 45-46).)

(ii)     Plaintiffs seek liability based on the premise that the jail's employees should have withheld work opportunities from the Plaintiffs or refused to give work lists to the Court, which actions would have harmed the Plaintiffs, and it would be contrary to basic legal principles to attribute criminal (or even civil liability) to such non-culpable conduct. *See Liparota*, *supra*.

(iii)    Plaintiffs arrived at the jail with a Municipal Court-issued sentence, and no jail officer threatened to increase that sentence or alter it for the worse if Plaintiffs chose not to work nor did they harm the Plaintiffs in any other way or threaten any other harm if they chose not to work; such harm or threat of harm to obtain the work is an essential element of a peonage claim. (*See generally* Doc. 243 at 18-23 (ECF pp. 26-31).)

Items (i) through (iii) above are also grounds for ruling in favor of the City on its motion for summary judgment as to the statutory anti-peonage provision.  But, even if the Court were to reject those arguments, Plaintiffs would still lose their summary judgment motion because there are genuine issues of material fact in dispute.  Because so many detainees worked even before any

credit was given for that work, it is necessarily a jury question whether any Plaintiff here would have worked without the work credit as explained in § 11.D., *supra*.

### C.      The City's Response to Plaintiffs' 18 U.S.C. § 1589(a) argument

#### 1.      Plaintiffs' § 1589(a) claim fails for the same reasons their § 1581 claim fails.

In Section II.B. of their brief, Plaintiffs move on to what they contend is also an anti-peonage law, the forced labor statute, 18 U.S.C. § 1589(a).  But they concede that the statute does not in fact have a "peonage" element.  Rather, they argue that a violation of § 1581 would necessarily constitute a violation of the broader terms of § 1589(a).  Of course, to the extent Plaintiffs are relying on the arguments in the § 1581 section of their brief as grounds for the City's liability under § 1589(a), the City rests on the arguments set out in subsection III.B., *supra*.

Below, the City addresses the two additional theories Plaintiffs proffer for their position that the City violated § 1589(a).

#### 2.      Plaintiffs' separately asserted § 1589(a)(4) claim fails because the City actors neither threatened nor caused any harm, nor was their conduct in any way culpable.

As additional grounds for finding in their favor under § 1589(a), Plaintiffs first cite to § 1589(a)(4) which prohibits obtaining labor "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."   (Doc. 248 at 18-19 (ECF pp. 22-23).)  Plaintiffs then cite *United States v. Calimlim,* 538 F.3d 706, 713 (7th Cir. 2008), for the proposition that a scheme violates the statute when an individual is caused to believe that if he

does not perform the labor, he or someone else would be seriously harmed.[37]  (*See* Doc. 248 at 19-21 (ECF pp. 23-25).)

Plaintiffs, they say, had every reason to believe harm would befall their children if they remained in jail.  That may be so, and, if so, it is regrettable to say the least, but it does not change the fact that the City did not enter the commutation orders at issue here, and the City cannot be held liable for the Court's actions over which the City had no control.  Moreover, even as to the Judges, no plaintiff was jailed because he or she failed to do work.

Here, again, the corrections officers' (and, indirectly or derivatively, the City's) wrongdoing, under Plaintiffs' logic, was to comply with the Court's request for a jail work list, which resulted in the Court's shortening Plaintiffs' sentences.  As noted earlier, Plaintiffs' position is legally and logically untenable.  Thus, Plaintiffs § 1589(a)(4) claim fails.  Corrections officers neither threatened nor caused Plaintiffs any harm nor caused the belief that anyone would be harmed if they failed to work.  And such is necessarily the gravamen of a § 1589 claim.  *See, e.g., Peterson, supra* (noting it would be absurd to conclude that conferring a benefit violated § 1589).  And, neither providing work opportunities or the work list to the Court constituted culpable conduct on the part of corrections officers where, had they refused to do so, Plaintiffs' would have been harmed.  *See* discussion *supra* regarding criminalizing non-culpable conduct.  Thus, Plaintiffs' § 1589(a)(4) claim fails.

---

[37] Plaintiffs spend almost a page talking about the importance of looking into the "'vulnerabilities and characteristics of the specific victim'" and "'all the surrounding circumstances.'"  (Doc. 248 at 19 (ECF p. 23) (citations omitted).)  While this language certainly highlights the problems Plaintiffs will have in maintaining these claims as a class action (individual issues by definition would predominate), the language does not otherwise advance their attempt to establish the City's liability.  This idea is a cousin to Plaintiffs' effort to construct a "coercion-through-jail-conditions" claim, which this Court soundly rejected.  (*See* Doc. 222 (text order) ("The Court agrees with the City that any alleged coercive jail conditions are not a part of this case and such information is not properly discoverable.").)  Whether an individual had a motive to work does not indicate that the City did anything unlawful in providing opportunities to work under the facts here.

    **3.**    **Plaintiffs' § 1589 (a)(3) abuse-of-process claim fails because no City actor threatened or abused any legal process.**

Next, Plaintiffs argue that the City also violated § 1589(a)(3)'s prohibition on obtaining work "by means of the abuse or threatened abuse of law or legal process." According to Plaintiffs, the City's liability is premised here on "Judge Hayes [having] already admitted to incarcerating indigent individuals for nonpayment of traffic tickets without any inquiry as to their ability to pay, in direct violation of Rule 26.11 of the Alabama Rules of Criminal Procedure." (Doc. 248 at 21 (ECF p. 25).) Of course, the content of that stipulation is substantially overstated and mis-stated by Plaintiffs, and it came in 2017, well after Plaintiffs' time in jail, so its existence cannot be evidence that the City or its corrections officers were somehow on notice of one Judge's errors.

As explained earlier, this broad characterization of what Judge Hayes stipulated to is just off-base. The Judge merely stipulated that on "many occasions" he did not conduct a sufficient inquiry into ability to pay or, alternatively, into alternatives to incarceration. Plaintiffs contend (as they did in their Brief's introduction) that Judge Hayes' acknowledgement of having committed this error of law on "many occasions" (which number is nowhere defined) shows that <u>he</u> "created the 'modern day debtor's prison,' that forced Plaintiffs to work off their debts to the City." (Doc. 248 at 21 (ECF p. 25).) However, it is now established that Judge Hayes was not a final policy maker for the City, as the ruling in *Finley* holds, and that his actions will not be made the basis for City liability. (*See* Doc. 183 at 16 (indicating Plaintiffs' remaining forced labor claim must be from separate judicial acts).) This Court has indicated that it does not intend to hold the City liable for alleged errors made by the Municipal Court. (*See, e.g.,* Doc. 183 at 1-14 and 16.) The Judges are out of the case, and the Court as an institution is not on trial here.

Thus, for purposes of municipal liability, the § 1589(a)(3) question is whether, after the detainees arrived in the jail under their Court-ordered commuted sentences, *the City or its*

*corrections officers* threatened the use of legal process or any use or abuse of law of any kind to obtain work.  And the answer is that <u>they did not</u>, and there is no evidence that they did.  The corrections officers filed no actions in court, and they threatened no court action nor any other harm against the named Plaintiffs or anyone.

> ### 4.   The Plaintiffs' § 1589 claims that the City may be liable as a perpetrator for "knowingly" obtaining labor by means of an abuse of process also fail for lack of evidence.

In a last-ditch effort to save the day, Plaintiffs attempt to construe 18 U.S.C. § 1589(a) extremely broadly so as to include within the definition of a direct perpetrator not just someone who "directly engaged in the abuse of process" but "whoever knowingly obtain[s] Plaintiffs' labor 'by means of'" an abuse of process.  (Doc. 248 at 21-22 (ECF pp. 25-26).)  Plaintiffs misread this statutory language as merely some passive involvement.  Whether the alleged perpetrator "obtains" the labor for himself or "provides" it to another, it is clear that it is the perpetrator himself who undertakes the various "means" set out in § 1589(a)(1)-(a)(4).  Again, the Judges, not the City or its corrections officers, imposed the sentences or permitted early release.  Thus, neither the City corrections officers nor the City undertook the allegedly wrongful means alleged here.

Moreover, neither the City nor its corrections officers had the authority to decline to house detainees sentenced by the Court.  Indeed, corrections officers did not even know the nature of the charges or sentences of the detainees they were charged with housing.  (*See* Doc. 241-22 (Hopkins Dep.) 38:15-21 ("I have no idea what [commuted] means."); Doc. 241- 22 (Hopkins Dep.) at 42:2-11 (not familiar with sitting out fines and costs.); Doc-241-23 (Lewis Dep.) at 54:18-55:1 & 78:1-

3 (same); Doc. 241-37 (Smith *Carter* Dep.) at 28:11-19.)   The Mayor did not even know that inmates did work at all.[38]   Thus, even liability under Plaintiffs' theory cannot be established.

Plaintiffs nonetheless contend that corrections officers knew that these Plaintiffs "should not have been in jail." (Doc. 248 at 22 (ECF p. 26).)   First, this very statement highlights Plaintiffs' *Rooker-Feldman* problem.   They are attacking the validity of a court order.   Second, Plaintiffs' facile supposition that any individuals jailed pursuant to Ala. Code § 15-18-62 and Rule 26.11 necessarily "should not have been jailed in the first place"[39] has been addressed briefly elsewhere (and in the *Rooker-Feldman* context).   It is simply not self-evident from the mere fact that a corrections officer might have been aware of the nature of the Plaintiffs' sentences that they would for that reason know that such sentences were entered in error or that such officers had any authority to overrule such sentence[40] or to refuse to house the detainee so sentenced.   (Nor did they.)

---

[38] (*See* Doc. 241-16 (Strange Dep.) at 24:4-10 (Mayor did not know whether he was ever informed that detainees were getting credit for jail work); *see also* Doc. 241-16 (Strange Dep.) at 23 (Mayor did not know if he was informed that inmates worked at all.).)

[39] (Doc. 248 at 22 (ECF p. 26).)

[40] To conclude that correction officers or the City generally knew that all these Plaintiffs were wrongfully sentenced would mean that the provisions of the rule and statute that authorize jailing people who fail to pay fines and costs could never be lawfully enforced unless the detainee had the exact amount of funds owed sitting in the bank or in his pocket, and was able to pay them at once.   The judicial analysis under these statutes and the constitutional law on which they are based is multifaceted and comes down to whether the defendant made a bona fide effort to pay – including seeking work, borrowing funds, and presumably cutting back – over the period during which the fines were due. See *Bearden* discussion, *supra*. And even these Plaintiffs' own testimony and pleadings create an issue of fact as to whether they either had the ability to pay or had not made a bona fide effort to do so. *See* n. 19, supra.   Plaintiffs simply have not shown that there is any proof at all, much less that there is no genuine dispute of material fact, that corrections officers or anyone at the City knew that or even should have known that, in each Plaintiff's case, or any of their cases, there had been a judicial error regarding whether they had made a bona fide effort to pay. Neither the corrections officers nor the City was charged with knowing the particulars of why or how people were sentenced.   A corrections officer is not an appellate court empowered to overrule or alter the rulings of a judge, nor are the City's executive or legislative branches.

Again, as the Court held in *United States v. Peterson*, "[I]t would be absurd to say that [§ 1589(a)] prohibits someone from threatening to misuse the legal process for the laborer's benefit." Id. at 1372 (emphasis added).  Thus, even were the corrections officers' actions construed as being a mis-use of the legal process, where, as here, it would have harmed Plaintiffs to withdraw the opportunity to work or to refuse to provide the list to the Court, it would be absurd to say that the City or its corrections officers criminally violated the law.

<div align="center">

**5.      Summary of City's arguments relative to Plaintiffs' § 1589 claims.**

</div>

In conclusion, the same grounds over and above the fact that the statutes do not apply to governmental entities – – that require denial of Plaintiffs' Summary Judgment motion as to § 1581 require denial as to § 1589; (i) the City cannot be held liable for judicial actions *and* doing so would contravene the *Rooker-Feldman* doctrine; (ii) jail employees' conduct was not culpable; (iii) no City official or correction officer harmed or threatened harm or led them to believe they would be harmed to obtain Plaintiffs' labor which is a crucial element of any § 1589 claim; and (iv) it is a jury question as to whether Plaintiffs would have worked without the Court's credit.   In addition, Plaintiffs have shown no abuse of process on the part of the City or its corrections officers to substantiate a claim under § 1589(a)(3).

**D.      Plaintiffs' argument that the City is liable for benefiting from participation in a venture that violated §§ 1581 or 1589(a) also fails.**

Finally, in Section II.C. of their brief, Plaintiffs move on to the theory that "benefiting from …participation in a venture engaged in violations of §§ 1581 or 1589(a)" also gives rise to liability under these criminal statutes.  This language is drawn presumably from both §§ 1589(b) and 1595(a).

**1.      There is not substantial (or any) evidence of a venture nor law cited to support the proposition that independent branches of government amount to a venture.**

What is glaringly absent from Plaintiffs' analysis is much thought as to why or how the City participated in a venture, and exactly what that venture was. All that they have to say is that, elsewhere in the TVPA – not in either of the three sections at issue here – "venture" is defined to mean "any group of two or more individuals associated in fact, whether or not a legal entity." (Doc. 248 at 22 (ECF p. 26).)

Neither the term "venture" nor "participation in a venture" apply here. One must begin with the premise that the TVPA is primarily a criminal statute and must be narrowly construed. Presumably, the putative venture here is between the City and the Municipal Court. To construe the City and its corrections officers and the Judges as participating together in a "venture" merely because they are parts of two separate branches of government that must work together is an indefensible stretch, at best. And nothing more is alleged here. Certainly no evidence has been put forth on this point. Even if the § 1581 definition of venture did apply here, that definition – "two or more individuals, associated in fact, whether or not a legal entity" – while not containing the word "business," clearly indicates that a business venture along the lines of a "legal entity" (for instance something like an LLC, a business partnership, a contractual arrangement or a commercial joint venture) was contemplated. At a minimum, the "two or more" must have acted together toward achieving some common goal.

The case law is replete with examples of what might arguably constitute a venture for purposes of §§ 1595 and 1589 venture liability, and, to the extent the undersigned has reviewed that case law, affected ventures all appear to be business arrangements of some kind. *See, e.g., Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) (hotel operator was arguably in venture with customer of hotel who rented rooms there where rooms were used to obtain sexual services in contravention of TVPA); *Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019) (lawyers for corrupt

religious organization who were hired and paid by sect to promote its nefarious actions and to hide nature of organization's wrongdoing were arguably in venture with sect leaders).  Moreover, a "venture" is defined in Black's Law Dictionary in terms of risk in the sense of a speculative business enterprise.  Black's Law Dictionary (11th ed. 2019) (defining venture as "[a]n undertaking that involves risk; esp., a speculative commercial enterprise").  The relationship between co-equal branches of government is not, by any definition, a business-type venture, and Plaintiffs have produced no evidence or law to that effect.  (Of course, the fact that the Act does not apply to governmental entities at all as explained earlier is further evidence that "venture" is to be understood in terms of a business relationship rather than a relationship between branches of government.)

Indeed, there is no evidence of any relationship at all here other than a standard relationship between two branches of government, which relationship is mandated by law.  The corrections officers' compliance with the Municipal Court's request for the work list does not amount to a venture under the statute.

> **2.**     **There is a genuine issue of material fact in dispute as to whether the work Plaintiffs did resulted in a benefit to the City.**

Instead of addressing how corrections officers made themselves part of a "venture," this short section of Plaintiffs' Brief focuses more on the premise that the City benefited from the labor.  (*See* Doc. 248 at 22-23 (ECF pp. 26-27).)  That is clearly a question for the jury.  Whether any particular work done by Movants benefited the City is a question of fact because the work opportunities were provided largely to give detainees structured activity.  (*See, e.g.*, Ex. 2 (Reaves Decl.) ¶¶ 6-8.)  These opportunities were not designed with benefit to the City in mind.  (*E.g.*, Ex. 2 (Reaves Decl.)  ¶¶ 7-8.)  Because corrections officers or others – individuals who could have accomplished it themselves – had to supervise the work and because often the work was make-

work where there was no real need for the work to be done, it cannot be determined, as a matter of summary judgment, that the work these Plaintiffs did benefited the City.  (*See* Ex. 2 (Reaves Decl) at ¶¶ 5-8; *see also* Ex. 1 (Smith Decl.) at ¶ 13.)  Certainly, there is a genuine dispute of fact on this point.

And, of course, the issue is not material here unless Plaintiffs have shown that the undisputed material facts establish through undisputed evidence that: (a) there was a violation of § 1589(a) or § 1581 by the Municipal Court; (b) the jailers and the Court constituted a "venture"; *and* (c) that the City participated in that venture.  Plaintiffs have not (and cannot) do so.

## CONCLUSION

For all the reasons set out herein Plaintiffs' Motion is due to be denied (and, in fact, the claims are due to be dismissed).

Respectfully submitted this 20th day of February, 2020.

<div style="margin-left:40%">

s/Shannon L. Holliday_____

Shannon L. Holliday [ASB-5440-Y77S]

Richard H. Gill [ASB-7945-G70R]

Robert D. Segall [ASB-7354-E68R]

COPELAND, FRANCO, SCREWS & GILL, P.A.

P.O. Box 347

Montgomery, AL 36101-0347

holliday@copelandfranco.com

gill@copelandfranco.com

segall@copelandfranco.com

**Attorneys for Defendant City of Montgomery**

</div>

## CERTIFICATE OF SERVICE

       I hereby certify that on the 20th day of February, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

| | |
|---|---|
| Martha I. Morgan<br>8800 Lodge Lane<br>Cottondale, Alabama  35453<br>mimorgan@yahoo.com<br><br>Harold C. Hirshman<br>Jennifer A. Barrett<br>Dentons US LLP<br>233 South Wacker Drive<br>Suite 5900<br>Chicago, IL  60606<br>harold.hirshman@dentons.com<br>jennifer.barrett@dentons.com<br><br>Stephen J. O'Brien<br>Dentons US LLP<br>One Metropolitan Square, Suite 3000<br>St. Louis, MO  63102<br>stephen.obrien@dentons.com<br><br>Greg Bass<br>Britney Wilson<br>National Center for Law and Economic Justice<br>275 Seventh Avenue, Suite 1506<br>New York, NY  10001<br>bass@nclej.org<br>wilson@nclej.org | Faya Rose Toure<br>Henry Sanders<br>Chestnut, Sanders & Sanders, LLC<br>P.O. Box 1290<br>Selma, AL  36702<br>fayarose@gmail.com<br>gpompey@csspca.com<br><br>Michael L. Jackson<br>Larry S. Logsdon<br>Wesley K. Winborn<br>Wallace, Jordan, Ratliff & Brandt, L.L.C.<br>P.O. Box 530910<br>Birmingham, AL  35253<br>mjackson@wallacjordan.com<br>llogsdon@wallacejordan.com<br>wwinborn@wallacejordan.com<br><br>E. Ham Wilson<br>Miland F. Simpler, III<br>Ball, Ball, Matthews & Novak, P.A.<br>P. O. Box 2148<br>Montgomery, AL  36109-5413<br>hwilson@ball-ball.com<br>msimpler@ball-ball.com<br><br>R. Bernard Harwood, Jr.<br>Rosen Harwood, P.A.<br>2200 Jack Warner Parkway<br>Suite 200<br>Tuscaloosa, AL  35401<br>bharwood@rosenharwood.com |

                             s/Shannon L. Holliday
                             Of Counsel