THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **ANGELA MCCULLOUGH, et al.,** | ) | |
| **ON BEHALF OF THEMSELVES,** | ) | |
| **INDIVIDUALLY, AND ON BEHALF OF A** | ) | |
| **CLASS OF ALL OTHERS SIMILARLY** | ) | |
| **SITUATED,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO: 2:15-CV-463-RCL-SMD** |
| | ) | |
| | ) | **CLASS ACTION** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE CITY OF MONTGOMERY, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN REPLY TO DEFENDANT THE CITY OF
MONTGOMERY, ALABAMA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

I.   THE CITY IS SUBJECT TO THE TVPA BECAUSE THE STATUTORY
     TERM "WHOEVER" APPLIES TO THE CITY ....................................................2

II.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
     THEIR TVPA CLAIMS…………………………………………………………..6

     A.   *Rooker-Feldman* Does Not Bar Plaintiffs' § 1581 Claims……………....6

     B.   Plaintiffs Have Established Valid § 1581 Claims.......................................8

          1.  Plaintiffs' claims satisfy the elements of § 1581……………………..8

          2.  Plaintiffs' labor constituted involuntary servitude because
              they were not jailed as punishment for crime………………………..12

     C.   Plaintiffs Have Established Valid § 1589 Claims......................................15

     D.   The City Benefitted from Participation in a Venture Between
          the Entities and Staff of the Municipal Court, the Jail, and
          Other City Departments and the Municipal Judges in Violation
          of §§ 1589(b) and 1593A………………………………………………...18

          1.  The coordination between the entities and staff of the Municipal
              Jail and other City Departments and the Municipal Court and
              judges to implement the City's Jail Work Program constitutes
              a "venture" under the TVPA………………………………………18

          2.  The City benefitted from its participation in the
              Jail Work Program………………………………………………...22

CONCLUSION....................................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Bailey v. Alabama,* ................................................................................................ 6, 9
    219 U.S. 219 (1911)

*Barrientos v. Corecivic, Inc.,* .............................................................. 2, 3, 4, 5, 12, 19
    No. 18-15081, 2020 U.S. App. LEXIS 6158 (11th Cir. Feb. 28, 2020)

*Bistline v. Parker,* ........................................................................................... 18, 19, 20
    918 F.3d 849 (10th Cir. 2019)

*Dixon v. State,* ......................................................................................................... 13
    920 So. 2d 1122 (Ala. Crim. App. 2005)

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* ................................................... 6, 8
    544 U.S. 280 (2005)

*Hoefling v. City of Miami,* ...................................................................................... 11
    811 F.3d 1271 (11th Cir. 2016)

*Int'l Primate Prot. League v. Admin'rs. of Tulane*
  *Educ. Fund,* ........................................................................................................ 5
    500 U.S. 72 (1991)

*Monell v. Dep't of Soc. Servs.,* .......................................................................... 4, 11
    436 U.S. 658 (1978)

*Nat'l Org. of Women v. Scheidler,*
    510 U.S. 249 (1994) ............................................................................................ 19

*Nuñag-Tanedo v. E. Baton Rouge Parish Sch. Bd.,* ............................................... 5
    No. SACV 10-1172-AG (MLGx), 2011 U.S. Dist. LEXIS 164138
    (C.D. Cal. May 12, 2011)

*Paguirigan v. Prompt Nursing Employ. Agency,* ............................................... 18, 20
    No. 17-cv-1302 (NG) (JO), 2020 U.S. Dist. LEXIS 4837
    (E.D.N.Y. Jan. 9, 2020)

*Pennhurst State Sch. & Hosp. v. Halderman,* ......................................................... 4
    465 U.S. 89 (1984)

*Pierce v. United States,* ........................................................................................... 9
    146 F.2d 84 (5th Cir. 1944)

*Ricchio v. McLean,* ...................................................................................................... 18, 19, 20
   853 F.3d 553 (1st Cir. 2017)

*Target Media Partners v. Specialty Mktg. Corp.,* ..................................................... 6, 7
   881 F.3d 1279 (11th Cir. 2018)

*Taylor v. Georgia,* ....................................................................................................... 12
   315 U.S. 25 (1942)

*United States v Albertini,* .............................................................................................. 3
   472 U.S. 675 (1985)

*United States v. Bly,*…………………………………………………………….....5
   510 F.3d 453 (2007)

*United States v. Calimlim,* ............................................................................................ 16
   538 F.3d 706 (7th Cir. 2008)

*United States v. Farrell,* ................................................................................................ 8
   563 F.3d 364 (8th Cir. 2009)

*United States v. Kozminski,* ....................................................................................... 8, 10
   487 U.S. 931 (1988)

*United States v. Reynolds,* .......................................................................................... 8, 9
   235 U.S. 133 (1914)

*United States v. St. Amour,* ............................................................................................ 3
   886 F.3d 1009 (11th Cir.), *cert. denied*, No. 18-5043, 2018 U.S. LEXIS 4690
   (Oct. 1, 2018)

*United States v. United Mine Workers of Am.,* .......................................................... 4, 5
   330 U.S. 258 (1947)

*Vasquez v. YII Shipping Co.,* ......................................................................................... 6
   692 F.3d 1192 (11th Cir. 2012)

*Watson v. Graves,* ..................................................................................................... 13, 14
   909 F.2d 1549 (5th Cir. 1990)

## U.S. CONSTITUTION

U.S. Const. amend. XIII…………………………………………………………………12

## FEDERAL STATUTES

1 U.S.C. § 1 ................................................................................................................. 4

18 U.S.C.  § 1581 .................................................................... 2, 5, 6, 7, 8, 9, 11, 22

18 U.S.C.  § 1581(a) ............................................................................................... 6

18 U.S.C.  § 1589 .................................................................... 2, 11, 15, 17, 22

18 U.S.C.  § 1589(a) .............................................................. 3, 17, 18, 22

18 U.S.C.  § 1589(a)(3) .......................................................... 16

18 U.S.C.  § 1589(a)(4) .......................................................... 15

18 U.S.C.  § 1589(b) .................................................. 17, 18, 19, 21, 22

18 U.S.C.  § 1591 .................................................................. 18

18 U.S.C.  § 1591(e)(6) ......................................................... 18, 19

18 U.S.C.  § 1593A .................................................. 17, 19, 21, 22

18 U.S.C.  § 1595 ................................................................... 2, 11, 17

18 U.S.C.  § 1595(a) .............................................................. 2, 3

18 U.S.C. § 1961(4)…………………………………………………………..19

## STATE CODES

Ala. Code. § 15-18-62.................................................................... 12, 13, 14

## MUNICIPAL CODES

Montgomery, Ala., Code § 2.01 (1973)………………………………………..4

## INTRODUCTION

Plaintiffs' affirmative motion for partial summary judgment is about—and only about—the statutory peonage and forced labor claims in Count VII of the First Amended Complaint. The crucial fact relevant to Plaintiffs prevailing on these claims cannot be disputed: the City of Montgomery received a benefit from Plaintiffs' coerced jail labor. The City's brief is a loquacious attempt to delay and distract the Court from this simple proposition.

The City takes issue with Plaintiffs pointing out Alabama's well-documented history with peonage (ECF 253 at 15), but Plaintiffs cannot in good conscience ignore the obvious connection between those practices and what Plaintiffs have endured today. The Defendant, however, repeatedly mischaracterizes the evidence and makes irrelevant assertions intended to distract from the record and label Plaintiffs as somehow deserving of the treatment they received while casting the work they did as some sort of favor or opportunity from the City.

Still, none of the factual arguments raised by the City in its Brief in Opposition to Plaintiffs' Motion for Summary Judgment, ECF 253, or in its Response to Plaintiffs' Statement of Facts, ECF 254, undermine the material facts that support Plaintiffs' motion. They do not and they cannot because the facts are that Plaintiffs were jailed, for lengths of time that varied according to the amounts they owed, because of their inability to pay their traffic fines. While in jail, Plaintiffs worked in the hopes of paying off their debts more quickly and returning home to their families, who were suffering in their absence.

Contrary to the City's assertions, Plaintiffs' claims do not challenge their jailing through commutation of their fines and costs. They challenge the City for taking advantage of that fact in order to coerce Plaintiffs' labor. Indeed, Plaintiffs should not have been jailed in the first place, but any comment to that effect in the briefings on this motion is intended to demonstrate that the

City knew that Plaintiffs could not afford to pay their fines, and thus knew that having them work off their debts at an additional $25 per day was in fact coercive. The City attempts to speculate that Plaintiffs could have paid their traffic fines, but such speculation is unfounded because there is no evidence in the record to suggest that they could or that municipal court judges made the required ability-to-pay determinations before sending Plaintiffs to jail.

While they make tepid arguments about extent and degree, the City likewise cannot dispute Plaintiffs' own words about the harm they and their families experienced while they were in jail or the fact that the City of Montgomery benefitted from Plaintiffs' jail labor. Thus, based on the undisputed material facts in the record, Plaintiffs are entitled to partial summary judgment on Count VII.

## I.  THE CITY IS SUBJECT TO THE TVPA BECAUSE THE STATUTORY TERM "WHOEVER" APPLIES TO THE CITY.

The City of Montgomery argues that Plaintiffs are not entitled to summary judgment on their 18 U.S.C. § 1595 claims for civil liability for violations of 18 U.S.C. §§ 1581 and 1589 ("collectively known as the Trafficking Victims Protection Act (TVPA)") because the Act does not apply to governmental entities. (ECF 253 at 27.) This argument, of course, ignores the plain language of the statute: the TVPA permits liability against "whoever" knowingly benefits from a violation of § 1581 or 1589. 18 USCS § 1595(a).

The Eleventh Circuit foreclosed the City's argument about the meaning of "whoever" in its recent decision in *Barrientos v. CoreCivic, Inc*., No. 18-15081, 2020 U.S. App. LEXIS 6158 (11th Cir. Feb. 28, 2020), holding that under the plain language of the TVPA, the Act applies to a private contractor operating a federal immigration detention facility. *Id.* at *4. Noting that the question of statutory interpretation begins with the language of the statute and that if "'the language at issue has a plain and unambiguous meaning . . . we need go no further,'" the Court

found the TVPA language of "'[w]hoever knowingly provides or obtains the labor or services of a person' by various illegal coercive means . . . . to be 'plain and unambiguous.'" *Id.* at *17 (quoting *United States v. St. Amour*, 886 F.3d 1009, 1013 (11th Cir.), *cert. denied*, No. 18-5043, 2018 U.S. LEXIS 4690 (Oct. 1, 2018)) (citing 18 U.S.C. §§ 1589(a), 1595(a)). The Eleventh Circuit held that the general use of the term "whoever" demonstrates "no intent on the part of Congress to restrict the application of the statute to particular actors or particular victims." *Id.* at *17.  Instead, the statute "limits liability only by reference to the actions taken by a would-be violator," i.e. those who knowingly obtain someone's labor through one of the four prohibited means included in the statute. *Id.* at *17-18. The court found that "[n]o other limiting principle is evident from the plain text." *Id.* At *18.

Additionally, the court noted that when the statutory meaning of the text is plain and unambiguous, "[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from the [statutory] language," *Id.* at *21-22 (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985) (quotation marks omitted) (further citation omitted)). It found that Congress' objective of combatting human trafficking through the TVPA did not justify departing from the plain and unambiguous language employed in the statutory text.  *Id.* at *22-23. Thus, the court's holding in *Barrientos* simply does not permit the City's contention that, simply by virtue of being a government entity, or "the sovereign," it is automatically, and by definition, carved out of the coverage of the TVPA. Congress' use of the plain and unambiguous statutory term "whoever" does not import any restriction or limiting principle corresponding to specific categories of defendant-actors such as the City of Montgomery.  *Id.* at *17-18.

Furthermore, the same holds true under the Dictionary Act definition of "whoever," upon which the City relies. (ECF 253 at 27-28.) The Dictionary Act includes corporations in the definition of "whoever" without any limiting designation or demarcation, *e.g.,* public or private. 1 U.S.C. § 1.  The express inclusion of corporations in the definition of the term "presumptively indicates" that the City of Montgomery, as a corporate entity, comes within the ambit of the TVPA. *Barrientos*, 2020 U.S. App. LEXIS 6158, at *18.  The City of Montgomery is legally constituted as a municipal corporation. MONTGOMERY, ALA., CODE § 2.01 (1973) ("Any such city which adopts the mayor-council form of government shall continue its existence as a body corporate under the name of 'City of _____ ' (inserting the name of such city).").  Thus, the City is subject to the TVPA based on its own interpretation of the Dictionary Act, and it can provide no reasonable argument to justify its exclusion from coverage under the TVPA.

The City relies on *United States v. United Mine Workers of Am.*, 330 U.S. 258, 275 (1947) to argue that "whoever" does not apply to governmental entities. (ECF 253 at 28.) However, the sovereign in question in *United Mine Workers* is the United States government, which is not equivalent to the City in this case, and to which the court finds the word "person" does not apply.[1] Not only does *United Mine Workers* not concern the definition of the statutory

---

[1] The City wrongly conflates the statutory terms "person" and "whoever" based on their definition in the federal Dictionary Act, ignoring the stated caveat that the interpretations in the Act are subject to the context of the statute in question. (ECF 253 at 27 (citing 1 U.S.C. § 1).) The text of the TVPA itself makes apparent that Congress did not regard "whoever" and "person" as synonymous terms.  In § 1581(a), for example, Congress employed the term "whoever" to ascribe liability to the victimizer and the term "person" to refer to the victim.  *See* 18 § U.S.C. § 1581(a) ("Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage....") (emphasis supplied); *see also*, *id.* § 1589(a) ("Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means....") (emphasis supplied). Additionally, the City's claim to sovereignty is contrary to basic principles of Constitutional law. *Compare e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (a *state* cannot be sued without its consent) with *Monell v.*

term "whoever," the word "whoever" does not appear anywhere in the case. The case also does not include a TVPA claim. The same is true for the other cases upon which the City relies for its statutory interpretation argument. (ECF 253 at 29-30 (citing *Int'l. Primate Prot. League v. Admin'rs. of Tulane Educ. Fund*, 500 U.S. 72 (1991) and *United States v. Bly*, 510 F.3d 453 (4th Cir. 2007)).)[2]

The City principally relies on *Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. SACV 10-1172-AG (MLGx), 2011 U.S. Dist. LEXIS 164138 (C.D. Cal. May 12, 2011), an unpublished decision holding that the TVPA definition of "whoever" does not include "a governmental entity." *Id*. at *34-35. *Nuñag-Tanedo*, however, did not consider the TVPA's applicability to municipal corporations like the City of Montgomery, which fall within the plain language of the TVPA definition and the Dictionary Act. Moreover, the approach of the *Nuñag-Tanedo* court— to read an exclusion into the TVPA not present in the plain language of the statute—conflicts with the Eleventh Circuit's direction in *Barrientos*.

---

*Dep't. of Soc. Servs.*, 436 U.S 658 (1978) (municipalities can be sued under 42 U.S.C § 1983). Thus, municipalities have not traditionally been included among the governmental entities that have sovereign immunity from liability.

[2] *United States v. Bly*, 510 F.3d 453 (2007) references the word "whoever," but only within the context of citing the relevant extortion statute. *Id.* at 459. Like *United Mine Workers*, the court's opinion centers on the meaning of the statutory term "person." *Id.* at 460-62. The court further finds that the relevant entity—a governmental corporation—qualifies as a "person" under the relevant statute. *Id.* at 462-64.

## II.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR TVPA CLAIMS.

### A. *Rooker-Feldman* Does Not Bar Plaintiffs' § 1581 Claims.

Contrary to the City's repeated assertions (ECF 253 at 16, 19, 31, 32, 44, 45), *Rooker-Feldman* does not bar Plaintiffs' claims.[3] The Supreme Court held that the *Rooker-Feldman* doctrine is "confined" to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *accord Vasquez v. YII Shipping Co.*, 692 F.3d 1192, 1195-96 (11th Cir. 2012). The doctrine prohibits federal courts from exercising jurisdiction "over those cases that are essentially an appeal . . . seeking to relitigate a claim that has already been decided in a state court." *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1281 (11th Cir. 2018). That is not the case here.

Plaintiffs' Section 1581 claim concerns having to work in jail in order to reduce their debt and more quickly secure their releases. They do not challenge the outcome of their traffic offense proceedings or attempt to relitigate those outcomes in federal court. Section 1581(a) prohibits "hold[ing] or return[ing] any person to a condition of peonage." 18 U.S.C. § 1581(a). Peonage is defined as "compulsory service in payment of a debt," *Bailey v. Alabama*, 219 U.S. 219, 242 (1911), and a peon is "one who is compelled to work for his creditor until his debt is paid." *Id.* Thus, Plaintiffs' jail work claim falls squarely within the activities proscribed under the statute.

---

[3] Plaintiffs incorporate their arguments with respect to the inapplicability of *Rooker-Feldman* to their claims as set forth in Plaintiffs' Combined Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, ECF 256 at 94-98, 95 n.20.

The City incorrectly contends that Plaintiffs' Section 1581 claims fail because they challenge judicial conduct and judicial orders. (ECF 253 at 31.) The City argues that the jail work program is an "initiative of the Court and the Court only," and that by challenging the jail work program Plaintiffs are essentially challenging judicial orders. (ECF 253 at 31.) However, Plaintiffs do not challenge judicial orders of any kind. No judicial order required Plaintiffs to work.

Despite the City's convenient attempt to distance itself from the jail work program by blaming the municipal court judges who have been dismissed from the case, this Court found that the City could have a "separate" and "independent" responsibility for the program apart from that of the municipal judge (ECF 183 (Memorandum Opinion on Motion for Judgment on the Pleadings) at 16), and the undisputed evidence in the record establishes that this is so. (ECF 251-5 at 5 (Baylor Dep., at 10:22-11:2) (the Municipal Jail of the City of Montgomery is part of the police department of the City of Montgomery); ECF 251-4 at 5 (Strange Dep., at 30:10-31:6) (the operations of the Jail ultimately fall within the responsibility of the Office of the Mayor of the City of Montgomery)); *see also below* Part D (discussing jail personnel's administration of and oversight over the work program). It is that jail work in exchange for debt reduction program for which the City is responsible—and not a judicial act or order—that Plaintiffs challenge.

Furthermore, to the extent that the City argues that *Rooker-Feldman* is a bar because Plaintiffs' Section 1581 claim necessarily arose out of judicial conduct of some kind, the Eleventh Circuit has found that that is not the existing standard. The court in *Target Media* ruled that "the class of federal claims that we have found to be 'inextricably intertwined' with state court judgments," such that *Rooker-Feldman* would apply, "is limited to those raising a question that was or should have been properly before the state court." *Target Media,* 881 F.3d at

1286.  A claim is not "inextricably intertwined" with a state court judgment if there was no

"reasonable opportunity to raise" that claim during the applicable state court proceeding. *Id.*

(internal citations and quotations omitted).

*Rooker-Feldman* does not apply to acts that occurred "long after the state court rendered

its judgment" because there was "no opportunity to complain about the allegedly injurious act in

the state court proceedings." *Id.* at 1287. The jail work program was not part of any of the court

orders sentencing Plaintiffs to commuted time. Plaintiffs did not even learn of the jail work

program until they were already serving their commuted sentences. Thus, Plaintiffs could not

have challenged the practice of having to work to pay off their debts during their traffic offense

proceedings or at any point before they were actually working in jail to pay off their debt. The

City has therefore "misperceived the narrow ground occupied by *Rooker-Feldman*," *Exxon*

*Mobil Corp.*, 544 U.S. at 284, and the doctrine does not bar Plaintiffs' Section 1581 claims.

### B. Plaintiffs Have Established Valid § 1581 Claims.

#### 1. Plaintiffs' claims satisfy the elements of § 1581.

The City next argues that Plaintiffs' Section 1581 claim fails because the City did not

obtain Plaintiffs' work by means of harm or threats of harm. (ECF 253 at 31.) This argument

fails because obtaining labor by "harm" or "threats of harm" is not an element of Section 1581.

To establish a claim of peonage under Section 1581, a Plaintiff must prove that the Defendant

"intentionally held a person against his or her will and coerced that person to work in order to

satisfy a debt by (1) physical restraint or force; (2) legal coercion; or (3) threats of legal coercion

or physical force." *United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009) (citing *United*

*States v. Kozminski*, 487 U.S. 931 (1988)).

Plaintiffs satisfy this standard because they were held in jail against their will and had to work to reduce the length of their incarceration. As the Supreme Court established in *United States v. Reynolds*, 235 U.S. 133, 144 (1914), the difference between peonage and the voluntary performance of labor as payment for a debt is the ability to "elect at any time to break [the contract for labor or service as payment for indebtedness], <u>and no law or force compels performance or a continuance of the service</u>." (emphasis supplied) (internal citations and quotations omitted). Thus, as this Court previously acknowledged, "it has long been established that the threat of jail to coerce labor is unlawful." (ECF 131 (Memorandum Opinion on Motion to Dismiss) at 23.) That Plaintiffs were already in jail when they were working as payment for their debt is "not a meaningful distinction." (ECF 131 at 23.) Rather, Plaintiffs' jailing facilitated the coercion of their labor. *See Reynolds*, 235 U.S. at 146 ("constant fear of imprisonment" and "authority to arrest and hold his person" were factors that "render[] the work compulsory"). The direct connection between the length of Plaintiffs' incarceration and the amount of debt they owed is sufficient to make Plaintiffs' labor to reduce that debt coercive in violation of Section 1581.

Additionally, the City argues that it is not liable under the peonage statute because Plaintiffs were not threatened with legal sanctions or harm based on their failure or refusal to perform work. (ECF 253 at 34.) Although the City cites cases that happen to include fact patterns in which plaintiffs were threatened with harm or additional punishment based on a failure or refusal to perform work (*see* ECF 253 at 34-35 (citing *United States v. Reynolds*, 235 U.S. 133 (1914); *Bailey v. Alabama*, 219 U.S. 219 (1911); and *Pierce v. United States*, 146 F.2d 84 (5th Cir. 1944))), threats of additional harm or punishment based on a failure or refusal to perform

work are not required to establish forced labor claims and none of the cases the City cites in support of this proposition hold that they are.[4]

The City contends that the *Kozminski* Court found that "in every case in which [the U.S. Supreme Court] has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction." (ECF 253 at 35 (citing *United States v. Kozminski*, 487 U.S. 931, 942-43 (1988)).) The Defendant misconstrues *Kozminski*, which also addresses physical coercion. As previously stated, if Plaintiffs had not worked, they would have had to remain in jail longer than if they had.

The City argues that the legal sanction came "at the front end" in the form of a jail sentence for prior criminal conduct, not because of Plaintiffs' refusal to work. However, as discussed further below, Plaintiffs' sentences for their traffic offenses consisted of fines, not custodial punishment, and the imposition of legal sanctions based on the refusal to work is not a requirement. Moreover, the City plainly subjected Plaintiffs to physical coercion in that the period of their confinement was tied directly to their labor. The City goes on to compare Plaintiffs to someone who has been sentenced to federal prison for failure to pay income taxes. Again, that comparison is not valid because, unlike Plaintiffs, that person would be in jail in connection with his sentence for a crime (tax evasion).

The City contends that there are genuine issues of material fact regarding whether Plaintiffs would have worked without the work credit because some Plaintiffs worked in jail before the jail-work-for-credit program began. (ECF 253 at 37, 39-40.) But Plaintiffs'

---

[4] Plaintiffs fully incorporate their discussion of these cases and the lack of a requirement of the threat of additional punishment based on the failure or refusal to perform work from ECF 256, Plaintiffs' Combined Motion in Opposition to Defendants' Motions for Summary Judgment at 71-74.

affirmative motion concerns—and only concerns—the work they performed for the City in order to pay down their debts and get out of jail faster. As Plaintiffs have explained, such a program is inherently coercive regardless of whether the City coerced their labor through different means at a prior point in time.[5]

The City attempts to deflect all responsibility for its operation of the jail work program to its corrections officers, who it then conveniently argues lacked sufficient knowledge to support liability. (ECF 253 at 43-45.) However, these evasion tactics fail because, as the Court noted in its Memorandum Opinion on Motion for Judgment on the Pleadings, all of the actions challenged in Count VII "took place at the municipal jail under the City's watch." (ECF 183 (Memorandum Opinion on Motion for Judgment on the Pleadings) at 16.)

The City also asserts that the Mayor did not know about the jail work program and that there is "no evidence that any policy maker for the City directed or even knew" about it. (ECF 253 at 38 n.36.) As a result, it argues that if the Court finds that the Defendant can be held liable under 18 U.S.C. § 1595, 1581, or 1589, then the Court should apply "the *Monell* standard." (ECF 253 at 38 n.36.) However, *Monell* applies within the context of Section 1983 claims, *Monell*, 436 U.S. 658 at 662, which Plaintiffs' affirmative motion does not concern. Even if *Monell* applied to TVPA claims, officials in charge of running the City of Montgomery and its jails may be held

---

[5] As to prior labor performed by Plaintiffs Jones and McCullough, which does not form part of this motion, Plaintiffs contend that this labor, too, was coerced in violation of Section 1589(a). (*See* ECF 256 at 74-75.) At the time, Plaintiffs believed that they did not have the option to refuse to work because they were in jail and they feared consequences if they did not work. (ECF 259-7 (McCullough Decl.) ¶ 8; ECF 259-5 (Jones Decl.) ¶ 5.) Plaintiff McCullough also worked in exchange for privileges such as using the telephone to contact her children. (ECF 259-7 (McCullough Decl.) ¶ 7.) As discussed above, Section 1589(a) includes a belief that one's family members will be harmed among the serious harm that the statute requires. Thus, Plaintiffs' prior labor still constituted forced labor in violation of Section 1589(a) and does not create any genuine issue of material fact.

responsible for a widespread custom or practice under which incarcerated individuals were working off debt as part of a program that provided janitorial and sanitation services to multiple City departments. *See e.g., Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) ("Municipal liability may also attach if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure"); (ECF 256 (Plaintiffs' Combined Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment) at 66-68).

The City argues further that requiring inmates to work does not constitute involuntary servitude. (ECF 253 at 32.) However, since the City's response was filed, the Eleventh Circuit has made it clear that even otherwise permissible prison work programs may violate the TVPA if "operated in a manner" that "forc[es] labor through coercive means." *Barrientos*, 2020 U.S. App. LEXIS 6158, at *20.

### 2. Plaintiffs' labor constituted involuntary servitude because they were not jailed as punishment for crime.

As Plaintiffs have previously argued, the Thirteenth Amendment to the United States Constitution prohibits involuntary servitude[6] "except as a punishment for crime whereof the party shall have been duly convicted." U.S. Const. amend. XIII § 1. Plaintiffs were subject to involuntary servitude because they were jailed for their inability to pay traffic fines and costs, not as punishment for crime.[7] The City disputes this point, arguing that Plaintiffs' incarceration was

---

[6] Defendant acknowledges that peonage is "simply a species of involuntary servitude." (ECF 253 at 33 (citing *Taylor v. Georgia*, 315 U.S. 25, 29 (1942)).

[7] Again, the City resorts to hyperbole as a defense by arguing that Plaintiffs' interpretation of the statutes would affect "criminal jury service, prison work programs, continuing legal education requirements, community service orders, and most certainly, the military draft." (ECF 253 at 38.) It would not. Plaintiffs refer the court to their discussion of their lack of "choice" and the obvious

criminal punishment because it represented the "conversion of one criminal punishment (fines and costs) into the criminal punishment of a jail sentence" pursuant to Rule 26.11 and Ala. Code § 15-18-62. (ECF 253 at 33, 44.)

The Defendant's conversion defense fails. As part of its continued efforts to persuade the court of the relevance of *Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990) (plaintiffs incarcerated as punishment for crime participated in prison work program), the City argues that "though connected to a delinquent fine, the Plaintiffs' sentences were criminal sanctions issued by a court . . . ." (ECF 253 at 33-34.) However, Plaintiffs' original sentences, which were "commuted" by the municipal court, did not include jail time of any sort, not even as a suspended sentence. (*See e.g.,* ECF 257-119 through 257-122 (McCullough, Johnson, Jones, Mooney); ECF 246-50, 246-70, 246-90 (Edwards, Agee, Caldwell).) The sentences imposed did not include a custodial component.

When Judge Hayes "commuted" the fines and fees, Plaintiffs' sentences had become final and could not be revised or extended. *Dixon v. State*, 920 So. 2d 1122, 1131 (Ala. Crim. App. 2005) (fines may only be amended within 30 days). The City states that the "idea behind Rule 26.11 and Ala. Code § 15-18-62 is that monetary fines and costs can be converted to jail time" as a different form of punishment, but it proffers no support for this statement, nor could it. (*See* ECF 253 at 22.)

Ala. Code § 15-18-62 does not reference "converting" fines and costs to a sentence of incarceration. Nor were Plaintiffs separately charged with violations of Ala. Code § 15-18-62. In fact, they could not have been so charged because Ala. Code § 15-18-62 does not create an

---

distinction between the jail work as payment for debt and high school community service requirements in ECF 256 at 69-71.

independent offense. Rather, it is part of the Code's Criminal Procedure provisions. Furthermore, Judge Hayes testified at his deposition that when he commuted unpaid fines and costs to jail time, he was *not* changing the original sentence. (ECF 246-6, JCS Ex. F (Hayes Dep., *Cleveland-Watts*), at 18:15-20.)

Additionally, the City's argument neglects the fact that Ala. Code § 15-18-62 only applies to "cases of <u>willful</u> nonpayment of [...] fines and costs" (emphasis supplied), not to cases where nonpayment is not willful. The record contains no evidence that Plaintiffs willfully did not pay their traffic fines and costs. The City blatantly misrepresents the content of the so-called "Jail Transcripts" that were issued by the municipal court when they "commuted" traffic fines and costs into jail time to argue, unsuccessfully, that the court inquired into defendants' ability to pay. In its response to the Plaintiffs' Statement of Undisputed Facts, the City repeats that the "jail transcript indicates that the [c]ourt made such a finding" of indigence or inability to pay. (ECF 254 at 31-32; *see also* ECF 254 at 36, 43, 48, 54-55.) Tellingly, Defendant chose not to cite the relevant "Jail Transcripts" in question to support this statement, because there is *no* indication *anywhere* on these transcripts that the municipal court made such a finding. (*See* ECF 241-56 at 4, 5; ECF 241-70 at 1-3; ECF 241-76 at 1; ECF 241-79 at 1; ECF 241-86 at 1-11; ECF 252-28 at 2-3.)

Further, Defendant cites testimony from Ken Nixon that could not possibly support the proposition that a jail transcript would show the municipal court's finding that a defendant failed to make a bona fide attempt to pay because the testimony does not even mention jail transcripts. (ECF 254 at 31-32, citing ECF 241-14 (Nixon *McCullough* Dep.) at 87:1-9, 100:1-11.) Despite the City's repeated refrain that municipal court judges conducted indigency inquiries and their claim that jail transcripts are evidence of such inquiries, the fact remains that

14

there is no evidence of record that any such inquiries were made for any Plaintiff. Moreover, Plaintiffs McCullough, Agee, Johnson, and Mooney all unequivocally testified that no judge inquired into their ability to pay their traffic fines and costs at any point. (ECF 250-1 ¶ 6, ECF 250-2 ¶ 12, ECF 250-3 ¶ 13, ECF 250-5 ¶ 4.)

In the final point of its response to the inapplicability of *Watson*, Defendant contests Plaintiffs' distinction that the *Watson* plaintiffs would lose the opportunity to earn money if they did not work but would not prolong their incarceration. (ECF 253 at 34 (citing ECF 248 at 21).) Instead, the City argues that if Plaintiffs had not worked, they would not have "prolonged" their incarceration, they "merely would not shorten it." (ECF 253 at 34.) Despite this exercise in semantics, the relevant point is that if Plaintiffs had not worked, they would have remained in jail longer than if they had worked. Plaintiffs' jailing was for debt collection, not punishment, and thus their labor as payment for that debt constituted involuntary servitude.

### C. Plaintiffs Have Established Valid § 1589 Claims.

The City did, however, obtain Plaintiffs' labor by means of harm and threats of harm in violation of 18 U.S.C. § 1589—the statute to which that element applies.[8] Despite previously arguing that Plaintiffs' peonage and forced labor claims should fail because Plaintiffs' labor was voluntary (*see* ECF 243 at 23-25), the City now argues that harm or the threat of harm is the true deciding factor in a peonage claim and that Plaintiffs have not established that they worked pursuant to it (ECF 253 at 32 (". . . the issue is not merely how one defines voluntary . . . .")).

---

[8] Defendant contends that Plaintiffs "concede" that Section 1589 does not have a "peonage element." (ECF 253 at 40.) Plaintiffs do not concede that. Plaintiffs argue that Section 1589 does not *require* the peonage element specifically addressed by Section 1581 because the statute bars forced labor more broadly. (ECF 248 at 22.)

Interestingly, the City does this while simultaneously acknowledging the harm that Plaintiffs suffered. (*See* ECF 253 at 41 ("Plaintiffs, they say, had every reason to believe harm would befall their children if they remained in jail. <u>That may be so</u>, and, if so, it is regrettable to say the least . . . .") (emphasis supplied).) In addition to contradicting itself, the City disregards—but does not dispute—that a "scheme, plan, or pattern" violates 18 U.S.C. § 1589(a)(4) when it is "intended to cause an individual to believe" that, if he or she did not perform labor, the person themselves or even "another person would suffer serious harm."[9] *United States v. Calimlim*, 538 F.3d 706, 710-13 (7th Cir. 2008).

Plaintiffs have also established evidence sufficient to show that the City knowingly obtained labor by means of an abuse of process in violation of Section 1589(a)(3). The undisputed facts show that the jail work program, providing $25 per day as a credit against their fines and costs, applied exclusively to people serving "commuted" time for debts owed to the City. (ECF 138 at 8; ECF 252-13 at 2.) The City knew that these inmates could not afford to buy their way out of jail because they did not have the money—and thus that they should not have been in jail in the first place. The City took advantage of this abuse of process to coerce Plaintiffs' labor in violation of Section 1589(a)(3).

In an effort to confuse the legal issues in this case, Defendant goes to great lengths in protracted footnotes to skewer Plaintiffs' financial histories (ECF 253 at 18-19 n. 17-18), and baldly speculate that no Plaintiff made a bona fide effort to pay traffic fines and costs, "including an effort to find work, to borrow the money and/or, presumably to reduce their expenses." (ECF 253 at 17.) Contrary to Defendant's misleading assertions, Plaintiffs testified that they did not

---

[9] Plaintiffs incorporate in full their previous discussions of the harm they and their families suffered while they labored in jail to pay their way out as set forth in ECF 248 at 22-26 and ECF 256 at 71-72 and the accompanying declarations.

have the money to pay their total traffic fines, which establishes an evidentiary basis for inability to pay. (ECF 250-1 ¶¶ 5-7; ECF 250-2 ¶ 4; ECF 250-3 ¶ 10; ECF 250-5 ¶ 4.)

Moreover, Plaintiffs' efforts to pay their traffic debts are beside the point. The undisputed evidence in the record is that the municipal court judges never inquired into Plaintiffs' ability to pay or indigency status prior to "commuting" their traffic debts to jail time. (ECF 250-1 ¶ 6, ECF 250-2 ¶ 12, ECF 250-3 ¶ 13, ECF 250-5 ¶ 4.)

The testimony invoked by the City to cast doubt on these findings is unavailing. The City argues that municipal court judges made ability-to-pay or indigency determinations based on testimony from Judges Hayes and Westry that judges have an obligation to inquire into a defendant's ability to pay before "commuting" fines and costs. (ECF 253 at 20 n. 21.) Plaintiffs certainly do not dispute that judges have such an obligation. But the record is clear that despite this obligation, municipal court judges failed to make ability-to-pay or indigency determinations. Indeed, former Presiding Judge Hayes not only admitted to this failure but was sanctioned for it. (ECF 252-2 at 4.) Defendant attempts to ascribe the failure to conduct ability-to-pay inquiries prior to "commuting" defendants' outstanding traffic debts solely to Judge Hayes. But the final judgment of the Alabama Court of the Judiciary concerning practices of the Montgomery Municipal Court found that these failures applied to other municipal court judges in addition to Judge Hayes, thus concluding that failing to make ability to pay inquiries was a court-wide practice. (*See generally* ECF 252-2.)

Finally, the City disputes Plaintiffs' definition of "perpetrator" within the meaning of Section 1589 as "not just someone who 'directly engaged in the abuse of process' but 'whoever knowingly obtain[s] Plaintiffs' labor 'by means of' an abuse of process.'" (ECF 253 at 43 (citing ECF 248 at 25-26).)  The City argues that Plaintiffs' definition is "extremely broad[]" and that

"it is the perpetrator himself who undertakes the various 'means' set out in § 1589(a)(1)-(a)(4)." (ECF 253 at 43.) However, the City has confused Plaintiffs' arguments under § 1589(a) with those made under § 1589(b). Despite Defendant's objection, courts—including this Court—have concluded that under Sections 1589(b), 1593A, and 1595, the City need not have directly engaged in the abuse of process in order to be held liable for knowingly obtaining Plaintiffs' labor by means of it. (ECF 183 at 17.)

As discussed further below, one does not have to be the "primary offender" in order to violate Section 1589(b). *Bistline v. Parker,* 918 F.3d 849, 871 (10th Cir. 2019) (attorneys hired by the perpetrator religious organization benefitted financially from the organization's violations of Section 1589(a) of the TVPA); *see also Ricchio v. McLean,* 853 F.3d 553 (1st Cir. 2017) (motel owners received financial benefits from renting a room to Section 1589(a) perpetrator). Section 1589(b) subjects individuals to liability who "'provide or obtain the labor or services by' any one of several enumerated means." *Paguirigan v. Prompt Nursing Employ't Agency*, No. 17-cv-1302 (NG) (JO), 2020 U.S. Dist. LEXIS 4837 at *3 (E.D.N.Y. Jan. 9, 2020) (emphasis supplied).

> ### D. The City Benefitted from Participation in a Venture Between the Entities and Staff of the Municipal Court, the Jail, and Other City Departments and the Municipal Judges in Violation of §§ 1589(b) and 1593A
>
> #### 1. The coordination between the entities and staff of the Municipal Jail and other City Departments and the Municipal Court and judges to implement the City's Jail Work Program constitutes a "venture" under the TVPA.

The City disputes that the jail work program represents its participation in or benefit from a venture in violation of the TVPA. (ECF 253 at 45-47.) The TVPA defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(6). Defendant complains that the TVPA's definition of "venture" appears in 18 U.S.C.

1591, under which Plaintiffs do not bring claims. However, as Plaintiffs explained in their affirmative motion, courts have used the definition of "venture" in Section 1591 to interpret other sections of the TVPA. (ECF 248 at 26.) *See e.g., Bistline*, 918 F.3d at 873-74 (accepting "venture" definition from 18 U.S.C. § 1591 and applying it to "venture" in § 1589(b)); *Ricchio*, 853 F.3d at 556 (using "venture" in 18 U.S.C § 1591 to analyze definition in 18 U.S.C § 1589(b)). Furthermore, these courts applied the definition to the acts of corporate defendants as well as natural persons. *Bistline*, 918 F.3d at 876 (law firm); *Ricchio*, 853 F.3d at 555-56 (motel).

The City argues that neither "venture" nor "participation in a venture" apply to the City's conduct because the City, the Municipal Court and its judges are "parts of two separate branches of government." (ECF 253 at 46.)  However, the text of the TVPA is clear: a "venture" arises whenever there is a group of two or more parties "associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(6). Here, the City, the Municipal Court and the Judges are clearly "associated in fact."

Despite conceding that the definition of "venture" included in the TVPA does not contain the word business, the City nevertheless relies on *Bistline* and *Ricchio* to argue that a "venture" must mean "business arrangements of some kind." (ECF 253 at 46.) Nowhere does the text of these cases support such a reading. Moreover, the TVPA's plain language directly contradicts the City's assertion that a legal business relationship or entity is required in order for a "venture" to exist. Because the language of the TVPA is "plain and unambiguous," *Barrientos*, 2020 U.S. App. LEXIS 6158 at *17-18, courts may not limit the meaning of "venture" in the manner that the City describes. Indeed, the definition of "venture" in the TVPA is identical to the definition of an association-in-fact enterprise in 18 U.S.C. § 1961(4), and it is settled law that *that* definition does not require the enterprise to have a business or other economic purpose. *Nat'l*

19

*Org. of Women v. Scheidler*, 510 U.S. 249, 259-60 (1994). The enactment of the TVPA post-dated *Scheidler* by six years, and Congress' use in 2000 of a phrase that had been authoritatively construed in 1994 is therefore dispositive.

As for venture liability under Sections 1589(b) and 1593A, the statute requires only that the conduct of the participant furthers or enables the violation, and that the participant receives a benefit—nothing more. Indeed, the cases Defendant cites for its "business" theory state as much. *See Bistline,* 918 F.3d at 871 ("Plaintiffs must plausibly allege that they provided labor or services that were procured by a method that is prohibited under the [TVPA], and that defendants knowingly benefited from participating in this venture"); *Ricchio*, 853 F.3d at 556; *see also Paguirigan*, No. 17-cv-1302 (NG) (JO), 2020 U.S. Dist. LEXIS 4837 at *4. Just as the attorneys benefitted financially from the coerced labor in *Bistline*, so too the City here benefits financially from the use of unpaid labor for tasks that would otherwise need to be performed by paid City employees.  No more is required.

As discussed below, the undisputed evidence establishes that the City benefited from the coercion of Plaintiffs' labor while in the City Jail, a scheme effectuated by municipal court and jail staff, the judges, and other City departments such as the Sanitation Department. In fact, it is precisely because the City's jail corrections officers and municipal court employees worked together to administer the jail work program that the City's participation in, and benefit from, a "venture" cannot be denied.

Here, the City maintained the jail work program through the coordination of efforts by City employees in departments that ultimately fall within the City's purview and control. (ECF 249 at 8-15 (explaining how the jail work program operates and how inmates are credited for jail labor).) Municipal court judges commuted Plaintiffs' unpaid tickets and fines and incarcerated

Plaintiffs to "sit out" their debts. While in jail, Plaintiffs learned that they could achieve early release if they performed work while in prison. The City Jail and other City department's organized and arranged the number of tasks or "work details" for inmates to perform. (ECF 252-7 at 2; *see also* ECF 252-8 at 2-4.) Jail corrections officers and City Sanitation Department employees supervised inmates while they performed work in and out of the Jail (ECF 249 ¶¶ 74-85), and jail corrections officers tracked and recorded the work performed by inmates with commuted sentences (ECF 251-7 at 5; 7 (Smith Dep. at 39:23-40:11; 49:4-7)).

City corrections officers reported to the municipal court which inmates performed work and for how many days in the form of weekly Jail Work Lists. (ECF 249 at 13-14 ¶¶ 89-94.) Court clerks and employees received the Jail Work Lists and used the information contained therein to adjust balances owed by inmates with commuted sentences according to the number of days they worked. (ECF 252-6 at 2; ECF 252-13 at 2.) According to the municipal court judges' directives, the court clerks and employees issued, and corrections officers subsequently effectuated, early Orders of Release for inmates who earned enough credit by working during their imprisonment. (ECF 252-14 at 2, ECF 252-18, ECF 252-24, ECF 252-30, ECF 138 ¶ 151, ECF 252-36, ECF 252-40.) The City argues that in order for the conduct of the City's employees and departments to be considered a "venture" under the TVPA, they must have "[a]t a minimum . . . acted together toward achieving some common goal." (ECF 253 at 46.) That is precisely what Plaintiffs have proved the City and the judges to have done.

As Plaintiffs have demonstrated, Plaintiffs' labor in jail following the "commutation" of their sentences was effected through a "venture" in which the judges, the Jail, and each of the participating City departments had clearly defined roles. The Jail supplied the labor; the judges and the Jail coerced that labor through the granting and accumulation of work credits enabling

Plaintiffs to hasten their releases, and the City oversaw the function of the Jail and other city

units that exploited Plaintiffs' indebtedness. And as discussed further below, the City obtained

the direct financial benefit from the coerced labor. None of this is or can be the subject of

dispute, and Plaintiffs have therefore established their claim under §§ 1589(b) and 1593A.

### 2. The City benefitted from its participation in the jail work program.

Finally, there is no genuine issue of material fact that the City benefitted from its

participation in the jail work program. This Court previously acknowledged as much in its

Memorandum Opinion on the City's Motion for Judgment on the Pleadings. (*See* ECF 183 at 19

(stating that the work Plaintiffs did while in jail "benefitted the City").) The TVPA imposes

liability on:

> [w]hoever knowingly benefits, *financially or by receiving anything of value*, from
> participation in a venture which has engaged in the providing or obtaining of labor or
> services by any of the means described in [Section 1589(a)], knowing or in reckless
> disregard of the fact that the venture has engaged in the providing or obtaining of labor or
> services by any of such means.

18 U.S.C. § § 1589(b) and 1593A (emphasis added). Despite the City's attempts to downplay

Plaintiffs' labor as "make-work" (ECF 253 at 23-24), as Plaintiffs have previously demonstrated,

the jail work program was economically valuable to the City (ECF 251-8 at 9 (Lewis dep. at

47:5-17)). The labor of Plaintiffs and other incarcerated individuals relieved the City's

corrections officers of some of their duties (ECF 249 at ¶¶ 61, 64, 73), prevented the City from

having to hire janitorial staff for the municipal jails (ECF 249 at ¶¶ 61, 64, 67, 73), and

performed unpaid labor for the City's Sanitation and Code Enforcement divisions (ECF 249 ¶¶

76-77, 79-80, 142, 187). The precise amount of the benefit is immaterial and thus cannot create a

jury question. Because there is no doubt that the City benefitted from Plaintiffs' labor in the jail

work program, this Court should award summary judgment to Plaintiffs.

## CONCLUSION

Based on the foregoing, Plaintiffs are entitled to partial summary judgment with respect to their claims under 18 U.S.C. §§ 1581, 1589, and 1593A.

Dated: March 9, 2020 Respectfully submitted,

By: s/ Britney Wilson

Martha I. Morgan (ASB-3038-A46M)
8800 Lodge Lane
Cottondale, AL  35453
Telephone: (205) 799-2692
Email: mimorgan@yahoo.com

Faya Rose Toure (ASB-5931-R78R)
Henry Sanders (ASB-6179A34H)
CHESTNUT, SANDERS &
  SANDERS LLC
P.O. Box 1290
Selma, AL  36702
Telephone:  (334) 526-4531
Fax:  (334) 526-4535
Email:  fayarose@gmail.com
Email:  gpompey@csspca.com

Harold C. Hirshman, *pro hac vice*
Jennifer A. Barrett, *pro hac vice*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Telephone:  (312) 876-8000
Fax:  (312) 876-7934
harold.hirshman@dentons.com
jennifer.barrett@dentons.com

Stephen J. O'Brien, *pro hac vice*
DENTONS US LLP
One Metropolitan Square, Suite 3000
St. Louis, MO 63102
Telephone:  (314) 259-5904
Fax:  (314) 259-5959
stephen.obrien@dentons.com

Gregory Lee Bass, *pro hac vice*
Britney Wilson, *pro hac vice*
National Center for Law and Economic
  Justice
275 Seventh Avenue, Suite 1506
New York, NY 10001
Telephone: (212) 633-6967
bass@nclej.org
wilson@nclej.org

**Attorneys for Plaintiffs**

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of Record, on this 9th day of March, 2020.

 s/  Britney Wilson