**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANGELA MCCULLOUGH, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO: 2:15-CV-463-RCL** |
| | ) | |
| **VS.** | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| **THE CITY OF MONTGOMERY,** | ) | |
| **ALABAMA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**CITY OF MONTGOMERY'S REPLY BRIEF**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

_____

## TABLE OF CONTENTS

I.     THE NATURE OF PLAINTIFFS' BRIEF ...........................................................1

II.    REFOCUSING THE ISSUES .........................................................................5

III.   THE PLAINTIFFS' CONCESSIONS ...............................................................8

IV.    THE CITY-JCS CONTRACT .......................................................................12

V.     CONSPIRACY ...........................................................................................18

VI.    THE STATUTE OF LIMITATIONS ...............................................................21

VII.   *ROOKER-FELDMAN/HECK* ......................................................................27

VIII.  PEONAGE .................................................................................................30

IX.    JUDGE HAYES ..........................................................................................33

CONCLUSION.......................................................................................................34

CERTIFICATE OF SERVICE .................................................................................35

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................1, 18, 19

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937 (2009)..............................................................32

*Bearden v. Georgia*,
461 U.S. 660 (1983)...............................................................27, 28, 33, 34

*Carter v. JCS, et al.*,
2:15-cv-00555-RCL (M.D. Ala.).....................................................................28

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................19

*DeLeon v. City of Haltom City*,
106 F. App'x 909 (5th Cir. 2004) ....................................................................2

*Denno v. Sch. Bd. of Volusia Cty., Fla.*,
218 F.3d 1267 (11th Cir. 2000) ......................................................................8

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*,
544 U.S. 280 (2005)........................................................................................27

*Gargiulo v. G.M. Sales, Inc.*,
131 F.3d 995 (11th Cir. 1997) .......................................................................18

*Hadley v. Gutierrez*,
526 F.3d 1324 (11th Cir. 2008) .....................................................................19

*Hamilton v. Judicial Correction Services, Inc.*,
No. 2:18-cv-00933-RDP, 2019 WL 5963473, 2019 U.S. Dist.
LEXIS 196289 at *4 (N.D. Ala., Nov. 13, 2019) ...........................................27

*Harvey v. Harvey*,
949 F.2d 1127 (11th Cir. 1992) .....................................................................19

*Heck v. Humphrey*,
512 U.S. 477 (1994)...........................................................8, 11, 27, 29

*Lacey v. Manicopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) .........................................................................18

*LaRoche v. Denny's, Inc.*,
    62 F.Supp.2d 1366 (S.D. Fla. 1999) ................................................................19

*Lufkin v. McCallum*,
    956 F.2d 1104 (11th Cir.), *cert. denied*, 506 U.S. 917 (1992).........................................21

*McMillian v. Monroe County*,
    520 U.S. 781 (1997).......................................................................................16

*McCullough, et al. v. Finley,*
    907 F.3d 1324 (11th Cir. 2018) ...........................2, 5, 6, 7, 8, 11, 12, 14, 16, 28, 30, 34, 35

*Monell v. Department of Social Services of the City of New York*,
    436 U.S. 658, 98 S. Ct. 2018 (1978)................................................16, 19, 33, 34

*Mullane v. Central Hanover Bank & Trust*,
    339 U.S. 306 (1950).......................................................................................4

*Ray v. Judicial Corr. Servs., Inc.*,
    No. 2:12-CV-2819-RDP, 2017 WL 660842
    (N.D. Ala. Feb. 17, 2017) ........................................11, 12, 14, 15, 17, 26, 27, 34

*Rodriguez v. Providence Community Corrections*,
    191 F.Supp.3d 758 (M.D. Tenn. 2016).............................................................3

*Sun v. Girardot*,
    237 F. App'x 415 (11th Cir. 2007) ................................................................19

*Teagan v. City of McDonough, Ga.*,
    949 F. 3d 670 (11th Cir. 2020) .....................................................................34

*Thurman v. JCS*,
    760 F. App'x 733 (11th Cir. 2019) ................................................10, 27, 29

*United States v. Bernardine*,
    237 F.3d 1279 (11th Cir. 2001) ......................................................................6

*United States v. Jackson*,
    568 F. App'x 655 (11th Cir. 2014) ..................................................................6

*United States v. Washington*,
    146 F.3d 219 (4th Cir. 1998) ..........................................................................6

*Webb v. Goord*,
    340 F.3d 105 (10th Cir. 2003) ......................................................................19

*Weiland v. Palm Beach Cnty. Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) .......................................................................19

*Wilkins v. Dan Haggerty & Assoc.*,
    672 So.2d 507 (Ala. 1995)..............................................................................17

*Winn-Dixie Stores, Inc. v. Se. Milk, Inc.*,
    No. 3:15-CV-1143-J-39PDB, 2019 WL 3854976, at *10
    (M.D. Fla. Jan. 16, 2019) ...............................................................................15

## RULES AND STATUTES

*Code of Ala.* § 12-4-2(a) .......................................................................12, 17

*Code of Ala.* § 15-18-62.............................................................................7

18 U.S.C. § 1589...........................................................................................21

42 U.S.C. § 1983................................................................11, 17, 18, 21, 23

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANGELA MCCULLOUGH, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO: 2:15-CV-463-RCL** |
| | ) | |
| VS. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| THE CITY OF MONTGOMERY, | ) | |
| ALABAMA, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

**CITY OF MONTGOMERY'S REPLY BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.      THE NATURE OF PLAINTIFFS' BRIEF

One thing that can be agreed on by the City as to Plaintiffs' Brief: the Plaintiffs must provide evidence in response to the City's Motion for Summary Judgment which "might affect the outcome of the suit under the governing law," and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Applying that standard to Plaintiffs' vast filing would reduce its bulk to nearly zero.

In response to the City of Montgomery's Motion for Summary Judgment and supporting brief, Plaintiffs, rather than actually addressing the City's arguments and factual evidence, have filed a 108 page document which attempts to blur the City's issues and those of JCS (the probation service contractor). They have succeeded in creating an essentially indecipherable lump in which the issues cannot be distinctly addressed in reply, and the alleged facts cannot be weighed or analyzed as to those claims which remain against the City and those which remain against JCS. The City is not a party to the claims under Count V or Count XII[1], but Plaintiffs simply elide Count

---

[1] (See Doc. 183 at 21 (dismissing Count VI) & Doc. 32 at 82 (Count XII did not name City as defendant).)

V into arguments about Count VIII, making it close to impossible to disentangle the skein. It is not clear why the Court should accept such a brief, and Plaintiffs made no effort to obtain permission to disregard responding separately to the distinct arguments made by JCS on the one hand and by the City on the other.

The First Amended Complaint - the genesis of the matter - proceeded on a claim that, while the Plaintiffs complained of many acts of the municipal judge, they got to sue the <u>City</u> because, they averred, the judge had been acting administratively as a fiscal policymaker for the City.  They persuaded this Court to permit that claim to go forward.  The wrongful actor, in Plaintiffs' theory, was the judge, but he acted for the City, to raise revenue.

Now, having been rebuffed by the Eleventh Circuit, Plaintiffs smoothly shift to a claim that the City proper was the direct wrongdoer, through some unidentified City official or City policy; they have no new or better evidence, but only a re-cast theory.  Nowhere do Plaintiffs identify the newly-asserted acts or misconduct of <u>any</u> City official or City policy. The "wrongdoer" remains a judge, but the connecting link has been destroyed by the holding in *Finley*. Not only is there no evidence of direct action by the City, but there would be no City liability even if some City policymaker ratified a judge's judicial conduct or knew of it and approved of it. *DeLeon v. City of Haltom City*, 106 F. App'x 909 (5th Cir. 2004).

Unsupported factual conclusions are scattered throughout the pages of Plaintiffs' Brief, without regard to which argument they are supposed to relate, which are often inconsistent and contradictory, depending on which argument Plaintiffs are advancing at a given point. Rather than acknowledge and cite to the extensive deposition testimony of all seven Plaintiffs, or to the

deposition of JCS' manager (Wes Ennis), they file lawyer-crafted declarations which are at odds with the depositions,[2] an impermissible tactic.

It is not possible for the City to respond to claims and allegations which are relevant to it, because there is, with the exception of the peonage claim section, no separate identification of those issues. The Plaintiffs' argument is without borders or boundaries. Off-hand, unsupported remarks against the City are scattered throughout the mass of the argument, whether or not that argument actually relates only to JCS and not the City. Plaintiffs' response, at times, is misdirected to an argument about to whether they have "plausibly alleged" a due process violation - a pleading issue - rather than to the question of whether they have produced triable evidence in opposition to summary judgment. (*See, e.g.*, p. 22, where Plaintiffs cite *Rodriguez v. Providence Community Corrections*, 191 F.Supp.3d 758 (M.D. Tenn. 2016), and, its ruling that, as to the complaint there, "The Court held that this plausibly alleged a Fourteenth Amendment violation.")

It is impossible in any reasonable length of pages to point out all of this sort of insidious technique, but a few examples are given here, to alert the Court to be wary. It is easy to grow weary in reading such an opus, and to let the small digs and unsupported statements slip by,[3] along with

---

[2] While parts of these new declarations are addressed *infra*, a glaring example is the purported declaration of Plaintiff Kenny Jones. Mr. Jones is mentally very limited, and has been receiving disability payments due to his condition since the age of seven; he cannot read or write and has limited or confused memory. In deposition, he did not even recall being jailed on any occasion within the statute of limitations, but spoke only of a much older event, now time-barred. He had no memory at all of any encounter with JCS or being assigned to JCS (or any probation agency). To shamelessly produce a literate document as if it is Mr. Jones' own words rather than a creation of the lawyers is dubious at best. Plaintiff Johnson, in her deposition, plainly and in exact detail set out that she volunteered to work, without any coercion of any kind (*see* Doc. 253 (City Response to Plaintiffs' Motion for Partial Summary Judgment), pp. 9-10), where her testimony is quoted verbatim). But Plaintiffs' Brief nonetheless just asserts that she was forced and coerced to work, and now attaches a declaration entirely ignoring her deposition testimony.

[3] *See, e.g.*, p. 58 of Plaintiffs' Brief, where they cannot resist making a snarky, condescending statement, ". . . as discussed, *supra* at n. 1, Montgomery undoubtedly has the history and context to make such a comparison valid [comparing the Plaintiffs' claims here as being similar to African slavery]." Note 1 is an untethered statement about a 110-year old peonage case that happened to originate in Montgomery, and cites to a 1903 New York Times op-ed piece, as if it has some relevance to the 2020 decision of this Court in a non-race based case. This kind of remark says much more about the mindset of Plaintiffs' Chicago and

the casual use of "defendants" (in the plural) when summing up or arguing about JCS' practices or the Court's actions, but where the City - the only Defendant, which could be within the plural - is neither implicated nor any claim supported by evidence.

One quick example of the item above is at page 26 of Plaintiffs' Brief: After an extended recital of JCS' alleged sins and omissions,[4] and about Judge Hayes' alleged stipulation, Plaintiffs leap to a generalized statement; using the plural of "defendants," as if their recital related to the City:

> Defendant**S** were responsible for notifying Plaintiffs of their right to an indigency determination, including the right to avoid paying their fees and to avoid jailing for non-payment as the result of such a determination. Defendant**S** did not provide such notification ever, in any shape or form, at any point in the process. Defendant**S**' notification procedures violated due process. (Emphasis added.)

Thus, without in any way addressing how or why the <u>City</u> was "responsible for" giving court notices or JCS notices,[5] or why the City would or could, consistent with the separation of powers, impose any "notification procedure" in a court case. Plaintiffs merely roll past such issues by pluralizing "Defendants." While many of Plaintiffs' accusations against JCS are not supported by the evidence, that argument is between JCS and Plaintiffs, and it is reasonably expected that

---

New York counsel than it does about the facts and the law before this Court. They persist in casting their arguments in racial terms as if this is a racial discrimination case, which this Court has ruled it is not. They carefully describe the race of each Plaintiff, making references to Montgomery as the "Cradle of the Confederacy" (Plaintiffs' Brief at 1) and cannot get past the fact that this is a due process/equal protection claim devoid of any racial cast.

[4] Plaintiffs cite *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306 (1950), which is not a case about anything related to advising people who are delinquent on their fines that they are entitled to an indigency determination. *Mullane* was about the need to give actual notice of the pendency of a legal proceeding to those whose names and addresses were known, rather than mere publication. It had nothing to do with whether a notice actually sent (as was done here) to the actual address had to contain specific advice that, at the hearing that would be held, the noticed party had a particular right to be told of his or her potential right not to be jailed without a hearing or indigency, <u>in</u> that notice.

[5] The evidence clearly shows that JCS regularly and consistently gave Plaintiffs notice of their failures to comply with the installment payment terms, and the Court, when and if (which rarely occurred) a Plaintiff appeared in response to a notice to appear on a revocation petition, was then the only agency responsible for making indigency determinations and advising Plaintiffs (who had uniformly already had a hearing before being given the payment plan alternative).

JCS will respond. But Plaintiffs cannot, merely by ipse dixit, simply shift their grievances about details of JCS' practices onto the City proper by pluralizing a word.[6] Plaintiffs similarly blend their grievances against Judge Hayes (or, sometimes more generally against the Municipal Court as an entity) into conclusions that the City somehow had the right or power to direct how the Court held hearings, imposed sentences, assigned to probation, appointed counsel, etc.

A similar example appears at page 66, where, in an argument about Count XII - solely against JCS - Plaintiffs just toss in, "JCS was a joint participant in the City's scheme to unlawfully imprison people." This is not illuminated as to any evidence of any "City scheme," or any basis to conclude that the City, rather than the Municipal Court, imprisoned any Plaintiff or anyone else. Such a statement is essentially nothing but a mass of misdirection, confused claims and false assertions.

Because the nature of Plaintiffs' Brief precludes any structured response to the whole, the City, in this reply, can only address, in discreet sections, what are actually the issues affecting it.

## II.    REFOCUSING THE ISSUES

While Plaintiffs completely ignore the Eleventh Circuit decision in *McCullough v. Finley*, 907 F. 3d 1324 (11th Cir. 2018) - this very case - that decision bears revisiting. It is that case which led this Court to dismiss all claims against the City officials and to state the remaining issue as whether the evidence establishes an issue of fact that the City was the moving force behind JCS' activities in short, whether Plaintiff could show a "scheme to increase revenue at the expense of its residents' constitutional rights" (Doc. 183 at 20 (internal citations omitted).).

---

[6] A similar example can be seen at page 18 of Plaintiffs' Brief, stating such things as, "Once on JCS, Defendants used unlawful threats of arrest and jail to coerce payment." The evidence of any such threats by JCS comes from some Plaintiffs, and is not credible; but there is no evidence, credible or otherwise, that the City made any such threat or encountered Plaintiffs in any fashion. Plaintiffs just pluralize and proceed.

The central question in *Finley* was whether this Court had erred in its Motion to Dismiss

Order when it found that there was an adequate basis pled to find Judge Hayes or the other judges

to have been acting administratively as final policymakers for the City in using the Municipal

Court as a financial resource for the City.

The Eleventh Circuit reviewed in detail what was charged against the municipal judges:

> The precise acts that the jailees allege that the judges performed - their probation
> procedure, indigency hearings, provision of counsel, sentences and <u>work programs</u>
> are all <u>judicial acts</u>. A probation order, and <u>setting its terms</u>, is 'clearly' a judicial
> act. *Owens v. Kelley*, 681 F.2d 1362, 1370 (11th Cir. 1982).[7] And a <u>judge's duty to</u>
> <u>advise indigent defendants of their rights</u>, even if done 'in a way that makes a
> mockery of those rights' is a judicial act. *Eggar v. City of Livingston*, 40 F.3d 312,
> 315 (9th Cir. 1994). The appointment of counsel, or failure to do so, is also a judicial
> act. *Davis v. Tarrant Cty.,* 565 F.3d 214, 223 (5th Cir. 2009). And sentencing a
> defendant, <u>including</u> giving an opportunity to reduce a sentence [*i.e.*, the jail work
> program], is a judicial act. *See Harris v. Deveaux*, 780 F.2d 911, 915 (11th Cir.
> 1986) (holding that ordering incarceration is a normal judicial function.)"

(907 F.3d at 1331; emphasis added.)

The Court of Appeals went on to note that each plaintiff "was sentenced for a failure to pay

fines within the context of an individual case. And each jailee could have directly appealed the

judges' acts concerning his <u>probation</u>, <u>hearings</u>, counsel and <u>sentence</u>." (Emphasis added.)

> ". . . The judges' judicial acts were not transformed into administrative acts because
> the judges held a status as presiding judge." *Id.* [referring to Plaintiffs' claims
> against Judge Hayes)]. The alleged hearings and what happened at those hearings,
> <u>including whether a defendant was advised of his rights</u>, or appointed counsel,
> occurred in a courtroom. And when the judges ordered the jailees to sit-out their
> fines [*i.e.*, when the sentence of a fine was commuted to a term in jail], the judges
> did so in a courtroom."

---

[7] Probation is a part of the judicial system, not the executive, including supervising probation officers and terms of probation. Probation and Pretrial Services are an arm of the Federal Judiciary, under the Administrative Office of Courts, and the same is true of the State level (of which the Municipal Courts are a part).  Courts consistently recognize that "probation officers based on their time-honored role as "neutral information gatherer[s] [have] loyalties to no one but the court." *United States v. Jackson*, 568 F. App'x 655, 658 (11th Cir. 2014); *see also United States v. Bernardine*, 237 F.3d 1279, 1283 (11th Cir. 2001) (probation officer is an "arm of the court" who acts as a "liaison between the sentencing court . . . and the defendant"); *United States v. Washington*, 146 F.3d 219, 223 (4th Cir. 1998).

(907 F.3d at 1332; emphasis added.)

It was the judges who "ordered each jailee to sit-out his or her fines during a pending case." The Court pointed expressly to Plaintiffs McCullough and Johnson, who claimed that Judge Hayes "did not make any inquiry" into their indigency when they appeared before him on a revocation or commutation hearing, finding that such matters were entirely judicial. (The Court also took note of the Alabama statute providing for municipal court judges to commute unpaid fines to jail terms. *Ala. Code* § 15-18-62.)

All of these binding appellate rulings control Plaintiffs' efforts here to suggest that it was the <u>City</u> which controlled or directed Plaintiffs' probation, sentence, commutation or sentence-reduction by jail work. Insofar as actions of the probation service used by the Court are attacked, probation itself is a judicial function and is not capable of direction by the City.

The Court of Appeals also dealt with claims that city officials - the Mayor and two Chiefs of Police - controlled or were the moving force behind Plaintiffs' alleged deprivations. While the Court's ruling was in the context of the Plaintiffs' pleading of claims against these city officers, it pointed to the circumstance that no acts by them were anything but factually-unsupported conclusions; the result was that those claims were dismissed. Plaintiffs' complaint remains the same today as it was when the Eleventh Circuit ruled. When Plaintiffs suggested that they might amend to add some factual basis against the Mayor and Chiefs, this Court closed the door on such a plan.  (*See* Doc. 197 (Order denying Plaintiffs' Motion for Reconsideration) at 2-3.)

Thus, there are no asserted facts against the City policymakers at the administrative level, against which to test the evidence in discovery. The City can only act through some person or persons with final policymaking authority in the area concerned - *i.e.*, the conduct of court hearings, sentencing, probation and its terms, commutations, or appointment of counsel or

Plaintiffs must identify and establish by evidence some official policy, or acquiescence in a course of conduct so pervasive and continuous as to have the force of law.  *See Denno v. Sch. Bd. of Volusia Cty., Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000).

No policy or policymaker has been identified: not the Mayor (who has been dismissed from this case), not the City Council, not the Chief of Police (who has not only been dismissed, but who had no role whatsoever in the conduct of court matters), and no city ordinance or regulation, and no court matter over which the City had any authority.[8]

This issue of lack of City involvement, much less of City action as the moving force, is addressed *infra*, but *Finley* forms the backdrop against which all of Plaintiffs' claims against the City must be viewed. However much Plaintiffs rage against Judge Hayes (and their interpretation of his consent plea is far from accurate[9]), it remains true that nothing he did in regard to Plaintiffs' probation, commutation or sentencing can be attributed to the City. Nor, as is addressed later, is there any basis for Plaintiffs' conspiracy charge - an effort to evade the dismissal of the claims against the City.

## III.   THE PLAINTIFFS' CONCESSIONS

Faced with the *Finley* decision (which, tellingly, Plaintiffs nowhere even acknowledge exists) with the lack of concrete facts, with *Rooker-Feldman*, with *Heck*, and other roadblocks, Plaintiffs attempt a convoluted series of evasions, which are not consistent as between various

---

[8] *Finley* points to the fact that there is no basis to even "infer that the Mayor or chiefs were ever present in a municipal courtroom when jailees were sentenced or in a municipal jail when jailees were forced to work." (*Id.* at 1334.) That remains the state of the record today.

[9] Plaintiffs' upset against Judge Hayes leads them to such overreach as the statement on page 25 of their brief, that, "In fact, Judge Hayes and the other municipal court judges had a policy and practice of not informing defendants about the potential availability of such [indigency] determinations" (emphasis added). The citation given does not say that, and there is certainly no evidence that there was any such court-wide policy. But Plaintiffs are, as throughout, not hemmed-in or deterred by the actual facts.

pieces of their argument. In the course of these often-tortured efforts, Plaintiffs make a number of concessions, which, collectively are destructive of their claims:

1)      At pages 70-71, Plaintiffs argue that it was <u>JCS</u> which was guilty of abuse of process for the ulterior motive of coercing and extorting money from Plaintiffs, who were indigent and unable to pay, "<u>for its own profit</u>."  Whether it did or did not, it is not something on which the City was the moving force. Plaintiffs recite a considerable litany of JCS' actions, all of which have nothing to do with the City and, oddly, note that the revocations, which Plaintiffs revile, would have the effect of terminating JCS' fees, whereas, almost immediately, Plaintiffs also complain that JCS requested the Court to issue arrest warrants, which would take JCS out of the picture, and certainly not "squeeze" any money out for JCS.  (Doc. 256 at 71.)

2)      The alleged conspiracy was, Plaintiffs say, with <u>Judge Hayes</u>, who is not a City actor and whose actions do not give rise to City liability. (*See* p. 83, Plaintiffs' Brief.)

3)      Plaintiffs <u>do not challenge the JCS fees</u> (which is the only specific probation element in the contract), but, they say, they only challenge "Defendants" violations committed in the process of collecting the fees. The JCS contract is addressed *infra*, but this is simply a grievance about the alleged <u>tactics</u> used by JCS, over which the City had no supervision or control, nor do Plaintiffs argue that the City did.  (Doc. 256 (Plaintiff's SJ Resp. Br.) at 84.)

4)      Plaintiffs <u>do not challenge</u> the probation orders, which set the monthly payments to JCS and its fees (p. 84, Plaintiffs' Brief). Yet, they somehow challenge the procedures by which Plaintiffs were placed on probation.  (Doc. 256 at 85.)  That is, in some metaphysical way, separating the <u>judge's</u> decision to place someone on probation from the procedure of him doing so. The sequence is important here:  A person got ordered to probation with JCS in one of two ways: he or she was ticketed, convicted (by trial or plea) and fined. The Court always allowed 30

days to pay, but if a defendant could not pay and asserted a need for an extended installment payment plan, he could be ordered to JCS probation.[10] That order is, by Plaintiffs' admission, not challenged. What procedure is it that Plaintiffs complain of here? And what did that have to do with the City?

The second method was for a person who was charged with what is called a "scheduled" offense (that is, an offense for which the fine was a pre-determined scheduled amount) to report to a court clerk at what was called the "window," where he could plead guilty or not guilty. If the plea was "not guilty," a court hearing date would be set. If "guilty," the scheduled fine could be paid then and the matter concluded; if a defendant needed time to pay (beyond the 30 days), he could accept an assignment to JCS and sign an acknowledgment to that effect, containing the fees, terms and conditions of such probation. None of the named Plaintiffs here were involved in the window procedure, and none has standing to challenge it. That procedure was set up <u>by order</u> of the Municipal Court for convenience and efficiency for both the Court and defendants alike.

Again, Plaintiffs' criticism of the window procedure seems misplaced, but it is not even an issue here because none of the seven Plaintiffs were assigned to JCS in that way; it was, in any event, a judicial action, not a City-directed or controlled action, and Plaintiffs <u>do not challenge</u> those probation orders (they make some complaint that those window orders were not signed by a judge, but, as held in *Thurman v. JCS*, 760 F. App'x 733 (11th Cir. 2019), that does not give rise to a due process claim.

5)      Plaintiffs do not challenge their convictions, their probation orders or the JCS fees. (Doc. 256 at 85-86.)

_____

[10] Not every defendant was put on JCS probation, and no contention is made that they were.

6)      Plaintiffs do not challenge their sentences of commutation.[11] (Doc. 256 at 87.)

7)      Plaintiffs concede that the City did <u>not</u> exercise oversight or supervision of JCS or its activities.  (Doc. 256 at 100.)

8)      JCS' complete independence from the City or supervision by a policy-making City official is conceded by Plaintiffs at length.  (Doc. 256 at 101-103.)

9)      Although it will be repeated in the City's reply on the peonage claims, Plaintiffs also concede that a § 1983 action for violation of the Thirteenth Amendment is barred by the statute of limitations.[12]  (Doc. 256 at 105.)

10)     Plaintiffs do not contend that an indigency hearing was required before the Court ordered a defendant to appear for a probation revocation hearing.  (Doc. 256 at 30.)

One is tempted to ask: What is left? The answer is that, as to the City, nothing is left. Yet, despite all those concessions, Plaintiffs' Brief, in purely conclusory fashion, marches on, and announces, "The entire probation scheme [that is, the use of by the Court, the probation orders and terms, the JCS fees, the probation revocations and the jailings (where such occurred)] violated equal protection and due process." (Doc. 256 at 83.).  But every element of that "probation scheme" has been cast off in Plaintiffs' efforts to plow around *Ray, Rooker-Feldman, Heck* and *Finley.* Consistency may be the hobgoblin of little minds, but some level of logic and consistency must govern and frame the arguments to this Court.

---

[11] Commutation was not tied in any way to JCS; it was a decision for the Court in any delinquent-payer case, and, to the extent it occurred in cases where JCS probation had initially been ordered, but in which JCS gave up and returned the case to the Court on a petition for revocation of probation, it was something that was later ordered by the judge in his discretion when the delinquent defendant appeared in court. As noted in *Finley*, the judicial order of commutation to a term in jail was appealable, but no Plaintiff took an appeal.

[12] The statutory claims are addressed *infra*, and are unrelated to JCS.  They are not the subject of this initial portion of the City's reply.

## IV.    THE CITY-JCS CONTRACT

While Plaintiffs' Brief conceals it beneath the mound of details it asserts about JCS practices, their only actual point of argument is that the City entered into a contract by which it authorized the Municipal Court to utilize JCS' probation services. It is permissible under Alabama law to use a private probation service. *See Ray v. Judicial Corr. Servs., Inc.*, No. 2:12-CV-02819-RDP, 2017 WL 660842, at *16 (N.D. Ala. Feb. 17, 2017).  From that fact, Plaintiffs extrapolate a whole universe of imaginary City responsibilities and liabilities. The City did, indeed, sign such a contract, but it does not give rise to liability on Plaintiffs' claims.

The contract (Docs.  241-9 & 241-10) commits the decision of when or whether to use JCS probation to the court, as it must have done. Alabama state law, *Code of Ala.* § 12-4-2(a), authorizes cities to provide for court clerks, magistrates, probation services and the like, just as the City may provide a municipal court generally, along with judges and staff. While the City must fund such services and facilities, it cannot direct or control the judicial actions, including probation. The federal analogy is complete: courthouses, judges, clerks, staff and probation services are all funded by the government, but they form a distinct branch of government whose actions cannot be directed or controlled by the executive or legislature.

As *Finley* noted, the probation procedure, and setting the terms of probation, are clearly judicial functions and acts. *See* 907 F.3d at 1331.

The contract does not give the City any supervisory authority over the court's use of JCS except to allow the judges the option to use such services, nor any supervision over the probation service itself once a defendant was assigned to probation by the court. There is no requirement in the contract that the court was required to use JCS for all probations or all collections. As Montgomery's Mayor Strange made clear in his Declaration (Doc. 241-31 at ¶¶ 2-5), the contract

provided a service which the court could use if it chose to; it was the judges' purview "to determine

the extent to which the Court would use JCS' service, who to assign to JCS for probation and

whether to revoke any such probation . . . Neither I nor the City administration had any role in the

JCS-court operation or function; the City did not control any of the Court's decisions as to

assignments to JCS, how JCS conducted its business or how JCS interacted with the Court or its

personnel."

Moreover, "the City never controlled or attempted to control or had any policy relating to

JCS' collection and probation practices . . . The City had no policy or practice as to any judicial

actions . . . There was never any arrangement, scheme, plan, policy or practice to control or

influence the JCS-court actions."[13] The contract recites that it is being entered into for JCS "to

---

[13] Mayor Strange's Declaration is consistent with his deposition testimony. (*See* Doc. 241-16 at 94-97.)
And Plaintiffs concede that the City did not exercise oversight or supervision of JCS.  (*See* Doc. 256 at
100.) The deposition of Wes Ennis, the JCS regional manager for Montgomery, agrees (*see* Doc. 242 (City
SOF) at Pars. 24-26 (quoting and summarizing Ennis testimony to this effect)):

    Q.  . . . I'll ask you whether or not there was any interaction with the City police as part of JCS'
        process of collecting fines and fees?
    A.  Absolutely not.
    Q.  . . . I'll ask you whether or not JCS reported to the City itself as opposed to the municipal
        court?
    A.  No, sir. Reported directly to the Court.
    Q.  . . . The Category 7 [of the Requests for Production] asks for interactions that JCS had with
        the City of Montgomery -- And again, it's distinct from the court -- as part of the compliance
        with the contract between the City and JCS. Did you have any interaction with the City or
        was your interaction with the court?
    A.  My interaction was with the court . . .."
    Q.  In your experience with JCS in Montgomery, did the mayor of Montgomery or the City
        council or the City officially override the Court's determination as to whether or not to assign
        people to JCS?
    A.  I can't recall a single time the City of Montgomery, outside of the Court, having any
        involvement with anything that went on with JCS.
    Q.  Did JCS ever make a recommendation to the City to incarcerate anybody?
    A.  No. That was not our place to do so.
    Q.  Did you even make any recommendations to the Court to incarcerate anybody?
    A.  No.  The judge made that ultimate determination. We had no basis of suggesting that.
    Q.  Did JCS ever make a recommendation to the City of Montgomery and then use the
        Montgomery police, that is JCS use the Montgomery police, to carry out arrests?
    A.  Absolutely not.
(Doc. 241-13 (Ennis Dep.) at 192-193.)

provide these services [probation] to the City and Court," and there shall be no charges billed to the City. The $40 per month JCS fee is not challenged by the Plaintiffs here, as noted above. The contract goes on to provide:

> 5.   JCS will supervise all probate cases sentenced by the Court. JCS will also supervise indigent cases when determined by the Court.
>  . . .
> 8.   JCS shall comply with all provisions of state and federal law.

As required by judicial independence, that ended the City's role, such as it was. There is simply no legal or actual basis to contend that the City is liable for the Plaintiffs' asserted catalog of "mistreatments" by JCS. The City, by law and universal usage, ultimately received a portion of net fines and costs collected by JCS and remitted by it to the Court, or by the Court outside of JCS, but the City received no part of the JCS fees, and it is not even contended that it did.

Plaintiffs brush aside the decision of the Northern District of Alabama in the *Ray v. City of Childersburg* case, on the dismissive assertion that the facts as to the JCS contract, policies and practices in Montgomery were different from those before Judge Proctor, who found that there was no constitutional deprivation by JCS relating to indigency determinations (*see Ray v. Judicial Correction Servs., Inc.*, 270 F. Supp. 3d 1262, 1298–1300 (N.D. Ala. 2017)), and that the JCS contract did not make the City of Childersburg liable. They just boldly assert, "That decision has no relevance here" (p. 28, n. 5, Plaintiffs' Brief) and move on. ("Nothing to see here, folks.") That is all the attention Plaintiffs give to *Ray*, but at least *Ray* is mentioned, unlike *Finley* which is not mentioned at all.

But a comparison of the JCS contract with Montgomery and the contract with Childersburg shows them to be in all material respects exactly the same. Both contracts have been provided. (*See* Ex. 1 to City's Supplementary Evidentiary Submissions (Childersburg contract) & Docs. 241-

9 & 241-10.)  Of course, also, Plaintiffs later make an argument in connection with the issue of tolling, that these Plaintiffs were all parties within the *Ray* complaint, and that their issues were the same, so as to invoke tolling. (That argument is wrong, given that no claims of any kind were made in *Ray* against Montgomery, and these Plaintiffs were not parties. Claims against JCS might have been tolled, but that doctrine does not run as to a party not before the Court.)  *See, e.g., Winn-Dixie Stores, Inc. v. Se. Milk, Inc.*, No. 3:15-CV-1143-J-39PDB, 2019 WL 3854976, at *10 (M.D. Fla. Jan. 16, 2019).  Plaintiffs might (unconvincingly) say that Judge Proctor's decision is not binding precedent, as a co-equal court, and that argument would be correct; but it is not correct to say that the careful, fully considered decision by Judge Proctor is not relevant authority at all. The *Ray* decision is clearly correct, and should be highly persuasive here.

Because the City is confident that this Court will read and study the full *Ray* decision, it will not burden this Court with all of that decision's points. But given Plaintiffs' dismissive treatment of *Ray*, several key elements should be noted:

1.     The contract between JCS and the City of Childersburg is, except for the amount of the JCS fee,[14] in every material respect the same as the Montgomery contract.

2.     The claims of the Plaintiffs in *Ray* contained all the same claims made by the *McCullough* Plaintiffs, and several other claims not advanced here. Those bear enumerating:

a.  Plaintiffs alleged that the City violated their due process rights by delegating certain functions of the Childersburg Municipal Court to Defendant JCS, "binding the Municipal Court to utilize JCS' private services, imposing probation in orders that did not impose suspended incarceration sentences, creating a probation system that imposed fines

---

[14] In the older Childersburg contract, it was set at $35.00, whereas in the Montgomery contract, it was $40.00.

and fees without regard for a probationer's indigency . . . failing to provide indigency hearings before imprisoning probationers for failure to pay . . .."

      b.   Plaintiffs claimed that the City violated their constitutional right to counsel by participating in a joint policy and practice with JCS [*i.e.*, a conspiratorial agreement] that transformed sentences without granting access to counsel [*i.e.*, commutation of fines].

      c.   Plaintiffs claimed that the City violated their Eighth Amendment rights by contracting with JCS to impose monthly fees against indigent probationers and jailing probationers for failing to pay fees and fines.

      d.   Plaintiffs claimed that the City denied them equal protection by engaging in a contractual policy that arbitrarily imposed disparate treatment on the basis of wealth - that is, that defendants who were able to pay did not incur the additional burden of probation under JCS' supervision and the extra fees charged by JCS.

Judge Proctor conducted a careful analysis of the law, including *Monell*,[15] and concluded, as must be concluded here, that:

    (i)   The Plaintiffs failed to demonstrate that a municipal policy or custom existed or was the moving force behind the asserted violations;

    (ii)   The policymaker as to Plaintiffs' sentences, probation, revocation and incarceration was the municipal judge, and the judge is a state official, not a City policymaker (Judge Proctor cited many of the cases relied on by Montgomery in the *Finley* interlocutory appeal, and reached the same conclusion that he Eleventh Circuit laid down in *Finley,* and by the Supreme Court in *McMillian v. Monroe County*, 520 U.S. 781, 792 (1997);

---

[15] *Monell v. Dept. of Soc. Services*, 436 U.S. 658 (1978).

(iii)   It was the Municipal Court - a state entity as part of the Alabama Unified Judicial System - which was responsible for making indigency determinations, appointing counsel, revoking and controlling probation, charging additional fees to delinquent defendants, issuing warrants and incarcerating individuals, and the City had no control over any of those things. Neither the City as a body corporate, nor the Mayor as its chief executive, had any authority over the Court's actions. (*See* pp. 25-27 of the *Ray* opinion.)

(iv)   It was permissible under Alabama law for a city to contract with a private entity to provide probation services (Code of Ala. § 12-4-2(a); *Wilkins v. Dan Haggerty & Assoc.*, 672 So.2d 507 (Ala. 1995), but the JCS contract did not - and could not - bind the Court to use JCS or oblige the municipal judges to set any particular terms of probation.  As stated in *Ray*,

> . . . the City's mayor and the City Council did not impose unconstitutional terms and conditions of probation, unconstitutionally imprison probationers without an indigency determination or access to counsel, unlawfully impose fees and probation terms beyond the statutory maximums available, or unconstitutionally treat defendants disparately based on their wealth. Those actions were committed either by the Municipal Court or by JCS employees *after* JCS had been assigned to supervise Plaintiffs' probation.

(v)   No policy or act of the City was the proximate cause of Plaintiffs' alleged injuries, and the City was not the moving force, in the causation analysis, behind those injuries. (*See* pp. 32-34, *Ray*) ("Nothing in the JCS-City Contract required the Municipal Court to sentence certain defendants to probation. Nor did the JCS-City Contract prevent the Municipal Court from holding indigency hearings or directing JCS to supervise a probationer without charging fees." (*Ray*, p. 33.)

(vi)   The City cannot be held liable under § 1983 on the basis of a principal-agent relationship between JCS and itself, even on the assumption that the contract obligated JCS to perform any duties for the City (which it did not).

In normal parlance, an on-all-fours decision of a sister court is relevant in a case based on the same conduct, the same categories of actors (city, court, private probation company) and the same claims, notwithstanding Plaintiffs' breezy pronouncement to the contrary.

## V.    CONSPIRACY

Conspiracy is not, per se, an actual wrong in and of itself ("[C]onspiracy is not itself a constitutional tort under § 1983," *Lacey v. Manicopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012), *en banc*. Claiming a conspiracy doesn't enlarge the nature of a plaintiffs' claims, and there must always be an underlying constitutional violation. (*Id.*), but is derivative of some underlying wrong, which must be proven. Before there is even an argument about anyone conspiring, the Plaintiffs must first establish a constitutional tort committed by JCS, and nothing of that sort has been shown by Plaintiffs' evidence. Whatever common-law wrongs may be alleged by Plaintiffs or testified to by them, such as mis-applying funds, failing to properly account for money received, making probationers wait at appointments, etc., those are not constitutional level wrongs.

Like much of the rest of Plaintiffs' argument, the effort to travel on a conspiracy theory is, in effect, just a replay of the allegations in their pleadings, but contains no actual evidence. Plaintiffs do not even set out a well-defined conspiracy claim, but toss the term in at various places, using terms such as "scheme" here and there, although Plaintiffs argue conspiracy (*see* Doc. 256 at 44) as if there were actually a conspiracy count in the First Amended Complaint, which there is not, except as to a dismissed RICO claim. It is not an explicit part of Count VII or Count VIII, which are what remain against the City, but a reading of Plaintiffs' Brief would not disclose that. It is a commonplace rule that, when responding to a Motion for Summary Judgment, it is insufficient to rely merely on the pleadings; rather, specific factual evidence must be presented. *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997), *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). Such evidence must be of significant probative value and not merely colorable. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A plaintiff may not simply rest on repeating the allegations of the complaint. *Anderson*, 477 U.S. at 252.  Suspicions, perceptions, opinions and belief - all of which form Plaintiffs' arguments and attitudes here - cannot be used to defeat a Motion for Summary Judgment. *LaRoche v. Denny's, Inc.*, 62 F.Supp.2d 1366 (S.D. Fla. 1999).

To establish a conspiracy in regard to a claim of deprivation of some constitutional right, there must be, first and foremost, evidence of an actual denial of such a right, and that the defendants[16] reached an <u>agreement</u> to deny the plaintiffs that constitutional right (here, of course, there are seven separate Plaintiffs who must each make such cases). *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008). In the instance of a claim against a municipality, under *Monell*, the plaintiff must not only show that there was an agreement to violate his or her constitutional rights, but that an official policy established as a formal policy or a *Monell*-level custom underlay such conspiracy. *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1330 (11th Cir. 2015). Unlike an agreement between two individuals, a conspiracy claim against a municipality "must include the existence of a policy or custom underlying the conspiracy." *Weiland*, 792 F.3d at 1330.

On both pleadings and summary judgment, Plaintiffs must provide detailed material facts establishing the agreement between the state actor and the private entity JCS, a meeting of the minds, <u>and</u> that the Defendants entered into an agreement to achieve the unlawful end. *Webb v. Goord*, 340 F.3d 105 (10th Cir. 2003); *Sun v. Girardot*, 237 F. App'x 415, 417 (11th Cir. 2007); *Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992).

---

[16] The only Defendants in this case are JCS and the City.

There is simply no such evidence. Such things as one email from the Court Administrator to the Mayor to the effect that probation services made available to the Court seemed to be working well does not even begin to provide evidence of an agreement or a policy or custom to violate Plaintiffs' constitutional rights. Yet, that is the sum and substance of Plaintiffs' evidence. There is no evidence whatsoever of an agreement between anyone to commit the constitutional wrongs Plaintiffs claim, much less that such agreement resulted from a City policy or custom aimed at achieving such violations.

The undisputed testimony from Mayor Strange and from Mr. Ennis of JCS is that, except for the initial contract, there were no dealings between the City and JCS and certainly no conspiratorial agreement to violate Plaintiffs' rights. In fact, the contract provides that JCS must operate in such a way as to be in conformity with all federal and state laws, the Constitution being the ultimate federal law. The deposition testimony of former Chief Baylor and former Chief Murphy also confirms that the City, through the police department, had no contact with JCS or even awareness of JCS' activities. (*See*, *e.g.*, Doc. 242 (City's SOF) at ¶¶ 17-19.)

There is no other evidence. No Plaintiff could even name anything that the City did or anybody who made an agreement or what its terms were, or how they did so -- all their grievances are against the Court in general and Judge Hayes in particular. Without some level of detailed material facts about who, how, when and for what purposes someone in authority at the City made such an agreement, or, in contractual terms, reached a meeting of the minds, on a plan to deprive Plaintiffs of their rights - or evidence of a policy adopted by the City or a long-established custom, and that the object of the conspiracy was actually achieved - that is, that there was an established constitutional violation - the conspiracy claim here is at an end. It began as an imaginary agreement, and it ends as an imaginary agreement.

No element of a conspiracy claim has been met. The City is due to be granted summary judgment as to Plaintiffs' conspiracy claims.

## VI.     THE STATUTE OF LIMITATIONS

There are several statutes of limitations at work in this case, some of which Plaintiffs concede and some of which they conceal by mixing up facts and dates of events.

The statute of limitations for a § 1983 claim under the Thirteenth Amendment is two years[17] (as is true of all claims under § 1983[18] *Lufkin v. McCallum*, 956 F.2d 1104, 1105, 1108 n.2 (11th Cir.), *cert. denied*, 506 U.S. 917 (1992)), and, in a very casual low-emphasis manner, Plaintiffs acknowledge this. (*See* Doc. 256 at 105.)

This action was filed on July 1, 2015, thereby barring all § 1983 claims accruing before July 1, 2013.

### Plaintiff Angela McCullough

Plaintiff McCullough had two separate assignments to JCS, which, due to her failure to comply or make payments, were revoked, and eventually (after her arrests for failure to appear) her fines were commuted to jail terms. The first of those lies outside the § 1983 statute of limitations (the relevant period was from November 2008 to February 2009 (*see* Doc. 242 (City's SOF) at ¶ 140), and that incarceration included her story about being put on a suicide watch.[19]

---

[17] The statutory peonage claims under 18 U.S.C. § 1589, etc. are longer, as discussed *infra*.

[18] Any derivative conspiracy claim is controlled by the statute governing the wrong itself and does not enlarge or expand time.

[19] Other witnesses strongly dispute Ms. McCullough's claimed facts, but, in any event, the incident, whatever the actual facts were, is time-barred. It is not related to a jail-work claim (the program did not exist), and is not anchored to any other claim; its inclusion by counsel in Plaintiffs' Brief can only have been for the purpose of misdirecting attention to an emotionally-charged story, but without clearly disclosing to this Court that the whole claimed incident is not relevant to any viable claim. Counsel must surely have been aware that the alleged event occurred, if at all, in 2008 or 2009, and had nothing to do with "forced labor" to satisfy a debt.

(She also makes no claim about the jail work-credit program as to that early incarceration, which program did not then exist.)

Her second incarceration - but not her second assignment to probation - was in July 2013. She served 21 days in jail. Her second probation was in fact terminated in 2011, but the warrants for failure to appear were not executed until July 3, 2013. Depending on the complaint she is making - that is, whether she is complaining about being assigned to probation and then mistreated in some fashion by JCS[20] prior to the 2011 probation revocation, or is complaining about the commutation and jailing in July 2013, which had nothing to do with JCS - this claim may also be time-barred, or not. Whatever claim she asserts about JCS prior to revocation are well outside the statute of limitations for this July 1, 2015 complaint. The complaint and Plaintiffs' arguments in brief do not make this problem clear, but attempt to just sweep everything about Ms. McCullough's various encounters, whether in 2008, 2011 or 2013 into a single pile and hope it gets past this court.

### Plaintiff Kenny Jones

Mr. Jones was questioned at length as to what complaints (in the sense of the grievances he has - not formal legal complaints), and he listed them. Over several pages of his deposition, Mr. Jones was asked about the things he complains about (he was not actually aware that he had sued the City of Montgomery, (Doc. 241-28 (Jones Dep.) at 84), but he knew what his upsets or grievances were. There were three:  (1) That he received a lot of tickets and wanted help concerning them (Ex. 2 to City's Supplementary Evidentiary Submissions at 71-74, 76-77); (2) that the judge

---

[20] Exactly how the probation itself injured her is a mystery since she testifies that when the Court entered the probation order, she never intended to comply and, in fact, never paid anything and never went to a single JCS appointment. (*See* Doc. 242 at ¶ 134; Doc. 241-25 (McCullough Dep.) at 192.) If it is the subsequent jailing consequent on the judge commuting her fines to a term in jail, then that is a purely judicial act, for which the City cannot be held liable.

"had locked me up for six months" (Ex. 2 to City's Supplementary Evidentiary Submissions at. 85); and (3) that he was shot with a rubber bullet or a bean bag by a bounty hunter for a bail-bonding company (Ex. 2 to City's Supplementary Evidentiary Submissions at 88). The incident with the bail bondsman is not part of any claim against anyone in this lawsuit. Counsel for the City then repeated and summarized his complaints:

> Q.  I'm going to try to put all your complaints together and you tell me if there are any more, okay? You had complaints about your tickets and about being locked up for six months by the judge, right?
> A.  Yes, ma'am.
> Q.  And you have a complaint about being shot by a bounty hunter and about the dreams that you have as a result of being locked up?
> A.  Yes, ma'am.
> Q.  Okay. Is there anything else?
> A.  That's it.

Those, when testifying in his own words, are all the claims he has. Mr. Jones identified the jailing about which he complains as being in February-June 2011 (Doc. 241-28 (Jones Dep.) at 201). (He was released on June 2, 2011, having served four (not six) months. The bounty hunter incident preceded the four-month jail time (Ex. to City's Supplementary Evidentiary Submissions 2 at 218-219, 222). He was quite specific and listed no complaint within the § 1983 statute of limitations. (*See* Doc. 242 (City's SOF at ¶ 179.) [21]

Now, however, Plaintiffs' counsel have crafted a declaration for Mr. Jones, in which they put into his mouth words about a different claim. As noted earlier, Mr. Jones can neither read nor write, and his memory is less than precise.[22] The three - the <u>only</u> three - matters which Mr. Jones complained about in his deposition were those listed above.

---

[21] Despite his counsel filing an errata sheet on November 23, 2019 for Mr. Jones, they did not suggest any omission of any other claims in his testimony, or error in his listing of them.

[22] For example, Mr. Jones testified that he served six months in jail on a commuted sentence. In fact, he serve four months in <u>2011</u> (Doc. 241-28 (Jones Dep.) at 199-200), which is a time-barred claim, although any such claim is not against the City of Montgomery.

Despite being put forward as a proposed class representative on all the JCS-City "conspiracy" or "scheme" claims, and all the due process claims associated with JCS probation, Mr. Jones testified that he had no recollection of being placed on JCS probation at all - and, then, he expressed no grievance about anything associated with JCS. (*See* Doc. 241-28 (Jones Dep.) at 100-101 (no memory of being placed on probation with JCS); at 103 (not even familiar with JCS); at 103 (no recall of being on a JCS installment payment plan).)  Even with prodding from Plaintiffs' counsel, Mr. Jones maintained that he had never heard of JCS (and that anything he "knew" about any entity collecting fines was second-hand (that is, he had been <u>told</u> about a system of collection through installment payments)). (*See* Doc. 241-28 (Jones Dep.) at 314-318.) While he often lacked funds to pay his tickets, his mother always paid them for him. (*See* Doc. 241-28 (Jones Dep.) at 107-108, 146-147.) He cannot remember whether he appeared in court (*see* Doc. 241-28 (Jones Dep.) at 163), nor whether or when he received tickets (*see* Doc. 241-28 (Jones Dep.) at 124, 314-318. He cannot recall that his license was suspended, although he has been ticketed several times for continuing to drive without a license. (*See* Doc. 241-28 (Jones Dep.) at 132.) On whatever occasions he went to court, with his mother, he always was appointed counsel. (*See* Doc. 241-28 (Jones Dep.) at 75.)

What <u>is</u> clear is that Mr. Jones' 2011 jailing[23] is what he is complaining about (*see* Doc. 242 (City SOF) at 179). While the complaint asserts that Jones worked during the four-month incarceration in 2011, he does not know if his work had anything to do with any jail-work $25 credit (the program was, as best as can be established, begun in late 2011, after Mr. Jones' release in June). (Doc. 241-28 (Jones Dep.) at 206; Doc. 241 (City SOF) at ¶ 185.) As was true of all commutees, he received a $25/day credit for sitting-out the fines (later raised to $50/day) which

---

[23] Mr. Jones recalls being jailed one other time, for one day, when he was held on a completely unrelated charge of pointing a gun at someone. (Doc. 241-28 (Jones Dep.) at 177-178.)

he is unable to distinguish from the work-credit which was also $25 per day. (Doc. 242 (City SOF) at 182.)

Thus, as to the claims which this individual Plaintiff actually asserts, they are all time-barred.

### Plaintiff Algia Edwards

Mr. Edwards was sentenced and assigned to JCS prior to 2011. His last interaction with JCS took place on May 2, 2011 (Doc. 241-24 (Edwards Dep.) at 299). Following that meeting, JCS sent Edwards a letter informing him that he had failed to fulfil his probation obligations and that a revocation hearing would be held on June 30, 2011. He did not appear in court, leading to a warrant, which was eventually executed in September 2012. His fines were commuted to jail time on September 19, 2012. All claims arising from Edwards' assignment to JCS, his payments, his JCS fees, and his experience with JCS until the termination of probation thus expired on June 30, 2013. Those claims, which he seeks to attach to the City, also expired as against the City, even if it were to be believed that the City controlled that JCS probation.

### Plaintiff Marquita Johnson

The end of Ms. Johnson's interaction with JCS occurred on February 9, 2012, and her sentence was later commuted to jail time. That sentence ended in January 2013 with her release. Thus, neither her claims against JCS nor against the judges occurred within two years of the filing of this complaint on July 1, 2015. Her statutory peonage claim is not time-barred, although it is otherwise due to be dismissed.

### Plaintiff Lavon Agee

Mr. Agee's JCS probation was terminated on March 2, 2011, and he had no dealings with JCS from that date forward. The warrant for failure to appear was not executed until June 13, 2013.

Mr. Agee's JCS/City claims are barred as falling outside the limitations period, which ended July 1, 2013.

### Plaintiff Christopher Mooney

Mr. Mooney's probation was revoked on July 27, 2012, and he was jailed on May 9, 2013; he was released on June 6, 2013, all outside of the July 1, 2013-July 1, 2015 time window. His statutory peonage claims survive.

### Plaintiff Hassan Caldwell

Mr. Caldwell asserts no jail work claims. His claim arising from his September 28, 2014 arrest, if any (he was not placed on JCS), whose contract had been terminated on June 30, 2014), would survive, but he asserts no claims that are now in this case. (He claims that his arrest was due to "targeting" or "profiling," but such claims have been dismissed.)

No fines assessed against Mr. Caldwell were commuted to jail time.

To the extent that there is a 10-year limitations period for the statutory peonage claims, those claims, as to all five of the Plaintiffs who worked, are subject to all the defects set out *infra* and in the City's Reply Brief on Plaintiffs' Motion for Partial Summary Judgment, and those arguments are adopted here.

Associated with the issue of the statute of limitations is Plaintiffs' argument that the pendency of the cases before Judge Proctor tolled the running of the statute. This is, again, one of the reasons why this Court is justified in rejecting Plaintiffs' border-less brief. The issue of tolling is one which affects Plaintiffs' claims against JCS, which was a party to the *Ray* case, but does not save the claims against the City of Montgomery. Montgomery was not a Defendant, and no class claims were made which would or could toll the statute for the separate claims now made against the City. The Plaintiffs' brief, containing extended arguments about tolling, does not differentiate

between the current Defendants, which is part of the evil of a brief of the sort Plaintiffs have filed, but this must be dealt with by JCS and need not be addressed by the City of Montgomery.

## VII.   *ROOKER-FELDMAN/HECK*

Without repeating the arguments made in the City's initial brief and that of JCS, a few points of emphasis bear noting:

*Rooker-Feldman* is a jurisdictional doctrine, which, in a general sense, bars a federal court from reviewing or revising a judgment or order of a state court. Much like Plaintiffs' casual brushing-aside of the *Ray* decision, Plaintiffs off-handedly attempt to brush aside the application of *Rooker-Feldman* (*see generally*, Doc. 256 (Plaintiffs' Brief) at 74, 81-82), where they make a cursory pass at disregarding the very relevant cases of *Thurman v. Judicial Correction Services, Inc.*, 760 F. App'x 733, 737 (11th Cir. 2019), and *Hamilton v. Judicial Correction Services, Inc.*, No. 2:18-cv-00933-RDP, 2019 WL 5963473, 2019 U.S. Dist. LEXIS 196289 at *4 (N.D. Ala., Nov. 13, 2019).

In order to evade the grasp of *Rooker-Feldman,* Plaintiffs quote the rubric that such doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."[24] But, of course, that is exactly what Plaintiffs are attempting to do. They complain, variously, that they should not have been sentenced to probation with JCS; that they should not have been ordered to pay the JCS fees; that the probation orders imposed restrictions on their liberty; that the court ordered them to jail upon commutation of their unpaid fines; that the court ordered them to jail without an adequate *Bearden* hearing; that the state

---

[24] The quotation, made without context, is from *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005).

court ordered them to jail without adequate counsel; that the state court, by an order or judgment, created a voluntary work program for credit.[25]

At every step of the way, Plaintiffs are complaining about an order or judgment by the Municipal Court, all of which orders were rendered prior to the commencement of the current district court proceedings, and invite - yea, demand - that this Court review and reject every one of those orders and judgments.

Apparently recognizing the blind alley into which their pleading excesses have led them, Plaintiffs now attempt to say that they are <u>not</u> inviting this Court's review and rejection of the Municipal Court's judgments. But, if Plaintiffs are not attacking their convictions, their probations, the terms ordered for their probations, the fees ordered to be paid, the orders of revocation, the commutations of their sentences, the creation of a work-credit program, or the release orders (where the work credit was calculated and applied), then what <u>are</u> they attacking? The asserted lack of an adequate *Bearden* inquiry and the asserted lack of counsel, are merely incidents forming part of the "wrongful" sentences, commutations, or probations.[26] As the *Finley* Court ruled, each jailee was complaining of one or more judicial acts, and "each jailee <u>could have appealed</u> the judges' acts concerning his probations, hearings, counsel and sentence." Yet, none did so, but are here asking this federal court to reject the convictions, the probations, the sentences, the commutations and all the parts of them. That is what *Rooker-Feldman* precludes, as a <u>jurisdictional</u> matter.

---

[25] While here, and in *Carter*, Plaintiffs assail the "window procedure" ordered by the Municipal Court, none of the *McCullough* Plaintiffs were assigned to JCS through that procedure, and they lack standing to base any claim on it.

[26] The City, at pages 8-10, *supra*, has listed Plaintiffs' efforts to pretend that they are not challenging their convictions, their probation orders (which contained the terms of probation, as noted by the *Finley* Court, including the monthly payments, fees and reporting obligations), the JCS fees or the commutation of their sentences. That effort simply fails. Without those challenges, Plaintiffs' entire case collapses.

Plaintiffs may assert that they "do not directly challenge the [probation] orders or fees" in an attempt to escape the holding of *Thurman*, but it is an assertion without any substance. They say they are, instead, complaining of "<u>Defendants</u>' (again, the undifferentiated plural) violations of Plaintiffs' constitutional rights committed in the process of collecting the fees." Isolated "constitutional violations" must somehow mean that Plaintiffs had to report to JCS on a monthly basis, that Plaintiffs had to stay current n the payments ordered or face revocation, or that Plaintiffs imagined that the uniforms and badges which JCS employees wore made them police officers.[27] While those things have nothing to do with any <u>City</u> policy, the requirements of keeping appointments and making the scheduled payments were all part of the probation terms ordered by the Municipal Court.

When Plaintiffs shift to address the impact of *Heck v. Humphrey*, 512 U.S. 477 (1994), they stumble over their own earlier efforts to evade *Rooker-Feldman*, when they then contend, ". . . [P]laintiffs challenge the procedures by which they were placed on probation, made to pay JCS fees and costs and ultimately jailed for non-payment - all without the required hearing to determine their ability to pay." (Plaintiffs' Brief at 85.) Yet, those "procedures by which they were placed on probation" were court orders by the Municipal Court, as were how they were "made to pay the JCS fees and costs," and certainly, as were how they were "ultimately jailed." <u>Every one</u> of those things Plaintiffs admittedly challenge (at least in the *Heck* section of their Brief) is, at bottom, a challenge to a judgment or order of the state court. No metaphysical dance around words can change that.

However hard Plaintiffs squirm, the application of *Rooker-Feldman* bars their claims.

---

[27] No Plaintiff has any evidence of any actual mistreatment by JCS - no arrests, no beatings, no midnight raids or any other lurid claim that might be put forward.

## VIII.   PEONAGE

The statutory peonage claims have been extensively briefed in the City's Reply to Plaintiffs' Motion for Partial Summary Judgment, and we will endeavor to spare the Court a full repetition. Again, however, a few points must be emphasized:

(1)      The creation of the program by which a jailee could volunteer for work and receive a credit which reduced the duration of a jail sentence was a judicial act.  "Sentencing a defendant, including giving an opportunity to reduce a sentence is a judicial act." *Finley*, 907 F.3d at 1331 (emphasis added).

(2)      The Plaintiffs'[28] entire position - now - is that they did not really mean it when they pled that they were underlined forced to work, and that they were, as the *Finley* Court noted, coerced by a threat of receiving a longer sentence. *See Finley*, 907 F.3d at 1328. And "The work program, according to the jailees, is forced labor because the City forced them to work to reduce their fines under threats of more unlawful jail time if they refused to work." (*Id.* at 1329.) No threat of more jail time ever occurred, and Plaintiffs do not even attempt to argue that there was any evidence of such.

Now, Plaintiffs are reduced to defining "forced labor" simply as a desire - common to all prisoners, it can be supposed - to get out of jail sooner. (Plaintiffs' Brief at 56.) Without openly admitting it, Plaintiffs have abandoned their claims of actual force or actual coercion through threats of misuse of legal process (such as adding to a sentence) - the colors under which they were sailing when they filed this action and then they briefed and argued *Finley*.

Given that each Plaintiff has, under oath, admitted that there was no force or coercion, that abandonment was necessitated. Instead, Plaintiffs have now filed conclusory declarations that just

---

[28] The five Plaintiffs who worked - McCullough, Johnson, Jones, Mooney and Agee.

assert, with no factual basis, that they felt forced because they wanted to get out sooner. They then go on to describe the concerns some of them had about being unable to care for their families, and, thus, their desire to get out of jail as soon as possible, such that they volunteered to work to obtain the extra credit.

It is hard to respond to such an argument that a mere desire to be out of jail is now to be defined as force or coercion within the meaning of the anti-trafficking and anti-peonage statutes. As set out in the City's Reply to Partial Summary Judgment, the labor must be "obtained by means of" harmful actions. Except for Plaintiffs' inherent claim regarding their sentence itself (which they characterize as unlawful[29]), there is <u>no</u> evidence of any kind of any harmful action or any threat to unlawfully increase a sentence, deprive a jailee of food or water, place them in solitary or anything else. As detailed in the Reply to Plaintiffs' Motion for Partial Summary Judgment, each of the five Plaintiffs acknowledges that they knew they were free to not work, without any adverse consequence.

The response to Plaintiffs' definition is difficult because that definition is not based on anything except their wishful thinking. There is nothing in the text of the statutes or in any legal precedent anywhere that supports such a definition, and, thus, there is no case law which exposes the imaginary nature of their claim. By that definition, 100% of all prisoners would be able to claim a peonage or TVPA violation for any work done, with or without a credit.

Plaintiffs' position would lead this Court into wholly uncharted waters, and should be rejected out of hand.

**(3)**     The same problem exists as to Plaintiffs' effort to translate a threat of harm to a jailee's family into meaning that the jailee's absence from her family is now to be construed as

---

[29] A classic *Rooker-Feldman* attack on a state court judgment.

unlawful coercion. The actual concept, of course, is quite different, and relates to extracting labor by threatening to injure a family member (a'la a gangster in some movie), none of which happened here.  No one threatened to harm Ms. Johnson's children; rather, the "harm" to those children, for example, was a purely collateral consequence of her being sentenced to jail by the court. There is no evidence that the jailers or City officials even knew Ms. Johnson had dependent children, much less that they threatened to injure such a child if she refused to work. To the contrary, the work-credit plan allowed Ms. Johnson, and the others, to get released sooner than would have occurred if there were no work-credit program at all.

(4)     No statutory claim lies against the governmental entity per se. That case law is set out in the City's Reply to Partial Summary Judgment. That rule does not preclude a claim against a government <u>official</u> or <u>agent</u>, but there are no such officials or agents sued here. It is the same outcome as was presented by *Iqbal*, where the Supreme Court ruled that the actual wrongful actor - a jailer, or U.S. Marshal or the like - who was alleged to have mistreated Mr. Iqbal could have been sued, but they were not.

No warden, no corrections officer, is sued or identified as someone who forced any Plaintiff to work, because, it is admitted, none did. It is the institutional system of credit put in place by the Court that is actually attacked, and that attack cannot be maintained.

Plaintiffs began by pleading that they were forced or unlawfully threatened - that is, that their work was obtained by means of such harmful actions - then they shifted to a definition that stands for the idea that no force or threats at all need be present, but a mere desire to be out of jail is enough, or that the collateral impact on a dependent child resulting from their mother's incarceration is enough. They tried to add a claim that the jail was an unpleasant place and that "bad jail conditions" indirectly "forced" them to work. That, too, was cut off by this Court. They

have now arrived at the last ditch, which requires doing violence to plain words, statutory text, and substantial precedent to try to re-cast their claim so as to avoid the necessary and inevitable end, whose hour has come.

The jail work credit program was, from the outset, deliberately mis-described by Plaintiffs as a forced labor program. When that false premise was shown to have no basis in fact, Plaintiffs have reached beyond the law, beyond logic and beyond the facts. For the above, and for all the reasons set out in the City's Reply to Partial Summary Judgment, which are adopted by reference here, summary judgment for the City is now due to be granted on all the peonage and trafficking claims.

## IX.    JUDGE HAYES

It is perhaps in the nature of a footnote to all the substantive argument, but a word is in order about Plaintiffs' virulent over-the-top attacks on Judge Les Hayes. Judge Hayes is no longer a party, and his counsel cannot speak on his behalf.

Those attacks, however, are of concern to the City, to the extent that Plaintiffs carelessly attribute Judge Hayes' plea arrangement with the Alabama Court of the Judiciary to the City, and, in doing so, mis-state what it was that the consent order actually agreed to.

The City of Montgomery was no part of the JIC/COJ proceedings and it never stipulated to anything, and there is no respondeat superior liability imposed on the City under *Monell*. The stipulation was personal to Judge Hayes and was not even intended to be evidence of some City policy or City control of the judiciary nor is it.

Throughout, Plaintiffs recite that the wrongdoer was Judge Hayes, who, they say, denied them *Bearden* hearings, did not appoint counsel, sentenced them to JCS probation, commuted sentences, etc. Even if all that were true - and it is not, nor is it part of any stipulation by Judge

Hayes - it ends there, as the *Finley* Court has ruled. Every bit of that has been found to be judicial, and not an act of the judge as some <u>City</u> policymaker. However colorfully Plaintiffs describe Judge Hayes' actions, even if taken as true, they pale by comparison to the activities of Judge Patten in the *Teagan* case (*Teagan v. City of McDonough, Ga.,* 949 F.3d 670 (11th Cir. 2020)), or Judge Ward in *Ray*. Yet, in both of those cases, the Eleventh Circuit adhered unwaveringly to the rule that the City does not and cannot control the courts, and cannot be liable for actions taken by them. Judge Hayes was accused of many things, generally by several of these same Plaintiffs, but at the end of the day, he agreed to a consent order that established only three things: (1) that in a number of instances he failed to conduct an adequate *Bearden* inquiry into some defendants' indigency; (2) that he did not maintain adequate records of his judicial actions, and (3) that he entered probation orders without an underlying suspended sentence. There is no particular finding in the COJ order that any of these seven Plaintiffs were among the affected persons. (Indeed, the evidence is that Judge Hayes was <u>not</u> the sentencing judge for several of the Plaintiffs, either on probation or commutation.)

The hyperbolic attacks on Judge Hayes are a side show, with no relevance to the questions presented here, and the Court should not be distracted by them.

<u>**CONCLUSION**</u>

The City stands alone and unique - there is nothing to support claims of conspiracy, direct municipal actions that led to any constitutional inquiry, or any other basis for liability under *Monell*, under the separation of powers, or under this Court's clear - and correct - message to Plaintiffs that they must provide direct evidence that the City was the moving force behind some injury to Plaintiffs. The City need not carry JCS' burden, nor Judge Hayes' burden either.

Separating out any distinct evidence or rationale against the City itself from the amorphous mass of Plaintiffs' brief is a tedious and unrewarding task, because it is all comingled, lumped into collective nouns ("Defendants" did this or that), and nowhere capable of isolation so as to allow analysis of the actual evidence - or lack thereof - against the City. There is, in fact, no such evidence, as the City's initial brief established, and Plaintiffs' response has provided none.

It is now time for this case to end, and for this Court to complete the work begun by *Finley*. The City respectfully urges that Motion for Summary Judgment is due to be granted.


Respectfully submitted this 9th day of March, 2020.


s/ Richard H. Gill_____
Richard H. Gill [ASB-7945-G70R]
Shannon L. Holliday [ASB-5440-Y77S]
Robert D. Segall [ASB-7354-E68R]
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347
gill@copelandfranco.com
holliday@copelandfranco.com
segall@copelandfranco.com

**Attorneys for Defendant City of Montgomery**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of March, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

| | |
|---|---|
| Martha I. Morgan<br>8800 Lodge Lane<br>Cottondale, Alabama  35453<br>mimorgan@yahoo.com<br><br>Harold C. Hirshman<br>Jennifer A. Barrett<br>Dentons US LLP<br>233 South Wacker Drive<br>Suite 5900<br>Chicago, IL  60606<br>harold.hirshman@dentons.com<br>jennifer.barrett@dentons.com<br><br>Stephen J. O'Brien<br>Dentons US LLP<br>One Metropolitan Square, Suite 3000<br>St. Louis, MO  63102<br>stephen.obrien@dentons.com<br><br>Greg Bass<br>Britney Wilson<br>National Center for Law and Economic Justice<br>275 Seventh Avenue, Suite 1506<br>New York, NY  10001<br>bass@nclej.org<br>wilson@nclej.org | Faya Rose Toure<br>Henry Sanders<br>Chestnut, Sanders & Sanders, LLC<br>P.O. Box 1290<br>Selma, AL  36702<br>fayarose@gmail.com<br>gpompey@csspca.com<br><br>Michael L. Jackson<br>Larry S. Logsdon<br>Wesley K. Winborn<br>Jonathan A. Griffith<br>Wallace, Jordan, Ratliff & Brandt, L.L.C.<br>P.O. Box 530910<br>Birmingham, AL  35253<br>mjackson@wallacjordan.com<br>llogsdon@wallacejordan.com<br>wwinborn@wallacejordan.com<br>jgriffith@wallacejordan.com<br><br>Wilson F. Green<br>Fleenor & Green LLP<br>1657 McFarland Blvd. N, Suite G2A<br>Tuscaloosa, AL  35406<br>wgreen@fleenogreen.com<br><br>R. Bernard Harwood, Jr.<br>Rosen Harwood, P.A.<br>2200 Jack Warner Parkway<br>Suite 200<br>Tuscaloosa, AL  35401<br>bharwood@rosenharwood.com |

s/ Richard H. Gill
Of Counsel