## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **ANGELA MCCULLOUGH**, et al., <br> individually and for a class of similarly situated persons, <br><br> *Plaintiffs*, <br><br> **v.** <br><br> **THE CITY OF MONTGOMERY**, et al., <br><br> *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) <br><br> **Case No. 2:15-cv-463-RCL** |

### MEMORANDUM OPINON

This is one of several cases to arise from the system of collecting traffic fines in Montgomery, Alabama. Under that system, the City's Municipal Court systemically jailed traffic offenders for failing to pay fines without inquiring into their ability to pay in violation of the Due Process and Equal Protection Clauses. *See Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983).

This case concerns the liability of the City of Montgomery and its contractors for their involvement in the system. The City entered a contract on behalf of itself and its Municipal Court with Judicial Correction Services, Inc. ("JCS"). Under the contract, JCS supervised misdemeanor probation for those on Municipal Court-ordered probation from June 2009 through June 2014. The City also operated the municipal jail, where traffic offenders who could not pay waited out — and worked off — their fines.

The plaintiffs are seven Montgomery residents. Each received traffic tickets in Montgomery, pleaded guilty to the underlying traffic offenses, and could not pay the assessed fine. The Municipal Court sentenced each plaintiff to probation with JCS and jailed him or her after JCS petitioned the court to revoke the probation. The Municipal Court failed to determine whether

any of the plaintiffs were indigent before jailing them. And while in jail, four of the plaintiffs worked and received credit against their fines for their labor.

The plaintiffs sued the City and JCS, on behalf of themselves and three purported classes of similarly situated individuals. Their operative complaint seeks damages under 42 U.S.C. § 1983 and two state law causes of action.[1]

Before the Court are motions for summary judgment filed by the City (ECF No. 240) and JCS (ECF No. 244) and a motion for partial summary judgment filed by the plaintiffs (ECF No. 247).

These motions present ten major questions:

1. Did the City and JCS violate the Thirteenth Amendment and federal anti-peonage laws by forcing some of the plaintiffs to work in the jail?

2. Does the *Rooker-Feldman* doctrine deny the Court jurisdiction to hear the plaintiffs' claims?

3. Does *Humphrey v. Heck* deny the plaintiffs' a cause of action under § 1983?

4. Are the defendants potentially liable under § 1983?

5. Did the plaintiffs validly state a claim for false imprisonment under Alabama law?

6. Did the plaintiffs validly state a claim for abuse of process under Alabama law?

7. Did the plaintiffs validly state a claim for malicious prosecution under Alabama law?

8. Are the plaintiffs' claims time barred?

---

[1] The plaintiffs also sued two City police chiefs, the City mayor, and the presiding judges of the Municipal Court. They also alleged violations of the Racketeer Influenced and Corrupt Organizations Act and of the Equal Protection Clause (for racial discrimination). The Court has dismissed those defendants and causes of action. Order (June 20, 2019) (ECF No. 186); Order 1–2 (Mar. 10, 2017) (ECF No. 132). The Court has also dismissed the claims of three plaintiffs who failed to attend their depositions. Order (Nov. 4, 2019) (ECF No. 231).

9. Is JCS entitled to qualified or quasi-judicial immunity?

10. Based on the facts in the Rule 56 record, are the defendants entitled to judgment as a matter of law on any of the plaintiffs' individualized claims?

For the reasons discussed below, the Court holds that:

1. The City and JCS did not violate the Thirteenth Amendment and federal anti-peonage laws;

2. The *Rooker-Feldman* doctrine denies the Court jurisdiction to hear the plaintiffs' unjust enrichment claim but not their § 1983 and false imprisonment claims;

3. *Humphrey v. Heck* does not deny the plaintiffs a cause of action under § 1983;

4. Defendants are potentially liable under § 1983, except that JCS and the City are not liable for conspiracy, JCS is not liable for failing to inform the plaintiffs of their rights, and the City is not liable for harms arising before it was on notice of JCS's practices;

5. The plaintiffs state a valid claim for false imprisonment under Alabama law, but only for imprisonment following their commutation hearings;

6. The plaintiffs state a valid claim for abuse of process under Alabama law;

7. The plaintiffs fail to state a valid claim for malicious prosecution under Alabama law;

8. The plaintiffs' claims are not time barred;

9. JCS is not entitled to qualified or quasi-judicial immunity; and,

10. Defendants' are entitled to summary judgment on Mr. Cadwell's *Bearden* claims.

Today, the Court also decided motions in a parallel case, *Carter v. City of Montgomery*, slip op., No. 2:15-cv-555 (M.D. Ala. July 7, 2020). *Carter* arises from the same pattern of events

as the plaintiffs' claims. For the sake of brevity, the Court will not repeat its analysis or discussion of the facts here other than as necessary.

Upon consideration of the motions, briefs, statements and counter-statement of uncontested facts, and evidentiary submissions, as well as all other papers of record, the Court will:

- grant summary judgment to JCS on Count III;

- grant summary judgment to JCS for all claims stemming from a JCS-City conspiracy or violations of the Fourth Amendment under Count V;

- deny summary judgment to JCS on all other aspects of Count V;

- grant summary judgment to the City and deny summary judgment to plaintiffs on Count VII;

- grant summary judgement to the City for all events before July 16, 2012 and to JCS and the City for all claims stemming from a JCS-City conspiracy under Count VIII;

- grant summary judgement to the City for all claims alleging Fourth Amendment violations under Count VIII;

- grant summary judgment to the City and JCS for Mr. Caldwell's claims under Count VIII;

- deny summary judgment to the City and JCS on all other aspects of Count VIII;

- grant summary judgment to JCS on Count XII for claims stemming from  arrests and imprisonments prior to a commutation hearing;

- deny summary judgment to JCS on Count XII for claims stemming from post-commutation detention

- deny summary judgment to JCS on Count XIII; and,

- grant summary judgment to JCS on Count XIV.

A separate order accompanies this memorandum opinion.

## I.   BACKGROUND

### A.  Factual Background[2]

#### 1.  Fines and Probation in Montgomery

The Court assumes familiarity with how the City, the Municipal Court, and JCS handled traffic offenses between 2009–14. *See Carter*, slip op. at 4–10.

In broad strokes, the Municipal Court sentenced traffic offenders who could not afford to pay their fines to probation with JCS. *Id.* at 5–6. JCS operated probation pursuant to an annual contract with the City. *Id.* at 6. JCS probation consisted primarily of facilitating extended payment plans, *id.* at 7, and probationers payed JCS monthly fees for that service, *id.* at 6. When a probationer could not make payments or missed appointments, JCS would petition the Municipal Court to revoke probation. *Id.* at 7. When the Municipal Court revoked a probation, it would "commute" the probationer's fines into a jail term: the offender would "sit out" his fine at the rate of $50 per day. *Id.* at 8. At revocation and commutation hearings, the Municipal Court routinely failed to inquire as to whether a defendant could pay his fines before sentencing him to jail time. *Id.* at 8–9. The City did not supervise JCS's operations, but evidence suggests that it may have been on notice of how JCS operated probation as early as July 2012. *Id.* at 10.

#### 2.  Work Credit Program in the Montgomery Jail

When the Municipal Court jailed people for failing to pay their fines, those inmates received credit against their fines for each day they spent in jail. Nixon Dep. 47:23–48:4 (ECF

---

[2] For convenience, the Court uses the following short forms throughout this opinion to cite to evidence in the Rule 56 record. Citations to "City Evid." refer to Evid. Submissions Supp. City's Mot. Sum. J. (ECF No. 241). Citations to "JCS Evid." refer to Evid. Submission Supp. JCS's Mot. Sum. J. (ECF No. 246). Citations to "Pls. Evid." refer to Pl.'s Compendium Doc. Exs. Supp. Pl's Mot. Summ. J. (ECF No. 252). The Court cites to depositions and declarations without reference to the evidentiary compilation in which they appear; it references the docket number only in the first citation to a deposition or declaration.

No. 251-1).  Inmates originally earned a $25 credit each day, but those arrested after July 13, 2012

earned $50.  *Id.* at 48:5–17; Pls. Evid., Ex. 6.

The Municipal Court also credited inmates $25 for each day they worked while in jail.

City's Answer ¶ 50 (ECF No. 138).  Inmates worked in the jail cleaning cells and common areas,

preparing meals, and laundering clothes.  Smith Dep. 35:19–23, 37:5–38:5 (ECF No. 251-7);

Hopkins Dep. 10:14–20 (ECF 251-6).  They also worked outside of the jail picking up litter on

highways and in parks and washing police cars.  Smith Dep. 50:19–51:6.  Four of the plaintiffs

worked while in jail; each of them declared "[a]t no time did I 'volunteer' to perform labor while

I was in jail.  I worked because if I did not work, I would have to spend more days in jail."

McCullough Decl. ¶ 13 (ECF No. 250-1); *accord* Agee Decl. ¶ 21 (ECF No. 250-2); Johnson Decl.

¶ 27 (ECF No. 250-3); Mooney Decl. ¶ 18 (ECF No. 250-5).

Jail employees assigned work to those inmates who wanted to participate in the work credit

program.  The plaintiffs variously describe putting their names on lists to work, Agee Dep. 421:12–

422:5 (ECF No. 241-29), or lining up to be selected to work, *e.g.*, McCullough Dep. 314:5–14

(ECF No. 241-25).  One plaintiff testified that he was not allowed to earn work-credit because the

jail employees engaged in favoritism in assigning jobs.  Edwards Dep. 296:14–17 (ECF No. 241-

24).  No plaintiff alleges that jail employees forced them to work through physical coercion,

solitary confinement, or threats of longer imprisonment.

### 3.  The Plaintiffs

#### (i)   *Levon Agee*

In 2010, the Municipal Court placed Mr. Agee on probation with JCS after he was unable

to pay his traffic tickets.  City Evid., Ex. 83.  When Mr. Agee missed appointments and failed to

make payments, JCS petitioned the Municipal Court to revoke his probation.  City Evid., Ex. 85.

Mr. Agee did not attend his revocation hearing, so the Municipal Court revoked his probation and issued a warrant for his arrest. City Evid., Ex. 34. In 2013, the Montgomery Police arrested Mr. Agee during a traffic stop and brought him before the Municipal Court. *Id.* The Municipal Court commuted Mr. Agee's fines to jail time. City Evid., Ex. 86. Mr. Agee spent twenty-eight days in jail until he was released on July 12, 2013. City Evid., Ex. 34.

While in jail, Mr. Agee put his name on a list to make himself available for work. *See* Agee Dep. 421:12–422:5. He acknowledges that he could have declined to work and that the only consequence of that decision would have been not receiving work-credit. *See id.* at 430:8–12. He also testified that on one occasion a jail employee directed him to clean an area without asking him to volunteer. *See id.* at 432:9–22. Mr. Agee worked on nineteen of the twenty-eight days he spent behind bars. See Pls. Evid., Ex. 23.

### (ii)   Hassan Caldwell

In 2013, the Municipal Court placed Mr. Caldwell on probation with JCS when he was unable to pay his traffic fines. JCS Evid., Ex. JJJJ at 4. When Mr. Caldwell missed appointments and failed to make payments, JCS petitioned the Municipal Court to revoke his probation. *Id.* Mr. Edwards did not attend his revocation hearing, so the Municipal Court revoked his probation and issued a warrant for his arrest. *Id.* In December 2013, the Montgomery Police arrested Mr. Caldwell during a traffic stop and brought him before the Municipal Court. JCS Evid., Ex. KKKK at 2. The Municipal Court allowed Mr. Edwards to be released on a bond. *See id.* at 4–7. The Municipal Court never commuted his fines to jail time. Caldwell Dep. 323:5–20 (ECF No. 241-27).

(iii)  *Algia Edwards*

In 2009 and again in 2010, the Municipal Court placed Mr. Edwards on probation with JCS

after he was unable to pay his traffic fines. City Evid., Ex. 52 at 10–13, Ex. 53 at 3–4.  When Mr.

Edwards missed appointments and failed to make payments, JCS petitioned the Municipal Court

to revoke his probation. City Evid., Ex. 52 at 2. Mr. Edwards did not attend his revocation hearing,

so the Municipal Court revoked his probation and issued a warrant for his arrest. *Id.* In 2012, the

Montgomery Police arrested him on warrants for unpaid tickets and brought him before the

Municipal Court. *See* JCS Evid., Ex. NNN at 2.  The Municipal Court commuted Mr. Edwards'

fines to jail time. *Id.* at 4–5.  Mr. Edwards served two days in jail before he was released on

September 20, 2012. *Id.* at 7.

Mr. Edwards did not work in jail. He testified that he was not allowed to earn work-credit

because the jail employees engaged in favoritism in assigning jobs. Edwards Dep. 296:14–17.

(iv)  *Marquita Johnson*

In 2011, the Court placed Ms. Johnson on probation with JCS after she was unable to pay

her traffic fines. City's Evid., Ex. 87.  When Ms. Johnson missed appointments and failed to make

payments, JCS petitioned the Municipal Court to revoke her probation. City Evid., Ex. 39.  Ms.

Johnson did not attend her revocation hearing, so the Municipal Court revoked her probation and

issued a warrant for her arrest. *Id.* In 2012, the Montgomery Police arrested Ms. Johnson during

a traffic stop and brought her before the Municipal Court. City Evid., Ex. 40; City Evid., Ex. 42.

The Municipal Court commuted Ms. Johnson's fines to jail time. JCS Evid., Ex. V.  Ms. Johnson

spent 279 days in jail until she was released on January 28, 2013. *See* City Evid., Ex. 41.

While in jail, Ms. Johnson asked jail employees to assign her work. Johnson Dep. 173:9–

20 (ECF No. 246-7).  She testified that she was free to choose not to work and would not have

8

suffered adverse consequences for that choice. *See id.* at 181:1–182:10. Ms. Johnson worked on 183 of the 279 days she spent in jail. *See* Pls. Evid., Ex. 29. While she was in jail, Ms. Johnson was unable to care for her children. Johnson Decl., ¶ 18.

> ### (v)   *Kenny Jones*

Mr. Jones has a "serious intellectual disability." Jones Decl. ¶¶ 3–4 (ECF No. 250-4). He cannot read, write, or maintain a regular job. *Id.* at ¶ 3. His only steady source of income is disability benefits. *See id.* at ¶ 3–4; Jones Dep. 43:11–12 (ECF No. 241-28).

In 2010, the Municipal Court placed Mr. Jones on probation with JCS after he was unable to pay his traffic tickets. JCS Evid., Ex. VVVV at 8. After Mr. Jones missed appointments and payments, JCS petitioned the Municipal Court to revoke his probation. *Id.* at 18. Mr. Jones did not appear at his hearing, and the Municipal Court revoked his probation.[3] *Id.*

In 2013, the Montgomery Police arrested Mr. Jones on warrants for unpaid tickets unrelated to his JCS probation. Pls. Evid., Ex. 37; *compare id. with* JCS Evid., Ex. VVV at 8 (listing different citation numbers). The Municipal Court commuted his sentence to jail time. Pls. Evid., Ex. 38. Mr. Jones served eight days in jail before he was released on May 10, 2013. *See* Plds. Evid., Ex. 40.

Mr. Jones's court records indicate that he worked while he was in jail. *Id.*

> ### (vi)   *Angela McCullough*

In 2010, the Municipal Court placed Ms. McCullough on probation with JCS after she was unable to pay her traffic tickets. City Evid., Ex. 67. Ms. McCullough never attended any appointments with JCS and never made any payments to JCS. City Evid., Ex. 66; *see also*

---

[3] The Municipal Court subsequently modified that order and took over supervision of Mr. Jones' probation itself. JCS Evid., Ex. VVVV at 19.

McCullough Dep. 192:1–6. JCS petitioned the Municipal Court to revoke her probation. City Evid., Ex. 68. Ms. McCullough did not attend her revocation hearing, so the Municipal Court revoked her probation and issued a warrant for her arrest. JCS Evid., Ex. RR. In July 2013, the Montgomery Police arrested Ms. McCullough on several warrants; some — but not all — of the warrants stemmed from tickets that had been assigned to JCS for probation. *See* City Evid., Ex. 70 at 1; City Evid, Ex. 67. Ms. McCullough was brought before the Municipal Court, which commuted her fines to jail time. City Evid., Ex. 70. She served twenty-one days in jail until she was released on July 22, 2013. City Evid., Ex. 71.

While in jail, Ms. McCullough lined up to request work assignments from jail employees. McCullough Dep. 314:5–14. Though she testified that she felt like jail employees ordered her to work, *id.* at 309:12–15, she acknowledges that she could have declined to work and not received work-credit, *id.* at 314:15–21.[4] Ms. McCullough worked on at least seven of the twenty-one days she served in jail. *See* Pls. Evid., Ex. 23. While Ms. McCullough was in jail, she was unable to care for her disabled son. McCullough Decl. ¶ 12.

### (vii)   Christopher Mooney

In 2011, the Municipal Court placed Mr. Mooney on probation with JCS after he was unable to pay his traffic tickets. City Evid., Ex. 74. When Mr. Mooney missed appointments and failed to make payments, JCS petitioned the Municipal Court to revoke his probation. City Evid., Ex. 75. Mr. Mooney did not attend his revocation hearing, so the Municipal Court revoked his probation and issued a warrant for his arrest. *Id.* In May 2013, the Montgomery Police arrested Mr. Mooney on several warrants; some — but not all — of the warrants stemmed from tickets that

---

[4] Ms. McCullough also describes a harrowing experience of standing suicide watch over another inmate. *See* McCullough Dep. 317:16–324:9. She performed that job in 2008, *id.* at 319:4, when she was in jail for a non-JCS related offense. She did not receive payment or work-credit for her watch duties. *Id.* at 328:13–19. Accordingly, that incident bears no relevance on any of the causes of action she pursues in this action.

had been assigned to JCS for probation. City Evid., Ex. 76; *see* City Evid., Ex. 74. The Municipal Court commuted Mr. Mooney's fines to jail time. City Evid., Ex. 76. Mr. Mooney spent twenty-eight days in jail until he was released on June 7, 2013. *See* Pls. Evid., Ex. 36.

While in jail, Mr. Mooney agreed to perform labor for what he understood to be some sort of credit against his fines. *See* Mooney Dep. 194:1–4, 195:2–8 (ECF No. 246-11). He testified that without the credit program, he would not have worked. *Id.* at 208:15–209:2. Mr. Mooney worked on twenty-two of his twenty-eight days in jail. *See* Pls. Evid., Ex. 35. While in jail, Mr. Mooney was unable to take care of his children. Mooney Decl., ¶ 16.

## B. Procedural History

The plaintiffs filed this lawsuit on July 1, 2015. *See* Compl. (ECF No. 1). They subsequently amended the complaint, alleging fourteen causes of action under federal anti-peonage, anti-racketeering and civil rights statutes and under state law. *See* Am. Comp. (ECF No. 32). In addition to suing the City and JCS, the plaintiffs sued four officials: the current and former City police chiefs, the mayor, and the presiding judge of the Municipal Court.[5]

The defendants moved to dismiss the case. The Court granted the motions in part, dismissing causes of action based on racial discrimination, violations of RICO, and false arrest for arrests carried out based on probable cause. *See McCullough v. City of Montgomery*, No. 2:15-CV-463 (RCL), 2017 WL 956362, at *17–18 (M.D. Ala. Mar. 10, 2017). It also held that JCS was not liable on the plaintiffs' anti-peonage claims. *Id.* at *12–13. The Court denied the motions on the other counts. *See id.* at *17–18. In particular, it held that plaintiffs had successfully pleaded claims under the Thirteenth Amendment and anti-peonage laws:

---

[5] During the appeal, Milton Westry replaced A. Lester Hayes, III as presiding judge and was thus substituted as the defendant.

11

> The Court sees the condition of peonage in the context of this complaint. Here, plaintiffs allege a modern day debtor's prison. Individuals sat out their debt at a preset rate that could be modified by working for the City. This is wholly distinct from sentences involving community service where individuals can continue to go about their daily lives and keep their jobs. Under defendants' understanding wherein the choice between work and continued incarceration is voluntary, it is not clear what would be involuntary.

*Id.* at *12. The Court also held that the mayor and police chief were not entitled to qualified immunity, *id.*, and that the judges were not entitled to judicial immunity, *id.* at *9–10.

The City and the officials appealed. The Circuit dismissed the City's appeal for lack of appellate jurisdiction. *McCullough v. City of Montgomery*, No. 17-11554-JJ, 2017 WL 4570538, at *1 (11th Cir. Aug. 17, 2017). Reaching the officials' appeal, it reversed the Court's decisions on immunity, holding that the judges were entitled to absolute judicial immunity, *McCullough v. Finley*, 907 F.3d 1324, 1332 (11th Cir. 2018), and that the plaintiffs had failed to plausibly allege facts that could overcome the mayor and police chiefs' qualified immunity, *see id.* at 1135. Accordingly, the Court dismissed the claims against the officials. Order (June 20, 2019) (ECF No. 186).

On remand, the City moved for judgment on the pleadings. It argued that the Circuit's decision to recognize the judicial immunity required the Court to hold that the judges' independent acts — and not the City's conduct — caused the plaintiffs' injuries. The Court agreed in part. It held that the City was not liable for issuing warrants or for failing to train some unspecified official in protecting the plaintiffs' rights under *Bearden* or in the providing plaintiffs with adequate counsel. *McCullough v. City of Montgomery*, No. 2:15-CV-463 (RCL), 2019 WL 2112963, at *6 (M.D. Ala. May 14, 2019). And it held that the City was not liable for the Municipal Court's bail schedule and appellate bond practices. *Id.* at *7. But the Court also held that the City was potentially liable for "constitutional torts stemming directly from the plaintiffs' placement on

probation and their interactions with JCS probation officers" as a party to the City-JCS contract. *Id.* at \*11. Thus, the Court dismissed all causes of action against the City except for Count VII (alleging violations of anti-peonage laws) and Count VIII (alleging constitutional torts resulting from City-JCS contract).

Accordingly, seven claims remain live in the case:

- Count III under § 1983 for violation of the Fourth Amendment against JCS:

- Count V under § 1983 for violation of *Bearden* rights against JCS;

- Count VII for violation of anti-peonage laws against the City;

- Count VIII under § 1983 for violation of *Bearden* rights and the Fourth Amendment against the City and JCS;

- Count XII for false imprisonment against JCS;

- Count XIII for abuse of process against JCS; and,

- Count XIV for money had and received against JCS.

The Court also granted a motion to dismiss, filed by the City and JCS, with respect to three of the original plaintiffs for failing to appear for depositions. Order (Nov. 4, 2019) (ECF No. 231).

Finally, the Court denied without prejudice plaintiffs' motion for class certification, reserving the question until after it lifted a stay on discovery. Order 2 (May 2, 2016) (ECF No. 95). And so, although the Court notes that the parties have conducted wide-ranging discovery, only the plaintiffs' individual claims are before the Court.

## II.   LEGAL STANDARDS

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant bears the burden of showing its entitlement to summary judgement; the movant,

however, must simply show that the non-movant has not produced enough evidence to meet his burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

In determining whether material facts are in dispute, the Court construes facts and makes inferences in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 379 (2007). "[W]hen conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (emphasis omitted). Facts, however, are disputed only if a reasonable jury could believe either side of the dispute. *See Scott*, 550 U.S. at 380. A fact is material if it is necessary to the Court's decision. *See United States v. Gilbert*, 920 F.2d 878, 883 (11th Cir. 1991).

## III.   ANALYSIS

### A. Issues Decided in Carter v. City of Montgomery

While the Court will separately address the claims and defenses unique to this case, it rests on its opinion in *Carter* to resolve the pending motions to the extent applicable. Specifically, the Court holds that:

- The *Rooker-Feldman* doctrine does not bar most of the plaintiffs' claims, but it does prevent the court from adjudicating their claim for restitution. *See Carter*, slip op. at 16–18.

- *Humphrey v. Heck* does not deprive the plaintiffs of a cause of action under § 1983. *See id.* at 18–19.

- The plaintiffs may assert claims under § 1983 based on *Monell* because a jury could find that both the City and JCS had a policy or custom that proximately caused the plaintiffs' substantive injuries; however, the city is only liable for events after July

16, 2012, and there is not enough evidence to support the existence of a conspiracy between JCS and the City. *See id.* at 23–27, 30–34, 36–37.

- The plaintiffs may assert claims under § 1983 against the City based on deliberate indifference to JCS's practices. *See id.* at 32–33.

- The plaintiffs' *Bearden* rights were violated. *See id.* at 37–38.

- JCS had no duty to inform the plaintiffs of their *Bearden* rights. *See id.* at 38.

- A jury could find JCS liable for wrongful imprisonment only for post-commutation detention. *See id.* at 39–40.

- JCS is not entitled to qualified or quasi-judicial immunity for its actions. *See id.* at 41–43.

## B. Peonage and Forced Labor

The plaintiffs allege that the City forced them to work in jail in violation of federal anti-peonage statues or the Thirteenth Amendment. The record does not support their claims.

Federal law criminalizes peonage and forced labor. 18 U.S.C. § 1581 criminalizes "return[ing] any person to a condition of peonage." Section 1589 of that title criminalizes knowingly obtaining or benefiting from forced labor. *See also* 18 U.S.C. § 1593A (criminalizing benefitting from violating anti-peonage laws). Congress has also provided an express civil cause of action permitting victims to sue those who violate federal anti-peonage laws. 18 U.S.C. § 1595.

Peonage is a form of involuntary servitude. *See United States v. Reynolds*, 235 U.S. 133, 143 (1914); *Clyatt v. United States*, 197 U.S. 207, 215–16 (1905). To state a claim for involuntary servitude, a plaintiff must prove he suffered physical or legal coercion. *See United States v. Kozminski*, 487 U.S. 931, 944 (1988). To state a claim for violation of the Thirteenth Amendment, a plaintiff must meet the same standard. *See id.*

In contrast, forced labor has a more capacious definition.  Labor is forced if it is obtained by means or threats of force or physical restraint, serious harm to the victim or another, abuse of the legal process, or schemes to make a victim believe he would suffer harm.  *See* 18 U.S.C. § 1589.  Serious harm includes "psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c).  Under § 1589, courts universally require that the defendant take (or threaten to take) actions that would constitute serious harm. *See, e.g.*, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir.), *cert. denied*, 139 S. Ct. 143 (2018); *Muchira v. Al-Rawaf*, 850 F.3d 605, 622–23 (4th Cir. 2017); *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).  Section 1589, though, does not forbid "permissible warnings of adverse but legitimate consequences." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012).  Accordingly, a person has forced another to work in violation of § 1589 if he takes (or threatens to take) actions that would cause serious enough harm to compel a similarly situated, reasonable person to work to avoid the harm.

The plaintiffs have not offered evidence of physical or legal coercion, so they cannot prevail against the City under § 1581 or the Thirteenth Amendment.

Nor can plaintiffs prevail on their claim that the City forced them to work in violation of § 1589.  Each plaintiff who worked in jail has declared that he or she did not volunteer to work, but rather that he or she worked to avoid spending more time in jail.  Some of the plaintiffs made similar statements in their depositions.   Additionally, Mr. Mooney testified in that had he not received credit towards his fine, he would not have worked.  No other evidence in the record supports the proposition that the plaintiffs worked involuntarily.  Rather, the plaintiffs describe a

system in which they asked corrections officers for the opportunity to work. *E.g.*, Johnson Dep. 173:9–23.  Indeed, one plaintiff testified that he was not allowed to work because the corrections officers reserved work for their favorite prisoners. *See* Edwards Dep. 296:6–17.  The plaintiffs do not say that they were ordered to work or punished for not working. *E.g.*, Johnson Dep. 181:1– 182:10.  Therefore, plaintiffs have failed to substantiate their allegation that they were forced to work.

This conclusion does not conflict with the Court's decision on the City's motion to dismiss. The Court saw allegations of modern-day peonage in the plaintiffs' complaint. *See McCullough*, 2017 WL 956362, at \*17.  The complaint alleged repeatedly that plaintiffs were "forced to" or "made to" work. *See, e.g.*, Am. Compl. ¶¶ 72 ("[Ms.] McCullough was forced to perform jail labor . . . ."), 84 ("[Ms.] Johnson was informed of and forced to accept alternative ways to perform jail labor in order to 'work off' her debt sooner."), 107 ("While in jail [Mr.] Agee was ordered to clean the bathrooms in the jail in order to reduce his debt and thus time served by $25 per day."), 150 ("[Mr. Mooney] was forced to perform jail work in order to exchange it for time so that he could be released earlier.").  But the record bellies those allegations.  Instead, it contains little to no support for the idea that City officials did anything to get inmates to work beyond offering work for which the Municipal Court gave credit.  Indeed, Mr. Edwards testified that he wanted to work and was not given a job.  The record would not allow a jury to conclude that that the City compelled the plaintiffs to work.

The plaintiffs also argue that the very existence of a program that offered poor inmates credit against their fines for work violates § 1589; the Court cannot accept that argument.  Section 1589(a) operates on those who obtain labor — here, the City.  The plaintiffs cannot show that the City engaged in any of the acts the statute prohibits.

First, plaintiffs offer no evidence of force or threats of force to compel them to work.

Second, defendants cannot rely on the statute's prohibition on physical restraint alone to render jailhouse work illegal. If the court took the statute's words literally, it could conclude that the City used physical restraint in jail to obtain labor from the plaintiffs. But "sterile literalism . . . loses sight of the forest for the trees." *New York Tr. Co. v. Comm'r*, 68 F.2d 19, 20 (2d Cir. 1933) (Hand, J.). Read in the proper context, only *unlawful* physical restraint triggers § 1589(a)(1). Congress enacted § 1589 as part of a sweeping package of anti-human trafficking measures. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub.L. 106-386 § 112(a)(2), 114 Stat. 1486. The statue clearly reaches broadly when it comes to a trafficker's unprivileged detention of a victim. But nothing indicates that Congress believed that lawful physical restraint would trigger the statue. Else a mother would commit a felony if she refused to allow her son to leave the house until he mowed the lawn. The statute does not require absurd results. Moreover, courts "ordinarily expect a clear and manifest statement from Congress to authorize an unprecedented intrusion into traditional state authority." *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (quotation marks omitted). And courts expect Congress to make evident when it intends to derogate from common law principles. *See United States v. Texas*, 507 U.S. 529, 534 (1993). Here, Congress offered no indication that the statute abrogates local governments' privilege to lawfully detain offenders on the order of a competent court. Nor would the Court lightly assume that Congress intended to transform ordinary jail-labor programs into felonious enterprises. Lawful restraint alone does not render labor forced.

Third, the plaintiffs cannot show that the City caused them or threatened them with serious harm for not working. To be sure, the plaintiffs suffered every day they remained in jail. But the

City did not cause that suffering: it did not make the plaintiffs poor or give them familial responsibilities. The plaintiffs therefore cannot demonstrate causation.

And fourth, the plaintiffs cannot point to an abuse of law or legal process under the statutory definition. The City employed no legal process against the plaintiffs that caused them to work. The Municipal Court ordered the plaintiffs on probation, revoked those probations, issued warrants, and jailed the plaintiffs. *Finley*, however, precludes holding the City responsible for the Municipal Court's judicial acts. *See Finley*, 907 F.3d at 1332. And while JCS potentially committed state-law abuse of process against the plaintiffs, *see infra* Section III.D.1, that legal process did not cause the plaintiffs to work.

Had the City had taken advantage of the plaintiffs' incarceration and the work-credit program by unlawfully forcing the plaintiffs to work, then it could be liable for violating § 1589. *See Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1277–78 (11th Cir. 2020). Absent some unlawful coercive act however, the City is not liable under § 1589.

Because plaintiffs cannot show an underlying violation of anti-peonage laws, the City is not liable for benefiting from plaintiffs' labor under § 1593A or § 1595.

Therefore, the City is entitled to summary judgment on Count VII.

## C. Fourth Amendment Claims

The plaintiffs do not contest summary judgment on Count III. *See* Pls.' Br. in Opp'n 17, n.4 (ECF No. 256). Accordingly, the City is entitled to summary judgment on the claim that Montgomery police violated the Fourth and Fourteenth Amendments by serving warrants for non-payment of debts.

Additionally, the plaintiffs attempt to tie a Fourth Amendment seizure claim to their *Bearden* claims. But that argument fails because it was the procedures that the Municipal Court

used to incarcerate the plaintiffs — not the act of arresting the plaintiffs — that violated plaintiffs' rights. The plaintiffs offer no support for this theory in their opposition to the defendants' motions for summary judgment. Accordingly, the defendants are entitled to summary judgment on the claim that the conduct underlying the *Bearden* claims also violates the Fourth Amendment.

### D. State Law Torts

#### 1. Abuse of Process

Under Alabama law, abuse of process requires (1) an ulterior motive, (2) the wrongful use of process, and (3) malice. *C.C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998). A use is wrongful if the defendant "somehow acted outside the boundaries of legitimate procedure." *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1025 (Ala. Civ. App. 1999) (quoting *Hagood*, 711 So. 2d at 951). If a plaintiff shows an ulterior motive and wrongful use of process, it satisfies the malice prong as a matter of law. *See id.* at 1026.

Here, the plaintiffs have produced enough evidence for a jury to find that JCS abused the probation orders. A jury could find that JCS abused the probation orders to profit by keeping non-compliant probationers on probation to continue extracting fees. *See Carter*, slip op. at 36 ("JCS ran a business premised on the fact that many traffic offenders in Montgomery could not afford to pay their fines. They extracted as much cash as they could from probationers — some of whom they knew to be disabled, unemployed, or dependent on government benefits — and then tossed them back to the Municipal Court."). That conduct could meet the elements of abuse of process.

#### 2. Malicious Prosecution

The plaintiffs' malicious prosecution claims fail. Under Alabama law, a malicious prosecution claim may be based only on a prosecution that terminates in the accused's favor.

20

*Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 183 (Ala. 2016). The plaintiffs all pleaded guilty to their traffic offenses. Therefore, they cannot satisfy one of the necessary elements of the claim.

### E. Statute of Limitations

The statute of limitations for § 1983 actions brought in Alabama is two years from when the plaintiff "knew or should have known of his injury and its cause." *Burt v. Martin*, 193 F. App'x 829, 830 (11th Cir. 2006); *see* Ala. Code § 6-2-38(l). The statute of limitations, however, may be extended if the defendant engages in a pattern of unlawful conduct. "The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007).

The plaintiffs filed this action on July 1, 2015; therefore, they may sue under § 1983 for injuries that accrued before July 1, 2013. The plaintiffs have offered enough evidence for a jury to conclude that JCS and the City engaged in a continuous series of violations that occurred before July 1, 2013. Accordingly, each plaintiff may maintain an action by pointing to harm he or she suffered after July 1, 2013.

Moreover, because each plaintiff would have been a putative class member in an action that alleged causes of action on behalf of a statewide class as of April 26, 2013, *see* Second Am. Complaint, *Ray v. JCS*, No. 2:12-cv-02819, (N.D. Ala. Apr. 26, 2013), they may bring claims *as individuals* for harms they suffered after April 26, 2011, *see Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1391 (11th Cir. 1998); *see also China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018) ("*American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations."); *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552–53 (1974).

The plaintiffs' claims as individuals are not time barred because they all suffered harms after April 26, 2013. The plaintiffs' claims as putative class representatives are not time barred if they suffered any harms after July 1, 2013; the Court will determine the temporal scope of the claims they may bring as class representatives when it considers motions for class certification.

### F. Defenses to Individual Plaintiffs' Claims

#### 1. Mr. Mooney

The City argues that because Mr. Mooney would have been arrested even without JCS-related cases on separate facially valid warrants, the City cannot be liable to him on any claim. A defendant is liable under § 1983 only if it is the but-for cause of the plaintiff's injury. *See Smith v. City of Oak Hill*, 587 F. App'x 524, 527 (11th Cir. 2014). And unlike a situation where joint tortfeasors are jointly liable for a harm, the non-JCS warrants provided an independent ground for arrest. Mr. Mooney fails to contest this argument and thus cannot not raise claims about his arrests. Mr. Mooney, however, raises claims against the City for *Bearden* violations: those claims stem from discrete sentences the Municipal Court imposed without due process. While some of Mr. Mooney's fines may have been commuted without JCS's actions, some of the fines were only commuted because JCS petitioned to revoke his probation. Those JCS-connected fines are at issue here, and other warrants and charges cannot sever the causal link between Mr. Mooney and JCS.

#### 2. Ms. McCullough

The City argues that because Ms. McCullough did not attend JCS appointments, she cannot succeed on her *Bearden* claims. JCS may be able to defend against Ms. McCullough's abuse of process claims on those grounds, but the Municipal Court imprisoned Ms. McCullough without a *Bearden* hearing as a proximate cause of JCS's actions. Ms. McCullough need not have attended a JCS meeting to be entitled to her *Bearden* rights.

22

The City also raises the same separate-warrant argument that it made against Mr. Mooney's claims against Ms. McCullough's claims.  The Court likewise rejects the argument.

### 3.  Mr. Caldwell

The City argues that because Mr. Caldwell's fines and costs were not commuted and he was not arrested for failure to appear at a JCS-noticed hearing, Mr. Caldwell cannot succeed on his *Bearden* claims.  Because Mr. Caldwell was not jailed for failure to pay fines, he cannot show that he was entitled to a *Bearden* hearing.  Accordingly, his claim under Count VIII must be dismissed.

### 4.  Mr. Jones

The City argues that because Mr. Jones could not remember interactions with JCS at his deposition, he cannot maintain an action for *Bearden* violations.  That callous argument fails.

To be sure, Mr. Jones could not recount details of his interactions with JCS, the Municipal Court, and the police.  *See* Jones Dep. 100:1–10, 103:6–20 (ECF No. 241-28).  But the record contains ample documentary evidence to allow a jury to support Mr. Jones allegations in the complaint.  *See, e.g.*, Pls. Evid, Exs. 38–40.  That Mr. Jones could not testify as to his treatment is not surprising: no one contests that he has a "serious intellectual disability."  Jones Decl. ¶¶ 3–4.  A jury could choose to credit the documentary evidence over Jones' understandable inability to testify about events.[6]  At minimum the material facts of whether JCS and the City deprived Mr. Jones of his rights are in dispute.  To suggest otherwise is to advocate for a rule that would deny

---

[6] Indeed, the City has recognized this point in an analogous context. *See* Br. Supp. Summ. J. 13, *Rudolph v. City of Montgomery*, 2:15-cv-57-RCL (M.D. Ala. Mar. 2, 2020) ("Because of the erratic nature of Ms. Brown's memory of events, the Court and the City must necessarily rely in many instances on the court records."); *id.* at 25–26 ("Mr. Williams, like Ms. Brown, is a long-time drug whose memory of the events surrounding his claims is imperfect. . . . Many of the basic facts thus necessarily come from Court records." (citation omitted)).

recourse to justice to people whose intellectual disabilities affect their memories. The Court will not countenance such a rule.

## IV.    CONCLUSION

Based on the foregoing, the ourt will:

- grant summary judgment to JCS on Count III;

- grant summary judgment to JCS for all claims stemming from a JCS-City conspiracy or violations of the Fourth Amendment under Count V;

- deny summary judgment to JCS on all other aspects of Count V;

- grant summary judgment to the City and deny summary judgment to plaintiffs on Count VII;

- grant summary judgement to the City for all events before July 16, 2012 and to JCS and the City for all claims stemming from a JCS-City conspiracy under Count VIII;

- grant summary judgement to the City for all claims alleging Fourth Amendment violations under Count VIII;

- grant summary judgment to the City and JCS for Mr. Caldwell's claims under Count VIII;

- deny summary judgment to the City and JCS on all other aspects of Count VIII;

- grant summary judgment to JCS on Count XII for claims stemming from  arrests and imprisonments prior to a commutation hearing;

- deny summary judgment to JCS on Count XII for claims stemming from post-commutation detention

- deny summary judgment to JCS on Count XIII; and,

- grant summary judgment to JCS on Count XIV.

Date: _____7 / 2 / 20_____

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge