**THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANGELA MCCULLOUGH, et al.,** | ) | |
| **ON BEHALF OF THEMSELVES,** | ) | |
| **INDIVIDUALLY, AND ON BEHALF OF A** | ) | |
| **CLASS OF ALL OTHERS SIMILARLY** | ) | |
| **SITUATED,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO: 2:15-CV-463-RCL-SMD** |
| | ) | |
| | ) | **CLASS ACTION** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE CITY OF MONTGOMERY, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .......................................................................................................................3

      A.     Procedural History .......................................................................................3

      B.     Facts Relevant to Class Certification .........................................................4

            1.     The City and JCS Contracted for Probation Services......................4

            2.     The Court Placed People on JCS When, and Only When,
                  They Could Not Pay Fines and Costs in Full...................................5

            3.     JCS Manipulated the Probation System to Maximize Its
                  Own Revenue ..................................................................................7

            4.     JCS Caused People to Appear Before the Court on
                  Unpaid Tickets...............................................................................10

             5.     The Court Had A Policy and Practice of Commuting
                  Fines to Jail Time Without Consideration of Ability to Pay .........13

            6.     JCS and the City Knew or Should Have Known of the
                  Court's Established Commutation Practices...................................14

      C.     Proposed Class Representatives.................................................................16

            1.     Plaintiff Levon Agee....................................................................16

             2.     Plaintiff Angela McCullough........................................................18

             3.     Plaintiff Algia Edwards................................................................19

             4.     Plaintiff Marquita Johnson...........................................................21

             5.     Plaintiff Kenny Jones....................................................................23

             6.     Plaintiff Christopher Mooney .......................................................25

             7.     Plaintiff Hassam Caldwell ...........................................................27

ARGUMENT ...........................................................................................................................29

I.     THE CLASSES ARE ASCERTAINABLE............................................................29

II.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(A) ..................34

     A.    Numerosity – Rule 23(a)(1) ........................................................................34

     B.    Commonality – Rule(a)(2)..........................................................................35

     C.    Typicality – Rule(a)(3) ...............................................................................38

     D.    Adequacy – Rule 23(a)(4)...........................................................................39

III.   PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(b)(3)................41

     A.    Common Legal and Factual Issues Predominate Over
          Individual Issues ........................................................................................42

          1.    Predominance is Satisfied as to Defendants' Liability
               On the *Bearden* Claim .................................................................43

          2.    Predominance is Satisfied as to JCS's Liability on the
               False Imprisonment Claim............................................................45

          3.    Predominance is Satisfied as to JCS's Liability on the
               Abuse of Process Claim................................................................49

          4.    Lost Liberty Damages Can Be Proven in One Proceeding on
               Behalf of All Members of the Proposed Classes ..........................50

          5.    JCS-Fee Damages Can be Proven in One Proceeding on
               Behalf of All Members of the Proposed Abuse of Process
               Class.............................................................................................52

     B.    A Class Action is the Superior Means of Adjudicating This
          Controversy................................................................................................53

          1.    Given the Complexity of the Case, Class Treatment
               Is More Likely to Benefit Class Members Than Individual
               Actions .........................................................................................53

2.      The Lack of Other Litigation Weighs in Favor of Class
        Certification .................................................................................55

3.      Resolving the Central Issues in a Single Proceeding Before
        This Court Will Serve Efficiency and Judicial Economy..............56

        C.      This Case Presents No Significant Management Difficulties...................57

IV.     CONSTITUTIONALLY SOUND NOTICE CAN BE PROVIDED TO
        MEMBERS OF THE CLASSES ...........................................................................61

V.      *MITCHELL* TOLLING DOES NOT AFFECT THE PROPOSED
        CLASSES ..............................................................................................................62

CONCLUSION.....................................................................................................................63

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alabama Coalition for Equity, Inc. v. Hunt,* ............................................................. 41
    CV-90-883-R, 15th Judicial Circuit Court, Montgomery Alabama

*Allapattah Servs. V. Exxon Corp,* ....................................................................... 44, 59, 61
    333 F.3d 1248, 1261 (11th Cir. 2003)

*Amchem Prod., Inc. v. Windsor,* ................................................................................... 54
    521 U.S. 591, 617 (1997)

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* .......................................................... 42
    568 U.S. 455, 469 (2013)

*Appleyard v. Wallace,* ................................................................................................... 38
    754 F.2d 955, 958 (11th Cir. 1985)

*Augustin v. Jablonsky,* ................................................................................................. 58
    819 F. Supp. 2d 153, 162 (E.D.N.Y. 2011)

*Ault v. Walt Disney World Co.,* ................................................................................... 38
    692 F.3d 1212, 1216-17 (11th Cir. 2012)

*Barnes v. Dist. of Columbia,* ........................................................................... 36, 52, 58, 59
    278 F.R.D. 14, 20 (D.D.C. 2011)

*Bearden v. Georgia,* ................................................ 1, 2, 4, 14, 15, 30, 32, 35, 37, 43
    461 U.S. 660, 672-73 (1983)

*Betances v. Fischer,* ................................................................................................... 52, 54
    403 F. Supp. 3d 212, 238 (S.D.N.Y. 2019)

*Bonner v. City of Prichard,* ........................................................................................ 30
    661 F.2d 1206, 1209 (11th Cir. 1981)

*Braggs v. Dunn,* ........................................................................................................ 34, 35
    317 F.R.D. 634, 654 (M.D. Ala. 2016)

*Briseno v. ConAgro Foods, Inc.,* ................................................................................ 31
    844 F.3d 1121, 1123 (9th Cir. 2017)

*Brown v. Electrolux Home Prods.,* ............................................................................. 42
    817 F.3d 1225, 1234 (11th Cir. 2016)

*C. C. & J., Inc. v. Hagood,* ............................................................................................ 49
    711 So. 2d 947, 950 (Ala. 1998)

*Carrera v. Bayer Corporation,* ........................................................................................ 32
    727 F.3d 300, 310 (3d Cir. 2013)

*Carriuolo v. Gen. Motors Co.,* ................................................................................... 29, 36
    823 F.3d 977, 984 (11th Cir. 2016)

*Carter v. City of Montgomery,* ............................................... 5, 8, 14, 15, 36, 44, 45, 48
    No. 2:15-cv-555 (M.D. Ala.)

*China Agritech, Inc. v. Resh,* ......................................................................................... 63
    138 S. Ct. 1800, 1804 (2018)

*City of Farmington Hills Employees Ret. Sys. v. Wells Fargo Bank, N.A.,* ................. 55
    281 F.R.D. 347, 357 (D. Minn. 2012)

*Cleveland v. City of Montgomery,* ......................................................................... 5, 6, 7, 15
    No. 2:13-cv-732 (M.D. Ala.)

*Covington v. Wallace,* ..................................................................................................... 52
    No. 2:12-cv-123:DPM, 2014 WL 5306720, at *2 (E.D. Ark. Oct. 15, 2014)

*Cox v. Am. Cast Iron Pipe Co.,* ...................................................................................... 35
    784 F.2d 1546, 1553 (11th Cir. 1986)

*Cox v. Porsche Fin. Servs., Inc.,* .................................................................................... 32
    330 F.R.D. 322, 330 (S.D. Fla. 2019)

*Crown Cent. Petroleum Corp. v. Williams,* .................................................................... 48
    679 So. 2d 651, 655 (Ala. 1996)

*Daniel v. Hodges,* ........................................................................................................... 51
    125 So.2d 726, 728 (Ala. Ct. App. 1960)

*DeBremaecker v. Short,* .................................................................................................. 29
    433 F.2d 733, 734 (5th Cir. 1970)

*Dellums v. Powell,* .......................................................................................................... 52
    566 F.2d 167, 208 (D.C. Cir. 1977)

*Dempsey v. Denman,* ....................................................................................................... 49
    442 So. 2d 63, 65 (Ala. 1983)

*DL v. Dist. of Columbia,* ........................................................................... 36
    86 F.3d 713, 724 (D.C. Cir. 2017)

*Doe v. Angelina Cty.,* ................................................................................. 44
    733 F. Supp. 245, 254 (E.D. Tex. 1990)

*Dolgencorp, Inc. v. Pounders,* .................................................................. 46
    912 So. 2d 523, 528 (Ala. Civ. App. 2005)

*Evans v. U.S. Pipe & Foundry Co.,* ......................................................... 35
    696 F.2d 925, 930 (11th Cir. 1983)

*Gagnon v. Scarpelli,* .................................................................................. 44
    411 U.S. 778, 786 (1973)

*Garcia v. E.J. Amusements of New Hampshire, Inc.,* ............................. 55
    98 F. Supp. 3d 277, 292 (D. Mass. 2015)

*George v. Academy Mortgage Corp. (UT),* .............................................. 62
    369 F. Supp. 3d 1356, 1368 (N.D. Ga. 2019)

*Graham v. R.J. Reynolds Tobacco Co.,* ................................................... 60
    857 F.3d 1169 (11th Cir. 2017)

*Grant v. Dolgen Corp.,* .............................................................................. 47
    738 So.2d 892, 894 (Ala. Civ. App. 1998)

*Green v. Mansour,* ...................................................................................... 38
    474 U.S. 64, 67 (1985)

*Griffin v. Carlin,* ........................................................................................ 40
    755 F.2d 1516, 1533 (11th Cir. 1985)

*Griffin v. Singletary,* ................................................................................. 63
    17 F.3d 356, 359 (11th Cir. 1994)

*Harper v. Hunt,* .......................................................................................... 41
    CV-91-117-R

*H.C. by Hewett v. Jarrard,* ....................................................................... 51
    786 F.2d 1080, 1088 (11th Cir. 1986)

*Heck v. Humphrey* ...................................................................................... 55

*Hoffer v. Jones,* .......................................................................................... 39
    323 F.R.D. 694, 698 (N.D. Fla. 2017)

*Hunter v. Beshear.*, ....................................................................................... 32
    No. 2:16-cv-798-MHt, 2018 WL 564856 at *4 (M.D. Ala. Jan. 25, 2018)

*In re HealthSouth Corp. Sec. Litig.*, ........................................................... 57
    261 F.R.D. 616, 646 (N.D. Ala. 2009)

*In re Nassau Cty. Strip Search Cases*, ....................................................... 56
    No. 99-CV-2844 (DRH), 2008 WL 850268, at *7 (E.D.N.Y. Mar. 27, 2008)

*In re Petrobras Sec.*, .................................................................................... 31
    862 F.3d 250, 265 (2d Cir. 2017)

*In re Visa Check/MasterMoney Antitrust Litig.*, ....................................... 60
    280 F.3d 123, 141 (2d Cir. 2001)

*Ingram v. The Coca Cola Co.*, ..................................................................... 39
    200 F.R.D. 685, 698 (N.D. Ga. 2001)

*J.W. v. Birmingham Bd. of Educ.*, ............................................................... 39
    No. 2:10-CV-03314, 2012 WL 3849032, at *9 (N.D. Ala. Aug. 31, 2012)

*Karhu v. Vital Pharm., Inc.*, .......................................................... 29, 31, 32
    621 F. App'x 945, 952 (11th Cir. 2015)

*Kerman v. City of New York*, ...................................................................... 51
    374 F.3d 93, 125-26 (2d Cir. 2004)

*Kinard v. E. Capitol Family Rental, L.P.*, ................................................. 54
    331 F.R.D. 206, 215 (D.D.C. 2019)

*Klay v. Humana, Inc.*, ......................................... 42, 43, 44, 50, 53, 57, 58, 59, 60
    382 F.3d 1241, 1250-51 (11th Cir. 2004)

*Kornberg v. Carnival Cruise Lines, Inc.*, .................................................. 38
    741 F.2d 1332, 1337 (11th Cir. 1984)

*Krakauer v. Dish Network, L.L.C.*, ............................................................. 32
    925 F.3d 643, 658 (4th Cir.)

*Kreuzfeld A.G. v. Carnehammar.*, .............................................................. 35
    138 F.R.D. 594, 599 (S.D. Fla. 1991)

*Lee v. Macon County Bd. of Educ. (Pickens County School System)*, ......... 41
    Case No. CV-70-BE-215-S (N.D. Ala.)

*McClendon v. Cont'l Grp., Inc.*, .................................................................................... 55
    113 F.R.D. 39, 45 (D.N.J. 1986)

*McCullough v. City of Montgomery.*,.................................................... 3, 13, 14, 49, 56
    No. 17-11554-JJ, 2017 U.S. App. LEXIS 28091, at *1 (11th. Cir. Aug. 17, 2017)

*McCullough v. Finley*,................................................................................................... 3
    907 F.3d 1324, 1332-35 (11th Cir. 2018)

*Menocal v. GEO Grp., Inc.*, .......................................................................................... 54
    882 F.3d 905, 915 (10th Cir.)

*Mitchell v. City of Montgomery*, .................................................................................. 16
    2:14-cv-00186-MHT-CSC (M.D. Ala.)

*Monell*, .......................................................................................................................... 55

*Morrisey v. Brewer*, ...................................................................................................... 44
    408 U.S. 471, 489 (1972)

*Mullane v. Cent. Hanover Bank & Trust Co.*, .............................................................. 62
    339 U.S. 306, 314 (1950)

*Mullins v. Direct Digital, LLC*,.................................................................................... 31
    795 F.3d 658, 660-61 (7th Cir. 2015)

*Murray v. Auslander*, .................................................................................................... 38
    244 F.3d 807, 811 (11th Cir. 2001)

*Napoles-Arcila v. Pero Family Farms, LLC*,............................................................... 35
    No. 08-80779-CIV, 2009 WL 1585970, at *6 (S.D. Fla. June 4, 2009)

*Navelski v. Int'l Paper Co.*, ..................................................................................... 59, 61
    244 F. Supp. 3d 1275, 309 (N.D. Fla. 2017)

*Ocwen Loan Servicing, LLC v. Belcher*,..................................................................... 31
    No. 18-90011, 2018 WL 3198552, at *3 (11th Cir. June 29, 2018)

*Otero v. Dart*, ............................................................................................................... 55
    306 F.R.D. 197, 207 (N.D. Ill. 2014)

*Pannell v. Reynolds*,.....................................................................................................
    655 So. 2d 935, 938 (Ala. 1994)

*Papapan v. Dometic Corp.*, ........................................................................................ 31
    No. 19-13242 (11th Cir.)

*Perry v. Schumacher Group of Louisiana*, ...................................................... 62
    2018 WL 2473721 (11th Cir. June 4, 2018)

*Ray v. JCS* ................................................................................................................. 5
    No. 2:12-cv-02819 (M.D. Ala., at 192:23-193:11

*Rikos v. Procter & Gamble Co.*, ....................................................................... 31
    799 F.3d 497, 525 (6th Cir. 2015)

*Rooker-Feldman*, ...................................................................................................... 55

*Roy v. Cnty. of Los Angeles*, ............................................................................ 52
    No. CV1209012, 2018 WL 3436887, at *3 (C.D. Cal. July 11, 2018)

*Sacred Heart Health Sys.*, ................................................................................ 42
    601 F.3d at 1170

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, ................................. 31
    821 F.3d 992, 996 (8th Cir. 2016)

*Seeligson v. Devon Energy Prod. Co., L.P.*, ............................................... 31
    761 F. App'x 329, 334 (5th Cir. 2019)

*Shoney's, Inc. v. Barnett*, ................................................................................... 49
    773 So. 2d 1015, 1025 (Ala. Civ. App. 1999)

*Smith v. Triad of Alabama, LLC*, .......................................................... 56, 57, 59
    No. 1:14-CV-324-WKW, 2017 WL 1044692, at *15 (M.D. Ala. Mar. 17, 2017)

*Taylor v. State*, ..................................................................................................... 44
    47 So. 3d 287, 290-91 (Ala. Crim. App. 1986)

*Thompson v. Jackson*, .......................................................................................... 36
    No. 1:16-cv-04217, 2018 WL 5993867, at *8 (N.D. Ga. Nov. 15, 2018)

*Thurman v. Judicial Correction Services*, .................................................. 15
    No. 2:12-cv-00724-RDP-TFM

*Turner v. Rogers*, .................................................................................................. 44
    564 U.S. 431, 449 (2011)

*Tyson Foods, Inc. v. Bouaphakeo*, .................................................................. 42
    136 S. Ct. 1036, 1045 (2016)

*United States v. Mojica-Leguizamo,* ................................................................. 44
    447 F. App'x 992, 996 (11th Cir. 2011)

*Valley Drug Co. v. Geneva Pharm.,* ................................................................. 40
    350 F.3d 1181, 1189 (11th Cir. 2003)

*Vega v. T–Mobile USA, Inc.,* ...................................................................... 35, 42
    564 F.3d 1256, 1267 (11th Cir. 2009)

*Venerus v. Avis Budget Car Rental, LLC,* ........................................................ 42
    723 F. App'x 807, 814 (11th Cir. 2018)

*Violette v. P.A. Days, Inc.,* ......................................................................... 55
    214 F.R.D. 207, 220 (S.D. Ohio 2003)

*Wal-Mart Stores, Inc. v. Dukes,* .................................................................. 36
    564 U.S. 338, 359 (2011)

*Walton v. Franklin Collection Agency, Inc.,* ..................................................... 50
    190 F.R.D. 404, 411-12, 2000 U.S. Dist. LEXIS 443, *19
    (N.D. Miss. January 11, 2000)

*Watts v. City of Montgomery,,* ............................................................ 5, 6, 7, 15
    No. 2:13-cv-733 (M.D. Ala)

*West v. City of Santa Fe,* ........................................................................... 44
    2018 U.S. Dist. LEXIS 144012, at *23-24 (S.D. Tex. Aug. 16, 2018)

*Williams v. Mohawk Indus., Inc.,* ................................................................. 57
    568 F.3d 1350, 1358 (11th Cir. 2009)

*Winston v. Jefferson Cnty.,* ................................................................... 55, 58
    No. 2:05-CV-0497-RDP, 2006 WL 6916381, at *12 (N.D. Ala. June 26, 2006)

## MISCELLANEOUS

*Newberg on Class Actions* § 3.3 & n.7 (5th ed.) .......................... 29, 30, 38, 54, 57, 58, 60, 61, 62

*Manual for Complex Litig. 4th* (Fed. Jud. Ctr. 2019) § 21.222 .................................................. 30

## PRELIMINARY STATEMENT

In July 2020, this Court found that the Montgomery Municipal Court "systemically jailed traffic offenders for failing to pay fines without inquiring into their ability to pay in violation of the Due Process and Equal Protection Clauses." ECF 269, at 1 (citing *Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983)). The Court recognized that Plaintiffs had experienced similar treatment. *Id.* And the Court determined that Defendants Judicial Correction Services, Inc. ("JCS") and the City of Montgomery must face trial to determine their liability for Plaintiffs' harms.

Plaintiffs all incurred traffic debt to the City of Montgomery that they could not afford to pay. As a result, the Montgomery Municipal Court placed each Plaintiff on "probation" with JCS, a private, for-profit corporation that contracted with the City to collect its traffic fines. JCS abused the probation orders to extract money from Plaintiffs, a substantial part of which it kept for itself. After bleeding Plaintiffs dry, JCS filed papers with the Montgomery Municipal Court seeking to revoke Plaintiffs' probation. When Plaintiffs came before the court, the judges failed to make constitutionally required ability-to-pay determinations and ordered six of the Plaintiffs to "sit out" their fines in jail at the rate of $25 or $50 per day. Plaintiff Caldwell escaped jailing only because his mother paid his JCS ticket debt in full. Plaintiffs lost money, liberty, and more.

Plaintiffs are only seven of the hundreds of low-income people aggrieved by Defendants' common courses of conduct. Over and over again from March 2009 through July 2014, JCS extracted as much money as possible from indigent traffic offenders before returning them to the Municipal Court for jailing in blatant violation of their core constitutional rights. And the City allowed the scheme to continue, pocketing a share of the funds collected though it had ample notice of Defendants' unlawful practices and could have terminated the contract. Because Defendants

applied the same systemic practices to each putative class member, Plaintiffs seek redress on behalf of all similarly situated individuals.

Plaintiffs seek certification of three Classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure:

(i)      A *Bearden* Class, represented by Plaintiffs Levon Agee and Angela McCullough, consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation, who: (1) had debt commuted to jail time in a JCS-supervised case after JCS petitioned the court to revoke probation; and (2) served any of that jail time on or after July 1, 2013;

(ii)     A False Imprisonment Class, represented by Plaintiffs Levon Agee, Angela McCullough, Algia Edwards, Marquita Johnson, Kenny Jones, and Christopher Mooney, consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation, who: (1) had debt commuted to jail time in a JCS-supervised case after JCS petitioned the court to revoke probation; and (2) served any of that jail time on or after July 1, 2009; and,

(iii)    An Abuse of Process Class, represented by Plaintiff Hassam Caldwell, consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation: (1) who at any time paid less than the minimum monthly payment ordered by the court; and (2) from whom JCS continued to collect or attempt to collect after July 1, 2013.

Plaintiffs move the Court to appoint Plaintiffs Agee and McCullough as representatives of the Bearden Class; Plaintiffs Agee, McCullough, Edwards, Johnson, Jones, and Mooney as representatives of the False Imprisonment Class; Plaintiff Caldwell as representative of the

Abuse of Process Class; and the National Center for Law and Economic Justice, Dentons LLP, Chestnut, Sanders & Sanders LLC, and Martha Morgan as counsel for the Classes. As set forth below, each of the requirements of Rule 23(a) and 23(b)(3) has been met, and Plaintiffs' motion should be granted.

## BACKGROUND

### A.    Procedural History

Plaintiffs filed their original class action Complaint on July 1, 2015, ECF 1, and an Amended Complaint on August 20, 2015. ECF 32. The Amended Complaint alleged fourteen causes of action against the City of Montgomery, JCS, and various individual actors including Judge Hayes, the presiding judge of the Montgomery Municipal Court. *Id.* Defendants moved to dismiss, and this Court granted the motions in part, dismissing causes of action based on racial discrimination, RICO, and false arrest for arrests based on probable cause, and allowing other claims to continue, including against the individual defendants. ECF 131.

Defendants appealed, and the Eleventh Circuit dismissed the City's appeal for lack of appellate jurisdiction, *McCullough v. City of Montgomery*, No. 17-11554-JJ, 2017 U.S. App. LEXIS 28091, at *1 (11th. Cir. Aug. 17, 2017), but reversed the decisions on immunity, finding the judges entitled to absolute judicial immunity and the individual city defendants entitled to qualified immunity. *McCullough v. Finley*, 907 F.3d 1324, 1332-35 (11th Cir. 2018). On remand, Defendants moved for judgment on the pleadings, and the court dismissed a number of additional claims. ECF 183, at 12-14; *McCullough v. City of Montgomery*, No. 2:15-CV-463 (RCL), 2019 U.S. Dist. LEXIS 82069, at *20-24 (M.D. Ala. May 14, 2019). The Court indicated that the parties should move forward with discovery and summary judgment briefing, and it deferred class certi-fication until after the resolution of summary judgment.

The parties briefed cross motions for summary judgment, which the Court granted in part and denied in part. ECF 269. Plaintiffs will proceed to trial against the City and JCS on *Bearden* violations and against JCS on state law torts of false imprisonment and abuse of process.

**B.      *Facts Relevant to Class Certification***

At all times relevant to this action, the Montgomery Municipal Court adjudicated criminal misdemeanors and traffic violations. Ala. Code 12-12-32, 12-12-51, 12-14-1. Judge Les Hayes served as the presiding judge. ECF 252-2 (Hayes Judgment, at 2). Defendants in the Montgomery Municipal Court often received fines and court costs in connection with their convictions or guilty pleas. ECF 252-2 (Hayes Judgment, at 2).

**1.      The City and JCS Contracted for Probation Services**

In 2009, and again in 2010, the City of Montgomery contracted with JCS, a for-profit probation company, to collect municipal court debt under the guise of "probation." ECF 241-9 (JCS 2009 Contract) and ECF 241-10 (JCS 2010 Contract). The 2009 and 2010 contracts had identical provisions and remained in effect until July 2014.

Montgomery's acting mayor signed the 2009 contract, ECF 241-9 (JCS 2009 Contract), and Montgomery Mayor Todd Strange signed the 2010 contract on behalf of the "CITY/COURT OF MONTGOMERY ALABAMA." ECF 241-10 (JCS 2010 Contract). The contracts bound the City of Montgomery, the City's Municipal Court, and JCS, and controlled the terms under which JCS operated its probation system in Montgomery. ECF 241-9 (JCS 2009 Contract); ECF 241-10 (JCS 2010 Contract). The 2010 contract provided that it would automatically renew in one-year increments unless terminated by either party upon thirty days' written notice. *Id.*

Under the contract, JCS supervised all defendants sentenced to probation in the Montgomery Municipal Court. ECF 241-9 at 2 (JCS 2009 Contract). As stipulated by Judge Hayes to the Alabama Judicial Inquiry Commission, and adopted by the Alabama Court of the Judiciary, JCS "acted as a service to monitor defendants solely in connection with the collection of outstanding fines and costs." ECF 252-2 at 4 (Hayes Judgment). The contract provided that "All fines, surcharges, and other fees shall be payable to JCS who will disburse monies to the City as directed by the Court." ECF 241-9 at 3.

Under the contract, the City paid JCS nothing. ECF 241-9 at 4. As consideration for JCS's services, the City and Court agreed that each probation order would include a $40 monthly probation fee and a one-time $10 set-up fee. *Id*. JCS made 100% of its contractual revenue and profit from these fees. *Id.*; *see* Ex. 3 (Colleen Ray Dep., *Ray v. JCS*, No. 2:12-cv-02819 (N.D. Ala., at 192:23-193:11) (JCS manager for the State of Alabama acknowledging that JCS is an offender-paid system).

## 2. The Court Placed People on JCS When, and Only When, They Could Not Pay Fines and Costs in Full

Clerks and magistrates at the municipal court pay window assigned people to JCS through a specialized procedure. ECF 261-2 (Nixon Dep., *Carter v. City of Montgomery*, No. 2:15-cv-555 (M.D. Ala.), at 135:16-20); *see also* ECF 246-12 (Nixon Dep., *Cleveland v. City of Montgomery,* No. 2:13-cv-732 (M.D. Ala.) / *Watts v. City of Montgomery,* No. 2:13-cv-733 (M.D. Ala.) ("*Cleveland-Watts*") at 40:21-41:5); ECF 246-97 (General Order 2013-0001).

People who pled guilty at the window had the option to pay the ticket in a single lump sum or—if they could not do that—go on JCS. Ex. 4 (Tolbert Dep. 41:6-16); ECF 246-97 (General Order 2013-0001); ECF 257-101 (JCS Standard Operating Procedures). General Order 2013-0001 directed that persons owing less than $250.00 could receive one 30-day extension on payment of

their traffic tickets, upon approval by a Court Operations Supervisor. ECF 246-97 (General Order 2013-0001). Those who could avoid JCS by paying in full did so. Shortly after JCS began operations, Ken Nixon, the court's administrator, reported to his boss, Mayor Strange, that "numerous citizens are electing to pay their tickets as opposed to going on a payment plan with JCS" and that the new system "should result in an increase in monthly revenues, in that citizens are only given extensions on a limited basis." EFC No. 257-46 (Nixon-Strange email).

Nobody could get a payment plan at the window without assignment to JCS. ECF 261-4 (Nixon Dep., *McCullough*, at 204:6-11). Window personnel "would not discuss indigency at all," even if the person said they could not pay the traffic tickets. ECF 246-12 (Nixon Dep., *Cleveland-Watts*, at 172:12 – 173:1). The JCS Standard Operating Procedures for the Montgomery Municipal Court demonstrate JCS's knowledge that the court placed people on probation only when they lacked sufficient funds to pay in full. ECF 257-101 (JCS Standard Operating Procedures, Sec. 21, Court Procedures) ("Once the clerk has determined that a defendant cannot pay in full they will instruct them to come to the JCS office located in the courthouse.").

The clerks could assign people to JCS without judicial involvement so long as they owed less than $1,500 and were not already with JCS or in good standing with JCS. ECF 246-97 (General Order 2013-0001). People who requested a payment plan but did not meet these conditions would go before the judge to consider possible JCS placement. *Id.*

JCS provided the court with form probation orders. ECF 252-2 (Hayes Judgment at 5). These orders, whether issued from the window or by a judge, all contained the bargained-for requirement that the probationer pay a $10 start-up fee and $40 per month in supervision fees on top of monthly installment payments. *See, e.g.,* ECF 246-26 (Johnson Order of Probation); ECF 246-40 (McCullough Order of Probation); ECF 246-68 (Mooney Order of Probation); ECF 246-

88 at 2 (Caldwell Order of Probation); ECF 257-91 (Edwards Order of Probation); ECF 246-100 at 8 (Jones Order of Probation); ECF 246-82 (Agee Order of Probation).

JCS provided a grace period by which people placed on probation could pay the full amount of the debt and avoid the $40 monthly fee. In the 2009 and 2010 contracts, the grace period was one week. ECF 241-9, at 2 (2009 Contract). JCS's Standard Operating Procedures extended the grace period to thirty days. ECF 257-101. By definition, all probationers who incurred the $40 monthly probation fee did not pay their tickets within thirty days of assignment to probation.

### 3. JCS Manipulated the Probation System to Maximize Its Own Revenue

Whether issued at the window or before a judge, JCS set the terms of the probation orders, including the amount of monthly payments. ECF 257-101 (JCS Standard Operating Procedures, Cases Received from Magistrates); ECF 257-89 (JCS Standard Operating Procedures, Cases Received from the Court); ECF 261-2 (Nixon Dep., *Carter* at 145:15-20). The Municipal Court judges did not decide the payment rates, amounts, or duration of payments. ECF 246-6 (Hayes Dep., *Cleveland-Watts,* at 106:14-107:15; 107:21-108:1); ECF 246-13 (Westry Dep., *Cleveland-Watts* at 104:01-107:02). JCS calculated the payment amounts as follows: "Add the amount of fines, court costs and restitution payments, divide that number by number of months the defendant has been sentenced to probation minus one month. Take the amount derived and add the monthly probation fee. Round the amount up to the nearest $5." ECF 246-98 at 15 (JCS Training Manual). The defendant's income and ability to pay did not factor into the calculation. *Id.*

JCS's training manual stated that monthly payments were "not to be less than $135/ $140/$145 monthly, unless a specified amount is ordered by the Judge." ECF 246-98 at 15. Regardless, "Company policy is to try to never make payments less than $85 per month." *Id.*; see also ECF 261-5 (Colleen Ray Dep., *Ray v. JCS*, at 88:4-5). The JCS Training Manual instructed

staff that on the defendant's first appointment, the $10.00 set-up fee "should be paid." ECF 246-98 at 125. It further stated: "The remainder of the payment [from the defendant] should be split between Fee and Fines, with 30% of the payment being credited to the 'Fee' and 70% of the payment being credited to the 'Fines.'" *Id*. In February 2013, JCS surreptitiously sought "to increase the percentage of probation fees to a 50/50 split." ECF 257-53 (Sanders Letter).

JCS's financial data shows that it collected more for itself in fees than it disbursed to the City of Montgomery in fines. From 2010-2014, JCS collected $15,514,655 for itself and $14,680,458.57 for the City of Montgomery. ECF 257-54 (JCS financial data).

More than 90% of payments JCS received were for less than the amount specified in the probation order. Rubens Dec. ¶ 31. When probationers paid less than the full amount, JCS decided for itself how to allocate the money between fees and fines. *See generally* part C, *infra*. The manual did not instruct JCS employees to ask why a probationer could not make a full payment. ECF 246-98. Nevertheless, JCS's records contain evidence that many class members lacked the ability to pay because they were unemployed or on disability. *Carter v. City of Montgomery*, 2020 U.S. Dist. LEXIS 118755, at *36 (M.D. Ala. July 7, 2020) (describing JCS records of people who were "unemployed, disabled, or receiving Supplemental Security Income benefits"). JCS did not modify its collection efforts based on probationers' inability to work or reliance on protected benefits as their sole source of income. ECF No. 246-4 (Ennis Dep., *Ray* at 178:12–181:19).

The training manual demonstrates the methods JCS used to string people along on probation, earning more monthly fees for itself. The manual instructs that people who bring less than $135/$140/$145 to a monthly appointment must have appointments set more frequently, with goals of paying "$70/$70/$75 bi-weekly" or "$35/$35/$40 weekly." ECF 246-98 at 73. The

weekly appointments were extremely burdensome because of long waits at the JCS office. ECF 259-4 (Johnson 2/2020 Decl. at ¶ 5); ECF 259-1 (Agee 2/2020 Decl. at ¶ 5).

The section of the JCS training manual called "Working A Typical Case," ECF 246-98 at 66, explains what to do when people miss appointments: call and hound them to come back in. The "Failure to Report" list had to "be produced and worked each day." *Id.* at 88. The goal was to get the person to come in and make a payment. *Id.* at 91 ("Before the call, determine the amount to be brought to the next appointment."). Even if the person could not bring in any money, JCS would set another appointment while pressuring them to find ways to come up with some money. ECF 259-1 (Agee 2/2020 Decl. at ¶ 6). Plaintiffs had to endure threats of arrest and jail from JCS staff if they did not make their assigned payments. ECF 259-4 (Johnson 2/2020 Decl. at ¶ 4); ECF 259-1 (Agee 2/2020 Decl. at ¶ 4). As Plaintiff Marquita Johnson recalled, "The first time I went to the JCS office, an employee there told me that if I didn't make my payments on time she would issue a warrant for my arrest. I understood that meant I would go to jail." ECF 259-4 (Johnson 2/2020 Decl. at ¶ 4). Some JCS employees wore badges and handcuffs, leading to the reasonable belief that they were police officers who could perform arrests. ECF 259-4 (Johnson 2/2020 Decl. at ¶ 7-8); ECF 259-1 (Agee 2/2020 Decl. at ¶ 7). As long as people made some appointments and paid any small amount of money, JCS kept them on probation, racking up more fees. ECF 246-83 at 3-4 (Agee ProbationTracker); ECF 257-93 at 7-10 (Edwards ProbationTracker); ECF 246-23 at 3-4 (Johnson ProbationTracker); ECF 246-100 at 4 (Jones 4 (ProbationTracker); ECF 246-69 at 5-6 (Mooney ProbationTracker).

If a person missed two appointments, JCS would send the "failure to report" or "FTR" letter, a JCS form stored in ProbationTracker. ECF 246-98 at 91. The FTR letter included yet another appointment date and threatened arrest if the person did not appear with payment. *Id.* at

94. The FTR letter did not explain what the person should do if they could not report because of family or work obligations or if they lacked the money to pay. *Id.*

If a person failed to respond to the FTR letter, JCS instructed probation officers to send a "Delinquency Letter." The delinquency letter included another appointment and a demand for payment. *Id.* at 103. It threatened to return the person to court and explained, "If you are unable to bring this amount please bring as much as you can. This will help you demonstrate to the court that you are making progress towards successful completion of your probation." *Id.*

**4.  JCS Caused People to Appear Before the Court on Unpaid Tickets**

If the person did not respond to the delinquency letter, or if FTR letters were returned as undeliverable, JCS could find the person in violation of probation. JCS would change the case status to "VOP" (Violation of Probation), schedule a court date, and generate a notice to show cause or petition to revoke probation. *Id.* at 104. VOP form letters contained the following warning, in boldface: "Note that a failure to appear in court on the above date will result in a warrant being issued for your arrest." *See, e.g.,* ECF 246-85 (Agee VOP Letter). Probation officers had the option to add a personal message to the letter encouraging the person to avoid revocation by making a partial payment. ECF 246-98 at 106, 108.

A form "Petition for Revocation of Probation and Statement of Delinquency Charges" accompanied the VOP letter. ECF 246-98 at 104, 106. The form petition requested that the defendant's probation be revoked and a warrant issued for their arrest. *See, e.g.,* ECF 246-101 at 12 (McCullough "Petition for Revocation of Probation and Statement of Delinquency Charges"). The form petition did not include a statement that the defendant had willfully failed to pay. *Id.* The petitions would allege appointments missed and fines and fees unpaid but omitted exculpatory

information in its files that demonstrated the probationer's genuine efforts to comply. *See generally* part C, *infra*. Neither the VOP letter nor the Petition for Revocation notified people that they had a right to an ability to pay determination or a waiver of JCS fees if unable to pay. *E.g.* ECF 246-101 at 12 (McCullough).

On the hearing date noticed in the petition for revocation, JCS presented the petition to the court. If the person appeared, the JCS probation agent would demand payment to have the hearing dismissed. ECF 246-98 at 117. The training manual did not allow for an alternative to incarceration for those who lacked the ability to pay. *Id.* The choice was payment, jail, or payment *and* jail. *Id.* The training materials provided a sample recommendation in the event the JCS officer moves forward with the hearing: "Your Honor, I recommend the defendant serve 5 days in jail and pay at least $145 to be released." *Id.*

JCS provided specific training concerning what information to present in court. The training manual cautioned that JCS employees should "[r]efrain from providing opinion. Probation Officers are not therapists or attorneys and should stick to the facts of the case." *Id.* at 9. The facts to which the probation officer had to "stick" consisted of: the date the defendant was placed on probation, the number of months the defendant was on probation, the charges, the beginning balance, the amount paid and the amount owed (including fees to JCS), the date and amount of the last payment, missed appointments, and "any other information that would be pertinent to the case," which the manual defined as "any classes not attended by the defendant, community service not performed, etc." *Id.* at 10. "The facts of the case" did not include information pertaining to the defendant's income and ability to pay, nor did it include information about the appointments the defendant had attended and payments they had made. *Id.* The sample ProbationTracker file included in this section has large black arrows next to the information the probation officer should

- 11 -

present to the court. *Id.* at 11. No black arrow points to the note stating that the defendant was "looking for employment." *Id.* at 12. JCS thus trained its employees to withhold from the court relevant information in its files that demonstrated lack of willfulness and inability to pay. *Id.* Presumably, providing this critical information to the court would have corresponded to the prohibited role of "therapist."

If the person did not appear at the noticed hearing, as often occurred, JCS presented the petition or notice to show cause to the court on an *ex parte* basis, and a warrant would issue. ECF 246-17 (Ray Decl. at ¶ 9). The court did not revoke Plaintiffs' probation at this stage. Rather the petition ordered that a revocation hearing be set and that JCS serve the defendant with notice of the hearing. *See, e.g.,* ECF 246-85 (Agee Petition to Revoke). This JCS never did. There is no evidence of record that JCS subsequently served any document setting a probation revocation hearing on a specific date. Instead, JCS waited for the police to execute the warrant, which typically occurred months or even years later. ECF 246-83 at 3-4 (Agee ProbationTracker); ECF 246-38 at 3 (McCullough ProbationTracker); ECF 257-93 at 7-10 (Edwards ProbationTracker); ECF 246-23 at 3-4 (Johnson ProbationTracker); ECF 246-100 at 4 (Jones 4 (ProbationTracker); ECF 246-69 at 5-6 (Mooney ProbationTracker). When people were brought in on warrants, Judge Hayes and the other judges of the municipal court still did not hold probation revocation hearings. Instead, the judges demanded payment. ECF 246-6 (Hayes Dep. at 29:18-23) ("I tell the defendants, as well as anyone that may be with them, that I will give them a ballpark estimate in the event that their fines and costs are commuted; but that that can be paid, and subsequent to payment, they will be released.").

**5.      The Court Had A Policy and Practice of
          Commuting Fines to Jail Time without
          Consideration of Ability to Pay**

When people appeared before the court on unpaid tickets—whether by means of a

warrant, a petition for revocation of probation, or a notice to show cause—the court followed the

same procedure. ECF 246-6 (Hayes Dep. at 18:9). The Court asked whether the defendant had the

money to pay. *Id*. at 9:6-10:3; 29:18-23. If the defendant did not, the Court "commuted" their

sentences to jail time. ECF 251-1 (Nixon Dep., *McCullough*, at 86:16-87:09); ECF 246-6 (Hayes

Dep. at 17:21-18:14). Prior to August 2012, people received credit against unpaid fines and costs

at the rate of $25 per day. ECF 251-1 (Nixon Dep., *McCullough*, at 48:5-48:8); ECF 252-5 (Hayes-

Nixon Email). People arrested on or after August 6, 2012, received credit at the rate of $50 per

day. ECF 251-1 (Nixon Dep., *McCullough*, at 48:9-48:17); ECF 252-6 (Williams-Barnes Email).

When commuting sentences to jail time, Judge Hayes and the other judges of the mu-

nicipal court did not comply with Rule 26.11 of the Alabama Rules of Criminal Procedure. ECF

252-2, at 3 (Hayes Judgment). The judges did not inquire whether the defendant had the ability to

pay, did not determine the reasons the defendant did not pay, nor did they consider alternatives to

incarceration. *Id.* Judge Hayes did not make use of Alabama's standard court form to allow de-

fendants to demonstrate indigency. ECF 246-6 (Hayes Dep. at 88:10-22 ); ECF 246-12 (Nixon

Dep., *Cleveland*, at 88:4-12). Nor did he inform defendants that they could not be jailed if they

could not afford to pay their fines. ECF 246-6 (Hayes Dep. at 40:10-14; 42:15-21). Judge Hayes

did not agree with that statement. *Id.*

When commuting sentences, the judges did not enter a signed order stating the reasons

for the court's ruling. ECF 252-2 at 5 (Hayes Judgment). Nor do oral records containing such

- 13 -

reasoning exist.[1] *Id.* Instead, the bailiff or clerk created the "jail transcript" for the benefit of the jail, which indicated for each charge the number of "mandatory" days (those days that were part of a criminal sentence) and the number of commuted days. *Id.* at 5-6. The jail transcript reflected the fact of the commutation, but not any reasons for it. ECF 251-1 (Nixon Dep., *McCullough*, at 88:19-89:8); ECF 251-2 (Westry Dep. at 41:6-22, 44:2-45:5).

### 6. JCS and the City Knew or Should Have Known of the Court's Established Commutation Practices

The Montgomery Municipal Court's commutation practices long pre-dated the City's contract with JCS. Judge Hayes began commuting sentences when he first came onto the bench in 2000. ECF 246-6 (Hayes Dep. at 84:4-8). Other municipal court judges had similar longstanding commutation practices. ECF 261-2 (Nixon Dep., *Carter*, at 147:15-148:3). The court's commutation practices were "not a secret to the court staff." *Id.* at 151:2-12. Nor were they a "kept secret" from "the police force or the jailers or . . . anybody within the City[.]" *Id.* at 160:21-161:21.

JCS understood the commutation process very well. Hundreds of ProbationTracker files dating from before February 2012 reference commuted sentences. Rubens Dec. ¶ 23. JCS staff worked in the courthouse every day. ECF 246-5 (Ennis Dep., *McCullough*, at 106:16-107:1). A JCS representative would typically sit next to the judge in the courtroom when in session. *Id.* at 121:7-23; ECF 257-89 (JCS Standard Operating Procedures, Cases Received from the Court); Ex. 9 (JCS Standard Operating Procedures). The JCS Training Manual instructs staff on procedures they must follow while present in court during the judge's deliberations. ECF 246-98, at 117.

---

[1]     In November 2014, when the City of Montgomery agreed to settled the *Mitchell* lawsuit, the City and the Municipal Court agreed that *Bearden* hearings would be recorded, ECF No. 257-123 at 2, and that "[t]he court record shall contain an explanation of any determination of non-indigence." *Id.* at App. 1, p. 2.

As for the City, Mayor Strange never attempted to conduct a municipal investigation of JCS's activities, and he did not know "whether they did a good job or a bad job." ECF 261-7 (Strange Dep. at 100:1-8). Court Administrator Ken Nixon testified that, other than the judges, no one at the Municipal Court supervised JCS staff, and the City never audited JCS's activity in Montgomery. ECF 261-2 (Nixon Dep., *Carter*, at 127:13-20); Ex. 5 (Nixon Dep., *Carter*, at 392:18-22). Judge Westry testified that the judges likewise had "no involvement with JCS determination of policies and procedures of JCS. The only time that we get involved is if there is a revocation or a show cause that they have submitted to the Court." ECF 246-13 (Westry Dep. at 113:17-114:10). The City simply expected JCS to do its job under the contract: "collect those moneys . . . [and] remit those collections." ECF 261-4 (Nixon Dep., *McCullough*, at 210:19–212:22).

But by July 16, 2012, the City had ample warning that JCS and the municipal court systematically violated probationer's *Bearden* rights. On that date, JCS sent an email to Ken Nixon notifying him of a lawsuit challenging JCS's probation operations for the Harpersville Municipal Court, "including incarcerating certain probationers solely for their failure to pay court ordered fines and fees." ECF 257-102 (Ray-Nixon Email). On September 20, 2012, Ken Nixon emailed Wes Ennis about a recently filed lawsuit, *Thurman v. Judicial Correction Services*, M.D. Ala. No. 2:12-cv-00724-RDP-TFM, which alleged that JCS charged unlawful probation fees and coerced payments from probationers. ECF 257-103 (Nixon-Ennis Email). In August 2013, the City, along with Judges Hayes and Westry, was sued for *Bearden* violations in *Cleveland v. City of Montgomery*, No. 2:13-cv-00732 (M.D. Ala.), and *Watts v. Montgomery*, No. 2:13-cv-00733 (M.D. Ala.). And on December 25, 2013, Mayor Strange, Nixon and Ennis exchanged emails about a Fox News report describing JCS as contributing to the operation of "debtors' prisons" in Alabama. ECF 257-

76. Throughout this time period, the City could have terminated its contract with JCS, but it chose to maintain its relationship with JCS until July 2014. The City ended its relationship with JCS only after the City became a defendant in a putative class action lawsuit. *Mitchell v. City of Montgomery*, 2:14-cv-00186-MHT-CSC (M.D. Ala.). The City's use of JCS was an issue in the lawsuit, and as part of the settlement, the City agreed not to contract with any private probation company for at least three years. ECF 257-123 at 5 (*Mitchell* Settlement Agreement).

### C.    *Proposed Class Representatives*

#### 1.    **Plaintiff Levon Agee**

Levon Agee is a 37-year-old African-American father of two children. ECF 250-2 (Agee Decl. ¶ 2). In 2010, he had 11 unpaid traffic tickets. He could not afford to pay the tickets in one lump sum, so the Montgomery municipal court placed him on JCS. *Id*. at ¶¶ 3-5; ECF 246-82 (Order of Probation). Mr. Agee was unemployed at the time. *Id*. at ¶¶ 4-5. He had lost his job at Johnson Controls manufacturing plant when the plant shut down. *Id*. at ¶ 5. Consistent with his unemployed status, JCS's records for Mr. Agee do not contain employment information. ECF 246-81 (Personal Information Sheet); ECF 246-83 (ProbationTracker). Mr. Agee's monthly expenses—including payments to JCS—exceeded his income from unemployment benefits. ECF 250-2 (Agee Decl. ¶¶ 4-5). Nobody at JCS told Mr. Agee that he had a right to go back to court and request an indigency determination, and if found indigent, JCS would have to waive its fees. ECF 259-1 (Agee 2/20/20 Decl. ¶ 6).

JCS records show that Mr. Agee missed his first appointments and payments. As directed by JCS policy, JCS employees called Mr. Agee and sent their standard form FTR and delinquency letters, which threatened arrest if he did not come in to make a payment. ECF 246-83 at

3-4 (ProbationTracker); ECF 246-85 at 2 (FTR Letter). Mr. Agee subsequently paid $80 on October 28, 2010. ECF 246-83 at 3-4 (ProbationTracker). JCS allocated $40 of this payment to Mr. Agee's fine and $40 to JCS fees. *Id*. JCS records do not reflect further payments. *Id*.

Mr. Agee would sometimes wait in line for a long time at one JCS location only to have them close before he was seen for his appointment, and he would have to drive to the second JCS office to appear for his appointment. ECF 250-2 (Agee Decl. ¶ 7); ECF 259-1 (Agee 2/20/20 Decl. ¶ 5). Mr. Agee observed some people at JCS dressed like police officers, in uniforms with badges and wearing walkie-talkies, and thought that he woman who handled his case at JCS was a police officer. ECF 259-1 (Agee 2/20/20 Decl. ¶ 7).

ProbationTracker records show that on January 16, 2011, JCS filed a petition to revoke Mr. Agee's probation and set a court date for March 2, 2011. ECF 246-83 (ProbationTracker); ECF 246-85 (Petition to Revoke). The petition requested "that the probation of the Defendant be revoked and this Honorable Court issue a warrant for the arrest of said Defendant." ECF 246-85 (Petition to Revoke). The petition alleged that Mr. Agee failed to pay fines, costs, and probation fees but did not allege that the nonpayment was willful. *Id*. Mr. Agee did not receive the petition, ECF 250-2 (Agee Decl. ¶ 8), and ProbationTracker shows that mail sent to Mr. Agee after his October 28 payment was returned as undeliverable. ECF 246-83 (ProbationTracker). Mr. Agee did not appear on March 2, 2011, and the court issued a warrant for his arrest. *Id*.

Mr. Agee was arrested on the JCS warrant two years later, on June 13, 2013. ECF 252-21 (Booking Card). Following his arrest, Mr. Agee appeared before a judge of the Montgomery municipal court, who commuted his outstanding traffic fines and court costs to jail time. ECF 252-22 (Transcript). The judge did not inquire into Mr. Agee's ability to pay, ECF 250-2 (Agee Decl. ¶ 12) nor does any document indicate that the judge ever found that Mr. Agee willfully refused to

pay. Mr. Agee did not have the money to pay his outstanding traffic debts, so he was jailed pursuant to the judge's order. Id. at ¶ 13. Mr. Agee spent 28 days in jail and was released on July 12, 2013. ECF 252-24 (Order of Release).

### 2.     Plaintiff Angela McCullough

Angela McCullough is a 45-year-old African-American mother of four children, one of whom is an adult with a serious psychiatric disability ECF 250-1 (McCullough Decl. at ¶ 2). In 2010, Ms. McCullough had numerous unpaid traffic tickets from the City of Montgomery. *Id*. at ¶ 3. Over the years she had paid thousands of dollars in traffic fines to the City, but she still had additional tickets she could not afford to pay. *Id*. at ¶ 3. On December 7, 2010, the Montgomery Municipal Court placed her on JCS. ECF 246-40 (Order of Probation). JCS records show that Ms. McCullough never attended any appointments, nor did she make any payments to JCS. ECF 246-38 at 3 (ProbationTracker Record). As directed by JCS policy, JCS employees called Ms. McCullough and sent their standard form FTR and delinquency letters, which threatened arrest if she did not come in to make a payment. *Id;* ECF 246-41 (FTR Letter). On January 11, 2011, JCS filed a petition to revoke Ms. McCullough's probation and set a court date for February 23, 2011. ECF 246-43 (Petition for Revocation). The petition stated that she owed $3,616 to the City and $130 in JCS fees and requested "that the probation of the Defendant be revoked and this Honorable Court issue a warrant for the arrest of said Defendant." *Id.* The petition did not allege that Ms. McCullough's nonpayment was willful. *Id*. Ms. McCullough did not appear on February 23, 2011, and the court issued a warrant for her arrest. ECF 246-38 at 3 (ProbationTracker).

In 2013, Ms. McCullough was balancing college classes at Faulkner University with parenting and working in housekeeping at Home Inn & Suites, where she earned $175 per week, barely enough to meet basic survival needs. ECF 250-1 (McCullough Decl. at ¶ 4). Ms. McCullough was in her last semester of school and had a 3.87 GPA. ECF 259-7 (McCullough

2/20/20 Decl. at ¶ 12). On or about July 2, 2013, Ms. McCullough was ticketed and arrested for warrants for unpaid traffic fines, including the JCS warrants. ECF 250-1 (McCullough Decl. at ¶ 5); ECF 252-15 (Booking Card); ECF 252-16 (Transcript). She later appeared before Judge Hayes, who ordered her to pay her outstanding balance of $5,760 immediately or serve jail time of 83 days. *Id*.; ECF 252-17 (Warrants). Ms. McCullough did not have the means to pay her balance in full, and Judge Hayes "commuted" her fines to an order of incarceration. ECF 250-1 (McCullough Decl. at ¶ 7); ECF 252-17 (Warrants). Judge Hayes did not inquire as to her ability to pay prior to issuing this order ECF 250-1 (McCullough Decl. at ¶ 6), nor does any document indicate that he ever found that Ms. McCullough willfully refused to pay.

When Ms. McCullough had been in jail for about two weeks, she received a student loan check. ECF 259-7 (McCullough 2/20/20 Decl. at ¶ 12). After serving 20 days, Ms. McCullough used her student loan money to pay her fines so that she could get out of jail. *Id*; ECF 252-18 (Order of Release). She was released on July 22, 2013. ECF 252-18 (Order of Release).

### 3.   Plaintiff Algia Edwards

Algia Edwards is a 33-year old African-American man and father of two children. ECF 259-3 (Edwards 2/20 Decl. at ¶¶ 1 and 3). On June 1, 2009, Judge Darron Hendley placed Mr. Edwards on JCS for unpaid traffic tickets. ECF 257-91 (Order of Probation). At the time the court placed him on probation, Mr. Edwards was supporting his sons, aged one and two. ECF 259-3 (Edwards 2/20 Decl. at ¶ 4). He worked the night shift at UPS, making about $150 a week, and had difficulty covering basic living expenses for his family. *Id*. Despite his limited financial resources, Mr. Edwards paid JCS when he could. *Id*. at ¶ 5. Some months he had to choose between having the lights on in the house for his young sons or making his JCS payment. *Id*.

ProbationTracker records show that Mr. Edwards reported and made payments to JCS from June 2009 through May 2011 and managed to pay some amount of money each month. ECF

257-93 at 8-10 (ProbationTracker at 8-9). Mr. Edwards had great difficulty making his payments and appointments because his resources were extremely limited and because he was working on a night shift and had to report to JCS during daytime hours when he would otherwise be sleeping. ECF 259-3 (Edwards 2/20 Decl. at ¶¶ 4-6). The woman Mr. Edwards spoke with at JCS threatened him that if she didn't see him coming in to make payments she would send a warrant out for him. *Id*. at ¶ 7. Mr. Edwards also saw Montgomery police officers at the JCS office and on at least one occasion witnessed a police officer arrest someone at the JCS office. *Id*. at ¶ 8. During the almost two years of his probation with JCS, Mr. Edwards paid $2,138, of which JCS kept $741 for itself, and he appeared at 49 appointments at JCS offices, an average of every two weeks. ECF 257-93 at 7-10 (ProbationTracker).

ProbationTracker records show that on May 23, 2011, JCS filed a Notice to Show Cause why Mr. Edwards's probation should not be revoked and set a court date for June 30, 2011. *Id*. at 3; ECF 246-67 (Notice to Show Cause). The Notice to Show Cause asserted that Mr. Edwards still owed money to the court, but did not disclose that Mr. Edwards had paid $2,138 towards his debt despite his difficult financial circumstances. ECF 246-67 (Notice to Show Cause). The notice alleged that Mr. Edwards failed to pay fines and costs but did not allege that the nonpayment was willful. *Id*. ProbationTracker records also show that the Notice to Show Cause and various FTR and Delinquency letters were each returned to JCS as undeliverable. *Id*.; Ex. 6 (Returned Mail). Despite receiving the undelivered notice, JCS proceeded with the hearing on June 30, 2011, and the court issued a warrant for his arrest. ECF 257-93 at 3 (ProbationTracker).

On September 19, 2012, Mr. Edwards was arrested on warrants for unpaid traffic tickets. ECF 257-17 at 4-6 (Booking Card and Transcript). All of his JCS tickets were "commuted." ECF 246-66 at 6 (Transcript). Mr. Edwards was released on September 20, 2012, after his wife

paid the court $1,900. *Id.* at 7 (Order of Release). Mr. Edwards and his wife got the $1,900 from a title pawn on their car. ECF 259-3 (Edwards 2/20 Decl. at ¶ 10). They were not able to pay off the title loan and never got the car back. *Id.*

### 4.   Plaintiff Marquita Johnson

Marquita Johnson is a 36-year-old African-American woman. ECF 250-3 (Johnson Decl. ¶ 2). In 2011, she was a single mother supporting three children by working full-time as a cocktail server at Wind Creek Casino where she earned $6.66 per hour plus tips. *Id.* at ¶ 5. She received little financial support from the fathers of her daughters and barely met her basic living expenses. *Id.*

On May 24, 2011, due to several unpaid traffic tickets, the Montgomery Municipal Court placed Ms. Johnson on JCS. ECF 250-3 (Johnson Decl. ¶ 30); ECF 252-25 and 252-26 (Orders of Probation). Despite her limited resources, Ms. Johnson went to appointments and paid JCS when she could. ECF 250-3 (Johnson Decl. ¶ 6). Ms. Johnson lost her job while on JCS, which limited her ability to make payments. *Id.* at ¶ 7.

ProbationTracker records show that Ms. Johnson appeared in person at seven JCS appointments between June and October of 2011, ECF 246-23 at 4 (ProbationTracker), and paid a total of $220, of which JCS kept $90 for itself. *Id.* at 5. JCS responded to Ms. Johnson's genuine attempts to pay her debt by ordering her to appear at in-person appointments with increased frequency, sending her threatening letters, and making harassing phone calls. *Id* at 3-5.

According to ProbationTracker, Ms. Johnson paid $140 on July 11, 2011, of which JCS allocated $90 to her fine and $50 to its own fees. ECF 246-23 at 4 (ProbationTracker); ECF 246-21 at 3 (Receipts). After accepting that payment, JCS ordered her to appear at another appointment 2 weeks later, on July 25. ECF 246-23 at 4 (ProbationTracker). Ms. Johnson missed that appointment but went to JCS in person four days later on July 29, after which JCS demanded

weekly appointments. *Id*. Ms. Johnson could not make every appointment, but she appeared on August 12 and August 26, when she managed to pay $60 towards her debt. *Id*. JCS took $30 for its fees. *Id*.; ECF 246-21 at 4 (Receipts). This pattern of frequent ordered appointments continued into October, when Ms. Johnson made her final payment of $20 to JCS. ECF 246-23 at 3 (ProbationTracker). JCS took half for its probation fee and allocated $10 towards her fine. *Id*.; ECF 246-21 at 2 (Receipts).

After Ms. Johnson made a payment in October, JCS continued to call and send letters threatening arrest. ECF 246-23 at 3 (ProbationTracker). ProbationTracker records show that on December 15, 2011, JCS filed a petition to revoke Ms. Johnson's probation and set a court date for February 9, 2012. *Id*.; ECF 246-95 at 4 (Petition to Revoke). The petition requested "that the probation of the Defendant be revoked and this Honorable Court issue a warrant for the arrest of said Defendant." ECF 246-95 at 4 (Petition to Revoke). The petition to revoke stated that Ms. Johnson failed to appear on eighteen occasions during her probation, but omitted that Ms. Johnson had in fact appeared seven times (sometimes more than once a month), and that many of the missed appointments were set a mere week after Ms. Johnson had reported. *Id*. The petition to revoke asserted that Ms. Johnson still owed money to the court and to JCS but did not disclose that she had paid $220 towards her debt despite her difficult financial circumstances. The petition alleged that Ms. Johnson failed to pay fines, costs, and probation fees but did not allege that the nonpayment was willful. *Id*. Ms. Johnson did not appear on February 9, 2012, and the court issued a warrant for her arrest. ECF 246-23 at 3 (ProbationTracker)

Ms. Johnson was arrested in April 2012 for unpaid traffic fines and costs. ECF 250-3 (Johnson Decl. ¶ 9); ECF 252-27 (Booking Card). She appeared before Judge Hayes, who ordered

her to pay $12,410 or serve 496 days in jail. ECF 250-3 (Johnson Decl. ¶ 11); ECF 252-28 (Transcript). Ms. Johnson did not have the money to pay, and Judge Hayes "commuted" her outstanding fines and costs to an order of incarceration. ECF 250-3 (Johnson Decl. ¶ 14); ECF 252-28 (Transcript). Judge Hayes did not inquire into Ms. Johnson's ability to pay prior to issuing this order ECF 250-3 (Johnson Decl. ¶ 13), nor does any document indicate that he ever found that she willfully refused to pay. Ms. Johnson was released on January 28, 2013 after serving 279 days in jail. ECF 252-30 (Order of Release).

### 5.    Plaintiff Kenny Jones

Mr. Jones is a 35-year-old African-American man with an intellectual disability. ECF 250-4 (Jones Decl. ¶¶ 2-3). He has received Supplemental Security Income (SSI) because of his disability since he was six or seven years old. *Id*. at ¶ 3. Because of his disability, Mr. Jones cannot read and comprehend documents, work a regular job, or manage his own money. *Id*. at ¶¶ 3-4. Mr. Jones relies on his brother, who receives his SSI payments on his behalf, to make sure that he has money for food, clothing, and shelter. *Id*. at ¶ 4.

On August 17, 2009, Judge Troy Massey placed Mr. Jones on probation with JCS for unpaid traffic tickets. ECF 246-100 at 8 (Order of Probation in Composite Exhibit). ProbationTracker records show that Mr. Jones reported to JCS three days later, on August 20, again on August 26, and again on September 3. *Id*. at 4 (ProbationTracker in Composite Exhibit). The ProbationTracker note for the September 3 visit reads "Def. wants to go back in front of the judge to seek reduce in payments because he cannot pay the 140 monthly due to disability; Def. paid $35 today." *Id*. JCS kept $15 of that payment for itself and allocated $20 towards Mr. Jones's debt. *Id*. There are no records, in ProbationTracker or elsewhere, that show that JCS took any action on Mr. Jones's request to go before the judge to show his inability to pay. *Id*. The December 4, 2009,

ProbationTracker entry contains a link to Mr. Jones's Social Security Administration letter showing his SSI income payments, but there is no notation next to the entry or indication that JCS gave this proof of disability to the judge. *Id*.

ProbationTracker records note that on October 2, 2009, "Def. Mother reported today on his behalf. Paid $100.00 and stated that per PO Cox it was okay for Def. to pay $100 a month" *Id*. ProbationTracker records show that Mr. Jones reported and made monthly payments continuously from August 2009 through April 2010. *Id*. JCS also ordered him to report more frequently than once per month, which Mr. Jones did, reporting in person to JCS sixteen times between August 20, 2009 and April 30, 2010. *Id*. When Mr. Jones was not able to make his frequent JCS appointments, JCS called him, his fiancé, his friend, and father-in-law, and sent letters threatening arrest, including during a period in April when JCS noted that Mr. Jones's mother was in a coma following a serious car accident. *Id*.

ProbationTracker records show that on September 17, 2010, JCS filed a petition to revoke Mr. Jones's probation and set a court date for November 4, 2010. ECF 246-100 at 18 (Petition to Revoke in Composite Exhibit). At the time, Mr. Jones had managed to pay $490 of his total debt to the City of $526, owing just $36, but he still owed JCS $305 in fees. ECF 246-100 at 3 (ProbationTracker in Composite Exhibit). JCS filed a petition to revoke but noted that it would cancel the hearing and close his case if he paid $150. ECF 246-100 at 18 (Petition to Revoke in Composite Exhibit). The petition to revoke states that Mr. Jones failed to appear on seven occasions during his probation but omits that Mr. Jones did appear twenty-four times. ECF 246-100 at 3-5 (ProbationTracker in Composite Exhibit, compilation of appointments ends in April but detailed notes show four additional visits). The petition to revoke asserted that Mr. Jones still owed money to the court and to JCS, but did not disclose that he had paid $715 towards his debt despite

having his disability payment as his only source of income. ECF 246-100 at 18 (Petition to Revoke in Composite Exhibit). The petition alleged that Mr. Jones failed to pay fines, costs, and probation fees, but did not allege that the nonpayment was willful. *Id.* Mr. Jones did not appear on November 4, 2010, and the court issued a warrant for his arrest. *Id.* ECF 246-100 at 3 (ProbationTracker in Composite Exhibit).

ProbationTracker records show that Mr. Jones was jailed on JCS cases on February 11, 2011 and was still in jail on March 23, 2011[2]. *Id.* at 3. ProbationTracker records also show that show that Mr. Jones' JCS debt was "commuted to days" by Judge Hayes on February 11, 2011. *Id.* Court records indicate that Mr. Jones remained jailed until June 2, 2011, when a docket entry states "Penalties to this date have been paid in full." Ex. 7 (Benchmark). A receipt bearing that date shows a cash payment of $79 made to his remaining JCS-supervised ticket ($36 fines, $16 solicitor's fee and $27 warrant fee). Ex. 8 (Payment Receipt).

### 6.    Plaintiff Christopher Mooney

Christopher Mooney is a 42-year-old African-American man. ECF 250-5 (Mooney Decl. ¶ 2). On October 11, 2011, Judge Karen Knight placed Mr. Mooney on probation with Judicial Correction Services (JCS) for unpaid traffic tickets. ECF 252-31 (Order of Probation). Mr. Mooney was a single father of four children for whom he was their sole support and provider. ECF 250-5 (Mooney Decl. ¶ 5). He was earning minimum wage for performing plumbing, maintenance, cleaning, and security tasks, which were also performed in exchange for his rent. *Id.* Mr. Mooney's basic living expenses, in addition to the payments owed to JCS, exceeded his income. *Id.* Despite

---

[2]    Mr. Jones does not appear on the City Jail spreadsheet (CITY00076) as that spreadsheet is limited to jailings on or after August 1, 2013, and Mr. Jones was jailed on February 11, 2011. Mr. Jones' JCS cases do not appear in the Benchmark documents or data files because they precede the Municipal Court's use of the Benchmark system which began in February 2012.

his limited financial resources, Mr. Mooney made payments to JCS when he could. *Id*. Probation-Tracker records also show that Mr. Mooney appeared in person at ten JCS appointments between October of 2011 and March of 2012  and paid a total of $850, of which JCS kept $240. ECF 246-69 at 5-6 (ProbationTracker). JCS responded to Mr. Mooney's attempts to pay his debt by ordering him to appear at in-person appointments with increased frequency, sending him threatening letters, and making harassing phone calls. *Id*.

ProbationTracker records show that Mr. Mooney first paid JCS on October 27, 2011. ECF 246-69 at 5 (ProbationTracker). Mr. Mooney paid $200, of which JCS kept $50 for itself, leaving $150 towards his City debt. *Id*. Mr. Mooney also reported to JCS in person on December 6, and returned three days later on December 9 to make a payment of $20, half of which JCS kept for itself. Id at 5-6. Mr. Mooney returned to JCS on December 17 and paid an additional $40, of which JCS again kept half for its own fees. *Id*. This pattern continued, as JCS ordered Mr. Mooney to appear at weekly or even more frequent appointments from the end of November of 2011 through February of 2012. *Id*. Despite Mr. Mooney making diligent payments of what he could afford, JCS continued to set frequent in-person appointments and call Mr. Mooney between ap-pointments, and continued keeping half or almost half of his payments for itself. *Id*.

ProbationTracker records show that on June 21, 2012, JCS filed a petition to revoke Mr. Mooney's probation and set a court date for July 27, 2012. ECF 246-101 (Petition to Revoke in Composite Exhibit). The petition requested "that the probation of the Defendant be revoked and this Honorable Court issue a warrant for the arrest of said Defendant." *Id*. The petition to revoke states that Mr. Mooney failed to appear eighteen times but omits that Mr. Mooney had in fact appeared on ten occasions, and that many of the missed appointments were set a mere week or even days after Mr. Mooney had attended an in-person appointment. *Id.* The petition to revoke

asserted that Mr. Mooney still owed money to the court and to JCS, but did not disclose that he had paid $850 towards his debt despite his difficult financial circumstances. *Id.* The petition alleged that Mr. Mooney failed to pay fines, costs, and probation fees but did not allege that the nonpayment was willful. *Id.* Mr. Mooney did not appear on July 27, 2012, and the court issued warrants for his arrest. *Id*.

On May 8, 2013, Mr. Mooney was stopped by City police for a traffic violation and arrested on warrants for unpaid traffic tickets. ECF 250-5 (Mooney Decl. ¶ 7); ECF 252-32 (Booking Card). Following his arrest, Mr. Mooney appeared before Judge Hayes. ECF 250-5 (Mooney Decl. ¶ 8). Judge Hayes ordered him to pay more than $4,000 or serve time in jail. *Id*. Mr. Mooney offered to pay $1,000 towards his debt, but Judge Hayes did not accept this offer. *Id*. Judge Hayes did not inquire into Mr. Mooney's ability to pay his traffic debts, *Id*. at ¶ 9, nor does any document indicate that he ever found that Mr. Mooney willfully refused to pay. Judge Hayes "commuted" Mr. Mooney's fines and court costs to an order of incarceration in the jail. ECF 252-33 (Warrants) and ECF 252-34 (Transcript). Mr. Mooney was released on June 7, 2013. ECF 138 (City of Montgomery Answer ¶ 151).

### 7.  Plaintiff Hassam Caldwell

Hassam Caldwell is a 25-year-old African-American man. ECF 259-2 (Caldwell 2/2020 Decl. ¶ 1). In 2013, Mr. Caldwell incurred a speeding ticket in the amount of $175 for which the Montgomery Municipal Court placed him on JCS probation. *Id*. at ¶ 3; ECF 246-88 at 2 (Order of Probation). At the time, Mr. Caldwell was a senior in high school. ECF 259-2 (Caldwell 2/2020 Decl. ¶ 5). He lived with his parents, and he had no income. *Id*. Consistent with his unemployed status, JCS's records for Mr. Caldwell do not contain employment information. ECF 246-88 at 3 (Personal Information Sheet); ECF 246-96 at 3 (ProbationTracker).

JCS records show that Mr. Caldwell came to his first appointment on April 25, 2013, but paid only $35. ECF 246-96 at 3 (ProbationTracker). He missed his next appointment and, as directed by JCS policy, JCS employees called Mr. Caldwell and his relatives and sent their standard form FTR letter, which threatened arrest if he did not make a payment. *Id*. Mr. Caldwell subsequently reported and paid $40 on May 28, 2013, and JCS ordered him to report again the next week, on June 4, 2013. *Id*. That day, Mr. Caldwell's mother reported on his behalf and paid $40, and JCS again ordered Mr. Caldwell to report the next week. *Id*. Mr. Caldwell missed that appointment, and JCS again made phone calls and sent the standard form FTR letter threatening arrest, after which Mr. Caldwell reported and paid $40 on June 17, 2013. *Id*.; ECF 246-96 at 5-9 (FTR letters). In total, Mr. Caldwell paid JCS $155—all but $20 of the amount of his fine—but JCS pocketed $50 for itself. ECF 246-96 at 4 (ProbationTracker).

After that Mr. Caldwell did not report, but JCS continued to attempt to collect from him by making phone calls and sending him standard form FTR letters threatening arrest. Id. at 2-3. JCS records show that they spoke with Mr. Caldwell by telephone on June 25 and July 9, 2013, and sent him FTR letters on June 28 and July 15, 2013. *Id*. JCS sent Mr. Caldwell a VOP letter and petition to revoke probation on July 23, 2013, with court date set for August 27, 2013. *Id*; ECF 246-88 at 4 (Petition to Revoke). The petition to revoke states that Mr. Caldwell failed to appear on ten occasions in April, May, June and July 2013 but omits that Mr. Caldwell had in fact appeared on four occasions in April, May, and June and paid what he could each time. ECF 246-88 at 4 (Petition to Revoke). The petition to revoke asserted that Mr. Caldwell still owed $150—$70 to the court and $80 to JCS—but did not disclose that Mr. Caldwell had already paid $155 on a $175 fine. *Id*. The petition also did not allege that Mr. Caldwell's nonpayment was willful. *Id*. The petition requested "that the probation of the Defendant be revoked and this Honorable Court issue

a warrant for the arrest of said Defendant." *Id.* Mr. Caldwell did not appear on August 27, and the

court issued a warrant for his arrest. ECF 246-96 at 2 (ProbationTracker).

Mr. Caldwell was arrested on the JCS warrant on December 28, 2013. ECF 246-89 at

1-2 (Warrants). Later that day, Mr. Caldwell appeared before a judge of the Montgomery munici-

pal court on the JCS ticket. Mr. Caldwell's mother paid $132 to resolve the JCS ticket.[3] ECF 246-

89 at 3, 7 (Warrants and Order of Release); ECF 246-93 (Receipt); ECF 246-2 at 64-65 (Caldwell

Dep. at 244:18 – 249:1 Of the $132, $20 went to the fine, $32 to a warrant fee, $85 to court costs,

and $30 to a DA collection fee. ECF 246-93 (Receipt). All in all, because of JCS, Mr. Caldwell

and his mother paid $287 on a $175 ticket. *Id.*

## ARGUMENT

### I.      THE CLASSES ARE ASCERTAINABLE

"[A] plaintiff seeking to represent a proposed class must establish that the proposed

class is adequately defined and clearly ascertainable." *Carriuolo v. Gen. Motors Co.*, 823 F.3d

977, 984 (11th Cir. 2016). This implicit Rule 23 requirement is satisfied if "the class can be ascer-

tained by objective criteria." 1 *Newberg on Class Actions* § 3.3 (5th ed. 2020); *see also  Karhu v.

Vital Pharm., Inc.*, 621 F. App'x 945, 952 (11th Cir. 2015) (unpublished) (Martin, J., concurring)

("[C]ourts essentially focus on the question of whether the class can be ascertained by objective

criteria"); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam) (rejecting pro-

posed "class made up of residents of this State active in the peace movement" because of the

---

[3]      Mr. Caldwell also had outstanding warrants on four other tickets not assigned to JCS. In
addition to paying $132 to close out the JCS ticket, ECF 246-89 at 7 (Order of Release), Mr.
Caldwell's mother also posted appearance bonds on the non-JCS tickets. ECF 246-2 at 64-
65 (Caldwell Dep. at 244:18 – 249:1).

"broad spectrum of positions and activities which could conceivably be lumped under that term").[4] "[A] court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." 1 *Newberg on Class Actions* § 3.3; *Manual for Complex Litig*. § 21.222 at 270 (4th ed. 2020) ("[T]he identity of individual class members need not be ascertained before class certification . . . ."). Here, the classes are easily ascertainable.

The proposed *Bearden* and False Imprisonment Classes will include all individuals the Montgomery Municipal Court sentenced to JCS-supervised probation who (1) had fines or fees commuted to jail time in a JCS-supervised case after JCS petitioned the Montgomery Municipal Court to revoke probation and (2) served any of that jail time on or after July 1, 2013 (*Bearden*) or July 1, 2009 (False Imprisonment). Membership in these classes turns entirely on three objective criteria: (1) Whether someone was sentenced to JCS-supervised probation, (2) whether and when their fines or fees were commuted to jail time in a JCS-supervised case after JCS petitioned for revocation, and (2) whether they served that jail time during one of the relevant periods.

The proposed Abuse of Process Class will include all individuals who the Montgomery Municipal Court placed on JCS-supervised probation: (1) who at any time paid less than the minimum monthly payment ordered by the court; and (2) from whom JCS continued to collect or attempt to collect after July 1, 2013. Again, membership in this class turns entirely on clearly defined, objective criteria.

To determine who meets those criteria, counsel need look no further than Defendants' own records. Combined, JCS's ProbationTracker and Montgomery's Benchmark databases contain

---

[4]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit handed down before October 1, 1981.

the names of all people sentenced to JCS-supervised probation, the date of any JCS-issued Petition

for Revocation or Notice to Show Cause, and documentation of any resulting commutation and

jailing. (Rubens Decl. ¶ 7.) JCS's database also contains detailed payment records, including for

each probationer the monthly payment amount specified in the probation order, the dates and

amounts of each payment made, and detailed event notes, which record every collection attempt

made by JCS. (*Id.* ¶¶ 29, 32.) Ascertainability, then, is no obstacle to class certification.

      That should be the end of the inquiry. But in 2015, an unpublished Eleventh Circuit

opinion imposed a heightened ascertainability standard, requiring plaintiffs to demonstrate that

"class members [can] be identified in an administratively feasible way." *Karhu*, 621 F. App'x at

947-48. The Eleventh Circuit has never endorsed the administrative feasibility requirement in a

published opinion, *Ocwen Loan Servicing, LLC v. Belcher*, No. 18-90011, 2018 WL 3198552, at

*3 (11th Cir. June 29, 2018), and the requirement is inconsistent with the Circuit's binding prece-

dent. *Karhu*, 621 F. App'x at 952 (Martin, J., concurring) (explaining history of ascertainability

standard in Eleventh Circuit); *DeBremaecker*, 433 F.2d at 734 (discussing ascertainability without

reference to administrative feasibility). The issue is currently on appeal from the Southern District

of Florida. *Papasan v. Dometic Corp.*, No. 19-13242 (11th Cir.).[5]

      This Court need not wade into this thicket, however, because the administrative feasi-

bility requirement would not obstruct class certification here. That heightened standard has posed

a problem in consumer class actions that involve retail purchases of small-dollar products that are

not tracked in the defendants' records. Because manufacturers rarely have records of end-user sales

---

[5]    The majority of federal appellate courts have rejected the heightened standard. *See In re Petrobras Sec.*, 862 F.3d 250, 265 (2d Cir. 2017); *Briseno v. ConAgro Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015); *Mullins v. Direct Digital, LLC*, 795 F.3d 658, 672 (7th Cir. 2015); *see also Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019) (unpublished).

and consumers rarely keep receipts, plaintiffs seeking to establish that each potential class member made a relevant purchase during the relevant time period face an uphill climb. *See, e.g.*, *Karhu*, 612 F.App'x at 948-49; *Carrera v. Bayer Corporation*, 727 F.3d 300, 308-09 (3d Cir. 2013).

This case could not be more dissimilar. Here, Plaintiffs can identify members of the Classes using a detailed, reliable strategy that uses data contained within Defendants' own records—the gold standard of identification for those courts that use the heightened ascertain ability standard. *See, e.g.*, *Krakauer v. Dish Network, L.L.C*., 925 F.3d 643, 658 (4th Cir.), *cert. denied*, 140 S. Ct. 676 (2019); *Cox v. Porsche Fin. Servs., Inc*., 330 F.R.D. 322, 330-31 (S.D. Fla. 2019). As in other cases challenging abuses in the criminal legal system, members of the Classes are identifiable based on records of their criminal proceedings. *See Hunter v. Beshear*, No. 2:16-cv-798-MHT, 2018 WL 564856, at *4 (M.D. Ala. Jan. 25, 2018) ("[T]he class is ascertainable by reference to the circuit court orders committing criminal detainees to . . . custody").

All members of the *Bearden* Class, and all members of the False Imprisonment Class whose debt was commuted in or after February 2012, are ascertainable through a straightforward process that is already well underway. First, an automated search of the JCS ProbationTracker system identified people who the Montgomery Municipal Court had placed on JCS probation. (Rubens Decl. ¶ 8) Second, that group was reduced to those who JCS placed in VOP status and initiated probation revocation proceedings against by issuing a Petition for Revocation or a Notice to Show Cause. (*Id.* ¶ 5, 6, 10, 19.)

Third, using the Municipal Court case numbers associated with those VOP-status probations, a search of the Municipal Court's Benchmark system was conducted to identify JCS probationers who had a Jail Transcript and an Order of Release entered into the Municipal Court's

Benchmark system on one or more of those cases in which JCS sought revocation of probation from the Municipal Court. *(Id.* ¶¶ 5, 6, 10, 19.)

Fourth, the JCS Petitions for Revocation or Notices to Show Cause, Jail Transcripts, and Orders of Release for those probationers are being manually reviewed to confirm that the JCS-related cases resulted in commutation of debt into jail days. (*Id*. ¶ 20.) This manual review will enable Plaintiff to confirm the electronic search results and show, for each member of the Classes, (1) that JCS sought revocation of probation; (2) that the Municipal Court then commuted debt to jail on the same case or cases on which JCS sought revocation; (3) the precise date on which each person's debt was commuted to jail time; and (4) the dates spent in jail attributable to the JCS-related case. (*Id*. ¶¶ 14-20; *see* Ex. B for an example of a manual review of a Petition for Revocation, Jail Transcript, and Order of Release.)

The process for ascertaining members of the False Imprisonment Class whose debt was commuted to jail time before the February 2012 implementation of Benchmark is even more straightforward. During that period, JCS employees routinely used the Detailed Visit Notes field in each probationer's ProbationTracker file to log instances where probationers had their debt commuted to days in jail in relation to that particular probation and the Montgomery Municipal Court cases associated with it. (*Id*. ¶¶ 23–25.) The "commuted" notation appears in the Probation-Tracker files of more than 400 probationers during the pre-Benchmark period. In each of those cases, there is a record of JCS having previously initiated probation revocation proceedings by submitting a Petition for Revocation or Notice to Show Cause to the Montgomery Municipal Court. (*Id*. ¶ 24; Ex. G (listing hundreds of notations of "commuted" from JCS's ProbationTracker files, such as "Judge Hayes took him off of JCS and commuted his case" and "PER COURT

CLERK, DEF SERVED DAYS IN JAIL FOR ALL OF HIS COMMUTED FINES"). This "commuted" entry in the Detailed Visit Notes enables anyone with access to ProbationTracker to identify people whose cases were commuted before Jail Transcripts and Orders of Release were routinely logged into the Benchmark system.

Finally, ascertaining the members of the Abuse of Process Class is equally clear. ProbationTracker stores detailed payment information for every probationer, including the monthly payment plan specified on the probation order, the date and amount of each payment made, and how JCS allocated the payments as between fines and fees. (*Id*. ¶ 29, 31). A simple process of comparing actual monthly payments to payment plans allows the identification of those who paid less than their payment plan amount. (*Id.* ¶ 31) ProbationTracker also contains detailed records for each probation of every JCS collection attempt (such as letters, phone calls, and petitions to revoke/notices to show cause), including the dates of such attempts (*Id.* ¶ 32). Thus, the detailed payment and activity records enable the precise identification of every probationer (1) who at any time paid less than the minimum monthly payment ordered by the court; and (2) from whom JCS continued to collect or attempt to collect after July 1, 2013.

## II.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(a)

All class actions in federal court must meet the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Each is satisfied here.

### A.    *Numerosity – Rule 23(a)(1)*

Rule 23 requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[C]ourts look at numerosity in a fairly straightforward fashion: by assessing the practicability of joinder, in light of the number of people who fall within the definition of the class." *Braggs v. Dunn*, 317 F.R.D. 634, 654 (M.D. Ala. 2016).

"[A] plaintiff need not show the precise number of members in the class" in order to satisfy the numerosity requirement. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983). Likewise, "[m]ovants for class certification do not need to present evidence showing—one by one, many times over—that individual putative class members can proceed on the class claims; requiring as much would largely defeat the efficiency benefits of class-wide adjudication, and is unnecessary in light of the commonality requirement." *Braggs*, 317 F.R.D. at 654.

Here, each of the classes is so numerous that joinder would be impractical. There are more than 100 members of the *Bearden* Class. (Rubens Decl. ¶ 20.) There are more than 600 members of the False Imprisonment Class. (*Id*. ¶¶ 20, 24.) And there are more than 2,800 members of the Abuse of Process Class. (*Id*. ¶ 32.)

While there is no strict numerical threshold, numerosity is presumptively satisfied if more than forty individuals fall within the class definition. *See, e.g.*, *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009) (citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)); *see also Napoles-Arcila v. Pero Family Farms, LLC*, No. 08-80779-CIV, 2009 WL 1585970, at *6 (S.D. Fla. June 4, 2009) (class of 150 and subclass of 50 satisfied numerosity requirement); *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 599 (S.D. Fla. 1991) (class of 130 satisfied numerosity requirement). Given the size of each of the proposed Classes, joinder would be impracticable and the numerosity requirement is easily satisfied.

**B.**     *Commonality – Rule 23(a)(2)*

The second prerequisite for class certification is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23 does not require that all the questions of law and fact raised by the dispute be common." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986). Indeed, "even a single common question will do." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

359 (2011)). But the common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (quoting *Dukes*, 564 U.S. at 350). This requirement is usually satisfied where the injuries to the class allegedly arise from the defendants' customary practices and policies. *See, e.g.*, *DL v. Dist. of Columbia*, 860 F.3d 713, 724 (D.C. Cir. 2017) (commonality satisfied where classes alleged standard policies and practices caused common harm to members); *Thompson v. Jackson*, No. 1:16-cv-04217, 2018 WL 5993867, at *8 (N.D. Ga. Nov. 15, 2018) (commonality satisfied where class alleged the "same practice and policy" injured members).

Here, the common injury to members of all of the Classes arises from Defendants' customary practices and policies, which "perpetuat[ed] a cycle of debt and unlawful imprisonment." *Carter v. City of Montgomery*, 2020 U.S. Dist. LEXIS 118755, at *53.

The members of the proposed Bearden and False Imprisonment Classes all incurred debt in the Montgomery Municipal Court, were placed by the court on JCS-supervised probation, had their debt commuted to days in jail after JCS petitioned the court to revoke probation, and served time as a result. Each member suffered a common injury—namely, the injury to human dignity associated with a loss of liberty, which is "presumed" in cases of unlawful detention. *Barnes v. Dist. of Columbia*, 278 F.R.D. 14, 20 (D.D.C. 2011); *see also Carter*, 2020 U.S. Dist. LEXIS 118755, at *49 (recognizing the primary injury alleged in this case "stems from a deprivation of liberty").

The members of the Abuse of Process class all incurred debt in the Montgomery Municipal Court, were placed by the court on JCS-supervised probation, failed to make the minimum payments ordered by the Court, and as a result experienced JCS's abusive collection practices.

JCS sent these class members form letters threatening arrest, made phone calls and required weekly appointments, all with the goal of coercing class members to continue paying what little they could scrape up, which JCS applied disproportionately to its own fees, and then when they could no longer pay, JCS threw them back to the court to be jailed.

Those standard practices and policies give rise to numerous questions of law and fact for which there are common answers that will drive the resolution of the litigation. Some of these questions and answers cut across multiple Classes. For example, the trier of fact will decide whether JCS engaged in a systemic practice of petitioning to revoke probation after extracting as much cash as possible from people who owed court debt and whether the Municipal Court engaged in a systemic practice of revoking probation and jailing these people for nonpayment of court debt without inquiring into ability to pay.

Additional common questions are present with respect to each of the theories of liability. For members of the *Bearden* Class, the trier of fact will determine whether JCS and the City caused the constitutional violations that members of the Class experienced; whether and when the City became aware of the Municipal Court's systemic practice of revoking probation and jailing members for nonpayment without inquiring into ability to pay; and whether the City was deliberately indifferent to that systemic practice.

For members of the False Imprisonment Class, the trier of fact will determine whether the jailing of members without an inquiry into ability to pay was unlawful; whether JCS instigated the unlawful detentions; and whether JCS did so in bad faith.

And for members of the Abuse of Process Class, the trier of fact will determine whether JCS had an ulterior profit-seeking motive and whether it engaged in a wrongful use of

process when it used the court's probation orders to enhance its own profits at the expense of indigent probationers, then dumped them back on the court for jailing.

Given the numerous common questions of law and fact, the commonality requirement is satisfied.

## C.      *Typicality – Rule 23(a)(3)*

The proposed classes meet the typicality requirement because Plaintiffs and class members share the same core claims. Class representatives' claims must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of the typicality requirement is to "ensure that . . . the interests of the class representatives are closely aligned with those of the class." 1 *Newberg on Class Actions* § 3.31 (5th ed. 2020). It is "not [a] demanding" test. *Id.* § 3:29 at 267. The court need only ask whether named plaintiffs' claims arise from "the same event or pattern or practice and are based on the same legal theory" as the claims of the class members. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *see also Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985) (typicality depends on "whether named representatives' claims have the same essential characteristics as the claims of the class at large") (internal quotation marks and citation omitted), *disapproved of on other grounds by Green v. Mansour*, 474 U.S. 64, 67 (1985). Even "substantial factual differences" do not destroy typicality so long as "there is a strong similarity of legal theories." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) (internal quotation marks and citation omitted).

Here, the typicality requirement is easily satisfied. Plaintiffs' claims are typical of the claims of the Classes because they all arise out of Defendants' uniform conduct towards the class members. *See, e.g.*, *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216-17 (11th Cir. 2012) (typicality met where "all claims . . . arise from the same policy" and "are all based upon" the same

- 38 -

liability theory); *Hoffer v. Jones*, 323 F.R.D. 694, 698 (N.D. Fla. 2017) (typicality met where inmates challenged corrections department's "very same . . . policies and practices for treating [Hepatitis C]"); *J.W. v. Birmingham Bd. of Educ.,* No. 2:10-CV-03314, 2012 WL 3849032, at *9 (N.D. Ala. Aug. 31, 2012) (typicality met where "the proposed class and Plaintiffs' claims arise from the same allegedly unconstitutional practices" and "are premised around the same injury . . . and the same legal theory"); *Ingram v. The Coca Cola Co.*, 200 F.R.D. 685, 698 (N.D. Ga. 2001) (typicality met where "claims arise out of and involve application of the same" company-wide policies and systems).

As explained above, the claims of Plaintiffs Agee, McCullough, Johnson, Mooney, Edwards and Jones are typical of the claims of members of the *Bearden* and False Imprisonment Classes in that the Montgomery Municipal Court placed them on probation with JCS, JCS petitioned the court to revoke their probation, the court commuted the remaining fines on the JCS-related cases to days in jail, and Plaintiffs served jail time during the relevant class periods.

And the claim of Plaintiff Caldwell is typical of the claims of members of the Abuse of Process class in that the Montgomery Municipal Court placed him on probation with JCS, JCS abused the probation process to coerce as much money as possible from him regardless of his inability to pay, JCS disproportionally allocated payments to its own profits instead of his fines, and JCS continued to attempt to collect from him during the relevant class period before tossing him back to the Municipal Court.

Accordingly, the typicality requirement is satisfied.

**D.     *Adequacy – Rule 23(a)(4)***

The fourth prerequisite for certification is a finding that the named plaintiffs will "fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4) & (g)(1). This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist

between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*,  350 F.3d 1181, 1189 (11th Cir. 2003) (internal quotation marks and citation omitted). Both prongs of the adequacy test are met here.

With respect to the first prong, the claims of the named Plaintiffs are coextensive with, and not antagonistic to, the claims asserted on behalf of the proposed Classes. For a conflict to bar class certification, it must be so "fundamental" that "some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Id*. No conflicts exist between Plaintiffs and the members of the Classes they seek to represent. Plaintiffs are prepared to pursue this case through resolution, understand their responsibilities as class representatives, and have demonstrated a commitment to prosecuting this action vigorously on behalf of the Class. (Wilner Decl. ¶ 7.)

Second, Plaintiff's counsel are "qualified, experienced, and generally able to conduct the proposed litigation[.]" *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). Plaintiffs have retained a competent and capable team of trial lawyers with significant experience litigating class actions and matters involving civil rights and debtors' prisons. Between them, Plaintiffs' counsel have many years of practice and academic experience involving class actions and civil rights cases and are prepared to prosecute this action on behalf of both named Plaintiffs and the members of the classes they seek to represent. (Wilner Decl. ¶¶ 3-6.)

Hank Sanders and Faya Rose Toure, of Chestnut, Sanders & Sanders, along with Martha Morgan, have represented Plaintiffs and the putative class since the inception of this litigation. Mr. Sanders and Ms. Toure have a longstanding practice helping poor and Black people save their lands, protecting people's constitutional rights, challenging corporate abuse, and helping build strong governments to serve all people. Mr. Sanders & Ms. Toure represented the plaintiffs in the

nationally known $1.2 billion Black Farmers Discrimination Litigation, which led to the payment of more than a billion dollars in damages to black farmers by the U. S. Department of Agriculture. Martha Morgan is Professor Emerita of Law at the University of Alabama School of Law, where she spent thirty-plus years teaching, researching and writing on the topics of Constitutional Law, Civil Rights Litigation, and Human Rights Law. Ms. Morgan served as an attorney for plaintiff schoolchildren in the federal class action desegregation case of *Lee v. Macon County Bd. of Educ. (Pickens County School System)*, Case No. CV-70-BE-215-S (N.D. Ala.) and state class action litigation challenging the inadequacy and inequity of Alabama's public school system. *Harper v. Hunt*, CV-91-117-R, consolidated with *Alabama Coalition for Equity, Inc. v. Hunt*, CV-90-883-R, 15th Judicial Circuit Court, Montgomery Alabama.

The National Center for Law and Economic Justice (NCLEJ), a national public interest law firm, and Dentons, Inc., have extensive class action experience. NCLEJ and Dentons have each served as class counsel in numerous actions. (Wilner Decl. ¶¶ 4-5). Plaintiffs' counsel have worked extensively to investigate the claims, are dedicated to prosecuting those claims of the Classes, and have the resources to do so.

## III.      PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(b)(3)

A court may certify a class action if the proposed class meets all of Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation and "at least one of the requirements" of Rule 23(b). *Venerus v. Avis Budget Car Rental, LLC*, 723 F. App'x 807, 814 (11th Cir. 2018); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250-51 (11th Cir. 2004). Under subsection (b)(3), certification is appropriate if "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A.      *Common Legal and Factual Issues*
        *Predominate Over Individual Issues*

To determine whether the predominance requirement has been satisfied, a court first "identif[ies] the parties' claims and defenses and their elements" and then "classif[ies] these issues as common questions or individual questions by predicting how the parties will prove them at trial." *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (citing *Klay*, 382 F.3d at 1254-55). "A common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotations omitted). An individual question is one where the proof "will vary from member to member." *Brown*, 817 F.3d at 1234 (internal citation and quotations omitted).

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013) (internal citations omitted) (emphasis in original). Rather, when "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3)" even if other matters must be tried separately. *Tyson Foods*, 136 S. Ct. at 1046. Predominance is a qualitative rather than quantitative concept. *Brown*, 817 F.3d at 1235.

Common questions of law and fact predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member." *Sacred Heart Health Sys.*, 601 F.3d at 1170 (emphasis in original) (quoting *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256,

1270 (11th Cir. 2009); *see also Klay*, 382 F.3d at 1255 ("Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . monetary relief.") (internal quotations omitted).

The Eleventh Circuit has articulated the following test to determine whether common questions predominate:

> [I]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered. Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Vega,* 564 F.3d at 1270 (alterations in original) (quoting *Klay*, 382 F.3d at 1255).

Here, questions regarding Defendants' liability to the Classes predominate over all else. The elements of the claims turn on Defendants' policies, customs and practices, and the evidence supporting those claims is the same for every member of the Classes. Defendants' liability to the Classes will be determined based on common proof, such as documents and other information contained in Defendants' own systems and databases, without the need for testimony from any particular member. And while there are some differences with respect to the extent of damages among members of the Classes, "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Klay*, 382 F.3d at 1259 (quoting *Allapattah*, 333 F.3d at 1261).

1. **Predominance Is Satisfied as to Defendants'
    Liability on the *Bearden* Claim.**

In *Bearden v. Georgia*, 461 U.S. 660, 672 (1983), the Supreme Court held that "[a] court violates the Due Process and Equal Protection Clauses if it fails to inquire into whether a

probationer has made a bona fide effort to pay a fine before revoking probation or if it fails to consider alternative punishments to imprisonment for an indigent probationer." *Carter*, 2020 U.S. Dist. LEXIS 118755, at \*53 (citing *Bearden*, 461 U.S. at 672-73). The failure to conduct an ability-to-pay hearing is unconstitutional regardless of what the outcome of the hearing would have been. *Doe v. Angelina Cty.*, 733 F. Supp. 245, 254 (E.D. Tex. 1990) (failing to conduct an ability-to-pay hearing is "unlawful *whatever the economic status* of the incarcerated person") (emphasis added); *accord West v. City of Santa Fe,* No. 3:16-cv-0309, 2018 U.S. Dist. LEXIS 144012, at \*23-24 (S.D. Tex. Aug. 16, 2018).

Given the importance of the process required before jailing, a court must create a written record of the ability-to-pay determination. *See Turner v. Rogers*, 564 U.S. 431, 449 (2011) (contempt order issued without written findings violated due process); *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973) (when revoking probation, due process requires "a written statement by the factfinders as to the evidence relied on and reasons for" revocation) (quoting *Morrisey v. Brewer*, 408 U.S. 471, 489 (1972)). The government bears the burden of proving that nonpayment was willful. *See United States v. Mojica-Leguizamo*, 447 F. App'x 992, 996 (11th Cir. 2011) (reversing revocation of probationer's supervised release based in part on the government's failure to prove willful failure to pay). That showing must also be cited in the court record. *Taylor v. State*, 47 So. 3d 287, 290-91 (Ala. Crim. App. 1986) (finding reversible error where "court's order fails to make the specific determinations and findings, supported by the evidence," required by *Bearden*).

Common evidence will establish that the Montgomery Municipal Court had a systemic practice of jailing people for nonpayment of traffic fines and costs without considering their ability to pay. Judge Hayes already stipulated to this before the Alabama Judicial Inquiry Commission, which issued a final judgment determining that Judge Hayes and the other municipal court judges

had a widespread practice of commuting fines and costs to jail time, failed to make ability-to-pay determinations when doing so, and did not record commutation hearings in any manner. ECF 252-2. Defendants' own records show that the commutations occurred and that members of the Classes lost their liberty as a result. Because municipal court judges did not record these proceedings, Defendants cannot argue that the question whether someone received an ability-to-pay hearing is individualized. No such evidence exists.

Because the evidence proving these facts is the same for every member of the Classes, Plaintiffs can establish in one proceeding that the Montgomery Municipal Court systemically violated *Bearden* and the United States Constitution when commuting fines to jail time. Plaintiffs can also establish at once each Defendant's role in and liability for those violations using evidence common to all members of the Class. The evidence establishing that JCS factually and proximately caused the commutations—and thus is liable for the ensuing deprivations of liberty—is contained in JCS's own documents and records, such as the JCS training manual, ProbationTracker records, and form petitions to revoke probation and notices to show cause. The evidence establishing the City's liability for the scheme is contained in the probation contract, the statutes that establish the City's relationship to the municipal court, and the documents in the City's possession demonstrating that the City had knowledge of JCS's unlawful practices as of at least July 16, 2012. None of this evidence will vary from one member to the next.

2. **Predominance Is Satisfied as to JCS's Liability on the False Imprisonment Claim.**

False imprisonment is "the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." *Carter*, 2020 U.S. Dist. LEXIS 118755, at *55-56 (citing Ala. Code § 6-5-170) (internal quotations omitted). "A person responsible for instigating a detention may be held liable only if he persuades or influences officials to imprison the

victim and if he acts in bad faith." *Carter*, U.S. Dist. LEXIS 118755, at 55-56 (citing *Dolgencorp, Inc. v. Pounders*, 912 So. 2d 523, 528 (Ala. Civ. App. 2005)).

The same common evidence Plaintiffs will use to prove the *Bearden* claim also estab-lishes the "unlawful detention" element of the false imprisonment claim. Thus, the only remaining questions are whether Plaintiffs can adduce common proof of the "instigator" and "bad faith" ele-ments. Like the *Bearden* claim, proof of these elements turns on JCS's policies and practices and does not require individualized inquiry.

Common evidence will show that JCS instigated the unlawful detention of Plaintiffs and members of the False Imprisonment Class by issuing Petitions for Revocation and Notices to Show Cause. The same evidence applies equally to the claims of every Class member because JCS operated according to uniform procedures and used form pleadings that varied only with respect to the allegation of appointments allegedly missed and amounts due. As this Court recognized on summary judgment, Plaintiffs have amassed enough evidence for a jury to conclude that once probationers could no longer pay fees to JCS, the company systematically funneled them back to the Montgomery Municipal Court, which, in keeping with its established practice, commuted Plaintiffs' fines to jail time. *Id.* That resolves the instigation element.

Common evidence will also establish that JCS instigated the Class members' deten-tions in bad faith. In a false imprisonment case, bad faith exists where the defendant lacked a reasonable basis for instigating the detentions. *See Grant v. Dolgen Corp.*, 738 So.2d 892, 894 (Ala. Civ. App. 1998). As the Court has recognized, a reasonable jury could find that JCS acted in bad faith here by petitioning to revoke Plaintiffs' probation when it "knew (or should have known) that [Plaintiffs] could not pay [their] fine[s] and would be jailed if the Municipal Court revoked [their] probation." *Carter*, 2020 WL 4559360, at *20. Because the evidence establishes this was

part of a systemic course of conduct by JCS, the jury can reach the same conclusion for all members of the False Imprisonment Class.

First, common evidence will show that JCS was aware of the Montgomery Municipal Court's notorious commutation policy. *See* section B.6, *supra*. With each request to revoke probation, JCS set a Municipal Court hearing date and urged the court to issue an arrest warrant if necessary. *See, e.g.*, ECF 246-98. JCS could thus foresee that these probationers would be brought before the court. And given the court's well-known commutation practice, JCS could also foresee that if probationers could not pay, the court would jail them without consideration of their financial circumstances or a finding of willfulness. Thus, by filing court papers seeking revocation, JCS knew or should have known it was setting in motion the unlawful jailing of probationers who could not pay their fines in full. That's the definition of bad faith.

Second, common evidence will show that JCS knew or should have known that the Class members could not pay their fines in full when it petitioned to revoke their probation. Under the Montgomery Municipal Court's standing orders, only people who could not pay their tickets or fines in full within 30 days of sentencing were placed on JCS probation. *See* part B.2, *supra*. ProbationTracker records show that well over 90% of payments were for less than the amount JCS demanded each month. (Rubens Decl. ¶ 31.) When probationers could make only partial payments, JCS had a policy of (1) increasing the number of appointments they had to attend (ECF 246-98 at 73 (Training Manual); *see generally* part C, *supra*); (2) adding monthly probation fees to probationers' balances no matter how little the probationers owed to the City (Ex. 9 (Standard Operating Procedures)); and (3) allocating more than half of all the money it collected from Montgomery probationers to its own fees (ECF 257-54 (JCS financial data)). These three

policies enabled JCS to keep people on probation as long as they were making small, partial pay-ments, in order to extract as much money as possible before sending them back to the Municipal Court. Only when it could no longer collect probation fees from a probationer would JCS seek to revoke probation. Based on this evidence, and without the need for testimony by individual class members, a jury could reasonably find that JCS knew or should have known that Class members lacked the ability to pay their fines when JCS sought to revoke their probations.[6]

Third, JCS routinely initiated judicial proceedings but then withheld evidence in its possession that demonstrated the probationers' inability to pay. *See* parts B.4, C.1-6, *supra*. The Alabama Supreme Court has held that an instigator acts in bad faith by failing to "state[] all mate-rial facts within his or her knowledge" or obtaining an indictment "by fraud, *by suppressing facts*, or by other misconduct." *Crown Cent. Petroleum Corp. v. Williams*, 679 So. 2d 651, 655 (Ala. 1996) (emphasis added) (quoting *Pannell v. Reynolds*, 655 So. 2d 935, 938 (Ala. 1994)). That is exactly the kind of bad faith in which JCS regularly engaged: JCS's standard forms urged the Municipal Court to revoke probation without any allegation or proof that the probationer had *will-fully* failed to pay—and without disclosing material facts showing the opposite.

Finally, Plaintiffs can meet the bad faith element by using common proof to establish that JCS conducted its entire operation in bad faith for the purpose of extracting as much money as possible from indigent defendants before tossing them back to the Municipal Court. ECF 269

---

[6]     In addition, JCS kept records of hundreds of probationers' means-tested government bene-fits, unemployment, and other indicia of indigence. *See Carter*, 2020 U.S. Dist. LEXIS 118755, at *36. While Plaintiffs do not rely on this evidence to establish classwide liability, the fact that JCS petitioned to revoke even these Class members' probations certainly cor-roborates Plaintiffs' argument that the company instigated unlawful jailings in bad faith.

at 20. The evidence for this will turn on JCS's uniform policies and practices and the jury's determination of JCS's intent in operating the probation scheme. Individualized evidence from class members is not necessary to establish the overarching bad faith of JCS's probation scheme.

Because Plaintiffs are able to prove each element of the false imprisonment claim using common evidence, they will be able to establish in one proceeding JCS's liability to all members of the False Imprisonment Class.

3.   **Predominance Is Satisfied as to JCS's Liability**
     **on the Abuse of Process Claim.**

Under Alabama law, "abuse of process requires (1) an ulterior motive, (2) the wrongful use of process, and (3) malice." *McCullough v. City of Montgomery*, 2020 U.S. Dist. LEXIS 118754, *29 (M.D. Al. July 7, 2020) (citing *C. C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998)). "The [ulterior motive] must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect." *Dempsey v. Denman*, 442 So. 2d 63, 65 (Ala. 1983). The "wrongful use of process is quite simply the use of a lawful process for a purpose for which it was not designed." *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1025 (Ala. Civ. App. 1999). If a plaintiff shows an ulterior motive and wrongful use of process, it satisfies the malice prong as a matter of law." *McCullough*, 2020 U.S. Dist. LEXIS 118754, at *29 (citing *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1025 (Ala. Civ. App. 1999)).

The evidentiary showing for systemic abuse of process requires proof of JCS's motives and conduct. Thus, evidence from individual class members is not relevant to establishing JCS's liability. *See, e.g.*, *Walton v. Franklin Collection Agency*, Inc., 190 F.R.D. 404, 411-12, 2000 U.S. Dist. LEXIS 443, *19 (N.D. Miss. January 11, 2000) (finding predominance for abuse of process where "any individual factual or legal issues that may arise will be secondary to the common questions concerning the Defendant's alleged course of conduct and its unlawfulness").

Common evidence will establish that JCS systematically abused the Montgomery Municipal Court's probation orders by wrongfully taking advantage of the probation process to coerce money from indigent people and divert that money to its own profit instead of the court debt owed. *See, e.g.*, *Klay*, 382 F.3d at 1255-56 (recognizing the misuse of a system for profit maximization as appropriate for class certification where factual issues related to the misuse were "common to all plaintiffs"). JCS took advantage of its contract with the City to use the probation process to exploit defendants for its own advantage—a result clearly not intended by law. When probationers paid less than the minimum amount ordered by the court, JCS appropriated large percentages of those small payments to its own fees. When probationers missed payments—a predictable occurrence covered in detail in JCS's training manual—JCS made phone calls and sent threatening letters in order to coerce them to return and make additional payments, which JCS again diverted for its own benefit. And when the probationers ceased to have value for JCS because they no longer had funds left to pay probation fees, JCS used the judicial process to return these probationers to the court for the ultimate shakedown, in which municipal court judges demanded immediate satisfaction and jailed those who could not pay. All of the evidence for JCS's conduct and motivations comes from its own training manual, form documents, and electronic records, and—at trial—the testimony of JCS's employees. Thus the question whether JCS's conduct constituted an abuse of process requires an analysis of policies and procedures that applied uniformly to all Plaintiffs and class members, and does not require individualized evidence from any particular plaintiff or class member.

      4.      **Lost Liberty Damages Can Be Proven in One Proceeding on Behalf of All Members of the Proposed Classes.**

As demonstrated above, Plaintiff will establish Defendants' liability in relation to each claim using evidence that is common to the Classes. Plaintiff will likewise use common evidence

to establish a category of general damages for all members of the Classes—specifically, the compensatory damages "recoverable for loss of liberty for the period spent in wrongful confinement." *Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004); *see also Daniel v. Hodges*, 125 So.2d 726, 728 (Ala. Ct. App. 1960) (recognizing that one who is unlawfully detained incurs "damage sustained by the loss of time and liberty"). These damages "are separable from [other] damages" that may arise from wrongful confinement, including damages "for such injuries as physical harm, embarrassment, or emotional suffering." *Kerman*, 374 F.3d at 125-26. Indeed, "[a] loss of time, in the sense of loss of freedom, is inherent in any unlawful detention and is compensable as 'general damages' for unlawful imprisonment without the need for pleading or proof." *Id.* at 130; *see also H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1088 (11th Cir. 1986) (holding that in cases involving unlawful detentions arising from constitutional violations, "real injury can be inferred from the facts").

When a class comprises people who lost their liberty because of a defendant's common course of unlawful conduct, courts may award aggregate compensatory damages to class members without the need for individualized evidence. *See, e.g.*, *Dellums v. Powell*, 566 F.2d 167, 208 (D.C. Cir. 1977) (Leventhal, J., concurring) (approving process by which jury awarded approximately 1,200 class members "damages for false arrest and false imprisonment on a variable scale"—$120 for each member detained 12 hours or less, $360 for each member detained 12 to 24 hours, $960 for each member detained 24 and 48 hours, and $1,800 for each member detained 48 and 72 hours); *Barnes*, 278 F.R.D. at 20 (applying "*Dellums* method" to "determin[e] general damages for the class"—namely, "the injury to human dignity that is presumed when a person is . . . overdetained"); *Betances v. Fischer*, 403 F. Supp. 3d 212, 238 (S.D.N.Y. 2019) (holding "a class-wide daily damages value may be assessed for each day of incarceration or other restraint of liberty");

- 51 -

*Roy v. Cnty. of Los Angeles*, No. CV1209012, 2018 WL 3436887, at *3 (C.D. Cal. July 11, 2018) (recognizing "general damages may be available on a class-wide basis in § 1983 cases based upon unlawful detention"); *Covington v. Wallace*, No. 2:12-cv-123:DPM, 2014 WL 5306720, at *2 (E.D. Ark. Oct. 15, 2014) (certifying class of people detained without due process and concluding it is "both fair and legally adequate" to measure damages "by the number of days each class member was unlawfully detained"). Such damages are typically applied based on a variable-scale or per-diem approach, both of which account for the value of time lost by any given class member. *See, e.g.*, *Dellums*, 566 F.2d at 208 (Leventhal, J., concurring) (variable scale); *Covington*, 2014 WL 5306720, at *2 (per diem). Once those figures are determined, the calculation of aggregate damages for lost liberty requires only basic math.

> 5. **JCS-Fee Damages Can Be Proven in One Proceeding on Behalf of All Members of the Proposed Abuse of Process Class**

Basic math also suffices to identify a category of damages alleged by the members of the Abuse of Process Class: the fees JCS collected from them through its abuse of the probation orders. In the ProbationTracker database, JCS recorded each probationer's payment plan requirements, all payments the probationer made to JCS in relation to that plan, and how JCS allocated the payments as between the City's fines and JCS's probation fees. (Rubens Decl. ¶ 30.) If the jury agrees with Plaintiffs that JCS systematically abused the probation process in Montgomery for an ulterior motive and must return the fees it collected to Class members, the aggregate judgment amount will be a simple summation of the fees each Class member paid to JCS.

The Eleventh Circuit has held that "where damages can be computed according to some formula . . . or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *Klay*, 382 F.3d at 1259-

60. This is particularly true when the calculation of each class member's damages "can be accomplished simply through reference" to the defendant's own documents. *Id*. at 1260. Plaintiffs need not set forth those calculations at this stage; rather, "Plaintiffs need only come forward with plausible . . . economic methodologies to demonstrate impact on a class-wide basis." *Id*. at 1259 (internal marks and citation omitted). Plaintiffs have done so here, and this further bolsters their satisfaction of the predominance requirement.

**B.**     ***A Class Action Is the Superior Means of Adjudicating This Controversy.***

Rule 23(b)(3)'s second prong considers whether "a class action is superior to other available methods for the fair and efficient adjudication of the [claims]." Fed. R. Civ. P. 23(b)(3). This inquiry focuses on "the relative advantages of a class action suit over whatever other forms of litigation might realistically be available to the plaintiffs." *Klay*, 382 F.3d at 1269. Courts consider four main factors: (A) whether the class members have an interest in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) any likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). Here, all four factors strongly favor class certification.

**1.**     **Given the Complexity of the Case, Class Treatment Is More Likely To Benefit Class Members Than Individual Actions.**

The first factor, class members' interest in bringing separate proceedings, plainly supports class certification. *See* Fed. R. Civ. P. 23(b)(3)(A). This factor is met where the court determines that a class action will "allow[] for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 915 (10th Cir.) (quoting *Amchem Prod., Inc. v. Windsor*,

521 U.S. 591, 617 (1997), *cert. denied*, 139 S. Ct. 143 (2018). "[T]he class action device is especially pertinent to vulnerable populations." *Id*. 882 F.3d at 915 (quoting 2 *Newberg on Class Actions* § 4:65 (5th ed. 2017)).

First, it is extremely unlikely that the putative Class members in this case—who were jailed because they lacked the means to pay municipal court fines—could bring § 1983 claims against these large, well-funded defendants individually. Under similar circumstances, courts routinely hold that a class action is superior to individual litigation. *See, e.g.*, *Kinard v. E. Capitol Family Rental, L.P.*, 331 F.R.D. 206, 215 (D.D.C. 2019) (in Fair Housing Act case on behalf of low-income tenants, class action superior because "most members would not pursue their claims outside of a class action, since the costs of individually prosecuting this litigation would outweigh an individual class member's potential damages"); *Betances*, 304 F.R.D. at 432 (class action superior where "the class consists of individuals who have been imprisoned for felonies, [and] it is unlikely that many if not most of these individuals would ever commence litigation on their own behalf to vindicate their rights"); *Garcia v. E.J. Amusements of New Hampshire, Inc.*, 98 F. Supp. 3d 277, 292 (D. Mass. 2015) (class action superior where "[m]any of the class members are low-income, uneducated, and lack the resources to litigate their own claims"); *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 220 (S.D. Ohio 2003) (class action superior where the "plaintiffs are of low income and lack the resources to secure representation and see the litigation through to completion," and so a class action could "allow[] for recovery by individuals who otherwise would not have been compensated for [the defendants'] alleged wrongdoings").

Second, "the complexity and expense of these cases suggest that individual class members have an interest in a single adjudication." *McClendon v. Cont'l Grp., Inc.*, 113 F.R.D. 39, 45 (D.N.J. 1986). To prevail on the constitutional claims against JCS and Montgomery individually,

each person would need to build an evidentiary record sufficient to support *Monell* liability and defeat myriad defenses such as *Rooker-Feldman* and *Heck v. Humphrey*. Under such circumstances, "class members who may not otherwise have the means to litigate their claims will likely benefit greatly from a class action, and a class action will ensure that class members who are otherwise unaware that they possess a claim will have their rights represented." *City of Farmington Hills Employees Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 357 (D. Minn. 2012); *see also Otero v. Dart*, 306 F.R.D. 197, 207 (N.D. Ill. 2014) (holding that "[a] class action is the superior procedure for litigating [unlawful jailing] claims because the Court can determine the legality of the alleged practice and procedure in one proceeding" and because "[t]he proposed class might include hundreds, if not thousands of members, many of whom are unlikely to pursue their claims on their own."); *Winston*, 2006 WL 6916381, at *12 (certifying a class whose members would have little ability to prosecute their claims against [the government d]efendant through individual actions").

Finally, apart from the *Carter* case, Plaintiff's counsel are unaware of "any individual suits hav[ing] been filed despite the amount of time that has passed since this action was commenced"—or indeed, since Montgomery cancelled its contract with JCS—which confirms that as a practical matter, members of the Classes have "little interest in individually controlling separate actions." *In re Nassau Cty. Strip Search Cases*, No. 99-CV-2844 (DRH), 2008 WL 850268, at *7 (E.D.N.Y. Mar. 27, 2008).

2. **The Lack of Other Litigation Weighs in Favor of Class Certification.**

The second factor, on other litigation, also supports class treatment. *See* Fed. R. Civ. P. 23(b)(3)(B). Aside from *Carter*, Plaintiffs' counsel know of no other pending litigation arising from the jailing of JCS probationers in Montgomery. *See Smith v. Triad of Alabama, LLC*, No.

1:14-CV-324-WKW, 2017 WL 1044692, at \*15 (M.D. Ala. Mar. 17, 2017) (class action superior where "[t]he court has not been made aware of any other [relevant] litigation . . . and concentrating this dispute in a single forum will help bring the matter to a uniform conclusion that neither prejudices nor privileges [the defendant] or particular class members"). Additionally, counsel for the plaintiffs in both *Carter* and *McCullough* believe that consolidating the two cases for trial is appropriate, and this will only increase the superiority of the class action procedure for resolving the claims fairly and efficiently for all members of the Classes. ECF 274 at 1-2.

3.  **Resolving the Central Issues in a Single Proceeding Before This Court Will Serve Efficiency and Judicial Economy.**

The third factor—the desirability of concentrating the litigation in a single forum—favors certification because the legal and factual questions at the heart of this case are common to all the Class members. *See* Fed. R. Civ. P. 23(b)(3)(C). "[A] finding that common issues predominate over individual issues leads to an inescapable conclusion that a class action presents the more desirable vehicle for adjudicating the plaintiffs' claims." *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 646 (N.D. Ala. 2009) (citing *Williams v. Mohawk Indus. Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009)). In contrast, "[h]olding separate trials for claims that could be tried together would be costly, inefficient, and would burden the court system by forcing individual plaintiffs to repeatedly prove the same facts and make the same legal arguments before different courts." *Klay*, 382 F.3d at 1270. It would also risk conflicting outcomes. *See Smith*, 2017 WL 1044692 at \*15 ("[C]oncentrating this dispute in a single forum will help bring the matter to a uniform conclusion that neither prejudices nor privileges [the defendant] or particular class members.").

Furthermore, this Court is already deeply familiar with the parties, claims, and issues in this litigation, has issued numerous rulings in both *Carter* and *McCullough*, and has already considered consolidating the two actions. Accordingly, judicial economy and efficiency strongly

support certifying the Classes and adjudicating all the claims in this forum. *See Klay*, 382 F.3d 1271 ("[I]t is desirable to concentrate claims in a particular forum when that forum has already handled several preliminary matters."); 2 *Newberg on Class Actions* § 4:71 (5th Ed. Nov. 2018) (certification in a particular forum is "particularly appropriate when that court has already made several preliminary rulings" and "other similar actions have been consolidated before the court").

**C.    *This Case Presents No Significant Management Difficulties.***

The final factor under Rule 23(b)(3)—manageability—also weighs in favor of class certification. *See* Fed. R. Civ. P. 23(b)(3)(D). The Eleventh Circuit has stated that concerns about manageability "will rarely, if ever, be . . . sufficient to prevent certification of a class." *Klay*, 382 F.3d at 1272; *see also id.* at 1273 ("Even potentially severe management issues have been held insufficient to defeat class certification"); *Winston*, 2006 WL 6916381, at *12 (N.D. Ala. June 26, 2006) (noting "strong presumption against denying class certification for management reasons"); 2 *Newberg on Class Actions* § 4:72 (noting "presumption against dismissing a class action on manageability grounds"). The manageability inquiry is not "whether this class action will create significant management problems, but instead . . . whether it will create relatively more management problems than any of the alternatives." *Klay*, 382 F.3d at 1273. "[W]here a court has already made a finding that common issues predominate over individualized issues, [it] would be hard pressed to conclude that a class action is less manageable than individual actions." *Id.*; *see also Mohawk*, 568 F.3d at 1358 (noting "manageability is ordinarily satisfied so long as common issues predominate over individual issues"); 2 *Newberg on Class Actions* § 4:72 (noting "the very concerns that might make a class suit difficult to manage also infect the procedural alternatives").

Plaintiffs propose a trial plan with three phases. In Phase I, Plaintiffs will use common evidence to prove on a class-wide basis both Defendants' liability and the aggregate damages to

which members of the Classes are entitled for their lost liberty and payment of JCS fees. For purposes of establishing lost liberty damages,[7] Plaintiffs suggest the Court allow each side to call a non-random sample of twelve members from across the *Bearden* and False Imprisonment Classes, who will testify to the details of their unlawful detentions but not other injuries suffered or their individual backgrounds (such as occupations, education levels, criminal histories, family situations, and similar personal facts). *See Barnes*, 278 F.R.D. at 20-21 (finding this to be "just and expeditious method of trying [general] damages" on class-wide basis); *see also Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 162 (E.D.N.Y. 2011) (noting juries can determine category of general damages on class-wide basis so long as "care [is] . . . taken to ensure that the amount awarded . . . excludes all elements of special damages"). Plaintiffs further suggest that in order "[t]o assist the jury in assigning values" for lost liberty damages, the Court "allow expert testimony that is limited to explaining the range of general damages that have been awarded by judges or juries in similar cases." *Barnes*, 278 F.R.D. at 21.

Because the issues to be resolved in Phase I are common to the members of the Classes, those issues predominate over any issues that will remain after Phase I. Indeed, if Defendants are absolved of liability, the case will be over. But if Plaintiffs establish that Defendants are liable, then all injuries other than loss of liberty that flow from Defendants' unlawful conduct will have to be proven individually. In Phase II, which (assuming liability is established) will occur immediately after Phase I, the jury from Phase I will determine the damages to which Plaintiffs—and Mr. Carter, if the cases are consolidated for trial—are entitled for their individual injuries. At that

---

[7]    As discussed, JCS-fee damages can be calculated based on Defendant's records without any additional proceedings.

point, the case will move into Phase III for determination of any individual damages owed to members of the Classes who come forward to seek such damages.

Plaintiffs acknowledge that the damages to be resolved in Phases II and III—which will compensate for injuries such as emotional distress and lost wages—are individualized. But such damages do not defeat predominance because the resolution of common issues in Phase I will "have a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . monetary relief" for lost liberty and JCS fees. *Klay*, 382 F.3d at 1255. Indeed, "it would be neither efficient nor fair to anyone, including Defendant[s], to hold [hundreds of] trials to hear the same evidence and decide the same liability issues." *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 309 (N.D. Fla. 2017); *see also Allapattah*, 333 F.3d at 1261 (holding that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"); *Smith*, 2017 WL 1044692, at *14 (explaining that resolution of individualized damages for hundreds of class members "shrinks in comparison to the burden of conducting a full-blown trial on every issue contained in every cause of action, for every class member," so those damages "do not sink the putative class"); *see also* 4 *Newberg on Class Actions* § 11:8 (5th ed. 2020) ("The efficiencies of the class suit can be accomplished by trying the defendant's liability once in the aggregate proceeding while working out the subsequent damages, if necessary either through similar classwide proof or through some kind of more individualized procedure.").

As the Eleventh Circuit has recognized, "[d]istrict courts have many tools to decide individual damages" issues. *Brown*, 817 F.3d at 1239. These include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damage proceedings; [and] (3) decertifying the class after the liability

trial and providing notice to class members concerning how they may proceed to prove damages" in separate proceedings after the liability trial. *Id.* (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 123, 141 (2d Cir. 2001)); *see also Klay*, 382 F.3d at 1273 ("There are a number of management tools available to a district court to address any individualized damages issues that may arise in a class action"). In *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017) (en banc), the Court of Appeals approved a three-phase approach similar to the one Plaintiff proposes here. "In Phase I, a jury decided issues common to the entire class, including general causation" and "defendants' common liability to the class members." *Id.* at 1175. "In Phase II, the [same] jury determined the liability of the [defendants] to three class representatives" and awarded compensatory damages to those representatives. *Id.* In Phase III, the class was decertified, and former members were allowed to pursue individual damages claims in separate lawsuits. *Id.* at 1175, 1178. Importantly, each member "retained the findings of liability by the jury from Phase I," and those findings had "res judicata effect" in the subsequent trials. *Id.* at 1178.

The appeal in *Graham* arose from a verdict in favor of a former class member who brought an individual wrongful death action after decertification. *Id.* at 1174-75. The Eleventh Circuit, sitting en banc, held "that giving preclusive effect to the findings of the jury in Phase I did not violate the due process rights of the tobacco companies" in the subsequent action. *Id.* at 1181; *see also Navelski v. Int'l Paper Co.*, 261 F. Supp. 3d 1212, 1219 (N.D. Fla. 2017) (holding "the Seventh Amendment will not be violated by bifurcation of causation and damages in [class action] case"). In reaching its conclusion, the Eleventh Circuit recognized that "courts, both state and federal, frequently manage class actions by splitting them into separate phases*." Graham*, 857 F.3d at 1184 (citing Newberg on Class Actions §§ 10.6, 11.3 (5th ed.)). Indeed, the Court noted this was "not the first time that defendant's common liability was established through a class action

and given binding effect in subsequent individual damages actions." *Id.*; *see also Allapattah*, 333 F.3d at 1257 (holding defendant's liability "was decided properly on a class-wide basis," but the damages suffered by class members would have to be determined "on an individual basis").

At this point, there is no way of knowing how many members of the Classes will step forward to prove injuries that are individual to them—that is, injuries suffered as a result of Defendants' conduct beyond the common loss of liberty and payment of JCS fees that all members experienced. The numbers may be such that the Court can handle those proceedings efficiently, whether by itself, with other district court judges, or through the appointment of a magistrate judge or special master. *See Brown*, 817 F.3d at 1239. But if the numbers prove substantial, the Court has the option of decertifying the class after the liability trial and providing notice to members concerning how they may pursue separate cases to establish their individual damages. *See id*. Of course, there is always the possibility of settlement after the liability phase and in that case, "a settlement-claiming program" can substitute for Phases II and III. 4 *Newberg on Class Actions* § 11:9. The bottom line is that "individual damages assessments do not defeat predominance" because the issues of liability and damages for lost liberty and JCS fees can be resolved at once for all members of the Classes, and the Court has various tools to resolve any other damages issues that may remain. *Thompson*, 2018 WL 5993867, at *11-12 (relying on *Brown* in certifying class action brought for unlawful detentions).

## IV.    CONSTITUTIONALLY SOUND NOTICE CAN BE PROVIDED TO MEMBERS OF THE CLASSES

To protect the rights of the members of the Classes, the Court must provide them with the best notice practicable when it grants certification under Rule 23(b)(3), including individual notice to all members who can be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B). "The notice may be by one or more of the following: United States mail, electronic means, or other

appropriate means." Id. Ultimately, the best notice practicable is that which is "reasonably calcu-lated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The ProbationTracker database JCS maintained includes the names, Social Security Numbers, and at least one street address for all proposed members of the Classes. (Rubens Decl. ¶ 4.) It is thus possible to obtain current addresses and send notice directly via First Class mail to all members of the Classes. *See, e.g., George v. Academy Mortgage Corp. (U*T*)*, 369 F. Supp. 3d 1356, 1368 (N.D. Ga. 2019) (discussing process by which administrator used names and Social Security Numbers to conduct "skip tracing" to locate current address information). If necessary and appropriate, notice can also be published in a local paper, through targeted internet postings, or on a website established to provide members of the Classes with information that will allow them to stay apprised of the status of the case and to access the notice form and other key docu-ments. See *Manual Complex Litig.* § 21.222, at 288. In short, it will not be difficult to provide the best notice practicable to the members of the Classes. If certification is granted, Plaintiffs will submit a detailed notice plan and form to the Court.

## V. *MITCHELL* TOLLING DOES NOT AFFECT THE PROPOSED CLASSES

In its September 11, 2020 order granting the City of Montgomery's motion for reconsid-eration and dismissing Algia Edwards' Count VIII *Bearden* claims against the City, the Court directed "the parties to address in their class certification briefing whether and how *Mitchell* [tolling] affects the proposed classes." ECF 279. The short answer is that it does not. In 2018, the Supreme Court resolved a circuit split regarding whether the filing of a class action lawsuit tolls the statute of limitations for putative class members to file their own class actions. *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018). The Court held that so-called *American*

*Pipe* tolling applies only to individual claims and does not permit the maintenance of successive

or stacked class actions. *Id.* This had already been the rule in the Eleventh Circuit since *Griffin v.*

*Singletary*, 17 F.3d 356, 359 (11th Cir. 1994), and Plaintiffs have never sought *American Pipe*

tolling on behalf of the putative Classes.[8]

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully ask the Court to certify the Classes

described in this motion.

Dated:  September 14, 2020                    Respectfully submitted,

By: s/ Claudia Wilner

Martha I. Morgan (ASB-3038-A46M)            Gregory Lee Bass, *pro hac vice*
8800 Lodge Lane                            Britney Wilson, *pro hac vice*
Cottondale, AL  35453                      Claudia Wilner, *pro hac vice pending*
Telephone: (205) 799-2692                  NATIONAL CENTER FOR LAW AND
Email: mimorgan@yahoo.com                  ECONOMIC JUSTICE
                                           275 Seventh Avenue, Suite 1506
Faya Rose Toure (ASB-5931-R78R)            New York, NY 10001
Henry Sanders (ASB-6179A34H)               Telephone: (212) 633-6967
CHESTNUT, SANDERS &                        bass@nclej.org
  SANDERS LLC                              wilson@nclej.org
P.O. Box 1290                              wilner@nclej.org
Selma, AL  36702
Telephone:  (334) 526-4531                 Attorneys for Plaintiffs and the Putative
Fax:  (334) 526-4535                       Classes
Email:  fayarose@gmail.com
Email:  gpompey@csspca.com

---

[8]    While in no way relevant to the class issues now being briefed, Plaintiffs also note the clear legal error in the City's continued insistence that, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), the *Mitchell* tolling period for individual claims ends upon the filing of the parties' stipulation of dismissal. In *Perry v. Schumacher Group of Louisiana*, 891 F.3d 954, 956 (11th Cir. 2018), the Eleventh Circuit made clear that Rule 41(a)(1)(A) is not an available mechanism for dismissals of anything short of an entire action.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of Record, on this 14th day of September, 2020.

 s/  *Britney Wilson*