IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ANGELA MCCULLOUGH, MARQUITA JOHNSON, KENNY JONES, ALGI EDWARDS, LEVON AGEE, ADRIAN EDDIE FLOYD, HASSAN CALDWELL, DEVRON JAMES, ASHLEY DAWN SCOTT, and CHRISTOPHER MOONEY, on behalf of themselves, individually, and on behalf of a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF MONTGOMERY, ALABAMA; EARNEST N. FINLEY, JR., Chief of Police of the City of Montgomery, in his individual capacity; KEVIN MURPHY, former Chief of Police of the City of Montgomery, in his individual capacity; LES HAYES III, Presiding Judge of the Municipal Court of the City of Montgomery, in his individual and official capacities; JUDICIAL CORRECTION SERVICES, INC., a corporation; and TODD STRANGE, Mayor of the City of Montgomery, in his individual capacity, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No.  2:15-cv-00463-RCL ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## Defendants' Joint Motion to Strike Expert Declaration

Defendants move this Court to strike the expert declaration of John Rubens (ECF No. 283-1) submitted by the Plaintiffs in support of their Motion for Class

Certification. (ECF No. 281.) Mr. Rubens was never disclosed as an expert witness (nor was he disclosed in any other way until the Motion for Class Certification was filed), Plaintiffs failed to respond to Defendants' discovery requests regarding expert witness disclosures, and, in any event, Rubens's declaration is insufficient to support certification of Plaintiffs' proposed class.

## I. Introduction and Procedural History

On June 20, 2019, this Court entered an Order (ECF No. 187) that required the parties to meet and confer to discuss and submit a proposed discovery plan and scheduling order. But the Court did not make this request open-ended. Instead, the Court directed: "The order shall provide for a discovery end-date of December 19, 2019." *Id*. at 2. If any doubt remained as to the firmness of this discovery cutoff directive, this Court further stated that, "Given this case's history and duration, these deadlines will not be further extended." *Id*.

The parties submitted a proposed discovery plan (ECF No. 192), but no other scheduling order was entered. The only deadlines ordered by the Court were the December 19, 2019, deadline for discovery, the January 20, 2020, deadline for dispositive motions, the February 20, 2020, deadline for responses to dispositive motions, and the March 9, 2020, deadline for replies to those responses. (ECF No. 187 at 2.) In the proposed discovery plan the parties agreed on a proposed date for Plaintiffs' expert disclosures but did not agree on the deadline for Defendants' expert disclosures. (ECF No. 192 at 6.).

Shortly before the agreed-upon deadline for Plaintiffs' expert disclosures, Plaintiffs' counsel wrote to the City of Montgomery's counsel saying that "there is no stipulation or court order regarding the schedule for disclosure of experts or their reports." *See* Ex. A, letter from Jennifer A. Barrett to Shannon L. Holliday, October 14, 2019. In response to this, JCS's counsel wrote to Plaintiffs' counsel on October 17, 2019, stating that JCS did not agree that there was no expert disclosure deadline in place for the Plaintiffs, as the parties' agreement on the Plaintiffs' disclosure date was a stipulation between the parties. *See* Ex. B, email thread between Wilson F. Green and Jennifer A. Barrett, October 17, 2019. JCS's counsel explained the purposes for its email: to get JCS's position on the record in case of the exact event that the Defendants now face – a late, surprise introduction of an expert witness. *Id*. Plaintiffs' counsel responded that, "Once we have [requested production items] then we would expect all the parties to be in a better position regarding identifying experts and exchanging reports." *Id*. JCS and the City of Montgomery produced documents after that correspondence, but Plaintiffs never disclosed any expert.

In addition to this, JCS sent discovery requests to Plaintiffs on July 23, 2019, that sought, among other things, the identity of any expert retained by the Plaintiffs and the nature of his or her expected testimony. *See, e.g.*, Ex. C, JCS's First Interrogatories and Requests for Production to Plaintiff Angela McCullough, at interrog. no. 13. Montgomery sent similar discovery requests to Plaintiffs on August 9, 2019. *See, e.g.*, Ex. D, Montgomery's First Interrogatories and Requests for Production to Plaintiff Angela McCullough, at interrog. no. 14. Each Plaintiff

3

responded that he or she would disclose experts in accordance with any deadline set by this Court. *See, e.g.*, Ex. E at interrog. no. 13.

On September 14, 2020, 8 months and 26 days past the discovery cutoff that this Court mandated, Plaintiffs revealed for the first time that they intended to use the testimony of John Rubens as an expert witness in support of their motion for class certification. (ECF Nos. 283-1 through 283-9.) Plaintiffs submitted Rubens's declaration (and 8 associated exhibits), in which Rubens makes assertions about the ability to use the ProbationTracker and Benchmark databases to identify certain probationers whose case histories fit certain parameters. *See id*. Despite his conclusion that these databases can be used to generate lists of probationers who all fall under uniform parameters for the purposes of class certification, Rubens failed to actually provide a list that establishes his claims.

Rubens may or may not have the qualifications that would have made him an acceptable expert witness in this case had he been properly disclosed and had he provided a competent expert report. Had this happened, Defendants could have deposed Rubens and examined him regarding his assertions. Defendants could have asked him to show how his methods could actually generate a list of probationers that would assist this Court in determining the ascertainability of the class that Plaintiffs ask this Court to certify. And after obtaining his testimony, Defendants would then demonstrate any problems with his methodology, obtain its own experts, or file a motion challenging him under *Daubert* and Rule 702, Fed. R. Evid. But that time has long passed. Plaintiffs opted for gamesmanship over compliance with this Court's

hard and fast December 19, 2020, discovery deadline. They should not be rewarded for this. Rubens is due to be excluded as an expert witness in this case, and his declaration and its associated exhibits are due to be struck.

## II. Argument

### A. Rubens's declaration is due to be excluded because he was not timely disclosed as an expert witness before the discovery cutoff.

One purpose of discovery is to create an orderly process by which a record may be generated to support trial of the case, dispositive motions, or other motions like the pending motion for class certification. Surprise is not favored under the rules. *Glass-Wyble v. Geico Ins. Co.*, No. 1:19-00429-KD-N, 2020 WL 5166034, at *3 (S.D. Ala. 2020). Recognizing this purpose, the 11th Circuit has ruled that expert disclosures must be made in a reasonable time to allow for opposition responses, and that an expert must be disclosed in sufficient time before the close of discovery to allow the opposing side to prepare and depose that expert. *OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1362 (11th Cir. 2008).

This Court gave the parties clear direction in its June 20, 2019, order: discovery in this case was to close no later than December 19, 2019, and no extension to that date would be granted. (ECF No. 187 at 2.) This was a deadline, not a mere suggestion, and was an exercise of this Court's authority to ensure that the case proceeded in a timely manner. *See Perez v. Miami-Dade County*, 297 F.3d 1255, 1265 (11th Cir. 2002) ("Indeed, we have repeatedly emphasized the responsibility of trial courts to manage pretrial discovery properly in order to avoid 'a massive waste of judicial and private resources' and a loss of society's 'confidence in the [court's] ability

5

to administer justice'"), *quoting Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1999)).

Courts in multiple jurisdictions have held that even disclosure of an expert before the close of discovery is not timely when such disclosure is so close to a discovery cutoff date that the non-disclosing party does not have sufficient time to address the new expert. *See, e.g.*, *Mobile Shelter Systems USA, Inc. v. Grate Pallet Solutions, LLC*, 845 F. Supp. 2d 1241, 1248-1251 (M.D. Fla. 2012) (excluding expert whose "supplemental" opinions were not disclosed until the final day of the discovery period); *Finwall v. City of Chicago*, 239 F.R.D. 494, 498-500 (N.D. Ill. 2006) (excluding experts disclosed prior to discovery deadline, but not in sufficient time to allow opposing side to prepare and depose those experts before the discovery cutoff, and collecting and citing a number of analogous cases supporting its holding); *Argo Systems FZE v. Liberty Ins. PTE, Ltd.*, No. Civ.A 04-00321-CGB, 2005 WL 1355060, *5 (S.D. Ala. 2005) (excluding proposed expert due to untimely disclosure where proposed testimony was based upon information in the possession of the disclosing party for ample time before the close of the discovery period); *White v. Volvo Trucks of North America, Inc.*, 211 F.R.D. 668, 669-70 (M.D. Ala. 2002) (holding that expert who was untimely disclosed was due to be excluded even if such disclosure did not prejudice the non-disclosing party where the court had set discovery deadlines).

The default rule that experts can be disclosed no later than 90 days before a trial date does not apply here. *See* Fed. R. Civ. P. 26(a)(2)(D)(i). The defaults under Rule 26 apply only when there has not been direction from the court. Experts must

be disclosed "at the times and in the sequence the court orders" and the default rule only applies "[a]bsent a stipulation *or a court order*." *Id*. "The default deadline in the rule does not apply in this case because there was a court order setting a discovery deadline." *Hassebrock v. Bernhoft*, 815 F.2d 334, 340-41 (7th Cir. 2016). Like in this case, the court in *Hassebrock* had ordered a discovery cutoff date, albeit not in a full scheduling order. *See id*. at 338 (noting that the discovery deadline was set in a minute order that simply stated, "Discovery shall be completed by 5/10/2014").

This Court unambiguously directed the parties to provide a discovery schedule that would "provide for a discovery end-date of December 19, 2019." To argue that December 19, 2019, was not the absolutely latest day they could have disclosed an expert, the Plaintiffs would essentially have to argue that expert discovery is not discovery. But absent some order saying otherwise, "discovery" means all discovery, including expert discovery. As the court in *Hassebrock* noted, "The [disclosing parties] make much of the fact that the order didn't say that '*all* discovery shall be completed' by [the cutoff date], but that hardly matters. The addition of the word 'all' would have been superfluous." *Id*. at 341. This Court's order was clear – discovery in this case ended on December 19, 2019, and Plaintiffs' untimely expert declaration is due to be excluded.

### B. Rubens's declaration is due to be excluded because Plaintiffs failed to respond to Defendants' discovery requests seeking the identity of expert witnesses and the content of their expected testimony.

In addition to Rubens's introduction being after the discovery cutoff generally, Plaintiffs also failed to disclose him or the substance of his testimony as requested by JCS's and Montgomery's interrogatories. JCS asked each and every Plaintiff to:

> Identify any and every expert witness you intend to call during the trial of this case or to use in support of any motion in this case, and with respect to each expert witness identified, state the expert witness's occupation and employer; the subject matter upon each expert witness is expected to testify; the substance of the facts and opinions to which the expert is expected to testify; and a summary of the grounds of each opinion the expert will provide, including (but not limited to) the witness's knowledge, education, training, work history, articles, publications, or periodicals.

*See, e.g.*, Ex. C at interrog. no. 13. Further, JCS asked each and every Plaintiff to produce any expert witness's curriculum vitae or résumé, billing records, time records, notes, correspondence, treatises, publications, and any and all documents or things relied upon by each expert witness in forming any opinions in this case. *See id.* at Request for Production 9. In response to the interrogatory, every Plaintiff answered that he or she would "identify expert witnesses, if any . . . pursuant to the requirements of Rule 26(a)(2)(A) and (B), and pursuant to any scheduled date ordered by the court." *See, e.g.*, Ex. E, at interrog. response no. 13. Similarly, Montgomery asked the Plaintiffs to, "Identify and describe with specificity and particularity each and every expert witness you rely on to support your claims in this case, including, the name and address of the expert witness, the opinions the expert is expected to

offer, the facts and evidence relied upon by the expert in forming his or her opinions, and qualifications of each expert witness." *See, e.g.*, Ex. D at interrog. no. 14. Plaintiffs gave the same responses to Montgomery that they gave to JCS. *See, e.g.*, Ex. F, at interrog. response no. 14. JCS later wrote to Plaintiffs' counsel and, as part of a more expansive letter concerning deficiencies in Plaintiff Christopher Mooney's discovery responses, reminded Plaintiffs of their duty to supplement their discovery responses with any known information about their expert's opinions and the facts underlying those opinions. *See* Ex. G, at 4, ¶ 13.

Then, even after the interrogatories, Plaintiffs' counsel wrote to Defendants' counsel and said they had no expert disclosure deadline. In response, two months before the discovery cutoff, counsel for JCS asked Plaintiffs' counsel whether they were going to use an expert, when they would know, and how long they needed. *See* Ex. B. JCS's counsel offered to have a conversation, and Plaintiffs' counsel never said whether Plaintiffs were going to use an expert. Plaintiffs' counsel said, however, that they would be in a position to discuss exchanging expert information after they received Benchmark data from Montgomery. *See id.* Plaintiffs' counsel never indicated that they were ready to make any disclosure or even talk about it.

As covered above, Plaintiffs' disclosure came nearly 9 months after the scheduled date ordered by this Court. This robbed Defendants of any opportunity to depose Rubens to see what he was going to say and secure its own rebuttal witness to challenge any conclusions that Rubens reached. It can be assumed that Plaintiffs believed it advantageous to, instead, spring this on Defendants during a reply period

9

short enough to even further limit Defendants' opportunities for rebuttal. Even though it would have still been untimely (and Rubens would have still been due to be excluded), Plaintiffs could have at least supplemented their interrogatory responses, as is their duty, when they first decided to use Rubens as an expert. *See Hancock v. Hobbs*, 967 F.2d 462, 457 (11th Cir. 1992) (holding that testimony of expert was properly excluded where the disclosing party failed to supplement interrogatory answer to disclose expert's identity and substance of testimony for months after retaining him and over 3 months after the close of discovery); *Goodman-Gable-Gould Co. v. Tiara Condominium Ass'n, Inc.*, 595 F.3d 1203, 1211-12 (11th Cir. 2010) (holding that district court did not abuse its discretion in excluding information that should have been disclosed through supplemental interrogatory responses); *Schearbrook Land and Livestock Co. v. U.S.*, 124 F.R.D. 221, 223 (M.D. Fla. 1988) (plaintiffs' expert was due to be excluded when they failed to supplement their interrogatory answers and designated an expert after the discovery period had closed, which placed defendants at a disadvantage and constituted "prejudicial surprise"). Plaintiffs should not be rewarded for their tactical delay, and Rubens's declaration should be excluded.

### C. Rubens's declaration is unreliable and unhelpful to this Court.

Even if this Court were to allow Rubens's declaration to be used (which it should not), the declaration is unreliable and is facially insufficient to support the certification of the class that Plaintiffs' seek. First, and most glaringly, Rubens claims that his methods can produce a list of class members using some interaction between

10

JCS's ProbationTracker software and the City of Montgomery's records, but he does not actually provide this list. (ECF No. 283-1.) Because he doesn't provide the list, Defendants (and this Court) have no way to check the proposed class his method supposedly generates to see if the method actually works.

Defendants suspect that Plaintiffs did not wish for Rubens to provide a list to prevent what has happened in JCS's previous successful attempts to show how ProbationTracker and court records cannot be relied upon to produce a certifiable class.[1] In the *Ray* case, the plaintiffs offered a list of potential class members by searching for certain status codes in ProbationTracker's SQL database. *See Ray v. Judicial Correction Services, Inc.*, 333 F.R.D. 552, 569 (N.D. Ala. 2019) (memorandum order denying class certification). In his order denying class certification, Judge Proctor noted the folly in relying on ProbationTracker records for events such as jailing because, "JCS's employees did not always consistently record events in the database. Moreover, JCS employees were not systematically (or even reliably) notified when probationers were jailed. Therefore, incarcerations could not be accurately tracked using probation tracker. This deficiency is not due to any fault of JCS." *Ray*, 333 F.R.D. at 570 (internal citations omitted). The Northern District, in so many words, confirmed the common data analysis adage: garbage in, garbage out.

Because the *Ray* expert actually produced a list that was the fruit of his methods, JCS was able to test the list. Unsurprisingly, given the unreliably of the

---

[1] In the *Ray* case, the plaintiffs' expert was properly disclosed and JCS had an opportunity to depose him. Much of his deposition testimony was later quoted by Judge Proctor in his order denying class certification. *See, e.g., Ray*, 333 F.R.D. at 569, 571. As explained in this motion, JCS has had no such opportunity to examine Rubens.

data, JCS didn't have to get far down the list to prove the unreliability of the expert's methods. *See, e.g.*, *Ray v. Judicial Correction Services, Inc.*, Case No. 2:12-cv-02819-RDP, JCS's Br. in Opp. to P. Mot. for Class Certification, ECF No. 714 at 10-12, 43 at n. 45. In summary, the Northern District found that the expert's method resulted in a list that contained obviously invalid class members alongside potentially valid class members, which is not allowed under 11th Circuit law. *Walesski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012) (affirming denial of class certification because class definition included persons who had never been injured and excluded persons who could have been injured). Much like Rubens proposes to do in this case, the *Ray* expert attempted to create a "jail class" by cross referencing ProbationTracker data with Childersburg arrest/jail records to generate a class list. *See, e.g.*, *Ray v. Judicial Correction Services, Inc.*, Case No. 2:12-cv-02819-RDP, JCS's Br. in Opp. to P. Mot. for Class Certification, ECF No. 714 at 34-35. But, again, because records on both sides were unreliable, to actually verify this list would have required individual inquiries of each and every name it contained. *See Ray v. Judicial Correction Services, Inc.*, 333 F.R.D. 552, 569, 571 (N.D. Ala. 2019) (holding that the *Ray* expert admitted that confirmation of class members would require individualized examination of files not maintained by JCS).[2]

---

[2] In *Carter*, the plaintiff submitted the Coons report (from *Ray*), with all references to the witness Coons removed, in an attempt to support his original motion for class certification. JCS's analysis of the list of potential class members included with that report also shows an unreliable list borne of faulty methodology. *See* Ex. H, Composite Exhibit Regarding "Coons" List. Because that list was generated using much of the same data used by Rubens, Defendants expect that any list he produces would have similar infirmities.

Although JCS has no idea who Rubens actually has on the list that Plaintiffs elected not to share in connection with his declaration (if such a list indeed exists), an examination of one of the named Plaintiffs shows that Rubens's methodology shares infirmities with the methodology of the *Ray* expert. Take the case of Plaintiff Christopher Mooney for example. Several of Mooney's court files include a document entitled "Order of Release from Jail," dated June 7, 2013, the date Plaintiffs claim Mooney was released. *See* Ex. I, COURT 005794. Each Order lists several offense numbers and that "subject has served all mandatory and commuted time." (*Id*.) But none of those offense numbers match up with any assigned to JCS. (*cf. id. with* Ex. J, Order of Probation, COURT 005789; Ex. K, Warrant List, COURT 005790). And this Order of Release from Jail, which appears in each Montgomery case file for Mooney, lists the defendant as "Robbie Ellis," an individual with a date of birth on the same day, but two years later, than Mooney's. Perhaps this was a typographical error. Perhaps it pertained to Mooney but, due to a single wrong number in a birthday, Ellis's name was used instead. If this Order was truly meant for Mooney, it shows he was commuted for charges that *did not relate to his JCS probations*. Or, perhaps, another person's records found their way into Mooney's entire court file due to a very similar birthday. Given the information they currently have, Defendants cannot guess which scenario is true. In any event, Defendants are sure that this example shows the fallacy in Rubens's logic. The court records are simply not reliable enough to run queries matched against JCS's ProbationTracker records to produce a competent class list. To determine whether Christopher Mooney would even be a part

13

of the proposed class, someone would need to dig through documents in search of a Mooney needle in the court record haystack and ultimately make a judgment call (or, more likely, a wild guess) as to what import to place on this document in Mooney's court files. This is precisely the type of individualized inquiry that precludes class action certification. The Defendants should have had the chance to question Rubens about his methodology and Defendants' perceived problems with his conclusions.

Another example of the prejudice to Defendants that would result from allowing Plaintiffs to use Rubens's declaration is shown by Rubens's statements regarding "Orders of Release from Jail." One of Rubens's primary observations is that one can rely on Montgomery court records to show jailing and commutation. Specifically, Rubens declares that one document that must be reviewed to ascertain this information is the "Order of Release from Jail." (ECF 283-1 at ¶¶ 13, 15-17, 19.) But this statement seemingly doesn't align with Plaintiffs' Brief in Support of Motion for Class Certification. Plaintiffs' brief cites not an Order of Release for the day Plaintiff Christopher Mooney was released from jail, but instead cite Montgomery's answer. (ECF No. 282 at 38.) For Plaintiff Algi Edwards, Plaintiffs cite some unnamed document that appears to be a clerk's request for an Order of Release (though Plaintiffs call it an Order of Release, which it is not, in their brief). (ECF No. 282 at 31-32.) This would be a document that would have to be found through an individual search of a probationer's court file. Finally, Plaintiffs cite to no Order of Release at all for Plaintiff Kenny Jones. In summary, Rubens's method would not have worked for 3 of the 7 named plaintiffs without further individual inquiry.

Perhaps Rubens has some explanation for how his methods don't seem to align with Plaintiffs' arguments, and perhaps he doesn't. Defendants can't say, because they weren't given an opportunity to ask him.

The Court of Judiciary decision incorporating Judge Les Hayes's stipulations, on which Plaintiffs rely heavily (when it suits them and largely mischaracterize[3]), contains findings that show the significant issues in relying on Montgomery records and, thus, the issues of using them to identify or ascertain a class or members of the class. The Court of Judiciary found that the Montgomery Municipal Court failed to "enter a signed order indicating the nature of the court's ruling, the number of days the individual was to spend in jail, and/or amount owed, which was to be converted to days in jail." (ECF No. 252-2 at 5-6.) The Court of Judiciary also found that there was no consistent method for indicating which judge had given an oral order or written instruction upon which the "jail transcript" was based, and the "jail transcript" was "rarely" signed by a judge. *Id*. In short, much of the fault that the Court of Judiciary found with the Montgomery Municipal Court related to its poor record-keeping. It defies logic for Plaintiffs to rely on a decision which highlights

---

[3] Plaintiffs assert utterly inaccurately that Judge Hayes stipulated to the Court of Judiciary that, "Judge Hayes and the other municipal court judges had a widespread practice of commuting fines and costs to jail time, failed to make ability-to-pay determinations when doing so, and did not record commutation hearings in any manner. (ECF No. 282 at 56.) In fact, Judge Hayes stipulated to none of these things before the Court of Judiciary. But he did stipulate that there was "generally neither a written order nor a general oral pronouncement in court that sets out the basis for the Court's decision to convert fines and costs to jail time." (ECF 252-2 at 4.) Further, Plaintiffs mischaracterize Judge Hayes's stipulations as stipulations to the acts of other judges. Judge Hayes stipulated only as to himself, not "the other municipal court judges," except as it relates to the nature of records kept.

15

record-keeping issues only to then present Rubens's method for class identification that is based largely on those kept records.

Some of Rubens's own observations further support the need for individualized inquiries when analyzing Montgomery records to find a proposed class. For example, Rubens admits that "[g]enerally the Order [of Release] states whether a person served mandatory and/or commuted time and ***sometimes*** states how many days were served for commuted time and how much money was paid for commuted cases." (ECF No. 283-1 at ¶ 15, p. 4 (emphasis added).) The qualifiers "generally" and "sometimes" suggest a method that only "generally" is accurate and "sometimes" may put a probationer in the class correctly. In reality, the lack of uniformity of Montgomery records (and JCS records, for that matter) makes it impossible to know exactly what happened with any given probationer without an individualized inquiry.

Finally, Rubens failure to actually produce a list of probationers that he claims would be in the proposed class is highlighted by his "Exhibit G," which purportedly shows visit notes from ProbationTracker that, in some instances, contain the phrase "commuted to days." (ECF No. 283-8.) The problem is, this Exhibit contains no probationer names or other identifiers, so JCS has no way to examine the case files from which these notations are lifted to attempt to figure out exactly what happened. However, a cursory review of the first page of Rubens's Exhibit G shows that it cannot help the Court in ascertaining a class even as structured by Plaintiffs. On that first page, in 3 of the first 4 dated entries, there is a narrative where it notes, variously, that probationers were:

16

- "ARRESTED ON NEW CHARGES AND TIME COMMUTED TO DAYS"

- "DEFENDANT APPEARED IN COURT FROM JAIL ON NEW CHARGES. DEF'S CASE WITH JCS HAS BEEN COMMUTED TO DAYS."

- "DEF APPEARED IN COURT AND IS CURRENTLY INCARCERATED IN THE CITY JAIL. JUDGE KNIGHT ADDRESSED."

Because Rubens did not share the names of the individuals, complete individualized inquiries to ascertain what happened in these situations cannot be done, but this much is clear: individualized inquiries are needed, because the notations listed above seem to show JCS probationers that were being commuted for crimes that had nothing to do with JCS or their JCS probation status.

As stated above, when JCS has been given a list of probationers on which it can perform individualized inquiries, the result has been consistent: because the ProbationTracker software was not intended to be a system that could be "keyword" searched to show a category of probationers that were treated the exact same way, JCS was able to show that individuals Plaintiffs claimed to be class members who simply don't fit. And Defendants would have had their opportunity to do that in this case, too, but Rubens was not disclosed, has not shown his methodology, and has kept his list (if one exists) to himself.

### III. Conclusion

In summary, Rubens's declaration is due to be excluded because it was disclosed nearly 9 months after the discovery cutoff date. Plaintiffs failed to supplement their interrogatory response concerning expert witnesses – interrogatories that JCS and the City posed precisely to avoid the surprise that they now face. And, even now, Rubens has not disclosed fully his methods used and conclusions reached, and, from what he has shown, it looks unreliable. He does not give the Court, JCS, or the City a list of proposed class members that can be used to test his methodology, but instead asks the Court to assume that he can use data which has been found by the Northern District and the Court of Judiciary to be "garbage in" and expect him to produce "treasure out."

If the Court does decide to consider allowing Plaintiffs to use Rubens's report, JCS and the City respectfully request a chance to depose Rubens, ***after he has produced an actual list of his purported class members and documents used to produce that list***, and additional time sufficient for Defendants to examine his testimony and use it in its opposition to Plaintiffs' motion for class certification and possibly use or obtain their own experts. But, even given this opportunity Defendants would remain severely prejudiced by Plaintiffs' gamesmanship in relation to disclosure of their expert. In addition, this would drag this case out even further, as Defendants would need, at the very least, 90 days to obtain documents from Rubens, review those documents, depose Rubens, get a deposition transcript, determine their own need for an expert, and allow that expert to review Rubens's materials and

deposition (without even taking into consideration the additional time that Plaintiffs would likely request to depose Defendants' rebuttal expert).

Respectfully submitted on October 7, 2020.

s/ *Wesley K. Winborn*
One of the Attorneys for Defendant Judicial Corrections Services

**Of Counsel**
Larry S. Logsdon
Michael L. Jackson
Wesley K. Winborn
Wallace, Jordan, Ratliff & Brandt, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253
llogsdon@wallacejordan.com
mjackson@wallacejordan.com
wwinborn@wallacejordan.com

Wilson F. Green
Fleenor & Green LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, Alabama 35406
wgreen@fleenorgreen.com

s/ *Shannon L. Holliday*
One of the Attorneys for Defendants City of Montgomery, Earnest N. Finley Jr., Kevin Murphy, Les Hayes III, and Todd Strange

**Of Counsel**
Shannon L. Holliday
Robert D. Segall
Richard H. Gill
Ben W. Maxymuk
Copeland, Franco, Screws & Gill, P.A.
P. O. Box 347
Montgomery, AL 36101-0347
holliday@copelandfranco.com
segall@copelandfranco.com
gill@copelandfranco.com
maxymuk@copelandfranco.com