IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ANGELA MCCULLOUGH, MARQUITA JOHNSON,   KENNY JONES, ALGI EDWARDS, LEVON AGEE, ADRIAN EDDIE FLOYD, HASSAN CALDWELL, DEVRON JAMES, ASHLEY DAWN SCOTT, and CHRISTOPHER MOONEY, on behalf of themselves, individually, and on behalf of a class of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  2:15-cv-00463-RCL |
| THE CITY OF MONTGOMERY, ALABAMA; EARNEST N. FINLEY, JR., Chief of Police of the City of Montgomery, in his individual capacity; KEVIN MURPHY, former Chief of Police of the City of Montgomery, in his individual capacity; LES HAYES III, Presiding Judge of the Municipal Court of the City of Montgomery, in his individual and official capacities; JUDICIAL CORRECTION SERVICES, INC., a corporation; and TODD STRANGE, Mayor of the City of Montgomery, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## Defendants' Joint Reply to Plaintiffs' Response to Defendants' Joint Motion to Strike Expert Declaration

Rubens's declaration is not merely a summary of voluminous data as Plaintiffs claim. Further, Plaintiffs have failed to establish that Rubens's methodology is

reliable. As Defendants established in their Motion (Doc. 285), Rubens's declaration is due to be struck.

I.    **Rubens's declaration, a description of his methodology that he claims would create an ascertainable class, is not a "summary" admissible under Rules 701 and 1006.**

Plaintiffs' first claim is that Rubens isn't an expert. Rubens holds himself out as an expert – indeed, as a testifying expert witness – to the public. Rubens is a member of PRC Consulting Group – a company whose website claims that while information is everywhere, it is "critical to not only know how to find it, but how to collect it properly prior to analysis." *See* Exhibit "A," website of PRC Consulting Group, https://prcconsult.com, *last accessed* October 23, 2020. The ability to handle this information properly is why, PRC says on its website, attorneys should turn to "[o]ur experts" who provide "Expert Witness and Consulting Services." PRC says it can provide the website reader with persons who have "been deposed as experts and have provided expert courtroom testimony in both state and federal courts."

In any event, a review of Rubens's declaration shows it is not merely a compilation of data that any lay person could create given enough time and "elbow grease" (ECF No. 288 at 3). It is, instead, a description (or potential description) of a methodology developed by a person that holds himself out as an expert in legal data analysis – although it contains no actual proof that the methodology works. Nor has Rubens produced any list of putative class members – at least, not one he has made available to the Court and to Defendants.

Rubens's declaration should not be admitted under Rule 1006 because it is not, as the Plaintiffs claim, merely a summary of voluminous-but-easy-to-compare

records. Instead, it is a description of a methodology that Rubens has developed, but which he has not proven to be reliable. (Indeed, how could he prove the method reliable without even providing a list generated from the method?) Rule 1006 states that, "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Let's take Rule 1006's elements elementally:

- ***Is it a summary that proves the contents of voluminous records? No, it is, at best, a description of an unverifiable methodology.*** The Plaintiffs' cited cases prove the point. In *United States v. Hamaker*, 455 F.3d 1316, 1331 (11th Cir. 2006), the Eleventh Circuit held admissible a summary that amounted to the witness "simply add[ing] and subtract[ing] numbers from a long catalogue of [] records, and [comparing] those numbers in a straightforward fashion." The government's witness's charts that were properly admitted were actual summaries – numbers that resulted from his comparisons that could be verified by anyone in the courtroom with a 4-function calculator. The charts offered in *United States v. Melgen,* 967 F. 3d 1250, 1257 (11th Cir. 2020), were like those in *Hamaker*; they offered answers. *See id.* (describing the charts entered into evidence as showing and comparing the actual number of injections made by defendant physician to those of physicians with similar practices). By contrast, Rubens offers a methodology for generating lists of class members with no real answers – and no lists. Rubens offers only a guess as to how many purported class members that

methodology might discover.[1] But he's still working on the actual lists, the Plaintiffs say. (ECF No. 288 at 10 ("Indeed, Rubens himself made clear that the process has not yet been completed.")).

It is difficult to understand how Rubens's declaration can be a "summary" of his findings when he admits he does not yet have findings. And if that weren't enough, why hasn't Rubens provided even partial or incomplete lists? On the ascertainability front, to be helpful to the Court at the class-certification stage, an "analysis of the objective criteria also should be administratively feasible[,]" meaning identifying class members easily and with little, if any, individual inquiry. *See Bussey v. Macon County Greyhound Park, Inc.*, 5652 Fed. App. 782, 787 (11th Cir. 2014). Plaintiffs note that Rubens has been working on this case for "well over a year" during which he has clearly conducted thousands of individualized inquiries (ECF No. 288 at 2, n. 1). A year of work yielding an admittedly unfinished and uncertain guess

---

[1] The other cases that Plaintiffs cite are also distinguishable for the same reasons. For example, in *Chao v. Tyson Foods, Inc.*, the witness gave a declaration that offered the court an actual "calculation of the number of times Defendant's employees punched a time clock during a single shift[.]" He gave the court a final answer that could be checked against his methodology. In *Furmanite America, Inc. v. T.D. Williamson, Inc.*, the witness, who was not allowed to testify as an expert witness because he was not properly disclosed, was only allowed to testify to the results of his data extraction. 506 F.Supp.2d 1126, 1133 (M.D. Fla. 2007). The *Furmanite* court cautioned the proponents of that witness that "attempts to introduce expert opinion testimony at trial . . . will be excluded on the grounds of unfair surprise due to the failure of [the proponent] to designate [the expert] as an expert witness or timely disclose the nature of such testimony to opposing counsel[.]" 506 F.Supp.2d at 1133. Rubens has offered no actual "results" in his declaration, but tells this Court he needs time above the year the Plaintiffs say he's been working to get a final answer. In *Henderson v. Corelogic National Background Data, LLC*, the witness offered "nothing more than a very simple summary of the relevant contents of the Results Returned database, consisting of plainly stated and discrete numerical facts within the grasp of the average juror." Civil Action No.: 3:12-CV-97, 2016 WL 354751 at *3 (E.D. Va. 2016). It was a "very basic factual summary of the relevant contents" of a single database, and it provided the exact number of searches that were performed during the class period. *Id.* at *1. Again – certain answers and results.

does not meet the standards for an analysis that would support ascertainability of a class.

- ***Is it a chart that proves the content of voluminous records? No, it contains no chart of results rendered by Rubens's methodology***. Without belaboring the point, Defendants would be pleased to view a chart that purports to be a sample of the class that Rubens's methodology identifies. This would give Defendants a chance to test the methodology against the results shown on that chart. Plaintiffs have offered no such chart. (It would also give Defendants a chance to assess whether they need a competing expert – because if Rubens is going to be allowed to testify, Defendants should be given that opportunity.)

- ***Is it a calculation that proves the content of voluminous records? No, if Rubens' methodology were a math equation, it would end at the "equals" sign***. What comes after that equals sign? Rubens says *ipse dixit*, and without even providing any supporting partial list, that his methods yield lists of members of ascertainable classes. This Court and Defendants have no way of knowing if that is true or not.

Because Rubens has not presented a "summary" that is presented by a lay witness, Plaintiffs' offer of his declaration is an attempt to "back door" expert testimony long after the time for expert discovery passed. As the Ninth Circuit wrote in *U.S. v. Figueroa-Lopez*:

> The Government's argument simply blurs the distinction between Federal Rules of Evidence 701 and 702. Lay witness testimony is governed by Rule 701, which limits opinions to those "rationally based on the perception of the witness." Rule

> 702, on the other hand, governs admission of expert opinion testimony concerning "specialized knowledge." The testimony in this case is precisely the type of "specialized knowledge" governed by Rule 702. A holding to the contrary would encourage the Government to offer all kinds of specialized opinions without pausing first properly to establish the required qualifications of their witnesses. The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702. Otherwise, a layperson witnessing the removal of a bullet from a heart during an autopsy could opine as to the cause of the decedent's death.

*U.S. v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997). This is precisely what Plaintiffs are attempting to do with Rubens's declaration. Rubens has not presented a mere summary of information in a database – he is testifying in his declaration that he can, in his capacity as a person skilled in database manipulation, give the Court a workable methodology to present a class. A summary can be cross-checked. Rubens's declaration cannot be cross checked. He is, essentially, asking the Court to rely on his method because, implicitly, he is an expert who is going to know how to push the right buttons to spit out accurate lists of class members. We don't have his summary. We don't have any lists – not even partial ones. We only have his conclusory position on ascertainability, offered without any supporting lists. Consider this: Plaintiffs are arguing that Rubens has summarized (and is summarizing continuously) the data of Defendants into lists, but he hasn't provided any lists – in other words, the lists themselves would be the summaries under Rule 1006, not Rubens' methods of generating lists (which is what his Declaration describes). "Plaintiff attempts to do exactly what Rule 701 forbids, clothe [their] expert witness[] in lay person garb." *Hill v. Allianz Life Ins. Co. of N.A.*, Case No.

6:14-cv-950-Orl-41KRS, 2016 WL 7228748, *4 (M.D. Fla. 2016). This should not be allowed and his declaration should be struck.

## II.   Plaintiffs violated both their disclosure and their discovery obligations by failing to identify Rubens in their disclosures and their discovery responses.

Plaintiffs also argue that Rubens did not have to be disclosed because he is not a "trial expert." Even if this Court were to determine that Rubens is not an expert, he would still be a person "likely to have discoverable information" (in this case, the methodology on which Plaintiffs rely for class certification) that was not properly disclosed to Defendants under Rule 26(a). Rule 37(c)(1) prohibits using such an undisclosed witness not just at trial, but also "at a hearing, or on a motion" unless the failure to disclose was harmless. *See Cooley v. Great Southern Wood Preserving*, 138 Fed. Appx. 149, 161 (11th Cir. 2005). Plaintiffs' failure to disclose Rubens here was not harmless. To the contrary, Defendants have been severely prejudiced in having to respond to respond to an expert that they were never given the opportunity to depose on an issue at the very center of the class certification analysis — ascertainability.

Further, this is not simply a failure of Plaintiffs to meet their *disclosure* obligations. It is also a failure of Plaintiffs to meet their *discovery* obligations. Defendants asked Plaintiffs to identify "any and every expert witness you intend to call during the trial of this case **or to use in support of any motion in this case**." (*See, e.g.,* ECF No. 286-3 at p. 7 (interrogatory no. 13) (emphasis added)). Defendants also asked Plaintiffs to identify "any and all witnesses" generally. (*See id.* at p. 5 (interrogatory no. 4)). Even if the Federal Rules regarding disclosures

would allow Plaintiffs to spring a surprise witness on Defendants at this late hour (which they do not), the Federal Rules regarding discovery would prohibit that surprise. "There obviously is overlap between information learned via 'disclosures' and information learned through 'discovery,' and a party may seek information through both means." *Mezu v. Morgan State University*, 269 F.R.D. 565, 579 n. 11 (D. Md. 2010). Defendants sought the identity of people like Rubens in discovery, and Plaintiffs failed to answer those requests. And as discussed in the initial Motion, when the *McCullough* counsel tried to dodge the agreed-upon expert deadline, Defendants specifically requested expert information or a discussion about experts, and Plaintiffs did not provide responsive information.

## III. Rubens's declaration does not offer a complete, workable, and accurate methodology.

Plaintiffs argue that Defendants demand a "definitive class list now." (ECF No. 288 at 9). Rule 23 demands it, not Defendants. Mr. Rubens says he has lists – so if he's going to be allowed to testify, Defendants need his lists – even preliminary lists – of probationers that Rubens claims to be proper class members identified by his methods so that Defendants can actually check a sample of that list. (They don't want to do that, because in the *Ray* case, plaintiffs' expert Mr. Coons couldn't come up with a workable method, either – and his work was exposed at class certification.) Without providing any lists, Plaintiffs (and Mr. Rubens) are essentially telling Defendants and the Court: "Trust us, it'll work when the time comes." One does not prove Rule 23 elements with assurances.

Plaintiffs claim that "nothing precludes Defendants from following the steps outlined by Rubens to conduct their own analysis on data they have long had in

their possession." (ECF No. 288 at 10-11.) We tried that; it doesn't work. For one thing, Rubens's description of his process "does not share his method for searching the 'Probation-Tracker Files' to identify commuted entries[.]" *See* Ex. M, Declaration of Dr. Brandon Dixon, at ¶5. Defendants' rebuttal expert, Dr. Brandon Dixon of the University of Alabama (and a Ph.D. computer scientist from Princeton, *See* Ex. N, *curriculum vitae* of Dr. Brandon Dixon), had to make inferences and guesswork, based on his knowledge and experience as an computer programmer, even to attempt to replicate Rubens' work. But he couldn't. That alone proves that Plaintiffs have not presented, as they claim, "a workable methodology[.]" (*See* ECF No. 288 at 10.) *See* Ex. M at ¶¶ 5 and 7 ("I was not able to obtain results anywhere close to the 'more than 400 entries' that Mr. Rubens says his search obtained. . . . "I was never able to recreate the '400 such entries' that Mr. Rubens reports he was able to obtain."). This means one of two things – either Rubens's methodology doesn't work, or he can't explain the steps necessary to replicate his results. His declaration is due to be struck under either scenario.[2]

While Plaintiffs go to great pains to try to differentiate their class search process from that of the *Ray* case, one primary similarity trumps all differences: the experiences of individual probationers varied wildly and this makes it impossible to simply print out an accurate class by relying on data like Probation Tracker records. For example, Plaintiffs argue that if JCS records contain the phrase "commuted to days" then that commutation necessarily was connected to a JCS probation. (ECF

---

[2] Defendants also note that Plaintiffs admit that Rubens has been working for over a year on his incomplete, "work in progress" methodology.  Because of the Plaintiffs' gamesmanship, Defendants do not have a year to do the same before their opposition to class certification is due.

No. 288 at 15.) That doesn't work: a review of the limited specific information that Rubens provided shows several instances where "commuted to days" appears in JCS probation records, but those commutations appear completely unrelated to JCS probation. (ECF No. 285 at 17 (noting 3 instances in Rubens's Exhibit G that "show JCS probationers that were being commuted for crimes that had nothing to do with JCS or their JCS probation status.")

## IV. Plaintiffs' own example of how Rubens's methodology works proves, instead, that it doesn't work.

Plaintiffs claim that Aldaress Carter's records provide a "clear example" of the functionality of Rubens's methodology that requires "no such guesswork." (ECF No. 288 at 12-13.) A methodology that is supposed to prove an ascertainable class can hardly be proven to work just because it works for one individual. Leaving that aside, though, Carter's case history actually shows why Rubens's methodology *doesn't* work.

This Court granted summary judgment to Defendant as to "any claim arising from arrest or detention before commutation. . . ." (*Carter* ECF No. 293 at 3-4). For Carter to be an appropriate class member, then, he must have actually served post-commutation jail time. The documents relied on by Plaintiffs (ECF No. 283-3) do not affirmatively show that to be case. Carter's arrest at issue occurred "on a Friday" in January 2014; Carter "spent the weekend in jail" before seeing the judge on the "jail docket." (*Carter* ECF No. 307 at p. 25; Ex. O (Carter Dep. Vol. I at 218-220)). Carter explained that when you go to jail on a "Friday or the weekend, you know, you can't see the judge until Monday so whoever got arrested that weekend wouldn't have had the opportunity to see the judge until Monday. . . ." (Ex. P (Carter Dep. Vol. II

at 296)). Carter also said he was "in jail until four days after his arrest, when his mother borrowed enough money to pay for his release." (*Carter* ECF No. 307 at p. 25). Counting ahead four days from the Friday arrest date puts us at Tuesday.

Carter's testimony contradicts his own records. Carter was adamant in deposition that he saw Judge Hayes at the post arrest hearing. (Ex. O (Carter Dep. Vol. 1 at 88, 136-138)). But the records show Judge Hayes was not on the bench on either Friday, January 24, 2014, or Monday, January 27, 2014. Judge Hayes did, however, preside on January 28, the date Carter claims he was released. (Ex. Q (Court 20034)). If Carter saw Judge Hayes at the post arrest commutation hearing (as he testified), that was the same day he was released, and therefore he would have served no post-commutation jail time. If Carter's hearing was on January 27 (as the records show), then Judge Hendley was presiding (*see id*.) – but there is no evidence in the record that Judge Hendley failed to provide Carter with a *Bearden* hearing.

The bottom line is that it's not clear Carter served jail time after the post-arrest hearing. The jail transcript for Carter just says "commuted" with an adjacent dollar amount. (ECF No. 283-3). There is nothing to show if jail time was served after the hearing and, if there were, how many days were served. It is unclear exactly what happened from looking at the records, but one reading is that the money he paid to be released on January 28 went toward paying off offenses related to the JCS probation while the commutation "to days" related to non-JCS offenses. (*Id*.) Without further and individualized inquiry, we simply don't know.

Additionally, Carter isn't part of the purported class if he didn't serve post commutation jail time *for a JCS supervised case* that was *triggered by a JCS petition to revoke*. But like many other Montgomery probationers, Carter appeared at a post-arrest hearing for 10 various City offenses –some unrelated to JCS. Four related to a Probation Order entered by Judge Knight on May 27, 2011. Judge Hendley entered a second Probation Order dated June 4, 2012, which related to three offenses. But that second probation was placed on "hold" and was not supervised by JCS.[3] (Ex. O (Carter Dep. Vo. I at Def.'s Ex. 18)). By law the second probation had not yet begun.[4] To round out the ten offenses, Carter also had three more before the court at the post-arrest hearing that were completely unrelated to JCS. The Petition for Revocation appears to be only for the first Probation Order on the "27th day of May, 2011" of "Judge Karen Knight" as there is no petition to revoke the "hold" unsupervised June 2012 Judge Hendley Probation Order. (ECF No. 283-3 at ECF p. 2, ¶¶ 1, 2 and 3). So if there was a post-commutation jailing related to the June 2012 Hendley order, it would not be included in the class. JCS did not seek to revoke that probation, and those offenses were not supervised by JCS.

As we dive deeper into Carter's history, matters get even more complicated. One of the documents that Carter relies on to prove his class-member status is

---

[3] Since the second probation was on hold and never activated, Carter did not even recall it. (Ex. O (Carter Dep. vol. I) at 109:15 to 112:3; Ex. O (Carter Dep. vol. I at Def.'s Ex. 18)).

[4] Entry of sentences on two or more convictions are to run consecutively unless sentencing judge specifically orders otherwise, and subsequent terms should each begin on the expiration of the preceding term. *See* Ala. Code § 14-4-9(a) ; Ala. R. Crim. P. 26.12(a); *Cook v. State*, 203 So. 2d 138 (1967) (sentences must run consecutively where no words of concurrency appear). Further, the Supreme Court of the United States has recognized the validity of state laws presuming that sentences are to run consecutively unless the sentencing judge orders otherwise. *Oregon v. Ice*, 555 U.S. 160, 163–64 (2009).

Ex. O at Def.'s Ex. 15 (*Carter* Doc. 307 at p. 25). One of the documents entitled "Booking Card" that is relied on by Carter lists only five offenses – three that were never assigned to JCS and two that were part of the unsupervised probation. (*Compare* "TR" numbers listed on Ex. O at Def.'s Ex. 15 at Court 005915 *with* "TR" numbers listed on the Carter Probation Order at Ex. O at Def.'s Ex. 10). Plaintiffs tell us that we should "note the release date on the Order." (ECF No. 288 at p. 12). But there is nothing on that Order that says "release date." (*Id*.) Even in the Plaintiffs' own telling of this story, figuring out exactly what happened requires many class-defeating judgment calls, inferences, and, in some cases, guesses.

In summary, it's simply impossible to reliably say, as Rubens tries, that every JCS probationer with "commuted to days" in their case notes is a valid member of the class. While Rubens gave Defendants no preliminary list to test, past failed attempts at showing a workable methodology show this plainly enough. In the *Carter* case, the Plaintiff first said that there were over 900 class members that could be ascertained through a list showing probationers jailed in connection with commutations. (*Carter* ECF No. 118-1 at 24; *Carter* ECF No. 118-10). But Defendants' testing of this list showed that this was in error. Take, for example, Anthony Means, the last name on the one of Carter's earlier lists (*Carter* ECF No. 118-1 at 24). His case file included the "commute to days" notation, but his jail time was due to non-municipal court offenses, and there is no record that he paid anything to JCS or served any municipal court related jail time. (Ex. R). Defendants know this because they performed an individual inquiry on this probationer. That's

what is required to confirm someone would be part of a potential class. But Rubens's method would list Means in the class – if we only had that list.

## V. Plaintiffs' claims about the "Orders of Release" fatally damage the credibility of Rubens's declaration.

Finally, Rubens's method seems to rely heavily on the "Order of Release" in determining if a probationer is a class member. Plaintiffs, however, acknowledge that there is no such Order for named Plaintiffs Jones and Mooney. (ECF No. 288 at 16-17.) For Plaintiff Edwards, Plaintiffs apparently couldn't find an Order of Release to put it in their class brief, but somehow found it later. If it takes that long for the Plaintiffs to find and gather together this document for the named Plaintiffs, one can imagine the time it would take to accomplish this task class-wide. Plaintiffs' also make a statement that the cases where an Order of Release was unavailable was a "small minority." (ECF No. 288 at 12, n. 4.). However, that claim is not supported by the record, and what we know from the named Plaintiffs seems to cut against it.

Contradicting Rubens's declaration, Plaintiffs say in their response to the motion that the Order of Release is not actually necessary to their methodology and in determining whether someone is in the class. If there is no order of release, Plaintiffs cannot prove (that is, without individual testimony from the probationer) that the person actually spent any time in jail on a commuted sentence. A person could have a commutation order but could have paid all fines and costs that were owed on the date on which they were commuted, thus avoiding jail completely and serving no commuted time.

Here's an example: Makesha Sneed was the very first person to go on VOP status in Probation Tracker in 2012 (when Benchmark went live). Her Benchmark records indicate that she was commuted on cases that had been assigned to JCS, but there is no release order in her file. That commutation occurred on January 14, 2013. *See* Ex. S, Makesha Sneed jail transcript. She would, therefore, be a putative class member by Plaintiff's methodology. But she is not. She actually paid all fines and costs due on January 14, 2013 before 5:00 p.m. and spent no time on her commuted sentence — she was, instead, released. One has to look further into her Benchmark files — beyond a commutation order or a release order — to discern this. The jail transcript confusingly shows commuted days that did not actually result in jail time. Ex. S. Her Benchmark files show that she was commuted on cases that had been previously assigned to JCS. *See* Exs. T & U, Makesha Sneed Benchmark files. They also show that the cases were closed and disposed of on January 14, 2013. And her payment history shows that on January 14, 2013 all cases she had with the Court were paid down to a zero balance on that day. *See* Ex. V, Makesha Sneed payment history. But Defendants cannot know whether someone like Ms. Sneed is in Plaintiff's putative class list compiled by Rubens's methodology, because Plaintiffs haven't provided any of Rubens's lists, and because Defendants have not been permitted to depose Rubens.

## VI.  Conclusion

Rubens was not properly disclosed, whether he's an expert or a lay witness. His declaration is not a summary of data, but is an incomplete, unreliable, and untestable attempt to describe a methodology that could produce a putative class.

His declaration is due to be excluded. If his declaration is not excluded, Defendants should be afforded the opportunity to depose Rubens and use that deposition in their response to Plaintiffs' motion for class certification, and to designate a counter-expert witness to meet Rubens' methods and opinions – and the deadline for Defendants' class certification briefing should be extended accordingly.

Respectfully submitted on October 28, 2020.

s/ *Wesley K. Winborn*
Attorney for Defendant Judicial Corrections Services

**Of Counsel**
Larry S. Logsdon
Michael L. Jackson
Wesley K. Winborn
Wallace, Jordan, Ratliff & Brandt, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253
llogsdon@wallacejordan.com
mjackson@wallacejordan.com
wwinborn@wallacejordan.com

Wilson F. Green
Fleenor & Green LLP
P.O. Box 2536
Tuscaloosa, Alabama 35403
wgreen@fleenorgreen.com

s/ *Shannon L. Holliday*
Attorney for Defendant City of Montgomery

**Of Counsel**
Shannon L. Holliday
Robert D. Segall
Richard H. Gill
Copeland, Franco, Screws & Gill, P.A.
P. O. Box 347
Montgomery, AL 36101-0347
holliday@copelandfranco.com
segall@copelandfranco.com
gill@copelandfranco.com

16