UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**ANGELA MCCULLOUGH**, et al.,
individually and on behalf of a class of
similarly situated persons,

    *Plaintiffs,*

**v.**

**THE CITY OF MONTGOMERY**, et al.,

    *Defendants.*

Case No. 2:15-cv-463-RCL

## MEMORANDUM OPINION

The Court once again considers a case arising from the system of collecting traffic fines in Montgomery, Alabama between 2009–2014. During that time, the Montgomery Municipal Court routinely jailed traffic offenders for failing to pay fines without inquiring into their ability to pay. In carrying out that system, the Municipal Court deprived offenders of their due process and equal protection rights not to be incarcerated for their poverty. *See Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983). During that period, the City of Montgomery contracted on behalf of itself and the Municipal Court with Judicial Correction Services, Inc. ("JCS") to supervise Municipal Court-ordered misdemeanor probation.

The plaintiffs are Montgomery residents who served probation with JCS after they were unable to pay their traffic tickets. The plaintiffs sued the City and JCS on behalf of themselves and purported classes of similarly situated persons. Their operative complaint alleges causes of action for violations of the Due Process and Equal Protection Clauses under 42 U.S.C. § 1983 and for false imprisonment and abuse of process.

The plaintiffs moved to certify three classes (ECF No. 281). The parties have fully briefed that motion (ECF Nos. 282, 294, 296, 322). They also submitted evidence in support of their briefs before (ECF Nos. 282, 295, 297, 323) and during a hearing on the motion (ECF Nos. 337, 338, 339, 341, 342, 343, 344).

Each party has also sought reconsideration of part of the Court's summary judgment decision (ECF Nos. 301, 310, 311). Those motions have been fully briefed as well (ECF Nos. 316, 317, 321, 325, 326, 331, 334, 340, 346, 348).

Upon consideration of the motions; briefs in support of and opposition thereto; evidentiary submissions; all other papers of record; and the arguments made, testimony offered, and evidence received over the course of a ten-hour hearing, the Court will:

- **DENY** the plaintiffs' motion for class certification;

- **GRANT IN PART** and **DENY IN PART** the City's motion to reconsider and **ENTER SUMMARY JUDGMENT** for the City on Mr. Jones's § 1983 claim;

- **DENY** JCS's motion to reconsider; and,

- **DENY** the plaintiffs' motion to reconsider.

## I.  BACKGROUND

### A. Factual Background

The Court assumes familiarity with the factual background of this case. *See* Mem. Op. 5–11 (July 7, 2020), ECF No. 269 ("Summ. J. Op."); *see also Carter v. City of Montgomery*, No. 2:15-cv-555-RCL, 2020 WL 4559360, at *2–5 (M.D. Ala. July 17, 2020) ("*Carter* Summ. J. Op.").

In brief:

> the Municipal Court sentenced traffic offenders who could not afford to pay their fines to probation with JCS. JCS operated probation pursuant to an annual contract with the City. JCS probation consisted primarily of facilitating extended payment

plans, and probationers [paid] JCS monthly fees for that service. When a probationer could not make payments or missed appointments, JCS would petition the Municipal Court to revoke probation. When the Municipal Court revoked a probation, it would "commute" the probationer's fines into a jail term: the offender would "sit out" his fine at the rate of $50 per day. At revocation and commutation hearings, the Municipal Court routinely failed to inquire as to whether a defendant could pay his fines before sentencing him to jail time. The City did not supervise JCS's operations, but evidence suggests that it may have been on notice of how JCS operated probation as early as July [16,] 2012.

Summ. J. Op. 5 (citations omitted).

## B. Procedural History

In preliminary proceedings, the Court dismissed several claims and parties. *See* Order (Mar. 10, 2017), ECF No. 132; Order (May 14, 2019); ECF No. 184; Order (June 20, 2019), ECF No. 186; Order (Nov. 4, 2019), ECF No. 231. Following discovery, the City and JCS moved for summary judgment, and the plaintiffs moved for partial summary judgment. The Court granted the City's and JCS's motions in part and denied them in part; it denied the plaintiffs' motion. *See* Order (July 7, 2020), ECF No. 270. Later, the Court reconsidered its summary judgment opinion and held that plaintiff Algia Edwards's § 1983 claims are time-barred. *See* Order (Sept. 11, 2020), ECF No. 279.

As a result of those proceedings, only three claims remain live in this case:

- A claim against JCS and the City under § 1983 for violation of the plaintiffs' *Bearden* rights;

- A claim against JCS for false imprisonment; and,

- A claim against JCS for abuse of process.

3

The Court previously denied a motion for class certification without prejudice, determining that it should address class certification after summary judgment. Order (May 2, 2016), ECF No. 95.

## II.   LEGAL STANDARDS

### A. Reconsideration

Rule 54(b) confirms the Court's power to reconsider its interlocutory orders. The Court has discretion in deciding whether to reconsider a previous order. *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993). In exercising that discretion, the Court disfavors reconsideration. "Reconsideration of a previous order is an extraordinary remedy to be employed sparingly." *United States v. Gumbaytay*, 757 F. Supp. 2d 1142, 1154 (M.D. Ala. 2010) (quotation marks omitted). Reconsideration is appropriate only to address an intervening change in controlling law or newly available evidence, or to correct clear error or manifest injustice. *Id.* Reconsideration is not an appropriate mechanism to raise new arguments for the first time. *Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1235 (11th Cir. 2020).

When the Court reconsiders a motion for summary judgment, it applies the same standards as it would to any summary judgment motion. The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant bears the burden of showing its entitlement to summary judgment: that the non-movant has not produced enough evidence to meet his burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To decide whether material facts are in dispute, the Court construes facts and makes inferences in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[W]hen conflicts arise between the facts evidenced by the parties, [the Court] credit[s] the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (emphasis omitted). Facts, however, are disputed only if a

reasonable jury could believe either side of the dispute. *See Scott*, 550 U.S. at 380. A fact is material if it is necessary to the Court's decision. *See United States v. Gilbert*, 920 F.2d 878, 883 (11th Cir. 1991).

## B. Class Certification

Class actions operate as an "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). The party seeking class certification bears the burden of demonstrating that class certification is appropriate after rigorous analysis.[1] *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009). Unless the proponents of a class action can show that all of Rule 23's requirements have been met, the Court must presume that the case should not be certified as a class action. *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016); Fed. R. Civ. P. 23.

Class certification often requires some examination of the merits of the underlying claims and defenses. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–52 (2011). That examination, however, should go only as far as required to decide if the proponents of certification have met Rule 23's requirements. *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009).

---

[1] The burden of proof appears to be contested in this Circuit. Some other district courts in this Circuit have asserted that a party must show by a preponderance of the evidence that it meets class certification requirements. *See, e.g.*, *Ray v. JCS*, 333 F.R.D. 552, 567 (N.D. Ala. 2019) (citing *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016)). But the Circuit itself has described at times a much lighter burden. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267–68 (11th Cir. 2009); *see also* 3 William B. Rubenstein, *Newberg on Class Actions* § 7:21 nn.3–4 (5th ed. 2011–2020) (noting divergent standards). The dispute over class certification here is not primarily one of evidence, so the Court need not resolve the exact standard of proof. The Court requires the plaintiffs to make a sufficient showing to support a finding that the Rule 23 criteria have been met, but this decision would come out the same even if it applied the preponderance of the evidence standard.

### 1. Threshold Issues

Before a class can be certified, it must be "adequately defined and clearly ascertainable." *Little v. T–Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quotation marks omitted). At minimum, ascertainability means that objective criteria define class membership. 1 *Newberg on Class Actions*, *supra*, at § 3.3. The parties dispute whether the method of ascertaining class members must additionally be administratively feasible.[2] A method is administratively feasible when it does not require extensive individualized fact-finding. *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013). In other words, a method is administratively infeasible when determination of class membership requires a series of mini-trials. *See Karhu*, 621 F. App'x at 949. The Court assumes, without deciding, that ascertainability does not require an administratively feasible method of ascertaining class membership.[3]

Even when courts do not demand administrative feasibility, they require classes to be clearly defined based on objective criteria. *See, e.g.*, *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). A class may fail to meet the standard if a significant segment of the class cannot be identified under the class definition. *See, e.g.*, *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495 (7th Cir. 2012) ("It's not hard to see how this class lacks the definiteness required for class certification; there is no way to know or readily ascertain who is a member of the class."). It may also fail if it contains too many people who have not been injured, *see, e.g.*, *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006), if it depends on subjective criteria, *see, e.g.*, *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970), or if the class definition assumes

---

[2] In *Karhu v. Vital Pharmaceuticals., Inc.*, 621 F. App'x 945 (11th Cir. 2015), an unpublished opinion, the Circuit held that "in order to establish ascertainability, the plaintiff must propose an administratively feasible method by which class members can be identified," *id.* at 947. But the circuit courts are split on the question, and no published opinion has established which standard applies to cases in this Circuit. *Ocwen Loan Servicing, LLC v. Belcher*, No. 18-90011, 2018 WL 3198552, at *3 (11th Cir. June 29, 2018); *see also Karhu*, 621 F. App'x at 952 (Martin, J., concurring).

[3] The Court would reach the same result under either standard.

success on the merits, *see, e.g., Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011). Under any standard, the party seeking class certification bears the burden of showing that the class can be ascertained.

Finally, as in all cases, the plaintiffs in a class action—class representatives and class members alike—must demonstrate standing. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019). They must show (1) an injury-in-fact, (2) causation, and (3) redressability. *Id.* at 1273.

### 2. Rule 23(a)

Before a class may be certified, the Court must find that four requirements are met:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The first factor, numerosity, requires the Court to determine whether joinder of all class members is a realistic alternative to a class action. While the proponents of class certification need not meet any specific numerical threshold to demonstrate numerosity, a class of more than forty individuals is generally too large for joinder to be practicable. *See Vega*, 564 F.3d at 1266–67. The size of the class must be established by some evidence, but the Court does not need to determine the precise size of the class to make a numerosity finding. *Id.* at 1267.

The second factor, commonality, requires the Court to determine whether at least one question of law or one question of fact is capable of classwide resolution. *See Dukes*, 564 U.S. at

350.    The common question must be central to the litigation: resolving the question should determine the validity of the claims. *Id.* The existence of factual differences does not prevent a finding of commonality when common legal questions are central to the case. *See* 1 William B. Rubenstein, *Newberg on Class Actions* § 3:21 nn.1–2 (5th ed. 2011–2020) (collecting cases).

The third factor, typicality, requires the Court to determine whether the proposed class representatives are aligned with the class. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Representatives' claims must "share the same essential characteristics as the claims of the class at large." *Id.* at n.14 (quotation marks and emphasis omitted). But factual differences between claims will not defeat a typicality finding when the claims of a representative and the class members arise from a common practice and under a common legal theory. *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1351 (11th Cir. 2001); *see also Prado*, 221 F.3d at 1279 n.14. Nor will variations in the amount of damages between the representatives and other class members. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Finally, while defenses unique to a class representative may demonstrate atypicality, those defenses must be a major focus of the litigation. *See, e.g.*, *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006) (collecting cases); *see also* 1 *Newberg on Class Actions*, *supra*, at § 3:45.

The fourth factor, adequacy, requires the Court to determine whether the proposed class representatives have any fundamental conflicts of interest with the class and whether they are qualified to serve as representatives. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). A representative has a fundamental conflict of interest with the class, for example, when some members of the class benefitted from the conduct at issue while others were harmed or where he has fundamentally different economic incentives from other members. *See id.* at 1189–90. And a representative is qualified to serve as a representative if he has at least a

little knowledge about the case. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966).

Additionally, the Court must determine that the proposed class counsel have the requisite

experience and commitment to serve the class. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F. 2d

718, 726 (11th Cir. 1987); *see also* Fed. R. Civ. P. 23(g).

### 3. Rule 23(b)(3)

In addition to meeting the requirements of Rule 23(a), the proponents of class certification

must meet one of the provisions of Rule 23(b). Here, the relevant part is Rule 23(b)(3), which

requires that

> the court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available
> methods for fairly and efficiently adjudicating the controversy. The
> matters pertinent to these findings include:
>
> > (A) the class members' interests in individually
> > controlling the prosecution or defense of separate
> > actions;
> >
> > (B) the extent and nature of any litigation concerning
> > the controversy already begun by or against class
> > members;
> >
> > (C) the desirability or undesirability of concentrating
> > the litigation of the claims in the particular forum;
> > and
> >
> > (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The predominance inquiry requires the Court to determine whether the proposed class is

"sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 623 (1997). In making that determination, the Court first characterizes

the elements of the claims and defenses as either individual or common questions. 2 *Newberg on*

*Class Actions*, *supra*, § 4.50. "An individual question is one where 'members of a proposed class

will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Newberg on Class Actions*); *see Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989). After characterizing the issues, the Court must weigh them to see which predominate. This weighing is not a counting exercise; rather, it is a qualitative and "pragmatic assessment" of whether there are enough common issues to make classwide resolution of those issues appropriate. *See Cordoba*, 942 F.3d at 1274. Indeed, a case may present many individual questions and still qualify for certification. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004). But "[w]here, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Id.* at 1255. Finally, individualized damages are less of a barrier to finding that common issues predominate than is individualized liability. *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), *aff'd on other grounds*, 545 U.S. 546 (2005).

The superiority inquiry requires the Court to decide whether a class action is the best means to resolve the dispute between the parties. The rule provides four non-exclusive criteria to consider in making that decision. *See Amchem*, 521 U.S. at 616. First, the Court must consider whether class members should individually control their claims. Members have a stronger interest in controlling their claims when they are entitled to larger individual damages. *Id.* at 617. Second, the Court must consider whether other litigation is pending on the same controversy. If a significant number of actions are pending, then a class action may not be superior to individual

cases. 2 *Newberg on Class Actions*, *supra*, at § 4.70.  Third, the Court must consider whether concentration of litigation in the forum is appropriate.  When a court has already resolved several preliminary issues, concentrating the case before that court is generally appropriate.  *Klay*, 382 F.3d at 1271.  And fourth, the Court must consider whether a class action would pose greater manageability issues than other methods of resolving the dispute.  When common issues predominate, a single case is usually easier to manage than multiple individual suits.  *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009).  Manageability "will rarely, if ever, be in itself sufficient to prevent certification of a class." *Klay*, 382 F.3d at 1272.

### 4. Rule 23(g)

In addition to considering the adequacy of class counsel under Rule 23(a)(4), prior to appointing class counsel the Court must also consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  The Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

## III.   ANALYSIS

### A. Motions to Reconsider

All the parties—(1) the City, (2) JCS, and (3) the plaintiffs—seek reconsideration of the Court's summary judgment decision.

1. **City's Motion to Reconsider**

The City seeks reconsideration on two grounds: whether they can be held liable for injuries

that occurred as a result of revocation petitions filed before July 16, 2012 and whether Mr. Jones's

claims are time-barred.

*(i)   Timing of Injuries*

The City argues that because JCS petitioned the Municipal Court to revoke probation for

Ms. McCullough, Mr. Agee, Mr. Jones, and Ms. Johnson prior to July 16, 2012 (the earliest date

on which the City could have had notice of systemic *Bearden* violations), it cannot be held liable

for any of the harms arising from those petitions.  It also argues that because JCS petitioned the

Municipal Court to revoke Mr. Mooney's probation within thirty days of July 16, 2012, it cannot

be held liable for any harms arising from his petition either because the contract required thirty-

days' notice for termination.

In its summary judgment ruling, the Court held that "[o]nce the City became aware that

JCS and the Municipal Court systemically violated probationers' rights, it bore policymaking

responsibility for the contract's foreseeable consequences until it terminated the contract." *Carter*

Summ. J. Op. at *14; *see also* Summ. J. Op. at 14–15.  But it also held that "until the City was on

notice to how JCS operated, it cannot be held liable for its deliberate failure to intervene to protect

[the plaintiffs'] rights." *Carter* Summ. J. Op. at *14; *see also* Summ. J. Op. at 14–15.

The City is not entitled to the "extraordinary remedy" of reconsideration. *See Gumbaytay*,

757 F. Supp. 2d at 1154.  The City fails to show any change of law, newly discovered fact, clear

error, or manifest injustice to justify reconsideration. *See id.* at 1154–55.  At best, the City argues

that it could not have presented this timing argument at summary judgment because the plaintiffs

did not consider the July 16, 2012 notice date in their brief.  Perhaps that is so.  In denying the

City's motion for summary judgment, the Court allowed the plaintiffs' claims to proceed on relatively narrow grounds. But the plaintiffs pleaded deliberate indifference in their complaint. *See* Am. Compl. ¶ 209. Whether or not the plaintiffs directly briefed the issue in opposing the City's motion for summary judgment, the City was not entitled to summary judgment unless it showed that the plaintiffs could not prevail at trial on that theory of liability. The City failed to meet that burden. It does not get a second bite at the apple.

Even if the Court reconsidered its summary judgment decision, it would not grant the City the relief it seeks for three reasons.

First, the City's argument as to Mr. Mooney is fundamentally flawed in presuming that it would have had to wait thirty days to terminate the contract with JCS. The City-JCS contract required JCS to comply with federal law. City Evid. Supp. Mot. Summ. J., Ex. 9 at 2, Ex. 10 at 2, ECF Nos. 241-9, 241-10. Alabama law allows for immediate repudiation of a contract in the event of a material breach. *See Edwards v. Allied Home Mortg. Capital Corp.*, 962 So. 2d 194, 207 (Ala. 2007). For the City to be entitled to summary judgment against Mr. Mooney, it must show that no reasonable jury could conclude that JCS materially breached the contract by engaging in the alleged *Bearden* violations. This it cannot do. *See Carter* Summ. J. Op. at *14 (holding that a reasonable jury could find that JCS violated *Bearden* rights); Summ. J. Op. 14–15 (same). A reasonable jury could conclude that the City had the right to terminate the contract on July 16, 2012.

Second, the City's argument as to all plaintiffs is fundamentally flawed in assuming that termination of the contract was its only means to stop systemic *Bearden* violations once it was on notice. It was not. The contract—coupled with the City's knowledge of systemic *Bearden* violations—tethers the City's inaction to the harms that the plaintiffs suffered. But once that

connection was established, the City had a duty to take remedial actions within its own power.[4]

The Mayor, for example, could have remitted the traffic fines. Ala. Code § 12-14-15 (2020). Or

the City could have insisted that JCS employees provide full information about compliance and

ability to pay to the Municipal Court. *See* City Evid. Supp. Mot. Summ. J., Ex. 9 at 2 (requiring

on revocation that the "probation officer will testify as to the circumstances of the case"), 3

(requiring JCS to "[p]rovide reports to the Court regarding compliance and payment information

as requested"); Ex. 10 at 2–3 (same). The City's failure to take remedial measures to stop *Bearden*

violations is what leaves it potentially liable under § 1983. *See Griffin v. City of Opa-Locka*,

261 F.3d 1295, 1311 (11th Cir. 2001).

Third, the City's argument as to all plaintiffs misapprehends the significance of July 16,

2012. The City is potentially liable for any *harms* that occurred after that date, not for any *actions*

JCS or the Municipal Court took after that date. The City had the ability to intercede and prevent

*Bearden* violations once it knew they were occurring. That it did not intercede allows a jury to

find that the City was deliberately indifferent to post-notice harms. The City's argument about the

date on which JCS petitioned the Municipal Court is thus irrelevant.

Were the Court to reconsider its summary judgment ruling, it would still conclude that a

reasonable jury could find the City liable for any harms that occurred after July 16, 2012.

Finally, as the summary judgment decision remains unaltered, granting the City's

alternative remedy—a Rule 16 conference to narrow the scope of claims—would be futile.

---

[4] Several of the plaintiffs' suggested remedies do not meet this standard because they require City to attempt to influence the Municipal Court. The City is not directly responsible for the Municipal Court's acts.

*(ii)  Statute of Limitations*

The City points to new evidence in the plaintiffs' motion for class certification, suggesting for the first time that Mr. Jones's *Bearden* claim is time-barred.  New evidence justifies reconsideration.  *See Gumbaytay*, 757 F. Supp. 2d at 1154.  Therefore, the Court will grant the motion to reconsider and will reexamine its summary judgment ruling with respect to Mr. Jones's *Bearden* claim.

Neither party disputes, on the basis of the dates of his commutation and release from jail, that Mr. Jones's claims fall outside the two-year statute of limitations for § 1983 claims (even as tolled).  Rather, Mr. Jones argues that his claims are subject to a twenty-year statute of limitations under Alabama law because he has an intellectual disability.  He points to Alabama Code § 6-2-8(a), which provides that

> [i]f anyone entitled to commence [a civil action] . . . is, at the time the right accrues, . . . insane, he or she shall have three years, or the period allowed by law for the commencement of an action if it be less than three years, after the termination of the disability to commence an action . . . . No disability shall extend the period of limitations so as to allow an action to be commenced . . . after the lapse of 20 years from the time the claim or right accrued.

The Code further defines "insane" to include "all persons of unsound mind."  Ala. Code § 1-1-1(5).  Mr. Jones says he qualifies.  The City responds that an intellectually disabled plaintiff is insane under the statute only if he is legally incompetent.  Mr. Jones bears the burden of showing that he was "insane" between 2011 and 2015.  *See Street v. Shadix*, 73 So. 73, 74 (Ala. 1916).

What qualifies as "insane" is far from clear.  The Alabama courts offer little guidance.  *See, e.g.*, *Travis v. Ziter*, 681 So. 2d 1348, 1352 (Ala. 1996) ("[V]ery few modern cases examine the meaning of 'insanity,' as used in § 6-2-8.").  In 1926, the Alabama Supreme Court said that "[a]s the word 'insanity' appears in . . . our Code, it is unexplained and unlimited."  *Alabama Power*

*Co. v. Shaw*, 111 So. 17, 20 (Ala. 1926).[5]   Accordingly, the court looked to the "broad and comprehensive meaning of the word" to conclude that temporary conditions fell within the statute's protections. *Id.*  But in 1996, the Alabama Supreme Court held that repressed memories fell outside the scope of insanity, based on "the policy goals furthered and protected by the statute of limitations." *Travis*, 681 So. 2d at 1355.  And so far as the Court can tell, no Alabama state court has squarely addressed whether having an intellectual disability can make someone "insane" under § 6-2-8.[6]

As the statute presents a question of state law, the Court must interpret the statute as the state's highest court would.[7]  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938).  The Alabama Supreme Court intercepts statutes to "ascertain and give effect to the intent of the legislature in enacting the statute." *Ex parte Dow AgroSciences LLC*, 299 So. 3d 952, 958 (Ala. 2020) (quoting *IMED Corp. v. Systs. Eng'g Assocs. Corp.*, 602 So. 2d 344, 346 (Ala. 1992)). Accordingly, "[w]ords used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says." *Id.*  Legal terms, in contrast, "are presumed to have been used in their legal sense." *Rochester-Mobile, LLC v. C & S Wholesale Grocers, Inc.*, 239 So. 3d 1139,

---

[5] The City says that "[t]he *Shaw* court described 'insanity' as used in § 6-8-2 to mean a 'derangement of the mind that deprives it of the power to reason or will intelligently.'" City Suppl. Br. on § 6-8-2 at 3.  But that language appears in *Shaw* only in a quotation from *Johnson v. Maine & N.B. Insurance Co.*, 22 A. 107, 108 (Me. 1891), and the extent to which *Shaw* embraced *Johnson*'s reading of the term is unclear.

[6] Several federal courts have weighed in on the question. *See, e.g., Warren ex rel. Robinson v. Ala. Dep't of Mental Health*, No. 7:16-cv-01666-RDP, 2017 WL 1282244, at *3 (N.D. Ala. Apr. 6, 2017); *Love v. Wyeth*, 569 F. Supp. 2d 1228, 1231–34 (N.D. Ala. 2008); *see also Garrison v. Alabama Dep't of Corr.*, No. 2:15-cv-846-MHT, 2016 WL 2636673, at *1 (M.D. Ala. May 9, 2016).

[7] The Court has the option to certify this question to the Alabama Supreme Court. *See* Ala. R. App. P. 18(a), (c). Certification is appropriate where there is "substantial doubt" as to the meaning of state law. *Stevens v. Battelle Mem'l Inst.*, 488 F.3d 896, 904 (11th Cir. 2007).  But the parties oppose certification, and the Court agrees that certification is inefficient because resolving this question would not finally resolve the case.  Therefore, the Court will resolve the question itself.

1144 (Ala. 2017) (quoting *Crowley v. Bass*, 445 So. 2d 902, 904 (Ala. 1984)). When the legislature

reenacts a statute (or substantially similar language), the Court must look to the original meaning.

*See Jones v. Conradi*, 673 So. 2d 389, 392 (Ala. 1995); *Haden v. Lee's Mobile Homes, Inc.*, 136

So. 2d 912, 918 (Ala. Ct. App. 1961). Finally, the Court must derive meaning from the text alone

if at all possible. *See Alabama Ins. Guar. Ass'n v. Ass'n of Gen. Contractors Self-Insurer's Fund*,

80 So. 3d 188, 202 (Ala. 2010).

The legislature first codified the relevant language between 1867 and 1876. *See* Ala. Code

§ 3236 (1876). And the legislature added language between 1886 and 1897 defining "insane" to

mean—together with "lunatic" and "non compos mentos"—"a person of unsound mind." *See* Ala.

Code § 1 (1897). Thus, the question is what the late-nineteenth-century Alabama legislature meant

by "insanity." To answer that question, the Court looks to the contemporary meaning of the word

as the best evidence of legislative intent.

Because the definition provision refers to an "unsound mind" and compares insanity to

"non compos mentos," the Court concludes that the legislature used insanity as a legal term.

Legally, in the late-nineteenth century, insanity for purposes of civil acts turned on capacity to

contract. *See, e.g., Cotton v. Ulmer*, 45 Ala. 378, 396–97 (1871); *see generally* Insanity, *Bouvier's

Law Dictionary* 1056–57 (Francis Rawles ed., 1897). And "insane persons" included both

"idiots"—"person[s] *destitute* of ordinary intellectual powers"—and "lunatics." *See* Insane

person, *Bouvier's*, *supra*, at 1050 (emphasis added). In short, the insane were those who needed a

next friend or guardian to sue because they could not act for themselves. *See* Ala. Code § 672

(1897); *see also West v. West*, 7 So. 830 (Ala. 1890).

Mr. Jones does not qualify under that definition because he has demonstrated himself

capable of testifying in this action, *see, e.g.*, Jones Decl., ECF No. 246-8; Jones Dep., ECF No.

250-4, and of contracting with his attorneys to represent him.[8] He put himself forward as someone capable of representing not just his own interests but those of the class. Indeed, his attorneys refuse to characterize him as "insane" or of "unsound mind." *See* Pls. Suppl. Br. 3, ECF No. 340. Nor, if the Court assumed the Alabama Legislature intended the definition of "insane" to evolve dynamically with the law, would Mr. Jones qualify under a modern definition. *See Mason v. Acceptance Loan Co.*, 850 So. 2d 289, 294–299 (Ala. 2002) (holding that evidence of "mental weakness" does not provide evidence of insanity). Based on the record before the Court, no reasonable jury could conclude that Mr. Jones was insane between 2012 and 2015.

The plaintiffs rely on two cases to support their argument to the contrary. Neither helps their cause. First, they point to a decision of the U.S. District Court for the Northern District of Alabama, in which the court rejected the defendant's argument that an intellectually disabled plaintiff's claims were time-barred. *See Warren ex rel. Robinson v. Ala. Dep't of Mental Health*, No. 7:16-CV-01666-RDP, 2017 WL 1282244, at *3 (N.D. Ala. Apr. 6, 2017). But the defendants did not contest whether § 6-2-8 applied, so the decision offers little guidance. *See id.* at *3 n.1. The plaintiffs also point to *Emerson v. Southern Railway Co.*, 404 So. 2d 576 (Ala. 1981), in which the Alabama Supreme Court said that "[§] 6-2-8 demonstrates legislative response to the need to protect individuals suffering under certain disabilities," *id.* at 578. The Court has no doubt that protecting people who are unable to protect themselves is a critically important policy goal. But the state supreme court has also recognized countervailing policy goals with this statute of limitations: repose and certainty. *See Travis*, 681 So. 2d at 1355. The Court cannot conclude that

---

[8] There is no evidence in the record that Mr. Jones's intellectual abilities have changed significantly between 2012 and today.

the Alabama Supreme Court would choose one of those policy goals over the other, and it certainly cannot do so without a strong reason for departing from the text.

Mr. Jones does not fall within the protections of § 6-2-8, and his § 1983 claims are, therefore, time-barred. The Court will enter summary judgment for the City on Mr. Jones's § 1983 claims.

### 2. JCS's Motion to Reconsider

JCS seeks reconsideration on three grounds.[9]

#### (i) Section 1983 Liability

JCS argues that Circuit precedent forecloses § 1983 liability when a judicial act intervenes in the chain of causation between a defendant's act and the plaintiff's harm, absent evidence that the defendant deceived or unduly pressured the judge. It also argues that the Court erred in drawing from Alabama law to determine causation standards for a § 1983 action.

In deciding the motions for summary judgment, the Court held that JCS was potentially liable for the foreseeable results of its actions. It reasoned that to be liable under § 1983, a municipality (or a private entity acting on behalf of a municipality),

> must be the factual and proximate cause of the plaintiff's injury. *Smith v. City of Oak Hill*, 587 F. App'x 524, 527 (11th Cir. 2014). A plaintiff must demonstrate that a municipality is the "moving force" behind his rights violation: he must show that the municipality is culpable for and caused the violation. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).
>
> . . .
>
> Because the torts [the plaintiffs] allege[ ] took place in Alabama, the Court looks to Alabama law to define the relevant causation standards. *Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982). In determining whether factual cause exists, Alabama courts ask whether the plaintiff's injury would have occurred but for the

---

[9] The Court considers the motion, which is styled as a motion to alter, amend, or vacate, as a motion to reconsider because the judgment in this case is not yet final. Compare Fed. R. Civ. P. 54(b), with Fed R. Civ. P. 59(e), 60(b).

defendant's act or omission. *Springer v. Jefferson Cty.*, 595 So. 2d 1381, 1383 (Ala. 1992) (citing *Prosser and Keeton on Torts* § 41 (5th ed. 1984)). For proximate cause, they ask whether the plaintiff's injury must naturally and probably result from the defendant's act or omission. *Mobile Gas Serv. Corp. v. Robinson*, 20 So. 3d 770, 780 (Ala. 2009). Though a proximate cause may not depend on the intervention of an independent cause, *id.*, more than one act or omission can concurrently cause an injury, *Lemley v. Wilson*, 178 So. 3d 834, 842 (Ala. 2015). And "a *foreseeable* intervening [act] does not break the causal relationship between the defendants' actions and the plaintiffs' injuries." *Mobile Gas*, 20 So. 3d at 780–81 (quoting *Ala. Power Co. v. Moore*, 899 So. 2d 975, 979 (Ala. 2004)) (emphasis and alteration in original).

. . .

JCS's petition naturally resulted in the Municipal Court's decision to revoke [the plaintiffs] probation. The Municipal Court intervened in the causal chain but did not break it. Because its intervention was foreseeable—indeed the natural consequence of a petition asking for revocation—JCS cannot shift its responsibility for [the plaintiffs'] injuries onto the Municipal Court. *See Springer*, 595 So. 2d at 1384. Moreover, given the Municipal Court's established practice of not holding indigency hearings, JCS could have foreseen the Municipal Court's decision to jail [the plaintiffs] without . . . indigency hearing[s]. Finally, a jury could find that JCS was culpable for [the plaintiffs'] injuries because it sought to revoke [their] probation when it knew or should have known that [they were] unable to pay.

*Carter* Summ. J. Op. at *15–16; *see also* Summ. J. Op at 14–15.

JCS seems to argue that it is entitled to reconsideration because the Court's decision was clearly erroneous. Not so.

First, the law of the Circuit does not impose an absolute prohibition on looking to state law to define § 1983 tort claims. Even the case JCS cites for the proposition that "[f]ederal law, not state law, governs the resolution of § 1983 claims" agrees. *Blue v. Lopez*, 901 F.3d 1352, 1358 (11th Cir. 2018). When discussing the elements of malicious prosecution, the *Blue* court noted that it "has looked to both federal and state law and determined how those elements have historically developed." *Id.* at 1357 (quotation marks omitted). The question that *Blue* held must

be determined by federal law was one of procedure: whether a directed verdict had preclusive effect. *Id.* at 1358. JCS offers no authority to suggest that the Court cannot look to state law to determine standards of causation in a § 1983 claim for *Bearden* violations. Indeed, § 1988(a) expressly authorizes courts to look to state substantive law in deciding civil rights cases. And the Circuit has applied state tort law to determine causation standards in § 1983 cases. *See, e.g.*, *Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982). JCS offers no reason why these cases are no longer good law.

Second, even if federal law would be a more appropriate source of law, federal law in this Circuit holds that reasonably foreseeable events do not sever proximate cause. *See Smith v. City of Oak Hill*, 587 F. App'x 524, 527 (11th Cir. 2014); *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000) ("[Section] 1983 defendants are, as in common law tort suits, responsible for the natural and foreseeable consequences of their actions."); *see also Malley v. Briggs*, 475 U.S. 335, 344–45 n.7 (1986) ("[Section] 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions."). JCS says that "[t]he intervening acts of the prosecutor, grand jury, judge and jury—assuming that these court officials acted without malice that caused them to abuse their powers—each break the chain of causation unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant." JCS Mot. Recons. 2 (quoting *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989)); *see also id.* (citing *Dixon v. Burke Cty.*, 303 F.3d 1271, 1275 (11th Cir. 2002)). That principle makes sense in the cases JCS cites, where no one alleged that the intervening judicial action was unconstitutional—much less foreseeably so.[10] But the Court cannot see how it applies to the facts

---

[10] Neither case even discusses foreseeability. JCS also points to *Powers v. Hamilton County Public Defender Commission*, 501 F.3d 592 (6th Cir. 2007), which does discuss foreseeability. JCS tells the Court that *Powers* stands for the proposition that "**even if it is foreseeable** that a defendant's conduct will lead to the complained of harm, a

in this case, where the plaintiffs allege that JCS should have foreseen that the Municipal Court itself would commit a tort of constitutional dimension.  Moreover, the plaintiffs allege that JCS failed to give critical information to the Court, which may be seen as a form of deception.  *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 611 (6th Cir. 2007); *see also Egervary v. Young*, 366 F.3d 238, 249 (3d Cir. 2004); *Lanier v. Sallas*, 777 F.2d 321, 324–25 (5th Cir. 1985). In this case, the Municipal Court's actions did not sever the causal chain, and Circuit precedent does not compel a different conclusion.

The Court's § 1983 causation holding was not clearly erroneous, and JCS is not entitled to reconsideration.  Even if the Court reconsidered its decision, it would reach the same conclusions for the reasons stated here and in its summary judgment opinions.  *See Carter* Summ. J. Op. at *15–16; *see also* Summ. J. Op. 14–15.

*(ii)  False Imprisonment*

JCS argues that it cannot be held to have instigated the plaintiffs' jailings because the Municipal Court judges made independent decisions to jail the plaintiffs.

In deciding the motions for summary judgment, the Court held that:

> [a] person responsible for instigating a detention may be held liable [for false imprisonment] only if he persuades or influences officials to imprison the victim and if he acts in bad faith. . . . JCS would be liable if it persuaded or influenced the Municipal Court to jail [the plaintiffs] in bad faith.  [The plaintiffs have] produced enough evidence for a reasonable jury to conclude that JCS persuaded the Municipal Court to jail [them] because JCS "request[ed] that the probation of [the Plaintiffs] be revoked," and because JCS knew (or should have known) that [the plaintiffs] could not pay [their] fine[s] and would be jailed if the Municipal Court revoked [their]

---

defendant *may* be able to avoid § 1983 liability by pointing to the intervening action of a judge as the proximate cause of the plaintiff's injury," JCS Mot. Recons. 2 (bolded emphasis in original, italicized emphasis added) (quoting *id.* at 610).  *Powers* is on all fours with this case. And it devastates JCS's argument. *Powers* is a *Bearden* case, in which the Sixth Circuit held that a municipal court order to jail a defendant did not break the chain of causation when the defendant failed to give the Court information about the plaintiff's financial status. 501 F.3d at 611. The plaintiffs proceed here on the same theory and with parallel factual allegations.

> probation.  And [the plaintiffs have] produced enough evidence for
> a reasonable jury to conclude that JCS acted in bad faith in
> petitioning the court to revoke probation when it knew that
> probationer[s] had not willfully failed to pay fines and fees.

*Carter* Summ. J. Op. at *20; *see also* Summ. J. Op. 15..

JCS says that reconsideration is appropriate because the Court's summary judgment ruling

was plainly erroneous.    To support that argument, it relies on *Heining v. Abernathy*,

295 So. 3d 1032 (Ala. 2019).  *Henning* stands for the proposition that a person who takes actions

that lead to a false arrest cannot be held liable for instigating that arrest when the imprisoning

officer undertakes an independent investigation and comes to his own determination that an arrest

is appropriate.  *Id.* at 1038.  So far, so good.  But JCS's application of *Heining* to the plaintiffs'

false imprisonment claim fails.  First, *Heining* is a false arrest case, which involves different

standards.  *See, e.g.*, *Carter* Summ. J. Op. at *20 (granting summary judgment to JCS on Mr.

Carter's claims for false arrest).  Second, whether the Municipal Court judges in this case "*act[ed]*

*solely upon [their] own judgment and initiative*," *Heining*, 295 So.3d at 1037 (emphasis in

original) (quoting *Standard Oil Co. v. Davis*, 94 So. 754, 756 (Ala. 1922)), is a contested factual

question.  The entire theory of the plaintiffs' *Bearden* case is that the judges did no such thing.

And the Court held that the plaintiffs sufficiently supported their theory to reach a jury.  Moreover,

even if the Court accepted JCS's averments that the judges determined whether the plaintiffs had

willfully refused to pay fines without considering JCS's petitions, no one can contest that the

judges had to rely at least in part on JCS's payment logs to determine non-compliance.  The judges

cannot have acted *solely* on the basis of their own investigations; they must have used at least some

evidence provided by JCS, else they would not have known the amounts the plaintiffs paid and

owed.  *Heining* does not help JCS.

The Court's false imprisonment holding was not clearly erroneous, and JCS is not entitled to reconsideration. Even if the Court reconsidered its decision, it would reach the same conclusions for the reasons stated here and in its summary judgment opinions. *See Carter*, Summ. J. Op. at \*20; *see also* Summ. J. Op. 15.

(iii) Rooker-Feldman *Doctrine*

JCS again argues that the *Rooker-Feldman* doctrine bars the plaintiffs' claims. It offers no reason at all why this argument is properly the subject of a motion to reconsider. It is not. And even if the Court were to reconsider JCS's argument, it would reject it.

JCS offers no reason why the Court should revisit its previous holding, which rejected the same arguments JCS re-raises here. To the extent that JCS's position can be construed to argue that the Court's ruling was demonstrably erroneous, that argument fails as well.

As the court explained in its summary judgment ruling:

> *Rooker-Feldman* is a narrow jurisdictional doctrine that prohibits federal district courts from reviewing . . . state court judgements. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 293 (2005); *see also District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Congress has conferred jurisdiction to review state court judgments only on the Supreme Court. *See* 28 U.S.C. § 1257; *see also Exxon Mobil*, 544 U.S. at 283–84. Because of that jurisdictional limit, *Rooker-Feldman* deprives federal courts of jurisdiction over an issue that is "inextricably intertwined" with a state court judgment. *Alvarez v. Att'y Gen.*, 679 F.3d 1257, 1262–63 (11th Cir. 2012). An issue is inextricably intertwined with a state court judgment when the federal claim cannot succeed without "effectively nullify[ing]" the state court [judgment] or requiring the conclusion that the state court wrongly decided its case. *Id.* Federal trial courts, however, may review claims that are independent of state [judgments], even if those claims have previously been litigated in state courts. *Exxon Mobil*, 544 U.S. at 293.

24

*Carter* Summ. J. Op. at *8. *Rooker-Feldman* prevents the lower federal courts from sitting as appellate courts over state court judgments—no more and no less.[11] The plaintiffs' § 1983 claims assume the validity of the Municipal Court's orders. They are not challenging the validity of those orders in this Court; indeed, if the Municipal Court's orders were invalidated on appeal, the plaintiffs would have no claims.[12] Rather, the plaintiffs' § 1983 claims seek damages against independent actors for unlawful conduct.[13] *Cf. Nivia v. Nation Star Mortg., LLC*, 620 F. App'x 822, 824–25 (11th Cir. 2015) (holding that *Rooker-Feldman* does not prevent suit challenging illegal conduct taken by independent actors after state foreclosure judgment). *Rooker-Feldman* does not bar those claims.

The Court has subject-matter jurisdiction over the plaintiffs' § 1983 claims.

---

[11] JCS also objects to the Court's *conferatur* citation to Judge Sutton's concurrence in *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397 (6th Cir. 2020), in which he cogently explains how the Supreme Court limited the scope of the *Rooker-Feldman* doctrine in *Exxon Mobil*:

> [*Rooker* and *Feldman*] apply only to litigants who sidestep § 1257 by trying to vacate or reverse final state court decisions in federal district court: namely, only to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." The key words are "review" and "judgments." The doctrine does not apply to federal lawsuits presenting similar issues to those decided in a state court case or even to cases that present exactly the same, and thus the most inextricably intertwined, issues. Else, *Rooker-Feldman* would extend "far beyond" its proper scope. As a jurisdictional doctrine focused on state court judgments, it's about one thing and one thing alone: efforts to evade Congress's decision to funnel all appeals from final state court decisions to the United States Supreme Court.

*Id.* at 406–07 (quoting *Exxon Mobil*, 544 U.S. at 283–84, 293). Nothing in Judge Sutton's opinion applies uniquely to *VanderKodde*'s statutory context or to Sixth Circuit law. But to be clear, in its summary judgment opinion, the Court expressly applied *Alvarez*, *see Carter* Summ. J. Op. at *8–9, the very case on which JCS relies.

[12] The plaintiffs' claims challenging the Municipal Court's orders have long since dropped out of this case. *See* Mem. Op. 8–14 (May 14, 2019), ECF No. 183; Order (May 14, 2019), ECF No. 184; Order (June 20, 2019), ECF No. 186.

[13] JCS argues that because under § 1983 it is a state actor, it cannot be considered an independent actor. But as JCS well knows, there is a crucial distinction between the Municipal Court and the City (or entities acting on its behalf). The Municipal Court conducted judicial acts as part of the state; JCS provided probation services pursuant to a contract with the City and in the capacity of a municipality. JCS does not fill the shoes of the Municipal Court when it acts in the City's stead.

The same is true for the false imprisonment claims.  Just as with their § 1983 claims, the plaintiffs' false imprisonment claims do not challenge the validity of the Municipal Court's orders. Rather, the plaintiffs assume that the orders are valid and seek damages from independent actors for their tortious conduct.  Nothing about the plaintiffs' claims involves impermissible appellate review of the Municipal Court's decisions.

Unlike with the *Bearden* and false imprisonment claims, JCS did not raise a *Rooker-Feldman* objection to the abuse of process claims at the summary judgment stage.  But their argument fares no better on this front.

A claim for abuse of process does not implicate the *Rooker-Feldman* doctrine because abuse of process assumes a valid court order to abuse.  No one challenges the validity of the probation orders, which distinguishes this case from the frontal challenge to the probation orders at issue in *Thurman v. JCS*, 760 F. App'x 733 (11th Cir. 2019).  Rather, all parties agree that the probation orders were valid.  So nothing this court could do would function as appellate review of the orders.  And nothing this court could do would effectively nullify the orders either, because the action seeks damages from a third party for its *misuse* of legal process.

Moreover, all of JCS's conduct occurred *after* the Municipal Court issued the probation orders, which further separates the Municipal Court's orders from JCS's conduct.  *See Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1286 (11th Cir. 2018) ("A claim about conduct occurring after a state court decision cannot be either the same claim or one 'inextricably intertwined' with that state court decision, and thus cannot be barred under *Rooker-Feldman*.").

The *Rooker-Feldman* doctrine cannot conceivably apply to the plaintiffs' abuse of process claim.  The Court has subject-matter jurisdiction over the false imprisonment claims.

JCS made its *Rooker-Feldman* argument and lost.  Continuing to relitigate the issue is improper.  JCS is entitled to no relief on the Court's *Rooker-Feldman* rulings.

### 3.  Plaintiffs' Motion to Reconsider

The plaintiffs ask the Court to reconsider its holding that the City is not liable for any claims that arose before July 16, 2012.  They argue that the Court should permit them to advance their argument that the City delegated its policymaking authority to JCS, which would encompass claims that arose at any time within the statute of limitations.

In its summary judgment decision, the Court held that "The City . . . cannot be held liable for the Municipal Court and JCS's actions just because it funds the court and probation services." *Carter* Summ. J. Op. at *13; *see also* Summ. J. Op. at 14–15.  But it held that "[t]he City-JCS contracts[ ] . . . would allow a reasonable jury to conclude that the City had final responsibility for JCS, either because it acquiesced to JCS's standard operating procedures or because it ratified decisions about how to provide probation that it delegated to JCS." *Carter* Summ. J. Op. at *14; *see also* Summ. J. Op. at 14–15.  It further held that "until the City was on notice to how JCS operated, it cannot be held liable for its deliberate failure to intervene to protect [the plaintiffs'] rights.  Therefore, the City is subject to liability for [the plaintiffs'] claims arising on or after July 16, 2012, but not for those before." *Carter* Summ. J. Op. at *14 (citation omitted); *see also* Summ. J. Op. at 14–15.  Accordingly, the Court granted summary judgment to the City for any claims arising before July 16, 2012. *Carter*, Summ. J. Op. at *23; *see also* Summ. J. Op. at 14–15.

The plaintiffs are not entitled to reconsideration. *See Gumbaytay*, 757 F. Supp. 2d at 1154.  They fail to show any newly discovered facts, clear error, or manifest injustice to justify reconsideration. *See id.*

The plaintiffs argue that the Court did not consider the argument, which they briefed extensively in their opposition to the City's motion for summary judgment. The Court's opinions belie that claim. The Court expressly held that the City's responsibility to provide probation services did not by itself create liability under controlling Circuit precedent. *Carter* Summ. J. Op. at *13 (citing *Turquitt v. Jefferson Cty.*, 137 F.3d 1285, 1289–90 (11th Cir. 1998)); *see also* Summ. J. Op. at 14–15. The Court also directly addressed delegation, holding that it was a potential source of liability only if the City *ratified* the delegated decisions. *Carter* Summ. J. Op. at *14; *see also* Summ. J. Op. at 14–15. Ratification requires knowledge. The Court considered and rejected this argument.

The plaintiffs also argue that *Harper v. Professional Probation Service, Inc.*, 976 F.3d 1236 (11th Cir. 2020), supplies an intervening change of law to justify reconsideration. But *Harper* is a case about the liability of a private probation company, not the city with which it contracted. *See id.* at 1244. And in *Harper*, the private probation company operated in a quasi-judicial capacity. *See id.* at 1242–43. While the Court agrees with the plaintiffs that *Harper* illustrates the dangers of for-profit private probation, the case makes no changes to substantive law that could affect the outcome of this case.

The plaintiffs are not entitled to reconsideration. And even if the Court reconsidered its decision, it would reaffirm the decisions it made at the summary judgment stage.

**B. Class Certification**

The plaintiffs moved to certify three classes: (1) a *Bearden* class, (2) a false imprisonment class, and (3) an abuse of process class.

To help them define the parameters of all three classes, the plaintiffs hired John Rubens, an e-discovery consultant, to organize and summarize the defendants' data.[14]

### 1. *Bearden* Class

The plaintiffs seek to certify a *Bearden* class "consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation, who: (1) had debt commuted to jail time in a JCS-supervised case after JCS petitioned the court to revoke probation; and (2) served any of that jail time on or after July 1, 2013." Mot. Class Certification 1.

Before addressing the express requirements of Rule 23, the Court must first address whether the class is ascertainable. To answer that question, it must first describe how the plaintiffs propose to ascertain class membership.

The plaintiffs assert that they can use the defendants' records to ascertain the people who were assigned to probation with JCS, were the subject of a JCS revocation petition, had a fine in a JCS-assigned case commuted to jail time, and served that jail time after July 1, 2013.

Two databases supply those records: one created by JCS's Probation Tracker software and another created by the Municipal Court's Benchmark software. JCS used Probation Tracker for the entire class period; the Municipal Court began using Benchmark in February 2012.

JCS created a Probation Tracker file each time the Municipal Court assigned a traffic offender to JCS probation. Rubens Decl. ¶ 8, ECF No. 238-1. Each Probation Tracker file contains: (1) the Municipal Court case numbers associated with the probation; (2) a history of

---

[14] The record contains contradictory evidence about Mr. Rubens's role in ascertaining the class. In his declaration, he suggests that he identified people who met the class definition. *See* Rubens Decl. ¶ 20, ECF No. 238-1 ("[T]o date, I have identified more than 200 probationers who spent commuted time in jail on JCS cases."). But at the hearing, he testified that he merely produced information about potential class members for the plaintiffs' attorneys to review. Rubens Hr'g Test. (cross-examination by Larry Logsdon). To the extent these statements contradict each other, the Court credits Mr. Rubens's hearing testimony.

payments (and non-payments) and attendance (and non-attendance) of meetings; and, (3) whether (and when) JCS logged a violation of probation.[15] *See, e.g.*, JCS Hr'g Ex. 34. Prior to February 2012, JCS documented many—but not all—commuted fines in Probation Tracker. Rubens Decl. ¶ 10.

Each Benchmark file contains a set of docket entries and associated files, including, for most—but not all—commuted offenders jail transcripts and release orders. *Id.* at ¶ 13. A jail transcript lists: (1) a booking number, (2) the Municipal Court case numbers, (3) any mandatory jail time an offender served (specified by offense), (4) any fines the Municipal Court commuted (specified by offense), and (5) the date of commutation. *Id.* at ¶ 14; *see, e.g.*, JCS Hr'g Ex. 30. An order of release contains: (1) the booking number and (2) date of release; they also often contained details about mandatory and commuted time. Rubens Decl. ¶ 15; *see, e.g.*, JCS Hr'g Ex. 31.

For cases commuted before February 2012, the plaintiffs looked for Probation Tracker files that indicated that an offender's fines had been commuted to jail time after JCS issued a petition for revocation. For cases commuted after February 2012, the plaintiffs cross-reference Probation Tracker files listing probationers as in violation of their probation with corresponding Benchmark files. Rubens Decl. ¶ 19. They narrowed their review to instances where a probationer served time in jail following probationer revocation. *Id.* And then they examined those records to find instances where a probationer served jail time for a JCS-assigned offense. *Id.* at ¶ 20.

These methods fail to produce an ascertainable class. The defendants' records do not provide an objective answer as to whether debt was commuted to jail time *in a JCS-supervised*

---

[15] JCS used two form documents to ask the Municipal Court to terminate a probation. One, a petition for revocation, expressly asked the Municipal Court to terminate probation. *See, e.g.*, JCS Hr'g Ex. 9. The other, a notice to appear, instructed a probationer to appear before the Municipal Court to explain why he had not made payments. *See, e.g.*, JCS Hr'g Ex. 50. The plaintiffs treated these documents as interchangeable.

*case* or whether probationers *actually served* any of that jail time. Evidence that debt was commuted to jail time in a non-JCS case has no relevance to the plaintiffs' claims against JCS and the City. Nor does evidence that plaintiffs fines were commuted to jail time that they did not serve.

Jail transcripts and release orders—the primary documents the plaintiffs rely on to show commutations—often contain ambiguities about which offenses resulted in actual jail time. Consider two examples. First, some probationers had two jail transcripts: one with handwritten notes and one without. *Compare, e.g.*, JCS Hr'g Ex. 15, *with* Pls. Hr'g Ex 3 (Edwards tab). The plaintiffs offer no objective way to determine which transcript should determine class membership or of how to interpret annotations on the transcripts. So the plaintiffs cannot determine which offenses were commuted when the records contain discrepancies. Second, some probationers earned "credit" for days served; the release orders, however, do not indicate that those days were actually served. *See, e.g.*, JCS Hr'g Ex. 35. The plaintiffs offer no objective way to determine whether the probationers actually served those days. These questions present factual disputes that a jury must decide—they would necessitate a series of mini-trials just to determine class membership. And those disputes go to the core of the class definition: whether the Municipal Court commuted JCS-assigned offenses and whether the probationers served jail time for those offenses determines class membership.

Additionally, the plaintiffs' methodology fails to exclude probationers who would have served the same amount of jail time regardless of commutation. Some probationers served mandatory time concurrently with commuted time. *See, e.g.*, JCS Hr'g Ex. 38. And some probationers were held because of detainer requests from other jurisdictions. *See, e.g.*, JCS Hr'g Ex. 71. The plaintiffs' method for ascertaining class membership does not eliminate probationers who would have served the same amount of time regardless of commutation. And the fact that

some probationers spent only hours in jail before paying their fines, *see, e.g.*, JCS Hr'g Ex. 47, exacerbates this particular problem. The plaintiffs' class definition fails to exclude these uninjured probationers.

Even under the most permissive ascertainability standards, a proposed class cannot be certified if it is too indefinite to exclude a significant number of uninjured persons. *See Jamie S.*, 668 F.3d at 495. The unaddressed ambiguities mean that the class lists could well contain many uninjured individuals. The plaintiffs must show that the class is definite and ascertainable, and they have not.

The work and testimony of plaintiffs' expert Mr. Rubens confirms that the class is not ascertainable. At the class certification hearing, Mr. Rubens repeatedly told the Court that the plaintiffs' attorneys had to make "judgment calls" about whether or not to include people on the class lists when his work did not produce a definite answer. During direct examination, Mr. Rubens analogized this attorney review process to document review in discovery where a consultant may filter documents before an attorney makes a legal judgment about whether the document is responsive or non-responsive. But that analogy does not hold for the application of objective fact-based criteria like class parameters. If applying class parameters requires legal judgment, then the class has not been objectively defined. *See Jamie S.*, 668 F.3d at 495. Moreover, if applying class parameters requires legal judgment, then that judgment cannot be left to the attorneys alone. Rubens Hr'g Test. (cross-examination by Richard Hill, cross-examination by Larry Logsdon). Mr. Rubens said that potential class members went on or came off the class lists based on those calls. *Id.* He also testified that he personally had to make his judgment calls in applying the class criteria to the datasets. Rubens Hr'g Test. (cross-examination by Larry Logsdon).

Mr. Rubens also told the Court that he could not explain why some people were not on his tentative class lists. Rubens Hr'g Test. (cross-examination by Richard Hill). For example, when asked why probationer Marquis Watts was not on the list, Mr. Rubens chalked the omission up to an attorney judgment call. *Id.* And the plaintiffs' attorneys verified that theory: they explained that they omitted Mr. Watts because he reached a separate settlement with the City. *See* Pls.' Suppl. Hr'g Evid., ECF No. 343; *see also Watts v. City of Montgomery*, No. 2:13-cv-733-MHT (M.D. Ala., case closed Nov. 17, 2014). There are two problems with that explanation. First, the class definition does not exclude those who have already settled with the City; while they may not have viable claims, such people are still members of the defined class. Second, the very fact that the plaintiffs' attorneys are making undisclosed adjustments to the class lists without reference to the class criteria renders unreliable their entire endeavor to ascertain class membership. The Court cannot be confident that the issue with Mr. Watts is an isolated problem, especially because Mr. Rubens testified that plaintiffs' attorneys would make adjustments to the lists based on "intervening circumstances" that fell outside the class criteria. Rubens Hr'g Test. (cross-examination by Richard Hill). Further, the plaintiffs' own exhibits show that for at least some putative class members, the data are inconclusive. *See* Pls. Hr'g Exs. 25, 27. Repeatedly, over hours of testimony, Mr. Rubens demonstrated the shortcomings of his methodology and the class definition.

Whether many people fit the class definition is contested—not just between the parties but among the plaintiffs' own team. Therefore, a jury would have to determine whether each putative class member is, in fact, a member of the class. And the class definition is not sufficiently definite to exclude a great many people who were not injured by the defendants' conduct. Finally, given the number of judgment calls required to apply the class definition, the Court questions whether

the criteria are truly objective. They certainly appear to be facially objective, but if applying them requires subjective judgment, then the criteria themselves may actually be subjective. The plaintiffs do not offer solutions to any of those critical problems. They thus cannot show that they have a method for ascertaining which probationers meet the class criteria.

The Court finds that the plaintiffs have not met their burden to show that the *Bearden* class is ascertainable; thus, it must hold that the class cannot be certified. And because the plaintiffs fail to surmount the first threshold issue, no further analysis of the Rule 23 criteria is necessary.

### 2. False Imprisonment Class

Next, the plaintiffs seek to certify a false imprisonment class "consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation, who: (1) had debt commuted to jail time in a JCS-supervised case after JCS petitioned the court to revoke probation; and (2) served any of that jail time on or after July 1, 2009." Mot. Class Certification 1.

The parameters of the *Bearden* class and false imprisonment class are the same, except that the false imprisonment class period starts four years earlier. For the same reasons that a *Bearden* class cannot be ascertained, neither can a false imprisonment class. *See supra* Section III.B.1.

The Court finds that the plaintiffs have not met their burden to show that the false imprisonment class is ascertainable; thus, it must hold that the class cannot be certified. Again, the Court's certification analysis ends here.

### 3. Abuse of Process Class

Finally, the plaintiffs seek to certify an abuse of process class "consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation: (1) who at any time paid less than the minimum monthly payment ordered by the court; and (2) from whom JCS continued to collect or attempt to collect after July 1, 2013." Mot. Class Certification 1–2.

The plaintiffs say they can use JCS's own records to ascertain the members of the abuse of process class. JCS's Probation Tracker database notes a minimum monthly payment and the payments by date each probationer made. Rubens Decl. ¶ 29, 31. The files also show by date attempts to collect fines and fees. *Id.* at ¶ 32. The plaintiffs say they will cull the Probation Tracker files to show probationers who failed to make at least one monthly payment in full. *See id.* at ¶ 31. From that narrowed list, the plaintiffs say they will identify those probationers who continued to make payments or from whom JCS continued to attempt to collect payments. *See id.* at ¶ 32.

The plaintiffs have failed to establish that they can ascertain the membership of the abuse of process class.

First, the class definition is too broad. Mr. Rubens testified that he did not consider any number of reasons why a probationer may have permissibly failed to make a payment, such as being incarcerated. Rubens Hr'g Test. (cross-examination by Larry Logsdon). He indicated that he thought he could exclude those people. *Id.* But the class definition gives him no basis to exclude those probationers. Again, a proposed class cannot be certified if it is too indefinite to exclude a significant number of uninjured persons. *See Jamie S.*, 668 F.3d at 495. And the plaintiffs have not shown that the class is narrow enough to clear that low bar.

Additionally, by relying solely on data in the "PAYMENTPLAN" field of the Probation Tracker database for determining the minimum monthly payment, Rubens Hr'g Test. (cross-examination by Larry Logsdon), the plaintiffs' method for defining the class does not necessarily turn on the content of the probation orders. Perhaps that data will match the Municipal Court's records; perhaps it will not. But the plaintiffs have not actually tied JCS's conduct to the probation orders at the heart of their abuse of process claims. And they must to show that their class definitions and class lists actually relate to the underlying conduct.

Finally, after months of work to define the class, all the plaintiffs offer is a list of people who missed a payment at any time.[16]  *See* Pls. Ex. 30; Rubens Hr'g Test. (cross-examination by Larry Logsdon).  They have not demonstrated that Mr. Rubens's work will successfully ascertain the class.  That point is particularly important, because most of the problems with the *Bearden* and false imprisonment classes became apparent only when Mr. Rubens provided draft class lists.  The problems with the *Bearden* and false imprisonment lists suggest that problems may well arise when the plaintiffs try to produce the abuse of process class list.

In sum, the Court finds three barriers to finding that the class is ascertainable: the class definition may be substantially overinclusive, the method of ascertaining the class is not directly tied to the class definition and underlying probation orders, and the plaintiffs have not done enough work to show that the method of ascertaining the class can succeed.  The plaintiffs must overcome all those problems to succeed in certifying a class.

The Court finds that the plaintiffs have not met their burden to show that the abuse of process class is ascertainable; thus, it must hold that the class cannot be certified.  The Court need not consider any other Rule 23 factors.

* * *

The plaintiffs opened the class certification hearing with a plea for justice: they argued that absent class certification, the putative class members would not be able to hold the City and JCS accountable.  The Court is cognizant of that concern, but it does not believe today's decision creates injustice.  In a few months, a jury will hear this case.  The trial may even serve as a kind of bellwether for other similar claims.  *Cf. Wolfson v. Baker*, 623 F.2d 1074, 1078–80 (5th Cir.

---

[16] For this reason, the plaintiffs would have also failed to meet their burden to show numerosity because they offer no basis to estimate how many people match the second part of their class definition. *See Vega*, 564 F.3d at 1267–68.

1980).   And plaintiffs here and in other § 1983 cases are entitled to attorneys' fees if they prevail.  42 U.S.C. § 1988(b).  Their path to relief remains open.

The motion for class certification must be denied.   The plaintiffs may still pursue accountability, but not as class representatives.

### C. Consolidation

The Court has considered consolidating this case with *Carter* several times.  *See* Order (Mar. 10, 2017), ECF No. 133; Order (Apr. 25, 2017), ECF No. 153; Order (July 7, 2020), ECF No. 271; Order (Aug. 14, 2020), ECF No. 275.   Because it cannot certify a class, the Court concludes that consolidation is not warranted.   While the cases involve common questions of law and fact, the Court finds that the additional burden of separate trials would be minimal and that the presence of different causes of action in each case risks confusing the jury.  *See Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985).

## IV.   CONCLUSION

Based on the foregoing, the Court will:

- **DENY** the plaintiffs' motion for class certification;

- **GRANT** in part and **DENY** in part the City's motion to reconsider and enter summary judgment for the City on Mr. Jones's § 1983 claim;

- **DENY** JCS's motion to reconsider; and,

- **DENY** the plaintiffs' motion to reconsider.

Date: _12/23/20_

Royce C. Lamberth
United States District Judge