UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**ANGELA MCCULLOUGH**, et al.,
individually and on behalf of a class of
similarly situated persons,

  *Plaintiffs,*

**v.**

**THE CITY OF MONTGOMERY**, et al.,

  *Defendants.*

Case No. **2:15-cv-463-RCL**

## MEMORANDUM OPINION

The Court once again considers a case arising from the system of collecting traffic fines in

Montgomery, Alabama between 2009–2014 when the Montgomery Municipal Court routinely

jailed traffic offenders for failing to pay fines without inquiring into their ability to pay. In carrying

out that system, the Municipal Court deprived offenders of their due process and equal protection

rights not to be incarcerated for their poverty. *See Bearden v. Georgia*, 461 U.S. 660, 672–73

(1983). During that period, the City of Montgomery contracted on behalf of itself and the

Municipal Court with Judicial Correction Services, Inc. ("JCS") to supervise Municipal Court-

ordered misdemeanor probation.

The plaintiffs are Montgomery residents who served probation with JCS after they were

unable to pay their traffic tickets. The plaintiffs sued the City and JCS on behalf of themselves and

purported classes of similarly situated persons. Their operative complaint alleges causes of action

for violations of the Due Process and Equal Protection Clauses under 42 U.S.C. § 1983 and for

false imprisonment and abuse of process.

The plaintiffs moved to certify three classes (ECF No. 281). The parties fully briefed that motion (ECF Nos. 282, 294, 296, 322). They also submitted evidence in support of their briefs before and during a hearing on the motion (ECF Nos. 282, 295, 297, 323, 337, 338, 339, 341, 342, 343, 344). After the hearing, the Court denied class certification, holding that the proposed classes could not be ascertained. Order (Dec. 23, 2020) (ECF No. 350); Mem. Op. 28–37 (Dec. 23, 2020) (ECF No. 349).

The plaintiffs sought interlocutory review of that decision. Notice of 23(f) Appeal (ECF No. 352). After the plaintiffs sought review, the Eleventh Circuit issued its decision in *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021), which settled the standard for determining whether a class is ascertainable. As a result, the Circuit granted the plaintiffs' petition and vacated and remanded this Court's class-certification decision for reconsideration in light of *Cherry*. Order, *McCullough v. City of Montgomery*, No. 21-90003-H (11th Cir. Feb. 3, 2021).

Following remand, the Court ordered, Order (Feb. 3, 2021) (ECF No. 362), and the parties provided, supplemental briefing (ECF Nos. 366, 367, 368, 369).

Upon consideration of the motion; briefs;[1] evidentiary submissions; all other papers of record; and the arguments made, testimony offered, and evidence received over the course of a ten-hour hearing, the Court will **DENY** the plaintiffs' motion for class certification.

---

[1] The plaintiffs' brief in support of class certification ("Pls.' Br.") (ECF No. 282), the City's brief in opposition to class certification ("City's Opp'n") (ECF No. 294), JCS's brief in opposition to class certification ("JCS's Opp'n") (ECF No. 296), the plaintiffs' reply brief ("Pls.' Reply") (ECF No. 322), the plaintiffs' supplemental brief ("Pls.' Supp. Br.") (ECF No. 367), the defendants' joint supplemental brief ("Defs.' Supp. Br.") (ECF No. 366), the plaintiffs' supplemental reply ("Pls.' Supp. Reply") (ECF No. 368), the defendants' joint supplemental reply ("Defs.' Supp. Reply") (ECF No. 369), the plaintiffs' notice of additional authority ("Pls.' Notice") (ECF No. 372), and the defendants' joint response to that notice ("Defs.' Resp. Notice") (ECF No. 373) constitute the extensive briefing on class certification.

The Court also notes that this case has proceeded in parallel with *Carter v. City of Montgomery*, No. 2:15-cv-555. Today, in a separate opinion and order, the Court will deny the motion for class certification in *Carter* as well.

# I.   BACKGROUND

## A.  Factual Background[2]

### 1.  Fines and Probation in Montgomery

#### (i)  The Municipal Court

The City has a Municipal Court to adjudicate misdemeanors and traffic offenses. Ala. Code §§ 12-12-32, 12-12-51, 12-14-1. The Municipal Court is part of the state judiciary, *see* Ala. Const. art. VI, § 145, so the City cannot control proceedings in the Municipal Court, *see* Ala. Const. art. III, § 42(c). But the City appoints the judges, Ala. Code § 12-14-30; the mayor appoints the presiding judge, *id.,* and the mayor may remit fines and costs payable to the City, *id.* at § 12-14-15. And the City must "provide appropriate facilities and necessary supportive personnel for the municipal court and may provide for probation services, clerks and municipal employees designated as magistrates." *Id.* at § 12-14-2. The City must also provide indigent defense in its Municipal Court. *Id.* at § 12-14-9. At the same time, the Municipal Court sets its own internal procedures, including those for processing traffic tickets.

During the time JCS operated probation service in Montgomery, the Municipal Court processed traffic tickets in one of two ways. When a person received a traffic ticket, the ticket required him to appear in the Municipal Court on a given date. *See* Nixon Dep. 42:16–23 (Apr. 18, 2014) ([*Carter*] ECF No. 73-1) ("2014 Nixon Dep."). If the offense had a pre-set (scheduled) fine, court staff directed the

---

[2] In describing the background to this case, the Court quotes extensively from its summary judgment opinions. *See Carter v. City of Montgomery*, 473 F. Supp. 3d 1273 (M.D. Ala. 2020); *McCullough v. City of Montgomery*, No. 2:15-CV-463-RCL, 2020 WL 3803045 (M.D. Ala. July 7, 2020). For ease of reference, the Court uses the following short forms to refer to the summary judgment record: Citations to "*Carter* City Evid." refer to Evid. Submissions Supp. City's Mot. Summ. J. (*Carter* ECF No. 253). Citations to "*Carter* Evid." refer to Evid. Submissions Supp. Pl.'s Opp'n to Mots. Summ. J. (*Carter* ECF No. 278). Citations to "*Carter* MSJ Evid." refer to Evid. Submissions Supp. Pl.'s Partial Mots. Summ. J. (*Carter* ECF No. 72). Citations to "*Carter* Class Evid." refer to Pl.'s Submission of Evid. Matters Supp. Mot. Class Certification (*Carter* ECF No. 118). Citations to "*McCullough* City Evid." refer to Evid. Submissions Supp. City's Mot. Summ. J. (ECF No. 241). Citations to "JCS Evid." refer to Evid. Submissions Supp. JCS's Mot. Summ. J. (ECF No. 246). Citations to "Pls.' Evid." refer to Pls.' Compendium Doc. Exs. Supp. Pls.'s Mot. Summ. J. (ECF No. 252). The Court cites depositions and declarations without reference to the evidentiary compilation in which they appear; it references docket numbers only in the first citation to a deposition or declaration.

appearing defendant to a magistrate's window. *Id.* at 45:16–21. The defendant could plead not guilty and receive a hearing before a judge or could plead guilty and pay the fine. *Id.* at 46:11–47:3; *see also* Ala. R. Jud. Admin. 20. If the offense did not have a scheduled fine, court staff required the defendant to appear before a judge. 2014 Nixon Dep. 52:1–6. Once the defendant pleaded or was found guilty, the Municipal Court imposed a fine.

If a defendant could not afford to pay his fine, the Municipal Court could offer the defendant more time to pay. For small fines, Municipal Court policy authorized a magistrate to grant a thirty-day extension for fines of up to $250. 2014 Nixon Dep., Ex. 11. For defendants with higher fines or who needed more time to pay, the Municipal Court made payment plans available through JCS probation, *id.*, purportedly under its statutory power to suspend a sentence and place a defendant on probation for up to two years, *see* Ala. Code § 12-14-13. A magistrate could place certain defendants—those who owed less than $1,500 and who were either not already on probation with JCS or in good standing with JCS— on JCS probation pursuant to a general order. 2014 Nixon Dep., Ex. 11; *see also id.* at 140:13–16. The Municipal Court required defendants who could not pay a fine of more than $1,500 to appear before a judge. *Id.* at Ex. 11; *see also id.* at 151:1–7, 12–23.

*Carter v. City of Montgomery*, 473 F. Supp. 3d 1273, 1287–88 (M.D. Ala. 2020) (footnote omitted).

### (ii) JCS Probation

JCS provided for-profit probation services for courts throughout Alabama. Ray Dep. 57:19–21 ([*Carter*] ECF No. 73-3).

During the years at issue here, the City contracted with JCS to provide probation to Municipal Court offenders. [*Carter*] City Evid., Ex. 11, 12; Carter Evid., Ex. 13 at 2. Their contract ran for an initial term of one year and automatically renewed for subsequent one-year terms unless either party gave notice that it would not renew. [*Carter*] City Evid., Ex. 12 at 5. The City's contract with JCS controlled the terms under which JCS could provide probation. For example, it provided that JCS must maintain case files on probationers and specified a maximum staff-to-probationer ratio. *Id.* at 3. The contract, though, did not facially require the Municipal Court to use JCS for probation services. And other than a provision that mandates JCS to "supervise indigent cases when determined by the [Municipal] Court" without charging probation fees, the contract is silent as to indigency determinations. *Id.* at 2.

JCS does not charge courts or cities for their probation. *Id.* at 4. Rather, JCS operates on an offender-paid model. Under the City-JCS contract, JCS charged probationers $40 per month in addition to a $10 one-time fee at the onset of probation. *Id.*

JCS's services consisted "primarily" of facilitating extended payment plans. 2014 Nixon Dep. 139:2–3. JCS would not petition to revoke probation the first time a probationer missed a payment or an appointment. Ray Dep., Ex. 2 at p. 4.26. Instead, JCS would allow the delinquent probationers to continue on probation—and to continue accruing monthly fees—under more onerous conditions. JCS required probationers who made their monthly payments in full to appear at a JCS office once a month. [*Carter*] City Evid., Ex. 12 at 3. For those probationers who could not keep up with monthly payments, however, JCS required them to appear more frequently— up to several times each week. *See* Carter Dep. 84:15–16 (Sept. 14, 2018) ([*Carter*] ECF No. 163-14) ("2018 Carter Dep."); [*Carter*] City Evid., Ex. 12 at 3. And when a probationer could not afford to make a payment in full, JCS determined how much of the partial payment to apportion to fines and to probation fees. *See* Carter Evid., Ex. 28 at 2.

Once placed on probation, a probationer made all payments through JCS. JCS provided the probationers with information about their cases and fines. And JCS instructed probationers when they first reported for probation not to "contact the Municipal Court" because "they will be unable to help you." Carter Evid., Ex. 23.

Over the term of its contract with the City, JCS collected more than $15.5 million in fees. *See* Carter Evid., Ex. 32. It also collected more than $14.6 million in fines for the City. *See id.*

*Id.* at 1288.

### *(iii) Revocation and Commutation*

When a probationer could not make payments or missed appointments, JCS would petition the Municipal Court to revoke probation. JCS's standard-form petition did not allege that the probationer *willfully* failed to pay. Carter MSJ Evid., Ex. 10. And despite JCS's claims that it never asked the Municipal Court to revoke a probation, the standard-form petition "respectfully requests that the probation of the Defendant be revoked and that this Honorable Court issue a warrant for the arrest of said defendant, if necessary . . . ." *See, e.g.,* [*Carter*] City Evid., Ex. 23. Once JCS filed a petition, either JCS or the Court would serve the probationer with a notice to appear at an initial revocation hearing. Nixon Dep.

233:16–23 (Sept. 16, 2019) ([*Carter*] ECF No. 278-20) ("2019 Nixon Dep.").

If a probationer appeared at his revocation hearing, the Municipal Court would determine whether to revoke his probation. Hayes Dep. 22:8–16 ([*Carter*] ECF No. 73-2). When the Municipal Court revoked a probation, it would "commute" the probationer's fines into a jail term: the offender would "sit out" his fine at the rate of $50 per day. *See id.* at 9:16–10:3. If a probationer failed to appear, the Municipal Court would issue a warrant for his arrest. *See* Nixon Decl. at ¶ 85 ([*Carter*] ECF No. 253-3). Once the police executed that warrant and arrested the probationer, they would bring him before the Municipal Court for a commutation hearing. *See id.* at ¶¶ 88, 91, 99. Commutation hearings and revocation hearings proceed in similar ways—the judge determined whether to transform the fine into a jail sentence—except that JCS did not directly participate in commutation hearings. *See* Hayes Dep. 18:9, 13–14 ("The end result is the same.").

At revocation and commutation hearings, the Municipal Court routinely failed to inquire as to whether a defendant could pay his fines before sentencing him to jail time. *In re Hayes*, No. 49, slip op. at 2–3 (Ala. Ct. Judiciary Jan. 5, 2017). Though the Alabama court system has created a standard form to allow defendants to show their indigency, the Municipal Court did not use that form. 2014 Nixon Dep. 88:4–12. And the Municipal Court judges did not tell defendants that they could not be jailed if they could not afford to pay their fines. *See* Hayes Dep. 40:10–14. The Municipal Court's conduct was so egregious that the Alabama Court of the Judiciary suspended Municipal Court Presiding Judge A. Lester Hayes III from the bench for eleven months for failing to conduct indigency hearings and for other ethics violations stemming from the Montgomery probation system. *In re Hayes*, slip op. at 2–7. In addition, the Municipal Court judges agreed in settling a lawsuit challenging its traffic ticket procedures to refrain from incarcerating defendants for inability to pay. *See Mitchell v. City of Montgomery*, No. 2:14-cv-186-MHT, 2014 WL 11099432, at *2–3, 5–10 (M.D. Ala. Nov. 17, 2014). They also agreed to train themselves, court staff, and public defenders to protect defendants' rights not to be jailed for inability to pay. *Id.*

Likewise, JCS did not formally assess whether a probationer could afford to pay his fines. Hamby Decl. at ¶ 33 ([*Carter*] ECF No. 163-2). But JCS kept records of its probationers' employment statuses, including when probationers were unemployed or relied on government benefits as their sole source of income. Carter Class Evid., Ex. 13. At least 217 probationers whom JCS listed as

> unemployed, disabled, or receiving Supplemental Security Income
> benefits served jail time after the Municipal Court revoked their
> probation. *Compare id.* (listing probationers' sources of income)
> *with* Carter Class Evid., Ex. 10 (listing probationers who served jail
> terms).

*Id.* at 1288–1289

> *(iv) The City's Knowledge*
>
> The parties dispute when the City became aware of JCS's allegedly
> unlawful conduct.
>
> [The evidence] suggests several points at which the City became
> aware or should have become aware of how JCS operated:
>
> . . .
>
> - On July 16, 2012, when Mr. Nixon received an email from
>   JCS notifying him of a lawsuit challenging JCS's probation
>   operations for the Harpersville Municipal Court. Carter
>   Evid., Ex. 38. The complaint alleged that JCS engaged in
>   many of same the practices in Harpersville and Montgomery
>   including petitioning for probation revocation for indigent
>   probationers. *See id.*
>
> - On January 16, 2013, when Mr. Nixon received a subpoena
>   from the plaintiffs in *Thurman v. Judicial Correction
>   Services* for Municipal Court probation orders. Carter Evid.,
>   Ex. 38. The *Thurman* complaint alleged that JCS unlawfully
>   collected probation fees in Montgomery. *See* Am. Compl.
>   10–14 (ECF No. 4), *Thurman v. Judicial Correction
>   Services*, No. 2:12-cv-724-RDP (M.D. Ala. 2012).
>
> In contrast, the City claims not to have been aware of how JCS
> operated until shortly before it terminated its contract with JCS. *See*
> City's [Mot. Summ. J.] Reply Br. 19 ([*Carter*] ECF No. 283).
>
> The City did not supervise JCS's operations. Strange Dep. 100:1–8
> ([*Carter*] ECF No. 278-35).

*Id.* at 1289–90. The Court has found that a reasonable jury could hold that the City became aware

of JCS's practices as early as July 16, 2012. *See id.* at 1300.

### 2. The Named Plaintiffs

#### (i) Levon Agee

In 2010, the Municipal Court placed Mr. Agee on probation with JCS after he was unable to pay his traffic tickets. [*McCullough*] City Evid., Ex. 83. When Mr. Agee missed appointments and failed to make payments, JCS petitioned the Municipal Court to revoke his probation. [*McCullough*] City Evid., Ex. 85. Mr. Agee did not attend his revocation hearing, so the Municipal Court revoked his probation and issued a warrant for his arrest. [*McCullough*] City Evid., Ex. 34. In 2013, the Montgomery Police arrested Mr. Agee during a traffic stop and brought him before the Municipal Court. *Id.* The Municipal Court commuted Mr. Agee's fines to jail time. [*McCullough*] City Evid., Ex. 86. Mr. Agee spent twenty-eight days in jail until he was released on July 12, 2013. [*McCullough*] City Evid., Ex. 34.

*McCullough v. City of Montgomery*, No. 2:15-CV-463-RCL, 2020 WL 3803045, at *3–4 (M.D.

Ala. July 7, 2020).

#### (ii) Hassan Caldwell

In 2013, the Municipal Court placed Mr. Caldwell on probation with JCS when he was unable to pay his traffic fines. JCS Evid., Ex. JJJJ at 4. When Mr. Caldwell missed appointments and failed to make payments, JCS petitioned the Municipal Court to revoke his probation. *Id.* Mr. Edwards did not attend his revocation hearing, so the Municipal Court revoked his probation and issued a warrant for his arrest. *Id.* In December 2013, the Montgomery Police arrested Mr. Caldwell during a traffic stop and brought him before the Municipal Court. JCS Evid., Ex. KKKK at 2. The Municipal Court allowed Mr. Edwards to be released on a bond. *See id.* at 4–7. The Municipal Court never commuted his fines to jail time. Caldwell Dep. 323:5–20 ([*McCullough*] ECF No. 241-27).

*Id.* at *4

#### (iii) Algia Edwards

In 2009 and again in 2010, the Municipal Court placed Mr. Edwards on probation with JCS after he was unable to pay his traffic fines. [*McCullough*] City Evid., Ex. 52 at 10–13, Ex. 53 at 3–4. When Mr. Edwards missed appointments and failed to make payments, JCS petitioned the Municipal Court to revoke his probation. [*McCullough*] City Evid., Ex. 52 at 2. Mr. Edwards did not attend

his revocation hearing, so the Municipal Court revoked his probation and issued a warrant for his arrest. *Id.* In 2012, the Montgomery Police arrested him on warrants for unpaid tickets and brought him before the Municipal Court. *See* JCS Evid., Ex. NNN at 2. The Municipal Court commuted Mr. Edwards' fines to jail time. *Id.* at 4–5. Mr. Edwards served two days in jail before he was released on September 20, 2012. *Id.* at 7.

*Id.*

### (iv) Marquita Johnson

In 2011, the Court placed Ms. Johnson on probation with JCS after she was unable to pay her traffic fines. [*McCullough*] City's Evid., Ex. 87. When Ms. Johnson missed appointments and failed to make payments, JCS petitioned the Municipal Court to revoke her probation. [*McCullough*] City Evid., Ex. 39. Ms. Johnson did not attend her revocation hearing, so the Municipal Court revoked her probation and issued a warrant for her arrest. *Id.* In 2012, the Montgomery Police arrested Ms. Johnson during a traffic stop and brought her before the Municipal Court. [*McCullough*] City Evid., Ex. 40; [*McCullough*] City Evid., Ex. 42. The Municipal Court commuted Ms. Johnson's fines to jail time. JCS Evid., Ex. V. Ms. Johnson spent 279 days in jail until she was released on January 28, 2013. *See* [*McCullough*] City Evid., Ex. 41.

*Id.*

### (v) Kenny Jones

Mr. Jones has a "serious intellectual disability." Jones Decl. ¶¶ 3–4 ([*McCullough*] ECF No. 250-4). He cannot read, write, or maintain a regular job. *Id.* at ¶ 3. His only steady source of income is disability benefits. *See id.* at ¶ 3–4; Jones Dep. 43:11–12 ([*McCullough*] ECF No. 241-28).

In 2010, the Municipal Court placed Mr. Jones on probation with JCS after he was unable to pay his traffic tickets. JCS Evid., Ex. VVVV at 8. After Mr. Jones missed appointments and payments, JCS petitioned the Municipal Court to revoke his probation. *Id.* at 18. Mr. Jones did not appear at his hearing, and the Municipal Court revoked his probation.[3] *Id.*

---

[3] "The Municipal Court subsequently modified that order and took over supervision of Mr. Jones' probation itself. JCS Evid., Ex. VVVV at 19." *McCullough*, 2020 WL 3803045, at *5 n.3.

In 2013, the Montgomery Police arrested Mr. Jones on warrants for unpaid tickets unrelated to his JCS probation. Pls. Evid., Ex. 37; *compare id. with* JCS Evid., Ex. VVV at 8 (listing different citation numbers). The Municipal Court commuted his sentence to jail time. Pls. Evid., Ex. 38. Mr. Jones served eight days in jail before he was released on May 10, 2013. *See* Pls. Evid., Ex. 40.

*Id.* at *4–5.

### (vi) Angela McCullough

In 2010, the Municipal Court placed Ms. McCullough on probation with JCS after she was unable to pay her traffic tickets. [*McCullough*] City Evid., Ex. 67. Ms. McCullough never attended any appointments with JCS and never made any payments to JCS. [*McCullough*] City Evid., Ex. 66; *see also* McCullough Dep. 192:1–6 [(ECF No. 241-25)]. JCS petitioned the Municipal Court to revoke her probation. [*McCullough*] City Evid., Ex. 68. Ms. McCullough did not attend her revocation hearing, so the Municipal Court revoked her probation and issued a warrant for her arrest. JCS Evid., Ex. RR. In July 2013, the Montgomery Police arrested Ms. McCullough on several warrants; some—but not all—of the warrants stemmed from tickets that had been assigned to JCS for probation. *See* [*McCullough*] City Evid., Ex. 70 at 1; [*McCullough*] City Evid., Ex. 67. Ms. McCullough was brought before the Municipal Court, which commuted her fines to jail time. [*McCullough*] City Evid., Ex. 70. She served twenty-one days in jail until she was released on July 22, 2013. [*McCullough*] City Evid., Ex. 71.

*Id.* at *5.

### (vii)   Christopher Mooney

In 2011, the Municipal Court placed Mr. Mooney on probation with JCS after he was unable to pay his traffic tickets. [*McCullough*] City Evid., Ex. 74. When Mr. Mooney missed appointments and failed to make payments, JCS petitioned the Municipal Court to revoke his probation. [*McCullough*] City Evid., Ex. 75. Mr. Mooney did not attend his revocation hearing, so the Municipal Court revoked his probation and issued a warrant for his arrest. *Id.* In May 2013, the Montgomery Police arrested Mr. Mooney on several warrants; some—but not all—of the warrants stemmed from tickets that had been assigned to JCS for probation. [*McCullough*] City Evid., Ex. 76; *see* [*McCullough*] City Evid., Ex. 74. The Municipal Court commuted Mr. Mooney's fines to jail time. [*McCullough*] City

> Evid., Ex. 76. Mr. Mooney spent twenty-eight days in jail until he
> was released on June 7, 2013. *See* Pls. Evid., Ex. 36.

*Id.* at *5–6.

### B. Procedural History

#### 1. Early Proceedings.

The plaintiffs' amended complaint alleged fourteen causes of action under state law and under federal anti-peonage, anti-racketeering and civil-rights statutes. *See* Am. Comp. (ECF No. 32). The plaintiffs sued the City, JCS, and sued four officials: the current and former City police chiefs, the mayor, and the presiding judge of the Municipal Court.[4] Through motions to dismiss, an interlocutory appeal of the Court's rulings on qualified immunity and judicial immunity, and a motion for judgment on the pleadings, the Court substantially narrowed the case against the City and JCS and dismissed the claims against the officials. *See* Order (Mar. 10, 2017) (ECF No. 132) (dismissing peonage claims against JCS and causes of action based on racial discrimination, violations of RICO, and false arrest for arrests carried out based on probable cause); Order (June 20, 2019) (ECF No. 186) (dismissing claims against officials); Order (May 14, 2019) (ECF No. 184) (dismissing claims against City based on bail and bond practices, warrants, and failing to train officials and provide the plaintiffs with adequate counsel); *see also McCullough v. Finley*, 907 F.3d 1324 (11th Cir. 2018). The Court also dismissed three named plaintiffs for failing to appear for their depositions. Order (Nov. 4, 2019) (ECF No. 231).

So before the summary judgment proceedings, claims remained in the complaint for violations of the Fourth Amendment (against the City and JCS), *Bearden* rights (against the City and JCS), and anti-peonage laws (against the City), and for false imprisonment (against JCS),

---

[4] While this case was pending, Milton Westry replaced A. Lester Hayes, III as presiding judge and was thus substituted as the defendant.

abuse of process (against JCS), and money had and received (against JCS). *McCullough*, 2020 WL 3803045, at *7.

### 2. Summary Judgment

The defendants moved for summary judgment, and the plaintiffs also moved for partial summary judgment. The Court relied on its analysis in *Carter* to resolve many parallel issues in this case. *See id.* at *7–8.

Resting on its opinion in *Carter*, the Court held that the plaintiffs' *Bearden* claims against the City and JCS, *id.* at *12, imprisonment claims against JCS, *id.*, and abuse-of-process claims against JCS, *id.* at *10, could go to trial.

At the same time, the Court rejected a slew of the plaintiffs' claims. The Court granted summary judgment to the City on the plaintiffs' anti-peonage claim, finding no evidence of forced labor. *Id.* at *8–10. It also granted summary judgment to the City and JCS for the plaintiffs' Fourth Amendment claims. *Id.* at *10.

The Court granted in part and denied in part the City's and JCS's motions for summary judgment and denied the plaintiffs' motion for partial summary judgment.

Later, the Court reconsidered its summary judgment opinion and held that plaintiff Algia Edwards's § 1983 claims are time-barred. *See* Order (Sept. 11, 2020) (ECF No. 279).

So after summary judgment, only three claims remain live in this case:

- A claim against JCS and the City under § 1983 for violation of the plaintiffs' *Bearden* rights;

- A claim against JCS for false imprisonment; and,

- A claim against JCS for abuse of process.

### 3. Class Certification Proceedings[5]

After summary judgment, the Court set a briefing schedule for class certification. Order (Aug. 14, 2020) (ECF No. 275). When the plaintiffs filed their motion, they also filed a declaration from John Rubens, whom the plaintiffs hired to help produce information about potential class members for the plaintiffs' attorneys to review.

The Court conducted a hearing on the motion for class certification—and on a trio of motions to reconsider (ECF Nos. 301, 310, 311)—and received evidence. *See* Hr'g Tr. (Dec. 16, 2020) (ECF No. 364); Hr'g Tr. (Dec. 17, 2020) (ECF No. 365).

Following the hearing, the Court denied the plaintiffs' motion for class certification, holding that the proposed classes could not be ascertained. Mem. Op. 28–37 (Dec. 23, 2020). It also granted in part and denied in part the City's motion for reconsideration, holding that the City could be liable for harms that occurred after July 16, 2012, but that Mr. Jones's *Bearden* claim was time-barred. *Id.* at 12–19. And it denied JCS's and the plaintiffs' motions to reconsider. *Id.* at 19–28. Finally, the Court held that consolidation of this case with *Carter* was not warranted. *Id.* at 37.

### 4. Interlocutory Review and Remand

The plaintiffs petitioned for review of the class certification decision under Rule 23(f). They argued that the Court erroneously held "JCS probationers who served less [than one day of] jail time before being released should have been excluded from the class[es] because they were 'uninjured,'" Notice of 23(f) Appeal 22–23, and that the Court improperly concluded that the classes were not ascertainable. *Id.* at 23–34.

---

[5] The Court previously denied a motion for class certification without prejudice, determining that it should address class certification after summary judgment. Order (May 2, 2016) (ECF No. 95).

After the plaintiffs filed their petition, the Eleventh Circuit decided *Cherry*. The next day, it granted the plaintiffs' petition for interlocutory review, vacated the Court's opinion on class certification, and remanded the case to the Court for reconsideration in light of *Cherry*.

The Court, accordingly, ordered supplemental briefing on how *Cherry* affects class certification. Order 1 (Feb. 3, 2021). It also reaffirmed its order and memorandum opinion as to the motions for reconsideration. *Id.* at 1–2.

## II.   LEGAL STANDARDS

Class actions operate as an "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). The party seeking class certification bears the burden of proving that class certification is appropriate after rigorous analysis. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009). Unless the proponents of a class action can show that all of Rule 23's requirements have been met, the Court must presume that the case should not be certified as a class action. *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016); Fed. R. Civ. P. 23.

Class certification often requires some examination of the merits of the underlying claims and defenses. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–52 (2011). While that examination should go only as far as required to decide whether the proponents of certification have met Rule 23's requirements, *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009), at the very least the proponents must produce enough evidence for a reasonable jury to make findings that would sustain their theory of the case, *see Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016) (discussing jury standard); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (requiring consistency between theory of liability and evidence); *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 785–86 (9th Cir. 2021).

**A. Threshold Issues**

Before a class can be certified, it must be "adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quotation marks omitted). "A class is inadequately defined if it is defined through vague or subjective criteria. And without an adequate definition for a proposed class, a district court will be unable to ascertain who belongs in it." *Cherry*, 986 F.3d at 1302.

"A class is 'clearly ascertainable' if [a court is] certain that its membership is 'capable of being' determined. But membership can be capable of determination without being capable of convenient determination. Administrative feasibility is not an inherent aspect of ascertainability." *Id.* at 1303. Whether a class would be difficult to ascertain is relevant to whether a class action is a superior means of dispute resolution, but difficulty ascertaining class membership does not preclude certification. *Id.* at 1303–04.

Finally, as in all cases, the plaintiffs in a class action—class representatives and class members alike—must establish standing. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019). Thus, they must show (1) an injury-in-fact, (2) causation, and (3) redressability. *Id.* at 1273.

**B. Rule 23(a)**

Before a class may be certified, the Court must find the four Rule 23(a) requirements are met:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).

The first factor, numerosity, requires the Court to determine whether joinder of all class members is a realistic alternative to a class action. While the proponents of class certification need not meet any specific numerical threshold to establish numerosity, a class of more than forty individuals is generally too large for joinder to be practicable. *See Vega*, 564 F.3d at 1266–67. The Court need not determine the precise size of the class to make a numerosity finding. *Id.* at 1267.

The second factor, commonality, requires the Court to determine whether at least one question of law or one question of fact is capable of classwide resolution. *See Dukes*, 564 U.S. at 350. The common question must be central to the litigation: resolving the question should determine the validity of the claims. *See id.* The existence of factual differences does not prevent a finding of commonality when common legal questions are central to the case. *See* 1 William B. Rubenstein, *Newberg on Class Actions* § 3:21 nn.1–2 (5th ed. 2011–2020) (collecting cases).

The third factor, typicality, requires the Court to determine whether the proposed class representatives are aligned with the class. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Representatives' claims must "share the same essential characteristics as the claims of the class at large." *Id.* at 1279 n.14 (quotation marks and emphasis omitted). But factual differences between claims will not defeat a typicality finding when the claims of a representative and the class members arise from a common practice and under a common legal theory. *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1351 (11th Cir. 2001); *see also Prado*, 221 F.3d at 1279 n.14. Nor will variations in the amount of damages between the representatives and other class members. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Finally, while defenses unique to a class representative may establish atypicality, those

defenses must be a major focus of the litigation. *See, e.g., Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006) (collecting cases); *see also* 1 *Newberg on Class Actions. supra* § 3:45.

The fourth factor, adequacy, requires the Court to determine whether the proposed class representatives have any fundamental conflicts of interest with the class and whether they are qualified to serve as representatives. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). A representative has a fundamental conflict of interest with the class, for example, when some members of the class benefitted from the challenged conduct while others were harmed or when he has fundamentally different economic incentives from other members. *See id.* at 1189–90. And a representative is qualified if he has at least a little knowledge about the case. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966). Additionally, the Court must determine that the proposed class counsel have the requisite experience and commitment to serve the class. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987); *see also* Fed. R. Civ. P. 23(g).

### C. Rule 23(b)(3)

On top of meeting the requirements of Rule 23(a), the proponents of class certification must meet one of the provisions of Rule 23(b). Here, the relevant part is Rule 23(b)(3), which requires that:

> [T]he [C]ourt find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The predominance inquiry requires the Court to determine whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In making that determination, the Court first characterizes the elements of the claims and defenses as either individual or common questions. 2 *Newberg on Class Actions*, *supra*, § 4.50. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 577 U.S. at 453 (quoting *Newberg on Class Actions*); *see Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989). After characterizing the issues, the Court must weigh them to see which predominate. This weighing is not a counting exercise. Instead, it is a qualitative and "pragmatic assessment" of whether there are enough common issues to make classwide resolution of those issues appropriate. *See Cordoba*, 942 F.3d at 1274. Indeed, a case may present many individual questions and still qualify for certification. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004). But "[w]here, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Id.* at 1255. Finally, individualized damages are less of a barrier to finding that common issues predominate than is individualized liability. *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), *aff'd on other grounds*, 545 U.S. 546 (2005).

The superiority inquiry requires the Court to decide whether a class action is the best means to resolve the dispute between the parties. The rule provides four non-exclusive criteria to consider in making that decision. *See Amchem*, 521 U.S. at 616. First, the Court must consider whether class members should individually control their claims. Members have a stronger interest in controlling their claims when they are entitled to larger individual damages. *Id.* at 617. Second, the Court must consider whether other litigation is pending on the same controversy. If enough actions are pending, then a class action may not be superior to individual cases. 2 *Newberg on Class Actions, supra* § 4.70. Third, the Court must consider whether concentration of litigation in the forum is appropriate. When a court has already resolved several preliminary issues, concentrating the case before that court is generally appropriate. *Klay*, 382 F.3d at 1271. And fourth, the Court must consider whether a class action would pose greater manageability issues than other methods of resolving the dispute. When common issues predominate, a single case is usually easier to manage than multiple individual suits. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009). Manageability "will rarely, if ever, be in itself sufficient to prevent certification of a class." *Klay*, 382 F.3d at 1272.

### D. Rule 23(g)

Besides considering the adequacy of class counsel under Rule 23(a)(4), before appointing class counsel the Court must also consider the following:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). The Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

## III.   ANALYSIS

The plaintiffs moved to certify three classes: (1) a *Bearden* class, (2) a false-imprisonment class, and (3) an abuse-of-process class. The Court will address the class-certification requirements for each in turn.

### A. *Bearden* Class

The plaintiffs seek to certify a *Bearden* class "consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation, who: (1) had debt commuted to jail time in a JCS-supervised case after JCS petitioned the court to revoke probation; and (2) served any of that jail time on or after July 1, 2013." Mot. Class Certification 1.

#### 1.   Threshold Questions

##### (i)   Ascertainability

The Court must first determine whether the *Bearden* class is "adequately defined and clearly ascertainable." *Little*, 691 F.3d at 1304 (11th Cir. 2012). That is, the Court must assure itself that the class is not "defined through vague or subjective criteria" and that the class membership is "'capable of being' determined." *Cherry*, 986 F.3d at 1302–03.

Here, the *Bearden* class criteria are not vague and are facially objective. Each criterion asks if certain historical facts are true of an individual: whether he had debt commuted to jail time, whether JCS supervised his case, whether JCS petitioned the Municipal Court to revoke his probation, and whether he served any jail time on or after July 1, 2013. *See* Mot. Class Certification 1. While the Court has concerns that the plaintiffs' proposed methodology for identifying class members relies on subjective judgment, *Cherry* forbids the Court from considering the method of

ascertaining a class at this stage of the class-certification inquiry. *See Cherry*, 986 F.3d at 1303–04.

The class is ascertainable because its membership is able to be determined. Again, each class criterion turns on historical facts. While a jury may ultimately need to establish those facts, class membership can be determined.

Therefore, the proposed *Bearden* class meets the *Cherry* ascertainability standard.

The defendants offer four counterarguments. Two are easily dismissed. First, they argue that a class is not ascertainable if individual inquiries are necessary to determine class membership. Defs.' Supp. Br. 8; Defs' Supp. Reply 3–6. But that argument simply repackages the administrative feasibility test that *Cherry* rejected. *See, e.g.*, *Carrera v. Bayer Corp.*, 727 F.3d 300, 307–08 (3d Cir. 2013) (holding that administrative feasibility demands a "process that does not require much, if any, individual factual inquiry."). *Cherry* rejects that requirement. Second, they argue that the proposed class criteria are subjective as applied. Defs.' Supp. Br. 8. But in determining ascertainability following *Cherry*, the Court may not look to how the plaintiffs propose to apply the class criteria. Rather, the Court may look only to whether a class can be ascertained. And the *Bearden* class can be ascertained without relying on the judgment of plaintiffs' attorneys.

Third, the defendants argue that the class is overinclusive because it includes people who were not injured by the defendants' conduct. Defs.' Supp. Br. 4–8. The Court shares the defendants' concern: the proposed class may well contain people who cannot show that the defendants' conduct factually or proximately caused of any injuries they suffered. But it concludes that the proper place for that analysis is in the Rule 23 analysis, not in establishing whether the class is ascertainable.

Fourth, the defendants argue that the class criteria assume essential elements of the cause of action. Defs.' Supp. Br. 9–10; Defs.' Supp. Reply 6–8. A so-called "fail-safe class" is one that "require[s] a court to decide the merits of prospective individual class members' claims to determine class membership." Rubenstein, *supra* § 3.6. Yet, that's not what the proposed class definition does. A person who (1) had debt commuted to jail time in a JCS-supervised case (2) after JCS petitioned the court to revoke probation, and (3) served that jail time after July 1, 2013, would be a class member. As a class member, he would be bound by the judgment in this case even if he could not prove a *Bearden* violation. The class definition, thus, does not turn on the merits. The plaintiffs have not proposed an improper fail-safe class.

None of the defendants' counterarguments are availing.

### (ii) *Rooker-Feldman Doctrine*

JCS continues to press its argument that the *Rooker-Feldman* doctrine deprives the Court of jurisdiction to hear the plaintiffs' § 1983 claims. The Court rejected that argument at the summary-judgment stage, and its holding remains the law of the case. *See Carter*, 473 F. Supp. 3d 1293–1295; *McCullough*, 2020 WL 3803045 at *7; *see also Winck v. Danzig*, 147 F. Supp. 2d 1278, 1280 (M.D. Ala. 2001). JCS offers no reason why the Court should revisit its previous holding. *See, e.g.*, Bryan A. Garner, et al., *The Law of Judicial Precedent* 480–87 (2016).

Even if JCS's position can be construed to argue that the Court's ruling was demonstrably erroneous, that argument fails as well since the Court's ruling was originally correct. As the Court previously explained:

> *Rooker-Feldman* is a narrow jurisdictional doctrine that prohibits
> federal district courts from reviewing . . . state court [judgments].
> *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284,
> 293 (2005); *see also District of Columbia Court of Appeals v.
> Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263
> U.S. 413 (1923). Congress has conferred jurisdiction to review state

> court judgments only on the Supreme Court. *See* 28 U.S.C. § 1257;
> *see also Exxon Mobil*, 544 U.S. at 283–84. Because of that
> jurisdictional limit, *Rooker-Feldman* deprives federal courts of
> jurisdiction over an issue that is "inextricably intertwined" with a
> state court judgment. *Alvarez v. Att'y Gen.*, 679 F.3d 1257, 1262–63
> (11th Cir. 2012). An issue is inextricably intertwined with a state
> court judgment when the federal claim cannot succeed without
> "effectively nullify[ing]" the state court [judgment] or requiring the
> conclusion that the state court wrongly decided its case. *Id.* Federal
> trial courts, however, may review claims that are independent of
> state [judgments], even if those claims have previously been
> litigated in state courts. *Exxon Mobil*, 544 U.S. at 293.

*Carter*, 473 F. Supp. 3d at 1293–94; *see also Lance v. Dennis*, 546 U.S. 459, 463–64 (2006).

*Rooker-Feldman* prevents the lower federal courts from sitting as appellate courts over state court judgments—no more and no less.[6] The plaintiffs' § 1983 claims assume the validity of the Municipal Court's orders; if the Municipal Court's orders were invalidated on appeal, the plaintiffs would have no claims.[7] Rather, the plaintiffs' § 1983 claims seek damages against independent actors for unlawful conduct. *Cf. Nivia v. Nation Star Mortg., LLC*, 620 F. App'x 822, 824–25 (11th Cir. 2015) (holding that *Rooker-Feldman* does not prevent suit challenging illegal conduct taken

---

[6] JCS also objects to the Court's *conferatur* citation to Judge Sutton's concurrence in *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397 (6th Cir. 2020), in which he cogently explains how the Supreme Court limited the scope of the *Rooker-Feldman* doctrine in *Exxon Mobil*:

> [*Rooker* and *Feldman*] apply only to litigants who sidestep § 1257 by trying to vacate or reverse final state court decisions in federal district court: namely, only to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." The key words are "review" and "judgments." The doctrine does not apply to federal lawsuits presenting similar issues to those decided in a state court case or even to cases that present exactly the same, and thus the most inextricably intertwined, issues. Else, *Rooker-Feldman* would extend "far beyond" its proper scope. As a jurisdictional doctrine focused on state court judgments, it's about one thing and one thing alone: efforts to evade Congress's decision to funnel all appeals from final state court decisions to the United States Supreme Court.

*Id.* at 406–07 (quoting *Exxon Mobil*, 544 U.S. at 283–84, 293). Nothing in Judge Sutton's opinion applies uniquely to *VanderKodde*'s statutory context or to Sixth Circuit law. But to be clear, in its summary judgment opinion, the Court expressly applied *Alvarez*, *see Carter*, 473 F. Supp. 3d at 1293–84, the very case on which JCS relies.

[7] The plaintiffs' claims challenging the Municipal Court's orders have long since dropped out of this case. *See McCullough v. City of Montgomery*, No. 2:15-CV-463 (RCL), 2019 WL 2112963, at *5–11 (M.D. Ala. May 14, 2019); Order (May 14, 2019) (ECF No. 184); Order (June 20, 2019) (ECF No. 186).

by independent actors after state foreclosure judgment). *Rooker-Feldman* does not bar those claims.

The Court has subject-matter jurisdiction over the plaintiffs' § 1983 claims.

## 2.   Rule 23(a)

### (i)   Numerosity

At least 100 members constitute the *Bearden* class. Rubens Decl. ¶ 20. Such a class is far too large for joinder of all members to be practicable. *See Vega*, 564 F.3d at 1266–67.

The defendants do not argue joinder is practicable. Of course, the Court must satisfy itself that the plaintiffs have met the Rule 23(a) requirements. But here, numerosity does not present a close call. A trial with one hundred plaintiffs would be impracticable.

### (ii)   Commonality

Whether and when the City knew about the actions of JCS and the Municipal Court is a question common to every *Bearden* claim against the City. The question is all-or-nothing. If the City lacked knowledge, none of the claims can proceed. If the City had knowledge, all the claims surmount a key hurdle. That one issue satisfies commonality for the *Bearden* class's claims against the City.

Whether JCS had an established custom of asking the Municipal Court to revoke probation when it knew that a probationer had not willfully failed to pay fines and fees is a question common to every *Bearden* claim against JCS. This question is all-or-nothing as well. If JCS had no custom, no claims against JCS can proceed. If JCS had a custom, then all the claims will have taken a necessary step toward establishing *Monell* liability. That one issue satisfies commonality for the *Bearden* class's claims against JCS.

24

### (iii) Typicality

The proposed class representatives for the *Bearden* class are Mr. Agee and Ms. McCullough. Each makes claims fundamentally aligned with those of the class. Each alleges that the Municipal Court placed him or her on JCS probation, that JCS petitioned for his or her probation to be revoked, and that the Municipal Court deprived him or her of liberty in violation of *Bearden* after JCS filed that petition. Those claims are the same across the class. And both the class members and class representatives assert that systemic practices—on the part of the Municipal Court, JCS, and the City—caused their injuries. All typicality requires is a common practice and a common legal theory. *Piazza*, 273 F.3d at 1279 n.4, 1351; *Kornberg*, 741 F.2d at 1337. The representatives' claims are thus typical.

The City argues that the class representatives are atypical, but their arguments are unpersuasive.

First, the City argues that the class representatives cannot be typical because, its asserts, some class members received an adequate *Bearden* hearing or had an alternative to incarceration. It also argues that the class representatives cannot be typical because individualized inquiry is needed to determine whether JCS withheld information from the Municipal Court. Those objections resonate in the predominance analysis. *See infra* Part III.A.3.(i). But factual differences between class members and class representatives do not render the representatives atypical. *See Piazza*, 273 F.3d at 1351. The class members and representatives all allege the same *type* of harm, which is all that Rule 23 requires to show typicality.

Second, the City argues that Mr. Agee and Ms. McCullough are atypical representatives because JCS petitioned to revoke their probation before the City found out about JCS and Municipal Court practices. But these defenses are unlikely to take center stage at a classwide trial

25

because that fact is not true of most would-be class mebmers, so they do not render the representatives atypical. *Beck*, 457 F.3d at 300. To the extent they also argue that Mr. Agee and Ms. McCullough will be motivated to settle because their claims are meritless, the Court addresses those arguments in the succeeding section.

The proposed representatives are typical of the class.

(iv) *Adequacy*

There is no evidence in the record to show a fundamental conflict of interest between the proposed class representatives and the class. The only suggestion of a conflict is the City's argument that Mr. Agee and Ms. McCullough are more likely to settle. But propensity to settle is not the type of fundamental conflict that would render a representative inadequate. *See Valley Drug*, 350 F.3d at 1189–90.

The record also establishes that the proposed class representatives know enough about the case to serve as representatives. *See, e.g.*, Agee Dep. (ECF 246-1); Carter Dep. (*Carter* ECF No. 262-3); McCullough Dep. (ECF No. 246-10).

The City suggests that the proposed representatives are inadequate because they are incredible and because they have no respect for the law or courts. The character of the proposed representatives does not go to their ability to represent the class, *see* 1 *Newberg on Class Actions*, *supra* § 3:68, and even if it did, the City has failed to substantiate its allegations of villainy.

Additionally, the proposed counsel for the class appear to have adequate experience and capacity to serve in that role.[8] Nothing in the record suggests that they will be unable to discharge

---

[8] The National Center for Law and Economic Justice and its senior attorneys, Claudia Wilner and Gregg Bass, represent that they have litigated many class actions as class counsel. Wilner Decl. ¶ 3 (ECF No. 283-10). Dentons, LLP and its senior attorney, Harold Hirshman, represent that they have served as class counsel in several cases (and as defense counsel in several other class actions). *Id.* ¶ 4. Hank Sanders and Faya Rose Toure, of Chestnut, Sanders & Sanders, represent that they have served as class counsel in one major class action in the past. *Id.* ¶ 5. Martha Morgan represents that she has served as class counsel in a pair of class actions. *Id.* ¶ 6.

their duties appropriately. And the defendants do not contest the proposed class counsels' adequacy.

The proposed representatives and counsel are adequate.

### 3. Rule 23(b)(3)

#### (i) Predominance

In *Bearden*, the Supreme Court held that the Fourteenth Amendment imposes two requirements before a court can jail a probationer for failure to pay. First, the Court must "inquire into the reasons for the failure to pay." *Bearden*, 461 U.S. at 672. Second, it may revoke probation only if it finds either that the probationer "willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay" or that "alternate measures are not adequate to meet the State's interests in punishment and deterrence." *Id.* If a court revokes probation without meeting either of those requirements, it violates the procedural protections *Bearden* employs to protect the rights of the indigent. *Cf. Dickerson v. United States*, 530 U.S. 428, 437–440 (2000) (employing procedural rule to protect underlying constitutional right); *Mapp v. Ohio*, 367 U.S. 643, 655–56 (1961) (same).

The defendants argue that *Bearden* has a third element, requiring the plaintiffs to prove their indigence. To support that claim, they point to the Eleventh Circuit's decision in *Walker v. City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018). In *Walker*, a case concerning bail—unlike the probation hearings at issue in *Bearden* and here—a pretrial detainee challenged a municipal policy, which required all persons charged with certain misdemeanors to be detained unless they paid a fixed cash bond. *Id.* at 1252–53. Under that policy, if a defendant could not pay, he would be held for up to forty-eight hours until he could appear before a magistrate and object to the bond amount. *Id.* A district court enjoined the policy, holding that the Fourteenth Amendment prohibits the

27

government from immediately releasing people who can afford to pay a fixed bond while detaining those who cannot for up to two days. *Id.* at 1257. On interlocutory appeal, the Eleventh Circuit vacated the injunction. *Id.* at 1272. While endorsing the district court's application of a *Bearden*-style hybrid equal protection/due process analysis, *id.* at 1259–60, the Circuit held that the plaintiff had not shown that he was likely to succeed on the merits, *id.* at 1269.

The defendants rely on one passage in *Walker* to support their argument. In that passage, in the Eleventh Circuit said

> The sine qua non of a *Bearden-* or *Rainwater*-style claim, then, is that the State is treating the indigent and the non-indigent categorically differently. Only someone who can show that the indigent are being treated systematically worse 'solely because of [their] lack of financial resources,'—and not for some legitimate State interest—will be able to make out such a claim. Those who simply find their own bail conditions too onerous must proceed under the Eighth Amendment's Excessive Bail Clause unless they can point to a separate due process violation.

*Id.* at 1260. The defendants interpret that passage to mean that only an indigent plaintiff (or class member) may bring a claim under *Bearden*. But the defendants' interpretation ignores both the context of *Walker* and the words they cite ("a *Bearden-* or *Rainwater*-style claim" (emphasis added)), both of which confirm that *Walker* describes what a plaintiff must show to *extend Bearden* to a new context. The plaintiffs here, however, do not bring a *Bearden*-style claim. They bring a *Bearden* claim. They ask the Court to apply *Bearden* in its original context and to apply the procedural safeguards that *Bearden* established. *Walker* does not affect classic *Bearden* claims.

Thus, accounting for the requirements of *Bearden* and § 1983, *see Carter*, 473 F. Supp. 3d at 1298–1303, to prevail on their *Bearden* claims against either the City or JCS, the plaintiffs must show:

- That the Municipal Court sentenced them to probation with JCS;

- That they failed to make payments to JCS in accordance with their probation orders;

- That JCS petitioned the Municipal Court to revoke their probation;

- That JCS knew or should have known that the Municipal Court was likely to deprive them of liberty without an adequate *Bearden* determination;

- That the Municipal Court commuted their fines to jail time;

- That the Municipal Court revoked their probation without inquiring into the reasons for failure to pay or without finding willful refusal to pay, willful failure to make bona fide efforts to pay, or inadequacy of alternative measures; and,

- Damages.

On top of those general elements, to prevail against the City the plaintiffs must show:

- That the City knew about the practices of JCS and the Municipal Court on or after July 16, 2020;

- That the City had final responsibility for JCS's actions, of which it had knowledge; and,

- That the City had a custom or policy of being deliberately indifferent to *Bearden* violations and that the City was thus the moving force behind their injuries.

To prevail against JCS the plaintiffs must show:

- That JCS had an established custom of asking the Municipal Court to revoke probation when it knew that a probationer had not willfully failed to pay fines and fees;

- That JCS was the but-for cause of their injuries; and,

- That JCS could have foreseen the Municipal Court's decision to deprive them of
  liberty without an adequate *Bearden* determination and that JCS was therefore the
  proximate cause of their injuries.

Having identified the questions the *Bearden* claims present, the Court must determine whether those questions are individual or common.

First, the Court classifies the issues shared by claims against the City and JCS. Three issues—whether the Municipal Court sentenced class members to probation with JCS, whether JCS petitioned the Municipal Court to revoke probation, and whether the Municipal Court commuted their fines to jail time—ask whether individuals are in fact members of the *Bearden* class. A common set of evidence—the Probation Tracker and Benchmark files—*may* be able to answer these questions for some class members. But for each class member, the fact-finder must determine individually whether the evidence supports class membership. For some class members, that will be an easy determination, but for others the question will be much harder. Thus, those three issues pose individual questions. The same is true regarding whether the class members failed to make payments in accordance with their probation orders.

Whether the Municipal Court revoked class members' probation without inquiring into the reasons for failure to pay or without making necessary findings could, in theory, be determined on either a classwide or an individual basis. The plaintiffs assert that classwide proof will resolve this question. But they have not put forward enough evidence to support that theory of the case. *See Tyson Foods*, 577 U.S. at 459; *Comcast*, 569 U.S. at 35. The record contains enough evidence for a reasonable jury to find that the Municipal Court systemically ignored *Bearden*. It also contains enough evidence for a reasonable jury to find that the Municipal Court failed to make the requisite inquiries and findings when jailing the named plaintiffs. But the record is almost devoid of

evidence about what happened at scores of other hearings—those of the putative class members.
The only evidence about what happened in those hearings in the record lies in the Municipal Court
and JCS files. That evidence contains only the outcomes of the commutation hearings; it is silent
as to any underlying findings or evidence. Without any classwide evidence, the Court must treat
this question as an individual one, because the only way to resolve the question is by asking what
happened at each hearing.

Rather than offer evidence to support their theory, the plaintiffs attempt to shift the burden
to the defendants. Pls.' Reply 22 (citing *United States v. Mojica-Leguizamo*, 447 F. App'x 992, 996
(11th Cir. 2011); *United States v. Davis*, 140 F. App'x 190, 191 (11th Cir. 2005)). But in a civil action
under § 1983, the plaintiffs have the burden of proving every element of the case, "even where the
government would bear [the burden] in a criminal case." *Gill as Next Friend of K.C.R. v. Judd*, 941
F.3d 504, 522–23 (11th Cir. 2019) (collecting cases). The plaintiffs must prove that the Municipal
Court failed to make the appropriate findings. Except as to the named plaintiffs, nothing in the record
suggests that the plaintiffs can meet that burden.[9] Thus, in this case, whether the Municipal Court
jailed JCS probationers without making adequate *Bearden* findings is an individual question.

In contrast, whether JCS knew or should have known that the Municipal Court was likely
to deprive class members of liberty without an adequate *Bearden* determination is susceptible to
common proof. If the Municipal Court's practice was systemic, then JCS's knowledge of the
practice would not change from class member to class member. Thus, it poses a common question.

Finally, the issue of damages is a common question under the plaintiffs' theory of the case.
The amount of loss-liberty damages can be determined on a classwide basis using a per diem

---

[9] To the extent that the plaintiffs point to the lack of *written* findings as evidence that no findings were made, that
argument fails as well. The Court cannot question the form of Municipal Court orders. *See Thurman v. JCS*, 760 F.
App'x 733, 737 (11th Cir. 2019). And nothing in *Bearden* requires written findings.

approach. *See, e.g.*, *Kerman v. City of New York*, 374 F.3d 93, 125–26 (2d Cir. 2004); *Barnes v. Dist. of Columbia*, 278 F.R.D. 14, 20–22 (D.D.C. 2011).

The Court turns to the issues unique to the City's liability. Whether and when the City knew about the practices of JCS and the Municipal Court is a common question. A single answer applies to all the class members' claims. The same is true for whether the City had final responsibility for JCS's actions and whether the City had a custom or policy of deliberate indifference to *Bearden* violations. If the City had a policy, it had a policy in all cases; if it did not have a policy, it cannot be held liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Next, the Court addresses issues unique to JCS's liability. Whether JCS had an established custom of asking the Municipal Court to revoke probation when it knew that a probationer had not willfully failed to pay fines and fees is inherently a common question, as with the issue of the City's customs. Whether JCS could have foreseen the Municipal Court's *Bearden* violations—and thus whether JCS was the proximate cause of the class members' injuries—depends on whether the Municipal Court engaged in a systemic practice and on JCS's knowledge of that practice. Like the question of whether the Municipal Court's *Bearden* violations were systemic and the question of the City's knowledge, this is a common question. The question of but-for causation, however, requires at least some individualized analysis. A fact finder must look at the timing of the revocation petition for each class member relative to the commutation, match the JCS and Court records, and potentially draw causal inferences.[10] That question, therefore, requires individualized analysis.

---

[10] In their briefs, the plaintiffs attempt to rebut a strawman: that class members who were jailed for "only hours" were not injured. *See* Pls. Supp. Br. 37–38; Pls.' Notice; *see also* Notice of 23(f) Appeal 22–23. They built that strawman out of one passage from the Court's since-vacated class certification opinion:

To recap, the *Bearden* claims present the following individual questions:

- Whether the Municipal Court sentenced class members to probation with JCS;

- Whether class members failed to make payments to JCS in accordance with their probation orders;

- Whether JCS petitioned the Municipal Court to revoke class members' probation;

- Whether the Municipal Court commuted class members' fines to jail time;

- Whether the Municipal Court revoked class members' probation without inquiring into the reasons for failure to pay or without finding willful refusal to pay, willful failure to make bona fide efforts to pay, or inadequacy of alternative measures; and,

- Whether JCS was the but-for cause of class members' injuries.

By contrast, the *Bearden* claims present the following common questions:

- Whether JCS knew or should have known that the Municipal Court was likely to deprive class members of liberty without an adequate *Bearden* determination;

- Whether the City knew about the practices of JCS and the Municipal Court on or after July 16, 2020;

- Whether the City had final responsibility for JCS's actions of which it had knowledge;

---

The plaintiffs' method for ascertaining class membership does not eliminate probationers who would have served the same amount of time regardless of commutation. And the fact that some probationers spent only hours in jail before paying their fines, *see, e.g.*, JCS Hr'g Ex. 47, exacerbates this particular problem. The plaintiffs' class definition fails to exclude these uninjured probationers.

Mem. Op. 31–32 (Dec. 23, 2020). To be clear, any person jailed for any period because of a *Bearden* violation has been injured. But to succeed in a § 1983 cause of action, a plaintiff must prove that the defendant's actions were the but-for and proximate causes of his injuries. And a plaintiff who would have spent the same amount of time in jail regardless of the *Bearden* violation cannot meet that burden.

- Whether the City had a custom or policy of being deliberately indifferent to *Bearden* violations and whether the City was thus the moving force behind class members' injuries;

- Whether JCS had an established custom of asking the Municipal Court to revoke probation when it knew that a probationer had not willfully failed to pay fines and fees;

- Whether JCS could have foreseen the Municipal Court's decision to deprive class members of liberty without an adequate *Bearden* determination and whether JCS was therefore the proximate cause of their injuries; and,

- Damages.

Weighing these questions requires the Court to exercise its pragmatic judgment and determine whether a classwide trial makes sense. *See Cordoba*, 942 F.3d at 1274. If the Court proceeded with a classwide trial and the plaintiffs answered all of the common questions in their favor, they would not have established liability for any class members. Nor would they have established that any class members were in fact class members. Rather, a fact finder would then need to establish what happened in the Municipal Court when each class member's probation was revoked. When liability turns on an individualized inquiry into the facts surrounding each class member's claim, common issues do not predominate. *See Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1235–36 (11th Cir. 2000); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997).

Even under the plaintiffs' own predominance test, they cannot prevail. The plaintiffs point to *Vega*, which held:

> [I]f the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that

> individual issues (made relevant only through the inclusion of these new class members) are important. If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

564 F.3d at 1270 (quoting *Klay*, 382 F.3d at 1255); *see* Pls. Br. 54. Even if the Court treats the Municipal Court and JCS records as a single set of evidence, the plaintiffs still would need to put on evidence for every new class member of what occurred at individual *Bearden* hearings. Because "significant amounts of new evidence" would need to be presented for each additional class member, individual issues predominate. *See Vega*, 564 F.3d at 1270.

The plaintiffs cannot prove their *Bearden* claims without establishing what happened to individual probationers at individual hearings. Thus, individual questions predominate for the *Bearden* class.

### (ii) Superiority

A class action is not the best means to resolve the dispute between the parties.

First, plaintiffs in general might have a reasonable interest in controlling their claims individually. *See* Fed. R. Civ. P. 23(b)(3)(A). In addition, the availability of attorney's fees in § 1983 actions, *see* 42 U.S.C. § 1988, lowers at least one barrier to individual claims. But the fact that, as far as the Court can determine, these two actions are the only cases seeking damages for JCS's operations in Montgomery suggests that *these* class members have little interest in pursuing their claims individually. That specific demonstration of a lack of interest supports a finding of superiority.

Second, the lack of individual suits challenging JCS's practices in Montgomery also suggests minimal difficulties in maintaining this case as a class action. *See* Fed. R. Civ. P. 23(b)(3)(B).

Third, concentrating litigation in this venue is appropriate. *See* Fed. R. Civ. P. 23(b)(3)(C). This Court has already taken significant strides towards bringing this case to its final resolution. And this District is the most appropriate venue to hear any claims arising from JCS's Montgomery operations.

Fourth, the administrative difficulties in trying this case as a class action would be immense. *See* Fed. R. Civ. P. 23(b)(3)(D). Because individual questions prevail and because individual trials on liability would be necessary following the classwide trial, class certification offers few advantages. That is especially so when compared to the alternative: individual trials following this action as a quasi-bellwether. Following that approach, if the plaintiffs here prevail, later plaintiffs may be able to rely on non-mutual offensive collateral estoppel to establish some elements of their claim (*e.g.*, knowledge, custom). *Cf. Wolfson v. Baker*, 623 F.2d 1074, 1078–80 (5th Cir. 1980).

A class action is not superior to other methods of resolving the *Bearden* claims.

### 4. Rule 23(g)

The proposed class counsel are able to fairly and adequately represent the interests of the class.

Counsel here have spent more than four years working to substantiate the *Bearden* claims. *See* Fed. R. Civ. P. 23(g)(1)(A)(i). They have adequate experience handling class actions and other complex litigation, including *Bearden* claims. *Supra* Part III.B.1.(iv) & n.8; *see* Fed. R. Civ. P. 23(g)(1)(A)(ii). They have shown knowledge of the appropriate law in their briefing here and in other cases. *Supra* Part III.B.1.(iv) at n.8; *see* Fed. R. Civ. P. 23(g)(1)(A)(iii). And they have committed adequate resources to try this action. *See* Fed. R. Civ. P. 23(g)(1)(A)(iv).

Appointment of the proposed class counsel to represent the *Bearden* class would be warranted.

* * *

For these reasons, the Court, with respect to the *Bearden* class, finds that:

- The proposed class is ascertainable;

- The proposed class is too numerous to make joinder of class members practicable;

- The there are issues of law and fact common to the class;

- Mr. Agee and Ms. Johnson present claims typical of the members of the class;

- Mr. Agee and Ms. Johnson would be adequate class representatives;

- The National Center for Law and Economic Justice, Dentons LLP, Chestnut, Sanders & Sanders LLC, and Martha Morgan would be adequate class counsel;

- Common questions do not predominate over individual questions;

- A class action is not superior to other forms of dispute resolution; and,

- Upon consideration of the factors enumerated in Rule 23(g)(1)(A) and other pertinent material of record, the National Center for Law and Economic Justice, Dentons LLP, Chestnut, Sanders & Sanders LLC, and Martha Morgan are able to fairly and adequately represent the interests of the class.

*See* Fed. R. Civ. P. 23(a), (b)(3), (g). Therefore, because plaintiffs did not meet their burden to show that common issues predominate over individual issues or that a class action would be the superior method of dispute resolution, certification of the *Bearden* class is not warranted.

## B. False-Imprisonment Class

The plaintiffs seek to certify a false-imprisonment class "consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation, who: (1) had debt commuted

to jail time in a JCS-supervised case after JCS petitioned the court to revoke probation; and (2) served any of that jail time on or after July 1, 2009." *McCullough* Mot. Class Certification 1.

### 1. Threshold Questions

#### (i) Ascertainability

The Court must first determine whether the false-imprisonment class is "adequately defined and clearly ascertainable." *Little*, 691 F.3d at 1304 (11th Cir. 2012). That is, the Court must assure itself that the class is not "defined through vague or subjective criteria" and that the class membership is "'capable of being' determined." *Cherry*, 986 F.3d at 1302–03.

Here, as with the *Bearden* class, the class criteria are not vague and are facially objective. Each criterion asks if certain historical facts are true of an individual: whether he had debt commuted to jail time, whether JCS supervised his case, whether JCS petitioned the Municipal Court to revoke his probation, and whether he served any jail time on or after July 1, 2013. *See* Mot. Class Certification 1. While the Court has concerns that the plaintiffs' proposed methodology for identifying class members relies on subjective judgment, *Cherry* forbids the Court from considering the method of ascertaining a class at this stage of the class certification inquiry. 986 F.3d at 1303–04.

The class is ascertainable because its membership is able to be determined. Again, each class criterion turns on historical facts. While a jury may ultimately need to establish those facts, class membership can be determined.

The defendants' objections to the ascertainability of the false*imprisonment class fail for the same reasons as their objections to the *Bearden* class.

Therefore, the proposed false-imprisonment class meets the *Cherry* ascertainability standard.

*(ii) Standing*

JCS argues that Mr. Edwards lacks standing to represent the false-imprisonment class because he did not serve post-commutation jail time. It says that after the Municipal Court commuted his fine on September 20, he paid his fine and was released on the same day. JCS Opp'n 23–24.

The record shows that Mr. Edwards was arrested at 2:49 p.m. on September 18, 2012. JCS Evid., Ex. NNN at 2. By 1:54 p.m. on September 19, 2012, Judge Westry had commuted Mr. Edwards's fines to jail time. *Id.* at 5–6. And a payment of $1,900 was made for his release on at 3:01 p.m. on September 20, 2012. *Id.* at 9–11.

Thus, the record shows that Mr. Edwards served at least one day in jail. He has shown an injury in fact. JCS's standing argument fails.

*(iii) Rooker-Feldman Doctrine*

Just as the settled law of the case foreclosed JCS's *Rooker-Feldman* argument on the § 1983 cause of action, so too does it foreclose JCS's argument on the false-imprisonment cause of action. *See Carter*, 473 F. Supp. 3d at 1293–95; *see also McCullough*, 2020 WL 3803045, at *7.

And even if the issue had not been settled, JCS would no more succeed on its false-imprisonment variation of their *Rooker-Feldman* argument than on its primary § 1983 argument. *See* Section III.A.1(ii). Just as with their § 1983 claims, the plaintiffs' false-imprisonment claims do not challenge the validity of the Municipal Court's orders. Rather, the plaintiffs assume that the orders are valid and seek damages from independent actors for their tortious conduct. Nothing about the plaintiffs' claims involves impermissible appellate review of the Municipal Court's decisions.

The Court has subject matter jurisdiction over the plaintiffs' false-imprisonment claims.

## 2. Rule 23(a)

### (i) Numerosity

At least 600 members constitute the false-imprisonment class. Rubens Decl. ¶ 20, 24. Just as the 100-member *Bearden* class was too large to join practicably, *see supra* Part III.A.2.i, so, *a fortiorari* this class is too. *See Vega*, 564 F.3d at 1266–67.

### (ii) Commonality

To prevail on their false-imprisonment claims against JCS, the plaintiffs must show:

- That the Municipal Court sentenced them to probation with JCS;

- That they failed to make payments to JCS in accordance with their probation orders;

- That JCS petitioned the Municipal Court to revoke their probation;

- That the Municipal Court commuted their fines to jail time;

- That the Municipal Court revoked their probation without inquiring into the reasons for failure to pay or without finding willful refusal to pay, willful failure to make bona fide efforts to pay, or inadequacy of alternative measures;

- That JCS persuaded or influenced the Municipal Court to jail them;

- That JCS acted in bad faith in persuading or influencing the Municipal Court to jail them; and,

- Damages.

Additionally, JCS will present probable cause to detain the plaintiffs as an affirmative defense.

All of those issues present individual questions. As with the *Bearden* class, three issues— whether the Municipal Court sentenced class members to probation with JCS, whether JCS

petitioned the Municipal Court to revoke probation, and whether the Municipal Court commuted their fines to jail time—ask whether individuals are in fact members of the class. The same is also true of whether the JCS persuaded or influenced the Municipal Court to jail class members, because that question simply asks whether JCS petitioned for revocation with the Municipal Court. And as with the *Bearden* class, individualized review of the evidence is needed to answer those questions, so the questions are individual. Likewise, whether the class members failed to make payments in accordance with their probation orders requires an individualized review of the defendants' records. And as with the *Bearden* class, whether the Municipal Court jailed the class members without an adequate *Bearden* hearing is, in this case, an individual question. Whether JCS acted in bad faith is an individual question, requiring an individualized review of what information JCS had about the class members and their ability to pay fines. *See* 473 F. Supp. 3d at 1307. Finally, whether probable cause existed to detain any class member is an individual question requiring individual review of the relevant circumstances.

Thus, there are no common issues of fact or law for the false-imprisonment class's claims against JCS.

### (iii) Typicality

The proposed class representatives for the false-imprisonment class are Mr. Agee, Mr. Carter, Ms. McCullough, Mr. Edwards, Ms. Johnson, Mr. Jones, and Mr. Mooney. Each makes claims that are fundamentally aligned with those of the class. Each argues that the Municipal Court placed him or her on JCS probation; that JCS petitioned for his or her probation to be revoked; that, in so doing, JCS, withheld material facts about his or her ability to pay fines; that JCS accordingly acted in bad faith and caused his or her jailing; and that the Municipal Court jailed him or her without an adequate *Bearden* determination. Those claims are the same across the class.

And both the class members and class representatives assert that systemic practices—on the part of the Municipal Court and JCS—caused their injuries. All typicality requires is a common practice and a common legal theory. *Piazza,* 273 F.3d at 1279 n.4, 1351; *Kornberg,* 741 F.2d at 1337. The representatives' claims are thus typical.

### *(iv) Adequacy*

There is no evidence in the record to show a fundamental conflict of interest between the proposed class representatives and the class.

The record also shows that seven of the proposed class representatives know enough about the case and their role to serve as representatives. *See, e.g.,* Agee Dep. (ECF No. 246-1); Carter Dep. (*Carter* ECF No. 262-3); McCullough Dep. (ECF No. 246-10); Edwards Dep. (ECF No. 246-3); Johnson Dep. (ECF No. 246-7); Mooney Dep. (ECF No. 246-11).

Mr. Jones however, does not. His deposition revealed clear issues with his memory, *see, e.g.,* Jones Dep. 11:7–10, 24:17–25:1, 99:23–101:5, 103:6–17 (ECF No. 246-8), and with his understanding of these proceedings, *see, e.g., id.* at 84:3–85:1, 86:12–87:6, 103:21–104:7. Neither of these issues, alone or combined, necessarily defeat his ability to serve as a class representative. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000). But Mr. Jones has also admitted that he does not understand what a class action is, Jones Dep. 241:11–19, or what his responsibilities as a class representative are, *id.* at 241:16–19. Because Mr. Jones has not shown that he understands his role as a class representative, he has not met his burden to show that he will protect the interests of the class. *See Spinelli v. Capital One Bank*, 265 F.R.D. 598, 614–15 (M.D. Fla. 2009).

Just as the proposed class counsel were adequate to serve as counsel for the *Bearden* class, *see* Section III.A.2.iv, so too are the same attorneys adequate to serve as counsel for the false-imprisonment class.

The proposed representatives, except for Mr. Jones, and counsel are adequate.

### 3.  Rule 23(b)(3)

As the plaintiffs have not satisfied the Rule 23(a) criteria, no Rule 23(b)(3) analysis is required. Even if, however, the plaintiffs could show a common issue of fact or law, they would be unable to show predominance or superiority. Individual questions dominate this claim.

### 4.  Rule 23(g)

The proposed class counsel are able to fairly and adequately represent the interests of the class.

Counsel have spent more than four years working to substantiate the false-imprisonment claims. *See* Fed. R. Civ. P. 23(g)(1)(A)(i). They have adequate experience handling class actions and other complex litigation. *Supra* Part III.B.2.iv & n.8; *see* Fed. R. Civ. P. 23(g)(1)(A)(ii). They have shown knowledge of the appropriate law in their briefing here and in other cases. *Supra* Part III.B.2.iv & n.8; *see* Fed. R. Civ. P. 23(g)(1)(A)(iii). And they have committed to bringing to bear adequate resources to try this action. *See* Fed. R. Civ. P. 23(g)(1)(A)(iv).

Appointment of the proposed class counsel to represent the false-imprisonment class is warranted.

* * *

For these reasons, the Court, with respect to the false-imprisonment class, finds that:

- The proposed class is ascertainable;

- The proposed class is too numerous to make joinder of class members practicable;

- There are not issues of law and fact common to the class;

- Mr. Agee, Ms. McCullough, Mr. Edwards, Ms. Johnson, Mr. Jones, and Mr. Mooney present claims typical of the members of the class;

- Ms. McCullough, Mr. Edwards, Ms. Johnson, and Mr. Mooney would be adequate class representatives;

- Mr. Jones would not be an adequate class representative;

- The National Center for Law and Economic Justice, Dentons LLP, Chestnut, Sanders & Sanders LLC, and Martha Morgan would be adequate class counsel;

- Upon consideration of the factors enumerated in Rule 23(g)(1)(A) and any other pertinent material of record, the National Center for Law and Economic Justice, Dentons LLP, Chestnut, Sanders & Sanders LLC, and Martha Morgan are able to fairly and adequately represent the interests of the class.

*See* Fed. R. Civ. P. 23(a), (b)(3), (g). Therefore, certification of the false-imprisonment class is not warranted.

### C. Abuse-of-Process Class

The plaintiffs seek to certify an abuse-of-process class "consisting of all individuals the Montgomery Municipal Court placed on JCS-supervised probation: (1) who at any time paid less than the minimum monthly payment ordered by the court; and (2) from whom JCS continued to collect or attempt to collect after July 1, 2013." *McCullough* Mot. Class Certification 1–2.

### 1. Threshold Questions

#### (i) Ascertainability

As with the *Bearden* and false-imprisonment classes, the class criteria are not vague and are facially objective. Each criterion asks if certain historical facts are true of an individual:

whether he was placed on JCS-supervised probation, whether at any time he paid less than the minimum monthly payment ordered by the court, and whether JCS continued to collect or attempt to collect payments from him after July 1, 2013. *See* Mot. Class Certification 1.

The class is ascertainable because its membership is able to be determined. Again, each class criterion turns on historical facts. While a jury may ultimately need to establish those facts, class membership can be determined.

Therefore, the proposed abuse-of-process class meets the *Cherry* ascertainability standard.

    *(ii)  Standing*

JCS argues that Mr. Caldwell lacks standing because his mother paid his fines and probation fees for him. JCS Opp'n 21–23. Thus, they assert, he cannot establish an injury-in-fact. *Id.*

JCS cites no authority suggesting that tort damages paid by a collateral source affects Article III standing. A pair of district court cases in the Eleventh Circuit expressly reached the opposite conclusion. *Cont'l 332 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124, 1145 (M.D. Fla. 2018); *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 512 (S.D. Fla. 2013).

Nor does JCS's proposed rule flow from standing doctrine. To establish an injury-in-fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An injury is concrete when it "actually exist[s]," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), and particularized when it "affect[s] the plaintiff in a personal and individual way," *id.* at 1549. Mr. Caldwell alleges that he was unlawfully required to

pay money. That injury is concrete because he was actually required to pay the money,[11] particularized because the obligation ran only to him, and actual because it occurred. The controversy does not become any less real if Mr. Caldwell's mother paid money directly to JCS rather than giving money to her son to pay JCS.

Mr. Caldwell has standing to pursue his claim.

### (iii) Rooker-Feldman Doctrine

Unlike with the *Bearden* and false-imprisonment claims, JCS did not raise a *Rooker-Feldman* objection to the abuse-of-process claims at the summary judgment stage. But their argument fares no better on this front.[12]

A claim for abuse of process does not implicate the *Rooker-Feldman* doctrine because abuse of process assumes a valid court order to abuse. No one challenges the validity of the probation orders, which distinguishes this case from the frontal challenge to probation orders in *Thurman v. JCS*, 760 F. App'x 733 (11th Cir. 2017). Rather, all parties agree that the probation orders were valid—so nothing this court could do would function as appellate review of the orders.

Moreover, all of JCS's conduct here occurred *after* the Municipal Court issued the probation orders, which further separates the Municipal Court's orders from JCS's conduct. *See Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1286 (11th Cir. 2018) ("A claim

---

[11] *See Ex parte Barnett*, 978 So. 2d 729, 731 (Ala. 2007) ("Under the collateral-source rule, an amount of damages is not decreased by benefits received by a plaintiff from a source wholly collateral to and independent of the wrongdoer.").

[12] JCS also argues that the plaintiffs' abuse-of-process claims are "logically incompatible" with their other claims. As JCS sees it, the plaintiffs are seeking to hold it liable both for (1) not filing revocation petitions and stringing along non-compliant probationers to extract more fees and (2) filing revocation petitions and sending probationers back to the Municipal Court where they faced systemic *Bearden* violations. JCS finds those two theories of liability contradictory. Not so. If JCS acted maliciously to extract additional fees from probationers, it committed an abuse of process. If JCS caused systemic *Bearden* violations, it violated the probationers' constitutional rights. To argue, as JCS does, that they had no alternative either to committing an abuse of process or to violating the probationers' constitutional rights requires quite a bit of *chutzpah*. The obvious rejoinder is that if JCS could not provide probation services without committing torts, it should not have provided probation services.

about conduct occurring after a state court decision cannot be either the same claim or one 'inextricably intertwined' with that state court decision, and thus cannot be barred under *Rooker-Feldman*.").

The *Rooker-Feldman* doctrine cannot conceivably apply to the plaintiffs' abuse-of-process claims. The Court has subject-matter jurisdiction over the claims.

### 2. Rule 23(a)

#### (i) Numerosity

At least 2,800 members constitute the abuse-of-process class. Rubens Decl. ¶ 20, 24. Just as the 100-member *Bearden* class was too large to join practicably, *see supra* Part III.A.2.i, so, *a fortiorari* this class is too. *See Vega*, 564 F.3d at 1266–67.

#### (ii) Commonality

Whether JCS acted with an ulterior motive in applying the probation orders presents an issue common to the class. The plaintiffs allege that JCS engaged in a uniform practice of using the probation orders to extract fees from class members for profit. Because the plaintiffs' theory of ulterior motive is that JCS acted in a systemic fashion to serve a single motive, that claim can be proven or disproven by common evidence.

JCS argues that its motive presents an individual question, requiring analysis of the moment in time when JCS crossed from proper to improper demands of payment. But that argument goes to the wrongful-use-of-process element of an abuse-of-process claim, not the ulterior-motive element.

Ulterior motive is a question common to the class.

### (iii) Typicality

The proposed class representative for the abuse-of-process class is Mr. Caldwell. His claim is fundamentally aligned with those of the class. He alleges that the Municipal Court placed him on JCS probation, that he failed to make minimum payments as the Municipal Court ordered, and that JCS continued to collect fees from him after he failed to pay. In so doing, he claims, JCS abused his probation order. Those allegations and claims are identical across the class. The class members allege—as does Mr. Caldwell—that JCS's common practice harmed them in the same way. Mr. Caldwell's claims are thus typical. *See Piazza,* 273 F.3d at 1279 n.4, 1351; *Kornberg,* 741 F.2d at 1337.

JCS argues that Mr. Caldwell cannot serve as a class representative because he had the ability to pay his fines and fees. Factual differences alone, however, will not render a class representative atypical.

### (iv) Adequacy

There is no evidence in the record to show a fundamental conflict of interest between the proposed class representative and the class.

The record also establishes that the proposed class representative knows enough about the case to serve as a representative. *See, e.g.,* Caldwell Dep. (ECF No. 246-2).

Just as the proposed class counsel were adequate to serve as counsel for the *Bearden* class, *see* Section III.A.2.(iii), so too are a subset of the same attorneys adequate to serve as counsel for the abuse-of-process class.

The proposed representatives and counsel are adequate.

### 3. Rule 23(b)(3)

#### (i) Predominance

To prevail on their abuse-of-process claims against JCS, the plaintiffs must show:

- That the Municipal Court ordered them on probation with JCS;

- That JCS acted with an ulterior motive in applying the probation orders;

- That JCS continued to assess and collect probation fees after they had violated the probation order;

- That JCS used the probation orders wrongfully; and,

- That JCS acted maliciously when it misused the probation orders.

JCS also raises the affirmative defense of good faith.

Whether the Municipal Court sentenced class members to probation with JCS and whether JCS continued to assess and collect probation fees after class members had violated the probation order ask whether class members are in fact members of the class. Individual review of JCS's records is necessary to answer these questions, rendering them individual. Whether JCS misused the probation orders is an individual question in each case because the plaintiffs must show that JCS "somehow acted outside the boundaries of legitimate procedure." *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1025 (Ala. Civ. App. 1999); *see also McCullough*, 2020 WL 3803045, at *10. That showing, in turn, requires an examination of the knowledge JCS had about why a class member could not pay and whether he would likely be able to pay in the future. Evidence of systemic indifference to ability to pay, as the plaintiffs propose to offer, would not by itself allow a jury to find that JCS misused any one probation order. Ulterior motive is a common question. *See supra* Part III.B.4.ii.b. Malice is a mixed—and thus individual—question, because malice may be presumed when the plaintiffs prove wrongful use and improper purpose. *See Shoney's, Inc. v.*

*Barnett*, 773 So. 2d 1015, 1026 (Ala. Civ. App. 1999). Finally, the good faith defense is an individual question because it turns on what JCS knew about each class member.[13]

Thus, the abuse-of-process claims present the following individual questions:

- Whether Municipal Court ordered class members on probation with JCS;

- Whether JCS continued to assess and collect probation fees after class members had violated the probation order;

- Whether JCS used the probation orders wrongfully;

- Whether JCS acted maliciously when it misused the probation orders; and

- Whether the defendants have proven their good faith affirmative defense.

And, the abuse-of-process claims present the following common question:

- Whether JCS acted with an ulterior motive in applying the probation orders.

As with the *Bearden* and false-imprisonment claims, common questions do not predominate in the abuse-of-process claims. JCS's ulterior motive is an important element of the claim, but it is the only common question the claim presents. And establishing ulterior motive would establish neither liability nor damages for any plaintiff. Instead, a jury would need to review evidence to determine whether an individual was a member of the class and whether any defenses apply. And so, like the *Bearden* and false-imprisonment claims, common questions do not predominate over individual questions for the abuse-of-process claims. *See also supra* Part III.B.3.i.

---

[13] The plaintiffs' argument that a jury would not need to look at why individual JCS employees acted misses the mark. The question is whether JCS, acting through its agents, believed in good faith that that if it continued to collect payments, a probationer could come back into compliance. Answering that question depends on what JCS knew about each plaintiff. JCS, for example, may have had good reason to believe that Mr. Caldwell could make payments given the financial support his family provided him.

*(ii) Superiority*

The analysis of whether a class action is the superior means of resolving the abuse-of-process claims is the same as for the *Bearden* and false-imprisonment claims, except that attorney's fees are unavailable for the abuse-of-process claims. *See supra* Part III.A.3.ii. The lack of attorney's fees alone, however, does not overcome the massive administrative difficulties discussed above. Thus, a class action is inferior to other methods of resolving the abuse-of-process claims.

### 4. Rule 23(g)

The proposed class counsel are able to fairly and adequately represent the interests of the class.

Counsel have spent more than four years working to substantiate the abuse-of-process claims. *See* Fed. R. Civ. P. 23(g)(1)(A)(i). They have adequate experience handling class actions and other complex litigation. *Supra* Part III.B.1.iv & n.8; *see* Fed. R. Civ. P. 23(g)(1)(A)(ii). They have shown knowledge of the appropriate law in their briefing here and in other cases. *Supra* Part III.B.1.iv & n.8; *see* Fed. R. Civ. P. 23(g)(1)(A)(iii). And they have committed to bringing to bear adequate resources to try this action. *See* Fed. R. Civ. P. 23(g)(1)(A)(iv).

Appointment of the proposed class counsel to represent the abuse-of-process class is warranted.

\* \* \*

For these reasons, the Court, with respect to the abuse-of-process class, finds that:

- The proposed class is ascertainable;

- The proposed class is too numerous to make joinder of class members practicable;

- There are issues of law and fact common to the class;

- Mr. Caldwell presents claims typical of the members of the class;

- Mr. Caldwell would be an adequate class representative;

- The National Center for Law and Economic Justice, Dentons LLP, Chestnut, Sanders & Sanders LLC, and Martha Morgan would be adequate class counsel;

- Individual questions predominate over common questions;

- A class action is superior to other forms of dispute resolution; and,

- Upon consideration of the factors enumerated in Rule 23(g)(1)(A) and any other pertinent material of record, the National Center for Law and Economic Justice, Dentons LLP, Chestnut, Sanders & Sanders LLC, and Martha Morgan are able to fairly and adequately represent the interests of the class.

*See* Fed. R. Civ. P. 23(a), (b)(3), (g). Therefore, certification of the abuse-of-process class is not warranted.

Therefore, because plaintiffs did not meet their burden to show that common issues predominate over individual issues or that a class action would be the superior method of dispute resolution, certification of the abuse-of-process class is not warranted.

### D. Consolidation

The Court has considered consolidating this case with *Carter* several times. *See* Order (Mar. 10, 2017) (ECF No. 133); Order (Apr. 25, 2017) (ECF No. 153); Order (July 7, 2020) (ECF No. 271); Order (Aug. 14, 2020) (ECF No. 275). Because it cannot certify a class, the Court holds that consolidation is not warranted. While the cases involve common questions of law and fact, the Court finds that the added burden of separate trials would be minimal and that the presence of different causes of action in each case risks confusing the jury. *See Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985).

## IV.   CONCLUSION

Based on the foregoing, the Court will **DENY** the plaintiffs' motion for class certification.

A separate order accompanies this memorandum opinion.

Date:   5/21/21

Royce C. Lamberth
United States District Judge